UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and ALEX SOPINKA, individually and on behalf of all others similar situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> DIGITAL CURRENCY GROUP, INC., and BARRY SILBERT, <br><br> *Defendants.* | No. <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |

Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex Sopinka (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Digital Currency Group, Inc. ("DCG") and Barry Silbert ("Silbert") (collectively with DCG, "Defendants"), based on personal knowledge, the investigation of counsel, and information and belief. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**INTRODUCTION**

1. Plaintiffs bring this action against Defendants DCG and Barry Silbert seeking damages for their liability as Control Persons as provided for by the federal securities laws. Plaintiffs are digital asset lenders who engaged in digital asset lending transactions with Defendant-controlled subsidiary company Genesis Global Capital, Inc. ("Genesis Global Capital") from February 2, 2021 through November 16, 2022 (the "Class Period").

2. As a result of the violations of the federal securities laws described herein, Plaintiffs and members of the Classes have been denied access to their digital assets since

November 16, 2022 and face little prospect of recovering a meaningful amount of the digital assets they lent to Genesis Global Capital.

3.    Defendant DCG is the parent entity of a conglomerate of subsidiaries which includes Genesis Global Capital. At all times alleged herein DCG was the 100% owner of Genesis Global Capital.

4.    Defendant Barry Silbert is the founder of DCG, Genesis Global Capital, and several other DCG subsidiary companies. Silbert is the controlling shareholder of DCG (owning 40%), chief executive officer of DCG, and chairman of DCG's board of directors.

5.    During the Class Period, Genesis Global Capital ran a borrow/lend business for the DCG conglomerate, attracting capital from digital asset owners by offering high rates of return via interest on the lending transactions.

6.    Genesis Global Capital executed lending transactions with its customers such as Plaintiffs via agreements sometimes styled "Master Digital Asset Loan Agreement(s)" (the "MDAL Agreement") and other times called "Master Borrow Agreement(s)" (collectively, the "Lending Agreements") whereby lenders such as Plaintiffs provided digital assets to Genesis Global Capital in exchange for interest payments and the eventual return of the digital assets.

7.    Genesis Global Capital pooled the digital assets it received pursuant to the Lending Agreements and, at the direction of DCG and Barry Silbert, deployed the digital assets pursuant to certain strategies designed to generate revenue for the DCG conglomerate and Silbert and to pay lenders interest.

8.    Genesis Global Capital, subject to the direction and control of DCG and Silbert, did not register the Lending Agreements with the U.S. Securities & Exchange Commission.

9.      Because the Lending Agreements meet the definition of investment contracts and notes under the federal securities laws, as offered and sold, the Lending Agreements constituted offers and sales of securities under the federal securities laws, including the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.

10.     Because no applicable exemption from registration applied, Genesis Global Capital's failure to register its securities offerings violated the federal securities laws, including Section 5 of the Securities Act.

11.     Independent of the federal securities laws' registration requirements, the federal securities laws prohibit parties from defrauding or deceiving, including through misrepresentation of material information, someone in connection with the purchase or sale of security.

12.     During the Class Period DCG and Silbert deployed the digital assets Genesis Global Capital received from lenders in ways designed to line DCG's and Silbert's own pockets.

13.     For example, DCG and Silbert directed Genesis Global Capital to use lenders' digital assets to engage in transactions designed to benefit the DCG conglomerate, including the purchase of GBTC, a publicly traded security managed by DCG and Silbert's Grayscale Investments subsidiary, to maximize the management fees collectable by the DCG conglomerate.

14.     DCG and Silbert also caused Genesis Global Capital to take on an unreasonable amount of counterparty concentration risk by lending almost 30% of Genesis Global Capital's total loan book to a single party: digital asset hedge fund Three Arrows Capital. This too was designed to benefit the DCG conglomerate by maximizing the management fees earned for managing GBTC.

15.      Predictably, these practices had disastrous results. Three Arrows Capital declared bankruptcy in June 2022, and after Three Arrows Capital liquidated its assets Genesis Global Capital was left with an uncollectable $1.1 billion debt, an impairment in value which Genesis Global Capital should have immediately recognized on its balance sheet regularly distributed to lenders such as Plaintiffs, members of the Classes, and their agents.

16.      Recognition of the impairment, however, would have meant Genesis Global Capital recognizing its own insolvency, which would have terminated all Lending Agreements and entitled lenders such as Plaintiffs and members of the Classes to the return of their digital assets. It also would have meant the end of the Genesis Global Capital's business and DCG's source of capital.

17.      Instead of recognizing the impairment, DCG and Barry Silbert directed and caused Genesis Global Capital to engage in a misleading sham transaction without any economic reality, designed to conceal its insolvency. At DCG and Silbert's direction, Genesis Global Capital proceeded to "sell" the uncollectable $1.1 billion Three Arrows Capital debt to DCG in exchange for a 10-year promissory note (the "DCG Promissory Note") with an interest rate of 1% per year due in 2032. Importantly, no cash, cash equivalents, or any assets meeting the definition of a current asset changed hands in this transaction, which meant that Genesis Global Capital received zero capitalization from DCG. Instead, Genesis Global Capital magically erased the bad debt from its books and replaced it with a "good" debt.

18.      Genesis Global Capital proceeded to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a current asset and/or receivable, which falsely portrayed Genesis Global Capital as solvent when, in fact, it was insolvent.

19.    Genesis Global Capital circulated balance sheets and other documents containing misrepresentations as to its solvency to Plaintiffs, members of the Classes, and their agent in order to induce the parties to continue to loan Genesis Global Capital digital assets and/or to prevent them from requesting redemptions of their loans.

20.    Importantly, Genesis Global Capital represented in *every lending transaction it executed* from July 1, 2022 forward that it was in fact solvent, when it was not.

21.    These misrepresentations and omissions concerning the Genesis Global Capital-DCG transaction and Genesis Global Capital's solvency violated of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, codified at 17 CFR 240.10b-5, which prohibit defrauding or deceiving, including through misrepresentation of material information, someone in connection with the purchase or sale of security.

22.    The misrepresentations and omissions were material, as no reasonable lender would have loaned digital assets to Genesis Global Capital had they known of Genesis Global Capital's true financial condition or the details of the $1.1 billion DCG Promissory Note.

23.    Plaintiffs, members of the Classes, and their agents reasonably relied on Genesis Global Capital's misrepresentations and omissions as to Genesis Global Capital's solvency in deciding to lend digital assets to Genesis Global Capital or to rollover existing loans with Genesis Global Capital into new terms.

24.    Thus, as a result of the misrepresentations and omissions, Genesis Global Capital received billions of dollars in new loans and loan roll-overs from Plaintiffs and members of the Classes Genesis Global Capital otherwise would not have.

25.    These misrepresentations and omissions came to light after Genesis Global Capital experienced a slew of withdrawal requests in November 2022 in the wake of the collapse

of digital asset trading platform FTX due to a general loss of confidence in the digital asset markets. This "bank run" combined with Genesis Global Capital's true financial condition meant that Genesis Global Capital did not have the assets to honor redemption requests.

26.     On November 16, 2022, Genesis Global Capital unilaterally stopped honoring redemption requests, meaning no lender could obtain their digital assets from Genesis Global Capital. Even then, Genesis Global Capital continued to misrepresent its financial condition, calling the cause of its inability to honor redemptions a result of a "liquidity and duration mismatch" when in reality it was because of insolvency.

27.     On January 19, 2022, Genesis Global Capital, LLC and two affiliated entities filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

28.     As a result of the conduct described herein, Plaintiffs and members of the Classes defined below have suffered significant harm and are owed billions of dollars.

29.     Plaintiffs seek relief, on behalf of themselves and the proposed Classes, for the injuries they have sustained as a result of Defendants' unlawful sale of unregistered securities, in violation of Section 5 and 12(a)(1) of the Securities Act, and fraud in connection with the sale or purchase of securities, in violation of Section 10(b) of the 1934 Exchange Act and Rule 10b-5 promulgated thereunder pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act.

## PARTIES

30.     Plaintiff William McGreevy ("Plaintiff McGreevy") is a resident of Kansas. Plaintiff McGreevy made several loans to Genesis Global Capital during the Class Period via the

Gemini Earn Program. A true and correct copy accounting of Plaintiff McGreevy's digital asset held by Genesis Global Capital is annexed hereto as Exhibit A.

31.     Plaintiff Ashwin Gowda ("Plaintiff Gowda") is a resident of Texas. Plaintiff Gowda made several loans to Genesis Global Capital during the Class Period via the Gemini Earn Program. A true and correct copy of all of Plaintiff Gowda's Genesis Global Capital lending transactions is annexed hereto as Exhibit B.

32.     Plaintiff Translunar Crypto LP ("Plaintiff Translunar") is a limited partnership organized and existing under the laws of the State of Delaware and resident of the State of Texas. Plaintiff Translunar made several loans to Genesis Global Capital during the Class Period via the Genesis Institutional Lending Program. A true and correct account of all of Plaintiff Translunar's Genesis Global Capital lending transactions is annexed hereto as Exhibit C.

33.     Plaintiff Christopher Buttenham ("Plaintiff Buttenham") is a resident of Nevada. Plaintiff Buttenham made several loans to Genesis Global Capital during the Class Period via the Gemini Earn Program. A true and correct copy of all of Plaintiff Buttenham's Genesis Global Capital lending transactions is annexed hereto as Exhibit D.

34.     Plaintiff Alex Sopinka ("Plaintiff Sopinka) is a resident of Nevada. Plaintiff Sopinka made several loans to Genesis Global Capital during the Class Period via the Gemini Earn Program. A true and correct copy of all of Plaintiff Sopinka's Genesis Global Capital lending transactions is annexed hereto as Exhibit E.

35.     Defendant Digital Currency Group, Inc. ("DCG") is a corporation formed and existing under and pursuant to the laws of Delaware. DCG maintains its principal place of business in Stamford, Connecticut. Prior to moving to Stamford, Connecticut, DCG maintained its principal place of business in New York, New York.

36.     Defendant Barry Silbert ("Silbert") is the founder and chief executive officer ("CEO") of DCG. Upon information and belief, he is a resident of Connecticut. Silbert has been reported to own 40% of the equity of DCG. Silbert has consistent and daily management responsibilities for DCG's and DCG's subsidiaries' operations, including Genesis Trading, Genesis Global Capital, and Grayscale Investments. For example, it has been reported that Silbert prefers focusing on the capital allocation activities of DCG and its subsidiaries. Silbert's activities and responsibilities include making the decision not to register Genesis Global Capital's issuance of notes and investment contracts with the SEC, and engaging in the transaction which led to the issuance of the DCG Promissory Note discussed below. Silbert has repeatedly and publicly discussed his role in DCG and oversight of this subsidiaries.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Classes are citizens of a state different from Defendant.

38.     Jurisdiction of this Court is further founded upon 28 U.S.C. § 1331 because the this complaint asserts claims under Sections 5 and 12(a)(1) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.

39.     Jurisdiction of this Court is also founded upon Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 10 and 20(a).

40.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) and 18 U.S.C. §1965, because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District.

41.     The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

42.     The Court also has personal jurisdiction over Defendants under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

## FACTUAL BACKGROUND

## I.     DIGITAL CURRENCY GROUP

43.     Digital Currency Group was founded by Defendant Barry Silbert in 2015 with two specific purposes: (1) to operate and control two companies which Silbert had already created and was actively operating: Genesis Global Trading and Grayscale Investments; and (2) to make venture capital investments in digital asset and blockchain companies.[1]

44.     Today, DCG is the parent company of a conglomerate of digital asset and blockchain technology companies and DCG's venture capital arm has invested in a number of companies in the digital asset and blockchain space. DCG describes itself as follows:

---

[1] https://techcrunch.com/2015/10/27/barry-silbert-launches-digital-currency-group-with-funding-from-mastercard-others/ (accessed Jan. 21, 2023).

9

Founded in 2015 by CEO Barry Silbert, DCG is the most active investor in the blockchain sector, with a mission to accelerate the development of a better financial system through the proliferation of digital assets and blockchain technology. Today, DCG sits at the epicenter of the industry, backing more than 175 blockchain-related companies in over 35 countries. DCG also invests directly in digital currencies and other digital assets. In addition to its investment portfolio, DCG is the parent company of Genesis (a global digital asset prime brokerage), Grayscale Investments (the largest digital currency asset manager), CoinDesk (a leading financial media, data, and information company), Foundry (a leader in bitcoin mining and staking) and Luno (a leading cryptocurrency platform with a large international footprint).

45.     In addition to its wholly-owned subsidiaries, DCG holds stakes in a portfolio that includes some of the most well-known and successful companies in the space including some of the more prominent exchanges such as Genesis Global Capital and Kraken.

46.     In 2021, at Barry Silbert's direction DCG announced it was moving its principal place of business to Stamford, Connecticut. The move was completed in early 2022.

47.     A 2021 financing round valued DCG at more than $10 billion.

## II.     BARRY SILBERT

48.     Barry Silbert is the founder, CEO, and Chairman of the board of directors of DCG.

49.     Barry Silbert owns approximately 40% of DCG and at all relevant times controlled the day-to-day activities of DCG and its wholly-owned subsidiaries Grayscale, Genesis Global Capital, and Genesis Global Trading, including the capital allocation strategies employed by these entities.

50.     Until 2021, Barry Silbert was CEO of DCG's wholly-owned subsidiary business Grayscale and served as Chairman of Grayscale's board of directors.

51.     As just one example of his total control of DCG and its subsidiaries, in or around 2020, Silbert decided to move DCG and many of its subsidiary businesses, including Grayscale, from New York, New York to Stamford, Connecticut, where Silbert lived.

52.     In April 2022, Forbes estimated Silbert's net worth at $3.2 billion, up front 2021's estimate of $1.6 billion.

III.    <u>**GRAYSCALE INVESTMENTS, LLC**</u>

53.     Grayscale Investments, LLC ("Grayscale") is a subsidiary of DCG and is a digital asset management company that offers investment products that provide exposure to the price movement of various digital currencies. Grayscale's most popular investment product is the Grayscale Bitcoin Trust, or "GBTC."

54.     In 2022, at Silbert's direction, Grayscale moved its principal place of business to Stamford, Connecticut.

55.     GBTC is a publicly traded investment vehicle managed by Grayscale that provides exposure to bitcoin's price movements without the need to directly buy and hold the digital currency.

56.     GBTC is traded on OTCQX, a market for over-the-counter securities.

57.     GBTC shares can be acquired in two ways: (1) anyone with a brokerage account can buy GBTC shares in the over-the-counter securities markets; and (2) investors can subscribe to the underlying trust (the "Trust").

58.     Subscribing to the Trust requires a minimum investment of $50,000 and is available only to accredited investors.

59.     Trust subscribers receive GBTC shares representing the value of Bitcoin held in the Trust equal to the amount invested by the subscriber.

60.     GBTC shares issued via subscriptions are subject to a six-month lockup period during which subscribers cannot sell their shares.

61.     GTBC subscribers are free to sell their GBTC shares once the lockup period ends.

62.     Until February 2021, GBTC shares traded at a premium or in excess of the net value of the assets held by GBTC (the "Net Asset Value" or "NAV"). For example, on December 22, 2020, GBTC was trading at a 38.57% premium to its NAV.

63.     The premium was attributed to the fact that GBTC was the only way for institutional investors to get regulator-approved access to Bitcoin's price movements, which caused demand to exceed supply.

64.     Traders sought to exploit the existence of the premium by subscribing to the Trust and selling their GBTC shares at a premium once the six-month lockup period expired (in what came to be known as the "Grayscale Trade").

65.     GBTC stopped trading at a premium to NAV in February 2021 and flipped to a discount.[2]

66.     Since February 2021, the discount of GBTC shares to GBTC's NAV continued to increase:

   a.   On November 30, 2021, GBTC shares were trading at a 12.05% discount to GBTC's NAV.

   b.   On January 31, 2022, GBTC shares were trading at a 25.11% discount to GBTC's NAV.

   c.   On June 1, 2022, GBTC shares were trading at a 29.97% discount to the GBTC's NAV.

   d.   On November 1, GBTC shares were trading at a 35.76% discount to the GBTC's NAV.

---

[2] As of January December 23, 2022, GBTC shares traded at a discount of 45.74% to the trust's NAV.

e.   On November 16, GBTC shares were trading at a 39.29% discount to the GBTC's NAV.

f.   On January 20, 2023, GBTC shares were trading at a 40.05% discount to GBTC's NAV.

67.   Grayscale charges a 2% annual management to manage GBTC, meaning that Grayscale, DCG, and Silbert earn hundreds of millions of dollars annually and have an incentive to maximize the AUM of Grayscale.

68.   On December 31, 2021, Grayscale published a chart on Twitter of Grayscale's AUM of $43.6 billion in and showing GBTC's AUM as $30.417 billion.

## IV.   GENESIS GLOBAL TRADING, INC.

69.   Genesis Global Trading, Inc. ("Genesis Trading") was formed in 2005 and was initially operated by Barry Silbert as the bitcoin trading arm of Silbert's company SecondMarket, which Silbert launched in 2004 as a private marketplace where accredited investors could buy and sell shares of private companies. Silbert served as CEO of SecondMarket until selling SecondMarket to Nasdaq in 2015.

70.   Silbert spun Genesis Trading out of SecondMarket prior to selling SecondMarket to Nasdaq and relaunched Genesis Trading as a standalone broker-dealer specializing in digital currencies on Thursday, April 16, 2015, over six months before Silbert announced the formation of DCG.

71.   In October 2015, in conjunction with the formation of DCG, Silbert caused Genesis Trading to become a wholly-owned subsidiary of DCG with Silbert serving as DCG's CEO, Chairman, and controlling shareholder, thus controlling Genesis Trading.

72.     Genesis Trading operated as a New York-based non-custodial, over the counter ("OTC") market-maker in digital assets and brokerage, holding a virtual currency BitLicense with NY DFS, and registered as a broker-dealer with the Securities and Exchange Commission ("SEC") and FINRA.

73.     In late 2017, Silbert and DCG organized Genesis Global Capital, LLC ("Genesis Global Capital") under the laws of the State of Delaware to house the growing digital asset lending business of the DCG conglomerate Genesis Trading had been operating for Silbert and DCG.

74.     In April 2018, Silbert and DCG caused Genesis Trading to reassign all existing digital asset loan agreements to Genesis Global Capital.

## V.      GENESIS GLOBAL CAPITAL, LLC

75.     From April 2018, Genesis Global Capital operated as the digital asset borrowing and lending desk for the Silbert and the DCG conglomerate, using high interest rates to attract lenders.

76.     Genesis Global Capital primarily borrowed digital assets via two programs: (1) directly from lenders via Genesis Global Capital's "Institutional Lending and Borrowing Business" (the "Genesis Institutional Lending Program") who were able to meet the minimum loan requirements; and (2) via the Gemini Earn program (the "Gemini Earn Program") established by the company Gemini Trust Company, LLC ("Gemini"), which had no minimum loan requirement (collectively, the Genesis Institutional Lending Program and the Gemini Earn program are referred to as the "Lending Program(s)").

77.     In theory, Genesis Global Capital's lending business model was simple: it borrowed digital assets from parties in exchange for promises to pay the lenders interest and then

deployed those digital assets in ways which sought to earn returns that exceeded the interest Genesis Global Capital had committed to paying its lenders.

78.     Genesis Global Capital typically loaned digital assets to third parties who believed they would earn outsized returns with those funds via their own proprietary investment strategies such as digital asset hedge funds such as the now-infamous digital asset hedge funds Alameda Research, LLC, and Three Arrows Capital.

79.     However, because lending demand (desire to earn a yield from one's own assets) commonly exceeds borrowing demand (desire to pay for use of someone else's assets), businesses like Genesis Global Capital cannot typically deliver on promises of high yields by simply re-lending funds to third parties at higher rates and capturing the "net interest margin" or spread between Genesis Global Capital's borrowing costs and lending rates.

80.     To bridge the revenue gap that the difference in lending and borrowing demand creates typically means businesses like Genesis Global Capital must engage in risky, proprietary strategies.

81.     At all times relevant herein, Barry Silbert, founder and controlling shareholder of Genesis Global Capital parent DCG, had authority to, and did, exercise control of the operations of Genesis Global Capital.

A.     **GENESIS GLOBAL CAPITAL'S INSTITUTIONAL LENDING PROGRAM.**

82.     Genesis Global Capital's Institutional Lending Program required participants such as Plaintiff Translunar to make minimum loan amounts which varied according to the type of asset being lent.

83.     Genesis Global Capital represented the minimums as follows on its website: 100 BTC, 1,000 ETH, $2 million U.S. Dollars, and $1 million of certain alternative digital assets.

84.     Institutional Lending Program transactions were executed pursuant to a document named the Master Borrow Agreement. The Master Borrow Agreement set forth the terms of the loan, including the types of occurrences that constituted events of default and what could cause termination of the agreement and required parties to make certain representations and warranties regarding the parties' financial condition (*e.g.,* that neither party is insolvent), and more.

85.     Genesis Global Capital made the following representations to lenders in *every* Master Borrowing Agreement:

> Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws
>
> Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

86.     Genesis Global Capital did not require lenders who loaned Genesis Global Capital digital assets via the Institutional Lending Program to establish that they were accredited investors via representation, warrantee, self-certification or other methodology in order to participate in the Institutional Lending Program. If a lender could meet the minimums, they were permitted to participate.

**B.      THE GEMINI EARN PROGRAM**

87.     Genesis Global Capital also attracted capital via a program named Gemini Earn established by the Gemini Trust Company, LLC ("Gemini"), a company that offers a range of digital asset services via the Gemini platform.

88.     Gemini Earn was launched on February 2, 2021, and was promoted as allowing Gemini digital asset trading platform customers to "transfer existing crypto holdings, or easily purchase crypto to transfer into Gemini Earn and earn interest for any period of time. They can

also redeem their crypto at any time. As a New York-based Trust company with security protocols on par with those offered by top financial institutions, Gemini's secure custody and exchange solutions also integrate seamlessly with Gemini Earn."

89.     The Gemini Earn Program promised Gemini Earn participants the hallmarks of a traditional bank savings or checking account: interest on deposits that are freely withdrawable.

90.     However, unlike owners of traditional bank accounts who received insurance protection for their deposits via the Federal Deposit Insurance Corporation, Gemini Earn customers receive no insurance protection for their digital assets (despite Gemini's misleading references to FDIC insurance); and unlike banks, which face extensive restrictions on what customers deposits can be used for, there was no limitation on the borrowers' use of Gemini Earn customers' digital assets.

91.     Notably, there was no minimum lending amount required for Gemini users to participate in the Gemini Earn Program and Genesis Global Capital did not require Gemini Earn Program participants to establish that they were accredited investors via representation, warrant, self-certification or other methodology in order to participate in the Gemini Earn Program.

92.     Gemini Earn Program transactions were executed pursuant to a document named the Master Digital Asset Loan Agreement. The Master Digital Asset Loan Agreement set forth the terms of the loan, including the types of occurrences that constituted events of default, what could cause termination of the agreement, and required parties to make certain representations and warranties regarding the parties' financial condition (*e.g.,* that neither party is insolvent), and more.

93.     Genesis Global Capital made the following representations to lenders in *every* Master Digital Asset Loan Agreement Genesis Global Capital executed:

Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

94.     While the Gemini Earn program was "dressed up" as a high-interest digital asset bank account, it was actually a scheme designed by DCG, Silbert, and Genesis Global Capital to attract retail investment in securities without complying with the federal securities laws.

## SUBSTANTIVE ALLEGATIONS

I.     **GENESIS GLOBAL CAPITAL'S LENDING PROGRAMS CONSTITUTED AN OFFER AND SALE OF SECURITIES UNDER *HOWEY* AND *REVES*.**

95.     Analysis of the facts and circumstances surrounding the offer and execution of the Lending Programs pursuant to the Lending Agreements by Genesis Global Capital shows that: (1) under the test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Lending Agreements qualify as "investment contracts"; and (2) the Lending Agreements qualify as "notes" under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990).

96.     The Securities Act defines "security" to encompass a wide range of investment vehicles, including "investment contracts" and "notes." *See* 15 U.S.C. §§ 77b, 78c.

97.     Under *Howey*, an "investment contract" is (1) an investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits; (4) derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the promise of profits." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

98.     This broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the

securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

99.     Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the internet, including digital assets.

100.    Therefore, under the definition of the Securities Act and the test articulated in *Howey,* the Lending Agreements as offered by Genesis Global Capital were securities subject to the federal securities laws.

**A.     THE NOTES ARE SECURITIES UNDER *REVES*.**

101.    A note is a type of debt security that, as done in the Lending Agreements, represents a promise to pay a specific amount of a money at a specified time or on demand.

102.    Under *Reves*, a note is presumed to be security unless it bears a strong resemblance to instruments that are not securities. In *Reves*, the Court examined the following four factors to determine whether a note is a security:

> (1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction;
> (2) the plan of distribution of the instrument;
> (3) the reasonable expectations of the investing public; and
> (4) whether other factors, such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990).

103.    Under the test articulated in *Reves*, the Lending Agreements were notes and offered and sold by Genesis Global Capital as securities.

### i.      MOTIVATIONS OF LENDING PROGRAM PARTICIPANTS

104.     Genesis Global Capital created the Lending Programs to obtain digital asset capital for DCG and third parties to deploy. Genesis Global Capital sought to generate enough revenue to (1) return profits to Genesis Global Capital, DCG, and Barry Silbert; and (2) to pay interest to Lending Program lenders.

105.     Genesis Global Capital, at the direction and subject to the control of DCG and Silbert, controlled the digital assets loaned to it by Lending Program participants had complete discretion in determining how much to hold, lend and otherwise use. Genesis Global Capital used the digital assets lent to it to make loans to third party borrowers or as collateral for Genesis Global Capital to borrow funds itself to pursue investment strategies.

106.     Lending Program lenders participated in the Lending Programs primarily for profit. That is, Lending Program participants loaned digital assets to Genesis Global Capital hoping to receive a return on their digital assets. Representations made by Genesis Global Capital to Lending Program participants in the execution documents and elsewhere caused Lending Program participants to loan Genesis Global Capital their digital assets with the expectation of profits in the form of interest on those digital assets.

### ii.      DISTRIBUTION PLAN OF THE LENDING PROGRAMS

107.     Gensis Global Capital publicly advertised the Lending Programs on its own websites, third party websites and social media.

108.     The Institutional Lending Program was offered and sold to, upon information and belief, at least hundreds if not thousands of investors willing to meet the lending minimums described above such as Plaintiff Translunar. Participation in the Institution Lending Program was not contingent on qualification as an accredited investor and Genesis Global Capital did not

seek to limit participation in the Institutional Lending Program to accredited investors at any time.

109.    The Gemini Earn Program was offered and sold to investors who signed up as users of the Gemini digital asset program and opted to participated in the Gemini Earn program, regardless of whether or not the user was an accredited investor or non-accredited investor. As of November 16, 2022, there were approximately 340,000 Gemini Earn Program participants, the majority of whom resided in the United States.

### iii.    EXPECTATIONS OF THE INVESTING PUBLIC

110.    Genesis Global Capital promoted the Lending Programs to the general public as an investment as a way to earn high "returns" or "yield" on Lending Program participants' digital assets.

111.    In conjunction with Gemini, the Gemini Earn program was repeatedly described as an investment providing interest rates that were "among the highest rates on the market" and "higher than most existing options." Gemini's website further claimed that Gemini Earn investors could "receive more than 100x the national interest rate."

112.    The economic realities of the Lending Program transactions, in which participants were provided with an opportunity to tender digital assets with to Genesis Global Capital in exchange for earning interest with some of the "highest rates" available for digital assets, further underscores why the investing public considered the Lending Programs to be an investment opportunity.

### iv.    NO RISK REDUCING FACTORS EXIST

113.    No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to the Lending Programs.

114.    For example, Genesis Global Capital stated that digital "are not covered by SIPC insurance" and that "[e]stablishing a lending and borrowing relationship with Genesis is not the same as opening a depository account or a savings account" and that "[a]ccounts with Genesis do not enjoy FDIC protection."

115.    Similarly, NYSDFS did not have oversight over Genesis Global Capital, DCG, or Silbert.

116.    These statements, and facts, make it clear that alternative regulatory schemes provided no protection for Lending Program participants.

**B.      THE LENDING AGREEMENTS ARE INVESTMENT CONTRACTS UNDER *HOWEY*.**

117.    Genesis Global Capital's offer and sale of the Lending Agreements constitutes the offer and sale of investment contracts under *Howey*.

118.    Digital assets qualify as "money" under the federal securities laws.

119.    The Lending Programs therefore involved an investment of money. Genesis Global Capital raised billions of dollars from hundreds of thousands of Lending Program participants, including Institutional Lending Program and Gemini Earn Program participants.

120.    Lending Program participants invested in a common enterprise with other investors. Lending Program participants' digital assets were pooled together by Genesis Global Capital and were not segregated in any way.

121.    Genesis Global Capital then deployed the pooled digital assets in ways designed to generate returns for DCG, Silber, Genesis Global Capital, and Lending Program participants.

122.    Because Lending Program participants assets and the returns earned by Gensis Global Capital were not segregated in any way, each Lending Program participants' fortunes were tied to the fortunes of other participants.

123.    Lending Program participants were also tied to Genesis Global Capital. Lending Program participants earned profits when Genesis Global Capital itself earned profits via the deployment of Lending Program participants' digital assets.

124.    Similarly, Genesis Global Capital's suffering of losses and entering bankruptcy has harmed Plaintiffs and members of the Classes by restricting their ability to access their digital assets.

II.    **GENESIS GLOBAL CAPITAL DID NOT REGISTER THE OFFER OR SALE OF THE LENDING AGREEMENTS AS REQUIRED.**

125.    As outlined above, Genesis Global Capital used interstate commerce to offer and sell securities through the Lending Programs.

126.    The federal securities laws require offers and sales of securities to be registered with the U.S. Securities & Exchange Commission unless an exemption from registration applies and to additionally require issuers to provide a slate of disclosures informing investors of the risks of investing.

127.    Specifically, Sections 5(a) and 5(c) of the Securities Act require that an issuer like Genesis Global Capital register the offer or sale of securities, including notes and investment contracts, with the SEC unless an exemption from registration applies.

128.    Genesis Global Capital's offers and sales of securities to non-accredited investors did not qualify for any exemption from registration with the SEC.

129.    Genesis Global Capital never had a registration statement filed or in effect with the SEC.

130.    Plaintiffs and members of the Classes were harmed by the failure to register the offer and sale of these securities because Genesis Global Capital's public disclosures contained selective or no information about Genesis Global Capital's financial history, audited financial

statements, management discussion and analysis of financial condition and results of operations, and ability to generate profits.

131.    Lending Program participants had limited or inadequate information about Genesis Global Capital's operations, financial condition, liquidity, or other factors relevant in considering whether to participate in the Lending Programs.

132.    Plaintiffs and members of the Class lacked full and detailed information regarding how Genesis Global Capital deploys their crypto assets, including its exposure to volatility in crypto asset markets, the financial condition of Genesis Global Capital's counterparties, and the amount of collateral Genesis Global Capital obtained, if any, as part of its loans to Institutional Borrowers.

133.    Because of the above-described conduct Lending Program participants lacked information about Genesis Global Capital that the SEC requires issuers to provide under the Securities Act when they solicit public investment.

134.    On January 12, 2023, the SEC filed an enforcement action (the "SEC Enforcement Action") against Genesis Global Capital and Gemini for engaging "in an unregistered offer and sales of securities to U.S. retail investors, in violation of the federal securities laws" via the offering of the Gemini Earn program. *See SEC v. Genesis Global Capital, LLC.*, Complaint, No. 23-cv-00287 (Jan. 12, 2023) (S.D.N.Y.).

135.    In the SEC Enforcement Action, the SEC alleges that after Gemini Earn Program participants entered into the tri-party Master Agreements with Genesis Global Capital and Gemini, Genesis Global Capital "pooled the crypto assets from Gemini Earn investors with assets from other investors. Genesis then deployed the crypto assets – primarily by lending the crypto assets to institutional counterparties ("Institutional Borrowers") – in order to generate

revenue for its business, including the revenue necessary to pay interest to Gemini Earn investors. Genesis earned revenue by lending the crypto assets at a higher rate than it paid to Gemini Earn and other investors."

136.    The SEC alleges the conduct described in the preceding paragraph "were securities that Genesis . . . offered and sold to the investing public … without registering the offer and sale with the SEC as required by the federal securities laws."

137.    As a result, the SEC alleges, Gemini Earn Program participants such as Plaintiffs lacked material information about the risks of their investment in the Gemini Earn Program and have suffered significant harm as a result of Genesis Global Capital's conduct, losing access to approximately $900 million-worth of digital assets.

III.    **GENESIS GLOBAL CAPITAL FRAUDULENTLY CONCEALED ITS INSOLVENCY IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5.**

A.    **DIGITAL ASSET MARKET TURMOIL WIPES OUT DIGITAL ASSET BORROWING AND LENDING BUSINESSES.**

138.    By 2021, the Grayscale Trade had become a cornerstone trade strategy of digital asset markets and was relied upon by digital asset hedge funds as well as borrowing and lending businesses to deliver the returns necessary to pay interest to lenders and returns to fund investors.

139.    The downward GBTC price movement which started in 2021 and continued throughout 2022 thus significantly stressed the financial health of these businesses as they watched locked up GBTC shares depreciate.

140.    One of the most prominent and prolific GBTC subscribers was the digital asset hedge fund Three Arrows Capital ("3AC"), who at one point had over $10 billion AUM.

141.    3AC, along with other prominent investors, continued subscribing to GBTC hoping the GBTC discount would close.

142.    3AC was also one of the biggest borrowers of digital assets from Genesis Global Capital.

143.    In June 2022, facing margin calls from several lenders due to declining digital asset prices, 3AC became unable to meet its liabilities.

144.    On June 27, 2022, 3AC was ordered by a British Virgin Islands court to liquidate its assets after defaulting on several debts and being sued by its creditors.

145.    On July 1, 2022, 3AC filed for Chapter 15 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

146.    At the time 3AC filed for bankruptcy, it owed Genesis Global Capital approximately $2.3 billion.

147.    After liquidating its assets, 3AC's outstanding debt to Genesis Global Capital stood at $1.1 billion.

148.    3AC's insolvency roiled the digital asset market, causing a credit crunch which negatively impacted digital asset lenders such as Genesis Global Capital and its competitors. The result was a number of Genesis Global Capital's competitor lending businesses becoming insolvent and filing for bankruptcy protection or receiving emergency lines of credit.

149.    On June 12, 2022, digital asset borrower and lender Celsius halted customer withdrawals, citing "extreme market conditions."

150.    On June 22, 2022, digital asset borrower and lender BlockFi announced it would receive a $250 million line of credit from FTX in order to bolster liquidity but denied liquidity issues.

151.    On July 1, 2022, BlockFi signed a revised deal with FTX giving FTX the right to purchase BlockFi for up to $240 million and to provide BlockFi with a $400 million revolving

credit facility. The revised terms were due to an increased risk that BlockFi would become insolvent due to the 3AC liquidation and other market events.

152.    On July 3, 2022, digital asset borrower and lender Voyager Digital announced it was suspending deposits, withdrawals, and trading due in large part to a failure to collect on a $650+ million loan made to 3AC.

153.    On July 6, 2022, Voyager Digital filed for Chapter 11 bankruptcy in United States Bankruptcy Court of the Southern District of New York.

154.    On July 13, 2022, Celsius filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. Celsius lost over $100 million on the Grayscale Trade as the premium flipped to a discount which then widened in 2022.

155.    The unwinding of the Grayscale Premium and steepening discount placed significant stress on the finances of DCG and Silbert. It decreased the attractiveness of GBTC as an investment, which decreased the AUM and NAV of GBTC, thereby decreasing the management fees DCG and Silbert stood to earn from managing GBTC.

156.    The decreased value of GBTC also impacted DCG's financing ability, as DCG held and wanted to use GBTC as collateral in financing transactions.

157.    To alleviate this pressure, DCG and Silbert forced Genesis Global Capital to execute a sham, self-interested, intercompany loan transaction on commercially unreasonably terms whereby Genesis Global Capital Genesis Global Capital loaned approximately $575 million to DCG for DCG to use in its own profit seeking endeavors.

158.    DCG used the $575 million in part to purchase more GBTC shares, hoping that GBTC shares would suddenly reverse their price trend and appreciate and used the rest to line

Silbert's pockets by executing share buybacks, cashing out DCG equity repurchases at opportune times.

159.     DCG could not have obtained financing on those terms at arm's length from an independent party.

160.     The $575 million loan from Genesis Global Capital to DCG is due for repayment in May 2023.

161.     Unfortunately for investors, the GBTC discount continued widening, rather than closing, causing investors holding locked-up GBTC shares to suffer large paper losses that, because of the lock-up period, they were unable to mitigate and/or stop by selling their shares.

**B.     DCG, SILBERT, AND GENESIS GLOBAL CAPITAL FRADULENTLY CONCEALED GENESIS GLOBAL CAPITAL'S INSOLVENCY.**

162.     3AC's bankruptcy filings revealed 3AC borrowed $2.36 billion from Genesis Global Capital and that after 3AC's collateral was liquidated, 3AC still owed Genesis Global Capital at least $1.1 billion,

163.     Because 3AC also owed other creditors billions of dollars, it was immediately clear that Genesis Global Capital would not recover any amount close to the $1.1 billion outstanding, which should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on Genesis Global Capital's books.

164.     The economic reality of Genesis Global Capital's situation should have forced Genesis Global Capital to declare itself insolvent and either seek recapitalization or restructuring.

165.     Instead, Genesis Global Capital dubiously maintained that 3AC's $1.1 billion debt to Genesis Global Capital was still worth $1.1 billion.

166.     Genesis Global Capital then "sold" its rights under those loans to its parent company, DCG, in exchange for a promissory note for $1.1 billion due in 10 years at an interest rate of 1%.

167.     The "sale" however, was a sham. There was no exchange of money and no movement of capital. Moreover, this sale could never have occurred between two parties negotiating at arm's length for at least three reasons:

    a.  First, the 3AC debt was not worth $1.1 billion at the time, and is not worth $1.1 billion now. The odds of Genesis Global Capital or DCG collecting anything near the full value of the debt were and remain incredibly low, and no party negotiating at arm's length with Genesis Global Capital would have valued the debt at $1.1 billion.

    b.  Second, even if the debt *were* worth $1.1 billion, the terms of payment were simply not competitive with the financing terms DCG would have received from a non-related party. No party other than a subsidiary completely controlled by DCG and Barry Silbert would have "sold" a $1.1 billion debt for a 10-year promissory note at 1% interest.

    c.  Third, given the first two realities, there is simply no reasonable possibility the resulting promissory note from DCG is worth anything close to $1.1 billion. Given the duration of the note and the underlying economic realities, the note would be heavily discounted by any third-party valuing the promissory note.

168.     This transaction was a sham because the loan was uncollectable, and the economic reality was that Genesis Global Capital was insolvent at the time of the transaction with its parent company DCG.

169.     On July 6, 2022, Michael Moro, then-CEO of Genesis Global Capital CEO, disseminated the following description of this transaction:

    "DCG has assumed certain liabilities of Genesis related to [Three Arrows Capital] to ensure we have the capital to operate and scale our business for the long-term."

170.     Moro's description, however, was misleading because no steps were taken to shore up the capitalization of Genesis Global Capital. The only way to fill the hole created by

3AC's collapse was to contribute to Genesis Global Capital some amount of money or assets to make up for the fact that Genesis Global Capital would not be receiving the same from 3AC. But as described above, no cash, capital, or assets changed hands from DCG to Genesis Global Capital.

171.    Genesis Global Capital also, at the direction of and/or subject to the control of DCG and Silbert, disseminated misleading and false financial statements to prospective Lending Program participants, directly and via their designated agent, Gemini.

172.    For example, it has been reported that Genesis Global Capital employees disseminated documents with misstatements relating to the above-described transactions, along with misleading financial metrics which emphasized Genesis Global Capital's access to capital and misrepresented the value of the DCG promissory note in order to convince counterparties that Genesis Global Capital would be able to continue to operate as usual.[3]

173.    Specifically, and according to Gemini Earn Program participants' agent Gemini, on July 6, 2022, Genesis Global Capital disseminated a document entitled "Three Arrows Post-Mortem," which contained the following statement attempting to explain the 3AC transactions: "Losses predominantly absorbed by and netted against DCG balance sheet, leaving Genesis with adequate capitalization to continue [Business as Usual]."

174.    The above statement concerning the "adequate capitalization to continue" business as usual, upon information and belief, was false and was made by Genesis Global Capital with the intent of misleading the agent of Gemini Earn Program participants because Genesis Global Capital did not in fact have adequate capitalization to continue to operate.

---

[3] *Picha et al. v. Gemini Trust Company, LLC, et al.*, No.  22-cv-10922-NRB, Answer ¶ 67-91 (Dkt No. 12) (Jan. 10, 2023)(hereinafter "Gemini Answer").

175.    In the same communication, Genesis Global Capital allegedly distributed a document titled "Gemini Risk Metric Request," which contained a section called "Financial Position per Asset" with the following table: [4]

| | Current | Receivable | | Liabilities | |
| | Assets | Loans | Collateral Rec. | Borrows | Collateral Pay. |
|---|---|---|---|---|---|
| Total | $3,377,241,616 | $4,449,809,050 | $2,845,541,484 | $7,178,964,609 | $3,401,109,542 |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| Assets | $10,672,592,150 | Liabilities | $10,580,074,150 | Equity | $92,518,000 |

176.    If provided as represented by Gemini Earn Program participants' agent, this table is a fraud, because it intentionally and knowingly lists the DCG promissory note as a current asset despite the fact that Genesis Global Capital, Barry Silbert, and DCG knew the promissory note did not meet the generally accepted definition of a "current asset."

177.    According to Gemini, acting in its role as agent for Gemini Earn Program participants, on July 27, 2022 Gemini sent the following table with the depicted highlight:

| | Current | Receivable | | Liabilities | |
| | Assets | Loans | Collat Rec | Borrows | Collat Pay |
|---|---|---|---|---|---|
| Total | $3,630 | $5,105 | $2,516 | $7,038 | $4,019 |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |
| Assets | $11,251 | Liabilities | $11,057 | Equity | $194 | [5] |

---

[4] Gemini Answer, at ¶ 76.

[5] *Id.*, at ¶ 81.

178.    Gemini asked Genesis Global Capital "[d]o we know what's included in the $2.2bn other assets? Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light on this?"[6]

179.    Genesis allegedly responded on July 28, 2022 with another misrepresentation, stating that '"Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis. This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties."[7]

180.    According to Gemini, acting in its role as agent for Gemini Earn Program participants, it also received a balance sheet from Genesis Global Capital on July 6, 2022 purporting to show Genesis Global Capital's balance as of June 30, 2022 improperly misrepresenting the $1.1 billion promissory note as a "Receivable from related parties" valued at $1.137 billion despite the fact that, as discussed above, there is no way the promissory note was worth anything close to that amount.

181.    Genesis Global Capital distributed the same balance sheets to each Genesis Institutional Lending Program participant and prospective participants, including Plaintiff Translunar.

182.    As presented, the balance sheet showed that Genesis Global Capital was only solvent by a mere $92.5 million, meaning that if it recognized virtually any impairment to the DCG promissory note's value, it would be insolvent.[8]

---

[6] *Id.,* at ¶ 82.

[7] *Id.*, at ¶ 83.

[8] *See id.,* at ¶ 87.

183.    As Genesis Global Capital mispresented its financial health to Plaintiffs, members

of the Classes, and their agents, Plaintiffs and members of the Classes made new digital asset

loans worth hundreds of millions of dollars to Genesis Global Capital and rolled over existing

open term loans worth that Plaintiffs and members of the Classes would not have otherwise

loaned or rolled over had they known Genesis Global Capital's true financial conditions.

184.    In executing each new transaction or rolling over open term loans, Genesis Global

Capital made the following representations to Plaintiffs and members of the Classes:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not
> subject to any bankruptcy or insolvency proceedings under any applicable laws.

> [Genesis Global Capital] represents and warrants there are no proceedings
> pending or, to its knowledge, threatened, which could reasonably be anticipated to
> have any adverse effect on the transactions contemplated by this Agreement or the
> accuracy of the representations and warranties hereunder or thereunder.

185.    As described above, these representations and warranties were false in two

respects: (1) Genesis Global Capital was in reality insolvent and lying about it; and (2) the 3AC

bankruptcy proceedings had already had an adverse effect on the transactions entered into under

the Lending Agreements.

186.    All of this was done to conceal the fact that Genesis Global Capital had

improperly and imprudently loaned billions of dollars to 3AC and that 3AC's bankruptcy had

caused the value of Genesis Global Capital's liabilities to the parties Genesis Global Capital had

borrowed from to exceeds its assets.

## IV.    GENESIS GLOBAL CAPITAL SUSPENDS REDEMPTIONS AND MISREPRESENTS THE REASON.

187.    It is possible that DCG, Barry Silbert, and Genesis Global Capital would have

gotten away with their misrepresentations, but, in November 2022, a loss of confidence in digital

asset markets caused large numbers of Genesis Global Capital customers to request redemptions (*i.e.,* withdrawals) of their loans.

188.    On November 16, 2022, Genesis Global Capital announced, via Twitter, that Genesis Global Capital would not permit further redemptions or new loan originations due to withdrawal requests exceeding Genesis Global Capital's liquidity:

> "FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, **which have exceeded our current liquidity**... In consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business[.]"

189.    The Nov. 16, 2022 announcement misleadingly blamed FTX for Genesis Global Capital's inability to honor customer redemptions instead of acknowledging that the blame lay with the dubious transactions and accounting methods employed by Genesis Global Capital, DCG, and Silbert.

190.    In fact, Genesis Global Capital was unable to continue to process redemption requests because Genesis Global Capital had become insolvent when it was unable to collect $1.1 billion of the $2.3 billion loaned to 3AC and the loan to parent DCG continued to decline in value.

191.    Genesis Global Capital was not merely illiquid; it was insolvent. This fact was confirmed when, on January 19, 2023, Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., filed voluntarily petitions under Chapter 11 of the U.S. Bankruptcy Code in the Southern District of New York.

## V.    DCG AND SILBERT ARE LIABLE FOR GENESIS GLOBALS CAPITAL'S VIOLATIONS OF FEDERAL SECURITIES LAWS AS CONTROL PERSONS.

192.    As discussed above, Barry Silbert specifically formed DCG to operate and control the business that eventually relaunched as Genesis Global Capital.

193.    Barry Silbert founded DCG, Genesis Global Trading, Genesis Global Capital, and Grayscale.

194.    At all relevant times, Barry Silbert maintained a 40% equity stake in DCG and served as DCG's CEO and Chairman of its Board of Directors.

195.    Exemplary of Silbert's control over DCG and its subsidiaries, Silbert has held several other leadership positions at DCG's wholly-owned subsidiaries. For example, until 2021, Barry Silbert served as CEO of Grayscale and still serves as Chairman of Grayscale's Board of Directors.

196.    By virtue of his positions and ownership interest, Barry Silbert is a control person as contemplated by Section 20(a) of the Securities Exchange Act.

197.    At all relevant times, DCG and Barry Silbert exercised actual power and control over Genesis Global Capital, possessing the power to direct or cause the direction of management and policies of DCG and Genesis Global Capital.

198.    For example, DCG and Silbert caused, or failed to prevent Genesis Global Capital's unregistered securities issuances detailed herein despite the fact that Silbert and DCG both could have prevented them.

199.    Additionally, DCG and Barry Silbert directed and/or caused Genesis Global Capital to enter into multiple intercompany transactions on commercially unreasonable terms that were favorable to DCG and Silbert and meant to benefit DCG's and Silbert's financial interests at the expense of Lending Program participants.

200.    For example, DCG caused Genesis Global Capital to loan $575 million to DCG on non-arm's length terms to support the DCG conglomerate and Barry Silbert's own economic interests.

201.    Similarly, DCG and Barry Silbert caused Genesis Global Capital to assign the

3AC debt in exchange for a $1.1 billion 10-year promissory note with 1% interest, another non-

arm's length transaction.

## CLASS ALLEGATIONS

202.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and 23(b)(3).

203.    Plaintiffs seek class certification on behalf of the following classes defined as

follows:

> **UNREGISTERED SECURITIES OFFERING CLASS**: All persons or entities
> who participated in the Lending Programs from inception to November 16, 2022
> (the "Unregistered Securities Offering").

> **SECURITIES FRAUD CLASS**: All persons or entities who participated in the
> Lending Programs and had digital loans outstanding at Genesis Global Capital as
> of November 16, 2022 (the "Securities Fraud Class").

204.    Plaintiffs reserve the right to modify or refine the definitions of the Class or

Subclasses based upon discovery of new information and to accommodate any of the Court's

manageability concerns.

205.    Excluded from the Classes are: (a) any Judge or Magistrate Judge presiding over

this action and members of their staff, as well as members of their families; (b) Defendants and

Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in

which any Defendant or its parents have a controlling interest, as well as Defendants' current or

former employees, agents, officers, and directors; (c) persons who properly execute and file a

timely request for exclusion from the Classes; (d) persons whose claims in this matter have been

finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants;

and (f) the legal representatives, successors, and assigns of any such excluded persons.

206.     **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Classes. Further, the Classes can be readily identified through records maintained by Defendant.

207.     **Numerosity (Rule 23(a)(1))**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Classes, as herein identified and described, is not known, upon information and belief there are hundreds of thousands of individuals and entities that participated in the Lending Programs.

208.     **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Classes:

    a.  Whether the Lending Agreements were notes;

    b.  Whether the Lending Agreements were investment contracts;

    c.  Whether Genesis Global Capital was required to register the Lending Agreement transactions as offerings and sales of securities;

    d.  Whether an exemption from registration applied to Genesis Global Capital's offer and sale of the Lending Agreements;

    e.  Whether misstatements or omission made by Genesis Global Capital were material to the decision made by Plaintiffs and the Classes to purchase securities from Genesis Global Capital;

    f.  Whether misstatements or omissions made by Genesis Global Capital were reasonably relied upon by Plaintiffs and members of the Classes;

    g.  Whether Plaintiffs and members of the Classes suffered damages as a result of the misconduct alleged herein;

    h.  Whether Genesis Global Capital misrepresented its financial condition;

    i.   Whether Genesis Global Capital violated federal and state law;

    j.   Whether DCG violated federal securities laws;

    k.   Whether Barry Silbert violated federal securities laws;

    l.   Whether DCG is a control person as to Genesis Global capital as contemplated by the federal securities laws;

    m.   Whether Barry Silbert is a control person as to Genesis Global capital as contemplated by the federal securities laws;

    n.   Whether Plaintiffs and members of the Classes are entitled to declaratory and injunctive relief.

209.   **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the other members of the proposed Class and Subclasses. Plaintiffs and members of the Class and Subclasses (as applicable) suffered injuries as a result of Genesis Global Capital's wrongful conduct that is uniform across the Class and Subclasses.

210.   **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class and Subclasses.

211.   **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. The prosecution of

separate actions by individual members of the Classes would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Classes treatment will create economies of time, effort, and expense and promote uniform decision-making.

212.    Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

213.    Classes certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Genesis Global Capital acted or refused to act on grounds generally applicable to the Classes and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

214.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## DISCOVERY RULE TOLLING

215.     Plaintiffs and the proposed Class had no way of discovering the true nature of

Genesis Global Capital's financial conditions, and the commensurate breach of the Master

Agreement, until November 16, 2022, and only discovered these facts after November 16, 2022.

## FRAUDULENT CONCEALMENT TOLLING

216.     All applicable statutes of limitation have also been tolled by Genesis Global

Capital's knowing and active fraudulent concealment and denial of the facts alleged herein

throughout the period relevant to this action. As a result, Plaintiffs and members of the Class

could not have, and indeed did not, discover the true nature of Genesis Global Capital's conduct

until November 16, 2022.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES ACT
SECTION 5, SECTION 12(a)(1) AND SECTION 15 OF THE SECURITIES ACT
(Against DCG and Barry Silbert)
(On Behalf of All Plaintiffs and Class Members)**

217.     Plaintiffs reallege the allegations above.

218.     This claim is asserted against DCG and Barry Silbert pursuant to Section 15 of the

Securities Act, 15 U.S.C. § 77o.

219.     Section 15 of the Securities Act provides: "Every person who, by or through stock

ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or

understanding with one or more other persons by or through stock ownership, agency, or

otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable

jointly and severally with and to the same extent as such controlled person to any person to

whom such controlled person is liable, unless the controlling person had no knowledge of or

40

reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id.* § 77o(a).

220.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

221.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." Id. § 77e(c).

222.    As alleged herein, Genesis Global Capital violated Sections 5 of the Securities Act by selling securities without registering the securities offering or qualifying for an exemption from registration.

223.    At the time of the violations of Sections 5 of the Securities Act by Genesis Global Capital alleged herein, DCG controlled Genesis Global Capital. DCG, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its

employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. DCG at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

224.    DCG purposefully exercised its power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by promoting, soliciting, offering, and selling unregistered securities to Plaintiffs and members of the Classes in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

225.    Genesis Global Capital is liable for its violations of Section 5 of the Securities Act under section 12(a)(1) of the Securities Act, *id*. § 77*l*(a)(1).

226.    DCG had sufficient influence to cause Genesis Global Capital to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act.  DCG purposefully decided not to do so.

227.    DCG knowingly and culpably participated in, and/or aided and abetted, Genesis Global Capital's violations of the Securities Act alleged herein.  DCG had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under section 12(a)(1) of the Securities Act.

228.    Accordingly, pursuant to Section 15 of the Securities Act, DCG is jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for damages relating to the Lending Agreements. *See id.* § 77*l*(a)(1).

229.    As CEO and founder of both DCG and Genesis Global Capital, and controlling shareholder owning 40% of the equity of DCG (which in turn owned 100% of Genesis Global Capital), Barry Silbert had the power and authority to direct the management and activities of

Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Silbert, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

230.    Silbert purposefully exercised his power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by directing Genesis Global Capital not to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiffs and members of the Classes in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

231.    Genesis Global Capital is liable for its violations of Section 5 of the Securities Act under section 12(a)(1) of the Securities Act, *id*. § 77*l*(a)(1).

232.    At the time of the violations of Section 5 of the Securities Act by Genesis Global Capital alleged herein, Silbert had sufficient influence to cause Genesis Global Capital to refrain from promoting, soliciting, offering, and selling unregistered securities in violation of the Securities Act.  Silbert purposefully decided not to do so.

233.    Silbert knowingly and culpably participated in, and/or aided and abetted, Genesis Global Capital's violations of the Securities Act alleged herein.  Silbert had knowledge of or reasonable ground to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under Section 12(a)(1) of the Securities Act.

234.    Accordingly, pursuant to Section 15 of the Securities Act, Silbert is jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Classes for damages as to each Lending Agreement. *See id.* § 77*l*(a)(1).

## SECOND CLAIM FOR RELIEF

**CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE EXCHANGE ACT
SECTION 10(b) AND 20(a) OF THE EXHANGE ACT
(Against DCG and Barry Silbert)
(On Behalf of All Plaintiffs and Class Members)**

235.    Plaintiffs reallege the allegations above.

236.    This claim is asserted against DCG and Barry Silbert pursuant to Section 20 of the

Exchange Act, 15 U.S.C. § 78t(a).

237.    Section 20(a) of the Exchange Act provides: "Every person who, directly or

indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or

regulation thereunder shall also be liable jointly and severally with and to the same extent as

such controlled person to any person to whom such controlled person is liable … unless the

controlling person acted in good faith and did not directly or indirectly induce the act or acts

constituting the violation or cause of action."  15 U.S.C. § 78t(a).

238.    Section 10(b) of the Exchange Act Section 10(b) declares it unlawful for any

person to "use or employ, in connection with the purchase or sale of any security" a

"manipulative or deceptive device or contrivance in contravention of such rules and regulations

as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

239.    SEC Rule 10b-5 promulgated pursuant to Section 10(b) of the Exchange Act

makes it unlawful for "any person, directly or indirectly, by the use of any means or

instrumentality of interstate commerce, or of the mails or of any facility of any national securities

exchange . . . [t]o employ any device, scheme, or artifice to defraud . . . [t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading,

or . . . [t]o engage in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 CFR § 240.10b-5.

240.    Genesis Global Capital, by the use by use of the instrumentalities of interstate commerce, intentionally and/or recklessly: employed a device, scheme, or artifice to defraud Plaintiffs and members of the Classes and their agents into making loans of digital assets or rolling over existing loans of digital assets to Genesis Global Capital; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading and/or engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the Classes in connection with Plaintiff's and the Classes' lending transactions made pursuant to the Lending Agreements, which constitute securities pursuant to 15 U.S.C.§ 77b(a)(1), in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

241.    Genesis Global Capital engaged in fraudulent and deceitful acts or practices by knowingly and intentionally, or recklessly, making materially false representations, including, but not limited to, its representations in documents circulated to all Genesis Global Capital lenders and their agents describing Genesis Global Capital's financial conditions, including its solvency. In fact, Genesis Global Capital knew or recklessly disregarded at the time of the statements and representations that it was insolvent, and that its financial condition was other than what was being represented to Plaintiffs and members of the Classes.

242.    Genesis Global Capital made these material misrepresentations or omitted to disclose the material facts with the intention of deceiving the investing public, including Plaintiffs and members of the Classes and their agents, and inducing Plaintiffs and members of

the Classes to continue to loan digital assets to Genesis Global Capital and/or not redeem their existing loans of digital assets to Genesis Global Capital.

243.    Not only did Genesis Global Capital knowingly withhold key information and thereby engage in conscious misbehavior, it had the motive to do so, because it resulted in higher compensation for Genesis Global Capital, DCG, and Barry Silbert.

244.    Genesis Global Capital also had the motive to keep its real financial condition secret, because Genesis Global Capital knew that its insolvency would likely result in mass investor redemptions and the end of its business.

245.    Genesis Global Capital had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Classes, or, in the alternative, Genesis Global Capital acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Genesis Global Capital. Genesis Global Capital's acts and omissions were committed willfully or with reckless disregard for the truth. In addition, Genesis Global Capital knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

246.    As a result of the aforementioned misrepresentations and/or omissions, Plaintiffs and the other members of the Classes executed additional digital asset loan transactions or rolled over existing digital asset loans already made to Genesis Global Capital and were damaged thereby.

247.     Had Plaintiffs and members of the Classes known the truth, they would not have executed additional digital asset loan transactions or rolled over existing digital asset loans already made to Genesis Global Capital.

248.     By reason of the conduct alleged herein, Genesis Global Capital knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

249.     As a direct and proximate result of Genesis Global Capital's material misrepresentations and omissions, Plaintiffs and members of the Classes have suffered damages in connection with their loan transactions with Genesis Global Capital in an amount to be determined at trial.

250.     At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, DCG controlled Genesis Global Capital. DCG, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. DCG, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

251.     DCG purposefully exercised its power and influence to cause Genesis Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of Genesis Global Capital.

252.   At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, DCG had sufficient influence to cause Genesis Global Capital to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act.

253.   DCG knowingly and culpably participated in, and/or aided and abetted, Genesis Global Capital's violations of the Exchange Act alleged herein.

254.   Accordingly, DCG is jointly and severally liable for the violations of the Exchange Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members relied on statement made by Genesis Global Capital in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

255.   At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as founder and CEO of both DCG and Genesis Global Capital and controlling shareholder of DCG.

256.   Silbert, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of DCG and Genesis Global Capital.

257.   Silbert purposefully exercised his power and influence to cause Genesis Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of Genesis Global Capital.

258.     At the time of the wrongs alleged herein, Silbert had sufficient influence to cause Genesis Global to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act. Silbert purposefully decided not to do so.

259.     Silbert knowingly and culpably participated in, and/or aided and abetted, Genesis Global Capital's violations of the Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder alleged herein.

260.     Accordingly, Silbert is jointly and severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members relied on statement made by Genesis Global Capital in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes respectfully requests relief as follows:

A.     An order certifying this dispute and the Classes requested herein as a class action, designating Plaintiffs as the representatives of the Classes, and appointing Plaintiffs' counsel as counsel to the Classes;

B.     A judgment awarding Plaintiffs and the Classes appropriate damages based on the claims for relief outlined herein;

C.     A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate;

D.      A judgment awarding Plaintiffs and the Classes prejudgment and post-judgment interest, as permitted by law;

E.      A judgment awarding Plaintiffs and the Classes costs and fees, including attorneys' fees and costs as permitted by law; and

F.      Granting such other legal, equitable or further relief as the Court may deem just and proper.


Dated:  January 23, 2023                            Respectfully submitted,

                                                    SILVER GOLUB & TEITELL LLP

                                                    */s/ Ian W. Sloss*
                                                    Ian W. Sloss ct31244
                                                    Steven L. Bloch ct31246
                                                    Zachary A. Rynar ct31372
                                                    One Landmark Square
                                                    Floor 15
                                                    Stamford, Connecticut 06901
                                                    Telephone: (203) 325-4491
                                                    Facsimile: (203) 325-3769
                                                    isloss@sgtlaw.com
                                                    sbloch@sgtlaw.com
                                                    zrynar@sgtlaw.com

                                                    *Attorneys for Plaintiffs*