# EXHIBIT G

Sean A. O'Neal
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

## <u>NOTICE OF FILING OF THE RESTRUCTURING TERM SHEET</u>

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.      On January 19, 2023 (the "<u>Petition Date</u>"), Genesis Global Holdco, LLC

("<u>Holdco</u>") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned

chapter 11 cases (collectively, the "<u>Debtors</u>"), each filed a voluntary petition for relief under

chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "<u>Bankruptcy Code</u>")

with the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy</u>

<u>Court</u>").

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

2.     Since November 2022, the Debtors have engaged in substantive discussions with their creditors, including with two ad hoc groups of GGC lenders (the "Ad Hoc Groups") that represent more than $2 billion in outstanding loans, and DCG, Holdco's corporate parent and its largest borrower, in an effort reach a consensual resolution that maximizes value and treats creditors fairly and equitably.  The Debtors and their advisors have actively facilitated and led these discussions, providing feedback and pushing the parties toward a resolution.

3.     As announced on the record at the status conference on February 6, 2023, the Debtors, DCG and the Ad Hoc Groups have reached an agreement in principle as described in the Restructuring Term Sheet (the "Term Sheet") attached hereto as Exhibit A, which Term Sheet remains subject to the negotiation and execution of definitive documentation, including a plan support agreement.  Copies of the Term Sheet can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov (PACER password required) or (ii) from the Debtors' proposed notice and claims agent, Kroll Restructuring Administration LLC, which maintains a website at https://restructuring.ra.kroll.com/genesis or by calling +1 888 524 2017.

| | |
|---|---|
| Dated:    February 10, 2023<br>New York, New York | *Sean A. O'Neal*<br>Sean A. O'Neal<br>Jane VanLare<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>One Liberty Plaza<br>New York, New York 10006<br>Telephone: (212) 225-2000<br>Facsimile: (212) 225-3999<br><br>*Proposed Counsel to the Debtors and*<br>*Debtors-in-Possession* |

**Exhibit A**

**Restructuring Term Sheet**

# GENESIS GLOBAL HOLDCO, LLC
# TERM SHEET
# FEBRUARY 10, 2023

This term sheet (including the annexes, exhibits, and schedules attached hereto, collectively, this "Term Sheet")[1] sets forth the general terms and conditions of certain related transactions (the "Transactions") which have been agreed to by an ad hoc group of creditors of Genesis Global Capital, LLC ("GGC," each creditor of GGC party hereto, a "Consenting GGC Creditor" and the Consenting GGC Creditors, collectively, the "Consenting GGC Creditors"), which in the aggregate hold or otherwise represent in excess of $2.4 billion in asserted claims against GGC (collectively, the "Ad Hoc Group") and are represented by Houlihan Lokey, Inc., Kirkland & Ellis LLP, and Proskauer Rose LLP (such advisors, the "Ad Hoc Group Advisors"), Genesis Global Holdco, LLC ("GGH," together with GGC, Genesis Asia Pacific, Pte. Ltd. ("GAP"), and the other subsidiaries of GGH, "Genesis"), Gemini Trust Company, LLC ("Gemini"), and Digital Currency Group, Inc. ("DCG").[2] The Consenting GGC Creditors, Genesis, Gemini, and DCG shall collectively be referred to as the "Parties" herein.

The Transactions will be consummated pursuant to an amended chapter 11 plan (the "Amended Plan") containing terms set forth herein to be confirmed in the cases commenced by GGH, GGC, and GAP (collectively, the "Genesis Debtors") on January 19, 2023 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), *In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (the "Chapter 11 Cases").

This Term Sheet does not address all material terms, conditions, covenants, and other provisions that would be required in connection with any potential transaction, including such changes to the structure as are necessary or appropriate to achieve a tax-efficient outcome, and any agreement is subject to access to certain financial information and the execution of definitive documentation consistent with this Term Sheet and otherwise acceptable to the Required Consenting GGC Creditors,[3] DCG, Genesis, and Gemini (to the extent the rights of Gemini Lenders are implicated) in the manner set forth herein and in the Plan Support Agreement, as defined below. As contemplated herein, subject to applicable securities laws, DCG is prepared to commit to have its preferred equity and related common shares included in the Transactions be freely tradeable, allowing GGC and/or its creditors (the "GGC Creditors") to monetize the shares for their preferred currency or participate in the potential appreciation of DCG equity over time, in accordance with the terms set forth herein and in the Plan Support Agreement.

**THIS TERM SHEET IS NOT LEGALLY BINDING AND DOES NOT CONSTITUTE AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(a)(2) OF THE SECURITIES ACT AND/OR SECTIONS 1125 AND 1145 OF THE BANKRUPTCY CODE AND APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR,**

---

[1] Capitalized terms used but not otherwise or immediately defined herein shall have the meaning ascribed to such terms elsewhere herein or in the Plan Support Agreement, as applicable.

[2] The Plan Support Agreement and the Amended Plan shall include provisions for distributions to be made to GAP creditors.

[3] "Required Consenting GGC Creditors" shall mean, as of the relevant date, Consenting GGC Creditors holding, collectively, in excess of fifty percent (50%) of the aggregate principal amount of asserted claims against GGC held or controlled by the Consenting GGC Creditors that are members of the Ad Hoc Group. Gemini, in its individual capacity, shall be considered a "Consenting GGC Creditor" under this Term Sheet and the Plan Support Agreement only with respect to the amount of claims that it actually controls for purposes of voting to accept or reject the Amended Plan, if any.

UNTIL CONFIRMATION OF THE AMENDED PLAN CONTEMPLATED HEREBY (AND THEN ONLY AS PROVIDED THEREIN), DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. FOR THE AVOIDANCE OF DOUBT, ANY PARTY MAY PUBLICLY DISCLOSE THE EXISTENCE OF SETTLEMENT NEGOTIATIONS, THIS TERM SHEET AND THE TERMS SET FORTH HEREIN.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE TRANSACTIONS OR ANY RELATED TRANSACTION OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY TRANSACTIONS OR RELATED TRANSACTIONS. NOTHING HEREIN SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES.

| | |
|---|---|
| **OVERVIEW AND PARTIES** | |
| **Plan Support Agreement** | The Parties shall agree to execute and deliver a Plan Support Agreement (the "Plan Support Agreement") evidencing their support for the Transactions contemplated herein, which Plan Support Agreement shall be consistent with the terms set forth herein. This Term Sheet shall be attached as an exhibit to the Plan Support Agreement, and shall become effective upon the PSA Effective Date. |
| **Global Settlement** | The Transactions are structured as a global settlement and compromise among the Parties. |
| **Implementation** | Subject to the terms and conditions of the Plan Support Agreement (which shall include additional milestones, consent rights, and conditions not set forth in this Term Sheet, solely to the extent mutually agreed by the parties thereto), the Transaction will be structured, implemented, and accomplished through the Amended Plan to be filed by the Genesis Debtors and confirmed by the Bankruptcy Court in accordance with section 1129 of the Bankruptcy Code, which Amended Plan shall be materially consistent with this Term Sheet and otherwise reasonably acceptable in form and substance to the Genesis Debtors, Gemini, DCG, and the Required Consenting GGC Creditors. |
| **GGC Creditor Recoveries In-Kind** | The Genesis Debtors and DCG will use commercially reasonable efforts, in consultation with the Ad Hoc Group Advisors and the Required Consenting GGC Creditors, to provide recoveries to GGC Creditors under the Amended Plan in kind in the form of crypto or fiat currency in which their claim is denominated; provided that nothing in this Term Sheet, the Plan Support Agreement, or the Amended Plan shall require the Genesis Debtors or DCG to acquire fiat currency or digital assets or otherwise exchange any type of fiat currency or digital asset into any other form of fiat currency or digital asset for purposes of making distributions to the GGC Creditors. |
| **CURRENT DCG CAPITAL STRUCTURE** | |
| **Existing Eldridge Facility** | DCG's obligations arising under or in connection with that certain senior secured Existing Eldridge Facility due November 2026 (the "Existing Eldridge Facility") consisting of $350 million in original principal amount, plus interest, fees, and other expenses arising and payable under that certain Credit Agreement, dated as of November 12, 2021, among DCG, as borrower, SB Corporate Funding, LLC (the "Agent"), as administrative agent and collateral agent, and the lenders party thereto (the "Existing Eldridge Lenders") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time). Pursuant to that certain Pledge and Security Agreement, dated as of November 12, 2021, by and among DCG, as borrower, the Grantors (as defined therein) from time to time party thereto, and the Agent, as security for the prompt and complete performance in full of the Secured Obligations (as defined therein), each Grantor pledged, collaterally assigned, mortgaged, hypothecated, and granted to the Agent, its successors, and permitted assigns, on behalf of and for the benefit of the Secured Parties (as defined therein) a continuing security interest in all of such Grantor's right, title, and interest in, to and under all of the personal property and other assets specified therein, whether then owned by or owing to, or thereafter acquired by or arising in favor of such Grantor (including under any trade name or derivations thereof), and whether then owned or consigned by or to, or leased from or to, such Grantor, and regardless of where located (all of the foregoing, the "Eldridge Collateral" and any such liens in favor of the Agent or any other Secured Party relating to the Eldridge Collateral, the "Eldridge Liens"). |
| **Existing DCG 2023 Loans** | DCG's obligations arising under or in connection with the Existing DCG 2023 Loans due May 2023 ("Existing DCG 2023 Loans") consisting of approximately $604 million USD |

| | in principal amount plus interest, fees, and other expenses arising and payable under (a) that certain Amended and Restated Master Loan Agreement, dated November 10, 2022, by and between DCG and GGC (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "A&R MLA") and (b) that certain Master Loan Agreement by and between GGC and DCG International Investments Ltd., dated as of June 21, 2019. |
| | The Existing DCG 2023 Loans are comprised of approximately (a) 4,550 BTC payable, with a value of approximately $102 million as of January 20, 2023, (b) 14,048 BCH payable, with a value of approximately $1.8 million as of January 20, 2023, and (c) $500 million payable in USD.  The Parties acknowledge that the balance is subject to an asserted $52 million setoff of DCG's obligation to GGC against DCG's asserted subrogation right following satisfaction by DCG of certain Luno Australia Pty Ltd. obligations pursuant to DCG's guarantee of such obligations, which all the Parties acknowledge is subject to dispute. |
| **Existing DCG 2032 Note** | DCG's obligations arising under or in connection with the Existing DCG 2032 Note due June 2032 ("Existing DCG 2032 Note") consists of approximately $1.1 billion in principal amount, plus interest, fees, and other expenses arising and payable under that certain Promissory Note, dated June 30, 2022, by and between DCG, as obligor, and GGC as holder (the "Promissory Note"). |
| **DCG Existing Shares** | All issued and outstanding common shares of DCG as of the PSA Effective Date, including all options or warrants to purchase such shares (the "DCG Existing Shares").  Currently, there are:  (a) 4,058,146 Class A common stock shares, (b) 62,067,301 Class B common stock shares and (c) 3,639,405 issued but unexercised options. |
| **MONETIZATION OF THE GENESIS PLATFORM** | |
| **The Sale Process[4]** | On or as soon as reasonably practicable following the effective date of the Amended Plan (the "Plan Effective Date"), DCG shall contribute all of the equity interests it currently holds in Genesis Global Trading, LLC ("GGT") to GGH (the "GGT Contribution").[5] |
| | Following the PSA Effective Date, and subject to finalization of Genesis entities' and GGT's business plans, GGH, in consultation with the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, DCG, and the official committee of unsecured creditors, if any, appointed by the U.S. Trustee in the Chapter 11 Cases (the "Committee"), shall conduct one or more marketing and sales processes in an effort to maximize the value of any disposition of GGT, Genesis Global Markets Limited ("GGML"), and/or other entities comprising the Genesis Platform according to the principles set forth herein (the "Sale Process"): |
| | • Joint Purpose:  The Parties shall endeavor to maximize the value of the Genesis Platform through the Sale Process; |

---

[4]  Parties to discuss the simultaneous timing of the GGT Contribution, sale, and credit to 2023 Loans.

[5]  As a condition precedent to the PSA Effective Date, DCG must obtain, and provide written confirmation to the other Parties of, the Existing Eldridge Lenders' or Replacement Facility Lenders' (as defined below) consent to entry into the Plan Support Agreement.

- <u>Coordination</u>: The Parties, in consultation with the Committee, shall use commercially reasonable efforts to agree to a marketing schedule for, and potential transaction parties to solicit over the course of, the Sale Process;

- <u>Consultation</u>: GGH shall determine, in consultation with the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, DCG, and the Committee, whether a Sale Transaction, a Wind-Down, an Equitization, or another course of action represents the most value maximizing disposition of the Genesis Platform; and

- <u>Use of Proceeds</u>: The proceeds of any Monetization Transaction shall vest (i) *first*, in the Genesis Debtors or a liquidation trust (the "<u>Liquidation Trust</u>") to be established on the Plan Effective Date, as applicable, in the amount of estimated administrative claims, priority claims, professional fee claims, and secured claims, (ii) *second*, if an Equitization does not occur, in the Liquidation Trust in an amount necessary (as determined by GGH, with the consent of the Ad Hoc Group Advisors and the Required Consenting GGC Creditors or with Bankruptcy Court approval, upon notice and hearing) to fund the Liquidation Trust's expenses until all Amended Plan distributions are made, (iii) *third*, if an Equitization occurs, in GGH in the amount necessary (as determined by GGH, with the consent of the Ad Hoc Group Advisors and the Required Consenting GGC Creditors or with Bankruptcy Court approval, upon notice and hearing), together with cash or digital assets on hand, to continue any Genesis businesses that were not otherwise sold in the Sale Process, and (iv) *fourth*, in a trust (the "<u>GGC Creditors Trust</u>") to be formed on the Plan Effective Date, which trust shall be responsible for making distributions to the GGC Creditors; *provided* that, notwithstanding the foregoing, any proceeds of any Monetization Transaction that are in the form of equity shall vest in the GGC Creditors Trust.[6] The GGC Creditors Trust shall use commercially reasonable efforts to provide any public reporting necessary to allow units of the GGC Creditors Trust to be tradeable. Notwithstanding the foregoing, under all circumstances, no proceeds of any Monetization Transaction shall be used by Genesis without entry of an order of the Bankruptcy Court, upon notice and hearing.

***Sale Process Milestones***. To be mutually agreed by Genesis, the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, and DCG.

"<u>Equitization</u>" means, if the Sale Process does not result in the sale of all or substantially all of the assets of Genesis, a restructuring under the Amended Plan pursuant to which the GGC Creditors will receive, among other things, one hundred percent (100%) of the equity in reorganized GGH, subject to dilution by a management incentive program that may be implemented with the approval of the Bankruptcy Court, upon notice and hearing.

"<u>Genesis Platform</u>" means, in consultation with the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, DCG, and the Committee, one or more of the following: (a)

---

[6] Treatment of administrative claims, priority claims, professional fee claims, secured claims, and wind-down costs in connection with an equity bid to be discussed.

| | the cryptocurrency savings and trading platform, or any successor platform thereto, operated by GGT, (b) GGML, and (c) any other subsidiaries of GGH. |
|---|---|
| | "Monetization Transaction" means a Sale Transaction, a Wind-Down, or any other monetization transaction or transactions. |
| | "Sale Transaction" means a transaction or transactions in which the Genesis Platform is sold, in whole or in part, to a third party. |
| | "Wind-Down" means the liquidation and formal dissolution of the Genesis Platform in whole or in part. |
| **TREATMENT OF EXISTING DCG CLAIMS AND INTERESTS** | |
| **Existing DCG-Eldridge Facility** | DCG shall be solely responsible for the refinancing and/or repayment of the Existing Eldridge Facility. |
| **Existing DCG 2023 Loans**[7] | On the Plan Effective Date, in exchange for, and in full and final satisfaction of the obligations arising under, the Existing DCG 2023 Loans (including any accrued and unpaid interest thereunder), DCG shall issue a new, junior secured term loan in two tranches in the aggregate total of approximately $500 million and 4,631.5275436429 BTC, respectively ("New Second Lien Facility"), made payable to the GGC Creditors Trustee, as agent for and on behalf of the GGC Creditors.[8]  The terms of the New Second Lien Facility shall include:<br><br>• Principal Amount:<br>    o Tranche 1: $473.7 million[9] minus the Mandatory Prepayment<br>    o Tranche 2: 4,631.5275436429 BTC<br>• Maturity: June 30, 2024.<br>• Interest Rate:<br>    o Tranche 1:  11.5% to be paid in U.S. dollars monthly in arrears.<br>    o Tranche 2:  5.0% to be paid in BTC monthly in arrears. |

---

[7]  As a condition precedent to the PSA Effective Date, DCG must obtain, and provide written confirmation to the other Parties of, the Existing Eldridge Lenders' or Replacement Facility Lenders' consent to entry into the Plan Support Agreement.

[8]  Notwithstanding the foregoing, the Parties shall meet and confer regarding the possibility of exchanging the loans denominated in USD to BTC, ETH, or other digital assets prior to closing.

[9]  The principal balance of Tranche 1 of the New Second Lien Facility reflects the reduction in an amount equal to fifty percent (50%) of the amount paid by DCG to Luno Australia Pty Ltd pursuant to the Luno Guarantee; *provided*, that the principal balance shall not be reduced by an amount greater than $26.3 million.  In exchange, DCG and Luno Australia Pty Ltd. shall agree to waive any and all claims against GGC relating to the Luno Guarantee and the loan(s) underlying such guarantee.

- **Payment at Maturity**: Principal repayment of all outstanding amounts, together with all accrued interest and fees with respect thereto.

- **Prepayment and Default Fees**: The New Second Lien Facility shall be prepayable at DCG's discretion, subject to the following prepayment schedule. Any prepayments of the New Second Lien Facility must be paid, on a *pro rata* basis, in kind to each of Tranche 1 or Tranche 2, which shall only be prepayable in their respective currencies.

  o If a prepayment is made within the first six (6) months following the close of the Transaction, there shall be no prepayment fee;

  o If a prepayment is made between six to twelve (6–12) months following the close of the Transaction, the prepayment fee shall be equal to one percent (1%) of the principal amount prepaid;

  o If a prepayment is made between twelve (12) months following the close of the Transaction and the Maturity Date, the prepayment/default fee shall be equal to two percent (2%) of the principal amount repaid; and

  o Following the Maturity Date, the Interest Rate shall be increased by two percent (2%) for all amounts, if any, then outstanding and DCG shall be deemed in default.

- **Reduction in New Second Lien Facility as a Result of Prepayments**: Any prepayment will accordingly result in a reduction of the New Second Lien Facility by such prepayment amount.

- **Collateral**: Same as Eldridge Collateral or Replacement Facility Collateral, as applicable.

- **Priority**: The liens securing the New Second Lien Facility shall be subordinate only to, as applicable, (i) the Eldridge Liens, (ii) the liens securing any rollover of the Eldridge Facility, or (iii) any liens granted in connection with a replacement of the Eldridge Facility (a "Replacement Facility"; the lenders thereunder, the "Replacement Facility Lenders"; and the collateral securing such Replacement Facility, the "Replacement Facility Collateral"), which, in any case, shall in no event be larger than $350 million in principal amount. The GGC Creditor Trustee shall be required to enter into an intercreditor agreement implementing the foregoing with the Agent or the agent or other representative for the Replacement Facility Lenders on terms and conditions reasonably satisfactory to the GGC Creditor Trustee and the Agent or agent or other representative for the Replacement Facility Lenders, as applicable.

- **Mandatory Prepayment**: The principal amount of the New Second Lien Facility shall be reduced by an amount equal to the Mandatory Prepayment Amount, subject to the terms hereof. For the avoidance of doubt, any cash and/or digital assets not sold in connection with a Sale Transaction for a Genesis Platform entity shall mandatorily be used to prepay Tranche 1 and Tranche 2 of the New Second Lien Facility; *provided*, *however*, that under all circumstances, Tranche 2 shall be

|   | repaid in kind.[10]  Additionally, subject to any mandatory prepayments under the Eldridge Facility, any proceeds from the sale or monetization of DCG affiliates or subsidiaries other than the Genesis Platform shall be used to prepay Tranche 1 and Tranche 2 of the New Second Lien Facility; *provided*, *however*, that under all circumstances, Tranche 2 shall be repaid in kind.[11]  Furthermore, for the avoidance of doubt, a Mandatory Prepayment shall not trigger any prepayment or default fees associated with DCG's discretionary prepayment of the New Second Lien Facility as contemplated by this Term Sheet. |
|---|---|
|   | • Trust:  The New Second Lien Facility and proceeds of the New Second Lien Facility shall be placed in the GGC Creditors Trust, and shall be distributed pursuant to the Amended Plan for the benefit of the GGC Creditors. |
|   | • Other Terms:  The Parties shall include in the Definitive Documents customary affirmative and negative covenants to be discussed (including limitations on Permitted Indebtedness, which shall not exceed the Debt Limit).  Holders will have the right to transfer or otherwise assign their interests in the New Second Lien Facility.  The Parties shall agree to treat the New Second Lien Facility, including Tranche 2, as debt for all applicable federal income tax purposes, unless otherwise required by a "determination." |
|   | "Book Value" shall mean the book value, according to generally accepted accounting principles, of each of the respective Subject Entities, as determined by the Independent Accounting Firm prior to commencement of the Sale Process, which shall reflect the recovery of the intercompany loan obligations owed by GGC International Ltd. ("GGCI") to GGML at par.[12] |
|   | "Debt Limit" shall mean $350 million (plus obligations outstanding under the New Second Lien Facility) and any indebtedness incurred pursuant to the immediately following sentence.  For the avoidance of doubt, DCG shall be entitled to incur additional debt in the amount necessary for (and actually used in connection with) the effectuation of any redemption of the Preferred Stock (as defined below). |
|   | "GGC Creditors Trustee" means the entity designated by the Required Consenting GGC Creditors, in consultation with the Genesis Debtors, Gemini, DCG, and the Committee, on or prior to the Plan Effective Date to serve as trustee/agent of the GGC Creditors Trust and with respect to the New Second Lien Facility. |
|   | "Independent Accounting Firm" shall mean an independent accounting firm mutually acceptable to the Parties to be agreed upon prior to commencement of the Sale Process. |

---

[10]  There shall be no obligation on Genesis or DCG to convert any proceeds or consideration into BTC to accomplish such reduction in kind.  Tranche 2 shall be reduced by the value received in BTC.  The remainder of any value received shall be applied to reduce Tranche 1.

[11]  There shall be no obligation on Genesis or DCG to convert any proceeds or consideration into BTC to accomplish such reduction in kind.  Tranche 2 shall be reduced by the value received in BTC.  The remainder of any value received shall be applied to reduce Tranche 1.

[12]  It is expected that the Book Value will be consistent with preliminary December balance sheets reviewed by DCG on January 19, 2023 that included Book Values of $85 million and $111 million for GGML and GGT, respectively.

| | |
|---|---|
| | "Mandatory Prepayment Amount" shall mean an amount equal to: |
| | (i)    in the event of a Sale Transaction, the greater of (x) the resulting proceeds (as determined by the Parties or an Independent Accounting Firm) and (y) the Book Value of each relevant Subject Entity; |
| | (ii)    in the event of a Wind-Down, an amount equal to the collective Book Values of all relevant Subject Entities *less* $3.0 million and $12.0 million as the Book Value reductions in a Wind-Down for GGML and GGT, respectively; |
| | (iii)    in the event there is neither a Sale Transaction nor a Wind-Down, the Book Value for the relevant Subject Entity. |
| | "Sale Process Consummation Date" means either (i) the effective date of a Monetization Transaction; or (ii) the date on which GGH, in consultation with the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, DCG, and the Committee, notifies the GGC Creditors that it has elected not to enter into a Monetization Transaction. |
| | "Subject Entities" means (i) GGT and (ii) GGML. |
| **Existing DCG 2032 Note** | In exchange for, and in full and final satisfaction of the obligations arising under, the Existing DCG 2032 Note (including any accrued and unpaid interest thereunder), DCG shall establish and issue, or cause a Permitted Subsidiary[13] or successor-in-interest to DCG to establish and issue (such successor or each Permitted Subsidiary, an "Alternative DCG Issuer"), a class of convertible Preferred Stock (the "Preferred Stock") upon the Plan Effective Date, which Preferred Stock shall be distributed as set forth below. |
| | • Deemed Issuance Date:  September 30, 2023. |
| | • PIK Rate:  The paid-in-kind rate ("PIK Rate") for the Preferred Stock shall be ten percent (10%) until December 31, 2027. |
| | • Preferred Value: Shall be $575 million as of the Deemed Issuance Date and, with respect to any calendar quarter starting after the Deemed Issuance Date, accrete on a quarterly basis on the last day of each calendar quarter (the "Quarterly Accretion") in an amount determined based on the following formula, as reflected in Table 1 below: |
| | Quarterly Accretion = (Applicable Preferred Value * (1 + PIK Rate) ^ Interest Period) – Applicable Preferred Value |
| | For the avoidance of doubt, the accretion shall continue even during periods when the Cash Rate is applicable. |
| | • Cash Rate:  The cash pay rate (the "Cash Rate") for the Preferred Stock shall be ten and one half percent (10.5%).  Effective as of December 31, 2027, but solely to the extent DCG or any Alternative DCG Issuer has not satisfied the DCG Listing Commitment (as defined below), the Cash Rate shall increase by an additional one percent (1%) every six (6) months thereafter until either (i) the DCG Listing |

---

[13] "Permitted Subsidiary" means a wholly-owned or controlled subsidiary of DCG agreed to by DCG, GGH, the Consenting GGC Creditors, and the Ad Hoc Group Advisors.

Commitment has been satisfied or (ii) the Preferred Stock has been repurchased or redeemed in full by DCG, or if applicable, the Alternative DCG Issuer.

- <u>Cash Rate Applicability</u>: If, by June 30, 2025, DCG or any Alternative DCG Issuer has not fulfilled all necessary requirements of a Listing (as described under the header "Listing" below) to list freely tradeable Exchanged Common Equity (the "<u>DCG Listing Commitment</u>") on an Approved Exchange (as defined below), then the Cash Rate shall be applicable and remain applicable until such time as DCG or any Alternative DCG Issuer fulfills the DCG Listing Commitment.

- <u>Cash Pay Interest</u>: For the period during which the Cash Rate is applicable (as described above), with respect to any calendar quarter, cash interest shall be paid on a quarterly basis on the first business day of the following quarter ("<u>Quarterly Cash Pay Interest</u>") in an amount equal to the product of:

Applicable Preferred Value * Cash Rate * Interest Period

For the convenience of the Parties, an illustrative example of the calculation of the Quarterly Cash Pay Interest is attached hereto as Exhibit 1

| Table 1: Preferred Schedule ($mm) | | | | |
|---|---|---|---|---|
| Date | Preferred Value | PIK Rate | Cash Rate | Quarterly Cash Interest[1] |
| Effective Date | $575.0 | - | - | - |
| 9/30/2023 | 575.0 | 10.00% | - | - |
| 12/31/2023 | 589.0 | 10.00% | - | - |
| 3/31/2024 | 603.1 | 10.00% | - | - |
| 6/30/2024 | 617.6 | 10.00% | - | - |
| 9/30/2024 | 632.7 | 10.00% | - | - |
| 12/31/2024 | 648.0 | 10.00% | - | - |
| 3/31/2025 | 663.5 | 10.00% | - | - |
| 6/30/2025 | 679.4 | 10.00% | 10.50% | 18.0 |
| 9/30/2025 | 695.9 | 10.00% | 10.50% | 18.4 |
| 12/31/2025 | 712.9 | 10.00% | 10.50% | 18.5 |
| 3/31/2026 | 729.8 | 10.00% | 10.50% | 19.1 |
| 6/30/2026 | 747.4 | 10.00% | 10.50% | 19.8 |
| 9/30/2026 | 765.5 | 10.00% | 10.50% | 20.3 |
| 12/31/2026 | 784.1 | 10.00% | 10.50% | 20.3 |
| 3/31/2027 | 802.8 | 10.00% | 10.50% | 21.0 |
| 6/30/2027 | 822.1 | 10.00% | 10.50% | 21.8 |
| 9/30/2027 | 842.1 | 10.00% | 10.50% | 22.3 |
| 12/31/2027 | 862.6 | - | 10.50% | 22.6 |
| 3/31/2028 | 862.6 | - | 10.50% | 22.6 |
| 6/30/2028 | 862.6 | - | 11.50% | 25.0 |
| 9/30/2028 | 862.6 | - | 11.50% | 25.0 |
| 12/31/2028 | 862.6 | - | 12.50% | 26.6 |
| Thereafter[2] | 862.6 | - | | |

*1. Cash interest paid quarterly on the first business day of the following quarter*

*2. If outstanding, cash interest rate increases by 1% every 6 months in perpetuity*

- Initial Preferred Stock Shares: Upon the Plan Effective Date, DCG shall issue, or shall cause an Alternative DCG Issuer to issue, the shares of Preferred Stock to (x) the GGC Creditors Trust, (y) Genesis for distribution to the GGC Creditors, or (z) to the GGC Creditors directly (as agreed upon by DCG and Genesis) in a number of shares to be determined by DCG (and reasonably agreed to by the Required Consenting GGC Creditors) prior to the PSA Effective Date (the "Initial Preferred Stock Shares").

- Conversion: Prior to satisfaction of the DCG Listing Commitment,

  o Holders of Preferred Stock may provide a notice of conversion ("Conversion Notice") at any time.

  o Preferred Stock that is subject of a Conversion Notice provided during the period beginning twenty (20) calendar days prior to the Applicable Quarterly Valuation Deadline and ending on the twentieth (20th) day following an Applicable Valuation Date (an "Exclusive Conversion Period") shall convert at the end of such Exclusive Conversion Period.

  o Preferred Stock that is subject of a Conversion Notice provided not during an Exclusive Conversion Period shall convert at the earlier of (i) the end of the next Exclusive Conversion Period and (ii) the first business day of the calendar quarter following satisfaction of the DCG Listing Commitment.

  o Following satisfaction of the DCG Listing Commitment, the Preferred Stock shall, on the first business day of each calendar quarter after the issuance of the Preferred Stock, be voluntarily convertible at the election of the holder of such Preferred Stock and mandatorily converted by DCG on December 31, 2027 (any such conversion of Preferred Stock, a "Conversion" and the date of each such Conversion, a "Conversion Date").

- Conversion Amount: The Preferred Stock shall convert into the number of shares of Exchanged Common Equity (the "Exchanged Common Equity Shares") such that the number of Exchanged Common Equity Shares received by the converting holders of the Preferred Stock *divided by* the number of DCG Outstanding Shares (after giving effect to the issuance of Exchanged Common Equity Shares and True-Up Shares) as of the Conversion Date is equal to Ratio B (as outlined in the equation below).

- Exchanged Common Equity Shares = Ratio B * the number of DCG Outstanding Shares (after giving effect to the issuance of Exchanged Common Equity Shares and True-Up Shares)

For the convenience of the Parties, an illustrative hypothetical example of the determination of the Conversion Amount at various hypothetical Conversion Dates is attached hereto as Exhibit 2.

- "Ratio A" shall mean, with respect to each Conversion Date, the quotient of (a) the number of shares of Preferred Stock being converted on such Conversion Date *divided by* (b) Initial Preferred Stock Shares.

- "Ratio B" shall mean the quotient of (a) the Preferred Value on the Conversion Date (as shown in Table 1) *multiplied by* Ratio A *divided by* (b) DCG Equity Value as of such Conversion Date. Notwithstanding the foregoing, upon any Conversion of shares of Preferred Stock, Ratio B shall at all times be subject to the Collar (as defined below). For the avoidance of doubt, for purposes of calculating Ratio B, the Preferred Value on the Conversion Date will be as shown in Table 1 and will not be affected by any prior Conversions or Redemptions.

- Voting Rights: All Preferred Stock shall be non-voting. DCG Exchanged Common Equity Shares shall be voting shares with substantially the same voting rights as the Class [•] of common stock of DCG have as of the date hereof.

- DCG Redemption Right: The Preferred Stock (or the equivalent thereof of any applicable Alternative DCG Issuer), in whole or in part, shall be redeemable by DCG (or the Alternative DCG Issuer, if applicable), at its election upon delivery by DCG (or the Alternative DCG Issuer, if applicable) to the applicable holders of a notice of such redemption (a "Redemption Notice"), for cash at a per share price equal to: (x) the Applicable Preferred Value (as shown in Table 1), as of the effective date of such redemption (and not the date of such Redemption Notice), divided by (y) the total number of Initial Preferred Stock Shares (a "Redemption," and the cost thereof, the "Redemption Price"); provided, however, that the DCG Redemption Right shall be suspended during (i) any Exclusive Conversion Period and (ii) any period during which a Quarterly Valuation is due but not delivered. The foregoing notwithstanding, once the DCG Listing Commitment has been satisfied, there shall be no further Exclusive Conversion Periods and the DCG Redemption Right shall be exercisable at any time. For the avoidance of doubt, no Preferred Stock (or the equivalent thereof of any applicable Alternative DCG Issuer) subject to a Redemption Notice may be converted following the delivery of a Redemption Notice. Furthermore, any Redemption Notice by DCG shall be deemed automatically terminated at the start of the next Exclusive Conversion Period if no Redemption has occurred.

- Collar: Upon the Conversion of any shares of Preferred Stock, the calculation of Ratio B for purposes of calculating the number of Exchanged Common Equity Shares to be issued in connection with such Conversion shall be subject in all cases to a minimum equity ownership threshold in DCG of twenty percent (20%) *multiplied by* Ratio A and an equity ownership cap of forty percent (40%) *multiplied by* Ratio A;[14] provided, however, that the Collar shall be adjusted as necessary to be considered economically neutral to the holders of Preferred Stock if such Preferred Stock is issued by the Alternative DCG Issuer.

---

[14] Subject to applicable law, in the event that this proposal is not accepted by creditors holding at least $2.4 billion of asserted claims against GGC on or before the date that is seven days following the PSA Effective Date, the equity ownership floor shall be 10% *multiplied by* Ratio A and the equity ownership cap shall be 30% *multiplied by* Ratio A.

- **Quarterly True-Up**: Upon each Conversion Date, if any holder of Exchanged Common Equity Shares that elected to convert in a prior quarter (an "<u>Existing Holder</u>") is subject to dilution from a holder of Preferred Stock shares electing to convert on such Conversion Date (a "<u>New Holder</u>") such that the ratio of Exchanged Common Equity Shares held by the Existing Holder divided by the number of DCG Outstanding Shares (after giving effect to such Conversion) is less than the Existing Holder's Initial Conversion Ratio, such Existing Holder will receive additional shares of DCG common equity ("<u>True-Up Shares</u>") such that the aggregate number of shares of DCG common equity (inclusive of Exchanged Common Equity Shares and True-Up Shares) held by such Existing Holder divided by DCG Outstanding Shares (after giving effect to the issuance of Exchanged Common Equity Shares and True-Up Shares) is equal to such Existing Holder's Initial Conversion Ratio, subject to dilution for issuances of DCG common equity other than the Exchanged Common Equity.[15]

- **Priority**: Prior to Conversion in full, the Preferred Stock shall be (a) subordinated only to debt and (b) senior to any other equity interests in DCG or the Alternative DCG Issuer, as applicable, in any insolvency. DCG shall not be permitted to issue another class of shares senior to DCG Existing Equity or incur any funded indebtedness in excess of the Debt Limit, in each case, so long as any Preferred Stock remains outstanding.

- **Listing**: DCG shall use commercially reasonable efforts to register and list the Exchanged Common Equity Shares on any Approved Exchange by February 15, 2025 (the "<u>Listing Deadline</u>"), and the Exchanged Common Equity Shares shall be freely tradeable (whether by registration or otherwise) by holders thereafter (other than as the result of (x) transfer restrictions arising as a result of such holders' status, such as an "affiliate" of the relevant issuer, or (y) any lock-up period applicable to any holder of Exchanged Common Equity Shares, the terms of which lock-up period shall be the same as or better for such holders of Exchanged Common Equity Shares than the terms of any lock-up to which any other holder of DCG Existing Equity will be subject in connection with the same offering. DCG shall provide to the GGC Creditors and their advisors all information reasonably necessary for the GGC Creditors and their advisors to facilitate a transaction to liquidate the Preferred Stock or Exchanged Common Equity Shares (to the extent permitted hereunder).

- **Registration Information**: GGC Creditors and, to the extent applicable, their advisors will provide DCG with all information reasonably necessary for Listing, and, subject to the terms hereof, shall (x) accept the terms of the offering as agreed upon by DCG and (y) complete and execute all such reasonably customary agreements, lock-up letters, and other documents required by the underwriter or reasonably requested by DCG; <u>provided</u> that the terms of any lock-up period shall be the same as or better for such holders of Exchanged Common Equity than the terms of any lock-up to which any other holder of DCG Existing Equity will be subject in connection with the same offering.

---

[15] The Plan Support Agreement will address issues related to dilution for issuances of DCG common equity other than the Exchanged Common Equity.

- Dividends to Equity: DCG or the Alternative DCG Issuer, as applicable, shall be prohibited from paying any dividend on account of the DCG Existing Shares so long as any Preferred Stock remains outstanding.

- Participation on Liquidation: In the event of a liquidation of DCG or the Alternative DCG Issuer, as applicable, the outstanding Preferred Stock shall be entitled to receive proceeds equal to the outstanding liquidation preference based on the Preferred Value of such outstanding Preferred Stock at the time of liquidation.

- Tax Treatment: The Parties agree that the Preferred Stock does not constitute "preferred stock" for purposes of Section 305 of the Internal Revenue Code, and the Parties shall report consistent with such treatment in the absence of a "determination."[16]

- Alienability: Prior to Registration, if the Preferred Stock is issued or distributed to the GGC Creditors, the Preferred Stock and the Exchanged Common Equity may be freely sold or transferred by GGC Creditors for cash or other consideration in one or more transactions, subject in all respects to compliance with applicable securities laws.

- Other Terms: Customary minority shareholder provisions (to be mutually agreed by DCG and the Required Consenting GGC Creditors prior to the Plan Effective Date) shall be automatically implemented upon conversion of any Preferred Stock.

- Reporting: For so long as the Preferred Stock remains outstanding, and is not registered pursuant to Section 12(g) of the Exchange Act, DCG shall distribute to all stockholders (including holders of the Preferred Stock or Exchanged Common Equity), on a "public basis", annual and quarterly financial statements, in each case, within customary time periods to be agreed.

- Other Distributions prior to Conversion. The following shall be contributed by DCG to the GGC Creditors Trust:

  o The first $25 million in value of any proceeds or consideration, which may be in-kind, that DCG recovers from TAC pursuant to the TAC Liquidation Proceeding, without any reduction in value in the Preferred Stock;

  o All cryptocurrency or digital assets identified in Schedule A of that certain Pledge Agreement dated January 27, 2022, by and between GAP and Three Arrows Capital Ltd. ("Pledged Tokens"), recovered from TAC pursuant to the TAC Liquidation Proceeding, without any reduction in value in the Preferred Stock; and

  o Any value that DCG recovers from TAC pursuant to the TAC liquidation proceeding in excess of $25 million (and without regard to the value of any Pledged Tokens that are recovered), which shall reduce the amount of the Preferred Value (at the time of such distribution) so long any Preferred Stock

---

[16] Subject to ongoing tax review.

remains outstanding by an amount equal to the value of any distribution pursuant to this sub-bullet.

- <u>Certain Definitions Applicable to this Section</u>:  Capitalized terms used above shall have the following meanings:

"<u>Applicable Quarterly Valuation Deadline</u>" means, with respect to each fiscal quarter, the date on which a Quarterly Valuation for such fiscal quarter is to be made available to all holders of the Preferred Stock, which date for each fiscal quarter will be mutually agreed by Genesis, DCG and the Required Consenting GGC Creditors in the Plan Support Agreement.

"<u>Applicable Preferred Value</u>" means, with respect to any calendar quarter for which the Quarterly Accretion is to be calculated and/or the Quarterly Cash Pay Interest is due, as applicable, the Preferred Value on the first day of such calendar quarter.

"<u>Approved Exchange</u>" means any exchange set forth on the Exchange List or any other exchange selected by DCG not included thereon that is otherwise consented to by the Required Consenting GGC Creditors (which consent shall not be unreasonably withheld, conditioned, or delayed).

"<u>Interest Period</u>" means the ratio equal to (i) the number of days elapsed during the calendar quarter for which the Quarterly Accretion is to be calculated and/or the Quarterly Cash Pay Interest is due, as applicable, divided by (ii) 365 days.

"<u>DCG Equity Value</u>" means the fair market value of DCG Outstanding Shares (after giving effect to the contemplated issuance of shares of Exchanged Common Equity and True-Up Shares on a given Conversion Date) as determined by the Independent Valuator. Any such determination of DCG Equity Value (each, a "<u>Quarterly Valuation</u>") shall be delivered to DCG by the Independent Valuator quarterly and shall be made available to all holders of the Preferred Stock and Exchanged Common Equity thereafter (the most recent date on which any such Quarterly Valuation was made available to all holders of the Preferred Stock, the "<u>Applicable Valuation Date</u>").

"<u>DCG Outstanding Shares</u>" means the number of shares of DCG common stock (or the equivalent thereof of any applicable Alternative DCG Issuer) equal to (a) DCG Existing Shares plus (b) any shares of Exchanged Common Equity previously issued in connection with any Conversion of the Preferred Stock.

"<u>Exchange List</u>" means the list of exchanges upon which DCG may list the Exchanged Common Equity for it to be considered freely tradeable in satisfaction of the DCG Listing Commitment.  The Exchange List shall be mutually agreed upon by DCG, Genesis, and the Required Consenting GGC Creditors in good faith and attached as an exhibit to the Plan Support Agreement.[17]  Notwithstanding the foregoing, DCG can satisfy the DCG

---

[17]  It is the Parties' intent that the exchanges on the Exchange List shall: (i) provide, to the extent reasonably practicable, for the Exchanged Common Equity to trade in the most liquid, accessible market for the Exchanged Common Equity; and (ii) include, without limitation, OTC markets (other than Pink Sheets) and the junior markets of the major exchanges, including, without limitation, TSX Venture Exchange and AIM (London Stock Exchange).

<table>
<tr>
<td></td>
<td>Listing Commitment by listing on a U.S. exchange not included on the Exchange List with the consent of the Required Consenting GGC Creditors.

"<u>Exchanged Common Equity</u>" shall mean any shares of Class [•] common stock of DCG (or the equivalent thereof of any Alternative DCG Issuer) ("<u>DCG Exchanged Common Equity</u>") exchanged and distributed to the GGC Creditors Trustee, as agent for and on behalf of the GGC Creditors, or the GGC Creditors directly, as applicable, pursuant to the exercise of the Preferred Stock in accordance with the terms set forth herein.

"<u>Independent Valuator</u>" means a nationally recognized corporate valuation firm, to be selected prior to the Plan Effective Date by mutual agreement among DCG, Genesis, and the Ad Hoc Group Advisors in good faith.

"<u>TAC</u>" shall mean Three Arrows Capital, Ltd and any of its affiliates or subsidiaries.

"<u>TAC Liquidation Proceeding</u>" shall mean that certain liquidation proceeding captioned *In the Matter of Three Arrows Capital Ltd. and in the Matter of Sections 159(1) and 162(1)(a) and (b) of the Insolvency Act 2003*, Claim No. BVIHC(COM)2022/0119 before the Eastern Caribbean Supreme Court in the High Court of Justice in the British Virgin Islands and the chapter 15 foreign recognition proceeding captioned *In re Three Arrows Capital, Ltd.*, No. 22-10920 (Bankr. S.D.N.Y. Jul. 1, 2022).

"<u>TAC Recovery</u>" shall have the meaning set forth in the Existing DCG 2032 Note.</td>
</tr>
<tr>
<td>**Dilution of Existing Equity**</td>
<td>The DCG Existing Shares shall be diluted by the issuance of the Exchanged Common Equity.</td>
</tr>
<tr>
<td colspan="2" align="center">**OTHER MATERIAL TRANSACTION TERMS**</td>
</tr>
<tr>
<td>**Plan of Reorganization**</td>
<td>The Genesis Debtors shall file an Amended Plan, revised to reflect the terms and conditions set forth in this Term Sheet, no later than ten (10) days after the PSA Effective Date. Under the Amended Plan, the claims of the Gemini Lenders (as defined below) against GGC (the "<u>Gemini Lender Claims</u>") will be classified in their own class(es), separate from the claims of the other GGC Creditors, and will receive substantially similar recoveries as the claims of the other GGC Creditors, except for the Gemini-specific release provision and Convenience Class provision set forth below. Treatment of GGC Creditor Claims shall be consistent with the terms set forth herein and subject to the consent of the Required Consenting GGC Creditors, which consent shall not be unreasonably withheld, conditioned, or delayed. Treatment of the Gemini Lender Claims shall be consistent with the terms set forth herein and subject to the consent of Gemini, which consent shall not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing and anything to the contrary in this Term Sheet, to the extent the treatment of GGC Creditor Claims and Gemini Lender Claims under the Amended Plan is consistent with this Term Sheet and the Plan Support Agreement, and does not include any other materially disproportionate or otherwise adverse treatment, the Parties will be deemed to consent to such treatment. In the event that either this Term Sheet or the Plan Support Agreement is terminated as to any Party, such Party and the Genesis Debtors reserve all rights and defenses with respect to the classification of claims under the Amended Plan or any other chapter 11 plan pertaining to the Genesis Debtors.[18]</td>
</tr>
</table>

---

[18] For the avoidance of doubt, notwithstanding anything to the contrary herein or in the Plan Support Agreement, nothing in this Term Sheet or in the Plan Support Agreement is intended to be, shall be, or shall be construed to

|  | The Amended Plan may include, with the consent of Gemini (such consent not to be unreasonably withheld, conditioned, or delayed), a convenience class (the "Convenience Class") in which any Gemini Lender that (i) holds Gemini Lender Claims in the aggregate under a threshold amount (to be determined by the Genesis Debtors with the consent of DCG, Gemini, the Required Consenting GGC Creditors, and the Committee, such consent not to be unreasonably withheld, conditioned, or delayed) or (ii) agrees to reduce the amount of its claims to such threshold amount, may elect to participate.[19] |
|--|--|
|  | In lieu of distributions of the New Second Lien Facility and the Preferred Stock, members of the Convenience Class may receive in cash a recovery percentage to be agreed upon by the Genesis Debtors, Gemini, DCG, and the Required GGC Consenting Creditors (the "CC Recovery Rate"); provided that the CC Recovery Rate shall not exceed the net present value of the recovery rate of other GGC Creditors under the Amended Plan. |
|  | If a Gemini Lender consents to a third-party release of its direct claims against the Gemini Parties, such Gemini Lender shall be entitled to receive, in addition to the treatment provided to all holders of allowed GGC Creditor Claims and to the extent not paid in full pursuant to the Amended Plan, its *pro rata* share (among all consenting Gemini Lenders) of the Cash Contribution. Gemini Lenders that elect not to provide the third-party release of their claims against the Gemini Parties shall retain their direct claims against the Gemini Parties and shall not be entitled to any recovery from the Cash Contribution. |
|  | For the avoidance of doubt, no Gemini Lender will be paid more than in full pursuant to the Amended Plan. |
|  | For purposes of distributions to be made under the Amended Plan, Gemini shall be deemed to be the holder of all Gemini Lender Claims, and all distributions on account of such allowed Gemini Lender Claims shall be made to Gemini and held in trust in a segregated account for the benefit of the holders of allowed Gemini Lender Claims. As soon as practicable following the Plan Effective Date, Gemini shall arrange to deliver or direct the delivery of such distributions to or on behalf of the holders of allowed Gemini Lender Claims, subject to any modifications, with the consent of Gemini (such consent not to be unreasonably withheld, conditioned, or delayed), to such distributions in accordance with the terms of the Amended Plan. |
|  | "Gemini Parties" means Gemini, its predecessors, successors and assigns, parents, subsidiaries, affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants and nominees. |
| **Gemini Support** | Gemini is executing this Term Sheet on its own behalf and in its capacity as agent for its retail users participating in the Earn program (the "Gemini Lenders") pursuant to that certain Master Digital Asset Loan Agreement entered into among each Gemini Lender, Gemini, and GGC (the "Gemini MDLA") and other agreements between each Gemini |

---

be an admission by any Consenting GGC Creditor as to the propriety of, or legal justification for, the classification of claims in the Amended Plan or any other chapter 11 plan pertaining to the Genesis Debtors.

[19] Parties to discuss the addition of a separate convenience class for non-Gemini claimants.

| | |
|---|---|
| | Lender and Gemini (together with the Gemini MDLA, the "Earn Agreements"). Gemini, when acting as agent, will do so only pursuant to the authority granted to Gemini to act on behalf of such Gemini Lenders in the Earn Agreements. Gemini shall use commercially reasonable efforts to encourage the Gemini Lenders to support the Transactions through voting to accept the Amended Plan. Gemini, in its individual capacity, shall be considered a "Consenting GGC Creditor" under this Term Sheet and the Plan Support Agreement only with respect to the amount of claims that it actually controls for purposes of voting to accept or reject the Amended Plan, if any. |
| **Disposition of Gemini Earn Collateral** | On November 16, 2022, Gemini purportedly foreclosed upon collateral maintained by Gemini with respect to the Gemini Lenders (the "Gemini Collateral"). As of the Petition Date, the Parties agree that the value of the Gemini Collateral was $354,180,262 (the "Petition Date Collateral Value"). To the extent that the value of the Gemini Foreclosed Collateral as of the Plan Effective Date is greater than the Petition Date Collateral Value, the amount of any such increase in value shall be referred to as the "Postpetition Appreciation". In no event shall the Genesis Debtors be obligated to provide any adequate protection to the Gemini Lenders as a result of any diminution in value of the Gemini Collateral.

Disposition of Gemini Foreclosed Collateral: The Petition Date Collateral Value shall be applied *pro rata* to the amounts owed to the Gemini Lenders by GGC to reduce the amount of such liability as of the Petition Date. On or as soon as reasonably practicable after the Plan Effective Date, Gemini shall distribute to each holder of an allowed Gemini Lender Claim its *pro rata* share of the Petition Date Collateral Value and the Postpetition Appreciation; *provided* that the Postpetition Appreciation shall (i) be deemed a distribution under the Amended Plan and (ii) not reduce such Gemini Lender Claims for purposes of calculating *pro rata* distributions with other GGC Creditors. For the avoidance of doubt, on the Plan Effective Date, the Genesis Debtors waive all rights, claims, and interests in or to the Gemini Collateral. |
| **Fiduciary Out** | Notwithstanding anything to the contrary in this Term Sheet or the Definitive Documentation, to the extent that (a) any of the Genesis boards of directors (or comparable governing member or body) or (b) any Consenting GGC Creditors appointed to an official committee under chapter 11 of the Bankruptcy Code, determine in good faith, based on the advice of counsel, that fiduciary obligations of the respective Party under applicable law require such Party to take or refrain from taking any action contemplated under this Term Sheet or the Plan Support Agreement, Genesis or any such Consenting GGC Creditor may, upon ten (10) business days' advance written notice to the other Parties, terminate this Term Sheet or the Plan Support Agreement, in the case of such Consenting GGC Creditor, as to itself, and in the case of Genesis, as to all Parties, without incurring any liability to any one or more of the Parties.

Notwithstanding anything to the contrary herein, nothing in this Term Sheet, the Plan Support Agreement, or the Definitive Documents shall create any additional fiduciary obligations on the part of any Party or any members, managers, or officers thereof, in such respective capacities, that did not exist prior to entry into this Term Sheet. |
| **PSA Effective Date** | The date (the "PSA Effective Date") upon which the Plan Support Agreement becomes effective pursuant to its terms, including the condition that the Plan Support Agreement has been executed by the following Parties: (i) holders or representatives of at least $2.4 billion |

| | in aggregate outstanding claims currently held, controlled, or represented by the Ad Hoc Group against GGC; (ii) DCG; (iii) Genesis; and (iv) Gemini. |
|---|---|
| **Governance** | In consideration for the Exchanged Common Equity to be provided in accordance with the terms herein, upon Conversion, the Required Consenting GGC Creditors shall have the option to elect up to two (2) independent members of the DCG board of directors with the reasonable consent of DCG (such consent not to be unreasonably withheld, conditioned, or delayed), depending on the percentage of GGC Creditors' equity ownership of DCG. |
| **Gemini Contribution** | In consideration for being included as a Released Party, on or as soon as reasonably practicable following the Plan Effective Date, as a contribution, Gemini will:<br><br>   i.   contribute cash in the amount of $100 million for the pro-rata benefit of Gemini Lender Claims that provide releases as provided for herein (the "Cash Contribution");<br>   ii.   distribute the Petition Date Collateral Value and the Postpetition Appreciation, if any, as set forth herein;<br>   iii.   release any and all claims, including, without limitation, contribution and or indemnity claims against all of the Released Parties; and<br>   iv.   distribute Gemini Lender recoveries to Gemini Lenders as set forth above.<br><br>The Cash Contribution shall be reduced *pro rata* by the percentage of Gemini Lenders that do not consent to grant the Gemini Parties third-party releases, as set forth above. |
| **Contribution of Avoidance Actions** | On or as soon as reasonably practicable following the Plan Effective Date, the Genesis Debtors will contribute to the GGC Creditors Trust any avoidance actions or similar actions that are not released under the Amended Plan. The GGC Creditors, including the Gemini Lenders, will be entitled to any proceeds therefrom, including, without limitation, the proceeds from any settlements thereof. |
| **Releases**[20] | Subject to the occurrence of the Plan Effective Date and the completion of the Special Committee's investigation of various potential causes of action against DCG and other persons, the Definitive Documents will contain customary mutual releases (the "Releases"), including a release of all claims by the Releasing Parties against the Released Parties relating in any way to the Genesis Debtors; *provided*, *however*, that the Amended Plan shall not release any avoidance actions, causes of action, or similar actions, which actions shall be contributed to the GGC Creditors Trust for the benefit of the GGC Creditors, except the Amended Plan shall release any avoidance actions, causes of action, or similar actions (x) with respect to DCG Parties, (y) in the event that each class of claims held by the GGC Creditors has voted to accepted the Amended Plan pursuant to section 1126(c) of the Bankruptcy Code (or is not impaired under the Amended Plan pursuant to section 1126(f) of the Bankruptcy Code), with respect to any entity or individual that is not entitled to vote on the Amended Plan because it received payment in full on its claims against GGC prior to the Petition Date, and (z) that could |

---

[20] The Special Committee has commenced an investigation with respect to certain prepetition transactions and communications. Genesis expects to be in a position to make a final recommendation as to whether the releases contemplated by this Term Sheet, the Plan Support Agreement and, as applicable, the Amended Plan are appropriate in advance of consummation of the transactions contemplated herein or the Genesis Debtors' proposed confirmation hearing, as applicable. For the avoidance of doubt, in the event that Genesis exercises its fiduciary out, the Plan Support Agreement will terminate as to all Parties.

23-10063-shl23-10063-shlDoc 800 Filed 02/10/23Doc 800Entered 02/10/23 16:05Filed 02/10/23Entered 02/10/23 16:05Main DocumentMain Document

Pg 23 of 32

| | |
|---|---|
| | be brought against any GGC Creditor (other than any GGC Creditor covered by the foregoing clause (y)) if (i) such GGC Creditor has elected to opt into a consensual third party release of its direct claims against the Released Parties and (ii) each class of claims held by the GGC Creditors has voted to accept the Amended Plan pursuant to section 1126(c) of the Bankruptcy Code (or is not impaired under the Amended Plan pursuant to section 1126(f) of the Bankruptcy Code). |
| | If at any time the Genesis Debtors determine not to pursue the releases by the Genesis Debtors in favor of the DCG Parties or the Gemini Parties as contemplated herein, DCG and/or Gemini (as applicable) shall have the right to terminate the Plan Support Agreement. |
| | "DCG Parties" means DCG, its predecessors, successors and assigns, parents, subsidiaries, affiliates, and all of their respective current and former officers and directors (other than in their capacities as current directors or officers of any the Genesis Debtors), principals, shareholders (and any fiduciaries or other agents of shareholders with any involvement related to the Genesis Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants and nominees. |
| | "Other Genesis Entities" shall mean, collectively, the subsidiaries of GGH other than GGC and GAP. |
| | "Released Parties" shall mean (i) the DCG Parties (including GGT), (ii) the Genesis Debtors, (iii) the Other Genesis Entities, (iv) the Consenting GGC Creditors, (v) the Gemini Parties, and (vi) the respective current and former affiliates, subsidiaries, members, managers, equity owners, employees, professionals, directors and officers (in each case in their respective capacities as such) of each of (i)–(v). |
| | "Releasing Parties" means (i) the DCG Parties (including GGT), (ii) the Genesis Debtors, (iii) the Other Genesis Entities, (iv) Gemini, and (v) the Consenting GGC Creditors. |
| | Nothing in this Term Sheet or the Plan Support Agreement will require any non-consensual third-party releases of parties other than the Genesis Debtors. |
| **Reimbursement of Fees and Expenses** | Upon the Plan Effective Date, subject to the terms and conditions of the existing fee reimbursement letters executed by Genesis, GGC shall (a) pay all accrued, but unpaid, documented fees and expenses of the Ad Hoc Group Advisors in connection with the Transactions and (b) reimburse the Ad Hoc Group Advisors on an ongoing and current basis for all the reasonable and documented fees and expenses incurred in connection with the Transaction. The Amended Plan shall provide that any fees and expenses of the foregoing advisors that are unpaid and invoiced as of the Plan Effective Date shall be paid no later than one (1) business day after the Plan Effective Date. |
| **Representations Regarding Holdings of the Consenting GGC Creditors** | Each Consenting GGC Creditor (i) either (A) is the sole legal and beneficial owner of the claims set forth below its name on the signature page hereof, free and clear of all claims, liens, and encumbrances, or (B) has sole investment and voting discretion with respect to the claims set forth below its name on the signature page hereof in respect of all matters, including those relating to the Transactions contemplated by this Term Sheet and the Definitive Documents and has the power and authority to bind the beneficial owner(s) of such claims to the Definitive Documents; and (ii) has full power and authority to act on |

| | |
|---|---|
| | behalf of, vote, and consent to matters concerning such claims with respect to matters relating to the Transactions contemplated by this Term Sheet, including, without limitation, the power and authority to vote on the Amended Plan, and dispose of, exchange, assign, and transfer such claims. Further, each Consenting GGC Creditor has made no prior assignment, sale, or other transfer of, and has not entered into any other agreement to assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such claims against the Genesis Debtors. |
| **Tax Structure** | The Parties will use good faith efforts to implement and structure the Transactions and all other transactions contemplated by this Term Sheet, including, without limitation, any distributions to be made pursuant to the Amended Plan, in a tax efficient manner, as mutually agreed to by Genesis, DCG, and the Required Consenting GGC Creditors. |
| **Regulatory Matters** | Genesis shall not enter into any binding settlement agreement in respect of (a) the litigation styled as *SEC v. Genesis Global Capital, LLC and Gemini Trust Company, LLC*, Case No. 1:23-cv-00271 (S.D.N.Y. Jan. 12, 2022) or (b) any other action or proceeding initiated by the Securities and Exchange Commission or other governmental or regulatory agency against Genesis prior to the Plan Effective Date, unless it has obtained approval of the Bankruptcy Court, upon notice and hearing. |
| **Forbearance / Standstill** | In connection with the execution of the Plan Support Agreement, until the earlier to occur of (a) ten (10) business days after the termination of the Plan Support Agreement and (b) the Plan Effective Date, (i) the Parties shall agree to a covenant not to commence or support any litigation or adversary proceedings against another Party or the DCG Parties (including GGT), and (ii) reasonably cooperate with respect to the defense of any pending or threatened litigations against any other Party solely to the extent that such litigation or adversary proceeding relates to the Genesis Debtors or any of the Transactions contemplated herein and; (ii) GGC shall waive any event of default, and forbear from exercising all remedies under the Existing DCG 2023 Loans; provided that, notwithstanding anything to the contrary in this Term Sheet, nothing in this Term Sheet or the Plan Support Agreement shall limit any Party from enforcing any rights under the Plan Support Agreement or the Definitive Documents, nor shall it limit the Special Committee's ability to conduct its investigation, including, without limitation, through Rule 2004 discovery. |
| **Extension of the Automatic Stay** | The Genesis Debtors may file a motion seeking, pursuant to section 105 of the Bankruptcy Code, to extend the automatic stay arising under section 362 of the Bankruptcy Code to the DCG Parties and/or the Gemini Parties until the earlier to occur of (x) ten (10) business days after the termination of the Plan Support Agreement, and (y) the Plan Effective Date. Each Party agrees not to, directly or indirectly, object to, delay, impede, or take any action that is reasonably likely to interfere with any such motion. |
| **Transfers and Acquisitions of Claims Against Genesis** | Each Consenting GGC Creditor agrees that, while this Term Sheet and the Plan Support Agreement remain effective according to their terms, it shall not sell, transfer, assign, or otherwise dispose of (collectively, "Transfer") any of its claims against Genesis Debtors, or any option thereon or any right or interest (voting or otherwise) in any of such claims (including, any participation therein), except to a person or entity that (i) is a Consenting GGC Creditor, it being understood and agreed that any such claims shall automatically be deemed to be subject to the terms of this Term Sheet and the Plan Support Agreement, or (ii) executes and delivers a joinder to Genesis on or prior to the date of the relevant |

| | Transfer, in which case such transferee shall be deemed to be a Consenting GGC Creditor for purposes of this Term Sheet and the Plan Support Agreement. Any Transfer of claims against Genesis Debtors by a Consenting GGC Creditor that does not comply with the procedures set forth in this Term Sheet and the Plan Support Agreement shall be deemed void *ab initio* without the need for further action. Each Consenting GGC Creditor agrees to provide to counsel for Genesis Debtors a notice in writing of any Transfer of a claim against Genesis Debtors within three (3) business days of the consummation of such Transfer. |
|---|---|
| | Each Consenting GGC Creditor agrees to provide to counsel for Genesis Debtors a notice in writing of the acquisition of any additional claims within two (2) business days of the consummation of the acquisition transaction. Any additional claims against Genesis Debtors that are acquired by a Consenting GGC Creditor shall automatically be deemed to be subject to the terms of this Term Sheet and the Plan Support Agreement. |
| **Definitive Documents** | This Term Sheet is indicative, and any final agreement shall be subject to the execution of one or more definitive agreements and transaction related documents, which documents shall be consistent in all material respects with the terms of this Term Sheet and shall contain terms, conditions, representations, warranties, and covenants, in each case, customary for the transactions described herein (collectively, the "<u>Definitive Documents</u>"). The Parties shall, in good faith, negotiate and finalize the Plan Support Agreement and Definitive Documents as promptly as reasonably possible, with the understanding that time is of the essence, and take such other steps as are reasonably necessary to document the agreements and transactions contemplated herein. |
| **Amendments** | For the avoidance of doubt, except as otherwise provided herein, this Term Sheet (and the corresponding provisions of the Plan Support Agreement) may not be modified, amended, or supplemented without the prior written consent of the Required Consenting GGC Creditors, Genesis, and DCG; *provided*, *however*, that any modification, amendment, supplement, or change to (a) the definition of Required Consenting GGC Creditors shall also require the consent of each Consenting GGC Creditor, (b) the "Releases" section shall also require the consent of each Consenting GGC Creditor that is, or may be, affected by such modification, amendment, supplement, or change, (c) the treatment of any creditor that results in the disproportionate treatment between GGC Creditors shall also require the consent of each affected Consenting GGC Creditor, (d) the Amendment Section of the Term Sheet and the Plan Support Agreement shall require the consent of each Consenting GGC Creditor, (e) the treatment of Gemini Lender Claims shall also require the consent of Gemini, and (f) the consent or consultation rights of the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, or Gemini shall require the consent of the Required Consenting GGC Creditors, the Ad Hoc Group Advisors, and Gemini. |

IN WITNESS WHEREOF, the Parties have executed and delivered this Term Sheet effective as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _____

Name: _____

Title: _____

**GENESIS GLOBAL HOLDCO, LLC, on behalf of itself and its subsidiaries**

By: _____

Name: _____

Title: _____

**GEMINI TRUST COMPANY, LLC, on behalf of itself and as agent provided for herein**


By: _____
Name: _____
Title: _____

Principal Amount of Claims Against GGC (in Its Individual Capacity):

**[CONSENTING GGC CREDITOR]**

By: _____

Name: _____

Title: _____

Principal Amount of Claims Against GGC:

## Exhibit 1 – Quarterly Cash Pay Interest Example

For example, interest accrued in the quarter ended September 30, 2025 is calculated using the accrued Preferred Value as of June 30, 2025 (~\$679 million) and would be payable on the first business day of October 2025 as follows:

$$\boldsymbol{Quarterly\ Cash\ Pay\ Interest} = \$679,412,284.12 \times 10.5\% \times \left(\frac{92}{365}\right) = \$17,981,157.99$$

## <u>Exhibit 2 - Hypothetical Preferred Conversion Example</u>

All assumptions contained within the hypothetical preferred conversion example detailed herein are illustrative in nature and do not reflect views on the anticipated number of Preferred Stock shares to be converted in a given quarter nor the DCG Equity Value at any point in time.

<u>12/31/2023 (First Conversion)</u>
Illustrative DCG Equity Value: $3.5 billion
Illustrative Number of Preferred Stock shares Converted: 100,000
Illustrative Initial Preferred Stock Shares: 1,000,000

$$Ratio\ A = \frac{100,000}{1,000,000} = 10.0\%$$

$$Ratio\ B = \frac{\$589.0\ million * 10.0\%}{\$3.5\ billion} = 1.68\%\ (Subject\ to\ Collar) = 2.00\%$$

$$Initial\ Conversion\ Ratio = 2.00\%$$

$$DCG\ Outstanding\ Shares^{21} = \frac{66,647,903}{1 - 2.00\%} = 68,008,064$$

$$Exchanged\ Common\ Equity\ Shares = \ 2.00\% \times 68,008,064 = 1,360,161$$

<u>3/31/2024 (New Holder Subsequent Conversion & Existing Holder True-Up)</u>
Illustrative DCG Equity Value: $4.5 billion
Illustrative Number of Preferred Stock shares Converted: 250,000
Illustrative Initial Preferred Stock Shares: 1,000,000

$$Ratio\ A = \frac{250,000}{1,000,000} = 25.0\%$$

$$Ratio\ B = \frac{\$603.1\ million * 25.0\%}{\$4.5\ billion} = 3.35\%\ (Subject\ to\ Collar) = 5.00\%$$

$$New\ Holder\ Initial\ Conversion\ Ratio = 5.00\%$$

$$Existing\ Holder\ Initial\ Conversion\ Ratio = 2.00\%$$

$$DCG\ Outstanding\ Shares^{23} = \frac{66,688,892}{1 - (5.00\% + 2.00\%)} = 71,708,486$$

---

[21]   Illustratively includes the dilutive impact of existing options based on treasury stock method at assumed DCG Equity Value prior to conversion of Preferred Stock on a given Conversion Date; DCG Existing Shares, DCG Outstanding Shares, True-Up Shares, and Exchanged Common Equity might change based on additional shares issued

$New\ Holder\ Exchanged\ Common\ Equity\ Shares = 5.00\% \times 71,708,486 = 3,585,424$

$Existing\ Holder\ True\text{-}Up\ Shares = 2.00\% \times 71,708,486 - 1,360,161 = 74,008$