## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM McGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and ALEX SOPINKA, individually and on behalf of all others similarly situated, Plaintiffs,<br><br>v.<br><br>DIGITAL CURRENCY GROUP, INC., and BARRY SILBERT, Defendants. | No. 3:23-cv-82 (SRU) |

## OPINION AND ORDER APPROVING REMO MARIA MORONE AND MEMBERS OF THE McGREEVY PLAINTIFF GROUP'S STIPULATION FOR APPOINTMENT AS CO-LEAD PLAINTIFFS AND APPROVING THEIR SELECTION OF COUNSEL

Before the Court is a proposed stipulation for appointment as joint lead plaintiffs in a securities class action arising under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Specifically, before the Court are motions for appointment as lead plaintiff by Remo Maria Morone, an individual (doc. no. 34); the McGreevy Plaintiff Group, a group consisting of four individuals and one entity (doc. no. 35); and a proposed stipulation by Morone and four members of the McGreevy Plaintiff Group seeking approval for appointment as co-lead plaintiffs (doc. no. 39). The proposed stipulation is unopposed. Each movant for lead plaintiff also moves for the appointment of its chosen counsel as lead counsel. For the reasons set forth in this order, I approve of the movants' stipulation to serve as co-lead plaintiffs and to appoint their attorneys, Kaplan Fox and Silver Golub & Teitell, as co-lead counsel.

I.      **Background**

   A.   Factual Allegations

Defendant Digital Currency Group ("DCG") is the parent entity of a conglomerate that includes Genesis Global Capital ("GGC") and, at all relevant times, the 100% owner of GGC. Compl, Doc. No. 1, at ¶ 3.  Defendant Barry Silbert is the founder of DCG, GGC, and several other DCG subsidiary companies.  *Id.* at ¶ 4.  Silbert is the controlling shareholder of DCG (owning 40%), chief executive officer of DCG, and chairman of DCG's board of directors.  *Id.*

Genesis Global Capital ran a borrowing and lending business for the DCG conglomerate, attracting capital from digital asset owners by offering high rates of return via interest on the lending transactions.  *Id.* at ¶ 5.  Genesis Global Capital borrowed digital assets from customers such as Plaintiffs and members of the putative classes via agreements sometimes styled "Master Digital Asset Loan Agreement(s)" (the "MDAL Agreement") and other times called "Master Borrow Agreement(s)" (collectively, the "Lending Agreements").  *Id.*  Genesis Global Capital pooled the borrowed digital assets and, at the direction of DCG and Silbert, deployed the assets pursuant to certain strategies designed to generate revenue for the DCG conglomerate and Silbert, and to pay lenders interest.  *See id*. ¶¶ 5-6.

Genesis Global Capital primarily borrowed digital assets via two programs: (1) directly from lenders able to meet minimum loan requirements, via Genesis Global Capital's "Institutional Lending and Borrowing Business" (the "Genesis Institutional Lending Program"); and (2) via the Gemini Earn program established by Gemini Trust Company, LLC ("Gemini"), which had no minimum loan requirement (collectively, the Genesis Institutional Lending Program and the Gemini Earn program are referred to as the "Lending Program(s)").  *Id.* ¶ 76.

Genesis Global Capital's Lending Agreements, as offered and sold, met the definition of investment contracts and notes under the federal securities laws, including the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77l(a)(1), 77o; nevertheless, subject to the direction and control of DCG and Silbert, GGC did not register the Lending Agreements with the U.S. Securities and Exchange Commission as required.  *See id.* ¶¶ 9-10.

In addition, DCG and Silbert deployed the digital assets Genesis Global Capital received from lenders in ways designed to line DCG's and Silbert's own pockets.  *Id.* ¶ 12.  For example, DCG and Silbert caused Genesis Global Capital to take on an unreasonable amount of counterparty concentration risk by lending almost 30% of GGC's total loan book to a single party: digital asset hedge fund Three Arrows Capital.  *Id.* at ¶ 14.  In June 2022, Three Arrows Capital declared bankruptcy.  *Id.* at ¶ 15.  After Three Arrows Capital liquidated its assets GGC was left with an uncollectable $1.1 billion debt.  *Id.*

The Three Arrows Capital debt was an impairment in value that GGC should have immediately recognized on its balance sheet regularly distributed to lenders such as Plaintiffs, members of the putative classes, and their agents.  *Id.*  Recognizing the impairment, however, would have meant that Genesis Global Capital recognized its own insolvency, which would have terminated all Lending Agreements and entitled lenders to the return of their digital assets.  *Id.* at ¶ 16.  Recognition also would have meant the end of the Genesis Global Capital's business and DCG's source of capital.  *Id.*  Instead of recognizing the impairment, then, DCG and Silbert directed and caused Genesis Global Capital to engage in a sham transaction designed to conceal GGC's insolvency.  *Id.*  At DCG and Silbert's direction, Genesis Global Capital proceeded to "sell" the uncollectable $1.1 billion Three Arrows Capital debt to DCG in exchange for a 10-year promissory note (the "DCG Promissory Note") due in 2032.  *Id.* ¶ 17.  Thereafter, Genesis

Global Capital circulated balance sheets and other documents containing misrepresentations about its solvency to Plaintiffs, members of the putative classes, and their agents to induce the parties to continue to loan GGC digital assets and/or to prevent them from requesting redemptions of their loans. *Id*. ¶ 19.  Genesis Global Capital also continued to represent and warrant, via the Lending Agreements, that it was solvent. *Id*. ¶ 19.  As a result, Genesis Global Capital represented in every lending transaction it executed on or after July 1, 2022 that it was solvent, when it was not. *Id*. ¶ 20.  Plaintiffs allege that GGC's misrepresentations and omissions concerning its solvency, made at the direction and subject to the control of DCG and Silbert, violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, which prohibit defrauding or deceiving someone, including through misrepresentation of material information, in connection with the purchase or sale of a security. *Id.* at ¶ 21.

In November 2022, Genesis Global Capital experienced a large number of withdrawal requests arising out of a loss of confidence in digital asset markets, which it could not honor because it lacked adequate funds. *Id*. ¶¶ 25-26.  On November 16, 2022, Genesis Global Capital suspended redemption requests, causing billions of dollars in losses to Plaintiffs and members of the putative classes in the form of uncollectable loans balances. *Id.* ¶¶ 26, 28.

On January 19, 2023, Genesis Global Capital and two affiliated entities filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York. *Id.* at ¶ 27.

B. <u>Procedural History</u>

On January 23, 2023, plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex Sopinka (the "McGreevy Plaintiff Group"), individually

and on behalf of all others similarly situated, filed the above-captioned action asserting violations

of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l(a)(1), 77o; the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); SEC Rule 10b-5, codified at 17

C.F.R. § 240.10b-5; and 15 U.S.C. § 78t(a), on behalf of the following proposed classes: (1) "All

persons or entities who participated in the Lending Programs from inception to November 16,

2022" (the "Unregistered Securities Offering"); and (2) "All persons or entities who participated

in the Lending Programs and had digital loans outstanding at Genesis Global Capital as of

November 16, 2022," with an alleged class period of February 2, 2021 through November 16,

2022 (the "Securities Fraud Class").  Compl., Doc. No. 1.

Counsel for the McGreevy Plaintiff Group caused a notice of the pendency of this

litigation to be filed on PRNewswire on January 23, 2023 ("the Notice").  Docs. No. 32, 32-1.

The Notice was addressed to "two putative classes of individuals and entities who loaned digital

assets pursuant to lending agreements to DCG's wholly owned subsidiary Genesis Global

Capital, LLC from February 2, 2021 through November 16, 2022" and detailed the claims in the

Complaint.  *Id.*  It set a sixty-day deadline for any member of the proposed classes to move to

serve as the lead plaintiff.  *Id.*

On March 24, 2023, the McGreevy Plaintiff Group moved under the PSLRA for

appointment as lead plaintiff and for approval of the group's selection of Silver Golub & Teitell

LLP ("Silver Golub") as lead counsel, enclosing a supporting memorandum and declaration of

Attorney Ian Sloss.  Docs. No. 35-38.  The McGreevy Plaintiff Group asserts that it incurred net

losses of 1,227,924.75 digital currency units, totaling approximately $8,798,171.36 in fiat

currency (valued as of March 20, 2023).  McGreevey Group Mem of Law, Doc. No. 37, at 12

(citing Sloss Decl., Exs. B-G, Docs. No. 38-1 through 38-7).  The group members report individual losses as follows:

| Plaintiff | Approximate Loss |
|---|---|
| William McGreevy | $305,367.46 |
| Ashwin Gowda | $631,290.90 |
| Translunar Crypto, LP | $7,487,653.22 |
| Christopher Buttenham | $253,794.70 |
| Alex Sopinka | $120,065.09 |
| TOTAL | $8,798,171.37 |

McGreevey Group Mem of Law, Doc. No. 37, at 10.

Also on March 24, 2023, Remo Maria Morone ("Morone") moved for appointment as lead plaintiff and for approval of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox") as lead counsel, enclosing a supporting memorandum and declaration of Attorney Andrew Crumbie.  Doc. No. 34.  Morone asserts that, as a result of his Class Period loans with Genesis Global Capital, he incurred losses of 1,243.6 digital currency units, totaling more than approximately 243.7 Bitcoin ("BTC) and 999.9 Ether ("ETH").  *Id*. at 13 (citing Morone Cert., Doc. No. 34-3).  Morone does not convert his alleged loss amount to fiat currency.  For purposes of an apples-to-apples comparison, the Court takes judicial notice of the values of the applicable digital currency units and estimates that Morone's losses approximate $6,780,490 in Bitcoin and $1,739,246 in Ethereum, totaling approximately $8,519,736 in fiat currency (valued as of March 20, 2023).[1]

No opposition to either motion was filed.

---

[1] Courts routinely take judicial notice of currency exchange rates.  *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 n.10 (1st Cir. 2008).  Accordingly, I conclude that I may take judicial notice of the value and exchange rate of the digital assets at issue in this matter.  *Accord Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 219 (E.D.N.Y.), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018) (taking judicial notice of the values of certain digital currencies).  According to Google's Market Summary, the exchange rate on March 20, 2023 was $1 BTC to $27,823.10 USD, and $1 ETH to $1,739.42 USD. *See* BTC/USD, *Google Finance*, https://www.google.com/finance/quote/BTC-USD?hl=en (accessed April 17, 2023); ETH/USD, *Google Finance*, https://www.google.com/finance/quote/ETH-USD?hl=en (accessed April 17, 2023).

On April 6, 2023, four members of the McGreevy Plaintiff Group—McGreevy, Gowda, Translunar Crypto LP, and Buttenham— and Morone filed a stipulation seeking an order appointing them co-lead plaintiffs and seeking approval for appointment of both Silver Golub and Kaplan Fox as co-lead counsel ("the Stipulation").  Doc. No. 39.  I treat the Stipulation as a joint application for appointment as lead plaintiffs, and I hereinafter refer to the members of the proposed stipulated lead plaintiff group as the "Joint Movants."  The Joint Movants assert that each proposed group member has: (i) alleged significant financial interests in the Action; and (ii) made a *prima facie* showing that they satisfy the adequacy and typicality requirements of Rule 23; that the interests of the putative classes will be best served by a combined group that represent various interests in the Action, including investors who have invested in securities offered via the Genesis Institutional Lending Program, and in securities sold via the Gemini Earn Program, utilizing the resources of movants and their respective selections of counsel; that they have agreed to work together to supervise the conduct of this litigation by their counsel, to ensure that counsel coordinate appropriately to avoid any duplication of effort in the conduct of the litigation, and to obtain the best possible outcome for the putative classes of investors, and they agreed that a group of five lead plaintiffs representing various interests would best serve the interests of the putative classes.  Stipulation, Doc. No. 39.

The Stipulation is unopposed.

## II.    Legal Standard

The PSLRA establishes the legal standard and procedures for selecting a lead plaintiff and lead counsel in a putative class action brought pursuant under the securities laws.  Within twenty days of filing the action, the plaintiff who files the first action must publish notice to the class.  15 U.S.C. § 78u–4(a)(3)(A)(I).  Within sixty days after publication of the notice, any

member or group of members of the proposed class may apply to the Court for appointment as

lead plaintiff, even if that member or group has not previously filed a complaint in the action.

*See id*. § 78u–4(a)(3)(A)-(B).  Within ninety days after publication of the notice, the Court must

consider any motion made by a purported class member and appoint as lead plaintiff the

"member or members of the purported plaintiff class that the court determines to be most capable

of adequately representing the interest of class members."  *Id*. § 78u-4(a)(3)(B)(i).  "The most

adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent

the class."  *Id.* § 78u-4(a)(3)(B)(v).

## III.    Discussion

### A.    Appointment of Lead Plaintiff

The PSLRA prescribes a two-step process for determining "the most adequate plaintiff."

First, under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff is:

> [T]he person or group of persons that--
>
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(A)(3)(b)(iii)(I).  Second, once a presumptive lead plaintiff has been

established, the Court must determine whether that presumption has been sufficiently "rebutted"

by a member of the purported plaintiff class.  *Id.* § 78u-4(a)(3)(B)(iii)(II)).  "Even when a motion

to appoint lead plaintiff is unopposed, the Court must still consider the factors under the PSLRA

to ensure that the movant is the most adequate plaintiff."  *Chitturi v. Kingold Jewelry, Inc.*, 2020

WL 8225336, at *4 (E.D.N.Y. Dec. 22, 2020) (citing *Nurlybaev v. ZTO Express (Cayman) Inc.*, 2017 WL 5256769, at *1 (S.D.N.Y. Nov. 13, 2017)).

Morone, the McGreevy Plaintiff Group, and the Joint Movants seek appointment as lead plaintiff.  I consider their motions for appointment as lead plaintiff and for approval of their choice of counsel.

1. *Notice to Class and Timely Motion for Appointment*

First, the plaintiff who files the first action must publish notice to the class within twenty days of filing the action in "a widely circulated national business-oriented publication or wire service," informing class members of (1) the pendency of the action; (2) the claims asserted therein; (3) the purported class period; and (4) the right to move the court to be appointed as lead plaintiff within sixty days of the publication of the notice.  *See* 15 U.S.C. § 78u–4(a)(3)(A)(I).  No party has objected to the adequacy of the Notice, but the Court has "an independent duty" to "scrutinize the published notice and ensure that the notice comports with the objectives of the PSLRA."  *Chitturi*, 2020 WL 8225336 at *3 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 1322721, at *2 (S.D.N.Y. June 1, 2005)).

I conclude that the Notice satisfies the PSLRA requirements, as set forth in 15 U.S.C. § 77z–1(a)(3)(A)(i).  The Notice was filed in *PRNewswire* on January 23, 2023, the same day the Complaint was filed.  *See* Notice, Doc. No. 32-1.  Courts in the Second Circuit routinely conclude that publication of a notice in *PRNewswire*, a widely-circulated national business-oriented wire service, constitutes sufficient notice for the purposes of the PSLRA.  *E.g.*, *City of Riviera Beach Gen. Emps. Ret. Sys. v. Macquarie Infrastructure Corp.*, 2019 WL 364570, at *5 (S.D.N.Y. Jan. 30, 2019).  The Notice also properly summarizes the allegations in the Complaint,

defines the relevant class period, and informs any potential lead plaintiff to move for appointment within sixty days of the date of publication.

I also conclude that the movants' applications were timely.  Based on the January 23, 2023 publication date, the sixty-day period in which members of the proposed classes could move to serve as lead plaintiff expired on March 24, 2023.  Morone and the McGreevy Plaintiff Group each timely sought appointment on March 24, 2023.  Docs. No. 34-35.  Although the Joint Movants' stipulation was filed after the sixty-day deadline on April 6, 2023, courts in Second Circuit "allow[] amended motions by groups that were configured after the sixty-day deadline where each member of the newly-formed group had previously filed a timely motion,' and where the group was not formed 'in order to secure lead plaintiff status' by 'manipulat[ing] the size of [the group's] financial loss.'"  *Peters v. Jinkosolar Holding Co.*, 2012 WL 946875, at *9-10 (S.D.N.Y. Mar. 19, 2012) (collecting cases).  Here, the members of the newly-formed group had previously filed timely motions, and the Stipulation does not appear to reflect an effort to manipulate the size of the losses suffered.  *See Baron v. Talkspace, Inc.*, 2022 WL 1912255, at *5 (S.D.N.Y. June 3, 2022).  Thus, the Stipulation is timely.

Accordingly, each of the prospective lead plaintiffs satisfy the first requirement.

2.  *Largest Financial Interest*

Second, under the PSLRA, there is a rebuttable presumption that the "most adequate plaintiff" is the movant with the "largest financial interest in the relief sought by the class," so long as the movant otherwise satisfies the requirements of Rule 23."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I).

Here, a person (Morone), a proposed group of persons and entities (the McGreevy Plaintiff Group), and the Joint Movants (a proposed group consisting of Morone and four

members of the five-member McGreevy Plaintiff Group) seek appointment as lead plaintiff.

Thus, as an initial matter, I must decide whether to permit the members of the McGreevy

Plaintiff Group to aggregate their financial interests with Morone in accordance with the

Stipulation.  *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 393

(S.D.N.Y. 2008); *Garnett v. RLX Tech. Inc.*, 2021 WL 3913541, at *5 (S.D.N.Y. Aug. 31, 2021)

(assessing aggregation in the context of a proposed stipulation).  Then I must determine which

potential lead plaintiff has the largest financial interest.

> a.   I may aggregate the interests of Morone and the members of the McGreevy
> Plaintiff Group

The PSLRA expressly allows a "group of persons" to be appointed as lead plaintiff, 15

U.S.C. § 78u-4(a)(3)(b)(iii)(I), but it does not provide any guidance for what a group "can or

should be, nor how its members must be related to one another."  *Varghese*, 589 F. Supp. 2d. at

392.  As a policy matter, the PSLRA was enacted to "prevent 'lawyer-driven' litigation, and to

ensure that 'parties with significant holdings in issuers, whose interests are more strongly aligned

with the class of shareholders, will participate in the litigation and exercise control over the

selection and actions of plaintiffs' counsel.'"  *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F.

Supp. 3d 607, 615 (S.D.N.Y. 2015) (internal citations omitted).  Therefore, plaintiffs with a

relationship that pre-dates the litigation may aggregate their financial interests and form a

putative lead plaintiff group with minimal court scrutiny.  *See Maliarov v. Eros Int'l PLC*, 2016

WL 1367246, at *5 (S.D.N.Y. Apr. 5, 2016).  On the other hand, when group members have

limited or no prior relationship, courts look skeptically at whether the grouping operates to

circumvent the purposes of the PSLRA.  *See Varghese*, 589 F. Supp. 2d at 392 (collecting cases).

Indeed, some courts refuse to permit a group of unrelated investors to aggregate their financial

interests to gain the status as lead plaintiff. *See id.*  Others say that the PSLRA's failure to prohibit groups indicates Congress's unwillingness to police the manner in which such groups form. *See id.*  Most courts only approve the grouping of unrelated investors "if such a grouping would best serve the class." *Varghese*, 589 F. Supp. 2d at 392.  Relevant here, a court is not bound by parties' stipulation to serve as co-lead plaintiffs, and a court must only approve of such stipulation upon a sufficient showing that the grouping is in the interest of the class. *See In re Donnkenny, Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y. 1997) (refusing to effectuate an agreement to appoint multiple lead plaintiffs where the parties offered no reason to do so).

To evaluate a lead plaintiff group, courts generally consider "(1) the size of the group; (2) the relationship between the parties; and (3) any evidence that the group was formed in bad faith." *Jinkosolar Holding Co.*, 2012 WL 946875 at *7; *see also Varghese*, 589 F. Supp. 2d at 392 (considering "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa").

First, the Joint Movants' proposed lead plaintiff group, consisting of five members, is "relatively small" and "presumptively cohesive." *Janbary v. Canadian Solar, Inc.*, 272 F.R.D. 112, 119 (S.D.N.Y. 2010); *see also Jinkosolar Holding Co.*,  2012 WL 946875 at *7 ("[C]ourts appear to generally agree that a group comprising five or fewer members is appropriate.").  Indeed, courts routinely approve of coalitions of lead plaintiffs in analogous cases involving digital assets.  *See* McGreevy Plaintiff Group's Mem of Law, Doc. No. 37, at 16 (citing *Lee v. Binance*, Dkt. No. 1:20-cv-02803-ALC, Doc. No. 40 (S.D.N.Y. Aug. 26, 2020) (approving a group of eight lead plaintiffs, including seven individuals— six of whom joined the action after it

was initially filed— in securities class action against crypto-asset exchange); *Underwood v. Coinbase Global Inc.*, Dkt. No. 1:21-cv-08353-PAE, Doc. No. 21, at *7-8 (S.D.N.Y. Jan 11, 2022) (approving a group of three individuals— one of whom joined after the action was initially filed— to serve as lead plaintiffs in securities class action against crypto-asset exchange); *Risley v. Universal Navigation Inc.*, Dkt. No. 1:22-cv-02780-KPF, Doc No. 40 (S.D.N.Y. July 29, 2022) (approving a group of six individuals as lead plaintiffs— five of whom joined the action after it was filed— in a securities class action against a so-called decentralized crypto-asset exchange)).

Second, the Joint Movants have sufficiently demonstrated that they can "function cohesively" and "effectively manage the litigation apart from lawyers." *Varghese*, 589 F. Supp. 2d at 392. Factors indicating the group's ability to function cohesively and separately from its lawyers include evidence of: "(1) the existence of a pre-litigation relationship between group members; (2) involvement of the group members in the litigation thus far; (3) plans for cooperation; (4) the sophistication of its members; and (5) whether the members chose outside counsel, and not vice versa." *Id.*

Here, the four members of the McGreevy Plaintiff Group worked together to conduct a pre-suit investigation, file the complaint, and jointly move for appointment of lead plaintiff. McGreevy Plaintiff Group's Mem of Law, Doc. No. 37, at 16. Although the McGreevy Plaintiff Group and Morone did not have a pre-existing relationship and initially moved separately for appointment as lead plaintiffs, the Joint Movants have since communicated through counsel and agreed to collaborate. Stipulation, Doc. No. 39, at 2-3 (memorializing counsel's meet-and-confer). Moreover, each of Buttenham, Gowda, McGreevy, Schmidt of Translunar Crypto LP, and Morone have certified that he is knowledgeable about the litigation, understands the

responsibilities of being a lead plaintiff, is committed to working cohesively and with counsel to actively prosecute the case, has established procedures to oversee the litigation and address any potential disagreements among fellow lead plaintiffs, and will otherwise fairly and adequately protect the interests of the class.  *See* McGreevy Cert, Doc. No. 38-2, at 2-3; Gowda Cert., Doc. No. 38-3, at 2-3; Schmidt Cert., Doc. No. 38-4, at 2-3; Buttenham Cert., Doc. No. 38-5, at 2-3; Morone Cert., Doc. No. 34-2, at 5; Stipulation, Doc. No. 39.  The Joint Movants further agree to collaborate "to supervise the conduct of this litigation by their counsel, to ensure that counsel coordinate appropriately to avoid any duplication of effort in the conduct of the litigation, and to obtain the best possible outcome for the putative Classes of investors. . . ."  Stipulation, Doc. No. 39, at 2.  Courts in this Circuit have determined that similar language illustrates potential lead plaintiffs' "'intent to participate directly'" in the litigation and their "'willingness and ability to serve as class representatives.'"  *Garnett v. RLX Tech. Inc*., 2021 WL 3913541, at *5 (S.D.N.Y. Aug. 31, 2021) (quoting *Janbay*, 272 F.R.D. at 119); *see also Perez v. HEXO Corp.*, 2020 WL 905753, at *3-4 (S.D.N.Y. Feb. 25, 2020) (appointing a group of investors that submitted a joint declaration demonstrating its ability to cohesively and proactively represent the class).

Third, although this coalition appears to have been formed for the purpose of this litigation, there is no evidence of bad faith.  *See Tan v. Goldman Sachs Grp. Inc.*, 2022 WL 1094766, at *3 (S.D.N.Y. Apr. 12, 2022).  Indeed, in my view, their agreement to proceed jointly avoids a potentially costly conflict over appointment of lead counsel and demonstrates action in accordance with the best interest of the putative classes.

Accordingly, the Joint Movants have set forth a satisfactory showing of their ability to work cohesively and to serve as lead plaintiff, and I deem them a "group of persons" for purposes of analyzing the movant with the largest financial interest.

   b.   The Joint Movants have the largest financial interest

The PSLRA does not specify a method for calculating the "largest financial interest.

Courts in the Second Circuit look to four factors: "(1) the total number of shares purchased

during the class period; (2) the net shares purchased during the class period (in other words, the

difference between the number of shares purchased and the number of shares sold during the

class period); (3) the net funds expended during the class period (in other words, the difference

between the amount spent to purchase shares and the amount received for the sale of shares

during the class period); and (4) the approximate losses suffered." *In re Aratana Therapeutics*

*Inc. Sec. Litig.*, 2017 WL 2491494, at *3 (S.D.N.Y. June 6, 2017) (citing *Lax v. First Merchants*

*Acceptance Corp.*, 1997 WL 461036, at *5 (N.D. Ill. Aug. 11, 1997)).  The fourth factor, the

magnitude of the loss suffered, is considered the most significant.  *Id.*

   Here, the Joint Movants have the largest financial interest, larger than either the

McGreevy Plaintiff Group or Morone individually.  Together, the members of the proposed lead

plaintiff group allege losses approximating $17,197,842, as set forth in the chart below:

| Plaintiff | Approximate Loss[2] |
|---|---|
| Remo Maria Morone | $8,519,736 |
| William McGreevy | $305,367 |
| Ashwin Gowda | $631,291 |
| Translunar Crypto, LP | $7,487,653 |
| Christopher Buttenham | $253,795 |
| TOTAL | $17,197,842 |

The Joint Movants' losses exceed the losses of Morone (approximately $8,519,736) and the

McGreevy Plaintiff Group (approximately $8,798,171).

   Accordingly, the Joint Movants are the presumptive lead plaintiff under the second step of

the analysis.

---

[2] I have rounded the estimated losses to the nearest whole dollar.

3.   *Rule 23 Requirements*

The plaintiff with the greatest financial stake in the litigation will only be entitled to the

status as presumptive lead plaintiff if it can show that it "otherwise satisfies the requirements of

Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).  Rule 23

requires a showing that the claims of the lead plaintiff are typical of the class and that the lead

plaintiff will be able to adequately represent the class.  At this early stage in the litigation, the

proposed lead plaintiff must only meet its *prima facie* burden of establishing its adequacy and

typicality.  *Varghese*, 589 F. Supp. 2d at 397.  The Joint Movants have made such a showing.

a.   Typicality: The Joint Movants satisfy the typicality requirements

Under Federal Rule of Civil Procedure 23(a)(3), "the claims or defenses of the

representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

The typicality requirement is satisfied by showing that each class member's claim "arises from

the same course of events, and each class member makes similar legal arguments to prove the

defendant's liability." *Janbay*, 272 F.R.D. at 120.  "[T]he typicality requirement may be

satisfied even if there are factual dissimilarities or variations between the claims of the named

plaintiffs and those of other class members, including distinctions in the qualifications of the

class members." *Id*.

Here, the claims of Morone and the members of the McGreevy Plaintiff Group are based

on the same legal theory and arise out of the same course of events.  Morone, the members of the

McGreevy Plaintiff Group, and the members of the putative classes (1) made digital asset loans

to Genesis Global Capital directly or via the Gemini Earn program; (2) loaned the assets based

on Defendants' alleged misconduct; and (3) suffered damages thereby.  Each of Morone and the

members of the McGreevy Plaintiff Group assert that they would not have made the loans if they

had known about GGC's true financial conditions, and that they were harmed as a result.  *See* Morone's Mem of Law, Doc. No. 34-1, at 15; McGreevy Plaintiff Group's Mem of Law, Doc. No. 37, at 15.  Thus, the Joint Movants have made a sufficient showing of typicality at this stage.

>    b.  Adequacy: The Joint Movants satisfy the adequacy requirements

Under Federal Rule of Civil Procedure 23(a)(4), the representative party must "fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is satisfied by showing that: "(1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) the class members' interests are not antagonistic to one another; and (3) the plaintiff has sufficient interest in the outcome of the case to ensure vigorous advocacy." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015).

Here, the Joint Movants' interests are aligned with the interests of the members of the proposed classes, and there is no evidence of any antagonism between either of the proposed lead plaintiff's interests and those of the proposed classes.  Moreover, as explained, Morone and each member of the McGreevy Plaintiff Group has demonstrated willingness to serve as an advocate on behalf of the putative classes.  *See* Morone Cert., Doc. No. 34-2, at 5; Certifications of McGreevy, Gowda, Schmidt, and Buttenham, Docs. No. 38-2 through 38-6.

>    4.  *The Presumption Favoring the Joint Movants Was Not Rebutted*

A member of the purported plaintiff class may rebut the presumption that the Joint Movants are the most adequate plaintiff "upon proof . . . that the presumptively most adequate plaintiff [ ] will not fairly and adequately protect the interests of the class; or [ ] is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).

Here, the Stipulation is unopposed, and the presumption has not been rebutted.

B.  Appointment of Class Counsel

The PSLRA provides that upon appointing a lead plaintiff, that plaintiff "shall, subject to

the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u–

4(a)(3)(B)(v).  "There is a strong presumption in favor of approving a properly-selected lead

plaintiff's decision as to counsel."  *Topping*, 95 F. Supp. 3d at 623–24 (citing *In re Adelphia*

*Commc'ns Corp. Sec. & Derivative Litig.*, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008)

(quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001))).  When courts have

authorized joint movants to proceed as co-lead plaintiffs, they have also authorized the

appointment of co-lead counsel.  *See*, *e.g.*, *Garnett v. RLX Tech. Inc.*, 2021 WL 3913541, at *6

(S.D.N.Y. Aug. 31, 2021); *Janbay*, 272 F.R.D. at 121.

The Joint Movants seek appointment of each of their counsel as co-lead counsel.  Having

reviewed the Stipulation, Morone and the McGreevy Plaintiff Group's Memoranda of Law

(docs. no. 34-1 and 37), as well as Attorney Crumbie's Declaration and the firm resume attached

as Exhibit B to that Declaration (docs. no. 34-1, 34-2) and Attorney Sloss's Declaration and the

firm resume attached as Exhibit H to that Declaration (docs. no. 38, 38-8), I find that Kaplan Fox

and Silver Golub, the parties' proposed co-lead counsel, will adequately and effectively represent

the interests of the class.  The attorneys at Kaplan Fox and Silver Golub both have substantial

experience with securities litigation and securities class actions.  I approve the selection and

appointment of Kaplan Fox and Silver Golub as co-lead counsel.

Finally, I advise that this joint appointment "is done with the understanding that there

shall be no duplication of attorneys' services and that counsel will work together to maximize

recovery for the proposed class."  *Garnett*, 2021 WL 3913541, at *6 (cleaned up).

**IV.     Conclusion**

The Stipulation, doc. no. 39, is **approved**.  For the foregoing reasons, I appoint Buttenham, Gowda, McGreevy, Morone, and Translunar Crypto LP as lead plaintiffs, and I approve of their choice of Kaplan Fox and Silver Golub as lead counsel.  The pending motions for appointment of Morone and the McGreevy Plaintiff Group (docs. no. 34 and 35) are hereby **denied**.

As set forth in my February 10, 2023 order (doc. no. 26), within ten business days of this ruling, counsel for Defendants and appointed lead counsel shall meet and confer regarding a proposed schedule for (1) the lead plaintiffs' time to file a consolidated and/or amended complaint, or otherwise designate an operative complaint; and (2) Defendants' time to answer or otherwise respond to the operative complaint in this action.  Within ten business days thereafter, the parties shall jointly submit their proposed schedule for this action (through resolution of Defendants' motion to dismiss) to the Court for approval.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of April 2023.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge