**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-00082-SRU |
| | Hon. Stefan R. Underhill |
| Plaintiffs, | |
| v. | |
| DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM, | September 11, 2023 |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, AND MARK MURPHY'S MOTION TO DISMISS

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000

DAY PITNEY LLP
One Stamford Plaza
263 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 977-7300

*Attorneys for Defendants Digital Currency Group, Inc., Barry Silbert, Glenn Hutchins, Lawrence Lenihan, and Mark Murphy*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    A.    Genesis's Lending Programs ................................................. 2

    B.    Three Arrows and the Collapse of FTX................................. 4

    C.    DCG's Loan to Genesis ....................................................... 5

    D.    This Action............................................................................ 6

ARGUMENT ......................................................................................................... 6

    I.    Counts I Through III Should Be Dismissed Because Plaintiffs Do Not Adequately Allege Violations of the Federal Securities Laws .............................. 7

        A.    Counts I and III Should Be Dismissed Because Plaintiffs Have Not Adequately Alleged Control-Person Liability Against the DCG Defendants ................................................................................................. 7

            1.    Plaintiffs Fail to Allege DCG Was a Control Person ................... 8

            2.    Plaintiffs Fail to Allege the Individual DCG Defendants Were Control Persons ................................................................. 10

        B.    Count II Should Be Dismissed Because Plaintiffs Fail to Allege Scheme Liability Under the Exchange Act................................................ 12

        C.    Counts II and III Should Be Dismissed Because Plaintiffs Fail to Plead the Essential Elements of an Exchange Act Violation.................... 14

            1.    Plaintiffs Fail to Plead a Strong Inference of Scienter.................. 14

            2.    Plaintiffs Fail to Plead Reliance.................................................... 18

            3.    Plaintiffs Fail to Plead Loss Causation ........................................ 22

            4.    Plaintiffs Fail to Plead Damages.................................................... 23

        D.    Count I Should Be Dismissed As to the Gemini Earn Plaintiffs Because the Securities Act Claim Is Barred by the One-Year Statute of Limitations................................................................................ 24

        E.    Plaintiffs' Copy/Paste Allegations About Statements Allegedly Made to Nonparties Are Irrelevant .......................................................... 25

    II.    Counts I Through III Should Be Dismissed Because There Was No Sale or Offer of a Security .............................................................................................. 27

        A.    There Was No Offer or Sale ................................................................. 27

        B.    The Lending Agreements Are Not Securities........................................ 29

1.      The Lending Agreements Do Not Constitute Investment
Contracts Under *Howey* ............................................................. 29

2.      The Lending Agreements Are Not Security Notes Under
*Reves* ...................................................................................... 34

III.   Counts IV and V Should Be Dismissed Because Plaintiffs Fail to
Adequately Allege Any State-Law Claims in the Alternative ............................ 37

A.     Count IV Should Be Dismissed Because Plaintiffs Have Failed to
Allege a CUTPA Claim ............................................................ 37

B.     Count V Should Be Dismissed Because Plaintiffs Have Not
Adequately Alleged an NYUDTPA Claim ................................................ 39

CONCLUSION ...................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)............................................................................28

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)............................................................................23

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)...............................................20

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)......................................................................................21

*Aimis Art Corp. v. N. Tr. Secs., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009)...........................................................24

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)...........................................................12

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  2023 WL 2585942 (S.D.N.Y. Mar. 21, 2023) ..........................................21, 22

*Alunni v. Dev. Res. Grp., LLC*,
  445 F. App'x 288 (11th Cir. 2011) (per curiam) ...........................................33

*Amorosa v. Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) .........................................6, 26

*Anderson v. Binance*,
  2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ...........................................24, 25

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................6

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).............................................................................15

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
  973 F.2d 51 (2d Cir. 1992).............................................................................35

*Barton v. Peterson*,
  733 F. Supp. 1482 (N.D. Ga. 1990)...............................................................25

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................6

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
   534 F. Supp. 3d 326 (S.D.N.Y. 2021)..............................................................25

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)................................................................11

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   916 F. Supp. 1343 (D.N.J. 1996)......................................................................24

*Bongiorno v. Baquet*,
   2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021)............................................34, 35

*C.N.S. Enters., Inc. v. G. & G. Enters., Inc.*,
   508 F.2d 1354 (7th Cir. 1975) ....................................................................31, 35

*Cooper v. King*,
   114 F.3d 1186, 1997 WL 243424 (6th Cir. 1997) ...........................................30

*Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   622 F.2d 216 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982) ...............................32

*Demarco v. LaPay*,
   2009 WL 3855704 (D. Utah Nov. 17, 2009) ..................................................33

*Denoia v. Pulte Home Corp.*,
   2013 WL 12155826 (M.D. Fla. Sept. 5, 2013) ...............................................25

*Dodds v. Cigna Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993).............................................................................24

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003) .........................................................................................9

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................9

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)............................................................................15

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)..............................................................16

*Elson v. Geiger*,
   506 F. Supp. 238 (E.D. Mich. 1980), *aff'd*, 701 F.2d 176 (6th Cir. 1982) ............33

*Fezzani v. Bear, Stearns & Co.*,
    384 F. Supp. 2d 618 (S.D.N.Y. 2004)...................................................................................12

*In re Fine Host Corp. Sec. Litig.*,
    25 F. Supp. 2d 61 (D. Conn. 1998).....................................................................................19

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)..................................................................................................23

*Fragin v. Mezei*,
    2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012).....................................................................35

*Friel v. Dapper Labs, Inc.*,
    2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023).................................................................30, 32

*In re Fyre Festival Litig.*,
    399 F. Supp. 3d 203 (S.D.N.Y. 2019)..................................................................................27

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (2002) ..........................................................................................................39

*Harman v. Harper*,
    914 F.2d 262, 1990 WL 121073 (9th Cir. 1990) .................................................................32

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996)................................................................................................9, 20

*Heine v. Colton, Hartnick, Yamin & Sheresky*,
    786 F. Supp. 360 (S.D.N.Y. 1992) ......................................................................................31

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)...................................................................................8

*Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*,
    683 F. Supp. 2d 278 (E.D.N.Y. 2010) .................................................................................35

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .....................................................................16

*Joseph Gen. Contracting, Inc. v. Couto*,
    119 A.3d 570 (Conn. 2015) .................................................................................................38

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).............................................................................................15, 16

*Kane v. Wichita Oil Income Fund*,
    1991 WL 233266 (S.D.N.Y. Oct. 29, 1991) ..........................................................................8

*Kavanagh v. Zwilling*,
   578 F. App'x 24 (2d Cir. 2014) ........................................................................10

*Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*,
   257 A.3d 874 (2021) ........................................................................................38

*Kirschner v. JP Morgan Chase Bank, N.A.*,
   — F.4th —, 2023 WL 5437811 (2d Cir. Aug. 24, 2023) ...........................34, 35, 36

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 159 (S.D.N.Y. 2001)..............................................................34

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).......................................................................22, 23

*Lewis v. Assurant, Inc.*,
   2022 WL 4599038 (D. Conn. Sep. 30, 2022) ...................................................38

*In re Livent, Inc. Sec. Litig.*,
   78 F. Supp. 2d 194 (S.D.N.Y. 1999).................................................................11

*Lops v. YouTube, LLC*,
   2023 WL 2349597 (D. Conn. Mar. 3, 2023) .....................................................38

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).........18

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).......17

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982).......................................................................................31

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ..............................................................30

*In re Marsh & Mclennan Cos., Inc. Sec. Litig*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................13

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) ..........................................................39, 40

*McVay v. W. Plains Serv. Corp.*,
   823 F.2d 1395 (10th Cir. 1987) ......................................................................31

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)..............................................................12

*In re MF Glob. Holdings Ltd. Secs. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................8, 10

*Milnarik v. M-S Commodities, Inc.*,
   457 F.2d 274 (7th Cir. 1972) ...............................................................................32

*Miramontes v. Ralph Lauren Corp.*,
   2023 WL 3293424 (S.D.N.Y. May 5, 2023) .......................................................39

*Nat'l Bank of Yugoslavia v. Drexel Burnam Lambert, Inc.*,
   768 F. Supp. 1010 (S.D.N.Y. 1991)....................................................................35

*Newman v. Fam. Mgmt. Corp.*,
   748 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013).......16

*Nolfi v. Ohio Ky. Oil Corp.*,
   675 F.3d 538 (6th Cir. 2012) ...............................................................................25

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ................................................................................17

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
   381 F. App'x 75 (2d Cir. 2010) ...........................................................................20

*P. Stolz Fam. P'ship, L.P. v. Daum*,
   166 F. Supp. 2d 871 (S.D.N.Y. 2001), *rev'd in part on other grounds by* 355
   F.3d 92 (2d Cir. 2004)....................................................................................7, 8

*In re Parmalat Sec. Litig.*,
   383 F. Supp. 2d 616 (S.D.N.Y. 2005)..................................................................12

*Pasternack v. Shrader*,
   863 F.3d 162 (2d Cir. 2017)..................................................................................9

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................16

*Plumbers & Steamfitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. Mar. 6, 2015) .......................................................17

*Pross v. Katz*,
   784 F.2d 455 (2d Cir. 1986)................................................................................13

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
   714 F. Supp. 2d 475 (S.D.N.Y. 2010)...............................................................7, 9

*Reeder v. Succession of Palmer*,
    736 F. Supp. 128 (E.D. La. 1990), *aff'd sub nom. Reeder v. Palmer*, 917 F.2d
    560 (5th Cir. 1990)............................................................................................................36

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)..................................................................................................30

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)...............................................................................................27, 29, 34

*Reynolds v. Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015).................................................................................39

*Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*,
    192 F. Supp. 3d 348 (S.D.N.Y. 2016)............................................................................39, 40

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011).................................................................................16

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .........................................................................11

*Schentag v. Nebgen*,
    2018 WL 3104092 (S.D.N.Y. June 21, 2018) .......................................................................36

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006)...............................................................................................28

*SEC v. Edwards*,
    540 U.S. 389 (2004)..........................................................................................................33

*SEC v. Genesis Global Capital, LLC*,
    No. 23-CV-287 (S.D.N.Y.).................................................................................................29

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020).................................................................................30

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) ...........................................................................................34

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022)  ................................................................................................13

*SEC v. Ripple Labs, Inc.*,
    2023 WL 4507900 (S.D.N.Y. July 13, 2023) ...................................................................27, 32

*SEC v. Terraform Labs Pte. Ltd.*,
    — F. Supp. 3d —, 2023 WL 4858299 (S.D.N.Y. July 31, 2023)............................................27

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..................................................................................27, 29

*Simmtech Co. v. Citibank, N.A.*,
   2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016), *aff'd*, 697 F. App'x 35 (2d Cir.
   2017) ..............................................................................................................20

*Singh v. Cigna Corp.*,
   277 F. Supp. 3d 291 (D. Conn. 2017), *aff'd*, 918 F.3d 57 (2d Cir. 2019) ..............................17

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012).........................................................8, 10, 11

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)..................................................11, 12

*Speer v. Select Portfolio Servicing*,
   2023 WL 4850556 (D. Conn. July 28, 2023) ........................................................38

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
   412 F.3d 103 (2d Cir. 2005)...............................................................................21

*Taylor v. Westor Cap. Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013).................................................................14

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967)...........................................................................................29

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
   531 F.3d 190 (2d Cir. 2008)...............................................................................15

*Telenor E. Inv. AS v. Altimo Holdings & Invs. Ltd.*,
   567 F. Supp. 2d 432 (S.D.N.Y. 2008).................................................................19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...........................................................................................15

*Teller v. Bill Hayes, Ltd.*,
   630 N.Y.S.2d 769 (N.Y. App. Div. 1995) ............................................................40

*Teva Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*,
   2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ......................................................24

*In re Teva Sec. Litig.*,
   2023 WL 3186407 (D. Conn. May 1, 2023) (Underhill, J.) ..................................26

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993)..............................................................................21, 22

*Titan Grp., Inc. v. Faggen*,
   513 F.2d 234 (2d Cir. 1975)......................................................................................21

*Trahan v. Lazar*,
   457 F. Supp. 3d 323 (S.D.N.Y. 2020).......................................................................31

*In re Trilegiant Corp*,
   11 F. Supp. 3d 82 (D. Conn. 2014), *aff'd sub nom. Williams v. Affinion Grp.,*
   *LLC*, 889 F.3d 116 (2d Cir. 2018) ......................................................................38, 39

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
   2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ..............................................................38

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac*
   *Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ........26

*Union Nat'l Bank of Little Rock v. Farmers Bank*,
   786 F.2d 881 (8th Cir. 1986) ....................................................................................33

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
   651 F.2d 1174 (6th Cir. 1981) ..................................................................................33

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .............................................................21

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).......................................................................15

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016).......................................................................................18

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017).........................................................................................21

*Walsh v. Rigas*,
   2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) .............................................................20

*Wilamowsky v. Take-Two Interactive Software, Inc.*,
   818 F. Supp. 2d 744 (S.D.N.Y. 2011).......................................................................23

*Wilson v. Comtech Telecomm. Corp.*,
   648 F.2d 88 (2d Cir. 1981).........................................................................................21

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003).........................................................................7

*Yi v. GTV Media Grp. Inc.*,
   2021 WL 3500920 (S.D.N.Y. Aug. 6, 2021) ........................................................................11

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ..................................................................................12

**Statutes**

15 U.S.C. § 77b ...............................................................................................................................28

15 U.S.C. § 77m ..............................................................................................................................24

15 U.S.C. § 77o .................................................................................................................................7

15 U.S.C. § 78t ..................................................................................................................................7

15 U.S.C. § 78j ................................................................................................................................28

15 U.S.C. § 78u-4 ...........................................................................................................................15

**Other Authorities**

17 C.F.R. § 240.10b-5(a) ...............................................................................................................12

Fed. R. Civ. P. 12(b)(6) ....................................................................................................................1

Fed. R. Civ. P. 9(b) ...........................................................................................................................1

FinCEN, https://www.fincen.gov/what-we-do (last visited Sept. 8, 2023) ...................................37

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Digital Currency Group, Inc. ("DCG"), Barry Silbert, Glenn Hutchins, Lawrence Lenihan, and Mark Murphy (collectively, the "DCG Defendants"), respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Class Action Complaint (the "Amended Complaint" or "Am. Compl.").

## PRELIMINARY STATEMENT

This securities fraud complaint alleges neither that the DCG Defendants made any misrepresentations to Plaintiffs, nor that anyone purchased or sold securities. Rather, the Amended Complaint concerns Plaintiffs' loans of their digital assets (including cryptocurrency) to non-party Genesis Global Capital, LLC ("Genesis") in exchange for loan fees. When the cryptocurrency exchange FTX unexpectedly collapsed in November 2022, Genesis was unable to honor the ensuing flood of redemption requests and suspended redemptions, later filing for bankruptcy. Creditors filed claims against Genesis in bankruptcy, but here, Plaintiffs trump up claims against Genesis's parent company—DCG—and various of its officers and directors (among others). That effort fails for three related reasons.

*First*, Plaintiffs fail to plead the basic elements of a securities fraud claim against the DCG Defendants. Although the Amended Complaint contains no coherent narrative, what is abundantly clear is that the DCG Defendants were not involved in the transactions that Plaintiffs challenge. This is hardly surprising, as the contracts giving rise to the challenged transactions are crystal clear that "*none of Genesis' parents or affiliates* shall have any liability *under this Agreement*[.]" Ex. A ("MBA") § XVII; *id.* Ex. B ("MLA") § XVII (emphasis added).

Plaintiffs cannot overcome this defect by charging the DCG Defendants with "control-person" liability. To begin with, the Amended Complaint fails to plead the elements of primary liability as to non-party Genesis, making the "control-person" claim unavailing. It also fails to

plead that DCG—much less DCG's individual officers and independent directors—had the requisite control or culpable participation in the transactions between Genesis and Plaintiffs.

*Second*, Plaintiffs' federal securities law claim fails for the additional, independent reason that Plaintiffs have failed to allege a purchase or sale of a security. The only purported "security" Plaintiffs point to are the lending agreements between themselves and Genesis, but those agreements were never "sold" to anyone. They merely established a contractual framework for a lending relationship under which Plaintiffs could—but were not required to—loan digital assets to Genesis in exchange for loan fees. And any event, the lending agreements themselves are not securities. Every day, consumers deposit funds into their bank accounts in exchange for interest, retaining the right to withdraw those funds at any time. That is exactly the arrangement here, with the only difference being that Plaintiffs deposited digital assets rather than cash. The lending agreements fail any applicable test for what constitutes a "security."

*Third*, Plaintiffs' fallback claims under state consumer protection laws likewise fail for many of the same reasons. In particular, Plaintiffs allege no fraudulent statements by the *DCG Defendants* to Plaintiffs, and cannot rely on any supposed misconduct by Genesis. Moreover, these state-law claims impose several other requirements that Plaintiffs do not allege.

Plaintiffs' recourse is in the bankruptcy proceedings against Genesis, where they can pursue any recovery to which they assert they are entitled. Their claims against the DCG Defendants should be dismissed.

## STATEMENT OF FACTS

### A.     Genesis's Lending Programs

Non-party Genesis is a "full-service digital currency prime brokerage" that, prior to its bankruptcy, was engaged in a variety of services related to management of digital assets, including cryptocurrency. Am. Compl. ¶¶ 3–4. One of Genesis's services was yield generation, through

which owners of digital assets could lend those assets to Genesis in exchange for regular interest payments. *See id.* ¶¶ 120–23. Genesis offered those services in two ways relevant here.

*First*, entities who met the minimum lending requirements could loan their digital assets directly to Genesis. Am. Compl. ¶¶ 123–24. That relationship was governed by a Master Borrow Agreement ("MBA"). *Id.* ¶ 122; *see generally* MBA. The MBA did not obligate participating lenders to loan any particular amount of digital assets to Genesis (or indeed, any digital assets at all), but rather set forth the framework for the lending relationship if one developed. Pursuant to the MBA, Genesis would send lending requests to qualified lenders with its proposed terms. MBA § II(b). Each lender could negotiate any of the terms with Genesis, and if Genesis and a lender reached agreement, the final terms of the loan would be memorialized in a separate term sheet. *See id.* The lender would then deposit its digital assets with Genesis, and Genesis would pay the lender the agreed-upon Loan Fee. Am. Compl. ¶ 122. The Loan Fee owed was dictated by the loan terms, and not by the success or failure of Genesis's subsequent use of the loaned assets.

*Second*, beginning in February 2021, Genesis partnered with non-party Gemini Trust Company, LLC ("Gemini")—a digital asset service company—through Gemini's Gemini Earn program. Am. Compl. ¶¶ 125–26. Under the program, Gemini customers could lend their digital assets to Genesis by depositing those assets into a Gemini Earn account. *Id.* Genesis would then pay Gemini interest on those assets, and Gemini would pass that interest on to its customers, keeping a percentage for itself. *Id.* ¶¶ 127–28. All Gemini Earn program loans were open-term, meaning that Gemini customers could terminate any portion of their loan at any time. *See* MLA § II(c).

To participate in the Gemini Earn program, Gemini customers entered into a Master Digital Asset Loan Agreement ("MLA") between themselves, Gemini, and Genesis. Under the MLA,

each Gemini Earn customer was the "Lender," Gemini was the "Custodian" and agent for each "Lender," and Genesis was the "Borrower."  The MLA stated that the loans facilitated by the agreement "are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws."  MLA § XXV.  As with the MBA, the MLA did not obligate the Gemini customer to lend assets to Genesis at any time.  *See id.* § II(a).  If the Gemini customer ultimately elected to loan assets to Genesis, Gemini would provide the pertinent loan terms at the time of the transaction.  *See id.* § II(a)–(b).  And as with the MBA, Genesis's obligation to pay interest on the digital assets was independent of how Genesis's own lending business performed.  *See generally id.*  Critically, the agreements were crystal clear that DCG was not a party to the MLA and had no obligations or liabilities arising from loans facilitated by the MLA:

> For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement *are only the obligation of Genesis*, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that *none of Genesis' parents or affiliates* shall have any liability *under this Agreement*[.]"

MLA § XVII; MBA § XVII (emphases added).

## B.    Three Arrows and the Collapse of FTX

Genesis made money by relending digital assets to others, and one of Genesis's lending counterparties was Three Arrows Capital Ltd. ("3AC").  Am. Compl. ¶ 208.  According to Plaintiffs, 3AC made money from those loans by using digital assets it borrowed from Genesis to purchase an interest in the Grayscale Bitcoin Trust ("GBTC")—a public trust managed by Grayscale Investments, LLC ("Grayscale"), an indirect affiliate of Genesis—and then reselling that interest on the secondary market for cash.  *Id.* ¶¶ 26, 215.

By June 2022, 3AC owed approximately $2.3 billion in loans to Genesis.  Am. Compl. ¶ 218.  Also in June 2022, however, 3AC was unable to satisfy margin calls from some of its

lenders and entered liquidation proceedings.  *Id.* ¶ 218.  Genesis was able to recover a portion of its outstanding credit from 3AC through the foreclosure of certain collateral, but 3AC still owed over $1 billion to Genesis, which Genesis is unlikely to recover.  *Id.* ¶¶ 218, 226.

    **C.**    **DCG's Loan to Genesis**

Defendant DCG is an investment corporation, the parent of Grayscale, and the indirect parent of Genesis.  Am. Compl. ¶¶ 6, 26.  Defendant Silbert is DCG's founder and CEO, *id.* ¶ 7, Defendant Murphy is DCG's President (formerly its COO), *id.* ¶ 8, and Defendant Kraines was the CFO from September 2021 through April 2023, *id.*  Defendants Hutchins and Lenihan were independent members of DCG's Board during the Class Period.  *Id.* ¶¶ 54–55.

On June 30, 2022, DCG executed a promissory note (the "Promissory Note" or "Note") with Genesis under which DCG assumed the $1.1 billion liability arising out of 3AC's debt default by providing Genesis with a promissory note for $1.1 billion, payable in 10 years at an interest rate of 1%.  Am. Compl. ¶¶ 222–23.  In other words, DCG gave Genesis a *collectable* $1.1 billion receivable in exchange for an *uncollectable* $1.1 billion receivable.

Plaintiffs allege that in conversations and email exchanges following the execution of the Note, Genesis inaccurately represented—though not to any of Plaintiffs—the nature of the Note and Genesis's financial condition.  *See* Am. Compl. ¶¶ 232–35.  Officers or employees of DCG were occasionally copied on these emails or joined these calls, but none of them is alleged to have made any misrepresentations in those interactions.  *Id.* ¶¶ 261, 265.  Plaintiffs identify just two sets of representations made by the DCG Defendants:  one to an unidentified lender and another to Gemini co-founder Cameron Winklevoss, a non-party.  *See id.* ¶¶ 257, 271–72.

In November 2022, DCG, Genesis, and Gemini entered into a tripartite agreement pursuant to which DCG transmitted over $600 million in additional collateral to Genesis for the benefit of Gemini Earn customers.  Am. Compl. ¶ 275.  That same month, however, the cryptocurrency

exchange FTX collapsed, triggering a large number of withdrawal requests, which Genesis was unable to fulfill with its current assets. *Id.* ¶¶ 39, 288.  On November 16, 2022, Genesis announced that it was suspending redemptions and new loan originations. *See id.* ¶ 288.  Genesis ultimately filed for Chapter 11 bankruptcy on January 19, 2023. *Id.* ¶ 12.

### D. This Action

Plaintiffs are lenders of digital assets to Genesis. *See* Am. Compl. ¶¶ 47–51.  All but one of Plaintiffs loaned digital assets to Genesis via the Gemini Earn program. *See* ECF Nos. 38-2, 38-3, 38-5, 34-2.  One Plaintiff (Translunar) loaned digital assets directly to Genesis. *See* ECF No. 38-4.  Plaintiffs filed this lawsuit on January 23, 2023, naming DCG and Silbert as the sole Defendants. *See* ECF No. 1.  Because Genesis is in bankruptcy, it was not and cannot be named as a party in this lawsuit.  Following appointment of lead Plaintiffs, Plaintiffs filed their Amended Complaint on July 12, 2023, adding several new Defendants and claims.

## <u>ARGUMENT</u>

In deciding this motion, the Court must assume that well-pled factual allegations in the Complaint are true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But the Court need not accept legal conclusions, naked assertions, mere conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009).  A claim must raise more than the "mere possibility of misconduct"—a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678–79.  Moreover, as set forth below, *see infra* Part I.E, the Court need not credit allegations "copied almost verbatim" from another action, as Plaintiffs have done, *Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022).  Ultimately, though, regardless of which allegations the Court credits, the claims should be dismissed in their entirety.

I.      **Counts I Through III Should Be Dismissed Because Plaintiffs Do Not Adequately Allege Violations of the Federal Securities Laws**

Plaintiffs' claims under the federal securities laws fail for a host of related reasons, including the absence of any allegations of fraudulent conduct by the DCG Defendants.

A.      **Counts I and III Should Be Dismissed Because Plaintiffs Have Not Adequately Alleged Control-Person Liability Against the DCG Defendants**

As discussed above, a cursory review of the Amended Complaint demonstrates that the DCG Defendants play no material role in its allegations.  The DCG Defendants did not borrow digital assets from Plaintiffs, did not sell or market any instruments to them, and did not have a contractual relationship with them.  All of Plaintiffs' complaints concern their dealings with Gemini and Genesis:  alleged statements by Genesis representatives regarding Genesis's solvency, *see* Am. Compl. ¶¶ 34, 37, alleged representations regarding the financial risk of the lending programs, *see id.* ¶ 37, 160, and Genesis's ultimate decision to stop honoring redemption requests, *see id.* ¶ 40, among other things.  Glaringly missing from the Amended Complaint is even a single allegation of any false statement by any DCG Defendant to any Plaintiff.

In an effort to compensate for the lack of allegations against the DCG Defendants, Plaintiffs attempt to assert "control person liability," a limited rule under federal securities law that allows a plaintiff to sue entities that exercised control over the challenged transactions.  *See* 15 U.S.C. §§ 77o(a), 78t(a).  For control person liability, Plaintiffs must establish (1) a primary violation of the securities law, (2) control of the primary violator by the defendant, and (3) culpable participation by the defendant in the primary violation.  *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 409 (S.D.N.Y. 2003).[1]

---

[1] Although there is a split of authority as to whether the culpable participation element applies to claims under Section 15 (control-person liability for violations of the Securities Act), several courts have held that it does.  *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010); *P. Stolz Fam. P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873

As discussed below, Plaintiffs fail to plead any primary violation by Genesis.  *See infra* Parts I.C & II.  And they fail to plead culpable conduct for the same reasons they have failed to adequately allege scienter.  *See infra* Part I.C.  But even if they could clear those hurdles, Plaintiffs also fail to plead any facts establishing "actual control" by the DCG Defendants of the challenged transactions involving the primary alleged violator (Genesis).  *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 580 (S.D.N.Y. 2012).

Plaintiffs summarily allege that the DCG Defendants controlled Genesis by pointing to such unremarkable facts as the DCG Defendants' stock ownership in DCG and/or Genesis, and their positions as officers or directors of DCG and/or Genesis.  *See* Am. Compl. ¶¶ 325–50.  But conclusory allegations of control are not sufficient:  Plaintiffs must plausibly allege that the DCG Defendants "possess[ed], in fact, rather than in theory, the ability to direct the actions of the controlled person."  *In re MF Glob. Holdings Ltd. Secs. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013); *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) ("Conclusory allegations of control are insufficient as a matter of law.").  Importantly, Plaintiffs must adequately allege "actual control *over the transaction in question*," *In re MF Glob. Holdings*, 982 F. Supp. 2d at 307 (emphasis added), not just general control over Genesis.  Here, Plaintiffs do not adequately allege that the DCG Defendants controlled either of the "transaction[s] in question"—*i.e.*, (1) Genesis's alleged sale of unregistered securities, Am. Compl. ¶ 331; or (2) Genesis's alleged misstatements and/or omissions regarding its financial condition, *id.* ¶ 371.

### 1.    Plaintiffs Fail to Allege DCG Was a Control Person

Plaintiffs fail to plausibly allege that DCG controlled Genesis.  Plaintiffs rely primarily on

---

(S.D.N.Y. 2001), *rev'd in part on other grounds by* 355 F.3d 92 (2d Cir. 2004); *Kane v. Wichita Oil Income Fund*, 1991 WL 233266, at *7 (S.D.N.Y. Oct. 29, 1991).

their allegation that Genesis is an indirect wholly-owned subsidiary of DCG.  *See* Am. Compl. ¶¶ 18, 341.  But "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities."  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).  DCG and Genesis are separate companies, and the "parent/subsidiary relationship is an insufficient basis from which to infer control."  *Pub. Emps' Ret. Sys. of Miss.*, 714 F. Supp. 2d at 485 (alterations and quotation marks omitted).  The mere existence of a corporate affiliation—even between a parent and a wholly-owned subsidiary—"says nothing" about the parent's actual control over the subsidiary or, more importantly, the particular transaction in question.  *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460–61 (S.D.N.Y. 2018).

The rule that courts will respect corporate separateness has particular application here, where Plaintiffs expressly agreed that their legal recourse for any claims arising out of the Lending Agreements would be solely against Genesis, and not DCG.  *See* MLA § XVII; MBA § XVII.  All of the claims Plaintiffs assert necessarily arise out of the Lending Agreements, because all of their claims depend on the lending relationship with Genesis.  These kinds of non-recourse provisions are enforceable under the securities laws, which provide that while "blanket releases of liability that accompany the purchase or sale of securities" are not enforceable, *Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017), provisions that do not "prohibit[] a party from suing at all" are, *Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996).  Thus, as both a matter of precedent and contract law, Plaintiffs cannot pursue DCG for their grievances against Genesis.

Aside from their bare allegations of a parent-subsidiary relationship, the only other effort Plaintiffs make to establish DCG's control is a single paragraph asserting that "[n]o party other than a subsidiary completely controlled by Defendants DCG and Silbert would have 'sold' a $1.1 billion debt for a 10-year promissory note at 1% interest."  Am. Compl. ¶ 226.  That is not an

allegation of *fact*, however, but rather attorney argument, and dismissable for that reason alone. *See Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).  In any event, this theory makes no sense:  Plaintiffs allege just one paragraph prior that "[t]he odds of Genesis [] or DCG collecting anything near the full value of the [3AC] debt were and remain incredibly low."  Am. Compl. ¶ 225.  Thus, it was to *Genesis*'s benefit, not DCG's, to exchange a $1.1 billion *uncollectable* account receivable for a $1.1 billion promissory note from a *solvent* entity.  A parent engaging in a transaction that is favorable to a subsidiary does not evince control, but rather demonstrates simply that the parent has a financial interest in the success of the subsidiary.

### 2.    Plaintiffs Fail to Allege the Individual DCG Defendants Were Control Persons

Plaintiffs' allegations of control as to the individual DCG Defendants—Silbert, Lenihan, Hutchins, and Murphy—fare no better.  As an initial matter, because Plaintiffs offer no well-pled allegations that *DCG* controlled Genesis, Plaintiffs necessarily cannot establish that the individual DCG Defendants—whose only alleged connection to this action is through their roles as officers or directors of DCG—were control persons.  But even if Plaintiffs could establish the requisite control by DCG itself, the Amended Complaint comes nowhere close to meeting Plaintiffs' burden of pleading particularized facts showing that each of the individual DCG Defendants personally exercised "actual control over the transaction[s] in question" between Plaintiffs and Genesis.  *In re MF Glob. Holdings*, 982 F. Supp. 2d at 307; *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d at 167 ("[Defendant's] position at entities other than the [primary violator] does not demonstrate his control over misleading statements in the [primary violator's] SEC filings.").

*Silbert*.  Plaintiffs do not allege that Silbert had any direct ownership interest in Genesis or that he held an officer or director position there.  Instead, Plaintiffs attempt to establish Silbert's control over DCG, contending that Silbert compelled one of DCG's *other* subsidiaries—

Grayscale—to move to Connecticut.  *See* Am. Compl. ¶¶ 81–82.  That says nothing about Silbert's control *over Genesis* or over the transactions at issue.  The Amended Complaint also points to Silbert's 40% ownership of DCG, *see id.* ¶¶ 18, 82, 341, but such minority ownership in an indirect parent entity also is not sufficient to establish control, *see In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (26% ownership interest insufficient to allege control).  The fact that Silbert founded DCG, standing alone, also is of no help.  *See Yi v. GTV Media Grp. Inc.*, 2021 WL 3500920, at *3 (S.D.N.Y. Aug. 6, 2021); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *5 (S.D.N.Y. Jan. 18, 2018).

**Murphy**.  Similarly, all Plaintiffs allege about Murphy is that he worked closely with Genesis on "strategy, execution, marketing and all management matters," and that he announced the appointment of the interim Genesis CEO.  Am. Compl. ¶ 59.  Even setting aside that these allegations are entirely conclusory, an individual's general involvement with strategy discussions does not establish actual *control* over the company, much less control as to the specific transactions at issue here.  *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d at 166 (finding no control person liability where the plaintiffs did not allege that the defendant "signed, drafted, approved, or confirmed a [] statement").  And although Plaintiffs claim that Murphy served as a director of Genesis, *see* Am. Compl. ¶ 8, Genesis is an LLC, not a corporation, *see* Am. Voluntary Petition, *In re Genesis Global Capital, LLC*, No. 23-10064-shl (Bankr. S.D.N.Y. Jan. 20, 2023) (ECF No. 3), and thus has no board of directors.  In any event, "officer or director status alone does not constitute control."  *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) (collecting cases).

**Lenihan and Hutchins**.  The only allegation of control as to Lenihan and Hutchins is that

they served as independent directors of DCG during the Class Period.  *See* Am. Compl. ¶¶ 54–55, 59.  This threadbare assertion is inadequate to show that Lenihan and Hutchins controlled *DCG*, *see In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 499 (S.D.N.Y. 2005) ("Director status alone is insufficient to establish control person status."); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8, and certainly comes nowhere close to alleging they controlled Genesis or the specific transactions at issue, *see Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 525 (S.D.N.Y. 2016) (holding "the positions" held by the CFO and the General Counsel of a parent company did "not support allegations of control over" its subsidiary); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004) (rejecting effort to plead "tertiary liability").

### B.   Count II Should Be Dismissed Because Plaintiffs Fail to Allege Scheme Liability Under the Exchange Act

Plaintiffs assert a claim directly against the DCG Defendants for "scheme liability," Am. Compl. ¶ 364, arising out of Rule 10b-5's prohibition against "employ[ing] any device, scheme, or artifice to defraud" in connection with a security, 17 C.F.R. § 240.10b-5(a).  These allegations, however, consist of nothing more than a rehash of Plaintiffs' insufficient allegations of control, *see supra* Part I.A, along with a single conclusory allegation regarding the execution of the promissory note, *see* Am. Compl. ¶ 364.  They fall well short.

To state a claim for scheme liability, Plaintiffs must allege facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017).  Rule 9(b) requires a plaintiff to "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005).  The scheme also must be "integral to the

purchase and sale of the securities in question." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986).

Plaintiffs' allegations under this theory amount merely to conclusory assertions that the DCG Defendants, by virtue of their roles as officers or directors of DCG, "caused" Genesis to make false statements or engage in deceptive conduct. Am. Compl. ¶ 364(a)–(c). That is simply another way of restating Plaintiffs' allegations of control-person liability, which, as set forth above, fail for a host of reasons. *See supra* Part I.A. To the extent Plaintiffs allege that the DCG Defendants "made, or allowed to be made, false or misleading statements despite their awareness or reckless disregard of the misconduct," such allegations are "insufficient to state a claim for scheme liability." *In re Marsh & Mclennan Cos., Inc. Sec. Litig*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006); *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (holding that misstatements and omissions—"without more"—cannot form the basis for scheme liability).

If Plaintiffs mean to allege that DCG's participation in two intercompany transactions— the $500 million loan from Genesis to DCG, and the $1.1 billion promissory note—give rise to scheme liability, *see* Am. Compl. ¶ 364(a)–(b), they would be wrong. With respect to the $500 million loan, Plaintiffs allege only that DCG received commercially favorable terms under the loan and intended to use the proceeds to "artificially prop up the price of GBTC." *Id.* ¶¶ 214–16. Even if true that the terms of the loan were not commercially reasonable, that is not indicative of a scheme to defraud Plaintiffs. What is more, the alleged use by DCG of the loan proceeds has nothing to do with Plaintiffs' allegations regarding fraudulent conduct by Genesis in connection with its digital-asset lending program. As for the $1.1 billion promissory note, Plaintiffs again simply aver that the terms of the loan were commercially unreasonable and challenge how Genesis—not DCG—allegedly *represented* the note to others. *See id.* ¶¶ 224–29. Again, that does not suggest fraud by DCG: It executed a Promissory Note that provided its subsidiary an

enforceable credit against a solvent parent company in exchange for a debt against an *in*solvent

third party.  Regardless of how Genesis characterized the Note, nothing about the Note itself is

plausibly alleged to have been fraudulent.

Moreover, both of these intercompany transactions long postdated Plaintiffs' executions of

the Lending Agreements, *see infra* Part I.C, and therefore could not possibly have contributed to

any fraudulent scheme undertaken "in connection" with Plaintiffs' purchases or sales of securities,

*see Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402 (S.D.N.Y. 2013) ("The plain language

of Rule 10b-5 mandates that the proscribed schemes or acts be done 'in connection with the

purchase or sale of any security.'").  Thus, these transactions do not give rise to scheme liability

against DCG, much less against the individual DCG Defendants, who are even further removed

from the intercompany transactions.

### C.     Counts II and III Should Be Dismissed Because Plaintiffs Fail to Plead the Essential Elements of an Exchange Act Violation

Plaintiffs' control-person and scheme-liability claims against the DCG Defendants for

Genesis's alleged dissemination of false or misleading statements, *see* Am. Compl. ¶¶ 356–57,

must also be dismissed because Plaintiffs fail to plead the elements of a claim under the Exchange

Act.  The DCG Defendants dispute that Plaintiffs have alleged any false or misleading statements

by Genesis with the requisite particularity, but setting that issue aside, Plaintiffs have failed to

allege the other essential elements of an Exchange Act claim: scienter, reliance, loss causation, or

damages.  These defects doom Plaintiffs' claim for primary liability against Genesis—and

therefore their claim for control-person liability against the DCG Defendants—and also

independently justify dismissal of Plaintiffs' scheme liability claim against the DCG Defendants.

### 1.     Plaintiffs Fail to Plead a Strong Inference of Scienter

The PSLRA's strict pleading standards require Plaintiffs to "state with particularity facts

giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(a); *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  This requirement precludes courts from drawing merely reasonable inferences in the plaintiff's favor at the motion to dismiss stage.  *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).  Instead, the allegations of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  A plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Plaintiffs fail to establish either prong.

*No Motive or Opportunity*.  To plead motive, a plaintiff "must assert a concrete and personal benefit . . . resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiffs' only allegations of a personal benefit relate to supposedly "higher compensation" for DCG and Silbert (but not other DCG Defendants) through management fees paid to Grayscale, purportedly through Genesis's continued lending operations to 3AC, and to deferring Genesis's demise to stave off "mass investor redemptions."  Am. Compl. ¶¶ 359–60.  Neither suffices.

At the outset, these motivations relate to profits allegedly earned by DCG's subsidiaries, not DCG itself.  As set forth above, Plaintiffs cannot simply disregard corporate separateness.  In any event, courts have repeatedly held that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to . . . increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA & Local 134 IBEW Joint Pension Tr.*, 553 F.3d at 198; *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 409 (S.D.N.Y. 2005) ("[A]llegations concerning the importance of [a subsidiary's]

revenue to [its parent's] revenue growth, without more, are inadequate to properly plead motive to commit fraud."). That is doubly true where, as here, Plaintiffs allege no facts demonstrating that the fees allegedly earned were "exorbitant or at all in excess of the industry standard." *See Newman v. Fam. Mgmt. Corp.*, 748 F. Supp. 2d 299, 309 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013).

Similarly, "[t]he theory that defendants engaged in fraud 'to protect the very survival of the company' is 'far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit.'" *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011); *see also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("Any corporation would be motivated to make a profit [or] to avoid bankruptcy."). DCG's alleged desire to keep Genesis from falling into liquidation proceedings is not sufficient to allege scienter.

***No Conscious Misbehavior or Recklessness***. Where—as here—a complaint fails to allege motive, "the strength of the circumstantial allegations" of conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Plaintiffs therefore "must allege a degree of scienter approaching a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts and must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question." *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *11 (S.D.N.Y. Mar. 30, 2012). To make this showing, a complaint "*must specifically identify* the reports or statements that are contradictory to the statements made." *Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (quotation marks omitted).

Plaintiffs come nowhere close to meeting this high bar. Plaintiffs point to nothing—no facts, allegedly concealed data, confidential witness testimony, corrective disclosures, or

restatement of financials—showing that Genesis, let alone the DCG Defendants, disbelieved Genesis's financial reporting or knew that it lacked a reasonable basis. *See* Am. Compl. ¶¶ 221–23, 238–53.  In effect, Plaintiffs allege nothing more than their disagreement with how Genesis accounted for the Note and their belief that Genesis *should have* recognized an impairment after the 3AC collapse.  But it is well-settled that in the Second Circuit, "GAAP violations, accounting irregularities, and the issuance of a restatement, 'standing alone, are insufficient to state a securities fraud claim.'"  *Plumbers & Steamfitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).  And, even if they could, that would at best support a claim against Genesis, not against the DCG Defendants.

Plaintiffs cannot rely on their allegations regarding capital withdrawals by Defendant Silbert and unnamed insiders in the months leading up to the 3AC default.  *See* Am. Compl. ¶¶ 284–85.  Plaintiffs do not explain why capital withdrawals *prior* to 3AC's announcement of insolvency in June 2022 (and Genesis's alleged insolvency) or the announcement of the Note on June 30, 2022 would be relevant to scienter.  In any event, "[t]he selling of even considerable shares is not sufficient, standing alone, to infer scienter," *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 319 (D. Conn. 2017), *aff'd*, 918 F.3d 57 (2d Cir. 2019), particularly where there is nothing "unusual or suspicious" about them, *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 296 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).[2]

* * *

---

[2] Plaintiffs' allegations as to HQ Cash Management Fund fail on their own terms.  *See* Am. Compl. ¶¶ 110–19.  Plaintiffs offer no factual basis for their "belief" that Silbert was an investor in the HQ Cash Management Fund (he was not), *see id.* ¶ 115, and the records they cite do not show that the $99 million capital withdrawal by HQ Cash Management Fund in June 2022 occurred after the announcement of 3AC's insolvency at the end of the month (they did not), *see id.* ¶ 284.

Plaintiffs' allegations do not support a plausible inference of fraud, let alone a compelling one.  They offer nothing beyond the motive of ordinary corporate profits—which did not even run to the DCG Defendants—as evidence of scienter.  That is demonstrably insufficient.  The far more plausible inference from the facts alleged is that DCG made a genuine effort to keep Genesis operational, but the collapse of FTX was too much for Genesis to bear.  Plaintiffs cannot shift responsibility for widespread disruption in the industry onto the DCG Defendants, and they certainly cannot use that disruption as the basis for claiming fraudulent intent.

### 2.      Plaintiffs Fail to Plead Reliance

Plaintiffs also fail to adequately plead reasonable reliance on either Genesis' alleged misrepresentations or the DCG Defendants' allegedly deceptive acts.  To plead individual reliance, Plaintiffs must allege facts showing that they knew of the alleged misstatement or deceptive act, and engaged in the transaction based on that specific statement or act.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256–57 (2d Cir. 2016).  None of Plaintiffs' alternative theories for reliance have merit.

The only representations Plaintiffs claim to have directly relied on are two statements in the Lending Agreements:  one that Genesis "represents and warrants that it is not insolvent" and one that Genesis "represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions." Am. Compl. ¶ 292.  But even assuming these statements became false or misleading after June 2022, Plaintiffs do not allege that they were false at the time of the alleged "purchase" or "sale" of a security, i.e., the execution of the Lending Agreements.  *See id.* ¶ 142.  Indeed, Plaintiffs executed their Lending Agreements long before Genesis is alleged to have become insolvent following 3AC's bankruptcy in June 2022.  *See* ECF Nos. 38 2, 38 3, 38 5, 34 2.  Thus, to the extent these statements were made "in connection" with the purchase or sale of a security, they were not false

or misleading at that time, and cannot form the basis for any allegation of reliance.  *See Taylor*, 943 F. Supp. 2d at 407.  Tellingly, the only allegations of falsity Plaintiffs offer as to those statements (which are conclusory) come in the context of their efforts to plead reliance.  *See* Am. Compl. ¶¶ 280–81, 292–93, 302–04.

That leaves Plaintiffs with an attenuated theory of reliance based on alleged correspondence between Genesis and Gemini regarding the fallout from 3AC's bankruptcy and Genesis's financial condition.  But Plaintiffs do not allege that *any* of these alleged misstatements were made to them—instead, Plaintiffs seek to establish reliance indirectly by claiming that Genesis made misrepresentations to Gemini, who allegedly was acting as the "agent" of Plaintiffs who participated in the Gemini Earn program (the "Gemini Earn Plaintiffs"), but not the agent of institutional lenders, like Plaintiff Translunar.  Am. Compl. ¶ 295.  But Gemini acted as the agent for the Gemini Earn Plaintiffs only for the purposes of facilitating lending transactions pursuant to the MLA, *see* MLA § 1(b) ("Principal [Gemini Earn lender] has specifically directed Agent [Gemini] . . . to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets"), and the MLA makes clear that the lenders had "not authorized Agent to exercise discretion in determining the amount, timing or selection of any Loan on Principal's behalf," *id.*  Gemini thus did not make any investment decisions on Plaintiffs' behalf, much less rely on the alleged misstatements or acts to do so.  *See In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998) (agency theory of reliance applies only where plaintiffs "allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants").

This theory of indirect reliance also suffers from a temporal defect.  Because a plaintiff "must have purchased or sold securities in reliance on the defendants' alleged fraud," *Telenor E.*

*Inv. AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 443 (S.D.N.Y. 2008), post-purchase misrepresentations or deceptive acts cannot form the basis of a fraud claim, *see Walsh v. Rigas*, 2019 WL 294798, at *7 (S.D.N.Y. Jan. 23, 2019); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *23 (S.D.N.Y. Aug. 29, 2012) ("Allegedly false statements made after the named plaintiff's last stock purchase are not actionable because the plaintiff could not possibly have relied on such statements in purchasing the stock.") (citation omitted).  Here, however, the Gemini Earn Plaintiffs executed their respective Lending Agreements no later than November 2021, *see infra* Part I.D, well before any of the misrepresentations or deceptive acts alleged in the Complaint, *see, e.g.*, Am. Compl. ¶¶ 33–34, 262–63, 267–68, 274–75.

Even if Plaintiffs could remedy *both* of those defects, though, this theory still fails, because the Gemini Earn Plaintiffs warranted in the MLA that they were "not relying on any communication (written or oral) of [Genesis] as investment advice or as a recommendation to enter into any Loan," MLA § V(i), and that the MLA "constitute[d] the entire Agreement among the parties with respect to the subject hereof and supersede[d] any prior negotiations, understandings and agreements," *id.* § XVI.  And, as set forth above, Plaintiffs agreed that their recourse for any claims arising out of the Lending Agreements would be against Genesis, not DCG.  *See supra* Part I.A.1.  Where a contract "limit[s] the bases upon which a fraud action could be brought" to the representations made within the agreement, fraud cannot be premised on extra-contractual statements.  *Harsco Corp.*, 91 F.3d at 343.  Courts routinely preclude reliance on extra-contractual representations in such circumstances.  *See, e.g.*, *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 79 (2d Cir. 2010); *Simmtech Co. v. Citibank, N.A.*, 2016 WL 4184296, at *14 (S.D.N.Y. Aug. 3, 2016) (precluding reliance based on clause identical to the one here), *aff'd*, 697 F. App'x 35 (2d Cir. 2017).  None of Genesis' statements to Gemini concerning its financial health

and risk management policies can form the basis of Gemini Earn Plaintiffs' 10(b) claim.

Plaintiffs offer one final effort to plead reliance in the form of the *Affiliated Ute* presumption, which allows a court to presume reliance "in cases involving primarily omissions, rather than affirmative misstatements, because proving reliance in such cases is, in many situations, virtually impossible." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972)); *see also* Am. Compl. ¶¶ 297–98. This presumption applies, however, only "in instances of total non-disclosure," *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975), where "no positive statements exist" and "reliance as a practical matter is impossible to prove," *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981). It does not apply to "misstatements whose only omission is the truth that the statement misrepresents." *Waggoner*, 875 F.3d at 96.

Here, Plaintiffs' claims are premised entirely on alleged misstatements regarding Genesis's financial condition. *See* Am. Compl. ¶¶ 196–98, 231, 234–35, 237, 243–44, 246–47, 250–51, 257, 262, 264, 272–73, 279–80. Plaintiffs thus cannot invoke the *Affiliated Ute* presumption by alleging that Genesis or the DCG Defendants omitted facts necessary to make those statements not misleading. *See, e.g.*, *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005) (finding *Affiliated Ute* presumption inapplicable where allegations "focuse[d] most heavily on allegedly misleading statements"); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *17 (E.D.N.Y. Jan. 11, 2022) (*Affiliated Ute* presumption did not apply because "the vast majority of the statements at issue in this case involve affirmative misstatements"). This is not a "pure-omission case[]," *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 2023 WL 2585942, at *19 n.18 (S.D.N.Y. Mar. 21, 2023), as evidenced by the absence of any allegations by Plaintiffs of a preexisting duty on the part of Genesis or the DCG Defendants to disclose material information

even in the absence of affirmative statements, *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").  Accordingly, Plaintiffs are not entitled to the *Affiliated Ute* presumption, and must plead individual reliance—which they have not done.

### 3.    Plaintiffs Fail to Plead Loss Causation

Plaintiffs' Exchange Act claims also fail because Plaintiffs do not plead loss causation. Under the Exchange Act, a plaintiff must adequately allege a "causal link between the alleged misconduct and the economic harm ultimately suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  As a result, loss causation is established only where "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct."  *Id.* at 174.  "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie."  *Id.* (citation omitted).  Plaintiffs may establish the requisite causal connection via one of two methods: "(1) a corrective disclosure or (2) a materialization of a concealed risk."  *Altimeo*, 2023 WL 2585942, at *11.

The problem for Plaintiffs under either theory is that their claimed injury—the freezing of their digital assets—is unconnected to any allegedly false or misleading representations by Genesis or the DCG Defendants.  There was no corrective disclosure here and, because the Lending Agreements are not tradeable securities, there was no subsequent drop in the market price for the Lending Agreements.  Nor can Plaintiffs rely on the delayed materialization of a concealed risk, because the risk that Plaintiffs claim Genesis failed to disclose—its insolvency—had already allegedly materialized in June 2022, yet the ultimate harm Plaintiffs now claim—the redemption freeze—did not manifest until November 2022.  *See* Am. Compl. ¶¶ 286, 288.  Thus, Plaintiffs'

claimed losses cannot be traced back to Genesis's alleged concealment of its purported insolvency, because Genesis's purported insolvency plainly was not the impetus for the redemption freeze.

The logical gaps in Plaintiffs' loss causation theory expose another problem:  It was the FTX collapse in November 2022 that, in Plaintiffs' own telling, rendered Genesis unable to "honor redemption requests" from lenders.  Am. Compl. ¶ 39–40.  "[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases."  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994).  In such cases, "a plaintiff's claim fails when it has not adequately [pled] facts which if proven, would show that its loss was caused by the alleged [misconduct] as opposed to [the] intervening event[]."  *Lentell,* 396 F.3d at 174.  Plaintiffs have not even tried to allege here that their claimed injury—the redemption freeze—would have occurred in the absence of the FTX collapse.  And they could not plausibly do so, given the significant time gap between the alleged concealment of Genesis's financial condition and the redemption freeze months later. *See Wilamowsky v. Take-Two Interactive Software, Inc.*, 818 F. Supp. 2d 744, 757 (S.D.N.Y. 2011).  That is fatal to any theory of loss causation.

### 4.    Plaintiffs Fail to Plead Damages

Finally, Plaintiffs also have failed to adequately allege damages.  In a typical securities case, damages are based on out-of-pocket losses, measured by the delta between the allegedly inflated stock price and the securities' actual value.  *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).  But here, the only "injury" Plaintiffs claim is that they have "been denied access to their digital assets since November 16, 2022" and may not ultimately recover those digital assets through the Genesis bankruptcy.  Am. Compl. ¶ 11; *see also id.* ¶ 175 (alleging Plaintiffs were harmed by Genesis's "suffering of losses and entering bankruptcy" which is "restricting their ability to access their digital assets").  That is not a concrete

injury—Plaintiffs may very well fully recover their digital assets in the Genesis bankruptcy.  The

speculation of future injury which may or may not manifest is not sufficient.  *See Aimis Art Corp.*

*v. N. Tr. Secs., Inc.*, 641 F. Supp. 2d 314, 320–21 (S.D.N.Y. 2009) (alleged damages resulting

from "reduced interest" and "lack of use" of funds were speculative and not recoverable).

### D.    Count I Should Be Dismissed as to the Gemini Earn Plaintiffs Because the Securities Act Claim Is Barred by the One-Year Statute of Limitations

The Securities Act claim brought by those Plaintiffs participating in the Gemini Earn

program—which includes all Plaintiffs except Translunar—should be dismissed for the additional

reason that it is barred by the statute of limitations.

Section 13 of the Securities Act bars a plaintiff from bringing an action enforcing Sections

5 and 12(a)(1) "unless brought within one year after the violation upon which it is based."  15

U.S.C. § 77m; *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993) (statute of

limitations applies to control person claims under Section 15).  Thus, a plaintiff must bring any

such claim within one year of its purchase of the alleged securities.  *See Anderson v. Binance*, 2022

WL 976824, at *2–3 (S.D.N.Y. Mar. 31, 2022); *Blatt v. Merrill Lynch, Pierce, Fenner & Smith*

*Inc.*, 916 F. Supp. 1343, 1354 (D.N.J. 1996).  This one-year limitations period applies "regardless

[of] whether [p]laintiff knew or reasonably could have known of the injury at that time."  *Teva*

*Pharm. Indus. Ltd. v. Deutsche Bank Sec. Inc.*, 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010);

*see also Anderson*, 2022 WL 976824, at *2 ("Section 12(a)(1) does not include a statutory

discovery rule.").

The Gemini Earn Plaintiffs' certifications establish that they began lending digital assets

to Genesis—via the Gemini Earn program—no later than November 2021, well over a year before

the commencement of this action on January 23, 2023.  *See* ECF Nos. 38-2, 38-3, 38-5, 34-2.  And

because the Gemini Earn Plaintiffs could only lend assets through the Gemini Earn program

subsequent to the execution of a Lending Agreement, the Gemini Earn Plaintiffs necessarily executed the Lending Agreement—and thus "purchase[d]" the alleged "security"—well outside the one-year statute of limitations imposed by the Securities Act.

The Gemini Earn Plaintiffs cannot rely on the discovery rule or any alleged fraudulent concealment tolling.  As noted above, "[s]ection 12(a)(1) does not include a statutory discovery rule," *Anderson*, 2022 WL 976824, at *2, and courts have held that fraudulent concealment likewise is "not available to toll the one-year statute of limitations," *Barton v. Peterson*, 733 F. Supp. 1482, 1482, 1490 (N.D. Ga. 1990) (collecting cases); *see also Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 553 (6th Cir. 2012) ("[T]he fact that the statute plainly fails to include a discovery rule for § 12(a)(1) . . . shows that Congress intended to negate equitable tolling in this context."). Moreover, Plaintiffs plainly fail to provide particularized allegations that the DCG Defendants "wrongfully concealed material facts" that "prevented plaintiff's discovery of the nature of the claim within the limitations period." *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 339 (S.D.N.Y. 2021).  Indeed, "whether a security is registered is a matter of public record, and therefore cannot really be concealed." *Denoia v. Pulte Home Corp.*, 2013 WL 12155826, at *11 (M.D. Fla. Sept. 5, 2013) (citation omitted).

Accordingly, the Gemini Earn Plaintiffs' Securities Act claim is barred by the one-year statute of limitations and should be dismissed on that basis (among many others).

### E.    Plaintiffs' Copy/Paste Allegations About Statements Allegedly Made to Nonparties Are Irrelevant

Scattered throughout the Amended Complaint are allegations that Plaintiffs do not even try to connect to any theory of liability.  Those allegations relate to allegedly false or misleading representations made by Silbert and Murphy to (1) Cameron Winklevoss, Gemini's co-founder, at a lunch in October 2022, and (2) an unidentified investor on a call.  *See* Am. Compl. ¶¶ 257, 272.

It is unclear how these allegations fit, if at all, into Plaintiffs' claims—likely because Plaintiffs lifted these allegations verbatim from a complaint filed by non-party Gemini against some of Defendants just weeks ago.  *Compare id.* ¶¶ 196–200, 204–07, 232–53, 255–78, *with* Compl., *Gemini Trust Co., LLC v. Digital Currency Grp, Inc.*, No. 1:23-cv-06864-LJL (S.D.N.Y. Aug. 4, 2023) (ECF No. 1-1) ¶¶ 28–31, 46–47, 61–80, 82–102.

Courts "generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation."  *Amorosa*, 2022 WL 3577838, at *1; *see also In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("[T]he Court still need not consider parroted allegations for which counsel has not conducted independent investigation."), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *cf. In re Teva Sec. Litig.*, 2023 WL 3186407, at *27 (D. Conn. May 1, 2023) (Underhill, J.) (denying request to strike allegations copied from complaints filed by others when the complaints were not identical).  Plaintiffs do not claim to have independently conducted an investigation into these allegations, nor could they have:  They included those allegations for the first time just *five days* after Gemini included them in its complaint.  Plaintiffs clearly have no independent grounds for making these factual allegations pulled verbatim from a different pleading, and cannot rely on them to satisfy the high pleading standard for fraud.

In any event, though, these allegations are deficient.  Neither of these representations were made to or relied upon by Plaintiffs, and while Plaintiffs assert that Gemini acted "as their designated agent," Am. Compl. ¶ 312(a), that is both inaccurate and immaterial, *see supra* Part I.C.2.  Moreover, Plaintiffs do not actually identify anything *false* about Silbert's statements to Winklevoss:  They merely repeat their claim that Genesis was insolvent.  But Silbert is not alleged

to have made any representations regarding solvency—Plaintiffs concede that Silbert advised that termination of the Gemini Earn program would cause a "mismatch" in Genesis's loan positions (*id.* ¶ 273)—and Silbert had no freestanding duty to give Winklevoss a full accounting of Genesis's financial condition (to the extent he even knew about it, which is not adequately alleged either). *See In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 217 (S.D.N.Y. 2019).  Plaintiffs' uncritical incorporation of allegations made in other lawsuits cannot salvage its claims.

## II.    Counts I Through III Should Be Dismissed Because There Was No Sale or Offer of a Security

Plaintiffs' securities law claims fail for the additional and independent reason that Plaintiffs have not adequately alleged the sale or offer of a "security," within the meaning of federal law.

### A.    There Was No Offer or Sale

There currently is a debate among courts, regulators, and legal academics as to whether digital assets such as cryptocurrency qualify as "securities" within the meaning of the federal securities laws, and whether, consequently, such digital assets must be registered as securities before they can be sold.  That debate often raises nuanced questions under two lines of Supreme Court authority—*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and *Reves v. Ernst & Young*, 494 U.S. 56 (1990)—and sometimes leads to divergent results.  *Compare SEC v. Ripple Labs, Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), *with SEC v. Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, 2023 WL 4858299 (S.D.N.Y. July 31, 2023).

That debate need not be resolved in this case.  Even assuming arguendo that cryptocurrency is a security, neither Genesis nor any of the DCG Defendants are alleged to have sold cryptocurrency to any of Plaintiffs.  Instead, Genesis offered a program through which parties could lend their own digital assets to Genesis and receive Loan Fees.  *See* Am. Compl. ¶¶ 120–23.  Once participants signed a Lending Agreement with Genesis, they could (but were not required)

to deposit their digital assets with Gemini in exchange for interest and withdraw those digital assets on demand, just like a normal deposit bank account.  *See id.* ¶¶ 125–26, 128.

Because no digital assets were bought or sold here, Plaintiffs allege that the Lending Agreements *themselves* are the relevant securities.  Am. Compl. ¶¶ 142–75.  The threshold and fatal problem for Plaintiffs, though, is that in no sense could it rationally be said that the Lending Agreements were "purchased" or "sold."  Section 5 of the Securities Act "requires that securities be registered with the SEC before any person may *sell or offer to sell* such securities."  *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006) (emphasis added).  A "sale" includes "every contract of sale or disposition of a security or interest in a security, *for value*," and "offer" includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, *for value*."  15 U.S.C.§ 77b(a)(3) (emphases added).  Section 10(b) of the Exchange Act similarly applies only to manipulative or misleading conduct undertaken "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  The Second Circuit has explained that a "purchase" or "sale" is "the act of entering into a binding contract to purchase or sell securities."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012).

Beyond more conclusory assertions, *see, e.g.*, Am. Compl. ¶¶ 331, 356, the Amended Complaint does not offer any factual allegations indicating the "purchase" or "sale" of securities. That is because the alleged "securities"—the Lending Agreements—were never sold or offered to be sold.  They simply established a framework that gave Plaintiffs the *opportunity* to lend digital assets to Genesis in the future, but no *obligation* to do so.  *See* MBA § II(a); MLA § II(a).  There was no exchange of "value," 15 U.S.C. § 77b(a)(3), and no "binding contract to purchase or sell securities," *Absolute Activist Value Master Fund*, 677 F.3d at 67.  Unlike traditional note sales, the Lending Agreements did not raise a fixed amount of capital, did not require the exchange of

consideration between the parties, and did not fix a maturity date for the loans. Plaintiffs retained full discretion to lend (or not lend) digital assets to Genesis at any interval, in any volume and length of their choosing, and Genesis was not obliged to accept any digital assets that might be offered by Plaintiffs for loan in the future. MBA § II(a); MLA § II(a). None of this course of conduct evinces a "sale," "offer," or "purchase" of anything.

Thus, to dispose of this case, the Court need not render a decision regarding the question of whether there is a "security" involved here, much less whether digital assets are securities.

### B.    The Lending Agreements Are Not Securities

Even if Plaintiffs could somehow contort their contractual arrangements with Genesis into a "sale," however, the Lending Agreements are not themselves securities. Plaintiffs offer two theories, claiming that (1) the Lending Agreements are "investment contracts" under *Howey*, 328 U.S. 293; and (2) the Lending Agreements are "security notes" under *Reves*, 494 U.S. 56. Neither withstands scrutiny.[3]

### 1.    The Lending Agreements Do Not Constitute Investment Contracts Under *Howey*

Under *Howey*, an instrument is an investment contract (and thus a security) where there is (1) an investment of money, (2) in a common enterprise, (3) in which the purchaser expects profits solely derived from the efforts of others. 328 U.S. at 299. At all times, the focus is on the economic reality of the transaction. *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Howey*, 328 U.S. at 298. Plaintiffs have not adequately alleged the first element for the reasons noted above, namely, the Lending Agreements did not require any "investment of money" by Plaintiffs—they simply established the contractual framework for future loans at Plaintiffs' discretion. Moreover,

---

[3] The SEC has filed suit against Gemini and Genesis claiming otherwise. *See SEC v. Genesis Global Capital, LLC*, No. 23-CV-287 (S.D.N.Y.). That case remains pending.

Plaintiffs have not adequately alleged the second or third elements of the *Howey* test.

### a.    Plaintiffs Did Not Invest In A Common Enterprise

Courts typically examine whether there is a "common enterprise" by considering whether there is "horizontal commonality." *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011). Horizontal commonality consists of the "tying of each individual investor's fortune to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

Fatal to any theory of horizontal commonality here is the absence of sufficient allegations of pooling of funds.  Pooling occurs when the funds received are "reinvested by the promoter into the business" and "[i]n turn, such reinvestment *increases the value of the instrument offered*." *Friel v. Dapper Labs, Inc.*, 2023 WL 2162747, at *11 (S.D.N.Y. Feb. 22, 2023).   But here, Genesis's deployment of the alleged pooled digital assets in its lending business increased neither the Loan Fee nor the value of the Lending Agreements:  Plaintiffs did not derive profit based on the success of Genesis's ecosystem, and in fact, a lender's digital asset loaned to Genesis could actually diminish in value, even as Genesis earned interest on its re-lending of that asset. *Cf. SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 174 (S.D.N.Y. 2020) (pooling adequately alleged only where all of the investors profited from the increased value of the crypto token).   The mere fact that Genesis commingled Plaintiffs' funds (Am. Compl. ¶ 173) "does not render this transaction a security." *Cooper v. King*, 114 F.3d 1186, 1997 WL 243424, at *2 (6th Cir. 1997) (Table).

Moreover, Plaintiffs' fortunes did not depend upon the profitability of the enterprise as a whole, further foreclosing horizontal commonality.  Instead, Plaintiffs' returns derived from a contractual "Loan Fee" paid by Genesis under the terms of the Lending Agreements. *See* MLA § III(a); MBA § III(a); *see also* MLA § III(a)(iv) (interest rate at all times greater than 0%). Neither Genesis's obligation to pay the Loan Fee nor the amount of the Loan Fee was tied to any

of Genesis's returns on its subsequent use of Plaintiffs' digital assets, and the absence of such a link is fatal to any conclusory assertions of a common enterprise.  *See, e.g.*, *Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 370 (S.D.N.Y. 1992) (holding no common interest when an investor's fortunes would not have been impacted by the success or setbacks of the business "[g]iven the fixed rate of return expected"); *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1399 (10th Cir. 1987) (finding no security because the "participants were not entitled to receive dividends on their certificates, only specified interest payments").

Plaintiffs offer nothing but conclusory and legally insufficient allegations in response. They allege that "both Genesis Global Capital and investors earned profits when Genesis Global Capital deployed the pooled assets."  Am. Compl. ¶ 174.  That conclusory allegation is just false: Plaintiffs' "profits" were based on Genesis's payment of the Loan Fees, which were independent of any returns Genesis earned on its reinvestment of the proceeds.  *See* MLA § III(a); *see also Trahan v. Lazar*, 457 F. Supp. 3d 323, 341 (S.D.N.Y. 2020) ("[W]hen any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control. . . ."). In fact, the Loan Fees varied across investors, with some Loan Fees being individually negotiated, *see* MBA § III(a), and others subject to variable interest rates, MLA § III(a).  Where, as here, each agreement is unique and "negotiated one-on-one by the parties," no common enterprise can exist. *Marine Bank v. Weaver*, 455 U.S. 551, 560 (1982).

Plaintiffs are wrong to point to Genesis's bankruptcy and subsequent inability to repay the loans as evidence of pooled assets and common enterprise.  *See* Am. Compl. ¶ 175.  The risk of loss due to a counterparty's insolvency is inherent in *every* lending agreement—and indeed, in every business transaction more generally—and thus is not an indicator of commonality of interest. *See C.N.S. Enters., Inc. v. G. & G. Enters., Inc.*, 508 F.2d 1354, 1359 (7th Cir. 1975) ("In one

sense every lender of money is an investor since he places his money at risk in anticipation of a profit in the form of interest."); *see also Harman v. Harper*, 914 F.2d 262, 1990 WL 121073, at *5 (9th Cir. 1990) (Table) ("[A]n individual borrower's failure to make payments on privately-negotiated notes does not give rise to liability under the securities laws.").

Some courts recognize an alternative species of commonality—strict vertical commonality—in which there is a "one-to-one relationship between the investor and investment manager such that there is an interdependence of *both profits and losses* of the investment." *Friel*, 2023 WL 2162747, at *10 (quotation marks omitted). The Second Circuit has not yet adopted this test, and at least two federal courts have rejected it. *See Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 222 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982); *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276–77 (7th Cir. 1972) (Stevens, J.). In any event, though, vertical commonality still requires an "interdependence of *both profits and losses* of the investment," *Friel*, 2023 WL 2162747, at *10, and as set forth above, Plaintiffs have offered no well-pled allegations that their fortunes rose or fell with those of Genesis.

### b.   Plaintiffs Do Not Allege They Had a Reasonable Expectation of Profits from the Efforts of Others

*Howey*'s third prong examines "whether the economic reality surrounding [the Lending Agreements] led [Plaintiffs] to have a 'reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *Ripple Labs*, 2023 WL 4507900, at *9. "The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Id.* (quotation marks omitted). Plaintiffs cannot establish this prong for many of the same reasons as they fail to establish the second prong.

*First*, the Amended Complaint is purely conclusory on this element, alleging only that Genesis "invested the pooled digital assets in ways designed to generate returns for DCG, Silbert,

[itself], and investors."  Am. Compl. ¶ 172.  Plaintiffs offer no factual allegations to support this assertion.  The mere fact that Genesis's *ability* to pay the Loan Fees owed to Plaintiffs and others depended on its solvency does not establish that any expectation of profits Plaintiffs had was dependent upon the efforts of Genesis.  *See Elson v. Geiger*, 506 F. Supp. 238, 242 (E.D. Mich. 1980) ("While the repayment of the mortgage may have depended on the solvency of the borrower, this is not the same as depending on entrepreneurial efforts."), *aff'd*, 701 F.2d 176 (6th Cir. 1982).

*Second*, the terms of the Lending Agreements foreclose any contention that Plaintiffs reasonably expected to profit from the efforts of Genesis.  As explained above, nothing about how Genesis "designed" its investments affected what Plaintiffs were entitled to receive.  *See, e.g.*, *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981) (no security where "the return expected by the Bank was simply the repayment of the amounts advanced plus a fixed rate of interest"); *Union Nat'l Bank of Little Rock v. Farmers Bank*, 786 F.2d 881, 884–85 (8th Cir. 1986) (no security where the plaintiff's "return was based solely upon [the issuer's] ability to repay the loan").  Although the promise of a fixed rate of return does not *per se* foreclose the possibility that an investment contract could be a security, *see SEC v. Edwards*, 540 U.S. 389, 396–97 (2004), what matters here is that the rate of return does not reflect the proceeds from the seller's efforts.  To the extent Plaintiffs allege that their expectations were influenced by information from websites and social media, *see* Am. Compl. ¶¶ 160–62, these allegations cannot override the clear terms of the Lending Agreements, *see, e.g.*, *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir. 2011) (per curiam) (explaining that "in determining whether or not a particular transaction is a security,'" an integration clause will exclude "oral representations" from qualifying as "promises [or] inducements"); *Demarco v. LaPay*, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) ("[M]arketing and advertising hooks do

not change the character of the transaction . . . .").

*Third*, even if Plaintiffs had a reasonable expectation of "profits" based on Genesis's reinvestment of the loaned digital assets, any such expectation depended on matters related to the market for cryptocurrency that had nothing to do with Genesis.  In such circumstances, the *Howey* test is not satisfied.  *See SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) ("[I]f the realization of profits depends significantly on the post-investment operation of market forces," this does "not satisfy *Howey's* third prong."); *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no investment contract where "any gain likely would result in large part from market movements").

## 2. The Lending Agreements Are Not Security Notes Under *Reves*

Plaintiffs' alternative theory—that the Lending Agreements are "security notes" within the meaning of the Supreme Court's decision in *Reves*, 494 U.S. 56—fails on its face, because there were no "notes" exchanged between the parties.  Plaintiffs deposited their digital assets with Genesis, received a Loan Fee, and could withdraw their assets at any time.  *See supra* p. 29. Plaintiffs retained a right of withdrawal, not a note payable at maturity.  The Lending Agreements thus do not even fit within the conceptual framework of *Reves*.

To the extent any further analysis is appropriate, however, Plaintiffs' arguments fail under each of the *Reves* factors:  (1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme significantly reduces the risk of the instrument.  *Reves*, 494 U.S. at 66–67; *see also Kirschner v. JP Morgan Chase Bank, N.A.*, — F.4th —, 2023 WL 5437811, at *8 (2d Cir. Aug. 24, 2023).

*First*, Plaintiffs' motivations were consistent with those of any lender.  The first *Reves* factor asks "whether the motivations are investment (suggesting a security) or commercial or

consumer (suggesting a non-security)." *Bongiorno v. Baquet*, 2021 WL 4311169, at *16 (S.D.N.Y. Sept. 20, 2021).  The question is whether "the overall motivation of the parties was the promotion of commercial purposes rather than an investment in a business enterprise."  *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992) (quotation marks omitted).  Thus, where "the amount to be paid is contractually established, and must be paid, whether or not the buyer's business is positively affected by the purchase," this factor favors treatment of the instrument as a commercial note, and not a security.  *Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010).

Here, Plaintiffs agreed to loan their digital assets in exchange for pre-determined, contractually-obligated Loan Fees.  Plaintiffs' returns were determined by market-based yield, and not on the success of a capital investment tied to appreciation in a company's value.  Plaintiffs' assertion that the lenders sought to "profit" off of their loans and "receive profit in the form of interest on [their] assets," Am. Compl. ¶¶ 151, 155, is an unremarkable observation:  "[E]very lender of money is an investor since he places his money at risk in anticipation of profit," *C.N.S. Enters., Inc.*, 508 F.2d at 1359.  But that does not render every lending arrangement a security.

*Second*, the plan of distribution does not suggest an investment.  The second *Reves* factor considers "'the plan of distribution' of the instrument," including whether it is subject to "common trading for speculation or investment."  *Kirschner*, 2023 WL 5437811, at *9.  To establish this factor, courts look to whether "there was a secondary market for the [notes]," *Nat'l Bank of Yugoslavia v. Drexel Burnam Lambert, Inc.*, 768 F. Supp. 1010, 1015 (S.D.N.Y. 1991), or whether the notes were sold to a "broad segment of the public," *Fragin v. Mezei*, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012).

There was no secondary market for the Lending Agreements, and in fact, investors were

expressly prohibited from trading their interest in the Lending Agreements to others.  MLA § XVII; MBA § XVII.  And it is not dispositive that the Lending Agreements were "publicly advertised," Am. Compl. ¶ 157, because Plaintiffs acknowledge that Genesis imposed high lending minimums on institutional lenders that excluded significant portions of lenders, *id.* ¶ 124, and that the Gemini Earn program was available only to those individuals or entities that "held a Gemini digital asset platform account," *id.* ¶ 126; *see also Kirschner*, 2023 WL 5437811, at *9 (no security where notes were offered to limited group of lenders and secondary market was restricted).

*Third*, there are no well-pled allegations that the investing public would equate the lending agreements to securities.  The third factor "examines whether there exists 'public expectation that the notes would be traded as securities.'"  *Schentag v. Nebgen*, 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018).  But the Lending Agreements prohibited lenders from transferring or assigning their rights under the agreements, *see* MBA § XVII; MLA § XVII, meaning those rights could not be traded on a secondary market like securities are, *see Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La. 1990), *aff'd sub nom. Reeder v. Palmer*, 917 F.2d 560 (5th Cir. 1990) (finding that since the alleged securities "were not commonly traded," "it is unnecessary to examine the reasonable expectation of the investing public").  Moreover, the Gemini Earn Plaintiffs agreed in the MLA that the loans were "intended to be commercial loans . . . not securities."  MLA § XXV; *see also Kirschner*, 2023 WL 5437811, at *10 ("If buyers were given ample notice that the instruments were . . . loans and not investments in a business enterprise, it suggests that the instruments are not securities." (alteration and quotation marks omitted)).

*Finally*, Plaintiffs have not adequately alleged that the Lending Agreements were insufficiently regulated such that application of the Securities Act is necessary.  *See Kirschner*, 2023 WL 5437811, at *11.  Both Gemini and Genesis were regulated by the U.S. Financial

Intelligence Unit during the relevant period, which investigates and combats money laundering and financial crimes.  *See* FinCEN, https://www.fincen.gov/what-we-do (last visited Sept. 8, 2023).  Moreover, as Plaintiffs acknowledge, Gemini was regulated by the New York Department of Financial Services.  *See* Am. Compl. ¶ 165.  The fact that *other* regulatory regimes did not apply to Genesis says nothing about the adequacy of the regulatory regimes that undisputedly *did* apply.

\* \* \*

At bottom, Plaintiffs cite nothing to distinguish these lending contracts from any other lending arrangement, or even from ordinary deposit accounts on which a bank pays interest.  It is always the case that the borrower's ability to pay contractual interest is dependent on its own profits, and borrowers very often take loans from multiple sources to finance a venture.  But those unremarkable features do not render such lending arrangements "securities" for purposes of federal law.  The Lending Agreements bear none of the hallmarks of securities, such as a pooled investment in an enterprise, a return dependent on the success or failure of that enterprise, or a secondary market.  Plaintiffs cannot wedge this case into the paradigm of the securities laws.

## III.  Counts IV and V Should Be Dismissed Because Plaintiffs Fail to Adequately Allege Any State-Law Claims in the Alternative

As a fallback, Plaintiffs assert claims under Connecticut and New York consumer protection laws based on allegedly "fraudulent marketing, advertising, and sales tactics."  *See* Am. Compl. ¶¶ 305–13.  Those claims are premised on the same factual allegations as the Exchange Act claims, and they fail for many of the same reasons.

### A.  Count IV Should Be Dismissed Because Plaintiffs Have Failed to Allege a CUTPA Claim

"[T]o prevail in a private cause of action under the [Connecticut Unfair Trade Practices Act ("CUTPA")], a plaintiff must establish that the defendant has (1) engaged in unfair methods of competition or unfair or deceptive acts or practices (2) in the conduct of any trade or commerce,

(3) resulting in (4) an ascertainable loss of money or property, real or personal, by the plaintiff."

*Kent Literary Club of Wesleyan Univ. at Middletown v. Wesleyan Univ.*, 257 A.3d 874, 889 (2021).

Where, as here, Plaintiffs' "CUTPA claims rely on claims of fraud," Rule 9(b)'s heightened

pleading standard applies.  *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at

*8 (S.D.N.Y. Mar. 5, 2013).

Plaintiffs' CUTPA claims fail for all of the same reasons as their other claims.  Where a

"CUTPA claim is 'alleged in skeletal form and largely based on the same factual allegations that

support" another failing claim, "the CUTPA claims cannot survive for the same reasons."  *Lops v.*

*YouTube, LLC*, 2023 WL 2349597, at *5 (D. Conn. Mar. 3, 2023).  Plaintiffs do not allege any

facts distinct from its Exchange Act claims, admitting that their CUTPA claims "are premised on

the same conduct that forms the basis of Plaintiffs' Exchange Act Claims."  Am. Compl. ¶ 45; *see*

*also id.* ¶¶ 305–15.  Thus, "because [the Exchange Act] claim fails, so too must [the] derivative

CUTPA claim."  *Speer v. Select Portfolio Servicing*, 2023 WL 4850556, at *6 (D. Conn. July 28,

2023).  That is particularly true here, where the CUTPA limits control-person liability even more

strictly than the Exchange Act, *see Joseph Gen. Contracting, Inc. v. Couto*, 119 A.3d 570, 588–89

(Conn. 2015), and imposes a rigorous standard for proximate causation, *see Lewis v. Assurant,*

*Inc.*, 2022 WL 4599038, at *8–9 (D. Conn. Sept. 30, 2022).

At the very least, Plaintiffs' class allegations under the CUTPA must be stricken, because

the statute limits class action standing to claims brought "on behalf of similarly situated residents

*of Connecticut* or those that were injured *in Connecticut.*"  *In re Trilegiant Corp*, 11 F. Supp. 3d

82, 114–19 (D. Conn. 2014), *aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir.

2018).  Plaintiffs plead neither requirement here.  *See* Am. Compl. ¶¶ 47–51.  Plaintiffs' vague

allegations that, beginning in 2022, DCG's principal place of business was in Connecticut and that

"Defendants have transacted business within the State of Connecticut," *id.* ¶¶ 52, 73, have no

bearing on the standing inquiry, *see Trilegiant Corp, Inc.*, 11 F. Supp. 3d at 114–19.

> **B.      Count V Should Be Dismissed Because Plaintiffs Have Not Adequately Alleged an NYUDTPA Claim**

Plaintiffs also allege that the DCG Defendants engaged in unfair methods of competition

and unfair or deceptive acts or practices in the conduct of their trade and commerce in violation of

the New York Uniform Deceptive Trade Practices Act ("NYUDTPA"), N.Y. Gen. Bus. Law

§ 349.  *See* Am. Compl. ¶¶ 401–16.  To state a claim for relief under the NYUDTPA, a plaintiff

must allege that the defendants engaged in a "consumer-orientated . . . act or practice [that] was

misleading in a material respect," and that "the plaintiff was injured as result."  *Royal Host Realty,*

*LLC v. 793 Ninth Ave. Realty, LLC*, 192 F. Supp. 3d 348, 358 (S.D.N.Y. 2016)

Plaintiffs' claims fail at the outset, because the NYUDTPA applies only where the

deception occurred in New York.  *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 325

(2002); *Miramontes v. Ralph Lauren Corp.*, 2023 WL 3293424, at *4 (S.D.N.Y. May 5, 2023).

The Amended Complaint is devoid of any allegations that Plaintiffs—all of which are out-of-state

residents, *see* Am. Compl. ¶¶ 47–51—were injured in New York or that a deceptive transaction

occurred in New York.  It is not sufficient that DCG maintained its principal place of business in

New York prior to 2022, *see Goshen*, 98 N.Y.2d at 315, nor that the "defendant [allegedly]

originated the overall scheme in the state," *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 519

(S.D.N.Y. 2015).  Plaintiffs' allegation that Silbert met with Cameron Winklevoss in New York is

not sufficient, because the alleged representations in that meeting were not made to Plaintiffs.

In any event, the claims fail for several independent reasons.  First, as with the Exchange

Act claim, Plaintiffs allege no deceptive conduct by the DCG Defendants, and they cannot impute

Genesis's conduct to DCG based on mere corporate affiliation.  *See McAnaney v. Astoria Fin.*

*Corp.*, 665 F. Supp. 2d 132, 144 (E.D.N.Y. 2009).  Second, the allegations here relate to private contracts between Plaintiffs and Genesis, but "[p]rivate contract disputes do not constitute conduct that affects consumers at large and, therefore, do not satisfy the consumer-oriented threshold requirement under" NYUDTPA.  *Royal Host Realty*, 192 F. Supp. 3d at 359.  And third, there is no allegation of the sale of a consumer good—the Lending Agreements were not made generally available to the public and in fact were not "sold" at all—which is required for a claim under the NYUDTPA.  *See Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 773 (N.Y. App. Div. 1995) (NYUDTPA does not apply to "complex arrangements, knowledgeable and experienced parties and large sums of money").

* * *

Neither the CUTPA nor the NYUDTPA can salvage Plaintiffs' legally deficient federal claims.  They fail for all of the same reasons as the Exchange Act claims, and more.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety with prejudice.

Dated: September 11, 2023                    Respectfully Submitted,

                                            DEFENDANTS DIGITAL CURRENCY
                                            GROUP, INC., BARRY SILBERT, GLENN
                                            HUTCHINS, LAWRENCE LENIHAN, AND
                                            MARK MURPHY


                                            By:

                                            /s/ Jonathan D. Polkes
                                            Jonathan D. Polkes (admitted *pro hac vice*)
                                            Caroline Hickey Zalka (admitted *pro hac vice*)
                                            Stefania D. Venezia (admitted *pro hac vice*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, NY 10153
                                            Telephone: (212) 310-8000
                                            Facsimile: (212) 310-8007
                                            jonathan.polkes@weil.com
                                            caroline.zalka@weil.com
                                            stefania.venezia@weil.com


                                            Joshua M. Wesneski (admitted *pro hac vice*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            2001 M Street NW, Suite 600
                                            Washington, DC 20036
                                            Telephone: (202) 682-7248
                                            joshua.wesneski@weil.com

                                            /s/ Thomas D. Goldberg
                                            Thomas D. Goldberg (ct04386)
                                            Jennifer M. Palmer (ct31099)
                                            DAY PITNEY LLP
                                            One Stamford Plaza
                                            263 Tresser Boulevard
                                            Stamford, CT 06901
                                            Telephone: (203) 977-7300
                                            Fax: (203) 977-7301
                                            tgoldberg@daypitney.com
                                            jpalmer@daypitney.com


                                            *Their Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2023, a copy of the foregoing was filed electronically and served by e-mail on counsel for the following parties, who consented to e-mail service:

Derar Islim
c/o David Esseks, Esq.
Allen & Overy LLP
david.esseks@allenovery.com

Notice of this filing will be sent by e-mail to all appearing parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ *Jonathan D. Polkes*
Jonathan D. Polkes

## <u>CERTIFICATION OF COMPLIANCE WITH RULE XI(D)</u>

I hereby represent pursuant to Rule XI(D) (Multiple Signatures) of the Electronic Filing Policies and Procedures of the U.S. District Court for the District of Connecticut that the other attorneys whose signatures appear on the foregoing consented to the inclusion of their signatures.

/s/ *Jonathan D. Polkes*
Jonathan D. Polkes