# EXHIBIT A

# MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this _____ ("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: _____ ("Lender")

Formation: _____

Formation Location (country or US state): _____

Address: _____.

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.   Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Genesis Global Capital, LLC.

09/22

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means _____.

"*Lender Email*" means _____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

"**_Loan Fee_**" means the fee paid by Borrower to the Lender for the Loan.

"**_Loan Term Sheet_**" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"**_Loaned Assets_**" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made. For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"**_Maturity Date_**" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"**_New Token Fee_**" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"**_Open Loan_**" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"**_Prepayment Option_**" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"**_Term_**" means the period from the Loan Effective Date through Termination Date.

"**_Term Loan with Call Option_**" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"**_Term Loan with Prepayment Option_**" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"**_Termination Date_**" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or U.S. Dollars</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Borrower may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i) Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;
(ii) the amount of Digital Currency or U.S. Dollars;
(iii) whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;
(iv) the Loan Effective Date; and
(v) the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i) <u>Loan Repayment</u>

4

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business. If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower Email. Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

  (iii)  the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

  (iv)  in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and Termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

  (e) <u>Redelivery in an Illiquid Market</u>

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "<u>Liquidity Exchanges</u>") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "<u>Illiquid Market Spot Rate</u>").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.  <u>Loan Fees and Transaction Fees.</u>

  (a) <u>Loan Fee</u>

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "<u>Loan Fee</u>"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee").  The Early Termination Fee is due with the repayment of the Loaned Assets.  The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

(e) <u>Taxes and Fees</u>

Borrower shall report to the Internal Revenue Service ("<u>IRS</u>") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS.  For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue.  Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    <u>Collateral Requirements</u>

(a) <u>Collateral</u>

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("<u>Collateral</u>") and memorialized using the Loan Term Sheet.  The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.  Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)).  If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) <u>Loan and Collateral Transfer</u>

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

DocuSign Envelope ID: F8C4F24B-A5A6-4DD5-BC88-62D5C009642A

(e) <u>Refund of Collateral</u>

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "<u>Collateral Refund Limit</u>"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Refunded Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Collateral Refund Spot Rate</u>").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "<u>First Refund Notification</u>") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate.  If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "<u>Second Refund Notification</u>") repeating the information in (i) – (iv) in the preceding paragraph.  Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph.  Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) <u>Payment of Refunded Collateral</u>

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) <u>Return of Collateral</u>

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

## V.    **Hard Fork**

(a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section V(b) above.  Alternatively, subject to Lender's written agreement, the

parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    **Representations and Warranties.**

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place

of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h)   Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i)   Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j)   Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   __Default__

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a)   the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b)   the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c)   the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d)   a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e)   any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not dismissed within thirty (30) days of the initiation of said proceedings; or

(f)   any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

13

## VIII.  Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty (30) days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.  Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.  Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.  Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration

DocuSign Envelope ID: F8C4F24B-A5A6-4DD5-BC88-63D5C009C42A

Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.   **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, either Party may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained

Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XIII.   **Notices.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XIV.   **Modifications.**

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XV.   **Single Agreement**

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.   **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.   **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably

16

withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

**XVIII. Severability of Provisions.**

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**XIX.   Counterpart Execution.**

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

**XX.   Relationship of Parties.**

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

**XXI.   No Waiver.**

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either

Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.  Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIV. Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:



By: _____
Name:
Title:




BORROWER:

GENESIS GLOBAL CAPITAL, LLC



By: _____
Name:
Title:

19

DocuSign Envelope ID: F8C4F24B-A5A6-4DD5-BC88-63D5C009C42A

**EXHIBIT A**

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: Lending
Email: lend@genesiscap.co

Name: Risk
Email: Risk@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XIII.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XIV.

DocuSign Envelope ID: F8C4F24B-A5A6-4DD5-BC88-62D5C009C42A

**EXHIBIT B**

**LOAN TERM SHEET**

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                            Genesis Global Capital, LLC

Lender:                              [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                           [Open Loan]
                                     [Fixed Term Loan]
                                     [Term Loan With Prepayment Option]

Maturity Date:


GENESIS GLOBAL CAPITAL, LLC                 [COMPANY NAME]


By: _____               By: _____
Name:                                 Name:
Title:                                Title:

21