**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM,<br><br>Defendants. | Case No. 3:23-cv-00082-SRU<br><br>Hon. Stefan R. Underhill<br><br><br><br>DECEMBER 15, 2023 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, AND MARK MURPHY'S MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    Genesis's Lending Programs ................................................................ 4

    B.    Three Arrows and the Collapse of FTX ............................................ 5

    C.    DCG's Loan to Genesis ....................................................................... 6

    D.    This Action............................................................................................ 7

ARGUMENT ........................................................................................................................ 7

    I.    Count III: Plaintiffs' Section 20(a) Claim Should Be Dismissed ......................... 7

        A.    Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act ...................................................................................... 8

            1.    Plaintiffs Fail to Plead Reliance.................................................... 9

            2.    Plaintiffs Fail to Plead Loss Causation ........................................ 14

            3.    Plaintiffs Fail to Plead Cognizable Damages............................... 16

        B.    Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation.......... 16

            1.    Plaintiffs Fail to Adequately Plead that the DCG Defendants Exercise Actual Control............................................................. 18

            2.    Plaintiffs Fail to Adequately Plead Culpable Participation As to the DCG Defendants ................................................................. 22

    II.    Count II: Plaintiffs Fail to Adequately Plead a "Scheme Liability" Claim Against the DCG Defendants.................................................................................. 24

    III.    Count I: Plaintiffs' Section 15 Claim Should Be Dismissed ............................... 27

        A.    The Securities Act Claim Is Barred by the One-Year Statute of Limitations ......................................................................................... 27

        B.    Plaintiffs Fail to Plead Statutory Standing With Respect to a "Sale" or "Offer"............................................................................................ 28

        C.    The Lending Agreements Are Not Securities ..................................... 30

            1.    The Lending Agreements Do Not Constitute Investment Contracts Under *Howey* .............................................................. 31

            2.    The Lending Agreements Are Not Security Notes Under *Reves* ............................................................................................. 34

D.     Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over the Alleged Primary Violation .......................................................... 36

IV.     Counts IV and V Should Be Dismissed Because Plaintiffs Fail to Adequately Allege Any State-Law Claims in the Alternative ............................. 37

A.     Count IV Should Be Dismissed Because Plaintiffs Have Failed to Allege a CUTPA Claim ........................................................................... 37

B.     Count V Should Be Dismissed Because Plaintiffs Have Not Adequately Alleged an NYUDTPA Claim ................................................ 38

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)...................................................................................29, 30

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)...............................................................................................16

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)...................................................................................................13, 14

*Aimis Art Corp. v. N. Tr. Secs., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009).........................................................................16

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005).........................................................................9

*In re Alstom SA Sec. Litig*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)................................17, 18, 20, 21, 22, 24, 27

*Alunni v. Dev. Res. Grp., LLC*,
  445 F. App'x 288 (11th Cir. 2011) (*per curiam*)....................................................34

*Amorosa v. Ernst & Young LLP*,
  672 F. Supp. 2d 493 (S.D.N.Y. 2009).........................................................................11

*Amorosa v. Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022).........................................................7

*Anderson v. Binance*,
  2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ....................................................27, 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................................................7

*In re Asia Pulp & Paper Sec. Litig.*,
  293 F. Supp. 2d 391 (S.D.N.Y. 2003).................................................................18, 19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..............................................................................................17

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
  763 F. Supp. 36 (S.D.N.Y. 1991) .................................................................................35

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    973 F.2d 51 (2d Cir. 1992)................................................................................34

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................10

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
    995 F. Supp. 2d 291 (S.D.N.Y. 2014)..........................................................10, 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................7, 19

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015)............................................................19, 20

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)....................................................................................11

*In re Cannavest Corp. Sec. Litig*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)..........................................................25, 26

*Colliton v. Cravath, Swaine & Moore LLP*,
    2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008)................................................15

*Cooper v. King*,
    114 F.3d 1186, 1997 WL 243424 (6th Cir. 1997) .................................................32

*Demarco v. LaPay*,
    2009 WL 3855704 (D. Utah Nov. 17, 2009) .........................................................34

*Dodds v. Cigna Sec., Inc.*,
    12 F.3d 346 (2d Cir. 1993)...........................................................................27, 28

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)................................................................18

*Dura Pharms. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................14

*ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..........................................................................26, 27

*Elson v. Geiger*,
    506 F. Supp. 238 (E.D. Mich. 1980), *aff'd*, 701 F.2d 176 (6th Cir. 1982) .............................33

*Fezzani v. Bear, Stearns & Co.*,
    384 F. Supp. 2d 618 (S.D.N.Y. 2004)................................................................22

*In re Fine Host Corp. Sec. Litig.*,
    25 F. Supp. 2d 61 (D. Conn. 1998) ........................................................................13

*Finjan LLC v. Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) ............................................................19

*Fragin v. Mezei*,
    2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) ........................................................35

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ...............................................................31, 32

*G.K. Alan Assoc. v. Lazzari*,
    44 A.D.3d 95 (2d Dep't 2007) ..............................................................................12

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (2002) ...........................................................................................39

*Griffin v. PaineWebber, Inc.*,
    2001 WL 740764 (S.D.N.Y. June 29, 2001) .........................................................30

*Harman v. Harper*,
    914 F.2d 262, 1990 WL 121073 (9th Cir. 1990) ...................................................32

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) ....................................................................................12

*Heine v. Colton, Hartnick, Yamin & Sheresky*,
    786 F. Supp. 360 (S.D.N.Y. 1992) ........................................................................32

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011) ...................................................................11

*Jianhu Yi v. GTV Media Grp. Inc.*,
    2021 WL 3500920 (S.D.N.Y. Aug. 6, 2021) ........................................................20

*Joseph Gen. Contracting, Inc. v. Couto*,
    119 A.3d 570 (Conn. 2015) ...................................................................................38

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ..................................................................................26

*Kent Literary Club of Wesleyan Univ. v. Wesleyan Univ.*,
    257 A.3d 874 (Conn. 2021) ..............................................................................37, 38

*Kirschner v. JP Morgan Chase Bank, N.A.*,
    79 F.4th 290 (2d Cir. 2023) ..............................................................................35, 36

*Landy v. Heller, White & Co.*,
   783 F. Supp. 125 (S.D.N.Y. 1991) ........................................40

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non- Ferrous Metals Trading Co.*,
   179 F. Supp. 2d 159 (S.D.N.Y. 2001).....................................34

*In re Lehman Bros. Sec. & ERISA Litig.*,
   2013 WL 5730020 (S.D.N.Y. Oct. 22, 2013) .........................10

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)............................................14, 15

*Lewis v. Assurant, Inc.*,
   2022 WL 4599038 (D. Conn. Sept. 30, 2022) ......................38

*Lops v. YouTube, LLC*,
   2023 WL 2349597 (D. Conn. Mar. 3, 2023) .........................38

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   412 F. Supp. 3d 392 (S.D.N.Y. 2019)..................................13

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982)..........................................................32

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) .................................31

*In re Marsh & Mclennan Cos., Inc. Sec. Litig*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)...............................24, 25

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) .................................39

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)..................................24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013).............................17, 20

*Miramontes v. Ralph Lauren Corp.*,
   2023 WL 3293424 (S.D.N.Y. May 5, 2023) .........................39

*Nat'l Bank of Yugoslavia v. Drexel Burnam Lambert, Inc.*,
   768 F. Supp. 1010 (S.D.N.Y. 1991).....................................35

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................24

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
    381 F. App'x 75 (2d Cir. 2010) ...........................................................12

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)...........................................18, 24

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..............................................................................28

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986)...........................................................24, 25

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010)..........................................37

*Reeder v. Succession of Palmer*,
    736 F. Supp. 128 (E.D. La. 1990) .......................................................36

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)....................................................................31

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)...................................................................30, 34, 35

*Reynolds v. Lifewatch, Inc.*,
    136 F. Supp. 3d 503 (S.D.N.Y. 2015)..................................................39

*Ross v. Bolton*,
    1989 WL 80428 (S.D.N.Y. Apr. 4, 1989)............................................17

*Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*,
    192 F. Supp. 3d 348 (S.D.N.Y. 2016)..................................................39

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)............................................23, 27

*Schentag v. Nebgen*,
    2018 WL 3104092 (S.D.N.Y. June 21, 2018) ......................................36

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006).................................................................27

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)..................................................26

*SEC v. Mgmt. Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975).................................................................17

*SEC v. Mut. Benefits Corp.*,
   408 F.3d 737 (11th Cir. 2005) ........................................................................34

*SEC v. Rio Tinto plc*,
   41 F.4th 47 (2d Cir. 2022) ...........................................................................24

*SEC v. Ripple Labs*,
   -- F. Supp. 3d --, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) .................................32, 33, 34

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020).................................................................31

*SEC v. Terraform Labs Pte. Ltd.*,
   -- F. Supp. 3d --, 2023 WL 4858299 (S.D.N.Y. July 31, 2023) .............................................33

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).............................................................................30, 31, 33, 34

*Simmtech Co. v. Citibank, N.A.*,
   2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016) .........................................................12

*Singh v. Cigna Corp.*,
   277 F. Supp. 3d 291 (D. Conn. 2017).................................................................23

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)...........................................................20, 21, 37

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000)....................................................21, 22

*Speer v. Select Portfolio Servicing*,
   2023 WL 4850556 (D. Conn. July 28, 2023) .........................................................38

*Sterling v. Securus Techs., Inc.*,
   2019 WL 3387043 (D. Conn. July 25, 2019) .........................................................17

*Stoneridge Inv. P'ers, LLC v. Sci.-Atlanta*,
   552 U.S. 148 (2008)...................................................................................8

*Taylor v. Westor Cap. Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013).................................................................25

*Tecku v. Yieldstreet, Inc.*,
   2022 WL 1322231 (S.D.N.Y. May 3, 2022) .........................................................22

*Telenor E. Inv. AS v. Altimo Holdings & Invs. Ltd.*,
   567 F. Supp. 2d 432 (S.D.N.Y. 2008)................................................................11

*Teller v. Bill Hayes, Ltd.*,
    213 A.D.2d 141 (2d Dep't 1995) ........................................................................40

*Teva Pharms. Indus. Ltd. v. Deutsche Bank Sec. Inc.*,
    2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) ....................................................28

*Titan Grp., Inc. v. Faggen*,
    513 F.2d 234 (2d Cir. 1975)................................................................................13

*In re Trilegiant Corp*,
    11 F. Supp. 3d 82 (D. Conn. 2014)....................................................................38

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
    2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ........................................................38

*In re UBS Auction Rate Sec. Litig.*,
    2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ......................................................16

*Underwood v. Coinbase Glob., Inc.*,
    654 F. Supp. 3d 224 (S.D.N.Y. 2023).................................................................30

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
    651 F.2d 1174 (6th Cir. 1981) ......................................................................33, 24

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .......................................................14

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)..........................................................................10, 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2018 WL 1142884 (N.D. Cal. Mar. 2, 2018).......................................................10

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)..........................................................................13, 14

*Walsh v. Rigas*,
    2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) .......................................................11

*Wilson v. Comtech Telecomm. Corp.*,
    648 F.2d 88 (2d Cir. 1981)..........................................................................13, 14

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .........................................................................9

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)..................................................................37

*Youngers v. Virtus Inv. Partners Inc.*,
  195 F. Supp. 3d 499 (S.D.N.Y. 2016) .......................................................................21, 22, 30

**Statutes & Rules**

17 C.F.R. § 240.10b-5 .................................................................................................................24

15 U.S.C. § 77b(a)(3) .................................................................................................................29

15 U.S.C. § 77m .........................................................................................................................27

15 U.S.C. § 78j(b) ..................................................................................................................8, 30

N.Y. Gen. Bus. Law § 349 .........................................................................................................39

Fed. R. Civ. P. 9(b) ...............................................................................................1, 10, 24, 26, 38

Fed. R. Civ. P. 12(b)(6) ................................................................................................................1

**Other Authorities**

FinCEN, https://www.fincen.gov/what-we-do (last visited Sept. 8, 2023) ..................................36

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Digital Currency Group, Inc. ("DCG"), Barry Silbert, Glenn Hutchins, Lawrence Lenihan, and Mark Murphy (collectively, the "DCG Defendants"), respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Class Action Complaint (the "AC").

## PRELIMINARY STATEMENT

This is Plaintiffs' third attempt to transform what is essentially a breach of contract claim against Genesis Global Capital, LLC ("Genesis") into a securities fraud class action against DCG and its executives. Plaintiffs (and all purported class members) entered lending agreements either directly with Genesis through a Master Borrow Agreement ("MBA") or through a Master Digital Asset Loan Agreement ("MLA") with Genesis and Gemini (collectively, the "Lending Agreements"). The MLA provided that Plaintiffs could deposit their digital assets (including cryptocurrencies) in a Gemini Earn Account at Gemini, which would in turn lend those assets to Genesis. Genesis would pay Gemini interest on those loaned assets and Gemini would pass the interest payments on to the Plaintiffs, keeping a portion as a fee. The MBA provided for a similar lending arrangement, by which Plaintiffs could lend digital assets to Genesis in exchange for periodic, contractually-set loan fees. In November 2022, the second largest cryptocurrency exchange, FTX, collapsed and filed for bankruptcy. This triggered a panic in the crypto market and a run on the bank in the crypto industry. Genesis could not honor the flood of redemption requests, and later filed for bankruptcy. Plaintiffs' crypto assets are all now the subject of creditor claims in the Genesis bankruptcy.

The DCG Defendants had nothing to do with any of this. Indeed, Plaintiffs explicitly acknowledged as much in the Lending Agreements:

> For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement *are only the obligation of Genesis*, and not any of its parents or affiliates,

including but not limited to Digital Currency Group, Inc. and
Genesis Global Trading, Inc. The Parties agree that *none of Genesis'
parents or affiliates* shall have any liability *under this Agreement*[.]"

MLA § XVII; MBA § XVII (emphases added). Further, no securities were purchased or sold in

connection with the Lending Agreements. The MLA is clear on this point as well. MLA § XXV

(Transactions "are intended to be commercial loans of Digital Assets and not securities under the

U.S. federal or state securities laws."). Yet Plaintiffs here seek to do exactly what they promised

in the Lending Agreements they would not: sue DCG and its executives for violations of the federal

securities laws. It is thus unsurprising that the AC fails on many independent grounds.

**First**, Plaintiffs assert that the DCG Defendants are liable for Genesis's allegedly

fraudulent statements as control persons under Section 20(a). This requires them to plead (i) a

primary violation as to Genesis, *and* (ii) control and culpable participation on the part of the DCG

Defendants. With respect to the primary Section 10(b) violation, Plaintiffs do not plead that any

securities were purchased or sold, rather, this case involves a contract that facilitated loans of

crypto assets. Plaintiffs also cannot establish that they (or the putative class members) relied on

Genesis's alleged false statements: The AC contains no allegations demonstrating that any

Plaintiff was aware of the alleged misstatements, much less relied on them in connection with their

decision to enter into the Lending Agreements years ago. Plaintiffs also fail to plead loss causation

and damages. Plaintiffs do not even attempt to allege a causal link between any of the alleged

misrepresentations and a loss of value of any securities as a result of those statements. Further,

Plaintiffs' damages are not cognizable under the securities laws. Plaintiffs allege only that their

assets are the subject of a pending bankruptcy proceeding, not that they have suffered any current

out of pocket losses resulting from a fraud. *See infra* Parts I.A.1–3.

Independently fatal to their Section 20(a) claim, Plaintiffs fail to establish that the DCG

Defendants had "actual control" over the transactions in questions—*i.e.*, Genesis's alleged misrepresentations about its financial solvency. Nor do Plaintiffs plead anything remotely close to the requisite particularized allegations demonstrating the DCG Defendants' "culpable participation" in Genesis's alleged wrongdoing. *See infra* Part I.B. All Plaintiffs do is fall back on generic allegations that DCG was the corporate parent of Genesis, which a legion of courts in this Circuit have ruled is not enough.

*Second*, Plaintiffs' "scheme liability" claim is nothing more than an impermissible repackaging of Plaintiffs' inadequately pleaded Section 20(a) claim. Moreover, the supposed scheme began *years* after most Plaintiffs entered into the Lending Agreements (the purported "securities" in question). The "scheme" thus bears no connection to Plaintiffs' decision to "purchase" the supposed "security" (Lending Agreements). This glaring temporal disconnect is fatal to Count II. *See infra* Part II.

*Third*, Plaintiffs' Section 15(a) of the Securities Act claim, which is premised on Genesis's alleged offer and sale of unregistered securities, is time-barred. And even assuming, *arguendo,* that it was timely, the claim is subject to dismissal because (i) Plaintiffs' contractual lending arrangements under which Plaintiffs could (but were not required to) loan digital assets to Genesis in exchange for interest do not constitute an "offer" or "sale" of anything; (ii) Plaintiffs fail to establish the underlying primary violation (*i.e.*, that the Lending Agreements are "securities"); and (iii) Plaintiffs cannot establish control by the DCG Defendants, as they offer nothing more than conclusory allegations that are in any event unrelated to the alleged offer or sale of unregistered securities by Genesis. *See infra* Parts III.A–D.

*Finally*, Plaintiffs' fallback claims under state consumer protection laws fail for many of the same reasons. In particular, Plaintiffs allege no fraudulent statements by the *DCG Defendants*

to Plaintiffs, and cannot rely on any supposed misconduct by Genesis.  Moreover, these state-law claims impose several other requirements that Plaintiffs fail to meet.  *See infra* Part IV.

For these reasons and those set forth below, the AC should be dismissed in its entirety and with prejudice.

## STATEMENT OF FACTS

### A.    Genesis's Lending Programs

Non-party Genesis is a "full-service digital currency prime brokerage" that offered various services related to managing digital assets, including cryptocurrency.  AC ¶¶ 3–4.  One service was yield generation, which allowed customers to lend their digital assets to Genesis in exchange for regular interest payments.  *See id.* ¶¶ 110–13.  Genesis offered this services in two ways.

*First*, entities who met the minimum lending requirements could loan their digital assets directly to Genesis.  AC ¶¶ 113–14.  That relationship was governed by the MBA.  *Id.* ¶ 112; *see generally* Ex. A (MBA).  The MBA did not obligate participating lenders to loan any particular amount of digital assets (or indeed, any digital assets at all), but rather set forth the framework for the lending relationship if one developed.  Pursuant to the MBA, Genesis would send lending requests to qualified lenders with its proposed terms.  MBA § II(b).  Each lender could negotiate any of the terms with Genesis, and if an agreement was reached, the final terms of the loan would be memorialized in a separate term sheet.  *See id.*  The lender would then deposit its digital assets with Genesis, and Genesis would pay the lender the agreed-upon Loan Fee.  AC ¶ 112.  The Loan Fee owed was dictated by the loan terms, not by the performance of Genesis's lending business.

*Second*, beginning in February 2021, Genesis partnered with non-party Gemini—a digital asset service company—through Gemini's Gemini Earn program.  *Id.* ¶¶ 115–16.  To participate in the Gemini Earn program, Gemini customers entered into an MLA between themselves (the "Lender"), Gemini (the "Custodian"), and Genesis (the "Borrower").  Under the program, Gemini

customers could lend their digital assets to Genesis by depositing those assets into a Gemini Earn account. *Id.* Genesis would then pay Gemini interest on those assets, and Gemini would pass that interest on to its customers, keeping a percentage for itself. *Id.* ¶¶ 117–18. All Gemini Earn program loans were open-term, meaning that Gemini customers could terminate any portion of their loan at any time. *See* Ex. B (MLA) § II(c). The MLA was clear that loans facilitated by the agreement "are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws." *Id.* § XXV. Like the MBA, the MLA did not obligate the Gemini customer to lend assets to Genesis at any time. *See id.* § II(a). If the Gemini customer elected to loan assets to Genesis, Gemini would provide the pertinent loan terms at the time of the transaction. *See id.* § II(a)–(b). Genesis's obligation to pay interest on the assets was independent of how Genesis's own lending business performed. *See id* § III(a). Critically, both the MLA and MBA were clear that DCG, a non-party to the Lending Agreements, had no obligations or liabilities arising from loans facilitated thereunder:

> For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement *are only the obligation of Genesis*, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that *none of Genesis' parents or affiliates* shall have any liability *under this Agreement*[.]"

MLA § XVII; MBA § XVII (emphases added).

### B.    Three Arrows and the Collapse of FTX

Genesis made money by relending digital assets to counterparties, including Three Arrows Capital Ltd. ("3AC"). AC ¶ 230. According to Plaintiffs, 3AC made money from those loans by using them to purchase an interest in the Grayscale Bitcoin Trust ("GBTC")—a public trust managed by Grayscale Investments, LLC ("Grayscale"), an indirect affiliate of Genesis—and then reselling that interest on the secondary market for cash. *Id.* ¶¶ 30–31.

By July 2022, 3AC owed approximately $2.3 billion in loans to Genesis.  AC ¶ 290.  Also in July 2022, 3AC was unable to satisfy margin calls from some of its lenders and entered liquidation proceedings.  *Id.* ¶ 325.  Genesis recovered some of its outstanding credit from 3AC, but was still owed $1.1 billion post-liquidation, which it is unlikely to recover.  *Id.* ¶¶ 290, 307.

### C.    DCG's Loan to Genesis

Defendant DCG is an investment corporation, the parent of Grayscale, and the indirect parent of Genesis.  *Id.* ¶¶ 6, 30.  Defendant Silbert is DCG's founder and CEO, *id.* ¶ 7, Defendant Murphy is DCG's President (formerly its COO), *id.* ¶ 8, and Defendant Kraines was the CFO from September 2021 through April 2023, *id.*  Defendants Hutchins and Lenihan were independent members of DCG's Board during the Class Period.  *Id.* ¶¶ 60–61.

On June 30, 2022, DCG executed a promissory note with Genesis under which DCG assumed the $1.1 billion liability arising out of 3AC's debt default by providing Genesis with a promissory note for $1.1 billion, payable in 10 years at an interest rate of 1% (the "Note").  *Id.* ¶¶ 299–300.  In other words, DCG gave Genesis a *collectable* $1.1 billion receivable in exchange for an *uncollectable* $1.1 billion receivable.  Plaintiffs allege that in conversations and email exchanges following the Note's execution, Genesis inaccurately represented—though not to Plaintiffs—the nature of the Note and Genesis's financial condition.  *See id.* ¶¶ 322–25.

In November 2022, DCG, Genesis, and Gemini entered into a tripartite agreement pursuant to which DCG transmitted over $600 million in additional collateral to Genesis for the benefit of Gemini Earn customers.  *Id.* ¶¶ 392–93.  That same month, however, the cryptocurrency exchange FTX collapsed, triggering a large number of withdrawal requests, which Genesis was unable to fulfill with its current assets.  *Id.* ¶¶ 43, 404.  On November 16, 2022, Genesis announced that it was suspending redemptions and new loan originations.  *See id.* ¶ 404.  Genesis ultimately filed for Chapter 11 bankruptcy on January 19, 2023.  *Id.* ¶ 15.

**D.     This Action**

Plaintiffs are lenders of digital assets to Genesis.  *See id*. ¶¶ 53–57.  All but two Plaintiffs loaned digital assets to Genesis via the Gemini Earn program.  *See* ECF Nos. 38-2, 38-3, 38-5.  Plaintiffs Translunar Crypto, LP ("Translunar") and Morone loaned digital assets directly to Genesis.  *See* ECF Nos. 34-2, 38-4.  Plaintiffs filed this lawsuit on January 23, 2023, naming DCG and Silbert as the sole Defendants.  *See* ECF No. 1.  Because Genesis is in bankruptcy, it cannot be named as a party in this lawsuit.  Following appointment of lead Plaintiffs, Plaintiffs filed their first amended complaint on July 12, 2023, adding several new Defendants and claims.  Defendants moved to dismiss the amended complaint on September 11, 2023.  On November 10, 2023, Plaintiffs filed a motion to amend their complaint, which the Court granted.

## ARGUMENT

In deciding this motion, the Court must assume that well-pled factual allegations in the AC are true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The Court need not accept legal conclusions, naked assertions, mere conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009).  A claim must raise more than the "mere possibility of misconduct"—a plaintiff must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678–79.  The Court need not credit allegations "copied almost verbatim" from another action, as Plaintiffs have done here.  *Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022).

**I.     Count III: Plaintiffs' Section 20(a) Claim Should Be Dismissed**

In Count III, Plaintiffs assert that the DCG Defendants are secondarily liable as "control persons" for Genesis's alleged violations of Section 10(b) of the Exchange Act, which requires Plaintiffs to plead not only the elements of a Section 10(b) violation against Genesis as the primary violator, but also that the DCG Defendants exercised actual control over, and culpably participated

in, the allegedly wrongful conduct.  Plaintiffs fail in every regard.

### A.   Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act

Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance in contravention of [the] rules and regulations" prescribed by the SEC under Rule 10b-5, "*in connection with the purchase or sale of any security*."  15 U.S.C. § 78j(b) (emphasis added).

The threshold defect in Plaintiffs' securities fraud claim is that there are no securities here, much less a purchase or sale of any.  According to Plaintiffs, the Lending Agreements are the "securities" at issue.  *See, e.g.*, AC ¶ 138.[1]  But as discussed below, these contracts bear none of the hallmarks of a cognizable security under the securities laws—they had no inherent value, could not be transferred or traded on a secondary market, and did not provide lenders with any speculative interest tied to Genesis's business performance.  They merely established a contractual lending arrangement that gave Plaintiffs the option (but not the obligation) to loan digital assets to Genesis in exchange for a market rate of interest.  *See infra* Part III.B.

Further, a Section 10(b) plaintiff must allege, *inter alia*, (1) a materially false or misleading statement or omission by the defendant, (2) on which the plaintiff relied, (3) that caused a loss (4) resulting in economic damages.  *Stoneridge Inv. P'ers, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Plaintiffs fail to allege with particularity precisely which misstatements are actionable.[2]

---

[1] Plaintiffs repeatedly identify the "Genesis Yield Investment Agreements" (*i.e.*, the Lending Agreements) as the purported security.  *See, e.g.*, AC ¶ 4 ("Members of the Class invested in Genesis Yield securities offered or sold by Genesis Global Capital by entering into standard form agreements . . ."); *id*. § IX ("THE GENESIS YIELD INVESTMENT AGREEMENTS ARE SECURITIES"); *id*. ¶ 138 ("[T]he Genesis Yield Investment Agreements as offered and sold by Genesis Global Capital were securities subject to the federal securities laws."); *id*. ¶ 139 ("A note is a type of debt security that, as done in the Genesis Yield Investment Agreements, represents a promise to pay a specific amount of money at a specified time or on demand."); *id*. ¶ 141 ("[T]he Genesis Yield Investment Agreements were notes that were offered and sold by [Genesis] as securities."); *id*. ¶ 435(b) (alleging that question common to the Class includes "[w]hether Genesis Global Capital was required to file a registration statement for Genesis Yield Investment Agreements with the SEC").

[2] The AC is an example of impermissible puzzle pleading.  Its disjointed and confused approach—resulting from Plaintiffs' slipshod copy-pasting from pleadings in separate actions—improperly "plac[es] the burden on the Court to

What is clear, however, is that while Plaintiffs describe numerous interactions and communications made by both named Defendants and non-parties, *e.g.*, AC ¶¶ 222, 264–73, 315, 322–25, 344, 363–64, 367, 371, 389, Plaintiffs do not premise liability on any of those misstatements. They attribute primary misstatement liability to Genesis alone, and instead seek to hold the DCG Defendants responsible as control persons for Genesis's statements (which efforts fail as discussed *infra* Part I.B). *Id.* ¶¶ 498–99, 505, 512, 523. These alleged misstatements by Genesis, which concern its solvency and financial condition, fall into two categories.

*First,* Plaintiffs allege that two representations made by Genesis in the Lending Agreements were "misstatements": That Genesis (i) "is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws," and that (ii) "there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder." AC ¶ 360; *see also* MLA § V(e)–(f); MBA § VI(e)–(f). *Second*, Plaintiffs challenge a series of allegedly false and misleading statements beginning in June 2022—again, made by Genesis and its executives—in tweets and in private discussions between Genesis and Gemini about Genesis's financial health in the wake of 3AC's default and subsequent collapse. *See, e.g.*, AC ¶¶ 313–53.[3]

### 1. Plaintiffs Fail to Plead Reliance

"Reliance is an essential element of a securities fraud action because it ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 445 (S.D.N.Y. 2013). Plaintiffs are uniquely

---

sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005).

[3] Plaintiffs' allegations as to falsity and scienter of Genesis's statements fail for the reasons set forth in the Genesis Defendants' respective memoranda of law in support of their motions to dismiss filed on December 15, 2023.

unable to establish that "proper connection" in this case.  In an ordinary Section 10(b) action, plaintiffs may rely on the "fraud-on-the-market" presumption to establish individual (and classwide) reliance on misrepresentations that are publicly made in an efficient securities market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988) (presumption applies in "an impersonal, well-developed market for securities").  Here, there is no market, and certainly not an efficient one:  The Lending Agreements are private contracts.  Accordingly, each Plaintiff (and class member) must instead plead *direct* reliance through particularized factual allegations demonstrating that each Plaintiff knew of the specific alleged misstatements and engaged in the transaction based on them.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256–57 (2d Cir. 2016); *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014) (applying Rule 9(b) to direct reliance).  Plaintiffs do not remotely satisfy their burden.

### a. Plaintiffs Fail to Plead Direct Reliance on Statements in the Lending Agreements

Out of the scores of alleged misrepresentations identified in the 556-paragraph AC, Plaintiffs purport to have directly relied on *just two statements*, both representations in the Lending Agreements.[4]  But nowhere do Plaintiffs allege that they (much less the class) actually read and considered the representations at bar.  *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2018 WL 1142884, at *10 (N.D. Cal. Mar. 2, 2018) ("To plausibly plead direct reliance, Plaintiff must also allege that [it] actually read the Memorandum and relied on the statements therein that are at issue."); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 5730020, at *4 (S.D.N.Y. Oct. 22, 2013) (no direct reliance where plaintiffs did not allege "that they read the SEC filings").  And even if Plaintiffs *read* those statements, Plaintiffs do not plead *when* they

---

[4] Namely, Genesis's representation that "it is not insolvent" and "there are no proceedings . . . which could reasonably be anticipated to have any adverse effect on the transactions[.]"  AC ¶ 408.

read these representations or *how* those representations supposedly affected their decision to enter into the Lending Agreements. *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011) (no direct reliance where plaintiffs alleged reliance on SEC filings "for indefinite periods of time" and "lack[ed] supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations); *Bear Stearns*, 995 F. Supp. 2d at 309–10 (allegations that plaintiff relied on alleged misrepresentations in a single SEC filing in purchasing securities over a "year-long period" insufficient to plead reliance).[5]

Plaintiffs' theory of direct reliance also suffers from a temporal defect. Because a plaintiff "must have purchased or sold securities in reliance on the defendants' alleged fraud," *Telenor E. Inv. AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 443 (S.D.N.Y. 2008), post-purchase misrepresentations or deceptive acts cannot form the basis of a fraud claim, *see Walsh v. Rigas*, 2019 WL 294798, at *7 (S.D.N.Y. Jan. 23, 2019). Here, however, the Gemini Earn Plaintiffs executed their respective Lending Agreements no later than November 2021, *see* ECF Nos. 38-2, 38-3, 38-5, long *before* June 2022, when Plaintiffs contend that the alleged fraud began. *See, e.g.*, AC ¶¶ 38, 262, 314. As a matter of both law and logic, Plaintiffs cannot have relied on a fraud that had yet to occur. *See Vivendi*, 838 F.3d at 262 ("Fraud depends on the state of events when a statement is made, not on what happens later.").[6]

---

[5] The institutional Plaintiffs (Translunar and Morone) do not claim reliance on any misstatements besides the two alleged misstatements in the Lending Agreements. *See* AC ¶¶ 408–12.

[6] Relatedly, Section 10(b) "limits private causes of action to purchasers and sellers," which means that a plaintiff shareholder has standing to bring suit only for alleged misrepresentations "that are alleged to have occurred prior to the purchase and/or sale dates." *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 510 (S.D.N.Y. 2009); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55 (1975). Here, Plaintiffs have either admitted that they entered into their respective Lending Agreements (the alleged "securities") long before any alleged misrepresentations in June 30, 2022, *compare* AC ¶ 314, *with* ECF Nos. 38-2, 38-3, *and* 38-5, or in the case of Translunar and Morone, have not alleged the date of the alleged purchase or sale at all. Plaintiffs attempt to evade this gating issue through a bait-and-switch, arguing that the underlying digital asset loans—rather than the Lending Agreements, as alleged elsewhere—are the relevant "securities." *Compare* AC ¶ 497(c), *with id.* ¶¶ 133, 138, 141. But they cannot rely on one transaction to plead a security and a different transaction for all other purposes of their claim.

**b. Plaintiffs Fail to Plead Reliance on Extra-Contractual Statements**

With respect to all other alleged misrepresentations (those made outside of the Lending

Agreements beginning in June 2022, AC ¶¶ 313–53), it is impossible for Plaintiffs to demonstrate

reliance (whether directly or indirectly) for a straightforward reason: Plaintiffs expressly

disclaimed reliance on any representation made outside of the four corners of the MLA.  Plaintiffs

acknowledged that they were "not relying on any communication (written or oral) of [Genesis] as

investment advice or as a recommendation to enter into any Loan," MLA § V(i), and that the MLA

"constitute[d] the entire Agreement among the parties with respect to the subject matter hereof and

supersede[d] any prior negotiations, understandings and agreements."  *Id*. § XVI.  In such cases,

courts regularly enforce non-reliance clauses such as these.  *See, e.g.*, *Harsco Corp. v. Segui*, 91

F.3d 337, 343 (2d Cir. 1996) (plaintiff precluded from establishing reasonable reliance on extra-

contractual statements for 10(b) claim where contract "limited the bases upon which a fraud action

could be brought" to the representations made within the agreement); *One Commc'ns Corp. v. JP

Morgan SBIC LLC*, 381 F. App'x 75, 79 (2d Cir. 2010); *Simmtech Co. v. Citibank, N.A.*, 2016 WL

4184296, at *14 (S.D.N.Y. Aug. 3, 2016) (precluding reliance based on clause identical to the one

here).

Further, even if the alleged extra-contractual misstatements were actionable, Plaintiffs'

fallback "agency" theory of reliance (*i.e.*, that Gemini supposedly relied on the statements on

Plaintiffs' behalf) does not come close to satisfying Plaintiffs' pleading burden.  Plaintiffs allege

only vaguely that they *indirectly* relied on those statements via their supposed "agency"

relationship with Gemini established through the MLA.  AC ¶ 411.  But under New York law,

which governs the MLA, an "agent is an agent only by virtue of the agent's consent to act on behalf

of a particular party, the principal, who has also consented that the agent shall act on his or her

behalf."  *G.K. Alan Assoc. v. Lazzari*, 44 A.D.3d 95, 101 (2d Dep't 2007).  Here, the MLA

expressly *prohibits* Gemini from making any lending decisions on Plaintiffs' behalf, explaining that the lenders had "not authorized Agent to exercise discretion in [] determining the amount, timing or selection of any Loan on Principal's behalf." MLA § 1(b).[7]  Gemini thus did not make—and could not make—any lending decisions on Plaintiffs' behalf, much less rely on the alleged misstatements or acts "in connection with" such transactions.  *See In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998) (agency theory of reliance applies only where plaintiffs "allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 411 (S.D.N.Y. 2019) (courts will consider an investment adviser's knowledge in determining reliance, "where that investment adviser *invests on behalf* of institutional plaintiffs.") (emphasis added).  It is therefore not surprising that the AC contains not a single allegation that Gemini, on Plaintiffs' behalf, relied on any of the alleged misrepresentations at issue in connection with even a single transaction.  The reason is simple—Plaintiffs made their own deposit and withdrawal decisions without any involvement from Gemini.

*Finally*, unable to demonstrate reliance on any alleged misrepresentation, Plaintiffs abruptly reverse course and invoke the *Affiliated Ute* presumption, which allows a court to presume reliance "in cases involving primarily omissions . . . because proving reliance in such cases is, in many situations, virtually impossible."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972)); *see also* AC ¶¶ 413–14.  However, it is black-letter law that this presumption applies only "in instances of total non-disclosure," *Titan Grp., Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1975), where "no positive

---

[7] Gemini was appointed to act as an agent for the *limited purpose* of administratively facilitating lending transactions pursuant to the MLA.  *See id.* ("Principal [Gemini Earn lender] has specifically directed Agent [Gemini] . . . to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets").

statements exist" and "reliance as a practical matter is impossible to prove," *Wilson v. Comtech Telecomm. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981).  It does not apply, as is the case here,[8] to "misstatements whose only omission is the truth that the statement misrepresents."  *Waggoner*, 875 F.3d at 96; *see also, e.g.*, *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *17 (E.D.N.Y. Jan. 11, 2022) (*Affiliated Ute* presumption did not apply where "vast majority of the statements at issue . . . involve[d] affirmative misstatements").

## 2.    Plaintiffs Fail to Plead Loss Causation

Plaintiffs' loss causation allegations (such as they are) fail for the same reason their reliance allegations fail—they fundamentally do not fit within the Section 10(b) framework.  Loss causation requires that Plaintiffs establish a "causal link between the alleged misconduct and the economic harm ultimately suffered," *i.e.*, that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172–73 (2d Cir. 2005).  This is because the purpose of Section 10(b) is "not to provide investors with broad insurance against market losses," but instead to "protect [investors] against those economic losses that misrepresentations actually cause."  *Dura Pharms. v. Broudo*, 544 U.S. 336, 345 (2005).

Here, Plaintiffs' own admissions foreclose any causal link between the alleged losses—their current inability to withdraw their assets—and the alleged misstatements.  In their original complaint, Plaintiffs admitted that "in November 2022, a loss of confidence in digital asset markets *caused* large numbers of [Genesis] customers to request redemptions (*i.e.*, withdrawals) of their loans," ECF No. 1 ¶ 187 (emphasis added), and that this "'bank run' combined with Genesis Global

---

[8] Plaintiffs' claims are premised entirely on alleged misstatements regarding Genesis's financial condition.  *See* AC ¶¶ 324–25, 327, 333–34, 336–37, 340–41, 363, 369, 371, 389–90, 397–98.  Indeed, in the very section of the AC in which Plaintiffs invoke the *Affiliated Ute* presumption, Plaintiffs concede as much:  "Genesis Global Capital had a duty to disclose this adverse undisclosed material facts when it *falsely and misleadingly represented to investors* that '[Genesis] represents and warrants that it is not insolvent . . .'"  *See id.* ¶ 418 (emphasis added).

Capital's true financial condition meant that [Genesis] did not have the assets to honor redemption requests," *id*. ¶ 25.  In fact, according to Plaintiffs, if not for this "general loss of confidence" in the broader crypto market and the ensuing "bank run" on Genesis, "*it is possible that DCG, Barry Silbert, and Genesis Global Capital would have gotten away with their misrepresentations[.]*"  *Id*. ¶¶ 25, 187 (emphasis added).  Put simply, Plaintiffs attributed the market's reaction to the FTX collapse as the primary (if not exclusive) cause of their purported losses, acknowledging that absent those events, Genesis may have been able to continue honoring redemptions.

Tellingly, Plaintiffs deleted these allegations from their amended pleadings in a blatant attempt to plead around a facially dispositive defect in their loss causation allegations.  *Compare id*. ¶ 187, *with* ECF No. 60 ¶ 288 *and* AC ¶ 404 (removing allegations that FTX collapse "caused" bank run on Genesis).  Plaintiffs should be forced to stand by their original allegations, which directly contradict the AC.  Either the FTX collapse caused Genesis to stop honoring redemptions, or it did not—Plaintiffs cannot have it both ways.  Where, as here, "a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'"  *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008).  Were this Court to credit Plaintiffs' original pleading, the result would be consistent with well-established precedent that when a "'loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged [misconduct] as opposed to intervening events.'"  *Lentell*, 396 F. 3d at 174.

In any event, Plaintiffs fail to plead, as they must, that any of the allegedly false statements

directly caused the drop in value of any security.  Rather they assert as damages that their crypto assets were caught in a bankruptcy, which is still pending, and as to which no losses have yet been realized.  Plaintiffs' current pleading, standing alone, fails to show how their claimed injury (the freezing of their digital assets) bears any connection to any allegedly false or misleading representation by Genesis.  *See* AC ¶¶ 404–07.

### 3.  Plaintiffs Fail to Plead Cognizable Damages

Plaintiffs' purported "damages" are similarly incompatible with the Section 10(b) framework.  In a typical securities case, damages are based on out-of-pocket losses, measured by the delta between the allegedly inflated stock price paid by the plaintiff and the securities' actual, realized value after a corrective disclosure reveals the truth and the stock price drops.  *See Acticon AG v. China N. E. Petroleum Holdings Ltd*., 692 F.3d 34, 38 (2d Cir. 2012).  But here, the only "injury" claimed by Plaintiffs is that they have "been denied access to their digital assets since November 16, 2022" and may not ultimately recover those digital assets through the Genesis bankruptcy.  AC ¶¶ 14, 185.  This is not a cognizable loss under the securities laws.  *See Aimis Art Corp. v. N. Tr. Secs., Inc.*, 641 F. Supp. 2d 314, 319–20 (S.D.N.Y. 2009) (alleged damages resulting from "lack of use" of auction rate securities not cognizable under Section 10(b)).  Nor is it even a concrete injury; Plaintiffs may very well recover their digital assets in the Genesis bankruptcy.  Speculation of future injury that may or may not manifest is insufficient.  *See In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009) (Exchange Act's "actual damages" limitation bars "speculative recoveries").

### B.  Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation

Glaringly absent from Plaintiffs' securities fraud claim is the allegation that DCG made any of the misstatements giving rise to primary liability under Section 10(b).  AC ¶¶ 498–99.  Thus,

even if Plaintiffs had adequately pleaded a Section 10(b) claim as to the Genesis Defendants (which they have not), Plaintiffs' attempt to shift liability for that primary violation to DCG is patently inadequate.  Section 20(a) is a limited doctrine: Congress did not enact control-person liability for securities fraud to allow plaintiffs to manufacture vague guilt-by-association theories of liability and thereby access the funds of deeper-pocketed parents of corporate wrongdoers. Instead, as recognized by the Second Circuit, the limited purpose of Section 20(a) is "to prevent [the] evasion of the provisions of the section by organizing dummies who will undertake the actual things forbidden by the section." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975).

 Informed by this narrow Congressional objective, Courts have long interpreted Section 20(a) "to mean that, in order to incur controlling person liability, a defendant must possess 'actual control *over the transactions in question*.'" *Ross v. Bolton*, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989) (emphasis added); *see In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013).  Not only must a defendant specifically direct such transaction, but the defendant must do so with fraudulent intent, *i.e.*, culpable participation.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  To impose liability without these crucial requirements would eviscerate the purpose of Section 20(a), *i.e.*, to deter those who attempt to skirt the securities laws by disguising their fraud through intermediaries—not to hold parent corporations liable for any and all subsidiary misfeasance based solely on corporate ownership.  *See Mgmt. Dynamics, Inc.*, 515 F.2d at 812; *see also Sterling v. Securus Techs., Inc.*, 2019 WL 3387043, at *5 (D. Conn. July 25, 2019) ("a parent corporation is not ordinarily liable for the actions of its subsidiary.").

Thus, to establish control person liability, Plaintiffs must plead, in addition to a primary Section 10(b) violation, (1) control of the primary violator, (2) control of the transactions in question, and (3) intent to defraud (culpable participation).  *In re Alstom SA Sec. Litig*, 406 F.

Supp. 2d 433, 486–87 (S.D.N.Y. 2005).  Plaintiffs fail to satisfy these onerous requirements.

> ### 1.    Plaintiffs Fail to Adequately Plead that the DCG Defendants Exercise Actual Control

Here, Plaintiffs fail to allege the DCG Defendants' actual control over the transactions in question, *i.e.*, Genesis's alleged misstatements regarding its financial condition.  *See id.* ¶ 512.

*DCG.*   The majority of Plaintiffs' control allegations concerning DCG speak only to DCG's general control of Genesis, not its specific control over Genesis's allegedly fraudulent statements.  *See* AC ¶¶ 12, 21, 111, 464.  Plaintiffs allege that (1) Genesis was an indirect wholly-owned subsidiary of DCG; (2) DCG had access to Genesis's books and records; (3) DCG and Genesis shared IT functions; and (4) Genesis displayed the DCG logo on its website.  *Id.*  These allegations are insufficient as a matter of law because they say nothing about DCG's purported control over the allegedly fraudulent statements in question.   In such circumstances, Courts routinely dismiss claims of control-person liability.  For instance, in *DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, the court dismissed allegations of control-person liability because the allegation that the defendant was the primary violator's corporate parent "says nothing regarding the control [defendant] actually exerts over [the primary violator's] operations *and, in particular, its preparation of its financial disclosures*."   323 F. Supp. 3d 393, 460–61 (S.D.N.Y. 2018) (emphasis added).  Likewise, in *In re Parmalat Sec. Litig.*, the court held that "access to another firm's books and records…does not suggest any concomitant right to control that firm *in respect to the transaction in question*."  375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (emphasis added). Courts have also rejected control-person liability claims where plaintiffs allege more specific examples of involvement in another corporation's affairs.  In *In re Asia Pulp & Paper Sec. Litig.*, the court held that the plaintiffs failed to plead 20(a) liability where they alleged that the controller directed the "management and policies" of the primary violator by setting its "professional

standards and principles." 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003). The court explained that these allegations were insufficient because they did not indicate that the alleged controller "was able to control or in any way influence *the particular audits conducted or opinions offered*[.]" *Id.* (emphasis added).

Recognizing that their control allegations rely on facts typical of any parent-subsidiary relationship and indicate nothing about DCG's control over any specific alleged fraudulent transaction,[9] Plaintiffs turn to a made-for-litigation argument that "[n]o party other than a subsidiary completely controlled by Defendants DCG and Silbert would have 'sold' a $1.1 billion debt for a 10-year promissory note at 1% interest." AC ¶ 308. But this is conjecture, not fact. *See Twombly*, 550 U.S. at 555–56. In any event, the theory makes no sense: A parent engaging in a transaction that is favorable to a subsidiary does not evince control, but rather that the parent has a financial interest in the success of the subsidiary. Courts have roundly rejected this type of allegation in analogous contexts. *Finjan LLC v. Trustwave Holdings, Inc.* is particularly instructive. In *Finjan*, the court held that a parent corporation did not "excercis[e] control over the activities of the [subsidiary]" for purposes of personal jurisdiction despite allegations, *inter alia*, that the parent financed the subsidiary "through intercompany loans that were arguably not negotiated at arm's length and may constitute self-dealing," because "[t]he fact that a parent corporation finances the operations of a subsidiary is not sufficient to support a finding that the subsidiary is a mere agent . . . of the parent." 2021 WL 5051147, at *11–12 (D. Del. Oct. 29, 2021); *see also Asia Pulp & Paper*, 293 F. Supp. 2d at 396 (comparing control allegations for control person liability to personal jurisdiction liability).

---

[9] Plaintiffs also mistakenly cling to the idea that interactions between DCG and Genesis employees are indicative of DCG's control. Many allegations involve non-officers at DCG, AC ¶¶ 316, 458, who are not entitled to any presumption of control. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015).

**DCG Individuals.**   Likewise, Plaintiffs come nowhere close to meeting their burden of pleading particularized facts showing that each individual DCG Defendant personally exercised "actual control over the transaction[s] in question" between Plaintiffs and Genesis.  *MF Glob.*, 982 F. Supp. 2d at 307; *see also In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 167 (S.D.N.Y. 2012) ("[Defendant's] position at entities other than the [primary violator] does not demonstrate his control over misleading statements in the [primary violator's] SEC filings.").

**Silbert**.   Plaintiffs claim that Silbert compelled one of DCG's other subsidiaries—Grayscale—to move to Connecticut.  *See* AC ¶¶ 87–88.  But that says nothing about Silbert's control over the transactions at issue or even Silbert's control over Genesis.  Allegations that Silbert told Genesis they should "perpetuate" the idea that Genesis was a "blue chip" company, *id.* ¶ 269, or that he allegedly reviewed Moro's tweets, *id.* ¶ 468, constitute nothing more than guidance, which Genesis was under no obligation to follow.  *See Alstom*, 406 F. Supp. 2d at 487 ("exercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control").  And the mere fact that Silbert re-tweeted Genesis's tweet, AC ¶ 268, does not show that he directed Genesis to tweet in the first instance.  The AC also points to Silbert's 40% ownership of DCG, *see id.* ¶¶ 21, 88, 464, but such minority ownership in an indirect parent entity also is not sufficient to establish control.  *See BioScrip,* 95 F. Supp. 3d at 740 (26% ownership interest insufficient to allege control).[10]  Plaintiffs' remaining allegations, like Silbert's alleged statements to Genesis in June 2022 "on how to utilize Genesis' loan book" (lifted from the New York Attorney General ("NYAG") Complaint)[11], similarly lack indicia of "actual control" over

---

[10] The fact that Silbert founded DCG, standing alone, also is of no help.  *See Jianhu Yi v. GTV Media Grp. Inc.*, 2021 WL 3500920, at *3 (S.D.N.Y. Aug. 6, 2021).

[11] *See State of New York v. Gemini Trust Co. et al.*, No. 452784/2023 (N.Y. Sup. Ct. N.Y. Cnty. Oct. 19, 2023).

Genesis' alleged misstatements and are insufficient.  AC ¶ 468.[12]

   ***Murphy***.  Plaintiffs allege that Murphy generally worked closely with Genesis on "strategy, execution, marketing and all management matters," controlled strategy and hiring, and that he announced the appointment of the interim Genesis CEO to allege control.  *Id*. ¶¶ 65, 475.  Again, these allegations are insufficient to show Murphy exercised control over the transactions in question.  And self-evidently, an individual's general involvement with strategy discussions does not establish actual control over the company, much less control as to the specific transactions at issue here.  *See In re Smith Barney*, 884 F. Supp. 2d at 166–67 (finding no control person liability where the plaintiffs did not allege that the defendant "signed, drafted, approved, or confirmed a [] statement").  And although Plaintiffs claim that Murphy served as a director of GGH, *see* AC ¶ 8, GGH is a distinct entity and separate from Genesis—the alleged primary violator.  In any event, "officer or director status alone does not constitute control."  *In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000).  Plaintiffs similarly rely on Murphy's position at DCG to show that he controlled the issuance of Moro's tweet.  But the AC fails to plead that Murphy controlled or directed the issuance of the tweet beyond vaguely alleging that he provided "support and guidance," AC ¶¶ 262, 272, which cannot establish the requisite control.  *See Alstom*, 406 F. Supp. 2d at 487.

   ***Lenihan and Hutchins***.  Lenihan and Hutchins' role as independent directors of DCG during the Class Period does nothing to establish their actual control over the transactions at issue as a matter of black letter law.  *See* AC ¶¶ 60–61; *see also Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 525 (S.D.N.Y. 2016) (holding "the positions" held by the CFO and the

---

[12] Plaintiffs' conclusory allegation that Genesis listed Silbert as one of Genesis's "officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control" on its bankruptcy filing have nothing to do with the transactions at issue.  AC ¶ 467.

General Counsel of a parent company did "not support allegations of control over" its subsidiary); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004) (rejecting effort to plead "tertiary liability").  Indeed, these threadbare assertions would even be inadequate to show that Lenihan and Hutchins actually controlled DCG.  *See Alstom*, 406 F. Supp. 2d at 499 ("Director status alone is insufficient to establish control person status."); *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *8.[13]

### 2.     Plaintiffs Fail to Adequately Plead Culpable Participation As to the DCG Defendants

In addition to establishing control, Plaintiffs must plead culpable participation on the part of the controller in order to sustain a Section 20(a) claim.  *See Tecku v. Yieldstreet, Inc*., 2022 WL 1322231, at *16 (S.D.N.Y. May 3, 2022).  Courts in the Second Circuit routinely apply the PSLRA's heightened pleading standard to culpable participation, requiring Plaintiffs to plead with particularity "facts giving rise to a *strong inference* that the controlling person knew or should have known that the primary violator was engaging in fraudulent conduct" or "ignored obvious signs of fraud"—a standard akin to scienter.  *Alstom*, 406 F. Supp. 2d at 491–92 (emphasis added).  The AC is rife with conclusory assertions that the DCG Defendants knew or recklessly disregarded Genesis's alleged fraud, *e.g.*, AC ¶¶ 224, 268, 361, 498, but is devoid of the requisite particularized allegations supporting culpable participation.

Plaintiffs repeatedly assert that the DCG Defendants knew or recklessly disregarded that Genesis was "insolvent" and misrepresented its financial condition in the run-up to 3AC's default and in the wake of its collapse in June 2022.  *E.g.*, *id*. ¶¶ 295, 385, 498, 501.  But Plaintiffs offer no well-pled facts—no allegedly concealed data, confidential witness testimony, corrective

---

[13] Hutchins and Lenihan's approval of the Note affected only whether DCG would authorize the transaction; it does not suggest that they influenced, much less controlled, Genesis's decision to enter into the Note.  AC ¶¶ 299–300.

disclosures, or restatement of financials—to show that that the DCG Defendants disbelieved Genesis's financial reporting or knew that it lacked a reasonable basis. *See id.* ¶¶ 299, 328–43. Instead, Plaintiffs try to impute sinister connotations to the unsurprising fact that the DCG Defendants discussed options to help its distressed subsidiary and ultimately issued the Note. *See id.* ¶¶ 263–66, 279, 299–300. But the DCG Defendants' desire to assist its subsidiary is not an inherently fraudulent act—it is one shared by any responsible corporate parent. Indeed, "[t]he theory that defendants engaged in fraud 'to protect the very survival of the company' is 'far too generalized (and generalizable)" to support an inference of scienter. *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011). Plaintiffs' theory—that DCG took on an enforceable obligation to Genesis in June 2022 despite believing that Genesis was insolvent—makes no sense.

Plaintiffs also cannot rely on their allegations regarding capital withdrawals by Defendant Silbert and unnamed insiders in the months leading up to the 3AC default. *See* AC ¶¶ 293–94. Plaintiffs do not explain why capital withdrawals well before any allegation as to Genesis's purported insolvency after 3AC's collapse in June 2022 would be relevant to the DCG Defendants' culpable participation. Moreover, "[t]he selling of even considerable shares is not sufficient, standing alone, to infer scienter." *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 319 (D. Conn. 2017). Equally, Plaintiffs' allegations as to HQ Cash Management Fund fail on their own terms. *See* AC ¶¶ 247–53. Plaintiffs offer no factual basis for their "belief" that Silbert was an investor in the HQ Cash Management Fund (he was not), and the records they cite do not show that the $99 million capital withdrawal by HQ Cash Management Fund in June 2022 occurred after the announcement of 3AC's insolvency (they did not). *See id.* ¶ 293.

At bottom, Plaintiffs' theory hinges on impermissible fraud by innuendo. Plaintiffs allege nothing more than their disagreement with how Genesis accounted for the Note and their belief

that Genesis *should have* recognized an impairment after the 3AC collapse, which is irrelevant to understanding the DCG Defendants' alleged fraudulent intent. Nonetheless, it is well-settled that in the Second Circuit, "GAAP violations of accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

These allegations fall far short of the "highly unreasonable or extreme misconduct" required to support an inference of culpable participation. *See Alstom*, 406 F. Supp. 2d at 491.

## II.    Count II: Plaintiffs Fail to Adequately Plead a "Scheme Liability" Claim Against the DCG Defendants

Plaintiffs attempt to also assert a direct claim against the DCG Defendants for "scheme liability." AC ¶ 505; *see* 17 C.F.R. § 240.10b-5(a). To state a claim for scheme liability, Plaintiffs must allege facts showing "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). Rule 9(b) requires a plaintiff to "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Parmalat*, 383 F. Supp. 2d at 622. The scheme also must be "integral to the purchase and sale of the securities in question." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986). Here too, Plaintiffs' allegations fall short.

*First*, this claim simply repackages Plaintiffs' Section 20(a) claim related to Genesis's alleged misstatements. AC ¶ 505(a)–(f). It is well-settled in the Second Circuit that alleged misstatements "cannot form the 'sole basis'" for scheme liability under Section 10(b). *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022); *see also In re Marsh & Mclennan Cos., Inc. Sec. Litig*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (allegations that "defendants made, or allowed to be

made, false or misleading statements despite their awareness or reckless disregard of the misconduct" are "insufficient to state a claim for scheme liability").

*Second*, even if these allegations were sufficient to constitute deceptive or manipulative acts, Plaintiffs cannot establish that any of these acts were done in furtherance of any alleged scheme to defraud.  Plaintiffs' scheme liability claim suffers from the same temporal defect discussed above, which affirmatively precludes the requisite contemporaneous "connection" to the purchase or sale of their Lending Agreements.  The first of the allegedly deceptive acts constituting the "scheme" began in June 2022, *see* AC ¶¶ 28, 505(a)–(b), long postdating most Plaintiffs' executions of the Lending Agreements, *see infra* Part III.A, and therefore could not possibly have contributed to any fraudulent scheme undertaken "in connection" with Plaintiffs' purchases or sales of securities.  Courts routinely reject scheme liability claims in circumstances where, as here, the alleged scheme is "unmoored" from the purchase or sale of any security.  *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402–04 (S.D.N.Y. 2013) (no scheme liability where purported scheme post-dated decision to transact in securities); *see also Pross*, 784 F.2d at 459 (no scheme liability where "steps to be taken to effectuate the fraud are not integral to the purchase and sale of the securities in question [] occur only well after the securities transaction has been completed").

*Third*, to the extent Plaintiffs allege that DCG's participation in two intercompany transactions—the $500 million loan from Genesis to DCG, and the $1.1 billion Note—gives rise to scheme liability, *see* AC ¶¶ 505(a)–(b), they are wrong.  With respect to the $500 million loan, Plaintiffs conclusorily allege only that DCG received commercially favorable terms and intended to use the proceeds to "artificially prop up the value of GBTC."  *Id.* ¶ 505(a).  Even if true that the terms of the loan were not commercially reasonable, that is not indicative of a scheme to defraud Plaintiffs.  *E.g.*, *In re Cannavest Corp. Sec. Litig*, 307 F. Supp. 3d 222, 251–52 (S.D.N.Y. 2018)

(allegations that company overstated value of asset sale to affiliate insufficient to establish deceptive scheme).[14]  As for the Note, Plaintiffs again simply aver that the terms of the loan were commercially unreasonable and challenge how Genesis—not DCG—allegedly *represented* the Note to others.  *See* AC ¶¶ 505(d)–(f).  Again, that does not suggest fraud by DCG:  It executed a Note that provided its subsidiary an enforceable credit against a solvent parent company in exchange for a debt against an *in*solvent third party.  Simply put, Plaintiffs take what is an objectively neutral series of events—a parent assisting a distressed subsidiary via a sophisticated financial transaction—and attempt to imbue it with sinister connotations.  This is not sufficient under Rule 9(b) or the PSLRA.  *See Cannavest*, 307 F. Supp. 3d at 249; *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (act must be "inherently deceptive" to constitute scheme liability).

*Finally*, Plaintiffs' attempt to establish some form of motive for the scheme falls entirely flat.  To plead motive, a plaintiff "must assert a concrete and personal benefit . . . resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiffs' only allegations of a personal benefit relate to supposedly "higher compensation" for DCG and Silbert (but not other DCG Defendants) through management fees paid to Grayscale purportedly through Genesis's continued lending operations to 3AC, and to deferring Genesis's demise to stave off "mass investor redemptions."  AC ¶¶ 500–01.  Neither suffices.  At the outset, these motivations relate to profits allegedly earned by DCG's subsidiaries, not DCG itself.  As set forth above, Plaintiffs cannot simply disregard corporate separateness.  In any event, courts have repeatedly held that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to . . . increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA & Loc. 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553

---

[14] The alleged use by DCG of the loan proceeds, AC ¶ 237, has nothing to do with Plaintiffs' allegations regarding fraudulent conduct by Genesis in connection with its digital-asset lending program.

F.3d 187, 198 (2d Cir. 2009).

Similarly, "[t]he theory that defendants engaged in fraud 'to protect the very survival of the company' is 'far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit.'"  *Russo*, 777 F. Supp. 2d at 519; *see also Alstom*, 406 F. Supp. 2d at 476 (intentionally underbidding contracts did not support a finding of scheme liability as the purpose was not deceptive but rather to "fill in business and keep the workforce running"). Thus, DCG's alleged desire to keep Genesis from entering into liquidation proceedings is insufficient to plead scheme liability.[15]

Plaintiffs' attempt to state a direct "scheme liability" claim against the DCG Defendants can be swiftly rejected.

### III.    Count I: Plaintiffs' Section 15 Claim Should Be Dismissed

Plaintiffs also assert that the DCG Defendants are secondarily liable as "control persons" for Genesis's alleged failure to register the Lending Agreements as "securities" under Section 12(a)(1) of the Securities Act.  AC ¶¶ 441–54.[16]  First, this claim is time-barred.  *See infra* Part III.A.  Second, Plaintiffs again fail to plead a primary violation on the part of Genesis, *see infra* Parts III.B–C, and fail to establish control on the part of the DCG Defendants over the transaction in question, namely, Genesis's alleged offer or sale of unregistered securities.  *See infra* Part III.D.

### A.    The Securities Act Claim Is Barred by the One-Year Statute of Limitations

A Securities Act claim must be "brought within one year after the violation upon which it is based," 15 U.S.C. § 77m; *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 n.1 (2d Cir. 1993) (statute of limitations applies to control person claims under Section 15), that is, within one year

---

[15] Plaintiffs cannot rely on their allegations regarding capital withdrawals by Silbert and unnamed insiders in the months leading up to the 3AC default for the reasons set forth above.  *See supra* Part I.B.2.

[16] Section 5 of the Securities Act "requires that securities be registered with the SEC before any person may sell or offer to sell such securities."  *SEC v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006).

of the purchase of the alleged securities, *see Anderson v. Binance*, 2022 WL 976824, at *2–3 (S.D.N.Y. Mar. 31, 2022).  This limitations period applies "regardless [of] whether [p]laintiff knew or reasonably could have known of the injury at that time."  *Teva Pharms. Indus. Ltd. v. Deutsche Bank Sec. Inc.*, 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010); *see also Anderson*, 2022 WL 976824, at *2 ("Section 12(a)(1) does not include a statutory discovery rule.").

The Gemini Earn Plaintiffs' certifications establish that they began lending digital assets to Genesis via the Gemini Earn program no later than November 2021, well over a year before the commencement of this action on January 23, 2023.  *See* ECF Nos. 38-2, 38-3, 38-5.  And because the Gemini Earn Plaintiffs could only lend assets through the Gemini Earn program subsequent to the execution of a Lending Agreement, the Gemini Earn Plaintiffs necessarily executed the Lending Agreement—and thus "purchase[d]" the alleged "security"—well outside the one-year statute of limitations imposed by the Securities Act.  The remaining Plaintiffs, who lent directly to Genesis, allege that Genesis began offering the purported unregistered securities in July 2020, *see* AC ¶ 110, well over two years before initiating this action.  Accordingly, Plaintiffs' claim is time-barred and should be dismissed on that basis alone.

**B.      Plaintiffs Fail to Plead Statutory Standing With Respect to a "Sale" or "Offer"**

Plaintiffs assert a primary violation of Section 12(a)(1) of the Securities Act, which creates a private cause of action against a person who *sells* or *offers* a security without registering the securities offering or qualifying for an exemption from registration.  Liability under Section 12(a)(1) extends only to "statutory sellers," meaning a party (1) who "passed title, or other interest in the security, to the buyer for value" or (2) "who successfully solicits the purchase [of securities], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988).  Plaintiffs fail to allege that Genesis is a statutory seller under either theory.

*First*, assuming, *arguendo*, that cryptocurrency is a security—a question that this Court need not grapple with to resolve this motion—Plaintiffs do not allege that Genesis (or any of the DCG Defendants) passed title or interest in any cryptocurrency. Instead, Gemini marketed a program through which parties could lend their own digital assets to Genesis and receive loan fees at regular intervals. *See* AC ¶¶ 110–13. Once participants signed a Lending Agreement with Genesis, they could (but were not required to) deposit their digital assets with Gemini in exchange for interest and withdraw those assets on demand, just like a normal deposit bank account. *See id*. ¶¶ 115–18.[17] Because no digital assets were bought or sold here, Plaintiffs allege that the Lending Agreements themselves are the relevant securities. *Id*. ¶ 133. The threshold and fatal problem for Plaintiffs, though, is that in no sense could it rationally be said that Genesis passed title or interest in the Lending Agreements, much less *for value*. A "sale" for purposes of the Securities Act includes "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). Here, the Lending Agreements simply established a framework that gave Plaintiffs the opportunity to lend digital assets to Genesis in the future, but no obligation to do so. *See* MBA § II(a); MLA § II(a). There was no exchange of "value," 15 U.S.C. § 77b(a)(3), and no "binding contract to purchase or sell securities," *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). Unlike traditional note sales, the Lending Agreements did not raise a fixed amount of capital, require the exchange of consideration between the parties, or fix a maturity date for the loans. Plaintiffs retained full discretion to lend (or not lend) digital assets to Genesis at any interval, in any volume and length of their choosing, and Genesis was not obliged to accept any digital assets offered by Plaintiffs for loans. MBA § II(a); MLA § II(a).

*Second*, Plaintiffs fail to allege that Genesis solicited Plaintiffs to "purchase" the Lending

---

[17] Similarly, parties who lent their "digital assets or cash" to Genesis directly pursuant to the MBA would receive pre-set Loan Fees on those assets, and could call their loans at any time. *See id.* ¶¶ 111–13.

Agreements.  A defendant must be "directly involved in the actual solicitation" of a particular plaintiff's purchase to be liable under Section 12(a)(1).  *Griffin v. PaineWebber, Inc.*, 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001); *see also Underwood v. Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 238–39 (S.D.N.Y. 2023) (collecting cases).  The AC is devoid of any allegation that Genesis communicated with or directly solicited Plaintiffs.  To the extent Plaintiffs allege that Genesis "promoted" its lending programs "through websites and social media," *see, e.g.*, AC ¶¶ 157–59, 164, those are precisely the kinds of "marketing efforts" that courts routinely reject as insufficient to establish active solicitation.  *E.g.*, *Youngers*, 195 F. Supp. 3d at 522–23 (making marketing materials available through "website and other channels" does not constitute active solicitation).

In sum, Plaintiffs have not pled Genesis's involvement in a "sale," "offer," "solicitation," or "purchase" sufficient to state a primary violation of Section 12(a)(1), and thus their Section 15 claim against the DCG Defendants should be dismissed.[18]

**C.    The Lending Agreements Are Not Securities**[19]

Even if Plaintiffs could somehow contort their contractual arrangements with Genesis into an "offer" or "sale," Plaintiffs must still establish that the Lending Agreements are "securities." Plaintiffs attempt to do this by claiming that the Lending Agreements: (1) are "investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); and (2) are "security notes" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  Neither theory withstands scrutiny.[20]

---

[18] Similarly, Section 10(b) of the Exchange Act applies only to manipulative or misleading conduct undertaken "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b).  As explained by the Second Circuit, a "purchase" or "sale" is "the act of entering into a binding contract to purchase or sell securities."  *Absolute Activist*, 677 F.3d at 67.

[19] Plaintiffs' failure to plead that the Lending Agreements are securities provides yet another, independent reason to dismiss Counts I and II of the AC as against all the DCG Defendants.

[20] The SEC has filed suit against Gemini and Genesis claiming otherwise.  *See SEC v. Genesis Glob. Cap., LLC*, No. 23-CV-287 (S.D.N.Y. Jan. 12, 2023).  That case remains pending.

1.   **The Lending Agreements Do Not Constitute Investment Contracts Under *Howey***

Under *Howey*, an instrument is an investment contract (and thus a security) where there is (1) an investment of money, (2) in a common enterprise ("horizontal commonality"), (3) in which the purchaser expects profits solely derived from the efforts of others. 328 U.S. at 299.[21]   Even assuming the Lending Agreements required an "investment of money" (they did not, *see supra* Part III.B), the Lending Agreements do not satisfy the other two elements.

a. **Plaintiffs Did Not Invest In A Common Enterprise**

A "common enterprise" considers whether there is "horizontal commonality," *Marini v. Adamo*, 812 F. Supp. 2d 243, 255–56 (E.D.N.Y. 2011), which is the "tying of each individual investor's fortune to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).   Here, neither Gemini Earn customers nor Genesis's institutional lenders shared in profits and losses with Genesis or each other.   The only "profit" lenders received from Genesis was interest at a pre-set rate (a contractual "Loan Fee" paid by Genesis under the terms of the Lending Agreements), which they earned irrespective of any returns Genesis earned on its reinvestment of the proceeds.   *See* AC ¶¶ 5, 117–18; MLA § III(a);   MBA § III(a).

Plaintiffs' conclusory allegation that "both Genesis Global Capital and investors earned profits when Genesis Global Capital deployed the pooled assets," AC ¶ 183, is wrong.   "Pooling" occurs when funds are "reinvested by the promoter into the business" and "[i]n turn, such reinvestment *increases the value of the instrument offered*." *Friel v. Dapper Labs, Inc.*, 657

---

[21] The subject of the alleged security must be considered alongside the "full set of contracts, expectations, and understandings" that attach to the subject.   *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020). Critically, the Gemini Earn Plaintiffs' express acknowledgement that any loans were "intended to be commercial loans . . . *not securities*," cuts against any notion that the Lending Agreements are securities at the outset.   *See* MLA § XXV (emphasis added).

F. Supp. 3d 422, 436 (S.D.N.Y. 2023) (emphasis added).  Not so here:  Genesis's reinvestment of customer assets in its lending business (and any resulting returns) increased neither the Loan Fees nor the value of the Lending Agreements—it had no impact whatsoever on customer profits.  The absence of such a link is fatal to a showing of common enterprise.  *See, e.g.*, *Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 370 (S.D.N.Y. 1992) (no common enterprise where investor's fortunes were not tied to those of the business "[g]iven the fixed rate of return expected").  That Genesis may have commingled Plaintiffs' assets (AC ¶¶ 122, 180) "does not render this transaction a security."  *Cooper v. King*, 114 F.3d 1186, 1997 WL 243424, at *2 (6th Cir. 1997) (Table).  Similarly, Plaintiffs' fortunes were never tied to that of any other lender, because the Loan Fees varied across all lenders.  *Compare* MBA § III(a) *with* MLA § III(a).  Where, as here, each agreement is unique and "negotiated one-on-one by the parties," it is not a security.  *Marine Bank v. Weaver*, 455 U.S. 551, 560 (1982).

Genesis's bankruptcy and subsequent inability to repay the loans does not establish common enterprise.  *See* AC ¶ 185.  At most, Plaintiffs allege that their continued receipt of the Loan Fees was tied to Genesis's solvency—but this solvency risk is inherent in *every* lending agreement, and cannot establish commonality of interest.  *See Harman v. Harper*, 914 F.2d 262, 1990 WL 121073, at *5 (9th Cir. 1990) (Table) ("[A]n individual borrower's failure to make payments on privately-negotiated notes does not give rise to liability under the securities laws.").

### b. Plaintiffs Do Not Allege They Had a Reasonable Expectation of Profits from the Efforts of Others

Plaintiffs also fail *Howey*'s third prong, which examines "whether the economic reality surrounding [the Lending Agreements] led [Plaintiffs] to have a 'reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'"  *SEC v. Ripple Labs*, -- F. Supp. 3d --, 2023 WL 4507900, at *9 (S.D.N.Y. July 13, 2023).

*First*, conclusory allegations that Genesis used proceeds from other lending activities to "generate revenue" and "pay the promised interest" to lenders, AC ¶¶ 184–85, and that Genesis lenders were thus "dependent on Genesis' managerial efforts," *id.* ¶ 125, are not the sort of "efforts of others" contemplated by *Howey*. As discussed above, the sole variable impacting Plaintiffs' "profits" was the interest rate, no matter how profitable Genesis was. The mere fact that lenders depended on Genesis's existence as a going concern and its *ability* to pay the Loan Fees does not establish an expectation of profits based on Genesis's efforts to drive speculative returns. *See Elson v. Geiger*, 506 F. Supp. 238, 242 (E.D. Mich. 1980) ("While the repayment of the mortgage may have depended on the solvency of the borrower, this is not the same as depending on entrepreneurial efforts"), *aff'd*, 701 F.2d 176 (6th Cir. 1982).

*Second*, the notion that Plaintiffs had a *reasonable* expectation of profits is foreclosed by the plain terms of the Lending Agreements, which entitled them to nothing more than fixed-rate payments and loan repayment. *See* MLA § III(a); MBA § III(a). "The qualification that the investors' expectations be reasonable is an important one," determined by whether "an objective investor would have perceived the defendants' statements and actions as promising the possibility of future returns." *SEC v. Terraform Labs Pte. Ltd.*, -- F. Supp. 3d --, 2023 WL 4858299, at *14 (S.D.N.Y. July 31, 2023). In view of the Lending Agreements, no lender would have had any expectation of profits (much less a reasonable one) that would rise and fall based on Genesis's success or acumen in managing its own investments. *See, e.g.*, *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1185 (6th Cir. 1981) (no reasonable expectation of profit where "the return expected . . . was simply the repayment of the amounts advanced plus a fixed rate of interest"); *Ripple*, 2023 WL 4507900, at *9–12 (no security where purchaser "did not derive [expectation of profit] from [crypto issuer]'s efforts (as opposed to other

factors, such as general cryptocurrency market trends).").  This is particularly the case where, as here, every lender contractually represented themselves to be sophisticated parties.  *See* MLA § V(d); MBA § VI(d); *see also Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992) (sophisticated participants who signed loan agreements "were given ample notice that the instruments were participations in loans and not investments in a business enterprise").[22]

*Third*, even if Plaintiffs had a reasonable expectation of "profits," such expectation derived entirely from the value of their crypto assets, which were determined by the broader cryptocurrency market, not Genesis.  In such circumstances, the *Howey* test is not satisfied.  *See SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (*Howey* not met where "realization of profits depends significantly on the post-investment operation of market forces"); *Lehman Bros. Com. Corp. v. Minmetals Int'l Non- Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no security where "any gain likely would result in large part from market movements").

## 2.    The Lending Agreements Are Not Security Notes Under *Reves*

Plaintiffs' alternative theory—that the Lending Agreements are "security notes" within the meaning of the Supreme Court's decision in *Reves*—fails on its face, because there were  no "notes" exchanged between the parties.  Plaintiffs deposited their digital assets with Genesis, received a Loan Fee, and could withdraw their assets at any time.  *See supra* Part III.B.  Plaintiffs retained a right of withdrawal, not a note payable at maturity.  The Lending Agreements thus do not even fit within the conceptual framework of *Reves*.

---

[22] To the extent Plaintiffs allege that their expectations were influenced by information from websites and social media, *see* AC ¶¶ 164–66, these allegations cannot override the clear terms of the Lending Agreements.  *See, e.g., Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir. 2011) (*per curiam*) (explaining that "in determining whether or not a particular transaction is a security," an integration clause will exclude "oral representations" from qualifying as "promises [or] inducements"); *Demarco v. LaPay*, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) ("[M]arketing and advertising hooks do not change the character of the transaction[.]").

To the extent any further analysis is appropriate, however, Plaintiffs fail each *Reves* factor: the (1) motivations of the parties; (2) plan of distribution; (3) reasonable expectations of the investing public; and (4) existence of another regulatory scheme that "significantly reduces the risk of the instrument." 494 U.S. at 66–67.

*First*, Plaintiffs shared the same motivations as any lender—to earn a market rate of interest on their own assets, not to speculate on Genesis's business acumen as Genesis stakeholders. Plaintiffs themselves allege that the Genesis lending arrangements appealed to lenders because "they would receive profit in the form of interest on those assets," AC ¶ 147, which indicates a commercial lending purpose. *See Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 43 (S.D.N.Y. 1991) (where participants who "earn[ed] a fixed rate of interest" on a loan were motivated by "commercial purposes," instrument was not a security).

*Second*, the plan of distribution does not suggest an investment. The second *Reves* factor considers "'the plan of distribution' of the instrument," including whether it is subject to "common trading for speculation or investment." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 306 (2d Cir. 2023). To establish this factor, courts look to whether "there was a secondary market for the [notes]," *Nat'l Bank of Yugoslavia v. Drexel Burnam Lambert, Inc.*, 768 F. Supp. 1010, 1015 (S.D.N.Y. 1991), or whether the notes were sold to a "broad segment of the public," *Fragin v. Mezei*, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012).

There was no secondary market for the Lending Agreements, and in fact, lenders were expressly prohibited from trading their interest in the Lending Agreements to others. MLA § XVII; MBA § XVII. And it is not dispositive that the Lending Agreements were "publicly advertised," AC ¶ 157, because Plaintiffs acknowledge that Genesis imposed high lending minimums on institutional lenders that excluded significant portions of lenders, *id.* ¶ 114, and that

the Gemini Earn program was available only to those individuals or entities that "held a Gemini digital asset platform account," *id.* ¶ 116; *see also Kirschner*, 79 F.4th at 306 (no security where notes were offered to limited group of lenders and secondary market was restricted).

*Third*, there are no well-pled allegations that "there exist[ed] 'public expectation that the notes would be traded as securities.'" *Schentag v. Nebgen*, 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018). The Lending Agreements prohibited lenders from transferring or assigning their rights under the agreements, *see* MBA § XVII; MLA § XVII, meaning those rights could not be traded on a secondary market like securities are. *See Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La. 1990), (finding that since the alleged securities "were not commonly traded," "it is unnecessary to examine the reasonable expectation of the investing public"). Moreover, the Gemini Earn Plaintiffs agreed that the loans were "intended to be commercial loans . . . *not securities*." MLA § XXV; *see also Kirschner*, 79 F.4th at 308 ("If buyers were given ample notice that the instruments were . . . loans and not investments in a business enterprise, it suggests that the instruments are not securities.") (cleaned up).

*Finally*, Plaintiffs have not adequately alleged that the Lending Agreements were insufficiently regulated such that application of the Securities Act is necessary. *See Kirschner*, 79 F.4th at 308–09. Both Gemini and Genesis were regulated by the U.S. Financial Crimes Enforcement Network during the relevant period, which investigates and combats money laundering and financial crimes.[23] And, as Plaintiffs acknowledge, Gemini was regulated by the New York Department of Financial Services. *See* AC ¶ 170. The fact that *other* regulatory regimes did not apply to Genesis says nothing about the adequacy of the regulatory regimes that did.

### D.   Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over the

---

[23] *See* FinCEN, https://www.fincen.gov/what-we-do (last visited Sept. 8, 2023).

**Alleged Primary Violation**

Once again, Plaintiffs unsuccessfully attempt to establish control person liability on the part of the DCG Defendants. In addition to a primary violation—which, for the reasons set forth above, Plaintiffs have not pleaded—control person liability with respect to the Securities Act claim requires that Plaintiffs *at least* plead actual control of the "transaction[s] in question," *i.e.*, Genesis's alleged offer or sale of unregistered securities. *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 409 (S.D.N.Y. 2003).[24] Here, Plaintiffs' only allegations of control have nothing to do with Genesis's decision to register (or not) the Lending Agreements as securities. *See supra* Part I.B. Indeed, the best Plaintiffs can muster with respect to Genesis's alleged Securities Act violation is that the DCG Defendants "had the power to direct or cause the direction of the management and policies of Genesis Global Capital." AC ¶ 452. Such generalized, conclusory allegations do not suffice. *See In re Smith Barney*, 884 F. Supp. 2d at 166–67.

## IV. Counts IV and V Should Be Dismissed Because Plaintiffs Fail to Adequately Allege Any State-Law Claims in the Alternative

As a fallback, Plaintiffs assert consumer protection law violations based on allegedly "fraudulent marketing, advertising, and sales tactics." *See* AC ¶¶ 421–29. Those claims are based on the same allegations as the Exchange Act claims and fail for many of the same reasons.

### A. Count IV Should Be Dismissed Because Plaintiffs Have Failed to Allege a CUTPA Claim

To state a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), "a plaintiff must establish that the defendant has (1) engaged in unfair methods of competition or unfair or deceptive acts or practices (2) in the conduct of any trade or commerce, (3) resulting in (4) an ascertainable loss of money or property, real or personal, by the plaintiff." *Kent Literary Club of*

---

[24] Some courts have held that the culpable participation element applies to claims under Section 15. *E.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010).

*Wesleyan Univ. v. Wesleyan Univ.*, 257 A.3d 874, 889 (Conn. 2021).  Where, as here, Plaintiffs' "CUTPA claims rely on claims of fraud," the heightened Rule 9(b) pleading standard applies.  *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, 2013 WL 791462, at *8 (S.D.N.Y. Mar. 5, 2013).  Moreover, where a "CUTPA claim is 'alleged in skeletal form and largely based on the same factual allegations that support'" another failing claim, "the CUTPA claims cannot survive for the same reasons."  *Lops v. YouTube, LLC*, 2023 WL 2349597, at *5 (D. Conn. Mar. 3, 2023).

Here, Plaintiffs allege no facts distinct from their Exchange Act claims—they admit that their CUTPA claims "are premised on the same conduct that forms the basis of Plaintiffs' Exchange Act Claims."  AC ¶ 51; *see also id.* ¶¶ 421–29.  Thus, "because [the Exchange Act] claim fails, so too must [the] derivative CUTPA claim."  *Speer v. Select Portfolio Servicing*, 2023 WL 4850556, at *6 (D. Conn. July 28, 2023).  That is particularly true here, where CUTPA limits control liability even more strictly than the Exchange Act, *see Joseph Gen. Contracting, Inc. v. Couto*, 119 A.3d 570, 586–88 (Conn. 2015), and imposes a rigorous standard for proximate causation, *see Lewis v. Assurant, Inc.*, 2022 WL 4599038, at *8–9 (D. Conn. Sept. 30, 2022).  At the very least, Plaintiffs' class allegations under CUTPA must be stricken, because CUTPA limits class action standing to claims brought "on behalf of similarly situated residents *of Connecticut* or those that were injured *in Connecticut.*"  *In re Trilegiant Corp*, 11 F. Supp. 3d 82, 114–19 (D. Conn. 2014) (emphasis added).  Plaintiffs plead neither here.  *See* AC ¶¶ 53–57.  Plaintiffs' vague allegations that DCG's principal place of business was in Connecticut and that Defendants "transacted business within the State of Connecticut," *id.* ¶¶ 58, 79, have no bearing on the class standing inquiry, *see Trilegiant Corp.,* 11 F. Supp. 3d at 114–19.

### B.   Count V Should Be Dismissed Because Plaintiffs Have Not Adequately Alleged an NYUDTPA Claim

Plaintiffs also allege that the DCG Defendants engaged in unfair methods of competition

and unfair or deceptive acts or practices in violation of the New York Uniform Deceptive Trade Practices Act ("NYUDTPA"), N.Y. Gen. Bus. Law § 349.  *See* AC ¶¶ 541–56.  NYUDTPA requires a plaintiff to allege that defendants engaged in a "consumer-orientated . . . act or practice [that] was misleading in a material respect," and that "the plaintiff was injured as result."  *Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*, 192 F. Supp. 3d 348, 358 (S.D.N.Y. 2016)

Plaintiffs' claim fails at the outset because NYUDTPA applies only where the deception occurred in New York.  *See Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 325 (2002); *Miramontes v. Ralph Lauren Corp.*, 2023 WL 3293424, at \*4 (S.D.N.Y. May 5, 2023).  The AC is devoid of any allegations that Plaintiffs—all of whom are out-of-state residents, *see* AC ¶¶ 53–57—were injured in New York or that a deceptive transaction occurred in New York.  It is not sufficient that DCG maintained its principal place of business in New York prior to 2022, *see Goshen*, 98 N.Y.2d at 325, nor that the "defendant [allegedly] originated the overall scheme in the state," *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 519 (S.D.N.Y. 2015).  Plaintiffs' allegation that Silbert met with Cameron Winklevoss in New York is also insufficient, because the alleged representations in that meeting were not made to Plaintiffs.

In any event, the NYUDTPA claim also fails because, as with the Exchange Act claim, Plaintiffs allege no deceptive conduct by the DCG Defendants, and cannot impute Genesis's conduct to DCG based on mere corporate affiliation.  *See McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 144 (E.D.N.Y. 2009).  Moreover, allegations here relate to private contracts between Plaintiffs and Genesis, but "[p]rivate contract disputes do not constitute conduct that affects consumers at large and, therefore, do not satisfy the consumer-oriented threshold requirement under" NYUDTPA.  *Royal Host Realty*, 192 F. Supp. 3d at 358.  Finally, there is no allegation that a consumer good was sold—the Lending Agreements were not generally available to the public

and were not "sold" at all—which is also required to plead a NYUDTPA claim. *See Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 (2d Dep't 1995) (NYUDTPA does not apply to "complex arrangements, knowledgeable and experienced parties and large sums of money").

Neither the CUTPA nor the NYUDTPA can salvage Plaintiffs' legally deficient federal claims.  They fail for all of the same reasons as the Exchange Act claims, and more.

## **CONCLUSION**

For the foregoing reasons, the AC—Plaintiffs' *third* attempt to state a securities fraud claim—should be dismissed in its entirety with prejudice.[25]

---

[25] *See, e.g.*, *Landy v. Heller, White & Co.*, 783 F. Supp. 125, 133 (S.D.N.Y. 1991) (dismissing with prejudice a second amended complaint that still failed to cure pleading deficiencies).

Dated: December 15, 2023                    Respectfully Submitted,

                                            DEFENDANTS DIGITAL CURRENCY
                                            GROUP, INC., BARRY SILBERT, GLENN
                                            HUTCHINS, LAWRENCE LENIHAN, AND
                                            MARK MURPHY


                                            By: */s/ Jonathan D. Polkes*
                                            Jonathan D. Polkes (admitted *pro hac vice*)
                                            Caroline Hickey Zalka (admitted *pro hac vice*)
                                            Stefania D. Venezia (admitted *pro hac vice*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, NY 10153
                                            Telephone: (212) 310-8000
                                            Facsimile: (212) 310-8007
                                            jonathan.polkes@weil.com
                                            caroline.zalka@weil.com
                                            stefania.venezia@weil.com

                                            Joshua M. Wesneski (admitted *pro hac vice*)
                                            WEIL, GOTSHAL & MANGES LLP
                                            2001 M Street NW, Suite 600
                                            Washington, DC 20036
                                            Telephone: (202) 682-7248
                                            joshua.wesneski@weil.com

                                            */s/ Thomas D. Goldberg*
                                            Thomas D. Goldberg (ct04386)
                                            Jennifer M. Palmer (ct31099)
                                            DAY PITNEY LLP
                                            One Stamford Plaza
                                            263 Tresser Boulevard
                                            Stamford, CT 06901
                                            Telephone: (203) 977-7300
                                            Fax: (203) 977-7301
                                            tgoldberg@daypitney.com
                                            jpalmer@daypitney.com

                                            *Their Attorneys*

41

## <u>CERTIFICATION OF COMPLIANCE WITH RULE XI(D)</u>

I hereby represent pursuant to Rule XI(D) (Multiple Signatures) of the Electronic Filing Policies and Procedures of the U.S. District Court for the District of Connecticut that the other attorneys whose signatures appear on the foregoing consented to the inclusion of their signatures.

/s/ *Jonathan D. Polkes*
Jonathan D. Polkes