## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, Individually and on Behalf of All Others Similarly Situated,

     Plaintiffs,

   v.

DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, MICHAEL MORO, and DERAR ISLIM,

     Defendants.

Case No.: 3:23-cv-00082-SRU

## LEAD PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**SILVER GOLUB & TEITELL LLP**
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
Krystyna Gancoss (*pro hac vice* forthcoming)
One Landmark Square, Floor 15
Stamford, CT 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com

*Lead Counsel for Lead Plaintiffs Christopher Buttenham, Ashwin Gowda, William McGreevy, and Translunar Crypto LP and the Proposed Class*

**KAPLAN FOX & KILSHEIMER LLP**
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiff Remo Maria Morone and the Proposed Class*

Dated: January 22, 2024

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ iv

I.     PRELIMINARY STATEMENT ................................................................... 1

II.    FACTS APPLICABLE TO ALL CLAIMS ...................................................... 6

III.   SECURITIES ACT CLAIMS ....................................................................... 8

    A.    Facts Concerning Claims under the Securities Act ................................... 8

    B.    The Complaint Adequately Alleges Claims under the Securities Act .................... 9

         1.    The Complaint Alleges Violations of the Securities Act for the Offer or Sale of Unregistered Securities ....................................... 9

         2.    The Securities Act Claims Are Timely ..................................... 10

         3.    The Terms of the Genesis Yield Investment Agreement Do Not Waive Application of the Federal Securities Laws ................................... 14

         4.    Genesis Offered or Sold Genesis Yield Securities to Plaintiffs and Members of the Class ........................................................ 15

         5.    The Genesis Yield Investment Agreements Are "Securities" .................. 20

             a.    The Genesis Yield Investment Agreements Are Notes Under *Reves* ......................................... 21

                 i.    The Motivations of GGC and Investors Demonstrate that Genesis Yield Investment Agreements are Securities ..................................... 22

                 ii.    The Plan of Distribution for Genesis Yield Securities Establishes a Securities Offering .......... 25

                 iii.    The Expectations of the Investing Public were that the Genesis Yield Investment Agreements were Investments ............................. 27

                 iv.    There is No Alternative Regulatory Regime or Risk-Reducing Factors to Protect Genesis Yield Investment Agreement Investors ................. 30

i

      b.     Genesis Yield Investment Agreements Are Investment Contracts Under *Howey* ................................ 31

           i.     Genesis Yield Investors Funded a Common Enterprise through Horizontal Commonality ........ 33

           ii.    Genesis Yield Investors Participated in a Common Enterprise through Strict Vertical Commonality ...................................................... 35

           iii.   Reasonable Investors Expected Profits in Genesis Yield to Come from GGC's Managerial Efforts ................................ 36

    6.     Defendants Controlled GGC and Are Liable under Section 15 of the Securities Act ...................................................... 39

IV.    EXCHANGE ACT CLAIMS ...................................................... 45

    A.     Facts Concerning Claims under the Exchange Act................................ 45

        1.     Misrepresentations and Omissions Regarding Risk Management Practices ...................................................... 45

        2.     Defendants Scheme to Cover Up GGC's Insolvency and Misrepresentations and Omissions Following 3AC's Default................ 46

        3.     Misrepresentations and Omissions Following DCG Promissory Note Transaction ...................................................... 50

        4.     Omission Regarding Unregistered Securities ........................................... 53

    B.     The Complaint Adequately Alleges Primary Violations of Section 10(b) of the Exchange Act. ...................................................... 53

    C.     The Complaint Adequately Alleges a Violation of Section 10(b) Based on Misrepresentations or Omissions. ...................................................... 53

    D.     The Complaint Adequately Alleges Scienter. ...................................................... 55

    E.     The Complaint Adequately Alleges Reliance. ...................................................... 58

        1.     The Complaint alleges reliance on GGC's solvency representations. ...................................................... 58

        2.     The Complaint Alleges Reliance is Presumed under *Affiliated Ute*. ........ 60

| | 3. | The Complaint Alleges Investors Who Purchased Genesis Yield Securities through the Gemini Earn Platform Relied by and through Gemini. ................................................................................ 62 |
|---|---|---|
| | 4. | The Complaint Alleges that Defendants' Misrepresentations and Omissions Were Part of a Scheme to Defraud. ........................................ 65 |
| F. | | Plaintiffs Adequately Allege Causation. ............................................................. 66 |
| G. | | The Complaint Adequately Alleges Economic Loss. ........................................... 69 |
| H. | | The Complaint Adequately Alleges Damages That Are Nonspeculative And Concrete. ..................................................................................................... 70 |
| I. | | Plaintiffs Adequately Allege Scheme Liability. .................................................. 72 |
| J. | | Plaintiffs Adequately Allege Control Person Liability Under Section 20(a) Of The Exchange Act ............................................................................................ 74 |
| V. | | THE COMPLAINT ADEQUATELY ALLEGES STATE LAW CONSUMER PROTECTION CLAIMS ........................................................................................ 76 |
| A. | | The Complaint Adequately Alleges Violations of CUTPA................................... 76 |
| B. | | The Complaint Adequately Alleges Alternative Claims for Violations of NYUDTPA........................................................................................................... 80 |
| VI. | | CONCLUSION...................................................................................................... 84 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Absolute Activist Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ........................................................................ 17

*Ace Tree Surgery, Inc. v. Terex Corp.*,
  2018 WL 11350262 (N.D. Ga. Dec. 10, 2018) ......................................... 80

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) .................................................................. 69, 71

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ...................................................................... 60, 62, 74

*Aimis Art Corp. v. N. Tr. Secs., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009) ...................................................... 71

*Alunni v. Dev. Res. Grp., LLC*,
  445 F. App'x 288 (11th Cir. 20211) ......................................................... 38

*American High-Income Trust v. Alliedsignal*,
  329 F. Supp. 2d. 534 (S.D.N.Y. 2004) ............................................... 42, 43

*Amorosa v. Gen. Elec. Co.*,
  2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) ........................................... 8

*Anderson v. Binance*,
  2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ........................................... 12

*Anwar v. Fairfield Greenwich Ltd.*,
  306 F.R.D. 134 (S.D.N.Y. 2015) ........................................................ 59, 61

*Artie's Body Shop, Inc. v. Hartford Fire Ins. Co.*,
  287 Conn. 208 (2008) ............................................................................... 77

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ....................................................................... 55

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................ 34, 42

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
   763 F. Supp. 36 (S.D.N.Y. 1991) ............................................................................ 24

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
   973 F.2d 51 (2d Cir. 1992) ...................................................................................... 23

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................. 58

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 7, 8

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975) .................................................................................................. 60

*Bongiorno v. Baquet*,
   2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021) ........................................................ 27

*Bridge v. Phx. Bond & Indem. Co.*,
   553 U.S. 639 (2008) .................................................................................................. 58

*Buchholtz v. Renard*,
   188 F. Supp. 888 (S.D.N.Y. 1960) ........................................................................... 11

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ...................................................................... 66, 67, 68

*Chris-Craft. Indus. v. Bangor Punta Corp.*,
   426 F.2d 569 (2d Cir. 1970) ..................................................................................... 19

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ............................................................... 40, 43

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................... 55

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*,
   928 F. Supp. 2d 705 (S.D.N.Y. 2013) ..................................................................... 42

*Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*,
   516 F.2d 811 (2d Cir. 1975) ............................................................................... 65, 66

*Corpes v. Walsh Constr. Co.*,
   130 F. Supp. 3d 638 (D. Conn. 2015) ...................................................................... 20

*Cruz v. FXDirect Dealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) ............................................................................... 80, 81

*Demarco v. LaPay*,
   2009 WL 3855704 (D. Utah Nov. 17, 2009)...........................................................38

*Deutsche Bank. Secs. Inc.*,
   2010 WL 6864006 (S.D.N.Y. Dec. 14, 2010) .........................................................12

*Diaz v. Paragon Motors of Woodside*,
   424 F. Supp.2d 519 (E.D.N.Y. 2006) ...............................................................82, 83

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
   2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) ...........................................................9

*Dodds v. Cigna Sec. Inc.*,
   12 F.3d 346 (2d Cir. 1993) .....................................................................................12

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) ..............................................................68, 69

*Dura Pharm, Inc. v. Broudo*,
   544 U.S. 336 (2005).................................................................................................67

*Elson v. Geiger*,
   506 F. Supp. 238 (E.D. Mich. 1980) .......................................................................37

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ..............................................................................66, 68

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015).................................................................................56, 77

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011).................................................................................................58

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938)...................................................................................................79

*Fairchild v. Quinnipiac Univ.*,
   16 F. Supp. 3d 89 (D. Conn. 2014) ...........................................................................7

*Fed. Deposit Ins. Corp. v. Credit Suisse First Boston Mortg., Sec. Litig.*,
   414 F. Supp. 3d 407 (S.D.N.Y. 2019) .....................................................................41

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ...............................................................41, 42

*FHFA v. Nomura Holding Am., Inc.*,
   873 F.3d 85, 99 (2d Cir. 2017)..................................................................................9

*Fragin v. Mezei*,
  2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) .................................................................. 26, 28

*Franks v. Cavanaugh*,
  711 F. Supp. 1186 (S.D.N.Y. 1989) ............................................................................... 11, 12

*Friel v. Dapper Labs, Inc.*,
  2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) .............................................................. *passim*

*FTC v. Roomster Corp.*,
  654 F. Supp.3d 244 (S.D.N.Y. 2023) ........................................................................................ 80

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000) ...................................................................................................... 54

*Gary Plastic Packaging v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ...................................................................................................... 39

*Ge Dandong v. Pinnacle Performance Ltd.*,
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ...................................................................... 58, 59

*Goshen v. Mut. Life Ins. Co.*,
  98 N.Y.2d 314 (2002) ................................................................................................................ 80

*Greenspan v. Brassler*,
  78 F.R.D. 130 (S.D.N.Y. 1978) ................................................................................................ 66

*Griffin v. PaineWebber, Inc.*,
  2001 WL 740764 (S.D.N.Y. June 29, 2001) ............................................................................ 19

*Harman v. Harper*,
  1990 WL 121073 (9th Cir. 1990) .............................................................................................. 35

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ........................................................................................................ 62

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) .............................................................................................. 61

*Heine v. Colton, Hartnick, Yamin & Sheresky*,
  786 F. Supp. 360 (S.D.N.Y. 1992) ..................................................................................... 34, 35

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ........................................................................... 56, 57, 71

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*,
  37 N.Y.3d 169 (2021) ................................................................................................................ 83

*Hinchliffe v. Am. Motors Corp.*,
    184 Conn. 607 (1981) ............................................................................ 77

*Houghton v. Leshner*,
    2023 WL 6826814 (N.D. Cal. Sept. 20, 2023) .......................................... 11

*In re Aggrenox Antitrust Litig.*,
    2016 WL 4204478 (D. Conn. Aug. 9, 2016) .............................................. 79

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ................................................. 40, 43

*In Re Biozoom, Inc. Sec. Litig.*,
    2015 WL 1954553 (N.D. Ohio. Apr. 29, 2015) ........................................ 11

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) ...................................................................... 56

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018) ..................................................... 55

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ..................................................... 45

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ............................................ 44

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012) ....................................................... 8

*In re Fine Host Corp. Sec. Litig.*,
    25 F. Supp. 2d 61 (D. Conn. 1998) .................................................... 63, 64

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................... 55

*In re Glob. Crossing*,
    2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005) ........................................... 45

*In re Globalstar Sec. Litig.*,
    2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) ........................................ 40

*In re Hain Celestial Grp., Inc. Sec. Litig,*
    20 F. 4th 131 (2d Cir. 2021) .................................................................... 55

*In re Ind. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) ................................................. 41, 43

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................... 36

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
   2017 WL 95176 (S.D.N.Y. 2017) ................................................................. 9

*In re Longfin Corp. Sec. Class Action Litig.*,
   2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .............................................. 9

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ......................................................... 53

*In re Mindbody, Inc. Sec. Litig.*,
   489 F. Supp. 3d 188 (S.D.N.Y. 2020) ......................................................... 74

*In re Nat'l Century Fin. Enterprises, Inc.*,
   846 F. Supp. 2d 828 (S.D. Ohio 2012) ....................................................... 64

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
   988 F. Supp. 2d 406 (S.D.N.Y. 2013) ......................................................... 55

*In re NTL, Inc. Sec. Litig.*,
   347 F. Supp. 2d 15 (S.D.N.Y. 2004) ........................................................... 53

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) ......................................................... 73

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
   2006 WL 6900987 (S.D.N.Y.) ............................................................ 40, 42

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
   404 F. Supp. 2d 605 (D.N.J. 2005) ............................................................. 71

*In re Rsrv. Fund Sec. & Der. Litig.*,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010) ......................................................... 72

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ......................................................... 73

*In Re Smith Barney*,
   884 F. Supp. 2d ........................................................................................... 40

*In re SSA Bonds Antitrust Litig.*,
   2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ............................................. 84

*In re Trilegiant Corp.*,
   11 F. Supp.3d 82 (D. Conn. 2014) ............................................................. 79

*In re UBS Auction Rate Sec. Litig.*,
 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) .......................................................... 71

*In re Vivendi Universal, S.A. Sec. Litig.*,
 123 F. Supp. 3d 424 (S.D.N.Y. 2015) ................................................................... 71

*In re Vivendi Universal, S.A. Sec. Litig.*,
 634 F. Supp. 2d 352 (S.D.N.Y. 2009) ............................................................. 67, 68

*In re Vivendi Universal, S.A.*,
 381 F. Supp. 2d 158 (S.D.N.Y. 2003) ................................................................... 43

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ................................................................................... 67

*In re WorldCom, Inc. Sec. Litig.*,
 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ..................................................................... 9

*In re Worldcom, Inc. Sec. Litig.*,
 294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................... 44

*IWA Forest Ind. Pen. Plan v. Textron Inc.*,
 14 F.4th 141 (2d Cir. 2021) ..................................................................................... 8

*Janel World Trade, Ltd. v. World Logistics Servs., Inc.*,
 2009 WL 735072 (S.D.N.Y. Mar. 20, 2009) .......................................................... 71

*Joseph Gen. Contracting, Inc. v. Couto*,
 317 Conn. 565 (2015) ....................................................................................... 77, 78

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
 40 F. Supp. 3d 332 (S.D.N.Y. 2014) ..................................................................... 71

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
 708 F. Supp. 2d 334 (S.D.N.Y. 2010) ................................................................... 68

*Kirschner v. JP Morgan Chase Bank, N.A.*,
 79 F.4th 290 (2d Cir. 2023) ................................................................................... 26

*Knipe v. Skinner*,
 999 F.2d 708 (2d Cir. 1993) ................................................................................... 20

*Kusner v. First Pa. Corp.*,
 531 F.2d 1234 (3d Cir.1976) ................................................................................. 14

*Lattanzio v. Deloitte & Touche LLP*,
 476 F.3d 147 (2d Cir. 2007) ................................................................................... 68

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............................................................... 39

*Lentell v. Merril Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................... 66, 68

*Levy v. Maggior*e,
    48 F. Supp. 3d 428 (E.D.N.Y. 2014) ............................................................... 55

*Lewis v. Assurant, Inc.*,
    2022 WL 4599038 (D. Conn Sept., 30, 2022) ....................................................... 78

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
    2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ........................................................ 14

*Lisk v. Lumber One Wood Preserving, LLC*,
    792 F.3d 1331 (11th Cir. 2015) ............................................................... 80

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ............................................................... 54

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ........................................................... 72, 73, 74

*MacNaughton v. Young Living Essential Oils, LC*,
    67 F.4th 89 (2d Cir. 2023) ............................................................... 81

*Marks v. United States*,
    430 U.S. 188 (1977) ............................................................... 79

*Mazuma Holding Corp. v. Bethke*,
    21 F. Supp. 3d 221 (E.D.N.Y. 2014) ............................................................... 70

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) ............................................................... 58

*McMahan & Co. v. Wherehouse Ent., Inc.*,
    65 F.3d 1044 (2d Cir. 1995) ............................................................... 14

*McNabb v. SEC*,
    298 F.3d 1126 (9th Cir. 2002) ..................................................... 22, 26, 27, 31

*Metro. Enter. Corp. v. United Techs. Int'l, Corp.,
    Pratt & Whitney Large Com. Engines Div.*,
    2004 WL 1497545 (D. Conn. June 28, 2004) ........................................................ 84

*Meyer v. Jinkosolar Hldgs. Co.*,
    761 F.3d 245 (2d Cir. 2014) ............................................................... 61

*Miller v. Guimaraes*,
  78 Conn. App. 760 (2003)................................................................................ 77

*Nguyen v. Maxpoint Interactive, Inc.*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017) .......................................................... 9

*Norfolk Cty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009).............................................. 56

*Normand Josef Ent., Inc. v. Conn. Nat. Bank*,
  230 Conn. 486 (1994) .................................................................................... 77

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).......................................................................... 57

*One Commc'ns Corp. v. JP Morgan SBIC LLC*,
  381 F. App'x 75 (2d Cir. 2010) .................................................................... 62

*Ontario Tchr.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp 3d 131, 182, 183 (D. Conn. 2019) ................................... *passim*

*Oswego Laborers' Local 214 v. Marine Midland Bank*,
  85 N.Y.2d 20 (1995)...................................................................................... 82

*Owen v. Elastos Found.*,
  2021 WL 5868171 (S.D.N.Y. Dec. 9. 2021) ...................................11, 12, 13

*Panos v. Island Gem Enterprises, Ltd., N.Y.*,
  880 F. Supp. 169 (S.D.N.Y. 1995) ........................................................ 69, 70

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017) ........................................................................ 14

*Pinter v. Dahl*,
  486 U.S. 622 (1988)....................................................................................... 15

*Pollack v. Laidlaw Holdings, Inc.*,
  27 F.3d 808 (2d Cir. 1994) .............................................................. 22, 23, 24

*Poptech L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
  792 F. Supp. 2d 328 (D. Conn. 2011) ................................................... 75, 76

*Priv. Corp. Advisors, Inc. Advisors, Inc. v. Heard*,
  1995 WL 66647 (S.D.N.Y. Feb. 17, 1995) ................................................ 22

*Radiation Dynamics, Inc. v. Goldmuntz*,
  464 F.2d 876 (2d Cir. 1972) ........................................................................ 17

*Real Estate Inv'rs Tax Exempt Fund Ltd. P'ship v. Schwartzberg,*
    929 F. Supp. 105 (S.D.N.Y. 1996) ...................................................... 19

*Reeder v. Succession of Palmer,*
    736 F. Supp. 128 (E.D. La.) .............................................................. 29

*Revak v. SEC Realty Corp.,*
    18 F.3d 81 (2d Cir. 1994) ............................................................ 33, 34

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) .................................................................. *passim*

*Ross v. Bolton,*
    1989 WL 80428 (S.D.N.Y. Apr. 4, 1989) ............................................. 45

*In re Scottish Re Grp. Sec. Litig.,*
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................................... 40, 41, 43

*SEC v. Blockvest,*
    2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ......................................... 18

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
    375 U.S. 180 (1963) ........................................................................ 74

*SEC v. Cavanagh,*
    1 F. Supp. 2d 337 (S.D.N.Y.) ..................................................... 10, 18

*SEC v. Edwards,*
    540 U.S. 389 (2004) .............................................................. 20, 29, 39

*SEC v. Gabelli,*
    653 F.3d 49 (2d Cir. 2011) .............................................................. 13

*SEC v. Hopper,*
    2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ....................................... 73

*SEC v. Kik Interactive Inc.,*
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ........................................... 33, 34

*SEC v. Mut. Benefits Corp.,*
    408 F.3d 737 (11th Cir. 2005) .......................................................... 39

*SEC v. Opulentia, LLC,*
    479 F. Supp. 2d 319 (S.D.N.Y. 2007) ................................................ 19

*SEC v. R.G. Reynolds Enterprises, Inc.,*
    952 F.2d 1125 (9th Cir. 1991) ......................................................... 27

*SEC v. Rio Tinto PLC.*,
  41 F.4th 47 (2d Cir. 2022) ................................................................. 72

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) ...................................... 38

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001) ............................................................... 29

*SEC v. Shavers*,
  2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ...................................... 32

*SEC v. Telegram Grp., Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ......................................... *passim*

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ...................................... 37

*SEC v. Thompson*,
  732 F.3d 1151 (10th Cir. 2013) ................................................... 23, 26

*SEC v. Universal Express, Inc.*,
  2007 WL 2469452 (S.D.N.Y. 2007) ................................................... 17

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ................................................................... *passim*

*SEC v. Wallenbrock*,
  313 F.3d 532 (9th Cir. 2002) ............................................. 22, 23, 25, 26

*SEC v. Zandford*,
  535 U.S. 813 (2002) ..................................................................... 60, 74

*Schentag v. Nebgen*,
  2018 WL 3104092 (S.D.N.Y. June 21, 2018) ..................................... 29

*Seekamp v. It's Huge, Inc.*,
  2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) ...................................... 59

*Setzer v. Omega Healthcare Inv'rs.*,
  968 F.3d 204 (2d Cir. 2020) ............................................................. 57

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ..................................................................... 78, 79

*Shearson/Am. Exp., Inc. v. McMahon*,
  482 U.S. 220 (1987) ......................................................................... 62

*Simmtech Co. v. Citibank, N.A.*,
   2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016) ........................................................... 63

*Small v. Lorillard Tobacco Co.*,
   94 N.Y.2d 43 (1999) ........................................................................................... 83

*Solow v. Citigroup, Inc.*,
   827 F. Supp. 2d 280 (S.D.N.Y. 2011) ................................................................... 66

*Spencer v. Hartford*,
   256 F.R.D. 284 (D. Conn. 2009) ........................................................................... 59

*Steele-Warrick v. Microgenics Corp.*,
   2023 WL 3959100 (E.D.N.Y. June 12, 2023) ........................................................ 83

*Stephenson v. Deutsche Bank AG*,
   282 F. Supp. 2d 1032 (D. Minn. 2003) .................................................................11

*Stoiber v. SEC*,
   161 F.3d 745 (D.C. Cir. 1998) ............................................................. 23, 25, 26, 27

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................................... 61

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) ................................................................................... 66

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ........................................................................................... 28

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................... 55

*Teller v. Bill Hayes, Ltd.*,
   213 A.D.2d 141 (2d Dept. 1995) ........................................................................... 83

*Tesco Ent., Inc. v. Fibredyne Corp.*,
   2015 WL 788900 (D. Conn. Feb. 24, 2015) ..................................................... 77, 78

*U.S. v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ................................................................................... 31

*U.S. v. Naftalin*,
   441 U.S. 768 (1979) ........................................................................................... 16

*U.S. v. Pierre*,
   2021 WL 4150969 (S.D.N.Y. Sept. 13, 2021) ........................................................ 29

*Underwood v. Coinbase Glob., Inc.*,
   654 F. Supp. 3d 224 (S.D.N.Y. 2023) ................................................. 19

*Union Planters Nat. Bank v. Com. Credit*,
   651 F.2d 1174 (6th Cir. 1981) ....................................................... 37

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................ 28, 32

*Vacold LLC v. Cerami*,
   545 F.3d 114 (2d Cir. 2008) ........................................................ 18

*Wallace v. Buttar*,
   239 F. Supp. 2d 388 (S.D.N.Y. 2003) .............................................. 45

*Washington State Inv. Bd. v. Odebrecht S.A.*,
   461 F. Supp. 3d 46 (S.D.N.Y. 2020) ............................................... 59

*Weinstein v. Cardis Enterprises Int'l N.V.*,
   2017 WL 9485677 (E.D.N.Y. Aug. 3, 2017) ....................................... 71

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) ...................................................... 19

*Yi v. GTV Media Grp. Inc.*,
   2012 WL 3500920 (S.D.N.Y. 2021) ................................................ 56

*Yoder v. Orthomolecular Nutrition Inst.*,
   751 F.2d 555 (2d Cir. 1985) ........................................................ 18

*Youngers v. Virtus Investment Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) .............................................. 19

**Statutes**

15 U.S.C. § 77b ......................................................................... 26

15 U.S.C. § 77b(a)(1) .......................................................... 2, 31, 45

15 U.S.C. § 77b(a)(3) .......................................................... 23, 24, 28

15 U.S.C. § 77e ...................................................................... 11, 14

15 U.S.C. § 77l ......................................................................... 14

15 U.S.C. § 77m ......................................................................... 16

15 U.S.C. § 77n ..................................................................... 3, 21

15 U.S.C. § 77o ............................................................................................ 53

15 U.S.C. § 78bb(a) ...................................................................................... 83

15 U.S.C. § 78cc ..................................................................................... 3, 21

15 U.S.C. § 78cc(a) ...................................................................................... 76

15 U.S.C. § 78u-4(b) ...................................................................................... 5

15 U.S.C. §§ 78c(a)(13), (14) ...................................................................... 74

15 U.S.C § 77e(a) .......................................................................................... 14

15 U.S.C § 77e(c) .......................................................................................... 15

N.Y. Gen. Bus. Law § 349 ......................................................... 90, 94, 96, 97

**Rules**

Fed. R. Civ. P. 8 ..................................................................................... *passim*

Fed. R. Civ. P. 9(b) ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) .............................................................................. 8, 9

Fed. R. Civ. P. 15(a)(2) ................................................................................ 98

Fed. R. Civ. P. 15(c) ..................................................................................... 16

**Regulations**

17 C.F.R. § 240.10b-5 ....................................................................... 59, 79, 86

**Other Authorities**

Connecticut's Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*, ......................... 76

New York's Uniform Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.* ........... 76

Restatement (Second) of Torts § 533 (1997) ............................................... 78

*The Place of Reliance in Fraud*,
    48 Ariz. L. Rev. 1001 (2006) ................................................................. 76

Lead Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto, LP, Christopher Buttenham, and Remo Maria Morone ("Plaintiffs") respectfully submit their Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss in the above-captioned action ("Action").  ECF Nos. 136-43.[1]

## I.    PRELIMINARY STATEMENT

The Amended Complaint for Violations of the Federal Securities Laws and State Consumer Protection Laws, ECF No. 135 (the "Complaint"), alleges nonfraud claims under the Securities Act of 1933 ("Securities Act"), fraud claims under the Securities Exchange Act of 1934 ("Exchange Act"), and in the alternative, violations of Connecticut and New York consumer protection laws.  Plaintiffs bring claims on behalf of themselves and a proposed class of investors who purchased Genesis Yield securities (defined below) from non-party Genesis Global Capital, LLC ("GGC" or the "Company") during the period February 2, 2021 through November 16, 2022 who have been damaged (the "Class Period").  Since November 16, 2022, Plaintiffs and members of the class have been unable to access the crypto assets they tendered to GGC in connection with their purchase of Genesis Yield securities from GGC.  On January 20, 2023, nonparty GGC filed for protection under Chapter 11 of the Bankruptcy Code.  *See In re: Genesis Glob. Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy").

As set forth herein, Defendants' arguments in support of their motions ignore key allegations, dispute and mischaracterize facts alleged in the Complaint, raise questions of fact that cannot be resolved on a motion to dismiss, and rely on distinguishable legal authorities. Defendants' motions, in essence, seek to evade liability for conduct that the U.S. Securities and

---

[1] On January 9, 2024, the Court granted Plaintiffs' motion to file an omnibus brief of up to 90 pages in response to Defendants' four motions to dismiss.  ECF. No. 145.

Exchange Commission ("SEC"), the Attorney General for the State of New York ("NYAG"), and a special committee in the Genesis Bankruptcy have asserted (with the benefit of discovery) constitutes serious wrongful acts by Defendants Digital Currency Group, Inc. ("DCG"), Barry Silbert ("Silbert") and Soichiro "Michael" Moro ("Moro") and other "DCG Parties."[2]

By way of example, Defendants assert that Genesis Yield Investment Agreements are not securities. However, as explained below, the Genesis Yield Investment Agreements are "investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), "notes" under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990), and are "evidence of indebtedness" under the Securities Act (15 U.S.C. § 77b(a)(1)). Indeed, internal GGC documents revealed in the NYAG Action show that before the Class Period GGC's chief legal officer acknowledged that Genesis Yield securities (sold through the Gemini Earn program) "'may be viewed as an investment contract under the securities laws.'" ¶134.[3] In yet another example, Defendants repeatedly argue that none of them are responsible for harm alleged in the Complaint because the Genesis Yield Investment Agreements purportedly contain broad waivers of liability. However, Defendants ignore that under the Securities Act and Exchange Act such waivers are void. *See* 15 U.S.C. § 78cc; 15 U.S.C. § 77n. Further, Defendants assert the specious argument that the Complaint's

---

[2] *See SEC v. Genesis Glob. Cap., LLC., et al.*, No. 23-cv-00287 (S.D.N.Y.) ("SEC Action"), ECF No. 1; *The People of the State of New York v. Genesis Glob. Cap., LLC, et al.*, Index No. 452784/2023 (Sup. Ct. N.Y.) ("NYAG Action"), NYSCEF Doc. No. 2; Genesis Bankruptcy, ECF No. 1036, at 20, 36 (Amended Disclosure Statement, dated Dec. 6, 2023) ("The Amended Plan does not propose to release the DCG Parties and the former employees, officers, or directors of the Debtors as of the Petition Date . . . The Special Committee has concluded that there are colorable claims against certain DCG Parties for various causes of action . . .") (footnote omitted). On October 18, 2023, the court in the SEC Action denied defendants' application to stay discovery pending the court's ruling on the motions to dismiss and entered a discovery plan and scheduling order. *See* SEC Action, ECF No. 52.

[3] Citations to "¶__" are references to paragraphs of the Complaint. "DCG Br. at __" refers to ECF No. 137, the Memorandum of Law in Support of Defendants DCG, Silbert, Glenn Hutchins, Lawrence Lenihan, and Mark Murphy's Motion to Dismiss. "Moro Br. at __" refers to ECF No. 138-1, the Memorandum of Law in Support of Defendant Moro's Motion to Dismiss. "Islim Br. at __" refers to ECF No. 143, Defendant Derar Islim's Memorandum of Law in Support of his Motion to Dismiss. "Kraines Br. at __" refers to ECF No. 141, the Memorandum of Law in Support of Defendant Michael Kraines' Motion to Dismiss.

Exchange Act claims (but not Securities Act claims) seek speculative damages because there may be a recovery of assets through the Genesis Bankruptcy.  While arguments concerning damages prematurely raise questions of fact and are subject to expert discovery, and therefore, cannot be decided on a motion to dismiss, the Genesis Bankruptcy contemplates distributing assets to GGC's unsecured creditors by valuing their digital assets as of the date of GGC's bankruptcy petition (January 20, 2023).  This means that in the Genesis Bankruptcy investors will recover less than 100% of crypto assets loaned to GGC through Genesis Yield securities because the value of cryptocurrencies, like Bitcoin and Ethereum, have substantially increased in value since January 2023.[4]

The claims under the federal securities laws satisfy all applicable pleading requirements and the motions to dismiss should be denied.  The Securities Act claims are strict liability against nonparty GGC under Section 12(a)(1) of the Securities Act for its unlawful offer and sale of unregistered Genesis Yield securities, and allege derivative controlling persons claims under Section 15 against Defendants who controlled GGC.  ¶¶16-23, 192-214, 441-91.[5]  The Securities Act claims are subject to the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure and do not require Plaintiffs to plead or prove scienter, reliance, or loss causation.  While Defendants do not dispute that GGC did not register Genesis Yield securities under Section 5 of the Securities Act, Defendants assert that claims under the Securities Act are barred by the one-year statute of limitations, that GGC did not "offer or sell" anything to Plaintiffs, that Genesis Yield Investment Agreements are not securities, and that Defendants did not control GGC.

---

[4] *See, e.g.,* Genesis Bankruptcy, ECF No. 989, at 109 of 114 (providing that unsecured claims to be valued as of the "Petition Date, " *i.e.* January 20, 2023); ECF No. 950, at 143 of 298 (stating Amended Plan values claims as of Petition Date.")

[5] The SEC Action and NYAG Action allege similar claims against GGC for the unregistered offering and selling of the same security at issue in the Action.

3

Defendants' arguments are meritless.  Each of the Plaintiffs purchased Genesis Yield securities within one year of the filing of the Action (¶¶53-57). Furthermore, through the Genesis Yield Investment Agreements, GGC offered and sold Genesis Yield securities to Plaintiffs and members of the Class, and the Genesis Yield Investment Agreements are securities under both *Howey* and *Reves* and are evidence of indebtedness.  Moreover, the Complaint alleges facts that show each of the Defendants controlled GGC, satisfying Rule 8's pleading requirement and putting Defendants on notice of the claims alleged.  ¶¶441-49.  Contrary to Defendants' arguments, particularity and facts alleging "culpable participation" or control over specific transactions are not required to plead a control person claim under Section 15 of the Securities Act.

With respect to the Complaint's fraud claims under the Exchange Act, the Complaint adequately alleges Defendants' materially false and misleading statements and scheme liability, and scienter with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  The Complaint alleges that at the start of the Class Period, GGC represented that it maintained sound risk management practices and its loan book was "over collateralized," when in fact GGC was engaging in risky lending to unreliable counterparties and related parties, and GGC's loan book was, in fact, undercollateralized during the Class Period.  ¶¶216-54.  In June 2022, when risky-counterparty Three Arrows Capital ("3AC") defaulted on a massive, $3.2 billion undercollateralized loan from GGC—creating an equity hole over $1 billion at GGC—instead of revealing the truth of GGC's insolvency, Defendants covered it up and then lied to investors in order to save themselves and their own pecuniary interests.  ¶¶256-386; ¶¶293-96 (alleging Defendant Silbert and other insiders pulled over $100 million from GGC).  While Defendants represented to investors that DCG provided capital and assumed the 3AC losses, in truth, DCG did

not inject any capital or money into GGC.  Far from being favorable to GGC, DCG's $1.1 billion promissory note ("DCG Promissory Note") was accounting fraud that covered up GGC's massive losses and insolvency, and was structured to favor DCG and Defendants, not GGC.  In light of GGC's insolvency, Defendants Moro, GGC's CEO through August 2022, and Derar Islim ("Islim"), GGC's interim CEO, caused GGC to falsely represent to every investor who purchased Genesis Yield securities that GGC was solvent which was not true.  ¶¶360, 504(d).  The Complaint further alleges Defendants knew, or at least recklessly disregarded, that their representations were materially false and misleading at the time they were made, based on contemporaneous records and daily internal meetings involving Defendants during which they planned and implemented their scheme.  *See e.g.*, ¶¶259-92; 297-312.

Defendants further assert that the Complaint fails to adequately allege reliance, causation and damages.  But the reliance, causation and damages elements of a claim under Section 10(b) of the Exchange Act are not subject to the heightened pleading standard of the PSLRA and are adequately alleged.  Moreover, Defendants' arguments challenging reliance, causation and damages raise questions of fact and expert discovery questions that cannot be resolved on a motion to dismiss, and prematurely raise issues to be decided at the class certification stage of the Action.

The claims under Connecticut and New York consumer protection laws are alleged in the alternative, assuming, *arguendo*, that Genesis Yield Investment Agreements are determined to not be securities.  As explained below, the Complaint adequately alleges claims under both Connecticut and New York law.

For these reasons, and as discussed below, Defendants' motions to dismiss should be denied in their entirety.

## II.      FACTS APPLICABLE TO ALL CLAIMS

GGC purported to be part of a "full-service digital currency prime brokerage" and provided a "full suite of services global investors require to manage their digital asset portfolios." ¶3.  In or around 2017-18, Defendants DCG and Silbert, DCG's CEO, chairman of DCG's three-person board of directors and controlling shareholder, created GGC and DCG provided $40 million to GGC to start its crypto lending business.  ¶¶59, 104-05.

During the Class Period, Defendant Silbert, along with Defendants Glenn Hutchins ("Hutchins") and Lawrence Lenihan ("Lenihan"), were members of DCG's three-person board of directors.  ¶¶7, 60-61, 263-66.  DCG's wholly-owned subsidiary, Genesis Global Holdco, Inc. ("GGH"), was a shell company that owned 100% of GGC. ¶6. Similarly, through GGH, DCG owned 100% of GGC's affiliate company, Genesis Global Trading, Inc. ("GGT"), which was a broker-dealer specializing in digital currencies.  ¶¶6, 101.

GGH was the sole managing member of GGC, and Defendants DCG, Silbert, Hutchins and Lenihan controlled GGC through its appointment of DCG executives Defendants Mark Murphy ("Murphy") and Michael Kraines ("Kraines") to GGH's board of directors.  ¶¶6, 211, 109, 455. Defendant Murphy was the Chief Operating Officer ("COO") of DCG during the period January 2020 through November 2022, and President of DCG since October 2022, and Defendant Kraines was Chief Financial Officer of DCG. ¶¶8, 64-65.  Defendant Moro was CEO of GGC from the start of the Class Period through August 2022, when he was dismissed by Defendant Murphy. On DCG's behalf, Defendant Murphy hand-picked Defendant Islim to serve as interim CEO of GGC and member of GGH's board of directors. ¶¶9, 62-63, 65, 106-07, 473.

Starting in or around July 2020, GGC began offering and selling an investment that allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis," which the Complaint refers to as Genesis Yield securities.  ¶¶4, 110.  On February 2, 2021, GGC through

its partnership with Gemini Trust Company, LLC ("Gemini"), expanded its investment offering of Genesis Yield securities and allowed individuals to invest with GGC through accounts with Gemini, a program called "Gemini Earn." ¶¶115-16.  Plaintiffs and members of the class invested in Genesis Yield securities by entering into a standard form agreement, referred to as Genesis Yield Investment Agreements, and then tendering digital assets or cash to GGC under executed term sheets (for investments directly with GGC), or under the terms presented to them via the Gemini Earn platform (for investors who purchased from GGC through the Gemini Earn program). ¶¶4, 17, 117, 207-10.  The entirety of these transactions and documents comprise the "Genesis Yield securities" that GGC sold for value during the Class Period. ¶¶192-214.  During the Class Period, GGC raised billions of dollars from hundreds of thousands of investors from its offer and sale of Genesis Yield securities. ¶¶13, 42, 177, 213, 229.

## III.    STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a complaint pleads facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In deciding whether a complaint has stated a claim upon which relief can be granted, courts must accept the complaint's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 555; *see also Fairchild v. Quinnipiac Univ.*, 16 F. Supp. 3d 89, 93 (D. Conn. 2014) (Underhill, J.) ("When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief") (citing *Ashcroft*, 556 U.S. at

678–79 and *Twombly*, 550 U.S. at 555–56).  The Complaint satisfies these standards. Where, as here, defendants' arguments are inconsistent with the facts alleged in a complaint and they seek inferences in their favor, courts must resolve such disputes in plaintiff's favor.  *See IWA Forest Ind. Pen. Plan v. Textron Inc.*, 14 F.4th 141, 146-48 (2d Cir. 2021).[6]

## III.   SECURITIES ACT CLAIMS

### A.   Facts Concerning Claims under the Securities Act

Section 5 of the Securities Act requires issuers of securities, like GGC, to file a registration statement with the SEC in order to sell securities to the investing public.  15 U.S.C. § 77e. Defendants do not dispute that GGC failed to register Genesis Yield securities and did not seek an exemption from registration with the SEC. ¶¶195-96.  Thus, investors were provided little to no information about GGC's operations, financial condition, liquidity, risks, related party transactions and other facts relevant in considering whether to invest, including information concerning how GGC would deploy investors' crypto assets in GGC's business.  ¶¶198-200, 204.

Each of the Plaintiffs invested in Genesis Yield securities in the year before the Action was commenced without the benefit of the disclosures required by the federal securities laws, including disclosure of risks concerning investment in Genesis Yield securities.  ¶¶53-57; 197-200.  Since November 2022, when GGC unilaterally suspended investors' redemption requests, Genesis Yield investors have lost access to their digital assets.

---

[6] Contrary to Defendants' argument (DCG Br. at 7), the Complaint's allegations are based on Plaintiffs' counsel's investigation as well as publicly available information that is consistent with and corroborated by the SEC Action, NYAG Action and other publicly available information.  *See, e.g., In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 472 (S.D.N.Y. 2012). (denying defendants' motion to strike allegations based on SEC complaint) The court's decision *Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022), is inapplicable because *Amorosa* involved an opt-out, pro se plaintiff who "wholesale" copied a class complaint, which the court had largely dismissed, including allegations based on confidential informants that Amorosa admittedly did not interview.

Plaintiffs have brought claims under Section 12(a)(1) for GGC's offering and selling securities in violation of Section 5, and seek damages under the Securities Act, including rescission.  ¶¶441-54.  Further, Defendants each controlled GGC and are therefore jointly and severally liable under Section 15 of the Securities Act for the damages GGC owes to Plaintiffs and members of the class.  ¶¶455-91.

### B.    The Complaint Adequately Alleges Claims under the Securities Act

Claims under Section 12(a)(1) are strict liability claims as to GGC, the issuer of Genesis Yield securities.  *FHFA v. Nomura Holding Am., Inc*., 873 F.3d 85, 99 (2d Cir. 2017) (stating Section 12 imposes strict liability on issuers).  Further, there is no requirement to plead scienter, reliance or loss causation under Section 12(a)(1), and the heighted pleading standard of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure do not apply.  *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2022 WL 912965, at *12 (S.D.N.Y. Mar. 29, 2022) ("To state a claim under Section 12(a)(1) of the Securities Act, a plaintiff need not plead scienter, reliance, or fraud"); *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) (same); *In re WorldCom, Inc. Sec. Litig*., 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) (same)

The notice pleading standard under Rule 8 of the Federal Rules of Civil Procedure applies and the Complaint need only provide Defendants "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."  Fed. R. Civ. P. 8(a); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *3 (S.D.N.Y. 2017) ("[T]he notice-pleading standard of Rule 8 applies to Plaintiffs' Securities Act claims."); *Nguyen v. Maxpoint Interactive, Inc.,* 234 F. Supp. 3d 540, 545 (S.D.N.Y. 2017) (finding Rule 8 notice pleading standard applies to Securities Act claims).

### 1.    The Complaint Alleges Violations of the Securities Act for the Offer or Sale of Unregistered Securities

Under Section 12(a)(1) of the Securities Act, "[a]ny person who--(1) offers or sells a

security in violation of [Section 5 of the Securities Act], . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l.  Section 5 of the Securities Act, 15 U.S.C. § 77e, requires securities to be registered with the SEC.  15 U.S.C § 77e(a); *see also* 15 U.S.C § 77e(c). To establish a prima facie case for a Section 5 violation, a plaintiff must prove three elements: first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998).

It is undisputed that Defendants did not register Genesis Yield securities with the SEC, that there was no registration statement in effect, and that GGC employed the use of interstate commerce in connection with the offer or sale of Genesis Yield securities. ¶¶18, 20, 195-200, 445-47.  The Complaint alleges that because no applicable exemption from registration applied, GGC's failure to register the Genesis Yield securities violated Section 5 of the Securities Act.  Defendants assert several arguments in support of their motions to dismiss, none of which has merit.

## 2.    The Securities Act Claims Are Timely

Each Plaintiff purchased Genesis Yield securities sold by GGC during the year before the Action was commenced.  ¶¶53-57.  On January 23, 2023, plaintiffs filed the initial complaint in the Action, alleging violations of Section 5 and 12(a)(1) of the Securities Act and control person

liability under Section 15 of the Securities Act. ECF No. 1.[7]  The Complaint alleges that both Plaintiffs Translunar and Morone purchased Genesis Yield securities sold by GGC within one year of the filing of the Action. ¶55 (alleging Translunar purchased Genesis Yield securities on September 2, 2022); ¶57 (alleging Morone purchased Genesis Yield securities on June 15 and October 24, 2022).  Likewise, Plaintiffs McGreevy, Gowda and Buttenham purchased Genesis Yield securities from GGC through the Gemini Earn program during the year before the Action was filed. ECF Nos. 38-2, 38-3 and 38-5.

Claims to enforce liability for the sale of unregistered securities under Sections 12(a)(1) and 15 are timely provided the action to enforce liability is brought within one year after the violation upon which it is based.  15 U.S.C. § 77m; *Owen v. Elastos Found.*, 2021 WL 5868171, at *10 (S.D.N.Y. Dec. 9. 2021); *see Franks v. Cavanaugh*, 711 F. Supp. 1186, 1193 (S.D.N.Y. 1989) (finding claim under Section 12(a)(1) timely where alleged violation occurred in April 1987 and action was commenced in March 1988); *Houghton v. Leshner*, 2023 WL 6826814, at *6-7 (N.D. Cal. Sept. 20, 2023) (statute of limitation for claims under Section 12(a)(1) "runs from the purchase"); *see also In Re Biozoom, Inc. Sec. Litig.*, 2015 WL 1954553, at *3 (N.D. Ohio. Apr. 29, 2015) (finding statute of limitations for violations of Section 12(a)(1) "runs from the last unlawful action that directly relates to a particular transaction that violates the Securities Act."); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1064 (D. Minn. 2003) (same); *Buchholtz v. Renard*, 188 F. Supp. 888, 892 (S.D.N.Y. 1960) (same). Accordingly, the Complaint's Section 12 claim seeking to enforce liability for the sale unregistered Genesis Yield securities is timely.[8]

---

[7] Defendants do not dispute that the Complaint relates back to the initial complaint (ECF No. 1) under Rule 15(c) of the Federal Rules of Civil Procedure.

[8] In contrast to the facts alleged in the Complaint, each of the authorities relied upon by Defendants (DCG Br. at 27-

Defendants assert that because Plaintiffs McGreevy, Gowda and Buttenham (referred to as Gemini Earn Plaintiffs) began purchasing Genesis Yield securities through the Gemini Earn program "no later than November 2021 . . . and because the Gemini Earn Plaintiffs could only lend assets through the Gemini Earn program subsequent to the execution of a Lending Agreement, the Gemini Earn Plaintiffs necessarily executed the Lending Agreement—and thus 'purchased' the alleged 'security—well outside the one-year statute of limitations imposed by the Securities Act." DCG Br. at 28; *see also* Kraines Br. at 7, n.5; Moro Br. at 22, n.3; Islim Br. at 1.

Defendants' argument is wrong because it conflates the execution of Genesis Yield Investment Agreement—through which GGC offered Genesis Yield securities—with the sale of Genesis Yield securities. "Each of the acts prohibited by Section 5—the offer, sale, and after-sale delivery of an unregistered security—are distinct violations for status of limitations purposes." *Owen*, 2021 WL 5868171, at *10; *see Franks*, 711 F. Supp. at 1193.

Defendants focus on the execution of Genesis Yield Investment Agreements as the date of "purchase" or sale that they assert tolled the one-year statute of limitations. However, Defendants' argument is premised on the baseless assertion that the execution of a Genesis Yield Investment Agreement constitutes the sale of Gemini Yield securities.[9] The Complaint alleges that the Genesis Yield Investment Agreements offered investors the opportunity to invest in Genesis Yield

---

28), involved offering or sales of unregistered securities over one year before the action was commenced. *See Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 348 (2d Cir. 1993) (finding claim to enforce Securities Act time barred when sale occurred in April 1990 and action commenced in February 1992); *Anderson v. Binance*, 2022 WL 976824, at *1, 3 (S.D.N.Y. Mar. 31, 2022) (finding Section 12(a)(1) time barred where "latest act of solicitation" or offer occurred in November 2018 and February 2019, and action commenced in April 2020); *Teva Pharma. Indus. Ltd. v. Deutsche Bank. Secs. Inc*., 2010 WL 6864006, at *2 (S.D.N.Y. Dec. 14, 2010) (finding Section 12(a)(1) time barred where sale occurred in June 2007 and action commenced in July 2009).

[9] While for purposes of the statute of limitations Defendants assert the execution of a Genesis Yield Investment Agreement was a "purchase" that tolled the statute, Defendants contradict themselves in separately asserting that there was no "offer or sale" of securities in connection with the execution of Genesis Yield Investment Agreements. DCG Br. at 29 (asserting no offer or sale in connection with Lending Agreement as there was no exchange of value).

securities (¶¶208-09), and GGC sold Genesis Yield securities when investors tendered their digital assets or cash to GGC in exchange for interest payments from GGC and the promise of eventual return of the digital assets on demand." ¶210; *see also* ¶¶4, 207.  Each purchase of Genesis Yield securities was a violation of Section 12(a)(1).

Defendants' statute of limitations arguments concerning Plaintiffs Morone and Translunar, to whom GGC directly sold Genesis Yield securities, fare no better.  While Defendants focus on the date that GGC began selling Genesis Yield securities to investors generally (July 2020), Defendants ignore that both Plaintiffs Morone and Translunar purchased Genesis Yield securities during the year before the Action was commenced.  ¶¶55, 57.  Defendants cite no authority for the extreme proposition that they urge the Court to adopt—that because claims for violations of the federal securities laws of some unknown purchasers of Genesis Yield securities who are not parties to the Action may be time-barred, Plaintiffs Translunar and Morone's claims for violations relating to sales that unquestionably occurred within one year of the filing of the Action are also time-barred. Tellingly, Defendant Moro concedes that at least Plaintiff Translunar's claims are not time barred. Moro Br. at 22, n.3.

Finally, Defendants' argument raises questions of fact that cannot be resolved on a motion to dismiss because the statute of limitations is an affirmative defense for which Defendants have the burden to prove and is a defense that is subject to discovery.  *SEC v. Gabelli*, 653 F.3d 49, 60 (2d Cir. 2011) (citations omitted), *rev'd on other grounds*, 568 U.S. 442 (2013) ("The 'lapse of a limitations period is an affirmative defense that a defendant must plead and prove,' and dismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'"); *Owen*, 2021 WL 5868171, at *10, fn. 4 (same). Defendants have not answered the Complaint, have not put forth proof concerning an affirmative

defense, and have opposed lifting the PSLRA stay to commence discovery.

The Complaint's Securities Act claims are timely and the Court should reject Defendants' statute of limitations argument.

> **3.      The Terms of the Genesis Yield Investment Agreement Do Not Waive Application of the Federal Securities Laws**

Defendants argue that none of them are responsible for harm alleged in the Complaint because the Genesis Yield Investment Agreements contain broad waivers of liability.  DCG Br. at 1, 5.  This argument is meritless.  Defendants, in effect, argue that Plaintiffs waived control person claims against them for violations of Section 15 of the Securities Act.  However, under Section 14 of the Securities Act, such contractual provisions are void and unenforceable:

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n.[10]

Under the statutory framework of the Securities Act and Exchange Act, investors may not be forced to forego their rights under the federal securities laws due to a contract provision. *See McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995); *see also Pasternack v. Shrader*, 863 F.3d 162, 171 (2d Cir. 2017) ("This anti waiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities."); *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *14 (S.D.N.Y. Apr. 26, 2020) (stating Section 29(a) of the Exchange Act forbids "enforcement of agreements to waive 'compliance' with the provisions of the federal securities laws); *see also Kusner v. First Pa. Corp.,* 531 F.2d 1234, 1239

---

[10] This argument applies with equal force to claims asserted under the Exchange Act, which contains an analogous anti-waiver provision.  15 U.S.C. § 78cc ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.").

(3d Cir.1976) (finding no "authority for the proposition that a 'no action' provision in an indenture effectively bars a direct action based upon the federal securities laws").  Accordingly, the Court should reject Defendants' argument out of hand.

4.    **Genesis Offered or Sold Genesis Yield Securities to Plaintiffs and Members of the Class**

Defendants assert that the Complaint fails to allege that GGC was a "statutory seller" under Section 12(a)(1) of the Securities Act under *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988), and that the Complaint fails to allege a "sale" or "offer to sell," and that "in no sense could it be rationally said that the Lending Agreements were 'purchased' or 'sold.'" DCG Br. at 28-30; Moro Br. at 24; Islim Br. at 1; Kraines Br. at 3. Defendants further argue that "there was no exchange of 'value' and 'no binding contract to purchase or sell securities'" and that the Genesis Yield Investment Agreements "simply established a framework that have Plaintiffs the *opportunity* to lend digital assets to Genesis in the future, but no *obligation* to do so." DCG Br. at 29 (emphasis in original); *cf.* DCG Br. at 28 (arguing that when Gemini Earn Plaintiffs "executed the Lending Agreement" that constituted purchase).

Defendants' arguments mischaracterize and ignore the Complaint's allegations and improperly seek inferences in their favor.  GGC is a statutory seller under both prongs of the test set forth in *Pinter* because it passed an interest in a security for value, and engaged in solicitation. The Securities Act broadly defines "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value. 15 U.S.C. § 77b(a)(3). Similarly, the terms "offer to sell" or "offer for sale" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. *Id.*  Here, the Complaint alleges that GGC both offered to sell Genesis Yield through the Genesis Yield Investment Agreements and, in fact, did sell Genesis Yield Securities to Plaintiffs and members of the Class. *See, e.g.*, ¶¶4, 17, 53-57,

133, 177, 207-10.

Defendants' argument that Genesis Yield Lending Agreements alone are relevant securities improperly considers the Genesis Yield Lending Agreements in isolation, and ignores the economic reality of the securities purchases at issue in the Action. The Genesis Yield Investment Agreements were a component of a larger investment opportunity that constitute Genesis Yield securities. The Genesis Yield Investment Agreements provide that a "loan" means an exchange for digital currency or cash "in accordance with this Agreement." ECF Nos. 139-1, Master Borrow Agreement at 2; Master Digital Asset Loan Agreement, at 2. By entering into the Genesis Yield Investment Agreements, investors sought an opportunity to invest in Genesis Yield securities. *See, e.g.*, ¶¶4, 17, 207-10. The Genesis Yield Investment Agreements, while essential to an investor's participation in Genesis Yield, were but one component of the entire Genesis Yield program, through which GGC Global Capital offered and sold securities for value. *Id.*

The entirety of the Plaintiffs' and GGC's interactions, regardless of whether transactions took effect at different points in time, constitutes the offering or sale of Genesis Yield securities. *See Howey*, 328 U.S. at 297–301 (finding three separate documents "together" constituted investment contract). The focus of the Securities Act is the *entire* process of selling securities from an issuer to investors. *See U.S. v. Naftalin*, 441 U.S. 768, 772–73 (1979) (stating "offer" and "sale" are "statutory terms[] which Congress expressly intended to define broadly…[and] are expansive enough to encompass the entire selling process"). Thus, Defendants' argument that the Court must limit its inquiry as to whether a "sale" or "offer to sell" has been established as to the Genesis Yield Investment Agreements alone, as opposed to the entire Genesis Yield program as alleged in the Complaint, is meritless.

Accordingly, Defendants' assertion that there was no "purchase or sale" and no "binding

contract to purchase or sell securities" and "no exchange of value" is based on the faulty premise that the Genesis Yield Investment Agreement alone is the "relevant security" and ignores that each of the Plaintiffs purchased Genesis Yield securities for value, as reflected in their certifications filed with the Court. ¶¶53-57. Moreover, "between February 2021 and November 2022, [GGC] raised billions of dollars from hundreds of thousands of investors, who tendered crypto assets to [GGC] under the Genesis Yield Investment Agreements." ¶177. Defendants' assertions to the contrary—that nothing was sold or purchased—strains credulity.

While Defendants assert that Plaintiffs retained discretion to lend and GGC was not obligated to accept digital assets under the Genesis Yield Agreements, Defendants ignore that the Complaint alleges that Plaintiffs and members of the Class did, in fact, purchase Genesis Yield securities sold by GGC through the Genesis Yield Investment Agreements. ¶¶53-57; 177. Each of the transactions alleged in Plaintiffs' certifications constitute a purchase of securities through which Plaintiffs tendered consideration (the investment principal) in exchange for GGC's promise to pay back the investment principal, together with accrued interest, on demand. ¶¶4; 207-10; *SEC v. Universal Express, Inc.*, 2007 WL 2469452, at *5 (S.D.N.Y. 2007) ("The Securities Act makes clear that the exchange of unregistered securities for services which have value constitutes a sale.").[11] The securities laws do not generally assign any relevance to when a formal exchange of money takes place. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876,

---

[11] Defendants rely on *Absolute Activist Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), for the proposition that a purchase or sale is the "act of entering into a binding contract to purchase or sell securities." The claims in *Ficeto* were under the Exchange Act and the Second Circuit analyzed the meaning of the terms "buy" and "purchase" under the Exchange Act. 677 F.3d 67 (stating that under the Exchange Act the terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire). The Securities Act, however, defines "sale" or "sell" more broadly to "include every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b. Even assuming, *arguendo*, the Court applied the Exchange Act definition to the Securities Act claims (which would be error), it does not matter because, as explained above, when Plaintiffs and members of the class tendered their respective crypto assets and GGC accepted, that constituted a sale of Genesis Yield securities.

890–91 (2d Cir. 1972) (stating "sale" occurred "when the parties to the transaction are committed to one another"). This standard for determining the point of sale "holds even if the later exchange of money and securities is contingent upon the occurrence of future events . . .". *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008). Indeed, "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Inst*., 751 F.2d 555, 559 (2d Cir. 1985).

Even assuming, *arguendo*, that the Genesis Yield Investment Agreements alone are the "relevant securities" (which is wrong for the reasons set forth above), at a minimum, GGC "offered" Genesis Yield Investment Agreements to Plaintiffs and members of the Class throughout the Class Period when they executed the Genesis Yield Investment Agreements, and through solicitations.  ¶¶164-66.  Under the Securities Act, the terms "offer to sell," "offer for sale," or "offer" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. 15 U.S.C. § 77b(a)(3).  Defendants' argument ignores that the term "offer" as used in the Securities Act has been interpreted as going well beyond the common law concept of an offer, and that "[i]f Section 5 were concerned only with the creation of legally enforceable contracts for the sale of unregistered securities, Section 77e(c)'s prohibition on offers to sell or offers to buy would not have been included in the statute. Thus, even if the 'offer' in this case, once accepted, did not give rise to an enforceable contract, that fact is immaterial for purposes of determining whether the harm with which Section 5 is concerned occurred." *Cavanagh*, 1 F. Supp. 2d at 368.

Courts have found conduct similar to GGC's marketing of Genesis Yield securities constitutes an "offer" under the Securities Act.  *See SEC v. Blockvest*, 2019 WL 625163, *9 (S.D. Cal. Feb. 14, 2019) (finding contents of "website[s] and "social media posts" concerning the

assets constituted "offer" of securities);  *Chris-Craft. Indus. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970) (statements to the public and press constituted an "offer to sell"); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345–46 (11th Cir. 2022) (finding that broadly disseminated communications can convey solicitation that falls under the Securities Act definition of "offer"); *SEC v. Opulentia, LLC,* 479 F. Supp. 2d 319, 328 (S.D.N.Y. 2007) (finding that soliciting sales on website and through advertising constituted "offer" under the Securities Act)).[12]  An offer occurs "[w]hen it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished." *Chris-Craft.*, 426 F.2dat 574; *Cap. Real Estate Inv'rs Tax Exempt Fund Ltd. P'ship v. Schwartzberg,* 929 F. Supp. 105, 112-13 (S.D.N.Y. 1996) (finding fund's press release containing detailed, attractive description of proposed transactions constituted solicitation).[13]  Accordingly, even assuming, *arguendo*, there was no sale or purchase "of anything" as Defendants assert, GGC, at a minimum, "offered" Genesis Yield securities throughout the Class Period to members of the Class through the Genesis Yield Investment Agreements and related marketing and solicitations.

For the reasons set forth above, the Complaint adequately alleges Genesis Yield securities

---

[12] Defendants, relying on *Youngers v. Virtus Investment Partners Inc.,* 195 F. Supp. 3d 499, 522-23 (S.D.N.Y. 2016), argue that GGC's promotion of Genesis Yield through websites and social media are the kinds of "marketing efforts" that courts routinely reject to establish solicitation. DCG Br. at 30. However, the key issue in *Youngers* was not the form of solicitation, but rather that Virtus was not a statutory seller because brokers unrelated to Virtus directly solicited plaintiffs' investment, thus Virtus was not a direct seller under *Pinter. Youngers,* 195 F. Supp. 3d at 523.

[13] Defendants' argument that the Complaint fails to allege that GGC communicated with or directly solicited Plaintiffs is misguided and relies on distinguishable authorities.  DCG Br. at 30.  Defendants rely on *Griffin v. PaineWebber, Inc.,* 2001 WL 740764, at *2 (S.D.N.Y. June 29, 2001) for the proposition that "a defendant must be 'directly involved in the actual solicitation' of a particular plaintiff's purchase to be liable under Section 12(a)(1)." DCG Br. at 30. In *Griffin*, the court dismissed a Section 12(a)(1) claim against CIBC because plaintiff did not purchase the securities in question directly from CIBC, but rather from a broker. *Griffin,* 2001 WL 740764, at *2. In contrast, the Complaint alleges that GGC actively solicited investments from Plaintiffs who purchased the Genesis Yield Agreements directly from GGC as a result of GGC's solicitation efforts. Likewise, in *Underwood v. Coinbase Glob., Inc.,* 654 F. Supp. 3d 224, 238-39 (S.D.N.Y. 2023), plaintiffs failed to adequately allege that Coinbase was a statutory seller under *Pinter* because Coinbase users did not transact directly with, or pass title to or from, a Coinbase entity.

were offered or sale by GGC to Plaintiffs and members of the Class.[14]

### 5.     The Genesis Yield Investment Agreements Are "Securities"[15]

The Genesis Yield securities sold under the Genesis Yield Investment Agreements are securities for three independent reasons: they are (1) "notes" under *Reves*; (2) "investment contracts" under the test set forth in *Howey*; and (3) are evidence of indebtedness.[16]  ¶¶133-85. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.  According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (emphasis in original).

The SEC and the NYAG have asserted that Genesis Yield Investment Agreements are securities and have brought claims against GGC alleging violations of federal and state laws for the sale of unregistered securities.  ¶¶48, 201-05.  Indeed, GGC's Chief Legal Officer, Arianna Pretto-Sakmann, arrived at the same conclusion before the launch of the Gemini Earn Program, stating the investment "program 'may be viewed as an investment contract under the securities

---

[14] Defendants assert that their arguments that no offer or sale has been alleged also applies to the Complaint's claims under the Exchange Act because there was "no binding contract to purchase or sell securities." DCG Br. at 30, n. 18. As explained above, Defendants are wrong. Each Plaintiff and members of the Class entered into binding agreements with GGC and exchanged value in connection with the purchase of Genesis Yield securities.

[15] The arguments in this section show that for purposes of the Exchange Act claims, Genesis Yield investments were "securities" under the Exchange Act.

[16] Defendants do not address, and therefore concede, that the Genesis Yield securities are evidence of indebtedness under 15 U.S.C § 77b(a)(1), which defines "security" under the Securities Act to include "evidence of indebtedness." *Corpes v. Walsh Constr. Co.,* 130 F. Supp. 3d 638, 644 (D. Conn. 2015) (finding that "raising new arguments for the first time in a reply brief is improper," and therefore the court may not consider the arguments.); *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").

laws.'" ¶134. Moreover, over the past 18 months, the SEC and numerous state securities regulators have evaluated investment products offered by other companies in the crypto industry that are nearly identical to Genesis Yield securities and have concluded that the products constitute "securities." ¶¶186-91.

<strong>a.     The Genesis Yield Investment Agreements Are Notes Under <em>Reves</em></strong>

The Complaint adequately alleges that the Genesis Yield Investment Agreements are notes under *Reves*. ¶¶133-74. Under *Reves*, a note is presumed to be a security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory regime that "significantly reduces the risk of the instrument" for investors other than the securities laws, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 64-69.

Defendants argue, without *any* legal support, that the Genesis Yield Investment Agreements "do not fit within the conceptual framework of *Reves*" because "there were no 'notes' exchanged between the parties." DCG Br. at 34. Even assuming, *arguendo*, Defendants' argument had any legal support (it does not), Defendants ignore the Complaint's allegations to the contrary. A note is a type of debt security that, as done in the Genesis Yield Investment Agreements, represents a promise to pay a specific amount of money at a specified time or on demand." ¶139; *see also* ¶113 (alleging Genesis Yield investments made directly with GGC could be for fixed terms such as six-months, or could be open-term, that GGC referred to open term investments as having a "call option", and that the "call options" on investments permitted an investor to demand repayment of all or a portion of an investment on any given business day, which would trigger an obligation on behalf of GGC to return the investor's capital). That investors retained a "right of

21

withdrawal" is irrelevant to the analysis under *Reves* and Defendants cite no authority in support of their suggestion that only a note "payable at maturity" qualifies as a note.  DCG Br. at 34.

i.        **The Motivations of GGC and Investors Demonstrate that Genesis Yield Investment Agreements are Securities**

Under the first *Reves* factor, a note is likely to be a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *McNabb v. SEC*, 298 F.3d 1126, 1131 (9th Cir. 2002) (quoting *Reves*, 494 U.S. at 66).  That is exactly what the Complaint alleges.  ¶¶142-56.

Tellingly, Defendants say nothing of GGC's own motivations, conceding that GGC's motivations support a finding that Genesis Yield Investment Agreements were notes under *Reves*. The Complaint specifically alleges that GGC offered Genesis Yield Investment Agreements to obtain crypto assets for use in its business—namely, to run its institutional crypto lending activities, generate profits for itself and Defendants, and to pay the interest promised to investors. ¶¶112, 122, 126-27, 142, 144, 148, 150-51.  In addition, GGC used the crypto assets as collateral for its own borrowing and would hold assets on its balance sheet to meet liquidity demands. *Id.* ¶146. Where funds are used for "general business activities," which is what GGC did with investors crypto assets, courts have found that the notes are securities.  *See Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812-13 (2d Cir. 1994); *McNabb*, 298 F.3d at 1131 (finding interest-bearing notes satisfied the first *Reves* factor where the money raised was used for the business, not for cash-flow purposes); *SEC v. Wallenbrock*, 313 F.3d 532, 538 (9th Cir. 2002) (finding automatic rollover of notes from month to month suggestive of intent to use investors' money for long-term financing and thus a security); *Priv. Corp. Advisors, Inc. v. Heard*, 1995 WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995) (stating notes "were part of a larger financing operation" in which "the proceeds from the

loan[s] were the equivalent of equity capital"). GGC's motivation was nothing like the situations that courts have found to evidence a commercial purpose, such as "remedying a cash flow deficit or purchasing a specific asset." *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998). Further, investors were provided no information regarding how GGC would deploy the assets, a fact that indicates that GGC used investors' crypto assets for general business purposes. *See* ¶¶146, 149, 179; Master Digital Loan Agreement (ECF No. 139-2); Master Borrow Agreement (ECF No. 139-1); *see, e.g.*, *Wallenbrock*, 313 F.3d at 538 (lack of information regarding assets backing loan indicated investment for general business purposes).

Defendants cite *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51 (2d Cir. 1992) in support of their argument that Genesis Yield Investment Agreements had a "commercial lending purpose." DCG Br. at 35. However, in contrast to the facts alleged in the Complaint, in *Banco Espanol*: "(1) all parties were sophisticated commercial or financial institutions that received 'detailed individualized presentations' about the product; (2) the instruments were not offered to the general public; and therefore (3) eligible buyers were limited to sophisticated entities 'with the capacity to acquire information about the debtor.'" *SEC v. Thompson*, 732 F.3d 1151, 1166 (10th Cir. 2013) (discussing and quoting *Banco Espanol*, 973 F.2d at 55); *Pollack*, 27 F.3d at 813-14 ("*Banco Espanol* was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements . . ."). Unlike the sophisticated commercial entities and institutions that purchased notes in *Banco Espanol*, the individual and retail investors of the Genesis Yield Investment Agreements were not interested in a short-term return on excess cash, but rather sought an investment opportunity with the highest rates on the market. ¶¶143, 147-48, 151-56, 165. Furthermore, the lenders' motivation in *Banco Espanol* was to increase lines of credit available to a banking customer as part of a continuing credit relationship.

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 42 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992).   Moreover, unlike the banks in *Banco Espanol*, Genesis Yield investors were unable to acquire detailed information about GGC's business.   The use of proceeds in *Banco Espanol* is a far cry from GGC's desire and need for crypto assets to fund its business enterprise.   *See* ¶¶122, 142, 144, 146, 149-50.   Nor does the Complaint's allegation that investors "would receive profit in the form of interest on those assets" somehow "indicate[] a commercial lending purpose" to the extent they "earn[ed] a fixed rate of interest."   DCG Br. at 35 (citing *Banco Espanol*, 763 F. Supp. at 43).   As explained above, in *Banco Espanol* factors other than "a fixed rate of interest" indicated that "the overall motivation of the parties was the promotion of commercial purposes."

Moreover, Defendants' arguments ignore and mischaracterize the Complaint's allegations. On a motion to dismiss, the Court must accept as true the Complaint's allegations that Plaintiffs and class members when investing were primarily interested in the profit they expected Genesis Yield to generate. ¶¶143, 147.  Defendants' assertions to the contrary improperly dispute facts and raise questions of fact that cannot be resolved on a motion to dismiss.

*First*, the yields received by Plaintiffs were not "a fixed rate of interest" in the sense Defendants characterize the facts.   To the contrary, yields for all open-term Genesis Yield Investment Agreements, including those through the Gemini Earn program, were adjusted on a monthly basis at GGC's discretion.   *See, e.g.*, Master Digital Loan Agreement, Section III(a)(i) (ECF No. 139-2); ¶¶154-55.  Furthermore, that GGC promised certain investors a pre-determined rate of interest for a fixed period does not, as Defendants suggest, indicate non-investment motivations. ¶¶143, 147; *see Pollack*, 27 F.3d at 813-14 (finding that that fixed rate of interest did not justify "characterizing appellants' motivations as anything but investment" and noting that

fixed rate bonds are securities).

*Second*, contrary to Defendants' unsupported argument that Plaintiffs' motivations were "to earn a market rate of interest . . . not to speculate on Genesis's business acumen" (DCG Br. at 35), the Complaint alleges that investors *were not* simply motivated by short-term interest at market rates, but sought the "highest rates on the market," which were adjusted on a monthly basis, and they were motivated by how much they could earn by participating in the program for one or more years based on the promises of returns through the experience and skill of GGC. ¶¶125, 143, 147-50, 150, 152, 154-56, 164-66, 178, 183-84; *see Reves*, 494 U.S. at 58–59 (noting variable rate designed to stay above rate offered by local financial institutions); *Wallenbrock*, 313 F.3d at 538 (finding automatic rollover of the notes with an interest rate above market rates suggestive of a security); *Stoiber*, 161 F.3d at 749–50 (finding *Reves* motivation factor was satisfied where "profit in the form of interest" was customers' primary goal).  Here, the Complaint alleges that investors understood that, for them to continue to receive, on a monthly basis, such high interest rates, GGC must continue to successfully use their crypto assets in its specialized investment program, applying GGC's skill and experience in the crypto industry.  ¶¶148-52. These facts are analogous to notes found to be securities in *Reves*, where the interest rate was revised to stay above the rate offered by local financial institutions. *See Reves*, 494 U.S. at 67-68.

### ii. The Plan of Distribution for Genesis Yield Securities Establishes a Securities Offering

The Complaint alleges that GGC publicly advertised Genesis Yield securities on its website, third party websites, and social media to a broad segment of the public, and indeed, at least 340,000 investors purchased Genesis Yield securities through the Gemini Earn program. ¶¶157-66. Gemini Earn was offered to the general public and there were effectively no limits, including no minimum investment, on who could invest. *Id.*  GGC's broad and ongoing advertising

campaign evidenced its intent to offer and sell Genesis Yield securities broadly in order to increase the number of investors, a fact strongly suggestive of a security. *Thompson*, 732 F.3d at 1164 ("Ultimately, the Supreme Court has instructed that the offer and sale of instruments to a 'broad segment of the public' is all that is necessary to establish this element.") (quoting *Reves*, 494 U.S. at 68)); *Wallenbrock*, 313 F.3d at 539 ("the broad availability of the notes, plus [the issuer's] evident interest in widening the scope of distribution, tips this factor strongly in favor of classifying the note as a security."). Distributions of notes to far fewer than 340,000 investors have been found to be securities.[17]

Defendants' argument that their plan of distribution was limited because there was no secondary market for the Genesis Yield Investment Agreements (and investors were "expressly prohibited from trading their interest in the [Agreements]") is specious. DCG Br. at 35. Genesis Yield securities were broadly advertised over the internet, including social media, and any member of the general public could open a Gemini account and directly invest in Genesis Yield securities through Gemini Earn with no minimum investment. ¶¶157-66. Accordingly, no secondary market was necessary. "Though it can be a strong indicator that a note is a security, the sale of the notes on an exchange is not necessary to establish the requisite common trading." *Thompson*, 732 F.3d at 1164 (citing *Reves*, 494. U.S. at 68).[18]

---

[17] *See, e.g.*, *Reves*, 494 U.S. at 68 (finding notes offered to over 23,000 individuals were securities); *McNabb*, 298 F.3d at 1132 (finding ten notes issued to six individuals were securities); *Wallenbrock*, 313 F.3d at 539 (notes held by over 1,000 investors); *Thompson*, 732 F.3d at 1164-65 (finding that even though the first note holders were "family and friends," defendant "sought to expand its distribution to anyone interested who had $100,000 to invest—even if that meant unsophisticated investors obtaining the money by liquidating home equity."); *Stoiber*, 161 F.3d at 750–51 (finding notes offered to 13 individuals were securities); *Fragin v. Mezei*, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012) (finding notes offered to over 11 individuals and institutions were securities).

[18] The Court in *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, found persuasive that restrictions on the notes in question worked to prevent the notes from being sold to the general public and that the notes were only sold to institutional and corporate entities, specifically noting that the "allocation process was not a broad-based, unrestricted sale[] to the general investing public." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th

### iii. The Expectations of the Investing Public were that the Genesis Yield Investment Agreements were Investments

The Complaint alleges that investors considered Genesis Yield Investment Agreements to be securities. GGC and Gemini, through websites and social media, promoted Genesis Yield securities (Gemini Earn) as an investment, specifically as a way to earn high "returns" or "yield" on investors' crypto assets. ¶¶147, 150-56, 158-59, 161-62, 164-66. Gemini repeatedly described Gemini Earn as an "investment" and touted that the interest rates offered were "among the highest rates on the market" and also described the potential profits to be earned by investing for a period of multiple years. ¶¶150-52, 155, 158, 161, 164-66. "Because the loans were pitched as investments, 'it would be reasonable for a prospective purchaser to take the [seller] at its word.'" *Bongiorno v. Baquet*, 2021 WL 4311169, at *17 (S.D.N.Y. Sept. 20, 2021) (quoting *Reves*, 494 U.S. at 69); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (characterizing program issuing notes as "investment program" would lead investor reasonably to think of financial interest as investment).

Under *Reves*, a court must consider "whether a reasonable member of the investing public would consider these notes as investments, 'even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction.'" *McNabb*, 298 F.3d at 1132 (quoting *Reves*, 494 U.S. at 66). The Supreme Court has described this factor as a "one-way ratchet" that allows "notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are," but does not "allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." *Stoiber*, 161 F.3d at 751. "[T]his factor

---

290, 306 (2d Cir. 2023). In sharp contrast, here the Complaint alleges that the Genesis Yield securities were broadly sold to the public, with no restrictions or limits to institutional investors or corporate entities.

is an objective test that turns on whether a reasonable purchaser would have perceived the [n]otes to be an investment." *Fragin*, 2012 WL 3613813, at *10.

Defendants argue that "there are no well-pled allegations that there existed public expectation that the notes would be traded as securities" and emphasize the lack of secondary market and transferability of rights within Gemini Earn. DCG Br. at 36 (internal citation and quotations omitted). But, as noted above, the Complaint alleges that the economic realities—and GGC and Gemini's advertising—created the expectation by the investing public that Genesis Yield (Gemini Earn) were securities.

Defendants further argue that the boilerplate language of the Gemini Earn Agreement (Master Digital Loan Agreement, ECF No. 139-2) (but not the direct GGC lending agreement, Master Borrow Agreement, ECF No. 139-1) indicates that the parties intended only to enter into commercial loans. DCG Br. at 31 n.21, 36. However, Defendants ignore that in construing the term "securities" courts are "not bound by legal formalisms, but instead take account of the economics of the transaction under investigation."[19] *Reves*, 494 U.S at 61; *see also Forman*, 421 U.S. at 849 (stating that "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto"); *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (in interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive.") (citing

---

[19] The Master Borrow Agreement, through which Genesis Yield investors invested directly with GGC (ECF No. 139-1) does not contain this language, and therefore this argument is inapplicable regarding investors who purchased Genesis Yield securities directly from GGC under the Master Borrow Agreement, such as Plaintiffs Morone and Translunar.

*SEC* v. *SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001)). GGC's labeling is not binding. The focus is not on the labels assigned but on the economic realities of the transactions. *See Edwards*, 540 U.S. at 393 ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.") (cleaned up); *see, e.g.*, *U.S. v. Pierre*, 2021 WL 4150969, *4 (S.D.N.Y. Sept. 13, 2021) ("Calling something a loan does not make it a loan.").

The economic realities of the Genesis Yield Investment Agreements, in which retail investors were invited to participate in a program repeatedly advertised as an "investment" offering rates of interest "among the highest rates on the market" for an indefinite period, would be perceived reasonably by the investing public as an offering of securities. ¶¶152-56, 158, 161, 165-66. Here, legal formalisms in the Gemini Earn Agreement that the agreements were "intended to be commercial loans . . . not securities" (DCG Br. at 36), the terms of which investors could not negotiate, elevates form over substance. The economic realities and investors' expectations—supported by Defendants' own words—are that the Genesis Yield Investment Agreements constituted an offering of securities. *See Telegram*, 448 F. Supp. 3d at 365 (disclaimers and public statements emphasizing consumptive use of Grams and rejecting any expectation of profit were insufficient to negate the substantial evidence that a reasonable purchaser expected to profit).[20]

---

[20] Defendants' citation to *Schentag v. Nebgen* is inapposite because, in contrast to the facts alleged in the Complaint, in *Nebgen* the plaintiff did not allege that the note at issue was "offered to members of the public." 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018). Defendants also cite *Reeder v. Succession of Palmer*, 736 F. Supp. 128 (E.D. La.), *aff'd sub nom. Reeder v. Palmer*, 917 F.2d 560 (5th Cir. 1990), which is nothing like facts alleged in the Complaint. *Reeder* involved an alleged Ponzi scheme where the "critical issue" before the court on the motion to dismiss was "whether a postdated check is a security." 736 F. Supp. at 129. In *Reeder*, the court's statement that the alleged securities "were not commonly traded" referred to fact that the alleged Ponzi scheme had only one investor, and not, as Defendants assert, to the fact that the alleged securities did not trade on a secondary market.

iv.    **There is No Alternative Regulatory Regime or Risk-Reducing Factors to Protect Genesis Yield Investment Agreement Investors**

The fourth prong of the *Reves* test assesses whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would "significantly reduce[ ] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67.  There is no alternative regulatory regime or risk reducing factors to protect Genesis Yield Investment Agreement investors. ¶¶167-74. The notes were unsecured and uncollateralized. ¶169. Genesis Yield securities are not protected or insured by the Federal Deposit Insurance Corporation ("FDIC"), the Securities Investor Protection Corporation ("SIPC"), any other governmental program, or Defendants. ¶¶167-68. Nor did Defendants provide investors with the full panoply of information and disclosures required by the federal securities laws. *Id.* ¶¶197-200, 204. Although Gemini is registered as a New York trust company regulated by the New York State Department of Financial Services ("NYDFS"), NYDFS did not have oversight over GGC or Genesis Yield Investment Agreements. *Id.* ¶170; *see Reves*, 494 U.S. at 69 (finding no risk-reducing factor that would make the application of the federal securities laws unnecessary where the notes were uncollateralized and uninsured and would escape federal regulation entirely if the securities laws were held not to apply).

Defendants further argue that both GGC and Gemini were "regulated" by the U.S. Financial Crimes Enforcement Network ("FinCEN") "which investigates and combats money laundering and financial crimes." DCG Br. at 36.  However, FinCEN does not regulate securities or the disclosure of risks to investors. ¶173.  FinCEN's collects and analyzes information to combat

money laundering, terrorist financing and other financial crimes.[21] *Id*.  FinCEN's narrow focus on money laundering and other crimes—which has nothing to do with regulating risks to the investing public—does not provide an alternate regulatory scheme that would "render[] application of the Securities Acts unnecessary" as required by *Reves*.  494 U.S. at 67.

Indeed, over 340,000 investors have been unable to access approximately $900 million worth of crypto assets since November 2022, facts that show there are no adequate risk-reducing factors such as an alternate regulatory scheme. *Id.* ¶¶163, 204. The absence of other regulatory regimes left Genesis Yield investors exposed to significant risk warranting the application of the federal securities laws. *See McNabb*, 298 F.3d at 1132-33 (finding that the promissory notes at issue were securities because "without such a classification there is the potential that the lender may be left open to significant risk.").

### b. Genesis Yield Investment Agreements Are Investment Contracts Under *Howey*

Under Sections 2(a)(1) of the Securities Act and 3(a)(10) of the Exchange Act, the definition of a security includes an "investment contract." *See* 15 U.S.C. §§ 77b(a)(1); 78c(a)(10). The Supreme Court defined the term "investment contract" to include any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99.[22]  The

---

[21] Similarly, the NYDFS regulated compliance with anti-money laundering and cybersecurity laws, of GGC's affiliate company, GGT.  GGT has shuttered its business in the State of New York, and "[a]fter routine examinations and an enforcement investigation, NYDFS said it found that [GGT] failed to meet standards around anti-money laundering compliance, suspicious activity report filings and cybersecurity." https://www.theblock.co/post/272369/genesis-global-trading-agrees-to-leave-new-york-and-pay-8-million-settlement (last visited Jan. 13, 2024).  "As part of the settlement, [GGT] the crypto broker lost its ability to operate in New York under the state's Department of Financial Services' BitLicense program. [GGT], an affiliate of Barry Silbert's Digital Currency Group, shuttered operations in September."  https://finance.yahoo.com/news/genesis-global-trading-surrenders-bitlicense-152139379.html (last visited Jan. 13, 2024).

[22] Courts of Appeal, including the Second Circuit, have uniformly held that "solely" was not to be taken literally. *See U.S. v. Leonard*, 529 F.3d 83, 88 n.6 (2d Cir. 2008) (collecting cases).

"touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975). This test embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

The Complaint alleges that Genesis Yield Investment Agreements were an investment opportunity involving the lending and investing of pooled crypto assets that was marketed to retail investors with no ability to negotiate the terms. ¶¶117-19, 122-26. Defendants' core argument ignores the economic reality of Genesis Yield Investment Agreements, mischaracterizes the Complaint and asserts that Genesis Yield Investment Agreements were a series of individually negotiated commercial loans. *See, e.g.*, DCG Br. at 32. Defendants are wrong.

The Complaint alleges that Genesis Yield constituted an investment contract that was offered and sold by GGC. ¶¶110-31, 175-91. The Genesis Yield Investment Agreements involved: (i) an investment of money (*id*. ¶¶176-77),[23] (ii) in a common enterprise (*id*. ¶¶178-80), and (iii) with a reasonable expectation of profits derived from GGC's efforts (*id*. ¶¶181-84, 164-66, 147-50, 125). These facts alone are sufficient to defeat Defendants' motion to dismiss. *See Friel v.*

---

[23] Defendants' only argument regarding the investment of money prong is a single sentence that the Genesis Yield agreements "[did not] require[] an 'investment of money'" by Plaintiffs—"they simply established a framework that gave Plaintiffs the opportunity to lend digital assets to Genesis in the future, but no obligation to do so." DCG Br. at 31, 29. Defendants' argument is meritless. To the extent the argument makes any logical sense (it does not) it argues nothing more than semantics without citing to any legal support. In any event, Defendants ignore that Plaintiffs did invest money and the Class covers persons *who did* purchase Genesis Yield securities—in other words members of the Class invested money in Genesis Yield securities. ¶¶2, 4, 53-57. Moreover, courts have held that the investment of cryptocurrencies such as Bitcoin satisfy the investment of money prong under *Howey*. *See, e.g.*, *SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that investment of Bitcoin was investment of money under *Howey*).

*Dapper Labs, Inc.*, 2023 WL 2162747, at *8 (S.D.N.Y. Feb. 22, 2023).[24]

> **i.**    **Genesis Yield Investors Funded a Common Enterprise through Horizontal Commonality**

Defendants argue that the Complaint fails to plead that Genesis Yield investors funded a "common enterprise" by failing to plead horizontal commonality—that "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole."  DCG Br. at 31 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  Defendants are wrong.

Defendants argue that the Complaint fails to plead pooling of funds.  DCG Br. at 31-32.  However, the Complaint alleges that Genesis Yield investors crypto assets were pooled by GGC to be further invested in GGC's business for the purpose of generating returns in the form of interest.  ¶¶147-49, 177-80.   The Complaint further alleges that GGC did not manage separate accounts for investors, but instead pooled investors' crypto assets and used them to generate returns for those investors, thus creating horizontal commonality. ¶¶122, 125, 178-80; *see Revak*, 18 F.3d at 87 (horizontal commonality is established by a pooling of assets and sharing profits and risks of the enterprise); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("This is not a scenario where the funds of each investor were segregated and separately managed").  Indeed, the pooling of investor assets was *necessary* for GGC to successfully operate its institutional lending business.  It was from the pool of investors' crypto assets that GGC determined whether, which, how much, and for how long the crypto assets would be used in counterparty transactions for generating revenue in GGC's business. *Id*. ¶¶125-26, 181-84.

Defendants argue that investors' fortunes did not depend on profitability of the enterprise

---

[24] Defendants, citing *Telegram*, 448 F. Supp. 3d at 379 (DCG Br. at 31, n.21), assert that Gemini Earn Plaintiffs acknowledged that the transactions were intended to be commercial loan, not securities.  For the same reasons discussed *supra* at 28, Defendants' arguments are meritless.

because investors' profits were derived from "a contractual 'Loan Fee.'"  DCG Br. at 31.  But courts do not require an agreement to distribute profits *pro rata* to establish horizontal commonality. *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("formalized profit-sharing mechanism" such as rights to *pro rata* distributions "is not required for a finding of horizontal commonality"); *Kik Interactive*, 492 F. Supp. 3d at 178 ("pro-rata distribution of profits . . . is not required."). Similarly, there is no requirement that profits paid to investors be proportional to the profits a promoter generates for itself. Rather, horizontal commonality is established when, as here, "investors' assets are pooled and the fortune of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 87).[25]

Ignoring this authority, Defendants mischaracterize and improperly dispute the Complaint's allegations, arguing that GGC did not pool investors assets because "Genesis's reinvestment of customer assets in its lending business (and any resulting returns) increased neither the Loan Fees nor the value of the Lending Agreements—it had no impact whatsoever on customer profits." DCG Br. at 31-32.  Defendants' argument ignores the Complaint's allegations of GGC's efforts to create successful returns for Genesis Yield investors and how investors' yields (*i.e.*, "Loan Fee") *were* dependent on GGC's efforts. *See e.g.*, ¶¶122-23, 125-26, 147-56, 164-66; 179-84.[26]  As such, when GGC achieved higher returns from its efforts in redeploying investors' assets,

---

[25] Defendants cite *Dapper Labs*, 2023 WL 2162747, at *11-12 (S.D.N.Y. Feb. 22, 2023) for the proposition that "pooling" occurs when funds are reinvested by the promoter and such reinvestment increases the value of the instrument offered.  Defendants' point, in essence, is another way of asserting profit sharing is required to demonstrate horizontal commonality, which, as noted above, is wrong.  An investment scheme promising a rate of return, such as the "Loan Fee," can be an "investment contract" and thus a "security" subject to the federal securities laws.  *Edwards*, 540 U.S. at 397.

[26] Defendants' reliance on *Heine* for its argument against horizontal commonality, is misplaced and actually supports Plaintiffs.  *Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 370 (S.D.N.Y. 1992).  Notwithstanding

yields increased.  ¶¶183-84, 154-56.  Moreover, when GGC's business performed poorly, yield declined. ¶¶154-56.  In fact, here, all Genesis Yield investors were restricted from withdrawing their crypto assets when GGC experienced liquidity issues as a result of their undisclosed, unduly risky and self-interested investment strategies with investors' capital to earn yield, showing that the fortunes of investors were tied to the success of GGC. ¶¶13, 43, 185, 125.

Defendants' assertion that that Genesis' liquidity crisis (or subsequent insolvency) is not a factor in demonstrating commonality is similarly unavailing.  DCG Br. at 32. That Genesis Yield investors lost access to their crypto assets as a result of GGC liquidity crisis demonstrates that the fortunes of the investors were tied to the fortunes of the GGC. GGC utilized investors' pooled crypto assets to generate returns for itself and for Genesis Yield investors.  When these returns were no longer sufficient to cover withdrawal requests, GGC could not continue.[27]

## ii.   Genesis Yield Investors Participated in a Common Enterprise through Strict Vertical Commonality

Defendants ignore and thus concede that the Complaint pleads a common enterprise through strict vertical commonality, as the fortunes of GGC are tied to the fortunes of the investors. *See Telegram*, 448 F. Supp. 3d at 369–71 (vertical commonality existed where "Telegram's fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success

---

the fact that the language Defendants cite concerned the court's analysis of *vertical* commonality, *Heine* involved various Ponzi-like schemes for which plaintiff conceded "that there were no businesses underlying Ashley's purported "investment contracts." *Id*. at 370.  In exchange for his money, the single investor-plaintiff was offered "a return of 25% interest annually."  *Id*. at 363. This is nothing like GGC's lending business funded by Genesis Yield investors and for which GGC frequently adjusted the yields depending on the success of its lending strategies. ¶¶183-84, 154-56.

[27] In an effort to rebut this stark economic reality, Defendants conflate commonality with the expectation of profits, citing *Harman v. Harper*, 1990 WL 121073 (9th Cir. 1990) (an unpublished decision).  In *Harman*, once the alleged securities were purchased, "[defendants'] efforts could not and did not make any difference" and "[defendants] made no promises to develop or otherwise manage the properties."  *Id*. at *5.  In contrast, the Complaint alleges that GGC marketed Genesis Yield as a profit-making opportunity based upon GGC's skill and experience in the crypto industry, and wherein investors invested their crypto assets with GGC in exchange for interest with the expectation that GGC's efforts, skill and experience would produce rates of return up to 100 times than the national average.

or failure of the [blockchain]"); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (same) (collecting cases in this District holding that strict vertical commonality is sufficient to establish a common enterprise).

The Complaint pleads strict vertical commonality because GGC and Genesis Yield investors earned profits when GGC used its skill and experience to reinvest crypto assets for the purpose of generating revenue in GGC's business. ¶¶143-44, 147, 150-51, 178-79 183-84. Specifically, investors' crypto assets that were obtained by GGC through Genesis Yield were used for GGC's only business—to earn interest from lending crypto assets to institutional counterparties. ¶¶110, 122-23, 125-27, 146, 151, 178-79, 181-84. That is how GGC made money for itself and to pay the interest GGC had promised to Genesis Yield investors, aligning their interests and creating strict vertical commonality. *Id.*; *see Telegram*, 448 F. Supp. 3d at 369–71.

### iii. Reasonable Investors Expected Profits in Genesis Yield to Come from GGC's Managerial Efforts

The Complaint alleges that reasonable Genesis Yield investors expected profits to come from GGC's managerial efforts, skill, and experience.  ¶¶125, 142-56, 164-66, 181-84. GGC publicly promoted Genesis Yield securities (including Gemini Earn) as an "investment" and way for investors to "earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty, and GGC promoted itself as the "premier institutional digital asset financial services firm" and "the world's largest digital asset lender." ¶¶110, 148, 150, 158, 161-62. In fact, GGC controlled the pooled crypto assets that it received from investors and determined how much and what type of crypto asset to hold, lend out to others, or otherwise use. ¶¶146, 149, 150, 154, 179. GGC determined the interest rates that it promised to pay to Genesis Yield investors and pooled crypto assets, identified counterparties, conducted due diligence, negotiated agreements, evaluated market conditions, managed risk, and set collateral levels for returns. ¶¶125, 149-52, 154-56, 178-

79, 182-83, 202. Based on these efforts, GGC and Gemini advertised that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market," inviting investors to invest their crypto assets to be used by GGC to generate rates much higher than what they could otherwise receive on their own. ¶¶155, 158, 165. These facts show that reasonable investors expect yield from the managerial efforts, skill and experience of GGC. *See Friel*, 2023 WL 2162747, at *433 (recognizing in crypto asset case that "at the motion to dismiss stage, Plaintiffs must plead facts adequate to establish the three prongs of the *Howey* test."). As such, Defendants' argument that these "are not the sort of 'efforts of others'" to support this prong is meritless. DCG Br. at 33.[28]

Equally unavailing are Defendants' arguments that the Genesis Yield program was not an investment contract because "the Lending Agreements . . . entitled [investors] to nothing more than fixed-rate payments and loan repayment." DCG Br. at 33.[29] To that end, Defendants argue that "no [investor] would have had any expectation of profits (much less a reasonable one) that would rise and fall based on Genesis's success or acumen in managing its own investments." DCG Br. at 33. This argument ignores the Complaint's allegations that rates of interest offered by GGC varied based on GGC's efforts (and was changed month-to-month in the case investors who

---

[28] Defendants cite *Elson v. Geiger*, 506 F. Supp. 238, 241–42 (E.D. Mich. 1980), which is distinguishable. In *Elson* the commercial arrangements at issue had none of the *Howey* factors *other* than profits in the form of fixed interest, including no entrepreneurial or managerial efforts of others. The Complaint alleges investors depended on GGC's skill and experience, and managerial efforts to generate yield.

[29] Defendants cite to *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, where an instrument with a fixed rate of return was deemed not to be an investment contract (DCG Br. at 33), but its facts are inapposite to the Action. 651 F.2d 1174, 1182 (6th Cir. 1981) (finding short-term loans, that neither party referred to as investments, with collateral, was "strongly suggestive of a commercial loan"). The Complaint, in contrast, alleges that yield for Genesis Yield investors was based on GGC's managerial experience and skill and Genesis Yield securities were advertised as investment opportunities with no collateral. In fact, much like the facts here, in *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *14 (S.D.N.Y. July 31, 2023), cited by Defendants (DCG Br. at 33), the court found that the reasonable expectation of profits prong *had* been satisfied based, in part, on allegations that the profits "would come about through the defendants' unique combination of investing and engineering experience." 2023 WL 4858299, at *14.

invested through the Gemini Earn program).  ¶¶150, 152, 154-55, 183-84.  The Complaint alleges

that Genesis Yield investors' returns were reliant on GGC's experience and skill to generate

revenue by loaning out the investors' crypto assets.  ¶¶125, 148-50, 154, 156, 178, 182-83, 202

(describing efforts by GGC pooling crypto assets, identifying counterparties for transactions,

negotiating agreements, managing risk, evaluating market conditions, negotiating and revising

interest rates with the institutional borrowers to which it lent assets, and setting collateral levels

for returns); *compare* DCG Br. at 33 (citing *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *12

(S.D.N.Y. July 13, 2023), *motion to certify appeal denied*, 2023 WL 6445969 (S.D.N.Y. Oct. 3,

2023) (finding that although "some Programmatic Buyers may have purchased XRP with the

expectation of profits to be derived from Ripple's efforts . . . the record establishes that with respect

to Programmatic Sales, Ripple did not make any promises or offers because Ripple did not know

who was buying the XRP, and the purchasers did not know who was selling it [and] [i]n fact, many

Programmatic Buyers were entirely unaware of Ripple's existence.").[30]

Defendants' argument that Plaintiffs' reasonable expectation of profits "derived entirely

from the value of their crypto assets, which were determined by the broader cryptocurrency market,

not Genesis" (DCG Br. at 34), is contradicted by the Complaint's allegations and makes no sense:

if GGC was not successful in generating returns based on the pooled crypto assets, Defendants

could not continue offering the "highest rates" in the market to investors on a monthly basis.  ¶¶148,

150, 152.  Indeed, the monthly interest rates were revised based on GGC's ongoing managerial

---

[30] Defendants cite *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288 (11th Cir. 20211) (per curiam) and *Demarco v. LaPay*, 2009 WL 3855704 (D. Utah Nov. 17, 2009) in support of their assertion that investors' expectations of profits from GGC's efforts (based on the promotion of Genesis Yield securities as an investment as a way to earn high "returns" or "yield") "cannot override the clear terms of the Lending Agreements."  DCG Br. at 33.  Again, Defendants ignore that the Genesis Yield agreements provided for the adjustment of investors' yield, as often as monthly.  ¶¶152, 154-56.  Nothing in the Genesis Yield Investment Agreements is inconsistent with investors' expectations that the yield would be adjusted based on GGC's skill and experience in deploying crypto assets.

efforts, experience and skill as the "premier institutional digital asset financial services firm . . .".

*Id.*; *see Gary Plastic Packaging v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240–41 (2d Cir. 1985) (finding investment contract exists where investors were "motivated by the expectation of a return of cash investment, the potential for price appreciation due to interest rate fluctuations, and the liquidity of these highly negotiable instruments" and where customers relied on the issuer's "skill and financial stability" and "ongoing monitoring" of market).[31]   As to the type of profits, "profits in the sense of income or return" include "for example, dividends, *other periodic payments*, or the increased value of the investment." *Edwards*, 540 U.S. at 394 (emphasis added).

### 6. Defendants Controlled GGC and Are Liable under Section 15 of the Securities Act

Section 15 of the Securities Act imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under" Section 12.  15 U.S.C. § 77o.  To adequately state a claim for control person liability under Section 15 of the Securities Act, the Complaint need only allege: (1) a primary violation of the Securities Act and (2) control by one or more defendants. *Ontario Tchr.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp 3d 131, 182, 183 (D.

---

[31] Defendants' citation to *SEC v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005) supports Plaintiffs.  There, the court found the settlement contracts at issue qualified as "investment contracts" where "investors' expectations of profits in this case relied heavily on the pre- and post-payment efforts of the promoters in making investments in viatical settlement contracts profitable" *Id*. at 744.  So too here, where investors expected that GGC was applying its skill and expertise on their behalf to generate returns on their crypto assets.  Nor does *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001) help Defendants.  There, the court found that "the structure of the [foreign exchange] transactions indicate[d] that any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts" where, as foreign exchange transactions, "the[] transactions resemble[d] a contractual wager based on movements in specific foreign-currency prices." *Id*. at 163-64.

Conn. 2019) (Underhill, J.); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 772 (S.D.N.Y. 2012) (same); *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *12 (S.D.N.Y. Dec. 15, 2003) (same).

Moreover, allegations of control under the Securities Act are not averments of fraud and therefore need not be pleaded with particularity, and at the pleading stage, the extent to which "control" must be alleged is governed by Rule 8's notice pleading standard. *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (stating whether defendant is control person "is a fact-intensive inquiry, and generally should not be resolve on a motion to dismiss.") (citations omitted); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp*., 450 F. Supp. 3d 379, 428 (S.D.N.Y. 2020) (same); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, 2006 WL 6900987, at *2 (S.D.N.Y.) (same).[32]  As set forth above, GGC violated Section 12(a)(1) by selling unregistered Genesis Yield securities in violation of Section 5 of the Securities Act, and GGC is strictly liable under Section 12.   Furthermore, the Complaint alleges that at the time of the violations of Sections 5 of the Securities Act by GGC during the Class Period, Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines and Murphy controlled GGC, controlled the digital assets investors loaned to GGC through their purchase of Genesis Yield securities, and that they each exercised their power and influence to cause GGC to violate the Securities Act by offering and selling unregistered securities to Plaintiffs and member of the Class.  ¶¶109, 145, 452-

---

[32] Accordingly, arguments and supporting authorities relating to control person claims under the anti-fraud provisions of the Exchange Act (Section 20(a)) are inapplicable to nonfraud claims under the Securities Act.  Defendants improperly conflate the essential elements and standards of review for control person claims under the Exchange Act and the Securities Act.  For example, Defendants cite *In Re Smith Barney*, 884 F. Supp. 2d at 166-67, and this Court's decision in *Teva*—decisions under Section 20(a) of the Exchange Act—in support of their argument that the Complaint has not alleged control person liability under Section 15 of the Securities Act claim.  DCG Br. at 37.  Defendants Kraines, Moro and Islim's arguments set forth in their separate briefs suffer from the same infirmity.  Kraines Br. at 2-7; Moro Br. at 25-26; Islim Br. at 2-4.  Defendants' authorities discussing claims under Section 20(a) of the Exchange Act are irrelevant and have no application to the Complaint's Section 15 claims.

54; ¶¶455-63 (alleging Defendant DCG's control of GGC); ¶¶464-70 (alleging Defendant Silbert's control of GGC); ¶¶471-74 (alleging Defendant Moro's control of GGC); ¶¶475-76 (alleging Defendant Islim's control of GGC); ¶¶477-80 (alleging Defendant Murphy's control of GGC); ¶¶481-83 (alleging Defendant Kraines's control of GGC); ¶¶484-86 (alleging Defendant Lenhian's control of GGC); ¶¶487-89 (alleging Defendant Hutchins's control of GGC).

The Complaint's allegations are sufficient to give Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines and Murphy notice under Rule 8 of the Federal Rules of Civil Procedure of the claims that each was a control person and the grounds on which the claim rest. "That is all that is required" at the motion to dismiss stage.   *Scottish Re*, 524 F. Supp. 2d at 401.[33] Numerous courts have held that allegations of a majority ownership interest and board representation, similar to the Complaint's allegations concerning DCG's 100% ownership of GGC, are sufficient to adequately allege a Section 15 control person claim.  *See Fed. Deposit Ins. Corp. v. Credit Suisse First Boston Mortg. Sec. Litig.*, 414 F. Supp. 3d 407, 413-14 (S.D.N.Y. 2019) (finding allegations that defendant corporation wholly owned the primary violator subsidiary were sufficient to state claim for control person liability under Section 15 of the Securities Act.);  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 575-76 (S.D.N.Y. 2015) ("Being a parent corporation over a subsidiary, and having common officers, directors, personnel … are also relevant indicia of control"); *In re Ind. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770-71 (S.D.N.Y. 2001) (finding plaintiffs adequately alleged control person liability against parent corporation where parent "was running the business of [subsidiary] through

---

[33] Defendants Silbert, Moro and Islim cannot credibly deny that they controlled GGC during the Class Period.  Indeed, according to GGC's filing in the Genesis Bankruptcy, sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of GGC, during the Class Period Defendants Silbert, Moro and Islim, as well as non-party Matthew Ballensweig, controlled GGC. ¶¶467, 472, 476.

common management" and where the three highest officers of parent company were on the operating committee that ran the subsidiary).

Defendant Silbert, as founder of DCG and GGC, chair of DCG's three-person board and controlling shareholder of DCG, which owned 100% of GGC, controlled GGC. *See Yi v. GTV Media Grp. Inc.,* 2012 WL 3500920, at *3-4 (S.D.N.Y. 2021) (finding that allegations that control person founded company, together with allegations of control over day-to-day operations, was sufficient to survive motion to dismiss); *Prestige,* 2006 WL 6900987, at *2 (S.D.N.Y. 2006). Likewise, as the most senior executives of GGC with day to day control over GGC's issuance of unregistered securities, Defendants Islim and Moro controlled GGC. *See City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.* 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("[C]orporate officers usually are presumed to possess the ability to control the actions of their employees."); *American High-Income Trust v. Alliedsignal,* 329 F. Supp. 2d. 534, 549 (S.D.N.Y. 2004) (finding control where plaintiffs alleged that defendant was principal executive officer); *Friel*, 657 F. Supp. 3d at 450 (finding control person liability against CEO where company found to have sold unregistered securities); *Balestra*, 380 F. Supp. 3d. at 359 (finding CEO with general and active management of business of company liable as control person). Finally, through their positions as directors of GGH (Defendants Murphy and Kraines) and DCG (Defendants Lenihan and Hutchins)—each exercised control over GGC. *See Nomura*, 104 F. Supp. 3d at 580-81 (finding individual defendants, all of whom were directors or officers, liable as control persons due to their status as director/officer in combination with other control allegations).

Defendants assert that "culpable participation" is a required element of a control person claim under Section 15. DCG Br. at 36-37; Moro Br. at 25, n.5; Islim Br. at 3-4; Kraines Br. at 3, n.3.  However, a majority of courts in the Second Circuit, including this Court, have determined

that nonfraud claims under the Securities Act do not require an allegation of culpable participation.

This Court in *Teva* held that culpable participation was not an element of a Section 15 claim:

> It appears, though, that a 'majority of judges' in this Circuit have held that a plaintiff need not prove the "culpable participant" requirement in a Section 15(a) claim. *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases). Neither the plaintiff nor any of the defendants argue that a claim under Section 15(a) requires a showing of 'culpable participant' and, therefore, I will join my colleagues in finding that the additional element of culpable participant is not present here. Accordingly, for the reasons analyzed with respect to Count Two, the defendants' motions to dismiss Count Five are denied.

*Teva*, 432 F. Supp. 3d at 183; *see also Evoqua*, 450 F. Supp. 3d at 428 (stating "majority of judges in this District-including the undersigned-have held such an allegation" of culpable participation is not required under Section 15); *Scottish Re*, 524 F. Supp. 3d at 387 ("Unlike a section 20(a) [claim], the plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15."); *Ind. Energy Holdings*, 154 F. Supp. 2d at 770 ("[C]laims under sections 11 and 12(a)(2) of the Securities Act sound in strict liability and do not require knowledge of the misrepresentations. The concept of culpability is therefore inapposite"); *Alliedsignal,* 329 F. Supp. 2d at 551 n.10 ("[T]his Court joins the 'apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15'"); *In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 188 (S.D.N.Y. 2003) (same).

The majority rule makes sense in light of the nonfraud claims enacted by Congress in the Securities Act and the plain language of Section 15.  As one decision (cited by Defendant Moro) explains: "Because the underlying violation pursuant to section 15 is a violation of sections 11 and 12(a)(2) in which strict liability is imposed (*i.e.*, knowledge of the misrepresentation is not required), this Court is in accord with those district courts that hold that merely two elements are required to establish a prima facie case of control person liability pursuant to section 15: (1) an underlying primary violation of the securities laws by the controlled person; and (2) control over

that controlled person." *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002). The Court here should follow plain language of the Securities Act, the majority of courts in the Second Circuit, and its decision in *Teva*, and reject Defendants attempt to graft a fraud-based element onto a nonfraud claim under Section 15 of the Securities Act.

The DCG Defendants and Defendant Islim assert that control person claims under Section 15 require an allegation of "actual control over the transaction in question." DCG Br. at 37, Islim Br. at 3; Kraines Br. at 3. Even assuming that *arguendo*, control over the issuance of unregistered securities is required, the Complaint alleges that Defendants through their power and influence caused GGC to offer and sell unregistered securities, which is sufficient under Rule 8's notice pleading standard. ¶453. Moreover, Defendants are wrong and the authorities they cite do not support their argument. The court's decision in *WorldCom* states "[t]o state a violation of Section 15, a plaintiff must plead (1) an underlying primary violation of Sections 11 or 12 by the controlled person; and (2) the defendant's control over the primary violator." 294 F. Supp. 2d at 409. Contrary to the DCG Defendants' assertion, nothing in the *WorldCom* decision states a Section 15 claim requires the Complaint to "*at least* plead actual control of the 'transaction[s] in question . . .'". DCG Br. at 37 (emphasis and alteration in original). Similarly misplaced is Defendant Islim's reliance on this Court decision *Teva*, which is cited for the proposition that the Complaint requires "individualized" facts that Defendant Islim "had 'actual control over the transaction in question.'" Islim Br. at 3. The Court's decision in *Teva* on this point concerned the fraud claims under Section 20(a) of the Exchange Act, and is irrelevant to the Complaint's claim under Section 15 of the Securities Act. 432 F. Supp. 3d at 175-76 ("Moreover, a Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question."). The court's decision in *Global Crossing* is not persuasive because it relied on

authorities that were interpreting Section 20(a) of the Exchange Act, not Section 15 of the Securities Act. *See In re Glob. Crossing*, 2005 WL 1881514, at \*12 (S.D.N.Y. Aug. 5, 2005) (citing *Ross v. Bolton,* 1989 WL 80428 (S.D.N.Y. Apr. 4, 1989); *Wallace,* 239 F. Supp. 2d at 396; and *In re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279, 319 (E.D.N.Y. 2002), both of which involved claims under Section 20(a) of the Exchange Act).

The Complaint has adequately alleged GGC's primary violation of Section 12(a)(1) of the Securities Act and each Defendants' control over GGC.  Accordingly, the Court should deny Defendants' motions to dismiss the claims under Section 15 of the Securities Act.

## IV.   EXCHANGE ACT CLAIMS

The Exchange Act claims are brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 against Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim and Murphy, and under Section 20(a) of the Exchange Act against Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines and Murphy. But for Genesis Global Capital's bankruptcy, it would have been named as a defendant for violating Section 10(b) of the Exchange Act.

### A.     Facts Concerning Claims under the Exchange Act

#### 1.     Misrepresentations and Omissions Regarding Risk Management Practices

Before the launch of Gemini Earn, Gemini had obtained and reviewed GGC's "Overview of Enterprise Credit Risk Management," which explained that GGC: (1) had "many levers to pull" to ensure [the company] is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools"; (2) had the "ability to responsibly manage credit risk and face zero defaults" and "to maintain a consistently high level of creditworthiness across our

entire loan portfolio"; (3) "primarily lends on an 'over-collateralized' basis – i.e., the collateral pledged exceeds the value of the loan"; and (4) "would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance" ¶¶217-18, 221. GGC's representations were materially false and misleading: GGC's loan book was not over-collateralized at any relevant time, and GGC was engaged in unduly risky and self-interested investment strategies. ¶¶224–39. Indeed, as evidenced by what would ensue, GGC wholly lacked and failed to follow its represented risk-management practices.

GGC never disclosed to Gemini, Plaintiffs, or other class members that GGC was engaged in unduly risky and self-interested investment strategies. ¶¶223-54. The representations in GGC's Overview of Enterprise Credit Risk Management and in the Genesis Yield Investment Agreements created the false impressions that GGC had and implemented risk management policies and procedures. ¶220. In truth, Defendants through GGC were engaging in reckless transactions with investors' assets, including massive, undercollateralized loans to 3AC and other counterparties, and with related parties. *See, e.g.,* ¶¶224, 240-54.

## 2. Defendants Scheme to Cover Up GGC's Insolvency and Misrepresentations and Omissions Following 3AC's Default

On June 13, 2022, 3AC defaulted on its obligations to GGC, leaving GGC insolvent with an uncollectable $1.1 billion debt. ¶¶257–58. Rather than disclose GGC's massive loss, GGC's insolvency and its impact on investors, Defendants engaged in a scheme to conceal from investors that GGC's defective risk management led to the 3AC losses and GGC's insolvency. From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's Chief Operating Officer ("COO")) [Defendant Murphy] met with Genesis Capital's leadership daily, often multiple times a day. ¶260. During these meetings, DCG and Genesis Capital employees discussed how to communicate with counterparties about Three Arrows, and how to bolster the

Genesis Entities' financial condition in the wake of these losses. *Id*. During the same period, DCG's COO [Defendant Murphy] and DCG's Head of Communications [Amanda Cowie] helped draft talking points documents for use by DCG and GGC personnel in conversations with counterparties. *Id*.

On June 13, 2022, Defendants Moro, Silbert, Lenihan, Hutchins, Murphy and other DCG and GGC employees met to discuss the 3AC and other losses, and Defendant Silbert reported to DCG's board that GGC was preparing for a bank run. ¶¶261-63. However, Defendants' public statements starkly contrasted with what they knew privately.  Also on June 13, 2022, Defendants caused GGC to falsely tweet, and Defendant Moro retweeted that "despite elevated market volatility, all business operations continue to function normally at GGC" thanks to "strong risk management practices and frameworks." ¶264.  On June 15, 2022, despite acknowledging that GGC was preparing for a bank run, Defendant Silbert wrote to Defendant Moro and other GGC personnel that "'the word on the street is that [GGC] is the 'blue chip' in this mess. . . we need to continue to perpetuate that of course." ¶269.  Also on June 15, 2022, GGC falsely tweeted, and Defendants DCG, Silbert, Murphy, Kraines, and Ballensweig retweeted, that "the Genesis balance sheet is strong and our business is operating normally." ¶267. On June 17, 2022, Defendant Moro falsely tweeted, and Defendants DCG, Kraines, and Ballensweig retweeted or reposted, that GGC had "carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week," that GGC had "shed the risk and moved on," and that "no client funds are impacted." ¶¶270–71. The same day, Ballensweig represented to Gemini's risk management personnel that GGC was solvent, operating "business as usual," had "no concerns on business operations," and, with regard to its 3AC exposure, that GGC "will absorb the losses using its own balance sheet." ¶273. On or around June 20, 2022, Ballensweig communicated to Caroline

Ellison of Alemeda and Sam Bankman-Fried of FTX, to whom GGC loaned hundreds of millions of dollars, that GGC might go under or default. ¶¶283-84.

The June 13, 15 and 17, 2022 tweets were materially false and misleading. In light of the massive losses from GGC's undercollateralized loans to 3AC and others, GGC did *not* have strong risk-management frameworks; its balance sheet was *not* strong; its business was *not* operating normally; it had *not* mitigated its losses, shed the risk, or moved on; and client funds *had* been impacted. ¶279. The Genesis entities had suffered a loss that exceeded their equity—a material, negative fact that Defendant Silbert asked DCG personnel to conceal. *Id.* (alleging Defendant Silbert requested that DCG personnel to conceal need to "fill" hole in GGC's equity by June 30, 2022). Thus, as of June 14, 2022, GGC was limiting the origination of new loans and shrinking its loan book, and as of June 17, 2022, GGC still held a $1 billion receivable as an uncollectable asset on its balance sheet. ¶¶281–82. Each Defendant knew, or at least recklessly disregard, information that was contrary to their various misrepresentations: the 3AC losses and resulting instability of GGC were reflected in GGC's internal documents, *see, e.g.,* ¶¶258, 281–82; discussed privately in daily meetings and among the GGC and DCG employees (including Defendants Silbert, Lenihan, Hutchins, Murphy, and Moro), *see, e.g.,* ¶¶259, 261–262, 265, 266, and 269; and reported to Defendants Silbert, Lenihan, and Hutchins), *see* ¶¶263, 266.

On June 27, 2022, 3AC declared bankruptcy, crystalizing GGC's $1.1 billion loss for which there was effectively no chance of GGC recovering. ¶¶289–91. Rather than reveal GGC's true financial condition and GGC's insolvency, Defendants engaged in accounting fraud. Defendant Moro proposed a plan of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." ¶286.

Moro explained, "[w]e wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] . . . for liquidity purposes, it could just be for balance sheet support." *Id*. Defendant Silbert approved of Moro's proposal. ¶288.

On June 30, 2022, Defendants DCG and its board (Defendants Silbert, Hutchins, and Lenihan) agreed to "purchase" 3AC's outstanding obligation to GGC in exchange for the DCG Promissory Note, purportedly worth $1.1 billion due in 10 years at an interest rate of 1%—terms which were not disclosed during the Class Period. ¶¶299–300, 377. Defendant Silbert signed the DCG Promissory Note on behalf of DCG, and Defendant Moro signed it on behalf of GGC. ¶¶301, 303. As the Complaint explains in detail, this transaction did nothing to "plug the equity hole" at GGC—it was merely an accounting fiction as no capital or cash was provided to GGC to cover its massive losses. *See* ¶¶304–14.The DCG Promissory Note was immediately and thereafter categorized as a $1.1 billion "current" asset on GGC's balance sheet to make it appear that GGC had positive equity, plugged the equity hole and shed the risk from 3AC, none of which was true. ¶300.

In connection with each purchase of Genesis Yield securities after the 3AC losses caused GGC to be insolvent, Defendants Moro and Islim, as CEOs of GGC, caused GGC to falsely represent to purchasers of Genesis Yield that GGC "is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws," and "represent[ed] and warrant[ed] that there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder." ¶¶119–21, 360, 505. ¶¶119–21, 360. Per each offer's terms, GGC's representations continued throughout the term of the investments. ¶121. GGC's uniform representations were materially false and

49

misleading because, in light of the 3AC and other losses, GGC was, in fact, insolvent and the DCG Promissory Note did nothing to fill GGC's billion-dollar equity hole.

### 3. Misrepresentations and Omissions Following DCG Promissory Note Transaction

After Defendants Silbert and Moro executed the DCG Promissory Note knowing that no capital was injected into GGC, Defendants repeatedly misrepresented GGC's financial condition to investors. On July 6, 2022, Moro falsely assured investors that DCG had "assumed certain liabilities of [GGC] related to [3AC] to ensure we have the capital to operate and scale our business for the long-term," a tweet that was reviewed and approved by Defendants DCG and Silbert. ¶¶315–16. Also on July 6, 2022, GGC, through Ballensweig, represented to Gemini that the 3AC "[l]osses [were] predominately absorbed by and netted against DCG balance sheet" and that GGC remained "well-capitalized." ¶¶321–23. Ballensweig then sent Gemini an email which, along with its attachments, included multiple false statements. ¶324. For example, one attachment referenced the 3AC losses and explained, "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure we have the capital to operate and scale our business for the long-term." ¶325. Another attachment, entitled "Gemini Risk Metric Request," listed the DCG Promissory Note as a "Current Asset." ¶¶327–29. These were false statements—the DCG Promissory Note, payable in 10 years, was not a current asset under generally accepted accounting principles (GAAP). ¶329, n. 102-03.

On July 18, 2022, Ballensweig represented to  Gemini that "'all of our loses [sic] have already been absorbed by DCG . . . .'" ¶344. On July 19, 2022, Defendant Murphy falsely stated on a call with an investor's representative that DCG had stepped in to absorb GGC's losses and that Genesis was well-capitalized to continue doing business in the future. ¶363. Again, these were lies—GGC was not well-capitalized.  ¶¶364-65.  The DCG Promissory Note was an accounting

fiction that did not create positive equity at GGC.  GGC was in fact insolvent and not well-capitalized.

Thereafter, Defendant Murphy and other DCG representatives were copied on email exchanges wherein GGC continued to provide false information in response to the investor's requests for information. ¶367. For example, on July 26, 2022, Defendant Murphy was copied on an email exchange in which Ballensweig made a series of false statements, including that DCG had "assumed the $1.1bn loan on June 30, 2022." ¶¶367–69. Ballensweig explained that his response had been prepared with assistance from the "Finance and Accounting teams" at both DCG and Genesis, a group which included Defendant Murphy. ¶367. On July 28, 2022, in response to an inquiry from Gemini, a GGC employee falsely described the DCG Promissory Note as a Current Asset and, specifically, "$1.1bn in receivables from related parties." ¶334. On August 16, 2022, Defendant Murphy was copied when GGC sent a fraudulent balance sheet to the same investor, which falsely included the $1.1 billion DCG Promissory Note as a receivable from related parties. ¶371. While Defendants repeatedly provided false financial information to investors, internally GGC employees expressed concerns about the Company's deceptive reporting. On September 1, 2022, GGC's Director of Lending informed Defendant Islim of the fraud: "I'm hearing concerns from front office folks . . . They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity . . . There is still no liquidity infusion from DCG to fill the gap and instead we have a 'note.'" ¶386.

On October 22, 2022, at a lunch meeting in New York City, Defendant Silbert assured Gemini that all was well and that, *inter alia*, GGC faced only a short-term timing mismatch between its outstanding loans and borrowing. ¶¶389-90.

Each of Defendants' statements to investors concerning GGC's financial condition was materially false and misleading. GGC was insolvent and had been since June 13, 2022 when 3AC defaulted. GGC never disclosed to Gemini, Plaintiffs, or other class members that it was insolvent. *See, e.g.,* ¶417. Each Defendant knew, or at least recklessly disregarded, that the DCG Promissory Note transaction was an accounting fiction: If the DCG Promissory Note had been included on GGC's balance sheet at any reasonable estimate of its fair value, it would have disclosed that GGC was insolvent by *at least* hundreds of millions of dollars. ¶342. Indeed, in the Genesis Bankruptcy GGC estimated the value of the DCG Promissory Note between $90 million (a 92% discount) to $323 million (a 70% discount). ¶310. Defendant Silbert himself valued the Note at $200 million. ¶311. As a result of Defendants' misrepresentations and omissions, Gemini maintained GGC's participation in Gemini Earn, and Plaintiffs and other class members continued to purchase Genesis Yield securities, all while GGC was insolvent. ¶¶53-54, 56; ECF Nos. 38-2, 38-3, 38-5. As one Genesis Yield investor explained:

> [Defendants Silbert and Moro] went out and publicly told people that [they] filled the hole . . . publicly said Genesis balance sheet is strong, it hasn't been affected. You induced us to loan new Bitcoin to you based on the fact that you stated Genesis was solvent because you have provided the $1.1 billion dollar note . . . If in June [2022], Barry [Silbert] had said, look, we're going to help Genesis by giving them $1.1 billion, and this is how we did it.  We give them a promissory note that's due in 10 years at 1% interest, nobody would have re-loaned. We would have seen basically what happened. But what they did is they kept it a secret.

¶377.

Ultimately, on November 16, 2022, GGC disclosed that it was unilaterally suspending withdrawals due to withdrawal requests exceeding GGC's liquidity. ¶¶404–07. Since that date, Plaintiffs and other class members have been unable to access their digital assets. ¶¶14-15.

### 4.     Omission Regarding Unregistered Securities

Genesis Yield securities were never registered with the SEC or otherwise. ¶130. Thus, investors' principal was *not*: (1) protected by SIPC, (2) insured by the FDIC, or (3) insured by the National Credit Union Administration. ¶132. GGC never disclosed to Plaintiffs or other class members that it was offering and selling unregistered securities. ¶131.

### B.     The Complaint Adequately Alleges Primary Violations of Section 10(b) of the Exchange Act.

Defendants argue that the Complaint fails to plead a primary violation of Section 10(b) of the Exchange Act. Specifically, Defendants argue that the Complaint fails to allege sufficient facts to show (1) a material misrepresentation or omission, or scheme liability, (2) scienter, (3) reliance, (4) causation, or (5) economic loss. As discussed below, Defendants are wrong.  The Complaint adequately alleges Defendants' false and misleading representations, scheme liability, and scienter with the particularity required by the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure, and reliance, causation and economic loss, which are not subject to a heightened pleading standard, are adequately alleged.

### C.     The Complaint Adequately Alleges a Violation of Section 10(b) Based on Misrepresentations or Omissions.

A Complaint meets the particularity requirement when it "specifically identif[ies] the date, publication, and speaker of each of the alleged misstatements or omissions and contain[s] facts supporting the existence and materiality of these problems" and highlights in some way the "particular aspects of the statements alleged to be misleading." *Teva*, 432 F. Supp. 3d at 153; *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22–23 (S.D.N.Y. 2004). The Complaint satisfies these requirements.

The Complaint alleges the following categories of material misrepresentations and

omissions: (1) Defendants' false and misleading statements and omissions regarding GGC's risk management practices (¶¶125, 216–20); (2) Defendants' false and misleading statements and omissions immediately following the 3AC losses (¶¶264, 267–68, 270–71, 273); (3) Defendants' false and misleading statements and omissions following the DCG Promissory Note transaction, (¶¶300–16, 321–344, 363, 367–372, 390, 404, 417), *including* the false solvency representations in the Genesis Yield Investment Agreements (¶117–21, 360); and, finally, (4) Defendants' failure to disclose, at any point, that GGC's securities were not registered with federal or state securities regulatory authorities. ¶¶131–32. As discussed above, the Complaint alleges who made the misrepresentation, when it was made and explains how each of Defendants' misrepresentations was false or misleading at the time. As to Defendants' omissions, the Complaint alleges facts supporting the existence of each undisclosed, material negative fact. *See, e.g.,* ¶¶277–312, 317–18, 326–97, 405–07.

Further, the Complaint alleges facts supporting the materiality of each of the aforementioned misrepresentations and omissions. ¶40 ("The misrepresentations and omissions were material, as no reasonable investor would have invested in Genesis Yield securities had they known of [GGC's] undisclosed concentration of risk and under collateralization, true financial condition, or the undisclosed details of the $1.1 billion DCG Promissory Note, i.e. that [GGC] was in effect insolvent."). To establish the materiality of the misrepresentation, a plaintiff must "allege[] 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000)). It is hard to envision a fact more important to an investor than the solvency of a company—after GGC's 3AC losses and the execution of the DCG Promissory Note, Defendants Moro and Islim caused GGC to falsely

represented to every investors who purchased Genesis Yield securities that it was solvent, when in fact, GGC was bankrupt. Courts within the Second Circuit have repeatedly found the materiality requirement met in cases like this one, where misrepresentations were made about the intentions, financial condition, or practices of a company. *See, e.g., Levy v. Maggior*e, 48 F. Supp. 3d 428, 447 (E.D.N.Y. 2014); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 238 (S.D.N.Y. 2018); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 421 (S.D.N.Y. 2013).

### D.    The Complaint Adequately Alleges Scienter.

In assessing a complaint's scienter allegations, courts assess cumulatively allegations of circumstantial evidence of intent together with alleged facts relating to motive and opportunity. *In re Hain Celestial Grp., Inc. Sec. Litig,* 20 F. 4th 131, 137-38 (2d Cir. 2021). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). Under *Tellabs*, scienter need be only "at least as compelling as any opposing inference of nonfraudulent intent." 551 U.S. at 314. A tie goes to the plaintiff. *City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

The Complaint alleges that Defendants had both a motive and an opportunity to commit fraud. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (scienter may be inferred from facts showing that a defendant had "both motive and opportunity to commit the fraud"). For example, the Complaint alleges that it was in Defendant DCG's and Silbert's interest to misrepresent its risk-management strategies to Gemini and investors, and fraudulently induce Plaintiffs to purchase Genesis Yield securities. Doing so allowed them to recklessly funnel billions of dollars' worth of Genesis Yield investors' assets into the self-interested Grayscale Trade, which had the effect of massively increasing the management fees earned by Grayscale, a DCG

subsidiary. ¶¶223–29. *Cf. Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008) (finding that plaintiff had adequately pleaded that defendants were motivated by a "concrete and personal benefit," given defendants' receipt of management fees).

Furthermore, it was in Defendants' interest to enter into the DCG Promissory Note and continue to represent that GGC was solvent when they knew that the opposite was true. Doing so benefited Defendants in two concrete ways: *First*, keeping GGC out of bankruptcy via the sham DCG Promissory Note prevented Defendant DCG and related entities from having their outstanding loans borrowed from GGC called immediately, requiring repayment for which DCG did not have the funds to repay. Because DCG was incapable of repaying these loans at that time, this would have forced DCG (GGC's largest borrower) into bankruptcy. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (finding motive where complaint alleged "more than the usual concern by executives to improve financial results" because the very survival of company was on the line); *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (finding allegations of "motives to hide internal weaknesses and paint a rosy picture … lend weight to not only a cogent inference of scienter, but a compelling one . . .").  *Second*, executing the DCG Promissory Note allowed Defendant Silbert and other GGC and DCG insiders to withdraw hundreds of millions of dollars' worth of personal capital from GGC by redeeming their investments. ¶¶293–96. *Cf. Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (finding that "motive and opportunity" where corporate officers engaged in significant transactions at opportune moments for significant personal gain).

In the Second Circuit, in addition to motive and opportunity, scienter is adequately pled where the defendants are alleged to have (1) knew facts or had access to information suggesting that their public statements were not accurate; (2) failed to check information they had a duty to

monitor; or (3) ignored obvious signs of fraud. *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000). Similarly, an egregious refusal to see the obvious, or to investigate the doubtful, gives rise to an inference of recklessness. *Id*. at 309; *Setzer v. Omega Healthcare Inv'rs.*, 968 F.3d 204, 215 (2d Cir. 2020). The Complaint alleges facts demonstrating strong circumstantial evidence of at least recklessness. *See Heller,* 590 F. Supp. 2d at 621 (securities fraud plaintiff may establish requisite intent by alleging strong circumstantial evidence of conscious misbehavior or recklessness). The Second Circuit has "defined reckless conduct as, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. The Complaint alleges facts that show Defendants knew, or at least recklessly disregarded, that their representations to investors were false at the time they made them based on contemporaneous documents and meetings. *See, e.g.,* ¶¶215–60 (scienter concerning GGC's deficient risk management); ¶¶261–96 (scienter concerning false representation in response to 3AC losses); ¶¶297-342. Accepted as true and viewed holistically, the Complaint's allegations raise a strong inference that Defendants "benefitted in a concrete and personal way from the purported fraud," and "knew facts or had access to information suggesting that that their public statements were not accurate." *Cf. Novak*, 216 F.3d at 311. Thus, a reasonable person would deem an inference of scienter at least as compelling as Defendants' suggested alternative inference that the DCG Promissory Note was an arms-length, good faith effort by DCG that was favorable to GGC. On the contrary, as explained above, the DCG Promissory Note had the effect benefitting Defendants and their pecuniary and personal interests at the expense of investors.

E.      **The Complaint Adequately Alleges Reliance.**

1.      **The Complaint alleges reliance on GGC's solvency representations.**

Defendants argue that direct reliance must be alleged through "particularized factual allegations demonstrating that each Plaintiff knew of the specific alleged misstatements and engaged in the transaction based on them" and that Plaintiffs fail to allege "that they (much less the class) actually read and considered the representations[.]" DCG Br. at 10.   Defendants' argument is wrong and ignores the Complaint's allegations.   The Complaint alleges that Plaintiffs were "aware of [Defendants'] statement[s] and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)). The Complaint alleges that "a result of GGC's materially false and misleading statements, Plaintiffs and members of the Class purchased Genesis Yield securities in reliance on Genesis Global Capital's representations" and that Plaintiffs and members of the Class would not have invested in Genesis Yield securities had they known the undisclosed, material adverse facts that were not disclosed at the time of their investment.  ¶¶408-10, 420.

Moreover, as the Second Circuit has explained, "proof of reliance by circumstantial evidence may be sufficient under certain conditions." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 225 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, (2008)). For example, in the context of a financial transaction—which "does not usually implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase"— payment alone "may constitute circumstantial proof of reliance upon a financial representation." *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013).

"In light of this case law, many courts in this Circuit and beyond have held that reliance may be proved through circumstantial evidence that plaintiffs would not have purchased a product

but for a defendant's uniform misrepresentations and omissions about that product." *Id. See, e.g.,* *Spencer v. Hartford,* 256 F.R.D. 284, 301–303 (D. Conn. 2009) (stating reliance could be proved through plaintiffs' acceptance of structured settlements where quotation documents were alleged to be misleading); *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (stating reliance could be proved through purchase of product where "every plaintiff would have relied on the [allegedly misleading] . . . representation of the [product's] legality and beneficialness in deciding whether to purchase it"); *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 75 (S.D.N.Y. 2020) (stating investor's complaint alleged with sufficient particularity its reliance on false and misleading statements where securities purchased under specific offering memoranda and plaintiffs identified the misstatements that it allegedly relied on.).

Here, Plaintiffs and members of the Class each executed the Genesis Yield Investment Agreement that uniformly represented that GGC was solvent and not subject to any adverse proceedings.  ¶¶360, 408-10. As such, the Complaint uniformly alleges that Plaintiffs purchased Genesis Yield securities via their acceptance of a *specific offer*, have identified the specific misstatements that they relied on *within the same offer*, *see, e.g.,* ¶¶115–22, and have alleged that they purchased Genesis Yield securities as a result of these misstatements, *see, e.g.,* 399. Thus, while the issue of classwide reliance is premature on a motion to dismiss, at class certification, courts have found that allegations of uniform misrepresentations and omissions are circumstantial evidence common to the class that supports finding of reliance. *See*, *e.g., Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 144 (S.D.N.Y. 2015) (granting class certification insofar as "common evidence can show reliance by the class on alleged misrepresentations" in case involving alleged violations of federal securities law).

Defendants further assert that the Complaint's reliance allegations suffer from a "temporal

defect" based on the fact that "the Gemini Earn Plaintiffs executed their respective Lending Agreements no later than November 2021." DCG Br. at 11 and n.6. Defendants emphasize that Section 10(b) "limits private causes of action to purchasers and sellers" and argue that, by extension, a plaintiff shareholder has standing to bring suit only for alleged misrepresentations "that are alleged to have occurred prior to the purchase and/or sale dates" *Id.* at 11 n.6.

But this argument ignores the *hundreds* of Genesis Yield securities purchases made by the Gemini Earn Plaintiffs Buttenham, Gowda, and McGreevy that occurred after GGC was rendered insolvent as a result of the 3AC losses in June 2022—transactions through which GGC repeated its solvency representation. ¶¶53-54, 56; ECF Nos. 38-2, 38-3, 38-5. In connection with each purchase after June 2022, GGC repeated and reaffirmed its false and misleading representation that it was solvent. *See* 15 U.S.C. §§ 78c(a)(13), (14) (stating that the Exchange Act applies to "any contract" for a security's purchase or sale). *Cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746 (1975) (holding Exchange Act does not protect person who did not actually buy securities, but who might have done so had the seller told the truth, insofar as the claim would rest on facts "totally unknown and unknowable to the defendant."). Moreover, the Complaint uniformly alleges misrepresentations that "coincide" with the investors purchase of Genesis Yield securities. *See  SEC v. Zandford*, 535 U.S. 813, 822, (2002) (stating "in connection with" requirement is met when the fraud and the purchase or sale "coincide").[34]

### 2.    The Complaint Alleges Reliance is Presumed under *Affiliated Ute*.

Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Defendants argue that *Affiliated Ute* is inapposite,

---

[34] Defendants' temporal defect argument (DCG Br. at 3) is equally meritless as applied to the Complaint's scheme liability allegations, which are discussed below. DCG Br. at 3.

asserting that "it is black-letter law that this presumption applies only 'in instances of total non-disclosure' where 'no positive statements are made.'" DCG Br. at 13-14. Defendants are wrong. "[W]here plaintiffs' claims are based on a combination of omissions and misstatements," courts nonetheless "have acknowledged the applicability of the *Affiliated Ute* presumption." *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205 (S.D.N.Y. 2021); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 319 (S.D.N.Y. 2016) ("[T]he existence of 'affirmative misrepresentations does not at this stage in the litigation preclude [plaintiffs] from relying on the *Affiliated Ute* presumption.'"). Within the Second Circuit, courts have adopted a "flexible and practical approach" that considers whether a case "primarily involve[s] omissions where reliance would be difficult to prove because Plaintiffs' claim is based on a negative." *Anwar* 306 F.R.D. at 145–46. Under such an approach, "the theory behind the *Affiliated Ute* presumption—that, when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision'—*is not undermined simply because a defendant makes misstatements at the same time it omits material information*." *Id.* (emphasis added).

The Complaint at its core alleges Defendants failed to disclose GGC's true financial condition—that GGC did not have strong risk management, it was never overcollateralized and after 3AC bankruptcy, GGC was insolvent and the Exchange Act Defendants covered it up to protect their own pecuniary interests. During the Class Period, Defendants did not disclose GGC engaged in unduly risky and self-interested investment strategies, that Genesis Yield securities were not registered with federal or state securities regulatory authorities, or that GGC was insolvent. ¶¶125, 131-32, 417. When Defendants spoke on these topics, "there is a duty to tell the whole truth," *Meyer v. Jinkosolar Hldgs. Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

Such information was material, and the Complaint alleges that investors would not have invested in Genesis Yield securities had Defendants disclosed the truth. ¶420. Defendants' various misrepresentations concealed and failed to disclose material, negative facts, making the application of *Affiliated Ute* appropriate in this Action. *See, e.g.*, ¶297.

> **3.     The Complaint Alleges Investors Who Purchased Genesis Yield Securities through the Gemini Earn Platform Relied by and through Gemini.**

The Complaint further alleges reliance based on false and misleading representations made to Gemini Earn investors' agent, Gemini. ¶¶220, 412.  It is well-established that fraud "covers cases beyond the most straightforward scenario of D uttering a misrepresentation to P, intending for P to rely on it, and inducing such reliance to P's detriment." *See* John C.P. Goldberg et. al., *The Place of Reliance in Fraud*, 48 Ariz. L. Rev. 1001, 1006 (2006). Two further possibilities exist: first, where a misrepresentation is made to a plaintiff's agent and induces reliance ("agency theory of reliance"), and, second, where a misrepresentation is made to a non-agent third party, but the defendant can expect that it will be repeated ("derivative reliance"). Gemini's reliance is attributable to Plaintiffs McGreevy, Gowda and Buttenham who purchased Genesis Yield securities through the Gemini Earn program under either theory.[35]

---

[35] Defendants argue that Plaintiffs cannot establish reliance on extracontractual misrepresentations and omissions because the MLA specifies that Plaintiffs were "not relying on any communications (written or oral) of [GGC] as investment advice or as a recommendation to enter into any Loan," and that the MLA "constitute[d] the entire Agreement among the parties with respect to the subject matter hereof and supersede[d] any prior negotiations, understanding and agreements." Def. Br. at 12.  Defendants ignore that Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or any rule of an exchange required thereby shall be void," and which is specifically concerned with whether the condition, stipulation, or provision "weakens [the] ability to recover under the Exchange Act." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 231 (1987). Nor do Defendants offer any authority in support of their argument that Plaintiffs have waived reliance on *post-agreement* misrepresentations, which are alleged to have been rampant here. Instead, Defendants cite two outlier cases wherein courts found reliance on pre-agreement representations unwarranted where the plaintiffs were sophisticated and one case in which the plaintiffs failed to specify any particular statements as fraudulent misrepresentations. *See Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996); *One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 79

Notably, this Court has endorsed the agency theory of reliance in securities fraud cases. *See In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998). To properly allege the agency theory of reliance in a securities fraud case, "[P]laintiffs need only allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants." *See In re Fine Host*, 25 F. Supp. 2d at 71–72. The Complaint alleges that GGC's acceptance of GGC as an authorized borrower in the Gemini Earn program was premised on GGC's material misrepresentation regarding its risk management practices and investment strategies which occurred prior to Plaintiff McGreevy, Gowda and Buttenham initial execution of the Genesis Yield Investment Agreements and purchase of Genesis Yield Securities. ¶¶53-54, 56; ECF Nos. 38-2, 38-3, 38-5.

Defendants argue that Gemini's reliance took place outside of the scope of Gemini's agency relationship with Plaintiffs and, thus, cannot be attributed to Plaintiffs. DCG Br. at 12-13. In support of this argument, Defendants emphasize a provision of the Master Loan Agreement (MLA) that states investors had "not authorized Agent to exercise discretion in determining the amount, timing, or selection of any Loan on Principal's behalf." DCG Br. at 13. But Defendants' emphasis on the MLA's limitations is a red herring. The Complaint's allegations center around Gemini's reliance on Defendants' misrepresentations not in specifically determining the amount, timing, or selection of any investment, but rather in endorsing and maintaining GGC's participation in the Gemini Earn program. *See, e.g.,* ¶¶215–222, 273, 300–14, 321–23, 324–44, and 387–94. Insofar as Gemini acted within the scope of its agency relationship when it facilitated the offer and sale of Genesis Yield securities under the MLA, the agency theory of reliance applies.

---

(2d Cir. 2010); *Simmtech Co. v. Citibank, N.A.*, 2016 WL 4184296, at *13 (S.D.N.Y. Aug. 3, 2016), *aff'd*, 697 F. App'x 35 (2d Cir. 2017).

However, even assuming, *arguendo*, that Gemini's reliance fell outside the scope of its agency relationship with Plaintiffs, Gemini's reliance can alternatively be attributed to Plaintiffs under the doctrine of derivative reliance, through which "a misrepresentation communicated to one person can support a claim for fraud by another person if the maker of the misrepresentation intends or has reason to expect that the statement will be repeated to the other person." *In re Fine Host*, 25 F. Supp. 2d at 71. This Court has noted that it is an "open question" whether allegations of derivative reliance by a non-agent are sufficient to state a claim under section 10(b) of the Exchange Act. *Id.*

Courts often apply derivative reliance principles where misrepresentations are made to credit-rating companies for the purpose of obtaining credit ratings. Restatement (Second) of Torts § 533 (1997) cmt. f. In such cases, the maker of the misrepresentations "is subject to liability to any person who may be expected to and does extend credit to him in reliance upon the erroneous rating so procured." *Id.* That a credit rating "summarize[s] with reasonable accuracy" or "expresses the effect of the misstatements made" is sufficient, so long as the plaintiff is dealing with the defendant "in any one of the ways in which the [defendant's] financial position is material." *Id.* To bring a fraud action against a defendant based on its misrepresentations to a credit-rating agency, a plaintiff needs to establish (1) that the plaintiff relied on the assigned rating and (2) that the deception affected the rating, which is to say that the rating agency "would have assigned a different rating (or not assigned a rating at all)" if not for the deception. *See In re Nat'l Century Fin. Enterprises, Inc.*, 846 F. Supp. 2d 828, 914 (S.D. Ohio 2012), *adhered to on denial of reconsideration sub nom. Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, 2013 WL 490717 (S.D.N.Y. Feb. 6, 2013).

Here, the theory of derivative reliance applies in a similar fashion. Gemini's role is

analogous to a credit agency.  Statements by Gemini, such as that "Gemini reviewed Genesis'

financial statements and verified that the lender's loans are overcollateralized," or that "based on

our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers

in an overcollateralized way," in tandem with Gemini's general endorsement and maintenance of

GGC's participation in the Gemini Earn program, can be analogized to a credit rating that

misrepresented by GGC's deception. ¶¶215-22. Further, the Complaint alleges that Gemini

repeated GGC's misrepresentations to investors. ¶222. Thus, wherever Gemini relied on

misstatements that induced it to endorse or maintain GGC's participation in the Gemini Earn

program, such reliance is attributable to Plaintiffs Gowda, Buttenham and McGreevy.

### 4.    The Complaint Alleges that Defendants' Misrepresentations and Omissions Were Part of a Scheme to Defraud.

The Complaint further alleges that Defendants' misrepresentations and omissions were part

of a comprehensive scheme to defraud. ¶497; 17 C.F.R. § 240.10b-5(a) and (c); *see infra* Section

V. In *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir.

1975) the Second Circuit explicitly ruled that "a showing of reliance is not required where a

comprehensive scheme to defraud which includes not only omissions and misrepresentation, but

substantial collateral conduct as well, is alleged." *Competitive Assocs., Inc.*, 516 F.2d at 814.

In *Competitive Assocs., Inc.*, the plaintiff, a publicly held mutual fund, alleged that the

defendant, an accounting firm, knowingly certified false and misleading financial statements of a

private investment fund in order to induce the plaintiff to hire the investment fund's manager,

Yamada, to manage a portion of the plaintiff's portfolio. *Id.* at 812. As a result, the plaintiff asserted

that it lost millions of dollars due to Yamada's unlawful purchases and sales of securities. *Id.* at

812–13. The court observed that the defendant's alleged omissions and misrepresentations were

only one part of an elaborate scheme asserted by the plaintiff to inflate Yamada's reputation as an

investment advisor, attract investors to him, and permit him to unlawfully manipulate securities prices. *Id.* at 814. The court concluded that the plaintiff was not required to prove plaintiff saw or directly relied on false financial statements. *Competitive Assocs., Inc.*, 516 F.2d at 814. *See also Greenspan v. Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y. 1978) ("Proof of reliance on particular misrepresentations is indeed unnecessary in a case grounded on an alleged 'comprehensive scheme to defraud.'"). The Second Circuit's reasoning in *Competitive Assocs., Inc.* applies with equal force to the Complaint: Plaintiffs have the opportunity to prove, but are not required to prove, direct reliance upon Defendants' misrepresentations and omissions.

### F.     Plaintiffs Adequately Allege Causation.

Defendants argue that the Complaint fails to adequately allege causation. DCG Br. at 14-16. Defendants are wrong.  The Complaint alleges transactional causation (¶¶409-10, 503-04) and loss causation.  ¶¶404-07, 507.  The causation element of a securities fraud claim has two prongs: (1) transactional, or "but for" causation and (2) loss causation. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95–96 (2d Cir. 2001); *Lentell v. Merril Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lentell*, 396 F.3d at 172 (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). The pleading of loss causation is governed by the Rule 8 notice-pleading standard. *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011).

To plead loss causation, plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Plaintiffs may do so either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud or (b) that the loss was foreseeable and caused by the materialization of the

risk concealed by the fraudulent statement. *Id.* at 232–33. To establish the materialization of the risk theory, "it is enough [to show] that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quoting *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

The Complaint's allegations sufficiently establish the materialization of the risk theory. The Complaint alleges that throughout the Class Period, Defendants concealed the negative, material risks concerning GGC's deficient risk management (¶¶215–55), that the 3AC default and bankruptcy caused GGC to be insolvent (¶¶257–58), and that the DCG Promissory Note was a sham transaction in which no capital or cash was transferred to GGC and the "equity hole" was not filled by DCG. ¶¶297–377. Starting November 16, 2022, these risks materialized when GGC disclosed that it was unilaterally suspending withdrawals due to withdrawal requests exceeding GGC's liquidity. ¶¶404–07. Since November 16, 2022, Plaintiffs and other class members have been unable to access their digital assets. ¶¶14–15.

Defendants argue that because GGC's suspension of withdrawals coincided with the FTX collapse, investors' losses cannot be causally linked with the alleged fraud. DCG Br. at 15. Defendants assert that allegations in a prior complaint (ECF No. 1 ¶187), which has since been amended, conflict with the Complaint's allegations. DCG Br. at 14-16. No such conflict exists, however, even if accepted, Defendants' argument in effect would absolve perpetrators of fraud whose misconduct was revealed by market turmoil.

Even assuming, *arguendo*, the original allegations "directly contradict" with the Complaint, these considerations are wholly irrelevant to the Court's loss causation analysis on a motion to dismiss because Defendants conflate loss causation and damages, raising questions of fact that are not appropriate to resolve on a motion to dismiss. *Cf. In re Vivendi Universal, S.A.*

*Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009). When there are two competing causes for an investment's decline, "it is easy to argue that one caused the entirety of the decline while the other did not cause any of it." *Id.* The Second Circuit has required plaintiffs to produce sufficient evidence ***at trial*** for the factfinder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Vivendi*, 634 F. Supp. 2d at 365 (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)). *See also Lentell*, 396 F.3d at 174 (emphasizing that plaintiffs were not required to allege the precise loss attributable to defendants' fraud and that the chain of causation "is a matter of proof at trial"); *Carpenters*, 750 F.3d 227 at 233 ("Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price."); *Emergent*, 343 F.3d 189 at 197 (observing that while proof of an intervening event would break the chain of causation, such was a matter of proof at trial). Thus, Plaintiffs are not required to "exclude other non-fraud explanations" in order to withstand a motion to dismiss. *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 649 (S.D.N.Y. 2012). To hold that the Complaint failed to plead loss causation solely because GGC's suspension of withdrawals coincided with another cause, such as the FTX collapse, "would place too much weight on one single factor and would permit [Defendants] to blame the asset-backed securities industry when their alleged conduct plausibly caused at least some proportion of plaintiffs' losses." *Cf. King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010).

In any event, Defendants' arguments are "premised on a confusion of cause and effect." *Cf. Dodana I, LLC*, 847 F. Supp. 2d at 649–50. Defendants maintain that the real culprit was a "'general loss of confidence' in the broader crypto market and the ensuing 'bank run' on Genesis." DCG Br. at 15. But the general loss of confidence in the broader crypto market simply revealed

Defendants' misconduct. Defendants misguided attempt to blame FTX for investors losses due to their wrongful conduct on a motion to dismiss should be rejected.  Moreover, the conduct alleged in the Complaint, which must be accepted as true on a motion to dismiss, made Defendants "active participant[s]" in the general loss of confidence in the broader crypto market and the ensuing bank run on GGC "rather than [] passive victim[s]." *Cf. Dodana I, LLC*, 847 F. Supp. 2d at 649–50.

      **G.**      **The Complaint Adequately Alleges Economic Loss.**

      Defendants argue that the Complaint's alleged damages are "incompatible" with the framework that arises in a "typical securities case," wherein out-of-pocket losses are measured in accordance with the difference between the price paid and the "value" of the stock when bought. DCG Br. at 16 (citing *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012)). Defendants, in essence, assert that anything outside of this framework is "not a cognizable loss" under the securities laws. Defendants are wrong.

      Section 28 of the Exchange Act provides that a plaintiff may maintain an action for "actual damages . . . on account of the act complained of." 15 U.S.C. § 78bb(a). Noting that Congress left the term "actual damages" undefined, courts interpreting Section 28 have been "reluctant to read the statute as applying a straight jacket to their traditional remedial role." *Panos v. Island Gem Enterprises, Ltd., N.Y.*, 880 F. Supp. 169, 175 (S.D.N.Y. 1995). Courts have interpreted the statute "as permitting *all forms of loss-based relief*, whether articulated under out-of-pocket, benefit-of-the-bargain, or other loss theories." *Id*. at 175 (emphasis added). As the Second Circuit has explained, "there cannot be any one rule of damages prescribed which will apply in all cases, even where it is conceded that the finding must be limited to actual damages." *Id.* Ultimately, therefore, "[i]t is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance." *Id.* Under these standards, the Complaint alleges investors have been unable to access or withdraw their own digital assets since the end of

the Class Period.  The appropriate measure of this economic loss is a question of fact for expert discovery and trial. *See Panos*, 880 F. Supp. at 175.

**H.    The Complaint Adequately Alleges Damages That Are Nonspeculative And Concrete.**

Defendants assert investors' inability to withdraw their assets is only a "speculative" injury, emphasizing that Plaintiffs have not established the impossibility of recovering their assets in The Genesis Bankruptcy proceedings. DCG Br. at 16.  While the Exchange Act is limited to "actual damages" in order to "bar speculative recoveries," *Mazuma Holding Corp. v. Bethke,* 21 F. Supp. 3d 221, 236 (E.D.N.Y. 2014), Defendants' argument reflects a misunderstanding of "speculative" injury, which refers to a fictitious measure of damages calculated by reference to an investor's expectations, not an existing, quantifiable injury that may possibly be mitigated or remediated in the future. *See, e.g., Panos*, 880 F. Supp. at 176 ("[T]he more speculative nature of reconstructing a world in which the plaintiffs' expectations come true often prevents a benefit-of-the-bargain recovery.").

Plaintiffs' damages here are far from speculative. Defendants speculate that Plaintiffs may recover digital assets in the Genesis Bankruptcy. DCG Br. at 16.  However, Plaintiffs and class members have been damaged because Defendants deprived them of the benefits of their ownership of their digital assets, including the appreciation of their digital assets. The plan of distribution in the Genesis Bankruptcy values Plaintiffs and class members' claims as of the petition date (January 19, 2023) and calls for payments in dollars, not digital assets, based on that valuation. This value is far less than the current value of Plaintiffs' digital assets. *See supra* n. 4.

Moreover, DCG disregards entirely that Plaintiffs have set forth concrete, nonspeculative damages; *vis-à-vis* the value they paid for their securities in individual certifications filed with the Court. ¶¶53-57. Allegations of funds lost due to a defendant's fraudulent conduct are sufficient to

establish damages at the motion to dismiss stage.[36] *See Weinstein v. Cardis Enterprises Int'l N.V.,* 2017 WL 9485677, at *8 (E.D.N.Y. Aug. 3, 2017), *report and recommendation adopted as modified,* 284 F. Supp. 3d 240 (E.D.N.Y. 2017) (plaintiff suffered economic loss in amount she invested in reliance on defendant's fraudulent representations); *Heller,* 590 F. Supp. 2d 603 at 613 n.13 (same); *Janel World Trade, Ltd. v. World Logistics Servs., Inc.,* 2009 WL 735072, at *8 (S.D.N.Y. Mar. 20, 2009) (same). The Complaint alleges all that is required to establish concrete and nonspeculative damages, with any further damage determination premature at this stage of the proceedings. *See, e.g., Kaplan v. S.A.C. Cap. Advisors, L.P.,* 40 F. Supp. 3d 332, 339 (S.D.N.Y. 2014) ("[i]t is universal doctrine that the amount claimed in an ad damnum is not part of a plaintiff's substantive allegations for purposes of deciding the sufficiency of a cause of action" (citation omitted)).

Moreover, properly applying the "out-of-pocket" measure for damages, a defrauded securities purchaser is entitled to recover "the excess of what he paid over the value of what he got." *Acticon,* 692 F.3d at 38.[37] Defendants' argument improperly suggests that Plaintiffs must first sell their securities, but no such sale is necessary "to have suffered or to recover 'actual damages.'" *In re Royal Dutch/Shell Transp. Sec. Litig.,* 404 F. Supp. 2d 605, 610 (D.N.J. 2005); *In re Vivendi Universal, S.A. Sec. Litig.,* 123 F. Supp. 3d 424, 440 n.132 (S.D.N.Y. 2015). Indeed, it is typical

---

[36] The cases on which DCG relies are inapt and do not support DCG's argument that the Complaint's damages allegations are insufficient. *See* DCG Br. at 16, *citing Acticon,* 692 F.3d at 41 (rejecting defendant's argument that *rebound in price* negates an inference of economic loss). In *Aimis Art Corp. v. N. Tr. Secs., Inc.*, 641 F. Supp. 2d 314, 320-21 (S.D.N.Y. 2009) and *In re UBS Auction Rate Sec. Litig.,* 2009 WL 860812, at *4 (S.D.N.Y. Mar. 30, 2009), the plaintiffs received a *full refund* when the auction rate securities were repurchased at par value, which was, in effect, rescission. GGC has not repurchased Plaintiffs' Genesis Yield securities, and there is no prospect of that occurring in the Genesis Bankruptcy. *See supra* n. 4.

[37] Defendants Moro, Islim, and Kraines join in the DCG Defendants' damages arguments. *See* Moro Br. at 1, 20 ("Moro joins and incorporates herein" the arguments in the DCG brief, which "provides a detailed explanation of Plaintiffs' failures to plead … damages."); Kraines Br. at 1 ("Kraines adopts each of the arguments in the Memorandum of Law filed on December 15, 2023, by [DCG]"); Islim Br. at 1 ("Islim incorporates, in all relevant parts, the points raised in the DCG Defendants' Motion to Dismiss as they relate to him and the claims against him.").

for securities fraud claims to follow a suspension of redemptions, as occurred here. *See, e.g.*, *In re Rsrv. Fund Sec. & Der. Litig.*, 732 F. Supp. 2d 310, 313 (S.D.N.Y. 2010) (upholding Section 10(b) and Rule 10b-5 claims following "drop in the NAV" of the fund and "suspension of redemptions").

## I.    Plaintiffs Adequately Allege Scheme Liability.

Defendants are additionally liable under subsections (a) and (c) of Rule 10b-5 for their employment of a "device, scheme, or artifice to defraud" and their engagement in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of securities. *See* 17 C.F.R. § 240.10b-5(a), (c). Defendants argue these subsections do not apply to their conduct insofar as misstatements and omissions "cannot form the 'sole basis'" for scheme liability. DCG Br. at 24; Moro Br. at 9. The Complaint alleges that Defendants engaged in wrongful conduct beyond their alleged false and misleading statements. *See SEC v. Rio Tinto PLC.*, 41 F.4th 47, 49–54 (2d Cir. 2022) (stating misstatements and omissions "can form *part* of a scheme liability claim").

The Complaint alleges that Defendants caused GGC to directly transmit false representations to Gemini, prospective investors, and the public to induce the purchase of securities.[38] ¶¶117–21, 216–20, 264, 267–68, 270–271, 273, 300–14, 315–16, 321–23, 324–44, 363, 367–72, 390, 404. *Cf. Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) (where defendant directly transmit false statements to prospective investors, scheme liability was sufficiently stated). Both the Supreme Court and the Second Circuit have explained that the knowing dissemination of false or misleading statements provides a sufficient basis for scheme liability. *See id.* at 1101–02*; Rio Tinto PLC.*, 41 F.4th at 54.

---

[38] Defendant Moro argues that the representations he disseminated were technically accurate at all relevant times. Moro Br. at 11–16. This argument lacks credibility and improperly disputes facts on a motion to dismiss and raises questions of fact for discovery.

For purposes of a motion to dismiss, while the Complaint need not lay out the precise metes and bounds of scheme liability, here the Complaint alleges the scheme with specificity. *See Lorenzo*, 139 S. Ct. at 1101 (defining "device" as that which is devised or formed by design; "scheme" as a project, plan, or program of something to be done; and "artifice" as an artful stratagem or trick). The Complaint alleges Defendants caused Genesis to loan approximately $500 million to Defendant DCG for DCG to use in its own profit-seeking endeavors and to artificially prop up the value of GBTC shares. ¶505. Second, the Complaint alleges that Defendants orchestrated and participated in the sham DCG Promissory Note transaction with GGC which, in turn, allowed GGC to maintain the appearance of solvency and was the source and basis for Defendants later misrepresentations to investors. ¶¶300–14. These are paradigmatic examples of schemes to defraud. *Cf. In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (finding defendants liable for engaging in deceptive transactions with Parmalat which, in turn, allowed Parmalat to publish misleading financial statements); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 477 (S.D.N.Y. 2004) (refusing to dismiss scheme liability claim where alleged fraud involved issuing false and misleading reports about a corporation in order to inflate the value of its stock and induce investments).

With regard to the DCG Promissory Note, contrary to Defendants' mischaracterization, the Complaint does not seek to impose liability on Defendants merely for "assisting" GGC. DCG Br. at 26. Rather, the Complaint alleges that Defendants orchestrated and participated in a sham transaction of purportedly massive value, conducted not for a legitimate business purpose but rather with the purpose of defrauding and deceiving investors and to benefit and protect Defendants' pecuniary interests. *Cf.  SEC v. Hopper*, 2006 WL 778640, at *11 (S.D. Tex. Mar. 24, 2006). As Defendant Moro himself explained in a June 28, 2022 email, the transaction was part of

a plan to maintain the appearance that Genesis was solvent and obtain additional investments. ¶286; *see also* ¶288 ("[Defendant] Silbert responded: 'It is certainly our hope and intention to help Genesis address the equity-hole'").

While Defendants assert that their alleged wrongdoing falls outside the scope of Rule 10-5(a) and (c), the purpose of the Exchange Act is to "achieve a high standard of business ethics in the securities industry" by meeting "'the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *See Lorenzo*, 139 S. Ct. at 1103 (quoting *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963), *Howey*, 328 U.S. at 299). Consequently, the Supreme Court has explained that the Exchange Act should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute*, 406 U.S. at 151).

Defendants also argue that the Complaint fails to allege scienter or reliance for scheme liability. DCG Br. at 26; Moro Br. at 19–21; *see also In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) ("To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.") (internal quotation marks omitted). As explained above, the Complaint adequately alleges facts that show a cogent and compelling inference of Defendants' scienter, and specific facts that show reliance.

### J.      Plaintiffs Adequately Allege Control Person Liability Under Section 20(a) Of The Exchange Act

To state a claim for control person liability under Section 20(a) of the Exchange Act, Plaintiffs must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Teva*, 432 F. Supp. 3d at 175. As discussed above, the

Complaint adequately alleges a primary violation against GGC and Defendants DCG, Silbert, Murphy, Hutchins, Lenihan, Moro and Islim.  With respect to the second prong, courts in this Circuit only require the plaintiff to satisfy the pleading requirements of Rule 8(a), rather than Rule 9(b). *See Poptech L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 334–35 (D. Conn. 2011). For that reason, "the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage." *Id.* at 335. While Defendants assert that the Complaint must plead Defendants' "actual control over the *transaction in question*," the Complaint alleges such control. For purposes of Section 20(a), "control" is defined broadly to include "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *Id.* at 336. The facts showing that Defendants controlled GGC are set forth above in Section II.  The Complaint further alleges that each Defendant had the power and authority to direct the management and activities of GGC and its employees and to cause GGC to engage in the violations of the Exchange Act. ¶¶508–26.

Defendants assert that the Complaint fails to allege control unless they actually sent the communications themselves, or approved the specific communications at issue themselves. DCG Br. at 18–22; Kraines Br. at 3–6; Islim Br. at 2–4. That is not the law. *See Poptech*, 792 F. Supp. 2d at 339 (rejecting the same argument). To the contrary, this Court and others have recognized in the Section 20(a) context that a firm may try to bifurcate the process of reporting information to investors in order to insulate particular people within the firm from future legal liability. *See id.* Under such circumstances, "it is at least possible that multiple parties or entities could share control over the flow of information to investors." *Id.* at 339–40. As such, the Complaint alleged the second prong of control person liability with respect to Defendants.

To allege culpable participation, the Complaint must allege "some level of culpable participation at least approximating recklessness." *Poptech*, 792 F. Supp. 2d at 333; *see also Teva*, 432 F. Supp. 3d at 176. As previously explained, the Complaint alleges each Defendants scienter, which is more than enough to show Defendants' culpable participation in the primary violations of Section 10(b) alleged in the Complaint. Even assuming, *arguendo*, control over the transactions at issue is required to show culpable participation, as set forth above, at least Defendants Moro, DCG and Silbert executed the DCG Promissory Note, a transaction at the heart of Defendants' fraudulent scheme and the basis for Defendants' materially false and misleading representations to investors.

## V.     THE COMPLAINT ADEQUATELY ALLEGES STATE LAW CONSUMER PROTECTION CLAIMS

The Complaint alleges violations of Connecticut's Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, *et seq*., and New York's Uniform Deceptive Trade Practices Act ("NYUDTPA"), N.Y. Gen. Bus. Law § 349, *et seq*. in the alternative if the Court concludes that Genesis Yield investments are not "securities" under the federal securities laws.   Contrary to Defendants' argument, the Complaint's alternative claims under CUTPA and NYUDTPA are adequately alleged.

### A.     The Complaint Adequately Alleges Violations of CUTPA.

Defendants assert that because the CUTPA claims are based on the same conduct that supports the Exchange Act claims, and, therefore, must meet the requirements of Fed. R. Civ. P. 9(b).   DCG Br. at 38.   As explained above in Section V, the Complaint's Exchange Act claims satisfy the requirements of Rule 9(b).[39]   Similarly, Defendants assert that their arguments in support

---

[39] The Complaint (¶421) alleges that Plaintiffs' consumer protection claims are pleaded in the alternative to both the

of dismissing the Exchange Act claims further support dismissal of the CUTPA claims. Defendants are wrong.  As shown above, Defendants' Exchange Act arguments do not support dismissal of the Exchange Act claims, so Defendants argument is based on a false premise.  But even if that were not the case, the requirements for a CUTPA claim are very different from those for a claim under Rule 10b-5, and it, therefore, does not follow that facts insufficient to state a claim under Rule 10b-5 are also insufficient to support a claim under CUTPA.[40]  In particular, CUTPA does not require a showing of fraud, *Miller,* 78 Conn. App. At 777; it does not require (or apply to) securities transactions, *Normand Josef Ent., Inc. v. Conn. Nat. Bank*, 230 Conn. 486, 512-17 (1994); and it does not require proof of reliance.  *Tesco Ent., Inc. v. Fibredyne Corp*., 2015 WL 788900, at *2 (D. Conn. Feb. 24, 2015) (Underhill, J.), citing *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 616-17 (1981).  Indeed, CUTPA is generally a remedial statute, broadly "aimed at 'eliminating or discouraging' . . . unfair or deceptive acts or practices," *id*., and it, therefore, has "come to embrace a much broader range of business conduct" than is covered by related actions at common law. *Tesco*, 2015 WL 788900, at *2.

CUTPA's liberal interpretation and broad application are also inconsistent with Defendants' assertion that CUTPA imposes more stringent requirements for "control person" liability and proximate cause than the Exchange Act, citing *Joseph Gen. Contracting, Inc. v. Couto*, 317 Conn. 565 (2015). DCG Br. at 38.  However, nothing in that case suggests that CUTPA

---

"Securities Act and Exchange Act claims alleged [in the Complaint]," and Plaintiffs' Securities Act claims explicitly disclaim any "allegations of fraud or scienter."  *Id.* ¶ 192.  Also, "a 'CUTPA violation need not involve fraud on the part of the violator.'"  *Miller v. Guimaraes*, 78 Conn. App. 760, 777 (2003).  Accordingly, to the extent Plaintiffs' CUTPA claims parallel their Securities Act claims, and those claims are not grounded in fraud, compliance with Rule 9(b) is not required.  *See, e.g., Litwin*, 634 F.3dat 715 (non-fraud based Securities Act claims are subject to the "ordinary notice" pleading standards in Fed. R. Civ.  P. 8(a)).

[40] *Compare Artie's Body Shop, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217-18 (2008) (elements for a CUTPA claim) with *Employees' Retirement System of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 304–05 (2015) (elements for a Rule 10b-5 claim).

imposes a stricter standard than the securities laws for "control person" liability.  In fact, there is little difference (if any) between the federal test for "control person" liability and the CUTPA test. *See supra* at 39 and 74 (stating elements of control person under Section 15 of the Securities Act, and under Section 20 of the Exchange Act).[41]  Defendants further argue, citing *Lewis v. Assurant, Inc.*, 2022 WL 4599038, at *8-9 (D. Conn Sept., 30, 2022), that CUTPA applies a more restrictive standard for proximate cause than the federal securities laws.  However, *Lewis* does not state this and Defendants' contorted interpretation is contrary to the broad remedial purposes of CUTPA. *Tesco*, 2015 WL 788900, at *2.

Finally, Defendants argue that, "at the very least," the Complaint's CUTPA class allegations should be stricken because "CUTPA limits class action standing to claims brought 'on behalf of similarly situated residents *of Connecticut* or those that were injured *in Connecticut*." DCG. Br. at 38 (emphasis added by Defendants).  Defendants' argument is procedurally deficient because they each moved to dismiss under Rule 12(b)(6), not Rule 12(f), which concerns motions to strike.  Moreover, Defendants' argument contravenes the U.S. Supreme Court's decision in *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), where the court considered a New York law providing that "an action to recover a penalty . . .  imposed by statute may not be maintained as a class action." *Id*. at 396, n.1.  The Supreme Court – per Justice Scalia, writing for four Justices, joined by Justice Stevens in a separate concurrence – found that both Rule 23 and the New York law addressed the same question (*i.e.*, "whether a class action may proceed for a given suit," *id*. at 401) and held that, because Rule 23 "creates a categorical rule

---

[41] In *Joseph*, the court described the applicable, "highly fact specific," test to be as follows: (1) "a plaintiff, after showing that an entity violated the [act], must prove that the individual either participated directly in the entity's deceptive or unfair acts or practices, or that he or she had the authority to control them;" and (2) "that the individual had knowledge of the wrongdoing at issue." *Id*. at 586.  "An individual's status as controlling shareholder or officer in a closely held corporation creates a presumption of the ability to control." *Id*.

entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action," and the state law "attempt[ed] to answer the same question" by dictating that the same suit "may not be maintained as a class action," the provisions conflicted, and, under *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), the federal rule must prevail.  559 U.S. at 398-99.  Under *Shady Grove*, Defendants' motion as to Plaintiffs' CUTPA's class action claims must be rejected.

Without mentioning *Shady Grove*, Defendants seek to avoid its impact by relying on *In re Trilegiant Corp.*, 11 F. Supp.3d 82, 114-19 (D. Conn. 2014), where Judge Bryant – invoking the rule of *Marks v. United States*[42] – declined to apply Justice Scalia's opinion, and instead held that Justice Stevens' concurring opinion was controlling.  Applying the two-step test advocated by Justice Stevens, she asked (1) "whether Rule 23 answers the question in dispute," and, if so, (2) whether the state law restricting class actions is "substantive" or "procedural," *Trilegiant*, 11 F. Supp.3d at 117-18.  Judge Bryant concluded that CUTPA's class action restrictions were "substantive," and were, therefore, not overridden by Rule 23.

Notably, this Court – without deciding the issue – has questioned both the applicability of *Marks* to the *Shady Grove* opinions and, more specifically, whether the decision applying Justice Stevens' concurring rationale in *Trilegiant* was "correct."  *See In re Aggrenox Antitrust Litig.*, 2016 WL 4204478, at *5-6 (D. Conn. Aug. 9, 2016) (Underhill, J.) (denying motion to dismiss class action claims based on indirect purchaser class action bar under Illinois antitrust law).  Also, whether or not Justice Steven' concurrence is deemed "controlling," numerous courts have held that class action restrictions in analogous consumer protection statutes are "procedural" and that

---

[42] In *Marks v. United States*, 430 U.S. 188 (1977), the court held that when no single rationale garners a majority, the holding of the Supreme Court is "that position taken by those Members who concurred in the judgments on the narrowest grounds."  *Id*. at 193.  Judge Bryant acknowledged that the "Second Circuit has yet to directly address" which *Shady Grove* opinion is controlling, *Trilegiant*, 11 F. Supp.3d at 116, and that is still the case.

Rule 23, therefore, displaces such restrictions.  One court has specifically rejected *Trilegiant* and held that the class action restrictions in CUTPA are "procedural" and, therefore, must yield to the requirements of Rule 23.  *Ace Tree Surgery, Inc. v. Terex Corp.*, 2018 WL 11350262, at *13-15 (N.D. Ga. Dec. 10, 2018), *citing Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1335 (11th Cir. 2015).  Plaintiffs respectfully submit that the reasoning applied in *Ace Tree* is correct and should control in this case. Finally, regardless whether Rule 23 is found to override CUTPA's class action restrictions, those restrictions cannot affect class members who are residents of, or were injured in, Connecticut.  Plaintiffs are clearly permitted to pursue class claims on their behalf.

**B.     The Complaint Adequately Alleges Alternative Claims for Violations of NYUDTPA.**

Defendants argue that the Complaint fails to state claims under N.Y. Gen. Bus. Law § 349 because (1) the Complaint does not allege that "the deception occurred in New York;" (2) the Complaint "allege[s] no deceptive conduct by the DCG Defendants;" (3) the "private contracts between Plaintiffs and Genesis" do not "satisfy the consumer-oriented threshold requirement under the NYUDTPA, and (4) the "Lending Agreements" were not "sold" as "consumer good[s]." DCG. Br. at 39-40.

Defendants base their first point on *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314 (2002), which they argue requires that the "deception" alleged under § 349 "occur[ ] in New York." Def. Br. 39.  However, "[t]he Second Circuit has made clear that, under *Goshen* and the cases construing it, a deceptive transaction in New York will fall within the territorial reach of [§ 349] as long as, 'some part of the underlying transaction . . . occurs in New York State.'" *FTC v. Roomster Corp.*, 654 F. Supp.3d 244, 264-65 (S.D.N.Y. 2023), citing *Cruz v. FXDirect Dealer, LLC*, 720 F.3d 115, 122-23 (2d Cir. 2013).  Thus, Defendants' observation that Plaintiffs are all "out-of-state residents" is irrelevant. *Roomster*, 654 F. Supp.3d at 265.  The issue is whether there is "'a sufficient nexus

between [plaintiff's] transactions with [defendants] and New York to fall within the territorial reach' of the New York General Business Law." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023), quoting *Cruz*, 720 F.3d at 122.

Here, the Complaint alleges an ample nexus between Defendants' deceptive conduct in New York and Plaintiffs' purchases of the Genesis Yield investments.  It alleges that Defendants falsely represented that GGC's loan portfolio was "over collateralized," when – due to Defendants' practice of making risky loans to unreliable counterparties and related parties – the opposite was true.  ¶¶216-54.  Moreover, when one counterparty defaulted on a $3.2 billion loan, Defendants – rather than truthfully disclosing the relevant facts – lied to investors, engaged in accounting fraud, and withdrew over $100 million from GGC to protect their own pecuniary interests.  ¶¶256-386. This deceptive conduct was closely connected with New York, which, during the Class Period, was where DCG was located, ¶¶58, 87; where Defendant Silbert resided, ¶59; where GGT's operations were based, ¶103; where the shared loan book of GGC and Genesis Asia Pacific was managed, , ¶10, 124; and where Defendant Silbert – in dealing with Gemini – knowingly concealed the fact that GGC was "massively insolvent" to prevent Gemini from terminating the Gemini Earn Program, as it had planned to do.  ¶¶387-403.  Thus, Defendant Silbert – as the New York-based CEO and controlling shareholder of the New York-based DCG – exercised his control of DCG (which, in turn, was the 100% shareholder of GGH and, indirectly, of GGC) to cause those entities to engage in the deceptive conduct which caused Plaintiffs' injuries.  Notably, the New York Attorney General found the nexus between New York and Defendants' unlawful conduct sufficiently extensive that she deemed it appropriate to file charges under New York law against DCG, Silbert, Moro, and GGC based on much of the conduct alleged here.  ¶¶47-48.

Defendants further assert that the Complaint fails to allege deceptive conduct by the "DCG Defendants" (*i.e.*, DCG, Silbert, Hutchins, Lenihan and Murphy), and that the conduct of GGC cannot be imputed to DCG "based on mere corporate affiliation."  DCG Br. at 39.  Defendants ignore that the principal allegations of the Complaint show how the "DCG Defendants" exercised their power and control over GGC to enrich themselves and to deceive Plaintiffs and alleges more than corporate affiliation.

Defendants mischaracterize the Complaint's claims as arising out of "private contracts between Plaintiffs and Genesis." DCG. Br. at 39.  Defendants are wrong.  A "private contract" of the sort that falls outside the ambit of § 349 is a "single shot transaction[ ]" that is "unique to the parties."  *See, e.g., Diaz v. Paragon Motors of Woodside*, 424 F. Supp.2d 519, 542 (E.D.N.Y. 2006) ("Private contract disputes, unique to parties, or 'single shot transactions' would not fall within the ambit of [§ 349]"), citing *Oswego Laborers' Local 214 v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995).  The Genesis Yield Investment Agreements were not such "single shot" "private contracts." Rather, they were generally "made available to consumers, who were exposed to the Consumer Protection Defendants' fraudulent marketing, advertising, and sales tactics designed to induce consumers to purchase, transfer, borrow, loan and/or trade digital assets via Genesis Yield."  ¶422.

Finally, Defendants argue "there is no allegation that a consumer good was sold" and "the Lending Agreements were not generally available to the public"—an assertion made without citation to the Complaint or any other source.  In fact, however, the Complaint alleges that the agreements were "made available to consumers," who were injured by Defendants' deceptive conduct.  ¶¶421-29.

As to the need to allege that "a consumer good was sold," DCG. Br. at 39, Section 349 is extremely broad, declaring unlawful any "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state . . . ." *See Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 55 (1999) (§ 349, "on its face, applies to virtually all economic activity"). And "[t]he New York Court of Appeals [has] recently embraced a broad understanding of the consuming public which can include distinct subclasses." *Steele-Warrick v. Microgenics Corp.*, 2023 WL 3959100, at *4 (E.D.N.Y. June 12, 2023), citing *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 178 (2021) ("Consumer-oriented conduct need not be directed to all members of the public;" it can, instead, be directed to "a subclass of consumers"). Thus, the class of "consumers" contemplated by § 349 includes subclasses and "is also broader than just those 'who purchase goods and services for personal, family, or household use.'" *Steele-Warrick*, 2023 WL 3959100, at *4 (quoting *Himmelstein*, 37 N.Y.3d at 176-77.) The Complaint alleges that Defendants broadly directed their deceptive conduct to "consumers [wishing to] tender digital assets in exchange for earning some of the 'highest' returns or yields and [obtain] the eventual return of their digital assets." ¶422. There is nothing in Section 349 that precludes this subclass of consumers from pursuing the claims asserted here.[43]

    Defendants Moro and Islim set forth additional bases for dismissal of the state law claims, neither of which is persuasive. Defendant Moro argues the Complaint fails to allege his individual misconduct occurred in Connecticut or that Plaintiffs were injured in Connecticut. *See* Moro Br. at 27. Defendant Moro is wrong. "CUTPA does not necessarily require that the violation occur

---

[43] Defendants' reliance on *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 (2d Dept. 1995), is misplaced. That case involved a large home renovation contract between a homeowner and contractor – *i.e.*, a classic "single shot transaction[ ]" that was "unique to the parties." *See Diaz,* 424 F. Supp. 2d at 542. Also, *Teller's* emphasis on the need for § 349 claims to have an "impact on consumers at large," *id*. at 145, is inconsistent with *Himmelstein's* determination that deceptive conduct directed toward subclasses of consumers can support claims under § 349.

within the state, only that it be tied to a form of trade or commerce intimately associated with Connecticut." *Metro. Enter. Corp.,* 2004 WL 1497545, at *6 (D. Conn. June 28, 2004).

Defendant Islim asserts that the Complaint fails to allege he "either participated directly in the entity's deceptive or unfair acts or practices had the authority to control them" or that he "had knowledge of the wrongdoing at issue." Islim Br. at 6. The Complaint alleges that Islim was COO and Interim CEO of GGC, and member of the board of GGH (the sole managing member of Genesis), that he caused GGC to offer or sell Genesis Yield securities and engage in transactions designed to benefit the DCG conglomerate, lend almost 30% of GGC's total loan book to 3AC to maximize DCG's profit, and misrepresent GGC's solvency to induce consumers to continue to invest and/or prevent redemptions. ¶¶145, 313, 397-98, 428, 475-76. Defendants' arguments that the Complaint fails to allege alternative claims under CUTPA and NYUDTPA are meritless and should be rejected.

## VI.    CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss should be denied in their entirety.[44]

Dated: January 22, 2024                          Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Ian W. Sloss*
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
One Landmark Square, Floor 15
Stamford, Connecticut 06901

---

[44] Defendants' motions present the first opportunity for the Court to review the Complaint's allegations.  If the Court dismisses some or all of the claims, Plaintiffs respectfully request leave to amend. Fed. R. Civ. P. Rule 15(a)(2); *In re SSA Bonds Antitrust Litig.,* 2018 WL 4118979, at *8 (S.D.N.Y. Aug. 28, 2018) ("[A]lthough Plaintiffs have already had the opportunity to amend their original complaint, because this is the Court's first opportunity to highlight the precise defects of Plaintiffs' pleading and it is not yet apparent that another opportunity to amend would be futile, the Court will permit Plaintiffs to replead their dismissed claims.").

Telephone: (203) 325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Jeffrey P. Campisi*
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris
800 Third Avenue, 38th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the
Proposed Class*

**CERTIFICATION OF COMPLIANCE WITH RULE XI (ATTORNEY SIGNATURES)
OF THE ELECTRONIC FILING POLICIES AND PROCEDURES OF THE U.S.
DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT (REVISED JAN. 9, 2023)**

I, Jeffrey P. Campisi, under Rule XI(D) (Multiple Signatures) of the Electronic Filing Policies and Procedures of the U.S. District Court for the District of Connecticut (Revised Jan. 9, 2023),  represent that I have obtained the consent of the other attorneys who have signed the document above.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of January 2024.                    */s/ Jeffrey P. Campisi*
                                                            Jeffrey P. Campisi

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on January 22, 2024 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Campisi*
Jeffrey P. Campisi