# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, individually and on behalf of all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM,<br><br>         Defendants. | Case No. 3:23-cv-00082-SRU<br><br>Hon. Stefan R. Underhill<br><br><br>FEBRUARY 21, 2024 |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, AND MARK MURPHY'S MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ...................................................................................................... 2

I.    Plaintiffs' Section 20(a) Claim Should Be Dismissed ............................................. 2

A.    Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act ............................................................................................ 2

    1.    Plaintiffs Fail to Plead Reliance ................................................. 3

    2.    Plaintiffs Fail to Plead Loss Causation ......................................... 10

    3.    Plaintiffs Fail to Plead Cognizable Damages ............................. 11

B.    Plaintiffs Fail to Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation ...................... 12

    1.    Plaintiffs Fail to Plead Actual Control ........................................ 12

    2.    Plaintiffs Fail to Plead Culpable Participation ............................. 14

II.    Plaintiffs Fail to Plead "Scheme Liability" ......................................................... 15

III.    Plaintiffs' Section 15 Claim Should Be Dismissed .............................................. 17

A.    Plaintiffs Cannot Identify the Relevant "Security" ................................... 17

B.    The Securities Act Claim Is Barred by the One-Year Statute of Limitations ................................................................................................ 19

C.    Plaintiffs Fail to Plead Statutory Standing With Respect to a "Sale" or "Offer" ................................................................................................ 20

D.    The Lending Agreements Are Not Securities ......................................... 21

    1.    There is No Security Under *Howey* ............................................ 22

    2.    There Is No Security Under *Reves* ............................................. 25

E.    Plaintiffs Fail to Plead Actual Control .................................................... 27

IV.    Counts IV and V Should Be Dismissed Because Plaintiffs Fail to Adequately Allege An State-Law Claims in the Alternative ............................... 28

A.    Count IV Should Be Dismissed Because Plaintiffs Have Failed to Allege a CUTPA Claim ......................................................................... 28

B.    Count V Should Be Dismissed Because Plaintiffs Have Failed to Allege a NYUDTPA Claim ...................................................................... 29

CONCLUSION .................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
  269 F.R.D. 252 (S.D.N.Y. 2010), *aff'd sub nom. Pa. Pub. Sch. Emps.' Ret.
  Sys. v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir.), *as amended* (Nov. 12,
  2014) .................................................................................................................................5

*Achtman v. Kirby, McInerney & Squire, LLP*,
  464 F.3d 328 (2d Cir.2006) ...........................................................................................21

*Aimis Art Corp. v. N. Tr. Sec., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009) ............................................................................11

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ..................................................................7

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ............................................................................14

*Alunni v. Dev. Res. Grp., LLC*,
  445 F. App'x 288 (11th Cir. 2011) .................................................................................24

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)......................................................................................................3, 5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................................21

*In re Asia Pulp & Paper Sec. Litig.*,
  293 F. Supp. 2d 391 (S.D.N.Y. 2003)........................................................................13, 27

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................................9

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
  763 F. Supp. 36 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992) ...........................25

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
  995 F. Supp. 2d 291 (S.D.N.Y. 2014) *aff'd sub nom. SRM Glob. Master Fund
  Ltd. P'ship v. Bear Stearns Cos.*, 89 F.3d 173 (2d Cir. 2016) ......................................4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................................21

*In re Bibox Grp. Holdings Ltd. Sec. Litig.*,
    534 F. Supp. 3d 326 (S.D.N.Y. 2021)........................................................................20

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008)................................................................................................5

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)......................................................................16

*Champions League, Inc. v. Woodard*,
    224 F. Supp. 3d 317 (S.D.N.Y. 2016)................................................................18, 20

*Chapman v. Priceline Grp., Inc.*,
    2017 WL 4366716 (D. Conn. Sep. 30, 2017) ..........................................................29

*Chase Manhattan Bank, N.A. v. Fidata Corp.*,
    700 F. Supp. 1252 (S.D.N.Y. 1988)...........................................................................9

*Chem. Bank v. Arthur Andersen & Co.*,
    726 F.2d 930 (2d Cir. 1984)......................................................................................9

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)......................................................................13

*Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*,
    516 F.2d 811 (2d Cir. 1975).......................................................................................9

*Crown Castle NG E. LLC v. City of Rye*,
    2017 WL 6311693 (S.D.N.Y. Dec. 8, 2017) .............................................................8

*Crummere v. Smith Barney, Harris Upham & Co.*,
    624 F. Supp. 751 (S.D.N.Y. 1985)..............................................................................9

*DeAngelis v. Corzine*,
    17 F. Supp. 3d 270 (S.D.N.Y. 2014)........................................................................30

*DoubleLine Capital LP v. Odebrecht Finance, Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)......................................................................12

*Dresner v. Utility.com, Inc.*,
    371 F. Supp. 2d 476 (S.D.N.Y. 2005).........................................................................7

*Ellul v. Congregation of Christian Bros.*,
    774 F.3d 791 (2d Cir. 2014).....................................................................................20

*Federal Housing Finance Agency v. Nomura Holding America, Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)......................................................................28

*In re Fine Host Corp. Sec. Litig.*,
  25 F. Supp. 2d 61 (D. Conn. 1998) ............................................................................8

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ........................................................................................*10*

*Frasier v. Stanley Black & Decker, Inc.*,
  109 F. Supp. 3d 498 (D. Conn. 2015) .......................................................................29

*Friel v. Dapper Labs, Inc.*,
  657 F. Supp. 3d 422 (S.D.N.Y. 2023) ..................................................................22, 23

*FTC v. Roomster Corp.*,
  654 F. Supp. 3d 244 (S.D.N.Y. 2023) ..................................................................29, 30

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
  41 F.4th 71 (2d Cir. 2022) .........................................................................................18

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) .......................................................................................23

*Ge Dandong v. Pinnacle Performance Ltd.*,
  2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ..............................................................4

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996) ..........................................................................................7

*Harte v. Ocwen Fin. Corp.*,
  2016 WL 3647687 (E.D.N.Y. July 1, 2016) ..............................................................21

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008) ........................................................................14

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ........................................................................27

*In re Independent Energy Holdings PLC Securities Litigation*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) ........................................................................27

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
  822 F. Supp. 2d 368 (S.D.N.Y. 2011) ..........................................................................4

*Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*,
  683 F. Supp. 2d 278 (E.D.N.Y. 2010) .............................................................23, 25, 26

*Kenshoo, Inc. v. Aragon Advert., LLC*,
  586 F. Supp. 3d 177 (E.D.N.Y. 2022) ........................................................................21

*Kirschner v. JP Morgan Chase Bank, N.A.*,
    79 F.4th 290 (2d Cir. 2023) ...................................................................26

*Kottler v. Deutsche Bank AG*,
    2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ...........................................5

*Lehman Bros. Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
    179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............................................... 24-25

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................10

*Lentini v. Fid. Nat'l. Title Ins. Co. of New York*,
    479 F. Supp. 2d 292 (D. Conn. 2007) .....................................................28

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007)........................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) .......................................................5

*Lops v. YouTube, LLC*,
    2023 WL 2349597 (D. Conn. Mar. 3, 2023) ............................................28

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    412 F. Supp. 3d 392 (S.D.N.Y. 2019), *aff'd*, 13 F.4th 247 (2d Cir. 2021) ..............................8

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ...............................................................15, 17

*McAnaney v. Astoria Financial Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) ....................................................30

*McLaughlin v. American Tobacco Co.*,
    522 F3d 215 (2d Cir. 2008)..................................................................4, 5

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) .....................................................9

*Minskoff v. Am. Express Travel Related Servs. Co.*,
    98 F.3d 703 (2d Cir. 1996)....................................................................8

*Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*,
    768 F. Supp. 1010 (S.D.N.Y. 1991)................................................. 25-26

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)....................................................13

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)........................................................................16

*Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*,
    527 F.2d 445 (2d Cir. 1975)......................................................................................9

*Pinter v. Dahl*,
    486 U.S. 622 (1988)................................................................................................20

*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
    792 F. Supp. 2d 328 (D. Conn. 2011)......................................................................13

*Reeder v. Succession of Palmer*,
    736 F. Supp. 128 (E.D. La.), *aff'd*, 917 F.2d 560 (5th Cir. 1990) ..........................26

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................................................................27

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)..............................................................................17, 21, 25, 26

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)......................................................................15

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004)......................................................................16

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)......................................................................16

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) .................................................................................24

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) .......................................................................................15

*SEC v. Ripple Labs, Inc.*,
    --- F. Supp. 3d ---, 2023 WL 4507900 (S.D.N.Y. July 13, 2023)...........................24

*SEC v. Terraform Labs Pte. Ltd.*,
    --- F. Supp. 3d ---, 2023 WL 4858299 (S.D.N.Y. July 31, 2023)...........................24

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)...................................................................................... *passim*

*Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*,
    559 U.S. 393 (2010)................................................................................................29

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)......................................................................13

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...........................................................13

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
   256 F.R.D. 284 (D. Conn. 2009).................................................................................4

*Steed Fin. LDC v. Laser Advisers, Inc.*,
   258 F. Supp. 2d 272 (S.D.N.Y.2003).......................................................................14

*Tatum v. Oberg*,
   650 F. Supp. 2d 185 (D. Conn. 2009).......................................................................28

*Taylor v. Westor Cap. Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013).......................................................................16

*Telenor Invest AS v. Altimo Holdings & Invs. Ltd.*,
   567 F. Supp. 2d 432 (S.D.N.Y. 2008).........................................................................5

*Teller v. Bill Hayes, Ltd.*,
   213 A.D.2d 141 (2d Dep't 1995)...............................................................................30

*In re Trilegiant Corp.*,
   11 F. Supp. 3d 82 (D. Conn. 2014)...........................................................................29

*In re UBS Auction Rate Sec. Litig.*,
   2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ...........................................................11

*In re UBS Auction Rate Sec. Litig.*,
   2010 WL 2541166 (S.D.N.Y. June 10, 2010) ...........................................................9

*Vacold LLC v. Cerami*,
   545 F.3d 114 (2d Cir. 2008)........................................................................................7

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ..............................................................6

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)..........................................................................................6

*Walsh v. Rigas*,
   2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) ..............................................................5

*Yi v. GTV Media Group Inc.*,
   2021 WL 3500920 (S.D.N.Y. Aug. 6, 2021)......................................................27, 28

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016)......................................................................27

**Statutes & Rules**

15 U.S.C. 77(b)(a)(1) ..............................................................................................21

Conn. Gen. Stat. § 42–110g(b) ..............................................................................29

Fed. Rule Civ. Proc. 9(b) ...................................................................................4, 27

Fed. Rule Civ. Proc. 12(b)(6)...............................................................................20

Fed. Rule Civ. Proc. 23 ..........................................................................................29

# PRELIMINARY STATEMENT[1]

Plaintiffs' opposition brief clearly demonstrates that the AC does not satisfy the legal demands of a securities case.  Plaintiffs change positions throughout their brief as to what the purported "security" here actually is.  They rely on out-of-circuit and outdated cases.  They invent new allegations and misconstrue existing ones.  They respond to core arguments in footnotes and ignore other arguments entirely.  Plaintiffs' opposition cycles through several alternative or conflicting theories of liability, but never lands on one that actually gives rise to liability against the DCG Defendants.  The motion to dismiss should be granted.

*First,* Plaintiffs have not pled a Section 20(a) claim based on violations of the Exchange Act.  Plaintiffs face a considerable challenge:  They must run the table on a myriad of issues— reliance, loss causation, damages, actual control, culpable participation—to give these claims even a chance of surviving.  They cannot do so.  Plaintiffs claim direct reliance on just *two* representations at issue, yet offer no well-pled allegations that they actually relied on those representations in making decisions.  Plaintiffs' responses on the other dispositive issues are likewise insufficient and do little to contend with the on-point precedent the DCG Defendants cited.  And even were all that not enough, Plaintiffs did not even bring these claims against any party actually responsible for the allegedly misleading statements, and have failed to allege control.

*Second*, Plaintiffs' effort to repackage their insufficient control person allegations as "scheme" liability fails.  Plaintiffs breeze past the binding precedent on this point, invoking cases that bear no resemblance to the theory of liability urged here.

---

[1] All capitalized terms and abbreviations have the same meaning as in the Memorandum of Law in Support of the DCG Defendants' Motion to Dismiss the Amended Complaint.  *See* ECF No. 137.

*Third*, Plaintiffs' Securities Act claims fare no better.  In fact, the issues that doom the Securities Act claims also foreclose Plaintiffs' Exchange Act claims:  The absence of a purchase or sale of a security, lack of statutory standing, and the absence of control.  Beyond that, the Securities Act claims are also untimely under the shorter one-year statute of limitations applicable to such claims.  Plaintiffs argue themselves in circles trying to address these defects, offering up inconsistent and mind-bending explanations that have no basis in the law or the allegations.  At alternate times, Plaintiffs have claimed that the alleged securities are the Lending Agreements, the Lending Agreements plus the underlying loans, a non-existent "Genesis Yield Program," and, finally, throwing up their hands in defeat, "the entirety of Plaintiffs' and [Genesis's] interactions." This exhausting game of rope-a-dope is no substitute for a cogent and plausible theory of liability, which Plaintiffs cannot provide.

*Finally*, Plaintiffs' fallback claims under state law also fail.  Plaintiffs do not seriously dispute that if their Exchange Act allegations fail, then so too does their claim under Connecticut law.  And New York law provides no refuge in the absence of a predominantly *New York* course of dealing or a consumer product or offering.  There is a good reason Plaintiffs spend so little time defending these claims—they are indefensible.

 In view of the fact that Plaintiffs have already once tried to cure these deficiencies, dismissal should be with prejudice.

## ARGUMENT

### I.     Plaintiffs' Section 20(a) Claim Should Be Dismissed

#### A.     Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act

The most basic defect of Plaintiffs' claims for control-person liability under Section 20(a) of the Exchange Act is that because this is not a securities action, Plaintiffs cannot allege the essential elements of a primary Exchange Act violation:  reliance, loss causation, or damages.  *See*

Mot. 8–16.  Plaintiffs' efforts to argue their away around those defects fail.

### 1.    Plaintiffs Fail to Plead Reliance

In their Motion, the DCG Defendants explained that Plaintiffs failed to allege any legally cognizable or factually coherent theory of reliance.  *See* Mot. 9–14.  Plaintiffs' response disregards the on-point case law the DCG Defendants cited, instead invoking novel and narrow theories of reliance unsupported by the law.  Plaintiffs' Exchange Act claims can and should be dismissed for failure to allege reliance.

**No Direct Reliance.**   The Motion exposed the absence of any well-pled or legally cognizable theory of actual reliance, foreclosing Plaintiffs' Exchange Act claims.  *See* Mot. 10–11.  In response, Plaintiffs do not dispute that the only allegations of direct reliance arise in the context of just two statements—out of the dozens of statements alleged throughout the AC to be false or misleading—in the Lending Agreements.  *See* Mot. 10.  And aside from rotely repeating the sole conclusory allegation of reliance, *see* Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Opp'n") 58, Plaintiffs do not seriously dispute that there are no allegations they even read those representations, much less relied on them.  Instead, Plaintiffs urge that reliance may be *presumed* where there is "circumstantial evidence that plaintiffs would not have purchased a product but for a defendant's uniform misrepresentations and omissions about that product."  Opp'n 58–59.  The Supreme Court says otherwise, and this alone is a basis to dismiss Plaintiffs' direct reliance argument.

Reliance cannot be presumed simply because a case involves uniform representations regarding financial transactions.  *See* Opp'n 58–59.  Unless the fraud-on-the-market presumption applies (and Plaintiffs concede that it does not), an Exchange Act plaintiff must "demonstrat[e] that she was personally aware of the defendant's statement and engaged in a relevant transaction based on that specific misrepresentation."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S.

455, 473 (2013) (alterations and quotation marks omitted); *see also In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014) (applying Rule 9(b) standard to reliance allegations), *aff'd sub nom. SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173 (2d Cir. 2016).   The cases on which Plaintiffs rely arose in the class-action certification context, where the plaintiff had *already* adequately pleaded reliance, and the question before the courts was whether classwide reliance could be established through common proof.

Even were those cases applicable at the pleading stage, Plaintiffs fail to offer any well-pled allegations to support invocation of this narrow theory.   There are no allegations of "circumstantial evidence" to suggest that the two statements they have plucked out of the Lending Agreements "were so fundamental to the" lending agreements that every lender must have both read *and* relied on those statements before signing the agreements, as was alleged in the cases Plaintiffs cite.   *Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013); *see also Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 303 (D. Conn. 2009) (reliance presumed where it was "clear that every plaintiff to whom a total dollar figure was represented relied on that dollar figure in deciding whether to accept the settlement").   All Plaintiffs have alleged here is that the Lending Agreements contained these representations and that they purchased the alleged securities "in reliance" on those representations—with no further detail.   *See* AC ¶ 409.   This "conclusory" and "broad" allegation is devoid of any "supporting factual matter indicating how [P]laintiffs relied on the alleged misrepresentations" and is legally insufficient. *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011).

Moreover, a presumption of reliance does not attach in every case where financial products are involved.   In *McLaughlin v. American Tobacco Co.*—which Plaintiffs themselves cite—the

Second Circuit cautioned against presuming reliance in fraud cases, because whether an individual read or relied on an alleged misrepresentation varies from person to person.  522 F.3d 215, 224–26 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  Since then, numerous courts have rejected efforts by plaintiffs to presume reliance on statements made in connection with the sale of financial products.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 570 (S.D.N.Y. 2018); *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 269 F.R.D. 252, 264–65 (S.D.N.Y. 2010), *aff'd sub nom. Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111 (2d Cir.), *as amended* (Nov. 12, 2014); *Kottler v. Deutsche Bank AG*, 2010 WL 1221809, at *4 (S.D.N.Y. Mar. 29, 2010); *see also Amgen*, 568 U.S. at 473 (where fraud-on-the-market presumption does not apply, "[i]ndividualized reliance issues would predominate").  Were the law as Plaintiffs suggest, there would be no need for the fraud-on-the-market presumption, because securities cases would always arise in connection with the sale of financial products.[2]

**No *Affiliated Ute* Presumption.**  The DCG Defendants explained that the *Affiliated Ute* presumption of reliance does not apply here, because this case does not involve "total non-disclosure," and instead concerns "misstatements whose only omission is the truth that the statement misrepresents."  Mot. 13–14.  Plaintiffs respond that *Affiliated Ute* can apply when there

---

[2] As an independent ground for rejecting this strained theory, the DCG Defendants pointed out that the alleged misrepresentations in the Lending Agreements are not alleged to have been false or misleading at the time they were made, *i.e.*, at the time Plaintiffs signed the Lending Agreements.  Mot. 11.  Plaintiffs respond that the warranties in the Lending Agreements were repeated in each lending transaction.  Opp'n 60.  But as set forth below, *see infra* Part III.A, Plaintiffs repeatedly aver that the alleged securities here are the "Genesis Yield Investment Agreements."  The Exchange Act applies only to the purchase or sale of securities, *see Telenor Invest AS v. Altimo Holdings & Invs. Ltd.*, 567 F. Supp. 2d 432, 443 (S.D.N.Y. 2008), and thus the only relevant question is what representations Plaintiffs were exposed to at the time they supposedly "purchased" the alleged securities, *i.e.*, the Lending Agreements.  Because the representations are not alleged to have been false at that time, the allegation that they may have been repeated and rendered false *after* the alleged purchases is immaterial.  *See Walsh v. Rigas*, 2019 WL 294798, at *7 (S.D.N.Y. Jan. 23, 2019) (post-purchase misrepresentations cannot form the basis of a fraud claim).

is a "combination of omissions and misstatements," Opp'n 61, but again, they are wrong as a matter of law.

In *Waggoner v. Barclays PLC*—which the DCG Defendants cited and Plaintiffs ignore—the Second Circuit explained that the *Affiliated Ute* presumption is applicable only where "no positive statements exist."  875 F.3d 79, 95 (2d Cir. 2017).  Where an alleged omission simply "relates back to an earlier statement," the omission really is a "misrepresentation," and the presumption does not apply.  *Id.*  That is because the purpose of the *Affiliated Ute* presumption is to permit a plaintiff to plead reliance where "reliance as a practical matter is impossible to prove." *Id.*; *see also In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *17 (E.D.N.Y. Jan. 11, 2022).

Here, the only "omissions" Plaintiffs purport to allege are undisclosed facts that allegedly render Genesis' positive statements regarding its risk management and debt collateralization false or misleading.  *See* Opp'n 61 (claiming Genesis failed to disclose that Genesis "did not have strong risk management" or that "it was never overcollateralized").  Plaintiffs do not claim, for example, that Genesis would have had a duty to disclose any of those alleged facts if it had not made the allegedly misleading representations.  And this is not an instance in which reliance would be impossible to prove—Plaintiffs have just failed to allege facts giving rise to a plausible inference of reliance on the challenged statements.  Where, as here, the only alleged "omission is the truth that the statement misrepresents," *Waggoner*, 875 F.3d at 96, the presumption does not apply.

**No Indirect Reliance.**  Defendants debunked any theory of indirect reliance based on alleged misrepresentations to Gemini, pointing out the strict limits of the MLA.  Mot. 12–13.  Plaintiffs respond with a meandering discussion of agency liability and derivative reliance that relies on academic articles and legal restatements, yet Plaintiffs do not cite a single case in which

a court found reliance in circumstances even remotely comparable to those at issue here.  Opp'n 62–65.

Relegated by Plaintiffs to a footnote is the dispositive fact that they disclaimed in the MLA any reliance on extra-contractual statements, which comprise all of the statements to Gemini on which Plaintiffs now claim indirect reliance.  *See* MLA §§ V(i), XVI; *see also* Mot. 12.  Plaintiffs invoke the anti-waiver provision of the Exchange Act, *see* Opp'n 62 n.35, but acknowledge that the Second Circuit has held that a disclaimer of reliance on extra-contractual statements does not offend the anti-waiver provision, *see Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996). Plaintiffs describe that case as an "outlier," but that is no answer to clear Second Circuit precedent on the precise issue before the Court, which numerous courts have followed.  *See, e.g., Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008); *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *15 (S.D.N.Y. Mar. 30, 2018); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 492 (S.D.N.Y. 2005).  Plaintiffs alternatively argue that they are not sophisticated parties, but that contention too is belied by the express terms of the MLA.  *See* MLA § V(d).  Plaintiffs' proffered distinction between pre-agreement and post-agreement representations is arbitrary and has no basis in the law:  The non-reliance provision states that it applies to "any Loan" entered into under the agreement, which necessarily encompasses all loan transactions executed subsequent and pursuant to the Lending Agreement.  MLA § V(i)

Even were this theory of reliance not foreclosed by the MLA, Plaintiffs still could not prevail.  Plaintiffs contend that Gemini acted as their agent "in endorsing and maintaining [Genesis's] participation in the Gemini Earn program," Opp'n 63, but conspicuously cite nothing in the MLA or any other agreement to support that.  This is pure invention, with no basis in the AC or the agreement.  Gemini acted as agent for the lenders for the *sole* purpose of "deliver[ing]

Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets." ECF No. 139-2 (MLA Ex. A ¶ 1(b)). Gemini did not and could not act as Plaintiffs' agent in "endorsing" Genesis, and Plaintiffs do not explain what that would even mean. *See Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (actual agency authority is limited by "the words and conduct of the principal as they are interpreted by a third party"). And even if there were such an agency relationship, whether Plaintiffs chose to trust Gemini to vet Genesis's representations has nothing to do with Plaintiffs' decision to lend their assets to Genesis, which at all times remained within their sole discretion. *See* MLA § 1(b) (Gemini Earn lenders had "not authorized Agent to exercise discretion in . . . determining the amount, timing or selection of any Loan on Principal's behalf"). Instead, third-party reliance may be appropriate where a plaintiff's *investment advisor* relies on the issuer's fraud to the plaintiff's detriment. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 412 F. Supp. 3d 392, 411 (S.D.N.Y. 2019), *aff'd*, 13 F.4th 247 (2d Cir. 2021); *In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71 (D. Conn. 1998). Nothing in the agreement establishes an investment advisor relationship.[3]

Plaintiffs next go even further down the rabbit hole and argue that the theory of "derivative reliance"—where representations to an intermediary are passed on to a principal, who then relies on them—applies here. Opp'n 64–65. But Plaintiffs have not alleged any of the elements of derivative reliance: Plaintiffs do not allege any facts showing that Gemini relied on the challenged

---

[3] Plaintiffs also invoke certain pre-class representations by Genesis concerning its risk management, which supposedly misled Gemini as to Genesis's risk and collateralization. *See* Opp'n 4, 45–46, 54, 57, 61, 64–65 (citing AC ¶¶ 215–23). These allegations are irrelevant because they pre-date the class period altogether. Moreover, Plaintiffs attribute these allegations to the NYAG complaint, but omit that the NYAG made these allegations only in the context of showing that *Gemini* misrepresented to its investors its risk assessment and due diligence. *Compare* AC ¶¶ 215–23, *with* NYAG Compl. ¶¶ 66–74. These allegations are legally immaterial and contradicted by the documents upon which Plaintiffs rely for them. They can and should be disregarded. *See Crown Castle NG E. LLC v. City of Rye*, 2017 WL 6311693, at *3 n.1 (S.D.N.Y. Dec. 8, 2017) ("[T]he Court need not accept as true allegations in the complaint that are directly contradicted by documents upon which the pleadings rely.").

misrepresentations, that Genesis had any expectation that its representations would be passed on to the individual lenders, or that they themselves relied on any of Gemini's representations to them based on Genesis's alleged misrepresentations.  *Cf.* AC ¶¶ 411–12; *see also Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*, 527 F.2d 445, 450–51 (2d Cir. 1975) (no derivative reliance in absence of evidence that the plaintiff relied on the underlying alleged misrepresentations); *Chase Manhattan Bank, N.A. v. Fidata Corp.*, 700 F. Supp. 1252, 1261 (S.D.N.Y. 1988) (doctrine not applicable where there were no allegations that misrepresentation was communicated to the plaintiff and that speaker intended it to be communicated).  Instead, what Plaintiffs say is that they relied on Genesis's representations to Gemini as "their agent," AC ¶ 412, but that says nothing about the elements of derivative reliance.

**No Alternative Presumption of Reliance**.  Finally, Plaintiffs argue that they need not establish reliance at all, because they have alleged a "comprehensive scheme to defraud."  Opp'n 65.  They rely entirely on a 49-year-old case—*Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975)—and ignore five decades of narrowing by subsequent Second Circuit decisions.  *See, e.g.*, *In re UBS Auction Rate Sec. Litig.*, 2010 WL 2541166, at *22 n.13 (S.D.N.Y. June 10, 2010) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 398 (S.D.N.Y. 2010) (same), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011); *Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 755–56 (S.D.N.Y. 1985) (citing *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)).  In any event, while Plaintiffs have tried (and failed) to allege a fraudulent scheme, *see infra* Part II, it is apparent that all of their theories of liability turn on the issuance of allegedly

false statements by Genesis.  In the absence of an efficient market, Plaintiffs must plead direct

reliance, which they have failed to do.

### 2.        Plaintiffs Fail to Plead Loss Causation

In their motion, the DCG Defendants exposed the absence of any allegations regarding loss

causation, citing binding authority holding:

> [W]hen the plaintiff's loss coincides with a marketwide phenomenon causing
> comparable losses to other investors, the prospect that the plaintiff's loss was
> caused by the fraud decreases, and a plaintiff's claim fails when it has not
> adequately pled facts which, if proven, would show that its loss was caused by the
> alleged misstatements as opposed to intervening events.

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (alteration and quotation marks

omitted).  In response, Plaintiffs simply recite the general rule that allocating loss causation

between two competing causes is a fact-intensive question for trial.  Opp'n 67–68.  That is an

inadequate response based on Plaintiffs' own admissions in the original complaint, and another

independent basis for dismissal.

The defect in Plaintiffs' allegations is not that they set forth two competing causes for the

alleged loss, but rather that they affirmatively assert that the collapse of FTX caused "a loss of

confidence in digital asset markets" and that but for that collapse, the alleged fraud may *never* have

come to light.  *See* ECF No. 1 ¶¶ 25, 187.[4]  Plaintiffs have thus themselves alleged a "marketwide

phenomenon" leading to their alleged losses, and they have pleaded themselves out of any

plausible showing that the underlying risk, rather than "intervening events," caused their alleged

losses.  *Lentell*, 396 F.3d at 174; *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d

763, 772 (2d Cir. 1994) (presence of "external factors" defeated proximate causation at pleading

stage).

---

[4] Plaintiffs do not dispute that they are bound in this respect to the allegations in their prior complaint.

Plaintiffs say that the FTX bankruptcy "simply revealed" the alleged misconduct, *see* Opp'n 68, but they have not pursued (and could not pursue) a theory of loss causation based on market reaction. Instead, they have argued only materialization of the risk, under which the *revelation* of the alleged misstatement is immaterial—what matters is when the alleged risk materialized (whether disclosed or not). And here, that time was in June 2022, when Genesis allegedly became insolvent, several months before Plaintiffs allege they incurred any losses. The "materialization" of the alleged risk in June 2022 thus could not plausibly be the cause of subsequent alleged losses arising out of the FTX collapse several months later. *See Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (securities claim dismissed at pleadings where the plaintiffs failed to adequately "show[] that it was the claimed concealment which caused plaintiffs' losses, rather than the market-wide Internet stock collapse"), *aff'd*, 216 F. App'x 14 (2d Cir. 2007).

### 3.    Plaintiffs Fail to Plead Cognizable Damages

The DCG Defendants pointed out that a temporary loss of access to assets is not a cognizable form of damages under the securities laws, particularly since there is a pending bankruptcy proceeding through which Plaintiffs may recover the entire value of those assets. Mot. 16. Plaintiffs respond with precedent generally stating that "actual damages" under the Exchange Act is undefined, Opp'n 69–70, yet do not cite a single case in which alleged losses of the kind sought here were deemed recoverable. In fact, ample precedent forecloses securities claims based on only "speculative" injuries from a lack of use. *See Aimis Art Corp. v. N. Tr. Sec., Inc.*, 641 F. Supp. 2d 314, 319–21 (S.D.N.Y. 2009); *see also In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009). Plaintiffs additionally contend that they have been damaged through the loss of appreciated value in their digital assets based on the price they "paid" for their alleged securities. Opp'n 70–72. But Plaintiffs have no argument for why they are

entitled to such appreciated value under the securities laws, and Plaintiffs never "paid" anything to Genesis—they *loaned* their assets and are receiving potentially a full recovery for those assets in the pending bankruptcy. Unless and until Plaintiffs actually—not hypothetically—incur damages, they have no recourse under the Exchange Act.

**B.   Plaintiffs Fail to Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation**

All of the above demonstrates the lack of sufficient allegations of securities fraud committed by anyone. But even if Plaintiffs had alleged a primary violation of the Exchange Act by others, the DCG Defendants established in their Motion the absence of any sufficient allegations establishing *their* control over, or culpable participation in, the conduct in question. *See* Mot. 16–24. Put simply, the allegations in the Amended Complaint have very little to do with DCG—they concern the conduct of DCG's *subsidiary*, Genesis. And since it is well established that a mere parent-subsidiary affiliation is insufficient to impute securities liability, *see DoubleLine Capital LP v. Odebrecht Finance, Ltd.*, 323 F. Supp. 3d 393, 460–61 (S.D.N.Y. 2018), Plaintiffs' conclusory allegations of control fail.

**1.   Plaintiffs Fail to Plead Actual Control**

Plaintiffs make little effort to defend their control allegations under the Exchange Act. They concede that control under the Exchange Act requires "actual control over the *transaction* in question," and then state in conclusory fashion that "[t]he facts showing that Defendants controlled [Genesis] are set forth in [the background section]." Opp'n 75. That statement is contradicted by the ample precedent the DCG Defendants offered in their Motion. *See* Mot. 18–22. As the DCG Defendants explained, unremarkable connections between two companies such as a parent-subsidiary relationship, *see DoubleLine*, 323 F. Supp. 3d at 460–61, access to books and records, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005), and even control

over general "management and policies," *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d 391, 396 (S.D.N.Y. 2003), are all insufficient to establish control over the transaction in question. So too are leadership positions at a parent corporation, *see In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 167 (S.D.N.Y. 2012), and officer or director status, *see In re Sotheby's Holdings, Inc. Sec. Litig.*, 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000). The DCG Defendants cited each of these cases to show that Plaintiffs had not alleged actual control by any of the DCG Defendants, yet Plaintiffs did not offer a response *to any of them*. That is reason enough to dismiss the Exchange Act claims.

Instead, Plaintiffs rely on a single case—*Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 340 (D. Conn. 2011)—which is of no aid to them. *See* Opp'n 74–75. There, the court held that "the mere ability to give advice, to persuade, and to give counsel, may not always constitute control." *Poptech*, 792 F. Supp. 2d at 340. The allegations there, however, rose above that level, because the entities "operated as a single entity," the controlling party "approv[ed] investor communications," and investors were told that the controlling party would send certain communications to investors itself. *See id.* There are no such allegations here: Plaintiffs do not dispute that all corporate formalities were observed or that Genesis was responsible for its own statements. Plaintiffs' conclusory control allegations fail to establish that Defendants actually controlled the formulation and dissemination of any of Genesis's alleged misstatements. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 427 (S.D.N.Y. 2020) ("[t]he power to influence managerial decisions is not the same as the power to direct the management and policies of the primary violator.").

### 2.      Plaintiffs Fail to Plead Culpable Participation

As to culpable participation, Plaintiffs ignore the DCG Defendants' cases and repeat the allegations of the Amended Complaint.  *See* Opp'n 55–57, 76.  For example, Plaintiffs say it was in DCG's and Silbert's interest to commit fraud so as increase the fund management fees earned by Grayscale, a DCG subsidiary.  Opp'n 55–56.  But the DCG Defendants already pointed out that such motivation, even if accepted, would run to Grayscale, not DCG or Silbert.  Mot. 26.  And moreover, mere desire to increase fund performance or associated fees is the kind of generalized motive insufficient to establish culpable participation.  *See Steed Fin. LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 278 (S.D.N.Y.2003) ("a motive to commit the fraud because the better the funds' performance, the higher [the] fees, is analogous to the argument previously rejected that an executive has a motive to commit fraud merely because his compensation is tied to stock price.").  Plaintiffs also assert that Silbert and other insiders were able to withdraw capital from Genesis through the alleged fraud, *see* Opp'n 56, overlooking that all of the alleged capital withdrawals occurred *before* the 3AC default, *see* Mot. 23 (citing AC ¶¶ 247–53, 293–94).[5]  Plaintiffs additionally offer a novel theory regarding DCG's desire to forestall its repayment obligations to Genesis, *see* Opp'n 56, but this theory appears nowhere in the AC and is unsupported by any allegations.

Culpable participation requires pleading facts that give rise to a "strong inference" of scienter.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 447 (S.D.N.Y. 2005).  Alleging an indirect financial benefit to the DCG Defendants from the continued operation of Genesis does not suffice.  *Cf. Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008)

---

[5] Plaintiffs apparently concede they have no plausible allegations that Silbert was an investor in the HQ Cash Management Fund, and given the timing of that fund's withdrawal, it would not matter if he did.  *See* Mot. 23.

(adequate motive where the defendants had a "*personal* financial investment" in the fraudulent fund).  Even an allegation that the fraud was undertaken "'to protect the very survival of the company' is 'far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit.'"  *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011).  Plaintiffs have failed to allege anything coming even close to culpable participation, and the Exchange Act claims against the DCG Defendants may be dismissed for that reason alone.

## II.     Plaintiffs Fail to Plead "Scheme Liability"

Defendants' Motion established that Plaintiffs' claim for "scheme" liability impermissibly repackaged its control-person allegations and was insufficient on its own terms.  *See* Mot. 24–27. Plaintiffs' arguments to the contrary uniformly fail.

*First*, Plaintiffs concede that misstatements "cannot form the sole basis" for scheme liability, *see SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022), but argue that the "knowing dissemination" of misstatements suffices, Opp'n 72.  That is true, but irrelevant:  What the cases Plaintiffs cite hold is that a defendant who "disseminate[s] false or misleading statements" made by another can be liable for scheme liability.  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1099 (2019); *see also Rio Tinto*, 41 F.4th at 53.  But Plaintiffs' theory of scheme liability is not that the DCG Defendants disseminated any of Genesis's alleged misrepresentations to investors; instead, Plaintiffs contend that the DCG Defendants "caused" Genesis to make the misrepresentations. Opp'n 72.  That theory is squarely foreclosed by Second Circuit precedent.  *See Rio Tinto*, 41 F.4th at 53–54.

*Second*, Plaintiffs ignore entirely the fact that the alleged scheme post-dates the "purchases" of the purported "securities," rendering any notion of scheme liability a temporal impossibility.  *See* Mot. 25.  The first of the allegedly deceptive acts constituting the scheme began in June 2022, *see* AC ¶¶ 28, 505(a)–(b), long post-dating Plaintiffs' executions of their Lending

Agreements.  Thus, the alleged scheme has no direct connection to the purchase or sale of any security, as it must to withstand dismissal.  *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402–04 (S.D.N.Y. 2013) (no scheme liability where purported scheme post-dated decision to transact in securities).  Plaintiffs have no response at all on this score.

*Third*, Plaintiffs provide nothing in support of their conclusory assertion that the two intercompany loans "are paradigmatic examples of schemes to defraud."  Opp'n 73.  Ordinary inter-affiliate transactions are not "inherently deceptive" and thus do not give rise to scheme liability.  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  That is true even if a plaintiff disagrees with the commercial terms of a transaction.  *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 251–52 (S.D.N.Y. 2018).  There is nothing fraudulent about loaning money to or executing a promissory note in support of a subsidiary.  Plaintiffs' own case proves the point:  In *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), the court held that financial institutions' execution of transactions that "were by nature deceptive"—insofar as "[t]hey depended on a fiction, namely that the invoices [securitized and factored by the defendants] had value"—could give rise to scheme liability.  *Id.* at 504.  But the court rejected that other transactions that "were not shams" and did not "depend on any fictions" could form the basis for scheme liability, noting that "[a]ny deceptiveness resulted from the manner in which [the loan recipient] or its auditors described the transactions on [its] balance sheets and elsewhere."  *Id.* at 505.  That is precisely the circumstance here.[6]

---

[6] Plaintiffs' other case on this point is even further afield—it involved an allegation that the defendant in question was the "orchestrator" of a scheme and "directly ordered a subordinate to issue false and misleading statements on behalf of the firm."  *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 474 (S.D.N.Y. 2004).  None of that is alleged here.

With no substantive response, Plaintiffs fall back on the Exchange Act's purpose to "achieve a high standard of business ethics in the securities industry." *Lorenzo*, 139 S. Ct. at 1103 (citation omitted); *see* Opp'n 74. At the point when Plaintiffs are invoking general statutory purpose, they have effectively conceded the issue.[7]

## III.   Plaintiffs' Section 15 Claim Should Be Dismissed

Plaintiffs' claims under the Securities Act likewise fail for multiple reasons, and Plaintiffs' opposition serves only to reinforce those defects. Most tellingly, Plaintiffs tie themselves in knots trying to define the relevant "security," vacillating between different formulations at different parts of their brief. But even setting aside that threshold problem, Plaintiffs still cannot overcome the numerous dispositive grounds for dismissal.

### A.   Plaintiffs Cannot Identify the Relevant "Security"

Plaintiffs have worked hard to make this motion more complex than necessary. In their AC, Plaintiffs repeatedly identified the Lending Agreements as the purported securities, Mot. 8 n.1, and the DCG Defendants focused on the Lending Agreements in their Motion, *see* Mot. 30–36. In their opposition, Plaintiffs again repeatedly refer to the relevant securities as "the Genesis Yield Investment Agreements."[8]

---

[7] For the reasons stated in Defendants' culpable participation section, Plaintiffs' allegations of motive also fail. *See supra* § I.B.2.

[8] *See, e.g.*, Opp'n 2 ("the Genesis Yield Investment Agreements are 'investment contracts' under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), [and] "notes" under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990)"); *id.* at 4 ("the Genesis Yield Investment Agreements are securities under both *Howey* and *Reves*"); *id.* at 19 n.13 ("the Complaint alleges that GGC actively solicited investments from Plaintiffs who purchased the Genesis Yield Agreements directly from GGC as a result of GGC's solicitation efforts."); *id.* at 20 ("The Genesis Yield Investment Agreements Are 'Securities'"); *id.* at 21 ("The Complaint adequately alleges that the Genesis Yield Investment Agreements are notes under *Reves*."); *id.* at 22 ("The Motivations of GGC and Investors Demonstrate that Genesis Yield Investment Agreements are Securities"); *id.* ("The Complaint specifically alleges that GGC offered Genesis Yield Investment Agreements to obtain crypto assets for use in its business"); *id.* at 27 ("The Expectations of the Investing Public were that the Genesis Yield Investment Agreements were Investments"); *id.* at 29 ("The economic realities of the Genesis Yield Investment Agreements . . . would be perceived reasonably by the investing public as an offering of securities."); *id.* at 30 ("There is no alternative regulatory regime or risk reducing factors to protect Genesis Yield Investment Agreement investors."); *id.* at 31 ("Genesis Yield Investment Agreements Are Investment Contracts Under *Howey*"); *id.* at 32 ("The Complaint alleges that Genesis Yield Investment Agreements were an investment opportunity"); *id.*

Yet Plaintiffs now claim in their opposition—although only at certain opportune moments—that the Lending Agreements are only "a component of a larger investment opportunity" constituting *one* purported security: "Genesis Yield."  Opp'n 10, 16.  Plaintiffs cannot "amend pleadings through a brief," *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022), and they also cannot describe the Lending Agreements as the relevant securities for some purposes but advance a different theory for others, *see Champions League, Inc. v. Woodard*, 224 F. Supp. 3d 317, 323 (S.D.N.Y. 2016) (no security sufficiently alleged where allegations are "vague and confusing" and do not "explain what securities were allegedly purchased").  But even if these defects could be overlooked, Plaintiffs' bait-and-switch still fails.

There is no "Genesis Yield" security.  That is a construct created by Plaintiffs improperly conflating two different lending agreements (MBA and MLA) and two distinct lending relationships (institutional lenders and Gemini Earn lenders).  These two types of Lending Agreements both set forth frameworks for lenders to loan digital assets to Genesis, but differed in other material ways.  The MBA provided that Genesis could initiate a loan by sending a lending request to qualified lenders with proposed terms.  MBA § II(b); *see also* Mot. 4.  Each lender could then negotiate any of the terms (including the Loan Fee) with Genesis, and if an agreement was reached, the final terms were memorialized in a separate term sheet.  MBA § II(b).  The MLA, on the other hand, provided that a lender could initiate each loan by directing Gemini to lend digital assets on its behalf to Genesis based on the terms offered on the Gemini Earn Platform.  *See* MLA § II(a), (b).  This difference in structure affects—and is potentially dispositive of—numerous

---

("The Genesis Yield Investment Agreements involved: (i) an investment of money (ii) in a common enterprise, and (iii) with a reasonable expectation of profits derived from GGC's efforts" (citations omitted)).

issues under the Securities Act, including statutory standing, investment in a common enterprise, and plan of distribution, to name just a few.  Moreover, nearly all of the representations alleged to have influenced lenders' decision to invest in "Genesis Yield" concerned the Gemini Earn program.

Plaintiffs' shifting theory for what constitutes the alleged security here render its arguments under the Securities Act claim unpersuasive and implausible.  This Court could dismiss on that basis alone, but as set forth below, Plaintiffs' approach gives rise to a host of other problems that independently warrant dismissal.

### B.    The Securities Act Claim Is Barred by the One-Year Statute of Limitations

The DCG Defendants explained that all of the Securities Act claims fall outside the one-year statute of limitations, because the supposed sale or offer of securities occurred no later than November 2021.  Mot. 27–28.  In response, Plaintiffs do not dispute those underlying facts, but assert that their Section 15 claim is timely because the alleged violation occurred when "investors tendered their digital assets or cash to GGC in exchange for interest payments."  Opp'n 13.  That simply makes no sense—the delivery of digital assets to Genesis (or to Gemini) is not and cannot be a "security" in its own right, because there is no purchase, sale, or offer of anything. *See infra*. Part III.D.  All of the arguments Plaintiffs make about why the Lending Agreements qualify as securities—the motivation of the parties, the plan of distribution, the expectations of the parties, the existence of a common enterprise, *etc.*—concern the contractual structure erected by the Lending Agreements.  Unlike an actual security—which carries with it equity rights or terms of repayment—the delivery of digital assets was just that: A delivery of digital assets.  If there are any securities here, they are the Lending Agreements that Plaintiffs say bear the attributes of a security.  How the parties *performed* under those contracts is immaterial—it would be absurd to say, for example, that a "sale" of a security occurred each time Genesis paid interest on loaned

assets, yet that is the implication of Plaintiffs' position.  Properly framed, then, Plaintiffs' Securities Act claims are too late and should be dismissed as untimely.[9]

### C.    Plaintiffs Fail to Plead Statutory Standing With Respect to a "Sale" or "Offer"

Plaintiffs likewise cannot overcome the AC's failure to allege that Genesis is a statutory seller, because there was no "purchase" or "sale" for value.  Mot. 28–30.  Plaintiffs make up a concept in opposition that Genesis "passed an interest in a security for value," *see* Opp'n 15, but do not explain what they means by that.  What interest did Genesis "pass" when Plaintiffs executed their Lending Agreements, or loaned their digital assets?  Plaintiffs do not say, asserting baldly that Genesis "offered to sell Genesis Yield."  *Id.*  Plaintiffs' inability to articulate an actual "sale" is fatal.  *See Champions League*, 224 F. Supp. 3d at 323.

Plaintiffs argue that even if the Lending Agreements are the relevant "securities," Genesis was nonetheless involved in the "solicitation" of a purchase or sale of a security through its website advertising.  *See* Opp'n 18–19.  But this argument simply leads back to the issue that Plaintiffs have not alleged an underlying purchase or sale at all.  "[A] prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities." *Pinter v. Dahl*, 486 U.S. 622, 644 (1988); *see also In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 335 (S.D.N.Y. 2021) (similar).  Without a "purchase" or "sale" of a security— which Plaintiffs have not and cannot allege—any involvement by Genesis in the supposed "solicitation" process is immaterial.  Accordingly, Plaintiffs lack statutory standing, as they never purchased or sold a security for value.

---

[9] Plaintiffs erroneously argue that this issue cannot be resolved on a motion to dismiss because it is an affirmative defense. Opp'n 13. However, the law is clear: "[A] statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).

D.    **The Lending Agreements Are Not Securities**

Plaintiffs' confused and inconsistent explanations of what supposedly constitutes a security

or a purchase thereof all lead to the same conclusion:  This not a securities case.  Depositing assets

with another party in exchange for regular interest payments is not a security, and indeed, the

standard tests for evaluating whether something is a security do not even logically apply to most

aspects of the Lending Agreements.  The DCG Defendants established this mismatch in detail in

their Motion.  *See* Mot. 30–36.

In opposition, Plaintiffs do not cite a single case in which a deposit and interest arrangement

like that at issue here was held to be a security.  They accuse the DCG Defendants of failing to

adduce legal support specifically holding that this arrangement is not a security, overlooking that

it is *their* burden to establish the existence of a security in the first place.  *See Harte v. Ocwen Fin.*

*Corp.*, 2016 WL 3647687, at *4 (E.D.N.Y. July 1, 2016) ("Plaintiff has the burden of pleading

each element of her claim.").  The DCG Defendants cannot prove a negative.  Plaintiffs' various

efforts to fit a round peg in a square hole fail, and the Section 15 claims—as well as the Exchange

Act claims—can be dismissed on this additional basis.[10]

The  DCG  Defendants'  motion  to  dismiss  clearly  demonstrated  that  the  Lending

Agreements cannot constitute a security either under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)

or *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  Mot. 30–36.  In response, Plaintiffs resort to

---

[10] Despite Plaintiffs' claim, the DCG Defendants did not concede that Genesis Yield is an evidence of indebtedness under 15 U.S.C. 77(b)(a)(1).  Mot. 20 n.16.  Plaintiffs offered no factual support to assert this purely conclusory statement, and indeed, besides mention in one paragraph of the 556-paragraph Complaint, Plaintiffs do not advance any allegations showing evidence of indebtedness.  Legal conclusions, without more, must be disregarded and do not need to be addressed.  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir.2006) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss"); *Kenshoo, Inc. v. Aragon Advert., LLC*, 586 F. Supp. 3d 177, 185 (E.D.N.Y. 2022) ("The pleading standard set by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), requires courts to remove conclusory assertions and legal conclusions in assessing the sufficiency of a complaint.").

repeating the allegations of their AC, distorting the language of the Lending Agreements, and mischaracterizing the DCG Defendants' arguments.  This proves fatal to Plaintiffs' Section 15 claim.[11]

### 1.   There is No Security Under *Howey*

Plaintiffs fail to allege how the Lending Agreements (or "Genesis Yield") satisfy any of the elements required under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

### a.  Plaintiffs Fail to Allege Common Enterprise

There are no well-pled allegations that Plaintiffs invested in a common enterprise through horizontal commonality, because there was no sharing of profits or losses.  *See* Mot. 31–32.  Plaintiffs advance four counterarguments in their opposition, each of which fails.

*First*, Plaintiffs contend that the AC sufficiently alleged pooling because Genesis "did not manage separate accounts."  Opp'n 33.  But that is not what is meant by "pooling"—even a deposit bank pools its customers' deposits.  As the DCG Defendants' explained, pooling occurs not when assets are comingled, but "when the funds received are 'reinvested by the promoter into the business' and '[i]n turn, such reinvestment *increases the value of the instrument offered*.'"  Mot. 31 (citing *Friel v. Dapper Labs, Inc*., 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023)).

*Second*, Plaintiffs invoke a straw man argument to address the DCG Defendants' argument that Plaintiffs' "profits" derived solely from a contractual Loan Fee, asserting that a *pro rata* distribution of profits is not required.  Opp'n 33–34.  This uncontroversial restatement of the law does not defeat the fact that Plaintiffs' returns (*pro rata* or otherwise) were promised irrespective of Genesis's overall success.  Even if Genesis was not profitable, Plaintiffs were still contractually entitled to their Loan Fee.  Mot. 31 (citing MLA § III(a); MBA § III(a)).  Plaintiffs *never* risked

---

[11] Plaintiffs' failure to plead a cognizable security also dooms their Sections 10(b) and 20(a) claims.  *See* Mot. 30 n.19.

loss while the alleged Genesis Yield program was operational, and it is an essential element under *Howey* that "the investor must risk loss." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985).

*Third*, Plaintiffs erroneously claim that their "yields" were dependent on Genesis's efforts, asserting for the first time that when Genesis "achieved higher returns from its efforts in redeploying investors' assets, yields increased," and, conversely, when Genesis's "business performed poorly, yield[s] declined." Opp'n 34–35. Plaintiffs seem to conjure this allegation out of thin air: Neither the AC nor the Lending Agreements describe any correlation between the Loan Fee (or yields) and Genesis's business. In fact, the AC clearly alleges that any variation in the Loan Fee (at least as to Gemini Earn Plaintiffs) was dependent on market forces, not on the efforts of Genesis. *See infra* Part III.D.1.b.

*Lastly*, Plaintiffs argue that Genesis's decision to freeze redemptions shows that their fortunes were tied to Genesis's success (and failure). Opp'n 35. Wrong again: Under Plaintiffs' theory, every loan would constitute a security, because every loan inherently depends upon the borrower remaining solvent and capable of repayment. Mot. 32; *see also cf. Intelligent Digital Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010) ("While payment might not . . . be made in the event of default, that default is not something that is unique to any 'investment-like' character of the asset purchase, but is a risk attendant to any sale.").[12]

### b. Plaintiffs Fail to Allege Expectation of Profits

---

[12] While Plaintiffs claim that the DCG Defendants ignore whether the AC pleads common enterprise through strict vertical commonality, this is incorrect. Opp'n 35. Similar to horizontal commonality, strict vertical commonality requires that the fortunes of the investor and the overall venture are linked so that the fortunes must rise and fall together. *See Friel*, 657 F. Supp. at 436. Thus, for all the same reasons there is no horizontal commonality, there likewise is no strict vertical commonality.

The DCG Defendants also explained that Plaintiffs cannot establish *Howey*'s third prong—that Plaintiffs had a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *SEC v. Ripple Labs, Inc.*, --- F. Supp. 3d ---, 2023 WL 4507900, at *9 (S.D.N.Y. July 13, 2023). Plaintiffs' opposition offers only circular reasoning: Because Genesis lent out digital assets in its business, Plaintiffs say Genesis could continue offering specific yields only based on those lending efforts. Opp'n 36–37. Again, however, that Genesis's efforts maintained its solvency and allowed Genesis to pay interest is common in every lending or interest-bearing deposit transaction and does not satisfy this element. *See SEC v. Terraform Labs Pte. Ltd.*, --- F. Supp. 3d ---, 2023 WL 4858299, at *14 (S.D.N.Y. July 31, 2023). Any objective investor would have reasonably understood that their perceived profitability derived only from a contractually prescribed Loan Fee. Mot. 33–34. Plaintiffs' repeated invocation of Genesis and Gemini's advertisements changes nothing: Plaintiffs held themselves out as sophisticated parties (MLA § V(d); MBA § VI(d)) and executed Lending Agreements that offered clear terms, *see* Mot. 34. Public advertisements can neither override the known terms nor change the character of the transaction. Mot. 34 n.22 (citing *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir. 2011).

Just because Plaintiffs say "rates of interest offered by GGC varied based on GGC's efforts," Opp'n 37, does not make it so. At most, Plaintiffs claim Genesis offered a market-based rate. *See, e.g.*, AC ¶ 152. To the extent this rate varied, Plaintiffs themselves concede that it was due to changes in the value of the digital asset loaned, illustrating that the cryptocurrency market set Plaintiffs' expectations. AC ¶¶ 152, 154; *see also SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (*Howey* not met where "realization of profits depends significantly on the post-investment operation of market forces"); *Lehman Bros. Com. Corp. v. Minmetals Int'l Non-*

*Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no investment contract where "any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts").  Moreover, for the Gemini Earn Plaintiffs, it was *Gemini*, not Genesis, that advertised the interest rates.  *See* AC ¶ 154.  To the extent the Gemini Plaintiffs had a different expectation owing to Gemini's representations, that does not alter Genesis's liability as an alleged securities issuer.

### 2.      There Is No Security Under *Reves*

The AC likewise fails to plead that the Lending Agreements (or Genesis Yield) constituted "security notes" under *Reves*.  As the DCG Defendants demonstrated in their motion to dismiss, each *Reves* factor weighs decisively against Plaintiffs.  *See* Mot. 34–36.

*First*, Plaintiffs do not meaningfully dispute that they shared the same motivations as any lender.  In *Banco Espanol de Credito v. Security Pacific National Bank*, the lenders sought "a short-term vehicle that would earn a fixed rate of interest that was higher than alternative money market instruments." 763 F. Supp. 36, 43 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992).  Yet the Second Circuit affirmed that this arrangement represented only a commercial interest, not an investment interest.  *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d at 55.  So too here:  The primarily open-term nature of the Lending Agreements illustrates that loans were intended to be short term rather than to speculate on Genesis's business acumen and long-term success.  MLA § II(c); MBA § II(b); *see also Intelligent Digital Sys., LLC*, 683 F. Supp. 2d at 284 (finding the motivations of the seller were commercial where "the amount to be paid is contractually established, and must be paid, whether or not the buyer's business is positively affected by the purchase").

*Second*, Plaintiffs disregard that the terms of the Lending Agreements significantly limited the plan of distribution.  Plaintiffs deride the DCG Defendants' discussion of the lack of a

secondary market as "specious," Opp'n 26 (citing out-of-circuit precedent), but the law is clear that the absence of such a market is highly relevant, *see Nat'l Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1015 (S.D.N.Y. 1991) ("Since there is no allegation that there was a secondary market for the time deposits, the Bank does not show that there was "'common trading for speculation or investment'" in the notes."); *see also Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 306–07 (2d Cir. 2023) (finding the "restrictions on any assignment of the Notes rendered them unavailable to the general public").  Moreover, the AC alleges that Plaintiffs were subject to various lending minimums and other restrictions before they could even execute a Lending Agreement., AC ¶ 114, undermining Plaintiffs' argument to the contrary, Opp'n 26 n.18.  Ultimately, "[t]his factor takes into account the fact that Congress intended the securities laws to protect unsophisticated investors," *Intelligent Digital Systems, LLC v. Visual Management. Systems, Inc*., 683 F. Supp. 2d 278, 285 (E.D.N.Y. 2010), which Plaintiffs represented they are not, MLA § V(d); MBA § VI(d).

*Third*, Plaintiffs again misrepresent the alleged "yields" they were contractually entitled to as proof that the investing public would have expected the Lending Agreements to be securities. Opp'n 27.  As explained above, the plain terms of the Lending Agreements neutralized any expectation that these would be traded as securities.  And because the Lending Agreements were not commonly traded (Mot. 36), the Court need not even consider this *Reves* factor, *see Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La.), *aff'd*, 917 F.2d 560 (5th Cir. 1990).

*Finally*, there are no well-pled allegations that Plaintiffs were not adequately protected by risk-reducing factors.  While Plaintiffs may now think the regulatory oversight agencies did not sufficiently reduce risk, it does not follow that they were not sufficient for purposes of reducing

risk generally.  That lenders currently cannot access their digital assets is also a red herring:  There is no regulatory scheme that can invariably protect investors from a borrower's insolvency.

**E.**     **Plaintiffs Fail to Plead Actual Control**

Even if Plaintiffs could overcome all of the above, though, the Securities Act claims still fail for failure to allege actual control by the DCG Defendants of the relevant transactions for purposes of imputing liability.  The DCG Defendants detailed this shortcoming in their Motion, *see* Mot. 18–22, and Plaintiffs have no adequate response.

Plaintiffs dismiss all authority going against them by saying those cases arise under Section 20(a) of the Exchange Act—rather than Section 15 of the Securities Act—and are inapplicable because the higher pleading standard for fraud does not apply to the Securities Act.  Opp'n 40 & n.32.  This is a perplexing claim, because Plaintiffs later argue that the Rule 9(b) fraud pleading standard *does not apply to control allegations under the Exchange Act*.  Opp'n 75.  The DCG Defendants agree and have never argued otherwise, and that is why it is well settled that "the control analysis is the same for Section 15 as it is for Section 20." *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016); *see also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) (same); *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d at 395 (same).  For the same reason, Plaintiffs' effort to distinguish authorities holding that the relevant control is control "over the transaction in question" fails, *cf.* Opp'n 44–45, and indeed, courts do impose such a standard under Section 15, *see Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 578 (S.D.N.Y. 2012).  Plaintiffs thus baselessly ignore most of the precedent the DCG Defendants invoked, confirming they have no answer.

As discussed further above, Plaintiffs' allegations of control fall well short, *see supra* Part I.B, and the cases they cite under Section 15 are inapposite.  In *In re Independent Energy Holdings PLC Securities Litigation*, the court held there were sufficient allegations that the controlling entity

"was running the business of [the subsidiary] through common management."  154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001).  In *Yi v. GTV Media Group Inc.*, the plaintiffs alleged that the control person had "control over the day-to-day operations" of the controlled party, including with respect to hiring, "pa[ying] for the securities offering," and "provid[ing] instructions and investment documents to potential investors."  2021 WL 3500920, at *3 (S.D.N.Y. Aug. 6, 2021).  And while the court in *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, agreed that status as a "parent corporation" may be "relevant" to control, it also noted a host of other factors not alleged here:  whether "the controlled entity was incapable of taking, or unlikely to take, actions on its own"; "common officers, directors, personnel, and office space or other shared resources"; and whether the "putative controlling person" acted "on the controlled entity's behalf."  104 F. Supp. 3d 441, 575–76 (S.D.N.Y. 2015).  None of those facts are alleged here with respect to the DCG Defendants.

## IV.    Counts IV and V Should Be Dismissed Because Plaintiffs Fail to Adequately Allege An State-Law Claims in the Alternative

The AC cannot be saved by Plaintiffs' half-hearted inclusion of state-law tort claims.

### A.    Count IV Should Be Dismissed Because Plaintiffs Have Failed to Allege a CUTPA Claim

Plaintiffs fail to rebut the several grounds defeating their Connecticut Unfair Trade Practices Act ("CUTPA") claim.  *See* Mot. 37–38.

*First*, Plaintiffs' contrary assertion notwithstanding, it is black letter law that CUTPA claims premised on fraud allegations must be pled with 9(b) particularity.  *See, e.g., Lentini v. Fid. Nat'l. Title Ins. Co. of New York*, 479 F. Supp. 2d 292, 298 (D. Conn. 2007); *Tatum v. Oberg*, 650 F. Supp. 2d 185, 195 (D. Conn. 2009) (same).  Plaintiffs concede that their CUTPA claim is "premised on the same conduct that forms the basis of Plaintiffs' Exchange Act Claims."  AC ¶ 51. Accordingly, Plaintiffs' derivative CUTPA claim must likewise fail.  *See Lops v. YouTube, LLC*,

2023 WL 2349597, at *5 (D. Conn. Mar. 3, 2023).  As for control, Plaintiffs say the test under CUTPA is no different than under federal law, yet admits in a footnote that CUTPA also requires "knowledge of the wrongdoing at issue."  Opp'n 78 & n.41.  In any event, Plaintiffs do not dispute that the standard for control liability under the CUTPA is *at least* as high as that imposed by the securities laws, and for that additional reason, Plaintiffs' CUTPA claim fails.

*Second*, at the very least, Plaintiffs' proposed class does not have standing to bring a CUTPA claim.  CUTPA limits class action standing to only "residents of [Connecticut]" or those that were "injured in [Connecticut]."  Conn. Gen. Stat. § 42–110g(b).  Plaintiffs respond by citing Justice Scalia's non-controlling opinion in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), for the proposition that Federal Rule of Civil Procedure 23, not CUTPA, governs the ability of Plaintiffs to bring suit on behalf of a class.  Opp'n 78–79.  Yet every single court in this district to confront the relationship between CUTPA and Rule 23 has applied CUTPA's class-action limitations.  *See In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 115-19 (D. Conn. 2014); *Frasier v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498, 506-07 (D. Conn. 2015); *Chapman v. Priceline Grp., Inc.*, 2017 WL 4366716, *6-7 (D. Conn. Sep. 30, 2017).  Plaintiffs offer no reason to depart from this uniform view.

## B.   Count V Should Be Dismissed Because Plaintiffs Have Failed to Allege a NYUDTPA Claim

Plaintiffs' opposition also fails to salvage their New York Uniform Deceptive Trade Practices Act ("NYUDTPA") claim.  *See* Mot. 38–39.

As an initial matter, Plaintiffs have not alleged a sufficient connection to New York State.  According to Plaintiffs' own cases, "[t]he appropriate test under [NYUDTPA] is . . . the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction."  *FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 265 n.31 (S.D.N.Y. 2023)

(citation omitted).  Although pointing to a smattering of allegations evidencing (at best) tenuous connections to New York,[13] Plaintiffs fail to point to any allegation that even a single Genesis Yield transaction—the transactions at the heart of this action—occurred in New York.  Opp'n 81. That the New York Attorney General elected to file a NYUDTPA claim against DCG is irrelevant—the Attorney General's claims are subject to a lower territoriality standard than those "brought by consumers."  *See Roomster Corp.*, 654 F. Supp. 3d at 265.

Plaintiffs' NYUDTPA claim also fails on additional grounds.  Plaintiffs' attempt to impute Genesis's conduct to DCG based on purported "power and control," Opp'n 82, is insufficient to overcome "the presumption of corporate separateness" that insulates DCG from liability for the alleged misdeeds of its subsidiary, *McAnaney v. Astoria Financial Corp.*, 665 F. Supp. 2d 132, 144 (E.D.N.Y. 2009).  And the transactions alleged here concern private contracts and sophisticated parties exchanging funds "as [alleged] investments, not as a purchase of traditional consumer goods"—exactly the kind of contracts that fall outside the purview of NYUDTPA. *DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014); *see also Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 (2d Dep't 1995) (NYUDTPA does not apply to "complex arrangements, knowledgeable and experienced parties and large sums of money").

## **CONCLUSION**

For the foregoing reasons, the AC should be dismissed with prejudice.

---

[13] For example, Plaintiffs cite (1) the location of DCG's offices, despite the fact those offices were relocated to Connecticut in the fall of 2021, well before any of the fraud alleged in the complaint occurred; and (2) Silbert's current residence, despite acknowledging that he was actually a Connecticut resident for the duration of the class period.  AC ¶¶ 58–59.

DEFENDANTS DIGITAL CURRENCY
GROUP, INC., BARRY SILBERT, GLENN
HUTCHINS, LAWRENCE LENIHAN, AND
MARK MURPHY


By: */s/ Jonathan D. Polkes*
Jonathan D. Polkes (admitted *pro hac vice*)
Caroline Hickey Zalka (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
jonathan.polkes@weil.com
caroline.zalka@weil.com

Joshua M. Wesneski (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
joshua.wesneski@weil.com

*/s/ Thomas D. Goldberg*
Thomas D. Goldberg (ct04386)
Johanna S. Lerner (ct31495)
DAY PITNEY LLP
One Stamford Plaza
263 Tresser Boulevard
Stamford, CT 06901
Telephone: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
jlerner@daypitney.com
*Their Attorneys*