**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, MICHAEL MORO, and DERAR ISLIM,<br><br>Defendants. | Case No.: 3:23-cv-00082-SRU |

**LEAD PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Lead Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto, LP, Christopher Buttenham, and Remo Maria Morone respectfully submit this Notice of Supplemental Authority. On March 13, 2023, the court in the action captioned *Securities and Exchange Commission v. Genesis Global Capital, LLC., and Gemini Trust Company, LLC,* No. 23-cv-00287 (ER) (S.D.N.Y.) denied defendants' motion to dismiss. A copy of the Opinion & Order is attached hereto. The Opinion & Order is relevant to the arguments set forth in Lead Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions To Dismiss (ECF No. 147), at 15-36.

Dated: March 13, 2024

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Jeffrey P. Campisi*
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris
800 Third Avenue, 38th Floor

New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

**SILVER GOLUB & TEITELL LLP**
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com

*Lead Counsel for Lead Plaintiffs and the
Proposed Class*

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on March 13, 2024 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey P. Campisi*
Jeffrey P. Campisi

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                     Plaintiff,

      – *against* –

GENESIS GLOBAL CAPITAL, LLC,
*and* GEMINI TRUST COMPANY, LLC,

                     Defendants.

**OPINION & ORDER**

23-cv-00287 (ER)

RAMOS, D.J.:

The Securities and Exchange Commission (SEC) brought this action against Genesis Global Capital, LLC, and Gemini Trust Company, LLC, alleging that they offered and sold unregistered securities through the Gemini Earn program. Both Defendants have moved to dismiss the complaint or, in the alternative, to strike two of the SEC's requested remedies. For the reasons set forth below, the motions are DENIED.

## I.  BACKGROUND

Unless otherwise noted, the following facts are taken from the allegations in the complaint, which the Court accepts as true at this stage. *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### A.  The Parties

Genesis is a Delaware limited liability company formed in 2017. Doc. 1 ¶ 16. It advertises itself as the "premier institutional digital asset financial services firm" and "the world's largest digital asset lender." *Id.* Gemini is a New York limited liability trust company founded in 2014. *Id.* ¶ 17. It is registered with the New York State Department of Financial Services. *Id.*

### B.  The Gemini Earn Program

In March 2018, Genesis began obtaining crypto assets from institutional and accredited investors—meaning investors with the "financial sophistication and ability to

sustain the risk of loss of investment or fend for themselves." *Id.* ¶ 23; *see also id.* ¶ 2 n.1.  In exchange, Genesis promised to pay interest on those assets.  *Id.* ¶ 23.  Genesis then pooled the investors' crypto assets and lent them to institutional borrowers.  *Id.*  This practice generated revenue for Genesis to pay the interest promised to its investors.  *Id.* The company earned profits by lending the assets to institutional borrowers at a higher rate than it paid to investors.  *Id.*[1]

Genesis eventually expanded this business model to include retail investors.  *Id.* ¶ 24.  In December 2020, Defendants agreed to offer Gemini customers—including U.S. retail investors—an opportunity to tender crypto assets to Genesis.  *Id.*  In exchange, again, Genesis promised to pay interest on those assets.  *Id.*  Defendants referred to this investment opportunity as the Gemini Earn program.  *Id.* ¶ 1.

Defendants made Gemini Earn available to retail investors in February 2021.  *Id.* ¶ 25.  Each investor entered into a standard agreement with Genesis and Gemini.  *Id.* ¶ 26.  That agreement was labeled as a "Master Digital Asset Loan Agreement" and stated that "[e]ach Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws."  Doc. 32-1 at 1, 16.[2]

To participate in Gemini Earn, investors had to hold eligible crypto assets with Gemini.  Doc. 1 ¶ 26.  Gemini published a list of more than fifty eligible crypto assets— including Bitcoin, Ether, USD Coin, and Dogecoin—and the interest rates offered on its website and mobile application.  *Id.* ¶ 29.  Investors would tender their crypto assets to

---

[1] The complaint defines "crypto assets"—also referred to as "digital assets"—as assets that are "issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called 'cryptocurrencies,' 'coins,' and 'tokens.'"  Doc. 1 ¶ 21; *see also id.* ¶ 16 n.2.  And it defines a blockchain or distributed ledger as "a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages."  *Id.* ¶ 22.

[2] Each Defendant attached a copy of the agreement to its motion to dismiss.  Docs. 32-1, 35-1.  (The two copies do not differ in substance, so the Court cites only Doc. 32-1.)  The Court may consider the agreement because it is incorporated into the complaint by reference.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Genesis, with Gemini facilitating the transaction as the investors' agent.  *Id.* ¶ 26.  In that role, Gemini aggregated the crypto assets and placed them in a "digital wallet" for Genesis.  *Id.*

Genesis, in turn, determined which crypto assets—and in what amounts—were eligible to be invested.  *Id.* ¶ 27.  The company offered investors in-kind interest on their crypto assets.  *Id.*  Genesis could unilaterally revise the interest rates on a monthly basis.  *Id.*  Investors thus received returns from Genesis, with an agent fee deducted by Gemini.  *Id.* ¶ 28.  Genesis had sole discretion over the interest rate it paid, while Gemini had sole discretion over its agent fee.  *Id.*  As of October 2022, the net interest rate offered to investors ranged from 0.45% to 8.05%.  *Id.* ¶ 30.  Gemini's agent fee ranged from 0.06% to 4.29%.  *Id.*  In one three-month period, Gemini received approximately $2.7 million in agent fees from Gemini Earn.  *Id.*

The Gemini Earn agreement provided that the crypto asset transactions were "open term" unless otherwise specified, and participants could terminate their investment at any time with no withdrawal fee.  *Id.* ¶ 31.  If an investor requested repayment, Genesis was obligated to return the invested crypto assets to a digital wallet controlled by Gemini.  *Id.*  Gemini would then transfer the crypto assets and any accrued interest to the investor's Gemini account, where they would be available for withdrawal.  *Id.*  Any failure by Genesis to return crypto assets or to pay interest to an investor would be considered a default.  *Id.* ¶ 32.

Both Defendants advertised the Gemini Earn program to investors.  The Genesis website explained that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis."  *Id.* ¶ 33 (alteration in original).  Genesis also highlighted its partnership with Gemini—and the yield that retail investors could earn—in tweets.  *Id.*

Gemini likewise touted the potential profits for investors from Gemini Earn.  *Id.* ¶ 34.  In a February 2021 press release, Gemini's CEO said:  "We designed a program that allows our customers the ability to generate a real return on their crypto holdings."

*Id.* Gemini's website stated: "We are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." *Id.* In addition, the website listed the interest rates that investors could earn for each eligible crypto asset. *Id.* Tweets from Gemini further emphasized the high interest rates offered through Gemini Earn. *Id.*

The Gemini website described Gemini Earn as an investment. *Id.* ¶ 35. One section discussed the risks of the program in these terms:

> Cryptocurrency, like many assets, can be volatile and subject to price swings. There is always a risk in <u>investing</u>, and each customer needs to assess their own risk tolerance before making any <u>investment decisions</u>. Our partners in Gemini Earn have an obligation to return funds according to the terms of their loan agreement. However, Gemini Earn customers (the lenders) always assume some level of risk when they decide to lend their funds. We believe Gemini Earn gives our retail investors another way to stay long-term in the asset class and have the <u>option to invest and earn interest</u>, all on the Gemini platform.

*Id.* (emphasis in complaint). The website included additional claims that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market," and that the program offered "more flexibility than other yield-generating cryptocurrency investments." *Id.* ¶ 36. A calculator feature allowed potential investors to estimate how much interest they could earn on their crypto assets. *Id.* ¶ 37.

By November 2022, approximately 340,000 retail investors had invested crypto assets through Gemini Earn. *Id.* ¶ 25. Genesis pooled the crypto assets it received from investors on its balance sheet; it did not segregate assets from different groups of investors. *Id.* ¶ 38. Genesis controlled these assets and exercised discretion as to how to use them to generate revenue and to pay the interest rates promised. *Id.* In general, Genesis would either lend Gemini Earn investors' crypto assets to institutional borrowers or use them as collateral for its own borrowing. *Id.* ¶ 39. Crypto assets not used for those purposes were held by Genesis on its balance sheet. *Id.* Genesis individually negotiated the terms of agreements with institutional borrowers, including the type of

crypto assets to be lent, interest rate, duration of the loan, and collateral. *Id.* ¶ 40. In doing so, Genesis separately evaluated each institutional borrower. *Id.* Gemini Earn investors' returns depended on "Genesis' evaluation of the Institutional Borrowers, negotiation of favorable terms, and management of market and counterparty risk." *Id.* ¶ 41.

Genesis used the interest income it received from lending crypto assets to institutional borrowers in order to pay the interest promised to Gemini Earn investors. *Id.* ¶ 42. In one three-month period, for instance, Genesis received approximately $169.8 million in interest income from institutional borrowers and paid $166.2 million in interest to crypto asset investors. *Id.* Genesis did not have any other revenue-generating activities. *Id.*

As of November 2022, Genesis held approximately $900 million in assets from Gemini Earn investors. *Id.* ¶ 7. At that time, Genesis announced that it would not allow retail investors to withdraw their crypto assets because of "withdrawal requests which have exceeded our current liquidity." *Id.*

The Gemini Earn program was terminated in January 2023, shortly before this lawsuit began. *Id.* ¶ 8.[3] But both Defendants remain active in the crypto asset industry. *Id.* According to the SEC, Genesis "intends to reengage in crypto asset lending activities," while Gemini "continues to hold billions of dollars' worth of crypto assets on behalf of retail investors." *Id.*

### C. Procedural History

The SEC filed this action on January 12, 2023, alleging that Defendants violated sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c). Doc. 1 ¶ 9. The SEC asks the Court to (1) permanently enjoin Defendants from violating sections 5(a) and 5(c)

---

[3] *See also* Press Release, *SEC Charges Genesis and Gemini for the Unregistered Offer and Sale of Crypto Asset Securities Through the Gemini Earn Lending Program*, U.S. Sec. & Exch. Comm'n (Jan. 12, 2023), https://www.sec.gov/news/press-release/2023-7.

of the Securities Act; (2) order Defendants to disgorge their ill-gotten gains, with prejudgment interest; and (3) impose civil money penalties on Defendants. *Id.* ¶ 12.

On May 26, 2023, both Defendants moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Docs. 30, 33. Each Defendant joined in the other's arguments, so the Court will address them together. Doc. 31 at 5; Doc. 34 at 1 n.1. Defendants also requested oral argument. Docs. 44, 45.

On September 15 and September 18, 2023, Defendants filed pre-motion letters asking the Court to stay discovery pending resolution of the motions to dismiss. Docs. 46, 47. The Court denied that request at a conference on October 18, 2023.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Koch*, 699 F.3d at 145. But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must "'raise a reasonable expectation that

discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. The Securities Act

Section 5 of the Securities Act makes it unlawful for any person to sell a security in interstate commerce without filing a registration statement. 15 U.S.C. § 77e; *see, e.g.*, *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011). "To prove a violation of Section 5 requires establishing three prima facie elements: (1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (quoting *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)). Only the first element—whether Defendants "sold or offered" a "security" within the meaning of the securities laws—is in dispute here.

The Supreme Court has explained that "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975)). "Congress painted with a broad brush," and it "determined that the best way to achieve its goal of protecting investors was to define the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." *Id.* at 60–61 (internal quotation marks and citation omitted). In other words, Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* at 61.

7

At the same time, Congress did not "intend to provide a broad federal remedy for all fraud." *Id.* (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)).  In determining which financial transactions are subject to the securities laws, courts must "take account of the economics of the transaction under investigation." *Id.*  Ultimately, "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Id.*

## III.  DISCUSSION

In this case, the SEC advances two independent theories as to how Defendants offered and sold unregistered securities.  The SEC asserts that (1) the Gemini Earn program constitutes an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and (2) the Gemini Earn agreements are notes under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).  At this stage, under both tests, the Court finds that the complaint plausibly alleges that Defendants offered and sold unregistered securities through the Gemini Earn program.[4]

### A.  The *Howey* Test

Section 2 of the Securities Act defines a "security" to include an "investment contract."  15 U.S.C. § 77b(a)(1).  *Howey* set out the test for evaluating a potential investment contract.  The Supreme Court held that "an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests

---

[4] Genesis has moved to dismiss under both Rule 12(b)(6) and Rule 12(b)(1).  Doc. 33.  It does not elaborate on the basis for dismissal under Rule 12(b)(1), which implicates a court's subject matter jurisdiction.  A Rule 12(b)(1) motion is typically not the proper vehicle to raise arguments about whether a plaintiff has alleged the "offer" or "sale" of a "security" because those elements are "integral to plaintiff's ability to state a claim."  *SEC v. Norton*, No. 95 Civ. 4451 (SHS), 1997 WL 611556, at *2 (S.D.N.Y. Oct. 3, 1997) (where defendant argued that court lacked subject matter jurisdiction because complaint failed to allege an offer or sale of any security, court denied Rule 12(b)(1) motion and proceeded to Rule 12(b)(6) analysis); *see also, e.g.*, *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 152–53 (2d Cir. 1984) (explaining that "when the contested basis of federal jurisdiction is also an element of plaintiff's asserted federal claim, the claim should not be dismissed for want of jurisdiction except when it 'appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous'" (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946))).  *See generally Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 468–69 (S.D.N.Y. 2014) (collecting cases rejecting Rule 12(b)(1) challenges to federal securities claims).  Here, as the discussion below demonstrates, the SEC's claim that Defendants offered and sold securities is not insubstantial or frivolous.  Accordingly, there is no basis for dismissal under Rule 12(b)(1).

his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298–99. Put differently, the *Howey* test requires "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

"This definition of investment contract 'embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (quoting *Howey*, 328 U.S. at 299). In conducting the analysis, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see also, e.g.*, *Forman*, 421 U.S. at 849 ("Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto."); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (noting that the inquiry focuses on "the economic reality and the totality of circumstances surrounding the sales"). "Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry." *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018).

*1. Investment in a Common Enterprise*

First, Defendants argue that Gemini Earn customers did not invest in a common enterprise. Doc. 34 at 9. As the Second Circuit has explained, a common enterprise "can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87. Horizontal commonality is present where "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Id.*

The SEC alleges that Gemini aggregated crypto assets from Gemini Earn investors and placed them in a digital wallet for Genesis.  Doc. 1 ¶ 26.  Importantly, after Genesis took possession of those assets, it pooled them on its balance sheet rather than segregating different assets from different investors.  *Id.* ¶ 38.  Relying on its discretion and judgment, Genesis then lent the crypto assets to institutional borrowers.  *Id.* ¶¶ 39–40.  Genesis used the interest it received from those transactions to pay Gemini Earn investors.  *Id.* ¶ 42.  The complaint thus alleges that "[t]he returns earned by each Gemini Earn investor were reliant on the pooling of the invested crypto assets and the ways in which Genesis deployed those assets."  *Id.* ¶ 41; *see also id.* ("[T]he returns of Gemini Earn investors were dependent on Genesis' managerial efforts and risk management in its lending activities.").

The Court can plausibly infer from these allegations that horizontal commonality is satisfied.  The decision in *Kik* is instructive.  There, defendant Kik Interactive had sold digital tokens—known as Kin—to be used within a larger digital ecosystem.  *Kik*, 492 F. Supp. 3d at 175.  On summary judgment, the court concluded that horizontal commonality was present because Kik had deposited the funds from the sale into a single bank account and used those funds for its operations.  *Id.* at 178.  As the court observed, Kik "pooled proceeds from its sales of Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment."  *Id.* at 179; *see also id.* (noting that "the nature of a common enterprise" is "to pool invested proceeds to increase the range of goods and services from which income and profits could be earned").

Here too, "[t]his is not a scenario where the funds of each investor were segregated and separately managed, allowing for profits to remain independent."  *Id.*; *see also United States v. Pierre*, No. 19 Cr. 783 (SHS), 2021 WL 4150969, at *4 (S.D.N.Y. Sept. 13, 2021) (holding that jury reasonably concluded that instruments were investment contracts where defendant "solicited money from investors and pooled it in his bank and trading accounts").  Instead, the complaint alleges that Genesis pooled crypto assets from

Gemini Earn investors and then used those assets to produce returns for investors.  Doc. 1 ¶ 59.  The assets were not segregated, so the investors' fortunes were tied together as Genesis deployed the pooled assets—lending them to institutional borrowers or using them as collateral for its own borrowing—to generate revenue.  *Id.* ¶¶ 38–41, 59; *see also id.* ¶ 42 (alleging that Gemini Earn investors were paid using the interest Genesis received from lending the pooled crypto assets and that Genesis had no other revenue-generating activities).  These allegations give rise to a plausible inference that each investor's success was dependent on the success of the overall scheme.  *See Kik*, 492 F. Supp. 3d at 179 ("The stronger the ecosystem that Kik built, the greater the demand for Kin, and thus the greater the value of each purchaser's investment."); *cf. Zaslavskiy*, 2018 WL 4346339, at *6 (finding that indictment's allegations were sufficient to show horizontal commonality because "it can readily be inferred from the facts alleged that the REcoin and Diamond investment strategies depended upon the pooling of investor assets to purchase real estate and diamonds").  And these circumstances are distinct from cases in which horizontal commonality was not satisfied because investors' assets were separated.  *See Savino v. E.F. Hutton & Co.*, 507 F. Supp. 1225, 1236 (S.D.N.Y. 1981) (finding that horizontal commonality was not present where money invested in each account "was not merged into a single investment fund" but rather each account "constituted a separate fund").

Defendants' arguments to the contrary are not persuasive.  For one, they suggest that the fortunes of Gemini Earn customers were not tied together because each customer "received a market rate of interest" rather than sharing in profits on a pro rata basis.  Doc. 34 at 10.  Other decisions have made clear, however, that "receiving a pro-rata distribution of profits . . . is not required for a finding of horizontal commonality."  *Kik*, 492 F. Supp. 3d at 178; *see also Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (explaining that although purchasers were not entitled to a pro rata share of profits, "such a formalized profit-sharing mechanism is not required for a finding of

horizontal commonality").  Instead, the complaint need only allege that "the fortunes of each investor depend upon the profitability of the enterprise as a whole."  *Revak*, 18 F.3d at 87.  At this stage, the SEC has satisfied that burden by alleging that the returns earned by each investor were dependent on how Genesis pooled and deployed the crypto assets, Doc. 1 ¶¶ 38–41—even if each investor was not entitled to a pro rata share.

Furthermore, accepting the complaint's allegations as true, the Court cannot agree with Defendants' contention that Gemini Earn customers "did not have the skin in the game that defines a common enterprise."  Doc. 34 at 10.  Defendants rely on *Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278 (6th Cir. 1989), but that case is factually distinct.  The plaintiffs had purchased a yacht and contracted with one of the defendants to charter it out to third parties.  *Id.* at 280.  That defendant also managed several vessels for other owners.  *Id.*  But the plaintiffs "never placed money in a common fund with other owners," and the defendant segregated the income generated by charters of each boat.  *Id.*  In this case, the complaint expressly alleges that there was no comparable segregation of each investor's funds.  Doc. 1 ¶ 38.[5]

Nor is it dispositive that Gemini Earn investors lent crypto assets "on a timetable of their choosing."  Doc. 34 at 9.  To be sure, Gemini Earn investors could terminate their investment at any time.  Doc. 1 ¶ 31.  But courts have held that investors' ability to exit a common enterprise does not defeat horizontal commonality.  *See Kik*, 492 F. Supp. 3d at 179 ("[T]he fact that [token] purchasers could sell their Kin whenever they pleased is not dispositive."); *Telegram*, 448 F. Supp. 3d at 370 n.9 ("The ability to sell their Grams [a type of cryptocurrency], and thereby exit the common enterprise, does not mean that the Initial Purchasers are not part of a common enterprise while they continued to possess

---

[5] Defendants also cite *Cooper v. King*, No. 96-5361, 1997 WL 243424 (6th Cir. May 9, 1997) (per curiam), but the facts of that case are not analogous either.  Although the purchasers received a fixed monthly rental fee of $75, they did not have an interest in the profits generated from the entire scheme.  *Id.* at *2.  By contrast, the complaint here alleges that Gemini Earn investors received returns based on how Genesis deployed the pooled crypto assets.  Doc. 1 ¶¶ 38–41.

Grams.").  Instead, when evaluating horizontal commonality, "the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise."  *Kik*, 492 F. Supp. 3d at 179.  Again, that feature is present here because the SEC alleges that investors' returns turned on how Genesis pooled and deployed the crypto assets.  Doc. 1 ¶¶ 38–41.

Defendants also highlight the language of the Gemini Earn agreements, which stated that "the Loans are intended to be commercial loans of Digital Assets and not securities."  Doc. 43 at 4 (quoting Doc. 34 at 6); *see also* Doc. 32-1 at 16.  The *Howey* test, however, is concerned with the "economic reality" of a transaction.  *Howey*, 328 U.S. at 298.  "The contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract."  *Kik*, 492 F. Supp. 3d at 178; *see also Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 432–33 (S.D.N.Y. 2023) ("[W]hat matters is not [] the name appended to a transaction but whether, in light of the economic reality and the totality of circumstances, the instrument was an investment contract." (second alteration in original) (internal quotation marks and citations omitted)); *Pierre*, 2021 WL 4150969, at *4 (declining to credit defendant's argument that instruments were promissory notes rather than investment contracts merely because they were labeled as such and noting that "[c]alling something a loan does not make it a loan").  With all reasonable inferences drawn in the SEC's favor, the overall scheme described in the complaint illustrates that Gemini Earn investors' fortunes were linked together.  The label ascribed to the agreements thus does not control the question whether the Gemini Earn program constitutes an investment contract under *Howey*.

Finally, Defendants contend that Gemini Earn customers were not aligned economically because each customer was treated separately and each loan stood on its own.  Doc. 34 at 11.  Again, this argument is at odds with the allegations in the complaint.  The SEC asserts that investors were *not* treated separately because Genesis

pooled the crypto assets that each of them invested.  Doc. 1 ¶ 38.  Genesis then made decisions about how to lend those crypto assets to institutional borrowers, *id.* ¶¶ 39–40, and "the returns of Gemini Earn investors were dependent on Genesis' managerial efforts and risk management in its lending activities," *id.* ¶ 41.  At this stage, these allegations are sufficient to satisfy the horizontal commonality requirement.  The Gemini Earn program thus involved an investment in a common enterprise.[6]

### 2.  *Expectation of Profits*

The remaining prong of the *Howey* test asks whether investors were "led to expect profits solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 299.  The Second Circuit has said that "the word 'solely' should not be construed as a literal limitation."  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008).  Instead, the court asks "whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way."  *Id.* (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)); *see also, e.g.*, *Kik*, 492 F. Supp. 3d at 179 ("To qualify as an investment contract, the investment must come with 'a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" (quoting *Forman*, 421 U.S. at 852)).  This is an objective test that examines "what purchasers were led to expect by the promoter."  *Friel*, 657 F. Supp. 3d at 442 (internal quotation marks and citation omitted).  Still, courts have considered the subjective intent of purchasers as "probative on the issue of what a reasonable purchaser

---

[6] The SEC contends that a common enterprise under *Howey* may also be established by a showing of strict vertical commonality.  Doc. 41 at 9 n.9.  According to the SEC, the complaint satisfies that requirement because it alleges that "the fortunes of Genesis are tied to the fortunes of the investors."  *Id.* at 9.  Since the Court concludes that horizontal commonality is present, it need not reach the question of vertical commonality.  *See, e.g.*, *Kik*, 492 F. Supp. 3d at 178 n.5 ("Because I find that horizontal commonality is present here, I need not address whether vertical commonality is sufficient for a finding of a common enterprise, nor whether vertical commonality is present here.").

would have expected." *Id.* (quoting *Audet v. Fraser*, 605 F. Supp. 3d 372, 398 n.7 (D. Conn. 2022)).

The complaint sufficiently alleges that Gemini Earn investors had an expectation of profits. Defendants marketed Gemini Earn as an investment opportunity and publicly touted investors' ability to earn returns. Doc. 1 ¶ 62. Gemini described the program as an investment on its website, stating that interest rates were "among the highest rates on the market" and that investors could "receive more than 100x the national interest rate." *Id.*; *see also id.* ¶ 34 (describing statement on Gemini's website that "[w]e are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield"). And Genesis described itself as "the world's largest digital asset lender" while stating that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." *Id.* ¶ 63 (alteration in original). This public advertising supports a finding that investors had a reasonable expectation of profits. *See Kik*, 492 F. Supp. 3d at 179 (concluding that expectation-of-profits prong was satisfied where defendant repeatedly touted Kin's profit-making potential in public statements); *Balestra*, 380 F. Supp. 3d at 355 (finding reasonable expectation of profits where defendants "launched a marketing campaign for ATB Coins that highlighted the potential profits that would result simply from holding those coins").

The complaint also makes clear that this expectation of profits was dependent on Genesis' efforts. It alleges that Genesis had "complete discretion" as to how deploy the crypto assets once it took possession of them. Doc. 1 ¶ 64. In particular, Genesis "undertook various complex tasks of pooling Gemini Earn crypto assets, identifying Institutional Borrowers to serve as counterparties, negotiating individual agreements with those counterparties, and managing market and counterparty risk." *Id.* Genesis used its experience and skill to negotiate high interest rates from institutional borrowers in order to generate maximum profits. *Id.* ¶ 65. Investors, for their part, understood that the interest rate for their Gemini Earn investments would be revised by Genesis on a monthly

basis, "reflecting Genesis' ongoing managerial efforts to pay among 'the highest rates in the market.'" *Id.* ¶ 66. The complaint thus adequately alleges that investors were reliant on Genesis' efforts. *See Kik*, 492 F. Supp. 3d at 180 (finding that growth of investment "would rely heavily on Kik's entrepreneurial and managerial efforts"); *cf. Zaslavskiy*, 2018 WL 4346339, at *7 (third *Howey* prong was satisfied where there was no indication that investors had any control over management of assets or that investors "would have been capable of participating in or directing their investments").

Defendants resist this conclusion. In their view, the complaint fails to allege that Gemini Earn customers had an expectation of profits solely from the efforts of Gemini or Genesis. Doc. 34 at 11. Once a customer signed a Gemini Earn agreement, Defendants argue, Genesis' efforts "made no difference in how much those customers were entitled to receive in exchange for lending their digital assets." *Id.* at 12.

That argument, however, is contradicted by the complaint's allegations that Genesis revised the interest rates on a monthly basis and negotiated high interest rates from institutional borrowers to maximize returns. Doc. 1 ¶¶ 65–66. Those allegations indicate that Gemini Earn investors were depending on Genesis' efforts to generate profits. *See Balestra*, 380 F. Supp. 3d at 355 (explaining that advertisements promoted digital assets as investment "that would generate profits for investors without any effort on their part"); *see also Howey*, 328 U.S. at 300 ("A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments.").[7]

The SEC has plausibly alleged that the Gemini Earn program involved an investment of money in a common enterprise, with a reasonable expectation of profits derived from Defendants' efforts. As a result, the Court finds that the SEC has plausibly

---

[7] Defendants' argument that the Gemini Earn loan rates constituted "the floor and the ceiling" of customers' expected earnings fails for similar reasons. Doc. 34 at 12. The complaint alleges that Genesis could—and did—revise those interest rates on a monthly basis, thereby tying investors' returns to Genesis' managerial efforts on their behalf. Doc. 1 ¶¶ 27, 65–66.

alleged that the Gemini Earn program constitutes an investment contract within the meaning of *Howey*.

###### B. The *Reves* Test

Alternatively, the SEC argues that the Gemini Earn agreements are notes and that the Gemini Earn program constitutes an offer and sale of securities under *Reves v. Ernst & Young*, 494 U.S. 56 (1990). Doc. 41 at 13. When applying the *Reves* test, courts "begin with a presumption that every note is a security." *Reves*, 494 U.S. at 65. From there, the analysis turns on four factors: (1) the motivations of the parties; (2) the "plan of distribution" of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument. *Id.* at 66–67.

The presumption that every note is a security can be rebutted "only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument." *Id.* at 67. At the time *Reves* was decided, that list of instruments included:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, . . . a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[,] . . . [and] notes evidencing loans by commercial banks for current operations.

*Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 305 n.70 (2d Cir. 2023) (alterations and omissions in original) (quoting *Reves*, 494 U.S. at 65). This test "allows courts to expand the list of non-security instruments to include the type of note at issue if, based on the four factors, a court concludes that the note is not a security." *Id.* at 305.

1. *Motivations of the Parties*

First, the Court must "examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it." *Reves*, 494 U.S. at 66. This inquiry asks "whether the motivations [of the seller and buyer] are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Kirschner*, 79 F.4th at 305 (alteration in original) (quoting *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994)). An instrument is likely to be a security if "the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Reves*, 494 U.S. at 66. But in cases where "the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, . . . the note is less sensibly described as a 'security.'" *Id.*

Defendants contend that Gemini Earn investors expected to collect a market rate of interest. Doc. 34 at 15. Because the Gemini Earn loans were redeemable at any time, the argument goes, investment in the program "did not reflect a confidence in [Genesis'] corporate vision for the future, but rather a desire for attractive and market-based yield that was *not* contingent on any appreciation in [Genesis'] value." *Id.* Defendants also assert that every loan was treated as an independent obligation of Genesis, so customers were not "sharing in the spoils" of the business. *Id.* at 16.

While Defendants focus on the motivations of Gemini Earn customers, they say little about the motivations of Genesis itself. Both are relevant to the Court's analysis. *Reves*, 494 U.S. at 66. The complaint alleges that Genesis obtained crypto assets in order to lend them to institutional borrowers, thereby generating revenue for the company. Doc. 1 ¶ 23; *see also id.* ¶ 45 (alleging that Genesis used Gemini Earn "to run its institutional lending activities, generate profits for itself, and to pay the interest promised to Genesis investors"). Genesis also used the assets as collateral for its own borrowing

and held them on its balance sheet to meet liquidity demands. *Id.* ¶ 46. These allegations support a plausible inference that Genesis' motivation was investment rather than commercial. *See Reves*, 494 U.S. at 67 (finding that seller's motivation was investment where it sold notes "to raise capital for its general business operations"); *Pollack*, 27 F.3d at 812–13 (concluding that seller's motivation was investment where it was "raising funds for its general business activities of making and servicing mortgages"); *cf. Kirschner*, 79 F.4th at 306 (holding that seller's motivation was commercial where loan was not used to raise funds for its business or to finance other investments).

The Court also finds that the motivation of Gemini Earn customers was investment rather than commercial. *Reves* is instructive. In that case, the Court explained that purchasers bought notes "in order to earn a profit in the form of interest." *Reves*, 494 U.S. at 67–68; *see also id.* at 68 n.4 (emphasizing that in the context of notes, "profit" means "'a valuable return on an investment,' which undoubtedly includes interest"). Furthermore, "one of the primary inducements offered purchasers was an interest rate constantly revised to keep it slightly above the rate paid by local banks and savings and loans." *Id.* at 68. Gemini Earn investors were similarly motivated by the opportunity to earn a profit in the form of interest. Gemini specifically advertised the program as offering interest rates that were "among the highest . . . on the market." Doc. 1 ¶ 36. And that rate was subject to revision on a monthly basis by Genesis, reflecting its ongoing efforts "to pay among 'the highest rates in the market.'" *Id.* ¶ 66.

Although Defendants rely heavily on *Banco Espanol de Credito v. Security Pacific National Bank*, 973 F.2d 51 (2d Cir. 1992), the motivations of the parties in that case are not analogous. The seller's motivation was "a desire to increase lines of credit to [a banking customer] while diversifying [the seller]'s risk." *Id.* at 55. Genesis, by contrast, sought to obtain crypto assets to generate revenue and fund its entire enterprise. Doc. 1 ¶ 42. Furthermore, as discussed above, Gemini Earn investors were motivated to earn a profit based on the high interest rates Defendants advertised. *Id.* ¶ 36. They were

not seeking "a short-term return on excess cash." *Banco Espanol*, 973 F.2d at 55.  As in *Reves*, therefore, the complaint's allegations indicate that "the transaction is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction."  494 U.S. at 68; *see also, e.g.*, *Kirschner*, 79 F.4th at 306 (allegations suggested that lenders' motivation was investment where they were entitled to receive quarterly interest payments and thus "expected to receive a 'valuable return' on their purchase of the Notes" (footnote omitted) (quoting *Reves*, 494 U.S. at 68 n.4)); *Pollack*, 27 F.3d at 813 (motivation of buyers was investment—and was "not even a close question"—where they invested funds in "conservative instruments" and generally received "a fixed rate of return in the form of interest").

Defendants maintain that the notes at issue here are distinct from "traditional lending investments" because they were "redeemable on demand."  Doc. 34 at 16 (emphasis omitted).  But *Reves* expressly rejected the Eighth Circuit's theory that "the virtually instant liquidity associated with demand notes is inconsistent with the risk ordinarily associated with 'securities.'"  *Reves*, 494 U.S. at 69.  The Court explained: "The demand feature of a note does permit a holder to eliminate risk quickly by making a demand, but just as with publicly traded stock, the liquidity of the instrument does not eliminate risk altogether."  *Id.*  The "demand nature" of the notes thus did not change the Court's conclusion that they were securities.  *Id.* at 69–70.  Here too, the fact that investors could withdraw from Gemini Earn at any time does not demonstrate a lack of investment intent.

Because the overall motivation of the parties was investment rather than commercial, the first factor weighs in favor of finding that the notes are securities.

### 2.  *Plan of Distribution*

Second, the Court assesses "the plan of distribution of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment."  *Id.* at 66 (internal quotation marks and citation omitted).  "This factor

weighs in favor of determining that a note is a security if it is 'offered and sold to a broad segment of the public.'" *Kirschner*, 79 F.4th at 306 (quoting *Reves*, 494 U.S. at 68). "This factor weighs against determining that a note is a security if there are limitations in place that 'work[] to prevent the [notes] from being sold to the general public.'" *Id.* (alterations in original) (quoting *Banco Espanol*, 973 F.2d at 55).

The SEC alleges that Gemini Earn agreements "were offered and sold to a broad segment of the general public." Doc. 1 ¶ 49. Defendants openly advertised Gemini Earn on their websites and on social media. *Id.* ¶¶ 33–37, 49. The agreements were offered and sold to "any U.S. investor, including retail investors." *Id.* ¶ 49. In short, this is not a case where "only institutional and corporate entities were solicited, detailed individualized presentations were made to potential purchasers and resales were prohibited without the express written permission of the broker." *Pollack*, 27 F.3d at 813. Nor was the plan of distribution here "a limited solicitation to sophisticated financial or commercial institutions and not to the general public." *Banco Espanol*, 973 F.2d at 55 (citation omitted).

Instead, as in *Pollack*, the record suggests that the scheme involved "broad-based, unrestricted sales to the general investing public." 27 F.3d at 814; *see also id.* at 813–14 (noting that sales were not "restricted to sophisticated investors who had 'the capacity to acquire information about the debtor'" (quoting *Banco Espanol*, 973 F.2d at 55)). The complaint alleges that approximately 340,000 retail investors were participating in Gemini Earn by November 2022. Doc. 1 ¶ 25. And there was no minimum investment requirement for investors to participate. *Id.* The breadth of the scheme, combined with Defendants' extensive advertising, indicates that the notes were offered and sold to a broad segment of the public. *See SEC v. Thompson*, 732 F.3d 1151, 1166–67 (10th Cir. 2013) (where company sold 138 instruments to around 60 holders, court found that it "intended to make, and did make, its Instruments available to any member of the public who could afford them"); *SEC v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002)

(observing that notes were held by over 1,000 investors and that defendant "put no limitations on who could purchase the notes, offering them to any member of the general public who would make the investment and provide his name, address, and social security number").

This factor also weighs in favor of finding that the notes are securities.

3. *Expectations of the Investing Public*

Third, the Court analyzes the reasonable expectations of the investing public. *Reves*, 494 U.S. at 66. In *Reves*, the Supreme Court explained that it would "consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *Id.* "If buyers were 'given ample notice that the instruments were . . . loans and not investments in a business enterprise,' it suggests that the instruments are not securities." *Kirschner*, 79 F.4th at 308 (omission in original) (quoting *Banco Espanol*, 973 F.2d at 55).

The complaint alleges that Defendants advertised Gemini Earn to the public as an investment opportunity. *E.g.*, Doc. 1 ¶ 34 (Gemini posted video on YouTube titled "Invest Better with Gemini Earn"); *id.* ¶ 35 (Gemini website referred to "investing," "investment decisions," and "the option to invest" (emphases omitted)). The Court can plausibly infer from these allegations that the public would have reasonably understood the notes to be investments. *See Reves*, 494 U.S. at 69 ("The advertisements for the notes here characterized them as 'investments,' and there were no countervailing factors that would have led a reasonable person to question this characterization." (internal citation omitted)); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (finding that letters characterizing scheme as investment program "would lead an investor reasonably to think of her financial interest as an investment").

In addition, Defendants touted the potential for customers to earn high "returns" or "yield" on their crypto assets. Doc. 1 ¶ 50. They promoted Gemini Earn interest rates

as "among the highest rates on the market" and "higher than most existing options."  *Id.*
This language lends further support to a reasonable expectation that participation in the
program constituted an investment.  *See Thompson*, 732 F.3d at 1168 (noting that
defendant "talked about the Instrument as though it were an investment"); *see also
Bongiorno v. Baquet*, No. 20 Civ. 7288 (LJL), 2021 WL 4311169, at *17 (S.D.N.Y. Sept.
20, 2021) ("Because the loans were pitched as investments, 'it would be reasonable for a
prospective purchaser to take the [seller] at its word.'" (alteration in original) (quoting
*Reves*, 494 U.S. at 69)).[8]

　　　At the same time, there are some potential "countervailing factors" that might
have led a reasonable person to question whether the notes were investments.  *See Reves*,
494 U.S. at 69.  For one, the agreements repeatedly refer to Gemini Earn customers as
lenders rather than investors.  *See generally* Doc. 32-1.  In *Kirschner*, the Second Circuit
held that the "lenders" label used in the loan documents aligned with "the reasonable
expectations of the experienced entities that the Notes were not securities."  79 F.4th at
308.  That case is not perfectly analogous, however, because the buyers were
"sophisticated entities," *id.*—unlike the retail investors who participated in Gemini Earn.
The agreements here also state that "[e]ach Party agrees that the Loans are intended to be
commercial loans of Digital Assets and not securities under the U.S. federal or state
securities laws."  Doc. 32-1 at 16.  While this language is not dispositive, it can inform
the analysis of how the investing public would have understood the notes.  *Cf. Thompson*,
732 F.3d at 1167–68 (noting that instrument expressly stated that it was not offering a
security but that other factors might have led a reasonable person to question that
characterization).

---

[8] Other courts have noted that the third *Reves* factor "is closely related to the first factor."  *Wallenbrock*, 313 F.3d at 539.  The investment—rather than commercial—motivations of the parties discussed in connection with the first factor thus are relevant here as well.  *Id.*

Because of the somewhat conflicting evidence, this factor tilts only slightly in favor of finding that the notes are securities.

### 4. Alternative Regulatory Schemes or Other Factors

Finally, the court considers "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67. "Among the factors that reduce the risks associated with an instrument are whether the instrument is secured by collateral or is insured and whether 'specific policy guidelines' issued by federal regulators address the type of instrument at issue." *Kirschner*, 79 F.4th at 309 (footnotes omitted) (quoting *Banco Espanol*, 973 F.2d at 55).

With respect to alternative regulatory schemes, Defendants point out that Gemini is registered with the New York State Department of Financial Services. Doc. 34 at 21 (citing Doc. 1 ¶ 52). According to Defendants, the Department "supervises and regulates the activities of New York financial institutions, such as Gemini." *Id.* But the complaint alleges that the Department did *not* have oversight of Genesis or Gemini Earn. Doc. 1 ¶ 52. Furthermore, "Gemini publicly stated that Gemini Earn does not operate like a traditional bank account, is not protected by a governmental program, and is not backed by Gemini itself." *Id.* Defendants offer no further explanation as to how Gemini's registration with the Department establishes the type of regulatory scheme that "significantly reduces the risk of the instrument." *Reves*, 494 U.S. at 67.

Noting that Genesis is based in New Jersey, Defendants also suggest that state law could offer additional protection for customers. Doc. 34 at 21. But "the fact that a company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws." *Wallenbrock*, 313 F.3d at 540; *see also Stoiber v. SEC*, 161 F.3d 745, 752 (D.C. Cir. 1998) (concluding that Illinois law did not "render[] the protection of federal securities law unnecessary" and that reliance on it "would expand the types of alternative protection cognizable beyond those

contemplated in *Reves*").  *Reves* emphasized that the notes at issue "would escape federal regulation entirely if the [Securities] Acts were held not to apply."  494 U.S. at 69.  The same is true here.

As for other potential risk-reducing factors, Defendants assert that the need for a regulatory scheme was lessened because Gemini Earn customers could reclaim their assets at any time.  Doc. 34 at 21.  As discussed above, however, *Reves* made clear that the demand nature of a note does not eliminate risk.  *See* 494 U.S. at 69.  That principle is evidenced by the circumstances here, as Genesis announced in November 2022 that it would not allow retail investors to withdraw their crypto assets from Gemini Earn.  Doc. 1 ¶¶ 7, 55.  This announcement left approximately 340,000 investors unable to access around $900 million in assets.  *Id.*  The complaint also alleges that Gemini Earn was not insured and that Genesis was not required to post collateral under the terms of the agreement.  *Id.* ¶¶ 52, 54; *see, e.g.*, *Reves*, 494 U.S. at 69 (concluding that no risk-reducing factors were present where notes were uncollateralized and uninsured); *Wallenbrock*, 313 F.3d at 539 ("[T]he absence of collateralization increases the risk of a loan because, in case of default, the lender or investor often has limited recourse to recoup the investment.").  The fourth factor thus weighs in favor of finding that the notes are securities.

In sum, three factors weigh in favor of finding that the notes are securities, while one factor tilts slightly in favor of that conclusion.  Accordingly, the SEC has plausibly alleged that the notes are securities under the *Reves* test.

### C.  "Sale" or "Offer to Sell"

Even if the Gemini Earn agreement qualifies as a security, Defendants argue that the complaint still must be dismissed because it fails to allege a "sale" or "offer to sell" a security.  Doc. 31 at 5.  Section 5 of the Securities Act makes it unlawful to "sell" or "offer to sell" a security without filing a registration statement.  15 U.S.C. § 77e(a), (c).  Section 2, in turn, provides that "[t]he term 'sale' or 'sell' shall include every contract of

sale or disposition of a security or interest in a security, for value." *Id.* § 77b(a)(3). The same provision defines "offer to sell" as including "every attempt or offer to dispose of . . . a security or interest in a security, for value." *Id.*

In this case, Defendants contend, the SEC has not alleged that a Gemini Earn agreement was ever sold for value or that any money changed hands at the time a customer signed the agreement. Doc. 31 at 7–8. Instead, the agreement simply established a mechanism for the parties to engage in future transactions. *Id.* at 8. Defendants observe that the terms of the agreement did not require a customer to do anything: "The amount of digital assets to lend, the length of the loan, and indeed whether to lend any digital asset at all, are completely at the lender's option." *Id.* at 8–9. According to Defendants, therefore, there was no "sale" within the meaning of the Securities Act. *Id.* at 10.

The Court agrees with the SEC that Defendants take too narrow a view of the "sale" or "offer to sell" requirement. In determining whether Defendants engaged in an unregistered offering and sale of securities, the Court is not limited to considering only whether the Gemini Earn agreements themselves were sold for value or required assets to change hands; the analysis focuses on the transaction or scheme in its entirety. *See Telegram*, 448 F. Supp. 3d at 368 (finding that "the series of understandings, transactions, and undertakings between [the parties] were investment contracts"); *see also Reynolds*, 952 F.2d at 1130, 1136 (holding that scheme involved "the offer and sale of securities" where investors gave defendant cash and he promised them a high rate of return in exchange).

Here, the SEC's theory is that Defendants offered and sold unregistered securities through the entire Gemini Earn program. Doc. 1 ¶ 44 ("Under *Reves*, the Gemini Earn Agreements were notes and offered and sold through Gemini Earn as securities."); *id.* ¶ 56 ("The offer and sale of Gemini Earn Agreements through the Gemini Earn program also constitutes the offer and sale of investment contracts under *Howey*."). The complaint

alleges that Gemini published the list of crypto assets eligible for investment in the Gemini Earn program, while both Defendants advertised the program to the public.  *Id.* ¶¶ 29, 33–37.  Genesis then obtained crypto assets from investors in exchange for a promise to pay interest on those assets.  *Id.* ¶¶ 1, 25–27.  And Gemini deducted an agent fee from investors' returns.  *Id.* ¶ 28.  These activities fall within the sweeping definition of an "offer" or "sale" under the statute, which encompasses "every attempt or offer to dispose of . . . a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3); *see also United States v. Naftalin*, 441 U.S. 768, 773 (1979) (explaining that Congress intended to define the terms "offer" and "sale" broadly and that they are "expansive enough to encompass the entire selling process, including the seller/agent transaction").

Defendants' arguments to the contrary are in tension with the broad scope of the securities laws.  In particular, the Court fails to see how adopting Defendants' position—that a program through which Defendants raised billions of dollars' worth of crypto assets, Doc. 1 ¶ 1, does not constitute a "sale" of or "offer to sell" securities—would be consistent with the Supreme Court's admonition that the securities laws are "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299; *see also Reves*, 494 U.S. at 61 ("Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."); *Reynolds*, 952 F.2d at 1133 ("[W]e construe the Securities Acts broadly to effectuate Congress' purpose to protect investors.").  And Defendants do not cite any case law to support their novel interpretation of the "sale" or "offer to sell" requirement.

Gemini also attempts to minimize its role in the Gemini Earn program.  Doc. 31 at 10.  The company says it was merely an agent to facilitate the agreement and did not itself borrow or lend any assets.  *Id.*  Because of that limited role, Gemini reasons, it is even further removed from any "sale" or "offer to sell."  *Id.*

This argument fails because section 5 liability "extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *SEC v. Sason*, --- F. Supp. 3d ---, No. 19 Civ. 1459 (LAP), 2023 WL 3260032, at *26 (S.D.N.Y. May 4, 2023) (alteration in original) (quoting *SEC v. Sourlis*, 851 F.3d 139, 143–44 (2d Cir. 2016)). The "necessary participant" inquiry "essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place—in other words, whether the defendants' acts were a substantial factor in the sales transaction." *Id.* (internal quotation marks and citation omitted). Substantial participation "is a concept without precise bounds, but one who plans a scheme, or, at the least, is a substantial motivating factor behind it, will be held liable as a seller." *Id.* (quoting *SEC v. Gallison*, 588 F. Supp. 3d 509, 521 (S.D.N.Y. 2022)).

Here, the complaint alleges that Gemini was involved in creating, advertising, and facilitating the Gemini Earn program. *E.g.*, Doc. 1 ¶¶ 25–37. Gemini deducted an agent fee from investors' returns and collected approximately $2.7 million in fees during one three-month period. *Id.* ¶¶ 28, 30. At this juncture, therefore, the SEC has sufficiently alleged that Gemini was a necessary participant or substantial factor in the scheme. *See, e.g.*, *SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *11 (S.D.N.Y. Dec. 9, 2013) (finding that defendant was substantial factor in sale of unregistered securities where he was "actively involved in the process and compensated for his role" and "the sales at issue would not have taken place but for [his] introductions").

\* \* \*

Under both *Howey* and *Reves*, the SEC has plausibly alleged that Defendants offered and sold unregistered securities through the Gemini Earn program. As a result, Defendants' motions to dismiss are DENIED.

### D. Remedies

Defendants raise an alternative argument challenging the complaint's proposed remedies. The SEC seeks a judgment that (1) permanently enjoins Defendants from

violating sections 5(a) and 5(c) of the Securities Act; (2) orders Defendants to disgorge all ill-gotten gains, with prejudgment interest; and (3) orders Defendants to pay civil penalties.  Doc. 1 at 21.  Defendants ask the Court to strike the request for a permanent injunction and disgorgement.  Doc. 34 at 22.

   1.  *Permanent Injunctive Relief*

   Defendants' attempt to strike the request for a permanent injunction is premature. Other courts have observed that "a claim for permanent injunctive relief should not ordinarily be dismissed at the pleadings stage, unless the underlying claim upon which relief is sought is dismissed."  *In re Lloyd's Am. Tr. Fund Litig.*, 954 F. Supp. 656, 682 (S.D.N.Y. 1997); *accord, e.g.*, *SEC v. Life Wealth Mgmt., Inc.*, No. 10 Civ. 4769 (RSWL) (MAN), 2010 WL 4916609, at *1 (C.D. Cal. Nov. 24, 2010).  As set forth above, the SEC has plausibly alleged that Defendants violated section 5 of the Securities Act, so the underlying claim will not be dismissed.

   In any event, "[o]nce the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies."  *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 390 (S.D.N.Y. 2010) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)).  Courts have recognized that permanent injunctive relief may be imposed if "the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation in the future."  *SEC v. Aly*, No. 16 Civ. 3853 (PGG), 2018 WL 4853031, at *2 (S.D.N.Y. Oct. 5, 2018) (omission in original) (quoting *SEC v. Jadidian*, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *5 (S.D.N.Y. Mar. 31, 2011)).  The complaint alleges that Defendants remain active in the crypto asset industry: Genesis intends to reengage in crypto asset lending activities, while Gemini continues to hold billions of dollars in crypto assets "in connection with its trading platform and other activity in this industry."  Doc. 1 ¶ 8.  The SEC thus asserts that "Defendants remain positioned to violate the registration provisions if they are not enjoined from doing so." *Id.*

29

Of course, these are only allegations.  If the case progresses further and judgment is ultimately entered against Defendants, the Court will have to conduct a more intensive analysis to determine whether a permanent injunction is appropriate.  *See, e.g.*, *SEC v. Bronson*, 246 F. Supp. 3d 956, 973–75 (S.D.N.Y. 2017) (granting SEC's motion for summary judgment and then analyzing whether permanent injunction was warranted).  But there is no reason to strike the request for permanent injunctive relief at this preliminary stage.

    *2.  Disgorgement*

Defendants also ask the Court to strike the complaint's request for disgorgement.  Doc. 34 at 22.  "Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct."  *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014).  "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation.'"  *SEC v. Am. Growth Funding II, LLC*, No. 16 Civ. 828 (KMW), 2019 WL 4623504, at *2 (S.D.N.Y. Sept. 24, 2019) (quoting *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995)).  A district court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."  *Contorinis*, 743 F.3d at 301 (quoting *First Jersey*, 101 F.3d at 1474–75).  And a court may award prejudgment interest on disgorgement "to fully compensate the wronged party for damages suffered."  *Bronson*, 246 F. Supp. 3d at 975.

Again, Defendants' request is premature.  Courts have recognized that "[a]t the pleading stage, it is 'premature to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law.'"  *SEC v. Church-Koegel*, No. 20 Civ. 8480 (FMO) (JC), 2021 WL 6104157, at *2 (C.D. Cal. Sept. 29, 2021) (citation omitted); *see also, e.g.*, *SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 310 (S.D.N.Y. 2015) (denying defendant's motion for judgment on the pleadings and then explaining that analyzing forfeiture "before [defendant] has even been held liable for a securities

violation" would be premature); *SEC v. Buntrock*, No. 02 Civ. 2180 (WRA), 2004 WL 1179423, at *3 (N.D. Ill. May 25, 2004) ("[T]o the extent that the defendants challenge the SEC's 'pleading' of the disgorgement remedy, that challenge is rejected as untimely because none of the defendants have yet been found liable for any securities violation.").

At this point, "all that is necessary is that the Court find that disgorgement would be appropriate if the SEC prevails in its case-in-chief." *SEC v. Cotton*, No. 06 Civ. 0905 (AJG) (AN), 2006 WL 8435069, at *9 (C.D. Cal. Dec. 18, 2006). The complaint alleges that Defendants raised billions of dollars in crypto assets by offering and selling unregistered securities through the Gemini Earn program. *E.g.*, Doc. 1 ¶¶ 1, 6. If the SEC can prove those allegations, it will be entitled to force Defendants "to give up the amount by which [they were] unjustly enriched." *Contorinis*, 743 F.3d at 301 (quoting *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 372 (2d Cir. 2011)).

In attempting to heighten the SEC's burden, Defendants rely on several cases that are procedurally inapposite. *See First Jersey*, 101 F.3d at 1474–76 (evaluating disgorgement following bench trial); *SEC v. Fernandez*, No. 19 Civ. 1843 (RBD) (LRH), 2021 WL 6125520, at *2–3 (M.D. Fla. Feb. 22, 2021) (discussing SEC's burden to support disgorgement request in motion for default judgment); *SEC v. Alexander*, 115 F. Supp. 3d 1071, 1087–88 (N.D. Cal. 2015) (analyzing disgorgement after granting summary judgment); *SEC v. Norton*, No. 95 Civ. 4451 (SHS), 1998 WL 691043, at *5 (S.D.N.Y. Sept. 30, 1998) (dismissing request for disgorgement at summary judgment stage). To repeat, the Court does not decide at this time whether an order of disgorgement will ultimately be appropriate; it simply concludes that the disgorgement request should not be stricken from the case.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are DENIED. Defendants' alternative motion to strike the complaint's request for permanent injunctive

relief and disgorgement is also DENIED.  Defendants' request for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 30, 33, 44.

It is SO ORDERED.

Dated:    March 13, 2024
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.