# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| )<br>SECURITIES AND )<br>EXCHANGE COMMISSION, )<br> )<br>        Plaintiff, )<br>    v. )<br> )<br>BINANCE HOLDINGS )<br>LIMITED, *et al.*, )<br> )<br>        Defendants. )<br> ) | Civil Action No. 23-1599 (ABJ) |

**<u>MEMORANDUM OPINION & ORDER</u>**

Plaintiff the Securities and Exchange Commission has brought this action against defendants Binance Holdings Limited, its founder Changpeng Zhao, and two related U.S. entities, BAM Trading Services, Inc. and BAM Management US Holdings, Inc., alleging violations of federal securities laws. Compl. [Dkt. # 1] at 1. The SEC alleges that defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by offering and selling crypto assets and related programs without a registration statement; operating crypto currency trading platforms without registering as an exchange, as a broker-dealer or broker, or as a clearing agency; and making false statements to investors and engaging in acts and practices that operated as fraud upon purchasers. Defendants have moved to dismiss the complaint. For the reasons explained below, the bulk of this action will move forward, but the motions to dismiss will be granted in part and denied in part, and Count Two and portions of Counts One and Three will be dismissed.

**BACKGROUND**

Defendant Binance is a Cayman Islands limited liability company that does business as Binance.com. Compl. ¶ 27. It has operated the internet-based Binance.com international crypto

asset trading platform "[s]ince at least July 2017." Compl. ¶ 27. Defendant Zhao founded, owns, and is the Chief Executive Officer of Binance. Compl. ¶¶ 27, 30. Also known as "CZ," Zhao is a Canadian citizen who lives outside of the United States. Compl. ¶ 30.

Defendant BAM Trading Services is a Delaware corporation that does business as Binance.US. Compl. ¶ 29. It has operated the Binance.US crypto asset internet-based trading platform since 2019. Compl. ¶¶ 7–8, 29. Defendant BAM Management, a Delaware corporation, is the parent of BAM Trading and other affiliated entities. Compl. ¶ 28. When the Binance.US platform launched in 2019, BAM Management was a Cayman Islands company, which was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that Zhao owned and controlled. Compl. ¶ 28. Zhao now owns eighty-one percent of BAM Management. Compl. ¶ 28. Zhao served as chairman of the boards of directors of both BAM Trading and of BAM Management until approximately March 2022. Compl. ¶ 30.

### Crypto Assets

To understand this case, it is appropriate to begin with a description of the assets at issue and the crypto industry in general. A crypto currency is a digital, encrypted, and decentralized medium of exchange, and individual units are often referred to as coins or tokens. *See* Compl. ¶¶ 62–64. They are traded on electronic platforms such as the Binance.com and Binance.US platforms operated by defendants. Compl. ¶ 73. Crypto assets are transferred and secured using technology known as a "blockchain" or distributed ledger: a database spread across hundreds and even thousands of computer servers that records transactions in digitally recorded data packages called "blocks." Compl. ¶ 63; Joint Mot. to Dismiss Claims Against Binance and Zhao [Dkt. # 118] ("Binance Mot.") at 4. There are a number of different blockchain networks in existence, with Bitcoin and Ethereum being two of the most well-known. Binance Mot. at 4.

Crypto asset trading platforms operate as a central depository for the crypto assets customers deposit or trade on the platforms. Compl. ¶ 73. Customers' entitlements are "typically tracked and maintained on the crypto asset trading platform's internal ledgers," Compl. ¶ 73, and platforms usually settle transactions by updating internal records with each investor's positions. Compl. ¶ 76. Because transactions on a blockchain are validated by consensus, rather than by a single entity such as a bank, the blockchains supply a decentralized location for recording transactions. *See* Compl. ¶¶ 67–68.

As the complaint explains, defendants' crypto asset trading platforms – Binance.com and Binance.US – "are marketplaces that generally offer a variety of services relating to crypto assets, often including brokerage, trading, and settlement services." Compl. ¶ 71. Both platforms permit their customers to purchase and sell crypto assets using other crypto assets or fiat currency – that is, currency issued by a government. Compl. ¶ 72. One of the concerns underlying this action is that according to plaintiff, Binance.com and Binance.US did not segregate their customers' crypto assets from other customers' assets or the firm's assets. Compl. ¶ 73.

Blockchains use cryptographic techniques to secure the recording of transactions, and like many digital systems, they can be subject to hacks. Compl. ¶¶ 63, 65, 349; Notice of BAM Trading Inc. and BAM Management US Holdings Inc.'s Mot. to Dismiss [Dkt. # 117]; Mem. of Law in Supp. [Dkt. # 117-1] ("BAM Mot.") at 34. To validate transactions, then, and to validate the state of the ledger, a blockchain will rely upon a "consensus mechanism," the method or protocol that will be utilized to agree on which transactions are valid and when and how to update the blockchain. Compl. ¶¶ 66, 67. Independent users and "validators" apply the protocol to determine whether they agree if a particular transaction is valid, and if the requisite number of them agree,

the transaction is processed and recorded on the blockchain. Compl. ¶¶ 66–68, 340; BAM Mot. at 6.

The two primary consensus mechanisms that blockchains employ are "proof of work" and "proof of stake." Compl. ¶ 68. Proof of work, used by the Bitcoin blockchain, involves computers, known as "validator nodes," that attempt to "mine" a "block" of transactions, in part by solving a complex mathematical problem. Compl. ¶ 68. The first miner to successfully solve the problem earns the right to update the blockchain and is rewarded with the blockchain's native crypto asset. Compl. ¶ 68. Proof of stake, used by the Ethereum blockchain, involves the selection of block validators from the crypto asset holders who have committed or "staked" a minimum number of crypto assets as part of the validation process. Compl. ¶ 68.

Blockchain protocols compensate those participants who validate transactions and add new blocks to the blockchain. Compl. ¶¶ 67, 340. The compensation or "rewards" are usually paid in the form of new tokens, and they are funded by various sources, including fees charged to those engaged in transactions on the blockchain or through the blockchain's creation or "minting" of additional quantities of its native crypto asset. Compl. ¶¶ 67, 340, 341; BAM Mot. at 6.

Crypto assets "represented on" their own blockchain are considered "native" to that blockchain, although a blockchain may represent both native and non-native crypto assets. Compl. ¶ 64. Crypto assets are typically stored in a "crypto wallet" – software that enables owners to store and manage the cryptographic information necessary to identify and transfer their assets. Compl. ¶ 65. Crypto wallets allow asset owners to make transactions on the associated blockchains. Compl. ¶ 65. The wallets provide users with a "public key," which is the user's blockchain "address" that can be shared with others, and a "private key," which operates as a password and is needed to transfer a crypto asset. Compl. ¶ 65.

Transactions involving the transfer of a crypto asset from one blockchain address to another are called "on-chain" transactions, and those that are only tracked in the internal recordkeeping mechanisms of the platform and do not involve transferring crypto assets from one wallet to another are called "off-chain" transactions. Compl. ¶ 72.

The complaint focuses on five of defendants' crypto assets and programs:

- "BNB," which is also called "Binance Coin," a crypto asset that was launched on the Binance.com platform in 2017. Compl. ¶¶ 4, 80–81.

- "BUSD," a Binance "stablecoin" that is "purportedly backed with cash (and cash equivalent) reserves and redeemable on a 1:1 basis for U.S. dollars." Compl. ¶¶ 4, 317. It is "a Binance-branded U.S. Dollar denominated crypto asset on the Ethereum blockchain." Compl. ¶ 31.

- Binance's "Simple Earn," which is marketed as set of "programs that pay interest to investors who lend their crypto assets to Binance for fixed or flexible lengths of time." Compl. ¶ 327.

- Binance's "BNB Vault," a program similar to Simple Earn that is limited to BNB holders and described on Binance.com as a "'BNB yield aggregator' whereby investors can lend their BNB to Binance to earn investment returns." Compl. ¶¶ 4, 328, 331.

- BAM Trading's "Staking Program," which allows crypto asset owners on the Binance.US platform to pool their assets to collateralize BAM Trading's validation of transactions on a blockchain, such as Ethereum. *See* Compl. ¶¶ 4, 339–51.

### Procedural History

On June 6, 2023, the SEC sued defendants for unlawfully soliciting U.S. investors to buy, sell, and trade crypto asset securities through their unregistered trading platforms Binance.com and Binance.US. Compl. ¶ 2.[1] It asserts thirteen violations of federal securities laws:

---

[1] The SEC filed a motion for a temporary restraining order the following day. Mot. for TRO [Dkt. # 4]; *see also* Tr. of Proceedings (June 16, 2023) [Dkt. # 69] ("TRO Hr'g Tr."). The motion was resolved by a June 17, 2024 consent order governing the parties' conduct and customers' assets pending resolution of the case. *See* Consent Order [Dkt. # 71].

Count One:    Binance violated Sections 5(a) and 5(c) of the Securities Act by offering and selling BNB without a registration statement.

Count Two:    Binance violated Sections 5(a) and 5(c) of the Securities Act by offering and selling BUSD without a registration statement.

Count Three:  Binance violated Sections 5(a) and 5(c) of the Securities Act by offering and selling Simple Earn and BNB Vault programs without registration statements.

Count Four:   BAM Trading violated Sections 5(a) and 5(c) of the Securities Act by offering and selling its Staking Program without a registration statement.

Count Five:   Binance violated Exchange Act Section 5 by operating the Binance.com platform without registering as an exchange.

Count Six:    Binance violated Exchange Act Section 15(a) by operating the Binance.com platform without registering as a broker-dealer.

Count Seven:  Binance violated Exchange Act Section 17A(b) by operating the Binance.com platform without registering as a clearing agency.

Count Eight:  Binance and BAM Trading violated Exchange Act Section 5 by operating the Binance.US platform without registering as an exchange.

Count Nine:   BAM Trading violated Exchange Act Section 15(a) by operating the Binance.US platform without registering as a broker.

Count Ten:    Binance and BAM Trading violated Exchange Act Section 17A(b) by operating the Binance.US platform without registering as a clearing agency.

Count Eleven: Zhao violated Exchange Act Sections 5, 15(a), and 17A(b) as a control person over Binance in connection with the alleged violations related to the Binance.com platform.

Count Twelve: Zhao violated Exchange Act Sections 5, 15(a), and 17A(b) as a control person over Binance and BAM Trading in connection with the Binance.US platform violations.

Count Thirteen: BAM Management and BAM Trading violated Securities Act Sections 17(a)(2) and (a)(3) by making materially false and misleading statements to investors and engaging in acts and practices that operated as a fraud upon purchasers.

On September 21, 2023, BAM Trading and BAM Management filed one motion to dismiss, BAM Mot., and Binance and Zhao filed another. Binance Mot. The SEC filed a single opposition to both motions, SEC's Omnibus Mem. in Opp. to Defs.' Mots. [Dkt. # 172] ("SEC Opp."), and the defendants filed reply briefs. Reply Mem. of BAM Trading and Bam Management [Dkt. #191] ("BAM Reply"); Reply in Supp. of Binance Mot. [Dkt. # 192] ("Binance Reply"). On January 22, 2024, the Court held a hearing on the motions. *See* Tr. of Proceedings (Jan. 22, 2024) [Dkt. # 212] ("Mot. Hr'g Tr.").

## STANDARD OF REVIEW

### Failure to State a Claim: Fed. R. Civ. Proc. 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

### Pleading Fraud with Particularity: Fed. R. Civ. Proc. 9(b)

Federal Rule of Civil Procedure 9(b) imposes heightened pleading standards in fraud cases, as plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "the rule specifically allows allegations of 'intent, knowledge, and other condition of mind' to be averred generally." *U.S. ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (applying Rule 9(b) to claims under the False Claims Act), quoting Fed. R. Civ. P. 9(b). This means that the degree of scienter involved or required for a particular cause of action is not determinative of whether Rule 9(b) applies. *See id.* Rather, the circumstances that must be pled "with specificity are matters such as the 'time, place, and contents of the *false*

representations,' such representations being the *element* of fraud about which the rule is chiefly concerned." *Id.* (emphasis in original); *see also Kowal*, 16 F.3d at 1278 ("[T]he pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud."), quoting *United States v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

The D.C. Circuit applies Rule 9(b)'s pleading standards to claims of misrepresentation under Section 10(b) of the Exchange Act. *See Kowal*, 16 F.3d at 1278. The majority of circuits have held that Rule 9(b) applies to claims under the Securities Act as well if they "sound in fraud," even though plaintiff only needs to allege negligence to state a claim. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("So while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."); *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1404–05 (9th Cir. 1996); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992) ("[W]hen § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies."). *But see In re NationsMart Corp. Secs. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) (holding that "the particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11").

The D.C. Circuit has yet to rule on this issue, but courts in this district have held plaintiffs alleging violation of the Securities Act to the heightened pleading standard. *See Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F. Supp. 2d 110, 115 (D.D.C. 2006) (noting that an action under Section 12(a)(2) of the Securities Act must satisfy Rule 9(b)'s requirements); *In re U.S. Office Prods. Secs. Litig.*, 326 F. Supp. 2d 68, 82 (D.D.C. 2004) (observing that "the D.C. Circuit has

never stated whether Rule 9(b)'s requirement of particularity applies to claims of violation of Sections 11 and 12(a)(2) of the Securities Act," but that many other circuits have applied Rule 9(b) to those claims).

Other courts have also required plaintiffs to meet Rule 9(b)'s heightened pleading standard in connection with claims under Section 17(a)(2) and 17(a)(3) of the Securities Act specifically, which only require allegations of negligence. *See, e.g.*, *SEC v. Wey*, 246 F. Supp. 3d 894, 911 (S.D.N.Y. 2017) (dismissing the misrepresentation claim under Section 17(a)(2) because it did not meet Rule 9(b)'s requirements); *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017) (concluding that Section 17(a) claims "all sound in fraud," so they must be pled with particularity).

### Personal Jurisdiction over Defendants: Fed. R. Civ. Proc. 12(b)(1)

To survive a motion to dismiss for lack of personal jurisdiction, the "plaintiff must make a *prima facie* showing of the pertinent jurisdictional facts." *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). That is, the plaintiff must allege specific acts connecting the defendant with the forum. *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 97–98 (D.D.C. 2008), citing *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). The plaintiff bears the burden of establishing personal jurisdiction over each defendant, *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990), and "cannot rely on conclusory allegations" to establish personal jurisdiction. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).

"A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of . . . personal jurisdiction[.]" *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002). However, "the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; rather, [plaintiff] may rest [its] arguments on the pleadings, 'bolstered by such affidavits and other written materials as [it] can otherwise

obtain.'" *Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010), quoting *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). Any factual discrepancies should be resolved in favor of the plaintiff. *Crane*, 894 F.2d at 456. But, the Court need not treat all of the plaintiff's jurisdictional allegations as true. *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000). "Instead, the court may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *In re Papst Licensing*, 590 F. Supp. 2d at 98 (internal quotation marks omitted).

## ANALYSIS

**I.   The complaint plausibly alleges that Binance and BAM Trading were engaged in unregistered offers and sales of securities.**

Defendants Binance and Zhao have moved to dismiss the complaint on multiple grounds, first and foremost that it fails to state a claim as a matter of law, *see* Binance Mot., and the BAM defendants similarly maintain that the action should be dismissed under Rule 12(b)(6). *See* BAM Mot. The motions raise the fundamental question underlying each of the thirteen claims in the complaint: were the defendants' offerings and sales of crypto assets "securities" for purposes of the Securities Act and the Exchange Act?

Section 2 of the Securities Act defines the word as follows:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. §77(b)(a)(1) (emphasis added). The SEC alleges that certain coins and programs fall within this definition because they were offered and sold by the defendants as "investment contracts." *See* Compl. ¶¶ 288, 316, 338, 348. The Supreme Court undertook to define that term in 1946, and the definition has remained unchanged since then.

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99 (1946).

Since *Howey* continues to be the touchstone of the investment contract analysis, it is helpful to review what the case was about. The W.J. Howey company was selling ownership in half of its citrus groves in Lake County, Florida, and would-be purchasers were offered both a land sales contract, which would result in the conveyance of a warranty deed for the acreage involved when executed, and a service contract with a related Howey company for the cultivation and development of the groves and the harvesting and marketing of the crops. *Id.* at 295. Prospective purchasers were told that it was not feasible to invest in a grove unless service arrangements were made. *Id.* Under the terms of the service contract, the landowner had no right to enter the land to market the crops; all of the produce was pooled, and each landowner would receive a pro rata share of the proceeds. *Id.* at 296. Purchasers tended to be out-of-state passive investors without the experience or equipment needed to cultivate citrus trees; they were "attracted by the expectation of substantial profits." *Id.*

The Court found that its definition was satisfied because "the respondent companies are offering something more than fee simple interests in land . . . . They are offering an opportunity to

contribute money and add to the share in the profits of a large citrus enterprise managed and partly owned by respondents." *Id.* at 299.

> [A]ll the elements of a profit-seeking business are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control, and operate the enterprise.

*Id.* at 300.

There is binding authority in this circuit that the determination before the Court is controlled by *Howey,* which, as the Court of Appeals put it fifty years later, held that:

> an investment contract is a security subject to the Act if investors purchase with (1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others.

*SEC v. Life Partners, Inc.,* 87 F.3d 536, 542 (D.C. Cir. 1996) ("*Life Partners I*"), rehearing denied, 102 F.3d 587 (D.C. Cir. 1996).

In addressing this concept, the Supreme Court has repeatedly emphasized that the statutory definition in general, and the term "investment contract" in particular, must be read broadly to address the variety of investment vehicles and money-making schemes that could not possibly have been foreseen in 1934 when the Securities Act was passed.

> In the Securities Act, the term 'security' was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as 'transferable share,' 'investment contract,' and 'in general any interest or instrument commonly known as a security.' We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. . . . [T]he reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security.'

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

This was the state of the law before *Howey* was decided. Indeed, the Supreme Court made reference to *Joiner* when it adopted the *Howey* definition in 1946 and explained that "[i]t embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299. The Court has not varied from that position. In 1967, it construed the term "security" in the Securities Exchange Act of 1934 for the first time, noting that the Securities Act of 1933 "contains a definition of security virtually identical to that contained in the 1934 Act." *Tcherepnin v. Knight*, 389 U.S. 332, 335–36 (1967). It observed, "we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Id.* at 335–36, citing *Howey,* 328 U.S. at 298; *see also id.* at 338 ("Even a casual reading of section 3(a)(10) of the 1934 Act reveals that Congress did not intend to adopt a narrow or restrictive concept of security in defining that term."). And fifty-eight years after *Howey*, the Supreme Court repeated that it looks to "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others," *SEC v. Edwards,* 540 U.S. 389, 393 (2003), quoting *Howey*, 328 U.S. at 301, and it once again recited *Howey*'s instruction that the test is a flexible one. *Id.*

Thus, courts applying these principles to the crypto industry have clearly understood that *Howey* requires "an examination of the entirety of the parties' understandings and expectations." *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y 2020), citing *Howey*, 328 U.S. at 297–98;[2] *see also SEC v. Terraform Labs PTE, Ltd.*, 684 F. Supp. 3d 170, 193 (S.D.N.Y. 2023),

---

2       The *Telegram* court also observed that in *Howey*, the Supreme Court declined to treat the service contracts and the deeds as separate transactions. *Id.*

("*Terraform I*") ("As the Supreme Court has long made clear, courts deciding whether a given transaction or scheme amounts to a 'investment contract' under *Howey* must analyze the 'substance' – and not merely the 'form' – of the parties' economic arrangement and decide if, under the 'totality of the circumstances,' that transaction or scheme meets the three requirements of *Howey*."), citing *Tcherepnin,* 389 U.S. at 336, and *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974); *see also SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023) ("*Ripple Labs I*"), *motion to certify appeal denied*, No. 20 CIV. 10832 (AT), 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ("*Ripple Labs II*").

### A. There is no requirement that an investment contract involve a contractual arrangement.

The defendants insist that the plain text of the provision and the history behind it require that an "investment contract" must involve some sort of contractual relationship or arrangement between the offeror and the purchaser. *See* BAM Mot. at 12–16; Binance Mot. at 14–20. But their argument has been foreclosed by Supreme Court and Circuit precedent, and indignation alone cannot open that door.

Defendant Binance argued at the hearing that the requirement was "inherent" in the *Joiner* decision, Mot. Hr'g Tr. at 8, but that is an inaccurate characterization. In *Joiner*, the Supreme Court found that the representations and economic inducements accompanying the marketing of oil leases made that offering an "investment contract." 320 U.S. at 352–353. The sales literature assured potential purchasers that the Joiner Company would be drilling a test well on its own property to reveal the oil-producing prospects of the nearby leaseholds; the leases being sold offered purchasers the opportunity to share in the value of what the "current exploration enterprise" might discover, with no further effort expended on their part. 320 U.S. at 346–48.

> The drilling of this well was not an unconnected or uncontrolled phenomenon to which salesmen pointed merely to show the possibilities of

> the offered leases.  The exploration enterprise was woven into these
> leaseholds in both an economic and legal sense; the undertaking to drill a
> well runs through the whole transaction as the string on which everybody's
> beads were strung.

*Id.* at 348.  While the Court employed the vocabulary of traditional contract principles, *see, e.g.,*

*id.* ("[a]n agreement to drill formed the consideration upon which [Joiner] was able to collect

leases"), it pointedly declined to determine whether the seller's representations gave rise to an

enforceable contract.

> Whether . . . the assignee acquired a legal right to compel the drilling of the
> test well is a question of state law which we find it unnecessary to
> determine.

*Id.* at 349.[3]  Instead, it was the expectations created by the seller, which were inextricable from the

interest being offered, that brought the transaction within the scope of the federal securities law.

> It is clear that an economic interest in this well-drilling undertaking was
> what brought into being the instruments that the defendants were selling and
> gave to the instruments most of their value and all of their lure.  The trading
> in these documents had all of the evils inherent in the securities transactions
> which it was the aim of the Securities Act to end.

*Id.*

With that as its foundation, the *Howey* Court then defined an investment contract as "a

contract, transaction or scheme," 328 U.S. at 298–99 – using a comma after "contract," the first

option in the series of three nouns – and not as a contract*ual* transaction or scheme.  The language

is deliberately broad, and the use of the word "scheme" pervades the Supreme Court's next

---

3       It is true that the Court added, "[t]he terms of the offering as quoted above either by itself
or when read in connection with the agreement to drill as consideration for the original leases
might be taken to embody an implied contract in which payments were timed and contingent upon
completion of the well and therefore a form of investment contract in which the purchaser was
paying for both a lease and a development project."  *Id.* at 349.  But it is clear from the use of the
word "might" that the actual existence of a contract was not necessary to the decision.

investment contract case, *SEC v. Edwards*. *See* 540 U.S. at 393. The question before the Court in *Edwards* was whether an investment scheme that offered an entitlement to a fixed rate of return could constitute an "investment contract," but the point of the opinion was not the presence or absence of a contract; the sole question before the Court was whether the fixed rate of the anticipated return, as opposed to a variable rate, excluded the arrangement from the term "investment contract." *Id.* at 391.

The defendants do not only misread Supreme Court precedent; they insist that the D.C. Circuit weighed in on the question in its decision denying rehearing *en banc* in *SEC v. Life Partners,* 102 F.3d. 587 (D.C. Cir. 1996). But a review of that decision proves that defendants' reliance on it is misplaced as well. In denying rehearing, the Court decided to clarify any misimpression left by the discussion in its initial opinion concerning the third element of the *Howey* test – that the expected profits must be generated by the "efforts of others" – and its observation that "post-purchase efforts" are "most obviously relevant." *See Life Partners I*, 87 F.3d at 545. The Court did not address the need for an actual contract at all.

Furthermore, the notion that a contractual relationship is required has been consistently rejected by other district courts faced with crypto currency cases in recent years. *See, e.g., Telegram*, 448 F. Supp. 3d at 365 ("The *Howey* test provides the mode of analysis for an unconventional scheme *or* contract alleged to fall within the securities laws.") (emphasis added); *see also id.* at 379 ("*Howey* refers to an investment contract, i.e. a security, as 'a contract, transaction or scheme,' using the term 'scheme' in a descriptive, not pejorative, sense.") In granting a motion for a preliminary injunction, the court in *Telegram* pointed to an implicit understanding, and not a formal agreement, as the basis for its finding that there was a substantial

likelihood the SEC would succeed on the merits of its claim that the Telegram Group sold its

tokens as an investment contract.

> As part of its *Howey* analysis, the Court finds an implicit (though formally disclaimed) intention on the part of Telegram to remain committed to the success of the TON Blockchain post-launch.  Indeed, Telegram, as a matter of fact rather than legal obligation, will be the guiding force behind the TON Blockchain for the immediate post-launch period while the 175 purchasers unload their Grams into the secondary market.  As such, the initial 175 purchasers possess a reasonable expectation of profit based upon the efforts of Telegram.

*Id.* at 358–59; *see also SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (D. Conn. 2020)

("[A]n ongoing contractual obligation is not a necessary requirement for a finding of a common

enterprise. . . . The contractual language is important to, but not dispositive of, the common

enterprise inquiry, and courts regularly consider representations and behavior outside the

contract."); *Terraform I*, 684 F. Supp. 3d at 193 ("[T]here need not be – contrary to defendants'

assertions – a formal common-law contract between transacting parties for an 'investment

contract' to exist.").[4]

---

[4]     Defendants cite *Rodriguez v. Banco Central Corp.*, 990 F.2d 7 (1st Cir. 1993), for the proposition that a contract is required, but that decision – that the offering at issue was not a security – did not turn on the absence of a contractual obligation on the part of the seller to make improvements to the real estate it was selling.  The court started with the principle that a simple sale of land, for use or for investment, is not a "security," *id.* at 10, but, after laying out the *Howey* test, it acknowledged that "[a]t some point, however, the commitments and promises incident to a land transfer, and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise."  *Id.* at 11.  Its decision that the deal in question did not qualify rested on the fact that while the defendants encouraged the buyers to anticipate future growth and development, they did not promise to do anything to help achieve that goal themselves; they "left the distinct, and distinctly false, impression that a community was going to grow through natural forces." *Id.* Indeed, the court noted, "[a] security *might* exist if the defendants had promised, along with the land sales, to develop the community themselves.  Then each buyer might be acquiring an interest not only in land but in a package of commitments that, taken together, could comprise a business venture harnessing the entrepreneurship of the promoter." *Id.*

**B.     The elements of an investment contract**

     **1.     The Court finds it necessary to distinguish between the digital coins themselves and the offers to sell them.**

The Court notes that several of the district courts presented with SEC enforcement actions involving crypto currencies have taken pains to differentiate the alleged investment contracts from the tokens themselves.  *See Telegram*, 448 F. Supp. 3d at 379 ("While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence. . . . This case presents a 'scheme' to be evaluated under *Howey* that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram."); *Terraform I*, 684 F. Supp. 3d at 193 (the court need not "restrict its *Howey* analysis to whether the tokens themselves – apart from any of the related various investment protocols – constitute investment contracts"); *see also Ripple Labs I*, 682 F. Supp. 3d at 323 ("*Howey* and its progeny have held that a variety of tangible and intangible assets can serve as the subject of an investment contract. . . . In each of these cases, the subject of the investment contract was a standalone commodity, which was not itself inherently an investment contract. Here, defendants argue that XRP does not have the 'character in commerce' of a security and is akin to other 'ordinary assets' like gold, silver, and sugar. . . . This argument misses the point because ordinary assets – like gold, silver, and sugar – may be sold as investment contracts, depending on the circumstances of those sales.") (internal citations omitted).

The Court finds these observations to be clarifying and persuasive, as the differentiation is consistent with the Supreme Court's earliest pronouncements concerning the meaning of the term "investment contract" buried within the lengthy list that comprises the definition of a "security":

> In applying acts of this general purpose, courts have not been guided by the nature of the assets back of a particular document or offering.  The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out

to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be.

*Joiner*, 320 U.S. at 352–53. Obviously, orange groves are not securities, yet the seminal case on this point found the set of contracts and expectations surrounding their sale to be an investment contract for purposes of the Act. *See Howey*, 328 U.S. 293.

In the Court's view, then, the SEC's suggestion that the token is "the embodiment of the investment contract," SEC Opp. at 29; *see also* Mot. Hr'g Tr. at 93 ("The token represents and embodies that investment contract."), as opposed to the *subject* of the investment contract, muddied the issues before the Court, ignored the Supreme Court's directive that the analysis is supposed to be based on the entire set of understandings and expectations surrounding the offering, and unnecessarily invited the defendants' argument that a decision in the government's favor here would somehow encroach on the jurisdiction of the Commodities Futures Trading Commission. Mot. Hr'g Tr. at 48–49. Therefore, the Court will endorse and follow the approach taken by the thoughtful judges who boldly wrestled with crypto assets before this case was filed, and it will assess the offerings identified in the complaint individually, resisting the government's implication that this ruling could go so far as to answer the definitional question that officials in the other branches of government appear to have been assiduously avoiding. In short, no one should read this case as deciding that crypto assets themselves are or are not "securities;" that is not the question presented.

There is no D.C. Circuit precedent directly on point, and while district courts in other jurisdictions have agreed on fundamental principles, they have sometimes diverged in important ways when applying them to the circumstances before them. As the court in *Kik Interactive* observed, this is a lonely place to be, but the general principles underlying securities jurisprudence can help illuminate a path through the uncharted waters:

> I have to decide this case without benefit of direct precedent in relation to cryptocurrencies. I do so, understanding that the definition of investment contract is "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

492 F. Supp. 3d at 177, quoting *Howey*, 328 U.S. at 299.

With the same understanding in mind, this Court will undertake the task it has been assigned: to apply all of the principles set forth above to the allegations in the complaint, resolving any inferences in favor of the plaintiff. But that being said, it is worth noting that intangible digital assets do not fit neatly into the rubric set forth in the mere seven pages that comprise the *Howey* opinion. Also, the agency's decision to oversee this billion dollar industry through litigation – case by case, coin by coin, court after court – is probably not an efficient way to proceed, and it risks inconsistent results that may leave the relevant parties and their potential customers without clear guidance.

### 2. The investment of money in a common enterprise

Under *Howey* and *Life Partners*, an investment contract requires an investment of money by the purchaser in a common enterprise. 328 U.S. at 298–99; 87 F.3d at 542. Since neither motion to dismiss challenges the sufficiency of allegations with respect to the investment of money, the Court need not dwell on that aspect of the analysis further. But what is a "common enterprise"?

*Howey* did not define the term. It observed, though, that the purchasers had no desire or ability to occupy the land or develop it themselves, and that individual development of the plots would not be economically feasible given their small size. 328 U.S. at 300. "A common enterprise managed by respondents or third parties with adequate personnel and equipment is therefore essential if the investors are to achieve their paramount aim of a return on their investments." *Id.*

Subsequently, the Second Circuit explained that "[a] common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). The Sixth Circuit also deemed the pooling of funds to be a necessary component of the arrangement:

> Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds.

*Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir. 1984), quoting *Union Planters Nat. Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir. 1981).

The leading D.C. Circuit case on investment contracts advised that "[s]o-called horizontal commonality – defined by the pooling of investment funds, shared profits, and shared losses – is ordinarily sufficient to satisfy the common enterprise requirement." *Life Partners I*, 87 F.3d. at 543, citing *Revak*, 18 F.3d at 87. The Court added, "it is the inter-dependency of the investors that transforms the transaction substantively into a pooled investment." *Id.* at 544. But it did not directly address the question of whether there was sufficient commonality in the situation before it; it disposed of the case based on its analysis of the third element: whether there was an expectation of profits based on the efforts of others, and it concluded that the test had not been met. *See id.* at 545–46.

In *SEC v. Banner Fund International*, 211 F.3d 602 (D.C. Cir. 2000), the Circuit upheld a trial court's ruling that an offering of interests in the Off Shore Banner Fund International Arbitrage Program was an investment contract. It repeated the *Life Partners* observation that a common enterprise is ordinarily met with a showing of horizonal commonality, which, it explained

"requires that there be a pooling of investment funds, shared profits and shared losses." *Id.* at 614 (internal quotations omitted), citing *Life Partners I*, 87 F.3d at 543. The Court emphasized that the program at issue was marketed on the express premise that Banner Fund would combine the funds from small investors so that they could participate in larger deals in the marketplace that would otherwise be far beyond their reach. *Id.* at 615; *see also id.* at 606. It also observed that profits and losses were shared with individual purchasers based upon the amount of their investments. *Id.* at 615.

Other circuits have determined that a showing of "vertical commonality," which is based on the relationship between the promotor and the investors can also satisfy the requirement of a common enterprise. *See, e.g., SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974).

> In an enterprise marked by vertical commonality, the investors' fortunes need not rise and fall together; a pro-rata sharing of profits and losses is not required. Two distinct kinds of vertical commonality have been identified: "broad vertical commonality" and "strict vertical commonality". To establish "broad vertical commonality", the fortunes of the investors need be linked only to the *efforts* of the promoter. . . . "Strict vertical commonality" requires that the fortunes of investors be tied to the *fortunes* of the promoter.

*Revak*, 18 F.3d at 87–88 (citations omitted) (emphasis in original).

District courts considering SEC actions against the issuers of crypto assets have referred to both horizontal and vertical commonality when addressing this element. In granting the agency's motion for a preliminary injunction in *Telegram I*, the court found that the SEC had satisfied the requirement of a common enterprise with a showing of both horizontal commonality and strict vertical commonality.

> After the 2018 Sales, Telegram pooled the money received from the Initial Purchasers and used it to develop the TON Blockchain as well as to maintain and expand Messenger. The ability of each Initial Purchaser to

23

> profit was entirely dependent on the successful launch of the TON Blockchain.
>
> * * *
>
> Alternatively, the SEC has made a substantial showing of strict vertical commonality.  Each Initial Purchaser's anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain.  Telegram's own fortunes were similarly dependent on the successful launch of the TON Blockchain as Telegram would suffer financial and reputational harm if the TON Blockchain failed prior to launch.

*Telegram I*, 448 F. Supp. 3d at 369–70 (citations omitted).

Given the dearth of circuit precedent concerning the vertical theory, though, decisions relying on horizontal commonality alone tend to predominate.  The court in *Kik Interactive* granted summary judgment in favor of the agency on a horizonal commonality theory:  "[t]he economic reality is that Kik, as it said it would, pooled proceeds from its sales of [the token] Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment."  492 F. Supp. 3d at 179; *see also id.* at 178 ("The success of the ecosystem drove demand for Kin and thus dictated investors' profits.  Kik recognized and repeatedly emphasized this.").  The court acknowledged that there was no pro rata distribution of profits as in the *Howey* situation, but it found that was not necessary for horizontal commonality as "investors reaped their profits in the form of the increased value of Kin."  *Id.*, citing *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("a formalized profit-sharing mechanism is not required for a finding of horizontal commonality").  In *Balestra,* the court rejected the defendants' contention that the purchasers' ability to exercise individual control over their own tokens signaled the absence of a common enterprise; "[p]laintiff

plausibly alleges that the potential profits stemming from the future valuation of the ATB Coins were entirely reliant on the success of the defendants' new blockchain."  *Id.*[5]

### 3.  The expectation of profits due to the efforts of others

The next element of the *Howey* standard is that the investor "is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 299.  The D.C. Circuit has softened the impact of "solely" by requiring only that profits be generated "predominantly" from the efforts of others.  *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992).

Profits can mean a share of the earnings realized from the use of the investors' funds, or "capital appreciation resulting from the development of the initial investment."  *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975).  With respect to crypto assets, courts have found that an anticipated increase in the market value of the coin falls within the category of a "profit" or financial return for purposes of the *Howey* test.  *See Kik Interactive,* 492 F. Supp. 3d at 179.

When elaborating upon the *Howey* "efforts of others" requirement, the D.C. Circuit differentiated between pre-purchase activities and the efforts to be undertaken after the investment

---

5      *See also Ripple Labs I*, 682 F. Supp. 3d at 325 (finding horizontal commonality since Ripple pooled the proceeds of sales and controlled the accounts, using the funds to finance its operations; also noting that the buyers' ability to profit was tied to Ripple's fortunes and the fortunes of other buyers since all received the same fungible token, the value of which was dependent on the success of the enterprise); *Terraform I*, 684 F. Supp. 3d at 195–96 (complaint alleged the existence of a common enterprise with respect to two tokens based on horizontal commonality:  defendants marketed the UST coins to be deposited in the Anchor Protocol, where they were "pooled," and through defendants' managerial efforts, would generate returns to be redistributed on a pro-rata basis; and as to the LUNA coins, the SEC alleged that the sales proceeds would be used to develop the Terraform blockchain, thereby increasing the value of the coins themselves, benefitting all holders equally); *see also SEC v. Terraform Labs*, No. 23-cv-1346 JSR, 2023 WL 8944860, at *14 (S.D.N.Y. Dec. 28, 2023) ("*Terraform II*") (reaching the same conclusion at summary judgement).

proceeds had been received, and between entrepreneurial efforts on the part of the promoter and purely ministerial ones. *Life Partners I*, 87 F.3d at 545–46. It later clarified in *Life Partners II*: "to the extent that we established any rule in applying the 'efforts of others' test, we held only that [1] pre-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others, and that [2] ministerial functions should receive a good deal less weight than entrepreneurial activities." 102 F.3rd at 588 (internal quotations omitted).[6]

Finally, the law in this Circuit is clear: "the expected profits must, in conformity with ordinary usage, be in the form of a financial return on the investment, not in the form of consumption." *Life Partners I*, 87 F.3d at 543; *see also Forman*, 421 U.S. at 853 ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased – 'to occupy the land or to develop it themselves,' as the *Howey* Court put it . . . the securities laws do not apply."); *Banner Fund*, 211 F.3d at 614. "The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371.

The Court must apply the principles set out above to each of the offerings alleged to be "investment contracts" in the complaint.

---

6    Applying that test, the Court of Appeals affirmed the trial court's determination that a viatical settlement – an arrangement through which an investor acquires an interest in the life insurance policy of a terminally ill person, at a discount determined by the insured's life expectancy – did not constitute an "investment contract" for purposes of the Securities Act. *Life Partners I*, 87 F.3d at 549; *Life Partners II*, 102 F.3d at 589. The seller's role was largely ministerial once the interest had been sold, and more importantly, the existence or amount of any "profits" was determined by the how long the insured survived, and therefore, it could not be said that the profits derived predominantly from the efforts of others. *Id.*

C.      **Count One plausibly alleges that Binance offered and sold BNB as an investment contract.**

1.      **The Initial Coin Offering**

The complaint alleges that in 2017, Binance launched its Binance.com platform to provide services to crypto asset investors, and it created and marketed a new digital token called the Binance coin, or BNB, to finance the venture.  Compl. ¶ 80.  BNB is an ERC-20 token issued on the Ethereum blockchain.  Compl. ¶ 287.  During the initial coin offering ("ICO"), Binance created 200 million BNB on the blockchain and announced that it would never issue more.  Compl. ¶ 293.  It structured the offering in phases with planned price increases at each successive phase, thereby rewarding the earliest buyers with an effective discount and the potential for immediate returns upon resale.  Compl. ¶ 293.

According to the SEC, "BNB was offered and sold as a security because Binance touted an investment in BNB as an investment in Binance's efforts to create a successful crypto asset trading platform centered around BNB."  Compl. ¶ 82.  The complaint draws heavily on representations and marketing statements contained in a whitepaper entitled "Binance Exchange," which was used to promote the ICO.  Compl. ¶¶ 82–83, 290, referring to Binance Exchange, Whitepaper V1.1 (June 16, 2017) ("Binance Whitepaper" or "Whitepaper").[7]

The Binance Whitepaper referred to the first purchasers of the new token coin as "investors," and it began, "[w]ith your help, Binance will build a world-class crypto exchange,

_____

[7]      Since the Binance Whitepaper is referenced and incorporated in the complaint, the Court may consider its contents in connection with the motion to dismiss.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  A copy of the Whitepaper, among other documents, were provided to the Court pursuant to its January 10, 2024 order for the parties to file the documents they considered to be "incorporated by reference in the complaint."  Minute Order (Jan. 10, 2024); *see* Notices of Docs. Incorporated by Reference in the Compl. [Dkt. ## 205–06].

powering the future of crypto finance."  Compl. ¶¶ 82, 291; *see also* Binance Whitepaper.[8]  The Whitepaper described the characteristics and capabilities of the new platform, "touting several competitive advantages the platform would supposedly have over other crypto asset platforms," Compl. ¶ 290, and it "lauded the credentials and financial expertise of Zhao and other founding members," pointing to their "decades of combined experience building and maintaining world class financial systems."  Compl. ¶ 291, quoting Binance Whitepaper.  The document concluded:

> We know this will be an ultra competitive space.  There are probably hundreds, if not thousands of teams wanting, planning or doing exchanges. Competition will be fierce.  But in this age, this is a common risk in any decent concept/startup or mature company.  The question is:  given our team, track record, experience, industry resources and product, do you believe we stand a better chance than the rest of the pack?  If yes, then please join our ICO.

Compl. ¶ 292, quoting Binance Whitepaper.

Viewed in the light most favorable to the plaintiff, the complaint plausibly alleges that the BNB was offered as an investment contract at the time of the ICO.  The allegations and the Whitepaper itself give rise to an inference that investors purchased coins with an expectation of profit, in the form of future appreciation, that would derive from a common enterprise dependent upon the managerial and entrepreneurial efforts of others.  Binance made it clear that it was soliciting the funds for the specific purpose of building a strong exchange that would not be plagued by the problems that had stymied the growth of other crypto exchanges, such as "poor technical architecture," "insecure platform," "poor market liquidity," "poor customer service," and "poor internationalization and language support."  *See* Whitepaper.  It assured the potential purchasers that its "matching engine is capable of sustaining 1,400,000 orders/second, making it

---

8       The seventeen-page Whitepaper lacks page numbers so they will be absent from the citations as well.

one of the fastest matching engines in the market." *Id.* It emphasized that its team had the technical expertise and deep experience to bring the project to fruition. *Id.* And importantly for the *Howey* analysis, Binance and its CEO expressly linked the future value of the coins to the success of the exchange it planned to develop with the proceeds of the ICO. Compl. ¶¶ 301, 302 ("For example, in a public 'Ask Me Anything' discussion on Reddit on June 28, 2017, Zhao explained: 'The token is a tool to facilitate the ICO. We didn't invent a new coin, our focus is on building a valuable platform. The value of the coin is heavily associated with how well the platform does. Basically, if the platform is successful, the more users use the platform to trade, the more users will buy the coin, hence the price will increase.").

Also, the averment that "each BNB coin is identical to every other BNB token, and the price of all BNB tokens increases or decreases together," Compl. ¶ 312, supports a finding of the horizontal commonality needed for the "common enterprise" element. The case law points to whether the proceeds of the offering were "pooled" as a critical aspect of analysis, and although the complaint is thin on this point, it does allege that "Binance pooled the proceeds of its BNB ICO to develop the Binance.com Platform as it stated publicly that it would," Compl. ¶ 298, and the Court is bound to accept the truth of that statement at this time. The Whitepaper further reflects the shared stake in the success of the enterprise when it announced that Binance would reserve forty percent of all BNB tokens for its "Founding Team" and another ten percent for the "Angel Investors" who purchased before the ICO. Compl. ¶ 294; *see also* Compl. ¶ 313 ("Binance's distribution of tokens among investors and its Founding team aligned their incentives in building

a successful Binance.com Platform, as that would yield an increase in BNB's market price that would yield profits to all BNB investors.").[9]

With respect to the "efforts of others" that would be the engine behind future gains for the investors, it is notable that in addition to undertaking to develop a superior platform, Binance also vowed at the start that it would take steps to increase demand for BNB – and thus, its value – by taking planned steps to restrict supply. "[T]he Binance Whitepaper stated that Binance would 'destroy,' or burn, half of the BNB over time by using Binance's profits with respect to the Binance.com Platform to repurchase and then destroy BNB." Compl. ¶ 295.

For all of these reasons, the Court finds that the complaint plausibly alleges that BNB was offered and sold as an investment contract, and therefore, as a security. There is no dispute that BNB was offered and sold without a registration statement filed or in effect, *see* Compl. ¶ 515, and therefore, to the extent that the First Claim for Relief is predicated on the initial coin offering in 2017, it states a claim for a violation of Sections 5(a) and 5(c) of the Securities Act.

That is not to say that the SEC's own allegations, and the materials upon which they are based, do not raise questions about what will be established at the end of the day. The question as to what motivated the reasonable purchaser at the time may prove to be a close one. As the court observed in the *Telegram* case, "[a] transaction does not fall within the scope of the securities laws when a reasonable purchaser is motivated to purchase by a consumptive intent." 448 F. Supp. 3d. at 371. In that case, the existence of an extended lockup period was one aspect of the first round of the offering that in the court's view "tend[ed] to negate the likelihood that a reasonable

---

9       Given the allegations supporting a plausible inference of horizontal commonality, the Court will not go on to consider vertical commonality at this juncture, particularly given the absence of Circuit precedent concerning a requirement of any form of vertical commonality.

[purchaser] purchased [the tokens] for consumptive use." *Id.* at 373; *see also id.* ("Simply put, a rational economic actor would not agree to freeze millions of dollars for up to 18 months . . . if the purchaser's intent was to obtain a substitute for fiat currency."); *Ripple Labs I*, 682 F. Supp. 3d at 328 (the Institutional Buyers' agreement to lock up the tokens was viewed as an additional factor supporting the reasonable expectation of profit element, as it was not consistent with the use of the tokens as currency). While that does not mean that the converse is true, i.e., that the absence of a lockup period shows that consumption *was* the motivation for the purchases, it is notable that there were no restrictions on even the first purchasers' use of their BNB.

It is also significant that one key selling point of the BNB coin detailed in the Whitepaper was that purchasers could use BNB to pay for any fees on the platform, including exchange fees, withdrawals fees, listing fees, and any other fees, and that when they used BNB to pay those fees, they would receive significant discounts: 50% the first year, 25% the second year, 12.5% the third year, and 6.75% in year four. *See* Whitepaper. This could support a contrary finding at a later stage in these proceedings that it was the ability to utilize the BNB to obtain discounts that served as the incentive for participation in the ICO. Indeed, the complaint alleges that when BAM "CEO B" looked back at the company's experience with BNB in an interview in 2021, he said:

> [W]e have learned a lot from the BNB coin (the Binance token) about the power of coupling incentives inside of a smart contract with fungibility. *Think about what the Binance token is – it represents the right to receive discounts on our trading fees, which people use it for, a lot. But increasingly, people are choosing to hold the token, rather than spend it for the discount because they found that the increased value of the token as the company grows, exceeds the financial value of the discounts.* And so it gets our customers to act a little bit more like owners – people who want the company to succeed; their interests are aligned with that of the company.

Compl. ¶ 302(d) (emphasis added). The facts underlying observations such as this could bear on the ultimate objective analysis of what the reasonable purchaser's expectations were at the time of the ICO as opposed to how they may have evolved over time.

Also, while the complaint alleges that "Binance pooled the proceeds of its BNB ICO to develop the Binance.com Platform – as it stated publicly it would," Compl. ¶ 298, the Whitepaper advised that just "35% of the funds will be used to build the Binance platform and perform upgrades to the system, which includes team recruiting, training, and the development budget." Whitepaper. The connection between the allocation of the remaining 65% and the value of the coins was somewhat more attenuated:

> 50% will be used for Binance branding and marketing . . . . A sufficient budget for various advertisement activities, to help Binance become popular among investors, and to attract active users to the platform.

> 15% will be kept in reserve to cope with any emergency or unexpected situation that might come up.

Whitepaper.

Looking at everything that has been alleged that bears on the economic reality of the overall transaction, though, and given the requirement that at this stage, it is required to accept the SEC's factual allegations as true and resolve every factual inference in its favor, the Court finds that the allegations are sufficient to state a plausible claim that the initial offering of BNB qualifies as an investment contract, and the claim will move forward.

### 2. Binance's ongoing sales of BNB after the ICO

The complaint does not stop at the ICO, however. It alleges that that "from the time of the ICO *to the present*, BNB was offered and sold as an investment contract and therefore, as a security." Compl. ¶ 288 (emphasis added). While this assertion is quite conclusory, if one considers the set of allegations concerning subsequent sales in the context of the other allegations in the complaint concerning the launch of BNB and the ICO, and resolves all inferences in favor of the SEC, what has been provided is sufficient to enable this aspect of the BNB claim to move forward for now as well.

Paragraph 302 alleges that "Binance has continued to tout the investment potential of BNB over time, and has continued to tell investors after the ICO that Binance's efforts to make the Binance.com Platform more profitable will increase BNB's value."  Compl. ¶ 302; *see also* Compl. ¶ 301 ("Since Binance.com launched in July 2017, BNB has traded on the Binance.com Platform, and Binance and Zhao have continued to lead BNB investors to believe that BNB's price is tied to the success of the Binance.com Platform.").  The complaint includes several examples of statements made by Binance executives encouraging purchasers to consider the coin's investment value:

- In an interview broadcasted globally on YouTube.com on October 10, 2018, Binance's Chief Growth Officer stated, "By having people invest in BNB token, they're even more interested in the success [of the Binance.com Platform] . . . . By holding BNB, you are effectively holding an influential share of the crypto project."

- In an interview broadcasted globally on YouTube.com on January 10, 2020, Binance's Managing Director stated, "Recently we launched lending, we launched staking, we launched futures, all of those new businesses contribute to the value of BNB."

Compl. ¶ 302.[10]  The complaint further alleges that Binance launched a $7.5 billion venture capital effort called "Binance Labs" that invested in grants to people developing applications for Binance blockchains, including BNB-related applications.  Compl. ¶ 304.  "And in October 2022, Binance announced that Binance Labs was investing in seven new projects that, as a Binance founder

---

[10]     Paragraph 302(c) also recites statements made by Zhao in December 2020 in "an internal Binance town hall" to the effect that the Binance.com platform is a "relatively big driving force for [BNB] value," and that "we'll push BNB as much as we can," "[w]e're also incentivizing the ecosystem," and "I'm fully bullish that BNB will outrun BTC."  Compl. ¶ 302(c).  But there are no facts alleged that would support an inference that this internal cheerleading reached the investing public.

described, 'will grow further and positively impact the BNB Chain and the broader crypto ecosystem.'" *Id.*

The SEC also alleges that since 2019, Binance offered to pay their employees' salaries in BNB, and that it made the public aware of that fact:

> Publicly reminding investors what the economic reality made plain – that Binance and its employees' fortunes with respect to BNB were tied to BNB investors' fortunes – Binance has frequently touted the popularity of Binance's program of offering BNB as compensation to its employees. For example, in a February 11, 2019 interview, Zhao stated, "Almost all [employees] take some comp in BNB. Many take 100% in BNB. They know what we do, and how we do it, literally, from inside out. And it is an easy decision for them to make."

Compl. ¶¶ 306–07 (alteration in original); *see also* Compl. ¶ 310 ("Zhao frequently touted Binance's Employee Stock Token Options Plan ('ESTOP'), which granted high performing employees BNB, essentially equivalent to employee stock options, as the best way for employees to profit from the growth of the Binance.com Platform. He has also encouraged Binance

employees to hold BNB to share in the company's profits, noting that it would correlate closely to the company's long-term financial growth.").[11]

The post-ICO aspect of Count One survives the motion to dismiss, but that does not mean that all questions have been put to rest. The SEC alleges that "[s]ince the ICO, Binance has encouraged the Binance.com Platform's customers to buy BNB by offering a 25 percent discount when investors use BNB to purchase a crypto asset. . . . Accordingly, Binance creates additional financial incentives to buy BNB, thereby increasing demand for BNB, and its value." Compl. ¶ 300; *see also* Compl. ¶ 304 ("Binance has additionally worked to increase demand for BNB by

---

[11]    Paragraph 306 alleges that Binance "offered and sold BNB to its employees in the United States and elsewhere by offering to pay salaries in the form of BNB." Compl. ¶ 306. Since the complaint does not have an independent claim alleging that the offer to employees was an "investment contract," and the SEC appears to be highlighting the statements about compensation and the stock option plans to advance its claim that after the ICO, Binance continued to market BNB to the public as an investment contract, the Court does not find it necessary to determine at this time whether the SEC has shown that the offer to pay employees BNB itself includes all of the elements of an investment contract, in particular, the first element of an investment of money. *See Ripple Labs I*, 682 F. Supp. 3d at 330–31 (finding that distributions to employees as compensation do not satisfy the first prong of *Howey*); *Ripple Labs II*, 2023 WL 6445969 at *6 (finding no substantial ground for difference of opinion about the holding in *SEC v. LBRY*, 639 F. Supp. 3d 211 (D.N.H. 2023), because the defendant in that case did not dispute the "investment of money" element).

At the hearing, the SEC cited *One-O-One Enterprises, Inc. v. Caruso*, 668 F. Supp. 693, 700 (D.D.C. 1987), for the proposition that the investment of money prong can be satisfied with the provision of services. Mot. Hr'g Tr. at 85. But that non-binding opinion does not discuss employee compensation, and it is not particularly helpful. The case involved an agreement in which the defendants, who owned a successful chain of steakhouses, purchased ten "debt ridden" restaurants from the plaintiffs and had a six year option to purchase twenty-five more. The plaintiffs alleged fraud in what they claimed was a securities transaction. 668 F. Supp. at 695–96. The court found that the option for defendants to buy some of the restaurants was not a security, even though the "investment of money" element was established: the defendants did not give the plaintiffs any money in exchange for the restaurants, but they did give plaintiffs valuable consideration in the form of waiving franchise fees, which had the same effect as giving them money. *Id.* at 700. The court added that the defendants provided plaintiffs with "training, on-going advice on operations, and marketing and promotional services," all of which also had financial value. *Id.*

seeking to create additional ways in which BNB can be used – *thereby further increasing demand for the token and its value*.") (emphasis added).  While entrepreneurial acts to increase demand may have the *effect* of enhancing BNB's value, and that is certainly good for investors and may support the "common enterprise" element, the allegation that Binance is marketing BNB – successfully – by emphasizing the ways it can be used raises questions about the strength of the showing supporting the existence of the "expected profits" element over time.  Will an evaluation of the totality of the circumstances surrounding sales after the ICO support the requisite finding that Binance's representations created an expectation on the part of the reasonable purchaser of profits in the form of a financial return on the investment?  Or was the company urging the reasonable purchaser to acquire the coins to use them?  While it is not necessary that each offeree purchase the asset that is the subject of an investment contract as an investment, *see Howey*, 328 U.S. at 300; *Terraform II*, 2023 WL 8944860, at *14, citing *Howey* at 300 (finding, in connection with grant of summary judgment in the SEC's favor that it was of no consequence that not all of the coin purchasers deposited them in the protocol that was part of the "investment contract"), it *does* matter how the asset was sold and what a purchaser in the marketplace would have reasonably understood it to be, and the complaint contains very little concerning how BNB was actually promoted and sold after the ICO.[12]  *See Ripple Labs I,* 682 F. Supp. 3d at 324 (differentiating between the circumstances surrounding Institutional Sales and those attending Programmatic Sales).

---

[12]    Indeed, in a document the SEC identified as incorporated in the complaint, *see* SEC's Notice of Docs. Incorporated by Reference in the Compl. [Dkt. # 205] at 2; Compl. ¶ 282–86, 325–38, Binance lauded the versatility and usefulness of its product:  "As the native coin of Binance Chain, BNB has multiple use cases:  Fueling transactions on the Chain, paying for transaction fees on Binance Exchange, making in-store payments, and many more."  "BNB Vault:  One-click to earn multi-benefits with BNB," Binance.com (Apr. 2, 2023).

### 3. Secondary sales of BNB

The absence of allegations on this point becomes even more problematical when one considers the SEC's contention that a determination that the BNB was sold as an investment contract at the outset necessarily means that any secondary sale of the token itself was a sale of a security. *See* Compl. at ¶¶ 288, 305; SEC Opp. at 15–17, 28–30. There is no circuit precedent on this issue, and district judges have differed in their approach.

The court in *Ripple Labs I* did not reach the issue, as it was addressing Programmatic Sales, but it observed in a footnote:

> Whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme.

682 F. Supp. 3d at 329, n.16, citing, *inter alia,* Tr. of Mots. Hr'g at 34:14–16, *SEC v. LBRY*, 639 F. Supp. 3d 211 (D.N.H. 2023) (No. 21 Civ. 206), ECF No. 105 (declining to extend holding to include secondary sales).[13] But the court in *Terraform I* expressly rejected that view:

> [T]he Court declines to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not.

---

13    The court reiterated in its opinion denying the SEC's motion for interlocutory appeal that its decision that Ripple Labs' Programmatic Sales were not investment contracts was not based merely on the fact that they were sold through secondary market transactions to retail investors. *Ripple Labs II*, 2023 WL 6445969 at *6. "Rather, the Court concluded, based on the totality of circumstances, that an objective, reasonable Programmatic Buyer would not believe that 'sales from purchases of *all* [XRP] . . . would be fed back into [Ripple and the XRP Ledger] and would generate additional profits for *all* [XRP] holders." *Id.* (alterations in original). While this clarifies that there is no holding in the *Ripple Labs* opinions with respect to secondary sales, it reiterates the *Ripple Labs* court's view that the determination of whether any sale constitutes an investment contract must be based on the totality of the circumstances surrounding that sale, and what an objective buyer's understandings would be.

684 F. Supp. 3d at 197. It noted that *Howey* makes no distinction between purchasers; "[t]hat a purchaser bought the coins directly from the defendants, or instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts. . . . [D]efendants[] embarked on a public campaign to encourage *both* retail and institutional investors . . . ." *Id.* (emphasis in original).

The Court is inclined to agree with the approach of the court in *Ripple Labs*, since the "it-is-what-it-is" approach of the SEC appears to be inconsistent with the clear Supreme Court directives quoted in its pleadings, which hold that it is the economic reality of the particular transaction, based on the entire set of contracts, expectations, and understandings of the parties, that controls. *See* SEC Opp. at 30–31, quoting *Joiner,* 320 U.S. at 352–53 ("[E]ven if these assets have some inherent use . . . [w]hat matters are the 'economic inducements' used to encourage the transaction. . . . All of the relevant circumstances surrounding the sale of the asset must be analyzed."). The SEC repeatedly hearkens back to "the circumstances under which the assets in this case *were* offered and sold," *see, e.g.*, SEC Opp. at 31 (emphasis added), but those do not go so far as to establish its contention that "BNB *is* offered and sold an investment contract." SEC Opp. at 14.

One cannot argue with the general proposition that once a thing is deemed to be a security, it remains a security; the thing has not changed its nature. But the SEC is not alleging or asking the Court to find that the thing in question – the BNB token – is a security. Its allegation is that during the ICO and after, it was *offered as,* or sold as, a security. *See, e.g.*, Compl. ¶ 82. That determination, the SEC has explained, does not depend on the nature of the thing. It does not depend on what the thing represented. It depends on the economic reality of the transaction. *See*

SEC, Strategic Hub for Innovation & Fin. Tech., Framework for "Investment Contract" Analysis of Digital Assets (2019), https://perma.cc/46KZ-P5EA ("Framework Analysis") at 2 ("Whether a particular digital asset at the time of its offer and sale satisfies the *Howey* test depends on the specific facts and circumstances."); *see also Ripple Labs I*, 682 F. Supp. 3d at 328–29; *Ripple Labs II*, 2023 WL 6445969, at *6.

It may be that the SEC can establish that sales after the ICO or certain groups of secondary sales meet the criteria of an investment contract. *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 380–81 (finding based upon all of the surrounding facts and circumstances that secondary sales of the crypto currencies at issue were an offering of securities under *Howey* because the crypto currencies were initially sold with the intent that the institutional buyers re-sell them on the secondary market; Telegram did not intend for the assets to "come to rest with the 175 Initial Purchasers but to reach the public at large via post-launch resales by the Initial Purchasers" and built incentives into the initial sales to ensure that the initial purchasers resold soon after launch). But the government's reliance on the assertion that "[t]he crypto assets are the embodiment of the investment contract," SEC Opp. at 28–29; *see also* Mot. Hr'g Tr. at 93–94, and its argument at the hearing about the nature of the technology and the interdependence of the platform and the performance of every token, is not enough, standing alone, to bring secondary sales of BNB under the investment contract rubric. Moreover, the agreement is somewhat inconsistent with the singular theory the government has been advancing since this action was filed: we aren't saying that the coins are securities – we are talking about investment contracts. For example, the case began with this colloquy at the hearing on the motion to a temporary restraining order.

> THE COURT: When you use the formulation crypto asset versus crypto asset securities, can you tell me, what are the differentiating factors?
>
> MR. SCARLATO: Whether they meet the Howey test.

> THE COURT:  That's it?  The Howey test for each one –
>
> MR. SCARLATO:  Yes.

TRO Hr'g Tr. at 11.[14]

The question came up again at the hearing on the motion to dismiss.

> THE COURT: . . . Just to get started, is it fair to say that the SEC is not taking the position that every digital asset, token, or crypto asset is a security?
>
> MS. FARER:  Yes, Your Honor.
>
> THE COURT:  And it's . . . not your position that one of the these tokens standing alone is a security simply because somebody who buys it might make a profit?
>
> MS. FARER:  Yes, Your Honor.
>
> THE COURT:  Now, do you agree that there is a difference between the coins, the subject of the investment contracts, and the contracts themselves?  That is, the totality of the circumstances, or as the Telegram case puts it, the full set of contracts, expectations, or understandings surrounding how any particular coin is sold or distributed, and it's the latter that's dispositive?
>
> MS. FARER:  Yes, Your Honor.  The crypto asset, as we briefed, as Your Honor has seen in these cases, is simply a line of code and what we're

---

14      The SEC seemed reluctant at that time to clarify fundamental aspects of its position.

> THE COURT:  But you have said all over the complaint crypto assets – and you differentiate that specifically from crypto asset securities, and you make it clear that one category is larger than the other category and that both categories are on the Binance.com platform and the Binance.US platform, correct?
>
> MR. SCARLATO:  Yes.
>
> THE COURT:  So I'm asking you, the ones that you are not putting in the securities category, what are they?  Are they commodities?
>
> MR. SCARLATO:  We are not – thank you, Your Honor.  We are not taking a position at this time. . . .

TRO Hr'g Tr. at 12.

looking at is the economic realities and the totality of circumstances of how they're offered and sold.

* * *

THE COURT:  But as to ["the stablecoins"] in particular, or all of them, I guess, a standalone sale is not enough, it has to be based on how it was sold and marketed?

MS. FARER:  Correct, Your Honor.  You would have to take all of the complex realities, including promotion, the efforts of the issuers, the retention of any tokens.  I could go through a variety of categories and factors that are evaluated in these cases.

Mot. Hr'g Tr. at 66–67; *see also* Framework Analysis at 1 ("The focus of the *Howey* analysis is

not only on the form and terms of the instrument itself (in this case, the digital asset) but also on

the circumstances surrounding the digital asset and the manner in which it is offered, old or resold (*which includes secondary market sales*).") (emphasis added).[15]

Insisting that an asset that was the subject of an alleged investment contract is itself a "security" as it moves forward in commerce and is bought and sold by private individuals on any number of exchanges, and is used in any number of ways over an indefinite period of time, marks

---

[15] At the hearing on the motion, the SEC seemed to speaking out of both sides of its mouth on this issue. At several points, it took pains to disavow any intention to argue that once the assets were sold as securities, they retained that character forever, *see e.g.*, Mot. Hr'g Tr. at 89 ("So, Your Honor, to clarify, if anything that I said suggested that we think something once an investment contract is always an investment contract, that's not the case. That's not our position at issue."), while at others, it left the distinct impression that that was exactly what it meant.

> QUESTION BY THE COURT: . . . So if the buyer [in] the ICO could reasonably think Binance is going to use my investment and it's going to develop this platform and it's going to support this coin, and you're not saying that carries over, necessarily, after the buyer sells it to someone else, what are the expectations and understandings for contracts that are the circumstances that surround any resale?

> MS. FARER: So, Your Honor, the token itself represents the investment contract. . . . [W]hat is occurring here [with] the purchase of the token is you're buying into the enterprise. . . . [H]ere there is a pooling at the initial ICO and the investors purchase based on marketing and the promise of profitability, . . . and that . . . was based on the efforts of the issuers and promoters. That then carries through with the token. The token represents and embodies that investment contract. And nothing has changed simply because someone buys it directly from the purchasers on the – in a primary sale ICO or on a resale . . . .

*Id.* at 92–93 (emphasis added). In short, the SEC appears to be insisting that the representations made at the outset travel with the token. That is different from saying that after the ICO, Binance continued to market the BNB to new buyers as an investment contract. While counsel added that Binance makes "representations about profitability" and "there are ongoing representations about what they're going to do," and that the token's "value derives solely from the blockchain" and "they have to maintain the blockchain," *id.* at 93, the complaint does not lay out enough of the facts and circumstances surrounding ongoing secondary sales to support to a plausible inference that the reasonable secondary buyer would expect Binance to use their investment to generate profits on the buyer's behalf.

a departure from the *Howey* framework that leaves the Court, the industry, and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't. It is not a principle the Court feels comfortable endorsing or applying based on the allegations in the complaint, particularly since the only term among the approximately twenty options included in the statutory definition of "security" that is being relied upon in this case is "investment contract."

For these reasons, the Court will apply the only test the government has offered for assessing for whether a non-traditional asset is a security, and it finds that the complaint does not include sufficient facts to support a plausible inference that any particular secondary sales satisfy the *Howey* test for an investment contract. The SEC argues in its opposition and at the hearing that there were ongoing representations about the superiority of the platform that allegedly gave the tokens their value, but more is needed. It may well be, as the government maintains, that the "common enterprise" is ongoing, since the fortunes of all token holders rise and fall together and that their fortunes are largely tied to those of the company and its platform or "ecosystem," but that element alone is not sufficient. What about the investment of money? Other courts have not been troubled by payments made to an exchange instead of the issuer, *see, e.g.*, *SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *24 (S.D.N.Y. Mar. 27, 2024); *Terraform I*, 684 F. Supp. 3d at 197; *see also In re Ripple Labs, Inc. Litig.*, No. 18-cv-06753-PJH, 2024 WL 3074379, at *7 (N.D. Cal. June 20, 2024) (declining in a private securities class action to find, based on those decisions, that there was no "investment of money" as a matter of law). And more importantly, the facts needed

to plausibly allege an "expectation of profits" in the form of a return on an investment have not

yet been alleged.[16]

    **4.**    **Count One is not barred by the statute of limitations.**

Binance has also moved to dismiss Count One's allegations that it offered and sold BNB

without filing a registration statement, Compl. ¶ 515, on the grounds that the portion of the claim

that involves the "offering" of BNB is barred by the statute of limitations.  Binance Mot. at 35–

36.

A court may dismiss a claim on statute of limitations grounds if the claim is conclusively

time-barred on the face of the complaint; if the issue turns on contested questions of fact, dismissal

is not appropriate.  *Bregman v. Perles*, 747 F.3d 873, 875–76 (D.C. Cir. 2014), citing *de Csepel v.

Republic of Hungary*, 714 F.3d 591, 603 (D.C. Cir. 2013) and *Firestone v. Firestone*,

76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam) ("[C]ourts should hesitate to dismiss a complaint

on statute of limitations grounds based solely on the face of the complaint . . . because statute of

limitations issues often depend on contested questions of fact . . . .").

---

16    The SEC has directed the Court to a recent decision issued in *In re Ripple Labs, Inc.
Litigation*, a case consolidating a set of private class actions alleging both federal and state
securities violations by Ripple Labs, one of its subsidiaries, and its CEO.  Notice of Supp. Auth.
[Dkt. # 247] (attaching 2024 WL 3074379).  The court denied a defense motion for summary
judgment on a claim involving secondary investors because in that case, it declined to conclude,
as a matter of law, that Ripple's conduct would not have led a reasonable retail investor to have an
expectation of profit due to the efforts of others.  2024 WL 3074379 at *10.  The court took pains
to contrast the record before it with what was described in the opinions issued by the Southern
District of New York; its ruling was based on an evidentiary record that contained "numerous
promotional materials that were distributed to the general public via widely-distributed internet
posts and videos," evidence of online marketing efforts in which the CEO answered XRP
purchasers' questions directly on YouTube, and other "publicly disseminated" statements
regarding Ripple's entrepreneurial and/or managerial efforts, for example, in connection with the
cross-border payments industry.  *Id.* at *9.  The instant complaint does not contain analogous
allegations concerning outreach to retail buyers by Binance, and the California court's careful,
fact-based reasoning does not point to a different conclusion here.

Defendant submits that the portion of the claim concerning the "offering" of BNB necessarily relates to the June 26 to July 3, 2017 initial coin offering. Binance Mot. at 35–36; Compl. ¶ 81. Since the complaint in this case was filed more than five years later, Binance contends that the ICO falls outside the five-year limitations period for SEC actions for civil monetary penalties or disgorgement. Binance Mot. at 35–36, citing 28 U.S.C. § 2462, 15 U.S.C. § 78u(d)(8)(A)(i), and *Kokesh v. SEC*, 581 U.S. 455, 459 (2017).

The defense is correct that ordinarily, a five-year statute of limitations applies to actions for civil penalties, 28 U.S.C. § 2462, and non-scienter-based disgorgement claims, 15 U.S.C. § 78u(d)(8)(A)(i), while a ten-year statute of limitations applies for SEC scienter-based disgorgement actions and equitable actions. 15 U.S.C. §§ 78u(d)(8)(A)(ii), 78u(d)(8)(B). But that is not the end of the analysis for a defendant who is not found in the United States.

The provision governing civil penalties states that an action "shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon." 28 U.S.C. § 2462. Courts applying this provision have held that the statute of limitations did not begin to run until the defendants were present in the United States. *See SEC v. Sharp*, 626 F. Supp. 3d 345, 386 (D. Mass. 2022); *SEC v. Straub*, 921 F. Supp. 2d 244, 259–61 (S.D.N.Y. 2013) ("[T]he operative language in § 2462 requires, by its plain terms, that an offender must be physically present in the United States for the statute of limitations to run."); *SEC v. Wey*, 246 F. Supp. 3d 894, 935 (S.D.N.Y. 2017) ("[T]he Court finds that the limitations period has not run as to claims for civil penalties against [the defendant] as he has not been present in the United States during the five-year period.").

The statute governing the limitations periods for SEC disgorgement and equitable actions provides that when "calculating any limitations period under this paragraph with respect to an action or claim, any time in which the person against which the action or claim, as applicable, is brought is outside of the United States shall not count towards the accrual of that period." 15 U.S.C. § 78u(d)(8)(C).[17] "Accrual is the date on which the statute of limitations begins to run," *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 (D.C. Cir. 1991), quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990), and under this section, the statute of limitations does not begin to run until the defendant is in the United States. *See Sharp*, 626 F. Supp. 3d at 386.

Binance is a limited liability company based in the Cayman Islands. Compl. ¶ 27. While its violations of federal securities laws are alleged to have had effects within the United States, Compl. ¶ 24, they were undertaken from outside the United States. The complaint alleges that as of the launch of the Binance.com platform, Binance actively solicited customers in the United States, Compl. ¶ 104, and that U.S. based investors purchased BNB during the initial ICO. Compl. ¶ 297. When advisors and employees warned Binance and Zhao they were potentially running afoul of U.S. securities laws, they allegedly established mechanisms to circumvent those laws and created the BAM entities and the Binance.US platform, which they controlled from outside the United States. Compl. ¶¶ 110–208. The SEC asserts that Binance has been and remains outside of the United States, and the company does not contest this, so the statute of limitations with

---

17    The statute defines "person" to mean "a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9).

respect to the initial BNB offering has not yet begun to run. Therefore, the motion to dismiss Count One in part on this basis will be denied.[18]

### D. Count Two does not plausibly allege that Binance offered and sold BUSD as an investment contract.

The complaint also alleges that Binance offered and sold another ERC-20 token issued on the Ethereum blockchain, BUSD, as an investment contract, and therefore, a security. *See* Compl. ¶¶ 315–24. But the description of the asset, how it was sold, and how the proceeds from its sale were to be distributed is quite different from the allegations concerning BNB, and the allegations do not align with the prongs of the *Howey* test.

The SEC alleges that in September of 2019, Binance entered into a "Stablecoin as a Service Agreement" with its affiliate, Binance (Switzerland) AG and Trust Company A, in which "the parties agreed to 'build and manage a platform on which BUSD can be issued and redeemed' in exchange for one U.S. dollar and to maintain reserves supporting redemption." Compl. ¶ 317. Since then, Binance has marketed BUSD as a "stablecoin," which can be redeemed on a 1:1 basis for U.S. dollars. Compl. ¶ 317.

---

18      The defense argues that the SEC cannot "have it both ways," with Binance's offering of BNB occurring outside the United States for purposes of the statute of limitations and inside the United States for purposes of extraterritoriality. Binance Reply at 18. But this argument conflates the two issues. Whether the statute of limitations has begun to run turns on when a defendant is located in the United States. *See* 28 U.S.C. § 2462; 15 U.S.C. § 78u(d)(8)(C). Extraterritoriality, as explained in detail in Section V below, "turns on the location of the conduct relevant to the focus" of the statutory provision being enforced. *See Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018) (rejecting argument that because defendant's conduct occurred exclusively in Poland, imposing Copyright Act liability would amount to an impermissible extraterritorial application of the Act and ruling that directing copyrighted video from foreign website to U.S. viewers upon their request "involves a permissible domestic application" of the act).

Beginning in September 2019, Binance offered and sold BUSD to investors on the Binance.com Platform. Compl. ¶ 320. The coin was also listed and marketed by the Binance affiliate, Compl. ¶ 317, and it could be purchased from Trust Company A. Compl. ¶ 320. "Trust Company A agreed to invest the BUSD reserves (essentially, proceeds from BUSD purchases) in profit-generating opportunities for the benefit of both Trust Company A and Binance. Trust Company A and Binance agreed that they would evenly split the net interest revenue earned on the reserves underlying BUSD." Compl. ¶ 317.

Absent from all of this is any suggestion that purchasers were informed that the proceeds from BUSD sales were to be deployed, through the issuers' managerial and entrepreneurial efforts, to generate a return for *their* benefit. While the complaint emphasizes with respect to BNB that potential buyers were told that proceeds from the offering would be used to strengthen the platform that would in turn give the tokens their value, for BUSD it simply states that the proceeds were to be spent on "profit-generating opportunities for the benefit of both Trust Company A and Binance." Compl. ¶ 317. There are no facts alleged to support an inference that this advanced the fortunes of those who bought the BUSD tokens, or that they reasonably expected to share in the companies' profits in the form of a return on their investment. The SEC makes the vague assertion that Binance used "at least a portion" of those returns to enable and promote the Binance ecosystem, which it says "gave BUSD its potential profit," Compl. ¶ 321, but it does not explicitly link the value of the token – which was tied to the U.S. dollar – to the success of the platform. Nor does it spell out how promoting the ecosystem made BUSD more profitable when the alleged defining feature of the "stablecoin" was that its value would remain constant. And there is little

in this count that connects the future value of the BUSD to the "entrepreneurial activities" the D.C. Circuit found to be important. *See Life Partners II*, 102 F.3d at 588.[19]

As for the "common enterprise" element, the most the SEC can say is "[t]he proceeds from investor purchases of BUSD were purportedly pooled in reserves, and Binance earned 50 percent of the investment returns on those pooled assets." Compl. ¶ 321. But it does not allege that the coin holders would share in those returns in any way. For these reasons, the Court finds that the complaint does not plausibly allege that Binance offered and sold BUSD as an investment contract under the *Howey* test.

The SEC goes on to allege, though, that "from the outset," Binance "marketed BUSD's profit-earning potential" and promoted "BUSD profit opportunities." Compl. ¶ 322. One example identified is the "BUSD Reward Program," which "promised interest payments to BUSD investors

---

19      Defendants have supplied the Court with a document to show that in an unrelated criminal case alleging fraud in connection with a "mixed swap" under the commodities laws, which, under the statute at issue, could not involve "a security," lawyers from the U.S. Attorneys' Office for the Southern District of New York, and not the SEC, said the following to the court:

> [T]here is no factual basis for treating USDC as a security or putting that question to the jury. A core component of a security is that the holders of the security "expect profits" from the efforts of others. The evidence at trial uniformly showed that holders of USDC do not expect profits from the token because the token is advertised as "maintain[ing] a value of one U.S. dollar." While that dollar peg is not always successful, there is no basis for a jury to conclude that holders of USDC expect to profit from holding it, so there is no basis for putting an instruction to the jury requiring them to find that USDC is not a security.

*See* Notice of Suppl. Auth., Letter brief filed by the government in *United States v. Eisenberg*, ECF No. 145, Case No. 1:23-cr-10 (S.D.N.Y. Apr. 13, 2024) [Dkt. # 236] (citations omitted). This representation was based on the state of the evidentiary record at trial, it does not purport to represent the position of the U.S. government as to all stablecoins, and the Court is not relying upon it in making its ruling concerning BUSD. But it does point out the need for consistency in how these investments are treated, and the fact that it may be more difficult to make the *Howey* showing when stablecoins are involved.

merely for holding BUSD on the Ethereum blockchain." Compl. ¶ 323.[20]   There were also

"Binance Flexible Savings, through which [token holders] can earn bonus BUSD at a 2%–5%

APY," Compl. ¶ 324; and a "'Binance Launchpool,' where a user's 'BUSD deposit will get [them]

a share of the free tokens from the offerings that launch on the platform and include BUSD in their

yield options,' and 'DeFi staking offerings' that 'can give around 20%–30% APY." *Id.*  The

complaint does not explicitly allege, though, that any or all of these individual programs available

to BUSD purchasers satisfies the criteria of an investment contract.  *Compare* Compl. ¶¶ 323–24

*with* Compl. ¶¶ 325–338 ("Binance offered and sold its BNB Vault and Simple Earn Programs as

securities.") and Compl. ¶¶ 339–52 ("BAM Trading offered and sold its Staking Program as a

security.").   Nor does it assert that the marketing of any particular protocol or opportunity in

connection with the sale of BUSD at any particular time made the overall transaction an investment

---

20      Paragraph 323 states that in the Reward Program, "BUSD investors' expectation of profits
came from the potential for direct, interest-like payments made by Binance, *in part* from the
proceeds of deploying BUSD investors' capital." Compl. ¶ 323 (emphasis added).  This vague
and anemic statement is the only allegation that begins to tie BUSD purchasers' potential earnings
to what Binance would do going forward.  However, it pales in comparison to what was shown in
*Terraform II*, where the court held that a protocol that promised "accrued interest pro-rata
distributed to all depositors" of the stablecoin in that case, was an investment contract in part
because "defendants' efforts developed" it.  *Terraform II*, 2023 WL 8944860, at *13–14.  These
efforts included a manager who was responsible for "strategic direction of the protocol, user
adoption, making sure that people were accountable for product roadmap items, [and] working
with [Terraform's founder] and the team on what those products should be." *Id.* at *14.

contract. So the Court has not been presented with the question of whether the allegations concerning programs are sufficient for that purpose.[21]

E.    **Count Three plausibly alleges that Binance offered and sold "BNB Vault" as an investment contract, but the allegations are not sufficient as to "Simple Earn."**

Count Three relates to two types of programs or "profit-making opportunities" offered by Binance on the Binance.com platform – "BNB Vault" and "Simple Earn" – which the SEC alleges were offered and sold as investment contracts, or securities. Compl. ¶¶ 325–38. According to the complaint, Binance markets Simple Earn as a set of "programs that pay interest to investors who lend their crypto assets to Binance for fixed or flexible lengths of time. The interest paid depends on the crypto asset lent and the duration of the loan," Compl. ¶ 327, and Binance determines the rate for each offering at its discretion. Compl. ¶ 328. "According to Binance, it may pool assets loaned through Simple Earn and use its managerial expertise to deploy them 'for a variety of

---

21    At the hearing on the motion to dismiss, the SEC assured the Court that it was "not alleging that the [BUSD] token itself was a crypto asset security." Mot. Hr'g Tr. at 100. It asserted that its claim was focused on the fact that BUSD "was offered and sold as a package, as an opportunity for purchasers to participate in these other profit-making programs." *Id.; see also id.* at 101 ("[T]he fact remains, Your Honor, that the offering and sale at issue provides opportunities to deploy the particular token for profit-making endeavors"). Counsel further insisted that the BUSD claim in the lawsuit only concerned when BUSD was "offered and sold as an opportunity for performing in these profit-making opportunities." *Id.* at 102. But that language does not appear anywhere in the complaint, and it is not at all clear that a package involving any reward program is the "offering and sale at issue." Count Two simply charges that "by engaging in the conduct in the Complaint, specifically *by offering and selling BUSD* without a registration statement filed or in effect *as to that security*," Binance violated and is violating the Securities Act. Compl. ¶¶ 518–519. Notwithstanding counsel's protestations, this language is identical to the language used in Count One concerning BNB.

purposes,' including on-chain staking, loans, or for other operational purposes by other business units within Binance." Compl. ¶ 329.[22]

While the SEC includes the words "profit-making," "pooled," and "managerial expertise" in its description of Simple Earn, its description of the program does not fit the rubric for an investment contract that the agency carefully laid out in its submissions to the Court. Compl. ¶¶ 326, 329. Not every "profit-making opportunity" is an investment contract, and the allegations concerning Simple Earn do not describe a scheme or transaction in which investors were urged to put their money in Binance's hands so that they could share in the return that Binance would generate through its managerial or entrepreneurial efforts. The holders of crypto assets simply agreed to loan them to the company for a specified period of time at a specified rate of interest,

---

[22]    In its Notice of Documents Incorporated by Reference in the Complaint [Dkt. # 205] ("SEC Notice of Incorporated Docs."), the SEC informed the Court that paragraph 328 incorporated a September 22, 2022 description on the Binance website entitled, "Introduction to Binance Simple Earn." There the company informed asset holders: "Simple Earn allows you to earn daily rewards by depositing your digital assets for flexible or locked terms. You can subscribe or redeem at any time, so you can retain flexibility and liquidity over your assets while earning daily rewards. . . . Locked products provided higher rewards in exchange for your assets being committed for fixed terms." *Id.* The company explained that "[d]aily rewards are distributed from Binance's own funds and are determined based on the assessment and evaluation of prevailing market conditions. The assets you deposit in Simple Earn are used for a variety of purposes, including by other business units within Binance," which may use them "for operational purposes." *Id.* Finally, Binance announced, "Simple Earn APR rewards are determined with various carefully designed factors to ensure that rewards paid to Simple Earn users are sustainable and competitive. Moreover, the APR offered to Simple Earn users is discretionary and doesn't reflect any indication of profitability within Binance's various operations. For example, Binance may have regard to its competitor's offerings in deciding on appropriate levels of APR." *See id.*

Given those statements, it is not clear to the Court how the SEC could summarily allege that "[i]n both the Simple Earn and BNB Vault programs, Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors . . . . Investors share pro rata the benefits of their pooled assets investment in the Simple Earn and BNB Vault programs." Compl. ¶ 335. The Simple Earn materials do not inform potential participants in the program that the loaned crypto assets were pooled or, more importantly, that they would be utilized by Binance to generate revenue that would be the source of the returns.

and the complaint lacks any allegation that they were led to believe that Binance's efforts would generate the return or make the assets more valuable at the end of the day. Binance could pool the assets or not, and it could deploy them for any purpose, without any connection between the use of the funds and the rewards paid to "investors." Moreover, the interest rate paid would be set at Binance's discretion, at a rate that would take market conditions and competitors' offerings into consideration, and the company explicitly disavowed any relationship between the interest rate to be paid and the company's profitability. While the BNB holders who chose to use their tokens in this manner may have had the expectation that they would be paid, the hallmarks of the "common enterprise" and the necessary connection between the anticipated returns and the offeror's managerial or entrepreneurial efforts are absent. There is no allegation that people who participated in the program reasonably understood that the tokens they loaned would be put towards the enhancement of the vaunted Binance "ecosystem" or any other enterprise, or that the interest rate was dependent on that enterprise's success.[23]

By contrast, the complaint alleges that "BNB Vault" was advertised to BNB holders as a "'BNB yield aggregator' whereby investors can lend their BNB to Binance to earn investment returns." Compl. ¶ 331. It was launched with the announcement, "Earn Daily Income from the $BNB Ecosystem." Compl. ¶ 332. Binance stated on its website in November 2020 that "BNB 'deposited' in BNB Vault will be 'flexibly allocated in different products to help users maximize potential rewards.'" Compl. ¶ 333; *see* Notice of Incorporated Docs., referring to the April 2, 2023 Binance.com website page, "BNB Vault: One-Click to earn multi-benefits with BNB" (FAQ:

---

[23]     In light of the ruling in *SEC v. Edwards* that a scheme could qualify as an investment contract even if it promised a fixed rate of return, 540 U.S. at 394, the Court's ruling is not based on the fact that Binance described the Simple Earn rewards in terms of APR.

"What are the sources of BNB Vault reward?" "The rewards from BNB Vault is accumulated by the income of different projects. Currently, it includes Simple Earn and Launchpool."); *see also id.* ("BNB Vault is equivalent to participating in multiple projects at the same time . . . ."). Paragraph 334 alleges, "[o]ne tweet from Binance touted the profit potential of BNB Vault: 'Just one click can increase how much you earn with your #BNB. BNB Vault combines the multiple income benefits of #Binance Smart Chain, Launchpool, Savings, #DeFi Staking, and more through just one interface.'" Compl. ¶ 334. This appears to be a way for coin holders to invest, as opposed to just use, their crypto assets, and they reaped their rewards by participating jointly in a set of specific programs that would be the source of their return. *See* Compl. ¶ 335 (alleging that in the BNB Vault program, "Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors . . . . Investors share pro rata the benefits . . . .").

For these reasons, the Court finds that the complaint plausibly alleges that Binance offered and sold BNB Vault as an investment contract, but it finds the allegations as to Simple Earn to be insufficient.

### F. Count Four plausibly alleges that BAM Trading offered and sold its Staking Program as an investment contract.

Count Four relates to the U.S. entity, BAM Trading, and the BAM Trading Staking Program, marketed on the Binance.US platform "as a way to earn 'passive income' through the efforts of Binance." Compl. ¶ 339. While individual investors may stake their assets and participate in the "Proof of Stake" consensus mechanism used by some blockchains to determine which transactions are valid, BAM Trading's Staking Program was promoted "as a superior and much easier way to obtain staking rewards by, among other things, pooling the crypto assets of a large number of investors." Compl. ¶¶ 339–40. The complaint explains that staking assets on

one's own is a "daunting process" that "requires considerable technical knowhow," as well as the requisite level of holdings:  potential validators must commit "a set amount of the blockchain's native asset;" validators are required to perform certain functions; and the more a person stakes, the more likely they are to be selected as a validator.  Compl. ¶¶ 341–44.  "The most successful staking operations maximize the chances of being selected by staking a large number of assets and minimizing server downtime."  Compl. ¶ 342.

The BAM Staking Program was designed to attract investors who lacked the technical acumen and hardware requirements to operate on their own, and the SEC alleges that it was "marketed as a way for investors to rely on and profit from BAM Trading's technical expertise and knowhow, industry relationships, and infrastructure."  Compl. ¶ 343.  "For each staking-eligible crypto asset that is a part of the Staking Program, BAM Trading, directly or through affiliates or other third parties, pools investor assets in a common 'staking pool' in which investors 'combine their staking power and share the reward proportionally to their contributions to the pool.'  Moreover, for as long as the investors choose to stake their tokens, investors receive payouts from BAM Trading that are distributed to them *pro rata*."  Compl. ¶ 350.  Participants in the program lose the ability to use their tokens for other purposes:  "BAM Trading will not allow users to sell or withdraw crypto assets while they are staked."  Compl. ¶ 349.[24]

_____

24    Defendants take the position that "staking" does not involve the necessary investment of money since the would-be validators are not giving their coins away.  BAM Mot. at 32–34.  But since the complaint alleges that investors must forego the right to sell or withdraw their assets while they are staked, and that there is a risk that investors could lose staked assets entirely, Compl. ¶ 349, resolving all inferences in favor of the government, the participants' inability to use or access their tokens while they are committed to the BAM Staking Program satisfies the requirement.

Given these allegations, the complaint plausibly alleges an investment in a common enterprise with the expectation of profit due to the managerial or entrepreneurial efforts of others. The investors' assets are pooled and controlled by BAM Trading, and their fortunes rise and fall with BAM Trading's success as a validator.

II.  **The complaint plausibly alleges that both Binance and BAM Trading were obliged and failed to register under the Exchange Act and that the Court has personal jurisdiction over Zhao for these violations.**

A.  **The complaint plausibly alleges that both Binance and BAM Trading were obliged and failed to register as an exchange, as a broker-dealer, and as a clearing agency under the Exchange Act.**

In Counts Five, Six, and Seven, the SEC alleges that by operating the Binance.com platform, Binance made use of the mails and the means and instrumentalities of interstate commerce to effect transactions in a security, to induce or attempt to induce the purchase or sale of any security, and to act as a clearing agency with respect to securities, and therefore, it was required to register under Section 5 of the Exchange Act as an exchange, as a broker-dealer, and as a clearing agency. Counts Eight, Nine, and Ten similarly allege that Binance and BAM Trading were required to register as an exchange, a broker-dealer, and a clearing agency due to their operation of the Binance.US platform.

Given the Court's findings that Binance.com offered BNB and the BNB Vault Program as investment contracts, and that BAM Trading offered its Staking Program as an investment contract, each of these counts will move forward. The registration requirements are triggered by transactions involving just one security, *see* 15 U.S.C. §§ 78e, 78o(a), 78q-1(b); *see also* Compl. ¶ 361, and putting aside the extraterritoriality issue raised with respect to Binance.com, which will be addressed below, the defendants have not challenged the sufficiency of these counts on any other basis. *See* BAM Mot. and Binance Mot.

The Court notes, though, that the SEC fattened the complaint with thirty-eight additional pages, comprised of 157 paragraphs, asserting that the defendants made at least ten other crypto assets, that had been offered and sold by their issuers as investment contracts, available on their platforms, *see* Section VIII of Compl. ¶¶ 352–509, along with four others that have been the subject of prior SEC enforcement actions. Compl. ¶ 360. Counsel explained at the hearing that in the government's view, this is just the tip of the iceberg: "We have alleged the other tokens because we maintain that this representative sample is just that, it's a representative sample of []other crypto asset securities that are offered and traded on the platform, and so that is relevant both to the scope of the violation and the remedy at issue." *See* Mot. Hr'g Tr. at 105. Since no party has challenged the sufficiency of these allegations, or relied on these allegations to attack or sustain the sufficiency of any count, the Court need not address their merits at this time. Indeed, it would be highly irregular to do so, since the issuers are not parties to this action and have not had an opportunity to weigh in on the claims that the offerings satisfy the requirements of an "investment contract" or security; the parties have not submitted memoranda measuring the allegations against the *Howey* framework; and the SEC has not yet specified which crypto assets should be brought under the umbrella of this case or why. *Id.* at 106–07 ("[W]e are not saying we would pursue or need to evaluate the hundreds of tokens on the particular – on these platforms.").

## B. The Court may exercise personal jurisdiction over defendant Zhao with respect to Exchange Act allegations.

In Count Eleven, the SEC alleges that as "a control person of Binance" for purposes of Exchange Act Section 20(a), defendant Zhao is personally liable for Binance's alleged violations of Sections 5, 15(a), and 17A(b) of the Exchange Act in connection with the operations of the Binance.com platform. Compl. ¶¶ 544–48. Count Twelve alleges that as "a control person of Binance and BAM Trading," he bears personal responsibility for the alleged violations of

Sections 5, 15(a), and 17A(b) of the Exchange Act in connection with the Binance.US platform. Compl. ¶¶ 549–53; *see also* Compl. ¶ 15. Zhao moves to dismiss these counts pursuant to Rule 12(b)(2) on the basis that the Court lacks personal jurisdiction over him. Binance Mot. at 43–45.

### 1. The requirements for personal jurisdiction

The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has no meaningful "contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985), quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). It is undisputed that Zhao resides outside of the United States. Compl. ¶ 30. Accordingly, to have personal jurisdiction over Zhao, the Court must find that it has specific jurisdiction over him. *See Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023) (general jurisdiction applies when a defendant resides in the jurisdiction). Specific jurisdiction may arise when a defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.*, quoting *Int'l Shoe Co.*, 326 U.S. at 316 (alteration in original).

With respect to foreign defendants, due process "requires meaningful contacts, ties, or relations with the United States to create a fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Lewis*, 62 F.4th at 593 (alteration in original) (internal quotation marks omitted). Defendants' contacts, ties, or relations "must be 'purposefully directed' at the forum to establish 'foreseeability . . . that the defendant's conduct and connection with the forum . . . are such that he should reasonably anticipate being haled into court there.'" *Id*. at 591, quoting *Burger King Corp.*, 471 U.S. at 474 (citation omitted); *see also Mwani*, 417 F.3d at 12 (when deciding whether a court has specific jurisdiction over a foreign defendant, the question is whether the foreign defendant purposefully availed himself of the forum).

Moreover, a plaintiff's claims "must aris[e] out of or relat[e] to the defendant's contacts with the forum." *Id.* (alterations in original), quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017). In cases brought under statutes that authorize nationwide service, though, such as the Securities Act and the Exchange Act, the relevant "forum" is the United States. *SEC v. e-Smart Techs., Inc.*, 926 F. Supp. 2d 231, 236 (D.D.C. 2013).

The plaintiff bears the burden of "establishing a factual basis for the exercise of personal jurisdiction" over each defendant. *Crane*, 894 F.2d at 456. "Each defendant's contacts with the forum . . . must be assessed individually," *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984), and "specific personal jurisdiction is claim-specific." *Smartmatic USA Corp. v. Powell*, No. 1:21-cv-02995 (CJN), 2023 WL 3619346, at *4 (D.D.C. May 24, 2023), citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274–75 (5th Cir. 2006); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018). Courts must resolve factual disputes in favor of the plaintiff, and jurisdictional facts are plausible if they allow a "court to draw the reasonable inference that the defendant" intended to target the United States. *Lewis*, 62 F.4th at 592–93, citing *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 556. If a plaintiff's assertions are conclusory or reflect bare allegations that "merely state the plaintiff['s] theory of specific jurisdiction[,] then exercising specific jurisdiction is improper." *Id.* at 593 (alterations in original) (internal quotation marks omitted).

## 2. The requirements for control person liability

Section 20(a) of the Securities Exchange Act attaches liability to "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C.

§ 78t(a).[25]  "Control" is defined by regulation as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405 (2024).

Defendants Binance and Zhao argue that control person liability under the Securities Exchange Act cannot support personal jurisdiction on its own, Binance Mot. at 44, and that the allegations in the complaint are insufficient to give rise to personal jurisdiction over Zhao for "the registration-based control person claims at issue."  Binance Mot. at 43; *id.* at 44 (arguing that allegations that "Zhao 'actively solicited U.S. investors to trade on the Binance Platforms' (Compl. ¶ 24) are insufficient to establish the requisite 'suit-related conduct'" needed to create "a substantial connection" between Zhao and the forum, and that the SEC alleges no direct contact between Zhao and U.S. users), quoting *Cockrum*, 319 F. Supp. 3d at 175.

Circuit courts are split on whether "control person" liability under the Securities Exchange Act, on its own, is enough to confer personal jurisdiction over a defendant.  In *San Mateo County Transit District v. Dearman, Fitzgerald & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992), the Ninth Circuit held that a plaintiff need only make "a non-frivolous allegation that the defendant controlled a person liable for the fraud" for a court to have personal jurisdiction over the defendant. But the Sixth Circuit rejected that approach, and it followed an opinion from this district instead. In *City of Monroe Employees Retirement System v. Bridgestone Corp.*, the Sixth Circuit held that substituting a claim of statutory liability for establishing personal jurisdiction would "impermissibly conflate[] statutory liability with the Constitution's command that the exercise of

---

25    *See* 15 U.S.C. § 78c(a)(9) (defining "person" to mean "a natural person, company, government, or political subdivision, agency, or instrumentality of a government").

personal jurisdiction must be fundamentally fair." 399 F.3d 651, 667 (6th Cir. 2005) (alteration in original), quoting *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d 117, 129 (D.D.C. 2003).

The D.C. Circuit has not decided this issue, but the SEC does not appear to be relying solely on control person liability to support the Court's exercise of jurisdiction over Zhao. *See* SEC Opp. at 71 (recognizing the circuit split but noting that the factual inquiries into control person liability and personal jurisdiction "involve a similar contact-based analysis"), quoting *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 667. And the Court finds the reasoning in *City of Monroe*, 399 F.3d at 667, and in *In re Baan Co. Sec. Litig.*, 245 F. Supp. 2d at 128–29, to be persuasive, so it will apply a traditional due process analysis without deciding whether control person status alone would be sufficient.

The complaint alleges that in November 2018, a consultant hired by Zhao to advise Binance on managing U.S. legal exposure recommended that Zhao and Binance create a U.S. entity, which the consultant referred to as the "Tai Chi" entity, and the SEC refers to the company's effort to follow this advice as the "Tai Chi Plan." Compl. ¶ 112. According to the agency, "Binance implemented much of the Tai Chi Plan. In addition to creating BAM Trading and the Binance.US Platform, Zhao and Binance implemented policies and controls to give the impression that the Binance.com Platform was blocking U.S. customers while at the same time secretly subverting those controls." Compl. ¶ 125. "On June 13, 2019, Binance issued a press release announcing that BAM Trading would soon be launching the Binance.US Platform. . . . '[T]o launch trading services for users in the United States.'" Compl. ¶ 151. It quoted Zhao as stating that "Binance.US will be led by our local partner BAM and will serve the U.S. market in full regulatory compliance." Compl. ¶ 152. The next day, "Binance updated the Binance.com Platform's 'Terms of Use' to provide – for the first time – that U.S. customers were not permitted to trade on the Binance.com

Platform" and announced that it would "begin implementing measures to block U.S. customers from trading or depositing assets on the platform after 90 days." Compl. ¶ 126.

But, the SEC alleges, "Zhao and Binance engaged in widespread covert efforts to permit U.S. customers to continue to trade on the platform." Compl. ¶ 127. Specifically, "Zhao directed Binance to implement a plan to encourage customers to circumvent Binance's geographic blocking of U.S.-based IP addresses by using a VPN service to conceal their U.S. location" and "to encourage certain U.S.-based VIP customers to circumvent the new [Know Your Customer ("KYC")] restrictions by submitting updated KYC information that omitted any U.S. nexus." Compl. ¶ 128.

The complaint further alleges that after launching BAM Trading, Zhao continued to control both its high-level and the day-to-day operations. Zhao was responsible, it says, for "[giving] final signoff on various decisions relating to the Binance.US Platform's trading services, including customer account opening processes, development of the front-end access, and creating a reserve to cover ACH deposits." Compl. ¶ 157. He was allegedly responsible for personally approving BAM Trading employees obtaining certain real-time trading data for the Binance.US Platform, "at least through much of 2021." Compl. ¶¶ 158–60. He was responsible for "direct[ing] which investment opportunities BAM Trading offered on the Binance.US Platform," including the decision to have Binance.US Platform offer BNB for purchase and sale – despite the perceived legal risks it presented with respect to U.S. securities law and against the advice of BAM Trading's CEO. Compl. ¶¶ 161–64. And, the agency asserts, Zhao was responsible, at least through January 30, 2020, for approving "all BAM Trading expenditures exceeding $30,000," and BAM Trading sought his and Binance's approval for such routine business expenses as "rent, franchise

taxes, legal expenses, Amazon Web Services ("AWS") fees to host Binance.US Platform customer data, and even an $11,000 purchase of Binance-branded hooded sweatshirts."  Compl. ¶ 170.

In short, the complaint amasses considerable detail to show that Zhao effectively operated as the CEO of BAM Trading.  The complaint alleges various failed efforts by the company's first CEO to gain independence from Zhao, Compl. ¶¶ 193–201, and it quotes testimony from company's second CEO, reporting:  "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me."  Compl. ¶ 205 (alteration in original).  BAM Trading's second CEO resigned three months later.  Compl. ¶ 205.

According to the Supreme Court, allegations of direct contact between Zhao and U.S. users are not required to exercise personal jurisdiction over Zhao:  "our 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014), citing *Int'l Shoe Co.*, 326 U.S. at 319.  The SEC alleges that Zhao ran the day-to-day operations of BAM Trading, Compl. ¶¶ 157–205, a U.S.-based company created to provide trading services for users in the United States of the crypto assets at issue in this case.  Compl. ¶ 151.  And it claims that Zhao personally directed Binance to instruct customers to circumvent the Binance.com platform's "geographic blocking of U.S.-based IP addresses" and Know Your Customer restrictions.  Compl. ¶ 128.

Construing the facts alleged in the plaintiff's favor, as it must at this stage of the litigation, *Kowal*, 16 F.3d at 1276, the Court finds that the SEC has set forth sufficient facts to plausibly allege that Zhao had "meaningful contacts, ties, or relations[] with the United States to create a fair warning" that his activity may subject him to this Court's jurisdiction.  *Lewis*, 62 F.4th at 593 (alteration in original) (internal quotation marks omitted).  Given these activities, the Court finds

that Zhao "purposefully avail[ed himself] of the privilege of conducting [business] activities within" the United States with respect to both Binance and BAM Trading, *Burger King*, 471 U.S. at 475, and that exercising jurisdiction over him would not offend due process. *See Walden*, 571 U.S. at 284.[26]

Nonetheless, citing *Mazza v. Verizon Washington DC, Inc.*, 852 F. Supp. 2d 28 (D.D.C. 2012), defendants argue that allegations that a parent company is "responsible for establishing" strategies for local subsidiaries are insufficient for establishing specific jurisdiction. Binance Mot. at 45, citing 852 F. Supp. 2d at 40. The *Mazza* case arose from a billing dispute between a D.C. consumer and a defendant telecommunications company. The plaintiff claimed that defendant Verizon Washington D.C., Inc. reported false information about his credit to consumer reporting agencies and engaged in abusive collection strategies, and that these actions should be imputed to its corporate parent Verizon Communications. *Id.* at 41. The court disagreed, ruling that allegations that the parent was "responsible for establishing revenue targets, operational goals and guidelines, customer acquisition and support strategies [and] for the infrastructure and client databases for [the subsidiaries]" were insufficient to "demonstrate that Verizon Communications directed any activity into the District of Columbia related to Mazza's claims" concerning bills collection and credit reporting. *Id.* at 40.

---

26      In addition, in November 2023, Zhao admitted a plea agreement in a criminal matter in the U.S. District Court for the Western District of Washington that "Binance was a foreign-located [money services business] *that did business in the United States*." Plea Agreement at 7, *United States v. Zhao*, 23-cr-0179RAJ (W.D. Wash Apr. 30, 2024) (emphasis added).

The decision is entirely inapposite. The instant case does not involve a corporate parent's setting broad corporate strategies or goals while its subsidiary managed local operations; the complaint is replete with allegations concerning Zhao's personal direction of the U.S. subsidiary.

Defendants also argue that broad allegations that a defendant influenced and controlled a company's decision-making are insufficient to support personal jurisdiction. Binance Mot. at 45, citing *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017). In that case, investors in a Brazilian petrochemical company alleged that its failure to disclose a bribery scheme violated federal securities law. 246 F. Supp. 3d at 740–41. The plaintiffs also named a major shareholder of the company as a defendant, but the court ruled it had no personal jurisdiction over the shareholder. *Id.* at 770. It found that the complaint failed to plead specific facts that the shareholder was accountable for the statements: the complaint did "not allege, concretely, that [the shareholder] played *any* role in making, proposing, editing or approving [defendant's] public filings in the United States." *Id.* (emphasis in original). Rather, it made only "sweeping and conclusory allegations" that the shareholder "had the power to influence and control and did influence and control, directly or indirectly," the company's decision-making, including the dissemination of the allegedly false and misleading statements. *Id.* This is also easily distinguished from the case at hand.

Defendants suggest that the allegations that Zhao actively solicited U.S. investors to trade on the Binance Platforms are insufficient, but this is a narrow characterization of the complaint that ignores the many allegations of Zhao's significant involvement in activities, in and directed towards, the United States. *See* Compl. ¶¶ 125–28, 157–205. The complaint specifically alleges that Zhao directed Binance to maintain U.S. customers on the Binance.com platform and that he

created and then controlled BAM Trading, all for the purpose of evading U.S. securities laws. *See* Compl. ¶¶ 125–40. The Court therefore finds that it has personal jurisdiction over Zhao.

## III.    The Securities Act and Exchange Act reach the offshore conduct in this case.

Defendants Binance and Zhao argue that the foreign components of Counts One and Two and all of Counts Three and Five through Seven against Binance, along with Count Eleven against Zhao, must be dismissed because the registration provisions of the Securities Act and the Exchange Act do not have extraterritorial reach. Binance Mot. at 36.[27] The motion to dismiss on that basis will be denied.

### A.    The law on extraterritoriality

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States'" and is "presume[d to be] 'primarily concerned with domestic conditions.'" *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991) ("*Aramco*"), quoting *Foley Bros. v. Filardo,* 336 U.S. 281, 285 (1949). Extraterritoriality is a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). So whether a statutory provision has extraterritorial reach is a merits question, not a matter that goes to subject matter jurisdiction. *Id.* at 253–54.

---

[27]    Counts One, Two, and Three allege that defendant Binance violated Sections 5(a) and (c) of the Securities Act by offering and selling BNB, BUSD, Simple Earn, and the BNB Vault programs without registration statements. *See* 15 U.S.C. § 77e(a), (c). Counts Five through Seven allege that it violated Sections 5, 15(a), 17A(b) of the Exchange Act by operating as an unregistered exchange, broker-dealer, and clearing agency with respect to the Binance.com platform. *See* 15 U.S.C. §§ 78e, 78o(a), 78q-1(b). Count Eleven alleges that Zhao is liable for Binance's Exchange Act violations as a control person for Binance under Section 20(a) of the statute. *See* 15 U.S.C. § 78t(a).

When considering whether a statute is extraterritorial, courts apply a two-step analysis. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023), citing *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016). First, a court must determine whether "Congress has affirmatively and unmistakably instructed that" the statutory provision at issue should "apply to foreign conduct." *Id.* at 417–18, quoting *RJR Nabisco*, 579 U.S. at 335. Next, it must go on to determine whether the suit seeks a permitted domestic or prohibited foreign application of the provision. *Id.* at 418. "To make that determination, courts must start by identifying the focus of congressional concern underlying the provision at issue," *id.* (internal quotation marks omitted), quoting *RJR Nabisco*, 579 U.S. at 336, then determine "whether the conduct relevant to that focus occurred in United States territory." *Id.*, quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018). In other words, "to prove that a claim involves a domestic application of a statute, plaintiffs must establish that the *conduct relevant to the statute's focus* occurred in the United States." *Id.* (emphasis added) (internal citations and quotation marks omitted).

The Supreme Court has made clear that while its "cases sometimes refer to whether the 'statute' applies extraterritorially, . . . the two-step analysis applies at the level of the particular provision implicated." *Abitron Austria*, 600 U.S. at 419 n.3, citing *RJR Nabisco*, 579 U.S. at 346; *Morrison*, 561 U.S. at 264–65. So the question here is whether Sections 5(a) and (c) of the Securities Act and Sections 5, 15(a), and 17A(b) of the Exchange Act – and by extension Section 20(a) – apply extraterritorially. Because "the SEC has alleged only domestic violations under step two," SEC Opp. at 61, the Court will address only that step of the analysis. *See WesternGeco*, 585 U.S. at 413 (noting discretion to begin at step two).

The "focus" of a statute is "the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Abitron*

*Austria*, 600 U.S. at 418 (internal edits and quotation marks omitted); *see WesternGeco*, 585 U.S. at 413–14; *Morrison*, 561 U.S. at 267. "The ultimate question regarding permissible domestic application [of a statutory provision] turns on the location of the conduct relevant to the focus." *Abitron Austria*, 600 U.S. at 422–23 (ruling that the conduct relevant to the Lanham Act provision at issue in that copyright infringement case was "infringing use in commerce"); *see also Spanski Enters., Inc., S.A.*, 883 F.3d 904 (Copyright Act case).

In the securities context, the Supreme Court has held that Section 10(b) of the Exchange Act, the anti-fraud provision of the statute, does not focus on *all* deceptive conduct but only deceptive conduct with respect to "purchases and sales of securities in the United States." *Morrison*, 561 U.S. at 266. Accordingly, it held, Section 10(b) applies only to (a) "transactions in securities listed on domestic exchanges" and (b) "domestic transactions in other securities." *Id.* at 267.

Applying *Morrison*, the Second Circuit has held that "to sufficiently allege the existence of a 'domestic transaction in other securities,'" a plaintiff "must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 62 (2d Cir. 2012). Irrevocable liability attaches when parties "becom[e] bound to effectuate the transaction or enter[ ] into a binding contract to purchase or sell securities." *Mia. Grp. v. Vivendi, S.A.*, 838 F.3d 223, 265 (2d Cir. 2016) (internal quotation marks omitted); *Absolute Activist*, 677 F.3d at 68 (internal citation omitted) (explaining irrevocable liability occurs "when the parties to the transaction are committed to one another").

**B.  The complaint alleges domestic transactions.**

Defendants argue that the SEC has failed to allege domestic transactions within the meaning of *Morrison*. They maintain that the allegations that Binance is a Cayman Islands

company, Binance.com is an international platform, individuals place orders on the platform from the United States, defendants market tokens to U.S. customers, and Binance accepts payment in U.S. dollars do not suffice to allege irrevocable liability arising in the United States under *Absolute Activist*. Binance Mot. at 39–41. The SEC maintains that the registration provisions do not focus on domestic transactions, but rather, on "those who promote securities, and who create or facilitate a market for securities in the United States," so *Morrison* does not apply. SEC Opp. at 60–65. It adds that even if it does, the complaint alleges that irrevocable liability attached in the United States in the case of transactions initiated in the United States. SEC Opp. at 66–68.

*Morrison* involved a provision of the Exchange Act not at issue here, and neither the Supreme Court nor the D.C. Circuit has considered whether the registration provisions of the Exchange Act and the Securities Act apply extraterritorially. But *Morrison* observed that the "same focus on domestic transactions" found with respect to the Exchange Act "is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading." 561 U.S. at 268 (internal citation omitted). Accordingly, the Court will assume for purposes of this case that for the provisions of the Exchange Act and the Securities Act at issue here to apply, the complaint must allege "domestic transactions" – that is, "purchases and sales of securities in the United States," *id.* at 266, since there is no allegation that Binance.com is a domestic exchange. *See* Compl. ¶ 27. That requirement is met here.

Defendants argue that to comply with *Morrison* then, the complaint must allege that irrevocable liability was incurred or that title was transferred in the United States. Binance Mot. at 39, citing *Absolute Activist*, 677 F.3d at 67–68. But *Williams v. Binance*, 96 F.4th 129 (2d Cir. 2024), which was decided after the parties briefed this issue, undercuts defendants' argument. In

that case, the Second Circuit held that when a defendant such as Binance disavows being located anywhere, it is appropriate to consider factors that are relevant to cases involving securities *not* traded on foreign exchanges in examining irrevocable liability. *Id.* at 139–40, quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 n.33 (2d Cir. 2014). It reasoned that transactions on an online exchange that purports to have no physical location cannot occur "nowhere." *See id.* at 137–38. It distinguished cases involving trades executed over a foreign exchange from the case before it, in which transactions occurred on an unofficial exchange, which disclaimed having any physical location, foreign or otherwise. *Id.* at 140, citing *City of Pontiac*, 752 F.3d at 181 (ruling that *Morrison* precludes Exchange Act claims by U.S. purchasers of shares of Swiss issuer on a Swiss exchange).

The plaintiffs in *Williams* were U.S. purchasers of seven Binance tokens: EOS, TRX, ELF, FUN, ICX, OMG, and QSP. *Id.* at 132–33. They claimed that Binance promoted, offered, and sold tokens in violation of the Securities Act and the Exchange Act. *Id.* at 132. They alleged that transactions on Binance.com were matched on servers located in the United States, that the plaintiffs were in the United States when they agreed to the Binance.com Terms of Use, placed purchase orders, and sent payments, and that they could not revoke their trades once they were submitted. *Id.* at 134–35. They also alleged, as here, that Binance targeted the U.S. market with advertising and customer support specifically aimed at U.S. users and advised U.S.-purchasers how to circumvent its own restrictions using VPNs while ostensibly cutting off U.S.-customer access to the platform in September 2019. *Id.* at 135.

Binance disclaimed having any location or being subject to any other particular jurisdiction, and its intransigence on that point led the court to reject its argument that the plaintiffs' transactions were not domestic. *Williams*, 96 F.4th at 136, 139. The court explained that the

irrevocable liability test, which examines where and when a transaction becomes irrevocable, "is particularly difficult when a transaction takes place over an exchange that claims to have no physical location in any geographic jurisdiction and not be subject to the oversight of any country's regulatory authority." *Id.* at 136–37. In such cases, the court reasoned, it is appropriate to consider factors typically considered in the context of transactions *not* on a foreign exchange: "our cases look to 'facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money' to determine when and where an investor becomes irrevocably bound to complete a transaction." *Id.* at 140 (emphasis omitted), quoting *City of Pontiac*, 752 F.3d at 181 n.33. The court ruled that "irrevocable liability was incurred when Plaintiffs entered into the Terms of Use with Binance, placed their trade orders, and sent payments, all of which they claim occurred from their home states within the United States." *Id.*[28]

Since Binance and Zhao were the defendants in *Williams*, it is not surprising that the allegations in that case are similar to those here. The SEC alleges that Binance is a Cayman Islands limited liability company and Binance.com is "an international crypto asset trading platform." Compl. ¶ 27. But neither is alleged to be headquartered or located in any particular jurisdiction. Rather, Zhao "has refused to identify the headquarters of Binance, claiming, 'Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office.'" Compl. ¶ 27.

The SEC further alleges that customers in the United States bought or traded tokens on the Binance.com platform, *see* Compl. ¶¶ 8, 106, 140, 320, 326, and that Binance accepted payment from them in U.S. dollars using U.S. banks. Compl. ¶¶ 98, 284. Further, Binance.com "offers

---

[28] The allegations in *Williams* that Binance matched orders on servers located in the United States also supported the ruling that plaintiffs adequately alleged domestic transactions. *See* 96 F.4th at 138–39. "In the absence of an official locus of the Binance exchange, . . . it is appropriate to locate the matching of transactions where Binance has its servers." *Id.* at 137.

'spot' (immediate) market trading through an order-matching functionality similar to that of a traditional securities exchange." Compl. ¶ 89.

> [W]hen an investor places an order on the Binance.com Platform, the order enters Binance's internal automated matching engine, called "MatchBox," which matches buy-and-sell orders based on programmed, non-discretionary rules that govern how orders will interact. When separate customers' buy and sell orders have prices that overlap, MatchBox executes the trade and removes the orders from the order book. Orders that do not execute immediately are typically ranked and displayed in price-time priority, meaning that orders placed earlier in time are prioritized for any given price. . . . Upon execution of a trade, other functionality in the Binance.com Platform settles the trade.

Compl. ¶¶ 90–91; *see also* Compl. ¶ 83 (alleging that the Whitepaper touted Binance's matching engine would be "capable of sustaining 1,400,000 orders/second, making Binance one of the fastest exchanges in the market").

Given that Binance disavows being located anywhere, this Court agrees with the Second Circuit's analysis in *Williams* and concludes that the factual allegations here plausibly allege that irrevocable liability was incurred in the United States when customers in the United States placed trade orders and sent payments on the Binance.com platform. *See Williams*, 96 F.4th at 140; *City of Pontiac*, 752 F.3d at 181 n.33.[29] And because Binance disclaims being located in any geographical jurisdiction, Compl. ¶ 27, there are no concerns about international comity or the risk

---

[29] The complaint also alleges that although defendants purported to bar U.S.-customers from the Binance.com platform, they purposefully encouraged those customers to circumvent the platform restrictions. *See* Compl. ¶ 128. These allegations do not go to where or when irrevocable liability was incurred, but they do indicate that defendants themselves believed they were engaged in domestic transactions. *See* Compl. ¶ 111 ("As Binance's CCO bluntly admitted to another Binance compliance officer in December 2018, 'we are operating as a fking unlicensed securities exchange in the USA bro.'") (emphasis omitted); *Messieh v. HDR Glob. Trading Ltd.*, No. 20-CV-3232 (ALC), 2024 WL 1436755, at *2 n.1, 3 (S.D.N.Y. Apr. 3, 2024) (applying *Williams* and observing that although the defendant's Mexican-based platform purportedly prevented U.S.-customer access, the defendant knew its U.S. customers were using anonymous emails and passwords and VPN networks to circumvent its systems).

of rulings that would be incompatible with the applicable laws of other countries. *Williams*, 96 F.4th at 139, citing *Morrison*, 561 U.S. at 269. Accordingly, this action does not involve an improper extraterritorial application of the Securities Act's and Exchange Act's registration provisions.

## IV. Count Thirteen states a plausible claim that BAM Management and BAM Trading violated the anti-fraud provisions of the Securities Act.

In the final count of the complaint, the SEC alleges that the U.S. entities, BAM Management and BAM Trading, committed violations of sections 17(a)(2) and (a)(3) of the Securities Act. Compl. ¶¶ 554–56; 15 U.S.C. § 77q(a)(2)–(3). In particular, the complaint alleges that those defendants misled Binance.US customers and equity investors in BAM Management "concerning the extent to which BAM trading and BAM Management had implemented controls to prevent manipulative trading on the Binance.US platform," Compl. ¶ 239, and in touting the volume of trading on the platform. Compl. ¶ 250.

### A. The anti-fraud provisions of the Securities Act

"The Securities Act imposes liability for material misrepresentations or deceit in connection with a securities offering." *Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006). Section 17(a) of the statute provides:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly –
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

###### 1. Section 17(a)(2)

To state a claim under Section 17(a)(2), the SEC must show that defendants were engaged in the offer or sale of securities, that they made material misrepresentations or omitted material facts necessary to make other statements not misleading, and that defendants obtained money or property through the use of the misstatements or omissions. *Id.*; *see also SEC v. Current Fin. Servs., Inc.*, 100 F. Supp. 2d 1, 6 (D.D.C. 2000); *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 175 (D.D.C. 1998). One need not demonstrate knowledge of wrongdoing or scienter to establish a violation of Section 17(a)(2); proof of negligence is sufficient. *Aaron v. SEC*, 446 U.S. 680, 696 (1980) (concluding that Section 17(a)(2) "is devoid of any suggestion whatsoever of a scienter requirement"); *Weiss*, 468 F.3d at 855; *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992) (observing that under this provision, a company is "liable merely for omitting disclosure of liabilities negligently – in other words, for failing to disclose liabilities about which [it] *should* have known") (emphasis in original).

Parties can only be liable for a violation of Section 17(a)(2), though, if they made misrepresentations or omissions that were material. 15 U.S.C. § 77q(a)(2). A statement or omission is material under the federal securities laws if there is "a substantial likelihood that a reasonable shareholder [or investor] would consider [the information] important." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (adopting *TSC Industries* standard for materiality to Section 10(b) and Rule 10b-5 claims); *Steadman*, 967 F.2d at 643. "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus.*, 426 U.S. at 449. "[T]he materiality of a misrepresentation or omission must be assessed as of the time of the

contested transaction." *Media Gen., Inc. v. Tomlin*, 387 F.3d 865, 869 (D.C. Cir. 2004). The question of whether alleged misrepresentations or omissions are material is a mixed question of law and fact. *Id.*

Because materiality is a mixed question of law and fact, courts have cautioned against granting a motion to dismiss based on the failure to plead materiality "unless [the information is] so obviously unimportant to a reasonable shareholder that reasonable minds could not differ on the question of their importance." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 514 (D.C. Cir. 1986); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011) (disagreeing with the district court "at this preliminary stage of litigation that the alleged omissions and misstatements" were "obviously unimportant"), quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000); *see SEC v. Brown*, 740 F. Supp. 2d 148, 167 (D.D.C. 2010) (finding that the agency had alleged a material omission because "reasonable minds could differ as to whether" the information was "obviously unimportant"), quoting *Ganino*, 228 F.3d at 162.

## 2. Section 17(a)(3)

Under Section 17(a)(3), it is unlawful for any person in the offer or sale of securities "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). As is the case with Section 17(a)(2), proof of negligence is sufficient to establish a violation of this provision. *See Aaron*, 446 U.S. at 697 (finding that section 17(a)(2) does not require scienter). The Supreme Court has observed that Section 17(a)(3) "plainly focuses upon the *effect* of particular conduct on members of the investing public, rather than upon the culpability of the person responsible." *Id.* (emphasis in original).

While the D.C. Circuit has not addressed the issue, other circuits have agreed that to establish "scheme liability" under Section 17(a)(3), which courts have analyzed under the same

framework as claims under Rule 10b-5,[30] the alleged conduct must include more than the same misrepresentations or omissions underlying the misstatement claims. *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011), *abrogated on other grounds by*, *Lorenzo v. SEC*, 587 U.S. 71 (2019) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions . . . when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").

In other words, scheme liability is only appropriate if Section 17(a)(2) "cannot fully cover the deceptive acts." *See SEC v. Familant*, 910 F. Supp. 2d 83, 9397 (D.D.C. 2012) (finding the complaint alleged conduct beyond mere misstatements and omissions to state a claim for scheme liability). Liability may arise under Section 17(a)(2) and 17(a)(3) based on the same set of facts, but only if the plaintiff alleges both that the defendants made misrepresentations in violation of the statute, and that the defendants undertook a deceptive course of conduct that went beyond the

---

30    *See, e.g.*, *SEC v. Coffey*, 493 F.2d 1304, 1309 (6th Cir. 1974) (concluding that the use of the term "prime" tended to operate as a scheme to defraud within the meaning of both Section 17(a)(3) and Rule 10b-5(c)); *Thompson*, 238 F. Supp. 3d at 596 n.10 (recognizing that because Section 17(a)(3) and Rule 10b-5 "have similar requirements," it is not necessary to distinguish between them unless it is material to the analysis); *SEC v. Stoker*, 865 F. Supp. 2d 457, 467–68 (S.D.N.Y. 2012) (applying the same standard under Section 17(a)(3) and finding that the complaint plausibly alleged a course of conduct beyond misrepresentations).

misrepresentations.  *See Brown*, 740 F. Supp. 2d at 172, citing *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005); *Stoker*, 865 F. Supp. 2d at 467.  A defendant will not be liable under subsection (3) if the only allegation is that the defendant was a participant in a scheme through which the misleading statements were made.  *See Spot Runner*, 655 F.3d at 1057–58 (affirming dismissal of claim where "[t]he fraudulent scheme allegedly involved the Defendant-Appellees planning together to not disclose the Founders' sale of securities in the secondary offering, and then not disclosing those sales; fundamentally, this is an omission claim").

### B.  Count Thirteen plausibly alleges that material false statements were made to crypto currency investors in connection with the offer and sale of crypto asset securities and to equity investors in BAM Management.

The particular fraudulent practices or false and misleading statements that underlie this count are detailed in Section VI of the complaint, paragraphs 239 through 281.  The gravamen of the count is that BAM Trading and BAM Management negligently misled customers and investors when they assured them that they had implemented controls to prevent manipulative trading, in particular "wash trading," on the Binance.US platform, when in fact, they had not.  Compl. ¶¶ 239–43.  The complaint explains that in "wash trading," the same trader is buying and selling assets among his own accounts, and it is not arm's length market activity.  Compl. ¶ 240.  "Wash trading gives the artificial appearance of, among other things, increased trading volume, liquidity, and trading interest for the asset at issue.  It may also artificially inflate the aggregate trading volume of the platform upon which the asset is being traded."  Compl. ¶ 240.  The SEC also alleges that BAM misled investors when it disseminated trading volume statistics without disclosing the fact that it lacked procedures that would enable it to verify the numbers.  Compl. ¶¶ 250–58.

According to the SEC, from the time the Binance.US platform was launched in September 2019, "BAM Trading and BAM Management . . . publicly touted their supposed efforts to monitor and prevent manipulative trading."  Compl. ¶ 246.  For example, the Trading Rules included in the

Terms of Use that potential customers were required to accept included an admonition that "[t]raders are prohibited from engaging in Market Manipulation," defined as any action or course of conduct intended or likely to "create a false or misleading appearance of active trading in any Digital Asset on the BAM Platform [] or artificially control or manipulate the price or trading volume of a Digital Asset." Compl. ¶ 245 (first alteration in original).[31] The complaint also alleges that during a public Coindesk webinar in November 2019, the then-BAM CEO explained that it was BAM Trading's "on-chain analytics [] monitoring all the behaviors that are taking place," with "really clear sets and risk parameters" that enabled it to be sure that manipulative activity was excluded. Compl. ¶ 246.[32]

Also, two years later, when BAM Trading and BAM Management were seeking equity investors in BAM Management, they allegedly "falsely touted the trade surveillance and other measures purportedly in place on the Binance.US platform to detect and prevent manipulative trading." Compl. ¶ 247. The complaint points to specific instances between September 2021 and

---

[31]     BAM suggests that a statement in the Trading Rules could not be an actionable material misrepresentation because the rules were only binding on customers; they did not create binding obligations on BAM's part. BAM Mot. at 41. But the SEC is not alleging that BAM violated the Rules; the claim is that the Rules exemplified and were part of the overall set of misleading representations made to the investing public about the integrity of the platform. BAM adds, "[a]bsent any facts . . . showing that BAM did not genuinely believe its statements to be true at the time, this allegation fails as a matter of law," *id.* at 42, citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–86 (2015). But BAM lifts that principle out of context since the *Omincare* opinion was only setting out the standard for when a statement *of opinion* would support a claim for making false statements in a registration statement, and it did not purport to supplant the negligence standard that applies under Section 17(a)(2) or (a)(3).

[32]     BAM informs the Court that the remarks of the former BAM executive have been taken out of context, and that any reasonable participant in the digital assets market would have understood that the "controls" she mentioned in the 2019 webinar referred to blockchain analytics and not trade surveillance. BAM Mot. at 43. This may be established at a later date, but we are resolving inferences in plaintiff's favor at this point in the proceedings.

April 2022, including a September 2021 "Seed Round Pitch Deck." Compl. ¶ 247–49. When describing the available "trade surveillance" on the platform, the Pitch Deck identified vendors BAM Trading had engaged "to supposedly 'deploy[] human intelligence' and 'artificial intelligence' to 'ensure the highest level of compliance,'" and its involvement of a third-party provider of software for "[t]rade surveillance, market manipulation, and transaction monitoring." Compl. ¶ 248 (alterations in original). In a July 2021 "Trade Surveillance Manual" provided to equity investors, the defendant allegedly "falsely described active surveillance . . . supposedly conducted by an internal team" using the trade surveillance software. Compl. ¶ 249 ("The Trade Surveillance Manual stated that Trade Surveillance Company A's 'real-time' and 'T+1' monitoring of trading activity enabled the platform to prevent market manipulation, identify abusive trading practices prohibited by the platform's trading rules, and conduct monthly reviews of 'all potential Wash Trades.'").

The complaint also alleges that the BAM defendants misled the public about the reliability of the trading volume figures for the Binance.US Platform, which were being disseminated to potential investors on such public resources as the market data API, the Binance U.S. Platform and its website, and data aggregators such a CoinMarketCap and CoinGecko, Compl. ¶¶ 250–53, and on social media. Compl ¶ 255 ("[O]n November 1, 2019, BAM Trading tweeted that the Binance.US Platform had '$30M in 24hr Volume.' Similarly, on January 8, 2021, BAM CEO A tweeted that the platform's total trading volume was '$500M.'"). Statistics such as these were also reported in the Pitch Deck and other material provided to potential equity investors. *See* Compl. ¶¶ 256–58 ("In the Pitch Deck, BAM Trading and BAM Management reported, with respect to the Binance.US Platform, '$24B' in average monthly trading volume, '$205B' in trading volume to date, and favorable trading volume comparisons to the Binance.US Platform's competitors" and "that the

Binance.US Platform's August 2021 trading volume was '5x larger than FTX.US and ~24% of Coinbase's global volumes.'").

Why does all of this add up to fraud?  According to the SEC, none of the surveillance and monitoring was in place at the time it was advertised, and what went unmonitored in its absence was wash trading among accounts connected to defendant Zhao himself.

The SEC alleges:

> When the Binance.US Platform launched in September 2019, BAM Trading – contrary to its public statements – had no controls to monitor for and prevent manipulative trading on the Binance.US Platform, and through at least February 2022, it had implemented no such trade surveillance or controls.

> Moreover, when BAM Trading and BAM Management reported trading volume without disclosing the extensive nature of the wash trading that they knew existed on the Binance.US Platform, . . . they deceived investors into thinking that the trading volumes on the platform were robust, real, and reliable.

Compl. ¶¶ 260–61.

The BAM defendants move to dismiss this count, arguing that:  the complaint does not set forth a plausible claim under Section 17(a) as to crypto currency customers or equity investors in BAM; the complaint does not adequately allege that reported trade volumes were inflated by manipulative wash trading or that they were material to equity investors; and the complaint lacks allegations that BAM made material misrepresentations about its Trade Surveillance Program. BAM Mot. at 36–45.

The Court finds that the allegations are set forth with sufficient specificity to satisfy Rule 9(b), and, accepting the facts as true and resolving all inferences in favor of plaintiff SEC, it

will permit this claim to move forward.[33]  While the agency will bear the burden of proving the allegations, it has averred that Zhou's alleged self-dealing gave rise to a false impression of the trading volume on the Binance.US platform; that the Trade Surveillance Program that was supposed to be in place to detect the alleged wash trading was virtually non-existent; and that the strength and popularity of the platform, as demonstrated by the trade volume, and the representations concerning the rigor and reliability of the Trade Surveillance Program and BAM's internal controls were material to both equity investors and investors in the crypto assets themselves.

The BAM defendants' other attacks on this count are also unavailing.  They argue that to the extent the claim is based on misstatements to crypto currency traders regarding the operation of the Binance.US platform, Section 17(a) would not apply because the alleged representations were not made "in the offer or sale" of any securities.  BAM Mot. at 37.  But the Court has already found that BNB was offered or sold as an investment contract, a type of security, and the BAM CEO made the alleged statements in a public webinar after BAM established the Binance.US platform, at a time when BNB was available for trading.  Compl. ¶¶ 164, 246.

BAM also argues that it did not receive "money or property" by means of the alleged misleading statements, BAM Mot. at 36, but the complaint expressly alleges that BAM received trading fees when it induced crypto asset investors to trade on its platform.  *See* Compl. ¶ 281. Finally, the Section 17(a)(3) claim does not fail on the grounds that it merely recapitulates the false

---

33      The BAM motion posits that some of the allegedly false statements were true, *see, e.g.*, BAM Mot. at 44; that the self-trades could have been inadvertent and therefore not improper, *see* BAM Mot. at 40; and that sophisticated equity investors would not have found it particularly important to know whether the company had implemented trade surveillance technology.  BAM Mot. at 44–45.  But arguments such as these present factual disputes that are misplaced in a Rule 12(b)(6) motion.

or misleading statements underlying the Section 17(a)(2) claim; while the alleged misrepresentations are central to the alleged "practice or course of business which operate[d] as a fraud," the complaint sets out the requisite other acts and omissions: there is the alleged failure to implement the trade surveillance measures and to retain the outside vendors that were the subject of soothing statements to the investing public, as well as the failure to adopt protocols and procedures to prevent the alleged trading among accounts connected to Zhao that the SEC alleges gave a false impression of actual trading volume on the platform.

## V. Neither the major questions doctrine nor due process concerns warrant dismissal of the complaint.

Finally, the defendants have advanced two grounds for why the Court should not entertain this case at all. Defendants invoke the major questions doctrine and argue that the SEC does not have authority to regulate the crypto currency industry through litigation. Binance Mot. at 33–35; BAM Mot. at 31–32; *see also* Br. of Amicus Curiae Chamber of Digital Commerce in Supp. of Defs.' Mot. to Dismiss [Dkt. # 169] ("Chamber Br.") at 16–19. They also suggest that the lawsuit violates due process since the defendants lacked the necessary notice of the agency's position on crypto assets. Neither of these sweeping arguments warrants the dismissal of the action.

### A. The major questions doctrine is not a basis to dismiss the complaint.

The major questions doctrine applies to "extraordinary cases . . . in which the history and breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (alteration in original) (internal quotation marks omitted).

This is not such a case. The Supreme Court has opined that when an agency claims the "power to regulate a significant portion of the American economy" that has "vast economic and

political significance," the agency must identify "clear congressional authorization" for that power. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks and citation omitted); *see also Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023). According to defendants, the doctrine applies here because the SEC's lawsuit is a "power grab," Binance Mot. at 31, that claims regulatory authority over the "digital asset industry – a nascent, transformative, trillion-dollar industry." BAM Mot. at 31. While this case and the other similar actions involving the crypto currency industry discussed above represent an effort to regulate a new variety of economic activity, and a ruling in this case – while not the first – could have implications for the industry as a whole, defendants have not begun to show that the effort would affect the U.S. *economy* as a whole.

The Court has not been given grounds to find that the industry, while important, has the broad reach that has motivated courts to apply the doctrine to other industries. *See, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137 (2000) (internal citation omitted) (describing the tobacco industry at the time as "one of the greatest basic industries of the United States with ramifying activities which directly affect interstate and foreign commerce at every point, and stable conditions therein are necessary to the general welfare"). Further, a ruling that certain of defendants' sales of crypto assets are investment contracts, and therefore securities, would not have the economic reach that other regulatory actions found to be subject to the doctrine would have had. *West Virginia*, 597 U.S. at 735 (describing the challenged EPA rule as one that would have "force[d] a nationwide transition away from the use of coal to generate electricity").

Also, with respect to the "power grab" argument, the SEC's enforcement action here does not reflect "enormous and transformative expansion in [the agency's] regulatory authority without clear congressional authorization." *Util. Air Regul. Grp.*, 573 U.S. at 324 (describing the EPA's

interpretation of its authority under a particular provision of the Clean Air Act as "an agency laying claim to extravagant statutory power over the national economy"). Rather, the SEC asks the Court to rule whether defendants' crypto assets are "securities" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, an application of enforcement powers that the agency has exercised since at least 1946, when the Supreme Court held in *Howey* that the contracts at issue in that case "under the circumstances . . . together constitute[d] an 'investment contract' within the meaning of" the federal securities laws. *Howey*, 328 U.S. at 297. Indeed, such enforcement was fully contemplated by the Supreme Court. *See id.* at 299 (describing the test for an investment contract as "flexible," not "static" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits"); *see also Joiner*, 320 U.S. at 351–52 (holding that "the reach of the [Exchange] Act does not stop with the obvious and commonplace," but must extend to "[n]ovel, uncommon, or irregular devices, whatever they appear to be," that are "widely offered [and sold]" in a way that "established their character" as a security).

To be sure, a ruling that either BNB, BUSD, BNB Vault, or Simple Earn is an investment contract under the securities laws could have important implications for the broader crypto asset industry and how issuers or platforms market digital assets. But the SEC's lawsuit seeking that ruling is an unremarkable exercise of the agency's enforcement authority.

> [T]he SEC's role is not to exercise vast economic power over the securities markets, but simply to assure that they provide adequate disclosure to investors. Thus, the SEC's decision to require truthful marketing of certain crypto-assets based on its determination that certain of such assets are securities hardly amounts to a "transformative expansion in its regulatory authority."

*Terraform I*, 684 F. Supp. 3d at 190, quoting *West Virginia*, 597 U.S. at 724; *see also FTC v. Kochava Inc.*, 671 F. Supp. 3d 1161, 1180 (D. Idaho 2023) (holding the major questions doctrine

did not apply in that case in which "the FTC [was] not flexing its regulatory muscles" but "merely asking a court to interpret and apply a statute enacted by Congress"); *United States v. Freeman*, 688 F. Supp. 3d 1, 18 (D.N.H 2023) (rejecting major questions doctrine in statutory enforcement action).

As another district court ruled recently, the crypto asset industry "falls far short of being a portion of the American economy bearing vast economic and political significance." *Terraform I*, 684 F. Supp. 3d at 189 (quotation marks omitted); *see also SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *24 (S.D.N.Y. Mar. 27, 2024) at *14–*15. This Court agrees and finds that the major question doctrine does not apply.

### B. Defendants have had fair notice of the SEC's position on digital tokens.

It is "[a] fundamental principle in our legal system" that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020), quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (holding that a statute or regulation fails to comply with due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement") (internal quotation marks omitted).

Defendants Binance and Zhao argue that the SEC failed to comport with these principles by failing to "identify, with ascertainable certainty, the standards with which the agency expects [an industry] to conform." Binance Mot. at 42 (alteration in original), quoting *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) (quotation marks omitted). They assert that the SEC has shifted positions on whether crypto assets and transactions are securities subject to the SEC's jurisdiction, Binance Mot. at 42–43, citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995), and that this lawsuit reflects a "new position" that "is at odds

with industry practice and the agency's 'very lengthy period of conspicuous inaction,'" creating "the

potential for unfair surprise." *Id.* at 43, citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S.

142, 157–58 (2012).

There is no question that the agency's position has evolved and that the agency has not

undertaken a comprehensive regulatory approach to the industry. But that does not mean that this

case came as a surprise. The SEC filed a number of other lawsuits before this one alleging that

the sale of crypto assets are investment contracts and, therefore, securities under *Howey*. They

include *SEC v. Terraform Labs Pte. Ltd.*, 23-cv-1346-JSR, filed in February 2023; *SEC v. Ripple

Labs, Inc.*, 20-cv-10832-AT, filed in December 2020, and *SEC v. Kik Interactive Inc.*,

19-cv-5244-AKH, filed five years ago in June of 2019. So defendants' suggestion that this case

presents a "new position" rings hollow. *See* Binance Mot. at 9 (describing recent SEC enforcement

actions alleging that crypto asset transactions are securities).

In those lawsuits, as in the instant case, the agency undertook to enforce a decades-old

federal securities statute and 1943 Supreme Court precedent interpreting it. As court in *Ripple

Labs* reasoned:

> the caselaw that defines an investment contract provides a person of
> ordinary intelligence a reasonable opportunity to understand what conduct
> it covers. *Howey* sets forth a clear test for determining what constitutes an
> investment contract, and *Howey*'s progeny provides guidance on how to
> apply that test to a variety of factual scenarios.

*Ripple Labs I*, 682 F. Supp. 3d at 332 (internal citations omitted), citing *United States v. Zaslavskiy*,

No. 17 Cr. 647, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) ("[T]he abundance of caselaw

interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued

by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice

that is constitutionally required."); *see SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *24 (S.D.N.Y.

Mar. 27, 2024) at *15–*17. *Howey* established "an objective test that provides the flexibility

necessary for the assessment of a wide range of contracts, transactions, and schemes." *Ripple Labs I*, 628 F. Supp. 3d. at 332.

Defendants focus on the SEC's failure to issue regulations on crypto assets and its inconsistent statements and approaches to regulating the sale of digital assets as investment contracts. *See* Binance Mot. at 7–10, 42–43. But this suit is consistent with the other enforcement actions that the agency has brought alleging that the sales of crypto assets are "investment contracts" within the meaning of *Howey*. *See, e.g.*, *Ripple Labs I*, 628 F. Supp. 3d. 308; *Telegram*, 448 F. Supp. 3d 352; *Kik Interactive*, 492 F. Supp. 3d 169.

While the fair notice doctrine calls for sufficient notice to "provide a person of ordinary intelligence fair notice of what is prohibited," *Fox Television Stations*, 567 U.S. at 253, quoting *Williams*, 553 U.S. at 304, and not a showing of actual notice, it is still notable nevertheless that the complaint alleges that Zhao and Binance knew their actions could trigger federal securities enforcement action. *See* Compl. ¶ 162 (alleging that in "an internal chat in September 2019, the Binance CFO and the Binance CCO agreed that . . . . if a 'Kik [W]ells notice happens to BNB, BNB price can go down significantly,'" referring to the prelude to the June 2019 enforcement action, *SEC v. Kik Interactive*); Compl. ¶ 162 ("They further quantified the legal risk of listing BNB on the Binance.US Platform as '$10 mm in legal fees and settlements,' contrasted to the fact that BNB's price could 'go up 20%.'"). Further, it is alleged that Zhao and Binance were aware of and advised about possible US regulatory exposure and took steps to conceal their activity. *See* Compl. ¶¶ 110–40, 162.

Moreover, the agency put the industry on notice even before 2019. In July 2017, the SEC issued a report advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities

laws." Compl. ¶¶ 78–79 (alteration in original), citing *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report") (advising that the platforms "'provided users with an electronic system that matched orders from multiple parties to buy and sell [certain crypto asset securities] for execution based on non-discretionary methods' and therefore 'appear to have satisfied the criteria' for being an exchange under the Exchange Act").[34] The report also concluded that the offerings of the crypto assets it examined were offerings of securities. Compl. ¶ 78; DAO Report at 11–15 (finding investors in The DAO invested money with a reasonable expectation of profits derived from the managerial efforts of others, satisfying the *Howey* test). And in 2019, the agency published the Framework for "Investment Contract" Analysis of Digital Assets. Framework Analysis; *see also* Binance Mot. at 8, citing Appx. A line 3.[35]

Therefore, the Court finds no violation of due process or lack of fair notice that would warrant the dismissal of the complaint.

---

[34] A copy of the DAO Report is available at https://perma.cc/7VQX-6A5S. *See also* Binance Mot., Appx. A line 1.

[35] The *amici* also take issue with what they call the SEC's "Regulation-by-Enforcement Approach." *See* Chamber Br. at 6 (complaining the SEC has refused to regulate crypto assets via ordinary administrative or regulatory procedures, such as through rulemaking or the publication of binding interpretive guidance but has chosen to regulate by bringing enforcement actions). But while one could have a lively debate on this subject from a policy perspective, and this Court has expressed some of its misgivings of its own concerning the efficiency of the SEC's approach, neither the defendants nor the *amici* have pointed to any legal authority barring the agency from exercising its discretion in this manner. "Agencies have authority to establish legal standards 'by general rule or by individual, *ad hoc* litigation.'" *Hoopa Valley Tribe v. FERC*, 629 F.3d 209, 212 (D.C. Cir. 2010), quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947); *CFPB v. Ocwen Fin. Corp.*, No. 17-80495, 2019 WL 13203853, at *16–19 (S.D. Fla. Sept. 5, 2019) (rejecting fair notice defense based on "regulation through enforcement," and noting "[f]ederal courts have rejected this argument").

# CONCLUSION

For these reasons and as summarized below, the BAM defendants' Motion to Dismiss [Dkt. # 117] is **DENIED**, and the Binance and Zhao Motion to Dismiss [Dkt. # 118] is **GRANTED IN PART** and **DENIED IN PART**.

- Count One:  The portions of Count One against Binance relating to the initial coin offering of BNB and Binance's ongoing sales of BNB after the ICO will move forward, while the portion concerning secondary sales of BNB, by sellers other than Binance, is dismissed.

- Count Two:  The claim against Binance concerning sales of BUSD is dismissed.

- Count Three:  The claim against Binance regarding BNB Vault will proceed, and the claim as to Simple Earn is dismissed.

- Count Four:  The claim that BAM Trading offered and sold its Staking Program as an investment contract will proceed.

- Counts Five through Ten:  The claims that Binance (Counts Five, Six, Seven, Eight, and Ten) and BAM Trading (Counts Eight, Nine, and Ten) failed to register under the Exchange Act will proceed.

- Counts Eleven and Twelve:  The claims against defendant Zhao as a control person over Binance and BAM Trading for their alleged violations of the Exchange Act will proceed.

- Count Thirteen:  The claim that BAM Management and BAM Trading violated the anti-fraud provisions of the Securities Act will proceed.

SO ORDERED.

AMY BERMAN JACKSON
United States District Judge

DATE:  June 28, 2024