```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2

 3   _____ )
     WILLIAM MCGREEVY, ET AL.,       )
 4                                   ) No. 3:22-cr-00132-SRU-1
                    Plaintiffs,      )
 5                                   ) July 3, 2024
     v.                              )
 6                                   ) 9:35 a.m.
     DIGITAL CURRENCY GROUP,         )
 7   INC. ET AL.,                    ) 915 Lafayette Boulevard
                                     ) Bridgeport, Connecticut
 8                   Defendants.     )
     _____ )
 9


10

                           MOTION HEARING
11

12   B E F O R E:

13          THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

14
     A P P E A R A N C E S:
15

     For the Plaintiffs:
16

17          SILVER GOLUB & TEITELL LLP
                One Landmark Square, 15th Floor
18              Stamford, CT 06901
                203-325-4491
19              E-mail:  Isloss@sgtlaw.com
            BY:  IAN WISE SLOSS, ESQ.
20

            KAPLAN FOX & KILSHEIMER LLP
21              800 Third Avenue, 38th Floor
                New York, NY 10022
22              212-687-1980
                E-mail:  Jcampisi@kaplanfox.com
23          BY:  JEFFREY P. CAMPISI, ESQ.

24   (Appearances Continued)

25                  Official Court Reporter:
                    Melissa J. Cianciullo, RDR, CRR, CRC
                    (203) 606-1794
```

```
1   A P P E A R A N C E S   (C O N T ' D):

2   For the Defendants Digital Currency Group, Inc.,
    Barry Silbert, Glenn Hutchins, Lawrence Lenihan and
3   Mark Murphy:

4        WEIL, GOTSHAL & MANGES
             767 Fifth Avenue
5            New York, NY 10153
             212-310-8881
6            E-mail: Jonathan.polkes@weil.com
                     Caroline.zalka@weil.com
7        BY: JONATHAN D. POLKES ESQ.
             CAROLINE ZALKA, ESQ.
8
         DAY PITNEY LLP
9            One Stamford Plaza
             263 Tresser Boulevard
10           Stamford, CT 06901
             203-977-7383
11           E-mail: Tdgoldberg@daypitney.com
                     Jlerner@daypitney.com
12       BY: THOMAS D. GOLDBERG, ESQ.
             JOHANNA LERNER, ESQ.
13

14   For the Defendant Soichiro Moro:

15       ARNOLD & PORTER KAYE SCHOLER LLP
             250 West 55th Street
16           New York, NY 10019-9710
             212-836-7222
17           E-mail: Marcus.asner@arnoldporter.com
                     Tyler.fink@arnoldporter.com
18       BY: MARCUS ASNER, ESQ.
             TYLER JAIRUS FINK, ESQ.
19

20   For the Defendant Derar Islim:

21       ALLEN OVERY SHEARMAN STERLING US LLP
             1221 Avenue of the Americas
22           New York, NY 10020
             212-610-6326
23           E-mail: David.esseks@aoshearman.com
         BY: DAVID ESSEKS, ESQ.
24

25   (Appearances Continued)
```

```
1   A P P E A R A N C E S    (C O N T ' D):

2

3   For the Defendant Michael Kraines:

        PILLSBURY WINTHROP SHAW PITTMAN LLP
4            31 West 52nd Street
             New York, NY 10019
5            212-858-1161
             E-mail:  Richard.donoghue@pillsburylaw.com
6       BY:  RICHARD PETER DONOGHUE, ESQ.

7       WIGGIN & DANA LLP
             Two Stamford Plaza
8            281 Tresser Boulevard
             Stamford, CT 06901
9            203-363-7626
             E-mail:  Rhoff@wiggin.com
10      BY:  ROBERT S. HOFF, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (CALL TO ORDER, 9:35 a.m.)
 2         THE COURT:  Good morning.  We're here in
 3    McGreevy v. DCG.
 4         Could I have appearances of anyone who is
 5    expected to speak today.
 6         MR. CAMPISI:  Good morning, your Honor.  Jeff
 7    Campisi, Kaplan Fox & Kilsheimer, for the lead
 8    plaintiffs.
 9         THE COURT:  Thank you.
10         MR. SLOSS:  Ian Sloss of Silver, Golub &
11    Teitell for the lead plaintiffs.
12         THE COURT:  Thank you.
13         MR. POLKES:  Good morning, your Honor.  I'm
14    Jonathan Polkes from Weil Gotshal and we are
15    representing the defendants Digital Currency Group,
16    Mr. Silbert, Mr. Hutchins, Mr. Lenihan and
17    Mr. Murphy.
18         THE COURT:  Thank you.
19         MS. ZALKA:  Good morning, your Honor.
20    Caroline Zalka from Weil Gotshal also on behalf of
21    the DCG defendants.
22         THE COURT:  Very good.
23         MR. GOLDBERG:  Good morning, your Honor.  Tom
24    Goldberg and with me is Johanna Lerner from Day
25    Pitney also for the DCG defendants.
```

```
1                    THE COURT:  Very good.

2                    MR. ASNER:  Good morning, your Honor.  Marcus

3    Asner with Arnold & Porter representing Michael Moro.

4    I have with me Tyler Fink from Arnold & Porter.

5                    THE COURT:  Thank you.

6                    MR. ESSEKS:  Your Honor, David Esseks, A&O

7    Shearman, representing Derar Islim, and Robert Hoff

8    as local counsel for him.

9                    THE COURT:  Very good.  Thank you.

10                   MR. DONOGHUE:  Good morning, your Honor.  For

11   Michael Kraines, Richard Donoghue from Pillsbury

12   Winthrop Shaw Pittman.

13                   THE COURT:  Very good.  All right.  Thank

14   you.

15                   Well, we've got a number of motions to

16   dismiss, of course.  And I want to have as fulsome an

17   argument as possible, but there are quite a number of

18   issues raised, and I think maybe I'm going to

19   encourage you to focus on your stronger issues, if

20   you will, and see how it goes.

21                   So who is going to take the lead today?

22                   MR. POLKES:  I will for the defendants, your

23   Honor.

24                   THE COURT:  Very good.  Thank you.

25                   MR. POLKES:  Shall I start?
```

```
 1              THE COURT:  Yes, please.

 2              MR. POLKES:  May it please the Court and

 3      thank you, your Honor.

 4              And it's actually sort of a pleasure to be

 5      arguing in federal court on July 4th.  So this is a

 6      nice experience, so thank you, your Honor.

 7              THE COURT:  I figured everybody here is

 8      heading up to the Cape or Rhode Island or somewhere

 9      and this is like a good stopping off point.

10              MR. POLKES:  I could think of nothing more

11      patriotic than having an argument in front of a

12      federal judge, so thank you.

13              Your Honor, as you said, there is a whole lot

14      of issues.  My goal is to assist the Court.  I know

15      the Court's read the materials, or I'm going to

16      assume the Court has read the materials.

17              THE COURT:  Fair assumption.

18              MR. POLKES:  And I want to focus on whatever

19      the Court wants me to.  There are four categories, I

20      think, one way to sort of break this down to size, of

21      argument.  One is the new one which is the damages

22      issue which I think I have to raise since this is our

23      only opportunity, so I'm going to address that.  And

24      I think it's a very material event in the life of

25      this case.
```

1          Two is the control issues because the DCG,

2    DCG and the DCG individual defendants, are all only

3    in here, you saw the primary violator is Genesis,

4    it's in the bankruptcy.  So I think that's a nice way

5    to sort of cleave off the only kind of hook that's

6    keeping our clients in the case.

7          Then the next -- or there are a bunch of

8    10b-5 issues that I have talked about.  There is the

9    reliance element, the causation element.

10         And then the last one, which in some ways is

11   sort of the one that covers everything, is whether or

12   not these crypto loans are even securities.  And

13   that's a very big issue:  law review articles, cases

14   coming out.  And if the Court wants to address that,

15   my partner Ms. Zalka is going to do that and is the

16   expert and is ready if the Court wants.  If the Court

17   does not want us -- that could take all day, and so

18   we're happy to rest on our papers for that issue, if

19   that's what the Court wants.  And, again, we're here

20   to serve so ...

21         THE COURT:  Well, I would just, in connection

22   with that issue, I would simply ask:  What did Judge

23   Ramos get wrong?

24         So maybe you can be prepared.

25         MS. ZALKA:  That's me, your Honor.

```
1          THE COURT:  Yeah, you can be prepared for
2     that.
3          MR. POLKES:  I was in the U.S. Attorney's
4     Office with Judge Ramos, and I used to ask him that
5     all the time back in the day.
6          All right, Judge.  So with that by way of
7     introduction, let me start with the damages issue
8     because I do think in many respects events have
9     overtaken this case, and it's sort of -- it's a nice
10    segue into the control issues too.
11         Your Honor saw, the fundamental issue in this
12    case is there is an allegation of securities fraud in
13    connection with the business of a bankrupt entity
14    called "Genesis Trading."  And Genesis was a crypto
15    trading company.  They had a program where you could
16    lend them your crypto at, different kinds, Ethereum
17    or bitcoin or whatever, and they would in turn lend
18    it out, and they would pay you interest for use of
19    your crypto, just sort of like a bank.  And there was
20    a contract that governed that agreement.
21         And then the agreement got -- the program got
22    bigger because there was another crypto company
23    called "Gemini," and Gemini had its own contract
24    relationship with Genesis that allowed all of its
25    customers to participate in the program.  So it
```

 1    became more retail.  The first program which was

 2    direct with Genesis had 1 or 2 million dollar --

 3              THE COURT:  Minimum.

 4              MR. POLKES:  -- sophistication, minimum,

 5    right.

 6              And then the Gemini program sort of made it

 7    more retail and anyone who wanted to could

 8    participate.  And there were some minor differences,

 9    but an important point here, which I think actually

10    got lost with in the papers so I don't want to leave

11    the Court with this if nothing else today:  The

12    master agreements, which is where the alleged false

13    statements took place, are master agreements.  In

14    other words, they set the framework for future

15    trading.  But they're very clear.  And if it helps

16    the Court, I can point out the relevant paragraphs in

17    the master agreements, that all the financial terms,

18    all of them are negotiated on a bespoke basis

19    whenever you actually want to transact.

20              So you can sign this agreement and never do

21    any business with Genesis.  If you sign the master

22    agreement and you want to do a loan, let's say it's a

23    year later, Genesis will tell you the terms, all the

24    relevant financial terms:  the interest they're going

25    to pay, the duration of your loan, whether it's

```
1    callable prior to the expiration date and all those

2    other sort of -- anything that's going to impact the

3    finances.  And the agreement even said, the master

4    agreement, that if any terms in that future

5    transaction agreement contradict anything in the

6    master agreement, that they control.

7         So the relevant documents here are the

8    contracts with Genesis.  There is the two-party one

9    which was the original one, the institutional one,

10   and then the Gemini one where they allowed their

11   customers, which was a three-party agreement,

12   tripartite agreement, the tripartite agreement said

13   specifically this has nothing to do with DCG; you

14   understand that.  The only contract counterparties

15   here were Gemini, Genesis and the investor.  So that

16   was the way this was set up.

17        And the allegation is Genesis went into

18   bankruptcy, Genesis went into bankruptcy, and the

19   people lost the access to their crypto because it was

20   locked up in these loans and they couldn't get it out

21   because of the bankruptcy.

22        And, again, the way -- this has nothing to do

23   with us so far, with DCG.  DCG is the corporate

24   parent.  And the way they try to get us involved is

25   through this control person theory which I'll talk
```

1    about in a second.

2           But before I do, I want to explain what

3    happened in the bankruptcy.  The obvious, the sort of

4    shortest distance between two points here is okay,

5    investor, go into the bankruptcy, file a proof of

6    claim and get paid out of the estate.  That's who you

7    had your contract with.  That's who you had all your

8    dealings with, so go get your money back.

9           THE COURT:  Or a small portion of your money.

10          MR. POLKES:  Or a portion.  Exactly.  Here is

11   what happened:  Crypto has gone through the roof.  It

12   has gone up four times in value since the filing of

13   the bankruptcy, approximately, as a result of which

14   the estate has been able to pay out 100 percent of

15   the crypto of every Gemini investor, which is one of

16   the classes here.  They haven't formally made it a

17   subclass but it's the Gemini people have gotten paid

18   every bit of -- every penny of crypto, every bitcoin

19   of their crypto, they've got be out.

20          And, in fact, Gemini issues a press release

21   that said not only are you getting all your crypto

22   back but because of the appreciation, you're getting

23   250 percent of the value of your crypto before the

24   bankruptcy.  So they've made out like bandits.

25          Then you have the institutional direct

1    investors.  There were -- they're getting, according

2    to the lawyers for the Genesis estate which they said

3    on the record in bankruptcy court which we have --

4    have we already provided this to the Court, the

5    transcript?  We will if we haven't already, your

6    Honor.  It's public record.

7              And 77 percent of the crypto, but on a dollar

8    basis because it's gone up in value, at least some of

9    them, we've done some math, this is not part of the

10   public record but the math is easy enough to do,

11   they've made 150 percent of the value on a cash

12   basis.  Even though they're not getting all the

13   crypto out, the crypto they are getting is worth so

14   much more, that they've done extremely well.  So --

15             THE COURT:  Well, okay.  On that point, if

16   they're not getting 100 percent of the crypto and the

17   crypto has done great, they would have made, you

18   know, 25 percent of the crypto that had skyrocketed.

19             MR. POLKES:  Right.

20             THE COURT:  So why doesn't that count?

21             MR. POLKES:  So let's put the Gemini people

22   to the side and just take those people.

23             Here is the issues:  In a securities, case

24   the damages are always measured.  The max damages is

25   your purchase price of your security.  Damages -- and

```
 1    I know your Honor has done Teva and other securities

 2    cases.  The damages are here is what I paid for my

 3    security, for my Teva, at an inflated price.  Then

 4    the truth came out and the price dropped.  My damages

 5    are the delta between what I paid and what I lost

 6    when the stock price went down.  The maximum damages

 7    you have if the stock price went down to zero, your

 8    damages are your purchase price.

 9            THE COURT:  Right.

10            MR. POLKES:  Here, here, the purchase -- it's

11    hard to know what the security even is here because

12    the theory has changed.  It's jumped around.  We

13    believe and we've said that the theory of the

14    security that the plaintiffs posited is it's this

15    master agreement which is a loan agreement to lend

16    crypto.  They've now said it may be the subsequent

17    transactions that were done underneath that document.

18    Either way, the only way to construe the purchase

19    price is the dollar value of the loan.  All of them

20    have now made a profit on the transaction.

21            So in the securities context, that would be

22    as if you bought your Teva and because of subsequent

23    events, you actually got more than you paid for your

24    Teva.  There is max damages plus an additional cap.

25            So our position, at least, is that even for
```

1    the institutional investors who are still getting a

2    cash windfall, there can't possibly be any securities

3    damages.

4            Now, let me say, Judge, I recognize -- I

5    don't want to interrupt.  I'm sorry.

6            THE COURT:  Well, I was just going to say,

7    would the securities laws recognize as a loss the

8    reduced number of bitcoin?  Because, you know, ex

9    ante I had 100 bitcoin.  Now I have 75 bitcoin.  Even

10   though the bitcoin has gone up and I'm feeling flush,

11   boy, you guys robbed me of 25 percent of my bitcoin.

12           MR. POLKES:  I've fully -- I've thought about

13   this as well, Judge, the same question.  Whatever the

14   answer to that is, we don't know because it's not

15   pled in the complaint.  At a bare minimum, at a bare

16   -- the only thing that was pled in the complaint is

17   our bitcoin got locked up in the bankruptcy.

18           THE COURT:  Right.

19           MR. POLKES:  It's not locked up anymore.  So

20   even if nothing else were to happen today, I think

21   the theory -- and I think the complaint should be

22   dismissed with prejudice for a whole host of reasons

23   including those I'm making now.  But at a bare

24   minimum, they're going to have to go figure out their

25   theory of damages and come back and plead it in a way

1    that your Honor and I can figure out.  And all

2    they've done so far, and this is not -- this is

3    perfectly appropriate but this all just happened.  We

4    just raised the issue.  They wrote back some theories

5    in a letter about interest.  That's all very

6    interesting.  But, you know, you can't amend a

7    complaint through a brief.  You surely can't amend it

8    through a letter back to our letter.

9        So, again, I think that's just the baseline

10   is go back and figure out what your case is about now

11   because it's completely changed.  And that's really

12   the point I wanted to make, Judge.

13       THE COURT:  Okay.  On that point, it would be

14   a dismissal without prejudice.

15       MR. POLKES:  I think it should be with

16   prejudice because -- and I think your Honor should --

17   could dismiss it with prejudice just on this point:

18   that as currently pled where the damages are your

19   securities, which in this case is the loan made under

20   the master agreement is locked up and you lost the

21   value of your investment, you've gotten back the

22   value of your investment plus.

23       And even the argument, your Honor, that was

24   speculating which I have too, what if they could have

25   sold it earlier and recognized, you know, done

better, that's sort of a holding case.  We'll never
know.  They can't plead, and there's lots of law on
this, what we might have done had it not been locked
up over the past year.  Because they might have sold
it a year ago and missed out on the additional
benefits.  It's sort of -- it's too speculative at
that point to allege damages.

So I think there's enough in here already,
certainly for the Gemini people.  I think their case
could be dismissed with prejudice right now.  I think
there's enough to dismiss the rest.  But at a bare
minimum, the plaintiff should have to come back and
sort of figure out what they want to do with their
case.

So that's the point on damages, Judge, and I
think that's a nice segue for turning to the control
person point because I think as you've heard from
everything I've said, this case is about Genesis.
There was a contract counterparty.  DCG is a
corporate parent that was not only not party to the
contract that is allegedly the security but to avoid
-- there was a for avoidance of doubt sentence in the
contract that said DCG is not a party and has nothing
to do with it.  So nonetheless, here we are.

And control person liability for both the '33

1    and the '34 Act claims is a particular thing. It's

2    not just sort of a throwaway like you can say, well,

3    here's the control person. It's there for a reason.

4         And I want to read to the Court from a Second

5    Circuit case, *SEC v. Management Dynamics*, it's in our

6    brief, where the Court said, "The purpose of control

7    person liability is to prevent the evasion of the

8    provisions of the section by organizing dummies who

9    will undertake the actual things forbidden by the

10    section."

11         So there is a clear purpose to it. You don't

12    want to have a loophole where, yeah, DCG didn't do

13    the fraud but we arranged for other people to do it

14    on our behalf. The way I put this is control means

15    control. It doesn't just mean you're a corporate

16    parent. It doesn't just mean you may have even known

17    this or that, you may have consulted. There's lots

18    of things corporate parents do like help financially

19    support their subsidiary.

20         Control person liability is much stricter for

21    good reason, and I think this case highlights why

22    that's such an important doctrine, because of course

23    DCG was the 100 percent equity owner of Genesis.

24         But there is no dispute, and the fact that

25    we're alleged as the only basis for our being here

```
1    legally is the control person liability.  There is no
2    allegation we were directly involved.  There is no
3    allegation of piercing the corporate veil.  There is
4    no allegation that Genesis wasn't a real company.
5    And in fact, you can -- Genesis filed for bankruptcy.
6    It's coming out of bankruptcy proceedings so
7    obviously it is a completely independent company.
8              And, yes, the complaint alleges things that
9    are completely unremarkable.  It alleges that
10   Mr. Silbert, who was the CEO of DCG, owned 40 percent
11   of DCG.  That's got nothing to do with anything.
12             It alleges that Mr. Murphy and Mr. Kraines,
13   who are two C-level officers at DCG, were on the
14   board of Genesis.  That's how all subsidiary
15   relationships work.
16             It alleges that DCG was a quote/unquote --
17   they use this word as if it's a nefarious word, a
18   conglomerate like the old JPMorgan companies with
19   Silbert sort of in charge of the whole thing.  Again,
20   that doesn't get you there.
21             And if you look, what would get you there --
22   I think a counterfactual is helpful here to sort of
23   draw the contrast.  In the amended complaint, your
24   Honor, at Paragraphs 409.  I don't know if your Honor
25   has it in front of you.
```

```
1              THE COURT:  I do.

2              MR. POLKES:  I'll give you a page cite.  It's

3    page 100, easy to remember.  So there's a lot of

4    verbiage in this complaint, your Honor.  It's over

5    500 paragraphs, it's 135 pages.  But here, I think,

6    is a distillation of a lot of the important concepts

7    that help understand and, frankly, I think make the

8    case easy to dismiss.

9              You see this is a section called "Presumption

10   of reliance for the Exchange Act claims."  And it

11   states right here what the false statements were

12   allegedly.  They were "Genesis Global Capital

13   represents and warrants it is not insolvent and not

14   subject to bankruptcy or insolvency proceedings."

15   That's in that Genesis contract I told you about.

16             And the second one says that they're not

17   aware of any pending insolvency proceedings.

18             So in order for there to have been control

19   person liability on behalf of DCG, my clients, we

20   would have had to have controlled these statements

21   being put in the contract:  either we told them to

22   put it in the contract, we ordered them to put it in

23   the contract, we were asked for permission to put it

24   in the contract.  In other words, these are the false

25   -- allegedly false statements that were made.  They
```

```
 1    were made by Genesis, not by anyone at DCG, and the
 2    allegation would have to be we controlled the making
 3    of those false statements.  The law is clear, we've
 4    cited it in our brief, control means control of the
 5    particular transaction at issue.
 6          So if these are the false statements, and
 7    here is what they say they were, there is -- it is
 8    very easy to go through this complaint and search for
 9    an allegation, it doesn't exist here, that we in some
10    way controlled that statement being made.
11          And, in fact, if your Honor -- you know, I've
12    said this a couple of times but I'll say it a third
13    and final time:  This contract even said DCG has
14    nothing to do with this agreement.  Now, I agree with
15    you that if we had told them to put that in and
16    ordered all of this, that that would be a different
17    situation.  But there is nothing alleging any kind of
18    control over this.
19          And so there is a lot of allegations in here
20    about we saw a tweet, we retweeted something, we
21    consulted on how to get money to our subsidiary,
22    again, totally normal thing.
23          There is a lot in this complaint about a
24    note, ten-year note that the parent --
25          THE COURT:  I was going to ask about that,
```

```
 1   yeah.
 2           MR. POLKES:  So the parent provided a
 3   ten-year note to the subsidiary.
 4           THE COURT:  Right.
 5           MR. POLKES:  Which they say wasn't what it
 6   seemed to be, that it was about equity but it looked
 7   like it was about liquidity and it was designed to
 8   create a false impression on the market.  These are
 9   the alleged false statements.  They're the only
10   things in which they even claim -- on paragraph 408
11   and 409 that they even claim the group -- the members
12   of the class relied upon.  There is nothing -- and so
13   there is no pleading that DCG not only didn't control
14   the making of these statements but had anything to do
15   with it.
16           And as for the note, even though it's not
17   even in here, as for the note, DCG provided financing
18   to a subsidiary.  That is not a sufficient pleading
19   to allege control over a fraud based on false
20   statements.
21           THE COURT:  Okay.  Let me ask you to look at
22   paragraph 409:  "As a result of the misstatements and
23   omissions described above."  You're ignoring the word
24   "omissions" and you're reading -- you're limiting the
25   word "misstatements" to paragraph 408.
```

1          Why isn't "described above" everything from

2   one through 407?

3          MR. POLKES:  Here is why:  Because these

4   statements were made in the master agreements which

5   are alleged to be the securities.  This again is

6   where we get to the idea that these theories are very

7   hard to follow through and they're, you know.

8          The fraud hadn't even allegedly started when

9   these statements were made.  The fraud allegedly

10  starts later in 2021.

11         So the omission would be these statements

12  were true when made but at some point were no longer

13  true as the Three Arrows situation happened in June

14  of '22 and there was no corrective statement made.

15         That would have to be the theory.  Again,

16  it's not spelled out here, but that would have to be

17  the theory.

18         And then my analysis to your Honor would be

19  the same.  You would have to allege that it was DCG

20  that consciously instructed Genesis not to update or

21  provide the corrective information that was not

22  available -- allegedly.  Even if it's true, even

23  accepting those allegations as true, that was not

24  available to the investors.

25         I know when you guys signed the MLA two years

1    ago -- 18 months ago.  The MLA started 18 months

2    before the Three Arrows went under which triggered

3    all of these events.  I know the statement was true

4    when you signed it, but we just want you to know that

5    in light of Three Arrows, situations got much more

6    precarious, we're not sure this is true anymore.

7         There is no allegation even about that event

8    happening which, again, you would need to make sense

9    of this complaint.  But there is certainty no

10   allegation that DCG had anything to do with that

11   failure, with that, even if there was such a meeting,

12   even if there was such a conscious decision.

13        THE COURT:  Aren't there allegations, and I

14   can't cite the number, that basically say DCG

15   instructed Genesis -- I get Genesis and Gemini mixed

16   up.  Excuse me.

17        MR. POLKES:  Me too.  I do the same thing.

18        THE COURT:  One of those "G" companies.

19        MR. POLKES:  Yeah, same syllable.

20        THE COURT:  Yeah, to basically hide the

21   impact of the loan which was really fraudulent, et

22   cetera, et cetera.  And if they're directing that the

23   subsidiary hide nature of that transaction, why isn't

24   that at least an omission, control person omission

25   case?

1          MR. POLKES:  I will strategically concede

2     that if there was such a pleading, that would be more

3     of a problem.  I don't think it's in here, Judge.

4     And I know that, again, this is 500 paragraphs plus

5     and any time I say something about one paragraph --

6     there's a Whac-A-Mole quality to this.

7          THE COURT:  Yeah.

8          MR. POLKES:  Which again goes to the idea

9     that as sort of just a theme here, just from a notice

10    pleading perspective, we're having to guess at a lot

11    of what these theories even would be.

12          But be that as it may, I do not believe there

13    is a paragraph in here that says we instructed,

14    directed Genesis to hide the nature of anything.  And

15    Genesis did what it did, and I think this is a good

16    sort of point to hearken back to the original point I

17    made:  This all should be dealt with in the

18    bankruptcy.  It's the shortest distance between two

19    points.  There was a contract with an entity that

20    filed for bankruptcy and they've now gotten paid.

21          This whole effort to sort of loop in DCG as a

22    deep pocket was a bad -- was fatally -- was legally

23    weak when it was done, but now it's not only that,

24    it's sort of really gratuitous.  Like this whole

25    effort to kind of pull us into a business

1    relationship that clearly existed between

2    counterparties to a contract that we had nothing to

3    do with now is as inappropriate as it is legally

4    weak.

5           And I do not believe, your Honor -- again,

6    it's too hard for us and there's too much time and

7    there are too many paragraphs in this complaint.

8    I've got a list of them all.  I've got a chart.  I've

9    looked at them all.  I do not believe that that

10   paragraph exists with one exception which is that in

11   connection with the '33 Act claim which is different,

12   and I just want to sort of make clear this applies to

13   that as well.  The '33 Act claim is strict liability

14   if this loan was a security and if you sold it and if

15   it wasn't registered, there's liability.  Right?

16          THE COURT:  Yeah.

17          MR. POLKES:  So there the control -- it's the

18   same standard but it would have to be that we control

19   the decision to sell an unregistered security, that

20   that was sort of up to us and we're the ones that

21   directed it.

22          There is a sentence in the middle of one of

23   these paragraphs in the middle of the complaint that

24   says Silbert decided to sell the unregistered

25   securities.  It's got no factual predicate at all.

1  It's sort of a line that seems to have been just

2  inserted into the middle of the paragraph.  It's got

3  no basis for the knowledge, and I think I would argue

4  to your Honor that that sentence is a legal

5  conclusion that is not the kind of factual allegation

6  that is properly considered in connection with a

7  motion to dismiss.

8      They're going to have to say how they knew

9  that, how that decision was conveyed to people,

10  something to show that it's more than just a

11  conclusion that's being pled as a fact.

12      So that's the control person argument, your

13  Honor.  And I agree that maybe this is as good a time

14  as any to move on, unless the Court has further

15  questions.  Because I agree with your Honor.  I think

16  there is a meeting of the minds on the right

17  standard, but I don't believe that if you really look

18  at this complaint you're going to see well-pled -- I

19  do not believe you're going to see well-pled

20  allegations.  If there was such a pleading, you could

21  put that in one paragraph and we would all be talking

22  about it right now.

23      And instead what you have are dozens of

24  paragraphs about Silbert decided to move a different

25  subsidiary called "Grayscale" to Connecticut because

he lived there, to show how he sort of controlled all

of this.

You see quotes from Silbert where he says

things in tweets like, "It's important that we plug

this equity hole and reassure the markets."  We do

see things like that, and maybe that's part of what

your Honor is recalling.

THE COURT:  Right.

MR. POLKES:  But that -- parents wanting to

financially protect and shore up a subsidiary is

completely acceptable, does not establish control

person liability over a fraudulent transaction.  And

that's true of every parent subsidiary relationship.

And we've cited cases that say that that's

permissible.  There is nothing pled that crosses a

line where your Honor will be able to see a direction

from the parent to the subsidiary that is a direction

to do something that is fraudulent, that is --

particularly that pertains to the false statements

that I identified before in paragraphs 409 and 410.

THE COURT:  Right.  Thank you.

MR. POLKES:  And I'll just then, your Honor,

to finish up, there are elements of the 10b-5 claim,

some of which we just were looking at so it's a good

place to transition to.  There's reliance, there's

causation and there's damages that simply don't work,
don't make sense in light of trying to turn this
crypto lending program into a security.

So even if your Honor crosses the hurdle and
says, okay, I'm going to say these are securities,
the way this is currently pled makes no sense.  Let
me explain why.  As you can see on page 100 and the
language we just looked at, they're very candid about
this:  They are relying on a presumption of reliance.

They're not asserting individual reliance on
behalf of the class members or even the individuals.
There is no pleading that they read these relevant
parts of the contract and relied on them.  There is
no pleading that anyone relied on any of the tweets
or anything else or that anyone relied on that -- the
note being conveyed.  There is zero.

The pleading on reliance is right here on
page 100.  And it relies on a presumption, and what
it says is, "As a result of the misstatements and
omissions described above," meaning about solvency,
"plaintiffs and members of the class purchased the
yield securities in reliance on the representations,
these representations and omissions."

THE COURT:  And again --

MR. POLKES:  "And omissions."  I'm good with

1   that.

2           THE COURT:  Well, right.  But, again, that --

3   you're reading that in a very cramped way.  Described

4   above, again, if --

5           MR. POLKES:  You're incorporating all of

6   the --

7           THE COURT:  Yeah.

8           MR. POLKES:  Let me read the next paragraph

9   then:  "Plaintiffs and members of the class would not

10  have, nor would any reasonable investor, purchased

11  the securities had they known the true financial

12  condition."

13          And so it's very clear this is a presumption

14  reliance.  Under United States Supreme Court

15  authority, the *Amgen* case which we cited, unless you

16  are relying on a bona fide legally recognized

17  presumption of reliance like fraud on the market, you

18  have to plead actual reliance.  You have to plead

19  that you actually read these statements and relied on

20  them and were shocked to learn that in fact they

21  weren't true and that the company was insolvent even

22  though, as I mentioned as a sort of important

23  additional detail, these would have been true when

24  made.  And so the argument has to be when you

25  transacted a year later, it was no longer true and

1    you didn't know that.

2         You would have to prove actual reliance.

3    *Amgen* case, Supreme Court authority.  The only

4    exceptions is if there is a presumption which, as you

5    see, they seem to be aware of this which is why they

6    title the section "Presumption of Reliance" and why

7    they don't say anybody saw anything.  They just say

8    no reasonable person would have bought it if they had

9    known the true financial condition.

10         Now, the only other -- there's the fraud on

11   the market presumption which as we know doesn't apply

12   here because there is no efficient market for these

13   loans, these securities.  Efficient market would be

14   -- the whole premise, I think, of *Basic v. Levinson*

15   helps in the *Teva* case.  It doesn't matter if someone

16   read the false statement.  It doesn't matter if an

17   investor didn't read the financials, wasn't at the

18   earnings call where the CEO made the false statement.

19   It doesn't matter because all of that gets reflected

20   in the share price.

21         That doesn't make any sense in this context.

22   There is no share price.  The price doesn't move.

23   It's just a loan with a fixed fee.

24         So the only other presumption of law, there

25   is only one other and that's the Affiliated Ute

```
 1    omissions.  And Second Circuit authority which we
 2    cited in our brief, the Wagner case, says that where
 3    there are false statements pled, you don't get the
 4    Affiliated Ute presumption.  That's only in a pure
 5    complete omissions case.  Right here you see what are
 6    the allegedly false statements.
 7            And even taking what your Honor is saying, as
 8    I must, taking as I must what your Honor has said
 9    about even if the rest of the complaint is brought
10    down here by incorporation, at best this is a mixed
11    omissions and false statement case.  They have lots
12    and lots of claims about the tweets and so forth.
13    You don't get Affiliated Ute.  Period.  Full stop.
14            So if you don't get fraud on the market and
15    you don't get Affiliated Ute, you're left with the
16    Amgen case.  You must plead actual reliance.  There
17    is no other way.  That is not done anywhere here.
18    And as you can see, they're just inventing a
19    presumption here and, sort of, it's -- frankly, it's
20    throwing a fastball by the Court.  They don't
21    identify what the presumption is, how it works, and
22    you just can't do that.
23            So I think that's --
24            THE COURT:  So --
25            MR. POLKES:  I'm sorry.  Go ahead, your
```

1    Honor.

2          THE COURT:  Are they essentially trying to

3    plead an indirect reliance claim?

4          MR. POLKES:  So they mentioned indirect

5    reliance.  They mentioned two theories:  one was

6    agency reliance and one was derivative reliance.

7          As for the agency reliance theory, dead in

8    the water.  The theory there was, well, we misled

9    Gemini -- DCG through -- Genesis, because DCG made it

10   so you've got to get back to the control person,

11   directed Gemini, misled Gemini, and Gemini was the

12   agent for all the Gemini investors, at least.  Now,

13   remember, those are the ones that have all been paid

14   out.  But be that -- set that aside.

15         That only works if Gemini was an agent with

16   trading discretion making the relevant investment

17   decisions, which they were not.  Gemini had no

18   ability to get its investors to invest or not invest,

19   had no discretion.  It was completely you can join

20   the program and from that point on, you make all your

21   own decisions.

22         So as a legal matter and as a factual matter,

23   the agency theory of reliance doesn't work here.

24         Similarly, for derivative, the derivative

25   theory, it has to have been said to someone, and in

this case it was Gemini, intending that Gemini would
then relay it to their investors.  And, again, there
is no pleading about anything that you would need.

So I respectfully submit that these were all
-- these theories of reliance were all sort of
reverse engineered after plaintiff saw our arguments.
They were sort of looking to see whatever theory they
could come up with, but I don't think those work.

And similarly, your Honor, causation, it's a
similar argument.  It just doesn't fit the theory
here, this novel theory of securities fraud.  As we
were saying before, and I'll take the *Teva* case
again, the theory is when the truth came out about
the fraud, it caused the stock price to drop.  That
model, that vocabulary doesn't even make any sense
here.  If the truth -- I don't know what the truth
coming out would be.  That it was really insolvent,
let's take that.  That had no impact on the value of
the security which is the loan because the loan
doesn't trade.

What -- the result of that, what that caused
is something else entirely, even according to the
complaint which is the crypto, which was the security
for the loan, got locked up in a bankruptcy, which it
no longer is.

 1          But even forgetting my original arguments

 2     aside, there is no theory of causation here whereby

 3     you can draw a straight line, as one must under *Dura*

 4     and other Supreme Court authority, between the

 5     allegedly false statements or omissions about

 6     solvency and a loss, a stock drop, if you will.

 7          THE COURT:  So I take it your position would

 8     be that the lost interest the plaintiffs talk about

 9     was in effect more than offset by the gains, is

10     that --

11          MR. POLKES:  It was -- a couple of things

12     about that.  That goes to the damages question.

13          First of all, it was more than offset by

14     gains.  But, again, let them plead whatever they

15     want.  Who knows what their theory is going to be.

16          But I think here is the more important legal

17     point:  If your Honor recalls, as I mentioned, there

18     is the master agreement, but that's not -- that

19     doesn't define the financial terms pursuant to which

20     anyone actually transacted.  Every one of these

21     individual plaintiffs and certainly every one in the

22     punitive class had their own completely bespoke

23     lending agreement.  The loans were made at different

24     times, different interest rates, different underlying

25     digital currencies, different terms:  Some were open

term.  Some were closed term.  Some were callable,
some were not callable throughout the entire period.
So heaven only knows what interest rates they think
they would be entitled to or deserve or how that
would be impact by the output of the bankruptcy.

In any event, none of that -- just getting
back to my causation argument, none of that fits the
*Dura Pharmaceutical* model of securities damages.

So, you know, we're sort of in a world here
where first your Honor would have to decide these
were securities, but then you'd have to fashion some
brand-new, literally brand-new because no one has
ever done it before, theory of causation that is
consistent with prior Supreme Court jurisprudence
that would explain how the truth coming out here
somehow impacted the value of this loan, of this
security which doesn't trade anyway and which has now
been completely reimbursed.  Even if it meant lost
interest rates, I don't think that would establish
*Dura*-like causation.  You know, that's sort of just a
different thing.  It's really a breach of contract
case as we've said.

And I can finish up here, Judge.

THE COURT:  Sure.

MR. POLKES:  Because same point for damages.

```
 1   Setting aside my original damages arguments which
 2   really have to do with events overtaking the case,
 3   the case becoming moot, there's no damages left
 4   anyway, even before that happened there was a problem
 5   with them pleading damages that are cognizable under
 6   10b-5.  As we've said, maximum damages under 10b-5 is
 7   your purchase price.  There is no world in which
 8   you're entitled to get more than that.  There is
 9   rescission but I'll -- that's a detail and I can
10   address that or your Honor can deal with that.  But
11   it's the purchase price.
12        Here there is -- the damages that were
13   alleged is we lost the use of our crypto, it got tied
14   up in a bankruptcy.  And so there is no way to
15   reconcile damages, which is your purchase price, with
16   this getting locked up in a bankruptcy.  It's just
17   not the kind of damages anyone has ever pled,
18   explained, justified.  It's not consistent with
19   Supreme Court jurisprudence.  And, again, now that
20   they've gotten back more than the dollar value of
21   their purchase price, I think they're really now just
22   sort of at sea in terms of the ability to articulate
23   a valid legal theory.
24        So that's my presentation.  I'm happy to
25   answer any questions.  I'm conscious of the time.
```

1    There's a lot of people behind me and --

2          THE COURT:  Yeah.  I think I asked them as we

3    went along.  So it's helpful.  Thank you.

4          MR. POLKES:  All right.  Thank you again,

5    Judge.  And happy Fourth.

6          MS. ZALKA:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MS. ZALKA:  Caroline Zalka from Weil Gotshal

9    on behalf of the DCG defendants.

10          And I guess I'm up to answer the question

11    with respect to what did Judge Ramos get wrong, and I

12    guess I would kind of frame it as, okay, let's talk

13    about the impact of that decision on this motion to

14    dismiss.  And the first point I would make is Judge

15    Ramos's decision is limited to the Gemini Earn

16    program.

17          Now, plaintiffs at length in their complaint

18    tried to conflate the Gemini Earn program and the

19    direct lending program as one.  They call it the

20    "Genesis Yield Investment Agreement."  That's a

21    fiction.  There was no one Genesis Yield investment

22    agreement or any one Genesis Yield security.

23          On the face of the complaint, it is the

24    master loan agreement for the Gemini program, and

25    then they reference the master borrowing agreement

1    for the direct lenders.

2         And so Judge Ramos's decision analyzed the

3    Gemini program.  It has no bearing whatsoever on

4    whether or not the master borrower agreement and all

5    of the direct lenders were offered securities.  So

6    that's the first point.

7         And I think on that regard, it's actually

8    very important to see what's in and out of the

9    complaint because, again, plaintiffs conflate the two

10   programs.  So when you look at the Master Borrow

11   Agreement which is for the direct lending, there is

12   nothing pled in the complaint as to what actually the

13   key terms of those agreements were.  They were

14   individually negotiated with direct lenders through a

15   term sheet.

16        And I'd refer your Honor to the Master Borrow

17   Agreement which was attached as Exhibit A to our

18   motion to dismiss.  It's ECF Number 139-1.

19             THE COURT:  I have it.

20             MS. ZALKA:  And if you look, your Honor, it's

21   on page 4 of the agreement, and it's Section II,

22   "General Loan Terms, (a) Loans of Digital Currency Or

23   U.S. Dollars."

24        And what this agreement says, your Honor, is

25   that all of the key terms of the agreement are going

1  to be filled in in the term sheet, all of the blanks.

2  So whether it's dollars or digital currency and if

3  digital currency, the type of currency, the amount,

4  whether it's going to be fixed term, a term loan with

5  a prepayment option, an open loan, what the loan

6  effective date is, what the maturity date is, and if

7  a fixed term or term loan with a prepayment only,

8  what that would be.

9       And then it says so all of the specific and

10  final terms of the loan are going to be memorialized

11  using the loan term sheet, and in the event of a

12  conflict of terms between the Master Borrow Agreement

13  and the term sheet, the terms in the loan term sheet

14  had govern.

15       So all of those terms are what informs

16  whether or not it's a security, respectfully, I would

17  say.  When you look at it under *Howey* or *Reves*, all

18  of that contractual arrangement which they say is the

19  security is in the term sheet.  There is absolutely

20  nothing pled in the complaint with respect to even

21  one of the hundreds or thousands of direct lenders as

22  to what the terms are in that term sheet, whether

23  they conflict with the Master Borrower Agreement,

24  whether the interest rate was a fixed rate for a

25  fixed term.

1          So it's theoretically possible, right, based

2    on the complaint because, again, there is a complete

3    vacuum that it was just a loan of cash for a fixed

4    interest rate for a fixed term and that there were

5    other terms of the Master Borrow Agreement that were

6    modified in the term sheet, all of which would have a

7    dramatically different result on whether or not it's

8    a security, respectfully, I would submit.  It's their

9    burden to plead the elements of those agreements and

10   whether or not they constitute a security.

11         And with respect to all of the direct lenders

12   that are kind of operating under this alternative

13   Master Borrow Agreement, there is nothing in the

14   complaint.

15         So respectfully, that's the first kind of

16   critical point I would make with respect to Judge

17   Ramos's decision, to go back to your question which

18   is it doesn't impact everything over here under the

19   Master Borrowing and all of that.  There is nothing

20   in the complaint to support -- even inform the

21   analysis of whether or not it's a security.  And,

22   again, it's their burden to plead it.  So that's

23   number one.

24         And then with respect to the Gemini Earn

25   program.  And respectfully, obviously, Judge Ramos's

decision addresses this.  I would submit that Judge

Ramos did get it wrong, and I think that the actual

recent decision in *Binance* by the D.C. Circuit Court,

Judge Jackson, explains why.

And so I think when you take a step back and

look at *Howey* and the horizontal commonality prong of

*Howey*, which obviously Judge Ramos analyzed, in

*Binance*, very similar to the Gemini Earn program,

what the Court analyzed was an agreement for either a

fixed or open term with an interest rate.  Right,

it's kind of the hallmarks of a loan.  And it says,

yes, there was pooling of assets but you don't stop

with pooling of assets because of course assets could

be pooled.  That's not a loan, what gives rise to a

security.  It's whether or not, essentially, you are

tying the investor's fortunes together and they rise

and fall, right, with the enterprise.

These people were just getting interest.

They're not sharing in the upside or the downside of

Gemini.  Gemini -- or, sorry, Genesis.  The "G"s

trick us all up.

So they're not -- whether Genesis has a good

year or a bad year, a great phenomenal year or the

worst year it's ever had, these people are just

getting their interest.  It is not, I think,

1    respectfully, the hallmark of kind of a common

2    enterprise where you're tying the investors' fortunes

3    together that would kind of give rise to the

4    expectation of a security.

5        And so I think the *Binance* Court analyzed

6    that, and with very similar allegations for the

7    Gemini Earn program, and actually it was called the

8    "Simple Earn Program" in *Binance*, just simply held

9    that not every profit making opportunity is an

10   investment contract, and the allegations concerning

11   Simple Earn, or here the Gemini Earn program, do not

12   describe a scheme or transaction in which investors

13   were urged to put their money in Binance's or

14   Genesis's hands so that they could share in the

15   return that would be generated.  And I think that is

16   equally applicable here.

17       Another aspect of the *Binance* Court's

18   decision which I think is very similar here and

19   explains also I think why Judge Ramos got it wrong is

20   that the holders of the crypto assets simply agreed

21   to loan them to the company for a specified period of

22   time at a specified rate of interest and the

23   complaint lacks any allegation that they were led to

24   believe that *Binance*'s efforts would generate the

25   turn or make the assets more valuable at the end of

 1    the day.  Exactly the same here.

 2         And then the final point I would make in this

 3    regard is that with respect to the interest rate, as

 4    with here, *Binance* determined the Simple Earn rate

 5    for each of its offerings in its discretion, taking

 6    in kind a variety of factors including market

 7    conditions.  That's exactly what plaintiffs have

 8    alleged here with respect to Gemini.

 9         Again, there is no allegation of what

10    interest rates or how it was set for any of the

11    direct lenders.  And so the fact that the interest

12    rate would be set at discretion at rates that would

13    take market conditions and competitor's offerings

14    into consideration was informative in finding that it

15    was not a security.  Because, again, they're not

16    sharing in the general upside or downside.  They're

17    getting an interest rate that may be informed by

18    general market conditions but it's not tied to their

19    investment and the return and success of the

20    enterprise.

21         Two other minor points on this, your Honor.

22    With respect to, I think, the *Reves* analysis in

23    particular, number one is obviously I think the lack

24    of a secondary market is critical to the plan of

25    distribution prong under the *Reves* test, and I don't

think Judge Ramos really grappled with it in the
decision.

I think that here you had nonassignment
provisions, where prohibited assignment without
consent in both of the agreements, and there was no
secondary market.  And I think that does inform and
is a countervailing factor when you consider all of
the *Reves* factors.

And similarly, with respect to there is a
disclaimer, obviously, in the Gemini agreement that
says that none of the parties intended them to be
securities and they were intended to be commercial
loans.

And Judge Ramos says, well, these were retail
investors, not sophisticated investors.  So, yes, I
take notice of that but I don't -- it's not
dispositive for me.

There is a contractual representation in both
agreements, including in the Gemini agreement, that
everybody was a sophisticated party.  And I think if
you look at the Second Circuit's decision in
*Kirschner*, that that kind of representation should be
given its weight.

So these were sophisticated investors.  They
agreed that it was not going to be a security and

 1   that in terms of when you consider the reasonable
 2   expectations of what someone understood it to be, I
 3   think that is something that should be taken into
 4   account.
 5        So that is my quasi short answer to the
 6   question of why, respectfully, I submit that Judge
 7   Ramos's decision is (a) of limited application and
 8   (b), I think, wrong under the laws.  And we submitted
 9   the *Binance* decision which was helpfully decided on
10   June 28th as a note of supplemental authority last
11   night.
12        THE COURT:  Thank you.
13        MS. ZALKA:  Thank you, your Honor.
14        THE COURT:  Thank you.
15        Why don't we go ahead and kind of interrupt a
16   little bit.  I understand you're going to want to
17   talk about your individual defendant, but maybe if I
18   start with some of these bigger issues, then we can
19   move on to it.
20        Very good.
21        MR. CAMPISI:  Thank you, your Honor.  May it
22   please the Court.  Jeff Campisi for the lead
23   plaintiffs.
24        I'm going to handle some of the Securities
25   Act issues and some of the control person, and my

colleague Mr. Sloss will handle the Exchange Act
fraud claims and the damages issue.

Could your Honor have a handout.  I may refer
to some slides from time to time.

Your Honor, I just want to start by kind of
resetting the table here.  The complaint alleges
claims under the Securities Act of 1933 and separate
claims under the Securities Exchange Act of 1934, and
they're really separate claims that could have been
brought in two separate complaints.

And the Securities Act claims are brought
under Section 15 against the individuals and entities
that controlled Genesis Global Capital, and we allege
that Genesis Global Capital violated the Securities
Act by selling unregistered securities which gives
rise to a private right of action under Section 12.
These claims are nonfraud claims and they're
evaluated on -- in a motion to dismiss under the
notice pleading standard of Rule 8.

And to get into it, I want to just respond to
some of the arguments that were made for the first
time in the reply, and then I'll jump into the issues
that you've heard this morning.

One of the arguments, and you've heard some
of it from defense counsel this morning, is that the

complaint doesn't allege what the relevant security

is.  They say they're confused, they don't know, it's

a changing and shifting allegation.  But the

complaint alleges the security several times in the

complaint.  You know, paragraph 4, you know, lays it

out, what the security is:  Members of the class

invested in Genesis Yield securities offered or sold

by Genesis Global Capital by entering into the

standard form agreements and then tendering the

digital assets or cash to Genesis Global Capital

pursuant to either a term sheet for the direct

investors or the terms presented to them on the

Gemini Earn platform.  In exchange for their purchase

of Genesis Yield securities, members of the class

received interest payments and the promise of the

eventual return of the digital assets on demand.

        That's the economic substance of the

transaction, and that's what *Reves* and *Howey* say the

Court should focus on on the question of what is a

security.

        Other paragraphs, I'll just read them into

the record:  It's paragraph 17, 110 to 13, 175, and

207 and 212 further outline the economic reality of a

transaction between class members and Genesis Global

Capital.

Defendants assert that plaintiffs essentially made up the term "Genesis Yield," but that's not the plaintiffs' terminology.  That's their terminology.  And we allege that in paragraph 111.  When they started this program, they called it "Yield, Genesis Yield."  So this is not something that we came up with out of thin air.  This is based on what -- you know, how they were marketing the program.

On reply, and you heard Ms. Zalka talk this morning about the so-called material differences between the agreement with the Genesis direct lenders and the Gemini Earn people, but they're really picking at the fringes.  The agreements are virtually the same, and the only material difference is that with the Gemini Earn program, there was an additional party, that's the -- Gemini was the agent for the Gemini Earn lenders.  But the terms are virtually the same.  The language is, you know, word for word the same but for the Gemini piece.

You know, in terms of what each -- what investor, the terms of their investment, defendants say it's not in the complaint.  But with respect to the lead plaintiffs, you know, their certifications were filed in this case in ECFs Document Number 34 and 38, and each of those certification lays out what

1    was tendered, what crypto and the terms and the

2    dates.  So that information is in the record,

3    contrary to what, you know, defendants have said to

4    you this morning.

5        You've also heard that the language in these

6    agreements precludes claims against them.  However,

7    the Securities Act and the Exchange Act both have

8    antiwaiver provisions that void that language.  We

9    made that argument in our opposition.  They didn't

10   even respond to it and they're still ignoring it

11   today, but I think that eviscerates that argument.

12       They've also raised the statute of

13   limitations argument, and that's wrong for, you know,

14   a number of reasons.  You know, each time a class

15   member tendered their crypto assets, that's a new

16   transaction and that's supported by the cases that we

17   cite in our opposition at page 11.  The defendants

18   try to look at the various components of the economic

19   transaction and focus on the lending agreements and

20   say, well, those were signed at one date and that's

21   the date you look at for the start of the statute of

22   limitations to run.  But that's not what the case law

23   says, as we cite at page 11.  Each of the investments

24   is a new transaction that gives rise to a new

25   violation, and it's set forth in all the

certifications, each of the lead plaintiffs
purchased, you know, in the year before the action
was first filed in January 2023.

Indeed, the defendant Moro concedes that at
least one of the lead plaintiffs filed within the
statute of limitations, so I think that argument
really just has no merit.

Though getting to the real core issue is that
the defendants are asserting that securities were not
offered or sold by Genesis Capital.

And, your Honor, if you'd turn to page 1 of
the handout, I think it's instructive, you know, if
we look at what people who have looked at this
security have said about it.  And some of it is very
telling.  You have the chief legal officer of Genesis
Global Capital saying that the investment program may
be viewed as an invest contract under the securities
laws.  You know, we allege that in our complaint.

The SEC has looked at this and has brought
claims against Genesis Global Capital and alleges
that there was the unregistered sale of securities.
The New York attorney general has looked at this and
has brought claims against Genesis and defendants
Silbert, Moro and DCG for selling unregistered
securities.

1          And your Honor noted that Judge Ramos's

2     decision in the *SEC* action is on point on this issue.

3     It's the same exactly security.  And Judge Ramos

4     found that under both the *Howey* test and the *Reves*

5     test, that the securities here were sold and they

6     were not registered.

7          Just to respond to this *Binance* case that the

8     defendants filed last night at 9 o'clock, I guess the

9     first point:  Judge Ramos's decision, we think, is

10    really on point here, and the Court doesn't need to

11    look at that.  But even if you look at that *Binance*

12    case, it's really a different case involving a

13    different transaction and different allegations.

14         First, the *Binance* case doesn't deal with the

15    *Reves* test.  It only deals with the *Howey* test.  And

16    Judge Ramos found that under both tests, the

17    investments heres were securities.

18         But a key factual distinction is that in

19    *Binance*, the Court found -- and this is in the

20    section that the defendants directed the Court to

21    read.  The Court found that there was no allegation

22    that investors who participated in the program

23    understood that the tokens loan would be used toward

24    the enterprise and that the interest was dependent on

25    the success of the business.

```
 1              But here the complaint does allege that.  The
 2     complaint alleges that investors were led to expect
 3     that defendants' efforts in the lending business
 4     would result in profits that would be used to pay the
 5     interest.  That's at paragraph 148.
 6              THE COURT:  Right.  But used to pay the
 7     interest is different than dependent upon, the return
 8     would be dependent upon profits, right?  In other
 9     words, it's like -- why is this not like a bank
10     making a loan?  The bank may have a very profitable
11     mortgage business.  It makes a personal loan at 8
12     percent and if the mortgage business is doing 15
13     percent, it's not going to affect the loan terms for
14     the personal loan.
15              MR. CAMPISI:  Your Honor, so in *Binance*,
16     there were a number of lines of business that could
17     generate.  And that's what the agreement said in that
18     case:  the interest could depend on the success of
19     the various lines of business.  But here the only
20     business is the lending business.
21              THE COURT:  Yes.  But it doesn't say the
22     success of your loan will turn on the success of our
23     investment business, does it?  Do you allege that?
24              MR. CAMPISI:  That is alleged, your Honor.
25              THE COURT:  Where is that?  And if these are
```

```
 1    fixed interest rate loans, how does that --

 2         MR. CAMPISI:  They're not always fixed

 3    interest rates and we allege that.  They reset every

 4    month.  So there was an expectation the investors had

 5    that, depending on the success of the lending

 6    business, they would reap profits from the benefits,

 7    the success of the business, and that would increase

 8    the interest rates.  And, in fact, they were reset on

 9    a regular basis to reflect that.

10         THE COURT:  All right.  Were they reset based

11    upon the success of the defendants' business or the

12    performance of the crypto market?

13         MR. CAMPISI:  The complaint as I used it was

14    based on the success of the way that Genesis would

15    manage their lending business.

16         THE COURT:  And where will I find that in the

17    record in terms of the agreements that were entered

18    into?

19         MR. CAMPISI:  I'm sorry.  Could you repeat

20    that last point.

21         THE COURT:  Where will I find that in the

22    agreements that were entered into by the plaintiffs?

23         MR. CAMPISI:  Your Honor, we allege it in the

24    complaint.  It's in paragraphs 175 to 185.

25         But in the master loan agreement, you know,
```

1    it's very clear borrower intends to use any loaned

2    assets under this agreement in its Digital Currency

3    lending business.

4            So they're being told we're going to take

5    your crypto and we're going to use it in our lending

6    business, in which they then relend the crypto and --

7            THE COURT:  But all right.  The connection

8    I'm not seeing in what you're telling me is:  I enter

9    into one of these agreements.  How is my return

10   dependent upon the success of the crypto business

11   that Genesis is engaged in?

12           MR. CAMPISI:  So Genesis takes the crypto

13   loan and then uses that, lends it to other people and

14   has various strategies.

15           THE COURT:  I understand.

16           MR. CAMPISI:  So depending on the success of

17   that effort, and the managerial experience and the

18   expertise of Genesis, will generate money for

19   Genesis.  And that -- the interest rates are reset.

20   Some of them are fixed, but there are floating rates

21   and they are reset on a regular basis.  So that's how

22   investors reap the profit of -- in the form of

23   increased payments.

24           THE COURT:  Can you point me to the language

25   of the loan agreements that says your interest rate,

```
 1    Mr. Investor, will depend upon the success of our
 2    lending business.
 3           MR. CAMPISI:  Your Honor, with respect to the
 4    term sleets, those are -- they're laid out in terms
 5    of what the interest rate is and that could be fixed
 6    or floating.  So --
 7           THE COURT:  Right.  So for the fixed, there
 8    is no connection.  It's just a loan at "X" percent.
 9    And whether Genesis soars or tanks doesn't --
10           MR. CAMPISI:  Well, even the fixed rate still
11    depends on -- setting that rate, and they market it
12    as having 100 times the national average, that is
13    being marketed to investors as they're using --
14    they're using their proprietary strategies to
15    generate yield.  And that's how they can market,
16    whether it's a fixed or floating rate, higher than
17    the national bank rate.  This is not an ordinary bank
18    loan.
19           THE COURT:  Well, it may be higher.  But if
20    it's not tied to their success, how is there a
21    securities claim there?
22           MR. CAMPISI:  It is tied to their success
23    because it is all inherent in their business.
24    They're going to take the crypto and then relend it.
25           THE COURT:  Well, you're saying every loan
```

1    agreement is necessarily an unregistered security.

2         MR. CAMPISI:  That's not -- looking at the

3    factors in *Howey* and *Reves*, that's -- it's not an

4    ordinary loan from a bank.  There are commercial

5    purposes and investment purposes.  And here the way

6    the program was marketed, it was not for commercial

7    purpose, it was for investment purposes.  Taking your

8    crypto, you could give your crypto to Genesis and

9    Genesis using its proprietary strategy and expertise

10   as the world's largest digital --

11        THE COURT:  For its own benefit.  For its own

12   benefit.  Not for your benefit.  We're going to take

13   your money that you loan us and we're going to make a

14   ton of money for ourselves.  How is that a security?

15        MR. CAMPISI:  Well, your Honor, we can walk

16   through the various factors in *Howey* and *Reves* and

17   how you end up in that conclusion that the

18   securities --

19        THE COURT:  Okay.  All right.  I'd like to

20   know two things:  If it's a fixed loan, it cannot be

21   dependent -- fixed rate loan cannot be dependent on

22   the success or failure of Genesis.  Will you

23   acknowledge that?

24        MR. CAMPISI:  Your Honor, this idea that a

25   fixed rate is sort of dispositive of the issue, I

1   think Judge Ramos dealt with that and I think it's

2   mentioned in the *Binance* case that that is not a

3   dispositive factor.

4        THE COURT:  I'm trying to deal with it.  I'm

5   trying to understand how a fixed rate loan can be a

6   security.  So help me understand that.

7        MR. CAMPISI:  Your Honor --

8        THE COURT:  How is a fixed rate loan tied to

9   the success or lack of success of Genesis?

10       MR. CAMPISI:  The interest rate is being set

11  as higher than the national average.

12       THE COURT:  That's right.  It's set.

13       MR. CAMPISI:  It's because it's based on the

14  success of their business and their strategies.

15       THE COURT:  No.  No.  It's a negotiated rate.

16  We're going to pay you 13 percent.  That's better

17  than you can get at your bank.  And, paren, we think

18  we can do that because we're such a successful

19  investment company.  That doesn't connect the lender

20  to the success of Genesis, does it?

21       MR. CAMPISI:  Your Honor, I think the

22  agreement itself says that this is what we're going

23  to do with your crypto.

24       THE COURT:  Of course.

25       MR. CAMPISI:  So I think that that is the

```
 1    expectation that investors had, that it would be
 2    based on the success of Genesis and its strategies,
 3    and that's how they came to arrive at an interest
 4    rate.
 5            THE COURT:  All right.  And where will I find
 6    the tie between the adjustable rate and the success
 7    or lack of success of Genesis?
 8            MR. CAMPISI:  Your Honor, paragraphs 175 to
 9    185 of the complaint, you know, we lay out the Howey
10    factors.
11            In addition, starting at paragraphs 133
12    through 174, we lay out the issues regarding the
13    interest rates, how they were set, how they were
14    reset and the expectations of investors based on how
15    this program was marketed.
16            THE COURT:  Okay.  The reasonable expectation
17    of profits is Genesis's expectation, not the lender's
18    expectation, isn't it?
19            MR. CAMPISI:  Well --
20            THE COURT:  The lender doesn't expect to
21    generate a reasonable expectation of profits derived
22    from Genesis because they're not going to -- they're
23    not going to share in the success of Genesis.
24            MR. CAMPISI:  I disagree with that, your
25    Honor.  Paragraph 154 lays out the -- how the
```

interest rates were fluctuated.  And based on this,

investors reaped profits in the form of increased

payouts.  The -- as Genesis could increase revenue

through its strategies, investors reaped the benefit

of that in terms of increased payouts.

THE COURT:  Well, I don't see -- I don't see

where you're alleging that individual investors had

their rate of return adjusted because Genesis did

well or did poorly.

You're indicating that there are different

rates at different times, and the rate -- the way I'm

reading this, the rate that they could have gotten

had they entered into a contract on February or May

of '21 differed.

But I'm not seeing where it says the investor

bought in February of '21, and in May '21, it was

adjusted up; they got a better rate.

Do you say that somewhere in here?  For a

particular contract, particular lending contract,

does the -- is there a contract where you allege over

time -- it's a ten-year contract.  It's going to be

fixed for three years.  And then we're going to

adjust based upon Gemini doing well or poorly, is

that alleged in here?  Or are you just saying at

different times they offered different rates?

```
1          MR. CAMPISI:  Your Honor, we don't have that
2     specific allegation, but there are allegations class
3     members invested.  The interest rates were reset over
4     time.
5          THE COURT:  But reset for new investors or
6     new investments.
7          MR. CAMPISI:  No.  Even for current
8     investments.  You could rollover your investment.
9          THE COURT:  You could roll it over.  But the
10    same -- in other words, right.  Your investment was
11    for a year and now a year later, you're getting a
12    better rate when you reinvest.  In other words, the
13    concept of a rollover is your investment is going to
14    end or you can continue it.  You can re-up, if you
15    will.
16         But what you're alleging is merely that at
17    times the re-up rate was different than the initial
18    investment rate.  Isn't that what you're alleging?
19         MR. CAMPISI:  That in essence, your Honor.
20    The notion that the only profit lenders received was
21    the preset of interest at the contractual loan fee,
22    that's the argument they're making.  I think that's
23    what your Honor is trying to understand, how that is
24    not -- how that is a security.  Is that fair?
25         THE COURT:  Well, what I'm trying to figure
```

out is:  When you talk about variable rates, are you

-- let's use mortgages.  Okay.  I like analogies.

This is like a mortgage, right?  You can get an

adjustable rate mortgage and depending what the prime

rate is, you're going to pay more or less in interest

after a set period of time.  That's an adjustable

rate.

            Or you can have a fixed rate and you can

refinance at a different fixed rate if you want to at

a later date in time depending on whether interest

rates go up or down.

            What I want to know is:  Are you alleging

that these investments were the -- were analogous to

an adjustable rate mortgage?  In other words, it's

the same loan, and the return on that loan, without

any rolling over or re-upping, reinvestment, the

return on that loan varied with the success,

financial success of Gemini.

            I don't think you've said that.  But if you

have, I'd love for you to point me to it or show me

an investment contract where it says, hey, every six

months we're going to readjust this rate on this

existing contract.

            MR. CAMPISI:  Your Honor, in the *SEC* case,

this is an argument that was made there.

```
 1              THE COURT:  Right.

 2              MR. CAMPISI:  And, you know, Judge Ramos

 3    looked at that.

 4              THE COURT:  Right.

 5              MR. CAMPISI:  And the idea that it's a fixed

 6    rate or adjustable rate, you know, that that's all

 7    that was promised is just one piece of the analysis.

 8              THE COURT:  Right.  I'm just trying to sort

 9    out this piece.

10              MR. CAMPISI:  Okay.

11              THE COURT:  So for this piece, can you point

12    me to an investment contract that says we're going to

13    adjust the rates for this particular contract?

14              Or are you simply saying you can exit the

15    contract, you can call your investment back and then

16    immediately reinvest because now we're offering a

17    different rate?  Which I see as two contracts, not as

18    one contract.  And if it's two contracts, why isn't

19    that just a series of fixed rate contracts?

20              MR. CAMPISI:  Well, your Honor, the way the

21    program worked, you could leave your money on the

22    platform.  You didn't have to call it.

23              THE COURT:  I got that.  I got that.

24              MR. CAMPISI:  Okay.  And their interest rates

25    would reset.  And by not recalling it, you would get
```

1    the benefit of the change in interest rate.

2         THE COURT:  So there is a presumed rollover.

3    Unless you call your money out, we're going to roll

4    it over and we're going to pay you -- for your next

5    period, we're going to pay you the rate that we're

6    paying today.

7         MR. CAMPISI:  Those would be the open term

8    loans that you -- they weren't fixed, right?

9         THE COURT:  Okay.

10        MR. CAMPISI:  Which were callable at any

11   time, but the interest rates would fluctuate.

12        THE COURT:  Okay.  All right.

13        MR. CAMPISI:  So, Your Honor, I'll just go

14   through briefly the arguments that the defendants are

15   making here are the same or virtually the same that

16   they made in the SEC action, and Judge Ramos rejected

17   all of them.

18        You know, on page 3, related to what we were

19   just talking about, the defendants make the argument

20   that the only profit received is the set interest

21   rate and the value of the instrument didn't change.

22   But that was rejected by Judge Ramos on the reasoning

23   that the returns earned by each investor were

24   dependent on how Genesis pooled and deployed the

25   crypto assets.  So even if investors are not entitled

```
 1    to some pro rata share, they did have skin in the

 2    game.

 3            And we have the very same allegations in the

 4    complaint at paragraphs 178, 179, 181 through 83.

 5            THE COURT:  Do we have in the record, can you

 6    point me to the actual investor contracts?

 7            MR. CAMPISI:  Yeah.  This is in the -- it's

 8    in EC -- for the lead plaintiffs, those contracts are

 9    not in the record.  But there is in the record the

10    master loan agreements.  That's in ECF 139.

11            THE COURT:  Right.  I have the master loan

12    agreements.  I've seen those.  But what I haven't

13    seen is a contract that does what you say was

14    happening.

15            MR. CAMPISI:  Well, your Honor, the part of

16    the lending agreement are these term sheets and

17    that's where the interest rates and the type of

18    crypto is specified.

19            THE COURT:  Okay.  And where are those term

20    sheets?

21            MR. CAMPISI:  That's, again, the lead

22    plaintiffs' term sheets are not in the record.  But

23    there is an example of a term sheet that is part of

24    the master loan agreement and the Master Borrower

25    Agreement.  We could submit those to your Honor if
```

 1   you'd like to see the lead plaintiffs.  I have a copy

 2   of at least one of them, if you'd like to see what

 3   that looks like.

 4        THE COURT:  Sure.  If you could just identify

 5   for opposing counsel what it is you're handing up.

 6        MR. CAMPISI:  Sure.  So this is the Master

 7   Borrow Agreement between lead plaintiff Remo Maria

 8   Morone and Genesis Capital.

 9        Handing it up to your Honor, here are the

10   agreements that have the term sheets.

11        THE COURT:  All right.  I'll read this.

12   Thank you.

13        MR. CAMPISI:  Continuing on, your Honor, in

14   terms of the *Howey* test factors, other arguments that

15   were made here and rejected in the *SEC* action:

16   Defendants argue that the plaintiffs retain full

17   discretion to lend or not lend and Genesis wasn't

18   obligated to accept any digital assets.  The same

19   exact argument was made in the *SEC* case, and Judge

20   Ramos found a key feature is not that investors must

21   reap their profits at the same time, it is that

22   investors profit at any given time or tied to the

23   success of the enterprise.  And that feature is

24   present here because it's alleged that investors'

25   returns turned on how Genesis pooled and deployed the

1    crypto assets.

2         You know, defendants argue that the

3    agreements expressly say that they are not

4    securities, but the *Howey* test is focussed on the

5    economic reality of the transaction.  And in the *SEC*

6    case, Judge Ramos found that the label ascribed to

7    the agreements do not control the question of whether

8    the Gemini Earn program constitutes an investment

9    contract.

10        The defendants also argue here that the

11   plaintiffs' fortunes were never tied to that of any

12   other lender.  And that argument was rejected because

13   in the *SEC* case, as is alleged here, investors were

14   not treated separately because Genesis pooled the

15   crypto assets that each of them invested and Genesis

16   made decisions about how to lend those crypto assets

17   to institutional borrowers.  The returns of Gemini

18   Earn investors were dependent on Genesis's managerial

19   efforts and risk management in the lending

20   activities.

21        In terms of expectation of profits,

22   defendants here argue that plaintiffs' profit was an

23   interest rate no matter how profitable Genesis was.

24   And the complaint here alleges, and Judge Ramos

25   credited allegations, that expectations of profits

1    are dependent on Genesis's efforts.

2         And in the *SEC* case, the Court noted Genesis

3    undertook various complex tasks of pooling Gemini

4    earned crypto assets, identifying institutional

5    borrowers to serve as counterparties and negotiating

6    individual agreements with counterparties, managing

7    market, counterparty risk, and Genesis used its skill

8    and experience to negotiate high interest rates from

9    institutional borrowers in order to generate maximum

10   profits.

11        Investors, for their part, understood that

12   the interest rate for the Gemini Earn investments

13   will be revised by Genesis on a monthly basis

14   reflecting Genesis's ongoing managerial efforts to

15   pay among the highest rates in the market.

16        THE COURT:  But that gets to the very point

17   that I've been trying to figure out.  Interest rates

18   are revised monthly.

19        Going back to my example.  A posted rate for

20   a mortgage is adjusted every month.  And if I took my

21   mortgage out last month, I don't get the advantage of

22   the extra -- the better rate this month unless I

23   refinance.

24        The connection I'm missing is how any loan

25   return fluctuated, interest rate fluctuated on that

loan, as opposed to, in effect, refinancing, calling

the crypto back and then entering into a new contract

for the adjusted rate.  I think there is a difference

if you have to call it and start again than if the

loan -- the loan interest rate varies without you

doing anything.  I'm not sure if I'm getting through

but that's what I'm trying to connect.

        MR. CAMPISI:  If it's a fixed rate loan, then

no, the rate does not --

        THE COURT:  Right.  So there is no connection

to the profitability of Genesis with a fixed rate

loan.

        MR. CAMPISI:  But the rate --

        THE COURT:  Would you acknowledge that?

        MR. CAMPISI:  No, because the rate that was

initially offered is tied to the --

        THE COURT:  That can't be.  That can't be the

connection to the securities laws.  Picking a higher

rate than payable elsewhere doesn't create a

security.

        MR. CAMPISI:  Well, you're looking at it,

your Honor, I think from a one-on-one bilateral

transaction.  But that's not how this program worked

and the way it was marketed.

        THE COURT:  The way it was marketed:  We're

going to pay you a high interest rate, that's our
marketing ploy, loan us your crypto.  Great.  I'm
going to buy a junk bond.  It pays more than a bank
does.  That's great.  I have confidence that the junk
bond company is going to make money so it's going to
be there, it's going to pay me.

        MR. CAMPISI:  And that interest rate is tied
to the efforts and success of the business that
Genesis is in.

        THE COURT:  From Genesis's point of view.
Genesis is confident that it can make more money than
it has to pay out on these loans.  That doesn't make
the loans a security just because they're going to be
a profitable company.  If GMAC can loan you at 4
percent and make 30 percent, it doesn't mean when you
buy a car, you're buying a security.

        You know, I just don't see the connection to
the profitability of Genesis.  You haven't really
alleged that.  You haven't alleged that the loan
fluctuates with the profitability of Genesis.

        What you've basically said is they're going
to set a new loan rate each month.  So new investors
as a practical matter, maybe can do a little better.
And if people want to call and take their money out
and reinvest it at this new, higher rate, they can do

```
 1    that.  But it's not -- there's no tie, is there?
 2          MR. CAMPISI:  Your Honor, what might be
 3    helpful is to look at the economic substance to the
 4    Reves test which is more akin to a note, the mortgage
 5    that you referred to, or a car loan.
 6          THE COURT:  Okay.
 7          MR. CAMPISI:  And looking at those factors, I
 8    think, touch on the issue that your Honor was
 9    concerned with, will show that under the Reves test,
10    that they are securities.
11          There's a four-factor test, your Honor.  A
12    note is presumed to be a security unless it resembles
13    some other commercial transaction, and the Supreme
14    Court laid out four factors in evaluating that.
15          The first is the motivation of the parties.
16    Here the defendants assert that the plaintiffs shared
17    the same motive as any lender to earn a market
18    interest rate on their own assets, not to speculate
19    on Genesis's business acumen.
20          Judge Ramos rejected this argument in the SEC
21    case and found that investors were similarly
22    motivated by the opportunity to earn a profit in the
23    form of interest.  Gemini specifically advertised the
24    program as offering interest rates that were among
25    the highest on the market, and that rate was subject
```

to revision on a monthly basis by Genesis reflecting

its ongoing efforts to pay among the highest rates in

the market.

THE COURT:  Yes.  But that's the point where

I really -- I'm hung up.  If Genesis had posts on the

Internet somewhere June rate is 8 percent, the July

rate is 9 percent, the August rate is 9.5 percent

because we're doing so well, that doesn't make any

particular lending contract dependent upon the

profitability of Genesis unless you can show me how

the contract rate payable by Genesis changes when the

rate, posted rate changes.  Do you see what I'm

saying?

MR. CAMPISI:  Your Honor, in terms of the

callable loans that they rolled over on a regular

basis, the rate is reset to reflect the success of

the business.

THE COURT:  When that happens, is there a new

contract signed or not?

MR. CAMPISI:  I'm not aware that the new

contract is signed.  I don't think that's the case.

THE COURT:  So the money --

MR. CAMPISI:  You just leave your assets on

the platform and they would rollover, with respect to

Gemini Earn.

1          With respect to the direct lenders, your

2    Honor, you know, it's not in the record.  I'm not

3    sure whether a new contract is signed.

4          THE COURT:  All right.  Let's look at the

5    term sheet for a second that you handed up.  There is

6    really two term sheets.

7          MR. CAMPISI:  Yeah.  I think one is fixed and

8    one is floating.  And as far as I'm aware, the

9    floating rate -- a new contract did not need to be

10   signed.  I'm not aware of that.  So, in other words,

11   by entering into that agreement, whatever the

12   fluctuation was, that would inner to the benefit of

13   the investor without having to sign it or enter into

14   a new agreement.

15         THE COURT:  All right.  So the open term is

16   1.5 percent annually.

17         MR. CAMPISI:  That's what it says.

18         THE COURT:  Right.  And the fixed term is 6

19   percent annually.  So it's going to tell me in here

20   that that open term will change month to month

21   depending upon the profit that Genesis earns.

22         MR. CAMPISI:  No, it doesn't say that there.

23         THE COURT:  It doesn't, does it?  Where do

24   you allege that the open term loans fluctuate

25   depending upon the profitability in the past month of

```
1    Genesis?  As opposed to the competitive rate or the
2    market rate or the price of crypto on some market,
3    there's lots of reason why is the rate could change.
4    But unless it's tied back to the profitability of
5    Genesis, that's an issue, isn't it?
6             MR. CAMPISI:  Your Honor, in 151, the
7    complaint alleges Genesis negotiated more favorable
8    loan terms and interest rates with borrowers than
9    Genesis Yield investors can negotiate on their own.
10            THE COURT:  Slow down.  Slow down.  151.
11   Right.  Okay.  Then look at 152.
12            MR. CAMPISI:  I was going to refer that to
13   the Court.  That refers to open term loans.
14            THE COURT:  Right.  But it says it varies,
15   would be revised by Genesis reflecting Genesis'
16   ongoing managerial efforts to pay among, quote, the
17   highest rates in the market, unquote.
18            What you're saying is the rate fluctuated
19   because Genesis wanted to be paying the highest rate
20   which suggests if somebody else ups their rate,
21   Genesis is going to top it.  It's like law firm pay
22   in New York City, right?  Horvath makes a move,
23   everybody else has to follow.  That's not profitable.
24   It says nothing about profitability.
25            Look, I think we've beaten this horse a
```

1    couple of times.  But I'll go back, I'll read the

2    complaint again and I'll read Judge Ramos's decision

3    again and we'll see what we can do.

4        MR. CAMPISI:  Okay.  Can I talk about a

5    control person?

6        THE COURT:  Yeah.  Yeah.

7        MR. CAMPISI:  I'll be brief.  I know we

8    belabored the last point, but I wanted to just

9    respond to some of the points you heard today.

10       Your Honor, if you look at page 9 of the

11   handout I gave you, it's an illustration of what's in

12   the complaint in terms of control.

13       Your Honor, I'll just begin by noting that

14   your Honor has noted in the *Teva* case that control

15   person is a fact-intensive inquiry and resolution is

16   rarely appropriate on a motion to dismiss.  You know,

17   allegations of control are not averments of fraud

18   under the Securities Act and don't need to be pleaded

19   with particularity.

20       The chart on page 10 illustrates how the

21   defendants controlled Genesis Global Capital.  The

22   only business of Genesis Global Capital was taking

23   crypto invested with them by class members and

24   reinvesting those assets to generate yield.  It's at

25   paragraphs 126 and 184.

1          Defendants Moro and Islim were the most

2     senior executives of Genesis Global Capital.  They

3     also served on the board of the shell company.  And

4     there is case law providing that corporate officers

5     are usually presumed to possess the ability to

6     control the actions of their employees.

7          Defendant Silbert, you know, he founded DCG.

8     He was a controlling shareholder of DCG, served as

9     the chair of the three-person DCG board along with

10    defendants Lenihan and Hutchins, and he was also the

11    CEO of DCG.

12         Silbert and DCG created Genesis Global

13    Capital and provided it with seed capital.  DCG was

14    the 100 percent equity owner of the shell company

15    Genesis Global Hold Co. which is the sole managing

16    member and 100 percent equity owner of Genesis Global

17    Capital and managed Genesis Global Capital through

18    its board.

19         The complaint alleges that DCG and Silbert

20    closely managed and controlled the company through

21    interlocking directors and officers.  Defendant Mark

22    Murphy was the chief operating officer of DCG and its

23    president and he's a member of the board of Genesis

24    Global Hold Co. which managed and controlled Genesis

25    Global Capital.

1        And defendant Kraines was the CFO of DCG, and
2  he is a member of the board of the shell company.
3  That's in paragraph 12.
4        I think you heard, your Honor, defendants,
5  and this is in their briefing, really focus on, well,
6  status isn't enough, or just sort of laying out the
7  organizational structure is not enough.
8        And the Court's decision in -- it's *Nomura*
9  versus -- or the *FHFA v. Nomura* which we cite at page
10 41, Judge Cote lays out a number of factors that are
11 instructive to kind of looking at what control means.
12 One of the factors is the status of the controlling
13 entity.  Section 15 provides that being a stock owner
14 is probative of control and Genesis Global Capital is
15 a wholly owned subsidiary of DCG.
16        Looking at the common officers, directors and
17 personnel and shared resources are also relevant
18 indicators of control, and the number and nature of
19 positions held are pertinent.  We had allegations
20 about all those things in the complaint.
21        Murphy and Kraines were the DCG executives on
22 the three-person board that managed Genesis Global
23 Capital.  That's paragraph 8.
24        The complaint alleges Murphy and Kraines had
25 oversight of the company operations as board members

 1    and DCG representatives on the board that managed

 2    Genesis Global Capital.  That's at paragraphs 12, 481

 3    and 478.

 4         The complaint alleges DCG controlled Genesis

 5    Global Capital's key hiring decisions, business

 6    strategy, budget, that they shared IT infrastructure

 7    and that DCG had direct access to Genesis Global

 8    Capital's books and records, that members of DCG's

 9    management team served on Genesis Global Capital's

10    risk committee which managed risks arising from the

11    business.  That's paragraph 12.

12         A DCG senior vice president was defendant

13    Silbert's eyes and ears at the company.  He directly

14    reported to Silbert.  That's at paragraph 458.

15         And Murphy, defendant Murphy and DCG

16    controlled the hiring of the most senior executives

17    of the company.  They hired defendant Islim as CEO of

18    Genesis Global Capital.  That's at paragraph 65.

19         Another factor I think is important here is

20    the actions taken on behalf of the controlled entity:

21    What did these defendants do on behalf of Genesis

22    Global Capital?  The complaint alleges defendants'

23    power over the management and policies of Genesis.

24    The complaint alleges defendant Silbert and DCG

25    unilaterally changed terms of loans made by Genesis

1    Global Capital to DCG for no consideration.  That's

2    at paragraphs 354 to 358.  We think this shows total

3    domination and control over Genesis Global Capital by

4    DCG and Silbert.

5        When Gemini indicated it was going to

6    terminate the Gemini Earn program, defendant Silbert

7    intervened, not the then-CEO of Genesis Global

8    Capital who was defendant Islim.  Silbert on behalf

9    of ECG intervened on behalf of Genesis Global Capital

10   to convince Gemini to not terminate the program.

11   That's at paragraphs 387.

12       The complaint alleges Murphy and Kraines

13   formulated and disseminated information to Genesis

14   investors concerning the solvency of Genesis.  That's

15   at paragraphs 363, 367 to 369.

16       Defendant Murphy and Silbert review tweets

17   that defendant Moro made on behalf of the company.

18   That's at paragraphs 272 and 316.

19       Defendant Silbert directly controlled the

20   business of Genesis Global Capital, ordering

21   defendant Moro to shrink its loan book in light of

22   the Three Arrows Capital default.  That's at

23   paragraph 265.

24       Defendant Murphy, Kraines and Silbert

25   retweeted Moro's tweet concerning the financial

1    condition of Genesis in light of the Three Arrows

2    Capital default to disseminate their preferred

3    message that Genisis Global Capital was blue chip and

4    that it had a strong balance sheet.

5           Your Honor, I'll just mention briefly, we

6    also have in the complaint that in the bankruptcy,

7    there are these disclosures about who controlled

8    Genesis Global Capital.  This is at slide -- pages 11

9    and 12.  And these clearly show that in the

10   bankruptcy, defendant Moro, defendant Silbert, DCG,

11   Murphy, Kraines, Islim, all of them are mentioned as

12   controlling people.  And the spirit of the bankruptcy

13   law is that these disclosures are necessary to help

14   creditors, to aid creditors understanding who was

15   running the company in the time running up to when

16   the company failed.  So these are meaningful

17   disclosures, despite what defendants say, and they're

18   used to identify who the insiders are and who was

19   running the business right before the company filed

20   for Chapter 11.

21          You've heard today in the defendant's

22   argument and brief that there is no allegation of

23   control over the unregistered sale of securities, but

24   the complaint does allege that in paragraphs 145.

25          452 to 454 alleges each of the defendants had

```
 1    control over the sale of the unregistered securities.

 2              Those allegations coupled with the

 3    allegations I just outlined for your Honor, I think,

 4    demonstrate the control over the transactions at

 5    issue.

 6              And, further, in terms of the transactions at

 7    issue, defendant Islim says he didn't control any of

 8    the transactions; but there are allegations that as

 9    CEO of Genesis Capital, he caused the false solvency

10    representations to be made in every loan agreement

11    since he was appointed by Murphy and DCG as the CEO.

12              The last point on this is defendant Kraines

13    says that, well, he's only a director of the Hold

14    Co., the shell company, and a DCG executive and he

15    had nothing to do with Genesis Global Capital.  But

16    based on the allegations I just outlined for your

17    Honor, I think it's really form over substance.  The

18    shell company had a three-member board.  Kraines is

19    on that board.  That company is the managing member

20    of Genesis Global Capital and they manage and

21    operated that company.

22              So we think that just because he wasn't an

23    executive of Genesis Global Capital, that really

24    ignores the reality of how this company was run and

25    operated.
```

1              I just want to make a final point in terms of

2    the damages argument.  You heard defendant say today

3    that with respect to the direct lenders, they're only

4    getting 77 percent of their crypto back.  I think

5    that should really end this argument in terms of

6    mootness for now.

7              They say that we don't allege what the

8    damages are but that's wrong.  It's in the complaint.

9    The Securities Act provides a damages formula that's

10   alleged and that includes recovery of consideration

11   plus interest.  So just based on what you heard

12   today, the direct lenders are not getting 100 percent

13   of their crypto back.  If you loaned 100 bitcoin,

14   according to what you heard today, you're only

15   getting 75 or 77 bitcoin back.  So that delta there

16   is a loss to investors that would be recoverable

17   under the Securities Act, in addition to the interest

18   component that we outlined for your Honor in the

19   letter we submitted.

20             THE COURT:  So it doesn't matter if the

21   direct investors received dollars that more than

22   compensate for the lost crypto?

23             MR. CAMPISI:  I think that's right, your

24   Honor.  If you loaned 100 bitcoin and you don't get

25   100 bitcoin back, the dollarization of it doesn't

```
 1   account for the bitcoin that is lost and has not been
 2   returned.
 3           There may be an upside that -- because of the
 4   appreciation that may offset some of the damages, but
 5   that doesn't completely moot the claim in terms of
 6   damages.
 7           THE COURT:  Thank you.
 8           MR. CAMPISI:  Thank you, your Honor.
 9           THE COURT:  Mr. Sloss, you're doing the
10   Exchange Act?
11           MR. SLOSS:  Yes.  And if it's okay, I'd like
12   to just briefly -- I don't want to belabor the point
13   on the claims, but I do want to offer an analogy that
14   I think might be more apt to this situation which is
15   I think this program should be looked at more like a
16   hedge fund than a lending operation with the hedge
17   fund, based on its own projections of success,
18   adjusting what it believes it needs to provide as a
19   cost of capital or a COC to attract additional
20   investment and keep the investment in the fund.
21           And it does say, you know, they did have a
22   constant posting of rates.  And those rates are not
23   dependent on the fed funds rate or an overnight rate
24   like mortgages are.  They are dependent upon the
25   ability of Genesis to go and find additional
```

1    investments which will yield beyond the yield that

2    they're promising to their investors.  And if the

3    yield that they promise to their investors went too

4    low, a rational investor would go elsewhere.

5        And, you know, for an open term loan, it's

6    not a constant rollover.  It's an investment with a

7    permanent callout sheet.  And so I just think that

8    distinction maybe helpful.  I don't know if you

9    agree.

10        THE COURT:  Well, the allegation in the

11    complaint is that they set rates high to make sure

12    that they had the highest rates in the industry, in

13    effect.

14        MR. SLOSS:  Well, they noted that they had

15    the highest rates in the industry, but they also said

16    that they had -- they also had high rates to attract

17    investment, and they were very clear about using

18    investment language.  So they didn't say, oh, we're

19    adjusting this rate higher because Bank of America is

20    only offering you 1 percent on your savings account.

21    They wanted people to invest and put their crypto to

22    work, and they wanted, for example, to take in

23    investment at 4 percent and reloan it to Three Arrows

24    Capital at 8 percent and collect the spread.

25        And the reason that that activity in the bank

context is not a security is that they're -- I don't
want to pretend I'm an expert.  But there are
specific laws that exempt bank deposits from being
considered securities, and there are very tight
controls over what banks may do with your funds as
federally chartered banks.  But this business, which
was essentially a hedge fund, had no such controls.

THE COURT:  Yeah.  I'm just referring to
paragraph 152:  Investors in open-term Genesis Yield
Investment Agreements understood that, on a monthly
basis, the interest rate for their Gemini Earn
investments would be revised by Genesis, reflecting
Genesis' ongoing managerial efforts to pay among,
quote, the highest rates in the market, unquote.

It's not saying, for example, the interest
rate on their Gemini Earn investments could be
revised by Genesis to reflect Genesis's profit on the
moneys lent.

MR. SLOSS:  I understand that's what it says.
I would submit that if given the opportunity, we
would amend to include those allegations.

I'd like to address some of the Exchange Act
issues that were brought up before.  So I would like
to start with damages.  The Exchange Act calls for
actual damages.

```
 1        I know my co-counsel just discussed this
 2   briefly, but the case law in the Second Circuit
 3   recite a Paxa- -- the case Panos in our brief, pretty
 4   clearly provides for the availability of benefit of
 5   the bargain damages.  You know, defendants say that
 6   "in the typical securities case."  Yes, in a typical
 7   stock drop case, there is a typical measure of
 8   damages available.  And that is, again, because stock
 9   is valued in dollars, you can compensate somebody in
10   dollars.
11        But here they -- by defendants' own
12   admission, the direct lenders are only anticipating
13   77 percent back.  And the price of bitcoin obviously
14   had skyrocketed, and that's not going to come close
15   to compensating people for their -- they can't go out
16   and buy the amount of bitcoin they would otherwise be
17   able to buy with the difference even if they got some
18   dollars back.
19        Also there is absolutely an entitlement to
20   interest paid in kind.  The investments entitled --
21   so if you agreed to 4 percent interest, you were
22   supposed to receive that in bitcoin.  So the interest
23   would have enjoyed the appreciation of bitcoin.  So
24   the lack of interest payments here are recoverable
25   under 10b and the actual damages requirement.
```

```
 1            In terms of reliance, you know, the defendant
 2    said that there is only the one allegation that's in
 3    the presumption in the complaint, that's under the
 4    presumption section.  But if I could bring the
 5    Court's attention to page 97 of the complaint, there
 6    are -- and specifically paragraphs 398 to 99, it
 7    says, "As noted above, in connection with investor's
 8    purchase of the securities" -- well, actually, it's
 9    starting on 397.  It says that the defendants caused
10    Genesis to misrepresent its financial health.
11            It references the two, in paragraph 398, the
12    two representations and warranties.
13            And then 399 says, "As a result of these
14    misstatements and omissions described above," and has
15    that plaintiffs relied on those in purchasing their
16    securities.
17            So, you know, there -- I absolutely agree
18    with the statement that in the next section, in
19    paragraphs 408 and 409, when the language described
20    above was covering the whole complaint but there are
21    identical and nearly identical allegations outside
22    that section, that those allegations were not limited
23    to the presumptions.
24            Also these reliance arguments depend on not
25    crediting a signed agreement -- not giving the
```

```
1   signatories of a signed contract credit for relying

2   on the representations and warranties therein.  And

3   the master agreements are clear that the

4   representations and warranties apply to -- that are

5   repeated and continuous and apply to every subsequent

6   loan and are active through the life of the master

7   agreement and the loans.  And so --

8          THE COURT:  But they weren't being -- we

9   don't know of any proceeding that's going to affect

10  our financial --

11         MR. SLOSS:  Well, the warranties -- there are

12  two.  This is, one, that we are not insolvent as of

13  this time.

14         THE COURT:  Okay.

15         MR. SLOSS:  And we also don't know about

16  proceedings that could change that.

17         So it's -- the case law they cite where --

18  you know, that notion that we have to specifically

19  allege that we read a paragraph in a contract that we

20  signed is beyond what the case law has ever -- I

21  mean, it's a simple, I would submit, tenet of

22  contract law that a signatory of an executed contract

23  is deemed to have relied on the representations

24  therein.

25         The cases they cite rely on extraneous
```

documents like SEC filings or memos, an offering

packet.  They have no independent indicia that the

receiver or plaintiff claiming to have read them

actually did read them.  But every one of these

master agreements had -- bears the mostly electronic

signatures via DocuSign of the plaintiffs.

And with respect to the Gemini Earn

plaintiffs, there is a specific provision in the

agreement which says that they have received and

reviewed the agreement.  And so I would submit that

-- I mean, we can include that allegation.  But we

clearly have met the standard that we were aware of

the representations and warranties and relied on the

representations and warranties in executing the

agreement.

I would also -- you know, there is another

issue with reliance which is the scope of the Gemini

agency.  The scope of the Gemini agency, I think, is

much broader than has been described by defendants.

There -- in fact, defendants describe it as limited

like to facilitate the investment but they have no

discretion over the amount invested, et cetera.  And

that is true with regard to the initial investment.

So if I were investor and Gemini were my agent, only

I could decide whether to invest one bitcoin at this

1    rate on this date.

2        But the agreement is very clear that Gemini

3    has been appointed agent for all purposes under this

4    agreement with the only limitation on that being the

5    initial investment.  So Gemini absolutely had the

6    power to and obligation to monitor the performance of

7    these investments during the life of these

8    investments.

9        So, for example, in July when they received a

10   balance sheet which had $2 billion of receivables,

11   they had an obligation under the agreement as a

12   responsible agent to say, What's that made up of.

13   And when they received a misstatement back that said

14   it's made up of current receivables when it is not

15   made up of current receivables, that is a

16   misstatement to the agent of Gemini Earn users.  And

17   it is within the scope of the agency as clearly

18   contemplated by the agreement.  It says -- I mean,

19   this is on page 9 of the Gemini Earn agreement,

20   Docket 139-2.  It says Section 6, subpart b, it says,

21   you know, "Lender," the plaintiffs, "have duly

22   appointed custodian as its agent to act on lender's

23   behalf for all purposes under this agreement."  So

24   they absolutely had the power.

25        There is another clause in an exhibit which

1    gives -- which basically says that Gemini and the

2    lenders stand in the same place under the agreement.

3    Gemini had the power to terminate the agreement.

4    They gave notice to terminate the program with

5    Genesis.  They gave notice that they were going to

6    terminate the program with Genesis in October, and

7    then that resulted in defendant Silbert meeting

8    directly with one of the executives of Gemini to say,

9    no, no, no.  Don't terminate this program.  We are

10    not insolvent.  We have a short-term mismatch in

11    liquidity.  Please don't terminate the program.

12        So to say that representations made to Gemini

13    are not -- and this is just -- as some of the cases

14    defendants cite say, agency is a personal

15    relationship.  But the relationship created here is

16    clearly a very broad agency with respect to these

17    loans.

18        And any misstatement made or any statement

19    made to Gemini under pretty straightforward agency

20    law should be -- with respect to this these loans,

21    the balance sheet of Genesis should be considered and

22    construed as a statement being made directly to the

23    lenders.

24        And I would say -- so the next issue I just

25    want to briefly touch upon is causation.  You know,

1    the defendants make a point about that there are

2    inadequate causation allegations here.  But we are

3    pretty clear that the causation, the cause of the

4    losses is that they were not honest about their

5    insolvency starting at least as early as June and

6    that people invested and people would not have

7    invested in an insolvent enterprise had they been

8    told the truth about that.

9         And the revelation of that condition later on

10   because they couldn't conceal it anymore is not --

11   you know, that is the cause.  But the cause is the

12   concealment in June.  It's not any -- you know, there

13   were market forces which forced the revelation of

14   that, but that's common with all frauds.  I mean,

15   there were frauds exposed when the markets went crazy

16   for COVID.  There were frauds, Madoff was exposed

17   when -- during the great financial crisis.  Those

18   aren't causes of frauds.  Those are, as Warren Buffet

19   said, the tide going out and exposing who is swimming

20   naked.

21        And I would like to then finally address,

22   there has been a point about how the only hook of --

23   to get DCG and the executives into this case is

24   control person liability, but that's not true under

25   what we alleged or the claims that we brought.  We

1  brought claims under 10b-5 under subsections (a), (b)

2  and (c).

3        We allege scheme liability and we allege that

4  the scheme liable arises from the creation of the

5  promissory note which was designed to deceive and is

6  an act above and beyond a misstatement.  It's an

7  extra act of deceit which under *Lorenzo* and *Rio Tinto*

8  is sufficient to give rise to scheme liability and is

9  also direct participation in the scheme by DCG, by

10  its board members who conceived of the promissory

11  note and by the employees of DCG and Genesis who

12  participated in the -- in conceiving of the

13  promissory note.

14        You know, the promissory note is essential to

15  understanding what happened.  It purported to solve a

16  $1 billion liquidity hole.  But its only purpose

17  could have been to deceive because it didn't come

18  close to doing that.  It didn't even purport really

19  to do that and they didn't -- nobody disclosed the

20  existence of it.  You know --

21        THE COURT:  It sounds a lot like you're

22  relying on omissions, primarily on an omissions case.

23        MR. SLOSS:  Well, if there is an ongoing

24  representation every day that they are solvent, which

25  the contract calls for, then it is an affirmative

```
1    misstatement.  But I would agree there is a mix of
2    misstatements and omissions.
3           THE COURT:  Well, to frame it differently,
4    when that warranty is out there, they have an
5    obligation to speak if it's not true any longer and
6    they omitted to do so.
7           MR. SLOSS:  Well, the contract says it is an
8    ongoing representation.  So I mean, either way, I
9    think it's -- I mean, if they have a duty to speak
10   and don't, I think it's fraudulent omission.
11          But the operation of the contract, on page 7
12   of 139-2, the first line is, "The parties hereby make
13   the following representations and warranties, which
14   shall continue during the term of this agreement and
15   any loan hereunder."
16          So, conceptually, if you have a call option
17   and you are not -- and every day your investment is
18   with Gemini -- with Genesis, I'm sorry.  They are
19   repeating -- the way we interpret that is they are
20   repeating that representation every day to you
21   because it says it shall continue during the term of
22   the loan.
23          THE COURT:  Yeah.  So under 9(b), do you have
24   to plead and prove that, or at least plead every day
25   so and so made a representation to so and so at such
```

```
1   and such a time and place?  In other words, this is a

2   continuing representation.

3              MR. SLOSS:  Right.

4              THE COURT:  And then what happens is an

5   omission to correct it as opposed to they didn't

6   issue one of these representations every day.  And

7   under 9(b) you've got -- if it's a misrepresentation,

8   you've got to say ...

9              MR. SLOSS:  Well, when you say "issue," I

10  mean ...

11             THE COURT:  Well, okay.  Under 9(b), who said

12  what to whom, and why is there a reasonable basis to

13  believe it was known to be false when made.  So this

14  is just out there.

15             MR. SLOSS:  Right.

16             THE COURT:  What you're saying is this was

17  out there and they had a duty, therefore, to correct

18  our reliance on it.

19             MR. SLOSS:  So I can -- I believe -- I can't

20  point you to the exact paragraph, and I'd be happy to

21  share it with the Court later.

22             I do believe we allege that these statements

23  were repeated with every additional investment made

24  by a Gemini Earn person.  So to the extent that, you

25  know, we can establish, you know, the date of an
```

```
 1   investment, it flows automatically that that
 2   statement was made on that date to the investor.
 3          THE COURT:  With respect to that investor.
 4          MR. SLOSS:  Right.  And so each --
 5          THE COURT:  On a class action --
 6          MR. SLOSS:  Well, so -- but everybody signed
 7   this agreement.
 8          THE COURT:  Right.  Which is why it's an
 9   omission case.  In other words --
10          MR. SLOSS:  Well, isn't it self -- I mean, I
11   guess it would be our position that this would be
12   self-proving if everybody signed a uniform -- I mean,
13   you couldn't participate in the program without
14   signing this document.
15          THE COURT:  Right.  But the -- if I signed it
16   on June 1.
17          MR. SLOSS:  Yes.
18          THE COURT:  That representation was not made
19   to me on June 2 just because somebody else signed a
20   similar document on June 2.  It was made to that
21   person, but it wasn't made to me.  So you're left
22   with an omissions situation if you're relying upon
23   misrepresentation as being continuing.  The contract
24   wasn't entered into by each investor every single day
25   so the representation wasn't renewed.
```

```
 1          MR. SLOSS:  Well, but the loan was because

 2    the loan was -- it was a day-by-day decision to leave

 3    it in or not.

 4          THE COURT:  That goes maybe to reliance but

 5    it doesn't go to false statement.  They didn't say on

 6    every single day, hey, don't -- you know, stick with

 7    your loan because we represent that we have the power

 8    to execute and deliver this, right?

 9          MR. SLOSS:  Well, I -- they -- sure.  I mean,

10    and I understand what you're saying.  But they had --

11    I mean, it's obviously a fraudulent -- I think that

12    these are affirmative ongoing misstatements.  I mean,

13    I do think that that is what they were calling for

14    with this.  And at the very least, they were repeated

15    every time a new investment was made and -- I mean,

16    every class member made an investment, and every

17    class member made an investment, part of the class,

18    during the fraudulent period.  So there is -- however

19    many investments were made during the period, there

20    are that many affirmative misstatements.

21          Now, the dates after that may be omissions.

22    But if the fraud begins June 15 and I invest on June

23    15, that's an affirmative statement on June 15.  It's

24    an omission on June 16.

25          THE COURT:  Right.
```

```
 1         MR. SLOSS:  But the 15th still causes the
 2  investment and the loss.
 3         THE COURT:  Well, okay.
 4         MR. SLOSS:  Because it gets me to part with
 5  my money under a fraudulent pretense.
 6         THE COURT:  I thought -- yeah.  All right.  I
 7  think you're trying to kind of walk around the
 8  problem at this point.  You know, in terms of a class
 9  allegation, you're kind of stuck with an omission, I
10  think.  It's the only thing that affected the class
11  every day was an omission.
12         MR. SLOSS:  Every day that there was a new
13  investment.  So if you were investing in a hedge fund
14  and there was a representation in the documents you
15  signed, one on the first day of your investment, and
16  it says we are solvent and they were not, then that's
17  an affirmative misrepresentation that gets you to
18  part with your money.  And if there were a class of
19  people who all did that, then --
20         THE COURT:  Right.  But as I understand the
21  allegations, what you're saying is, for many people
22  this agreement was entered into before there was any
23  insolvency.  So it was true when initially made.  And
24  what happened was the insolvency arises, maybe
25  there's efforts to hide it, and there is no --
```

```
 1    they're omitting correction of the outstanding
 2    representation.
 3            MR. SLOSS:  But they are -- so they are
 4    deemed repeated with every new investment.
 5            THE COURT:  Yes.
 6            MR. SLOSS:  And so but if the class --
 7            THE COURT:  Individually.  But the class
 8    can't rely upon everybody else's representations, can
 9    they?
10            MR. SLOSS:  But each one, each class member
11    has their own representations from Genesis to them.
12            THE COURT:  Yes.  Yes.  But not every day.  I
13    understand your position.
14            MR. SLOSS:  Is your point that every class
15    member has -- I'm sorry.  I'm not trying to -- is
16    your point that every class member has their own
17    direct reliance so you can't do class by reliance?
18            THE COURT:  Well, if you're arguing that
19    everybody got the same representation on a different
20    day.
21            MR. SLOSS:  Yes.
22            THE COURT:  Then you're going to have to look
23    at when did the insolvency arise and had they made
24    the representation before or after that insolvency.
25    You know, after the insolvency, you may have a
```

```
 1   subclass, oh, they knew it was false when they made
 2   it.
 3           MR. SLOSS:  Right.
 4           THE COURT:  But prior, my understanding is a
 5   lot of these people signed these loan agreements in
 6   advance.  This is part of the statute of limitations
 7   argument.
 8           MR. SLOSS:  Well, so they signed the loan
 9   agreements in advance.  But the securities
10   transactions, there was -- every time a new
11   investment was made, it was a new transaction.
12           So if you signed -- let's, for argument's
13   purposes, say that the fraud begins on June 13th.  If
14   you signed the master agreement on June 13th but
15   don't deposit until -- or on June 10th and don't
16   deposit until June 17th, the reps are remade to you
17   on the 17th.  And if they know on the 13th that
18   they're insolvent, they're fraudulent affirmative
19   misstatements on the 17th.
20           THE COURT:  All right.  I understand the
21   argument.
22           MR. SLOSS:  Okay.  Well, there are, of
23   course, we -- two of our plaintiffs entered into --
24   the direct lenders entered into contracts in the fall
25   of '22.  So they received these well within what you
```

refer to as a potential subclass and well after the

alleged insolvency in June.

And so with respect to at least, we would

submit, investors who invested after the alleged

insolvency, they all received an affirmative

misstatement which was untrue at the time made.

THE COURT:  Okay.

MR. SLOSS:  And so the final point I would

like to make -- I don't know if I got too far into it

about the scheme liability.  But scheme liability is

primary liability that attaches in participation of a

course of conduct that constitutes fraud or the

development of a deceitful device or contrivance,

which I'll rely on what we've pled and the briefing

on this.  But the promissory note qualifies -- and

the behavior around the promissory note, we submit,

qualifies under both Subsection (a) and (c) of 10b-5

for scheme liability.

So control person, this is -- you know, Barry

Silbert and the DCG folks were directly involved in

figuring out how to plug the equity hole and

considered a number of options, and the option they

chose was one tailor-made to enable misstatements

later on.

And, you know, executing a sham financial

1   document is the type of additional action under the

2   cases I talked about, that *Lorenzo* and *Rio Tinto*,

3   which can give rise to scheme liability even in the

4   presence of misstatements later on.

5          And so and then the final point I'd like to

6   make, and I think both sides didn't touch on it too

7   much.  Even if these are -- if your Honor doesn't

8   find these instruments and investments to be

9   securities, we feel like we've made out claims under

10  both CUTPA and the New York GBL, which we believe

11  would squarely cover the deceitful and fraudulent

12  course of conduct we've alleged, even if the

13  investments were regular loans and not securities.

14         THE COURT:  Well, okay.  But extraterritorial

15  reach of those statutes becomes an issue.

16         MR. SLOSS:  Well, I suppose so.  But New York

17  and Connecticut where, you know, the fraudulent acts

18  took place both have interest in applying their

19  unfair trade practices to businesses and individuals

20  who commit those acts within the state.

21         THE COURT:  Okay.

22         MR. SLOSS:  And Silbert, you know, whether

23  you agree whether he was in Connecticut or New York,

24  we have claims under both.  They had offices in both.

25  And these acts, in theory, the creation of the

 1    promissory note and the agreements to continue with

 2    misstatements occurred in Connecticut and New York.

 3            All right.  Thank you.

 4            THE COURT:  I know there are others who want

 5    to be heard.

 6            MR. DONOGHUE:  Good morning, your Honor.  My

 7    name is Richard Donoghue.  I represent Michael

 8    Kraines this matter and only Michael Kraines.

 9            I do feel a bit though like I represent Waldo

10    in a Where's Waldo game because it's sometimes

11    difficult to find my client in all of this.

12            I would just point out at the outset, because

13    there was some discussion of scheme liability under

14    Claim 2, Mr. Kraines is not included in Claim 2.

15    He's included in Claims 1, 3, 4 and 5.

16            He was the CFO of DCG, the indirect parent of

17    Genesis.  And he was a board member of the holding

18    company above Genesis, both of these after the start

19    of the class period.  The class period, as your Honor

20    knows, is February of 2021.  According to the

21    allegations in the amended complaint, Mr. Kraines

22    became the CFO in September of '21 and he became a

23    board member in June of '22 shortly before the end of

24    the class period.

25            So he is there in those roles.  But beyond

that, you can't find much about Mr. Kraines in the
amended complaint.

Counts One and Two -- I'm sorry.  Counts One
and Three, of course, are federal securities law, and
he is alleged to have liability under a control
person theory.  And Four and Five are the state
consumer protection law allegations.

The Court knows well the requirements for
control person liability, and we submit that they
have failed to sufficiently allege that with regard
to Mr. Kraines.

Beyond control of the entity, the party
that's alleged to have engaged in the misconduct, the
defendant here must have control of the transactions.
And the reasons I point that out, and Mr. Kraines
didn't even become involved, didn't even show up on
the scene until September of '21 according to the
complaint, is that these loan agreements were
drafted, issued, entered into long before Mr. Kraines
even showed up on the scene.

And you can have the debate that the Court
just engaged in with counsel about whether they or
repeated and how long they go on and all of that.

But he had nothing to do -- according to the
allegations in the complaint, nothing to do with

1    drafting the language in those loan agreements,

2    nothing to do with the execution of the loan

3    agreements or how they were carried out and nothing

4    to do with the representations that later followed.

5          So in terms of his actual control which is

6    required, his actual control not only of Genesis,

7    that's not sufficiently alleged, but his actual

8    control of the transactions that underlie the claims

9    brought here is also not sufficiently alleged.

10         The PowerPoint that plaintiffs' counsel

11   showed up with this morning is actually helpful in a

12   sense because if you flip through that, you see that

13   Mr. Kraines is mentioned three times.  He is on

14   Slides 9, 12 and 13.  On 9, he's in the diagram box

15   just showing that he is at the Genesis Global Hold

16   Co. level.  That is true.  He is also at the DCG

17   level, that is true but that relates to his roles.

18         If you go to slide 12, there is one word that

19   relates to Mr. Kraines.  The word is "Director."  So,

20   again, accurately reflects his role as director in

21   the Hold Co. but says really nothing about his own

22   actual involvement.

23         Thirteen has a little bit more.  It talks

24   about Murphy and Kraines collectively.  And

25   obviously, your Honor, throughout the pleadings they

talk about these defendants collectively, whether
they're Securities Act defendants or the Exchange Act
defendants.  But Mr. Kraines is essentially just
lumped into those parties, for the most part,
throughout.

When they talk about him on slide 13, they
mention -- they have bracketed paragraphs in the
amended complaint.  He's actually mentioned in only
three of those paragraphs, according to my very quick
review of the amended complaint.

So it gives a good view as to Mr. Kraines's
very limited role in the matters and, not
surprisingly, very limited appearance in the amended
complaint.

Obviously his position as an officer in the
parent, the indirect parent, and his role as a
director in the Hold Co. is in and of itself clearly
insufficient as a matter of law.

And here he is not even alleged to be an
officer or director of the primary violator.
Obviously, he's removed even then.  If they were to
show he was an officer or director of Genesis, the
primary violator, that in and of itself would not be
enough.  But here he's even further removed.

So the amended complaint currently does not

1    allege that Mr. Kraines had any control over Genesis

2    lending agreements.  It does not allege that he had

3    any control over the representations made about

4    Genesis, and it does not allege anything that would

5    indicated that Mr. Kraines was a culpable

6    participant, that he had any scienter, any intent to

7    deceive.  So for those reasons the motion to dismiss

8    submitted on behalf of Mr. Kraines should be granted.

9            I'm happy to talk about the Connecticut and

10   New York counts if that's helpful to the Court.  I

11   don't know that it is.  We set forth in our paper the

12   limitations.  It's not just a matter of, yeah, there

13   were people in Connecticut; yes, there were people in

14   New York and things happened in those states.  Those

15   statutes have very specific limitations with regard

16   to who can get remedied under the statute, residency,

17   et cetera.  And the fact is that the allegations set

18   forth in the amended complaint do not sufficiently

19   put forth what's needed to get recovery under either

20   of those statutes.

21           Other than that, I'm happy to answer any

22   questions the Court may have.

23           THE COURT:  No questions.  Thank you.

24           MR. DONOGHUE:  Thank you, your Honor.

25           MR. ASNER:  Very briefly, your Honor.  Marcus

1    Asner.  I'm for Michael Moro.  Michael Moro was the

2    CEO of Genesis.

3         I just have, really, three quick points to

4    make because I know there has been a lot of argument

5    so far.

6         An important point for us is that Mr. Moro

7    left Genesis in August of '20- -- August 26, '22.

8    And so if you take the plaintiffs' complaint, what

9    they're complaining about, the harm that they're

10   alleging is that effectively in November they could

11   no longer withdraw the bitcoin or the cryptocurrency

12   that they had because it was tied up in bankruptcy.

13   And so a point I want to emphasize is that that time

14   period is untethered to anything that Michael Moro

15   would have been involved with or what he did.

16        Now, the last thing they point to, as far as

17   I can tell, is the July 6 tweet that Mr. Moro made.

18   So if you take the situation of July 7th, plaintiffs'

19   counsel wants to assert that as of July 7th or July

20   1st, that Genesis was insolvent.  Now, the term

21   "insolvent" is being cast around and depending on the

22   moment, it's either that it was not capitalized,

23   essentially that the balance sheet was in the red, or

24   that it was -- that there was insufficient liquidity.

25        Well, in their complaint they effectively

1    admit that as of July 1st, it was in fact in the

2    black because any loss that might arise from Three

3    Arrows Capital had now been sucked up by DCG.  So on

4    a balance sheet point of view, we're in the black.

5         So they must be talking about liquidity.  In

6    the complaint it's very plain, between July 6 and

7    November when they closed the door on redemptions,

8    they had the liquidity and paid every single

9    redemption as it came due.

10        And so there is a huge causation problem with

11   Mr. Moro because he was not around and the

12   intervening cause happened in November, not at this

13   alleged insolvency, which I would argue is not true

14   because it was not insolvent for the reasons I just

15   said.

16        So that's my first point, and I think that is

17   frankly dispositive with respect to Moro, in addition

18   to the other arguments that counsel made.

19        Two other relatively minor points:  I agree

20   with Mr. Donoghue that the PowerPoint that plaintiffs

21   passed up is in fact helpful in some ways for

22   Mr. Moro if you look at the control test.  What

23   they're really arguing is is that Mr. Moro was by

24   position the CEO of Genesis during a period of time.

25        And, you know, you go to paragraph 13 where

they explain the most about Mr. Moro.  And really
when they get to the crux of it, they say he was
responsible as CEO.  So they're talking about his
positional role as CEO rather than anything
affirmatively that he did.

And then the final point I wanted to hit was
plaintiffs' counsel made a statement that Mr. Moro
conceded at least that plaintiff's Translunar's
claims were not time-barred.  In fact, we did not
concede that.  We addressed this in our reply brief.
That's ECF 150, page 4, Footnote 1.  All we said was
that while all of the other plaintiffs had given --
put forth facts that alleged when, you know, the
timing element, that under their facts they were
time-barred, where Translunar had not admitted that
they had entered into a lending agreement before
January 23, 2022.

So it's not like we conceded it.  It's what
we -- the only thing we conceded was that they didn't
actually put the date in the complaint.

We rest on our briefs on the rest unless the
Court has any questions.

THE COURT:  No.  Thank you.

MR. DONOGHUE:  Thank you.

MR. ESSEKS:  Good morning, Judge.

```
 1            THE COURT:  Yes, it is.

 2            MR. ESSEKS:  Just barely.  David Esseks for

 3    Derar Islim.  Thank you for hearing us this morning.

 4            I wanted to focus the Court on particulars

 5    with respect to our client.  Mr. Islim was the COO of

 6    Genesis and later the acting interim CEO, and he was

 7    also on the board of the holding company GGH.  He is

 8    the furthest down in the caption.  He's the last guy

 9    named.  And as is typical in that seat, there is

10    actually not a lot pled about him, and I want to

11    focus the Court on the lack of allegations about him

12    because we think it's ultimately dispositive here.

13            What does the complaint allege about him?  He

14    said nothing.  He did himself nothing.  Let me unpack

15    that.  But those -- that's what you see when we look

16    at the complaint.  Leave aside all the rest of the

17    mishugana.

18            And we focus on what does it say about

19    Mr. Islim?  He said nothing.  He did nothing.  And

20    that, we think, is absolutely dispositive.

21            First, search the complaint as you will.  It

22    attributes no actual statement, no words to Mr. Islim

23    at all.  He said nothing.  The complaint is full of

24    -- it has many allegations in it that are of the

25    following pattern:  This guy and this guy and this
```

1   guy and Mr. Islim and this guy caused Genesis to do

2   blank.  Those -- there are quite a number of those,

3   20 or so.  They're all conclusory.  They are perhaps

4   a start at a well-pled complaint with respect to

5   Mr. Islim, but they never, ever unpack what it is

6   that Mr. Islim did to cause that.  They don't unpack

7   that he knew that whatever that is was truthful,

8   untruthful, wrongful, appropriate.  These are

9   conclusions, Judge, again and again in a complaint

10  and they are insufficient.

11       If we look at the complaint as a whole, 556

12  paragraphs, of them 53 mention Mr. Islim's name.

13  Well, let's unpack that.

14       Twenty-seven are in charging paragraphs.

15  Let's put them aside.  They're just legal

16  conclusions.  They have to be there.  Fine.

17       Twenty of them are the category I just

18  described:  wholly conclusory starting points towards

19  a well-pled factual allegation.  And they start again

20  and again and they never go anywhere.

21       Four allege that he was COO, interim CEO and

22  on the board.  Four of them spend time on his titles.

23       That leaves us with two, Judge, and I'm going

24  to take the Court to those two.  Paragraph 356 on

25  page 86.  It cites, the Court sees an e-mail from

1   DCG's treasurer to Mr. Islim and a managing director

2   at Genesis.  And it says, "We received guidance from

3   Mr. Silbert to repaper a particular loan from Genesis

4   to DCG by ten months.  Please let us know what

5   documentation is needed to execute on the new loan.

6   We need to include language that the loan could be

7   repaid early without any penalty."

8          Islim here, in one of two allegations in the

9   complaint that say anything specifically about him,

10  first, he is not saying anything.  He is not doing

11  anything.  He is being told something.  He is not

12  being told that there is a problem.  He is being

13  informed about repapering a loan.  Perhaps that could

14  be part of a larger story that is not developed in

15  the complaint with respect to Mr. Islim.  He's told

16  this.  He's not told that it is -- it is not

17  obviously alarming and he's not told as alleged that

18  it is alarming, concerning, problematic, fraudulent,

19  wrongful.

20         The second and final paragraph that says

21  anything about Mr. Islim is 386 on page 93.  And it

22  reads, as your Honor sees, and I'll paraphrase

23  slightly, but Genesis Capital personnel, and this is

24  end of August, I think, September 1st, soon drew

25  concerned that Genesis Capital had provided false

information to counterparties.  On September 1, 2022,
Genesis Capital's director of lending reported to its
interim CEO Mr. Islim:  "I'm hearing concerns from
front office folks.  They're concerned about the
accuracy of information we have shared with clients
about liquidity and variability in our equity.  There
still is no liquidity infusion from DCG to fill the
gap and instead we have a note."

Nevertheless, it alleges neither DCG nor
Genesis Capital corrected the misstatements.

So a more interesting allegation to be sure,
but what's happening?  Mr. Islim is not alleged to
have said anything.  He's not alleged to have done
anything.  It's alleged that he was told something,
that a colleague was hearing concerns about others
about the accuracy of information.  He's not told, as
alleged, that there was a problem.  He is not told
even that the person reporting the concerns to him
shared them.  He's simply being told in an internal
communication that, hey, Derar, some folks over there
have some worries.  That's it.

So if we look then at the sum total of what
are the allegations in this fraud complaint that
requires 9(b) specificity about what is it that
warrants keeping this man in this complaint, this is

1    what we have:  He's informed on two occasions about

2    some things, one of which is wholly innocuous as far

3    as we can tell and the other of which is reporting

4    that there are some concerns by some people.  And

5    they're not supported, validated, invalidated.

6    They're just hanging there in the air.  Could a

7    complaint use something like that as part of a more

8    particularized story about what it is that this man

9    did that warrants him being in federal court as a

10   defendant, perhaps.  Do they come anywhere close to

11   doing that in this complaint?  No, they don't.  There

12   are insufficient allegations utterly to support any

13   scienter theory at all with respect to Mr. Islim.

14        We adopt the arguments of our colleagues on

15   the various and significant across-the-board problems

16   that this complaint has.  But with respect to

17   allegations about Mr. Islim, there is nothing that

18   comes close to a viable allegation of scienter.

19        And if we take that then through the whole

20   range of claims against him, those problems get rid

21   of every single complaint, every single claim.

22        The standard for scienter, as I know the

23   Court is very well aware, involves a requirement of

24   showing either motive and opportunity or strong

25   circumstantial evidence of conscious misbehavior.

1        They reference motive.  Judge, I'll take you

2   to paragraph 500, please, because they realize they

3   need to make some allegations about motive.

4   Paragraph 500, page 122, 500 alleges, hey, these

5   guys, Silbert, Hutchins, Lenihan, Murphy, Islim and

6   Moro, caused Genesis Capital to withhold this

7   information and they had the motive and opportunity

8   to do so because their conduct resulted in higher

9   compensation for Genesis Capital, defendant DCG and

10  defendant Silbert.  A generalized allegation of

11  interest, general corporate interest common across

12  the entity.  The law says not good enough.

13        501, they go on to say, well, they had the

14  motive to keep Genesis Global Capital's real

15  financial condition secret because they knew or had

16  reason to know that its insolvency would likely

17  result in mass investor redemptions, the end of its

18  business and losses to defendants Silbert, DCG and

19  others.  They don't even have the gumption to say

20  that would hurt Mr. Islim.  And even if they said it,

21  Judge, it's a generalized allegation of a generalized

22  motive that the case law says is not sufficient.  But

23  they don't even get the words out in that paragraph.

24  So we are woefully short on that bit.

25        On the strong circumstantial evidence of

conscious misbehavior or recklessness, I've pointed

the Court to the two paragraphs that say anything

about him at all.  Not even close.  The complaint,

again, is full of conclusory allegations that are

perhaps the start of a well-pled set of allegations

against him.  They start again and again.  They never

finish.  They never say anything about what was in

his head about why the Court should conclude that

there is a case to answer for about his scienter.

And that runs right the way through.  The closest

they come perhaps is alleging effectively the

defendants must have known that their statements were

false.

        Well, that's not enough, so says Judge Bryant

in this district.  That's not enough says logic.

There is no detail unpacked in this complaint

alleging how the Court should have confidence that

Mr. Islim had any idea that he was involved in

something wrongful.

        This then takes us right the way through the

control person tests.  There needs to be culpable

participation.  They can't allege that without

scienter.  They haven't alleged it.

        And I'll say that that goes right into the

15(a) control person issue.  There is a division of

1    authority about whether culpable participation is a

2    requirement there.  And I know that your Honor in the

3    *Teva* matter decided no, it's not required.  But you

4    candidly said, No one is arguing to me that it is

5    required.  Well, we are arguing to you that it is

6    required.

7         Judge Rakoff in the Southern District in a

8    *Merrill Lynch* case, *Public Employees Retirement*

9    *System of Mississippi* against *Merrill Lynch*

10   articulates what I submit is a very sensible

11   perspective on this which is we're talking

12   effectively about a strict liability entity

13   obligation, and when we're bringing people into it,

14   there needs to be some mechanism to make sure that

15   they're really there.  And the mechanism is culpable

16   participation in the same way that it is under

17   Section 20.  That's the view of Judge Rakoff.  That's

18   the view of many of your colleagues, and we submit

19   that that should be this Court's view.

20        The complaint is replete with problems.  It

21   says virtually nothing about Mr. Islim and we think

22   it is woefully inadequate.

23        Thank you, Judge.  I'm happy to take

24   questions.

25        THE COURT:  I'm all set.  Thank you.

1          Anyone else wish to be heard?

2          MR. CAMPISI:  Your Honor, just a few brief

3     comments.

4          Earlier you heard Mr. Polkes mention that the

5     case should be dismissed with prejudice.  We don't

6     think the complaint should be dismissed, but if your

7     Honor were to do that, this is the first opportunity

8     for your Honor to review our complaint and we would

9     ask for leave to replead.

10          And I would note that since the briefing

11     closed, there have been new disclosures about

12     information from the bankruptcy, from the New York

13     Attorney General's case that we could replead if the

14     Court required it.

15          The last thing I'll mention, culpable

16     participation.  The weight of the authority in the

17     Second Circuit is it's not required for a 15(a)

18     claim.  It's just control.  So despite counsel's

19     argument, the vast majority of cases, including your

20     Honor in *Teva,* said that, you know, it's not a fraud

21     claim, it makes no sense to graft a fraud element.

22     Culpable participation Courts have looked at as a

23     fraud element.  So we don't think that's required or

24     necessary, and the case law doesn't support that.

25          Thank you, your Honor.

```
1              THE COURT:  Thank you.

2              Well, let me inquire, actually, whether the

3      plaintiff wishes to replead at this point.  In other

4      words, is there enough additional information?  Are

5      there arguments that you think have some merit that

6      need to be addressed through an amended complaint?  I

7      take these cases seriously but I am not fast.  So I'm

8      happy to decide this, but I've got a lot of

9      information here and it's probably going to take me

10     months rather than weeks to get that sorted through.

11             So I'll throw out the opportunity to file one

12     last shot if you wish to do that.  And, frankly, I

13     would encourage you to think about some of the

14     arguments that have been made today, whether you need

15     seven individuals as defendants.  Some would argue

16     that's a weakness when you make it to trial if you

17     have too many people over here.

18             Anyway, you've heard the arguments as clearly

19     as I have, and if you -- what I don't want to do is

20     spend six months deciding this and then say, oh, now

21     can we replead.  So I'd rather have you make that

22     call now and we can ...

23             MR. CAMPISI:  Your Honor, I appreciate the

24     opportunity.  It somewhat put us on the spot.  If we

25     could just have a couple days, maybe a week to decide
```

that.  And if we elect to amend, we would let the
Court and the parties know, and if not, we would say
that we're standing on the complaint and let the
Court know either way, if that's okay.

THE COURT:  Yeah.  That's fine.  A week is
fine.  You know, I am more likely to rule with
prejudice if I go through all of this on the current
complaint, so to the extent that the motions are
going to be granted.

MR. CAMPISI:  Understood, your Honor.

THE COURT:  Yeah.  Okay.  Anybody else have
anything to offer today?

You know, I almost always -- this case may
not be a good candidate.  But whenever I have a big
argument like this, it could be the smallest of cases
but I say, wait a minute, this case is going to cost
you lots and lots of money, cost your clients lots
and lots of money to litigate.  I can't imagine the
scope of discovery.  *Teva* is a good example.  You
might call up both sides and find out what their
legal bills were.

But is anybody interested in trying to
resolve the case?  I know it may be early, but
sometimes when there is a motion hanging in the
balance, everybody focuses a little bit more on the

```
1   strength and weaknesses of the case and it might be

2   an opportune time to talk to a magistrate judge.  Any

3   interest?

4        MR. CAMPISI:  Your Honor, we haven't had any

5   discussions on that end, but we're always happy to

6   talk about that if -- provided defendants are willing

7   to do so.

8        THE COURT:  Well, yeah.  Okay.  I mean, the

9   two sides can talk among themselves whenever they

10  want.  What I'm really trying to figure out is:

11  Should the court devote some resources in the form of

12  a magistrate judge's time to sit down and try to work

13  through the issues in the case?  Some of the issues

14  obviously are legal.  Some of the issues are

15  practical, and some of the issues may be financial.

16        So what I'm trying to figure out is:  Should

17  I refer you for a settlement conference to a

18  magistrate judge or not?

19        MR. CAMPISI:  That would be fine with

20  plaintiffs, your Honor.

21        MR. POLKES:  I'd obviously have to check with

22  our clients, your Honor, before we could respond.  It

23  does feel premature, to be honest, and we do -- we

24  are able to reach out to them, there may be an

25  amended complaint, there may not be.  It's a funny
```

 1    time for us to do that.  But obviously we're more

 2    than happy to take that back to our client and report

 3    to your Honor.

 4          THE COURT:  That's fine.  I'm not trying to

 5    force anybody to do anything.  I just -- there's two

 6    great times to settle cases:  One is now at the start

 7    -- somewhat at the start, and the other is when the

 8    jury is deliberating.  And there is a huge difference

 9    in time and effort and cost for everybody between

10    here and there.  So if there is any interest, great.

11    If there's not, that's fine too.  I'm here to decide

12    cases.  I actually enjoy it and, you know, we'll get

13    it done.

14          MR. POLKES:  Thank you, your Honor.

15          THE COURT:  Well, thank you all.  This has

16    been a very interesting argument.

17          And we'll stand in recess.

18          (PROCEEDINGS ADJOURNED, 12:15 p.m.)

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          RE: WILLIAM MCGREEVY, ET AL.
                        v.
4          DIGITAL CURRENCY GROUP, INC. ET AL.
                No. 3:22-cr-00132-SRU-1
5

6          I hereby certify that the within and

7    foregoing is a true and accurate transcript taken in

8    the aforementioned matter to the best of my skill and

9    ability.

10

11          /s/_Melissa J. Cianciullo_____

12     MELISSA J. CIANCIULLO, RDR, CRR, CRC
                Official Court Reporter
13            United States District Court
               915 Lafayette Boulevard
14             Bridgeport, CT 06604
                 (203) 606-1794
15

16

17

18

19

20

21

22

23

24

25