**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, REMO MARIA MORONE, DOMINIC MACRI, LARRY WIENER, DEREK WILSON, DANIEL AMELI, and LEE JACOBSON Individually and on Behalf of All Others Similarly Situated, | Civil Action No.  3:23-cv-00082-SRU |
| Plaintiffs, | CLASS ACTION |
| v. | Hon. Stefan R. Underhill |
| DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF DEFENDANT SOICHIRO "MICHAEL" MORO'S**
**MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

LEGAL STANDARD.......................................................................................................... 6

ARGUMENT ...................................................................................................................... 8

    I.     COUNT II FAILS BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT MR. MORO BEARS "SCHEME LIABILITY".................... 8

          A.    Plaintiffs Do Not Adequately Allege That Mr. Moro Committed a Deceptive or Manipulative Act.................................................................. 9

          B.    Plaintiffs Allege No Facts Demonstrating Mr. Moro Acted With Scienter ....................................................................................................... 17

          C.    Plaintiffs Have Not Sufficiently Alleged Reliance, Loss Causation, or Damages ................................................................................................ 21

    II.    COUNTS I AND III FAIL BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL PERSON LIABILITY ......................... 25

          A.    Plaintiffs Fail to Allege a Primary Violation of the Securities Laws ....... 25

          B.    Plaintiffs Fail to Allege Mr. Moro Was a Culpable Participant in any of the Company's Alleged Violations of the Securities Laws ........... 28

    III.    COUNTS IV THROUGH XI FAIL BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE (IN THE ALTERNATIVE) ANY STATE-LAW CLAIMS ................................................................................................. 29

CONCLUSION................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AmBase Corp. v. City Investing Co. Liquidating Tr.*,
  326 F.3d 63 (2d Cir. 2003)............................................................................................7

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................7

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................7

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998).........................................................................................25

*Chill v. GE*,
  101 F.3d 263 (2d Cir. 1996).........................................................................................20

*Collier v. Aksys Ltd.*,
  2005 WL 1949868 (D. Conn. Aug. 15, 2005) ............................................................24

*DeMaria v. Andersen*,
  153 F. Supp. 2d 300 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003) .............25

*Devaney v. Chester*,
  709 F. Supp. 1255 (S.D.N.Y. 1989).............................................................................23

*Dreamco Development Corporation v. Empire State Development Corporation, et al.*,
  197 A.D.3d 847 (NY App. 2021) .................................................................................30

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................................7

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).................................................................................15, 19

*Ellison v. Am. Image Motor Co.*,
  36 F. Supp. 2d 628 (S.D.N.Y. 1999)........................................................................8, 28

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
  12 N.Y.3d 553 (2009) ..................................................................................................29

*Fant v. Perelman*,
  Nos. 97 CIV. 8435 (LAP), 97 CIV. 8436 (LAP), 1999 WL 199078 (S.D.N.Y.
  Apr. 19, 1999) ..............................................................................................................27

*Feiner v. SS&C Techs., Inc.*,
    47 F. Supp. 2d 250 (D. Conn. 1999) ......................................................................26

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) ...............................................................................10, 22, 24

*Forsberg v. Always Consulting, Inc.*,
    No. 06-CV-13488 (CS), 2008 WL 5449003 (S.D.N.Y. Dec. 31, 2008) .................................25

*Gurfein v. Ameritrade, Inc.*,
    411 F. Supp. 2d 416 (S.D.N.Y. 2006) ..........................................................................9

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ..........................................................................17

*In re Australia and New Zealand Banking Group Ltd. Securities Litig.*,
    No. 08 CIV.11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ...........................15

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000) .....................................................................................18

*In re Deutsche Telekom*,
    No. 00 CIV 9475 (SHS), 2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ...............................28

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) ..........................................................................19

*In re Fine Host Corp. Sec. Litig.*,
    25 F. Supp. 2d 61 (D. Conn. 1998) .............................................................................23

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ..........................................................................20

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) .......................11

*In re Marsh & Mclennan Cos., Inc. Sec. Litig*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..........................................................................9

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010) ...................................................................................26

*In re PXRE Grp., Ltd., Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y.) ...........................................................................20, 21

*In re Tower Auto. Secs. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ..........................................................................10

*In re Tronox, Inc. Sec. Litig.*,
    No. 09 CIV. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)................................8

*In re Vivendi*,
    838 F.3d 223 (2d Cir. 2016)...................................................................................21, 22

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................................................7, 14

*Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*,
    919 F. Supp. 2d 321 (S.D.N.Y. 2013)........................................................................19

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...............................................................................18, 19

*Kane v. Wichita Oil Income Fund*,
    No. 90 Civ. 5714 (PKL), 1991 WL 233266 (S.D.N.Y. Oct. 29, 1991) ...............................28

*Krys v. Pigott*,
    749 F.3d 117 (2d Cir. 2014)........................................................................................6

*Laser Mortgage Mgmt., Inc. v. Asset Secur. Corp.*,
    No. 00 Civ. 8100 (WRB), 2001 WL 1029407 (S.D.N.Y. Sept. 6, 2001) .........................27, 28

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir. 1996).........................................................................................15

*Lentell v. Merrill Lynch & Co. Inc.*,
    396 F.3d 161 (2d Cir. 2005).............................................................10, 21, 23, 24

*Levitt v. J.P. Morgan Sec. Inc.*,
    9 F. Supp. 3d 259 (E.D.N.Y. 2014) ..........................................................................25, 26

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*,
    LLC, 797 F.3d 160 (2d Cir. 2015) ..............................................................................7

*Mandala v. NTT Data, Inc.*,
    975 F.3d 202 (2d Cir. 2020)......................................................................................7

*Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purch. Antitrust Litig.)*,
    585 F.3d 677 (2d Cir. 2009)......................................................................................18

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)...............................................................9, 12, 15

*Morse v. Weingarten*,
    777 F. Supp. 312 (S.D.N.Y. 1991) ...........................................................................30

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...........................................................................20, 21

*Ontario Teachers' Pension Plan Board v. Teva Pharm. Ind. Ltd.*,
 432 F. Supp. 3d 131 (D. Conn. 2019)....................................................................25

*P. Stolz Family P'ship, L.P. v. Daum*,
 166 F. Supp. 2d 871 (S.D.N.Y. 2001), *rev'd in part on other grounds by* 355
 F.3d 92 (2d Cir. 2004)..............................................................................................28

*Pinter v. Dahl*,
 486 U.S. 622 (1988)...................................................................................................26

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
 89 F. Supp. 3d 602 (S.D.N.Y. 2015)........................................................................21

*Pross v. Katz*,
 784 F.2d 455 (2d Cir. 1986)........................................................................................8

*Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
 714 F. Supp. 2d 475 (S.D.N.Y. 2010)......................................................................28

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)........................................................................................7

*Russo v. Bruce*,
 777 F. Supp. 2d 505 (S.D.N.Y. 2011)......................................................................19

*Schuler v. NIVS Intellimedia Tech. Grp., Inc.*,
 No. 11 CIV. 2484 (KMW) (FM), 2013 WL 944777 (S.D.N.Y. Mar. 12, 2013)....................26

*SEC v. First Jersey Secs. Inc.*,
 101 F.3d 1450 (2d Cir. 1996).....................................................................................26

*SEC v. Kelly*,
 817 F. Supp. 2d 340 (S.D.N.Y. 2011)...........................................................9, 12, 15

*SEC v. Lee*,
 720 F. Supp. 2d 305 (S.D.N.Y. 2010)......................................................................18

*Shields v. Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994).......................................................................................17

*Stoneridge Inv. P'ers, LLC v. Sci.-Atlanta, Inc.*,
 552 U.S. 148 (2008).............................................................................................21, 22

*Taylor v. Westor Cap. Grp.*,
 943 F. Supp. 2d 397 (S.D.N.Y. 2013).......................................................................10

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)............................................................16, 17

## **Statutes**

15 U.S.C.
   § 77l(a)(1) ........................................................................................................26
   § 78u-4 .............................................................................................................7
   § 78u-4(b)(2)(A) ..............................................................................................17

Securities Act of 1933
   § 5.............................................................................................................1, 25
   § 12(a)(1) ...................................................................................................1, 25
   § 15.......................................................................................................... *passim*

Securities Exchange Act of 1934
   § 10(b)....................................................................................................1, 2, 8
   § 20(a)..............................................................................................1, 25, 27

California Unfair Competition Law ("CUCL")............................................................29

Connecticut Unfair Trade Practices Act ("CUPTA")...................................................1

Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") ...............................29

Illinois Uniform Deceptive Trade Practices Act ("IUDTPA")....................................29

Kansas Consumer Protection Act ("KCPA") .............................................................29

Nevada Deceptive Trade Practices Act ("NDTPA") ..................................................29

New York Uniform Deceptive Trade Practices Act ("NYUDTPA").......................1, 29

Texas Deceptive Trade Practices Act ("TDTPA") .....................................................29

## **Other Authorities**

FED. R. CIV. P.
   9(b)......................................................................................................... *passim*
   12(b)(6)....................................................................................................1, 6

Rule 10b-5.............................................................................................. *passim*

Soichiro "Michael" Moro ("Mr. Moro"), the former Chief Executive Officer ("CEO") of Genesis Global Capital, LLC ("Genesis Global Capital" or the "Company") and Genesis Global Capital Trading, Inc. ("GGT"), by and through his attorneys, hereby respectfully submits this memorandum of law in support of his motion to dismiss, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Plaintiffs' Third Amended Complaint for Violations of the Federal Securities and State Consumer Protection Laws, as well as Common Law Fraud allegations, dated August 12, 2024 (the " Third Amended Complaint" or "TAC") [ECF 171].

## **PRELIMINARY STATEMENT**

Plaintiffs' fourth attempt at bringing actionable claims against Defendants incorporates few additional factual allegations that (if even true) were known to Plaintiffs both when they filed their previous complaints and at oral argument on Defendants' motions to dismiss the Second Amended Complaint. As explained below, Plaintiffs' latest amended complaint lacks merit.

Based entirely on the same set as facts as their Second Amended Complaint, Plaintiffs' Third Amended Complaint retains four of the five claims previously asserted against Mr. Moro: (i) control person liability pursuant to Section 15 of the Securities Act of 1933 ("Securities Act") for the Company's alleged violations of Section 5 and 12(a)(1) of the Securities Act (Count I); (ii) primary "scheme liability" under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder (Count II); (iii) control person liability pursuant to Section 20(a) of the Exchange Act for the Company's alleged violation of Section 10(b) of Exchange Act (Count III); and (iv) primary liability for deceptive and unfair practices in violation of New York Uniform Deceptive Trade Practices Act ("NYUDTPA") (Count VII). Plaintiffs dropped their claim for a violation of the Connecticut Unfair Trade Practices Act ("CUPTA"), but added five new Plaintiffs and seven new claims, including six claims alleging violations of the California, Florida, Illinois, Texas, Kansas, and Nevada state-consumer protection laws, as well as common law fraud — all while failing to include any new factual allegations related to Mr. Moro to support these claims.

The arguments in Digital Currency Group, Inc.'s ("DCG") memorandum of law in support of its motion to dismiss (the "DCG Memorandum") with respect to each of these claims, which Mr. Moro joins and incorporates herein, require dismissal of all claims against him. Mr. Moro respectfully submits this separate memorandum of law to assert additional grounds for dismissal of these claims.

As a preliminary matter, and for the reasons stated in the DCG Memorandum, all of Plaintiffs' securities laws claims fail because they do not allege the essential element of an offer or sale of a security. *See* DCG Memorandum Section I.A. Plaintiffs yet again attempt to redefine what allegedly constituted the "security" underlying their claims — only now pleading that the Lending Agreements they had pointed to in their previous complaints, when combined with each lenders' later decision to lend digital assets to Genesis pursuant to a Lending Agreement, collectively constitute the "securities" underlying their securities law claims. Yet these Lending Agreements, and any subsequent loans pursuant to the them, were never "offered" or "sold," and, separately, cannot reasonably be considered "securities" under the federal securities laws. *See id.* And, given the recoveries provided through the bankruptcy proceedings, Plaintiffs' alleged "damages" are no longer actionable. *See id.*

As to Count II against Mr. Moro, Plaintiffs' only primary liability theory under the federal securities laws against him, Plaintiffs fail to allege sufficiently that Mr. Moro bears "scheme liability" under Section 10(b) of the Exchange Act and Rule 10b-5. Plaintiffs' "scheme liability" theory rests almost exclusively on unsupported, general allegations that Mr. Moro "caused" Genesis Global Capital to disseminate false or misleading information or omissions, including in its financial statements and balance sheets, without any factual assertions showing how Mr. Moro did so or that he committed a deceptive or manipulative act as part of this "scheme" with the requisite scienter. Plaintiffs try to overcome these fatal flaws by claiming Mr. Moro also bears "scheme liability" for two tweets and one retweet on Twitter concerning DCG's assumption of

certain Genesis Global Capital liabilities, but they allege no facts to demonstrate that these tweets were in fact false or that Mr. Moro knew of or was reckless as to their falsity at the time he tweeted or retweeted them. More importantly, Plaintiffs fail to allege any facts to demonstrate than any plaintiff or putative class member ever saw much less actually relied on Mr. Moro tweets and retweet, a failure to plead that eviscerates their "scheme liability" claim.

As to Counts I and III, Plaintiffs offer similarly deficient allegations that Mr. Moro is responsible for the *Company's* alleged violations of the Securities Act and the Exchange Act based on a theory of control person liability. Indeed, Plaintiffs do not allege any facts to show that Mr. Moro was a participant, much less a "culpable participant," in the Company's alleged violations, mirroring their failure to allege Mr. Moro acted with the requisite scienter to be primarily liable under Section 10(b).

As to Counts IV through XI, after dropping the Connecticut consumer protection act claim, Plaintiffs purport to plead new state-law consumer protection claims and common law fraud claims "in the alternative" to their federal securities laws claims, but these claims simply re-package their federal claims and fail for many of the same reasons. Plaintiffs' consumer protection claims fail to demonstrate how their allegations against Mr. Moro have any connection to each of the various states sufficient to allege liability under any of the state-law consumer protection acts. Moreover, many of these consumer protection claims also fail because, as stated in the DCG Memorandum, these claims also impose several other requirements that Plaintiffs fail to meet.

For these reasons and those that follow, Plaintiffs' Third Amended Complaint should be dismissed as to Mr. Moro in its entirety.

## STATEMENT OF FACTS

As described in the Third Amended Complaint, Barry Silbert ("Silbert") formed GGT in 2015 and later formed Genesis Global Capital in 2017. TAC ¶¶ 111–113. Mr. Moro served as the Chief Operating Officer of GGT from its formation until he was later elevated to the role of CEO

in the Spring of 2016. Mr. Moro continued to serve as the CEO of GGT, and later Genesis Global Capital, until August 17, 2022, and departed the Company on August 26, 2022. *Id*. ¶ 77.

Plaintiffs' Third Amended Complaint is as replete with conjecture and conclusory allegations against Genesis Global Capital, DCG, and other individual defendants as their Second Amended Complaint, while now attempting to reframe Plaintiffs' alleged "damages" to avoid the fact that through Genesis's Chapter 11 bankruptcy reorganization plan, Gemini Earn users received 100% of their digital assets that were frozen by Genesis in November 2022, in-kind (with an appreciation value of 237% of the original loans) and the remaining Genesis creditors have begun receiving initial rounds of distributions pursuant to the same plan — which represent well over 100% of the dollar value of their original loan amounts.[1]

Despite adding over forty pages to their complaint, specific factual allegations relating to Mr. Moro remain sparse: these comprise of two public-facing tweets (and one retweet) regarding actions taken by Genesis to address its financial condition following the default of one of its lending partners, and a handful of non-public, out-of-context communications, involving Mr. Moro and other Genesis or DCG employees over the course of three weeks. Relevant to their claims against Mr. Moro, Plaintiffs allege that on June 13, 2022, Three Arrows Capital Ltd. ("3AC") — one of Genesis Global Capital's lending counterparties — defaulted on loans with Genesis Asia Pacific worth billions of dollars and, as a result, the Genesis Global Capital lending business generally incurred a loss of approximately $1 billion. *Id.* ¶ 297. As Plaintiffs further alleged, on June 27, 2022, 3AC was required to liquidate its assets by a British Virgin Islands court following default on several of its liabilities, and subsequently sought Chapter 15 bankruptcy protection in U.S. Bankruptcy Court on July 1, 2022. *Id.* ¶ 343. Post-liquidation, 3AC's outstanding obligation to the Company was $1.1 billion. *Id.* ¶ 344.

---

[1] See DCG Memorandum "Statement of Facts" for a more fulsome discussion of Genesis's business model and lending programs more-broadly, as well as a more detailed discussion on the impacts of the Genesis Bankruptcy Proceedings on this action.

As alleged by Plaintiffs, in the weeks between 3AC's default on its loans with Genesis and the commencement of 3AC's liquidation proceedings, "DCG employees and executives . . . met with Genesis [Global] Capital's leadership daily, often multiple times a day" where they discussed "how to communicate with counterparties about Three Arrows, and how to bolster the Genesis Entities' financial condition in the wake of these losses." *Id.* ¶ 306. On June 13, 2022, the Genesis Global Capital Twitter account tweeted, and Mr. Moro re-tweeted, the first of the three tweets on which Plaintiffs base their case against Mr. Moro. Genesis Global Capital wrote in its tweet: "[d]espite elevated market volatility, all business operations continue to function normally at Genesis. We have strong risk management practices and frameworks and remain committed to supporting our clients through all market conditions." *Id.* ¶ 312. Subsequently, on June 17, 2022, Mr. Moro sent the second of the three tweets at issue which stated:

> Genesis can confirm that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week. No client funds are impacted. We sold and/or hedged all of the liquid collateral on hand to minimize any downside . . . We will actively pursue recovery on any potential residual loss through all means available, however our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.

TAC ¶ 323. As discussed further below, *infra* Section I.A.3, Plaintiffs incorrectly allege that these tweets were false and misleading, and include no allegations to support an inference that Mr. Moro acted with the requisite scienter to defraud when he sent or re-tweeted them.

On June 30, 2022, Genesis Global Capital sold 3AC's debt to DCG in exchange for a $1.1 billion promissory note (the "DCG Promissory Note") due in 10 years at an interest rate of 1%. *Id.* ¶ 356. On July 6, 2022, following execution of the DCG Promissory Note, Mr. Moro tweeted that "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure we have capital to operate and scale our business for the long-term." TAC ¶ 371. Plaintiffs again incorrectly allege that this statement was false and misleading and fail to allege that Mr. Moro acted with the requisite scienter to defraud when he sent the tweet, *see infra* Section I.A.3, and allege no facts to show that

any plaintiff or putative class member ever saw much less relied on any of Mr. Moro's tweets. Given these tweets are the only alleged public "misstatements" that Plaintiffs attribute to Mr. Moro with any specificity, Plaintiffs' allegations are insufficient to support claims for "scheme liability" under the federal securities laws, state-law consumer protection statutes, and common law fraud.

The remainder of Plaintiffs' allegations against Mr. Moro are pled without any specificity, and include nothing more than general allegations that Mr. Moro: (i) "caused" the Company to disseminate misleading and false financial statements to consumers, (ii) "engaged" in transactions designed to benefit the DCG conglomerate, rather than Genesis Global Capital or Plaintiffs and class members, and (iii) "caused" the Company to lend almost 30% of Genesis Global Capital's total loan book to 3AC in order to maximize DCG's profit. *See, e.g.*, TAC ¶ 483. Plaintiffs, however, fail to identify which supposedly false and misleading financial statements Mr. Moro is alleged to have caused the Company to disseminate, when and to whom those statements were sent and by whom, and whether and how Mr. Moro was involved in the alleged dissemination; nor do they allege that Mr. Moro himself *ever* spoke directly to any Genesis lender, or even to Gemini, following the 3AC liquidation. That Plaintiffs are unable to support any allegations of wrongdoing against Mr. Moro is easy to understand when viewed in light of one simple fact: Plaintiffs' "loss" allegedly became revealed from Genesis Global Capital's decision to stop honoring redemption requests on November 16, 2022 following the collapse of the second largest cryptocurrency exchange, FTX, earlier that month — a decision that occurred *three months after* Mr. Moro left the Company. Furthermore, in the nearly two years since their alleged "loss" occurred, Plaintiffs have recovered significantly more in value than what they originally lent to Genesis — rendering all of their claims moot.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court reviews the complaint and accepts as true "only its factual allegations, and the reasonable inferences that can be drawn therefrom." *Krys v.*

*Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). The Court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *AmBase Corp. v. City Investing Co. Liquidating Tr.*, 326 F.3d 63, 72 (2d Cir. 2003). The Court should dismiss the complaint if the plaintiff has not stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "But while this plausibility pleading standard is forgiving, it is not toothless." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020). Thus, it "does not require [the Court] to credit legal conclusions couched as . . . factual allegations or naked assertions devoid of further factual enhancement." *Id.*

Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)") and the Private Securities Litigation Reform Act ("PSLRA") impose heightened pleading standards in securities fraud actions that require plaintiffs to state with particularity the circumstances constituting fraud. 15 U.S.C. § 78u-4. "The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). Thus, allegations of fraud must "inform each defendant of the nature of [his or her] alleged participation in" each fraud alleged. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 172 (2d Cir. 2015). Similarly, the PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 347 (S.D.N.Y. 2011) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

## ARGUMENT

I.  **COUNT II FAILS BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE THAT MR. MORO BEARS "SCHEME LIABILITY"**

Count II asserts that Mr. Moro bears "scheme liability" under Section 10(b) of the Exchange Act and Rule 10b-5 based solely on two tweets and one retweet by Mr. Moro relating to Genesis Global Capital TAC ¶ 587 (f) ("Genesis Global Capital and Defendants engaged in the fraudulent and deceitful acts or practices alleged in Section XII that are distinct from the alleged material omissions . . . including the following : . . . (f) Defendant Moro publicly announced on Twitter…"). As a preliminary matter, in paragraphs 578-580, 583, 587(c)-(e) of the Third Amended Complaint, Plaintiffs seek to impose primary Section 10(b) liability on Mr. Moro through factually unsupported claims that he (and other defendants) "caused" Genesis Global Capital to engage in conduct that might arguably violate Section 10(b) of the Exchange Act.  TAC ¶¶ 578-580, 583, 587(c)-(e). Putting aside that this kind of group pleading fails to satisfy Rule 9(b), *see, e.g.*, *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999), these allegations should be rejected because they are an attempt to establish primary liability "by virtue of a corporate title" that is insufficient to survive a motion to dismiss.  *In re Tronox, Inc. Sec. Litig.*, No. 09 CIV. 6220 (SAS), 2010 WL 2835545, at *10 (S.D.N.Y. June 28, 2010). Mr. Moro joins DCG's arguments regarding scheme liability in Section II.C of its Memorandum and offers the following additional, independently-dispositive reasons that Plaintiffs' "scheme liability" claim against Mr. Moro fails as a matter of law.[2]

---

[2] Plaintiffs' "scheme liability" claim also fails against all Defendants, including Mr. Moro, because Mr. Moro and the other defendants are not "integral to the purchase and sale of the [alleged] securities in question." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986). As described in Section II.A., *infra*, and in the DCG Memorandum incorporated by reference herein, all of Plaintiffs' federal securities law claims also fail because Plaintiffs have not adequately alleged the sale or offer of a security within the meaning of federal law.  *See* DCG Memorandum, Section I.

A.    **Plaintiffs Do Not Adequately Allege That Mr. Moro Committed a Deceptive or Manipulative Act**

To state a claim for primary scheme liability under Section 10(b), Plaintiffs must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi*, 277 F. Supp. 3d at 517. Plaintiffs "must specify what manipulative acts were performed . . . , when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Gurfein v. Ameritrade, Inc.*, 411 F. Supp. 2d 416, 425 (S.D.N.Y. 2006). Because the claim is based on an alleged scheme to defraud, the heightened pleading standards of Rule 9(b) and the PSLRA apply, *supra* at 7, and Plaintiffs must identify a "deceptive act" that is distinct from any alleged misrepresentations. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) (dismissing scheme liability claim because plaintiffs did not identify any deceptive act apart from the alleged misrepresentation); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (same). Plaintiffs' allegations fail to meet this standard as to Mr. Moro.

1.    **Financial Statements and Balance Sheets [TAC ¶ 587 (c), (e)]**

Plaintiffs first generically allege that "Defendants Moro and Murphy, and Ballensweig *caused* Genesis Global Capital . . . to disseminate misleading and false financial statements to prospective investors either directly or through Gemini as their designated agent." TAC ¶ 587(c) (emphasis added); *see also Id*. ¶ 587(e) (alleging that Mr. Moro "caused" Genesis and Defendant Ballensweig "to disseminate its balance sheet and other documents containing misrepresentations…"). Conclusory allegations that Mr. Moro "made, or allowed to be made, false or misleading statements despite [his] awareness or reckless disregard of the misconduct" are "insufficient to state a claim for *scheme* liability." *In re Marsh & Mclennan Cos., Inc. Sec. Litig*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (emphasis added). And as the Second Circuit has held, "where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have

not made out a . . . claim under Rule 10b-5(a) and (c)." *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 177 (2d Cir. 2005).

Plaintiffs also fail to meet the heightened pleading standard under the PSLRA and Rule 9(b) as to the financial statements and balance sheets allegations. *First*, despite adding forty pages to their complaint, Plaintiffs still fail to identify which allegedly false or misleading financial statements or balance sheets Mr. Moro is alleged to have "caused" the Company or Ballensweig to disseminate, and when or how they were disseminated, and they still cannot offer any factual allegations demonstrating when or by what method Mr. Moro supposedly caused such dissemination. *Second*, while Plaintiffs once again allege that certain Genesis Global Capital employees provided documents and information to Gemini in July 2022, Plaintiffs still fail to include a single specific factual allegation that Mr. Moro disseminated documents to Gemini, Plaintiffs, or any class member himself, directed or otherwise compelled a Genesis Global Capital employee to disseminate any documents to Gemini, Plaintiffs, or any class member, or had any hand in preparing, reviewing, or approving documents before they were disseminated to Gemini, Plaintiffs, or any class member. As a result, Mr. Moro and the Court are still left to guess at which financial statements or balance sheets form the basis of Plaintiffs' allegations, which Plaintiffs or other class members (if any) they were sent to, when they were sent, the substance of the alleged misrepresentation(s) in those materials, and how Mr. Moro is in any way connected to these supposed misrepresentations. This failure to comport with Rule 9(b) is fatal. *Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 403–04 (S.D.N.Y. 2013) (dismissing 10b-5(c) claim where complaint "contains virtually no details about this alleged scheme: it is impossible to tell what . . . acts were performed, who performed them, when they were performed, what securities were involved, and what effect this scheme had on the market for those securities"); *In re Tower Auto. Secs. Litig.*, 483 F. Supp. 2d 327, 349–50 (S.D.N.Y. 2007) (dismissing 10b-5(a) and (c) claim for failure to comply with Rule 9(b)).

### 2. Lending Agreement Solvency Representation [TAC ¶¶ 299-304, 579, 581-586, 587(d)]

In the paragraph in which Plaintiffs lay out the allegedly fraudulent and deceitful acts or practices made by each Defendant that support their scheme liability claim, *see generally* TAC ¶ 587, Plaintiffs remove the allegation specific to Mr. Moro that they had included in their prior complaint related to solvency representations. *See* ECF No. 135 ¶ 505 (d) ("Defendants Moro and Islim caused Genesis Global Capital to represent in connection with every sale of Genesis Yield securities it executed from July 1, 2022 on with Plaintiffs and members of the Class that it was in fact solvent, when it was not."). Instead, despite only referencing the Solvency Warranties contained within the Lending Agreements in passing in their previous complaints, Plaintiffs now heavily rely on these Solvency Warranties in an effort to argue that, following the 3AC default on June 13, 2022, Genesis Global Capital was insolvent, and Defendants engaged in a scheme that caused Genesis Global Capital to "knowingly and intentionally, or at least recklessly," fail to disclose this alleged insolvency to investors. *See e.g.*, TAC ¶¶ 299-304, 579, 582-86.

While Plaintiffs' still allege that, "Defendant Moro and Islim *caused* Genesis Global Capital to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a 'current asset and/or receivable[,]'" TAC ¶ 587(d), despite what Plaintiffs' assert, this charge is not distinct from the alleged material omissions that arises out of the representation contained in the lending agreements between Genesis Global Capital and lenders which states: "[Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws." *Id.* ¶ 470. As addressed in Mr. Moro's previous motion to dismiss the Second Amended Complaint, this lending agreement statement cannot support a finding of scheme liability as to Mr. Moro for the simple fact that Plaintiffs do not, and cannot, allege that these representations were false *at the time they were made. See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577 (S.D.N.Y. 2014), *aff'd*, 604 F.

App'x 62 (2d Cir. 2015). Furthermore, Plaintiffs executed their lending agreements long before Plaintiffs (wrongly) allege Genesis Global Capital became insolvent in June 2022, *see* ECF Nos. 38-2, 38-3, 38-5, 34-2, 171 at 182-183, TAC ¶¶ 71–74, and while Plaintiffs allege that one plaintiff, Translunar, lent Genesis additional digital assets in September 2022, *after Mr. Moro left the Company*, *see* TAC ¶¶ 67, 77, they still have not alleged that any other lender or putative class member executed a lending agreement following 3AC's bankruptcy or DCG's assumption of Genesis Global Capital's liabilities related to 3AC.

Moreover, Plaintiffs latest allegations contradict the notion that Mr. Moro or any other Defendant believed, or had reason to believe, that Genesis Global Capital was insolvent at the time of 3AC's default. Plaintiffs cherry-picked two chats out of a total of 366 messages from a June 15, 2022 Teams chat involving dozens of individuals from both DCG and Genesis to misleadingly assert that Mr. Moro and Mr. Ballensweig were concerned about "leaking Genesis's *overall financial health*" when, in fact, the chat messages makes clear they were discussing "leakage of [Genesis] *overall net position*" as to the 3AC loan. TAC ¶ 317 (emphasis added).

### 3.    Mr. Moro's July 6, 2022 Tweet [Am. Compl. ¶ 587 (f)]

The final basis Plaintiffs explicitly assert for their "scheme liability" claim against Mr. Moro is Plaintiffs' blanket allegation that he "publicly announced on Twitter that DCG had assumed certain liability to ensure that Genesis [Global Capital] had the capital to operate, when it had not, tweets that were edited, reviewed and draft (sic) by DCG employees and Defendant Silbert." TAC ¶ 587(f). Like Plaintiffs' claim of alleged misrepresentations in the financial statements and balance sheets addressed above, Mr. Moro's tweets (either individually or collectively) are not a "'deceptive act' that is distinct from any alleged misrepresentations,'" and therefore cannot support a claim for "scheme liability." *Menaldi*, 164 F. Supp. 3d at 586; *Kelly*, 817 F. Supp. 2d at 344. As explained below, even if Mr. Moro's tweets could support a scheme liability claim, Plaintiffs latest complaint still fails to offer factual allegations demonstrating that

his tweets were false or misleading, or that any plaintiff or putative class member ever saw much less relied on them.

### a. Mr. Moro's July 6, 2022 Tweet

Mr. Moro's July 6, 2022 tweet states that "DCG has assumed certain liabilities of Genesis [Global Capital] related to [3AC]. . . ." TAC ¶ 371. While Plaintiffs continue to quibble with the means by which DCG accomplished this assumption of the 3AC debt, namely attacking the terms and mechanism of the DCG Promissory Note, their Third Amended Complaint continues to demonstrate that Genesis Global Capital did in fact exchange a potentially *uncollectable* $1.1 billion receivable from 3AC for a *collectable* $1.1 billion receivable from DCG. *Id.*¶ 374 (admitting that "DCG entered into a 10-year promissory note with Genesis Global Capital at an interest rate of 1%--due in 2032").

Plaintiffs' concerns about Mr. Moro's July 6 tweet still result from their conflating what Mr. Moro actually stated in the second half of the tweet — that DCG assumed the Company's 3AC liabilities "to ensure we [the Company] have the ***capital*** to operate and scale our business for the long-term" — with Plaintiffs' belief that the DCG Promissory Note "did nothing to improve Genesis Global Capital's immediate ***liquidity*** position." *Id.* (emphasis added). Since Mr. Moro's tweet said nothing about the effect of the DCG Promissory Note on Genesis Global Capital's "liquidity," that is not grounds to find that the tweet was false or misleading. While Plaintiffs take issue with the way Genesis Global Capital accounted for the DCG Promissory Note on its books, they admit that, without the DCG Promissory Note, the Company would have had to "declare itself insolvent" as a result of the 3AC liquidation. *Id.* ¶ 354. Instead, due to the support of DCG, the Company was able to report positive equity on its balance sheet, *id.* ¶ 398 ("the balance sheet showed 'Total member's equity' of just $92.5 million"), meaning it had the *capital* to continue operations rather than declaring itself insolvent, exactly as Mr. Moro stated in his tweet. *Id.* ¶ 371.

In fact, Plaintiffs' continued attempts to conflate capital and liquidity in order to allege Mr. Moro's tweet was false or misleading is once again directly countered by allegations carried over from the Second Amended Complaint that show Mr. Moro took seriously at the time he made the tweet the distinction between equity and capital on the one hand, and liquidity on the other, and understood that the Company would have to work to address both issues. Prior to sending the July 6 tweet, Mr. Moro emailed DCG and Genesis Capital executives on June 27, 2022 "explaining the need to show a 'well-*capitalized*' balance sheet to counterparties," saying "once the *equity* problem is solved, the *liquidity* problem is much easier to solve." *Id.* ¶ 339 (emphasis added). Again on June 28, 2022, Mr. Moro wrote that "[w]hile *liquidity* [was] still [Genesis Global Capital's] number one focus, [they] only ha[d] a couple of days until quarter-end" and, as a result, proposed a plan "of injecting certain assets to 'plug the *equity* hole.'" *Id.* ¶ 340 (emphasis added). As Mr. Moro explained, addressing equity and capital in the near-term would strengthen the balance sheet, allowing Genesis Global Capital to "be able to source additional unsecured funding to be able to continue to manage [its] *liquidity* and withdrawal obligations." *Id.*

Even if Mr. Moro's tweet was deemed to be false or misleading, which it is not, Plaintiffs continue to assert no facts to show whether and how Mr. Moro was aware of or reckless as to its alleged falsity. As described above, Mr. Moro clearly understood statements about Genesis Global Capital's capital situation did not suggest anything about its liquidity situation. And, Plaintiffs allege that the tweets were "edited, reviewed and draft[ed] by DCG employees and Defendant Silbert," *id*. ¶ 587(f), providing additional confidence to Mr. Moro that the information was true and accurate. Moreover, Plaintiffs assert no facts to show that any plaintiff or putative class member ever saw much less relied on the tweet.

> **b.    Mr. Moro's June 13 and June 17, 2022 Tweet and Re-Tweet**

While not explicitly cited by Plaintiffs as a basis for their scheme liability claim, Mr. Moro's earlier tweets are also insufficient to support a finding of scheme liability for the same

reasons as his July 6, 2022 tweet. These tweets — which are themselves alleged by Plaintiffs to be misrepresentations — are not "'deceptive act[s]' that [are] distinct from any alleged misrepresentations,'" and therefore cannot support a claim for "scheme liability." *Menaldi*, 164 F. Supp. 3d at 586; *Kelly*, 817 F. Supp. 2d at 344. Plaintiffs allegations that these tweets were false or misleading are also meritless for the following reasons.

Demonstrating the fallacy of any reliance on Mr. Moro's retweet of a June 13, 2022 tweet by Genesis, Plaintiffs continue to quote almost entirely from the original version of the complaint filed by the New York Attorney General on October 19, 2023 (the "NYAG Complaint"),[3] and claim this tweet and retweet "falsely represented that Genesis has 'strong risk management practices and frameworks.'" TAC ¶ 312. As an initial matter, the Second Circuit has held that statements by a defendant "regarding its highly disciplined risk management and its standard-setting reputation for integrity . . . are no more than puffery which does not give rise to securities violations." *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (internal quotations omitted). Statements such as these "are too general to cause a reasonable investor to rely upon them," and are "merely generalizations regarding [defendants'] business practices" which are "precisely the type of puffery that this and other circuits have consistently held to be inactionable." *Id.* at 206. *See also Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (finding statements that "business strategies [would] lead to continued prosperity" were inactionable puffery); *In re Australia and New Zealand Banking Group Ltd. Securities Litig.*, No. 08 CIV.11278 (DLC), 2009 WL 4823923, *11 (S.D.N.Y. Dec. 14, 2009) ("general statements about [defendant's] risk management practices and controls—constitute 'puffery.'"). Further, even if such a tweet was actionable, Plaintiffs still offer

---

[3] The NYAG Complaint was subsequently amended on February 9, 2024. Despite the NYAG amending their complaint six months prior to the filing of the TAC, Plaintiffs still almost exclusively cite the original NYAG Complaint filed prior to the filing of their Second Amended Complaint — demonstrating that Plaintiffs' claims in the TAC are based on entirely the same set of facts as their previous complaints.

no specific factual allegations to suggest that Genesis Global Capital's risk management processes were insufficient, much less that Mr. Moro knew that the practices were insufficient, at the time he shared Genesis' tweet. *See, e.g.*, *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 231–232 (S.D.N.Y. 2020) (dismissing claim where complaint is "devoid of particularized allegations demonstrating the falsity of the challenged statements" and "does not set forth specific, contradictory information of which Defendants were aware.").

Plaintiffs maintain their baseless new allegations by repeating their prior allegation that investors relied on a June 17, 2022 tweet by Mr. Moro that Plaintiffs claim was false and misleading in several ways — again quoting almost verbatim from the allegations in the NYAG Complaint, without adding any new specific factual allegations to bolster this claim of reliance. Instead, they once again assert that some unspecified internal documents at Gemini "indicate" that some unspecified Earn Investors may have been reassured by unspecified public communications made by some Defendants on behalf of Genesis, not specifically Mr. Moro's June 17 tweet. TAC ¶¶ 322–323, 328–333. As discussed throughout, Plaintiffs do not allege any facts to show that any plaintiff or putative class member ever saw much less relied on Mr. Moro's tweets in making any investment decisions, which is no surprise given the timing and source of these newfound allegations. *See infra* Section I.C. Nevertheless, the June 17, 2022 tweet is inactionable for the separate and distinct reason that Plaintiffs do not allege facts that in any way demonstrate the tweet was, in fact, false or misleading.

Plaintiffs once again challenge the portion of Mr. Moro's tweet that stated "[n]o client funds are impacted." TAC ¶¶ 329. While Plaintiffs continue to point to the *liquidity* issues that resulted from the 3AC default to attempt to discredit the tweet, the context of Mr. Moro's tweet made clear that it was discussing steps Genesis Global Capital took, and would take, to "carefully and thoughtfully mitigate [its] losses with a large counterparty who failed to meet a margin call . . ." *Id.* ¶323.  Plaintiffs allege no new facts to suggest that Genesis Global Capital used, or intended

to use, client funds to mitigate those losses. Instead, Genesis Global Capital "sold and or hedged all of the liquid *collateral* on hand to minimize any downside," as Mr. Moro explained in the tweet and, later, DCG assumed the liability that resulted from the 3AC default. *Id.* (emphasis added).

With no new facts to support their claim, Plaintiffs simply repeat their arguments that the tweet was false or misleading because it "conceal[ed] that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral" and that Genesis Global Capital "had not 'shed the risk and moved on.'" TAC ¶¶ 331–32. To the contrary, the tweet expressly stated that Genesis Global Capital sold *liquid* collateral to "mitigate" and "minimize," not "eliminate," any downside or losses, and that Genesis Global Capital "will actively pursue recovery on any potential residual loss though all means available." *Id.* ¶ 323. As a result, anyone who read Mr. Moro's June 17, 2022 tweet would be on notice both that Genesis Global Capital was actively addressing the issues arising out of the 3AC default and that the potential for additional losses remained. That those losses ultimately materialized when 3AC was forced into liquidation on June 27, 2022 does not make Mr. Moro's tweet false or misleading when it was made on June 17, 2022.

Accordingly, because Plaintiffs fail to allege that Mr. Moro committed a deceptive or manipulative act, much less one independent of any supposed misrepresentations, their claim for scheme liability under Section 10(b) and Rule 10b-5 must be dismissed.

### B.    Plaintiffs Allege No Facts Demonstrating Mr. Moro Acted With Scienter

Plaintiffs' scheme liability claim fails for the additional, independent reason that they fail to plead any facts demonstrating that Mr. Moro engaged in any activity with the requisite scienter. To state a claim for scheme liability, Plaintiffs must plead particularized facts establishing a strong inference of scienter. *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005); PSLRA, 15 U.S.C. § 78u-4(b)(2)(A). *See also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (holding to properly plead scienter for a securities fraud claim under Rule 9(b), plaintiff must allege "facts that give rise to a strong inference of fraudulent intent").

Moreover, in a case involving "multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter (when required) for each defendant; guilt by association is impermissible." *SEC v. Lee*, 720 F. Supp. 2d 305, 321 (S.D.N.Y. 2010) (citing *Meijer, Inc. v. Ferring B.V. (In re DDAVP Direct Purch. Antitrust Litig.)*, 585 F.3d 677, 695 (2d Cir. 2009)). A "strong inference" of scienter can be established from: (i) allegations that the defendant had a "motive and opportunity" to commit fraud; or (ii) allegations that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). The Amended Complaint is devoid of any allegation that Mr. Moro acted with the requisite scienter.

### 1.    Motive and Opportunity

Plaintiffs' only allegations that remotely touch on anyone's motive say nothing as to Mr. Moro — they make conclusory assertions that the alleged scheme allowed an unrelated subsidiary to allegedly maximize management fees, TAC ¶¶ 37–38, and that "[r]ecognition of the impairment,[4] however, would have meant Genesis Global Capital recognizing its own insolvency, which would have terminated all Genesis Yield Investment Agreements and entitled investors such as members of the Class to the return of their digital assets. It also would have meant the end of Genesis Global Capital's business and DCG's source of capital." *Id.* ¶ 40. Plaintiffs do not allege anything about Mr. Moro's compensation, and thus fail to "assert a concrete and personal benefit [to Mr. Moro] . . . resulting from the [alleged] fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Indeed, while Plaintiffs' Third Amended Complaint continues to allege that "the Exchange Act Defendants orchestrated the sham DCG Promissory Note transaction and used it as an excuse to continue to claim Genesis Global Capital was solvent while they extracted their own capital," *id.* ¶ 352, Mr. Moro is not among the individuals in the tables Plaintiffs allege "show that other

---

[4] The alleged impairment cited by Plaintiffs refers to the $1.1 billion of uncollateralized loans originally owed to Genesis by 3AC, which Plaintiffs make the conclusory assertion without any proof that following 3AC declaring bankruptcy on June 27, 2022, no portion of that debt could be recoverable through the 3AC bankruptcy proceedings.

Defendant DCG, Genesis Global Capital and GTT insiders extracted millions out of Genesis." *See* TAC ¶¶ 349–350. In fact, while the Third Amended Complaint still includes no factual allegations demonstrating any specific benefit to Mr. Moro resulting from this purported "scheme," it does allege that multiple of the proposed plans to further this alleged "scheme" to conceal Genesis Global Capital's alleged insolvency would have *negatively impacted Mr. Moro*. These include the proposed options of "[j]ettison the Genesis Capital business" and "firing Moro [replacing him as CEO] with Silbert, " *id.* ¶ 315, both of which have the obvious negative consequence of Mr. Moro being unemployed.

At most, Plaintiffs allege that Mr. Moro acted with a motive to keep Genesis Global Capital afloat. *Id.* ¶ 40. Such a motive is insufficient as "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to . . . increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Russo v. Bruce*, 777 F. Supp. 2d 505, 519–20 (S.D.N.Y. 2011) ("[t]he theory that defendants engaged in fraud to protect the very survival of the company is far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit."); *Russo v. Bruce*, 777 F. Supp. 2d 505, 519–20 (S.D.N.Y. 2011); *see also In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 216 (S.D.N.Y. 2008) ("[A]ny corporation would be motivated to make a profit [or] to avoid bankruptcy."); *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 333 (S.D.N.Y. 2013) ("a general desire to maintain a profitable business relationship will not, by itself, support a motive to defraud").

### 2.    Conscious Misbehavior or Recklessness

To the extent Plaintiffs hope to remedy their failure to plead motive and opportunity by alleging circumstances indicating that Mr. Moro engaged in conscious misbehavior or was reckless, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*,

264 F.3d at 142 (citation omitted). There is a "significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill v. GE*, 101 F.3d 263, 270 (2d Cir. 1996). Recklessness "cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). It is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.) (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *see also Chill*, 101 F.3d at 269 (same). Here again, Plaintiffs fall far short of satisfying the demanding standard for pleading scienter.

Plaintiffs' factual allegations in support of Claim II against Mr. Moro boil down to (i) Mr. Moro's June and July 2022 tweets, (ii) certain unidentified financial documents disseminated to Gemini that supposedly were false and misleading, and (iii) in the wake of the 3AC default Mr. Moro knowingly or recklessly disregarded Genesis' alleged insolvency and caused the company to misrepresent its financial condition. As discussed above, Mr. Moro's tweets were factually accurate according to other allegations in Plaintiffs' Third Amended Complaint, including because DCG *did* assume the 3AC liability by providing the Company a promissory note and, as a result, Genesis Global Capital *did* continue to maintain positive equity on its balance sheet, meaning it had sufficient capital to continue to operate. *See supra* Section I.A.3.

But even assuming, as Plaintiffs allege, the Company should have accounted for the DCG Promissory Note in a different manner under GAAP, Plaintiffs do not allege any facts that demonstrate *Mr. Moro* played any role in determining the proper accounting treatment before issuing his tweet or allegedly causing the financial statements at issue to be disseminated. And despite this being their fourth attempt at bringing these claims, they still have not alleged that Mr. Moro has any relevant background, training, or experience with GAAP accounting sufficient for him to doubt those who did make the accounting determinations — much less that he was "highly

unreasonable" in relying on them. *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 535. Further, it is well-settled in the Second Circuit that "GAAP violations, accounting irregularities, and the issuance of a restatement, 'standing alone, are insufficient to state a securities fraud claim.'" *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (citing *Novak*, 216 F.3d at 309). And Plaintiffs' own allegations make clear that that the documents and communications allegedly disseminated by the Company's employees to Gemini in July 2022 made it readily apparent that the $1.1 billion DCG Promissory Note had been included, whether correctly or incorrectly, as a "receivable from related parties" under "Current Asset," TAC ¶¶ 397, a fact that eviscerates Plaintiffs' conclusory allegation that Mr. Moro and other defendants engaged in a fraudulent scheme to hide this fact.

Because Plaintiffs fail to allege facts to support the strong inference of scienter necessary to maintain their "scheme liability" claim against Mr. Moro, Plaintiffs' Section 10(b) and Rule 10b-5 claim should be dismissed.

### C.    Plaintiffs Have Not Sufficiently Alleged Reliance, Loss Causation, or Damages

To plead reliance adequately, Plaintiffs must allege facts showing that they knew of the alleged misstatement or deceptive act, and engaged in the transaction based on that specific statement or act. *See In re Vivendi*, 838 F.3d 223, 256–57 (2d Cir. 2016); *Stoneridge Inv. P'ers, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148 (2008). Further, to proceed with a claim under the Exchange Act, a plaintiff must adequately allege a "causal link between the alleged misconduct and the economic harm ultimately suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). The DCG Memorandum provides a detailed explanation of Plaintiffs' failures to plead reliance, loss causation, and damages for both Genesis' alleged misrepresentations and the Defendants' allegedly deceptive acts. DCG Memorandum at Sections II.A.2 – II.A.4. Mr. Moro in particular emphasizes the DCG Memorandum Section II.A.2 regarding Plaintiffs' complete failure to plead reliance on the Lending Agreements both directly and by "material omission." *See* DCG

Memorandum II.A.2a, II.A.2b. To the extent any additional arguments apply to Mr. Moro's allegedly deceptive acts, they are incorporated herein as well. This memorandum focuses on three additional arguments specific to Mr. Moro.

*First*, Plaintiffs do not include any factual allegations to demonstrate that any plaintiff or putative class member ever saw much less relied on any of Mr. Moro's tweets or retweets. Indeed, Plaintiffs' Third Amended Complaint and pleading history lays bare that none of the named Plaintiffs ever saw Mr. Moro's tweets, as their constant amendments to their complaint reveals their knowledge of the tweets at issue came from two sources: (i) documents filed by parties involved in the NYAG Action, *see generally* TAC ¶¶ 312–334 (citing primarily the NYAG Complaint and a handful of other documents filed within the NYAG Action for all allegations regarding the June 13 and 17, 2022 tweets which were not mentioned in the first two versions of Plaintiffs' complaint), 372–373 (citing the NYAG Complaint and the NYAG Amended Complaint for allegations regarding the July 6, 2022 tweet not included in the first two versions of Plaintiffs' complaint), and (ii) Gemini. TAC ¶ 374 ("*According to Gemini*, this [July 6, 2022 tweet] was false and misleading." (emphasis added)). As a result, Plaintiffs have failed to plead any facts demonstrating that any Plaintiff knew of or made any decision based on any of the alleged misstatements or deceptive acts attributed to Mr. Moro in the TAC. *See In re Vivendi*, 838 F.3d at 256–57; *Stoneridge Inv. P'ers, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148 (2008).

*Second*, Plaintiffs Third Amended Complaint is devoid of any allegation that any of the Genesis' financial statements allegedly disseminated by Genesis employees that allegedly contained misstatements were actually disseminated to Plaintiffs or any other potential class members. As discussed in the DCG Memorandum, Plaintiffs' theories of reliance are a hodgepodge of theories primarily based on the Solvency Warranties within the Lending Agreements. DCG Memorandum II.A.2. In particular, despite failing to plead this in any of their previous three attempts to plead actual reliance, Plaintiffs now plead for the first time that Plaintiff

Translunar, through some unspecified person on some unspecified date (which very well could have been after Mr. Moro was no longer at Genesis), "reviewed and relied upon the representations and warranties by Genesis" concerning Genesis' solvency, when determining whether Translunar would enter into and remain in a lending relationship with Genesis. *Id.* (citing TAC ¶¶ 67, 462–63). Despite this eleventh-hour addition to their Third Amended Complaint, the lack of particularity regarding who on the behalf of a business plaintiff actually read and relied on these warranties, further warrants the rejection of Translunar's reliance claim. DCG Memorandum II.A.2 (quoting *Devaney v. Chester*, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989)).

Undoubtedly because Plaintiff knew the allegations in the Third Amended Complaint are based on unsubstantiated theories lacking well pled particularized facts, Plaintiffs once again try unsuccessfully to establish reliance indirectly by claiming misrepresentations were made to Gemini, which allegedly was acting as the "agent" of the Gemini Earn Plaintiffs, despite the fact Gemini did not make investment decisions on Plaintiffs' behalf. DCG Memorandum II.A.2 (citing *In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998) (agency theory of reliance applies only where plaintiffs "allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants."). In that same vein, Plaintiffs do not include any factual allegations demonstrating that any of the named Plaintiffs (much less any other potential class member) ever saw — much less relied on — Mr. Moro's June 13 retweet or his June 17 and July 6, 2022 tweets.

*Third*, loss causation is established only where, "the relationship between the plaintiffs' investment loss and the information misstated or concealed by the defendant . . . is sufficiently direct." *Lentell*, 396 F.3d at 174. Given their recovery through the Genesis Bankruptcy proceedings, Plaintiffs have once again changed their theory on loss causation. As explained in the DCG Memorandum, "Plaintiffs advance a materialization of the risk theory, under which a misrepresentation or omission is the proximate cause of an investment loss if the risk that caused

such loss was 'within the zone of risk concealed by the misrepresentations." DCG Memorandum Section II.A.3 (citing *Lentell*, 396 F.3d at 173.) Yet, for the reasons stated in the DCG Memorandum, Plaintiffs have failed to properly allege a materialization of risk theory against any Defendant because Plaintiffs spent 690 paragraphs alleging that the risk had already materialized as of June 13, 2022 — *i.e.*, Defendants caused Genesis to conceal the company's alleged insolvency, not that Defendants caused Genesis to conceal the company's alleged *risk of insolvency*. And despite efforts to distance the impact of the FTX collapse on their injury, Plaintiffs' still acknowledge that it was not until *after* FTX collapsed on November 16, 2022, that Genesis subsequently announced it was pausing redemptions, which is when Genesis' financial condition began to be revealed to Plaintiffs.

This fact remains ever fatal to their claims against Mr. Moro given the FTX collapse and subsequent decision by Genesis Global Capital to suspend redemption requests occurred on November 16, 2022 — over four months after Mr. Moro's tweet and *three months after Mr. Moro left the Company*. TAC ¶ 77. Given (i) there is a significant time gap between Mr. Moro's alleged conduct and the moment Plaintiffs alleged loss began, (ii) Mr. Moro was not at the company or involved in any decisions-making for at least three months before this moment, and (iii) from the time of the purported insolvency in June 2022 until these two sequential events in November 2022, Plaintiffs do not allege that Genesis failed to honor any redemption requests — thus Genesis had been operating business as usual and debunks Plaintiffs claim that their "loss was caused by the alleged [misconduct of Mr. Moro months earlier] as opposed to intervening events." *Lentell*, 396 F.3d at 174 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)); *see also Collier v. Aksys Ltd.*, 2005 WL 1949868, at *13 (D. Conn. Aug. 15, 2005) (seven months after fraud was "virtual lifetime in the market" and too remote to support causal link).

For all of these reasons, Plaintiffs failure to sufficiently plead facts supporting key elements of their scheme liability claim against Mr. Moro requires Count II be dismissed.

## II.    COUNTS I AND III FAIL BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

Plaintiffs' attempt to allege that Mr. Moro is liable based on a theory of "control person liability" pursuant to Section 15 of the Securities Act and Section 20(a) of the Exchange Act, Am. Compl. ¶¶ 515–72 (Claim I), 590–612 (Claim III), also fails.

To establish control person liability under Section 20(a) of the Exchange Act, Plaintiffs must plead facts demonstrating "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Ontario Teachers' Pension Plan Board v. Teva Pharm. Ind. Ltd.*, 432 F. Supp. 3d 131, 175 (D. Conn. 2019); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (same). The requirements for a control person claim under Section 15 of the Securities Act are similar. *See DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), *aff'd*, 318 F.3d 170 (2d Cir. 2003) ("In order to survive a motion to dismiss a claim under Section 15, plaintiffs must allege: (i) an underlying primary violation of the securities laws by the controlled person; (ii) control over the controlled person; and (iii) particularized facts as to the controlling person's culpable participation in the violation of the controlled person.").

### A.    Plaintiffs Fail to Allege a Primary Violation of the Securities Laws

Plaintiffs base their control person liability claims against Mr. Moro on alleged violations by Genesis Global Capital of (i) Sections 5 and 12(a)(1) of the Securities Act and (ii) Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. As a preliminary matter, "there is no private right of action under § 5 of the Securities Act." *Levitt v. J.P. Morgan Sec. Inc.*, 9 F. Supp. 3d 259, 273–74 (E.D.N.Y. 2014); *Forsberg v. Always Consulting, Inc.*, No. 06-CV-13488 (CS), 2008 WL 5449003, at *2 (S.D.N.Y. Dec. 31, 2008). Rather, "private civil liability for violations of § 5 exists only when the provisions of § 12 have been met." *Levitt*, 9 F. Supp. 3d at 274.  Section 12(a)(1) provides, in relevant part, that "[a]ny person *who offers or sells a security* in violation of [Section

5] . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77l(a)(1) (emphasis added).[5] Similarly, "to establish primary liability under § 10(b) and Rule 10b-5 of the Exchange Act, a plaintiff is required to prove that *in connection with the purchase or sale of a security* the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (emphasis added).

As explained in Section I of the DCG Memorandum, there is still no allegation that Genesis Global Capital or Mr. Moro offered or sold any security to any Plaintiff. In their previous three complaints, when attempting to articulate a securities fraud claim, Plaintiffs relied solely on the allegation that certain Lending Agreements entered into between Genesis Global Capital and Plaintiffs were the "securities" underlying their claims. *See, e.g.*, ECF No. 1, ¶ 95; ECF No. 60, ¶ 142; ECF No. 135, ¶ 138. However, after being confronted with the reality that these lending agreements can only be construed as contracts, Plaintiffs now allege that the lending agreements *and* all loans made pursuant to them are the relevant securities. TAC ¶ 156. This is now the second time throughout this litigation that Plaintiffs put forth the unprecedented theory that the "Genesis Yield Security" includes both the Lending Agreements and each lenders' later decision to lend digital assets to Genesis pursuant to a Lending Agreement. Mr. Moro incorporates Section I of the DCG Memorandum regarding these securities claims but includes the following additional arguments.

---

[5] Section 12 liability extends only to "statutory sellers," *Levitt*, 9 F. Supp. 3d at 273–74, meaning one who: "(1) 'passed title, or other interest in the security, to the buyer for value' or (2) 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (quoting *Pinter v. Dahl*, 486 U.S. 622, 642 (1988)); *see also Feiner v. SS&C Techs., Inc.*, 47 F. Supp. 2d 250, 254 (D. Conn. 1999) (quoting same regarding solicitation); *Schuler v. NIVS Intellimedia Tech. Grp., Inc.*, No. 11 CIV. 2484 (KMW) (FM), 2013 WL 944777, at *8 (S.D.N.Y. Mar. 12, 2013) ("A 'statutory seller' is one who 'in a public offering, either transferred title to the purchaser or successfully solicited the transfer for financial gain.'") (citations omitted).

As stated in Mr. Moro's prior motions, at a high level, these Lending Agreements simply formed a contractual relationship between the parties and allowed Plaintiffs to deposit digital assets *they already owned* with Genesis Global Capital (or Gemini) in exchange for regular interest payments and withdraw those digital assets on demand. TAC at ¶¶ 131–34, 136–37, 140. There is no credible allegation that the entirety of these transactions and documents — namely, the Master Digital Asset Loan Agreement ("MLA") or Master Borrow Agreement ("MBA", together with the MLA, the "Lending Agreements") that Plaintiffs' call "<u>Genesis Yield Investment Agreements</u>" *as well as* each lenders' later decision to lend digital assets to Genesis pursuant to a Lending Agreement — were, or even could be, "purchased" or "sold." And even if Plaintiffs could somehow characterize entering into these contractual agreements with the Company as a "sale," there is still no plausible argument that these lending agreements themselves constitute securities — even taking into account all loans made pursuant to these agreements. *See* DCG Memorandum at I.A.

Accordingly, Plaintiffs have failed to allege both that (i) there was an offer or sale by Genesis Global Capital and (ii) there was an offer or sale of any security, meaning they have failed to allege a primary violation of the Securities Act or the Exchange Act and their claims against Mr. Moro for control person liability must be dismissed. *See Laser Mortgage Mgmt., Inc. v. Asset Secur. Corp.*, No. 00 Civ. 8100 (WRB), 2001 WL 1029407, at *12 (S.D.N.Y. Sept. 6, 2001) ("[A]s we have previously concluded that plaintiff has not shown a primary violation . . . plaintiff's Section 15 claim ... is also dismissed."); *Fant v. Perelman*, Nos. 97 CIV. 8435 (LAP), 97 CIV. 8436 (LAP), 1999 WL 199078 at *16 (S.D.N.Y. Apr. 19, 1999) ("Without a primary violation . . . there can be no secondary, or derivative, violation under section 20(a), which creates liability for 'controlling persons.'").

**B.**     **Plaintiffs Fail to Allege Mr. Moro Was a Culpable Participant in any of the Company's Alleged Violations of the Securities Laws**

Even if Plaintiffs had adequately pleaded a primary violation by Genesis Global Capital, which they did not, dismissal of Plaintiffs' control person claims against Mr. Moro still would be necessary because Plaintiffs do not allege particularized facts establishing "culpable participation" by Mr. Moro. The culpable participation element "require[s] a showing of both fraudulent conduct and a culpable state of mind." *Laser Mortg. Mgmt Inc. Asset Secur.*, No. 00 Civ. 8100 (NRB), 2001 WL 1029407, at *11 (S.D.N.Y Sept. 6, 2001). What is more, the "culpable participation element is subject to the heightened pleading requirement of the PSLRA," *id.*, and Plaintiffs' Amended Complaint must therefore give rise to a "strong inference of culpable participation." *In re Deutsche Telekom*, No. 00 CIV 9475 (SHS), 2002 WL 244597, at *7 (S.D.N.Y. Feb. 20, 2002).[6]

Plaintiffs fail to plead culpable conduct sufficient to support their control person liability claims against Mr. Moro for the same reasons they failed to adequately allege scienter for their primary fraud liability claim against him. *See supra* Section I.B. Plaintiffs' unsupported allegations that two tweets and one retweet by Mr. Moro were false or misleading offer no facts to demonstrate that Mr. Moro acted with knowledge of or reckless disregard to its accuracy. And unsupported, general allegations that Mr. Moro "caused" Genesis Global Capital to disseminate financial statements and balance sheets that Plaintiffs believe incorrectly accounted for the DCG Promissory Note under GAAP are not sufficient when there are no specific factual allegations regarding which documents were distributed, when and to whom they were distributed, whether and how Mr. Moro had any involvement in the determination of how to account for the DCG Promissory Note under

---

[6] While the district courts are divided, there is substantial authority holding that culpable participation also must be alleged to state a claim under Section 15 of the Securities Act, and the "same considerations that apply in the context of control person liability under the Exchange Act apply to control person liability pursuant to the 1933 Act." *Ellison v. Am. Image Motor Co.*, 36 F. Supp. 2d 628,638 (S.D.N.Y. 1999). *See also Pub. Empls.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010); *P. Stolz Family P'ship, L.P. v. Daum*, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001), *rev'd in part on other grounds by* 355 F.3d 92 (2d Cir. 2004); *Kane v. Wichita Oil Income Fund*, No. 90 Civ. 5714 (PKL), 1991 WL 233266, at *7 (S.D.N.Y. Oct. 29, 1991).

GAAP or any basis to question that determination if made by others, or any involvement by Mr. Moro in their dissemination to Plaintiffs or anyone else. Put simply, Plaintiffs' conclusory characterizations and statements about Mr. Moro's alleged involvement are not an adequate substitute for the requisite particularized allegations of fact required to establish control person liability, and Plaintiffs' claims against him should therefore be dismissed.

## III.    COUNTS IV THROUGH XI FAIL BECAUSE PLAINTIFFS DO NOT ADEQUATELY ALLEGE (IN THE ALTERNATIVE) ANY STATE-LAW CLAIMS

Plaintiffs' fourth attempt at pleading a proper complaint removes their Connecticut Consumer Protection Claim, while adding a common law fraud claim, as well as six other state-consumer protection claims[7] to their already existing New York consumer protection claim — all still based on the same set of facts as their Exchange Act Claims. Since these claims are premised on the same allegations as the Exchange Act claims, all eight of these claims against Mr. Moro fail for many of the same reasons. Mr. Moro also expressly incorporates herein the arguments for dismissal of these state-consumer protection claims and common law fraud claim found in Section III of the DCG Memorandum and offers the following additional arguments specific to Plaintiffs' common law fraud claim against him.

Since Plaintiffs' common law fraud claim is premised on the "same conduct" as the Exchange Act claims — thus is premised on the alleged misstatements in the Lending Agreements, TAC ¶63; *see also id.* ¶¶ 684–90, as noted in the DCG Memorandum Section III.B, New York State law governs claims based on these agreements.[8] Under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP*

---

[7] Namely, claims based on the California Unfair Competition Law ("CUCL"), Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), Texas Deceptive Trade Practices Act ("TDTPA"), Kansas Consumer Protection Act ("KCPA"), and Nevada Deceptive Trade Practices Act ("NDTPA") to go along with their claim based on New York Uniform Deceptive Trade Practices Act ("NYUDTPA").

[8] ECF No. 139-1 at 14; ECF No. 139-2 at 12.

*v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Moreover, Plaintiffs' common law fraud claim against Mr. Moro cannot be based on the handful of non-public communications that were not directed to any Plaintiff. *See, e.g.*, *Dreamco Development Corporation v. Empire State Development Corporation, et al.*, 197 A.D.3d 847, 848 (NY App. 2021) (holding complaint failed to state a claim where it "does not set forth any material misrepresentations that defendant allegedly made *to plaintiffs*" (emphasis added)) (citing caselaw). As a result, of the allegations within Plaintiffs' Third Amended Complaint, Plaintiffs common law fraud claim against Mr. Moro can only be based on his public facing tweets, and one re-tweet. As stated throughout Section I of this brief, all of Mr. Moro's tweets were true at the time they were made, and he had no reason to believe they were false. Thus, because the identical Section 10(b) analysis applies to this common law fraud claim, *see Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991), Plaintiffs common law fraud claim fails for the same reasons their Section 10(b) claims fails. *See* Section I, *supra*.

Accordingly, for the reasons expressed in the DCG Memorandum and herein, Plaintiffs state-consumer protection claims and common law fraud claim against Mr. Moro, like the Securities Act and Exchange Act claims that came before, should be dismissed as to Mr. Moro.

## **CONCLUSION**

For the foregoing reasons, Mr. Moro respectfully requests that the Court dismiss Plaintiffs' Third Amended Complaint against him in its entirety for failure to state claims upon which relief may be granted.

Dated: September 30, 2024

_/s/ Christian D. H. Schultz_

**SPEARS MANNING & MARTINI LLC**
Joseph W. Martini (CT07225)
2425 Post Road, Suite 203
Southport, CT 06890
Telephone: (203) 292-9766
jmartini@spearsmanning.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
Marcus Asner (_pro hac vice_)
Tyler Fink (_pro hac vice_)
Kodjo Kumi (_pro hac vice_)
250 W 55th Street
New York, NY 10019
Telephone: (212) 836-8000
marcus.asner@arnoldporter.com

Christian D. H. Schultz (_pro hac vice_)
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
christian.schultz@arnoldporter.com

_Counsel to Defendant Soichiro "Michael" Moro_