**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, REMO MARIA MORONE, DOMINIC MACRI, LARRY WIENER, DEREK WILSON, DANIEL AMELI, and LEE JACOBSON, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-00082-SRU |
| Plaintiffs, | |
| v. | Hon. Stefan R. Underhill |
| DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM, | |
| Defendants. | SEPTEMBER 30, 2024 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, AND MARK MURPHY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Contents**

PRELIMINARY STATEMENT ..................................................................... 11

STATEMENT OF FACTS .......................................................................... 4

    A.    Genesis's Lending Programs ................................................... 4

    B.    Three Arrows and the Collapse of FTX .................................... 5

    C.    DCG's Promissory Note and Intercompany Loans ..................... 6

    D.    This Action And Developments In the Bankruptcy Proceedings ............. 7

ARGUMENT .......................................................................................... 8

I.    Count I: Plaintiffs' Securities Act Claim Should Be Dismissed ........................... 9

    A.    Plaintiffs Fail to Plead a Cognizable Security ........................... 9

    B.    Plaintiffs Fail to Plead Control Over the Primary Violation ................... 19

    C.    Plaintiffs Have No Damages Recoverable Under the Securities Act ....... 23

II.    Counts II and III: Plaintiffs' Exchange Act Claims Should Be Dismissed ......... 24

    A.    Plaintiffs Fail to Plead a Primary Violation of Section 10(b) ................... 25

    B.    Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation .......... 35

    C.    Plaintiffs Fail to Plead "Scheme Liability" Against the DCG Defendants ................................................................. 36

III.    Counts IV to XI: Plaintiffs Fail to Plead State Law Claims in the Alternative ......................................................................... 37

    A.    Plaintiffs Fail to Allege Violations of State Consumer Protection Laws ................................................................... 38

    B.    Plaintiffs Fail to Allege Common Law Fraud ........................... 40

CONCLUSION ....................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)............................................................................28, 29, 30, 33

*Aimis Art Corp. v. N. Tr. Secs., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009)......................................................24, 33, 34

*In re Alstom SA*,
  406 F. Supp. 2d 433 (S.D.N.Y 2005)..............................................................35, 36

*Alpine View Co. v. Atlas Copco AB*,
  205 F3d 208 (5th Cir. 2000) ...............................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................9

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)..................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...................................................................................26

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
  763 F. Supp. 36 (S.D.N.Y. 1991) .........................................................................1

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
  973 F.2d 51 (2d Cir. 1992)..............................................................................16, 17

*In re Barrick Gold Secs. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................35

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..............................................................................................28

*Baudoin v. Lender Processing Servs.*,
  2012 WL 2367820 (D. Nev. June 21, 2012)........................................................39

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................8, 20

*Benedict v. Amaducci*,
  1995 WL 413206 (S.D.N.Y. July 12, 1995) ........................................................18

*Bongiorno v. Baquet*,
   2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021)........................................................................16

*Camasta v. Jos A. Bank Clothiers, Inc.*,
   761 F.3d 732 (7th Cir. 2014) ...............................................................................................39

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018)...................................................................................37

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)..................................................................................................27

*Clinger v. Edgewell Pers. Care Brands, LLC*,
   2023 WL 2477499 (D. Conn. Mar. 13, 2023) .......................................................................38

*Cohen v. Cap. One Funding, LLC*,
   489 F. Supp. 3d 33 (E.D.N.Y. 2020) ....................................................................................12

*Collier v. Aksys Ltd.*,
   2005 WL 1949868 (D. Conn. Aug. 15, 2005) .......................................................................33

*Com. Union Assur. Co., plc v. Milken*,
   17 F.3d 608 (2d Cir. 1994)....................................................................................................24

*Cunha v. WinnCompanies*,
   2014 WL 2871588 (D. Conn. June 24, 2014)........................................................................16

*Davenport v. GMAC Mortg.*,
   2013 WL 5437119 (Nev. Sept. 25, 2013)........................................................................38, 39

*DeJohn v. The TV Corp. Int'l.*,
   245 F. Supp. 2d 913 (N.D. Ill. 2003) ....................................................................................38

*Devaney v. Chester*,
   709 F. Supp. 1255 (S.D.N.Y. 1989)......................................................................................30

*Doe v. Boys Clubs of Greater Dall., Inc.*,
   907 S.W.2d 472 (Tex. 1995)..................................................................................................38

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018)...................................................................................20

*DoubleLine Cap. LP v. Odebrecht S.A.*,
   413 F. Supp. 3d 187 (S.D.N.Y. 2019)...................................................................................32

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)...............................................................................................................31

*Elson v. Geiger*,
    506 F. Supp. 238 (E.D. Mich. 1980) ............................................................................... 15

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am.,*
    *Inc.,*,
    873 F.2d 85 (2d Cir. 2017) ............................................................................................... 35

*In re Fine Host Corp. Sec. Litig.*,
    25 F. Supp. 2d 61 (D. Conn. 1998) .................................................................................. 31

*Finjan LLC v. Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) ...................................................................... 20

*Fragin v. Mezei*,
    2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) .................................................................. 17

*Francisco v. Abengoa*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................................................................. 27

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) .............................................................................. 14

*G.K. Alan Assoc. v. Lazzari, Inc.*,
    44 A.D.3d 95 (N.Y. 2d Dep't 2007) ................................................................................. 31

*Garcia v. Kashi Co.*,
    43 F. Supp. 3d 1359 (S.D. Fla. 2014) .............................................................................. 38

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ............................................................................................. 14

*In re Genesis Glob. Holdco, LLC*,
    23-10063-SHL, ECF No. 1691 ......................................................................................... 21

*Gleis v. Buehler*,
    2012 WL 1194987 (D. Conn. Apr. 10, 2012) ................................................................... 10

*In re Google Assistant Priv. Litig.*,
    457 F. Supp. 3d 797 (N.D. Cal. 2020) ............................................................................. 38

*Harman v. Harper*,
    1990 WL 121073 (9th Cir. 1990) ..................................................................................... 14

*Harsco Corp. v. Segui*,
    91 F.3d 337 (2d Cir. 1996) ............................................................................................... 31

*Hasemann v. Gerber Prods. Co.*,
    2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024) ................................................................. 39

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)............................................................................19, 20

*Huffman v. Blue Compass RV*,
   2024 WL 2863250 (D. Kan. June 6, 2024)...............................................................................38

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
   822 F. Supp. 2d 368 (S.D.N.Y. 2011)....................................................................................30

*Intelligent Digit. Sys. LLV v. Visual Mgmt. Sys., Inc.*,
   683 F. Supp. 2d 278 (E.D.N.Y. 2010) ...................................................................................16

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020)......................................................................................................28

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)....................................................................................................26

*Kirschner v. J.P. Morgan Chase Bank, N.A.*,
   2020 WL 2614765 (S.D.N.Y. May 22, 2020) ........................................................................17

*Kirschner v. JP Morgan Chase Bank, N.A.*,
   79 F.4th 290 (2d Cir. 2023) ........................................................................................16, 17, 18

*In re Lehman Bros. Mortgage-Backed Sec. Litig,.*,
   650 F.3d 167 (2d Cir. 2011)....................................................................................................22

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 ...........................................................................................................................32

*Li v. Eqonex Ltd.*,
   2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024)........................................................................22

*Macquarie Infrastructure Corp. v. Moab P'ers, L.P.*,
   601 U.S. 257 (2024)................................................................................................................29

*Maher v. Glob. Factors LLC*,
   2024 WL 3356985 (S.D.N.Y. July 8, 2024) .....................................................................23, 24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ..................................................................................................28

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
   518 F. Supp. 3d 772 (S.D.N.Y. 2021).....................................................................................27

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................................................11

*Mary Kay, Inc. v. Dunlap*,
    2012 WL 2358082 (N.D. Tex. June 21, 2012) ..................................................................39

*McAnaney v. Astoria Fin. Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) ...........................................................................38

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)............................................................................36

*Morse v. Weingarten*,
    777 F. Supp. 312 (S.D.N.Y. 1991) .................................................................................40

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    279 F.R.D. 598 (D. Kan. 2012)......................................................................................38

*Nat'l. Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*,
    768 F. Supp. 1010 (S.D.N.Y. 1991)...............................................................................17

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...........................................................................................31

*In re Packaged Seafood Prods. Antitrust Litig.*,
    242 F. Supp. 3d 1033 (S.D. Cal. 2017)..........................................................................38

*Palmer v. Apple Inc.*,
    2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) ...............................................................39

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)............................................................................20

*Paypolitan OU v. Marchesoni*,
    2022 WL 17541091 (S.D.N.Y. Aug. 26, 2022) .............................................................34

*Procter & Gamble Co. v. Bankers Tr. Co.*,
    925 F. Supp. 1270 (S.D. Ohio 1996) .............................................................................16

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986)......................................................................................36, 37

*Prudencio v. Midway Importing, Inc.*,
    831 F. App'x. 808 (9th Cir. 2020) .................................................................................38

*Reeder v. Succession of Palmer*,
    736 F. Supp. 128 (E.D. La. 1990) ..................................................................................18

*Reid v. Unilever U.S., Inc.*,
    964 F. Supp. 2d 893 (N.D. Ill. 2013) .............................................................................38

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994) ...................................................................................11

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990), The TAC ....................................................................... *passim*

*In re Rockwell Med., Inc. Sec. Litig.*,
  2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ........................................................27

*Ross v. Bolton*,
  1989 WL 80428 (S.D.N.Y. Apr. 4, 1989)...............................................................19

*Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*,
  192 F. Supp. 3d 348 (S.D.N.Y. 2016)................................................................38, 39

*Russo v. Bruce*,
  777 F. Supp. 2d 505 (S.D.N.Y. 2011).....................................................................27

*Salas v. Whirlpool Corp.*,
  2024 WL 694067 (C.D. Cal. Jan. 24, 2024) ...........................................................39

*Sanchez v. Walmart Inc.*,
  2024 WL 2132426 (N.D. Ill. May 13, 2024) ...........................................................40

*Schentag v. Nebgen*,
  2018 WL 3104092 (S.D.N.Y. June 21, 2018) .........................................................18

*Schiro v. Cemex, S.A.B. de C.V.*,
  396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................28

*SEC v. Binance Holdings Ltd.*,
  2024 WL 3225974 (D.D.C. June 28, 2024).........................................................14, 15

*SEC v. Genesis Glob. Cap., LLC*,
  2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) .........................................................14

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)..........................................................................9, 10, 12, 14

*SEC v. Kelly*,
  817 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................37

*SEC v. Mgmt. Dynamics, Inc.*,
  515 F.2d 801 (2d Cir. 1975)...................................................................................19

*SEC v. Rio Tinto plc*,
  41 F. 4th 47 (2d Cir 2022) .....................................................................................37

*SEC v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023)................................................................15

*Simmtech Co. v. Citibank, N.A.*,
    2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016).......................................................31

*Singh v. Cigna Corp.*,
    277 F. Supp. 3d 291 (D. Conn. 2017).................................................................26

*Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*,
    941 F. Supp. 1369 (S.D.N.Y. 1996)....................................................................22

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012).................................................................19

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008)............................................................................................25

*Sw. Bell Tel. Co. v. Vollmer*,
    805 S.W.2d 825 (Tex. Ct. App. 1991).................................................................38

*Taylor v. Westor Cap. Grp.*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013).................................................................37

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)............................................................................................26

*Teller v. Bill Hayes, Ltd.*,
    213 A.D.2d 141 (2d Dep't 1995).........................................................................39

*Troy v. Am. Bar Ass'n.*,
    2024 WL 1886753 (E.D.N.Y. Apr. 30, 2024) .....................................................39

*In re UBS Auction Rate Sec. Litig.*,
    2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ...........................................24, 33, 35

*Vargas v. JP Morgan Chase Bank, N.A.*,
    30 F. Supp. 3d 945 (C.D. Cal. 2014)..................................................................39

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)...............................................................................28

*Waggoner v. Barclays PLC*,
    875 F. 3d 79 (2d Cir. 2017).................................................................................30

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013).........................................................................28

*In re WorldCom, Inc. Sec. Litig.*,
   2004 WL 1097786 (S.D.N.Y. May 18, 2004) ........................................................20

*Youngers v. Virtus Inv. Partners Inc.*,
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ...........................................................22, 36

**Statutes & Rules**

15 U.S.C. § 77l(a) ................................................................................................8, 22

15 U.S.C. § 78bb ...............................................................................................32, 33

15 U.S.C. § 78j(b) ....................................................................................................24

15 U.S.C. § 78u-4(b)(2) ...........................................................................................24

California Unfair Competition Law ("CUCL") ..................................................38, 39

Fed. R. Civ. Proc. 9(b) ........................................................................................1, 37

Fed. R. Civ. Proc. 12(b)(6) .......................................................................................8

Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") ......................38, 39

Illinois Uniform Deceptive Trade Practices Act ("IUDTPA")........................38, 39, 40

Kansas Consumer Protection Act ("KCPA") ...........................................................38

Nevada Deceptive Trade Practices Act ("NDTPA") ...........................................38, 39

New York Uniform Deceptive Trade Practices Act ("NYUDTPA")...................38, 39

Texas Deceptive Trade Practices Act ("TDTPA") .........................................38, 39, 40

Tex. Bus. & Com. Code § 17.505(a) .........................................................................40

Pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, Defendants Digital Currency Group, Inc. ("DCG"), Barry Silbert, and Mark Murphy (collectively, the "DCG Defendants"), respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Third Amended Complaint (the "TAC").

## PRELIMINARY STATEMENT

This is now Plaintiffs' fourth attempt to transform a breach-of-contract claim against two non-parties, Genesis Global Capital, LLC ("Genesis") and Gemini Trust Company, LLC ("Gemini"), into a sweeping securities action against Genesis's parent company, DCG. Like all of Plaintiffs' prior attempts, this one fails as a matter of law.

Plaintiffs entered into Lending Agreements either directly with Genesis through a Master Borrow Agreement ("MBA") or indirectly via Gemini through a Master Digital Asset Loan Agreement ("MLA"). The MLA provided that Plaintiffs could deposit their digital assets in a Gemini Earn Account at Gemini, which would in turn lend those assets to Genesis. Genesis would pay Gemini interest on those loaned assets, and Gemini would pass the interest payments on to Plaintiffs, keeping a portion as a fee. The MBA provided for a similar lending arrangement, by which Plaintiffs could lend digital assets to Genesis directly in exchange for individually negotiated, contractually-set periodic loan fees (*i.e.*, interest). None of these interest payments were contractually contingent on or varied as a result of Genesis's success or failures in its own lending business or as an enterprise. In November 2022, the second largest cryptocurrency exchange, FTX, collapsed and filed for bankruptcy. This event triggered panic and, in effect, a run on the bank in the crypto industry. Genesis was unable to immediately honor the flood of redemption requests and months later, after an independent special committee assumed oversight

of Genesis, filed for bankruptcy. Plaintiffs, facing an uncertain recovery in the bankruptcy and in the hopes of ensuring their recoveries, filed this suit against the DCG Defendants.

But any uncertainty is long gone: The value of cryptocurrency has skyrocketed since Genesis filed for bankruptcy, and Plaintiffs have benefited. Upon confirmation of the Genesis chapter 11 reorganization plan, those Plaintiffs who contracted with Gemini received their entire loaned cryptocurrency (representing a 237% recovery in value since their assets were frozen). All other Plaintiffs have recovered amounts exceeding the value of their initial loans to Genesis—an unprecedented recovery that few creditors of a bankrupt entity can ever hope to achieve. Yet they continue to press their baseless claims here, improperly contorting the securities laws as a means to recover more than what they already have recovered in the bankruptcy. And they want the DCG Defendants—non-parties to the contracts at issue who did not sell or offer securities (or anything else) to Plaintiffs, made no representations to Plaintiffs (certainly none on which Plaintiffs could have relied), and did not direct Genesis to carry out any conduct upon which the claims are based— to pay them. The TAC should be dismissed in its entirety, with prejudice, for several reasons.

*First*, Plaintiffs cannot establish a violation of the Securities Act premised on Genesis's alleged offer and sale of unregistered securities, for one straightforward reason: There are no securities here. Plaintiffs have repeatedly shifted their theory of what instrument allegedly constitutes a "security" under the Securities Act, but whatever theory they now settle on, they cannot escape the fact that the arrangement here was simply a loan of assets for a monthly interest rate, indistinguishable from deposit accounts or thousands of other commercial loans made each day. Moreover, Plaintiffs cannot establish actual control by the DCG Defendants as to the specific conduct giving rise to the alleged securities violation—the offer or sale of unregistered securities. And finally, given Plaintiffs' recoveries in the bankruptcy proceedings, there are no cognizable

damages to recover through their Securities Act claims. *See* Part I.

*Second*, with respect to the Exchange Act claims, Plaintiffs' primary Section 10(b) claim premised on Genesis's alleged misstatements and omissions falls short on virtually every element. Plaintiffs (i) do not plead that any securities were purchased or sold; (ii) fail to allege scienter; (iii) do not establish that they (or the putative class members) relied on the Genesis Defendants' alleged false statements—indeed, there are no allegations plausibly demonstrating that any Plaintiff was aware of the alleged misstatements, much less relied on them in connection with their decision to enter into the lending agreements years ago (a temporal impossibility); (iv) do not allege a coherent link between the alleged misrepresentations and a loss of value of any securities as a result, damning their loss causation argument; and (v) fail to allege damages as a result of their recoveries in the bankruptcy proceedings. Any of these failures is reason enough to dismiss both the primary claim and the tagalong Section 20(a) control person claim against the DCG Defendants. Further, the control person claim fails on its own terms: The TAC is devoid of allegations of actual control by the DCG Defendants over any of the alleged misstatements or omissions by Genesis. And Plaintiffs' "scheme liability" claim against the DCG Defendants is nothing more than an impermissible repackaging of Plaintiffs' inadequately pleaded Section 20(a) claim. *See* Part II.

*Finally*, Plaintiffs' fallback claims of common law fraud and state consumer protection laws fail for many of the same reasons. In particular, Plaintiffs allege no fraudulent statements made by the DCG Defendants to Plaintiffs and cannot rely on any supposed misconduct by Genesis. These state law claims also impose several other requirements that Plaintiffs fail to meet. *See* Part III.

For these reasons, the TAC should be dismissed in its entirety with prejudice.

**STATEMENT OF FACTS**

A.    **Genesis's Lending Programs**

Non-party Genesis was a "full-service digital currency prime brokerage" that, prior to its bankruptcy, was engaged in a variety of services related to the management of digital assets, including cryptocurrency. TAC ¶¶ 3-4. One of Genesis's services was yield generation, through which owners of digital assets could lend those assets to Genesis in exchange for regular interest payments. *See id.* ¶¶ 131-34. Genesis offered those services in two ways relevant here.

*First*, entities who met the minimum lending requirements could loan their digital assets directly to Genesis. *Id.* ¶¶ 134-35. That relationship was governed by the MBA, which did not obligate participating lenders to loan a particular amount of digital assets to Genesis (or any at all), but rather set forth the framework for the lending relationship if one developed. Pursuant to the MBA, Genesis would send lending requests to qualified lenders with its proposed terms. Ex. A (MBA) § II(b). Each lender could negotiate any of the terms with Genesis, and the final terms of the loan would be memorialized in a separate term sheet. *See id*. The lender would then deposit its digital assets with Genesis, and Genesis would pay the lender the agreed-upon Loan Fee. TAC ¶ 133. The amount of the Loan Fee was dictated by the loan terms—and informed by market conditions—and did not depend on the success or failure of Genesis's subsequent use of the loaned assets, or how the company fared as an enterprise.

*Second*, beginning in February 2021, Genesis partnered with non-party Gemini—a digital asset service company—through Gemini's Earn ("Earn") program. *Id.* ¶¶ 136-37. To participate in the Earn program, Gemini customers entered into an MLA between themselves, Gemini, and Genesis. Under the program, Gemini customers could lend their digital assets to Genesis by depositing those assets into an Earn account. *Id.* ¶ 138. Genesis would then pay Gemini interest on

those assets, and Gemini would pass that interest on to its customers, keeping a percentage for itself. *Id.* ¶¶ 138-40. All Earn loans were open-term, such that lenders could terminate any portion of their loan at any time. *See* Ex. B (MLA) § II(c).

Under the MLA, each Earn customer was the "Lender," Gemini was the "Custodian" and agent for each "Lender," and Genesis was the "Borrower." The MLA stated that the loans facilitated by the agreement "are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws." *Id.* § XXV. As with the MBA, the MLA did not obligate the Gemini customer to lend assets to Genesis at any time. *Id.* § II(a). If the Gemini customer ultimately elected to loan assets to Genesis, Gemini would provide the pertinent loan terms at the time of the transaction. *Id.* § II(a)-(b). And as with the MBA, Genesis's obligation to pay interest on the digital assets was independent of how Genesis's own lending business performed. *See id.* § III(a). Each and every one of the MLAs and MBAs was clear that DCG was not a party to the agreement and had no obligations arising from loans facilitated by the agreement:

> For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement *are only the obligation of Genesis*, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that *none of Genesis' parents or affiliates* shall have any liability *under this Agreement*[.]

Ex. B (MLA) § XVII; Ex. A (MBA) § XVII (emphases added).

## B.    Three Arrows and the Collapse of FTX

Genesis generated revenue by relending digital assets to others, and one such lending counterparty was Three Arrows Capital Ltd. ("3AC"). TAC ¶ 282. By June 2022, 3AC owed approximately $2.3 billion in loans to Genesis. *Id.* ¶ 344. In June 2022, 3AC was unable to satisfy margin calls from some of its lenders and entered liquidation proceedings. *Id.* ¶ 381. Genesis recovered a portion of its outstanding credit from 3AC, but after Genesis foreclosed on the

collateral, 3AC still owed $1.1 billion to Genesis, a liability that DCG assumed. *Id.* ¶¶ 344, 363.

      **C.**    **DCG's Promissory Note and Intercompany Loans**

DCG is an investment corporation and the indirect parent of Genesis. *Id.* ¶¶ 6, 37. Barry Silbert is DCG's founder and CEO, Mark Murphy is DCG's President, and Michael Kraines was DCG's CFO from September 2021 through April 2023. *Id.* ¶¶ 7-8.

On June 30, 2022, DCG executed a promissory note with Genesis under which DCG assumed the $1.1 billion liability arising out of 3AC's debt default by providing Genesis with the promissory note ("Note") for $1.1 billion, payable in 10 years at an interest rate of 1%. *Id.* ¶¶ 355-56. In other words, DCG gave Genesis a *collectable* $1.1 billion receivable in exchange for an *uncollectable* $1.1 billion receivable. Plaintiffs allege that in communications following the execution of the Note, Genesis inaccurately represented (though not to any Plaintiffs) the nature of the Note and Genesis's financial condition. *See id.* ¶¶ 378-81. Plaintiffs identify just two sets of allegedly false or misleading representations made by the DCG Defendants: one to an unidentified lender and another to Gemini co-founder Cameron Winklevoss, a non-party. *Id.* ¶¶ 417, 442-43. Plaintiffs neither premise their securities fraud claims on these statements by DCG, nor use them to plead elements of their Section 10(b) claim—namely, falsity, scienter, or reliance.

In November 2022, DCG, Genesis, and Gemini entered into a tripartite agreement which required DCG and GGC to each transmit roughly half of a sum of additional collateral (then worth over $600 million) to Genesis for the benefit of Earn customers. *Id.* ¶ 446-47. That same month, however, the cryptocurrency exchange FTX collapsed, triggering a large number of withdrawal requests, which Genesis was unable to immediately fulfill with its current assets. *Id.* ¶¶ 52, 457. On November 16, 2022, Genesis announced that it was suspending redemptions and loan originations. *Id.* ¶ 457. Genesis filed for chapter 11 bankruptcy on January 19, 2023. *Id.* ¶ 15.

**D.      This Action And Developments In the Bankruptcy Proceedings**

Plaintiffs are lenders of digital assets to Genesis. *See* TAC ¶¶ 65-69. All but three Plaintiffs loaned digital assets to Genesis via the Earn program. The other Plaintiffs—Translunar, Morone, and Ameli—loaned digital assets directly to Genesis. *See* ECF Nos. 34-2; 38-4; 171 at 182-83. Plaintiffs filed this lawsuit on January 23, 2023, naming DCG and Silbert as the sole Defendants. ECF No. 1.[1] Following appointment of Lead Plaintiffs, Plaintiffs amended their complaint twice, adding several new Defendants and claims. As of February 21, 2024, the parties had fully briefed Defendants' motions to dismiss Plaintiffs' third attempt to state a cognizable claim under the securities laws (the second amended complaint, or "SAC").

Developments in the bankruptcy proceedings changed the circumstances. On April 19, 2024, the Genesis bankruptcy court entered an order approving a settlement between Gemini and Genesis, which provided for a *full* in-kind return of Earn users' digital assets that were held by Genesis at the time of the redemption freeze.[2] Then, on May 17, 2024, the Genesis bankruptcy court confirmed Genesis's chapter 11 reorganization plan, which provided for a payout of assets to other Genesis creditors. *See* ECF Nos. 160-1, 160-2. On June 20, 2024, Earn users received in-kind distributions of 100% of the digital assets that were frozen by Genesis in November 2022. *See* ECF No. 160-3. Given the appreciation in digital assets since then, Earn users recovered 237% of the value of their loans as of the November 2022 redemption freeze. Ex. C (June 20, 2024 Gemini Press Release). On August 2, 2024, the remaining Genesis creditors, including Translunar, Morone, and Ameli, received in-kind distributions under the Plan. TAC ¶ 17. In that initial

---

[1] Because Genesis is in bankruptcy, it cannot be named as a party in this lawsuit.

[2] *In re Genesis Glob. Holdco, LLC,* No. 23-10063 (SHL) (Bankr. S.D.N.Y.), ECF No. 1598. All recovery valuations are calculated based on publicly available sources and/or the named Plaintiffs' certifications. As indicated throughout, these valuations are based on the date of the redemption freeze (November 16, 2022), the petition date (January 19, 2023), or, with respect to Translunar, Morone, and Ameli, as of the date of their loan transactions.

distribution, creditors who invested BTC received 51.28% of the BTC tokens they had invested with Genesis, paid in BTC (*i.e.*, a BTC creditor who invested 100 BTC received 51.28 BTC); ETH creditors recovered 65.87% of their ETH tokens, and U.S. dollar and stablecoin creditors received 100% recoveries paid in U.S. dollars. *Id.* The initial distribution of these digital assets (BTC and ETH) represented well over 100% of the petition date value of creditors' loans in the aggregate, with BTC creditors recovering 166% of their petition date value, and ETH creditors recovering 153% of their petition date value. *See* Ex. D (Aug. 26, 2024 Cleary Press Release). And measuring these recoveries as of the dates of the institutional Plaintiffs' loan transactions, Translunar, Morone, and Ameli each recovered between 116% and 145% of the value of their assets, as of the dates that they originally lent them to Genesis. *See* Part II.A.4. The Plan provides for subsequent distributions to Genesis creditors and entitles them to receive up to 100% of their digital assets in-kind. *See* ECF Nos. 160-1, 160-2; TAC ¶ 17. In other words, Plaintiffs received far more in value than what they lent to Genesis.

On July 3, 2024, at oral argument on the motions to dismiss, the Court afforded Plaintiffs a final opportunity to amend their pleading. On August 12, 2024, Plaintiffs filed the TAC, which added five new Plaintiffs (without leave of the Court)—mostly Earn users who received 100% in-kind recoveries—and adding six claims alleging violations of state consumer protection laws for the states in which the new Plaintiffs reside.[3] *See* TAC ¶¶ 1, 70-74, 613-34, 651-90.

<u>**ARGUMENT**</u>

In deciding this motion, the Court must assume that well-pled factual allegations in the TAC are true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court need not accept legal conclusions, naked assertions, mere conclusory statements, or implausible inferences. *See*

---

[3] Plaintiffs also added a common law fraud claim and dropped the Connecticut consumer protection claim.

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009). A claim must raise more than the "mere possibility of misconduct"—a plaintiff must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. Although this is a Rule 12(b)(6) motion, it should be considered in the context of the procedural history of this case. When they amended the complaint the second time, Plaintiffs were fully aware of the DCG Defendants' arguments in the first motion to dismiss. And in filing the TAC, Plaintiffs had the benefit of a full round of briefing and the Court's observations at oral argument. The TAC is thus Plaintiffs' attempt to cure the facial defects twice identified by the DCG Defendants and probed by the Court. The question, then, is whether the TAC cures those defects, or if it simply papers over the legal deficiencies in the pleading. The answer is the latter.

## I.    Count I: Plaintiffs' Securities Act Claim Should Be Dismissed

The TAC asserts that the DCG Defendants are liable as "control persons" for Genesis's alleged failure to register the "Genesis Yield" program as a security under Section 12(a)(1) of the Securities Act. TAC ¶¶ 515-72. This claim fails several times over: Plaintiffs fail to plead the existence of any "security," or that the DCG Defendants exercised actual control over any specific conduct. In any case, Plaintiffs' recoveries in the bankruptcy preclude any further recovery here.

### A.    Plaintiffs Fail to Plead a Cognizable Security

The threshold defect in Plaintiffs' securities fraud claims is that there are no securities here. Throughout this litigation, Plaintiffs have changed their legal positions and factual allegations to squeeze a securities fraud action out of a quintessential breach of contract dispute. Over three complaints, Plaintiffs consistently pointed to the Lending Agreements as the alleged securities.[4] Now on their fourth attempt, Plaintiffs change the formulation of the purported security. Rather

---

[4] *See, e.g.*, ECF Nos. 1, ¶ 95; 60, ¶ 142; 135, ¶ 138.

than alleging that the "securities" in question are just the Lending Agreements, Plaintiffs now contend that both the Lending Agreements *and* all loans pursuant to them are the relevant securities—which they collectively dub "Genesis Yield securities"—and replace references to the Lending Agreements with this new formulation.[5] But Plaintiffs' global find-and-replace doesn't cure any of the deficiencies that plagued their prior pleadings. Plaintiffs claim that Genesis "offered and sold securities (Genesis Yield)" to Plaintiffs "whereby [Plaintiffs] tendered consideration (the investment principal) to Genesis Global Capital in exchange for Genesis Global Capital's promise to pay back the investment principal in-kind, together with accrued interest, on demand." TAC ¶ 25. This is still no different from a run-of-the-mill loan. And in alleging so-called "Genesis Yield" securities, Plaintiffs allege a fiction, conflating two contractual relationships that are entirely distinct. *See* ECF No. 149 at 18-19. But no matter what Plaintiffs call the lending arrangement, their allegations still fail to establish the alleged securities are (1) "investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); or (2) "notes" under *Reves v. Ernst & Young*, 494 U.S. 56 (1990).[6]

## 1.    The Lending Agreements Are Not Investment Contracts Under *Howey*

Under *Howey*, an instrument is an investment contract where there is (1) an investment of money, (2) in a common enterprise, (3) in which the purchaser expects profits solely derived from the efforts of others.  328 U.S. at 299. Plaintiffs fail to meet this standard.

***Plaintiffs Did Not Invest In a Common Enterprise***. A "common enterprise" requires

---

[5] *E.g.*, Ex. E (Redline to SAC) at 52 (replacing header titled "The Genesis Yield Investment Agreements Are Securities" with "The Genesis Yield Securities Are a 'Security' Under the Federal Securities Laws").

[6] The TAC newly asserts that the Lending Agreements are similar to bonds or promissory notes (*see* TAC ¶¶ 162-69), yet Plaintiffs do not actually allege the purported securities constitute a bond or promissory note. Plaintiffs' allegations amount to improper legal argument and should be disregarded. *See, e.g.*, *Gleis v. Buehler*, 2012 WL 1194987, at *5 (D. Conn. Apr. 10, 2012) ("inappropriate to include legal argument and briefing within a complaint").

"horizontal commonality," *Marini v. Adamo*, 812 F. Supp. 2d 243, 255-56 (E.D.N.Y. 2011), which is the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).[7] Horizontal commonality turns on whether Plaintiffs' profits were tied to—and *depended* on—the success of Genesis's lending business. Neither Earn users nor direct lenders shared in profits and losses with Genesis or each other. Plaintiffs' only financial return was "a fixed rate of return in the form of interest" in exchange for lending their digital assets. TAC ¶ 183. At oral argument, the Court pointed out this deficiency: Plaintiffs had not pled that rates "could be revised by Genesis to reflect Genesis's profit on the moneys lent," and gave Plaintiffs "one last shot" to correct this issue.[8] On their last shot, Plaintiffs predictably miss.

Unable to shore up their factual allegations, Plaintiffs opine that "investors' rates of return were dependent upon the yield the Company could earn when it reinvested investors' capital" and "investors would share in the success of the Company's efforts in generating yield because they would receive a portion of the yield generated by the Company in the form of interest payments." TAC ¶ 170.[9] That is akin to saying a bank met its obligation to pay interest on a loan payable, because another entity paid the bank interest on a loan receivable, and that somehow one interest payment dictated the other. But nothing magically transforms such loans into securities.

Plaintiffs try to compensate for this defect by cherry picking quotes from current and former Genesis representatives. *Id.* ¶¶ 171-74. Specifically, Plaintiffs allege that Genesis touted its

---

[7] Plaintiffs' prior opposition brief insisted that the AC could establish "common enterprise" through "strict vertical commonality," meaning that the fortunes of Genesis are tied to the fortunes of the lenders. Opp. at 35-36. Any such theory fails for the same reasons that there is no horizontal commonality.

[8] *See McGreevy v. Digital Currency Group Inc.*, No. 3:23-cv-00082-SRU, July 3, 2024 Motion Hearing Tr. ("Tr.") 69:19-20, 84:8-18, 119:11-12.

[9] *See also id.* ¶¶ 183, 191, 194, 196, 199, 207, 213, 232-37.

lending acumen and confirmed that the revenue from its lending business would pay the lenders' interest rates.[10] These statements about Genesis's belief in its own success, however, do not plausibly suggest that Genesis's profitability *determined* the interest rates payable to lenders. As this Court aptly noted, the fact that a successful investment company is able to offer higher interest rates does not mean the interest rates paid depend on the company's day-to-day success.[11] That is because the profits "*used to pay* the interest is different than [returns] *dependent upon*" a company's profits. Tr. 52:6-7. And when reviewed with full context, the statements Plaintiffs point to affirmatively rebuke their theory altogether. For example, on a podcast that Plaintiffs cite, Ballensweig explained that lenders' returns did not fluctuate with Genesis's profitability, stating, "if a default [or loss] were to happen from a borrower, [Genesis] would eat that loss . . . and not socialize that loss out to lenders[.]"[12] If Genesis was not "socializing" its losses with Plaintiffs or its lenders, then it cannot be that lenders' returns fluctuated with Genesis's profitability, and there was thus no pooling of assets under *Howey*. And, on another podcast, Ballensweig discussed at length *the market conditions* dictating the returns for lenders.[13]

Further, Plaintiffs' own allegations fatally undermine their effort to tie Genesis's fortunes to interest payments. Plaintiffs allege Genesis adjusted the interest rate based on two factors: "(1) the opportunities to invest digital assets and earn yield Genesis Global Capital saw in the

---

[10] *See* TAC ¶ 171 ("[W]e go out to the market, lend those assets out to our . . . network of borrowers, generate the yield and then pay Gemini back so that it can pay its users."); *id.* ¶ 172 ("I think we're really a nexus point in the space to kind of understand the economics around lending, why rates are the way they are."); *id.* ¶ 173 ("We understand the crypto [] market . . . this gives us a cutting edge in providing the right liquidity and also the best yield in the market.").

[11] *See* Tr. 57:16-20 ("We're going to pay you 13 percent. That's better than you can get at your bank. And, [] we think we can do that because we're such a successful investment company. That doesn't connect the lender to the success of Genesis, does it?").

[12] Modern Finance, "How Safe Is My Crypto Yield?" at 36:14-22 (May 2021) https://open.spotify.com/episode/596chBVv6g1x0OrD9nQSU3 ("Modern Finance"). The Court may consider the full podcast to be incorporated by reference because the TAC quotes excerpts from the podcast. *See, e.g.*, *Cohen v. Cap. One Funding, LLC*, 489 F. Supp. 3d 33, 44 (E.D.N.Y. 2020).

[13] The Block, "The Block Presents: The Evolution of Crypto Lending," 28:50-32:02 (Sept. 17, 2020) https://www.youtube.com/watch?v=YFEOyG5tk44 ("The Block").

market; and (2) the rate of return Genesis Global Capital determined it needed to offer prospective investors to attract investment capital to take advantage of the investment opportunities." TAC ¶ 194. But Plaintiffs continue to allege that the rate adjustments reflect Genesis's efforts to "pay among 'the highest rates in the market,'" *id.* ¶ 192; *see* SAC ¶ 152 (same), thus continuing to attribute the rates to market realities, not to Genesis's success or failure as an enterprise. As this Court previously indicated, such allegations amount to pleading that "at different times [Genesis] offered different rates," *see* Tr. 59:18-25, and are no substitute for the lack of allegations that the rates were adjusted based on Genesis's business performance.[14] And reality forecloses that allegation. Indeed, an FAQ on Gemini's website entitled "Why did Gemini Earn rates change?" provides:

> Since Gemini Earn is a lending program, ***it is subject to the same market forces of supply and demand that affect every lending market***.
>
> ***Our partner adjusts their interest rates based on market-wide shifts for specific crypto***. We are committed to offering ***competitive rates*** on all assets offered through Gemini Earn. Gemini will notify you whenever our rates change and generally we strive to change rates less frequently than once a month.[15]

Gemini also explained on its website that interest "[r]ates vary based on the ***supply and demand for each cryptocurrency*** in crypto lending markets, similar to how interest rates vary for any type of currency." Ex. G (Gemini Website) at 12 (emphasis added). Virtually identical representations were made on Genesis's website: An FAQ on Genesis's website entitled "How are rates determined?" provides, "Rates are based on ***prevailing market conditions*** and ***reflect supply and demand*** mechanics within our portfolio of counterparties." Ex. H (Genesis Website) at 8 (emphasis

---

[14] *See* Tr. 49:6-25 ("I don't see where you're alleging that individual investors had their rate of return adjusted because Genesis did well or did poorly . . . . [W]e're going to adjust based upon Gemini doing well or poorly . . . .").

[15] Ex. F (Gemini FAQ) at 1 (emphasis added). The Court may consider both Gemini and Genesis's websites to be incorporated by reference in the TAC because alleged representations made on the websites are integral to the TAC. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 (S.D.N.Y. 2009).

added). Plaintiffs thus cannot plausibly allege that their returns—whether fixed or variable—fluctuated with the profitability of Genesis rather than market conditions, competitors' offerings, and the specific type of digital asset loaned.[16] Not only do Plaintiffs point to no factual evidence supporting the allegation that returns fluctuated in this way, but Plaintiffs' own sources demonstrate that the rates did not fluctuate with profitability.[17] As this Court observed, there is no security absent such allegations. *E.g.*, Tr. 68:10-20 ("So there is no connection to the profitability of Genesis with a fixed rate loan . . . . That can't be the connection to the securities laws. Picking a higher rate than payable elsewhere doesn't create a security."). Thus, Plaintiffs cannot allege pooling, which occurs when funds are "reinvested by the promoter into the business" and "[i]n turn, such reinvestment increases the value of the instrument offered." *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023). Unlike in a traditional investment contract, Plaintiffs never bore a true risk of loss (beyond the risk of default, which is present in every lending arrangement). *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) (essential element under *Howey* is that "the investor must risk loss"). Genesis's bankruptcy and subsequent inability to repay Plaintiffs' loans cannot establish horizontal commonality. *See* TAC ¶ 233. Solvency risk is inherent in *every* lending relationship, and does not transform such relationship into a security.[18]

Finally, Plaintiffs unpersuasively invoke a recent decision by Judge Ramos which held that the Earn program was adequately pled as a security under *Howey* and *Reves*.[19] But another court

---

[16] *See SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *26 (D.D.C. June 28, 2024) (finding no security in nearly identical lending program where "the interest rate paid would be set at Binance's discretion, at a rate that would take market conditions and competitors' offerings into consideration").

[17] *See* Modern Finance at 36:14-22; The Block at 28:50-32:02; Ex. F (Gemini FAQ) at 1; Ex. G (Gemini Website) at 12; Ex. H (Gemini Website) at 8.

[18] *See Harman v. Harper*, 1990 WL 121073, at *5 (9th Cir. 1990) ("individual borrower's failure to make payments on privately-negotiated notes" does not give rise to securities violation).

[19] *See SEC v. Genesis Glob. Cap., LLC*, 2024 WL 1116877, at *16 (S.D.N.Y. Mar. 13, 2024).

recently found that this sort of lending arrangement—where "[t]he holders of crypto assets simply agreed to loan them to the company for a specified period of time at a specified rate of interest"—does not fit the securities rubric, because "[n]ot every profit-making opportunity' is an investment contract." *Binance*, 2024 WL 3225974, at \*26. As *Binance* shows, Judge Ramos's analysis overstates the significance of literal pooling. Plaintiffs must allege facts beyond the commingling of assets to demonstrate "the hallmarks of the 'common enterprise,'" *i.e.*, that "the interest rate was dependent on that enterprise's success." *Binance*, 2024 WL 3225974, at \*26. Otherwise, all lending agreements would incorrectly fall within the ambit of the securities laws.

***Plaintiffs Had No Expectation of Profits from the Efforts of Others***. Plaintiffs also cannot establish that they had a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 329 (S.D.N.Y. 2023). For this element, Plaintiffs advance the same threadbare and conclusory allegations that "the returns of Genesis Yield [lenders] were dependent on Genesis' managerial efforts and risk management in its lending activities." TAC ¶ 231. The TAC offers no facts tying the lenders' alleged expectation of profits to Genesis's managerial efforts, which is fatal to the claim. As discussed above, Plaintiffs' only "profits" were contractual interest payments, set by reference to the broader crypto market. At most, Plaintiffs allege they expected to be paid. Such an expectation lacks "the necessary connection between the anticipated returns and the offeror's managerial or entrepreneurial efforts." *Binance*, 2024 WL 3225974, at \*26.[20]

### 2.    The Lending Agreements Are Not Security Notes Under *Reves*

Plaintiffs' other theory—that the Lending Agreements are "notes" under *Reves*—fails on

---

[20] *See also Elson v. Geiger*, 506 F. Supp. 238, 242 (E.D. Mich. 1980) (repayment of mortgage, while dependent on borrower's solvency, was not "the same as depending on entrepreneurial efforts").

its face because there were no "notes" exchanged between the parties.[21] That is, when Plaintiffs

loaned their digital assets to Genesis, they did not receive an instrument in exchange for that loan,

such as a tradeable note or bond. They simply retained a contractual right of withdrawal under the

original lending agreement, the same kind of right consumers at deposit banks around the country

exercise every day without any claim they are engaged in the purchase of unregistered securities.[22]

The conceptual framework of *Reves*, which requires the Court to compare the instrument

exchanged here with the kind of notes covered by the securities laws, does not apply. As the

Supreme Court cautioned, "although the [Securities] Act defines 'security' to include 'any note,'

the phrase 'any note' should not be interpreted to mean literally 'any note.'" *Kirschner v. JP

Morgan Chase Bank, N.A.*, 79 F.4th 290, 303-04 (2d Cir. 2023). That is because the securities laws

regulate only the "investment market," and do not provide a "broad federal remedy for all fraud."

*Id.* In any case, the TAC confirms that the "notes" were issued in the commercial or consumer

context, and thus fail each *Reves* factor.[23]

**The Motivations of the Parties Were Commercial**. The first *Reves* factor asks "whether

the motivations are investment (suggesting a security) or commercial or consumer (suggesting a

non-security)." *Bongiorno v. Baquet*, 2021 WL 4311169, at *16 (S.D.N.Y. Sept. 20, 2021).

Plaintiffs must demonstrate more than that they sought to profit off a loan. Indeed, all lenders seek

to "profit" off of their loans. TAC ¶ 182; *see Intelligent Digit. Sys. LLV v. Visual Mgmt. Sys., Inc.*,

683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010) (no security where "motivation of the seller is not to

---

[21] To the extent Plaintiffs alternatively allege that the lending agreements are "evidence of indebtedness" under the Securities Act, *see* TAC ¶ 156, this analysis rises and falls with *Reves*. E.g., *Procter & Gamble Co. v. Bankers Tr. Co.*, 925 F. Supp. 1270, 1280 (S.D. Ohio 1996) ("The test [of] whether an instrument is within the category of 'evidence of indebtedness' is essentially the same as whether an instrument is a note.").

[22] The TAC's improper legal arguments that deposit accounts are exempt from the Securities Act, ¶ 236, should be disregarded. *See Cunha v. WinnCompanies*, 2014 WL 2871588, at *2 (D. Conn. June 24, 2014).

[23] These factors are the (1) parties' motivations; (2) plan of distribution; (3) expectations of the investing public; and (4) alternative regulatory schemes. *Reves*, 494 U.S. at 66-67.

invest in the future success of the buyer," and "price to be paid might vary along with the success, or lack thereof, of the buyer's business. Instead, the amount to be paid is contractually established, and must be paid"). Here, Plaintiffs agreed to loan digital assets in exchange for contractually-obligated interest that was expressly dependent on market conditions, and made loans irrespective of Genesis's business success. Plaintiffs themselves allege that the Genesis lending arrangements appealed to lenders because "they would receive profit in the form of interest on those assets," TAC ¶ 187. Such facts are common to every lender and indicate a commercial lending purpose. *See Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 43 (S.D.N.Y. 1991) (no security where participants earning "fixed rate of interest" on loan had commercial motivations).

**The Lending Agreements Were Not Subject To Common Trading**. The second *Reves* factor considers "'the plan of distribution' for the instrument, including whether it is subject to 'common trading for speculation or investment.'" *Kirschner v. J.P. Morgan Chase Bank, N.A.*, 2020 WL 2614765, at *8 (S.D.N.Y. May 22, 2020). The inquiry is whether "there was a secondary market for the [notes]," *Nat'l. Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1015 (S.D.N.Y. 1991), or whether they were sold to a "broad segment of the public," *Fragin v. Mezei*, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012). This factor cuts against Plaintiffs. There was no secondary market for the Lending Agreements. In fact, lenders were expressly *prohibited* from trading their interest in the Lending Agreements to others. Ex. B (MLA) § XVII; Ex. A (MBA) § XVII. It is not dispositive that the Lending Agreements were "publicly advertised," TAC ¶ 200, because Genesis imposed high lending minimums on institutional lenders, *id.* ¶ 135, and the Gemini Earn program was available only to those lenders that "held a Gemini digital asset platform account," *id.* ¶ 137; *see also Kirschner*, 79 F.4th at 306-07 (no security where notes were offered to limited group of lenders and secondary market was restricted). Moreover,

Plaintiffs represented that they were sophisticated parties. Ex. A (MBA) § VI(d); Ex. B (MLA) § V(d). Because the Lending Agreements limited participation to sophisticated individuals and entities, Plaintiffs cannot plausibly allege that they were sold to a broad segment of the public.[24]

***No Public Expectation That The Loans Were Securities***. The third factor examines "the reasonable expectations of the investing public." *Kirschner*, 79 F.4th at 307. The TAC fails to plead any allegations that "there exist[ed] 'public expectation that the notes would be traded as securities.'" *Schentag v. Nebgen*, 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018). As described above, the reasonable expectation of the public was to earn a market-based interest rate tied to the digital asset loaned. *See* ECF Nos. 137 at 32-34; 149 at 24-25. Additionally, the Lending Agreements prohibited lenders from transferring their rights to others. Ex. A (MBA) § XVII; Ex. B (MLA) § XVII. Accordingly, neither Plaintiffs nor the public expected these rights to be traded on a secondary market.[25] The MLAs further recited that the loans were "intended to be commercial loans . . . *not securities*." Ex. B (MLA) § XXV (emphasis added); *see also Kirschner*, 79 F.4th at 308 ("If buyers were given ample notice that the instruments were . . . loans and not investments in a business enterprise, it suggests that the instruments are not securities.") (cleaned up).

***Alternative Regulatory Schemes Were In Place***. "The last *Reves* factor is 'the existence of another regulatory scheme [to reduce] the risk of the instrument.'" *See Kirschner*, 79 F.4th at 309-10. The TAC alleges no facts demonstrating that there are insufficient regulatory schemes overseeing the Lending Agreements such that application of the securities laws is necessary. *Kirschner*, 79 F.4th at 308-09. As Plaintiffs acknowledge, Gemini was regulated by the New York

---

[24] *See Banco Espanol*, 973 F.2d at 55 (plan of distribution was limited to "sophisticated financial or consumer institutions and not to the general public").

[25] *See Reeder v. Succession of Palmer*, 736 F. Supp. 128, 131 (E.D. La. 1990) (where alleged securities "were not commonly traded," "it is unnecessary to examine the reasonable expectation of the investing public"); *Benedict v. Amaducci*, 1995 WL 413206, at *10 (S.D.N.Y. July 12, 1995) (note not a security where "there was no public expectation that the notes would be traded as securities").

Department of Financial Services for the relevant period, and was subject to New York's banking and anti-money laundering laws, among others. Both Gemini and Genesis were regulated by the U.S. Department of the Treasury Financial Crimes Enforcement Network. TAC ¶¶ 217-19. There were thus substantial regulatory structures in place, and the fact they did not prevent Genesis from the fallout of a marketwide crash does not transform ordinary lending arrangements into securities.

### B.    Plaintiffs Fail to Plead Control Over the Primary Violation

Even if Plaintiffs could plead the existence of a security (they cannot), their attempt to shift liability via a "control person" theory to the DCG Defendants—who did not issue the alleged securities and had no relationship with Plaintiffs whatsoever—fails as a matter of law. The limited purpose of control person liability is "to prevent [the] evasion of the provisions of the section by organizing dummies who will undertake the actual things forbidden by the section." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975). Consistent with this objective, courts have long held that "in order to incur controlling person liability, a defendant must possess 'actual control *over the transactions in question*.'" *Ross v. Bolton*, 1989 WL 80428, at *3 (S.D.N.Y. Apr. 4, 1989) (emphasis added). Accordingly, to establish control person liability under Section 15, Plaintiffs must plead both (1) control of the primary violator and (2) control of the transactions in question. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 578-81 (S.D.N.Y. 2012). Plaintiffs' vague, conclusory allegations—*e.g.*, that the DCG Defendants "exercised their power and influence to cause Genesis Global Capital to violate the Securities Act," TAC ¶ 531—plainly do not suffice to show that DCG had actual control over Genesis's alleged offer or sale of unregistered securities.[26] Plaintiffs' remaining control allegations fare no better.

***DCG.*** Nearly all of Plaintiffs' allegations concerning DCG relate to DCG's general control

---

[26] *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166-67 (S.D.N.Y. 2012).

of Genesis as its wholly owned, indirect subsidiary. *See* TAC ¶¶ 30, 533-35. It is black letter law that a mere parent-subsidiary relationship cannot establish control person liability.[27] Plaintiffs allege nothing more than facts typical of any parent-subsidiary relationship, *e.g.*, that (1) DCG had access to Genesis's books and records; (2) DCG and Genesis shared IT functions; and (3) Genesis displayed the DCG logo on its website. TAC ¶¶ 13, 132. These allegations say nothing about DCG's *actual* control over the primary violation, and courts routinely disregard such allegations.[28]

Plaintiffs' recycled allegations concerning the Note and intercompany loans remain unpersuasive. Plaintiffs claim that "[n]o party other than a subsidiary completely controlled by DCG and Silbert would have 'sold' a $1.1 billion debt for a 10-year promissory note at 1% interest," TAC ¶ 364. But these allegations are conjecture, not fact, *see Twombly*, 550 U.S. at 555-56, and they are wrong on their face—Genesis did not "sell" a collectible $1.1 billion debt to DCG, it exchanged a $1.1 billion claim into the 3AC bankruptcy estate, the recovery on which was (and continues to be) highly uncertain, for a 10-year promissory note from a creditworthy counterparty. *See* TAC ¶¶ 39, 43, 356, 400. In any case, a parent engaging in a transaction that is favorable to a subsidiary does not evince control over the subsidiary's operations, but rather shows simply that the parent has a financial interest in the success of the subsidiary.[29] Similarly, allegations that DCG caused Genesis to extend the maturity date on loans from Genesis to DCG for no consideration, TAC ¶ 539, do not suffice. The TAC itself concedes that Genesis made several "objections" before

---

[27] *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460-61 (S.D.N.Y. 2018) (allegation that the defendant was the primary violator's corporate parent "says nothing regarding the control [defendant] actually exerts over [the primary violator's] operations *and,* in particular, its preparation of its financial disclosures"); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) (parent-subsidiary relationship cannot establish control, as entities "are regarded as legally distinct").

[28] *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("access to another firm's books and records…does not suggest any concomitant [] control" over transaction in question); *see also Duoyuan*, 887 F. Supp. 2d at 580 (the "appointment of [a director] to the DGW Board, [the] ability to inspect DGW's facilities and receive financial reports, and [the] right to approve certain of DGW's actions" insufficient to plead control).

[29] *See Finjan LLC v. Trustwave Holdings, Inc.*, 2021 WL 5051147, at *11-12 (D. Del. Oct. 29, 2021) (allegations that parent financed subsidiary's operations through non-arm's-length intercompany loans insufficient for control).

agreeing to the proposed terms, including interest. *Id.* ¶¶ 412-14. *See Alpine View Co. v. Atlas Copco AB*, 205 F3d 208, 219 (5th Cir. 2000) (in alter ego context, intercompany loans did not support "requisite domination" and interest-bearing loans "suggest separation of corporate entities"). The TAC also conveniently omits various parts of the negotiations which are necessary to put the discussions into context. In any case, Genesis—as a wholly owned subsidiary of DCG— is much better positioned to assess DCG's creditworthiness than ordinary third parties, so a decision to lend to DCG on favorable terms is a reasonable one.

As a last-ditch effort, Plaintiffs newly allege that the "GGC and GGH operating agreements" establish control. TAC ¶¶ 530-31. According to Plaintiffs, these operating agreements provided DCG and Silbert with "the power and authority to put [GGC and GGH] into bankruptcy." *Id.* ¶ 54. But these allegations have no basis in fact. Judicially-noticeable court records in the bankruptcy proceeding demonstrate that DCG had nothing to do with the decision to initiate bankruptcy—indeed, as the bankruptcy court explained, an independent Special Committee was the "final decision maker" with respect to such decision.[30] Moreover, neither operating agreement vests DCG with control over the decision to file for bankruptcy: The GGH Operating Agreement requires majority Board approval, but as Plaintiffs themselves point out, the agreement allots DCG only a minority position and provides it with the right to block (but not commence) such proceedings. *See* TAC ¶ 118; Ex. I (GGH Op. Agmt.) ¶ 5(a)-(b). Plaintiffs thus concede that DCG had no control over the GGH Board. And the GGC Operating Agreement provided only GGH (again, whose Board DCG did not control) with the right to make that decision, *see* Ex. J (GGC Op. Agmt.) ¶ 6. On the face of the TAC, the DCG Defendants had no power to initiate bankruptcy proceedings. But even if they did, that has no bearing on whether the DCG

---

[30] *See In re Genesis Glob. Holdco, LLC*, 23-10063-SHL, ECF No. 1691 (Memorandum of Decision), at 9 n.15.

Defendants had control over the *transaction in question*—the issuance of unregistered securities. The operating agreements are of no help to Plaintiffs in that regard, either: Plaintiffs allege that those agreements were "entered into" in 2022, TAC ¶¶ 115, 117, years after the so-called "Genesis Yield" program began, *id.* ¶ 131.

   ***DCG Individuals.*** Plaintiffs' allegations concerning Silbert and Murphy rely almost entirely on them fulfilling the responsibilities required by their positions at DCG. TAC ¶¶ 542-49, 558-64. Plaintiffs generally assert that Silbert, as the CEO of DCG, and Murphy, as the COO of DCG and a director of GGH, had the power and authority to direct Genesis. *Id.* But that is wrong as a matter of fact (as discussed above) and insufficient as a matter of law—assertions that Silbert and Murphy held positions at a parent company simply cannot establish control over a subsidiary's daily operating decisions.[31] Similarly, allegations that Silbert owned a minority share of DCG are insufficient to establish control. *See Li v. Eqonex Ltd.*, 2024 WL 4241951, at *16 (S.D.N.Y. Sept. 18, 2024) (minority stock ownership and ability to appoint minority of board are insufficient to plead control).[32] Plaintiffs also point to Silbert and Murphy's general and strategic involvement at Genesis. TAC ¶¶ 80, 537-38. But allegations that Silbert engaged in discussions or reviewed communication materials or that Murphy worked closely with Genesis on "strategy, execution, marketing and all management matters," *id.* ¶ 80, are of no significance—these examples are typical of any parent-subsidiary relationship and are nothing more than guidance from officers of a corporate parent, which Genesis was under no obligation to follow.[33]

---

[31] *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 525 (S.D.N.Y. 2016) (no inference of control over subsidiary based on executives' positions at parent company).

[32] The fact that Silbert founded DCG is also of no help. *See Sloane Overseas Fund, Ltd. v. Sapiens Intern. Corp., N.V.*, 941 F. Supp. 1369, 1379 (S.D.N.Y. 1996) (allegations that executive was founder, minority shareholder, and could appoint minority board seat insufficient to establish control).

[33] *See In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 187 (2d Cir. 2011) ("allegations of advice, feedback, and guidance" fail to imply power to control, "rather than merely inform" ultimate decisions).

**C.      Plaintiffs Have No Damages Recoverable Under the Securities Act**

Even if Plaintiffs could establish liability against the DCG Defendants, there is nothing for them to recover here in light of the distributions they already received in the bankruptcy proceeding. *Supra* at 7-8. Section 12(a) of the Securities Act provides that plaintiffs can sue to "recover the *consideration paid* for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if [they] no longer own[] the security," 15 U.S.C. § 77l(a)(2) (emphasis added), *i.e.*, rescission or money damages. Here, Plaintiffs seek "rescission or a recessionary [*sic*] form of relief for Defendants' wrongful conduct in connection with the purchase of Genesis Yield securities." TAC ¶ 272. The institutional Plaintiffs seek the return of digital assets lent to Genesis, plus interest from the end of the Class Period onward. The Earn Plaintiffs seek damages for unpaid interest on their loans from the end of the Class Period through June 20, 2024, the date Earn users recovered their assets. *Id.* ¶¶ 22-23.

Under any theory, Section 12 entitles Plaintiffs only to the *consideration* originally paid for the security. In this context, recovery is limited to the *value* of the digital assets at the time of Plaintiffs' original loans in 2021 through 2022, offset by any income or excess value received thereon (including any interest payments made prior to the redemption freeze). That is, rescissory damages are "measured by the difference between the amount Plaintiffs invested and the amount realized when Plaintiffs sold the securities back to Defendants, reduced by the cash income received as distributions while Plaintiffs owned the units." *Maher v. Glob. Factors LLC*, 2024 WL 3356985, at *31 (S.D.N.Y. July 8, 2024). Having recovered over 100% of the value of the "amount Plaintiffs invested," Plaintiffs have already recovered more than Section 12 permits.

Nevertheless, Plaintiffs contend they are also entitled to the monthly interest payments on their loans pursuant to the Lending Agreements from the time of the redemption freeze through

the present. But Courts in the Second Circuit are clear that where, as here, plaintiffs have already recovered the equivalent of rescission damages, they are not entitled to additional benefit-of-the-bargain damages, such as hypothetical interest payments: "Rescission and restitution are alternatives to money damages; a plaintiff cannot both rescind a transaction and ask for the benefit of the bargain rescinded."[34] Moreover, the "interest" contemplated by Section 12 is pre-judgment interest—not monthly interest payments pursuant to a contract. Any award of pre-judgment interest is discretionary and intended to "fully compensate" a plaintiff for actual damages suffered. *See Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 614-15 (2d Cir. 1994) ("[C]ourts must be careful that an award does not overcompensate a plaintiff."). Given that Plaintiffs have been made whole (and then some), there are no recoverable damages here.

## II.    Counts II and III: Plaintiffs' Exchange Act Claims Should Be Dismissed

Plaintiffs' claims under the Exchange Act likewise fail. As an initial matter, Plaintiffs' failure to plead a cognizable security forecloses their Exchange Act claims. *See* Part I.A. But even if that fundamental defect could be overlooked (it cannot), a cursory review of the TAC demonstrates that the DCG Defendants played no material role in the Exchange Act allegations. All of Plaintiffs' complaints concern their dealings with Gemini and Genesis: alleged statements by Genesis representatives regarding Genesis's solvency, *e.g.*, TAC ¶¶ 47, 142, 469-579; alleged representations regarding the financial risk of the lending programs, *id.* ¶ 35; and Genesis's ultimate decision to stop honoring redemption requests, *id.* ¶ 53. Glaringly missing is a single

---

[34] *In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *5-6 (S.D.N.Y. Mar. 30, 2009) (plaintiffs who had received rescission-like money damages in a separate settlement could not "seek additional interest or dividends as benefits of [securities] purchases they have already elected to disavow"); *see also Aimis Art Corp. v. N. Tr. Secs., Inc.*, 641 F. Supp. 2d 314, 320-21 (S.D.N.Y. 2009) (plaintiffs who elected rescission could not avail themselves of benefit of the bargain damages in the form of the reduced interest earned on their securities); *Maher*, 2024 WL 3356985, at *32 (declining to award expected distributions and prejudgment interest thereon in addition to rescissionary damages where it would "give Plaintiffs far more than would be necessary to make them whole").

allegation of a false statement by any DCG Defendant to any Plaintiff. In an effort to compensate for these shortcomings, Plaintiffs assert that the DCG Defendants are liable as control persons for Genesis's alleged misstatements and omissions, and also allege that the DCG Defendants are susceptible to "scheme liability" for supposedly causing Genesis to engage in the relevant conduct. Plaintiffs fail on all fronts. They do not adequately allege the elements of a primary violation, and certainly do not plead "actual control" by the DCG Defendants over any of Genesis's conduct.

### A.    Plaintiffs Fail to Plead a Primary Violation of Section 10(b)

Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Even if Plaintiffs could allege a security, Section 10(b) requires a showing of a materially false or misleading statement or omission by the defendant, scienter, reliance, loss causation, and economic damages. *See* Stoneridge *Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Here, the allegedly misleading statements or omissions fall into two categories: (1) representations by Genesis that Genesis is not insolvent or subject to any bankruptcy proceedings, TAC ¶ 142; and (2) allegedly false and misleading statements made by Genesis in tweets and private discussions with Gemini concerning Genesis's financial health in the wake of 3AC's collapse, *id.* ¶¶ 303-42, 353-451.[35]

### 1.    Plaintiffs Fail to Plead a Strong Inference of Scienter

Plaintiffs come nowhere close to alleging the required "strong inference" that the DCG Defendants acted with scienter with particularity. 15 U.S.C. § 78u-4(b)(2). The inference of scienter must be at least as "cogent and [] compelling" as the competing inference of nonfraudulent intent, and courts may not draw reasonable inferences in the plaintiffs' favor at the pleading stage.

---

[35] To the extent Plaintiffs identify representations made by the DCG Defendants, these are non-actionable as the TAC unambiguously alleges that their securities claims are premised on *Genesis*'s misstatements. *See* TAC ¶¶ 578-83, 593-94, 597, 612. In any event, Plaintiffs fail to plead with particularity that these statements were actually false, made with scienter, or directly relied upon. Thus, these misstatements independently fail as a matter of law.

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). To meet this high burden, Plaintiffs must plead particularized facts showing (1) Defendants' motive and opportunity to commit fraud, or (2) circumstantial evidence of conscious misbehavior or recklessness. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). They do neither here.

### a. Plaintiffs Fail to Plead Scienter as to the Individual DCG Defendants

***No Motive or Opportunity***. Motive is adequately alleged when a plaintiff asserts "a concrete and personal benefit . . . resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs' only allegations of a personal benefit to any individual Defendant relate to maximizing management fees to Grayscale, another DCG subsidiary (who had nothing to do with the lending arrangements at issue here), debt repayment by Genesis, and protecting the survival of DCG and Genesis as a going concern. *See* TAC ¶¶ 37-38, 40, 347. Such allegations do not suffice. There are no allegations that any management fees earned by Grayscale flowed to the individual DCG Defendants. Likewise, screenshots of Genesis's debt repayments (governed by their own lending agreements) to DCG and Silbert in the months leading up to the 3AC default— which Plaintiffs mischaracterize as "capital withdrawals"—cannot support a personal benefit. *See* TAC ¶¶ 347-50. Moreover, "[t]he selling of even considerable shares is not sufficient, standing alone, to infer scienter." *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 319 (D. Conn. 2017). Plaintiffs' allegations as to HQ Cash Management Fund similarly fail on their own terms. *See* TAC ¶¶ 287-93. Plaintiffs assert an unadorned "belief" that Silbert was an investor in the HQ Cash Management Fund without any factual basis. And they are wrong: Silbert was *not* an investor, and the records they cite do not show that the $99 million so-called "capital withdrawal" by HQ Cash Management Fund (more accurately, a loan repayment by Genesis) in June 2022 occurred after the announcement of 3AC's insolvency (it did not). *See id.* ¶ 349. In any case, "[t]he theory that

defendants engaged in fraud 'to protect the very survival of the company' is 'far too generalized'"
to support an inference of scienter, and the individual DCG Defendants' alleged desire to keep
Genesis from bankruptcy does not establish motive.[36]

**No Conscious Misbehavior or Recklessness**. Having failed to allege scienter through
motive, the strength of the circumstantial allegations of conscious misbehavior or recklessness
must be "correspondingly greater." *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp.
3d 772, 780 (S.D.N.Y. 2021). This "significant burden" requires alleged "conduct which is highly
unreasonable and which represents an extreme departure from the standards of ordinary care."
*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269-70 (2d Cir. 1996). Plaintiffs' allegations boil down to
the notion that the DCG Defendants recklessly disregarded Genesis's insolvency and financial
condition in the run-up to 3AC's default and in the wake of its collapse in June 2022. *See*, *e.g.*,
TAC ¶¶ 39, 43-45, 384-86, 281-83, 351, 439, 579. Plaintiffs plead no facts to show that the DCG
Defendants disbelieved Genesis's financial reporting or that such reporting allegedly lacked a
reasonable basis. *See* TAC ¶¶ 355, 384-99. Instead, Plaintiffs try to impute sinister connotations
to the fact that the DCG Defendants discussed options to help a distressed subsidiary and ultimately
issued the Note. *See id.* ¶¶ 309-17, 330, 355-56. The desire to assist a subsidiary is not an inherently
fraudulent act—it is one shared by any responsible corporate parent. *See Russo*, 777 F. Supp. 2d
at 519. Plaintiffs offer little more than shopworn, conclusory allegations that the individual
Defendants held leadership positions and had access to undefined non-public information, *e.g.*,
TAC ¶¶ 81, 583, which are "entitled to no weight."[37]

### b. Plaintiffs Fail to Plead Scienter as to DCG

---

[36] *Russo v. Bruce*, 777 F. Supp. 2d 505, 519 (S.D.N.Y. 2011); *Francisco v. Abengoa*, 481 F. Supp. 3d 179, 213
(S.D.N.Y. 2020) (no motive based on "desire for the corporation to appear profitable and [] keep stock prices high").
[37] *See In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (collecting cases).

A defendant corporation's scienter can be pled by (1) imputing the scienter of the individual who made the challenged statement; (2) imputing the scienter of senior officers or directors; or (3) in "exceedingly rare instances," pleading a "statement [] so 'dramatic' that collective corporate scienter may be inferred." *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020). Plaintiffs fail to plead scienter by any of these methods. As set forth above, Plaintiffs cannot impute any individuals' scienter to DCG. Plaintiffs' only remaining option is to plead DCG corporate scienter through a "dramatic" misstatement, and they make no attempt to do so. There are no allegations that DCG even spoke to Plaintiffs at all during the class period,[38] nor do Plaintiffs identify any *statement* that comes remotely close to the sort of readily ascertainable "dramatic" corporate statement that can give rise to an inference of scienter. *E.g.*, *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (strong inference of scienter if a company announced it had "sold one million SUVs, [] and the actual number was zero").

## 2.    Plaintiffs Fail to Plead Reliance

"Reliance is an essential element of a securities fraud action because it 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 445 (S.D.N.Y. 2013). In an ordinary Section 10(b) case, plaintiffs may rely on the "fraud-on-the-market" presumption to establish individual (and classwide) reliance on public misstatements made in an efficient market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). Here, there is no efficient market: The Lending Agreements are private contracts. Thus, Plaintiffs must either establish that the *Affiliated Ute* presumption of reliance for omissions cases applies, or plead actual reliance through particularized factual allegations. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256-57 (2d Cir. 2016). Here, Plaintiffs

---

[38] "A subsidiary's scienter is [not], automatically and without more, imputed to its parent when the subsidiary stands at the center of a fraud." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 301 n.9 (S.D.N.Y. 2019).

cobble together a mishmash of attenuated theories: they allege direct reliance on statements in the Lending Agreements by only one Plaintiff, Translunar (an institutional lender), TAC ¶ 461; invoke the *Affiliated Ute* presumption of reliance as to the remaining Plaintiffs, *id.* ¶ 461; and assert indirect reliance as to Earn Plaintiffs, premised on extra-contractual statements that Genesis allegedly made to Gemini, *id.* ¶ 474. These disjointed efforts to plead reliance uniformly fail.

**a. Plaintiffs Fail to Plead Reliance on the Lending Agreements**

Out of the scores of alleged misrepresentations identified in the 690-paragraph TAC, Plaintiffs' theory of actual reliance largely hangs on just two of them—Genesis's contractual representation and warranty in the Lending Agreements that "it is not insolvent" and "there are no proceedings . . . which could reasonably be anticipated to have any adverse effect on the transactions." *Id.* ¶ 462. Plaintiffs contend these representations were false only in agreements executed after June 13, 2022, the date of Genesis's purported insolvency post-3AC collapse. *Id.* ¶ 463. Plaintiffs offer two theories of reliance premised on the Lending Agreement, but both fail.

*First*, Plaintiffs argue that they and class members who entered into Lending Agreements before June 13, 2022 are entitled to the *Affiliated Ute* presumption of reliance, alleging two "material omissions" that Genesis "had a duty to disclose" once they manifested: (1) "that Genesis [] was insolvent;" and (2) "that 3AC's default and bankruptcy proceedings could reasonably be anticipated to have an adverse effect on the transactions contemplated by [the Lending Agreements] or the accuracy of the representations and warranties made" therein. *Id.* ¶ 469. To the extent Plaintiffs advance a pure omissions theory, which occurs "when a speaker says nothing, in circumstances that do not give any special significance to that silence," that theory can be swiftly rejected: "Pure omissions are not actionable under Rule 10b-5(b)." *Macquarie Infrastructure Corp. v. Moab P'ers, L.P.*, 601 U.S. 257, 258 (2024). And if Plaintiffs mean to allege that the

statements involved "half-truths," *i.e.*, omitted facts necessary to make statements not misleading, *Affiliated Ute* does not apply to "misstatements whose only omission is the truth that the statement misrepresents." *Waggoner v. Barclays PLC*, 875 F. 3d 79, 96 (2d Cir. 2017). However construed, Plaintiffs cannot invoke the *Affiliated Ute* presumption.

*Second*, the TAC asserts that Translunar, the only Plaintiff who executed a Lending Agreement after June 13, 2022, "reviewed and relied upon the representations and warranties by Genesis" concerning Genesis's solvency in deciding to enter and remain in a lending relationship with Genesis. TAC ¶¶ 67, 462-63. This is the *first time* (out of four attempts) that Plaintiffs allege that a particular investor actually read and relied upon the purported misrepresentations in the Lending Agreements. That alone should give the Court pause before crediting this conclusory allegation. More crucially, the TAC does not provide the requisite factual allegations necessary to establish actual reliance, such as *who* at Translunar reviewed those statements, *when* Translunar reviewed them, or *how* it relied upon them. Courts have rejected allegations that "lack supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations," *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011), or fail to "particulariz[e] who, on behalf of [a business plaintiff] in fact read and relied on the statement," *Devaney v. Chester*, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989). That minimal level of detail is notably absent here.

### b. Plaintiffs Fail to Plead Reliance on Extra-Contractual Statements

None of the other alleged misrepresentations, made outside of the Lending Agreements beginning in June 2022 are actionable, because Earn users disclaimed reliance on any such representations.[39] Even if these extra-contractual statements were actionable, Plaintiffs do not

---

[39] Earn users acknowledged in the MLA that they were "not relying on any communication (written or oral) of [Genesis] as investment advice or as a recommendation to enter into any Loan," Ex. B (MLA) § V(i), and that the MLA "constitute[d] the entire Agreement among the parties with respect to the subject hereof and supersede[d] any

allege that any Plaintiff actually read, reviewed, or relied on them in making lending decisions.

Instead, Plaintiffs invoke a fallback theory of "agency" reliance (as to Earn users only), alleging

that those "who purchased Genesis Yield securities . . . did so in reliance on Genesis Global

Capital's direct representations to Gemini, the appointed agent of Earn users." TAC ¶¶ 474-75.

But an "agent is an agent only by virtue of the agent's consent to act on behalf of a particular party,

the principal, who has also consented that the agent shall act on his or her behalf." *G.K. Alan Assoc.*

*v. Lazzari, Inc.*, 44 A.D.3d 95, 101 (N.Y. 2d Dep't 2007). Here, the MLA expressly *prohibits*

Gemini from making any lending decisions on Plaintiffs' behalf. Ex. B (MLA) § 1(b); *see* TAC ¶

129. Gemini was appointed to act as an agent for the *limited purpose* of administratively facilitating

lending transactions.[40] And Gemini disavowed responsibility for any statements made by Genesis

in the Authorization Agreement signed by all Earn users.[41] Gemini thus did not make any lending

decisions on Plaintiffs' behalf, much less rely on the alleged misstatements "in connection with"

any transaction.[42] The reason is simple: Plaintiffs made their own lending decisions.

### 3.   Plaintiffs Fail to Plead Loss Causation

Loss causation requires "that the defendant's misrepresentation (or other fraudulent

conduct) proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544

U.S. 336, 346 (2005). Loss causation is established either by alleging losses were "caused by the

materialization of the risk concealed by the fraudulent statement," *In re Omnicom Grp., Inc. Sec.*

---

prior negotiations, understandings and agreements," *id.* § XVI. *See also Harsco Corp. v. Segui*, 91 F.3d 337, 343 (2d Cir. 1996) (no reasonable reliance on extra-contractual statements for 10(b) claim where contract "limited the bases upon which a fraud action could be brought" to contractual representations); *Simmtech Co. v. Citibank, N.A.*, 2016 WL 4184296, at *14 (S.D.N.Y. Aug. 3, 2016) (precluding reliance based on identical non-reliance clause).

[40] Ex. B (MLA) § 1(b) ("Principal [Gemini Earn lender] has specifically directed Agent [Gemini] . . . to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets").

[41] *See* Ex. K (Auth. Agmt.) at 4-5 "[Gemini] shall not be responsible for any statements, representations, warranties, or covenants made by any Borrower in connection with any Loan.").

[42] *See In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71-72 (D. Conn. 1998) (agency reliance only where plaintiffs "allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations").

*Litig.*, 597 F.3d 501, 513 (2d Cir. 2010), or by a corrective disclosure, which revealed something previously concealed from the market and "negatively affected the value of the security," *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161. 173 (2d Cir. 2005). Plaintiffs fail to plead either.

Plaintiffs advance a materialization of the risk theory, under which a misrepresentation or omission is the proximate cause of an investment loss if the risk that caused such loss was "within the zone of risk concealed by the misrepresentations[.]" *Lentell*, 396 F.3d at 173. Plaintiffs argue that the risk that "materialized" was Genesis's insolvency in June 2022 after the 3AC default, at which point Genesis did not have the assets to honor redemption requests. TAC ¶ 52. And that materialization was only "revealed" to lenders in November 16, 2022, following the FTX collapse, when Genesis suspended redemptions. *Id.* Plaintiffs' theory fails on its face. Materialization of the risk requires an issuer to misrepresent a current risk that *later* materializes, giving rise to losses. *See DoubleLine Cap. LP v. Odebrecht S.A.*, 413 F. Supp. 3d 187, 213 (S.D.N.Y. 2019). Plaintiffs have it backwards here—they allege that the purportedly misleading statements (including the supposed concealment of Genesis's financial condition through "dubious transactions and accounting methods," TAC ¶ 458) occurred *after* the risk had already materialized in June 2022. The allegation is not that Genesis concealed a *risk* of insolvency, but rather that it concealed that it was *already* insolvent. That is not a materialization of the risk theory.[43] Crediting Plaintiffs' allegation that Genesis's insolvency "materialized" in June 2022 dooms loss causation altogether.

Moreover, any connection between the alleged fraud in June 2022 and investor losses is too attenuated to support causation. Plaintiffs contend that the true extent of Genesis's financial condition began to be revealed in November 2022, meaning that Genesis—an allegedly insolvent entity, purportedly without assets to honor loan redemptions—continued operating business as

---

[43] The real "risk" here—that Genesis might default—was disclosed: All Lending Agreements and Authorization Agreements contemplated the risk of default. *See* Ex. B (MLA) § VII; Ex A. (MBA) § VII; Ex. K (Auth. Agmt.) at 1.

usual and meeting loan obligations for five months after Defendants allegedly took steps to conceal Genesis's purported insolvency. And Genesis filed for bankruptcy in January 2023—seven months after the alleged fraud, on the heels of the intervening FTX collapse and market fallout. *See Collier v. Aksys Ltd.*, 2005 WL 1949868, at *13 (D. Conn. Aug. 15, 2005) (revelation seven months after fraud was "virtual lifetime in the market" and too remote for causal link).

### 4.    Plaintiffs Fail to Plead Cognizable Damages

Plaintiffs must also plead damages to withstand dismissal. *Aimis*, 641 F. Supp. 2d at 319. Section 28(a) of the Exchange Act limits recovery to actual damages.[44] The typical measure of damages in a Section 10(b) case are a plaintiff's out-of-pocket losses, which is "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct," *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972), or rescission, *see Aimis*, 641 F.2d at 319. Courts treat the damages provisions under the Exchange Act and Securities Act as identical, as they arise out of a common equitable principle of restoring plaintiffs to their position absent the fraud. *UBS Auction Rate*, 2009 WL 860812, at *3. Whatever the measure of damages, Plaintiffs' recovery is capped at the value of the amounts loaned to Genesis pursuant to the Lending Agreements—that is, the value of the digital assets they loaned on the dates they extended such loans. *See* 15 U.S.C. § 78bb.

*First*, having already recovered in the bankruptcy, the Earn Plaintiffs attempt to obtain what they were unable to recover in the bankruptcy proceeding—contractual interest payments from the end of the Class Period through the present, pursuant to contracts that were terminated over two years ago. And they want non-parties to those contracts to pay for those interest amounts. But as discussed *supra* at 7, the Earn Plaintiffs have recovered 100% of their digital assets that

---

[44] 15 U.S.C. § 78bb(a)(1) ("No person . . . shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages to that person on account of the act complained of.").

were frozen on November 16, 2022, representing a 237% recovery over the dollar value of their assets at the time of the redemption freeze. The law is clear: they are not entitled to more.[45]

*Second*, the institutional Plaintiffs have recovered more than half of their in-kind digital assets following distributions in the Genesis bankruptcy (the *first* in a series of in-kind distributions pursuant to the Plan), *see* TAC ¶ 18, which already represents a recovery of over 100% of Plaintiffs' initial deposits with Genesis when valued on a dollar basis. As shown below,[46] as of the date of the initial distributions on August 2, 2024, each institutional Plaintiff has already recovered digital assets worth between 116% and 145% of the value of their initial deposits.[47]

| ($ in millions) | | Morone | | Translunar | | Ameli | |
|---|---|---|---|---|---|---|---|
| | | Units | $ | Units | $ | Units | $ |
| BTC | | 243.71 | $6,898,462 | 180.00 | $3,594,559 | 50.00 | $1,169,472 |
| ETH | | 999.92 | 1,344,897 | 1,400.00 | 2,208,109 | - | - |
| **Total Claims at Time of Deposit** | **[A]** | | **$8,243,359** | | **$5,802,668** | | **$1,169,472** |
| BTC | | 124.00 | $7,615,469 | 92.30 | $5,668,611 | 25.64 | $1,574,682 |
| ETH | | 658.00 | 1,964,795 | 922.18 | 2,753,639 | - | - |
| **Total Amounts Received on 8/2** | **[B]** | | **$9,580,263** | | **$8,422,250** | | **$1,574,682** |
| **Implied Recovery on Claims at Time of Deposit** | **[B]/[A]** | | **116.2%** | | **145.1%** | | **134.6%** |

Any notion that the institutional Plaintiffs are entitled to the same number of digital asset tokens originally lent (*e.g.*, 100 bitcoin), rather than the dollar value of such tokens at the time of

---

[45] *See Aimis*, 641 F. Supp. 2d at 319-21 (dismissing Section 10(b) claims for failure to plead cognizable damages where plaintiff had "received the par value of its [initial] investment," and precluded plaintiff from "receiv[ing] further recovery from the transaction" in the form of interest or dividends on his original investment).

[46] The Court may take judicial notice of crypto prices. *See Paypolitan OU v. Marchesoni*, 2022 WL 17541091, at *2 n.3 (S.D.N.Y. Aug. 26, 2022).

[47] On August 4, 2021, June 15, 2022, and October 24, 2022, Morone made deposits of BTC and ETH, valued at $8.24M. ECF No. 34-2 at 6; Ex. L (BTC Price Chart); Ex. M (ETH Price Chart). On August 2, 2024, Morone received an initial distribution of 124 BTC and 658 ETH, TAC ¶ 18(c), valued at $9.58M on the distribution date. Ex. L (BTC Price Chart); Ex. M (ETH Price Chart). On September 2, 2022, Translunar made deposits of BTC and ETH, valued at $5.8M. ECF No. 1-3, Ex C; Ex. L (BTC Price Chart); Ex. M (ETH Price Chart). Translunar received 92.3 BTC and 922.18 ETH in the initial distribution, TAC ¶ 18(a), valued at $8.42M. Ex. L (BTC Price Chart); Ex. M (ETH Price Chart). On October 5, 2020, October 11, 2021, and July 19, 2022, Ameli made separate deposits of 50 BTC each, valued at $1.17M. ECF No. 171 at 182-83; Ex. L (BTC Price Chart). Ameli received 25.64 BTC in the initial distribution, TAC ¶ 18(b), valued at $1.57M. Ex. L (BTC Price Chart).

Plaintiffs' original "purchases" (*e.g.*, the value of 100 bitcoin at the time it was loaned in 2021) is contrary to law. Rescission is "a mutual accounting in which each party pays for benefits received from the other" in order to restore them to their position prior to the violation, and allows "a defrauded buyer of securities . . . to . . . recover only the excess of what he paid over the value of what he got." *In re Barrick Gold Secs. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016). The "security" here (digital assets) cannot itself be used to measure the difference in value between "what [Plaintiffs] paid" and "what [Plaintiffs] got," because those digital assets have always had a value untethered to any fraud alleged by Plaintiffs (*i.e.*, they never allege that their digital assets lost value because of the fraud)—a value that has more than *doubled* since the bankruptcy began.[48] Consistent with case law, rescission is thus appropriately measured in the dollar value of the assets, not the number of tokens.[49] And like the Earn Plaintiffs, the institutional Plaintiffs have recovered in excess of the maximum damages recoverable under the securities laws (100% of the value of their initial deposits). As a result, Plaintiffs cannot allege damages, which justifies dismissal.[50]

### B. Plaintiffs Fail to Adequately Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation

Even if Plaintiffs could allege a primary 10b-5(b) claim against Genesis, however, that still would not solve the fundamental problem with all of Plaintiffs' theories—they are not properly alleged against the *DCG Defendants*. To establish control person liability, Plaintiffs must plead,

---

[48] The practical reality of carrying out Plaintiffs' request for rescission in the form of the return of their original assets underscores the absurdity of that relief. Although Plaintiffs assert that they will tender their "securities,", TAC ¶ 528, they would eventually need to hand over the digital assets they recovered in the bankruptcy proceedings in exchange for a cash payment equal to the value of the digital assets at the time they initially loaned those assets. If at the time of tender, BTC and ETH prices are still more than double what it was at the end of the Class Period, Plaintiffs would give up more than fifty cents on the dollar as their damages "award"—something no rational plaintiff would ever seek.

[49] *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 136 (2d Cir. 2017) (equitable rescission "required the seller to refund the buyer the full original purchase price in exchange for the purchased item, regardless of its present value.")

[50] *See, e.g.*, *UBS Auction Rate*, 2009 WL 860812, at *5 (dismissing Section 10(b) claim where plaintiffs had recovered rescissionary damages in separate settlement).

in addition to a primary 10(b) violation, (1) control of the primary violator, (2) control of the transactions in question, and (3) intent to defraud (culpable participation). *In re Alstom*, 406 F. Supp. 2d 433, 486-87 (S.D.N.Y. 2005). Plaintiffs have not alleged these elements. As set forth in Part I.B, Plaintiffs' allegations do not establish that the DCG Defendants exercised actual control over the transactions in question—Genesis's alleged misstatements and omissions regarding its financial condition. TAC ¶¶ 13, 132.[51] At most, Plaintiffs allege the DCG Defendants' strategic involvement at Genesis, which is not sufficient under settled law. Nor do Plaintiffs plead culpable participation (akin to scienter), which requires particularized facts giving rise to "a strong inference that the controlling person knew or should have known that the primary violator was engaging in fraudulent conduct" or "ignored obvious signs of fraud." *Alstom*, 406 F. Supp. 2d at 491-92. For the same reasons discussed in Part II.A.1, Plaintiffs similarly cannot plead culpable participation.

### C.    Plaintiffs Fail to Plead "Scheme Liability" Against the DCG Defendants

Plaintiffs also assert a direct claim against the DCG Defendants for "scheme liability" pursuant to 10b-5(a) and (c). TAC ¶ 578. Scheme liability requires particularized allegations "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017). The scheme must be "integral to the purchase and sale of the securities in question." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986). Here, Plaintiffs allege that the DCG Defendants participated in a scheme to conceal Genesis's "insolvency" through intercompany loans and cause Genesis to make material misstatements and omissions concerning its financial condition. TAC ¶¶ 578, 587-89.

*First*, these allegations largely repackage Plaintiffs' Section 20(a) control person claim

---

[51] *See Youngers*, 195 F. Supp. 3d at 523 (control analysis is the same under the Exchange Act and the Securities Act).

premised on Genesis's alleged misstatements. It is well-settled law that misstatements "cannot form the 'sole basis'" for scheme liability. *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022).

*Second*, DCG's alleged participation in two intercompany transactions—the intercompany loans from Genesis to DCG in early 2022 and the $1.1 billion Note, TAC ¶ 587—cannot give rise to scheme liability. With respect to the intercompany loans, Plaintiffs conclusorily allege only that DCG received commercially favorable terms and intended to use the proceeds to "artificially prop up the value of GBTC." *Id.* ¶ 483(d). Even if loan terms were not commercially reasonable, that is not indicative of a scheme to defraud Plaintiffs.[52] There is nothing fraudulent about loaning money to a parent or executing a promissory note in support of a subsidiary. *See* ECF No. 137 at 25-26. As for the Note, Plaintiffs simply aver that the terms were commercially unreasonable and challenge how Genesis—not DCG—allegedly *represented* the Note to others. *See* TAC ¶ 587. That does not suggest fraud by DCG, which merely executed the Note to absorb its subsidiary's debt. Simply put, Plaintiffs take an objectively neutral series of events—a parent assisting a distressed subsidiary via a sophisticated financial transaction—and try to imbue it with sinister connotations. *See supra* Part II.A.1. This is not sufficient under Rule 9(b) or the PSLRA.[53]

*Finally*, the alleged scheme post-dates almost all "purchases" of "securities," because it began in June 2022, long after all but one Plaintiff established lending relationships and deposited assets. *See* Part II.A.3. The alleged scheme thus could not have been undertaken "in connection" with those transactions, and courts routinely reject scheme liability claims in such circumstances.[54]

### III.    Counts IV to XI: Plaintiffs Fail to Plead State Law Claims in the Alternative

---

[52] *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 251-52 (S.D.N.Y. 2018) (allegations company overstated value of asset sale to affiliate insufficient to establish scheme).

[53] *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (act must be "inherently deceptive" to constitute scheme).

[54] *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402-04 (S.D.N.Y. 2013) (no scheme liability where purported scheme post-dated decision to transact in securities); *Pross*, 784 F.2d at 459 (similar).

### A.    Plaintiffs Fail to Allege Violations of State Consumer Protection Laws

As a fallback, Plaintiffs allege violations of seven different state consumer protection laws[55] for allegedly "fraudulent marketing, advertising, and sales tactics." *See* TAC ¶¶ 477-84, 613-83. While the requirements vary by statute, all of them require at a minimum, that the plaintiff plead (1) a violation of a deceptive business practice as defined under the respective statute, (2) causation, and (3) damages or injury.[56] These claims, premised on the same allegations as the Exchange Act claims, fail for many of the same reasons.

To start, all of the claims fail because Plaintiffs do not adequately allege deceptive conduct *by DCG* (or any of its executives), and cannot impute Genesis's conduct to DCG based on mere corporate affiliation.[57] Plaintiffs must show that DCG was *independently* responsible for the conduct through its own actions, or pierce the corporate veil by alleging that DCG used Genesis as a sham to perpetrate a fraud. *Supra* n.49. For the reasons in Part II.C, Plaintiffs fail to do so.

Moreover, Plaintiffs fail to allege any fraudulent business practices premised on misrepresentations concerning Genesis's solvency before June 13, 2022. Deceptive acts under

---

[55] Namely, the California Unfair Competition Law ("CUCL"), Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), New York Uniform Deceptive Trade Practices Act ("NYUDTPA"), Texas Deceptive Trade Practices Act ("TDTPA"), Kansas Consumer Protection Act ("KCPA"), and Nevada Deceptive Trade Practices Act ("NDTPA").

[56] *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 838-39 (N.D. Cal. 2020) (CUCL); *Clinger v. Edgewell Pers. Care Brands, LLC*, 2023 WL 2477499 (D. Conn. Mar. 13, 2023) (FDUTPA); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 918 (N.D. Ill. 2013) (IUDTPA); *Royal Host Realty, LLC v. 793 Ninth Ave. Realty, LLC*, 192 F. Supp. 3d 348, 358 (S.D.N.Y. 2016) (NYUDTPA); *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 478 (Tex. 1995) (TDTPA); *In re Motor Fuel Temperature Sales Pracs. Litig.*, 279 F.R.D. 598, 604-05 (D. Kan. 2012) (KCPA); *Davenport v. GMAC Mortg.*, 2013 WL 5437119, *2 (Nev. Sept. 25, 2013) (NDTPA).

[57] *See Prudencio v. Midway Importing, Inc.*, 831 F. App'x. 808, 810 (9th Cir. 2020) (no vicarious liability for CUCL violation absent "personal participation" and "unbridled control"); *Garcia v. Kashi Co.*, 43 F. Supp. 3d 1359, 1394-95 (S.D. Fla. 2014) (FDUTPA); *DeJohn v. The TV Corp. Int'l.*, 245 F. Supp. 2d 913, 925 (N.D. Ill. 2003) (IUDTPA); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 143 (E.D.N.Y. 2009) (NYUDTPA); *Sw. Bell Tel. Co. v. Vollmer*, 805 S.W.2d 825, 832-33 (Tex. Ct. App. 1991) (TDTPA); *Huffman v. Blue Compass RV*, 2024 WL 2863250, at *5 (D. Kan. June 6, 2024) (KCPA); *cf. In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017) (CUCL and NDTPA survived where parent companies alleged to have directly controlled the fraud).

consumer protection statutes must be deceptive *at the time of the transaction*.[58] Here, Plaintiffs concede that contractual representations of Genesis's solvency were true when made as to all but one Plaintiff, and their theory of liability under the Exchange Act is premised on an alleged failure to correct those statements when they later became false. *See* Part II.A. But the consumer statutes do not impose liability for accurate statements that later become false based on a duty to correct. *Supra* n.50. Plaintiffs' failure on this score justifies dismissal of the FDUTPA, IUDTPA, NYUDTPA, NDTPA, and CUCL[59] claims. And Plaintiffs' consumer claims relate to private contracts between Plaintiffs and Genesis—not the consumer goods and services that these statutes seek to regulate.[60] There is no allegation that a consumer good was "sold"—the Lending Agreements were neither generally available to the public nor "sold" at all.[61]

Finally, Plaintiffs have no damages, which independently warrants dismissal. *See supra* n.56. As discussed in Part II.A.4, Plaintiffs have recovered in the Genesis bankruptcy, and thus fail to plead any harm capable of redress. And the IUDTPA claim fails because Plaintiffs seek only

---

[58] *E.g.*, *Hasemann v. Gerber Prods. Co.*, 2024 WL 1282368, at *9 (E.D.N.Y. Mar. 25, 2024) (FDUTPA liability asks whether statements were "misleading *when made*, not whether they would be misleading if made today"); *Camasta v. Jos A. Bank Clothiers, Inc.*, 761 F.3d 732, 737-38 (7th Cir. 2014) (IUDTPA); *Troy v. Am. Bar Ass'n.*, 2024 WL 1886753, at *4 (E.D.N.Y. Apr. 30, 2024) (NYUDTPA); *see also Salas v. Whirlpool Corp.*, 2024 WL 694067, at *8 (C.D. Cal. Jan. 24, 2024) (dismissing CUCL claim where plaintiff did not allege they "viewed or relied on" the alleged misrepresentations); *Davenport*, 2013 WL 5437119, at *2 (NDTPA liability requires knowledge of falsity).

[59] Plaintiffs invoke the "unfair" and "unlawful" prongs of the CUCL, *see* TAC ¶ 616, but plead no facts to establish a claim under either. The TAC alleges no predicate violation of another California law, as required to plead an "unlawful" act in violation of the CUCL. *See Vargas v. JP Morgan Chase Bank, N.A.*, 30 F. Supp. 3d 945, 952-53 (C.D. Cal. 2014). Nor do Plaintiffs allege "unfair" business practices under any recognized theory—there are no allegations that Plaintiffs' harm outweighed the utility of Defendants' conduct, or that any "unfairness" is "tethered to some legislatively declared policy." *See Palmer v. Apple Inc.*, 2016 WL 1535087, at *6 (N.D. Cal. Apr. 15, 2016).

[60] *See, e.g., Royal Host Realty*, 192 F. Supp. 3d at 358 ("Private contract disputes do not constitute conduct that affects consumers at large and, therefore, do not satisfy the consumer-oriented threshold requirement under [the NYUDTPA]"); *Baudoin v. Lender Processing Servs.*, 2012 WL 2367820, at *3 (D. Nev. June 21, 2012) ("As the transaction at issue did not involve the sale or lease of goods or services, a claim under NRS § 598.0915 is not viable."); *Mary Kay, Inc. v. Dunlap*, 2012 WL 2358082, *2-4 (N.D. Tex. June 21, 2012) (plaintiff who received rights under a contract was not a "consumer" under the TDTPA because goods or services did not form the basis of her complaint).

[61] *See Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147 (2d Dep't 1995) (NYUDTPA does not apply to "complex arrangements, knowledgeable and experienced parties and large sums of money").

damages, but the statute provides only for injunctive relief. *Sanchez v. Walmart Inc.*, 2024 WL 2132426, at *6 (N.D. Ill. May 13, 2024). Plaintiffs allege no future or ongoing harm for which injunctive relief under the IUDTPA would be appropriate. *See id.*[62]

### B.    Plaintiffs Fail to Allege Common Law Fraud

Plaintiffs assert a common law fraud claim in the alternative premised on the "same conduct" as the Exchange Act claims—specifically, that Genesis's alleged misstatements induced them to invest. TAC ¶ 63; *see also id.* ¶¶ 684-90. Under the MBA and MLA, New York state law governs this claim,[63] which in turn requires Plaintiffs to show a material false representation by the defendant made with intent to defraud, reliance, and damages. *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991) "Because these elements are substantially identical to those governing § 10(b), the identical analysis applies." *Id.* Plaintiffs' common law fraud claim thus fails for the same reasons that their Section 10(b) claim fails. *See* Part II, *supra*.

## <u>CONCLUSION</u>

For the foregoing reasons, the TAC should be dismissed in its entirety, with prejudice.

---

[62] Plaintiffs Translunar, Gowda, and the Texas subclass have failed to comply with the TDTPA's mandatory notice provision, which requires them to give Defendants 60-days pre-suit notice. *See* Tex. Bus. & Com. Code § 17.505(a).

[63] Ex. A (MBA) § XI; Ex. B (MLA) § X.

Dated: September 30, 2024

DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, AND MARK MURPHY


By: */s/ Jonathan D. Polkes*
Jonathan D. Polkes (admitted *pro hac vice*)
Caroline Hickey Zalka (admitted *pro hac vice*)
Tania C. Matsuoka (*pro hac vice pending*)
Amber Venturelli (*pro hac vice pending*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
jonathan.polkes@weil.com
caroline.zalka@weil.com
tania.matsuoka@weil.com
amber.venturelli@weil.com


Joshua M. Wesneski (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
joshua.wesneski@weil.com


Thomas D. Goldberg (ct04386)
Johanna S. Lerner (ct31495)
DAY PITNEY LLP
One Stamford Plaza
263 Tresser Boulevard
Stamford, CT 06901
Telephone: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
jlerner@daypitney.com
*Their Attorneys*

## CERTIFICATION OF COMPLIANCE WITH RULE XI(D)

I hereby represent pursuant to Rule XI(D) (Multiple Signatures) of the Electronic Filing Policies and Procedures of the United States District Court for the District of Connecticut that the other attorneys whose signatures appear on the foregoing consented to the inclusion of their signatures.

*/s/ Jonathan D. Polkes*

Jonathan D. Polkes