## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, REMO MARIA MORONE, DOMINIC MACRI, LARRY WIENER, DEREK WILSON, DANIEL AMELI, and LEE JACOBSON, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:23-cv-00082-SRU |

Plaintiffs,

v.

DIGITAL CURRENCY GROUP, INC., BARRY
SILBERT, MICHAEL KRAINES, MARK MURPHY,
MICHAEL MORO, and DERAR ISLIM,

Defendants.

## PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

| **SILVER GOLUB & TEITELL LLP** | **KAPLAN FOX & KILSHEIMER LLP** |
|---|---|
| Ian W. Sloss ct31244 | Donald R. Hall (CT Bar No. 416065) |
| Steven L. Bloch ct31246 | Jeffrey P. Campisi (admitted *pro hac vice*) |
| Johnathan Seredynski ct30412 | Jason A. Uris (*pro hac vice* forthcoming) |
| Krystyna Gancoss ct31660 | 800 Third Avenue, 38th Floor |
| One Landmark Square, Floor 15 | New York, NY 10022 |
| Stamford, CT 06901 | Telephone: (212) 687-1980 |
| Telephone: (203) 325-4491 | dhall@kaplanfox.com |
| isloss@sgtlaw.com | jcampisi@kaplanfox.com |
| sbloch@sgtlaw.com | juris@kaplanfox.com |
| jseredynski@sgtlaw.com | |
| kgancoss@sgtlaw.com | |

*Lead Counsel for Lead Plaintiffs Christopher Buttenham, Ashwin Gowda, William McGreevy, and Translunar Crypto LP, and the Proposed Class, and Counsel for the Additional Named Plaintiffs*

*Lead Counsel for Lead Plaintiff Remo Maria Morone and the Proposed Class, and Counsel for the Additional Named Plaintiffs*

Dated: November 14, 2024

**ORAL ARGUMENT REQUESTED**

### TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... iv

I.      PRELIMINARY STATEMENT ................................................................................ 1

II.     FACTS APPLICABLE TO ALL CLAIMS ................................................................ 6

III.    STANDARD OF REVIEW ........................................................................................ 7

IV.     SECURITIES ACT CLAIMS .................................................................................... 8

        A.      Facts Concerning Claims under the Securities Act ...................................... 8

        B.      The Complaint Adequately Alleges Claims under the Securities Act .................... 8

                1.      The Complaint Alleges Violations of the Securities Act for the
                        Offer or Sale of Unregistered Securities ....................................... 9

                2.      GGC Offered or Sold Genesis Yield Securities to Plaintiffs and
                        Members of the Class .................................................................. 10

                3.      The Terms of the Genesis Yield Investment Agreement Do Not
                        Waive Application of the Federal Securities Laws .................................. 13

                4.      Genesis Yield Investments Are "Securities" ............................................ 15

                        a.      The Genesis Yield Investments Are Notes Under
                                *Reves* ........................................................................ 15

                                i.      The Motivations of GGC and Investors
                                        Demonstrate that Genesis Yield are Notes
                                        under *Reves* ......................................................... 18

                                ii.     The Plan of Distribution for Genesis Yield
                                        Securities Demonstrates That They Were
                                        Notes under *Reves* ................................................ 22

                                iii.    The Expectations of the Investing Public Was
                                        that Lending Digital Assets to GGC Was an
                                        Investment ............................................................. 24

                                iv.     There is No Alternative Regulatory Regime
                                        or Risk-Reducing Factors to Protect Genesis
                                        Yield Investors ....................................................... 28

i

|  |  | b. | Genesis Yield Securities Are Investment Contracts Under *Howey* | 30 |
|  |  |  | i. | Genesis Yield Investors Funded a Common Enterprise through Horizontal Commonality | 32 |
|  |  |  | ii. | Genesis Yield Investors Participated in a Common Enterprise through Strict Vertical Commonality | 36 |
|  |  |  | iii. | Reasonable Investors Expected Profits in Genesis Yield to Come from GGC's Managerial Efforts | 37 |
|  | 5. | Defendants Controlled GGC and Are Liable under Section 15 of the Securities Act | 38 |
|  | 6. | The Complaint Adequately Alleges Recoverable Damages under the Securities Act | 48 |
| V. | EXCHANGE ACT CLAIMS | 51 |
|  | A. | Facts Concerning Claims under the Exchange Act | 51 |
|  |  | 1. | Misrepresentations and Omissions Regarding Risk Management Practices | 51 |
|  |  | 2. | Defendants Scheme to Cover Up GGC's Insolvency and Misrepresentations and Omissions Following 3AC's Default | 52 |
|  |  | 3. | Material Misrepresentations and Omissions Following DCG Promissory Note Transaction | 55 |
|  |  | 4. | Omission Regarding Unregistered Securities | 58 |
|  | B. | The Complaint Adequately Alleges Primary Violations of Section 10(b) of the Exchange Act. | 58 |
|  | C. | The Complaint Adequately Alleges a Violation of Section 10(b) Based on Material Misrepresentations or Omissions. | 59 |
|  | D. | The Complaint Adequately Alleges Scienter. | 60 |
|  | E. | The Complaint Adequately Alleges Reliance. | 64 |
|  |  | 1. | The Complaint alleges reliance on GGC's solvency representations. | 64 |
|  |  | 2. | Reliance is Presumed under *Affiliated Ute*. | 66 |

3.      The Complaint Alleges Investors Who Purchased Genesis Yield Securities through the Gemini Earn Platform Relied by and through Gemini. ................................................ 69

4.      The Complaint Alleges that Defendants' Misrepresentations and Omissions Were Part of a Scheme to Defraud. ......................................... 72

F.      The Complaint Adequately Allege Loss Causation. ............................................... 73

G.      The Complaint Adequately Alleges Cognizable Damages. ................................. 78

H.      The Complaint Adequately Allege Scheme Liability.......................................... 80

I.      The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act....................................................................................... 85

VI.      THE COMPLAINT ADEQUATELY ALLEGES STATE LAW CONSUMER PROTECTION CLAIMS ................................................................................... 87

A.      Defendants Directly Engaged in Unfair and Deceptive Conduct ........................ 88

B.      Defendants Had a Duty to Disclose GGC's Insolvency After June 13, 2022 ....... 91

C.      The Genesis Investment Contracts were not "Private Contracts" ....................... 92

D.      Plaintiffs Continue to Suffer Significant Financial Damages .............................. 92

VII.      THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW FRAUD ............... 93

VIII.      CONCLUSION.............................................................................................. 95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advisors, Inc. v. Heard,*
  1995 WL 66647 (S.D.N.Y. Feb. 17, 1995) ................................................................... 19

*Affiliated Ute Citizens of Utah v. United States,*
  406 U.S. 128 (1972) .................................................................................................. 66

*Aimis Art Corp. v. Northern Tr. Sec., Inc.,*
  641 F. Supp. 2d 314 (S.D.N.Y. 2009) ....................................................................... 50

*Alpine View Co. Ltd v. Atlas Copco AB,*
  205 F.3d 208 (5th Cir. 2000) ..................................................................................... 43

*Am. High-Income Trust v. Alliedsignal,*
  329 F. Supp. 2d. 534 (S.D.N.Y. 2004) ................................................................ 43, 47

*Anwar v. Fairfield Greenwich Ltd.,*
  306 F.R.D. 134 (S.D.N.Y. 2015) ..................................................................... 66, 67, 68

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................... 7

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ........................................................................................ 61

*AUSA Life Insurance Co. v. Ernst & Young,*
  206 F.3d 202 (2d Cir. 2000) ................................................................................ 74, 75

*Balestra v. ATBCOIN LLC,*
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................. 32, 42, 43

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank,*
  763 F. Supp. 36 (S.D.N.Y. 1991) ............................................................................... 21

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank,*
  973 F.2d 51 (2d Cir. 1992) ................................................................................... 20, 21

*Bangor Punta Corp.,*
  426 F.2d 569 (2d Cir. 1970) ...................................................................................... 13

*Chris-Craft. Indus. v. Bangor Punta Corp.,*
  426 F.2d 569 (2d Cir. 1970) ...................................................................................... 13

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................ 64

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................... 7, 8

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975) ............................................................................ 84

*Bongiorno v. Baquet*,
   2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021) ......................................... 25

*Bridge v. Phx. Bond & Indem. Co.*,
   553 U.S. 639 (2008) ............................................................................ 65

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ................................................................. 73

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ............................................... 39, 47

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................... 61

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*,
   928 F. Supp. 2d 705 (S.D.N.Y. 2013) ............................................... 43, 45

*Coffey v. WCW & Air, Inc.*,
   2018 WL 4154256 (N.D. Fla. Aug. 30, 2018) .................................... 87, 91

*Collier v. Aksys Ltd.*,
   2005 WL 1949868 (D. Conn. Aug. 15, 2005) ......................................... 77

*Collins v. eMachines, Inc.*,
   134 Cal. Rptr. 3d 588 (Ct. App. 2011) ................................................... 88

*Com. Union Assur. Co., plc v. Milken*,
   17 F.3d 608 (2d Cir. 1994) ................................................................... 78

*Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*,
   516 F.2d 811 (2d Cir. 1975) ............................................................. 72, 73

*Cont'l Ins. Co. v. Mercadante*,
   222 A.D. 181, 225 N.Y.S. 488 (1st Dept. 1927) ..................................... 75

*DeCoursey v. Murad, LLC*,
   673 F. Supp. 3d 194 (N.D.N.Y. 2023) ................................................... 87

*Devaney v. Chester*,
   709 F. Supp. 1255 (S.D.N.Y. 1989) .................................................................. 68

*Diaz v. Paragon Motors of Woodside*,
   424 F. Supp. 2d 519 (E.D.N.Y. 2006) ................................................................ 92

*Digilytic Int'l FZE v. Alchemy Fin., Inc.*,
   2022 WL 912965 (S.D.N.Y. Mar. 29, 2022) ......................................................... 9

*DirecTV Latin Am., LLC v. Park 610, LLC*,
   691 F. Supp. 2d 405 (S.D.N.Y. 2010) ................................................................ 93

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018) ................................................................ 41

*Dura Pharm, Inc. v. Broudo*,
   544 U.S. 336 (2005) ...................................................................................... 73

*Elson v. Geiger*,
   506 F. Supp. 238 (E.D. Mich. 1980) .................................................................. 38

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp, Inc.*,
   343 F.3d 189 (2d Cir. 2003) ....................................................................... 73, 76

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ............................................................................ 62

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ...................................................................................... 64

*Erickson v. Jernigan Cap., Inc.*,
   692 F. Supp. 3d 114 (S.D.N.Y. 2023) ................................................................ 78

*Estrada v. Progressive Direct Ins. Co.*,
   53 F. Supp. 3d 484 (D. Mass. 2014) .................................................................. 88

*Fairchild v. Quinnipiac Univ.*,
   16 F. Supp. 3d 89 (D. Conn. 2014) ..................................................................... 7

*Falk v. Gen. Motors Corp.*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) .............................................................. 87

*Fed. Deposit Ins. Corp. v. Credit Suisse First Boston Mortg.*,
   414 F. Supp. 3d 407 (S.D.N.Y. 2019) ................................................................ 40

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
   104 F. Supp. 3d 441 (S.D.N.Y. 2015) ........................................................... 40, 44

*Finjan LLC v. Trustwave Holdings, Inc.*,
   2021 WL 5051147 (D. Del. Oct. 29, 2021) .............................................................. 43

*Forsythe v. Clark USA, Inc.*,
   224 Ill. 2d 274, 864 N.E.2d 227 (2007) ................................................................... 91

*Fragin v. Mezei*,
   2012 WL 3613813 (S.D.N.Y. Aug. 22, 2012) ................................................... 24, 25

*Friel v. Dapper Labs., Inc.*,
   657 F. Supp. 3d 422 (S.D.N.Y. 2023) ............................................................... 33, 43

*Galstaldi v. Sunvest Communities USA, LLC*,
   637 F. Supp. 2d 1045 (S.D. Fla. 2009) .................................................................... 88

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ..................................................................................... 60

*Gary Plastic Packaging Corp v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   756 F.2d 230 (2d Cir. 1985) ..................................................................................... 17

*Ge Dandong v. Pinnacle Performance Ltd.*,
   2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) .......................................................... 65

*Greenspan v. Brassler*,
   78 F.R.D. 130 (S.D.N.Y. 1978) ............................................................................... 73

*Gutter v. Wunker*,
   631 So. 2d 1117 (Fla. Dist. Ct. App. 1994) ............................................................. 89

*Hardin v. Tron Found*,
   2024 WL 4555629 (S.D.N.Y. Oct. 23, 2024) .......................................................... 45

*Harman v. Harper*,
   1990 WL 121073 (9th Cir. 1990) ............................................................................ 36

*Harris County, Texas v. Eli Lilly and Company*,
   2020 WL 5803483, n.4 (S.D. Tex. Sept. 29, 2020) ................................................. 91

*Harsco Corp. v. Segui*,
   91 F.3d 337 (2d Cir. 1996) ....................................................................................... 69

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
   338 F.R.D. 205 (S.D.N.Y. 2021) .................................................................. 66, 67, 68

*Heller v. Goldin Restructuring Fund, L.P.*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) ............................................................... 61, 62

*Ho v. Duoyan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ................................................................ 41

*Huddleston v. Herman & MacLean*,
  640 F.2d 534 (5th Cir. 1981) ............................................................................. 50

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ......................................................... 38, 46

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ............................................................................... 61

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) ............................................................... 60

*In re Deutsche Telekom AG Sec. Litig.*,
  2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ..................................................... 47

*In re Fine Host Corp. Sec. Litig.*,
  25 F. Supp. 2d 61 (D. Conn. 1998) .............................................................. 70, 71

*In re Gen. Motors LLC Ignition Switch Litig.*,
  257 F. Supp. 3d 372 (S.D.N.Y. 2017) ............................................................... 87

*In re Gen. Motors LLC Ignition Switch Litig.*,
  339 F. Supp. 3d 262 (S.D.N.Y. 2018) ............................................................... 87

*In re Genesis Global Holdco, LLC*,
  660 B.R. 439 (Bankr. S.D.N.Y. May 17, 2024) ................................................ 49

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................... 60

*In re Globalstar Sec. Litig.*,
  2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) .................................................. 39

*In re Hain Celestial Grp., Inc. Sec. Litig*,
  20 F. 4th 131 (2d Cir. 2021) .............................................................................. 60

*In re Ind. Energy Holdings PLC Sec. Litig.*,
  154 F. Supp. 2d 741 (S.D.N.Y. 2001) ......................................................... 40, 47

*In re J.P. Jeanneret Assocs., Inc.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) ............................................................... 36

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
  2017 WL 95176 (S.D.N.Y. 2017) ........................................................................ 9

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ................................................................. 87

*In re Longfin Corp. Sec. Class Action Litig.*,
    2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) ..................................................... 9

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................. 59

*In re Milo's Dog Treats Consol. Cases*,
    9 F. Supp. 3d 523 (W.D. Pa. 2014) ................................................................. 91

*In re Motor Fuel Temperature Sales Pracs. Litig.*,
    867 F. Supp. 2d 1124 (D. Kan. 2012) ............................................................. 87

*In re Nat'l Century Fin. Enterprises, Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ........................................................... 71

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013) ............................................................. 60

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ............................................................... 59

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ............................................................. 41

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................. 83

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
    2006 WL 6900987 (S.D.N.Y.) .................................................................. 39, 40

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................................................. 83

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ....................................................... 39, 40

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012) ............................................................. 40

*In re Sotheby's Holdings, Inc.*,
    2000 WL 1234601 (S.D.N.Y. 2001) ............................................................... 45

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ............................................................. 39

*In re UBS Auction Rate Sec. Litig.*,
 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ........................................................... 50

*In re Vivendi Universal, S.A.*,
 381 F. Supp. 2d 158 (S.D.N.Y. 2003) .................................................................... 47

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ................................................................................... 73

*In re WorldCom, Inc. Sec. Litig.*,
 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ...................................................................... 9

*In re WorldCom, Inc., Sec. Litig.*,
 2004 WL 1097786 (S.D.N.Y. 2004) ...................................................................... 41

*Intelligent Digital Systs., LLC v. Visual Mgmt. Systs., Inc.*,
 683 F. Supp. 2d 278 (E.D.N.Y. 2010) .................................................................... 20

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
 822 F. Supp. 2d 368 (S.D.N.Y. 2011) .................................................................... 68

*SEC v. Kik Interactive Inc.*,
 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............................................................... 32, 33

*Kirschner v. JP Morgan Chase Bank, N.A.*,
 79 F.4th 290 (2d Cir. 2023) ................................................................................... 24

*Knight v. International Harvester Credit Corp.*,
 627 S.W.2d 382 (Tex. 1982) ................................................................................. 88

*Krueger v. Wyeth, Inc.*,
 396 F. Supp. 3d 931 (S.D. Cal. 2019) .................................................................... 88

*Kusner v. First Pa. Corp.*,
 531 F.2d 1234 (3d Cir. 1976) ................................................................................ 14

*Lentell v. Merrill Lynch Co., Inc.*,
 396 F.3d 161 (2d Cir. 2005) .................................................................................. 73

*Levy v. Maggiore*,
 48 F. Supp. 3d 428 (E.D.N.Y. 2014) ..................................................................... 60

*Li v. Eqonex*,
 2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024) ....................................................... 44

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
 2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020) ........................................................ 14

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ................................................................. 60

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ............................................................ 74, 76

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019) ..................................................................... 81, 82

*Macquire Infrastructure Corp. v. Moab Partners*, L.P.,
  601 U.S. 257 (2024) .......................................................................... 66, 67

*Makaeff v. Trump University, LLC*,
  145 F. Supp. 3d 962 (S.D. Cal. 2015) ..................................................... 88

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982) ................................................................................ 17

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) .................................................................... 65

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  65 F.3d 1044 (2d Cir. 1995) .............................................................. 14, 78

*McNabb v. SEC*,
  298 F.3d 1126 (9th Cir. 2002) ........................................................*passim*

*Native Am. Arts, Inc. v. Vill. Originals, Inc.*,
  25 F. Supp. 2d 876 (N.D. Ill. 1998) ........................................................ 87

*Nguyen v. Maxpoint Interactive, Inc.*,
  234 F. Supp. 3d 540 (S.D.N.Y. 2017) ....................................................... 9

*FHFA v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ....................................................................... 9

*Norfolk Cty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009)............................................ 62

*Nota Construction Corp. v. Keyes Associates*,
  694 N.E.2d .......................................................................................... 89, 90

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................. 62, 63

*One Comm's Corp. v. JP Morgan SBIC LLC*,
  381 F. App'x 75 (2d Cir. 2010) ............................................................... 69

*Osofsky v. Zipf*,
   645 F.2d 107 (2d Cir. 1981) .................................................................................. 78

*Oswego Laborers' Local 214 v. Marine Midland Bank*,
   85 N.Y.2d 20 (1995) ............................................................................................. 92

*Panos v. Island Gem Enterprises, Ltd., N.V.*
   880 F. Supp. 169 (S.D.N.Y. 1995) ....................................................................... 78

*Pasternack v. Shrader*,
   863 F.3d 162 (2d Cir. 2017) .................................................................................. 14

*Pinter v. Dahl*,
   486 U.S. 622 (1988) .............................................................................................. 10

*On. Tchr.' Pen. Plan Bd. v. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp 3d 131 (D. Conn. 2019) .............................................................. *passim*

*IWA Forest Ind. Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021) .................................................................................... 8

*Pollack v. Laidlaw Holdings, Inc.*,
   27 F.3d 808 (2d Cir. 1994) ................................................................... 2, 19, 20, 21

*Poptech L.P. v. Stewardship Credit Arbitrage Fund, LLC*,
   792 F. Supp. 2d 328 (D. Conn. 2011) ...................................................... 85, 86, 87

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*,
   991 F.2d 42 (2d Cir. 1993) .................................................................................... 93

*Radiation Dynamics, Inc. v. Goldmuntz*,
   464 F.2d 876 (2d Cir. 1972) .................................................................................. 12

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986) .............................................................................................. 50

*Real Estate Inv'rs Tax Exempt Fund Ltd. P'ship v. Schwartzberg*,
   929 F. Supp. 105 (S.D.N.Y. 1996) ....................................................................... 13

*Reeder v. Succession of Palmer*,
   736 F. Supp. 128 (E.D. La. 1990) ......................................................................... 27

*Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*,
   68 F.3d 1478 (2d Cir. 1995) .................................................................................. 93

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) ................................................................................ 32, 33

*Reves v. Ernst & Young*,
 494 U.S. 56 (1990) ............................................................................................ *passim*

*Rotella v. Ring Around Products, Inc.*,
 614 S.W.2d 455 (Tex. App. 1981) ............................................................................ 88

*Schneider v. CitiMortgage, Inc.*,
 2014 WL 5390273 (D. Kan. Oct. 22, 2014) ............................................................. 91

*Schentag v. Nebgen*,
 2018 WL 3104092 (S.D.N.Y. June 21, 2018) ........................................................... 27

*In re Scottish Re Grp. Sec. Litig.*,
 524 F. Supp. 3d ................................................................................................ 47

*SEC v. Blockvest*,
 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ............................................................ 13

*SEC v. Cavanagh*,
 1 F. Supp. 2d 337 (S.D.N.Y.) ......................................................................... 10, 13

*SEC v. Edwards*,
 540 U.S. 389 (2004) .................................................................................... *passim*

*SEC v. Genesis Glob. Cap, LLC*,
 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024) ................................................. *passim*

*SEC v. Binance Holdings Ltd.*,
 2024 WL 3225974 (D.D.C. June 28, 2024) ............................................................. 34

*SEC v. Hopper*,
 2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ........................................................... 83

*SEC v. Opulentia, LLC*,
 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ..................................................................... 13

*SEC v. R.G. Reynolds Enterprises, Inc.*,
 952 F.2d 1125 (9th Cir. 1991) ................................................................................ 25

*SEC v. Rio Tinto PLC.*,
 41 F.4th 47 (2d Cir. 2022) ......................................................................... 80, 81, 82

*SEC v. SG Ltd.*,
 265 F.3d 42 (1st Cir. 2001) .................................................................................... 26

*SEC v. Shavers*,
 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ........................................................... 30

*SEC v. Telegram Grp., Inc.*,
　448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...............................................................*passim*

*SEC v. Thompson*,
　732 F.3d 1151 (10th Cir. 2013) ....................................................... 20, 23, 24, 25

*SEC v. W.J. Howey Co.*,
　328 U.S. 293 (1946) ....................................................................... 2, 11, 15, 31

*SEC v. Wallenbrock*,
　313 F.3d 532 (9th Cir. 2002) ...........................................................*passim*

*SEC v. Zandford*,
　535 U.S. 813, (2002) ..................................................................................... 84

*Seekamp v. It's Huge, Inc.*,
　2012 WL 860364 (N.D.N.Y. Mar. 13, 2012) .................................................. 65

*Setzer v. Omega Healthcare Inv'rs.*,
　968 F.3d 204 (2d Cir. 2020) ........................................................................... 62

*Shearson/Am. Exp., Inc. v. McMahon*,
　482 U.S. 220 (1987) ....................................................................................... 69

*Simmtech Co. v. Citibank, N.A.*,
　2016 WL 4184296 (S.D.N.Y. Aug. 3, 2016) ................................................. 69

*Sloane Overseas Fund, Ltd., v. Sapiens Intern. Corp., N.V.*,
　941 F. Supp. 3d 1369, 1379 (S.D.N.Y. 1996) .............................................. 44

*Speakman v. Allmerica Fin. Life Ins. Co.*,
　367 F. Supp. 2d 122 (D. Mass. 2005) ........................................................... 88

*Spencer v. Hartford*,
　256 F.R.D. 284 (D. Conn. 2009) ................................................................... 65

*Stoiber v. SEC*,
　161 F.3d 745 (D.C. Cir. 1998) ........................................................ 20, 22, 24, 25

*Strougo v. Barclays PLC*,
　312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................ 66, 67, 68

*Tcherepnin v. Knight*,
　389 U.S. 332 (1967) ....................................................................................... 26

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
　551 U.S. 308 (2007) ....................................................................................... 61

*U.S. v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ........................................................................ 31

*U.S. v. Naftalin*,
    441 U.S. 768 (1979) .................................................................................. 11

*U.S. v. Pierre*,
    2021 WL 4150969 (S.D.N.Y. Sept. 13, 2021) ......................................... 26

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975) ......................................................................... 20, 26, 31

*Vacold LLC v. Cerami*,
    545 F.3d 114 (2d Cir. 2008) ...................................................................... 12

*Washington State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ........................................................ 65

*Wells v. John Hancock Mut. Life Ins. Co.*,
    149 Cal. Rptr. 171 (Cal. Ct. App. 1978) .................................................. 90

*Wildes v. BitConnect Int'l PLC*,
    25 F.4th 1341 (11th Cir. 2022) ................................................................. 13

*Yoder v. Orthomolecular Nutrition Inst.*,
    751 F.2d 555 (2d Cir. 1985) ...................................................................... 12

*Yi v. GTV Media Grp. Inc.,*
    2012 WL 3500920 (S.D.N.Y. Aug. 6, 2021) ........................................... 43

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) ........................................... 44, 45, 46

**Statutes**

15 U.S.C. § 77b(a)(3) ........................................................................... 10, 11, 12

15 U.S.C. §§ 77b(a)(1) ................................................................................... 31

15 U.S.C. § 77c ............................................................................................... 17

15 U.S.C. § 77e ..................................................................................... 8, 9, 13

15 U.S.C. § 77e(a), (c) ...................................................................................... 9

15 U.S.C. § 77l ................................................................................................. 9

15 U.S.C. § 77l(a)(1) ........................................................................................ 4

15 U.S.C. § 77n ................................................................................................ 14

15 U.S.C. § 77o ......................................................................................... 38, 48

15 U.S.C. § 78cc .............................................................................................. 14

15 U.S.C. § 78cc(a) .......................................................................................... 69

15 U.S.C. § 78u-4(b) .......................................................................................... 4

15 U.S.C. §§ 78c(a)(13), (14) .......................................................................... 84

**Rules**

Fed. R. Civ. P. 8 ........................................................................................... 9, 40

Fed. R. Civ. P. 9(b) .................................................................................. 4, 9, 59

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 7

**Regulations**

17 C.F.R. § 230.405 ......................................................................................... 39

17 C.F.R. § 240.10b-5 ...................................................................................... 51

17 C.F.R. § 240.10b-5(a) and (c) ..................................................................... 72

17 C.F.R. § 240.10b-5(a), (c) ........................................................................... 80

17 C.F.R. § 240.12b-2 ...................................................................................... 85

**Other Authorities**

*John C.P. Goldberg et al., The Place of Reliance in Fraud,*
    48 Ariz. L. Rev. 1001, 1007 (2006) ........................................................... 69

Restatement (Second) of Torts § 525 ............................................................... 75

Restatement (Second) of Torts § 533 ............................................................... 71

Restatement (Second) of Torts, § 551 ........................................................ 89, 90

*The Place of Reliance in Fraud,*
    48 Ariz. L. Rev. 1001 (2006) ..................................................................... 69

Lead Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto, LP, Christopher Buttenham, and Remo Maria Morone, and additional plaintiffs Daniel Ameli, Lee Jacobson, Dominic Macri, Larry Wiener and Derek Wilson ("Plaintiffs") respectfully submit their Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss the above-captioned action (the "Action").  ECF Nos. 175-80.[1]

## I.    PRELIMINARY STATEMENT

The Complaint alleges nonfraud claims under the Securities Act of 1933 ("Securities Act"), fraud claims under the Securities Exchange Act of 1934 ("Exchange Act"), and in the alternative, violations of state consumer protection laws and common law fraud.  Plaintiffs bring claims on behalf of themselves and a proposed class of investors who purchased Genesis Yield securities from non-party Genesis Global Capital, LLC ("GGC" or the "Company") during the period from February 2, 2021 through November 16, 2022 who have been damaged (the "Class Period").[2] Defendants' motions, in essence, seek to evade liability for conduct that the U.S. Securities and Exchange Commission ("SEC"), the Attorney General for the State of New York ("NYAG"), and a special committee in the Genesis Bankruptcy have asserted (with the benefit of discovery) constitutes serious wrongful acts by Defendants Digital Currency Group, Inc. ("DCG"), Barry Silbert ("Silbert") and Soichiro "Michael" Moro ("Moro") and other "DCG Parties."[3]

---

[1] On November 12, 2024, the Court granted Plaintiffs' motion to file an omnibus brief of up to 100 pages in response to Defendants' four motions to dismiss.  ECF. No. 189.  "DCG Br. at __" refers to ECF No. 177, the Memorandum of Law in Support of Defendants DCG, Silbert and Mark Murphy's Motion to Dismiss.  "Moro Br. at __" refers to ECF No. 175-1, the Memorandum of Law in Support of Defendant Moro's Motion to Dismiss.  "Islim Br. at __" refers to ECF No. 179, Defendant Derar Islim's Memorandum of Law in Support of his Motion to Dismiss.  "Kraines Br. at __" refers to ECF No. 182, the Memorandum of Law in Support of Defendant Michael Kraines' Motion to Dismiss. Citations to "¶ __" are references to paragraphs of the Third Amended Complaint, ECF No. 171 (the "Complaint").

[2] On January 20, 2023, nonparty GGC filed for protection under Chapter 11 of the Bankruptcy Code.  *See In re: Genesis Glob. Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy").

[3] *See SEC v. Genesis Glob. Cap., LLC., et al.*, No. 23-cv-00 (S.D.N.Y.) ("SEC Action"), ECF No. 1; *The People*

Defendants assert that class members' investments of digital assets with GGC are not securities. Defendants are wrong. Under the Securities Act, "security" is defined to include "notes," "bonds," and "evidence of indebtedness," all of which involve the loan of money for a regular payment of interest and have been found to be securities. *See, e.g., Pollack v. Laidlaw Holdings, Inc.,* 27 F.3d 808, 812-13 (2d Cir. 1994). Class members' investments with GGC were the same as or similar to investing in a bond or promissory note that pays a fixed rate of return in the form of interest with a return of principal at maturity. ¶¶ 162-69. As explained below, the facts alleged in the Complaint plausibly allege that Genesis Yield securities were notes under the factors established by *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990). ¶¶ 156-221. Defendants struggle to distinguish the court's decision in *SEC v. Genesis Glob. Cap, LLC*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024), which is directly on point and found that Genesis Yield securities are "notes" under the factors established by *Reves*. 2024 WL 1116877, at *14 ("[T]he SEC has plausibly alleged that the notes are securities under the *Reves* test.").

Furthermore, the Complaint plausibly alleges that Genesis Yield were "investment contracts" under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). ¶¶ 156-57, 222-37. At oral argument on July 3, 2024, the Court commented that "there is no connection to the profitability of Genesis with a fixed rate loan . . . That can't be the connection to the securities laws."[4] Unsurprisingly, Defendants repeatedly mention the Court's comments and argue that class

---

*of the State of New York v. Genesis Glob. Cap., LLC, et al.*, Index No. 452784/2023 (Sup. Ct. N.Y.) ("NYAG Action"), NYSCEF Doc. Nos. 2, 17; Genesis Bankruptcy, ECF No. 1036, at 20, 36 (Amended Disclosure Statement, dated Dec. 6, 2023) ("The Amended Plan does not propose to release the DCG Parties and the former employees, officers, or directors of the Debtors as of the Petition Date . . . The Special Committee has concluded that there are colorable claims against certain DCG Parties for various causes of action . . .") (footnote omitted)). Both the SEC and the NYAG have settled claims against GGC. ¶¶ 58-60 (noting NYAG obtained $2 billion settlement and SEC obtained $21 million settlement).

[4] Transcript of Oral Argument, at 68:10-20, *McGreevy v. Digital Currency Group, Inc.*, No. 3:23-cv-00082-SRU (D. Conn. July 3, 2024).

members' investment in Genesis Yield was "simply a loan of assets for a monthly interest rate" that "did not depend on the success or failure of Genesis' subsequent use" of investors' digital assets or how "the company fared as an enterprise." DCG Br. at 1-2, 4, 10. Defendants' arguments confuse "profits" that investors sought when they invested their digital assets with GGC through Genesis Yield—a regular fixed interest payment and a promise of the return of their digital assets— with profits generated by the success of GGC's business. The Supreme Court in *SEC v. Edwards*, 540 U.S. 389, 391, 394-7 (2004), addressed "whether a moneymaking scheme is excluded from the term 'investment contract' simply because the scheme offered a contractual entitlement to a fixed, rather than variable, return." In *Edwards*, the Supreme Court held that "promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws." *Edwards*, 540 U.S. at 397. Most important, the Supreme Court in *Edwards* found that

> "when we held that 'profits' must 'come solely from the efforts of others' [under *Howey*], we were speaking of the profits that investors seek on their investment, not profits of the scheme in which they invest. We used 'profits' in the sense of income or return to include for example, dividends, *other periodic payments*, or the increased value of the investment."

*Id.* at 394 (emphasis added). Notably, the court in the SEC Action rejected Defendants' arguments and found that the SEC plausibly alleged that Genesis Yield were securities under *Howey*. *Genesis Glob. Cap.*, 2024 WL 1116877, at *7 (rejecting argument that fortunes of Genesis Yield investors were not tied together because they "'received a market rate of interest' rather than sharing in profits" of GGC's business). Under these authorities, the Complaint plausibly alleges Genesis Yield were investment contracts under *Howey*.

Defendants also assert the stunning argument that class members have no recoverable damages under the Securities Act and have benefitted from Defendants' wrongful conduct because the Genesis Bankruptcy has returned some of investors' digital assets paid as consideration for Genesis Yield securities. Defendants' argument fails because, unlike the authorities they cite,

these class members have not been made whole.  ¶¶ 16-19.  As the Court observed during the July 3, 2024 oral argument "ex ante I had 100 Bitcoin. Now I have 75 Bitcoin. Even through the Bitcoin has gone up and I'm feeling flush, boy, you guys robbed me of 25% of my Bitcoin."[5]  In fact, as of November 2024, only 55.97% of Bitcoin and 70.82% of Ethereum have been returned to members of the Class who invested directly with GGC.[6]  Under the Securities Act, class members seek to recover the full consideration paid (digital assets) or damages to restore the status quo ex ante. 15 U.S.C. § 77l(a)(1).  Under Section 15 of the Securities Act, each of the Defendants is jointly and severally liable for GGC's Securities Act violations and, contrary to Defendants' arguments, the Complaint plausibly alleges ample facts to put Defendants' on notice of the Section 15 control person claims alleged against them.

As for the Complaint's fraud claims under the Exchange Act, the Complaint adequately alleges Defendants' materially false and misleading statements and scheme liability, and scienter with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  In June 2022, when risky counterparty Three Arrows Capital ("3AC") defaulted on a massive, $3.2 billion undercollateralized loan from GGC—creating an equity hole over $1 billion at GGC— rather than revealing the truth of GGC's insolvency, Defendants covered it up and then lied to investors in order to save themselves and their own pecuniary interests.  ¶¶ 296-440, 347-50 (alleging Defendant Silbert and other insiders pulled over $100 million from GGC).  While Defendants represented to investors that DCG provided capital and assumed the 3AC losses, in truth, DCG did

---

[5] Transcript of Oral Argument, at 14:8-11, *McGreevy v. Digital Currency Group, Inc.*, No. 3:23-cv-00082-SRU (D. Conn. July 3, 2024)

[6] *See* Genesis Bankruptcy, ECF No. 2056.  On or around October 30-31, 2024, Genesis Global Capital distributed $231 million in digital assets, which the Company represented had "increased recoveries on an in-kind basis by approximately 4% to 5% across most digital assets." *Id.*

not inject any capital or money into GGC. Far from favoring to GGC, DCG's $1.1 billion promissory note ("DCG Promissory Note") was accounting fraud that covered up GGC's massive losses and insolvency, and was structured to favor DCG and Defendants, not GGC. In light of GGC's insolvency, Defendants Moro, GGC's CEO through August 2022, and Derar Islim ("Islim"), GGC's interim CEO, caused GGC to falsely represent to every investor who purchased Genesis Yield securities that GGC was solvent, which was not true. ¶¶ 35, 300, 451, 462, 581. The Complaint further alleges Defendants knew, or at least recklessly disregarded, that their representations were materially false and misleading at the time they were made, based on contemporaneous records and daily internal meetings involving Defendants during which they planned and implemented their scheme. *See, e.g.*, ¶¶ 305-46, 353-68.

Defendants further assert that the Complaint fails to adequately allege reliance, loss causation and damages. But the reliance, loss causation and damages elements of a claim under Section 10(b) of the Exchange Act are not subject to the heightened pleading standard of the PSLRA and are adequately alleged. Moreover, Defendants' arguments challenging reliance, loss causation and damages raise questions of fact and expert discovery questions that cannot be resolved on a motion to dismiss, and prematurely raise issues to be decided at the class certification stage of the Action.

The claims under state consumer protection laws and common law fraud are alleged in the alternative, assuming, *arguendo*, that class members' investments in Genesis Yield are determined to not be securities. As explained below, the Complaint adequately alleges claims under New York, California, Florida, Illinois, Texas, Nevada and Kansas law, and common law fraud.

For these reasons, and as discussed below, Defendants' motions to dismiss should be denied in their entirety.

## II.    FACTS APPLICABLE TO ALL CLAIMS

GGC purported to be part of a "full-service digital currency prime brokerage" and provided a "full suite of services global investors require to manage their digital asset portfolios." ¶ 3.  In or around 2017-18, Defendants DCG and Silbert, and Defendant Moro, created GGC and DCG provided $40 million to GGC to start its crypto lending business.  ¶¶ 76, 113-14, 134, 136-40.

During the Class Period, Silbert was the controlling shareholder of DCG (owning approximately 40%), chairman of DCG's three-person board of directors, and DCG's CEO.  ¶¶ 7, 59, 309-12.  DCG's wholly owned subsidiary, Genesis Global Holdco, Inc. ("GGH"), was a shell company that owned 100% of GGC. ¶ 6. Similarly, through GGH, DCG owned 100% of GGC's affiliate company, Genesis Global Trading, Inc. ("GGT"), which was a broker-dealer specializing in digital currencies.  ¶¶ 6, 110.

GGH was the sole managing member of GGC, and Defendants DCG and Silbert controlled GGC through its appointment of DCG executives Defendants Mark Murphy ("Murphy") and Michael Kraines ("Kraines") to GGH's board of directors.  ¶¶ 6, 120-21, 123, 533, 536. Defendant Murphy was the Chief Operating Officer ("COO") of DCG during the period January 2020 through November 2022, and President of DCG since October 2022, and Defendant Kraines was Chief Financial Officer of DCG. ¶¶ 8, 79-80.  Defendant Moro was CEO of GGC from the start of the Class Period through August 2022, when he was dismissed by Defendant Murphy. ¶¶ 77, 119.  On Defendant DCG's behalf, Defendant Murphy hand-picked Defendant Islim to serve as interim CEO of GGC and member of GGH's board of directors. ¶¶ 9, 77-78, 80, 119-20, 552.

Starting in or around July 2020, GGC began offering and selling an investment that allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis," which the Complaint refers to as Genesis Yield securities.  ¶¶ 4, 131-32.  On February 2, 2021, GGC through its partnership with Gemini Trust Company, LLC ("Gemini"), expanded its investment

offering of Genesis Yield securities and allowed individuals to invest with GGC through accounts with Gemini, a program called "Gemini Earn." ¶¶ 136-37. Plaintiffs and members of the class invested in Genesis Yield securities by entering into a standard form agreement, referred to as Genesis Yield Investment Agreements, and then tendering digital assets or cash to GGC under executed term sheets (for investments directly with GGC), or under the terms presented to them via the Gemini Earn platform (for investors who purchased from GGC through the Gemini Earn program). ¶¶ 4, 25, 138-39, 264-67. The entirety of these transactions and documents comprises the "Genesis Yield securities" that GGC sold for value during the Class Period. ¶¶ 248-72. During the Class Period, GGC raised billions of dollars from hundreds of thousands of investors from its offer and sale of Genesis Yield securities. ¶¶ 14, 51, 224, 270.

## III.    STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a complaint pleads facts that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In deciding whether a complaint has stated a claim upon which relief can be granted, courts must accept the complaint's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Twombly*, 550 U.S. at 555-56; *see also Fairchild v. Quinnipiac Univ.*, 16 F. Supp. 3d 89, 93 (D. Conn. 2014) (Underhill, J.) ("When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and decide whether it is plausible that the plaintiff has a valid claim for relief") (citing *Ashcroft*, 556 U.S. at 678–79 and *Twombly*, 550 U.S. at 555–56). The Complaint satisfies these standards. Where, as here, defendants' arguments are inconsistent with the facts alleged in a complaint, and they seek

inferences in their favor, courts must resolve such disputes in plaintiff's favor.  *See IWA Forest Ind. Pen. Plan v. Textron Inc.*, 14 F.4th 141, 146-48 (2d Cir. 2021).

## IV.    SECURITIES ACT CLAIMS

### A.    Facts Concerning Claims under the Securities Act

Section 5 of the Securities Act requires issuers of securities, like GGC, to file a registration statement with the SEC to sell securities to the investing public.  15 U.S.C. § 77e.  Defendants do not dispute that GGC failed to register Genesis Yield securities and did not seek an exemption from registration with the SEC.  ¶¶ 251-52.  Thus, investors were provided little to no information about GGC's operations, financial condition, liquidity, risks, related party transactions and other facts relevant in considering whether to invest, including information concerning how GGC would deploy investors' crypto assets in GGC's business.  ¶¶ 254-56, 260.

Each of the Plaintiffs invested in Genesis Yield securities in the year before the Action was commenced without the benefit of the disclosures required by the federal securities laws, including disclosure of risks concerning investment in Genesis Yield securities.  ¶¶ 65-74, 253-56.  In November 2022, GGC unilaterally suspended investors' redemption requests and Genesis Yield investors lost access to their digital assets.

 Plaintiffs have brought claims under Section 12(a)(1) for GGC's offering and selling securities in violation of Section 5.  ¶¶ 16-23, 515-32.  Defendants controlled GGC and are therefore jointly and severally liable under Section 15 of the Securities Act for the damages GGC owes to Plaintiffs and members of the class.  ¶¶ 533-72.  As a result of GGC's violations of the Securities Act, Plaintiffs and members of the Class seek damages or the return of all digital assets invested with GGC that have not been returned with interest.  ¶¶ 27-28, 526, 572.

### B.    The Complaint Adequately Alleges Claims under the Securities Act

Claims under Section 12(a)(1) are strict liability claims as to GGC, the issuer of Genesis

Yield securities. *FHFA v. Nomura Holding Am., Inc*., 873 F.3d 85, 99 (2d Cir. 2017) (stating Section 12 imposes strict liability on issuers). There is no requirement to plead scienter, reliance or loss causation under Section 12(a)(1), and the heightened pleading standards of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure do not apply. *Digilytic Int'l FZE v. Alchemy Fin., Inc.*, 2022 WL 912965, at *12 (S.D.N.Y. Mar. 29, 2022) ("To state a claim under Section 12(a)(1) of the Securities Act, a plaintiff need not plead scienter, reliance, or fraud"); *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *5 (S.D.N.Y. Apr. 11, 2019) (same); *In re WorldCom, Inc. Sec. Litig*., 346 F. Supp. 2d 628, 659 (S.D.N.Y. 2004) (same).

The notice pleading standard under Rule 8 of the Federal Rules of Civil Procedure applies and the Complaint need only provide Defendants "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a); *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *3 (S.D.N.Y. 2017) ("[T]he notice-pleading standard of Rule 8 applies to Plaintiffs' Securities Act claims."); *Nguyen v. Maxpoint Interactive, Inc.,* 234 F. Supp. 3d 540, 545 (S.D.N.Y. 2017) (finding Rule 8 notice pleading standard applies to Securities Act claims).

### 1.  The Complaint Alleges Violations of the Securities Act for the Offer or Sale of Unregistered Securities

Under Section 12(a)(1) of the Securities Act,

> [a]ny person who--(1) offers or sells a security in violation of [Section 5 of the Securities Act], . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l. Section 5 of the Securities Act, 15 U.S.C. § 77e, requires securities to be registered with the SEC. 15 U.S.C. § 77e(a), (c). To establish a prima facie case for a Section 5 violation, a plaintiff must prove three elements: first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a

use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998).

It is undisputed that Defendants did not register Genesis Yield securities with the SEC, that there was no registration statement in effect, and that GGC employed the use of interstate commerce in connection with the offer or sale of Genesis Yield securities. ¶¶ 26, 29, 248-56, 519-21. The Complaint alleges that because no applicable exemption from registration applied, GGC's failure to register the Genesis Yield securities violated Section 5 of the Securities Act. Defendants assert several arguments in support of their motions to dismiss, none of which has merit.

## 2. GGC Offered or Sold Genesis Yield Securities to Plaintiffs and Members of the Class

Defendant Moro alone asserts that there is "no allegation that [GGC] or Mr. Moro offered or sold any security to any Plaintiff." Moro. Br. at 26.[7] Defendant Moro is wrong. GGC is a statutory seller under both prongs of the test set forth under *Pinter v. Dahl*, 486 U.S. 622, 642, 647 (1988) because it passed an interest in a security for value, and engaged in solicitation. The Securities Act broadly defines "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value. 15 U.S.C. § 77b(a)(3). Similarly, the terms "offer to sell" or "offer for sale" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. *Id*. Here, the Complaint alleges that GGC

---

[7] In moving to dismiss the second amended complaint (ECF No. 135), Defendants argued that Plaintiffs' Securities Act claims were time barred by the statute of limitations and that there was no offer or sale of securities. ECF No. 137 at 27-30 (DCG Defs' Memo. of Law in Supp. of DCG Defs' Mot. to Dismiss) ("there was no exchange of 'value' and 'no binding contract to purchase or sell securities'" and that the Genesis Yield Investment Agreements "simply established a framework that gave Plaintiffs the opportunity to lend digital assets to Genesis in the future, but no obligation to do so"); ECF No. 138-1. Defendants have abandoned the statute of limitations argument, and except for Defendant Moro, Defendants have abandoned the argument that there was no offer or sale in connection with the purchase of Genesis Yield.

both offered to sell Genesis Yield and, in fact, did sell Genesis Yield securities to Plaintiffs and members of the Class. *See, e.g.*, ¶¶ 4, 17, 53-57, 133, 177, 207-10.

Defendants Moro's argument ignores the economic reality of the securities purchases at issue in the Action. The Genesis Yield Investment Agreements were a component of a larger investment opportunity that constitute Genesis Yield securities. The Genesis Yield Investment Agreements provide that a "loan" means an exchange for digital currency or cash "in accordance with this Agreement." ECF Nos. 180-1, at 2, 180-2, at 2. By entering into the Genesis Yield Investment Agreements, investors sought an opportunity to invest in Genesis Yield securities. *See, e.g.*, ¶¶ 4, 17, 207-10. The Genesis Yield Investment Agreements, while essential to an investor's participation in Genesis Yield, were but one component of the entire Genesis Yield program, through which GGC offered and sold securities for value. *Id.*

The entirety of the Plaintiffs' and GGC's interactions, regardless of whether transactions took effect at different points in time, constitutes the offering or sale of Genesis Yield securities. *See Howey*, 328 U.S. at 297–301 (finding three separate documents "together" constituted investment contract). The focus of the Securities Act is the *entire* process of selling securities from an issuer to investors. *See U.S. v. Naftalin*, 441 U.S. 768, 772–73 (1979) (stating "offer" and "sale" are "statutory terms[] which Congress expressly intended to define broadly…[and] are expansive enough to encompass the entire selling process"). Thus, Defendant Moro's argument that the Court must limit its inquiry to whether a "sale" or "offer to sell" has been established as to the Genesis Yield Investment Agreements alone, as opposed to the entire investment in Genesis Yield as alleged in the Complaint, is meritless.

Defendant Moro's assertion that there is no credible allegation that Genesis Yield were or could be purchased or sold is based on the faulty premise that the Genesis Yield Investment

Agreement alone is the "relevant security" and ignores that each of the Plaintiffs purchased Genesis Yield securities for value, as reflected in their certifications filed with the Court. ¶¶ 65-70. Moreover, during the Class Period, GGC "raised billions of dollars in assets from hundreds of thousands of investors who tendered digital assets to Genesis Global Capital under the Genesis Yield Investment Agreements through loan term sheets, or via wire or electronic transfer through the Gemini Earn program." ¶ 270. Defendant Moro's assertions to the contrary—that nothing was sold or purchased—strains credulity and should be rejected. *See SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *14 ("Defendants take too narrow a view of the 'sale' or 'offer to sell' requirement").

The securities laws do not generally assign any relevance to when a formal exchange of money takes place. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972) (stating "sale" occurred "when the parties to the transaction are committed to one another"). This standard for determining the point of sale "holds even if the later exchange of money and securities is contingent upon the occurrence of future events . . . ." *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008). Indeed, "a contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed." *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 559 (2d Cir. 1985).

Under the Securities Act, the terms "offer to sell," "offer for sale," or "offer" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. 15 U.S.C. § 77b(a)(3). Defendant Moro's argument ignores that the term "offer" as used in the Securities Act has been interpreted as going well beyond the common law concept of an offer, and that

> [i]f Section 5 were concerned only with the creation of legally enforceable contracts
> for the sale of unregistered securities, Section 77e(c)'s prohibition on offers to sell

or offers to buy would not have been included in the statute. Thus, even if the 'offer' in this case, once accepted, did not give rise to an enforceable contract, that fact is immaterial for purposes of determining whether the harm with which Section 5 is concerned occurred.

*Cavanagh*, 1 F. Supp. 2d at 368.

Courts have found conduct similar to GGC's marketing of Genesis Yield securities constitutes an "offer" under the Securities Act. *See SEC v. Blockvest*, 2019 WL 625163, *9 (S.D. Cal. Feb. 14, 2019) (finding contents of "website[s] and "social media posts" concerning the assets constituted "offer" of securities); *Chris-Craft. Indus. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970) (statements to the public and press constituted an "offer to sell"); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345–46 (11th Cir. 2022) (finding that broadly disseminated communications can convey solicitation that falls under the Securities Act definition of "offer"); *SEC v. Opulentia, LLC,* 479 F. Supp. 2d 319, 328 (S.D.N.Y. 2007) (finding that soliciting sales on website and through advertising constituted "offer" under the Securities Act).  An offer occurs "[w]hen it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished." *Chris-Craft.*, 426 F.2d at 574; *Cap. Real Estate Inv'rs Tax Exempt Fund Ltd. P'ship v. Schwartzberg,* 929 F. Supp. 105, 112-13 (S.D.N.Y. 1996) (finding fund's press release containing detailed, attractive description of proposed transactions constituted solicitation). GGC, at a minimum, "offered" Genesis Yield securities throughout the Class Period to members of the Class through the Genesis Yield Investment Agreements and related marketing and solicitations.

For the reasons set forth above, the Complaint adequately alleges Genesis Yield securities were offered for sale by GGC to Plaintiffs and members of the Class.

### 3. The Terms of the Genesis Yield Investment Agreement Do Not Waive Application of the Federal Securities Laws

Defendants reassert the argument that under the terms of the Genesis Yield Investment

Agreements they have "no obligations arising from the loan facilitated by" the agreements. DCG Br. at 5. Defendants, in effect, argue that Plaintiffs waived control person claims against Defendants for violations of Section 15 of the Securities Act. However, under Section 14 of the Securities Act, such contractual provisions are void and unenforceable:

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n.[8]

Under the statutory framework of the federal securities laws, investors may not be forced to forgo their rights under the federal securities laws due to a contract provision. *See McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1050-51 (2d Cir. 1995); *see also Pasternack v. Shrader*, 863 F.3d 162, 171-72 (2d Cir. 2017) ("This anti waiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities."); *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *14 (S.D.N.Y. Apr. 26, 2020) (stating Section 29(a) of the Exchange Act "forbids 'enforcement of agreements to waive 'compliance' with the provisions of the [federal securities laws]'");*see also Kusner v. First Pa. Corp.,* 531 F.2d 1234, 1239 (3d Cir. 1976) (finding no "authority for the proposition that a 'no action' provision in an indenture effectively bars a direct action based upon the federal securities laws"). Accordingly, the Court should reject Defendants' argument out of hand.

---

[8] This argument applies with equal force to claims asserted under the Exchange Act, which contains an analogous anti-waiver provision. 15 U.S.C. § 78cc ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void.").

### 4.    Genesis Yield Investments Are "Securities"[9]

Class members investment in Genesis Yield are securities because they are (1) "notes" under the factors set forth in *Reves* and are evidence of indebtedness; and (2) "investment contracts" under the test set forth in *Howey*. ¶¶ 133-85. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.  According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." *Edwards*, 540 U.S. at 393 (emphasis in original).

The SEC and the NYAG have asserted that Genesis Yield are securities and have brought claims against GGC alleging violations of federal and state laws for the sale of unregistered securities.  ¶¶ 57, 201-05.  In the SEC Action, the court denied defendants' motion to dismiss, finding that under "both *Howey* and *Reves*, the SEC has plausibly alleged that Defendants offered and sold unregistered securities through the Gemini Earn program." *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *16.

#### a.    The Genesis Yield Investments Are Notes Under *Reves*

The Complaint plausibly alleges that the Genesis Yield securities are notes under *Reves*. ¶¶ 175-99. A note is a type of debt security that, as done in the Genesis Yield securities, represents a promise to pay a specific amount of money at a specified time or on demand. ¶¶

---

[9] The arguments in this section show that for purposes of the Exchange Act claims, Genesis Yield investments were "securities" under the Exchange Act.

166, 175; https://www.sec.gov/investor/pubs/promise.htm (last visited Nov. 12, 2024) ("A promissory note is a form of debt – similar to a loan or an IOU – that a company may issue to raise money. Typically, an investor agrees to loan money to the company for a set period of time. In exchange, the company promises to pay the investor a fixed return on his or her investment, typically principal plus annual interest.").   Under *Reves*, a note is presumed to be a security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory regime that "significantly reduces the risk of the instrument" for investors other than the securities laws, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 64-69; *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *10-13.

Defendants argue, without *any* legal support, that the "conceptual framework of *Reves*. . . does not apply" to Genesis Yield securities because "there were no 'notes' exchanged between the parties." DCG Br. at 15-16.  Even assuming, *arguendo*, Defendants' argument had any legal support (it does not), Defendants ignore the Complaint's allegations and SEC guidance to the contrary. ¶¶ 166, 175, 134 (alleging Genesis Yield investments made directly with GGC could be for fixed terms such as six-months, or could be open-term, that GGC referred to open term investments as having a "call option," and that the "call options" on investments permitted an investor to demand repayment of all or a portion of an investment on any given business day, which would trigger an obligation on behalf of GGC to return the investor's capital).  That investors retained a "right of withdrawal" is irrelevant to the analysis under *Reves* and Defendants cite no authority in support of their argument that only a note "payable at maturity" qualifies as a note.  DCG Br. at 16.  "'The demand feature of a note does not permit a holder to

eliminate risk quickly by making a demand, but just as with publicly traded stock, the liquidity of the instrument does not eliminate risk altogether . . . the 'demand nature' of the notes thus does not change the Court's conclusion that they were securities.'" *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *11 (citing *Reves*, 494 U.S. at 69-70).

While GGC styled Genesis Yield investors' investments as "loans" to the Company and characterized GGC's redeployment of those assets as a "borrowing and lending" business, in substance, GGC managed a pooled investment fund and issued securities used to fund its investment business. ¶ 150. Specifically, GGC pooled investors' capital and purported to use its investment expertise and knowledge of the digital assets markets to invest those assets in ways designed to earn returns that exceeded the returns GGC promised its investors. ¶ 234.

Defendants assert that Genesis Yield conferred "the same kind of right consumers at deposit banks around the country exercise every day without any claim they are engaged in the purchase of unregistered securities." DCG Br. at 16. However, Defendants ignore that Congress recognized that ordinary consumer banking meets the definition of a security under the Securities Act, but specifically exempted such lending from the definition of a security because of strict capital controls and regulations that place limitations on how banks may re-invest consumer deposits. *See* 15 U.S.C. § 77c; *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982) ("It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws."); *Gary Plastic Packaging Corp v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985) ("The crux of the *Marine Bank* decision is that federal banking regulations and federal deposit insurance eliminate the risk of loss to the investor, thereby obviating the need for the protection of the federal securities laws.").

Genesis Yield investors had none of those protections. ¶ 155.  Defendants' argument is, in effect, an admission that they were operating an unregulated bank through GGC.  *See* Transcript of Oral Argument, at 8:19, *McGreevy v. Digital Currency Group, Inc.*, No. 3:23-cv-00082-SRU (D. Conn. July 3, 2024) (DCG Defendants' counsel describing GGC "just sort of like a bank").

### i.  The Motivations of GGC and Investors Demonstrate that Genesis Yield are Notes under *Reves*

Under the first *Reves* factor, a note is likely to be a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *McNabb v. SEC*, 298 F.3d 1126, 1131 (9th Cir. 2002) (quoting *Reves*, 494 U.S. at 66). Because the Complaint alleges that the overall motivation of the parties was investment, this factor weighs in favor of finding Genesis Yield securities were notes under *Reves*. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *11.

Class members sought to invest in Genesis Yield securities by loaning crypto or cash in exchange for a fixed rate of return in the form of interest on an unsecured basis and the promise of the return of principal at maturity. ¶ 183.  GGC sought to generate enough revenue by reinvesting investors' assets to (1) return profits to GGC, Defendant DCG, and Defendant Silbert; and (2) to pay interest to investors. ¶ 184.  As explained by Defendants Islim and Ballensweig, during the Class Period, GGC ran a pooled investment fund where it aggregated investors' capital and purported to use its investment expertise and knowledge of the digital assets markets to invest those assets in ways designed to earn returns that exceeded the returns GGC promised its investors, and GGC marketed Genesis Yield to "**investors** who know they want to be long for an extended period of time and want to earn incremental interest." ¶¶ 170-73, 211 (emphasis added), 234.  As GGH director Paul Aronzon testified in the Genesis Bankruptcy, class members gave their digital

assets to Genesis "**to invest**."  ¶ 174 (emphasis added).  Defendant Silbert described GGC's business as investing when noting in a private chat among DCG executives that GGC provides DCG "access to low priced capital via institutional investor and retail channel like Gemini . . . and will help power the next stage of investing." ¶ 42.

Tellingly, Defendants say nothing of GGC's own motivations, conceding that GGC's motivations support a finding that Genesis Yield were notes under *Reves*. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *10. The Complaint alleges that GGC offered Genesis Yield to obtain digital assets for use in its general business activities—namely, to run its institutional lending activities, generate profits for itself and Defendants, and to pay the interest promised to investors. ¶¶ 133, 146, 148-50, 170-73, 181, 183, 186, 189-90.  In addition, GGC used investors' digital assets as collateral for its own borrowing and would hold assets on its balance sheet to meet liquidity demands.  ¶ 186.

Where funds are used for "general business activities" courts have found that the notes are securities. *See Pollack*, 27 F.3d at 808, 812-13; *McNabb*, 298 F.3d at 1131-32 (finding interest-bearing notes satisfied the first *Reves* factor where the money raised was used for the business, not for cash-flow purposes); *SEC v. Wallenbrock*, 313 F.3d 532, 538-39 (9th Cir. 2002) (finding automatic rollover of notes from month to month suggestive of intent to use investors' money for long-term financing and thus a security); *Priv. Corp. Advisors, Inc. v. Heard*, 1995 WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995) (stating notes "were part of a larger financing operation" in which "the proceeds from the loan[s] were the equivalent of equity capital").

GGC's motivation was nothing like the situations that courts have found to evidence a commercial purpose, such as "remedying a cash flow deficit or purchasing a specific asset" or where the purchaser "is motivated by a desire to use or consume the item purchased."  *United*

*Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852-53 (1975); *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998).[10]  Further, investors were provided no information regarding how GGC would deploy the assets, a fact that indicates that GGC used investors' crypto assets for general business purposes. ¶¶ 186, 189, 213; Master Digital Loan Agreement (ECF No. 180-2); Master Borrow Agreement (ECF No. 180-1); *see, e.g.*, *Wallenbrock*, 313 F.3d at 538 (lack of information regarding assets backing loan indicated investment for general business purposes).

Defendants heavily rely on *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51 (2d Cir. 1992) in support of their argument that Genesis Yield securities had a "commercial lending purpose."  DCG Br. at 17. However, in contrast to the facts alleged in the Complaint, in *Banco Espanol*: "(1) all parties were sophisticated commercial or financial institutions that received 'detailed individualized presentations' about the product; (2) the instruments were **not** offered to the general public; and therefore (3) eligible buyers were limited to sophisticated entities 'with the capacity to acquire information about the debtor.'" *SEC v. Thompson*, 732 F.3d 1151, 1166 (10th Cir. 2013) (discussing and quoting *Banco Espanol*, 973 F.2d at 55); *Pollack*, 27 F.3d at 813-14 ("The marketing scheme in *Banco Espanol* was more analogous to a group of highly sophisticated commercial entities engaging in short-term commercial financing arrangements . . ."). Unlike the sophisticated commercial entities and institutions that purchased notes in *Banco Espanol*, the hundreds of thousands of individual and retail investors in Genesis Yield securities that Defendants assert are "sophisticated" were not interested in a short-term return on excess cash, but rather sought long-term investment opportunity. ¶¶ 183, 187-88, 192-

---

[10] The court in *Intelligent Digital Systs., LLC v. Visual Mgmt. Systs., Inc.*, 683 F. Supp. 2d 278 (E.D.N.Y. 2010) found the parties' motivations for the note at issue were commercial because, unlike class members' investment with GGC, the transaction involved the sale of technology from one business to another for a lump sum and "the motivation of the seller [was] not to invest in the future success of the buyer." *Id.* at 284.

93, 197, 211 (GGC stating "[]investors who know they want to be long for an extended period of time . . . can received monthly payments at rates ranging between 6% and 12% annually depending on the asset"). Furthermore, the lenders' motivation in *Banco Espanol* was to increase lines of credit available to a banking customer as part of a continuing credit relationship. *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 42 (S.D.N.Y. 1991), *aff'd*, 973 F.2d 51 (2d Cir. 1992). Moreover, unlike the banks in *Banco Espanol*, Genesis Yield investors were unable to acquire detailed information about GGC's business. The use of proceeds in *Banco Espanol* is a far cry from GGC's desire and need for crypto assets to fund its business enterprise. ¶¶ 150, 181, 184, 186, 189-91. Nor does the Complaint's allegation that investors "would receive profit in the form of interest on those assets" somehow "indicate[] a commercial lending purpose" to the extent they "earn[ed] a fixed rate of interest." DCG Br. at 17 (citing *Banco Espanol*, 763 F. Supp. at 43). As explained above, in *Banco Espanol*, factors other than "a fixed rate of interest" indicated that "the overall motivation of the parties was the promotion of commercial purposes."

Defendants' assertions to the contrary fail. That GGC promised certain investors a predetermined rate of interest for a fixed period does not indicate non-investment motivations. ¶ 183; *see Pollack*, 27 F.3d at 813-14 (finding that fixed rate of interest did not justify "characterizing appellants' motivations as anything but investment" and noting that fixed rate bonds are securities); *see also Edwards*, 540 U.S. at 394–97 ("when we held that 'profits' must 'come solely from the efforts of others', we were speaking of the profits that investors seek on their investment, not profits of the scheme in which they invest. We used 'profits' in the sense of income or return to include for example, dividends, *other periodic payments*, or the increased value of the investment." (emphasis added)). Moreover, Defendants' argument that Plaintiffs'

motivations were "to loan digital assets in exchange for contractually obligated interest . . . and made loans irrespective of Genesis's business success" (DCG Br. at 17), contradicts the Complaint's allegations delineated above. Investors *were not* simply motivated by short-term interest at market rates, but sought a long-term investment and were motivated by profits they could earn in the form of interest by based on the promises of returns generated through the experience and skill of GGC. ¶¶ 172-73, 183, 187-99, 207, 210, 212-13; *see Wallenbrock*, 313 F.3d at 538 (finding automatic rollover of the notes with an interest rate above market rates suggestive of a security); *Stoiber*, 161 F.3d at 749–50 (finding *Reves* motivation factor was satisfied where "profit in the form of interest" was customers' primary goal). Investors understood that, for them to continue to receive  such high interest rates on a monthly basis, GGC must continue to successfully use their crypto assets in its specialized investment program, applying GGC's skill and experience in the crypto industry.  ¶¶ 181, 183, 186-92.

> **ii.    The Plan of Distribution for Genesis Yield Securities Demonstrates That They Were Notes under *Reves***

GGC publicly advertised Genesis Yield securities on its own website, third party websites, podcasts, crypto industry webinars, and social media, and offered or sold Genesis Yield securities to a broad segment of the general public. ¶¶ 171-73, 200.  Further, the Company promoted and solicited investors through Telegram, email, and MS Teams.  ¶¶ 199, 207.  The offer or sale of Genesis Yield securities was not limited to institutional and corporate entities, but rather involved broad-based, unrestricted sales to the general investing public to whom the risks of investing with GGC were not disclosed and who were not provided access to records needed to assess GGC's creditworthiness, risks and financial plans. ¶ 200.  Indeed, at least 340,000 investors purchased Genesis Yield securities through the Gemini Earn program.  ¶ 206.

Defendants argue that Genesis Yield securities could not be offered to a "broad segment of the public" because only those with a Gemini digital asset account could become lenders. DCG Br. at 17. However, the Complaint alleges that Gemini Earn was offered to the general public and there were effectively no limits, including no minimum investment, on who could invest. ¶ 206. While GGC purportedly had a minimum investment threshold to invest directly in Genesis Yield securities and purportedly limited investment to "sophisticated individuals," these restrictions were not enforced and individual investors with less than the stated minimum requirements of cash or crypto were allowed to directly invest. ¶¶ 135, 208. Defendants' reliance on the boilerplate language in Genesis Yield Investment Agreements that investors were "sophisticated" is unavailing as the term is subjective, undefined, and was not subject to any verification, raising questions of fact that cannot be resolved on a motion to dismiss. An investor could have concluded that they were sophisticated for many reasons, including reasons having nothing to do with the investment. Defendants' arguments ignore the Complaint's allegations that anyone could open a Gemini earn account and that direct lending minimum asset requirements were ignored.

GGC's broad and ongoing advertising campaign evidenced its intent to offer and sell Genesis Yield securities broadly in order to increase the number of investors, a fact strongly suggestive of a security. *Thompson*, 732 F.3d at 1164 ("Ultimately, the Supreme Court has instructed that the offer and sale of instruments to a 'broad segment of the public' is all that is necessary to establish this element.") (quoting *Reves*, 494 U.S. at 68); *Wallenbrock*, 313 F.3d at 539 ("the broad availability of the notes, plus [the issuer's] evident interest in widening the scope of distribution, tips this factor strongly in favor of classifying the note as a security.").

Distributions of notes to far fewer than 340,000 investors have been found to be securities.[11]

Defendants' argument that their plan of distribution was limited because there was no secondary market for the Genesis Yield (and investors were "expressly prohibited from trading their interest in the [Agreements]") is specious. DCG Br. at 17. Genesis Yield securities were broadly advertised over the internet, including social media, and any member of the public could open a Gemini account and directly invest in Genesis Yield securities through Gemini Earn with no minimum investment. ¶¶ 200-208. Accordingly, no secondary market was necessary. "Though it can be a strong indicator that a note is a security, the sale of the notes on an exchange is not necessary to establish the requisite common trading." *Thompson*, 732 F.3d at 1164 (citing *Reves*, 494. U.S. at 66).[12]

This factor weighs in favor of finding that Genesis Yield securities are notes under *Reves*. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *12.

### iii.   The Expectations of the Investing Public Was that Lending Digital Assets to GGC Was an Investment

The Complaint alleges facts that show investors considered Genesis Yield to be an investment in securities. ¶¶ 209-13. GGC through websites and social media promoted Genesis Yield securities as an investment, specifically as a way to earn high "returns" or "yield" on

---

[11] *See, e.g.*, *Reves*, 494 U.S. at 68 (finding notes offered to over 23,000 individuals were securities); *McNabb*, 298 F.3d at 1132 (finding ten notes issued to six individuals were securities); *Wallenbrock*, 313 F.3d at 539 (finding notes held by over 1,000 investors); *Thompson*, 732 F.3d at 1164-65 (finding that even though the first note holders were "family and friends," defendant "sought to expand its distribution to anyone interested who had $100,000 to invest— even if that meant unsophisticated investors obtaining the money by liquidating home equity."); *Stoiber*, 161 F.3d at 750–51 (finding notes offered to 13 individuals were securities); *Fragin v. Mezei*, 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012) (finding notes offered to over 11 individuals and institutions were securities).

[12] The Court in *Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A.*, found persuasive that restrictions on the notes in question worked to prevent the notes from being sold to the general public and that the notes were only sold to institutional and corporate entities, specifically noting that the "allocation process was not a broad-based, unrestricted sale[ ] to the general investing public." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 306 (2d Cir. 2023). In sharp contrast, here the Complaint alleges that the Genesis Yield securities were broadly sold to the public, with no restrictions or limits to institutional investors or corporate entities.

investors' crypto assets. ¶¶ 187-88, 190, 192-93, 195-97, 200-07, 209-12. Gemini repeatedly described Gemini Earn as an "investment" and also described the potential profits to be earned by investing for a period of multiple years. ¶¶ 170, 173, 187-88, 192, 197, 204-05, 210-12. For example, a GGC Market Observation Reports for Q2 2020 stated: "**Investors** who know they want to be long for an extended period of time and want to earn incremental interest on their holdings can receive monthly payments at rates ranging between 6% and 12% annually depending on the asset." ¶ 211 (emphasis added). "Because the loans were pitched as investments, 'it would be reasonable for a prospective purchaser to take the [seller] at its word.'" *Bongiorno v. Baquet*, 2021 WL 4311169, at *17 (S.D.N.Y. Sept. 20, 2021) (quoting *Reves*, 494 U.S. at 69); *see also SEC v. R.G. Reynolds Enterprises, Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (characterizing program issuing notes as "investment program" would lead investor reasonably to think of financial interest as investment); *Thompson*, 732 F.3d at 1168 (noting that defendant "talked about the Instrument as though it were an investment").

Under *Reves*, a court must consider "whether a reasonable member of the investing public would consider these notes as investments, 'even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction.'" *McNabb*, 298 F.3d at 1132 (quoting *Reves*, 494 U.S. at 66). The Supreme Court has described this factor as a "one-way ratchet" that allows "notes that would not be deemed securities under a balancing of the other three factors nonetheless to be treated as securities if the public has been led to believe they are," but does not "allow notes which under the other factors would be deemed securities to escape the reach of regulatory laws." *Stoiber*, 161 F.3d at 751. "[T]his factor is an objective test that turns on whether a reasonable purchaser would have perceived the [n]otes to be an investment." *Fragin*, 2012 WL 3613813, at *10.

Defendants argue that the boilerplate language of the Gemini Earn Agreement (Master Digital Loan Agreement, ECF No. 180-2) (but not the direct GGC lending agreement, Master Borrow Agreement, ECF No. 180-1) indicates that the parties intended only to enter into commercial loans. DCG Br. at 18. However, Defendants ignore that courts, in construing the term "securities," are "not bound by legal formalisms, but instead take account of the economics of the transaction under investigation."[13] *Reves*, 494 U.S at 61; *see also Forman*, 421 U.S. at 849 (stating that "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto"); *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967) (in interpreting the term "security," "form should be disregarded for substance and the emphasis should be on economic reality"); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive.") (citing *SEC* v. *SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001)). GGC's labeling is not binding. The focus is not on the labels assigned but on the economic realities of the transactions. *See Edwards*, 540 U.S. at 393 ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.") (cleaned up); *see, e.g.*, *U.S. v. Pierre*, 2021 WL 4150969, at *4 (S.D.N.Y. Sept. 13, 2021) ("Calling something a loan does not make it a loan.").  Defendants' reliance on *Kirschner* (DCG Br. at 18), is unavailing because, in *Kirschner*, the buyers were "sophisticated entities," unlike the retail and individual

---

[13] The Master Borrow Agreement, through which Genesis Yield investors invested directly with GGC (ECF No. 180-1) does not contain this language, and therefore this argument is inapplicable regarding investors who purchased Genesis Yield securities directly from GGC under the Master Borrow Agreement, such as Plaintiffs Morone, Translunar and Ameli.

investors who purchases Genesis Yield. *Edwards*, 540 U.S. 394 (noting that fixed returns are particularly attractive to less sophisticated individuals).

Defendants likewise argue that the Complaint "fails to plead any allegations that 'there existed public expectation that the notes would be traded as securities.'" DCG Br. at 18. However, the economic realities of the class members' investment in Genesis Yield, in which investors were invited to participate in a program repeatedly advertised both over the internet and on social media as an "investment" offering rates long term, would be perceived reasonably by the investing public as an offering of securities. ¶¶ 200-08, 211. Here, legal formalisms in the Gemini Earn Agreement that the agreements were "intended to be commercial loans . . . not securities" (DCG Br. at 18), the terms of which investors could not negotiate, elevates form over substance. The economic realities and investors' expectations—supported by Defendants' own words and conduct—are that the Genesis Yield constituted an offering of securities. *See Telegram*, 448 F. Supp. 3d at 365 (disclaimers and public statements emphasizing consumptive use of Grams and rejecting any expectation of profit were insufficient to negate the substantial evidence that a reasonable purchaser expected to profit).[14] The Complaint alleges that investors did not negotiate the terms of their investments, and the two agreements at issue (the Master Borrow Agreement and Master Digital Asset Loan Agreement) are, but for provisions concerning Gemini, virtually identical. ¶¶ 138-39, 199 (alleging that investors who invested crypto assets directly with GGC or through Gemini Earn did not individually negotiate terms);

---

[14] The court's decision in *Schentag v. Nebgen* is inapposite because, in contrast to the facts alleged in the Complaint, in *Nebgen* the plaintiff did not allege that the note at issue was "offered to members of the public." 2018 WL 3104092, at *10 (S.D.N.Y. June 21, 2018). Likewise, Defendants' reliance on *Reeder v. Succession of Palmer*, 736 F. Supp. 128 (E.D. La. 1990), *aff'd*, 917 F.2d 560 (5th Cir. 1990), is distinguishable from the facts alleged in the Complaint. *Reeder* involved an alleged Ponzi scheme where the "critical issue" before the court on the motion to dismiss was "whether a postdated check is a security." 736 F. Supp. at 129. In *Reeder*, the court's statement that the alleged securities "were not commonly traded" referred to the fact that the alleged Ponzi scheme had only one investor, and not, as Defendants assert, to the fact that the alleged securities did not trade on a secondary market.

*Compare* ECF No. 180-1 (Master Borrow Agreement) with ECF No. 180-2 (Master Digital Asset Loan Agreement).

Defendants emphasize the lack of secondary market and transferability of rights within Gemini Earn. DCG Br. at 17-18 (internal citation and quotations omitted). But, as noted above, the Complaint alleges that the economic realities—and GGC's advertising—created the expectation by the investing public that Genesis Yield were securities. Genesis Yield securities were broadly advertised over the internet, including social media, and any member of the public could open a Gemini account and directly invest in Genesis Yield securities through Gemini Earn with no minimum investment. ¶¶ 200-08. Accordingly, no secondary market was necessary.

This factor weighs in favor of finding that Genesis Yield securities are notes under *Reves*. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *13 (finding that due to conflicting evidence, this factor tilts slightly in favor of finding that Genesis Yield are notes under *Reves*).

### iv. There is No Alternative Regulatory Regime or Risk-Reducing Factors to Protect Genesis Yield Investors

The fourth prong of the *Reves* test assesses whether there are adequate risk-reducing factors such as an alternate regulatory scheme that would "significantly reduce[ ] the risk of the instrument" to the lender, "thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67. There was no alternative regulatory regime or risk reducing factors to protect Genesis Yield investors. ¶¶ 214-21. The notes were unsecured and uncollateralized. ¶ 216. Genesis Yield securities were not protected or insured by the Federal Deposit Insurance Corporation ("FDIC"), the Securities Investor Protection Corporation ("SIPC"), any other governmental program or banking regulations, or Defendants. ¶¶ 155, 215. Nor did Defendants provide investors with the full panoply of information and risk disclosures required by the federal securities laws. *Id.* ¶¶ 200, 254-55.

Although Gemini is registered as a New York trust company regulated by the New York State Department of Financial Services ("NYDFS"), NYDFS did not have oversight over GGC, Defendants DCG or Silbert, or Genesis Yield securities. ¶¶ 217-18; *see Reves*, 494 U.S. at 69 (finding no risk-reducing factor that would make the application of the federal securities laws unnecessary where the notes were uncollateralized and uninsured and would escape federal regulation entirely if the securities laws were held not to apply). "Gemini Earn" was not approved by NYDFS, and GGC was not regulated by NYDFS. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *13 (finding NYDFS "did not have oversight of Genesis or Gemini Earn . . . 'Gemini publicly stated that Gemini Earn does not operate like a traditional bank account, is not protected by a governmental program, and is not backed by Gemini itself. . . . Defendants offer no further explanation as to how Gemini's registration with the Department establishes the type of regulatory scheme that 'significantly reduces the risk of the instrument.'").

Defendants further argue that both GGC and Gemini were "regulated" by the U.S. Financial Crimes Enforcement Network ("FinCEN") which investigates and combats money laundering and financial crimes. DCG Br. at 19. However, FinCEN does not regulate securities or the disclosure of risks to investors. ¶ 220. FinCEN's collects and analyzes information to combat money laundering, terrorist financing and other financial crimes. *Id*. FinCEN's narrow focus on money laundering and other crimes—which has nothing to do with regulating risks to the investing public—does not provide an alternate regulatory scheme that would "render[] application of the Securities Acts unnecessary" as required by *Reves*. 494 U.S. at 67.

Indeed, that over 340,000 investors were unable to access their digital assets at the end of the Class Period illustrates that there were no adequate risk-reducing factors such as an alternate regulatory scheme. ¶ 206. The absence of other regulatory regimes left Genesis Yield investors

exposed to significant risk warranting the application of the federal securities laws. *See McNabb*, 298 F.3d at 1132-33 (finding that the promissory notes at issue were securities because "without such a classification there is the potential that the lender may be left open to significant risk."). This factor weighs in favor of finding that Genesis Yield securities are notes under *Reves*. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *14.

In sum, the analysis of the Complaint's allegations show that all factors weighs in favor of finding that investments in Genesis Yield were notes under *Reves*.

### b. Genesis Yield Securities Are Investment Contracts Under *Howey*

The Complaint alleges that Genesis Yield was an investment opportunity involving the lending and investing of pooled crypto assets that was marketed to retail and individual investors with no ability to negotiate the terms. ¶¶ 138-40, 145-49, 199.[15]  Genesis Yield involved: (i) an investment of money (¶¶ 223-24),[16] (ii) in a common enterprise (¶¶ 225-28), and (iii) with a reasonable expectation of profits derived from GGC's efforts (¶¶ 229-32, 209-13, 187-94, 148). GGC operated a pooled investment fund where it aggregated investors' capital and purported to use its investment expertise and knowledge of the digital assets markets to invest those assets in ways designed to earn returns that exceeded the returns GGC promised its investors.  ¶¶ 171-74,

---

[15] The DCG Defendants improperly incorporate by reference their reply brief in support of their motion to dismiss the second amended complaint in support of their argument that the Complaint "conflates" differences in the Gemini Earn and direct lending agreements.  DCG Br. at 10 (citing ECF No. 149 at 18-19).  The Court respectfully should strike, or at least ignore, arguments incorporated by reference in DCG Defendants' reply brief because it would violate the 40-page limit under Rule 7(a)(5) of the Local Rules of Civil Procedure for the U.S. District Court for the District of Connecticut. Assuming, *arguendo*, the Court considers this argument, it should be rejected because it contradicts the facts alleged in the Complaint.  Neither direct lenders nor Gemini Earn investors individually negotiated terms. ¶¶ 138-39, 199.

[16] Courts have held that the investment of cryptocurrencies such as Bitcoin satisfy the investment of money prong under *Howey*. *See, e.g., SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (holding that investment of Bitcoin was investment of money under *Howey*).

234.  This is the same business model utilized by commercial banks and pooled investment funds such as hedge funds. Both activities are covered by the Securities Act. ¶ 235.

Under Sections 2(a)(1) of the Securities Act and 3(a)(10) of the Exchange Act, the definition of a security includes an "investment contract." *See* 15 U.S.C. §§ 77b(a)(1); 78c(a)(10). The Supreme Court defined "investment contract" to include any "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99.[17]  The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852–53. This test embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.  "The fact that investors have bargained for a return on their investment does not mean that the return is not also expected to come solely from the efforts of others.  Any other conclusion would conflict with our holding that an investment contract was offered in *Howey* itself."  *See Edwards*, 540 U.S. at 395–97; *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *9.

Defendants' core argument ignores the economic reality of Genesis Yield, mischaracterizes the Complaint and asserts that Genesis Yield were a series of individually negotiated commercial loans. *See, e.g.*, DCG Br. at 11, 10. Defendants are wrong.  As outlined below, the facts alleged in the Complaint plausibly support that Genesis Yield was an investment contract under *Howey*. *See SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *5-9.

---

[17] Courts of Appeal, including the Second Circuit, have uniformly held that "solely" was not to be taken literally. *See U.S. v. Leonard*, 529 F.3d 83, 88 n.6 (2d Cir. 2008) (collecting cases).

i.      **Genesis Yield Investors Funded a Common Enterprise through Horizontal Commonality**

Defendants argue that the Complaint fails to plead that Genesis Yield investors funded a "common enterprise" by failing to plead horizontal commonality—that "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole." DCG Br. at 10-11 (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Defendants assert that "horizontal commonality turns on whether Plaintiffs' profits were tied to – and depended on – the success of Genesis' lending business," that "[n]either Earn users nor direct lenders shared in profits and losses with Genesis or each other." DCG Br. at 11.

Defendants' arguments miss the mark and ignore the Supreme Court's decision in *Edwards*. Capital appreciation and participation in GGC's earnings from the use of investors' funds—facts that Defendants assert are required and missing here—are two examples of the "touchstone" of an investment contract, but these forms of "profits" are not an exhaustive list. *Edwards*, 540 U.S. at 396. A promise of a fixed rate of return, like the promise to Genesis Yield investors, does not preclude a scheme from being an investment contract. *Id*. "Profits" under *Howey* means profits that investors seek on their investment (periodic interest payments), not the profits of the scheme in which they invest (GGC). *Id*. at 394. That class members received a market rate of interest—what Defendants call a contractual "Loan Fee"—rather than sharing in the profits of Genesis is not required for a finding of horizontal commonality. *SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *7 (noting pro rata distributions of profits not required for horizontal commonality); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("formalized profit-sharing mechanism" such as rights to *pro rata* distributions "is not required for a finding of horizontal commonality"); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("pro-rata distribution of profits . . . is not required.").

Defendants assert that "Plaintiffs cannot allege pooling, which occurs when funds are 'reinvested by the promoter into the business' and '[i]n turn, such reinvestment increases the value of the instrument offered.'" DCG Br. at 14. However, there is no requirement that profits paid to investors be proportional to the profits a promoter generates for itself. Rather, horizontal commonality is established when, as here, "investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 87).[18]

The Complaint alleges that Genesis Yield investors digital assets were pooled by GGC to be further invested in GGC's business for the purpose of generating returns in the form of interest. ¶¶ 147-49, 177-80. GGC did not manage separate accounts for investors, but instead pooled investors' crypto assets and used them to generate returns for those investors, thus creating horizontal commonality. ¶¶ 122, 125, 171, 228-30; *SEC v. Genesis Global Capital, LLC*, 2024 WL 1116877, at *8 (finding horizontal commonality plausibly alleged because Genesis Yield investors were reliant on the pooling of invested crypto assets and the way GGC deployed those assets); *Kik Interactive Inc.*, 492 F. Supp. 3d at 178-79 ("This is not a scenario where the funds of each investor were segregated and separately managed"). Indeed, the pooling of investor assets was *necessary* for GGC to successfully operate its institutional investing business. It was from the pool of investors' crypto assets that GGC determined whether, which, how much, and for how long the crypto assets would be used in counterparty transactions for generating revenue in GGC's business. ¶¶ 148-50, 171-73, 229-232.

---

[18] Defendants cite *Friel v. Dapper Labs., Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023) for the proposition that "pooling" occurs when funds are reinvested by the promoter and such reinvestment increases the value of the instrument offered. Defendants' point, in essence, is another way of asserting capital appreciation is required to demonstrate horizontal commonality, which, as noted above, is wrong. An investment scheme promising a rate of return, such as the "Loan Fee," can be an "investment contract" and thus a "security" subject to the federal securities laws. *Edwards*, 540 U.S. at 397.

Defendants argue that Judge Ramos' analysis in *SEC v. Genesis Global Capital* "overstates the significance of literal pooling" and that "Plaintiffs must allege facts beyond the commingling of assets to demonstrate 'the hallmarks of the common enterprise.'" DCG Br. at 15; *Binance*, 2024 WL 3225974, at *26 (D.D.C. June 28, 2024). Defendants' argument is unpersuasive. Defendants mischaracterize and ignore the Complaint's allegations that go far beyond mere commingling of assets. The Complaint alleges that GGC used the pool of investor assets to make favorable terms with institutional borrowers to earn profits for both itself and its customers. ¶ 232. Without the skill, expertise and efforts of GGC, no profits would be possible.

Defendants' reliance on *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974, at *26 (D.D.C. June 28, 2024), an out of circuit decision that is factually distinguishable, is misplaced.[19]  In *Binance*, the allegations concerning the Simple Earn product did not "describe a scheme or transaction in which investors were urged to put their money in Binance's hands so that they could share in the return that Binance would generate through its managerial or entrepreneurial efforts." *Binance*, 2024 WL 3225974, at *26. There, investors were not informed "that the loaned crypto assets were pooled or, more importantly, that they would be utilized by Binance to generate revenue that would be the source of the returns." *Id.* at 26 and n.22. In contrast, the Complaint alleges that GGC promoted Genesis Yield as an investment and that investors relied on GGC's managerial efforts, skill and expertise to earn returns or profits when GGC aggregated investors' digital assets. ¶¶ 170-71 (Ballensweig explaining "the way the model works, is that the deposits . . . will get aggregated . . . lend those assets out to our . . . network of borrowers, generate the yield and pay Gemini back so that it can pay its users."), ¶ 213 ("Class members

---

[19] The Court in *Binance* analyzed the alleged security under *Howey* and, unlike the Complaint here, there was no allegation that the security at issue was a "note" under *Reves*. The Court in the SEC Action found that Genesis Yield were securities under both *Howey* and *Reves*.

understood that the cash or digital assets invested with Genesis Global Capital would be reinvested by Genesis Global Capital and that the interest rate offered was dependent on Genesis Global Capital using its expertise and knowledge of the crypto market to find investment opportunities and earn the yield necessary to pay investors the agreed upon returns.  To accomplish this, Genesis Global Capital would aggregate assets from investors and use class members' assets as working capital to reinvest with institutional borrowers in the crypto market to generate yield for Genesis Global Capital and for investors.").

Defendants argue that Plaintiffs do not establish horizontal commonality because the rate of return promised to investors was dependent on market realities rather than the Company's efforts to achieve profitability and success. DCG Br. at 12-14. Again, Defendants' argument ignores and contradicts the Complaint's allegations of GGC's efforts to create successful returns for Genesis Yield investors and how investors' yields were dependent on GGC's skill, expertise and efforts in the digital asset lending market. *See, e.g.*, ¶¶ 145-46, 148-50, 187-99, 209-13, 227-34.  GGC's executives promoted their skill and expertise in the digital asset lending market as the reason why they could offer rates higher than traditional markets: "what sets Genesis apart is the fact that we're kind of uniquely positioned . . . our roots are obviously in trading and understanding [over the counter] markets and understanding exchanges and the nuances of the market structure" and "we are experts in this space." ¶¶ 172-73.

Defendants' assertion that that GGC's liquidity crisis (or subsequent insolvency) is not a factor in demonstrating commonality is similarly unavailing.  DCG Br. at 14. That Genesis Yield investors lost access to their crypto assets as a result of GGC liquidity crisis demonstrates that the fortunes of the investors were tied to the fortunes of GGC. GGC utilized investors' pooled crypto assets to generate returns for itself and for Genesis Yield investors.  When these returns

were no longer sufficient to cover withdrawal requests, GGC could not continue.[20]

### ii.    Genesis Yield Investors Participated in a Common Enterprise through Strict Vertical Commonality

Defendants relegate the Complaint's allegations of vertical commonality to a footnote, arguing that Plaintiffs' theory "fails for the same reasons that there is no horizontal commonality." DCG Br. at 11, n.7. However, the Complaint plausibly alleges strict vertical commonality as the fortunes of GGC are tied to the fortunes of the investors. *See Telegram*, 448 F. Supp. 3d at 369–71 (vertical commonality existed where "Telegram's fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the [blockchain]"); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (same) (collecting cases in this District holding that strict vertical commonality is sufficient to establish a common enterprise).

The Complaint pleads strict vertical commonality because GGC and Genesis Yield investors earned profits when GGC used its skill and experience to reinvest digital assets for the purpose of generating revenue in GGC's business. ¶¶ 170-74, 182-84, 187, 190-92, 225-26, 231-34. Investors' crypto assets that were obtained by GGC through Genesis Yield were used for GGC's only business—to earn interest from relending investors' digital assets to institutional

---

[20] Defendants' reliance on *Harman v. Harper*, 1990 WL 121073 (9th Cir. 1990) (an unpublished decision) for the proposition that "solvency risk is inherent in every lending relationship, and does not transform such relationship into a security" is misplaced. DCG Br. at 14, n. 18. Defendants cherry pick language from the opinion and the facts are not only distinguishable, but cut in Plaintiffs' favor.  In *Harman*, once the alleged securities were purchased, "[defendants'] efforts could not and did not make any difference" and "[defendants] made no promises to develop or otherwise manage the properties." *Id*. at *5. The Court therefore found that the instruments were not securities because the lenders did not rely on the efforts of the borrowers, and therefore insolvency did not "turn" the instruments into securities. *Harman*, 1990 WL 121073, at *5 (applying *Howey* test, "while the repayment of the mortgage may have been depended on the solvency of the borrower, this is not the same as relying on entrepreneurial efforts."). In contrast, the Complaint alleges that GGC marketed Genesis Yield as a profit-making opportunity based upon GGC's skill and experience in the crypto industry, and wherein investors invested their crypto assets with GGC in exchange for interest with the expectation that GGC's efforts, skill and experience would produce rates of return up to 100 times than the national average.

counterparties using their skill, knowledge and expertise. ¶¶ 131, 145-46, 148-50, 170-74, 186, 190, 225-27, 229-32. That is how GGC made money for itself and to pay the interest GGC had promised to Genesis Yield investors, aligning their interests and creating strict vertical commonality. *Telegram*, 448 F. Supp. 3d at 369–71.

### iii. Reasonable Investors Expected Profits in Genesis Yield to Come from GGC's Managerial Efforts

The Complaint alleges that reasonable Genesis Yield investors expected profits to come from GGC's managerial efforts, skill, and experience. ¶¶ 148, 182-93, 209-13, 229-32, 234. GGC publicly promoted Genesis Yield securities as an "investment" and way for investors to "earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty," and GGC promoted itself as the "premier institutional digital asset financial services firm" and "the world's largest digital asset lender." ¶¶ 131, 188, 190, 201, 204-05, 211 (GGC "Market Observation Report stating: "Investors who know they want to be long for an extended period of time and want to earn incremental interest on their holdings can receive monthly payments at rates ranging between 6% and 12% annually depending on the asset."). In fact, GGC controlled the pooled crypto assets that it received from investors and determined how much and what type of crypto asset to hold, lend out to others, or otherwise use. ¶¶ 186, 189-90, 194-95, 227. GGC determined the interest rates that it promised to pay to Genesis Yield investors and pooled crypto assets, identified counterparties, conducted due diligence, negotiated agreements, evaluated market conditions, managed risk, and set collateral levels for returns. ¶¶ 148, 189-93, 191-96, 225-26, 230-31, 258. Based on these efforts, GGC and Gemini advertised that Gemini Earn investors could "receive more than 100x the average national interest rate, among the highest rates on the market," inviting investors to invest their crypto assets to be used by GGC to generate rates much higher than what they could otherwise receive on their own. ¶¶ 195-96, 201, 210.

These facts show that reasonable investors expected investment returns from the managerial efforts, skill and experience of GGC. As set forth in *Edwards*, "when we held that 'profits' must 'come solely from the efforts of others' [under *Howey*], we were speaking of the profits that investors seek on their investment, not profits of the scheme in which they invest. We used 'profits' in the sense of income or return to include for example, dividends, *other periodic payments*, or the increased value of the investment." 540 U.S. at 394 (emphasis added). As such, Defendants' argument that such an expectation lacks the necessary connection between the anticipated returns and the offeror's managerial or entrepreneurial efforts to support this prong (DCG Br. at 15) is meritless.[21]  *See SEC v. Genesis Glob. Cap.*, 2024 WL 1116877, at *9.

In sum, the Complaint alleges facts that plausibly show Genesis Yield securities were investment contract under *Howey*.

### 5.    Defendants Controlled GGC and Are Liable under Section 15 of the Securities Act

Section 15 of the Securities Act imposes joint and several liability on "[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under" Section 12.  15 U.S.C. § 77o.  To plead control person liability under Section 15 of the Securities Act, the Complaint need only allege: (1) a primary violation of the Securities Act and (2) control of the primary violator by one or more defendants. *On. Tchr.' Pen. Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp 3d 131, 182, 183 (D. Conn. 2019) (Underhill, J.); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F.

---

[21] Defendants cite *Elson v. Geiger*, 506 F. Supp. 238, 241–42 (E.D. Mich. 1980), which is distinguishable. DCG Br. at 15. In *Elson* the commercial arrangements at issue had none of the *Howey* factors *other* than profits in the form of fixed interest, including no entrepreneurial or managerial efforts of others. The Complaint alleges investors depended on GGC's skill and experience, and managerial efforts to generate yield.

Supp. 2d 746, 772 (S.D.N.Y. 2012) (same); *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *12 (S.D.N.Y. Dec. 15, 2003) (same).  Control is "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193 (E.D.N.Y. 2000) (quoting 17 C.F.R. § 230.405).

Allegations of control under the Securities Act are not averments of fraud and therefore need not be pleaded with particularity, and the extent to which "control" must be alleged is governed by Rule 8's notice pleading standard.  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (stating whether defendant is control person "is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.") (citations omitted); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 427 (S.D.N.Y. 2020) (same); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, 2006 WL 6900987, at *2 (S.D.N.Y.) (same).

As set forth above, GGC violated Section 12(a)(1) by selling unregistered Genesis Yield securities in violation of Section 5 of the Securities Act, and GGC is strictly liable under Section 12.  At the time of the violations of Sections 5 of the Securities Act by GGC during the Class Period, Defendants controlled GGC, controlled the digital assets investors loaned to GGC through their purchase of Genesis Yield securities, and that they each exercised their power and influence to cause GGC to violate the Securities Act by offering and selling unregistered securities to Plaintiffs and members of the Class.  ¶¶ 6-9, 12-13, 30-31, 75-81, 90-99, 115-123, 185, 530-532; ¶¶ 533-41 (alleging Defendant DCG's control of GGC); ¶¶ 542-49 (alleging Defendant Silbert's control of GGC); ¶¶ 550-54 (alleging Defendant Moro's control of GGC); ¶¶ 555-57 (alleging Defendant Islim's control of GGC); ¶¶ 558-64 (alleging Defendant Murphy's control of GGC); ¶¶

565-69 (alleging Defendant Kraines's control of GGC).[22] The Complaint's allegations are sufficient to give Defendants notice under Rule 8 of the Federal Rules of Civil Procedure of the claims that each was a control person and the grounds on which the claims rest. "That is all that is required" at the motion to dismiss stage. *Scottish Re*, 524 F. Supp. 2d at 401.

**_DCG._** Numerous courts have held that allegations of a majority ownership interest and board representation, similar to the Complaint's allegations concerning DCG's 100% ownership of GGC and their interlocking directors and officers, are sufficient to adequately plead a Section 15 control person claim. *See Fed. Deposit Ins. Corp. v. Credit Suisse First Boston Mortg. Sec. Litig.*, 414 F. Supp. 3d 407, 413-14 (S.D.N.Y. 2019) (finding allegations that defendant corporation wholly owned the primary violator subsidiary sufficient to state claim for control person liability under Section 15 of the Securities Act); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 575-76 (S.D.N.Y. 2015), *aff'd*, 873 F. 3d 85 (2d Cir. 2017) ("Being a parent corporation over a subsidiary, and having common officers, directors, personnel . . . are also relevant indicia of control"); *In re Ind. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770-71 (S.D.N.Y. 2001) (finding plaintiffs adequately alleged control person liability against parent corporation where parent "was running the business of [subsidiary] through common management" and where the three highest officers of parent company were on the operating committee that ran the subsidiary); *Prestige*, 2006 WL 6900987, at *2 (S.D.N.Y. 2006) (finding plaintiffs adequately alleged control person liability against a majority shareholder with the power

---

[22] Defendants further argue that "Plaintiffs' vague, conclusory allegations – e.g., that the Defendants 'exercised their power and influence to cause Genesis Global Capital to violate the Securities Act,' TAC ¶ 531 – plainly do not suffice to show that DCG had actual control over Genesis' alleged offer or sale of unregistered securities." DCG Br. at 19 (relying on *In re Smith Barney Transfer Agent Litig.,* 884 F. Supp. 2d 152, 166-67 (S.D.N.Y. 2012)). Defendants' reliance on *Smith Barney* is misplaced because the control allegations in *Smith Barney* focused "exclusively on [Defendant's] 'control person status' rather than [Defendant's] exercise of 'actual control over the matters at issue.'" *In re Smith Barney*, 884 F. Supp. 2d at 166. In contrast, the Complaint alleges that Defendants actively managed GGC, whose only business was borrowing and lending digital assets, *i.e.*, offering and selling unregistered securities.

to appoint board members).

Defendant DCG argues that its parent-subsidiary relationship cannot establish control person liability. However, in the cases that Defendant cites, the court dismissed control person claims against parent companies because the plaintiffs failed to allege that the parent had any ownership of the subsidiary's voting securities or any other basis to demonstrate control over the subsidiary. *See* DCG Br. at 20, n. 27-28 (citing *In re WorldCom, Inc.*, *Sec. Litig*., 2004 WL 1097786, at *3 (S.D.N.Y. 2004); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310-11 (S.D.N.Y. 2005); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460-61 (S.D.N.Y. 2018)). In *Ho v. Duoyan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 580 (S.D.N.Y. 2012), the court dismissed a control person claim against a shareholder who had only a minority interest in the allegedly controlled company. By contrast, the Complaint alleges DCG's control of GGC as 100% owner of GGC through GGH, board representation, and that DCG's representatives actively controlled and managed GGC.  ¶¶ 553-41.

Defendant DCG argues that the GGH/GGC Operating Agreements ("the Operating Agreements") do not establish control because DCG "had nothing to do with the decision to initiate bankruptcy" and that "an independent Special Committee was the "final decision maker" with respect to initiating bankruptcy. DCG Br. at 21-22.  This argument raises questions of fact and ignores that the DCG Defendants' respective roles in the decision to create the Special Committee are highly fact-intensive and cannot be determined at the pleading stage. Even assuming, *arguendo*, that the "Special Committee" alone made the ultimate decision to declare bankruptcy, the Special Committee could not have been created without the approval of Defendants Islim, Murphy and Kraines, conduct which demonstrates their control over the Company. *See* Genesis Bankruptcy, ECF No. 17 (Decl. of Derar Islim in Support of First Day Motions and Applications

in Compliance with Local Rule 1007-2, ¶ 8 (stating that Defendants Kraines, Murphy and Islim as board members of GGH formed Special Committee on November 18, 2022).  More broadly, the Operating Agreements provided the DCG Defendants with management authority over GGH and GGC and the Complaint alleges that the DCG Defendants actively managed the Company under the Operating Agreements (¶¶ 6, 118, 116, 372-440).  *See Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 359 (S.D.N.Y., 2019) (finding LLC agreement showed executives were lifeblood of company and responsible for "active management" of company's operations).[23]

DCG asserts that it had a "minority position" on the GGH board and that the Complaint concedes that DCG had no control over the GGH board. DCG Br. at 21.  This is wrong.  This argument ignores that during the Class Period Defendants Islim, Murphy, and Kraines were members of the GGH board and acted as agents on behalf of Defendants DCG and Silbert.  ¶¶ 8, 120-21.  DCG's arguments that the intercompany loans and the DCG Promissory Note do not establish control over GGC fare no better because they ignore the facts alleged and dispute facts. For example, Defendants do not dispute that Defendants DCG and Silbert caused GGC to extend the maturity date for GGC's $100 million unsecured loan to DCG by 10 months for no consideration because DCG could not repay the loan and would have been forced into bankruptcy. Defendants instead argue, without explanation, that "context" is missing and dispute facts.  The Complaint alleges that Defendants Silbert and DCG dictated the terms and that GGC did "not have much room to push pack, so we will do what DCG needs us to do." ¶ 413.  This illustrates DCG's total domination and control over GGC and that DCG, GGC, and GGH operated as a single entity

---

[23] Defendants argue that the Operating Agreements do not establish control because they were entered into after the Genesis Yield Program began. This argument ignores that these were amended agreements and ignores the Complaint's allegations that GGC was established before GGC began offering Genesis Yield. ¶ 113 (alleging GGC organized in 2017); ¶ 131 (alleging GGC began selling Genesis Yield in 2020); ECF Nos. 180-9-10 (amended and restated operating agreements of GGC and GGH).

during the Class Period. ¶¶ 12, 410-14, 539. Based on Defendant Silbert's private chat uncovered by the NYAG, Defendants DCG and Silbert, in effect, treated GGC as their personal piggy bank and source of low-cost capital. ¶ 42 (Defendant Silbert: "we can't risk money leaving Genesis and depleting our liquidity . . . Genesis access to low priced capital via institutional investor and retail channel like Gemini is going to give us a major competitive advantage").[24]

**_Individual Defendants._** Defendant Silbert—as founder of DCG and GGC, CEO of DCG, chair of DCG's three-person board, and controlling shareholder of DCG, which owned 100% of GGC—controlled GGC. *See Yi v. GTV Media Grp. Inc.,* 2021 WL 3500920, at *3-4 (S.D.N.Y. Aug. 6, 2021) (finding allegations that control person founded company, together with allegations of control over day-to-day operations, were sufficient to survive motion to dismiss). Likewise, as the most senior executives of GGC with day-to-day control over GGC and its issuance of unregistered securities—the Company's only line of business—Defendants Islim and Moro controlled GGC. *See City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.* 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("[C]orporate officers usually are presumed to possess the ability to control the actions of their employees."); *Am. High-Income Trust v. Alliedsignal,* 329 F. Supp. 2d. 534, 549 (S.D.N.Y. 2004) (finding control where plaintiffs alleged that defendant was principal executive officer); *Friel*, 657 F. Supp. 3d at 450 (finding control person liability against CEO where company found to have sold unregistered securities); *Balestra*, 380 F. Supp. 3d. at 359 (finding CEO with general and active management of business of company liable as control person). Finally, Defendants Murphy and Kraines exercised control over GGC through their positions as executive officers of DCG as well as their positions on the board of directors of GGH

---

[24] DCG's reliance on *Finjan LLC v. Trustwave Holdings, Inc*. 2021 WL 5051147 at *11-12 (D. Del. Oct. 29, 2021), and *Alpine View Co. Ltd v. Atlas Copco AB*, 205 F.3d 208, 219 (5th Cir. 2000) are unpersuasive because these decisions concern personal jurisdiction issues, not control person liability.

which managed the business of GGC. [25] *See Nomura*, 104 F. Supp. 3d at 580-81 (finding individual defendants, all of whom were directors or officers, liable as control persons due to their status as director/officer in combination with other control allegations).

Defendant Silbert's argument that his position as CEO and owner of 40% of DCG's equity and ability to appoint a "minority" of the GGH/GGC Board, is insufficient to establish control of GGC (DCG Br. at 22), ignores the Complaint's allegations of Defendant Silbert's control and domination over GGC's operations. For example, the Complaint alleges that Silbert was a founder of GGC; had consistent and daily management responsibilities for DCG's subsidiaries' operations, specifically their capital allocation and activities; used his power and influence over Defendant Moro and the Company's core business; reviewed Defendant Moro's public statements made on behalf of GGC before their issuance concerning its financial condition; and when Gemini threatened to withdraw from the Gemini Earn Program, Defendant Silbert, rather than GGC's CEO, intervened to convince Gemini not to do so because it was in the best interest of DCG. ¶¶ 7, 76, 542, 546.[26] Moreover, the Complaint alleges Defendants Silbert and DCG controlled the

---

[25] Defendants Silbert and Murphy, relying on *Youngers v. Virtus Inv. Partners Inc.,* 195 F. Supp. 3d 499, 525 (S.D.N.Y. 2016), argue that "assertions that Silbert and Murphy held positions at a parent company cannot establish control over a subsidiary's daily operating decisions." DCG Br. at 22. This argument ignores allegations in the Complaint that show that Defendants Silbert and Murphy actively managed GGC. For example, the Complaint alleges that Defendant Silbert had consistent and daily management responsibilities for GGC, and used his power and influence to both direct Defendant Moro and GGC on how to utilize GGC's loan book and to perpetuate the idea that GGC was "highly stable." ¶¶ 7, 76, 542, 546. The Complaint further alleges that Defendant Murphy hand-picked Defendant Islim to serve as interim COO of GGC and to serve as a member of the board of GGH, hand-picked Tom Coheeney to serve as a special advisor to GGC and to serve as a member of the board of GGH, drafted and edited communications that Defendant Moro made on behalf of the Company concerning its financial condition, and formulated and disseminated information on behalf of Company to GGC investors concerning its solvency. ¶¶ 414-18, 560-63.

[26] Defendants Silbert, relying on *Sloane Overseas Fund, Ltd., v. Sapiens Intern. Corp., N.V.*, 941 F. Supp. 3d 1369, 1379 (S.D.N.Y. 1996), argues that the fact that he is the founder of DCG is of no help. DCG Br. at 22, n. 32. In contrast to *Sapiens*, in addition to being the founder of DCG, the Complaint alleges that Silbert dominated and controlled both DCG and GGC. For example, DCG and Silbert organized GGC in 2017 to house the growing digital asset investment business, Silbert used his power and influence to pack GGH's board with DCG representatives, and he was involved in the management of GGC's operations. ¶¶6-9, 76, 112, 306-11. Defendant Silbert's reliance on *Li v. Eqonex*, 2024 WL 4241951, at *16 (S.D.N.Y. Sept. 18, 2024), is misplaced. In contrast to the facts in *Eqonex*, the Complaint alleges

GGH board, which controlled GGC, through the appointment of a majority of GGH's board of directors.  ¶¶ 8-9.

Defendant Islim argues that the Complaint's allegations are insufficient to establish his control over GGC because they "rely only on [his] titles." Islim Br. at 8.[27] Assuming, *arguendo,* that the Complaint only relies on Mr. Islim's titles as CEO and COO of GGC, "corporate officers are usually presumed to possess the ability to control the actions of their employees." *See City of Westland Police and Fire Ret. Sys,* 928 F. Supp. 2d at 721.[28] But the Complaint alleges more than Islim's corporate position to show his control over GGC. For example, the Complaint alleges that: Defendant Murphy stated that Islim was "instrumental in developing key areas of the Genesis business"; Islim promoted and advertised GGC's investment business; Islim stated that he worked with other GGC employees to ensure GGC's loan book was in good liquidity standing after the 3AC default; and Defendant Moro stated that Islim was "involved in every step of what has been happening" with GGC after the 3AC default. ¶¶ 80, 173, 556.  In other words, Defendant Islim as CEO and COO of GGC was an active manager over GGC, an enterprise whose only business was reinvesting class members' digital assets.

Defendants Murphy and Kraines argue that their respective positions as DCG's COO and

---

that Defendant Silbert was the *controlling* shareholder of DCG and used his power to appoint DCG representatives on the GGH board in order to closely manage and control GGC. ¶¶ 7-8, 76, 542, 546.

[27] Defendant Moro, GGC's CEO from the start of the Class Period through August 17, 2022, does not dispute that he controlled GGC. *See* Moro Br. at 25-29. *See Hardin v. Tron Found,* No. 20-CV-2804, 2024 WL 4555629 at *14 (S.D.N.Y. Oct. 23, 2024) (finding control person liability against CEO who was involved in the founding of the company, negotiated its partnerships, and played a vital role in its development).

[28] Defendant Islim relies on *Youngers v. Virtus Inv. Partners Inc.,* 195 F. Supp. 3d 499, 524-26 (S.D.N.Y. 2016), to argue that "boilerplate allegations that a party controlled another based on officer or director status are insufficient." Islim Br. at 8. However, in that case, the court dismissed control person claims against the "Executive Vice President, Chief Financial Officer, and Treasurer" and the "Executive Vice President and General Counsel" of a parent company for its subsidiary's primary violation. *Id.* at 525-26. The court also dismissed control person claims against the subsidiary's "Executive Vice President of product development." *Id.* By contrast, Defendant Islim was the CEO and COO of GGC and a member of the GGH board.  Defendant Islim relies on *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *8 (S.D.N.Y. 2001), to argue that "officer or director status alone does not constitute control" (Islim Br. at 8), however, in this case, the court sustained control person claims against the CEO.

CFO, and as members of GGH's board are insufficient to establish control over GGC. DCG Br. at 22; Kraines Br. at 5-8.  Again, Defendants Murphy and Kraines ignore that the Complaint alleges more than their respective status to show control over GGC.  ¶¶ 558-70.  For example, the Complaint alleges Defendant Murphy hand-picked Defendant Islim to serve as CEO of GGC, and that both Defendants Murphy and Kraines strategized with other DCG executives on how GGC should proceed after the 3AC default, and formulated and disseminated information to investors concerning GGC's solvency on GGC's behalf. ¶¶ 46, 317, 320, 324, 369, 416-22 (Defendants Murphy and Kraines formulating and disseminating information to GGC investors), ¶¶ 563, 567 (Defendant Kraines managing GGC's collateral position and risk). [29]

Defendants Moro, Islim, and Kraines assert that "culpable participation" is a required element of a control person claim under Section 15. Moro Br. at 28, n.6; Islim Br. at 7, n.4; Kraines Br. at 3, n.3.  However, a majority of courts in the Second Circuit, including this Court, have determined that nonfraud claims under the Securities Act do not require an allegation of culpable participation.  This Court in *Teva* held that culpable participation was not an element of a Section 15 claim:

> It appears, though, that a "majority of judges" in this Circuit have held that a plaintiff need not prove the "culpable participant" requirement in a Section 15(a) claim. *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) (collecting cases). Neither the plaintiff nor any of the defendants argue that a claim under Section 15(a) requires a showing of "culpable participant" and, therefore, I will join my colleagues in finding that the additional element of culpable participant is not present here. Accordingly, for the reasons analyzed with respect to Count Two, the defendants' motions to dismiss Count Five are denied.

---

[29] Defendant Kraines previously asserted that the Complaint failed "to cite any cases where control person liability was extended to the primary violator's parent company's officers." ECF No. 151 at 4. However, in *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 526 (S.D.N.Y. 2016), a case that Defendant Kraines cites six times in his most recent motion to dismiss, control person liability was extended to the primary violator's parent company's officer. *Id.*

*Teva*, 432 F. Supp. 3d at 183; *see also Evoqua*, 450 F. Supp. 3d at 428 (stating "majority of judges in this District-including the undersigned-have held such an allegation" of culpable participation is not required under Section 15); *Scottish Re*, 524 F. Supp. 3d at 387 ("Unlike [a] section 20(a) [claim], the plaintiff is not required to allege culpable participation by the controlling person in order to state a claim under section 15."); *Ind. Energy Holdings*, 154 F. Supp. 2d at 770 ("[C]laims under sections 11 and 12(a)(2) of the Securities Act sound in strict liability and do not require knowledge of the misrepresentations. The concept of culpability is therefore inapposite"); *Alliedsignal,* 329 F. Supp. 2d at 551 n.10 ("[T]his Court joins the 'apparent majority of judges in the Southern District that have determined that culpable participation is not an element of § 15'"); *In re Vivendi Universal, S.A.,* 381 F. Supp. 2d 158, 188 (S.D.N.Y. 2003) (same).

The majority rule makes sense in light of the nonfraud claims enacted by Congress in the Securities Act and the plain language of Section 15. As one decision (cited by Defendant Moro) explains:

> Because the underlying violation pursuant to section 15 is a violation of sections 11 and 12(a)(2) in which strict liability is imposed (*i.e.*, knowledge of the misrepresentation is not required), this Court is in accord with those district courts that hold that merely two elements are required to establish a prima facie case of control person liability pursuant to section 15: (1) an underlying primary violation of the securities laws by the controlled person; and (2) control over that controlled person.

*In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *6 (S.D.N.Y. Feb. 20, 2002). The Court here should follow plain language of the Securities Act, the majority of courts in the Second Circuit, and its decision in *Teva*, and reject Defendants' attempt to graft a fraud-based element onto a nonfraud claim under Section 15 of the Securities Act.

Defendants assert that control person claims under Section 15 require an allegation of "actual control over the transaction in question—the issuance of unregistered securities." DCG Br. at 19, 22; Islim Br. at 8; Kraines Br. at 3. This requirement is not set forth in the plain language of Section

15 of the Securities Act. 15 U.S.C. § 77o. Even assuming, *arguendo*, actual control over the transactions in question is required, the Complaint alleges that Defendants through their power and influence caused GGC to offer and sell unregistered securities. ¶¶ 453, 530-31. The Complaint alleges that Defendants Islim and Moro as the most senior officers of GGC, had control over GGC's lending business (¶¶ 47, 122, 553), and that both Defendants Murphy and Kraines engaged in acts designed to prevent investors from redeeming Genesis Yield or to induce them to reinvest with GGC. ¶¶ 416-22. The Complaint further alleges that Defendants Silbert, Moro, Islim, Kraines and Murphy actively managed GGC. Indeed, according to GGC's filing in the Genesis Bankruptcy, sworn under oath and penalty of perjury by Defendant Islim as Interim CEO of GGC, during the Class Period they controlled GGC. ¶¶ 545, 551, 557, 564, 570.[30]

The Complaint has adequately alleged GGC's primary violation of Section 12(a)(1) of the Securities Act and each Defendants' control over GGC. Accordingly, the Court should deny Defendants' motions to dismiss the claims under Section 15 of the Securities Act.

> ### 6. The Complaint Adequately Alleges Recoverable Damages under the Securities Act

Defendants assert that "[e]ven if Plaintiffs could establish liability against the [] Defendants, there is nothing for them to recover here in light of the distributions they already received in the bankruptcy proceeding." DCG Br. at 23. Defendants concede that Section 12 entitles Plaintiffs "to the *consideration* originally paid for the security" and "rescissory damages

---

[30] Defendant Islim previously disputed the significance of his sworn statement that he controlled GGC during the Class Period. *See* ECF. Nos. 143 (Defendant Derar Islim's Memorandum of Law in Support of his Motion to Dismiss) and 152 (Reply Memorandum of Law in Further Support of Defendant Derar Islim's Motion to Dismiss). Defendant Islim previously argued that the bankruptcy filing was insufficient to establish control because it "merely states that, as of January 12, 2023, months after the Class Period ended, Mr. Islim was an officer and director of Genesis" and "merely confirms that, as of the date of the Genesis Bankruptcy, Mr. Islim was GGC's interim CEO and COO." *See* ECF Nos. 143 at 3; 152 at 3. Defendant Islim has abandoned this argument and, in effect, concedes his sworn statement demonstrates that he controlled GGC during the Class Period.

are 'measured by the difference between the amount Plaintiffs invested and the amount realized when Plaintiffs sold the securities back to Defendants.'" *Id.* It is undisputed that class members who invested digital assets directly with GGC have not fully recovered the consideration paid for Genesis Yield securities. ¶¶ 16-23. In other words, the in-kind distributions in the Genesis Bankruptcy to class members who directly invested with Genesis has been significantly less than a full in-kind recovery. Class members have not been made whole.

Defendants confuse "consideration"—investors' digital assets such as Bitcoin that were invested with GGC—with the dollar value of investors' digital assets at the time of distribution through the Genesis Bankruptcy. Defendants highlight the "full in-kind" return of "100% of the digital assets" invested by class members through Gemini. DCG Br. at 7. In other words, class members who invested through Gemini obtained a recovery of 100% of the "consideration" paid for Genesis Yield securities. However, with respect to investors who directly invested with GGC, Defendants shift focus, from the "consideration" paid and what Section 12 expressly states may be recovered, to the dollar "value" of the in-kind distributions, asserting "Plaintiffs have already recovered more than Section 12 permits." *Id.* Defendants' arguments are meritless.[31]

---

[31] Relatedly, DCG objected to confirmation of the plan in the Genesis Bankruptcy. *In re Genesis Global Holdco, LLC*, 660 B.R. 439, 473 (Bankr. S.D.N.Y. May 17, 2024) (noting "DCG's objection to confirmation revolves around one central contention: it contends that the claims of unsecured creditors must be calculated using their value in U.S. dollars on the Petition Date. According to DCG, any post-petition increase in the value of the cryptocurrency held by the Debtors should not be passed along to the unsecured creditors who lent the cryptocurrency to the Debtors, but instead should be available to DCG as the equity holder." The Genesis Bankruptcy rejected DCG's objection and confirmed the plan, which provides for in-kind distributions. *Id.* at 533. Indeed, the court in the Genesis Bankruptcy noted that GGC's "goal to pay back their creditors in full and in-kind" was "consistent with the MLAs here," citing a GGH board member's testimony that "one of the things that we thought about there, and we thought about it from the very beginning of my engagement, was how to handle the creditors who had handed us assets—cash, coins, different sorts of things—to be used in our business .... The people who gave us their assets, they own them. Yes, they gave them to us to invest. They're basing their claims on the amount for the value of the assets that they gave to us .... [Y]ou heard a lot of people talk about restitution and honoring the contracts and the benefit of the bargain. That's the reason for the deviation in thinking out of the box about how to handle these claims."). *Id.* at 481.

Tellingly, Defendants' substitution of "value" for "consideration" in Section 12 of the Securities Act is unsupported by any legal authority. The consideration that class members paid for Genesis Yield securities included digital assets in exchange for interest payments and the promise of return of the consideration paid to GGC at maturity. ¶ 525. "There is no indication that Congress intended the word 'consideration' in § 12(2) to mean anything other than what the context would suggest—the money or property given by the investor in exchange for the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 659-60 (1986). "Rescission is the avoidance or undoing of the transaction. Its purpose is to return the defrauded purchaser to the status quo ante; it contemplates the return of the injured party to the position he occupied before he was wrongfully induced to enter the transaction." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 554 (5th Cir. 1981). In order for class members to be made whole, **all** digital assets invested with GGC must be returned. It is undisputed that this has not occurred with respect to class members who invested directly with GGC. ¶¶ 16-23.

In a footnote, Defendants cite two cases in support of their argument that class members have no recoverable damages under Section 12 of the Securities Act. DCG Br. at 24 n.34. These authorities are distinguishable because investors who paid cash for auction rate securities (ARS) were paid back the purchase price in full. *See Aimis Art Corp. v. Northern Tr. Sec., Inc.*, 641 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (finding plaintiff "received the par value of its investment . . . effectively rescinding the transaction"); *In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812, at *5 (S.D.N.Y. Mar. 30, 2009) ("When Plaintiffs elected to have UBS buyback their ARS at par value, they received a full refund of the purchase price."). In contrast, class members who invested directly with Genesis have not recovered the equivalent of rescission damages through the distributions in the Genesis Bankruptcy and, contrary to Defendants' arguments, have not been

"made whole (and then some)." As the Court has recognized, "ex ante I had 100 Bitcoin. Now I have 75 Bitcoin. Even through the Bitcoin has gone up and I'm feeling flush, boy, you guys robbed me of 25% of my Bitcoin."[32]

## V.    EXCHANGE ACT CLAIMS

The Exchange Act claims are brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 and under Section 20(a) of the Exchange Act against Defendants. But for GGC's bankruptcy, it would have been named as a defendant for violating Section 10(b) of the Exchange Act.

### A.    Facts Concerning Claims under the Exchange Act

#### 1.    Misrepresentations and Omissions Regarding Risk Management Practices

Before the launch of Gemini Earn, Gemini had obtained and reviewed GGC's "Overview of Enterprise Credit Risk Management," which explained that GGC: (1) had "many levers to pull to ensure [the company] is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools"; (2) had the "ability to responsibly manage credit risk and face zero defaults" and "to maintain a consistently high level of creditworthiness across our entire loan portfolio"; (3) "primarily lends on an 'over-collateralized' basis – i.e., the collateral pledged exceeds the value of the loan"; and (4) "would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance" ¶¶ 275-76, 279. GGC's representations were materially false and misleading: GGC's loan book was not over-collateralized at any relevant time, and GGC was engaged in unduly risky and self-

---

[32] Transcript of Oral Argument, at 14:8-11, *McGreevy v. Digital Currency Group, Inc.*, No. 3:23-cv-00082-SRU (D. Conn. July 3, 2024)

interested investment strategies. ¶¶ 282–98. Indeed, as evidenced by what would ensue, GGC wholly lacked and failed to follow its represented risk-management practices.

GGC never disclosed to Gemini, Plaintiffs, or other class members that GGC was engaged in unduly risky and self-interested investment strategies. ¶¶ 281-95.  The representations in GGC's Overview of Enterprise Credit Risk Management and in the Genesis Yield Investment Agreements created the false impressions that GGC had and implemented risk management policies and procedures. ¶ 278.  In truth, Defendants through GGC were engaging in reckless transactions with investors' assets, including massive, undercollateralized loans to 3AC and other counterparties, and with related parties. *See, e.g.,* ¶¶ 282-83, 284-95.

### 2.    Defendants Scheme to Cover Up GGC's Insolvency and Misrepresentations and Omissions Following 3AC's Default

On June 13, 2022, 3AC defaulted on its obligations to GGC, leaving GGC insolvent with an uncollectable $1.1 billion debt. ¶¶ 297-98. Rather than disclose GGC's massive loss, GGC's insolvency and its impact on investors, Defendants engaged in a scheme to conceal from investors that GGC's defective risk management led to the 3AC losses and GGC's insolvency.  From June 13, 2022, through July 2022, DCG employees and executives (including Defendants Silbert and Murphy) met with Genesis Capital's leadership daily, often multiple times a day. ¶ 306.  During these meetings, DCG and GGC employees discussed how to communicate with counterparties about 3AC, and how to bolster the Genesis Entities' financial condition in the wake of these losses. *Id*. During the same period, DCG's COO Defendant Murphy and DCG's Head of Communications Amanda Cowie helped draft talking points documents for use by DCG and GGC personnel in conversations with counterparties. *Id*.

On June 13, 2022, Defendants Moro, Silbert, and Murphy, and other DCG and GGC employees met to discuss the 3AC and other losses, and Defendant Silbert reported to DCG's board

that GGC was preparing for a bank run. ¶¶ 307-09. However, Defendants' public statements starkly contrasted with what they knew and discussed privately.  Also on June 13, 2022, Defendants caused GGC to falsely tweet, and Defendant Moro retweeted that "despite elevated market volatility, all business operations continue to function normally at GGC" thanks to "strong risk management practices and frameworks." ¶ 312.  On June 15, 2022, despite acknowledging that GGC was preparing for a bank run, Defendant Silbert wrote to Defendant Moro and other GGC personnel that "the word on the street is that [GGC] is the 'blue chip' in this mess. . . we need to continue to perpetuate that of course."  ¶ 318.  Also on June 15, 2022, GGC falsely tweeted, and Defendants DCG, Silbert, Murphy, Kraines, and Ballensweig retweeted, that "the Genesis balance sheet is strong and our business is operating normally." ¶ 319. On June 17, 2022, Defendant Moro falsely tweeted, and Defendants DCG, Kraines, and Ballensweig retweeted or reposted, that GGC had "carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week," that GGC had "shed the risk and moved on," and that "no client funds are impacted." ¶¶ 323-24. The same day, Ballensweig represented to Gemini's risk management personnel that GGC was solvent, operating "business as usual," had "no concerns on business operations," and, with regard to its 3AC exposure, that GGC "will absorb the losses using its own balance sheet." ¶ 326. On or around June 20, 2022, Ballensweig communicated to Caroline Ellison of Alemeda and Sam Bankman-Fried of FTX, to whom GGC loaned hundreds of millions of dollars, that GGC might go under or default. ¶¶ 335-36.

The June 13, 15 and 17, 2022 tweets were materially false and misleading. In light of the massive losses from GGC's undercollateralized loans to 3AC and others, GGC did *not* have strong risk-management frameworks; its balance sheet was *not* strong; its business was *not* operating normally; it had *not* mitigated its losses, shed the risk, or moved on; and client funds *had* been

impacted. ¶¶ 328-33. GGC entities had suffered a loss that exceeded its equity—a material, negative fact that Defendant Silbert asked DCG personnel to conceal. *Id.* (alleging Defendant Silbert requested that DCG personnel conceal DCG's and GGC's need to "fill" hole in GGC's equity by June 30, 2022). Thus, as of June 14, 2022, GGC was limiting the origination of new loans and shrinking its loan book, and as of June 17, 2022, GGC still held a $1 billion receivable as an uncollectable asset on its balance sheet. ¶¶ 332-33. Each Defendant knew, or at least recklessly disregard, information that was contrary to their various misrepresentations: the 3AC losses and resulting insolvency of GGC were reflected in GGC's internal documents (*see, e.g.,* ¶¶ 298, 332-33), discussed privately in daily meetings and among the GGC and DCG employees, including Defendants Silbert Murphy, and Moro, (*see, e.g.*, ¶¶ 305-07, 315-18); and reported to Defendant Silbert (*see* ¶¶ 309, 315).

On June 27, 2022, 3AC declared bankruptcy, crystalizing GGC's $1.1 billion loss for which there was effectively no chance of GGC recovering. ¶¶ 343-45. Rather than reveal GGC's true financial condition and GGC's insolvency, Defendants engaged in accounting fraud scheme to cover it up. Defendant Moro proposed a plan of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." ¶ 340. Moro explained, "[w]e wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] . . . for liquidity purposes, it could just be for balance sheet support." *Id.* Defendant Silbert approved of Moro's proposal. *Id.*

On June 30, 2022, Defendants DCG and its board (controlled by Defendant Silbert) agreed to "purchase" 3AC's outstanding obligation to GGC in exchange for the DCG Promissory Note, purportedly worth $1.1 billion due in 10 years at an interest rate of 1%—terms which were not

disclosed during the Class Period. ¶¶ 355-56, 431. Defendant Silbert signed the DCG Promissory Note on behalf of DCG, and Defendant Moro signed it on behalf of GGC. ¶¶ 357, 359. This transaction did nothing to "plug the equity hole" at GGC—it was merely an accounting fiction as no capital or cash was provided to GGC to conceal its massive losses. *See* ¶¶ 360-70. The DCG Promissory Note was immediately and thereafter categorized as a $1.1 billion "current" asset on GGC's balance sheet to make it appear that GGC had positive equity, plugged the equity hole and shed the risk from 3AC, none of which was true. ¶ 356.

In connection with each purchase of Genesis Yield securities after the 3AC losses caused GGC to be insolvent, Defendants Moro and Islim, as CEOs of GGC, caused GGC to falsely represent to purchasers of Genesis Yield that GGC "is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws," and "represent[ed] and warrant[ed] that there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder." ¶¶ 141-44, 462, 587. Per each offer's terms, GGC's representations continued throughout the term of the investments. ¶ 144. GGC's uniform representations were materially false and misleading because, in light of the 3AC and other losses, GGC was, in fact, insolvent and the DCG Promissory Note did nothing to fill GGC's billion-dollar equity hole.

### 3. Material Misrepresentations and Omissions Following DCG Promissory Note Transaction

After Defendants Silbert and Moro executed the DCG Promissory Note knowing that no capital was injected into GGC, Defendants repeatedly misrepresented GGC's financial condition to investors. On July 6, 2022, Moro falsely assured investors that DCG had "assumed certain liabilities of [GGC] related to [3AC] to ensure we have the capital to operate and scale our business

for the long-term," a tweet that was reviewed and approved by Defendants DCG and Silbert. ¶¶ 371-72.  Also on July 6, 2022, GGC, through Ballensweig, represented to Gemini that the 3AC "[l]osses [were] predominately absorbed by and netted against DCG balance sheet" and that GGC remained "well-capitalized." ¶¶ 376-79.  Ballensweig then sent Gemini an email which, along with its attachments, included multiple false statements. ¶ 380. For example, one attachment referenced the 3AC losses and explained, "DCG has assumed certain liabilities of Genesis related to [3AC] to ensure we have the capital to operate and scale our business for the long-term." ¶ 381. Another attachment, entitled "Gemini Risk Metric Request," listed the DCG Promissory Note as a "Current Asset." ¶¶ 383-84. These were false statements—the DCG Promissory Note, payable in 10 years, was not a current asset under generally accepted accounting principles (GAAP). ¶¶ 385-86, n.102-03.

On July 18, 2022, Ballensweig represented to Gemini that "'all of our loses [sic] have already been absorbed by DCG . . .'" ¶ 400. On July 19, 2022, Defendant Murphy falsely stated on a call with an investor's representative that DCG had stepped in to absorb GGC's losses and that GGC was well-capitalized to continue doing business in the future. ¶ 417. Again, these were lies—GGC was not well-capitalized.  ¶¶ 418-19.  The DCG Promissory Note was an accounting fiction that did not create positive equity at GGC.  GGC was in fact insolvent and not well-capitalized.

Thereafter, Defendant Murphy and other DCG representatives were copied on email exchanges wherein GGC continued to provide false information in response to the investor's requests for information. ¶ 421. For example, on July 26, 2022, Defendant Murphy was copied on an email exchange in which Ballensweig made a series of false statements, including that DCG had "assumed the $1.1bn loan on June 30, 2022." ¶¶ 421-23. Ballensweig explained that his

response had been prepared with assistance from the "Finance and Accounting teams" at both DCG and Genesis, a group which included Defendants Murphy and Kraines. ¶¶ 421-22. On July 28, 2022, in response to an inquiry from Gemini, a GGC employee falsely described the DCG Promissory Note as a Current Asset and, specifically, "$1.1bn in receivables from related parties." ¶ 390. On August 16, 2022, Defendant Murphy was copied when GGC sent a fraudulent balance sheet to the same investor, which falsely included the $1.1 billion DCG Promissory Note as a receivable from related parties. ¶ 425. While Defendants repeatedly provided false financial information to investors, internally GGC employees expressed concerns about the Company's deceptive reporting. On September 1, 2022, GGC's Director of Lending informed Defendant Islim of the fraud: "I'm hearing concerns from front office folks . . . They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity . . . There is still no liquidity infusion from DCG to fill the gap and instead we have a 'note.'" ¶ 440.

On October 22, 2022, at a lunch meeting in New York City, Defendant Silbert assured Gemini that all was well and that, *inter alia*, GGC faced only a short-term timing mismatch between its outstanding loans and borrowing. ¶¶ 443-44.

Each of Defendants' statements to investors concerning GGC's financial condition was materially false and misleading. GGC was insolvent and had been since June 13, 2022 when 3AC defaulted. GGC never disclosed to Gemini, Plaintiffs, or other class members that it was insolvent. *See, e.g.,* ¶ 469. Each Defendant knew, or at least recklessly disregarded, that the DCG Promissory Note transaction was an accounting fiction: If the DCG Promissory Note had been included on GGC's balance sheet at any reasonable estimate of its fair value, it would have disclosed that GGC was insolvent by *at least* hundreds of millions of dollars. ¶ 398. Indeed, in the Genesis Bankruptcy GGC estimated the value of the DCG Promissory Note between $90 million (a 92% discount) to

$323 million (a 70% discount). ¶ 366. Defendant Silbert himself valued the Note at $200 million.

¶ 367. As a result of Defendants' misrepresentations and omissions, Gemini maintained GGC's

participation in Gemini Earn, and Plaintiffs and other class members continued to purchase

Genesis Yield securities, all while GGC was insolvent. ¶¶ 65-66, 68; ECF Nos. 38-2, 38-3, 38-5.

As one Genesis Yield investor explained:

> [Defendants Silbert and Moro] went out and publicly told people that [they] filled
> the hole . . . publicly said Genesis balance sheet is strong, it hasn't been affected.
> You induced us to loan new Bitcoin to you based on the fact that you stated Genesis
> was solvent because you have provided the $1.1 billion dollar note . . . If in June
> [2022], Barry [Silbert] had said, look, we're going to help Genesis by giving them
> $1.1 billion, and this is how we did it. We give them a promissory note that's due
> in 10 years at 1% interest, nobody would have re-loaned. We would have
> seen basically what happened. But what they did is they kept it a secret.

¶ 431.

Ultimately, on November 16, 2022, GGC disclosed that it was unilaterally suspending

withdrawals due to withdrawal requests exceeding GGC's liquidity. ¶¶ 457-60.

### 4.   Omission Regarding Unregistered Securities

Genesis Yield securities were never registered with the SEC or otherwise. ¶ 153. Thus,

investors' principal was *not*: (1) protected by SIPC, (2) insured by the FDIC, or (3) insured by the

National Credit Union Administration. ¶ 155. GGC never disclosed to Plaintiffs or other class

members that it was offering and selling unregistered securities. ¶ 154.

### B.   The Complaint Adequately Alleges Primary Violations of Section 10(b) of the Exchange Act.

Defendants argue that the Complaint fails to plead a primary violation of Section 10(b) of

the Exchange Act. Specifically, Defendants argue that the Complaint fails to allege sufficient facts

to show (1) a material misrepresentation or omission, or scheme liability, (2) scienter, (3) reliance,

(4) causation, or (5) economic loss. As discussed below, Defendants are wrong. The Complaint

adequately alleges Defendants' false and misleading representations, scheme liability, and scienter

with the particularity required by the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure, and reliance, causation and economic loss, which are not subject to a heightened pleading standard, are adequately alleged.

### C. The Complaint Adequately Alleges a Violation of Section 10(b) Based on Material Misrepresentations or Omissions.

A Complaint meets the particularity requirement when it "specifically identif[ies] the date, publication, and speaker of each of the alleged misstatements or omissions and contain[s] facts supporting the existence and materiality of these problems" and highlights in some way the "particular aspects of the statements alleged to be misleading." *Teva*, 432 F. Supp. 3d at 153; *see also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22-23 (S.D.N.Y. 2004). The Complaint satisfies these requirements.

The Complaint alleges the following categories of material misrepresentations and omissions: (1) Defendants' false and misleading statements and omissions regarding GGC's risk management practices (¶¶ 148, 274-78); (2) Defendants' false and misleading statements and omissions immediately following the 3AC losses (¶¶ 312, 319-20, 323-24, 326); (3) Defendants' false and misleading statements and omissions following the DCG Promissory Note transaction, (¶¶ 356-72, 377-400, 417, 421-26, 444, 451, 457, 469), *including* the false solvency representations in the Genesis Yield Investment Agreements (¶¶ 120-21, 142, 144, 462); and, finally, (4) Defendants' failure to disclose, at any point, that GGC's securities were not registered with federal or state securities regulatory authorities. ¶¶ 152-54. As discussed above, the Complaint alleges who made the misrepresentation and when it was made and explains how each of Defendants' misrepresentations was false or misleading at the time.  As to Defendants' omissions, the Complaint alleges facts supporting the existence of each undisclosed, material negative fact.

*See, e.g.,* ¶¶ 328-62, 373-74, 382-451, 458-60.

Further, the Complaint alleges facts supporting the materiality of each of the aforementioned misrepresentations and omissions. ¶ 49 ("The misrepresentations and omissions were material, as no reasonable investor would have invested in Genesis Yield securities had they known of [GGC's] undisclosed concentration of risk and under collateralization, true financial condition, or the undisclosed details of the $1.1 billion DCG Promissory Note, i.e. that [GGC] was in effect insolvent."). To establish the materiality of the misrepresentation, a plaintiff must "allege[] 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161-62 (2d Cir. 2000)). It is hard to envision a fact more important to an investor than the solvency of a company—after GGC's 3AC losses and the execution of the DCG Promissory Note, Defendants Moro and Islim caused GGC to falsely represent to every investor who purchased Genesis Yield securities that it was solvent, when in fact, GGC was bankrupt. Courts within the Second Circuit have repeatedly found the materiality requirement met in cases like this one, where misrepresentations were made about the intentions, financial condition, or practices of a company. *See, e.g., Levy v. Maggior*e, 48 F. Supp. 3d 428, 447 (E.D.N.Y. 2014); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013); *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 238 (S.D.N.Y. 2018); *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 421 (S.D.N.Y. 2013).

### D.    The Complaint Adequately Alleges Scienter.

In assessing a complaint's scienter allegations, courts assess cumulatively allegations of circumstantial evidence of intent together with alleged facts relating to motive and opportunity. *In re Hain Celestial Grp., Inc. Sec. Litig,* 20 F. 4th 131, 137-38 (2d Cir. 2021). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the

allegations holistically." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). Under *Tellabs*, scienter need be only "at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. A tie goes to the plaintiff. *City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

The Complaint alleges that Defendants had both a motive and an opportunity to commit fraud. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (scienter may be inferred from facts showing that a defendant had "both motive and opportunity to commit the fraud"). For example, the Complaint alleges that it was in Defendant DCG's and Silbert's interest to misrepresent its risk-management strategies to Gemini and investors, and fraudulently induce Plaintiffs to purchase Genesis Yield securities. Doing so allowed them to recklessly funnel billions of dollars' worth of Genesis Yield investors' assets into the self-interested Grayscale Trade, which had the effect of massively increasing the management fees earned by Grayscale, a DCG subsidiary. ¶¶ 37, 100-08. *Cf. Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008) (finding that plaintiff had adequately pleaded that defendants were motivated by a "concrete and personal benefit," given defendants' receipt of management fees).

Furthermore, it was in Defendants' interest to enter into the DCG Promissory Note and continue to represent that GGC was solvent when they knew that the opposite was true. Doing so benefited Defendants in two concrete ways: *First*, keeping GGC out of bankruptcy via the sham DCG Promissory Note prevented Defendant DCG and related entities from having their outstanding loans borrowed from GGC called immediately, requiring repayment for which DCG did not have the funds to repay. Because DCG was incapable of repaying these loans at that time, this would have forced DCG (GGC's largest borrower) into bankruptcy. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (finding motive where complaint alleged "more than the usual

concern by executives to improve financial results" because the very survival of company was on the line); *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (finding allegations of "motives to hide internal weaknesses and paint a rosy picture … lend weight to not only a cogent inference of scienter, but a compelling one . . ."). *Second*, executing the DCG Promissory Note allowed Defendant Silbert and other GGC and DCG insiders to withdraw hundreds of millions of dollars' worth of personal capital from GGC by redeeming their investments. ¶¶ 349-52. *Cf. Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (finding that "motive and opportunity" where corporate officers engaged in significant transactions at opportune moments for significant personal gain).

In the Second Circuit, in addition to motive and opportunity, scienter is adequately pled where the defendants are alleged to have (1) know facts or had access to information suggesting that their public statements were not accurate; (2) failed to check information they had a duty to monitor; or (3) ignored obvious signs of fraud. *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000). Similarly, an egregious refusal to see the obvious, or to investigate the doubtful, gives rise to an inference of recklessness. *Id*. at 309; *Setzer v. Omega Healthcare Inv'rs.*, 968 F.3d 204, 215 (2d Cir. 2020). The Complaint alleges facts demonstrating strong circumstantial evidence of at least recklessness. *See Heller,* 590 F. Supp. 2d at 621 (securities fraud plaintiff may establish requisite intent by alleging strong circumstantial evidence of conscious misbehavior or recklessness*)*. The Second Circuit has "defined reckless conduct as: at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. The Complaint alleges facts that show Defendants knew, or at least recklessly disregarded, that their representations to investors

were false at the time they made them based on contemporaneous documents and meetings. *See,*
*e.g.,* ¶¶ 273-314 (scienter concerning GGC's deficient risk management); ¶¶ 306-52 (scienter
concerning false representation in response to 3AC losses); ¶¶ 353-98 (scienter concerning true
nature and purpose of DCG Promissory Note).  Accepted as true and viewed holistically, the
Complaint's allegations raise a strong inference that Defendants "benefitted in a concrete and
personal way from the purported fraud," and "knew facts or had access to information suggesting
that that their public statements were not accurate." *Cf. Novak*, 216 F.3d at 311. Thus, a reasonable
person would deem an inference of scienter at least as compelling as Defendants' alternative
inference that the DCG Promissory Note was an arms-length, good-faith effort by DCG that was
favorable to GGC.  On the contrary, as explained above, the DCG Promissory Note had the effect
of benefiting Defendants and their pecuniary and personal interests at the expense of investors.

Nevertheless, Defendants Moro, Kraines, and Islim argue that Plaintiffs' allegations of
scienter are not sufficiently particular as to them individually. Moro Br. 17-20; Kraines Br. 8-11;
Islim Br. 6-7. According to Defendant Moro, there are no facts to demonstrate that he acted with
knowledge of or reckless disregard as to the accuracy of his tweets and retweets, and that
allegations relating to the dissemination of the financial statements and balance sheets are too
conclusory as to him. Moro Br. at 17-21. Defendant Islim argues that his senior role at GGC and
receipt of one email noting potential concerns about solvency are insufficient. Islim Br. at 6-7.
Defendant Kraines' argument rests on his position that he is impermissibly "lump[ed] together"
with other defendants, without any allegations specific to him. Kraines Br. at 10-11.

Although Defendants attempt to downplay their roles, Plaintiffs have adequately pled not
only that each defendant had motive and opportunity, but also that each knew (or had access to
information suggesting) that their public statements were not accurate, they failed to check

information they had a duty to monitor, and/or they completely ignored obvious signs of fraud. ¶¶ 43-47, 587-88, 600-02, 609-11. The Complaint alleges a cogent and compelling inference of scienter that is at least as likely as Defendants' arguments seeking alternative inferences.

### E.    The Complaint Adequately Alleges Reliance.

#### 1.    The Complaint alleges reliance on GGC's solvency representations.

According to Defendants, that Plaintiffs allege (for the first time) that a particular investor actually read and relied upon the purported misrepresentations in the Genesis Yield Investment Agreements is too conclusory to be credited. DCG Br. at 30.[33]  Defendants' argument is wrong and ignores the Complaint's allegations.  The Complaint alleges that Plaintiffs were "aware of [Defendants'] statement[s] and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011). The Complaint alleges that as "a result of GGC's materially false and misleading statements, Plaintiffs and members of the Class purchased Genesis Yield securities in reliance on Genesis Global Capital's representations" and that Plaintiffs and members of the Class would not have invested in Genesis Yield securities had they known the undisclosed, material adverse facts that were not disclosed at the time of their investment.  ¶¶ 462-64, 473.  Several Plaintiffs allege that they reviewed and relied upon the representations and warranties by GGC in determining whether to loan digital assets to GGC, the loan amount and whether to recall the loans.  ¶¶ 65-68.

Moreover, as the Second Circuit has explained, "proof of reliance by circumstantial evidence may be sufficient under certain conditions." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d

---

[33] Defendant Moro makes the similar argument as to himself specifically that "Plaintiffs do not include any factual allegations to demonstrate that any plaintiff or putative class member ever saw much less relied on any of Mr. Moro's tweets or retweets" or "that any of the Genesis' financial statements allegedly disseminated by Genesis employees that allegedly contained misstatements were actually disseminated to Plaintiffs or any other potential class members." Moro Br. at 22. According to Moro, this lack of particularity warrants rejection of any actual reliance claim. *Id.* As set forth herein, this misconstrues the applicable standard and allegations of the Complaint.

215, 225 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553

U.S. 639 (2008)). For example, in the context of a financial transaction—which "does not usually

implicate the same type or degree of personal idiosyncratic choice as does a consumer purchase"—

payment alone "may constitute circumstantial proof of reliance upon a financial representation."

*Ge Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013).

   "In light of this case law, many courts in this Circuit and beyond have held that reliance

may be proved through circumstantial evidence that plaintiffs would not have purchased a product

but for a defendant's uniform misrepresentations and omissions about that product." *Id. See, e.g.,*

*Spencer v. Hartford,* 256 F.R.D. 284, 301–303 (D. Conn. 2009) (stating reliance could be proved

through plaintiffs' acceptance of structured settlements where quotation documents were alleged

to be misleading); *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012)

(stating reliance could be proved through purchase of product where "every plaintiff would have

relied on the [allegedly misleading] . . . representation of the [product's] legality and

beneficialness in deciding whether to purchase it"); *Washington State Inv. Bd. v. Odebrecht S.A.*,

461 F. Supp. 3d 46, 75 (S.D.N.Y. 2020) (stating investor's complaint alleged with sufficient

particularity its reliance on false and misleading statements where securities purchased under

specific offering memoranda and plaintiffs identified the misstatements that it allegedly relied on.).

   Here, Plaintiffs and members of the Class each executed the Genesis Yield Investment

Agreement that uniformly represented that GGC was solvent and not subject to any adverse

proceedings.  ¶¶ 142, 462, 471-73. As such, the Complaint uniformly alleges that Plaintiffs

purchased Genesis Yield securities via their acceptance of a *specific offer*, have identified the

specific misstatements that they relied on *within the same offer*, *see, e.g.,* ¶¶ 136–45, and have

alleged that they purchased Genesis Yield securities as a result of these misstatements, *see, e.g.,*

452. Thus, while the issue of class-wide reliance is premature on a motion to dismiss, at class certification, courts have found that allegations of uniform misrepresentations and omissions are circumstantial evidence common to the class that supports finding of reliance. *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 144 (S.D.N.Y. 2015) (granting class certification insofar as "common evidence can show reliance by the class on alleged misrepresentations" in case involving alleged violations of federal securities law).

### 2.    Reliance is Presumed under *Affiliated Ute*.

Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). The Complaint, as Defendants acknowledge, at its core alleges Defendants failed to disclose GGC's true financial condition. *See* DCG Br. at 29 (alleging two "material omissions" that Genesis "had a duty to disclose" once they manifested: (1) "that Genesis [] was insolvent;" and (2) "that 3AC's default and bankruptcy proceedings could reasonably be anticipated to have an adverse effect on the transactions contemplated by [the Lending Agreements] or the accuracy of the representations and warranties made" therein. (citing ¶ 469)). This is a straightforward, uncontroversial example of fraudulent nondisclosure, *i.e.,* a failure to disclose by a party that has a duty to do so. Courts in this circuit have regularly "acknowledged the applicability of the *Affiliated Ute* presumption" in these situations." *Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 216 (S.D.N.Y. 2021); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 319 (S.D.N.Y. 2016)

To avoid a straightforward application of the Affiliated Ute presumption, Defendants attempt to construct a world where it no longer applies to 10(b)(5)(b) claims. In their telling, *Affiliated Ute* applies only to "pure omissions" cases and pure omissions cases are barred by the recent Supreme Court decision in *Macquire Infrastructure Corp. v. Moab Partners*, L.P., 601 U.S. 257 (2024). Or in other words, in Macquire the Supreme Court overturned Affiliated Ute and

decades of cases, many cited in the parties' last round of briefing, analyzing whether statements are primarily omissions or misrepresentations to determine whether Affiliated Ute applies – all without mentioning Affiliated Ute; or discussing the "presumption of reliance."

Instead, the Supreme Court confirmed the application of 10b-5 to the omissions Plaintiffs allege here. In *Macquarie*, the Court held that Rule 10b-5 does not apply to "pure omissions," which SCOTUS defined as occurring "when a speaker says nothing, ***in circumstances that do not give any particular meaning to that silence***." *Macquire*, 601 U.S. at 263 (Emphasis added). Instead, the Court held that Rule 10b-5(b) "prohibits omitting material facts necessary to make the 'statements made . . . not misleading' . . . [p]ut differently, [Rule 10b-5(b)] requires disclosure of information necessary ***to ensure that statements already made*** are clear and complete." *Id*. This is consistent with how courts have been applying *Affiliated Ute* for years. "[W]here plaintiffs' claims are based on a combination of omissions and misstatements," courts nonetheless "have acknowledged the applicability of the *Affiliated Ute* presumption." *Hawaii Structural Ironworkers*, 338 F.R.D. at 216 (S.D.N.Y. 2021); *Strougo*, 312 F.R.D. at 319 (S.D.N.Y. 2016) ("[T]he existence of 'affirmative misrepresentations does not at this stage in the litigation preclude [plaintiffs] from relying on the *Affiliated Ute* presumption.'"). Within the Second Circuit, courts have adopted a "flexible and practical approach" that considers whether a case "primarily involve[s] omissions where reliance would be difficult to prove because Plaintiffs' claim is based on a negative." *Anwar*, 306 F.R.D. at 145–46. Under such an approach, "the theory behind the *Affiliated Ute* presumption—that, when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision'—*is not undermined simply because a defendant makes misstatements at the same time it omits material information*." *Id.* (emphasis added).

Defendants' argument that Plaintiffs are simply alleging "misstatements whose only omission is the truth that the statement misrepresents" similarly misses the mark. DCG Br. at 30. The alleged omissions fall squarely within *Macquarie*: that GGC's insolvency rendered GGC's once-truthful statements relating to GGC's solvency in the Genesis Yield Investment Agreements misleading, unclear, and incomplete, necessitating disclosure of the insolvency to Plaintiffs and the class. Because the alleged omissions are tied to affirmative prior *statements*, (the solvency rep's and warranties) they fall squarely *outside* the Supreme Court's, and courts' in this Circuit's definition of a "pure omission," and are actionable under rule 10b-5, and are still entitled to *Affiliated Ute* reliance. *See*, *Hawaii Structural Ironworkers* 338 F.R.D. at 216 (S.D.N.Y. 2021) (In cases "[w]here plaintiffs' claims are based on a combination of omissions and misstatements, courts . . . have acknowledged the applicability of the *Affiliated Ute* presumption."); *Strougo*, 312 F.R.D. at 319 ("[T]he existence of 'affirmative misrepresentations does not at this stage in the litigation preclude [plaintiffs] from relying on the *Affiliated Ute* presumption.'").

Plaintiffs also plead that after June 13, 2022, Genesis made affirmative misstatements to prospective investors, like Translunar, that were objectively false at the time that they were made TAC 461-63. Defendants grasp at straws in seeking to discredit these rather direct and specific allegations that Plaintiffs relied on specific investments and would not have invested but for those statements. And the cases they cite do not help them. *See Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011) (where plaintiffs alleged broad reliance on 10-Ks over a period of years); *Devaney v. Chester,* 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989) (where plaintiffs summarily plead reliance and argued that it was not appropriate to decide on a motion to dismiss).

At bottom, GGC hid the truth from and lied to investors at the direction of and subject to the control of Defendants. The Court should reject Defendants' erroneous, strained reading of the law they seek to apply to excuse their conduct.

### 3. The Complaint Alleges Investors Who Purchased Genesis Yield Securities through the Gemini Earn Platform Relied by and through Gemini.

The Complaint further alleges reliance based on false and misleading representations made to Gemini Earn investors' agent, Gemini. ¶¶ 278, 475. It is well-established that fraud "covers cases beyond the most straightforward scenario of D uttering a misrepresentation to P, intending for P to rely on it, and inducing such reliance to P's detriment." *See* John C.P. Goldberg *et. al.*, *The Place of Reliance in Fraud*, 48 Ariz. L. Rev. 1001, 1006 (2006). Two further possibilities exist: first, where a misrepresentation is made to a plaintiff's agent and induces reliance ("agency theory of reliance"), and, second, where a misrepresentation is made to a non-agent third party, but the defendant can expect that it will be repeated ("derivative reliance"). Gemini's reliance is attributable to Plaintiffs McGreevy, Gowda and Buttenham who purchased Genesis Yield securities through the Gemini Earn program under either theory.[34]

Notably, one court has endorsed the agency theory of reliance in securities fraud cases. *See*

---

[34] Defendants argue that Plaintiffs cannot establish reliance on extracontractual misrepresentations and omissions because the MLA specifies that Plaintiffs were "not relying on any communications (written or oral) of [GGC] as investment advice or as a recommendation to enter into any Loan," and that the MLA "constitute[d] the entire Agreement among the parties with respect to the subject matter hereof and supersede[d] any prior negotiations, understanding and agreements." DCG Br. at 30, n. 39. Defendants ignore that Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a), provides that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or any rule of an exchange required thereby shall be void," and which is specifically concerned with whether the condition, stipulation, or provision "weakens [the] ability to recover under the Exchange Act." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 231 (1987). Nor do Defendants offer any authority in support of their argument that Plaintiffs have waived reliance on *post-agreement* misrepresentations, which are alleged to have been rampant here. Instead, Defendants cite two outlier cases wherein courts found reliance on pre-agreement representations unwarranted where the plaintiffs were sophisticated and one case in which the plaintiffs failed to specify any particular statements as fraudulent misrepresentations. *See Harsco Corp. v. Segui*, 91 F.3d 337, 344 (2d Cir. 1996); *One Comm's Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 79 (2d Cir. 2010); *Simmtech Co. v. Citibank, N.A.*, 2016 WL 4184296, at *13 (S.D.N.Y. Aug. 3, 2016), *aff'd*, 697 F. App'x 35 (2d Cir. 2017).

*In re Fine Host Corp. Sec. Litig.*, 25 F. Supp. 2d 61, 71–72 (D. Conn. 1998). To properly allege the agency theory of reliance in a securities fraud case, "[P]laintiffs need only allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants." *See In re Fine Host*, 25 F. Supp. 2d at 71–72. The Complaint alleges that Gemini's acceptance of GGC as an authorized borrower in the Gemini Earn program was premised on GGC's material misrepresentation regarding its risk management practices and investment strategies which occurred prior to the initial execution by Plaintiff McGreevy, Gowda, and Buttenham of the Genesis Yield Investment Agreements and purchase of Genesis Yield Securities. ¶¶ 65-66, 68; ECF Nos. 38-2, 38-3, 38-5.

Defendants argue that Gemini's reliance took place outside of the scope of Gemini's agency relationship with Plaintiffs and, thus, cannot be attributed to Plaintiffs. DCG Br. at 12-13. In support of this argument, Defendants emphasize a provision of the Master Loan Agreement (MLA) that states investors had "not authorized Agent to exercise discretion in determining the amount, timing, or selection of any Loan on Principal's behalf." DCG Br. at 13. But Defendants' emphasis on the MLA's limitations is a red herring. The Complaint's allegations center around Gemini's reliance on Defendants' misrepresentations not in specifically determining the amount, timing, or selection of any investment, but rather in endorsing and maintaining GGC's participation in the Gemini Earn program. *See, e.g.,* ¶¶ 130, 273-280, 326, 356-70, 377-79, 380-400, 441-48. Insofar as Gemini acted within the scope of its agency relationship when it facilitated the offer and sale of Genesis Yield securities under the MLA, the agency theory of reliance applies.

However, even assuming, *arguendo*, that Gemini's reliance fell outside the scope of its agency relationship with Plaintiffs, Gemini's reliance can alternatively be attributed to Plaintiffs under the doctrine of derivative reliance, through which "a misrepresentation communicated to

one person can support a claim for fraud by another person if the maker of the misrepresentation intends or has reason to expect that the statement will be repeated to the other person." *In re Fine Host*, 25 F. Supp. 2d at 71. One court has noted that it is an "open question" whether allegations of derivative reliance by a non-agent are sufficient to state a claim under section 10(b) of the Exchange Act. *Id.*

Courts often apply derivative reliance principles where misrepresentations are made to credit-rating companies for the purpose of obtaining credit ratings. Restatement (Second) of Torts § 533 (1997) cmt. f. In such cases, the maker of the misrepresentations "is subject to liability to any person who may be expected to and does extend credit to him in reliance upon the erroneous rating so procured." *Id.* That a credit rating "summarize[s] with reasonable accuracy" or "expresses the effect of the misstatements made" is sufficient, so long as the plaintiff is dealing with the defendant "in any one of the ways in which the [defendant's] financial position is material." *Id.* To bring a fraud action against a defendant based on its misrepresentations to a credit-rating agency, a plaintiff needs to establish (1) that the plaintiff relied on the assigned rating and (2) that the deception affected the rating, which is to say that the rating agency "would have assigned a different rating (or not assigned a rating at all)" if not for the deception. *See In re Nat'l Century Fin. Enterprises, Inc.*, 846 F. Supp. 2d 828, 914 (S.D. Ohio 2012), *adhered to on denial of reconsideration sub nom. Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, 2013 WL 490717 (S.D.N.Y. Feb. 6, 2013).

Here, the theory of derivative reliance applies in a similar fashion. Gemini's role is analogous to a credit agency. Statements by Gemini, such as that "Gemini reviewed Genesis' financial statements and verified that the lender's loans are overcollateralized," or that "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers

in an overcollateralized way," in tandem with Gemini's general endorsement and maintenance of GGC's participation in the Gemini Earn program, can be analogized to a credit rating that misrepresented by GGC's deception. ¶¶ 273-80. Further, the Complaint alleges that Gemini repeated GGC's misrepresentations to investors. ¶ 280. Thus, wherever Gemini relied on misstatements that induced it to endorse or maintain GGC's participation in the Gemini Earn program, such reliance is attributable to Plaintiffs Gowda, Buttenham and McGreevy.

### 4. The Complaint Alleges that Defendants' Misrepresentations and Omissions Were Part of a Scheme to Defraud.

The Complaint further alleges that Defendants' misrepresentations and omissions were part of a comprehensive scheme to defraud. ¶ 578; 17 C.F.R. § 240.10b-5(a) and (c); *see infra* Section V.H.  In *Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath*, 516 F.2d 811 (2d Cir. 1975) the Second Circuit explicitly ruled that "a showing of reliance is not required where a comprehensive scheme to defraud which includes not only omissions and misrepresentation, but substantial collateral conduct as well, is alleged." *Competitive Assocs., Inc.*, 516 F.2d at 814.

In *Competitive Assocs., Inc.*, the plaintiff, a publicly held mutual fund, alleged that the defendant, an accounting firm, knowingly certified false and misleading financial statements of a private investment fund in order to induce the plaintiff to hire the investment fund's manager, Yamada, to manage a portion of the plaintiff's portfolio. *Id.* at 812. As a result, the plaintiff asserted that it lost millions of dollars due to Yamada's unlawful purchases and sales of securities. *Id.* at 812–13. The court observed that the defendant's alleged omissions and misrepresentations were only one part of an elaborate scheme asserted by the plaintiff to inflate Yamada's reputation as an investment advisor, attract investors to him, and permit him to unlawfully manipulate securities prices. *Id.* at 814. The court concluded that the plaintiff was not required to prove plaintiff saw or directly relied on false financial statements. *Competitive Assocs., Inc.*, 516 F.2d at 814. *See also*

*Greenspan v. Brassler*, 78 F.R.D. 130, 133 (S.D.N.Y. 1978) ("Proof of reliance on particular misrepresentations is indeed unnecessary in a case grounded on an alleged 'comprehensive scheme to defraud.'"). The Second Circuit's reasoning in *Competitive Assocs., Inc.* applies with equal force to the Complaint: Plaintiffs have the opportunity to prove, but are not required to prove, direct reliance upon Defendants' misrepresentations and omissions.

### F.    The Complaint Adequately Allege Loss Causation.

Defendants argue that the Complaint fails to adequately allege loss causation. DCG Br. at 14-16; Moro Br. at 23-24. Defendants are wrong.  The Complaint's allegations have established loss causation, which "'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Lentell v. Merrill Lynch Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  This requirement is akin to the tort-law proximate cause requirement, and "[a] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentation and omissions alleged by a disappointed investors." *Lentell*, at 173.  To plead loss causation, plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

Plaintiffs may do so either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud, or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement or omission. *Id.* at 232–33. To establish the materialization of the risk theory, "it is enough [to show] that the loss caused by the alleged fraud results from the 'relevant truth . . . leak[ing] out.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (quoting *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).

The Complaint's allegations sufficiently establish the materialization of the risk theory, as the connection between the fraud and the losses here is clear-cut. The Complaint alleges a direct and undeniable link between GGC's omissions (caused by Defendants) and the losses incurred by Plaintiffs when GGC admitted it could not honor redemptions and ultimately declared bankruptcy. According to the Complaint, GGC was insolvent as of June 13, 2022, triggering a legal duty to disclose its insolvency to investors such as Plaintiffs. ¶¶ 52-53, 144. Instead, Defendants orchestrated a concealment of GGC's insolvency to encourage further investments and stave off withdrawals. ¶¶ 299-460. By doing so, Defendants prolonged the inevitable losses, which materialized when GGC revealed it lacked the funds to meet redemption requests and subsequently froze withdrawals. ¶¶ 457-60. [35]

These facts align with the loss causation principles articulated in *AUSA Life Insurance Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) and *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940 (9th Cir. 2005). The *AUSA* decision involved allegations that accounting firm Ernst & Young's audits failed to disclose significant accounting irregularities, which misrepresented JWP's financial health, thereby misleading investors to believe the JWP was solvent and stable. *AUSA Life Insurance Co.*, 206 F.3d at 205. These alleged misrepresentations induced continued investments, and when JWP's true financial condition came to light, its bankruptcy inflicted substantial losses on investors. *Id.* at 206. The Second Circuit reversed the district court's finding that "the plaintiffs could not establish that E&Y's egregious accounting idiosyncrasies caused plaintiffs' losses" and pointed to other post-audit events the District Court believed caused JWP's insolvency, as opposed to E&Y's conduct. *Id.* at 207. The Second Circuit

---

[35] Given this, Defendant Moro's argument that "the FTX collapse and subsequent decision by Genesis Global Capital to suspend redemption requests occurred on November 16, 2022 — over four months after Mr. Moro's tweet and three months after Mr. Moro left the Company" somehow negate loss causation as to him (Moro Br. at 23-24) is untenable.

reversed and remanded, and articulated guiding principles for the district court's determination, which bear on this case.

A key element of *AUSA* was the Second Circuit's reliance on the principles outlined in the Restatement (Second) of Torts § 525 and related comments, which emphasize that liability arises not merely from the misrepresentation itself but from its material impact on the plaintiff's decision-making and the subsequent harm. In *AUSA*, plaintiffs argued—and the Second Circuit acknowledged—that JWP's financial collapse was not merely the result of external factors like market conditions, but was exacerbated by Ernst & Young's concealment of accounting irregularities, which delayed corrective action and obscured risks.

In so holding, the Second Circuit emphasized that in evaluating whether loss causation had been established, the focus should be on whether the misstatement or omission had its intended effects:

> Where [the defendant] accomplishes his dishonest purpose, and his misrepresentation can fairly be said to have contributed to this result, he should compensate for the loss which he intended to cause . . . . The test should not be whether the defrauded party might conceivably still have lost, had the fraud not been practiced, but whether there was a reasonable probability that the fraud actually accomplished the result it was intended to bring about.

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d at 212 (citing *Cont'l Ins. Co. v. Mercadante,* 222 A.D. 181, 225 N.Y.S. 488 (1st Dept.1927)).

This principle applies directly to the allegations against Defendants. The Complaint alleges that Defendants concealed GGC's insolvency to mislead investors, discourage withdrawals, and induce further investments. As in *Continental*, where misrepresentations caused plaintiffs to retain bonds and delay further inquiry, Defendants' actions here caused existing investors to make additional investments and delay withdrawals. The resulting losses occurred precisely because the concealment achieved its intended purpose: maintaining a false impression of solvency while the

financial situation deteriorated. Under *AUSA* and *Continental*'s reasoning, this clear causal link between the fraud and the harm supports a finding of loss causation.

Similarly, *Livid Holdings* emphasized that loss causation is established when a misrepresentation directly obscures the true financial condition of the subject entity, thereby precipitating the plaintiff's economic losses. *Livid Holdings Ltd.*, 416 F.3d at 949. The *Livid Holdings* decision involved a private placement of $10 million worth of the stock of Purely Cotton, Inc. ("PCI") in December 1999. *Id.* at 944-45. At issue was a sentence in an offering memorandum that misleadingly suggested that PCI had already received $25 million in funding, when it had received less than $2 million. *Id.* Because of this dire financial condition, the plaintiff alleged, plaintiff alleged, PCI eventually went bankrupt. *Id.* at 949 (citing *Emergent Cap. Inv. Mgmt. v. Stonepath Grp., Inc.,* 343 F.3d 189, 198–99 (2d Cir. 2003) (holding sufficient evidence of loss causation exists when the "content of the alleged misstatements or omissions," caused the financial "harm actually suffered" by plaintiffs)).  The Ninth Circuit in *Livid Holdings* found loss causation satisfied where the plaintiff alleged the defendants misrepresented the financial stability of PCI, concealing its dire financial circumstances and the likelihood of its eventual bankruptcy. *Id.* This concealment induced the plaintiff's investment and directly led to their losses when PCI's actual financial instability came to light, resulting in its collapse. *Id.*

Here, the Complaint alleges that Defendants caused GGC to misrepresent its financial condition by concealing its insolvency. This omission masked GGC's inability to meet its obligations, inducing further investments and delaying withdrawals. Plaintiffs ultimately suffered losses when the concealed insolvency came to light at the end of the Class Period, prompting GGC to freeze redemptions. This closely parallels *AUSA* and *Livid Holdings*. In both cases, misrepresentations or omissions regarding a company's financial health not only induced

investments but also concealed the underlying financial vulnerabilities that ultimately caused the losses via insolvency and bankruptcy. The Complaint here establish the same causal link: Defendants' concealment of GGC's insolvency delayed corrective actions and directly resulted in the harm they suffered.

The Court should ignore Defendants attempt to distort the Complaint's allegations by fixating on use of the word *materialize* in paragraph 52, claiming that "Plaintiffs have it backwards" and "allege that the purportedly misleading statements…occurred after the risk had already materialized in June 2022." DCG Br. at 32. This argument misrepresents the Complaint's allegations and the "risk" at issue. The "risk" at issue is the *risk of loss* caused by an event's occurrence, not merely the risk of an event's occurrence in the abstract. Here, the Complaint alleges that Plaintiffs suffered losses as the truth about GGC's financial condition emerged at the end of the Class Period. Defendants' reading would lead to absurd results: if a fact becomes true (*i.e.*, materializes) but remains concealed until later, investors would be left without any recourse for the harm caused by the concealment because, as Defendants argue, the risk materialized first. The materialization of risk theory is concerned with when the risk of *financial losses* materializes. Here, the undisclosed risk—GGC's insolvency—materialized in June 2022, but as a result of Defendants' fraudulent scheme to conceal this risk, the truth regarding GGC's true financial condition was not uncovered until the end of the Class Period.[36]

---

[36] The DCG Defendants' loss causation argument relies on a crabbed reading of the court's decision in *Collier v. Aksys Ltd.*, 2005 WL 1949868 at *13 (D. Conn. Aug. 15, 2005). While the DCG Defendants argue that "revelation seven months after fraud was 'virtual lifetime in the market' and too remote for causal link" (DCG Br. at 33), the court in Collier found that investor "losses [that] occurred seven months after Defendants' revelation [was] a virtual lifetime in the market." (Emphasis added). *Id*. The facts in Collier are distinguishable from the facts alleged in the Complaint, which alleges that on November 16, 2022, the truth began to be revealed when GGC announced the undisclosed material negative risks of GGC's true financial condition, and, on the same day, GGC stopped paying interest on Genesis Yield securities and stopped honoring redemption requests, causing investors' loss. ¶¶ 52-53; 457-460.

### G.    The Complaint Adequately Alleges Cognizable Damages.

The Complaint adequately alleges cognizable damages under both rescission-based and benefit-of-the-bargain based theories. Contrary to well-established Second Circuit law, Defendants argue that Plaintiffs are not entitled to damages under either theory because the dollar amounts required to properly compensate Plaintiffs pursuant to those theories may exceed the U.S. dollar value of the digital assets at the time of the investment. DCG Br. at 33-34. But this position is without basis, as evidenced by Defendants simply ignoring a line of Second Circuit and district court cases that repeatedly and consistently recognize that benefit-of-the-bargain damages are available under the Exchange Act where they can be calculated with "some reasonable degree of certainty." *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1049 (2d Cir. 1995); *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir.1981); *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 614 (2d Cir. 1994); *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 123 (S.D.N.Y. 2023), leave to appeal denied, No. 23-1350, 2024 WL 748759 (2d Cir. Feb. 21, 2024); *Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F. Supp. 169, 176-77 (S.D.N.Y. 1995).

The "reasonable certainty" requirement is easily satisfied here as Plaintiffs' benefit-of-the-bargain can be calculated with nearly absolute certainty via simple arithmetic. Indeed, Defendants' own papers include precise valuations of the digital assets plaintiffs have received to date via the Genesis Bankruptcy, DCG Br. at 34, demonstrating that the value of the digital assets plaintiffs are yet to receive can similarly be calculated.

To illustrate: Plaintiff Morone had an investment balance of 243.71 BTC and 999.92 ETH with GGC when it froze redemptions at the end of the Class Period. He has since received two distributions from the Genesis Bankruptcy totaling 135.439 BTC (a 56% recovery) and 707.54 ETH (a 71% recovery), leaving a balance of 108.271 BTC and 292.38 ETH due to him. As of November 13, 2024, the 108.271 BTC is worth $10,016,119.89, and the 292.38 ETH is worth

$960,813.31, meaning that Plaintiff Morone is currently owed digital assets worth $10,976,933.20 at November 13, 2024 prices.

Similarly, Plaintiff Translunar had an investment balance of 180 BTC and 1400 ETF with GGC when it froze redemptions in November 2022 at the end of the Class Period. Translunar has since received two distributions from the bankruptcy estate totaling 100.75 BTC (56% recovery) and 999.55 ETH (71% recovery), leaving a balance of 79.25 BTC and 408.45 ETH due to Translunar. As of November 13, 2024, the 79.25 BTC is worth $7,331,508.07, and the 408.45 ETH is worth $1,342,225.04, meaning that Plaintiff Translunar is currently owed digital assets worth $8,673,733.11.

The same calculation can be done for all direct lender plaintiffs as well as the Gemini Earn plaintiffs. While Gemini Earn plaintiffs received 100% of their deposits back in-kind, they did not receive any of the interest they were entitled to from the end of the Class Period through the date of their distributions despite being entitled to periodic in-kind digital currency interest payments. *See, e.g.*, ¶¶ 195-96. The amount of interest due to each Gemini Earn investors is easily calculable by reference to the date of investment and length of investment and the historic and current prices of digital assets in U.S. dollar values.

Viewed properly, the appreciation of digital assets price against the U.S. dollar has exacerbated the damages Plaintiffs have suffered and are continuing to suffer, and has not diminished them as Defendants argue. While the present U.S. dollar value of the digital assets recovered via the bankruptcy—which are fractions of the total amount of digital assets Plaintiffs invested and are entitled to the return of—exceeds the present U.S. dollar value on the date of investment, but that is immaterial here where Plaintiffs entered into agreements which call for the in-kind return of specific digital assets. Indeed, an essential motivating factor behind Plaintiffs'

investments in GGC via lending transactions, as opposed to other forms of investment, was to allow Plaintiffs to benefit from any appreciation digital assets experienced against the U.S. dollar or other fiat currencies during the term of the investment. And, as Plaintiffs' thought might happen when they invested with GGC, the digital assets Plaintiffs loaned to GGC have appreciated dramatically since Plaintiffs loaned them to GGC. Plaintiffs, not Defendants, are entitled to the benefit of the bargain Plaintiffs negotiated with GGC.

### H.    The Complaint Adequately Allege Scheme Liability.

Defendants are liable under subsections (a) and (c) of Rule 10b-5 for their employment of a "device, scheme, or artifice to defraud" and their engagement in an "act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with investors' purchase of Genesis Yield securities. *See* 17 C.F.R. § 240.10b-5(a), (c). Defendants advance three main arguments as to why the Complaint fails to state a claim for scheme liability.

First, Defendants argue the Complaint's scheme liability allegations "largely repackage" the Complaint's control person claims and are premised solely on misstatements, which Defendants assert "cannot form the 'sole basis'" for scheme liability. DCG Br. at 35-36; Islim Br. at 5. But Defendants unsurprisingly mischaracterize the Complaint's allegations, which are that Defendants engaged in wrongful conduct beyond their alleged false and misleading statements. The Complaint details Defendants' *direct participation* in a scheme to conceal GGC's insolvency from Plaintiffs and other Genesis Yield investors that involved much more than misstatements and omissions.  ¶¶ 299-456; *see SEC v. Rio Tinto PLC.*, 41 F.4th 47, 49–54 (2d Cir. 2022) (stating misstatements and omissions "can form *part* of a scheme liability claim"). Indeed, the linchpin of the scheme was the sham promissory note designed and executed by Defendants DCG, Silbert, and Moro, serving as the "something extra that makes a violation a scheme." *Rio Tinto* PLC, 41

F.4th at 54. The misrepresentations and omissions that followed execution of the DCG Promissory Note were complimentary to it and bolstered its effectiveness.

In addition to Defendants' direct participation in the scheme, Defendants caused GGC to directly transmit false representations to Gemini, prospective investors, and the public to induce the purchase of securities.[37] ¶¶ 355, 274-76, 312, 546, 323, 326, 356-60, 371-72, 377-79, 434-35, 417, 421-28, 444, 457. *Cf. Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) (where defendant directly transmits false statements to prospective investors, scheme liability was sufficiently stated). Both the Supreme Court and the Second Circuit have explained that the knowing dissemination of false or misleading statements provides a sufficient basis for scheme liability. *See id.* at 1101–02; *Rio Tinto PLC.*, 41 F.4th at 54.

Defendant Moro argues that the Complaint fails to identify a "deceptive act" distinct from any misrepresentations, instead relying on conclusory allegations that about his tweets and dissemination of financial statement or balance sheets. Moro Br. at 9-10. But of course, this ignores his participation along with Defendant Silbert others in the design *and execution of the sham promissory note* specifically designed to deceive investors, as well as additional after-the-fact conduct designed to conceal GGC's insolvency. ¶¶ 355-409.

Similarly, Defendant Islim claims no scheme liability can lie as to him because the Complaint fails to set forth any facts showing that he engaged in a "device, scheme or artifice to defraud," or allege "something beyond misstatements and omissions, such as dissemination." Islim Br. at 5-6. But this ignores the role the Complaint alleges Islim played in guiding GGC's response at the direction of Defendants Silbert and Moro, his knowledge of the existence of the sham

---

[37] Defendant Moro argues that the representations he disseminated were technically accurate at all relevant times. Moro Br. at 11–16. This argument lacks credibility and improperly disputes facts on a motion to dismiss and raises questions of fact for discovery.

promissory note and its purpose, and his dissemination of financial statements with that knowledge. As *Lorenzo* made clear, dissemination of others' false statements supports a finding of scheme liability. *Rio Tinto*, 41 F.4th at 52 ("the Supreme Court held in *Lorenzo* that an individual who disseminated a false statement, but who did not make it, could be liable under the scheme subsections.")

Finally, Defendant Kraines argues that the Complaint's allegations as to him are wholly insufficient to establish scheme liability, "impermissibly lump[ing] together" him and multiple other defendants without any specific allegations as to him. Kraines Br. at 10-11. But the Complaint alleges that Defendant Kraines participated in conversations "strategiz[ing] on how to proceed" in light of GGC's insolvency during which it was "agreed that the group needed to prioritize concealing GGC's financials condition from lenders such as Plaintiffs and class members, as well from as the public." ¶ 317. These conversations ultimately led to the design, creation, and execution of the DCG Promissory Note as well as the dissemination of numerous misleading statements regarding GGC's financial both before and after execution of the sham promissory note to bolster the scheme. ¶¶ 317, 320, 324. Disseminating false statements made by others falls squarely within the definition of deceptive acts supporting scheme liability post-*Lorenzo* and *Rio Tinto,* 41 F.4th at 52.

The second argument Defendants advance is that design, execution, and lies about the DCG Promissory Note "cannot give rise to scheme liability" as the Complaint's allegations "take an objectively neutral series of events—a parent assisting a distressed subsidiary via a sophisticated financial transaction—and try to imbue it with sinister connotations." DCG Br. 37. Defendants are wrong and improperly dispute facts. The Complaint alleges that Defendants orchestrated and participated in the execution of the sham DCG Promissory Note transaction with GGC which, in

turn, allowed GGC to maintain the appearance of solvency and was the source and basis for Defendants' later misrepresentations to investors. ¶¶ 356-60. These are paradigmatic examples of schemes to defraud. *Cf. In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (finding defendants liable for engaging in deceptive transactions with Parmalat which, in turn, allowed Parmalat to publish misleading financial statements); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455, 477 (S.D.N.Y. 2004) (refusing to dismiss scheme liability claim where alleged fraud involved issuing false and misleading reports about a corporation in order to inflate the value of its stock and induce investments).

Contrary to Defendants' arguments, the Complaint does not seek to impose liability on Defendants merely for "supporting" GGC. DCG Br. at 37. Rather, the Complaint alleges that Defendants orchestrated and participated in a sham transaction of purportedly massive value, conducted not for a legitimate business purpose, but rather with the purpose of defrauding and deceiving investors and to benefit and protect Defendants' pecuniary interests. *Cf.  SEC v. Hopper*, 2006 WL 778640, at *11 (S.D. Tex. Mar. 24, 2006).  As Defendant Moro himself explained in a June 28, 2022 email, the transaction was part of a plan to maintain the appearance that GGC was solvent and obtain additional investments in Genesis Yield. ¶ 340; *see also* ¶ 342 ("[Defendant] Silbert responded: 'It is certainly our hope and intention to help Genesis address the equity-hole'"). And the Complaint does far more than "simply aver that the terms were commercially unreasonable."  DCG Br. at 37.  The Complaint alleges particular facts that the DCG Promissory Note was worth nothing close to the fictitious amount Defendants asserted in order to create the illusion of GGC's solvency. ¶ 363 (alleging the odds of collection of the face value of the note were extremely low), ¶ 364 (alleging that the 1% interest rate was not competitive), ¶366 (citing GGC's own Exhibit to Disclosure Statement "which estimated the value of the DCG Promissory

Note between $90 million (a 92% discount) to $323 million (a 70% discount)"), ¶ 367 (citing Defendant Silbert's own valuation of the DCG Promissory note at $200 million).

Finally, Defendants argue that "the alleged scheme post-dates almost all 'purchases' of 'securities'" because it supposedly began in June 2022, long after all but one Plaintiff had established lending relationships and deposited assets. DCG Br. at 37; Kraines Br. at 11 (arguing that Plaintiffs' claim "suffers from a temporal defect"). Yet Defendants effectively concede that the scheme did not post-date Plaintiff Translunar's purchase, nor the purchases of any direct investors who executed contracts with Genesis after June 13, 2022, undercutting their argument. Defendants ignore that hundreds of thousands of Gemini Earn investors made additional investments with Genesis after June 13, 2022,

Equally importantly, Defendants ignore the *hundreds* of Genesis Yield securities purchases made by the Gemini Earn Plaintiffs Buttenham, Gowda, and McGreevy that occurred after GGC was rendered insolvent as a result of the 3AC losses in June 2022— relying on Defendants' then-false representations about GGC's solvency—representations that Defendants had a duty to correct, but never did. ¶¶ 65-66, 68; ECF Nos. 38-2, 38-3, 38-5. In connection with each purchase after June 2022, GGC failed to correct its false and misleading representation that it was solvent. *See* 15 U.S.C. §§ 78c(a)(13), (14) (stating that the Exchange Act applies to "any contract" for a security's purchase or sale). *Cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 746 (1975) (holding Exchange Act does not protect person who did not actually buy securities, but who might have done so had the seller told the truth, insofar as the claim would rest on facts "totally unknown and unknowable to the defendant."). Moreover, the Complaint uniformly alleges misrepresentations that "coincide" with the investors purchase of Genesis Yield securities. *See SEC v. Zandford*, 535 U.S. 813, 822, (2002) ("in connection with" requirement is met when the

fraud and the purchase or sale "coincide").[38]

### I.    The Complaint Adequately Alleges Control Person Liability Under Section 20(a) of the Exchange Act

To state a claim for control person liability under Section 20(a) of the Exchange Act, Plaintiffs must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Teva*, 432 F. Supp. 3d at 175. As discussed above, the Complaint adequately alleges a primary violation against GGC and Defendants.

"Control" is defined broadly to include "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *See Poptech L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328, 336 (D. Conn. 2011) (quoting 17 C.F.R. § 240.12b—2). Because control of the primary violator is a nonfraud element, courts in this Circuit only require the plaintiff to satisfy the pleading requirements of Rule 8(a), rather than Rule 9(b). *Id.* at 334-35. Therefore, "the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage." *Id.* at 335. The facts showing that Defendants controlled GGC are set forth above.  The Complaint further alleges that each Defendant had the power and authority to direct the management and activities of GGC and its employees and to cause GGC to engage in the violations of the Exchange Act. ¶¶ 593-605.

The DCG Defendants, Kraines, and Islim assert that control requires allegations of "actual control over the transaction in question." Islim Br. at 8; Kraines Br. at 3-7; DCG Br. at 36.  At oral argument, the Court stated, "[a]ren't there allegations . . . that . . . say DCG instructed Genesis . . .

---

[38] Defendants' temporal defect argument (DCG Br. at 3) is equally meritless as applied to the Complaint's scheme liability allegations.

to . . . hide the impact of the loan which was really fraudulent . . . and if they're directing that the subsidiary hide the nature of that transaction, why isn't that at least . . . a control person omission case?" Transcript of Oral Argument, at 23-24, *McGreevy v. Digital Currency Grp., Inc.*, No. 3:23-cv-00082-SRU (D. Conn. July 3, 2024).  In response, counsel for the DCG Defendants noted "I will strategically concede that if there was such a pleading, that would be more of a problem." *Id.*

> The Complaint satisfies the standard articulated by the Court.  The Complaint alleges that

> Defendants Moro, Kraines, Murphy and Islim caused Genesis Global Capital and Ballensweig to disseminate misleading balance sheets and other documents containing misrepresentations to Genesis Yield investors and their appointed agent intended to induce additional parties to invest in Genesis Yield securities, convince existing Genesis Global Capital investors to reinvest in Genesis Yield securities and/or to prevent them from requesting redemptions of their securities and return of investors digital assets.

¶ 46.  The Complaint further alleges that Defendants DCG, Silbert, and Moro executed the Promissory Note to conceal GGC's insolvency, a transaction at the heart of Defendants' fraudulent scheme and the basis for Defendants' materially false and misleading representations to investors. ¶¶ 357-59.

> Defendants further assert that the Complaint fails to allege control unless they actually sent or approved the Company's communications. DCG Br. at 36; Kraines Br. at 6-7; Islim Br. at 8. That is not the law. *See Poptech*, 792 F. Supp. 2d at 339 (rejecting the same argument). To the contrary, this Court and others have recognized in the Section 20(a) context that a firm may try to bifurcate the process of reporting information to investors in order to insulate particular people within the firm from future legal liability. *See id.* Under such circumstances, "it is at least possible that multiple parties or entities could share control over the flow of information to investors." *Id.* at 339-40. Accordingly, the Complaint alleges the second prong of control person liability with respect to Defendants.

To allege culpable participation, the Complaint must allege "some level of culpable participation at least approximating recklessness." *Poptech*, 792 F. Supp. 2d at 333; *see also Teva*, 432 F. Supp. 3d at 176. As noted in Section V., the Complaint alleges each Defendants scienter, which is more than enough to show Defendants' culpable participation in the primary violations of Section 10(b) alleged in the Complaint. ¶¶ 607-12. Accordingly, the Complaint adequately alleges Section 20(a) control person liability.

## VI.    THE COMPLAINT ADEQUATELY ALLEGES STATE LAW CONSUMER PROTECTION CLAIMS

Should the Court determine that the Genesis Yield investments are not securities, Defendants are liable to Plaintiffs under the consumer protection laws of Plaintiffs' home states. Each of the Plaintiffs' home state consumer protection statutes broadly prohibit deceptive and unfair conduct[39] and recognize that a party with a duty to disclose a fact to another that fails to do so, or conceals it has engaged in deceptive or unfair conduct.[40]  Although there is substantive overlap between causes of action brought under the deception prong of consumer protection statutes with common law fraud claims, consumer protection statutes require a lower quantum of

---

[39] *See Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1097–98 (N.D. Cal. 2007) ("UCL prohibits acts or practices which are (1) fraudulent, (2) unlawful, or (3) unfair"); *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 279 (S.D.N.Y. 2018) (KCPA liberally construed to protect consumers from "deceptive and unconscionable practices"); *Coffey v. WCW & Air, Inc.*, No. 3:17-CV-90-MCR-CJK, 2018 WL 4154256, at *3 (N.D. Fla. Aug. 30, 2018) (FDUTPA prohibits "deceptive acts or unfair practices"); *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 423–24 (D.N.J. 2018) (any person "who is a victim of ... [a] deceptive trade practice" may bring an action under the NDTPA); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 448 (S.D.N.Y. 2017), *modified on reconsideration*, No. 14-MC-2543 (JMF), 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) (TDTPA applies to "false, misleading or deceptive acts"); *DeCoursey v. Murad, LLC*, 673 F. Supp. 3d 194, 214 (N.D.N.Y. 2023) (NYUDTPA prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any services"); *Native Am. Arts, Inc. v. Vill. Originals, Inc.*, 25 F. Supp. 2d 876, 882 (N.D. Ill. 1998) (ICFA is "broadly construed" to prohibit "deceptive trade practices which injure consumers").

[40] *See, e.g.*, *In re Motor Fuel Temperature Sales Pracs. Litig.*, 867 F. Supp. 2d 1124, 1139 (D. Kan. 2012) (finding that under KCPA defendants "owed plaintiffs a duty to disclose the temperature of, or the effect of temperature on, the motor fuel plaintiffs purchased at retail"); *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1098 (N.D. Cal. 2007) (noting duty to disclose exists "when the defendant ha[s] exclusive knowledge of material facts not known to the plaintiff" and finding plaintiff's UCL claim adequately pled company had duty to disclose any known and material defects to consumers).

proof for deception-based claims than common law fraud claims, even where they are subject to Rule 9(b).[41] Liability under these statutes extends to all parties whose conduct causes injury to consumers through an unfair or deceptive practice, regardless of whether the parties are in direct or contractual privity.[42]

### A.    Defendants Directly Engaged in Unfair and Deceptive Conduct

The principal bases of the Complaint's state consumer protection law claims are (1) Defendants' failure to disclose GGC's insolvency to Plaintiffs despite having a duty to do so, and (2) Defendants' active and direct participation in a scheme to conceal GGC's insolvency from Plaintiffs. Stated otherwise, Defendants unfairly and deceptively omitted facts basic to Plaintiffs' investment transactions and participated in a scheme intended to conceal material information Defendants had a duty to disclose. Defendants' omissions and concealment are both independently actionable and sufficient to maintain consumer protection claims under the "deception" and "unfairness" prongs of the state consumer protection statutes alleged in the Complaint.

---

[41] *See Estrada v. Progressive Direct Ins. Co.*, 53 F. Supp. 3d 484, 499 (D. Mass. 2014) (stating act or practice is deceptive for purposes of the "deceptive" prong of the MCPA "if it has the 'capacity' or 'tendency' to deceive .... [t]he plaintiff need not necessarily prove actual reliance on a misrepresentation; rather, the plaintiff must prove a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception"); *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 588, 595 (Ct. App. 2011) ("Unlike common law fraud, a UCL fraud claim 'can be shown even without allegations of actual deception, reasonable reliance and damage'; what is required to be shown is 'that members of the public are likely to be deceived.' ...'In order to be deceived, members of the public must have had an expectation or an assumption about' the matter in question."); *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 942 (S.D. Cal. 2019) ("Actual falsehood, the perpetrator's knowledge of falsity, and perhaps most importantly, the victim's reliance on the false statements, each of which are elements of common-law fraud claims, are not required to show a violation of [the UCL]"); *Rotella v. Ring Around Products, Inc.* 614 S.W.2d 455, 462 (Tex. App. 1981) (scienter or intent to deceive is not required under TDTPA).

[42] *See, e.g., Speakman v. Allmerica Fin. Life Ins. Co.*, 367 F. Supp. 2d 122 (D. Mass. 2005) (upholding MCPA claim against corporate affiliates not in contractual privity based on affiliates' participation in statutory violations); *Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp. 2d 1045, 1056-57 (S.D. Fla. 2009) (upholding FDUTPA claim against developers not in contractual privity based on developers' promotion and participation in deceptive project); *Knight v. International Harvester Credit Corp*., 627 S.W.2d 382, 389 (Tex. 1982) (upholding TDTPA claim against finance company for deceptive clause in agreement notwithstanding lack of privity with buyer since company was "inextricably intertwined" with the challenged transaction); *Makaeff v. Trump University, LLC*, 145 F. Supp. 3d 962, 979-80 (S.D. Cal. 2015) ("fact that Plaintiffs entered into a transaction with Trump University rather than Trump himself" not dispositive).

Each Defendant independently had a duty to Plaintiffs to disclose GGC's insolvency under the circumstances. Restatement (Second) of Torts, § 551 sets forth the black-letter law imposing liability for non-disclosure on a party involved in a business transaction, irrespective of contract or privity with a plaintiff. Section 551, which has been adopted (or followed) in each of Plaintiffs' home states, provides, in relevant part:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to exercise reasonable care to disclose the matter in question.

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> …
>     (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

>     (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> …
>     (e) facts basic to the transaction, if he knows that the other is about to enter into it **under a mistake as to them**, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

(Emphasis added).

Courts have applied § 551(2)(e) to hold parties indirectly involved in a transaction (*i.e.*, without privity) liable for failing to disclose "facts basic to the transaction." *See Nota Construction Corp. v. Keyes Associates*, 45 Mass.App.Ct. 15, 694 N.E.2d 401, 404-05 (1998) (architect had duty to disclose information about property to subcontractor bidding on municipal school construction project, where although architect not in privity with subcontractor, it "knew or should have known that potential bidders on the project would indeed rely on the plans and specifications for preparation of their bids" and undisclosed facts were basic to the subcontractor's bid); *Gutter*, 631

So.2d at 1118 (attorneys receiving finder's fee for helping promoter secure investors were liable for failing to disclose to investors facts material to the investment); *Wells v. John Hancock Mut. Life Ins. Co.*, 149 Cal. Rptr. 171, 175 & n. 8  (Cal. Ct. App. 1978) (life insurance company had duty to notify insured's creditor accepting the policy as security for a debt that the policy lapsed).

There can be no question here, where each investment agreement Plaintiffs executed with GGC contained specific and ongoing representations and warranties regarding Genesis' solvency, that Genesis' solvency was a "fact basic to the transaction," the falsity of which Defendants were required to disclose. *See Restatement*, § 551(2)(e), comment j (a basic fact is one "that goes to the basis or essence of the transaction, and is an important part of the substance of what is bargained for or dealt with").

The Complaint is replete with detailed allegations establishing Defendants' control of GGC, day to day involvement in GGC's business activities, and most importantly, Defendants' *direct* role in the DCG Promissory Note transaction which Defendants themselves claimed "plugged the equity hole." These activities bring Defendants in line with the parties in *Nota*, *Gutter*, *Wells,* and other cases in which parties indirectly involved in business transactions were found to have a duty to disclose facts basic to a transaction to parties with whom they lacked direct privity.

Defendants are also liable to Plaintiffs for their affirmative acts undertaken to conceal GGC's insolvency. The Complaint alleges the various ways in which Defendants *directly* acted to suppress GGC's true financial condition from Plaintiffs and the investing public. ¶¶ 299-456. Defendants' contention that Plaintiffs allege only indirect, derivative liability against Defendants is false. *See* DCG Br. at 38. Defendants' conduct, as alleged in the Complaint and the above discussion on scheme liability, falls squarely within the ambit of the state consumer protection

claims asserted by Plaintiffs that impose liability on parties who directly engage in deceptive or fraudulent business and cause a loss of money. Where a party participates directly in deceptive or unfair conduct, their status as a parent corporation or majority shareholder does not shield them from liability.[43]

### B.    Defendants Had a Duty to Disclose GGC's Insolvency After June 13, 2022.

Defendants argue that no misrepresentations were made regarding GGC's solvency before June 13, 2022, as if their duty to disclose GGC's true financial condition expired on that date. DCG Br. at 38-39. This argument, however, overlooks key allegations. First, before June 13, 2022, Defendants and GGC made specific misrepresentations about GGC's business model, loan book, and investing strategy to prospective investors, including statements made to Gemini, acting as agent for the Gemini Earn investors.   ¶¶ 273-94. These misleading statements induced initial investments from Gemini Earn investors by creating a false impression of GGC's stability and purportedly sound risk management. *Id.* Second, Defendants had an ongoing duty to disclose GGC's insolvency after June 13, 2022 because existing investors, such as the Gemini Earn Plaintiffs, were making hundreds of new, periodic investments based on GGC's representations and warranties of solvency during this time, which Defendants knew (indeed, this was the entire point of the deception). During this time, Defendants failed to disclose facts basic to the thousands, if not millions, of new investments made by Plaintiffs and class members after June 13, 2022 *and*

---

[43] *See, e.g., Coffey v. WCW & Air, Inc.*, No. 3:17-cv-90-MCR-CJK, 2018 WL 4154256 (upholding FDUPTA claims against parent of subsidiary based on parent's "direct participation"); *Harris County, Texas v. Eli Lilly and Company*, No. H-19-4994, 2020 WL 5803483, at *3 n.4 (S.D. Tex. Sept. 29, 2020) (declining to dismiss DTPA claim where parent "directly involved" in subsidiary's activities that gave rise to cause of action); *In re Milo's Dog Treats Consol. Cases,* 9 F. Supp. 3d 523, 531 (W.D. Pa. 2014) (denying motion to dismiss plaintiffs' UCL claim against parent company and finding claim was "not based solely on [parent's] parent-subsidiary relationship with [subsidiary] but speak to [parent's] own conduct and/or participation in the wrongdoing"); *Schneider v. CitiMortgage, Inc.,* No. 13-4094-SAC, 2014 WL 5390273, at *1 (D. Kan. Oct. 22, 2014) (denying parent company's motion for summary judgment on KCPA claim because it "has not shown that it cannot be held liable as a parent company"). *See also Forsythe v. Clark USA, Inc.,* 224 Ill. 2d 274, 282–83, 864 N.E.2d 227, 233 (2007) (in Illinois, liability is properly imposed on a parent company in "instances where the parent is directly a participant in the wrong complained of").

took affirmative steps designed to conceal GGC's insolvency from the public. This caused Plaintiffs Translunar, McGreevy, Gowda, Buttenham, Macri, Wiener, Wilson, Jacobson, and other investors to rely on these assurances to make either new or additional investments and prevented investors like Plaintiffs Morone and Ameli from withdrawing their funds.

### C.    The Genesis Investment Contracts were not "Private Contracts"

Defendants mischaracterize the Complaint's allegations as arising out of "private contracts between Plaintiffs and Genesis." DCG Br. at 39. Defendants are wrong. A "private contract" of the sort that falls outside the ambit of § 349 is a "single shot transaction[ ]" that is "unique to the parties." *See, e.g., Diaz v. Paragon Motors of Woodside*, 424 F. Supp. 2d 519, 542 (E.D.N.Y. 2006) ("Private contract disputes, unique to parties, or 'single shot transactions' would not fall within the ambit of [§ 349]"), citing *Oswego Laborers' Local 214 v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). The Genesis Yield Investment Agreements through which Plaintiffs invested in Genesis Yield were not such "single shot" "private contracts." Rather, they were generally "offered to consumers, who were exposed to … Defendants' fraudulent marketing, advertising, and sales tactics designed to induce consumers to purchase, transfer, borrow, loan, and/or trade digital assets via Genesis Yield." ¶ 477.

### D.    Plaintiffs Continue to Suffer Significant Financial Damages

Finally, Defendants argue that Plaintiffs lack cognizable damages, pointing to alleged gains in cryptocurrency value since GGC's bankruptcy and asserting that Plaintiffs have recovered their losses via bankruptcy distributions. This assertion is both inaccurate and misleading. Plaintiffs contracted to have their digital assets returned—not fiat currency—and receiving only a portion of their investments in U.S. dollars through the Genesis Bankruptcy proceeding does not make them whole. The Complaint alleges that Plaintiffs invested with GGC under the explicit understanding and contractual right that their investments would be held and returned in kind—the same type and

amount of digital assets they initially provided. ¶ 25. GGC's failure to honor this obligation deprives Plaintiffs of the full value of their investments, especially as cryptocurrency prices have surged since their initial investments. This appreciation amplifies Plaintiffs' damages, rather than the reserve dynamic Defendants advance: the digital assets owed are now worth significantly more than their original dollar value, widening the gap between what they are contractually entitled to and the partial returns they have received through the Genesis Bankruptcy. [44]

## VII.    THE COMPLAINT ADEQUATELY ALLEGES COMMON LAW FRAUD

Defendants are additionally liable to Plaintiffs under the common law fraud theories of nondisclosure and concealment. The elements of a fraud by omission claim under New York law are "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 434 (S.D.N.Y. 2010). An omission or failure to disclose can constitute a fraud where there is a duty to disclose. *Id.*; *see also Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 47 (2d Cir. 1993). In the absence of a fiduciary relationship, "a duty to disclose may arise if: (1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party, or (2) one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1484 (2d Cir. 1995) (citations and internal quotations omitted).

---

[44] In addition to the points raised by DCG, Defendants Moro and Islim each additionally argue (in a conclusory fashion) that the state consumer protection claims must fail as to them on the ground that those claims rely on the same allegations as the Exchange Act claim. *See* Moro Br. at 29; Islim Br. at 9-10. As set forth above, the allegations as to both Moro and Islim are more sufficient. *See, supra,* Sections IV(B)(5) and V.

The Complaint alleges that that Defendants had a duty to disclose GGC's insolvency but failed to. For the reasons set forth above in the discussion of scheme liability, the Complaint adequately alleges a claim for common law fraud against Defendants because of their omissions and misstatements. Defendants not only failed to disclose GGC's insolvency, but also engaged in affirmative acts to conceal it, knowing that Plaintiffs and class members were acting under the mistaken belief that GGC was solvent and financially stable. Plaintiffs reasonably relied on Defendants' misrepresentations and omissions, as Defendants were in the best position to both understand and speak accurately as to the support that GGC had received from DCG and the resulting effect on GCC's financial condition. ¶ 687. Defendant Silbert's meeting with Gemini, the agent for the Gemini Earn investors, further underscores Defendants' direct involvement in perpetuating this deception, as Defendant Silbert knowingly withheld material information about GGC's financial distress, misleading Gemini and its investors. ¶¶ 441-50. These allegations satisfy the elements of common law fraud by omission and concealment. Thus, Defendants' argument that the Complaint's common law fraud claim "fails for the same reasons that their Section 10(b) claim fails" falls flat. DCG Br. at 40; Moro Br. at 30; Islim Br. at 10; Kraines Br. at 12.[45]

---

[45] As previously set forth herein, the Complaint's Section 10(b) claims against Defendants are adequately alleged. *See, supra,* Section V. So too is common law fraud.

## VIII.  CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss should be denied in their entirety.

Dated: November 14, 2024

Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Ian W. Sloss*
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
Krystyna Gancoss ct31660
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com

**KAPLAN FOX & KILSHEIMER LLP**

*/s/ Jeffrey P. Campisi*
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris
800 Third Avenue, 38th Floor
New York, New York 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the Proposed Class and Counsel for the Additional Named Plaintiffs*

**CERTIFICATION OF COMPLIANCE WITH RULE XI (ATTORNEY SIGNATURES) OF THE ELECTRONIC FILING POLICIES AND PROCEDURES OF THE U.S. DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT (REVISED JAN. 9, 2023)**

I, Ian W. Sloss, under Rule XI(D) (Multiple Signatures) of the Electronic Filing Policies and Procedures of the U.S. District Court for the District of Connecticut (Revised Jan. 9, 2023), represent that I have obtained the consent of the other attorneys who have signed the document above.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of November 2024.      _/s/ Ian W. Sloss_
                                              Ian W. Sloss

## <u>CERTIFICATE OF ELECTRONIC FILING</u>

I hereby certify that on November 14, 2024 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Ian W. Sloss*

Ian W. Sloss
