## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, REMO MARIA MORONE, DOMINIC MACRI, LARRY WIENER, DEREK WILSON, DANIEL AMELI, and LEE JACOBSON, individually and on behalf of all others similarly situated, | Case No. 3:23-cv-00082-SRU |
| | Hon. Stefan R. Underhill |
| Plaintiffs, | |
| v. | December 13, 2024 |
| DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM, | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, AND MARK MURPHY'S MOTION TO DISMISS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

    I.      Plaintiffs' Section 15 Claim Should Be Dismissed ................................................. 2

          A.      The Lending Agreements Are Not Securities ............................................. 2

              1.      There is No Security Under *Howey* ............................................. 2

              2.      There Is No Security Under *Reves* .............................................. 8

          B.      Plaintiffs Fail to Plead Actual Control Over The Alleged Primary Violation ...................................................................................................... 12

          C.      Plaintiffs Fail to Plead Cognizable Damages Under the Securities Act ............................................................................................................... 15

    II.      Plaintiffs' Section 20(a) Claim Should Be Dismissed ........................................... 18

          A.      Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act ............................................................................................ 18

          1.      Plaintiffs Fail to Plead Scienter ................................................... 18

          2.      Plaintiffs Fail to Plead Reliance .................................................. 20

               a.      Plaintiffs Cannot Plead Reliance on the Lending Agreements ......................................................................... 20

               b.      Plaintiffs Fail to Plead Reliance on Extra-Contractual Statements ....................................................................... 22

          3.      Plaintiffs Fail to Plead Loss Causation ....................................... 24

          4.      Plaintiffs Fail to Plead Cognizable Damages Under the Exchange Act ............................................................................... 26

          B.      Plaintiffs Fail to Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation ....................... 27

    III.    Plaintiffs Fail to Plead "Scheme Liability" .......................................................... 28

    IV.    Counts IV Through X Should Be Dismissed Because Plaintiffs Fail to Plead State-Law Claims in the Alternative ..................................................................... 30

          A.      Plaintiffs Fail to Allege Violations of Any State Consumer Protection Laws ......................................................................................... 30

    V.     Count XI Should Be Dismissed Because Plaintiffs Fail to Adequately Allege Common-Law Fraud Claims ................................................................................... 32

CONCLUSION ...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)................................................................17

*Aimis Art Corp. v. N. Tr. Sec., Inc.*,
    641 F. Supp. 2d 314 (S.D.N.Y. 2009).........................................16, 18, 27

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011)................................................................14

*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................24

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
    973 F.2d 51 (2d Cir. 1992) .......................................................8, 9, 10, 12

*Bongiorno v. Baquet*,
    2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021).....................................11

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002).................................................................20

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018).................................................29

*Carriuolo v. General Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ............................................................32

*Collier v. Aksys Ltd.*,
    2005 WL 1949868 (D. Conn. Aug. 15, 2005) ...............................25, 26

*Colliton v. Bunt*,
    709 F. App'x 82 (2d Cir. 2018)...........................................................14

*Curtis v. Aetna Life Ins. Co.*,
    2021 WL 1056785 (D. Conn. Mar. 18, 2021) .......................................4

*Dettmering v. VBit Techs. Corp.*,
    2024 WL 3617604 (D. Del. Aug. 1, 2024) ............................................5

*Devaney v. Chester*,
    709 F. Supp. 1255 (S.D.N.Y. 1989)....................................................21

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) .................................................................13, 28

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*,
    343 F.3d 189 (2d Cir. 2003) .........................................................................................26

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015) ...........................................................................13

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ........................................................................3, 5

*G.K. Alan Assoc. v. Lazzari, Inc.*,
    44 A.D.3d 95 (N.Y. 2d Dep't 2007) .............................................................................23

*In re Genesis Glob. Holdco, LLC*,
    No. 23-10063-SHL, Dkt. No. 2056 ...............................................................................18

*In re Genesis Glob. Holdco, LLC*,
    No. 23-10063-SHL (Bankr. S.D.N.Y. July 21, 2024), Dkt. No. 1874 .........................18

*Gross v. Rell*,
    585 F.3d 72 (2d Cir. 2009) .............................................................................................4

*Gutter v. Wunker*,
    631 So.2d 1117 (Fla. Dist. Ct. App. 1994) ..................................................................31

*Harman v. Harper*,
    1990 WL 121073 (9th Cir. Aug. 21, 1990) ....................................................................7

*Heller v. Goldin Restructuring Fund, L.P.*,
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ..........................................................................19

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    154 F. Supp. 2d 741 (S.D.N.Y. 2001) ..........................................................................13

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
    822 F. Supp. 2d 368 (S.D.N.Y. 2011) ..........................................................................21

*Intelligent Digit. Sys., LLC v. Visual Mgmt. Sys., Inc.*,
    683 F. Supp. 2d 278 (E.D.N.Y. 2010) .......................................................................7, 10

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................................10, 11

*Kaufmann v. Yoskowitz*,
    1989 WL 79364 (S.D.N.Y. July 13, 1989) ..................................................................27

*Kirschner v. JP Morgan Chase Bank, N.A.*,
  79 F.4th 290 (2d Cir. 2023) ...................................................................9

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..........................................................24, 25

*Lorenzo v. SEC*,
  587 U.S. 71 (2019)..................................................................................29

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)................................................................................22

*Maher v. Glob. Factors LLC*,
  2024 WL 3356985 (S.D.N.Y. July 8, 2024) .........................................16

*Maung Ng We v. Merrill Lynch & Co.*,
  2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000) .......................................14

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................24

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  676 F. Supp. 486 (S.D.N.Y. 1987) .........................................................17

*Morse v. Weingarten*,
  777 F. Supp. 312 (S.D.N.Y. 1991) .........................................................32

*New York v. Gemini Tr. Co.*,
  Index No. 452784/2023 (N.Y. Sup. Ct. Oct. 19, 2023) ......................23

*Norfolk Cty. Ret. Sys. v. Ustian*,
  2009 WL 2386156 (N.D. Ill. July 28, 2009)..........................................20

*Nota Constr. Corp. v. Keyes Assocs.*,
  694 N.E.2d 401 (Mass. App. Ct. 1998) .................................................31

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005).....................................................13

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005).............................................29, 30

*Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*,
  527 F.2d 445 (2d Cir. 1975)....................................................................23

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
  2006 WL 6900987 (S.D.N.Y. Nov. 9, 2006) .........................................13

*Priv. Corp. Advisors, Inc. v. Heard*,
    1995 WL 66647 (S.D.N.Y. Feb. 17, 1995)............................................................................11

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986)....................................................................................................30

*Rensel v. Centra Tech, Inc.*,
    2019 WL 6828270 (S.D. Fla. Dec. 13, 2019) .........................................................................16

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990).............................................................................................................2, 10

*In re Salomon Analyst AT&T Litig.*,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004)....................................................................................30

*SEC v. Binance Holdings Ltd.*,
    No. 1:23-cv-01599 (D.D.C. June 5, 2023), ECF No. 1 ............................................................6

*SEC v. Binance Holdings Ltd.*,
    2024 WL 3225974 (D.D.C. June 28, 2024)....................................................................5, 6, 7

*SEC v. Edwards*,
    540 U.S. 389 (2004)..................................................................................................................5

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................................29

*SEC v. R.G. Reynolds Enters., Inc.*,
    952 F.2d 1125 (9th Cir. 1991) ................................................................................................11

*SEC v. Rio Tinto PLC*,
    41 F.4th 47 (2d Cir. 2022) ......................................................................................................29

*SEC v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023)......................................................................................7

*SEC v. Thompson*,
    732 F.3d 1151 (10th Cir. 2013) ..............................................................................................11

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)..................................................................................................................2

*SEC v. Wallenbrock*,
    313 F.3d 532 (9th Cir. 2002) ..................................................................................................11

*Singer v. Livoti*,
    741 F. Supp. 1040 (S.D.N.Y. 1990)........................................................................................12

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ..............................................................................26

*Tab P'ship v. Grantland Fin. Corp.*,
   866 F. Supp. 807 (S.D.N.Y. 1994) ..........................................................................11

*Taylor v. Westor Cap. Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013)......................................................................30

*In re UBS Auction Rate Sec. Litig.*,
   2009 WL 860812 (S.D.N.Y. Mar. 30, 2009) ......................................16, 18, 26, 27

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975)..................................................................................................9

*Waggoner v Barclays Plc*,
   875 F.3d 79 (2d Cir. 2017)......................................................................................22

*Wells v. John Hancock Mut. Life Ins. Co.*,
   85 Cal. App. 3d 66 (Cal. Ct. App. 1978) ................................................................31

*In re WorldCom, Inc., Sec. Litig.*,
   2004 WL 1097786 (S.D.N.Y. May 18, 2004) ........................................................13

**Statutes**

15 U.S.C. § 77l(a)(2)........................................................................................................16, 17

15 U.S.C. § 78bb.....................................................................................................................26

**Other Authorities**

Restatement (Second) of Torts § 551..........................................................................................31

# PRELIMINARY STATEMENT[1]

The DCG Defendants demonstrated in their motion to dismiss ("Motion") the fundamental deficiencies that remain in each of the claims asserted in the Third Amended Complaint ("TAC"). Plaintiffs' Opposition fails to substantively engage with any of these showings, let alone refute them.

*First,* the DCG Defendants established Plaintiffs' failure to plead facts supporting their position that the Lending Agreements (or "Genesis Yield") are securities under the securities laws. In response, Plaintiffs repeat the allegations in the TAC ostensibly supporting their position, arguing that the DCG Defendants ignore facts or contradict them. But Plaintiffs identify nothing to undercut the arguments made in the Motion. The basic fact remains: This is not a securities case. And without a cognizable security alleged, Plaintiffs cannot maintain any of their federal securities claims.

*Second*, as the DCG Defendants argued in the Motion, Plaintiffs have not pled a Section 20(a) claim based on violations of the Exchange Act. Plaintiffs failed to allege the essential and threshold elements of scienter, reliance, loss causation, and damages. But even setting aside those myriad issues, Plaintiffs fail to rebut the DCG Defendants' dispositive arguments establishing a lack of control and culpable participation. Plaintiffs' threadbare responses ignore or misconstrue the DCG Defendants' arguments, and instead largely reiterate allegations in the TAC, which the Motion demonstrated are insufficient.

*Third*, the Motion established the absence of scheme liability, and Plaintiffs' response on that score is similarly deficient. Once again, Plaintiffs fall back on simply reiterating the TAC's allegations, making conclusory assertions that the Note was fraudulent, ignoring the DCG

---

[1] All capitalized terms and abbreviations have the same meaning as in the Memorandum of Law in Support of the DCG Defendants' Motion to Dismiss the Amended Complaint. *See* ECF No. 177.

Defendants' arguments that Plaintiffs' efforts to repackage their inadequate control person claims as "scheme" liability fall flat, and ultimately failing to engage with well-established law that alleged misstatements cannot form the basis for a scheme liability claim.

*Finally*, Plaintiffs' fallback claims under state law fare no better. These claims fail for the same reason their Exchange Act claims fail, and Plaintiffs barely mount a defense, dedicating a mere three pages out of their 96-page Opposition to those eight claims—a tacit admission that they lack merit.

For these reasons, and those set forth below, the TAC must be dismissed in its entirety, with prejudice.

## ARGUMENT

### I.    Plaintiffs' Section 15 Claim Should Be Dismissed

The DCG Defendants set forth three independent grounds warranting dismissal of Plaintiffs' Section 15 claim. First, Plaintiffs cannot establish that the Lending Agreements (or "Genesis Yield") are cognizable securities. Mot. 9-19. Second, the TAC fails to allege actual control to support secondary liability. Mot. 19-23. And finally, Plaintiffs' full recovery in the Genesis bankruptcy proceeding precludes any recovery under Section 15. Mot. 23-24. Plaintiffs' Opposition cannot stave off dismissal.

#### A.    The Lending Agreements Are Not Securities

The DCG Defendants' Motion established that the Lending Agreements cannot constitute (i) an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), or (ii) a security note under *Reves v. Ernst & Young*, 494 U.S. 56 (1990). Mot. 9-18. Plaintiffs simply cannot overcome this dispositive showing.

##### 1.    There is No Security Under *Howey*

As set forth further below, Plaintiffs' Opposition does not defeat the DCG Defendants'

showing that the TAC fails to satisfy *Howey*'s required elements.

   ***Plaintiffs Did Not Invest In a Common Enterprise***. Plaintiffs acknowledge that the relevant inquiry here is whether their "profits were tied to—and depended on—the success of Genesis's lending business." Opp'n 32.[2] However, Plaintiffs contradict themselves in their Opposition when trying to establish this element, arguing in some places that class members received an interest rate set by the market and in others that the interest rate depended on Genesis's efforts and profitability. *Compare id.* ("class members received a *market* rate of interest") (emphasis added) *with id.* at 34 ("investors relied on GGC's managerial efforts, skill and expertise to earn returns or profits when GGC aggregated investors' digital assets"). As already demonstrated by the DCG Defendants, the interest rate depended on general supply and demand market forces in the crypto industry, not the success of Genesis's business operations. Mot. 10-15. In the Opposition, the only factual allegations Plaintiffs offer in support of their position that interest rates depended on Genesis's success are: (i) statements from current and former Genesis representatives, and (ii) Genesis's promotional materials and advertisements. With respect to each, the DCG Defendants identified fatal deficiencies in their Motion that Plaintiffs do not meaningfully refute.

   Regarding the statements from Genesis representatives, the Opposition refers to various quotes in which Genesis marketed Genesis Yield to "investors" or claimed that class members lent their digital assets to Genesis "to invest." Opp'n at 18-19; 34-35. None of those cherry-picked statements support Plaintiffs' proposition, nor change the fact that the supposed "investment"

---

[2] The Opposition also insists that the TAC pleads a common enterprise through "strict vertical commonality," but this is incorrect. Opp'n 36-37. Like horizontal commonality, strict vertical commonality requires that the fortunes of Genesis are tied to the fortunes of the lenders so that the fortunes must rise and fall together. *See Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 436 (S.D.N.Y. 2023). Thus, for all of the same reasons the TAC fails to plead horizontal commonality, it likewise fails to plead strict vertical commonality.

being made was a loan into an account that provided a market rate of return, and was not an "investment" into Genesis's business itself. As the DCG Defendants established, these statements only establish Genesis's belief in its own success and, when viewed in full context, are consistent with the notion that any returns depended on broader market conditions. Mot. 11-12. Rather than actually engage with this showing, Plaintiffs merely repeat the quotes again in the Opposition. *See, e.g.*, *Gross v. Rell*, 585 F.3d 72, 94 (2d Cir. 2009) (claims not discussed in opposition to defendant's motion to dismiss are waived).

On the promotional materials and advertisements, Plaintiffs once again fail to engage with the DCG Defendants' argument that the exact same sources foreclose Plaintiffs' position that the rates were adjusted based on Genesis's success. Mot. 13-14. Both Gemini's and Genesis's websites plainly disclosed that interest rates depended upon supply and demand, market forces, and competitors' offerings. *See* ECF No. 180-6 (Gemini Website) at 1 ("Our partner [Genesis] adjusts their interest rates **based on market-wide shifts** for specific crypto."); *id.* ("offering **competitive** rates on all assets"); ECF No. 180-7 (Gemini Website) at 12 ("Rates vary **based on the supply and demand** for each cryptocurrency in crypto lending markets); ECF No. 180-8 (Genesis Website) at 8 ("Rates are **based on prevailing market conditions** and reflect **supply and demand** mechanics") (emphases added). Plaintiffs complain that these sources (which they themselves rely upon) "contradict[]" the TAC's allegations. Opp'n 35. Precisely so. Even at the liberal pleading stage, Plaintiffs cannot advance legal conclusions that are readily contradicted by the sources they rely upon. *See, e.g.*, *Curtis v. Aetna Life Ins. Co.*, 2021 WL 1056785, at *6 (D. Conn. Mar. 18, 2021) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.").

Apart from falling back on the same insufficient quotes from the TAC, Plaintiffs advance

four generalized counterarguments—none of which overcome the DCG Defendants' showing.

*First*, Plaintiffs rely extensively on *SEC v. Edwards*, 540 U.S. 389 (2004), but misconstrue its holding. Opp'n 32. While the parties agree that a fixed rate of return does not necessarily preclude a scheme from being an investment contract, Plaintiffs ignore that such a scheme must still satisfy *Howey*'s other essential elements. *See Edwards*, 540 U.S. at 394-95 (holding "[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the [*Howey*] test" and thus declining to "read into the securities laws a limitation"). Fatal to Plaintiffs' theory is not just that the interest rate was fixed but that the rate (fixed or variable) was tied to—and depended upon—the broader market, which forecloses an investment in a common enterprise. *See SEC v. Binance Holdings, Ltd.*, 2024 WL 3225974, at *26 (D.D.C. June 28, 2024) (no security where interest rate set based on market conditions).

*Second*, Plaintiffs reprise their argument that the TAC sufficiently alleged pooling because Genesis "did not manage separate accounts." Opp'n 33. Pooling occurs, however, not just when assets are comingled, but rather when assets are comingled to be "reinvested by the promoter into the business," and "[i]n turn, such reinvestment increases the value of the instrument offered." *Friel*, 657 F. Supp. 3d at 436.[3] In other words, the comingling of assets is a necessary *but not sufficient* condition for pooling. *See, e.g.*, *Dettmering v. VBit Techs. Corp.*, 2024 WL 3617604, at *4 (D. Del. Aug. 1, 2024) (finding no common enterprise where pooling of resources had "no bearing on the distribution of profits and losses" and was only used "to strengthen the probability of successfully mining for cryptocurrency"). Plaintiffs here lack the additional allegations

---

[3] Plaintiffs' attempt to distinguish *Friel* on the grounds that an "investment scheme promising a rate of return, such as the 'Loan Fee,' can be an 'investment contract' and thus a 'security' subject to the federal securities laws," Opp'n 33 n.18, is unavailing for the additional reasons outlined below. Namely, Plaintiffs were contractually entitled to their Loan Fee regardless of Genesis's profitability, and were therefore promised returns separate and apart from Genesis's overall success. *See* ECF No. 180-1 (MBA) § III(a); ECF No. 180-2 (MLA) § III(a).

necessary to establish "whether, which, how much, and for how long" Genesis uses the assets to generate revenue and returns. Opp'n 33.

*Third*, Plaintiffs contend that *SEC v. Binance Holdings Ltd.*, 2024 WL 3225974 (D.D.C. June 28, 2024), is "factually distinguishable," but do not even attempt to explain that purported distinction. Opp'n 34. Indeed, the TAC's allegations are virtually identical to the allegations in *Binance* in all material respects. For instance, the SEC alleged that Binance marketed a digital asset lending program as a "profit-making opportunit[y]" where, like Genesis Yield, lenders could loan their crypto assets to Binance for fixed or flexible lengths of time and earn interest rates as high as 18.9%. *Compare SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. June 5, 2023), Dkt. No. 1 ("*Binance* Compl.") ¶¶ 326-27; *with* TAC ¶¶ 187, 207 (alleging interest rates as high as 8.05% for Gemini Earn and as high as 12% for institutional lenders). The SEC further alleged that "Binance exercise[d] discretion and use[d] its entrepreneurial expertise in managing [the] program[], including identifying liquidity needs, negotiating with [] issuers, choosing terms, holding and controlling the invested assets, and generating revenue, through its operation of the Binance.com Platform to pay the Simple Earn . . . investors." *Binance* Compl. ¶ 336. And on these allegations, the court held that the investors "simply agreed to loan them to the company for a specified period of time at a specified rate of interest, and the complaint lacks any allegation that they were led to believe that Binance's efforts would generate the return or make the assets more valuable at the end of the day." 2024 WL 3225974, at *26. So too here. Like in *Binance*, and as this Court observed, there are "lots of reason[s] why [] the rate could change" (July 3, 2024 Mot. Hr'g Tr. 73:3 ("Tr.")), and Plaintiffs here fail to show that their returns depended on Genesis's success, as opposed to the general supply and demand market forces in the broader crypto market. *See* 2024 WL 3225974, at *26.

*Fourth*, Plaintiffs assert that Genesis's decision to freeze redemptions "demonstrates that the fortunes of the investors were tied to the fortunes of GGC." Opp'n 35. Plaintiffs do not identify a single authority supporting the notion that Genesis's bankruptcy and subsequent inability to repay Plaintiffs' loans is sufficient to plead horizontal commonality. In Plaintiffs' view, every loan would constitute a security because every lending relationship depends upon the borrowers' solvency. This view has been roundly rejected. Mot. 14; *see also Intelligent Dig. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010) ("While payment might not . . . be made in the event of a default, that default is not something that is unique to any 'investment-like' character of the asset purchase, but is a risk attendant to any sale.").[4]

**Plaintiffs Had No Expectation of Profits from the Efforts of Others**. The DCG Defendants further demonstrated in their Motion that Plaintiffs cannot establish *Howey*'s third element—a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 329 (S.D.N.Y. 2023). The Opposition rests on the same threadbare and conclusory allegations that the DCG Defendants already demonstrated were insufficient as a matter of law. Mot. 15. Indeed, Plaintiffs again reference that Genesis "pooled crypto assets, identified counterparties, conducted due diligence, negotiated agreements, evaluated market conditions, managed risk, and set collateral levels for return" to determine the interest rates. Opp'n 37. Based on these efforts, Plaintiffs argue, Genesis advertised that lenders could receive an interest rate "among the highest [] on the market." *Id.* Notwithstanding that Gemini and Genesis's own disclosures contradict these allegations on their face (*supra* at 3-4), Plaintiffs still fail to plausibly establish how these purported efforts impacted

---

[4] Plaintiffs argue that *Harman v. Harper*, 1990 WL 121073 (9th Cir. 1990), is distinguishable on the basis that the efforts of the defendants could not and did not make any difference in the plaintiffs' returns. Opp'n 36 n.20. But Plaintiffs ignore that they likewise fail to allege that Genesis's efforts would make any difference in the rates of return. As demonstrated throughout, Plaintiffs' returns here depended on market conditions.

the rates. It may be true that Genesis exercised certain managerial efforts *and* set high interest rates, but unless Plaintiffs can tie these variables to each other, they cannot establish *Howey*'s third element. *Binance*, 2024 WL 3225974, at *26 (*Howey* requires the "necessary connection between the anticipated returns and the offeror's managerial or entrepreneurial efforts"). As this Court observed, "[p]icking a higher rate than payable elsewhere doesn't create a security," and, at most, that is all Plaintiffs allege. Tr. 68:18-20.

Moreover, just because Plaintiffs say "reasonable investors expected investment returns from the managerial efforts, skill and experience of G[enesis]," does not make it so. Opp'n 38. Plaintiffs fail to point to any allegations in the TAC to support their conclusion. Rather, as the DCG Defendants detailed, the only expectation of any reasonable investor was to receive a contractually-obligated rate of return, which was set by the broader crypto market. Mot. 15; *supra* at 4.[5]

### 2.    There Is No Security Under *Reves*

The DCG Defendants likewise demonstrated that each *Reves* factor weighs decisively against Plaintiffs' theory that the Lending Agreements are "security notes." Mot. 15-19.

***The Motivations of the Parties Were Commercial.*** As demonstrated in the Motion, the first *Reves* factor cuts against Plaintiffs because the parties' motivations were plainly commercial. Mot. 16-17. Plaintiffs do not meaningfully dispute that they shared the same motivations as every lender. Like the lenders in *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, Plaintiffs simply sought a "return on excess cash," which does not transform a note into a security. 973 F.2d 51, 53,

---

[5] Notably, Plaintiffs themselves concede as much, contending that for purposes of calculating damages, "[t]he amount of interest due to each Gemini Earn investors [sic] is easily calculable by reference to the date of the investment and length of investment and the historic and current prices of digital assets in U.S. dollar values," Opp'n 79.

55 (2d Cir. 1992).[6] To avoid the clear terms tracking the parties' obvious motivations, Plaintiffs try to point to what non-lenders "called" the program. Opp'n 18-19. For example, Plaintiffs claim that Genesis marketed Genesis Yield to "investors" and that a Genesis representative testified in the bankruptcy proceedings that class members lent their digital assets to Genesis "to invest." *Id.* at 18-19. As an initial matter, these allegations reveal nothing about the motivations prompting the parties to enter into the transaction, and Plaintiffs fail to cite a single case suggesting otherwise. Moreover, this formalistic read improperly "elevates form over substance" and, as Plaintiffs insist and the cases they cite make clear, Genesis's "labeling is not binding." Opp'n 26; *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851-52 (1975) ("In considering these claims we again must examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties."); *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 308 (2d Cir. 2023) ("Isolated references [to 'investors'] could not have plausibly created the reasonable expectation that the buyers were investing in securities").

And as the DCG Defendants already explained, Plaintiffs had purely commercial motivations: to receive a contractually-obligated Loan Fee tied exclusively to the market. Mot. 16-17. Indeed, Plaintiffs did not receive any portion of Genesis's profits nor any stake in the future success of Genesis's business. *Id.* And where, like here, the "motivation of the seller is not to invest in the future success of the buyer" and instead, "the amount to be paid is contractually established, and must be paid, whether or not the buyer's business is positively affected by the purchase," the

---

[6] Plaintiffs' attempt to distinguish *Banco Espanol* is unavailing. According to Plaintiffs, the lenders in *Banco Espanol* were "limited to sophisticated entities 'with the capacity to acquire information about the debtor.'" Opp'n 20. Plaintiffs ignore, however, that they (and all the putative class members) represented in the Lending Agreements that they were sophisticated parties (ECF No. 180-1 (MBA) § VI(d); ECF No. 180-2 (MLA) § V(d)), and that the TAC further alleges that loans were solicited through "email, MS Teams or Telegram chats" (TAC ¶ 199). These allegations are contrary to Plaintiffs' claims that they were neither sophisticated nor could "acquire information."

seller has not "invested" in the buyer's business. *Intelligent Dig. Sys., LLC v. Visual Mgmt. Sys., Inc.*, 683 F. Supp. 2d 278, 284 (E.D.N.Y. 2010).[7]

***There Was No Plan of Distribution.*** Plaintiffs also cannot overcome the DCG Defendants' showing on the second *Reves* factor, which considers the "plan of distribution" to determine whether "there is common trading for speculation or investment." *Reves*, 494 U.S. at 66. The DCG Defendants demonstrated that the lack of a secondary market, the limitation of its primary lending program to sophisticated parties, and other participation restrictions cut against Plaintiffs. Mot. 17-18. The TAC even recognizes such limitations, alleging that Genesis imposed high lending minimums for the institutional lenders and was only available through the Gemini platform for the Gemini lenders. TAC ¶¶ 135, 137. The Opposition also confirms that Genesis made targeted loan solicitations to qualified lenders through "Telegram, email and MS Teams," Opp'n 22, further confirming that the plan of distribution was limited to specific, sophisticated lenders. *See Banco Espanol*, 973 F.2d at 55 (finding parties were sophisticated where issuer solicited loans from institutional and corporate entities and made individualized presentations).

In response, Plaintiffs contend that, despite all of the above obstacles, there were "effectively no limits" and any representations that they were sophisticated parties cannot be resolved at the pleading stage because the term is "subjective" and "undefined." Opp'n 23. But Plaintiffs do not identify a single case to support that position, and the law is to the contrary. As Plaintiffs' own cited cases confirm, courts routinely assess contractual terms and representations on a motion to dismiss. *See, e.g.*, *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y.

---

[7] Plaintiffs' contention that the DCG Defendants "say nothing" about Genesis's own motivations is false. Opp'n 19. Throughout the Motion, the DCG Defendants exposed the absence of any well-pled allegations necessary to establish how or why Genesis utilized the loans. Mot. 9-19. At most, the TAC asserts threadbare and conclusory allegations that Genesis sought loans "to use in its business." TAC ¶ 181. Even if true, such allegations do not suffice: A company motivated by a need to "finance its current operations" has commercial motivations. *Banco Espanol*, 973 F.2d at 55. As such, Genesis's motivations, like Plaintiffs', were obviously commercial.

2011) (examining "Discretionary Investment Management Agreements" or "DIMAs" at the motion to dismiss stage, including what "the DIMAs explicitly stated" and "the provisions of the DIMA"); *Priv. Corp. Advisors, Inc. v. Heard*, 1995 WL 66647, at *8 (S.D.N.Y. Feb. 17, 1995) (observing at motion to dismiss stage that "[b]y its terms, payment on the Note was subordinated").[8]

    *No Reasonable Public Expectation That Loans Were Securities.* Plaintiffs agree that the third *Reves* factor is an objective test, examining whether a reasonable purchaser would have perceived the notes to be an investment. Opp'n 25. As demonstrated in the Motion and above, the TAC's allegations preclude any such perception. Indeed, the only reasonable expectation of the public was to earn a market-based interest rate dependent upon the broader crypto market. Mot. 18; *supra* Part I.A.1. Plaintiffs' response merely restates their deficient allegations, insisting that Genesis's and Gemini's websites and social media "promoted" the program as an "investment." Opp'n 24. Plaintiffs cannot simply ignore the economic realities. *See Tab P'ship v. Grantland Fin. Corp.*, 866 F. Supp. 807, 809–10 (S.D.N.Y. 1994) ("Plaintiffs' use of the word 'investor' is not a sufficient showing that the defendants intended to trade this agreement publicly.").[9]

    Additionally, the DCG Defendants explained that the plain terms of the Lending Agreements buttress this perception. Specifically, the Lending Agreements prohibited lenders from transferring or assigning their rights and obligated loan repayment and interest, and the MLAs

---

[8] Plaintiffs cite two readily distinguishable, out-of-circuit cases to argue that "broad and ongoing advertising" campaigns weighs in favor of finding a security note. Opp'n 23. In *SEC v. Wallenbrock*, the issuer "put no limitations on who could purchase the notes, offering them to any member of the general public who would make the investment." 313 F.3d 532, 539 (9th Cir. 2002). And in *SEC v. Thompson*, the issuer "intended to make, and did make, its Instruments available to any member of the public who could afford them." 732 F.3d 1151, 1167 (10th Cir. 2013). Unlike in those cases, Plaintiffs here were subject to lending minimums, platform restrictions, and had to represent that they were sophisticated.

[9] Plaintiffs' cases to the contrary are inapposite. *See Bongiorno v. Baquet*, 2021 WL 4311169, at *16 (S.D.N.Y. Sept. 20, 2021) (finding plaintiff's own investment advisor pitched the investment opportunity); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1131 (9th Cir. 1991) (noting, in addition to characterizing the opportunity as a lending program, investors were told that the promoter's profits were contingent on the investors' profits).

expressly provided—and Earn users agreed—that the loans were "intended to be commercial loans . . . not securities." Mot. 18; ECF No. 180-2 (MLA) § XXV. Plaintiffs fail to squarely address these terms and instead fall back on vague notions of "economic realities." Opp'n 26. But to truly evaluate the economic realities here, the Court must consider broader market forces, the public sources outlining the program to interested lenders, and the Lending Agreements' terms. When viewed in totality, it is clear that Plaintiffs "were given ample notice that the instruments were participations in loans and not investments in a business enterprise." *Banco Espanol*, 973 F.2d at 55.

*Alternative Regulatory Schemes Existed.* The TAC likewise fails to plead the final *Reves* factor: that Plaintiffs were not adequately protected by risk-reducing factors. Mot. 18-19. The Opposition confirms that Plaintiffs now believe the regulatory oversight agencies did not sufficiently reduce risk, but hindsight does not govern this inquiry. Nor does it require any specific type of risk-reducing factor. Indeed, there is no regulatory scheme capable of invariably protecting lenders from a borrower's insolvency, which is exactly what Plaintiffs seek. The parties agree that Gemini was regulated by NYDFS, and both Gemini and Genesis were regulated by FinCEN. Opp'n 29. As such, there *was* a "regulatory scheme present that significantly reduced the risk of the instrument," *Singer v. Livoti*, 741 F. Supp. 1040, 1050 (S.D.N.Y. 1990), and Plaintiffs do not identify any authority to the contrary. The fact that a borrower ultimately defaulted in spite of such protections does not somehow suffice to show that none existed in the first place.

### B.    Plaintiffs Fail to Plead Actual Control Over The Alleged Primary Violation

The Motion also established that, setting aside the TAC's failure to plead a cognizable security, the Securities Act claim still fails because Plaintiffs do not allege actual control over the transaction in question—the issuance of unregistered securities. Mot. 19. And as the DCG Defendants predicted, Plaintiffs seek to bypass this pleading requirement and pin secondary

liability on the DCG Defendants based solely on vague, generalized allegations. Plaintiffs concede as much, contending they sufficiently alleged "actual control" based on allegations "that Defendants *through their power and influence* caused G[enesis] to offer and sell unregistered securities." Opp'n 48 (emphasis added). As detailed in the Motion and below, this is wholly inadequate.

Plaintiffs claim that "[n]umerous courts have held that allegations of a majority ownership interest and board representation . . . are sufficient to adequately plead a Section 15 control person claim." Opp'n 40 (citing cases). Contrary to Plaintiffs' suggestion, nearly all of the cases Plaintiffs cite for this notion had factual allegations beyond mere ownership interest and board representation. In fact, in each of the cases, the courts also held that there were sufficient facts to establish actual control over the transaction in question.[10] Plaintiffs also appear to dispute black letter law, arguing a mere parent-subsidiary relationship can establish control at the pleading stage. Opp'n 41. But again, Plaintiffs' cited authorities do not support this sweeping claim. *See In re WorldCom, Inc., Sec. Litig.*, 2004 WL 1097786, at *3 (S.D.N.Y. May 18, 2004) ("[I]t is a well-settled principle of corporate law that 'a parent corporation and its subsidiary are regarded as legally distinct entities.'"); *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460-61 (S.D.N.Y. 2018) ("OEC's status as a corporate parent, however, says nothing regarding the control that OEC actually exerts over CNO's operations and, in particular, its preparation of its financial disclosures").[11] The law in this Circuit is clear: Plaintiffs must allege facts establishing

---

[10] *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 580-81 (S.D.N.Y. 2015) (finding actual control where controlling entities could "prevent the primary violator from issuing" the relevant securities); *In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) ("Actual control over the wrongdoer and the transactions in question is necessary for control person liability."); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, 2006 WL 6900987, at *1-2 (S.D.N.Y. Nov. 9, 2006) (stating the "nature and extent of control is fact intensive" and taking note of allegations that the Prospectus stated the controlling entity would "maintain[] substantial control" over the primary violator).

[11] *See also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 310–11 (S.D.N.Y. 2005) ("actual control" could be inferred where there were allegations that the controlling entity had authority to resolve disputes between primary violators).

actual control of the transaction in question to survive dismissal, and, as the DCG Defendants

demonstrated, Plaintiffs fall well short of this pleading standard.

The Opposition repeats a series of generic allegations that are either customary to any

parent-subsidiary relationship or wholly unrelated to Genesis. For example, Plaintiffs point to

Silbert's and Murphy's roles at DCG and/or GGH as well as their general involvement in strategy

decisions or financial success. Opp'n 43-46. The DCG Defendants cited ample precedent in their

Motion showing that such allegations are insufficient to allege control (Mot. 22), and yet Plaintiffs

offer no meaningful rejoinder to any of it. Indeed, as courts in this Circuit have held, "[i]t is one

thing to 'consult' with, or obtain 'recommendations' or approval from a parent corporation. It is

quite another for the parent's approval to be *required* before the subsidiary can act." *Maung Ng

We v. Merrill Lynch & Co.*, 2000 WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000). Here, Plaintiffs

allege only the former—that Genesis conferred with the DCG Defendants on certain issues—but

such conferrals on their own say nothing about whether Genesis's decisions hinged on the DCG

Defendants approval. *See id.* ("The fact that Teoh and Elias sought guidance from or 'conferred

with' one or more of the [parent] defendants does not by any measure indicate that they or [the

subsidiary] MLIB were subject to those companies' direction and control in a legally relevant

sense.").

Plaintiffs' continued reliance on the operating agreements fares no better. Opp'n 41-42.

Contrary to Plaintiffs' claims, the Motion demonstrated that none of the DCG Defendants were

"final decision maker[s]" with respect to Genesis's decision to initiate bankruptcy. Mot. 21.[12]

---

[12] Plaintiffs' claim that the Court cannot evaluate this allegation because it raises issues of fact is incorrect. Opp'n 41. Pursuant to the language of the operating agreements, there are no "questions of fact" on whether the Special Committee had final authority to force Genesis into bankruptcy—the documents from the judicially-noticeable bankruptcy docket clearly show that to be the case. Mot. 21; *e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011).

Unable to refute the plain terms of the operating agreements, Plaintiffs invoke inference upon inference—newly claiming that certain Defendants created the Special Committee and thus "control[led]" Genesis. Opp'n 41. This is both procedurally improper and irrelevant. *E.g.*, *Colliton v. Bunt*, 709 F. App'x 82, 83 (2d Cir. 2018) ("Courts cannot consider new factual assertions . . . submitted in opposition to a motion to dismiss."). The formation of the Special Committee long post-dates Genesis's decision to offer allegedly unregistered securities and thus says nothing about the transaction in question.

### C.    Plaintiffs Fail to Plead Cognizable Damages Under the Securities Act

As the DCG Defendants established, the distributions Plaintiffs already received in the bankruptcy proceeding exceeded 100% of the value of the digital assets they originally lent to Genesis at the time of such loans, precluding any further recovery under Section 12 of the Securities Act. *See* Mot. 23-24. In their Opposition, Plaintiffs agree that Earn users have recovered 100% of their crypto assets in-kind, Opp'n 49 (representing a return of 237% of the dollar value of those assets, *see* Mot. 34), thus conceding that Earn users (*e.g.*, Plaintiffs McGreevy, Gowda, Buttehamm, Macri, Wiener, Wilson, and Jacobson) have no claim for damages here. But Plaintiffs insist that Section 12 entitles Plaintiffs who lent directly to Genesis (Morone, Translunar, and Ameli) to the return of "all digital assets invested with GGC," *i.e.*, the *number* of digital asset tokens that the direct lender Plaintiffs lent to Genesis—despite the fact that each of them have already received in-kind distributions exceeding 100% of the original dollar value of their crypto assets at the time of the loans. *See* Opp'n 49-50. In other words, Plaintiffs contend that damages should be measured in the *number* of crypto tokens lent, not the *value* of those tokens at the time of the loan. Plaintiffs are wrong for three reasons.

*First*, as the DCG Defendants established in the Motion, Plaintiffs are not entitled to the number of tokens lent as a matter of law. Mot. 23-24. Section 12 damages entitle plaintiffs to the

dollarized value of their tokens, not to their tokens in-kind. *See* 15 U.S.C. § 77l(a)(2) (plaintiffs may "recover the *consideration paid* for such security with interest thereon, *less* the amount of any income received thereon, upon the tender of such security, *or* for damages if [they] no longer own[] the security") (emphasis added). In response, Plaintiffs quibble about the statutory meaning of "consideration paid," suggesting that they should be able to recover the number tokens originally lent. *See* Opp'n 50. But that ignores on-point authority that in the Securities Act context, "the proper computation of Plaintiffs' damages is the *value* of the BTC or ETH consideration paid . . . reduced by the amount realized[.]" *Rensel v. Centra Tech, Inc.*, 2019 WL 6828270, at *4 (S.D. Fla. Dec. 13, 2019) (emphasis added). And it also ignores clear precedent measuring damages in terms of the dollar value of a security less the amount realized on such securities—which, here, would be the tokens and any interest earned and appreciation in value thereon. *See, e.g.*, *Maher v. Glob. Factors LLC*, 2024 WL 3356985, at *31 (S.D.N.Y. July 8, 2024) (measuring damages "by the difference between the amount Plaintiffs invested and the amount realized when Plaintiffs sold the securities back to Defendants, reduced by the cash income received as distributions while Plaintiffs owned the units."). Plaintiffs offer no authority to the contrary, but instead try to distinguish two cases cited in the Motion, arguing that the plaintiffs in those cases paid cash for their securities, so they necessarily received cash as damages in return. Opp'n 50 (*see* Mot. 24 n.34, citing *Aimis Art Corp. v. N. Tr. Sec., Inc.*, 641 F. Supp. 2d 314 (S.D.N.Y. 2009) and *In re UBS Auction Rate Sec. Litig.*, 2009 WL 860812 (S.D.N.Y. Mar. 30, 2009)). But Plaintiffs misconstrue Defendants' argument—Defendants cited *Aimis* and *UBS* for the entirely separate and undisputed proposition that Section 12(a) does not permit plaintiffs to recover both rescission damages and benefit-of-the-bargain damages. Mot. 24 n.34.[13]

---

[13] Plaintiffs have no response to the argument that they are not entitled to monthly interest payments or pre-judgment interest under Section 12(a), and have thus abandoned that theory of recovery.

*Second*, Plaintiffs overlook the fact that the relief they seek—to force Defendants to hand over actual digital asset tokens—is equitable relief that is neither available to Plaintiffs (given that they have recovered the equivalent of rescission damages) nor possible as a practical matter. As Plaintiffs acknowledge, [t]he Genesis bankruptcy estate has now distributed substantially all its assets," TAC ¶ 19, meaning that further in-kind awards could require the DCG Defendants to source, purchase, and/or distribute digital assets that it may not even possess on the open market. To compel that result would be to impose specific performance, an equitable remedy that is unavailable to Plaintiffs in view of their rescissionary damages in the bankruptcy. Under a statutory scheme offering damages "either at law or in equity," 15 U.S.C. § 77l(a)(2), one where plaintiffs "cannot choose to recover for [their] injuries yet retain [their] windfall" (*Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987), Plaintiffs' recoveries plainly preclude any further payout. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) ("a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got.").

*Third*, Plaintiffs fail to acknowledge that any damages as to the direct lenders are speculative. Regardless of whether measured in the number of tokens or the value of those tokens, the direct lender Plaintiffs cannot yet determine the amount of their damages, because Genesis's creditors may well continue to receive in-kind distributions of crypto assets in the bankruptcy.  Indeed, as Plaintiffs admit in their Opposition, distributions to Genesis's direct lenders are ongoing—on October 31, Genesis announced an additional distribution of $230 million worth of digital assets to direct lenders in the bankruptcy proceeding, returning an average of 5% of additional claims across the various types of tokens held by direct lenders. As a result, BTC creditors have now received 56% of their digital assets back in-kind and ETH creditors have received more than 71%.

*See* Opp'n 4 n.6; Oct. 31, 2024 Notice of Occurrence of Subsequent Distribution, *In re Genesis Glob. Holdco, LLC*, No. 23-10063-SHL, Dkt. No. 2056. As a result of this distribution, Plaintiffs Morone, Translunar, and Ameli (each of whom had already recovered well over 100% of the dollar value of their digital assets as of the date of the original loans, *see* Mot. 34) have recovered even more upside from the appreciation in their cryptocurrency. And, as Plaintiffs conspicuously omit from their Opposition, Genesis intends to make future distributions in the bankruptcy: Indeed, Genesis has claimed as an asset more than $1 billion worth in claims against DCG, which Genesis has publicly indicated that it plans to use to buy more crypto needed for creditor recoveries. With the Plan providing for direct lenders to receive up to 100% of their digital assets back on an in-kind basis (and any appreciation in the market value of those assets), *see* Debtors' Amended Joint Chapter 11 Plan at 114-19, *In re Genesis Glob. Holdco, LLC*, No. 23-10063-SHL (Bankr. S.D.N.Y. July 21, 2024), Dkt. No. 1874, the ultimate sum of direct lender recoveries is far from certain. Such speculative damages are not cognizable under the securities laws. *See Aimis*, 641 F. Supp. 2d at 319-21 (S.D.N.Y. 2009); *see also UBS*, 2009 WL 860812, at *3.

Plaintiffs have no cognizable damages under the Securities Act, thus there is nothing for them to recover here.

## II.     Plaintiffs' Section 20(a) Claim Should Be Dismissed

### A.     Plaintiffs Fail to Plead a Primary Violation of Section 10(b) of the Exchange Act

The Motion set forth numerous independent grounds for dismissal of Plaintiffs' claims under the Exchange Act. Specifically, the DCG Defendants demonstrated that the TAC fails to plead scienter, reliance, loss causation, and damages. Mot. 25-35. Plaintiffs' Opposition fails to meaningfully respond to, let alone overcome, any of these arguments.

#### 1.     Plaintiffs Fail to Plead Scienter

The DCG Defendants detailed how the TAC falls far short of pleading facts sufficient to show either (a) motive and opportunity to commit fraud, or (b) conscious misbehavior or recklessness. Mot. 25-28. Plaintiffs' response does nothing to cure that deficiency.

**_No Motive and Opportunity_**. Plaintiffs contend that the operations of Grayscale can somehow impute a personal benefit on the DCG Defendants. Plaintiffs rely on a single case for this notion—*Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008)—which is of no aid to them. Opp'n 61. There, examining an undercapitalized investment fund the defendants personally managed, the court found "motive and opportunity to commit fraud" because the defendants wanted both to profit more on their personal investments and to reap additional management fees. *See Heller*, 590 F. Supp. 2d at 620-21. There are no such allegations here: Plaintiffs do not dispute that the management fees only flowed to Grayscale, a DCG subsidiary. And as demonstrated in the Motion, this alleged relationship is too attenuated to support any compelling inference of fraudulent intent. Mot. 26-27.

Plaintiffs further argue that the DCG Defendants benefited from "enter[ing] into the DCG Promissory Note" and "continu[ing] to represent that GGC was solvent" in two ways: (1) the Note kept GGC out of bankruptcy, preventing GGC from calling outstanding loans that DCG purportedly did not have the funds to repay and would have forced DCG into bankruptcy; and (2) certain DCG Defendants could then make purported "capital withdrawals" from Genesis. Opp'n 61-62. With respect to each, Plaintiffs' efforts fail. On their claim that DCG would have otherwise been forced into bankruptcy but for the Note, Plaintiffs offer no particularized facts supporting this conclusory theory nor grapple with the cases cited in the Motion rejecting similar allegations as far too generalized. Mot. 27. Plaintiffs instead cite two out-of-circuit cases that are readily distinguishable. In each case, the plaintiffs alleged facts showing a motivation well beyond the

desire to ensure the survival of the company. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 39-40 (1st Cir. 2002) (noting "particularized allegations of large-scale fraudulent practices over time"); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at \*8 (N.D. Ill. July 28, 2009) (identifying eight indicia of scienter). As to the purported capital withdrawals, Plaintiffs entirely ignore the DCG Defendants' detailed showing that Plaintiffs advance pure conjecture in drawing the conclusion that any Defendant "redeem[ed] their investments" from GGC: Plaintiffs offer nothing in defense of their baseless assertions that management fees from Grayscale flowed to any individual Defendant, nor do they contest that the so-called "capital withdrawals" by HQ Cash Management Fund were anything other than legitimate debt repayments from Genesis to DCG. *See* Opp'n 61-62; Mot. 26. Plaintiffs thus fail to allege any motive or opportunity to commit fraud.

> ***No Conscious Misbehavior or Recklessness***. Plaintiffs' sole retort is that the DCG Defendants knew, or at least recklessly disregarded, that certain representations were false at the time they were made "based on contemporaneous documents and meetings." Opp'n 62-63. To support this argument, Plaintiffs point to—without any analysis—over 120 paragraphs in the TAC concerning the 3AC default and issuance of the Note as purported "circumstantial evidence" of recklessness. *Id.* Even a charitable, "holistic" read of these allegations, however, shows not one well-pled fact showing that the DCG Defendants disbelieved Genesis's financial reporting or that such reporting lacked a reasonable basis—the TAC shows nothing more than a parent company discussing certain options to help a subsidiary in financial distress and ultimate issuance of the Note, which as the DCG Defendants demonstrated, is insufficient to support scienter. Mot. 27.

### 2.    Plaintiffs Fail to Plead Reliance

#### a.    Plaintiffs Cannot Plead Reliance on the Lending Agreements

As set forth in the Motion, Plaintiffs offer two theories of reliance premised on the Lending Agreements: (1) direct reliance for any lender executing the Lending Agreements after June 13,

2022; and (2) a presumption of reliance under *Affiliated Ute* for any lender executing the Lending Agreements before June 13, 2022. Mot. 29-30. Both theories fail as a matter of law, and Plaintiffs' Opposition does not demonstrate otherwise.

**No Direct Reliance**. The DCG Defendants exposed the absence of any well-pled allegations to establish direct reliance. Mot. 30. Plaintiffs do not seriously attempt to rebut this showing, but rather contend that some (but not all) Plaintiffs "reviewed and relied upon the representations and warranties by [Genesis] in determining whether to loan digital assets to [Genesis], the loan amount[,] and whether to recall the loans." Opp'n 64. Such rote repetition of the TAC's allegations cannot overcome the deficiencies identified in the Motion, because those allegations "lack supporting factual matter indicating how plaintiffs relied on the alleged misrepresentations," *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 386 (S.D.N.Y. 2011), and fail to "particulariz[e] who, on behalf of [a business plaintiff] in fact read and relied on the statement," *Devaney v. Chester*, 709 F. Supp. 1255, 1264 (S.D.N.Y. 1989).

Unable to salvage these insufficient allegations, Plaintiffs pivot to an unrecognized theory of reliance, urging that direct reliance may be proven by "circumstantial evidence that plaintiffs would not have purchased a project but for a defendant's uniform misrepresentations and omissions about that product." Opp'n 65. But Plaintiffs rely solely on inapposite cases concerning the class certification "predominance" requirement to support the proposition that "proof of reliance by circumstantial evidence may be sufficient" at the pleading stage. *See id*. None of these authorities supplant Plaintiffs' pleading-stage obligations, which require them to plead particularized allegations that they read the alleged misrepresentations, when they read them, and how they relied on them. *See Citigroup*, 822 F. Supp. 2d at 386. In any event, any such "circumstantial evidence" is conspicuously absent from the TAC.

**No *Affiliated Ute* Presumption**. Recognizing that they cannot plead direct reliance, Plaintiffs simply respond that they do not have to: They contend that the *Affiliated Ute* presumption of reliance applies, sidestepping the DCG Defendants' showing that black letter law forecloses any such presumption here, whether framed as a pure omissions theory, or one premised on both alleged omissions and misstatements. *See* Opp'n 66-67; Mot. 29. Plaintiffs spill much ink defending the continued viability of the *Affiliated Ute* presumption in mixed misstatement and omissions cases following the Supreme Court's decision in *Macquarie Infrastructure Corp. v. Moab Partners*, 601 U.S. 257 (2024). *See* Opp'n 66-68.   That is beside the point—the DCG Defendants argued (and Plaintiffs do not dispute) that, to the extent Plaintiffs advance a pure omissions theory, that is no longer actionable under *Macquarie*. Mot. 29. In response, Plaintiffs contend that they advance a mixed misstatement and omissions theory, to which *Affiliated Ute* can still apply. *See* Opp'n 66-68. But even if *Affiliated Ute* remains good law, Plaintiffs have no response to the DCG Defendants' showing that binding Second Circuit precedent precludes application of *Affiliated Ute* where, as here, the only alleged "omission is the truth that the statement misrepresents." *Waggoner v Barclays Plc*, 875 F.3d 79, 96 (2d Cir. 2017). *See* Mot. 29-30. Here, Plaintiffs concede that all of the alleged omissions fall squarely within that category: In Plaintiffs' own words, "the alleged omissions are tied to affirmative prior statements." Opp'n 68. Plaintiffs' Opposition confirms that *Affiliated Ute* does not apply.

        **b.    Plaintiffs Fail to Plead Reliance on Extra-Contractual Statements**

As to the agency theory of reliance, Plaintiffs concede that Gemini, as Plaintiffs' agent, could not make investment decisions for Plaintiffs. Opp'n 69-70. Nevertheless, Plaintiffs argue that Gemini's reliance on Genesis' misrepresentations was within the scope of Gemini's own relationship with Plaintiffs, because Gemini ultimately endorsed Genesis's participation in the

Earn Program. Opp'n 70. But Gemini was not Plaintiffs' agent for that purpose either (nor do Plaintiffs allege otherwise). *See* Mot 31; ECF No. 180-2 (MLA), Exhibit A, § 1(b). Gemini did not—and could not—invest on behalf on Plaintiffs, and accordingly, Plaintiffs cannot claim reliance on statements Gemini heard when making their own investment decisions. *See G.K. Alan Assoc. v. Lazzari, Inc.*, 44 A.D.3d 95, 101 (N.Y. 2d Dep't 2007) (an "agent is an agent only by virtue of the agent's consent to act on behalf of a particular party . . . who has also consented that the agent shall act on his [] behalf.").

Plaintiffs also unconvincingly invoke "derivative reliance," where representations to an intermediary are passed on to a principal, who then relies on them—a theory that Plaintiffs acknowledge has never been recognized in the Section 10(b) context. *See* Opp'n 71. Even if it were a valid theory, Plaintiffs have not made out the elements of derivative reliance. There are no allegations that Gemini relied on the challenged statements,[14] that Gemini had any expectation that its representations would be passed on to individual lenders, or that Plaintiffs themselves relied on Gemini's representations to them based on Genesis's alleged misrepresentations. *See* TAC ¶¶ 461-75; *see also Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*, 527 F.2d 445, 450-51 (2d Cir. 1975) (no derivative reliance in absence of evidence that plaintiff relied on underlying alleged misrepresentations).

Finally, Plaintiffs' fallback argument—that they need not establish reliance at all, because they have alleged a "comprehensive scheme to defraud," based on two half-century old cases, *see* Opp'n 72—can be swiftly rejected. Those cases predated decades of narrowing by subsequent

---

[14] Plaintiffs bizarrely analogize Gemini's statements to a credit rating that might be "misrepresented by GGC's deception." Opp'n 72. Setting aside the self-evident fact that Gemini acted nothing like a credit rating agency, the source of these allegations—which Plaintiffs copied from the NYAG complaint detailing Gemini's evaluation of Genesis's collateralization levels—actually allege that *Gemini* lied to its own customers (e.g., Plaintiffs) about Genesis's collateral. *See New York v. Gemini Tr. Co.*, Index No. 452784/2023 (N.Y. Sup. Ct. Oct. 19, 2023) Compl. ¶¶ 66, 94; Opp'n 71-72.

Second Circuit decisions recognizing only two instances where Plaintiffs can invoke a reliance presumption in a 10(b) case: fraud-on-the-market and *Affiliated Ute*. *See, e.g.*, *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 398 (S.D.N.Y. 2010) (citing *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)). In any event, while Plaintiffs have tried (and failed) to allege a fraudulent scheme, *see infra* Part III, it is apparent that all of their theories of liability turn on the issuance of allegedly false statements by Genesis. In the absence of an efficient market, Plaintiffs must plead direct reliance, which they have failed to do.

### 3.    Plaintiffs Fail to Plead Loss Causation

The Motion demonstrated that the fundamental problem with Plaintiffs' materialization of the risk theory is that they have it backwards: Plaintiffs allege a risk (Genesis's insolvency) that materialized *before* any of the alleged misrepresentations or omissions about that already-materialized risk were made. Mot. 32. As set forth in the Motion, loss causation premised on materialization of an undisclosed risk requires misrepresentations or omissions concerning a current risk that *later* materializes, resulting in plaintiffs' investment losses. *Id*.; *see, e.g.*, *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173-75 (2d Cir. 2005).

In their opposition, Plaintiffs attempt to recast the "risk at issue" not as the risk of Genesis's insolvency that materialized in June 2022, but rather as "the *risk of loss*" caused by the concealment of Genesis's financial condition, which materialized in November upon Genesis's default. *See* Opp'n 77 (alleging that "the undisclosed risk—GGC's insolvency—materialized in June 2022," but that the "risk" was "conceal[ed] . . . . until the end of the Class Period."). This argument fails for three reasons.

*First*, if the relevant "risk" was the risk of losses (and not Genesis's insolvency) as Plaintiffs now contend, then it was fully disclosed: All Lending Agreements and Authorization Agreements contemplated the risk that Genesis might default on its loans. *See* ECF No. 180-2

(MLA) § VII; ECF No. 180-1 (MBA) § VII; ECF No. 180-11 (Auth. Agmt.) at 1; Mot. 32 n.43. Plaintiffs do not dispute, and thus concede, that this risk was fully disclosed in the Lending Agreements, foreclosing their loss causation argument altogether.

*Second*, Plaintiffs' new formulation is not a materialization of the risk theory at all—it is a corrective disclosure theory premised on the concealment of Genesis's supposed insolvency following the 3AC collapse in June 2022. But Plaintiffs do not advance a corrective disclosure theory at all, nor can they: Plaintiffs identify no disclosure that "corrects" the supposed misstatements and omissions concerning Genesis's financial condition in June 2022, much less one that "negatively affected the value of the security," (Plaintiffs allege only that their assets were frozen, not that they lost value, *see* TAC ¶ 53) as they must to plead loss causation based on a corrective disclosure. *See Lentell*, 396 F.3d at 173.

*Third*, Plaintiffs fail to meaningfully address the argument that the connection between the alleged fraud—the concealment of Genesis's insolvency beginning in June 2022—and investors' losses in November 2022 is too attenuated to support loss causation. Notably, Plaintiffs do not contest the notion that the FTX collapse in early November 2022 and resulting market fallout was an intervening cause of their losses. In a footnote, Plaintiffs attempt to distinguish *Collier v. Aksys Ltd.*, 2005 WL 1949868, at *13 (D. Conn. Aug. 15, 2005), a case which held that a revelation (and subsequent losses) occurring seven months after the alleged fraud was a "virtual lifetime" that could not support a causal link. Opp'n 77 n.36. Plaintiffs contend that here, the "truth" about the fraud began to be revealed on November 16, 2022, when Genesis revealed "undisclosed material negative risks of GGC's true financial condition," and also stopped honoring redemptions that day. Opp'n 77 n.36. But that is irrelevant, because loss causation is not concerned with the temporal link between a corrective disclosure and investors' losses—it is concerned with the "link between

the [defendant's] alleged misconduct" and those losses. *Collier*, 2005 WL 1949868, at *1 (quoting

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

### 4.     Plaintiffs Fail to Plead Cognizable Damages Under the Exchange Act

In their Opposition, Plaintiffs concede that the dollar amounts of their distributions in the

bankruptcy proceedings exceed their initial investments, and appear to abandon any rescission-

based theory of damages altogether. *See* Opp'n 78-80. Instead, Plaintiffs appear to now solely seek

benefit-of-the-bargain damages, which they argue are still available because they "can be

calculated with 'some reasonable degree of certainty'" here. Opp'n 78. Specifically, Plaintiffs

contend that they are entitled to benefit-of-the-bargain damages in the form of the return of the

remainder of the direct lenders' assets in-kind, as well as interest owed to Gemini Earn lenders

from the end of the Class Period through the date of distributions to Gemini Earn lenders in July

2022. Plaintiffs are wrong for several reasons.

*First*, Plaintiffs cannot recover benefit-of-the-bargain damages, because they have already

recovered more than the maximum damages permitted under the Exchange Act. As set forth in the

Motion, Plaintiffs' recoveries under the Exchange Act are capped at the value of the assets they

loaned to Genesis pursuant to the Lending Agreements on the dates they extended such loans. *See*

Mot. 33; 15 U.S.C. § 78bb ("No person . . . shall recover, through satisfaction of judgment in one

or more actions, a total amount in excess of his actual damages to that person on account of the act

complained of."). As illustrated in Part I.C, each Plaintiff has already recovered more than the

dollar value of the assets they loaned to Genesis through the Gemini settlement and bankruptcy,

and it is axiomatic that "a plaintiff may not recover twice for the same injury." *In re Smith Barney

Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013).

*Second*, Plaintiffs ignore the DCG Defendants' showing that they cannot recover additional

damages where they have already *recovered rescission in a separate action*. *See In re UBS Auction*

26

*Rate Secs. Litig.*, 2009 WL 860812, at *5. Plaintiffs' acceptances of the return of crypto assets in the Genesis bankruptcy "operated to rescind those purchases," and "a plaintiff cannot both rescind a transaction and ask for the benefit of the bargain rescinded.'" *Id.* (quoting *Kaufmann v. Yoskowitz*, 1989 WL 79364, at *8 (S.D.N.Y. July 13, 1989). That is particularly so for the Earn plaintiffs, who received 100% in-kind recoveries (a recovery equating to 237% of the dollar value of their assets at the time of the redemption freeze), but nevertheless seek additional contractual interest payments from the end of the Class Period through July 2024 pursuant to non-party contracts that were terminated by Genesis over two years ago pursuant to their terms.[15] *See Aimis,* 641 F. Supp. 2d at 319-21 (plaintiff who had "received the par value of its [initial] investment" was precluded from "further recovery from the transaction" in the form of interest or dividends on his original investment).

*Finally*, as discussed in Part I.C, the direct lender Plaintiffs are not entitled to damages equivalent to the number of tokens they originally lent to Genesis, which in any case is a form of equitable relief that is categorically unavailable to them.

### B.    Plaintiffs Fail to Plead the DCG Defendants' Control Over, or Culpable Participation in, the Alleged Primary Violation

The DCG Defendants also established in their Motion the absence of any sufficient allegations establishing their actual control over, or culpable participation in, the transactions in question—Genesis's alleged misstatements or omissions regarding its financial condition. Mot.

---

[15] Furthermore, Plaintiffs' argument that "[t]he amount of interest due to each Gemini Earn investors [sic] is easily calculable by reference to the date of the investment and length of investment and the historic and current prices of digital assets in U.S. dollar values," Opp'n 79, directly contradicts their argument that the interest rates were dependent on Genesis' performance, not the appreciation rate of the digital assets—a necessary element of establishing that the Lending Agreements are securities (and even subject to the securities laws in the first instance). *Compare* Opp'n at 22 ("Investors understood that, for them to continue to receive such high interest rates on a monthly basis, GGC must continue to successfully use their crypto assets in its specialized investment program, applying GGC's skill and experience in the crypto industry.").

35-36. As already discussed above, generic allegations of corporate structure do not suffice to show actual control. *Supra* Part I.B. Indeed, Plaintiffs' Section 20(a) claim fails for the same reasons as its Section 15 claim.

In the Opposition, Plaintiffs advance one additional argument specific to their Section 20(a) claim. Specifically, Plaintiffs contend they only need allegations that the DCG Defendants were "directing that the subsidiary [Genesis] hide the nature of [the alleged fraudulent] transaction." Opp'n 85-86. Plaintiffs point to allegations in which (i) Murphy "caused" Genesis to disseminate misrepresentations, and (ii) DCG and Silbert executed the Promissory Note to conceal Genesis's insolvency. Opp'n 86. Neither allegation comes close to satisfying this Court's inquiry. In addition to being wholly conclusory, these allegations suggest, at most, that the DCG Defendants sought to assist a subsidiary in financial distress. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460–61 (S.D.N.Y. 2018) (holding that "status as a corporate parent" is insufficient to allege control over a subsidiary, particularly its "financial disclosures"). Accordingly, Plaintiffs' conclusory allegations of control fail and their Section 20(a) claim must be dismissed.[16]

## III.    Plaintiffs Fail to Plead "Scheme Liability"

Defendants' Motion demonstrated that Plaintiffs' "scheme" liability claim improperly duplicated its control-person allegations and failed on its own terms. *See* Mot. 36–37. Plaintiffs' response is unavailing.

*First*, Plaintiffs seemingly agree that misstatements cannot be the "sole basis" for scheme liability. Opp'n 80-81. Yet Plaintiffs concede that their scheme liability claim is premised on "Defendants caus[ing] GGC to directly transmit false representations." Opp'n 81. To try and argue around dismissal, Plaintiffs also claim that the Note was the "linchpin of the scheme" and thus

---

[16] As demonstrated in Part II.A.1, Plaintiffs likewise fail to allege culpable participation.

"something extra that makes a violation a scheme." Opp'n 80. Plaintiffs' cited cases do not support such a sweeping theory of liability. Indeed, in those cases, the courts held that a defendant who "disseminate[s] false or misleading statements" made by another can be liable for scheme liability. *Lorenzo v. SEC*, 587 U.S. 71, 78 (2019); *see also SEC v. Rio Tinto PLC*, 41 F.4th 47, 53 (2d Cir. 2022). Unlike in those cases, Plaintiffs' theory here is not that the DCG Defendants disseminated misrepresentations, but rather that the DCG Defendants "caused" Genesis to make the alleged misrepresentations. That theory of liability has been roundly rejected by Second Circuit precedent. *See Rio Tinto*, 41 F.4th at 53–54.

*Second*, Plaintiffs cannot establish that the Note or any other intercompany loans are "paradigmatic examples of schemes to defraud." Opp'n 83. Ordinary inter-affiliate transactions are not "inherently deceptive" and thus cannot establish scheme liability. *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). Plaintiffs' disagreement with whether the terms were economically reasonable does not change this conclusion. *See In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 251–52 (S.D.N.Y. 2018) (allegations that company overstated value of asset sale to affiliate were insufficient to establish scheme liability). As the DCG Defendants demonstrated, there is nothing deceptive about a parent company supporting a subsidiary, whether through an intracompany loan or a promissory note. Plaintiffs' own case supports this: In *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472 (S.D.N.Y. 2005), the court held that intercompany transactions that "were not shams" could not give rise to scheme liability, because "[a]ny deceptiveness resulted from the manner in which [the loan recipient] or its auditors described the

transactions on [its] balance sheets and elsewhere." *Id.* at 505. That is what occurred here, and nothing in the TAC suggests otherwise.[17]

*Lastly*, the alleged scheme originated in June 2022, placing it long after all but one Plaintiff had deposited assets and began their lending relationships. Therefore, the scheme could not have been undertaken "in connection with" Plaintiffs' purchase or sale of securities. Courts routinely reject scheme liability claims in circumstances similar to the plaintiffs' alleged scheme. *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 402-04 (S.D.N.Y. 2013) (no scheme liability where purported scheme post-dated decision to transact in securities); *Pross v. Katz*, 784 F.2d 455, 458-459 (2d Cir. 1986) (similar). Plaintiffs' attempt to demonstrate a direct "scheme liability" against the DCG defendants is insufficient and can be rejected.

## IV.    Counts IV Through X Should Be Dismissed Because Plaintiffs Fail to Plead State-Law Claims in the Alternative

### A.    Plaintiffs Fail to Allege Violations of Any State Consumer Protection Laws

Plaintiffs fail to defend their fallback state consumer protection claims. Plaintiffs do not dispute the pleading requirements common to all seven consumer protection claims: (1) a deceptive business practice, (2) causation, and (3) damages or injury. Mot. 38. The DCG Defendants set forth several grounds for dismissal, and Plaintiffs' failure to rebut these arguments proves fatal to their claims.

*First*, the most basic defect to Plaintiffs' claims is the lack of allegations sufficient to show that any of the DCG Defendants engaged in deceptive conduct. Mot. 38. Plaintiffs respond that every Defendant had a duty to disclose Genesis's insolvency and, by failing to do so, engaged in

---

[17] Plaintiffs also cannot rely on *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004). Unlike the allegations at issue here, in *Salomon*, the plaintiff alleged that the defendant in question was the "orchestrator" of the scheme and "directly ordered a subordinate to issue false and misleading statements on behalf of the firm." *Id.* at 474.

deceptive acts. Opp'n 89. Plaintiffs' theory of liability is premised entirely on the Restatement (Second) of Torts. Opp'n 89. But Plaintiffs do not cite any applicable case law in support of their theory.[18] The Motion explained that Plaintiffs must either allege that DCG was independently responsible for the conduct through its own actions or pierce the corporate veil be alleging that DCG used Genesis as a sham to perpetrate a fraud. Mot. 38. Plaintiffs cannot end-run around their pleading obligations by invoking non-binding, irrelevant authority. And for all the reasons described in Parts I and II, Plaintiffs fall far short of these obligations.

Plaintiffs' contention that the TAC is "replete with detailed allegations establishing Defendants' control," Opp'n 90, is equally flawed. The DCG Defendants already established that the TAC's allegations concerning control are neither replete nor detailed, foreclosing this made-up theory all together. *Supra* Parts I.B and II.B. As a last ditch effort, Plaintiffs argue that their allegations concerning scheme liability are enough to also establish deceptive conduct. Opp'n 90. Yet Plaintiffs' scheme claim largely repackaged their control claim, cutting directly against Plaintiffs' suggestion that the DCG Defendants "participate[d] directly" in the alleged conduct. Opp'n 91; *supra* Part III.

*Second*, Plaintiffs do not dispute the black letter law requiring that deceptive acts be deceptive at the time of the transaction. Mot. 39. Plaintiffs' entire response instead focuses on the

---

[18] To the contrary, Plaintiffs' cited cases are inapposite. *See Nota Constr. Corp. v. Keyes Assocs.*, 694 N.E.2d 401 (Mass. App. Ct. 1998) (allowing claims against a defendant architectural firm under a Massachusetts statute, where firm allegedly misrepresented specifications of a project even though the subcontractor harmed by the misrepresentations did not contract with the firm); *Gutter v. Wunker*, 631 So.2d 1117 (Fla. Dist. Ct. App. 1994) (declining to dismiss fraud claims against lawyers who prepared a prospectus for a restaurant and failed to disclose certain information that harmed investors); *Wells v. John Hancock Mut. Life Ins. Co.*, 85 Cal.App.3d 66 (Cal. Ct. App. 1978) (holding that an insurer had a duty to disclose to the assignee of a life insurance policy that the policy had lapsed, even though the insurer did not issue her the policy). Even if § 551 was a proper means to establish liability under the state consumer protection statutes, it does not apply unless "[o]ne *party to a business transaction* is under a duty to exercise reasonable care." Restatement (Second) of Torts § 551 (emphasis added). Unlike the defendants in the cases cited by Plaintiffs, DCG was not remotely involved in any transactions involving Plaintiffs, and therefore did not owe them "a duty . . . to exercise reasonable care to disclose the matter in question." *Id.*

alleged failure of the DCG Defendants to correct those statements later in time. Opp'n 91. As the Motion established, this theory of liability is simply not cognizable under the state consumer protection statutes, and Plaintiffs wholly ignore this obstacle. Mot. 39. Unlike the Exchange Act, which imposes affirmative obligations on issuers of securities whose values are tied to the performance of the issuer, the consumer protection statutes merely regulate the marketing and sale of products, and thus "[t]he injury occurs at the point of sale." *Carriuolo v. Gen. Motors Co*., 823 F.3d 977, 987 (11th Cir. 2016).[19]

*Finally*, the consumer protection claims fail because Plaintiffs have already recovered over 100% of the value of the assets they lent to Genesis, and thus cannot allege a cognizable injury. Mot. 39-40. For the same reasons set forth above, Plaintiffs have no recovery here, and therefore their consumer protection claims must be dismissed. *Supra* Parts I.C and II.A.4.

## V.    Count XI Should Be Dismissed Because Plaintiffs Fail to Adequately Allege Common-Law Fraud Claims

Plaintiffs assert a claim for common law fraud based on the "same conduct" constituting the Exchange Act claims. TAC ¶ 63; see also id. ¶¶ 684-90. Their attempts to reframe their common law fraud claim fail. The elements of a common law fraud claim are "substantially identical to those governing § 10(b)." *See Morse v. Weingarten,* 777 F. Supp. 312, 319 (S.D.N.Y. 1991)*.* As demonstrated above, Plaintiffs' Section 10(b) claim fails and as "the identical analysis" applies to common law fraud as to 10(b) actions, their common law fraud claim fails. *See supra* Part II; *Morse*, 777 F. Supp. at 319*.*

## CONCLUSION

For the foregoing reasons, the TAC should be dismissed with prejudice.

---

[19] Plaintiffs also do not meaningfully dispute that the consumer claims relate to private contracts—not the consumer goods and services that these statutes seek to regulate.

Dated: December 13, 2024

DEFENDANTS DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, AND MARK MURPHY

By: */s/ Jonathan D. Polkes*
Jonathan D. Polkes (admitted *pro hac vice*)
Caroline Hickey Zalka (admitted *pro hac vice*)
Tania C. Matsuoka (admitted *pro hac vice*)
Amber Venturelli (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
jonathan.polkes@weil.com
caroline.zalka@weil.com
tania.matsuoka@weil.com
amber.venturelli@weil.com

Joshua M. Wesneski (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7248
joshua.wesneski@weil.com

*/s/ Thomas D. Goldberg*
Thomas D. Goldberg (ct04386)
Johanna S. Lerner (ct31495)
DAY PITNEY LLP
One Stamford Plaza
263 Tresser Boulevard
Stamford, CT 06901
Telephone: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
jlerner@daypitney.com

*Their Attorneys*