**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| WILLIAM McGREEVY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiffs, v. DIGITAL CURRENCY GROUP, INC., ET AL., Defendants. | No. 3:23-cv-00082 (SRU) |

## RULING AND ORDER ON MOTIONS TO DISMISS

### I.    Introduction

This case involves a claim that executives of a cryptocurrency brokerage firm and its parent company defrauded investors in connection with the digital assets the investors lent to that firm. The investors brought a putative class action suit against the parent company and those executives, alleging violations of both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). *See generally* Third Amended Complaint, Doc. No. 171. On August 12, 2024, the plaintiffs filed their Third Amended Complaint ("TAC"). Now before the Court are the defendants' motions to dismiss the TAC. The motions have been fully briefed, and I held oral argument on the motions on July 1, 2025. *See* Min. Entry, Doc. No. 206.

For the reasons set forth below, I **grant in part and deny in part** the defendants' motions to dismiss.

### II.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

1

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

III. Background

a. Factual Allegations

The following factual statements are set forth in the TAC and are treated as true for purposes of these motions.

Defendant Digital Currency Group ("Digital") is the parent entity of a conglomerate that includes Genesis Global Capital ("Genesis"), Grayscale Investments, LLC ("Grayscale"), and Genesis Global Holdco ("Holdco").  Digital owns Holdco 100% and Holdco owns Genesis 100%.  TAC, Doc. No. 171 ¶ 6.  Holdco was the sole managing member of Genesis.  *Id*.

Through its ownership of Holdco, Digital was the 100% owner of Genesis and Grayscale. *Id*.  Defendant Barry Silbert is the founder of Digital, Genesis, and other Digital subsidiary companies.  *Id*. ¶ 7.  Silbert was the controlling shareholder of Digital during the class period (owning 40%), chief executive officer of Digital, and chairman of Digital's board of directors. *Id*.

Genesis ran a "full-service digital currency prime brokerage" business for Digital, attracting capital from digital asset owners by offering high interest rates.  *Id*. ¶ 3.  Genesis's role was to "rais[e] capital for the greater conglomerate of" Digital affiliated companies.  *Id*. ¶ 4. Genesis advertised that it provided "a full suite of services [that] global investors require to manage their digital asset portfolios."  *Id*. ¶ 3. Genesis also partnered with the Gemini Earn platform.  Gemini Earn was a "pooled investment program" created by non-party Gemini Trust Company, LLC ("Gemini").  *Id*. ¶ 58.

The plaintiffs tendered either digital currency or cash to Genesis.  *Id*. ¶ 133. All investors signed the Genesis Yield Investment Agreement.  *Id*. ¶ 141.  That agreement made the following representations:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws (the "Solvency Warranty").
>
> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the

representations and warranties hereunder or thereunder (the "Adverse Proceedings Warranty").

*Id*. ¶ 142.

Gemini Earn investors tendered their assets pursuant to the terms presented to them via the Gemini Earn platform. *Id*. ¶ 4. Each Gemini Earn investor appointed Gemini as their agent for all purposes: "VI. Appointment of Custodian as Agent . . . Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it: . . . (ii) has duly appointed Custodian as its agent to act on Lender's behalf for all purposes under this Agreement; . . ." *Id*. ¶ 127. Gemini's only limitation as an agent was that Gemini was not authorized to determine the "amount, timing or selection of any Loan." *Id*. ¶ 129. There was no minimum investment amount to participate in the Gemini Earn program. *Id*. ¶ 206. The Gemini Earn investments were open term investments and could be recalled at any time by giving notice to Genesis. *Id*. ¶ 138. Genesis revised the interest rate of Gemini Earn investments monthly. *Id*. ¶ 192.

Direct investors executed term sheets and a Master Borrow Agreement ("MBA"). *Id*. ¶ 139. The investments were either for a fixed or open period of time, the terms and conditions of which were "not individually negotiated" by the investors.[1] *Id*. Open-term investments could be redeemed at any time. *Id*. Interest accrued daily and was paid out monthly. *Id*. ¶ 140. Genesis revised the direct investor interest rates weekly. *Id*. ¶ 192. Investment minimums were later dropped in February 2021, the beginning of the class period. *Id*. ¶ 136.

The plaintiffs argue that Genesis advertised its investments like securities—i.e., in a way that caused consumers to expect to gain profits solely from the efforts of Genesis. Genesis

---

[1] The Digital Defendants dispute whether the direct investors' interest was individually negotiated, but I assume the plaintiffs' allegation to be true. Doc. No. 177 at 11.

advertised the Genesis Yield program on "its own websites, third party websites, podcasts, crypto industry webinars, and social media." *Id*. ¶ 200. The plaintiffs allege that Genesis specifically promoted investments—not mere loans—by discussing "high returns or yield on investors' digital assets." *Id*. ¶ 209 (cleaned up). For instance, Genesis issued two tweets on February 2, 2021 (the beginning of the class period) that "Gemini and Genesis are working together to offer interest rates that are more than 100 times the national average . . . up to 7.4 . . . APY on their holdings." *Id*. ¶ 201-202 (cleaned up). On Telegram, a social media application, Genesis solicited investment by promoting its yield rates: "We're still best bid for BTC at 7-month FT at 6% and USD/stables for 12-month FT at 10.75% . . . [f]or BTC, we are best bid for 8-month FT at 6%. For USD/stables, we've raised our rates on the front end of the curve and are best bid for 12mo FT at 12%." *Id*. ¶ 207. On its website, Gemini stated, "investors could 'put their crypto to work. With Gemini Earn, you can receive up to 8.05% APY on your cryptocurrency.'" *Id*. ¶ 205. Gemini also stated, "we designed a program that allows our customers the ability to generate a real return on their crypto holdings"; "[w]e are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." *Id*. ¶ 205. Genesis advertised itself as "the world's largest digital asset lender" and an institution where "holders of digital currencies can earn yield on their assets by lending directly to Genesis." *Id*. ¶ 188 (cleaned up).

For direct investors, Genesis typically adjusted its yield rates on investments on a weekly basis. *Id*. ¶ 199. Genesis listed each cryptocurrency and the yield each cryptocurrency was worth on "rate cards." *Id*. Genesis disseminated the rate cards directly to investors through email, MS Teams, or Telegram. *Id*. For Gemini Earn investors, Genesis posted a similar Earn Page with yield rates that differed per cryptocurrency. *Id*. ¶ 195. Gemini's FAQ page on its

website explained that Gemini Earn rates are "subject to the same market forces of supply and demand that affect every lending market. Our partner adjusts their interest rates based on market-wide shifts for specific crypto . . . . [G]enerally we strive to change rates less frequently than once a month." Doc. No. 177 at 23.

Genesis adjusted interest rates based on two factors: "(1) the opportunities to invest digital assets and earn yield Genesis Global Capital saw in the market; and (2) the rate of return Genesis Global Capital determined it needed to offer prospective investors to attract investment capital to take advantage of the investment opportunities." TAC, Doc. No. 171 ¶ 194. To achieve Genesis's promised high yields, Genesis "commingled and/or pooled" investors' principal and "pledged, repledged, hypothecated, rehypothecated, sold, lent, staked, arranged for staking, and otherwise transferred" the assets. *Id*. ¶ 145. Genesis had "complete discretion" and control over determining how much to hold the assets on its balance sheet, lend, or otherwise use the investors' assets. *Id*. ¶ 186. "In practice," Genesis "did not segregate the digital assets it received from different groups of investors." *Id*. ¶ 225.

The returns earned by each Genesis Yield investor were also dependent on the ways in which Genesis deployed those pooled assets, including Genesis's evaluation of the institutional borrowers, negotiation of favorable terms, and management of market and counterparty risk. *Id*. ¶ 231. Genesis was able to negotiate "more favorable loan terms and interest rates with borrowers than Genesis Yield investors could negotiate on their own" because of Genesis's reputation as "a large institutional lender in the cryptocurrency industry." *Id*. ¶ 191. Genesis did not register the offer or sale of the Genesis Yield program with the SEC. *Id*. ¶ 26.

Digital and Silbert allegedly used investors' assets to engage in risky, unsecured transactions. For example, Digital and Silbert caused Genesis to take on an unreasonable amount

of counterparty concentration risk by lending almost 30% of Genesis's total loan book to a single party: digital asset hedge fund Three Arrows Capital ("3AC"). *Id*. ¶ 38. On June 13, 2022, 3AC defaulted on its loans from Genesis. *Id*. ¶ 39. On June 27, 2022, 3AC declared bankruptcy. *Id*. As a result, Genesis was left with an uncollectable $1.1 billion debt. *Id*.

After 3AC's default and bankruptcy, Genesis was insolvent. *Id*. ¶ 299. Recognizing its own insolvency would have terminated all of the investment agreements and would have entitled investors to the return of their digital assets. *Id*. ¶ 40. Instead, Digital and Silbert directed and caused Genesis to engage in a transaction designed to conceal Genesis's insolvency. *Id*. ¶ 43. At Digital and Silbert's direction, Genesis "sold" the 3AC debt to Digital in exchange for a 10-year promissory note (the "Digital Promissory Note"). *Id*. Moro induced Genesis and Matthew Ballensweig to circulate balance sheets and other documents containing alleged misrepresentations about Genesis's solvency to the plaintiffs and Gemini. *Id*. ¶ 587. Moro also prevented the plaintiffs from requesting redemptions of their assets. *Id*.

On November 16, 2022, Genesis experienced a large number of withdrawal requests coinciding with a loss of confidence in digital asset markets, which Genesis could not honor due to inadequate funds. *Id*. ¶ 52. The same day, Genesis stopped honoring redemption requests and stopped paying interest on the plaintiffs' investments. *Id*. ¶ 53.

On January 19, 2023, Genesis and Holdco filed for Chapter 11 bankruptcy. *Id*. ¶ 460. Pursuant to the bankruptcy action, Genesis returned the full amount of the Gemini Earn investors' initial digital asset investments, but only returned partial amounts of the direct investors' initial digital asset investments. *Id.* ¶¶ 16-18. Both the SEC and the New York Attorney General settled claims against Genesis in early 2024. *Id.* ¶¶ 58, 60.

From when Genesis froze the digital coins to the date of the bankruptcy distributions, the value of cryptocurrency rose dramatically. *See* Doc. No. 177 at 12. Because of that increase in monetary value, the defendants maintain that the director investor plaintiffs' recoveries exceeded the value of their original investments. *Id*. Although the increase in cryptocurrency's value helped the plaintiffs recover the value of their initial investment, the direct investor plaintiffs did not recover all the digital coins that they originally invested. *E.g.,* TAC, Doc. No. 171 ¶ 18 (describing three plaintiffs' alleged damages). The direct investor plaintiffs therefore assert that the loss incurred is the discrepancy between the original number of digital coins invested and the number of coins recovered. Neither the direct investor plaintiffs nor the Gemini Earn plaintiffs received interest on the assets they had invested. *Id.* ¶¶ 16, 18.

      b.  Procedural History

On January 23, 2023, plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex Sopinka ("plaintiffs"), individually and on behalf of all others similarly situated, filed this action asserting violations of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l(a)(1), 77o; the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5; and 15 U.S.C. § 78t(a), on behalf of the following proposed classes: (1) "All persons or entities who participated in the Lending Programs from inception to November 16, 2022"; and (2) "All persons or entities who participated in the Lending Programs and had digital loans outstanding at Genesis as of November 16, 2022," with an alleged class period of February 2, 2021 through November 16, 2022 (the "Class Period"). Compl., Doc. No. 1 ¶¶ 1, 37-39, 203. The plaintiffs amended the complaint twice and added, among other things, state consumer protection claims and a common law fraud claim.

IV.    Overview of the Claims

The plaintiffs plead various claims for relief. First, the plaintiffs allege violations of Section 5 and 12(a)(1) of the Securities and control person liability for those violations through Section 15.  TAC, Doc. No. 171 ¶¶ 515-572. Second, the plaintiffs allege both primary scheme liability and control person liability for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5. *Id*. ¶¶ 573-612. Third, the plaintiffs allege violations of state consumer protection and unfair competition laws. *Id*. ¶¶ 613-683. Fourth, the plaintiffs allege common law fraud. *Id*. ¶¶ 684-690.

To rule on whether the plaintiffs have adequately pled violations of the Securities Act and the Exchange Act, I must first resolve two threshold questions. The first inquiry is whether the plaintiffs sufficiently alleged that the Genesis Yield program is a security. The second inquiry is whether the plaintiffs met their burden to allege that the defendants were control persons and also culpable participants in the claimed fraud. After resolving those inquiries, I proceed to the plaintiffs' federal securities claims.

V.    The TAC adequately pleads that the Genesis Yield program is a security.

To proceed with their case, the plaintiffs must first adequately allege that the Genesis Yield program is a security.[2] If the plaintiffs cannot meet that burden, their Securities Act and Exchange Act claims necessarily fail.

The parties disagree sharply regarding how to define the Genesis Yield program. Doc. No. 177 at 19-20. The plaintiffs argue that the program is a security under federal securities laws. TAC, Doc. No. 171 at ¶ 156-174. The defendants instead liken the program to a "run-of-the-mill loan" with monthly interest returns. Doc. No. 177 at 20.

---

[2] I define the "Genesis Yield Program" as the investment agreements, the corresponding opportunity to invest digital assets, and the investors' tender of those digital assets.

Federal courts commonly employ two different tests to determine whether a particular financial scheme can be classified as a security. First, the *Howey* test asks whether the scheme involves "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak v. S.E.C. Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Second, the *Reves* test evaluates whether a note is a security by examining "1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; 2) the plan of distribution of the instrument; 3) the reasonable expectations of the investing public; and 4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Kirschner v. JP Morgan Chase Bank, N.A.*, 79 F.4th 290, 304 (2d Cir. 2023) (cleaned up).

Before applying *Howey* and *Reves* to the Genesis Yield program, I note the difficulties of using older legal frameworks to evaluate a modern industry that has evolved unpredictably and rapidly. As individuals and companies have made cryptocurrency the "subject" of schemes like the Genesis Yield program, *see S.E.C. v. Binance Holdings Ltd.,* 738 F. Supp. 3d 20, 44 (D.D.C. 2024), cryptocurrency has evolved into a "billion dollar industry" regulated almost entirely "through litigation." *Id*. That securities litigation is then governed by tests that predate the origin of cryptocurrency. Naturally, the Genesis Yield program will not "fit neatly" within either test. *Id*. In such cases of novel financial schemes or instruments, the Supreme Court instructs that courts should construe federal securities laws flexibly, as "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S.E.C. v. W. J. Howey Co.,* 328 U.S. 293, 299 (1946). With that charge in mind, I turn now to the application of the *Howey* test to the Genesis Yield program.

A.  The plaintiffs have adequately pled that the Genesis Yield program constitutes an investment contract under *Howey*.

"The Supreme Court long ago defined the term 'investment contract' to include any 'contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.'" *Revak,* 18 F.3d at 87 (quoting *Howey,* 328 U.S. at 299). If the scheme is deemed an investment contract under *Howey*, it is also a security under Section 2 of the Securities Act.[3]

"[C]ourts have applied *Howey*, which itself dealt with citrus orchards, to evaluate and classify a wide range of financial schemes and investment contracts, offers, and instruments that at first blush would not appear to be securities."  *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 433 (S.D.N.Y. 2023). When applying the *Howey* test, "form should be disregarded for substance and the emphasis should be on economic reality." *S.E.C. v. Genesis Glob. Capital, LLC,* 2024 U.S. Dist. LEXIS 44372, at *13 (S.D.N.Y. Mar. 13, 2024) (quoting *Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967)). "The three elements of the *Howey* test must all be present for a land sale contract to constitute a security: (i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak,* 18 F.3d at 87.

1.  Investment of Money

The first element of the *Howey* test is satisfied. The TAC alleges that the Genesis Yield program involved an investment of money. TAC, Doc. No. 171 ¶ 223. In arguing that the program is not a security under *Howey*, the defendants do not dispute that the program involved an investment of money. Doc. No. 177 at 20.

---

[3] "Section 2 of the Securities Act defines a 'security' to include an 'investment contract.'" *S.E.C. v. Genesis Glob. Capital, LLC,* 2024 U.S. Dist. LEXIS 44372, at *12 (S.D.N.Y. Mar. 13, 2024) (quoting 15 U.S.C. § 77b(a)(1)).

The Supreme Court added an additional requirement to the first element of the *Howey* test in *Marine Bank v. Weaver*: for an agreement to involve an investment of money, the investor must subject herself to a risk of financial loss. *See Marine Bank v. Weaver*, 455 U.S. at 558-559 (1982); *see also S.E.C. v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 300 (S.D.N.Y. 2024). Both the Supreme Court and the Second Circuit have explained that the risk-of-loss determination often hinges on whether the plaintiffs already enjoy the protection of separate federal regulations. *See Marine Bank*, 455 U.S. at 559 (stating that "[i]t is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws."); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985) (explaining that in *Marine Bank*, "The Court held that a conventional certificate of deposit was not a security under the federal securities acts because federal banking regulations and the FDIC eliminate all risk of loss to the investor."). In other words, a plaintiff did not expose herself to a risk of loss if alternate federal regulations already insulated her from any alleged risk of loss.

The defendants claim the plaintiffs cannot meet *Marine Bank*'s risk-of-loss requirement. They argue that the plaintiffs "never bore a true risk of loss" and state, without support, that the risk of insolvency or default does not count as a risk of loss under *Marine Bank* or *Howey*. Doc. No. 177 at 24.

To the contrary, the TAC adequately alleges exposure to a risk of loss. First, Genesis informed investors that they were not covered by either FDIC protection or Securities Industry Protection Corporation insurance. TAC, Doc. No. 171 ¶ 215. Therefore, the TAC alleges that no alternate federal regulations insulated the plaintiffs from a risk of loss. Second, the plaintiffs

relinquished control of their crypto assets to the defendants in exchange for the intermediate rates of return and the final return of the investors' assets at the conclusion of the investment. *Id*. ¶ 133. *See Coinbase*, 726 F.3d at 302 (ruling that when investors are "unable to transact in their crypto-assets, including to quickly react to market price fluctuations," their control over their assets is constrained and that constraint helps demonstrate exposure to a risk of loss). Indeed, as further evidence that plaintiffs' lack of control over their crypto assets qualifies as a risk of loss, Genesis never returned the full number of coins that direct investors initially invested in the Genesis Yield program.  TAC, Doc. No. 171 ¶¶ 18-19.

That failure to return the plaintiffs' assets leads to the final basis for evaluating exposure to a risk of loss. The plaintiffs exposed themselves to the largest risk of all: risk of insolvency or default. *See Coinbase*, 726 F.3d at 302 ("[t]o that point, the economic reality is such here that certain broader risks — including failures by Coinbase or of the underlying protocol — are also inherent in the investments in the staking service and are thus sufficient to demonstrate a risk of loss."). And again, that risk materialized: Genesis, together with Genesis Global Holdco and Genesis Asia Pacific, declared bankruptcy. Although Gemini Earn investors received full returns of their crypto assets, direct investors did not. TAC, Doc. No. 171 ¶¶ 18-19. Therefore, by virtue of pleading actual loss, the plaintiffs have adequately pled exposure to a risk of loss.

2.  Common Enterprise

Regarding the second element of the *Howey* test, a common enterprise exists when there is horizontal commonality or vertical commonality. *Revak*, 18 F.3d at 87.  Plaintiffs can rely on either theory of commonality to prove the existence of a common enterprise.

a.   Horizontal and Vertical Commonality

I begin with horizontal commonality. "Horizontal commonality exists where two considerations are established: (1) a sharing or pooling of the funds of investors and (2) that the fortunes of each investor in a pool of investors are tied to one another and to the success of the overall venture." *Friel*, 657 F. Supp. 3d at 435 (S.D.N.Y. 2023) (internal quotation marks and citations omitted).

To determine whether there was horizontal commonality, I turn first to pooling. The parties do not dispute that Genesis Global Capital ("Genesis") pooled investors' assets, that is, the lent cryptocurrency, and loaned those assets to other institutions and entities. TAC, Doc. No. 171 ¶ 225; Doc. No. 177 at 25.

But the defendants take pains to emphasize that "literal pooling" of investors' assets is not enough to establish horizontal commonality. Doc. No. 177 at 25. They are correct. Having adequately alleged the fact of "literally" pooled assets, the question now becomes whether "the digital asset's value is tied, and depends upon, the continued success of the [enterprise]." *Friel*, 657 F.3d at 438. "[I]n determining whether horizontal commonality exists, the aim must be on the totality of the scheme and the economic realities that encompass it." *Id*. at 439.

To dispute horizontal commonality, the defendants rely in substantial part on *S.E.C. v. Binance Holdings Ltd*., 2024 WL 3225974 (D.D.C. June 28, 2024), where the Court examined whether several different programs constituted securities. District Judge Amy Berman Jackson held that the plaintiffs did not adequately allege that the Simple Earn program was a security, but that the plaintiffs did adequately allege that the BNB Vault program was a security. *Id*. Judge Jackson concluded that the defendants marketed Simple Earn as a straightforward opportunity to lend crypto assets to the company in exchange for a specified rate of interest. *Id*. at 62. The SEC

did not allege that Binance itself generated the interest returns from the Simple Earn program, nor that Binance deployed its managerial efforts to increase those returns. *Id*. at 62.

On the other hand, Judge Jackson ruled that the complaint adequately alleged that BNB Vault was an investment contract. *Id*. at 63. The defendants advertised BNB Vault as an opportunity to "earn investment returns" which Judge Jackson noted "appear[ed] to be a way for coin holders to invest, as opposed to just use, their crypto assets." *Id*. She noted that the complaint alleged "Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors….Investors share pro rata the benefits." *Id*.

The *Binance* decision actually provides some support for the McGreevy plaintiffs' position here. The Genesis Yield program is more similar to the BNB Vault program than the Simple Earn program. Like the allegations concerning BNB Vault, the plaintiffs contend that Genesis "pooled Genesis Yield investors' digital assets on [Genesis's] balance sheet and invested those assets in order to generate returns for both [Genesis] and investors." TAC, Doc. No. 171 ¶ 225. Mapping further onto Judge Jackson's analysis of the BNB Vault program, Gemini CEO Tyler Winklevoss stated that the partnership between Gemini Earn and Genesis was a "program that allows our customers the ability to generate a real return on their crypto holdings." *Id*. ¶ 205. The defendants' reliance on *Binance* is therefore unpersuasive.

Regardless, the TAC sufficiently pleads that the fortunes of the investors depended on the "continued success" of the enterprise. *Friel*, 657 F.3d at 438. The entire Genesis "enterprise" consisted of soliciting digital assets for investment, "identifying institutional borrowers to serve as counterparties, negotiating individual agreements with those counterparties, and managing market and counterparty risk." TAC, Doc. No. 171 ¶ 189. Genesis periodically revised the

investors' rates of return on their digital assets. *Id.* ¶ 192. Genesis adjusted the rates of return it offered to investors according to "the opportunities to invest digital assets and earn yield that [Genesis] saw in the market." *Id.* ¶ 194. From that allegation, it is reasonable to infer that if Genesis identified higher-yield opportunities to invest the plaintiffs' digital assets, the plaintiffs would then receive higher rates of return. The TAC therefore adequately pleads that the fortunes of the investors depended on Genesis's continued success.[4]

In the alternative, the plaintiffs can rely on vertical commonality to establish a common enterprise. Although other circuits recognize a broader version of vertical commonality, the Second Circuit has endorsed only strict vertical commonality. *Revak,* F.3d at 88. Strict vertical commonality exists when the fortunes of the investors are tied to the fortunes of the promoter. *Id.*

To oppose a determination of vertical commonality, the defendants rely on their argument against horizontal commonality. Doc. No. 177 at 21. The plaintiffs address vertical commonality in their response to the defendants' motions to dismiss. I rejected above the defendants' arguments against horizontal commonality. The TAC alleges that Genesis revised the rates of return based on its success in relending the plaintiffs' assets. TAC, Doc. No. 171 ¶¶ 189-199; Response, Doc. No. 190 at 53-54. Therefore, the TAC adequately pleads that the fortunes of the investors are tied to those of the promoter. I hold the TAC sufficiently alleges vertical commonality.

3. Expectation of Profits

Under *Howey*, the plaintiffs must also adequately allege that the profits of the investors came solely from the efforts of others. 328 U.S. at 301. The Second Circuit has since clarified

---

[4] District courts have held more tenuous allegations regarding a common enterprise to be sufficient to survive a motion to dismiss. *See S.E.C. v. Genesis Glob. Capital, LLC,* 2024 U.S. Dist. LEXIS 44372, at *20-21 (S.D.N.Y. Mar. 13, 2024); *United States v. Pierre,* 2021 U.S. Dist. LEXIS 173388, at *11 (S.D.N.Y. Sept. 13, 2021); *S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020).

that "'solely' should not be construed as a literal limitation; rather, we consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (internal quotation marks and citations omitted).

When determining whether there is a connection between expected profits and the managerial efforts of others, courts have placed a premium on expert management *after* the execution of the transaction. *See Coinbase*, 726 F.3d at 303 (explaining that in *Howey*, because the promoter both sold the orchard lots and contracted to manage the lots after purchase, the investors' profits were more dependent on the promoter's activities). But the promoter's activities must be significant and managerial in nature. Minor, routine, or clerical functions do not constitute managerial efforts. *See S.E.C. v. Life Partners, Inc.*, 87 F.3d 536, 545-46 (D.C. Cir. 1996) ("LPI characterizes these functions as clerical and routine in nature, not managerial or entrepreneurial, and therefore unimportant to the source of investor expectations; in sum, anyone including the investor himself could supply these services.").

The defendants argue that the plaintiffs have alleged no facts connecting the investors' expectations of profits to Genesis's managerial efforts. Doc. No. 177 at 25. I disagree. The basic mechanics of the Genesis Yield program tie the investors' expectation of profits to Genesis's efforts. The plaintiffs maintain that "[Genesis] controlled the pooled crypto assets that it received from investors and determined how much and what type of crypto asset to hold, lend out to others, or otherwise use." Doc. No. 190 at 54. Those functions are managerial, require specialized knowledge, and could not be completed by the average person. *See Life Partners*, 87 F.3d at 545-46.

The TAC goes further in offering allegations connecting investors' expectations of profit to Genesis's managerial efforts. The plaintiffs maintain that Genesis evaluated institutional borrowers, negotiated favorable terms with those borrowers, and managed market and counterparty risk. Genesis's own statements confirm those efforts.[5] Again, those functions all require specialized knowledge. Indeed, the defendants themselves touted their expertise when explaining how Genesis could offer "the best yield in the market." TAC, Doc. No. 171 ¶ 173. The TAC adequately alleges that plaintiffs had an expectation of profits from the managerial efforts of others.

Therefore, under *Howey*, the TAC adequately alleges that the Genesis Yield program constituted an investment contract.

B. The complaint adequately alleges that the Genesis Yield program is a security under *Reves*.

In the alternative, the plaintiffs can rely on the test outlined in *Reves* to allege that the Genesis Yield program is a security.[6] The Supreme Court instructed that the test "begins with a presumption that any note with a term of more than nine months is a security." *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990) (internal quotations omitted).

The *Reves* test evaluates whether a particular note is a security by examining "1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction; 2) the plan of distribution of the instrument; 3) the reasonable expectations of the investing public; and

---

[5] The TAC contains several examples of Genesis touting its own managerial efforts and practices. First, on June 13, 2020, the @GenesisTrading Twitter account tweeted that "[w]e have strong risk management practices and frameworks." TAC, Doc. No. 171 ¶ 312. Second, defendant Derar Islim stated that "we are experts in this space. We understand the crypto funding market very veryf well. And this gives us a cutting edge in providing the right liquidity and also the best yield in the market." *Id.* ¶ 173. Third, after the 3AC default, defendant Michael Moro tweeted that "we worked with [Digital] to find the optimal strategy to further isolate the risk." *Id.* ¶ 381.
[6] Section 2 of the Securities Act defines a "security" to include a "note." 15 U.S.C. § 77b(a)(1). *Reves* sets forth a test by which courts determine whether a particular note qualifies as a security under Section 2 of the Securities Act.

4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Kirschner,* 79 F.4th at 304 (cleaned up).

1. Motivations of the Parties

I first examine the motivations of the buyer and sellers of the alleged security. *Reves*, 494 U.S. at 66. This inquiry hinges on "whether the motivations [of the seller and buyer] are investment (suggesting a security) or commercial or consumer (suggesting a non-security)." *Kirschner*, 79 F.4th at 305. "If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security." *Reves*, 494 U.S. at 66. But "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a security." *Id*.

The TAC alleges that Genesis's motivations were oriented toward investment, rather than commercial purposes. The plaintiffs maintain that Genesis offered and sold the Genesis Yield program "to obtain digital assets, cash, and other capital to use in its business – namely, to run its investment activities, generate profits for itself, and to pay the interest promised to Genesis Yield investors." TAC, Doc. No. 171 ¶ 181. In effect, that was Genesis's entire business: loaning the plaintiffs' assets to institutional borrowers to generate higher yields for itself and the plaintiffs. Those activities more closely resemble investment functions; for example, "[raising money] for the general use of a business enterprise or [financing] substantial investments." *Reves*, 494 U.S.

at 66. The TAC alleges that the plaintiffs were "primarily interested in the profit they expected the Genesis Yield product to generate." TAC, Doc. No. 171 ¶ 182.

The defendants fall back on their argument that the agreements were run-of-the-mill commercial loans. They maintain that any production of profit is "common to every lender and indicate[s] a commercial lending purpose." Doc. No. 177 at 27.  But the defendants do not attempt to grapple with the distinctions made in *Reves* between investment and commercial functions. *Reves*, 494 U.S. at 66. Their silence on the *Reves* distinction between investment and commercial activities weakens their argument. The plaintiffs maintain that they were primarily interested in the profit they expected the program to generate and that Genesis was focused on obtaining the plaintiffs' crypto assets to run its investment activities. TAC, Doc. No. 171 ¶¶ 181-182.  The TAC therefore adequately alleges that the motivations of the parties to the Genesis Yield program were investment.

### 2. Plan of Distribution

Next, I must examine the plan of distribution of the instrument "to determine whether it is an instrument in which there is common trading for speculation or investment." *Reves*, 494 U.S. at 66. "This factor weighs in favor of determining that a note is a security if it is offered and sold to a broad segment of the public. This factor weighs against determining that a note is a security if there are limitations in place that work to prevent the [notes] from being sold to the general public." *Kirschner*, 79 F.4th at 306.

During the class period, Gemini and Genesis never set minimum investment amounts for the Gemini Earn program.  TAC, Doc. No. 171 ¶ 206. For direct investors, Genesis first did not enforce the investment minimums and then later dropped the investment minimums. *Id*. ¶ 135. As of November 2022, about 340,000 individuals and entities invested with Genesis.  *Id*. ¶ 206.

Genesis advertised on Twitter and on its own website, *see, e.g., id.* at ¶¶ 201-202, which are channels available to "a broad segment of the public." *Kirschner*, 79 F.4th at 306.

Digital argues that the plan of distribution was limited because investors were prohibited from trading their interest in the Genesis Yield program to others, which means there was no secondary market for the notes. Doc. No. 177 at 27 (citing *Nat'l. Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*, 768 F. Supp. 1010, 1015 (S.D.N.Y. 1991)). A secondary market is not required under *Reves*. *See Nat'l Bank of Yugoslavia*, 768 F. Supp. at 1015–16 ("[T]he absence of" an allegation of a secondary market "is not fatal to the Bank's securities laws claims. A debt instrument may be distributed to but one investor, yet be a security.") (internal quotation marks omitted); *S.E.C. v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013) ("Though it can be a strong indicator that a note is a security, the sale of the notes on an exchange is not necessary to establish the requisite common trading.").

The TAC adequately pleads that the defendants offered and sold the Genesis Yield program to "a broad segment of the public." TAC, Doc. No. 171 ¶ 200.

3.   Reasonable Expectations of the Investing Public

I now examine the "reasonable expectations of the investing public." *Reves*, 494 U.S. at 66. If the investing public is given "ample notice that the instruments were participations in loans and not investments in a business enterprise," the fact that notice was provided suggests the instruments are not securities. *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 973 F.2d 51, 55 (2d Cir. 1992); *see also Kirschner*, 79 F.4th at 308. But even if the economic realities of the transaction say otherwise, courts can consider a note to be a security if the public reasonably perceived it that way. *See Kirschner*, 79 F.4th at 307-08.

The TAC alleges that Genesis promoted Genesis Yield securities as an opportunity to earn high "returns" or "yield" on the investors' digital assets. TAC, Doc. No. 171 ¶ 209. The plaintiffs also argue that the economic circumstances of the transaction, in which the defendants claimed to offer "the best yield in the market," *id*. ¶ 173, demonstrate that it was reasonable for the investing public to view the transaction as an investment and therefore a security. *Id*. ¶ 212. Genesis also explicitly referred to the participants as "investors" and the transaction as an "investment." *Id*. ¶ 211.

Most importantly, officers affiliated with Genesis told the investing public that the transaction constituted an investment. Paul Aronzon, a director of Holdco, explained that "the people who gave us their assets, they own them. Yes, they gave them to us to invest." *Id*. ¶ 174 (cleaned up). Ballensweig stated on a podcast that "the way the model works, is that deposits, like you said, will get aggregated in batched [sic] and swept over to Genesis from Gemini" and become "working capital." *Id*. ¶ 171. "We're facing about 250 or so unique institutional borrowers on the other side. . . . And so we'll go out and lend the capital that we borrow from our depositors out to the market. . . . Gemini on a daily basis will come to Genesis [and] basically deposit those assets with us, we go out to the market, lend those assets out to our, you know, network of borrowers, generate the yield and then pay Gemini back so that it can pay its users." *Id*. Islim stated at a virtual forum that "a lot of [Genesis's] clients reach us to provide their assets for us to be able to get yield on that overall. . . . [O]r are they more short-term investors - they want to have open-term loans without just to get extra used in the short-term like extra funding." *Id*. ¶ 173.

Digital points to the MLA's disclaimer for Gemini Earn investors: "Each Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the

U.S. federal or state securities laws." Doc. No. 180-2 at 17 (MLA § XXV). "Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive." *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020); *see id.* (holding that the defendants' disclaimers and public statements dissuading the public from any expectation of profit "are insufficient to negate the substantial evidence that a reasonable purchaser expected to profit from Grams.").

Despite the defendants' issuance of the disclaimer, the plaintiffs' allegations are still sufficient to meet their burden on a motion to dismiss. The TAC therefore adequately alleges that the investing public reasonably believed that the Genesis Yield program constituted securities, not loans.

4. Other Risk-Reducing Factors Rendering Application of Securities Laws Unnecessary

Finally, I examine "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves*, 494 U.S. at 67. The Second Circuit has instructed that some of the factors reducing the risk include whether the instrument is secured by collateral, whether it is insured, and whether other federal regulations cover the instrument. *See Kirschner*, 79 F.4th at 309.

The defendants point out that Gemini was regulated by the New York Department of Financial Services and was subject to New York's banking and anti-money laundering laws. Doc. No. 177 at 28-29. However, regulations covering Gemini do nothing to answer the fourth *Reves* inquiry. Gemini merely provided a digital platform, Gemini Earn, through which investors (the "Gemini Earn investors") could invest their crypto assets in Genesis.

23

The relevant question is therefore whether the Genesis Yield program was subject to another regulatory scheme. The defendants offer a brief answer to that question: the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") regulated Genesis. Doc. No. 177 at 29. But as the TAC points out, FinCEN focuses on combatting domestic and international money laundering, terrorist financing, and other financial crimes, not "regulat[ing] securities or the disclosure of risks to investors." TAC, Doc. No. 171 ¶ 220; *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 573 (E.D.N.Y. 2012) (defining FinCEN as a regulator that "administers and enforces money laundering and anti-terrorism financing policies.").

The TAC alleges other facts that bear on the risk-reducing factors identified in *Kirschner*. Gemini told Gemini Earn investors that "[a]ll lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit." TAC, Doc. No. 171 ¶ 216. Moreover, Gemini was aware that only FinCEN regulated Genesis and the Genesis Yield program and categorized that lack of regulation as a risk factor in internal documents. *Id*. ¶ 219.

The plaintiffs sufficiently alleged that the Genesis Yield program was not covered by another regulatory scheme that significantly reduced the risk of the program. *Reves*, 494 U.S. at 67. The TAC therefore adequately pleads that no risk-reducing factors rendered the application of securities laws unnecessary.

Because each *Reves* factor weighs in favor of the plaintiffs, I conclude that the TAC plausibly alleges that the Genesis Yield program constituted a security.

VI.    It is premature to resolve the control person liability inquiry at the motion to dismiss stage.

A. Control Person Liability

For their federal securities claims, the plaintiffs rely on (1) Section 5 of the Securities Act to cover the alleged failure to file a registration statement regarding the Genesis Yield program; and (2) Section 10(b) of the Exchange Act to cover the defendants' misrepresentations regarding Genesis's risk management practices and solvency. Those are the alleged primary violations. But plaintiffs do not allege that the defendants were the primary violators committing all of those actions.[7] Accordingly, to impute liability to the defendants for act for which they were not the primary violators, the plaintiffs rely on Section 15 of the Securities Act and Section 20(a) of the Exchange Act. These sections establish control person liability for violations of Sections 5 and 12(a)(1) of the Securities Act and Section 10(b) of the Exchange Act. *See Jianhu Yi v. GTV Media Grp. Media Inc.,* 2021 U.S. Dist. LEXIS 115218, at *9 (S.D.N.Y. June 18, 2021); *see also Okla. Law Enf't Ret. Sys. v. Papa John's Int'l, Inc.,* 444 F. Supp. 3d 550, 558 (S.D.N.Y. 2020).

Section 15 of the Securities Act and Section 20(a) of the Exchange Act both provide for control person liability when the defendant has control over the primary violator. Control is "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *In re Lehman Bros. Mortg.-Backed Sec. Litig.,* 650 F.3d 167, 185 (2d Cir. 2011). "The mere exercise of influence is not sufficient to establish control." *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 524 (S.D.N.Y. 2016) (cleaned up). And "officer or director status alone is not sufficient to constitute control," but control can be inferred from "the corporate position of certain officers . . .. Arguably, a CEO could fall under this category." *In re Alstom SA*, 406 F. Supp. 2d 433, 487-488 n.51 (S.D.N.Y. 2005).

---

[7] The TAC alleges some primary violations by the defendants of Section 10(b) of the Exchange Act. *See* TAC, Doc. No. 171 ¶¶ 573-589.

I decline to decide today whether the plaintiffs can prove that the defendants were control persons. "[D]etermining whether an individual is a control-person is a fact-intensive inquiry often inappropriate for resolution on a motion to dismiss." *Nabil Helo v. Sema4 Holdings Corp.*, 2025 LX 130204, at *28-29 (D. Conn. June 23, 2025) (internal quotations and citation marks omitted).

Other courts within the Second Circuit have approached the control person liability inquiry in a different manner. For example, the court in *In re Barrick Gold Sec. Litig.*, 2015 U.S. Dist. LEXIS 43053, at *51 (S.D.N.Y. Apr. 1, 2015), held that the plaintiffs plausibly alleged control person liability when the complaint pled the defendants occupied high-level positions and had some involvement in the alleged fraud. Here, too, the TAC alleges that the defendants occupied high-level positions and had some involvement in the alleged securities violations. Following *Barrick* would result in a conclusion that the plaintiffs plausibly pled control person liability for all defendants. Nevertheless, in this case, I hold only that it is premature to resolve any inquiries relating to control person liability at the motion to dismiss stage.

### B. Culpable Participation

Section 20(a) of the Exchange Act, which establishes control person liability for primary violations of Section 10(b) of the Exchange Act, has a third and final requirement[8]: a plaintiff must allege that the defendant was a "culpable participant in the controlled person's fraud." *Nabil Helo,* 2025 LX 130204, at *28. That is a separate inquiry from control person liability.

---

[8] There is a split in authority regarding whether Section 15 plaintiffs must also allege culpable participation. The Second Circuit has not decided that issue, but "a majority of judges in this Circuit have held that a plaintiff need not prove the culpable participant requirement in a Section 15(a) claim." *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 183 (D. Conn. 2019) (quoting *In re Bear Stearns Mortg. Pass-Through Certificates Litigation*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012)). I therefore decline to require that the plaintiffs plead culpable participation for their Section 15 claims.

"Culpable participation -- though a longstanding requirement of a Section 20(a) prima facie claim -- has been left undefined by the Court of Appeals." *Audet v. Fraser*, 2017 U.S. Dist. LEXIS 167830, at *24 (D. Conn. Oct. 11, 2017). District courts in this Circuit have dealt with that void by applying two different approaches. The first approach views culpable participation as a state of mind requirement.  *Id*. at 25. Under that approach, a "Section 20(a) claim must allege particularized facts of the controlling person's conscious misbehavior or recklessness." *Brodzinsky v. FrontPoint Partner LLC*, 2012 U.S. Dist. LEXIS 59152, at *16 (D. Conn. Apr. 25, 2012). Plaintiffs meet that burden when they "specifically allege defendants' awareness of facts or access to information contradicting their public statements and thus that they knew or should have known they were misrepresenting material facts related to the corporation; or (2) allege facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Alstom*, 406 F. Supp. 2d at 491 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). The second approach declines to treat culpable participation as a state of mind requirement. Instead, that approach requires only that the plaintiff allege "naked allegations of control" to adequately plead the defendant's culpable participation. *See In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016).

Here, regardless of the approach I apply, the plaintiffs will meet their burden to survive the motions to dismiss. But with an eye toward observing the PSLRA's heightened pleading requirements, I will apply the first approach. *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations."). Therefore, I will determine whether the plaintiffs have alleged particularized facts of each defendant's conscious misbehavior or recklessness in connection with the alleged Exchange Act violations.

a. Barry Silbert

The plaintiffs have adequately alleged that Barry Silbert knew or should have known that the alleged primary violations of Section 10(b) of the Exchange Act constituted fraudulent conduct. Silbert is the founder of Digital, Genesis, and several other subsidiary companies. TAC, Doc. No. 171 ¶ 7. The plaintiffs claim Silbert "closely managed and controlled" Digital and Genesis through "interlocking directors and officers." *Id*. ¶ 8.

The plaintiffs allege that Silbert spearheaded both the execution of the Digital Promissory Note and the concealment of Genesis's insolvency to investors. The plaintiffs provide sufficient facts to support the conclusion that Silbert knew about the material omissions and misrepresentations relating to Genesis's insolvency.

After the 3AC default, Silbert informed Digital colleagues that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30." *Id*. ¶ 42. Despite Silbert knowing that Genesis was insolvent after the 3AC default, he emphasized that "[w]e just can't allow people inside or outside [to] question Genesis's solvency." *Id*. ¶ 330. Instead of recognizing the insolvency, Silbert caused Genesis to sell the $1.1 billion debt from 3AC to Digital in exchange for the Digital Promissory Note. *Id*. ¶ 356. Silbert signed the Digital Promissory Note as CEO of Digital. *Id*. ¶ 357. Genesis then classified the Digital Promissory Note as a $1.1 billion asset on its balance sheet. *Id*. ¶ 356. The plaintiffs maintain that the Digital Promissory Note did not and could not restore Genesis to solvency because Digital and Genesis never exchanged money nor moved capital in connection with the note. *Id*. ¶ 362. Moreover, because the 3AC debt was uncollectable, the plaintiffs maintain the Digital Promissory Note was not worth $1.1 billion. *Id*. ¶ 363.

After the execution of the Digital Promissory Note and the distribution of Genesis's financial statements listing the Note as a $1.1 billion asset, the plaintiffs allege that Silbert took actions designed to stop investors from withdrawing investments from Genesis. *Id.* ¶¶ 441-456. On October 13, 2022, Gemini provided 30 days' notice of its termination of the Gemini Earn Program and the Gemini Earn MLAs. *Id.* ¶ 441. After that notice, Silbert reached out to Cameron Winklevoss, co-founder of Gemini, and met Winklevoss for lunch to convince him not to terminate the Gemini Earn Program. *Id.* ¶¶ 441, 443. Silbert represented Genesis's issues as a timing problem, in which there was "only a short-term timing mismatch between [Genesis's] outstanding loans and borrowing." *Id.* ¶ 444. Silbert's assurances worked: Gemini opted to delay termination of the Gemini Earn program, despite Genesis still facing a $1.1 billion equity hole. *Id.* ¶ 446. The plaintiffs maintain that if Silbert had properly notified Winklevoss and Gemini of the extent of Genesis's financial issues, Gemini would have instead sought an accelerated termination. *Id.*

The plaintiffs have therefore pleaded with particularity facts sufficient to support Silbert's conscious misbehavior and recklessness.

b. Michael Kraines

The plaintiffs have adequately alleged that Michael Kraines knew or should have known that the alleged primary violations of Section 10(b) of the Exchange Act constituted fraudulent conduct. Kraines was Digital's Chief Financial Officer from September 2021 to April 2023. *Id.* ¶ 8.

The plaintiffs maintain that, as the Chief Financial Officer, Kraines had control over the formulation and dissemination of the Genesis's allegedly false and misleading financial statements after the Digital Promissory Note. The plaintiffs allege that Kraines re-tweeted

statements from the @GenesisTrading Twitter account that stated "the Genesis balance sheet is strong and our business is operating normally." *Id*. ¶ 319. On the same day, however, Kraines participated in a Microsoft Teams chat in which Ballensweig and Moro expressed concern about "any leakage" regarding Genesis's true financial health. *Id*. ¶ 317.

Although the plaintiffs' allegations regarding Kraines's behavior are certainly less compelling than those concerning the other defendants, the plaintiffs have still provided facts that suggest Kraines was aware of Genesis's dire financial state and then acted in a way designed to conceal that condition. That is the definition of recklessness. *See Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir. 1982) (ruling that recklessness must "approximate an actual intent to aid in the fraud being perpetrated"); *see also Novak*, 216 F.3d at 308 (stating that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of…recklessness.") It goes without saying that merely alleging Kraines's position as CFO and his corresponding control over the financial statements at issue is not a particularized allegation of his knowledge of the wrongdoing. But a reasonable fact finder could infer from his high-level position that Kraines "was likely ignoring obvious signs of fraud, and was therefore reckless." *S.E.C. v. Czarnik*, 2010 U.S. Dist. LEXIS 125463, at *31 (S.D.N.Y. Nov. 29, 2010).

The plaintiffs have therefore pleaded with particularity facts sufficient to support Kraines's recklessness.

c.  Mark Murphy

The plaintiffs have adequately alleged that Mark Murphy knew or should have known that the alleged primary violations of Section 10(b) of the Exchange Act constituted fraudulent

conduct. Murphy was Digital's Chief Operating Officer from January 2020 to November 2022 and has been President of Digital since October 2022. TAC, Doc. No. 171 ¶ 8.

The plaintiffs claim that Silbert directed Murphy to lead Digital and Genesis's response to the 3AC default. *Id*. ¶ 307. To allay any potential concerns investors could have regarding Genesis's solvency, Murphy allegedly drafted talking points for Digital and Genesis executives to guide their conversations with counterparties. *Id*. ¶ 306. The plaintiffs allege that Murphy reviewed defendant Moro's tweets that claimed "Digital has assumed certain liabilities of Genesis [Genesis] related to [3AC] to ensure we have the capital to operate." *Id*. at ¶¶ 371-372. The plaintiffs maintain that those tweets were false because Digital did not assume the $1.1 billion 3AC liability. Instead, Digital replaced that liability with the Digital Promissory Note, which Genesis's bankruptcy filings only valued at $90-323 million. *Id*. ¶ 45. Even after both the execution of the Digital Promissory Note and Digital and Genesis's assurances to investors, Ballensweig informed Murphy that "the issue is more structural…we have about 1.345B we'd need to get in the form of long-term debt or equity to ultimately have enough liquid capital to wind everything down." *Id*. ¶ 402.

Moreover, the plaintiffs allege that Murphy engaged in actions designed to stop investors from withdrawing investments from Genesis.  *Id*. ¶¶ 417-425. A Genesis Yield investor asked Digital and Genesis executives about a "parent guaranty of Genesis Global Capital's borrowing from Digital." *Id*. ¶ 416. Ballensweig directed the investor to Murphy. The plaintiffs claim that Murphy walked the investor through the same talking points that Murphy himself drafted. Those talking points maintained that Digital absorbed Genesis's losses relating to the 3AC default and that Genesis was able and ready to continue business as usual. *Id*. ¶ 417.

The plaintiffs have therefore pleaded with particularity facts sufficient to support Murphy's conscious misbehavior and recklessness.

d.  Michael Moro

The plaintiffs have adequately alleged that Michael Moro knew or should have known that the alleged primary violations of Section 10(b) of the Exchange Act constituted fraudulent conduct. Moro was the CEO of Genesis from the start of the class period until August 17, 2022. *Id*. ¶ 9.

The plaintiffs allege that, while occupying that high-level position, Moro and Genesis sold the "uncollectable $1.1 billion [Three Arrows Capital] debt to [Digital] in exchange for a 10-year promissory note." *Id*. ¶ 43. Plaintiffs claim that Moro then caused Genesis to include that $1.1 billion promissory note as an asset worth $1.1 billion on the balance sheet. *Id*. ¶ 44. In a filing in the Genesis Bankruptcy Action, Genesis estimated that the Digital Promissory Note was actually worth only $90-$323 million. *Id*. ¶ 45. Moro's allegedly misleading valuation of the Three Arrows Capital debt meant that Genesis appeared solvent to investors. Plaintiffs allege that after the Three Arrows Capital default and bankruptcy, Genesis was insolvent and the Digital Promissory Note did nothing to fix that insolvency. *Id*. ¶ 43.

Plaintiffs further allege that Moro, by virtue of his position and control over Genesis's lending business, "had a duty to disclose to each investor that purchased Genesis Yield securities during the period July 1, 2022 through the end of the Class Period that the Company was insolvent due to the 3AC bankruptcy in June 2022." *Id*. ¶ 47. Moro allegedly did not disclose any information regarding Genesis's insolvency to investors. *Id*. ¶¶ 47-48. The plaintiffs allege that those material omissions constitute violations of Section 10(b). *Id*. ¶ 47.

The plaintiffs have therefore pleaded with particularity facts sufficient to support Moro's conscious misbehavior and recklessness.

e. Derar Islim

The plaintiffs have adequately alleged that Derar Islim knew or should have known that the alleged primary violations of Section 10(b) of the Exchange Act constituted fraudulent conduct. Islim was the COO of Genesis from the start of the class period until August 17, 2022. On that date, Digital and defendant Murphy appointed Islim as interim CEO of Genesis. *Id.* ¶ 9.

The plaintiffs claim that Islim was intimately involved in Genesis's response to the situation involving the Three Arrows Capital default and bankruptcy. They point to a conversation between Moro and Silbert, in which Moro explained that "Derar [Islim] and I are involved [in] every step of what has been happening." *Id.* ¶ 553. In a Microsoft Teams chat regarding the 3AC default that included Islim, Matthew Ballensweig wrote that "we need to still be very cautious about what we say….[I am] very concerned about any leakage of our overall net position." *Id.* ¶ 317. The plaintiffs allege that after these strategy discussions, Islim caused Genesis to distribute misleading and false financial statements to both prospective and existing investors. *Id.* ¶ 369. After the distribution of those financial statements, Genesis Director of Lending told Islim that "[Front office folks are] concerned about the accuracy of information we have shared with clients….There still is no liquidity infusion from Digital to fill the gap and instead we have a 'note.'" *Id.* ¶ 440. Plaintiffs allege that even after an employee brought the misleading financial statements to his attention, Islim did not correct those statements. *Id.*

The plaintiffs have therefore pleaded with particularity facts sufficient to support Islim's conscious misbehavior and recklessness.

VII.    Securities Act Claims

The TAC alleges that: 1) Genesis did not register the offer or sale of the Genesis Yield program with the SEC; 2) there was no registration statement in effect covering the Genesis Yield program; and 3) Genesis did not seek or have a valid exemption from registration. *Id*. ¶ 26.

The plaintiffs bring those claims under Sections 5, 12(a)(1), and 15 of the Securities Act. Section 5 prohibits the use of interstate commerce to offer or sell a security unless it is registered with the SEC or is exempt from registration. *Dewald v. Black Tusk Glob., LLC*, 2021 U.S. Dist. LEXIS 152886, at *9 (S.D.N.Y. Aug. 13, 2021). Section 12(a)(1) establishes civil liability for breaches of Section 5. *Id*. Section 15 "imposes liability on control persons of companies that have violated Section 5." *Id*. at 12.[9]

"To state a cause of action under Section 5, one must show '(1) lack of a [required] registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (internal quotation marks omitted). "If the [plaintiff] makes a prima facie case of a Section 5 violation, defendants then bear the burden of proving the applicability of an exemption from Section 5's registration requirement." *S.E.C. v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008) (internal citations and quotation marks omitted) (cleaned up).

The defendants challenge the plaintiffs' Securities Act claims by contending that the Genesis Yield program was not a security. I therefore analyze the elements of the Securities Act claims as pleaded in the TAC.

---

[9] Earlier, I declined to decide whether the plaintiffs adequately alleged control person liability for each of the defendants. I made that decision because "determining whether an individual is a control-person is a fact-intensive inquiry often inappropriate for resolution on a motion to dismiss." *Nabil Helo v. Sema4 Holdings Corp.*, 2025 LX 130204, at *28-29 (D. Conn. June 23, 2025) (internal quotations and citation marks omitted). Here, I analyze the adequacy of the plaintiffs' Securities Act claims with the assumption that they adequately pled control person liability. That assumption will not endure past this stage of litigation.

The TAC properly alleges all the elements of a claim under Section 5 of the Securities Act. The plaintiffs maintain that Genesis never filed a registration statement covering the Genesis Yield investment agreements. TAC, Doc. No. 171 ¶ 26.

Regarding the offer or sale requirement, the plaintiffs allege that the Genesis Yield program, which consisted of the investment agreements, the corresponding opportunity to invest digital assets, and the investors' tender of those digital assets, constitutes the offer or sale of securities. *Id.* ¶ 222. Both statute and precedent support their position. Section 77b(a)(3) defines "sale" and "offer for sale" expansively.[10] The Supreme Court confirmed that Congress "expressly intended to define [the statutory terms] broadly." *United States v. Naftalin,* 441 U.S. 768, 773 (1979) (citing H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). In cryptocurrency-focused securities cases, district courts have applied the statute liberally. *See Genesis Glob. Capital, LLC,* 2024 U.S. Dist. LEXIS 44372, at *41 (analyzing the financial scheme in its entirety and holding that the Gemini Earn program satisfied the offer or sale requirement). I therefore agree with the plaintiffs that the defendants offered and sold securities through the Genesis Yield program.

Finally, the plaintiffs allege that Genesis made use of interstate commerce to sell and offer Genesis Yield securities. TAC, Doc. No. 171 ¶ 521. The defendants dispute the securities determination and the plaintiffs' theory of damages, but are otherwise silent regarding the Section 5 elements. I therefore hold that the plaintiffs have adequately alleged that the defendants violated Section 5 of the Securities Act and that the defendants are liable through Sections 12(a)(1) and 15 of the Securities Act.

---

[10] "Sale" includes "every contract of sale or disposition of a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). "Offer for sale" includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3).

VIII.    Exchange Act Claims

The plaintiffs bring Exchange Act claims under Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5. *Id*. ¶ 32. Section 10(b) of the Exchange Act and Rule 10b-5 prohibit "persons from (1) making any untrue statement of a material fact and (2) from omit[ting] to state a material fact necessary in order to make [] statements made, in the light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020) (internal citations and quotation marks omitted). Section 20(a) establishes control person liability for primary violations of Section 10(b) of the Exchange Act. *Black Tusk Glob., LLC*, 2021 U.S. Dist. LEXIS 152886, at *9.[11]

To state a claim under Section 10(b) and Rule 10b-5, a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007). The allegations supporting those claims must also satisfy Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA requires a plaintiff "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter*." Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

---

[11] Earlier, I declined to decide whether the plaintiffs adequately alleged control person liability for each of the defendants. I made that decision because "determining whether an individual is a control-person is a fact-intensive inquiry often inappropriate for resolution on a motion to dismiss." *Nabil Helo v. Sema4 Holdings Corp.*, 2025 LX 130204, at *28-29 (D. Conn. June 23, 2025) (internal quotations and citation marks omitted). Here, I analyze the adequacy of the plaintiffs' Exchange Act claims with the assumption that they adequately pled control person liability. That assumption will not endure past this stage of litigation.

A. Material Misstatement or Omission

The TAC identifies two categories of alleged material misstatements or omissions that the plaintiffs relied upon in participating in the Genesis Yield program during the Class Period: those regarding risk management practices and those regarding Genesis's solvency. TAC, Doc. No. 171 ¶¶ at 273-475. I now determine whether those statements satisfy the plaintiffs' burden to adequately plead a material misstatement or omission.

1. Material Misrepresentations Regarding Risk Management Practices

The plaintiffs allege that the defendants misled Gemini, the plaintiffs' agent, and the Genesis Yield direct investors by "touting Genesis Global Capital's purportedly robust risk-management practices and a supposedly thorough vetting process of the counterparties." *Id.* ¶ 273. The TAC further maintains that the defendants made those misrepresentations regarding risk management practices to induce the parties to participate in the Genesis Yield program. *Id.*

At the start of the Class Period, Genesis sent an "Overview of Enterprise Credit Risk Management" to Gemini claiming that Genesis was able to "responsibly manage credit risk and face zero defaults" through "collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools." *Id.* ¶ 275. (internal quotation marks omitted). Genesis claimed that it "had many levers to pull to ensure [Genesis] is well protected, including collateral." *Id.* ¶ 275 (internal quotation marks omitted). Genesis told Gemini that it "primarily lends on an 'over-collateralized' basis – i.e., the collateral pledged exceeds the value of the loan" and said that "[Genesis] would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance." *Id.* ¶ 276 (internal quotation marks omitted). Plaintiffs allege, however, that Genesis was at no point over-collateralized. *Id.* ¶

281. Genesis's collateralization during the Class Period peaked at 90% and bottomed at around 60%. *Id.*

The plaintiffs further allege that Genesis disregarded its own stated risk management practices and instead pursued risky investment and trading strategies. *Id.* ¶ 282. Genesis was overconcentrated in one entity, 3AC. *Id.* Genesis told Gemini that it reviewed its borrowers' books quarterly, but Genesis failed to review 3AC's financial statements for almost two years. *Id.* Genesis's overconcentration in 3AC, with inadequate collateral, ultimately resulted in an approximately $1 billion uncollectable loss upon 3AC's default. *Id.* ¶ 297. Around the same time, Genesis also lost $100 million upon another borrower's default, Babel Finance. *Id.*

Another trading strategy overconcentrated Genesis's risk. Grayscale created its own Bitcoin Trust ("GBTC"). *Id.* ¶ 100. Genesis loaned assets to Digital, its own parent company, and Digital used that loan to purchase shares of GBTC. *Id.* ¶ 37. Each time Grayscale issued new GBTC shares, it received a 2% fee. *Id.* ¶ 108. That fee incentivized Digital and Silbert to maximize Grayscale's assets under management. *Id.*

Genesis was also overly concentrated in affiliated entities. When Digital experienced financial strain, Digital compelled Genesis to make an under-secured $575 million loan to Digital. *Id.* ¶ 56. Digital in total borrowed over $800 million from Genesis, with several of those loans being made on an unsecured basis. *Id.* ¶ 284. Another affiliated entity, HQ Digital, invested $100 million with Genesis. *Id.* ¶ 287. The vast majority of HQ Digital's assets constituted Silbert's personal wealth, *id.* ¶¶ 289-290, and the entity appears to have served the "single purpose" of managing Silbert and other Digital executives' personal finances. *Id.* ¶ 288.

Genesis additionally loaned at least $500 million to Alemeda Research and then sought repayment of that loan. *Id.* ¶ 335. Caroline Ellison, an Alemeda executive, testified that her

understanding was that Genesis needed the $500 million back or else "they might go under or have to default on some loans if they didn't get it." *Id*. ¶ 336. Genesis's loans to Alemeda "were often only 50% secured and were not over collateralized." *Id*. ¶ 146.

Based on the above allegations, the plaintiffs have adequately pled that Genesis's misrepresentations to the plaintiffs and Gemini concerning its risk management practices were both false and material.

2.  Material Misrepresentations Regarding Genesis's Solvency

The plaintiffs allege that the defendants misled counterparties by concealing Genesis's poor financial condition and engaged in a "sham transaction" designed to disguise Genesis's insolvency. *Id*. ¶ 356.

The Genesis Yield Investment Agreements stated that "any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect" constituted an "Event of Default." *Id*. ¶ 300. When an event of default occurred, the plaintiffs could demand payment of the outstanding loan balance or, if Genesis did not cure the event of default within 30 days, terminate the agreement. *Id*. ¶ 301.

The plaintiffs allege that the defendants knew that an event of default could trigger "a bank run," *id*. ¶ 330, and chose instead to "[engage] in a scheme which ultimately directed and caused Genesis Global Capital to conceal its insolvency in order to induce Plaintiffs and members of the class not to recall their loans or to make new loans to Genesis Global Capital." *Id*. ¶ 302. At defendant Silbert's direction, Genesis "sold" 3AC's uncollectable debt to Digital in exchange for the Digital Promissory Note. *Id*. ¶ 356. In exchange for the 3AC debt, Digital would pay Genesis $1.1 billion in ten years at a 1% interest rate. *Id*. Genesis categorized the Digital Promissory Note as a $1.1 billion asset on its balance sheet. *Id*. In fact, the TAC alleges

(1) the note was not a current asset, because Digital had no obligation to provide cash payments to Genesis until ten years from its execution; and (2) the note's actual value was lower than $1.1 billion. *Id*. ¶¶ 363-365. Gemini valued the note at $300 million, Genesis valued the note somewhere between $90 million and $323 million, and Silbert valued the note at $200 million. *Id*. ¶¶ 365-367. Digital provided no collateral for the loan. *Id*. ¶ 360.

The plaintiffs allege the defendants and other senior executives continually misrepresented the Digital Promissory Note to investors. On July 6, 2022, Gemini representatives spoke with Genesis representatives because the Gemini representatives "wanted accurate information about Genesis Global Capital's financial condition." *Id*. ¶ 378. After that call, Ballensweig sent Gemini an email containing numerous false statements. *Id*. ¶¶ 380-385. First, the email contained a post-mortem report on 3AC. That report informed Gemini that Genesis had the capital to operate long-term. *Id*. ¶ 381. The plaintiffs maintain that the $1.1 billion 3AC debt made that long-term operation nearly impossible. *Id*. ¶ 382. Second, the email contained a risk metric report that characterized the Digital Promissory Note as a current asset. *Id*. ¶ 384. Genesis updated the risk metric report numerous times in the following months, sharing the report on a "sometimes daily" basis with Gemini. *Id*. ¶ 399. All updates listed the Digital Promissory Note as a current asset. *Id*. The July 6th email also contained outstanding loan metrics that excluded the Digital Promissory Note's 10-year debt duration, *id*. ¶ 394, and a balance sheet that did not disclose the note's actual value. *Id*. ¶ 397. Genesis allegedly kept up this practice for months, repeatedly making fraudulent statements to Gemini in the aforementioned financial documents. *Id*. ¶ 399.

Moreover, on multiple occasions after the 3AC default, Gemini requested Genesis's cash flow and income statements. *Id*. ¶ 437. But the plaintiffs allege that Genesis's chief financial

officer, presumably Kraines, directed Genesis employees not to share cash flow and income

statements. *Id*. ¶ 436. The TAC maintains that those "financial statements would have revealed

hundreds of millions of dollars in losses during the second quarter of 2022 and would have

revealed that Digital did not absorb the loss." *Id*. (internal quotation marks omitted).

Based on the above allegations, the plaintiffs have adequately pled that Genesis's

misrepresentations to the plaintiffs and Gemini concerning its solvency were both false and

material.

B. Intent to Deceive or Defraud (Scienter)

Next, the plaintiffs must plausibly plead "facts evidencing scienter", *Tellabs,* 551 U.S. at

313, that is, that the defendants acted with "intent to deceive, manipulate, or defraud." *Ernst &

Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The PSLRA requires plaintiffs to "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind." 15 U.S.C. § 78u-4(b)(2)(A). That inference "must be more than merely plausible or

reasonable—it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent," *Tellabs*, 551 U.S. at 314. Plaintiffs can meet that burden by "alleging facts

showing that (1) the defendants had the motive and opportunity to commit fraud, or (2) strong

circumstantial evidence of conscious misbehavior or recklessness." *Gimpel v. Hain Celestial

Grp., Inc.*, 156 F.4th 121, 144 (2d Cir. 2025).

Scienter may also be established through "a showing of reckless disregard for the truth."

*S.E.C. v. Halitron, Inc.*, 2025 LX 220248, at *3 (2d Cir. Mar. 3, 2025). In *Halitron*, the Second

Circuit held the SEC met that burden when it presented thirteen statements Halitron made

regarding the timeline for its audit. *Id*. at 4. Those various statements advised investors that the

audit was almost complete. The SEC then offered a glimpse behind-the-scenes at Halitron, where

Halitron employees confessed to being "very concerned about the timing of [the audit]" and admitted that the audit had "no end in sight." *Id*. Rejecting the defendants' argument that those statements were an "optimistic" view, the Second Circuit explained that those statements were false and misleading statements of fact made with a reckless disregard for the truth. *Id*. at 5.

I now examine scienter regarding the misrepresentations relating to Genesis's risk management practices. The plaintiffs have alleged facts that indicate the defendants had the motive and opportunity to commit fraud. *See Gimpel*, 156 F.4th at 144. The motive: the defendants made false representations regarding Genesis's risk management and investment practices to encourage more investment and to maximize Grayscale management fees. *See* TAC, Doc. No. 171 ¶ 273. The opportunity: the defendants had complete control over both Genesis's adherence to its stated risk management practices and its investment choices. *See, e.g., id*. ¶¶ 8, 13, 47. As long as the investors *perceived* the Genesis Yield program as low-risk and high-yield, the investors would continue investing and the defendants could continue their high-risk practices. Together, the motive and opportunity sustained the fraud: pledging allegiance to one set of risk management and investment practices and then abandoning those practices behind the scenes.

I turn to an analysis of scienter regarding the misrepresentations relating to Genesis's solvency. Those misrepresentations bear a strong resemblance to the misrepresentations the Second Circuit examined in *Halitron*. The defendants continually represented to both counterparties and investors that Genesis had "no concerns on business operations," *id*. ¶ 326, "will absorb the [3AC] losses using its own balance sheet," *id*., and "shed the risk" from the 3AC default. *Id*. ¶ 546. Behind the scenes, however, senior executives expressed "[concern] about any leakage of [Genesis's] overall net position," *id*. ¶ 317, and estimated the equity hole at $1.345

billion. *Id*. ¶ 402. Far from constituting an optimistic view of Genesis's solvency, there is a strong inference that those statements were false and misleading statements made with a reckless disregard for the truth. *Halitron*, 2025 LX 220248, at *3.

The plaintiffs' allegations are sufficient to show a strong inference of intent to deceive, manipulate, or defraud investors into participating in the Genesis Yield program during the Class Period. Each named defendant was not privy to every conversation discussing fraudulent motives, but the allegations show that each defendant was privy to, inter alia, the high-risk Grayscale Trade and the execution of the 10-year promissory note. *See, e.g.,* TAC, Doc. No. 171 ¶¶ 317-320. The defendants have not raised "plausible opposing inferences" that one or more defendant was ignorant of the scheme to defraud, or did not share in Silbert's more explicit intent to defraud investors. *Tellabs,* 551 U.S. at 323 (internal citations omitted). "[A]ssess[ing] all the allegations holistically[,]" *id*. at 326, I conclude that plaintiffs sufficiently alleged the defendants made material misrepresentations with intent to defraud the plaintiffs. Thus, the requirement to plead scienter has been met.

C.  Connection between the Misrepresentation and the Purchase or Sale of a Security

Next, the plaintiffs must adequately plead that the alleged misrepresentations were made in connection with the purchase and sale of securities. *ATSI Commc'ns.,* 493 F.3d at 105. The TAC sufficiently alleges that each category of misrepresentation was connected to the purchase or sale of a security. First, for the alleged misrepresentations made regarding Genesis's risk management practices, the TAC adequately pleads that the defendants made those misrepresentations to convince investors that the Genesis Yield program was low-risk and high-yield. TAC, Doc. No. 171 ¶ 278. Second, for the alleged misrepresentations made regarding Genesis's solvency, the TAC adequately pleads that the defendants made those

misrepresentations to prevent a "bank run" in which investors pulled their assets from Genesis. *Id*. ¶¶ 320, 330.

### D.  Reliance

The plaintiffs must also adequately plead reliance on the misrepresentations. The TAC presents three different theories of reliance: direct reliance (traditional), agency reliance, and *Affiliated Ute* presumption of reliance. *Id*. ¶¶ 461-475. Because the TAC adequately pleads both direct reliance and agency reliance, I decline to reach *Affiliated Ute* presumption of reliance.

### 1.  Direct Reliance

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Waggoner v. Barclays PLC,* 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 810 (2011)).

In its Genesis Yield Investment Agreements, Genesis represented to both Gemini and directly to the investors that it was solvent.

> [Genesis] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws....[Genesis] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

TAC, Doc. No. 171 ¶ 142. Genesis made the above warranty with each purchase of Genesis Yield securities during the entire Class Period, February 2, 2021-November 16, 2022. *Id*.

The plaintiffs allege that the warranty became a misrepresentation after the 3AC default because Genesis was effectively insolvent. *Id*. ¶¶ 581-583. The plaintiffs then allege that, had they "known the truth [regarding Genesis's insolvency], they would not have purchased

securities from Genesis Global Capital." *Id*. ¶ 586. Those allegations satisfy the plaintiffs' burden to plead direct reliance for the direct investors.

2. Agency Reliance

Gemini's reliance on Genesis's warranty can only be imputed to the Gemini Earn plaintiffs through a theory of agency or derivative reliance. Plaintiffs allege that Gemini was their expressly appointed agent regarding their participation in the Genesis Yield program, *id*. ¶¶ 492-493, and that Gemini relied upon Genesis's representations regarding its financial health throughout the duration of the Gemini Earn program. *Id*. ¶¶ 446, 449, 494.

"Under well-settled principles of agency law, one who defrauds an agent is liable to the principal. . . . plaintiffs need only allege that an agent acting on their behalf reasonably relied on the alleged misrepresentations of the defendants." *In re Fine Host Corp. Sec. Litig.,* 25 F. Supp. 2d 61, 71-72 (D. Conn. 1998). So long as Gemini acted within the scope of its agency relationship with the investors, the agency theory of reliance applies. Under the investment agreements, Gemini was every Gemini Earn investor's authorized agent "for all purposes" except determining the "amount, timing, or selection of any Loan" on the investors' behalf. TAC, Doc. No. 171 ¶¶ 128-129; MLA, Doc. No. 180-2 at 19.

Defendants claim that Gemini could not have relied on the defendants' solvency warranty because it had no discretion to make individual investment decisions on the investors' behalf. Doc. No 177 at 41. Accordingly, Gemini could not have "reasonably relied on the alleged misrepresentations of the defendants." *See In re Fine Host,* 25 F. Supp. at 72.

The plaintiffs allege that Gemini relied on the defendants' solvency warranty and disclosures throughout the duration of the Gemini Earn program. TAC, Doc. No. 171 ¶¶ 130, 274, 278, 386. In summer 2022, Gemini reviewed Genesis financial documents and participated

on calls with Genesis regarding Genesis's financial position. *Id*. ¶¶ 378, 399. Gemini followed

up with Genesis on, for instance, whether "Other Assets" on Genesis's balance sheet included

crypto—"Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light

on this?" *Id*. ¶ 389. Given that Genesis routinely traded with Bitcoin as collateral, Gemini was

concerned. The TAC alleges that Gemini would not have continued the Gemini Earn program

had Genesis revealed its actual financial condition. *Id*. ¶ 446.

After Gemini finally decided to terminate the Gemini Earn program, Silbert met

Gemini's co-founder Cameron Winklevoss for lunch on October 22, 2022 to convince Gemini

otherwise. *Id*. ¶¶ 441-446. Silbert misrepresented that Genesis "faced only a short-term timing

mismatch between its outstanding loans and borrowing" despite the 10-year length of the

promissory note and the 765-day average duration of Genesis's outstanding loans. *Id*. ¶¶ 444-

445. Those "misrepresentations had the desired effect. Relying on Defendant Silbert's claims,

Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the

possibility of pursuing more rapid termination or other relief[.]" *Id*. ¶ 446. Those allegations

satisfy the plaintiffs' burden to plead agency reliance for the Gemini Earn investors.

Because the TAC adequately alleges agency reliance, I need not determine whether the

TAC properly pleads derivative reliance.

E.  Transaction and Loss Causation

"A plaintiff alleging a violation of section 10(b) or Rule 10b-5 must allege both

[transaction] and loss causation." *Pa. Ave. Funds v. Inyx, Inc.*, 2010 U.S. Dist. LEXIS 19177, at

*43 (S.D.N.Y. Mar. 1, 2010) (citing *Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 172 (2d

Cir. 2005)).

"[T]ransaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities. It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (internal citations omitted).

Loss causation examines "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Id*. To allege loss causation, the plaintiff must plead that "the damages suffered by plaintiff [are] a foreseeable consequence of any misrepresentation or material omission." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (cleaned up).

I first examine transaction causation. The plaintiffs allege that they purchased Genesis Yield securities because of the solvency warranty in the Genesis Yield Investment Agreements and would not have purchased the securities had they known Genesis's actual financial condition and insolvency risks.  TAC, Doc. No. 171 ¶ 452. At the motion to dismiss stage, that allegation is sufficient to satisfy transaction causation. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)) ("Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'").

I now turn to loss causation. To establish loss causation, "a plaintiff must show that the loss [was a] foreseeable result of the defendant's conduct (i.e., the fraud), and that the loss [was] caused by the materialization of the risk concealed by the defendant's alleged fraud." *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (cleaned up).

Because of Genesis's high-risk trading, 3AC's default and bankruptcy caused a large enough exposure in Genesis to render Genesis insolvent, in combination with other borrower defaults. TAC, Doc. No. 171 ¶ 39. Genesis concealed that insolvency through the Digital Promissory Note. *See id*. ¶ 43, 53, 356. After the execution of the Digital Promissory Note, Genesis's insolvency caused it to refuse to honor investors' redemption requests because the withdrawal requests exceeded Genesis's liquidity. *Id*. ¶ 457. Genesis blamed FTX's crash, and the disruption it caused in the crypto market, for its inability to honor redemption requests. *Id*. But Genesis was insolvent as early as June 2022, months before the FTX crash in November 2022. *Id*. Therefore, the plaintiffs have adequately alleged that the loss was (1) a foreseeable result of Genesis not adhering to its risk management practices and (2) caused by the insolvency that the defendants intended the Digital Promissory Note to conceal.

The plaintiffs have adequately pled both transaction and loss causation.

IX.    Damages

By alleging loss on the digital assets originally invested and interest due on those assets, the TAC adequately pleads damages for the purposes of this motion.

X.    State Consumer Protection Claims

The TAC also alleges violations of the consumer protection and unfair competition laws of seven states. *Id*. ¶¶ 613-683. I may not adjudicate those claims without exercising supplemental jurisdiction. District courts exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). It is inarguable that the plaintiffs' state law claims derive from a "common nucleus of operative fact" as the federal securities

claims. *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka,* 134 F.4th 73, 75 (2d Cir. 2025) (internal citations omitted).

However, I see compelling reasons to decline to exercise supplemental jurisdiction over the plaintiffs' state law claims. First, the state law claims overlap with and duplicate the federal securities claims. *See* 28 U.S.C. § 1367(c)(2). Second, adjudication of those state law claims will undoubtedly delay the adjudication of the federal securities claims. *See* 28 U.S.C. § 1367(c)(4). Third, the courts of some of those states have not addressed whether the state consumer protection or unfair competition statutes cover securities transactions. *See* 28 U.S.C. § 1367(c)(1). Finally, the courts of some other of those states have expressly ruled that the cited statutes do not cover securities transactions. *See Shearson Lehman Bros. v. Greenberg,* 1993 U.S. Dist. LEXIS 21322, at *1 (C.D. Cal. Mar. 15, 1993), aff'd., 60 F.3d 834 (9th Cir. 1995) (holding that the California Unfair Competition Law does not apply to securities transactions); *see also Rogers v. Nacchio,* 2006 U.S. Dist. LEXIS 101855, at *45 (S.D. Fla. June 5, 2006) (ruling that the "FDUTPA does not apply to securities claims."); *see also Balta v. Ayco Co., LP,* 2005 U.S. Dist. LEXIS 53203, at *8 (W.D.N.Y. Nov. 21, 2005) (holding that Section 349 is "inapplicable to the sale of securities.").

Therefore, I **grant** the defendants' motions to dismiss the plaintiffs' state law claims without prejudice.

XI.    Common Law Fraud Claim

The plaintiffs also brought a state common law fraud claim. *Id.* ¶¶ 485-494. For the reasons discussed above regarding the state consumer protection claims, I decline to exercise supplemental jurisdiction over the state common law fraud claim.

I therefore **grant** the defendants' motions to dismiss the plaintiffs' state common law fraud claim without prejudice.

XII.    Conclusion

For the reasons discussed above, the defendants' motions to dismiss are therefore **granted in part and denied in part.** The PSLRA discovery stay is also **lifted.**

So ordered.

Dated at Bridgeport, Connecticut, this 24th day of February 2026.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge