## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, REMO MARIA MORONE, DOMINIC MACRI, LARRY WIENER, DEREK WILSON, DANIEL AMELI, and LEE JACOBSON, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs,

v.

DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM,

        Defendants.

Case No.: 3:23-cv-00082-SRU

CLASS ACTION

JURY TRIAL DEMANDED

## DEFENDANT MICHAEL KRAINES' ANSWER TO
## THE THIRD AMENDED COMPLAINT

Richard Donoghue (admitted *pro hac vice*)
Ari Berman (admitted *pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Tel. No.: (212) 858-1638
E-mail: richard.donoghue@pillsburylaw.com
      ari.berman@pillsburylaw.com

Stephen P. Fogerty
Federal Bar No. 01398
FLB Law, PLLC
315 Post Road West
Westport, CT 06880
Tel. No.: (203) 247-9299
Email: fogerty@flb.law

Dated: April 27, 2026

***Counsel for Defendant Michael Kraines***

Defendant Michael Kraines, by and through his undersigned counsel, hereby submits the following Answer to the Third Amended Complaint (the "TAC") filed by Lead Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto, LP, Christopher Buttenham, and Remo Maria Morone (collectively, "Lead Plaintiffs") and named plaintiffs Dominic Macri, Larry Wiener, Derek Wilson, Daniel Ameli, and Lee Jacobson (together with Lead Plaintiffs, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs allege that former Digital Currency Group ("DCG") Chief Financial Officer Michael Kraines acted knowingly and recklessly in connection with alleged securities law violations both before and after Three Arrows Capital ("3AC") defaulted on a Genesis Global Capital ("Genesis") loan on June 13, 2022.  To the contrary, while at DCG Mr. Kraines identified potential issues at every turn, advocated for constructive outcomes for Genesis, and made the case that Genesis should observe strict processes throughout.  The Court has already concluded that the allegations against Mr. Kraines are insufficient to establish that he acted knowingly, ECF No. 216 at 30, and the scant allegations upon which Plaintiffs rely to claim recklessness are overwhelmingly contradicted by the evidence.[1]

**I.      Mr. Kraines Consistently Identified Risk Issues at Genesis**

*A. Mr. Kraines consistently raised concerns about Genesis' risk profile to both DCG and Genesis.*

Beginning not long after the start of his tenure as CFO of DCG in March 2021, Mr. Kraines made a concerted effort to identify and raise issues regarding potential risks at Genesis.  His efforts included seeking to understand the risk profile at Genesis, engaging outside risk consultants to

---

[1] As the Court has noted, the limited allegations against Mr. Kraines "are certainly less compelling than those concerning the other defendants."  ECF No. 216 at 30.  This is unsurprising, given both the record and that Plaintiffs contend Mr. Kraines is liable "[b]y virtue of his position" as CFO of DCG, Genesis' parent company, and because he became a member of the Genesis Global Holdco, LLC ("GGH") Board in July 2022.  (TAC ¶ 569.)

study the issue and make independent recommendations, and drafting and presenting multiple reports to the DCG Board.

Mr. Kraines' risk-related work was wide-reaching over this lengthy span of time, as summarized in a memo he drafted in December 2022 to provide a clear chronology of his more important efforts in this regard, which included the following:

| Month/Year | |
|---|---|
| April 2021 | Initiated full-scale review of DCG's risk with outside advisors |
| April 2021 | Presented on "Genesis Catastrophic Risk" Hypothetical to DCG Board |
| May 2021 | Urged Genesis to create first-ever risk dashboard |
| July 2021 | Updated DCG Board on risk-related vulnerabilities |
| July 2021 | Engaged Oliver Wyman to independently analyze the Genesis risk |
| August 2021 | Provided DCG Board with interim findings from Oliver Wyman |
| September 2021 | Provided DCG Board with updates from Oliver Wyman |
| January 2022 | Arranged to provide DCG Board Oliver Wyman's findings |
| March 2022 | Pioneered new scenario-based stress tests |
| April 2022 | Presented new scenario-based stress tests to DCG Board |
| May 2022 | Led or co-led in-depth review of Genesis-Luna Foundational Guard trade |
| May 2022 | Required a Genesis Risk Committee meeting |

Mr. Kraines also inaugurated a regular process of reporting to the DCG Board regarding potential risk at Genesis and issues related thereto.  Beginning with the DCG Board presentation he contributed to in Q1 2021, Mr. Kraines included a segment identifying possible risk at Genesis during every DCG quarterly board meeting throughout both 2021 and 2022.

Appreciating that he was not a risk management expert and lacked the specific training to effectively debate certain risk-related technical issues, Mr. Kraines took the additional step of engaging independent risk consulting firms to review Genesis' risk management and loan book, and to make recommendations to Genesis.  In that regard, Mr. Kraines engaged blue-chip, independent consulting firm Oliver Wyman to conduct its own assessment.

*B. Mr. Kraines continued advocating for improved risk reporting at Genesis over time.*

As of February 7, 2022, according to an email from that date, Mr. Kraines was still "trying to answer one simple question": was Genesis generating returns "by taking on a little bit of risk or a whole lot of risk?"  Mr. Kraines was principally concerned with risks at Genesis that were beneath the surface and thus outside of DCG's visibility, and in an email on February 13, 2022, Mr. Kraines stressed to Genesis' management team that they needed to "embrace total transparency and frankness" in their risk reporting.  In the Q2 2021 DCG Board deck, Mr. Kraines noted that the Genesis "risk management process" warranted "senior management attention," and in Q3 2021, he told the DCG Board that the "goal [was] to increase visibility into submerged risks, build a 'common vocabulary', and upgrade our risk practices."

When Genesis leadership projected that Genesis' total expected portfolio exposure was $37 million, Mr. Kraines wrote over email in February 2022, "we're all worried about the risk of the market tanking . . . where there would be contagion risks and failures triggering other failures – so are you telling us that [your] risk here is really only ~$37mm?"  Similarly, Mr. Kraines challenged Genesis' risk approach, stating in a March 29, 2022 email, "I'd suggest that we can't begin to understand our real credit risk without having some mechanism for understanding how our loan book would behave in a market blow out . . . . Absent that I don't see how we know anything about what could actually happen to us."  Far from perpetuating Genesis' allegedly inaccurate risk-related disclosures (*see, e.g.*, TAC ¶¶ 36, 38, 148), Mr. Kraines was expending great effort to identify the potential risk.

*C. Mr. Kraines ensured that Genesis received specific risk-related recommendations in advance of the default.*

In January 2022, with support from Mr. Kraines, Oliver Wyman delivered its first major report to Genesis' leadership, which included a full set of concrete recommendations for

mitigation.  Throughout March and April 2022, Mr. Kraines engaged Oliver Wyman to support an analysis conducted with Genesis that identified Genesis' potential exposure from the hypothetical defaults of its largest counterparties, in addition to other standard risk scenarios.  And, during the Q1 2022 Board meeting on April 26, 2022, Mr. Kraines' section of the presentation contained a segment where he presented stress-test scenarios that included, among other hypotheticals, the exposure to Genesis in the event of a default at 3AC.

Mr. Kraines also supported a second Oliver Wyman report delivered in mid-May 2022 that identified deficiencies in Genesis' risk processes and provided recommendations for future action, including, *inter alia*, developing a clearer risk strategy and implementing a due diligence framework.

### D. Mr. Kraines advocated for a robust Genesis risk committee backed by outside risk and legal experts.

Following the Q1 DCG Board meeting on April 26, 2022, Mr. Kraines asked over email to "convene the risk committee for Genesis asap," which he noted was "a critical piece of infrastructure."  In a May 12, 2022 email, Mr. Kraines told Genesis personnel that he "would not remain a member of the [Genesis] risk committee unless they engaged an outside law firm and risk consultant (of their choice) to help review the raw data and ask the right questions."

Five days later, Mr. Kraines stressed in another email to DCG's leadership the importance that "the committee have real teeth and not be a paper tiger."  And on May 31, 2022—following the committee's May 18 meeting—Mr. Kraines urged over email that the Genesis Risk Committee "serve as an effective counterweight and not a paperweight" and advocated for it to receive "full transparency" and "expert guidance."

### E. Others acknowledged Mr. Kraines' risk-related efforts.

After the 3AC default, Mr. Kraines wrote in a June 29, 2022 preserved chat to a coworker:

> I kinda feel like I was jamming at this risk stuff all year - I made [Genesis] redo the risk dashboard, hired OW [Oliver Wyman] (who they later fired), forced [a Genesis executive] to present findings to Barry [Silbert] and Mark [Murphy] - and basically got slow played the whole year . . . I came close to saying . . . "I was the one frigging guy here who spotted the problem a year ago - and spent a frigging million hours trying to get it flagged and addressed - and put it into your [B]oard decks - but I don't have the authority to force that specific change at Genesis."

In response, that coworker agreed: "It sure does validate everything you were fighting for."

## II.    Mr. Kraines Advocated for Effectively Backstopping the Genesis Counterparties

Mr. Kraines' preferred path to deal with the 3AC default was to transfer approximately $1.4 billion in liquid and quasi-liquid assets from DCG to Genesis to address both Genesis' balance sheet and liquidity issues.[2]   On this topic, Mr. Kraines stated in a preserved chat communication from June 26, 2022 that his "goal" was "to contribute $1.4bb of liquid assets to cover the M2M [month-to-month]" and "this is to provide liquid assets to plug the M2M hole" "not related to the book eq issue."  Mr. Kraines also advocated for an ultra-conservative approach of transferring assets down from DCG to Genesis and then calling for the full cessation of the Genesis lending program until its current loan book had run its ordinary course.[3]

Mr. Kraines presented the plan to move the assets down to Genesis at the DCG Board meeting on June 28, 2022, and that plan was approved by the Board that day.  Following the Board meeting, Mr. Kraines advised Genesis in a preserved chat communication that "the [B]oard has green-lit our moving down [of] sufficient assets to bring [Genesis'] balance sheet into the black as of June 30th."

---

[2] That DCG had the available capital is confirmed by a preserved chat conversation from June 26, 2022, where DCG personnel confirmed to Mr. Kraines that DCG could compile "1.4bb liquid and quasi liquid assets."

[3] As Mr. Kraines described it in a June 26, 2022 email to various outside advisors and members of the DCG team, his "Defease GenCap" approach consisted of "send[ing] the $1.4bb of value down to GenCap" and "then announc[ing] that we're defeasing the book," meaning they "completely hedge out all of the existing exposure - so positions (losses) are all locked down and known" and then "put[] the [Genesis] portfolio into run off."

Even months after the decision to execute the June 30, 2022 promissory note was made, Mr. Kraines continued to advocate for DCG backstopping Genesis. In a September 5, 2022 preserved chat communication, he proposed "hav[ing] DCG guarantee Genesis for a period of time." Mr. Kraines intended this to send "a clear message to the world that we are backing Genesis [and that] Genesis is here to stay" while also eliminating "ambiguity."

### III. Mr. Kraines Recommended that Genesis' Financials Include Helpful Detail for Recipients

In a June 28, 2022 preserved chat communication concerning the June 2022 Genesis balance sheet, Mr. Kraines suggested to the Genesis leadership team that Genesis also include "ancillary adjustments or overlays that might be helpful in addition of course." Significantly, Mr. Kraines never saw the financial statements sent by Genesis to its counterparties.[4]

### IV. Mr. Kraines Understood that Genesis Was Taking Down Its Risk

After the DCG Board meeting on April 26, 2022, Mr. Kraines conveyed the Board's direction that Genesis begin to take steps to reduce the risk exposure of its lending book. Mr. Kraines continued to pursue this exercise at Genesis, including over email with DCG and Genesis executives. On June 8, 2022 a Genesis executive acknowledged over email that he was "responsible to deliver" on what had previously been promised.

### V. Mr. Kraines Held No Managerial Authority Over Genesis and No Review Authority Over the Financials it Sent to Counterparties

Not a single executive or employee of Genesis—including anyone in its finance department—reported to Mr. Kraines. While Plaintiffs appear to assume that Genesis employees must have reported to the DCG officers, this was not the case. Each of DCG's subsidiaries had its

---

[4] On July 9, 2022, he did receive a highly abridged and non-standard version of the Genesis balance sheet that presented the DCG promissory note in a manner that would be understood by any financial reviewer as a non-current asset.

own officers, and they led their respective entities.

As a result, at no point did Mr. Kraines draft or review Genesis' communications with its counterparties. Instead, he relied upon Genesis' assurances that its financials were in conformance with Generally Accepted Accounting Principles and that Genesis' finance team was in regular communication with outside advisor Ernst & Young ("EY"). With respect to Genesis' disclosure obligations, Mr. Kraines was also informed by an email on June 28, 2022 from a partner at EY noting that "[a]s far as reporting to [Genesis] lenders, [it is] not so much a question from an accounting perspective" but rather a legal one.

## VI. Following the 3AC Default, Mr. Kraines Consistently Advocated for Involving and Deferring to Expert Outside Advisors

Mr. Kraines and others at DCG ensured that expert external advisors—including outside accountants and attorneys—were intimately involved in helping DCG and Genesis respond to the 3AC default. Indeed, Mr. Kraines *repeatedly* insisted that counsel be involved in the decision-making processes. As but one example, on the day of the 3AC default, June 13, 2022, Mr. Kraines attended a call with Goodwin Procter and Ducera Partners LLC regarding Genesis, and he forwarded pertinent information to those advisors for their expert review and assessment, something he continued to do in the days that followed.

Mr. Kraines followed this pattern going forward. For instance, on June 23, he informed Mr. Silbert in a preserved chat communication that he was including "[Matthew] Kramer [from Ducera], Jonathan [Scott] from Goodwin, & Jason [Schwartz] from EY" at an upcoming meeting to discuss DCG's and Genesis' options. In a June 28, 2022 preserved chat communication, he told the Genesis team that the "full resources of EY and Goodwin [were] available" to assist with moving assets from DCG to Genesis. And in a June 29, 2022 preserved chat communication, prior to its execution, he asked whether the promissory note had been "signed off on by the lawyers."

During this time period, he also specifically stated that Mr. Scott, a partner at Goodwin Procter who was providing advice "shouldn't let himself be intimidated".  And when the DCG Board adopted an alternative approach resulting in DCG taking on an obligation to pay Genesis $1.1 billion, Mr. Kraines repeatedly helped ensure that the proper expert advisors were involved.[5]

Mr. Kraines understood, and frequently confirmed with colleagues, that counsel was involved at every turn, and his insistence on the involvement of outside experts represents his consistent efforts to insist on and conform to good process.

## VII.    Mr. Kraines Understood There Were Multiple Viable Paths for DCG to Backstop Genesis

In the days following the 3AC default, Mr. Kraines helped review several alternatives to backstop Genesis' balance sheet consistent with the written directive from Mr. Silbert conveyed over email on June 13, 2022 that "[e]verything needs to be on the table."  One plan that Mr. Kraines advocated for—and which was approved by the DCG Board on June 28—involved DCG transferring more than $1 billion of liquid and quasi-liquid assets down to Genesis.  A related second plan, as indicated by a senior DCG executive in a preserved chat, involved DCG's "immediate[] contribut[ion] all of DCGI to Genesis (Capital or Global)" as part of a "shock and awe strategy."

A third plan involved efforts to attract additional liquidity into Genesis by "exploring financing options for DCG to further strengthen our balance sheet."  A fourth plan involved efforts to bring strategic investors either into Genesis or into DCG.  A fifth plan involved selling equity

---

[5] There are numerous other examples of Mr. Kraines recommending and confirming the involvement of outside advisors.  Below are just a few preserved chat communications relating to the promissory note transaction approved by the DCG Board on June 30, 2022, that demonstrate Mr. Kraines' effort to ensure experts were involved in vetting the decisions that were being made:

- "can you talk to the lawyers?"
- "do we know if Goodwin and EY have signed off?"
- "is this signed off on by the lawyers?"

or convertible equity in DCG.  And a sixth alternative involved a large hedge fund that offered to provide a backstop for Genesis.

These several contemporaneous statements and initiatives supported Mr. Kraines' understanding that multiple viable alternatives were actively being pursued to backstop Genesis. Further, it was always Mr. Kraines' understanding that any approach taken would be "kosher and by the book," as was relayed to him and others in a June 13, 2022 email.

## VIII.  Conclusion

As the record amply demonstrates, Mr. Kraines was a consistent advocate for better risk management at Genesis, going so far as to engage independent outside risk consultants and actively promoting better analyses and more understandable briefings to the DCG Board.  He advocated for constructive solutions to the 3AC default at Genesis, and he consistently recommended in favor of good process, including by repeatedly seeking assurances as to the presence and participation of the appropriate outside experts.  Far from acting recklessly, as Plaintiffs allege, the record indicates that Mr. Kraines took prudent steps to help identify risk and regularly advocated for adherence to good process throughout.

## RESPONSES TO PLAINTIFFS' ALLEGATIONS

Unless expressly and specifically admitted below, Mr. Kraines denies each and every allegation in the TAC, including, without limitation, the headings and sub-headings contained therein. Unless otherwise expressly stated, Mr. Kraines uses the defined terms and phrases set forth in the TAC for purposes of this Answer. In so doing, however, Mr. Kraines does not concede that any such defined terms or phrases are proper. Mr. Kraines expressly reserves the right to amend and/or supplement this Answer, including the defenses and affirmative defenses set forth herein.

On February 24, 2026, the Court granted in part and denied in part Defendants' motions to dismiss the TAC, dismissing Claims IV through XI (collectively, the "Dismissed Claims"). Accordingly, Mr. Kraines states that he is not required to answer the allegations concerning the Dismissed Claims. To the extent a response to such allegations is required, however, except as expressly admitted below, Mr. Kraines denies each and every allegation.

Subject to the above-noted qualifications, Mr. Kraines hereby responds to the TAC as follows:

## I.    NATURE OF THE CLAIMS.

1.     This class action (the "Action") is brought under Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l and 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), and 78t(a), the rules and regulations promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), including Rule 10b-5, 17 C.F.R. §240.10b-5, and, alternatively, the New York Uniform Deceptive Trade Practices Act, GEN. BUS. LAW § 349, *et seq.*, Illinois, Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. §§ 510/2, *et seq.*, Florida, Deceptive and Unfair Practices Act, FLA. STAT. §§ 501.201, *et seq.*, Kansas, KAN. STAT. ANN. § 50-634, Nevada, NEV. REV. STAT. § 598.0903, *et seq.*, TEX. BUS. & COM. CODE §§ 17.41, *et seq.*, CAL. BUS. & PROF. CODE §§ 17200, *et seq.*, and common law.

**ANSWER**:  States that the allegations in Paragraph 1 constitute legal conclusions and relate partially to the Dismissed Claims, to which no response is required.

2.     Plaintiffs bring claims on behalf of all persons who purchased Genesis Yield securities (as defined in herein) offered and sold by non-party Genesis Global Capital, LLC

11

("Genesis Global Capital," "GGC" or the "Company") during the period February 2, 2021 through November 16, 2022 (the "Class Period") who were damaged thereby (the "Class").

**ANSWER**:  States that the allegations in Paragraph 2 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 2.

3.      Before and during the Class Period, Genesis Global Capital purported to be a part of a "full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors" and provided "a full suite of services global investors require to manage their digital asset portfolios."

**ANSWER**:  States that Paragraph 3 purports to quote and characterize Genesis Global Capital, LLC's ("GGC") website, and refers to that website for a complete and accurate description of its contents.

4.      Genesis Global Capital's role in the "full-service digital currency prime brokerage" was raising capital for the greater conglomerate of companies operated by Defendants Digital Currency Group, Inc. ("DCG") and Barry Silbert ("Silbert"), by offering and selling Genesis Global Capital's Genesis Yield securities (as defined herein) to individuals and entities to be pooled and invested by Genesis Global Capital and DCG. Members of the Class invested in Genesis Yield securities offered or sold by Genesis Global Capital by entering into standard form agreements and then tendering digital assets or cash to Genesis Global Capital pursuant to either executed term sheets (for direct investors) or the terms presented to them via the Gemini Earn platform (for Gemini Earn investors). In exchange for their purchase of the Genesis Yield securities, members of the Class received interest payments and the promise of the eventual return of their digital assets on demand (the "Genesis Yield Investment Agreements" or "Genesis Yield securities").

**ANSWER**: States that the allegations in Paragraph 4 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations  in Paragraph 4, except states that the first sentence of Paragraph 4 purports to quote and characterize GGC's website, and refers to that website for a complete and accurate description of its contents; states that the third sentence of Paragraph 4 purports to characterize the Master Digital Asset Loan Agreement ("MLA") and the Master Borrow Agreement ("MBA," together with the MLA, the

"Lending Agreements" and, each, a "Lending Agreement"), and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

5.    Genesis Global Capital pooled investors' digital assets it received pursuant to the Genesis Yield Investment Agreements and invested the digital assets pursuant to certain strategies designed to generate revenue for Genesis Global Capital and its affiliates, and to pay Genesis Global Capital's investors interest.

**ANSWER**: States that the allegations in Paragraph 5 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 5.

6.    Defendant DCG is the parent entity of a conglomerate of subsidiaries that operate and invest in the digital currency, or crypto, market, including the Genesis-affiliated companies. At all times alleged herein DCG was the 100% owner of a holding company, Genesis Global Holdco, LLC ("GGH"), which was the 100% owner of Genesis Global Capital and the Company's sole managing member. GGH does not operate any business separate from Genesis Global Capital and its other operating subsidiaries. GGH and Genesis Global Capital do not have separate boards and the board members of GGH through GGH's board controlled and managed the day-to-day affairs of the Company. GGH is a sister company of Genesis Global Trading, Inc. ("GGT"), which is 100% owned by DCG and engaged in crypto trading, derivatives, and custody services. GGH and Genesis Global Capital had no independent board of directors until after June 30, 2022. Instead, non-party GGT's board of directors heard matters pertaining to Genesis Holdco and Genesis Global Capital through at least June 30, 2022.[6]

**ANSWER**: Denies the allegations in the fourth sentence of Paragraph 6, except admits that DCG is an investor and operator of the crypto industry and the parent entity of GGC and Genesis-affiliated companies; admits that GGH's Amended and Restated Operating Agreement dated July 19, 2022 (the "GGH Operating Agreement") established that the business and affairs of GGH would be managed by a board of directors; admits that GGC has never been managed by a board of directors; admits the allegations in the second, fifth, and seventh sentences of Paragraph 6 and its associated footnote; and states that to the extent Paragraph 6 and its associated footnote purport to characterize a complaint filed on October 19, 2023 (the "NYAG Complaint") in the

---

[6] NYAG Compl. (filed Oct. 19, 2023), ¶26.

action captioned *The People of the State of New York v. Genesis Global Capital, LLC, et al.*, Index No. 452784/2023 (Sup. Ct. N.Y.) (the "NYAG Action"), and refers to the NYAG Complaint for a complete and accurate description of its contents.

7.      Defendant Silbert is the founder of DCG, Genesis Global Capital, and several other DCG subsidiary companies. During the Class Period, Silbert was the controlling shareholder of DCG (owning approximately 40%), chairman of DCG's three-person board of directors, and DCG's Chief Executive Officer ("CEO").

**ANSWER**:  Denies the allegations in Paragraph 7, except admits that Barry Silbert is the founder of the entity that would later be renamed DCG; admits that Mr. Silbert is the Chief Executive Officer ("CEO") of the entity that would become DCG from its founding in 2004 to present; admits that Mr. Silbert is the Chair of DCG's board of directors; admits that Mr. Silbert is the founder of GGC; and admits that Mr. Silbert beneficially owned approximately [38%] of the equity of DCG.

8.      Defendants DCG and Silbert closely managed and controlled the Company and its affiliates through interlocking directors and officers. Defendant Mark Murphy ("Murphy") was the Chief Operating Officer ("COO") of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH which managed and controlled the Company. Defendant Michael Kraines ("Kraines") was the Chief Financial Officer ("CFO") of DCG from in or around September 2021 through April 2023, and is a member of the board of directors of GGH which managed and controlled the Company.

**ANSWER**:  States that the first sentence in Paragraph 8 constitutes a legal conclusion, to which no response is required.  Denies the remaining allegations in Paragraph 8, except admits that Mr. Kraines was the Chief Financial Officer ("CFO") of DCG from March 2021 to April 2023 and was a member of the GGH's board of directors from July 19, 2022 to April 3, 2023.

9.      Defendant Soichiro "Michael" Moro ("Moro") was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022 when he "stepped down" as CEO, and was a member of the board of GGT. Defendant Derar Islim ("Islim") has served as the COO of Genesis Global Capital and GGT since the start of the Class Period. On or around August 17, 2022, Defendants DCG and Murphy hand-picked Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH, which was the sole managing member of Genesis. Matthew

Ballensweig ("Ballensweig") was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022.

**ANSWER**:  Denies the allegations in Paragraph 9, except admits that Michael Moro was the CEO of GGC and Genesis Global Trading ("GGT") until his resignation on August 17, 2022, and was a member of GGT's board of directors from the start of the Class Period to the date of his resignation; admits that Derar Islim was the COO of GGT since February 2, 2022 and the COO of GGC starting January 19, 2021; admits that Mr. Islim became the interim CEO of GGC and GGT on August 17, 2022 and was a member of GGH's board of directors from July 19, 2022 to August 2, 2024; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the last sentence of Paragraph 9 and denies on that basis.

10.    Defendants DCG, Silbert, Murphy, Kraines, Moro and Islim are referred to collectively as the "Defendants."

**ANSWER**:  States that the allegations in Paragraph 10 constitute legal conclusions, to which no response is required.

11.    The complaint in the NYAG Action alleges that "Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York." On information and belief, Managing Director No. 1 alleged in the NYAG complaint is Ballensweig. According to a sworn declaration filed by Defendant Islim in the Genesis Bankruptcy Action (defined below), dated August 31, 2023, Ballensweig was "Managing Director, Co-Head Trading & Lending and the primary manager of Genesis's lending relationship with 3AC [Three Arrows Capital]."

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 and denies on that basis, except states that the first sentence of Paragraph 11 purports to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents; and states that the third sentence of Paragraph 11 purports to quote and characterize a declaration filed by Mr. Islim on September 1, 2023 in the action captioned *In re: Genesis Global Holdco, LLC, et al.*, Case No.

23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy Action"), and refers to that declaration for a correct and accurate description of its contents.

12.     The Genesis Entities operated as a single entity during the Relevant Period. They shared officers, capital, offices, IT infrastructure, and back-office functions.[7] Genesis Capital and GGT, the broker-dealer entity, each had their own balance sheet, however, corporate formalities and separateness were regularly disregarded or ignored. For example, investors who purchased Genesis Yield securities from Genesis Global Capital logged on to their accounts through GGT's platform, employees of GGT whose Internal Revenue Service W-2 forms reported GGT as their employer performed services for Genesis Global Capital, and information concerning Genesis Global Capital was disseminated through the twitter account of GGT.

**ANSWER**:  Denies the allegations in Paragraph 12 and its associated footnote, except states that the second sentence of Paragraph 12 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

13.     During the Relevant Period, Defendants controlled the Genesis Entities' key hiring decisions, business strategy, and budget. DCG and the Genesis Entities also shared IT infrastructure and DCG had direct access to the Genesis Entities' books and records. Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.[8]

**ANSWER**:  Denies the allegations in Paragraph 13 and its associated footnote, except admits that Mr. Kraines served on GGH's board of directors from July 19, 2022 to April 3, 2023; admits there was a Genesis Global Risk Committee, which Mr. Kraines served on at some time; and states that the second sentence of Paragraph 13 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents

14.     On November 16, 2022, Genesis Global Capital experienced a slew of withdrawal requests from investors, and because Genesis Global Capital did not have the assets to honor redemption requests from investors, the Company unilaterally stopped honoring redemption

---

[7] *Id.*, ¶25.

[8] *Id.*, ¶37.

requests from investors, meaning no investor could obtain their digital assets from Genesis Global Capital and interest payments were suspended. At the time the Company stopped honoring redemption requests from investors, the Company had offered or sold billions of dollars in securities to investors.

**ANSWER**:  Denies the allegations in Paragraph 14, except admits that GGC suspended redemptions and new loan originations on November 16, 2022.

15.     On January 19, 2023, the Company and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 in the United States Bankruptcy Court for the Southern District of New York and the chapter 11 overview of cases are being jointly administered under the lead case *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy Action"). Under Section 362(a) of the Bankruptcy Code, the Company's filing of its voluntary petition gave rise to a stay of claims alleged against it in the Action. But for their bankruptcy, Genesis Global Capital and GGH would have been named as defendants in the Action for their wrongful conduct alleged herein.[9] The results of bankruptcy for Class Members are now largely known.

**ANSWER**:  Admits the allegations in Paragraph 15 and its associated footnote, except lacks knowledge or information sufficient to form a belief as to the truth of the third and fourth sentences of Paragraph 15 and its associated footnote and denies on that basis.

16.     First, in or around May and June 2024, through the Genesis Bankruptcy Action, Genesis Global Capital returned assets to investors who invested with Genesis Global Capital through the Gemini Earn platform through in-kind distributions; however, none of the at least tens of millions of dollars in interest due to Gemini Earn investors has been paid on the assets for the period from the end of the Class Period through the dates on which Genesis Global Capital returned the assets to Gemini Earn investors.

**ANSWER**:  Denies the allegations in Paragraph 16, except states that Paragraph 16 purports to characterize distributions to certain creditors in the Genesis Bankruptcy Action pursuant to the chapter 11 plan confirmed by the United States Bankruptcy Court for the Southern District of New York on May 31, 2024 (the "Plan"), and refers to the Plan for a complete and accurate description of its contents.

17.     Next, on August 2, 2024, Genesis Global Capital announced the completion of its restructuring:

---

[9] *See* https://restructuring.ra.kroll.com/genesis/ (last visited July 19, 2024).

NEW YORK--(BUSINESS WIRE)--Genesis Global Holdco, LLC ("GGH"), Genesis Global Capital, LLC ("GGC") and Genesis Asia Pacific Pte. Ltd. ("GAP", together with GGH and GGC, "Genesis" or the "Company") today announced the completion of its restructuring on August 2, 2024 (the "Effective Date").

Genesis has commenced making approximately $4 billion in distributions of digital assets and US dollars to creditors pursuant to the chapter 11 plan (the "Plan"). Unlike many bankruptcy cases, the Plan does not seek to cap recoveries at petition date value. As part of the initial distribution, creditors will receive on average 64% recoveries on an in-kind, coin by coin, basis as described below:

- On the Effective Date, BTC creditors will receive 51.28% recoveries as valued on an in-kind basis in the form of BTC, and ETH creditors will receive 65.87% recoveries as valued on an in-kind basis in the form of ETH.

- As soon as practicable after the Effective Date, altcoin creditors (other than Solana) will receive on average 87.65% recoveries as valued on an in-kind basis, and Solana creditors will receive 29.58% recoveries as valued on an in-kind basis.

- On the Effective Date, US dollar and stablecoin creditors will receive 100% recoveries on an in-kind basis in the form of US dollars.

- Creditors will be entitled to additional recoveries following the initial distribution, depending on the results of ongoing claims reconciliation, contractual rights against third parties, and litigation.

**ANSWER**: Admits that the allegations in Paragraph 17 purport to quote and characterize an August 2, 2024 press release issued on *Business Wire* titled "Genesis Completes Restructuring and Commences Distributions to Creditors," and refers to that press release for a complete and accurate description of its contents.

18. As the fractional percentages make clear, these distributions did not come close to fully compensating Plaintiffs and class members who invested directly with Genesis. For example:

a) Plaintiff Translunar executed transactions investing 180 BTC and 1,400 ETH directly with Genesis, but on Aug 2, 2022, received distributions from the Genesis bankruptcy estate of only 92.30 BTC and 922.18 ETH. Plaintiff Translunar is thus still owed digital assets (made up of both investment principal and interest due) worth approximately $7,109,736.56.

b) Plaintiff Ameli executed a transaction investing 50 BTC directly with Genesis, but on Aug. 2, 2024 received distributions from the Genesis bankruptcy estate of only 25.64 BTC. Plaintiff Ameli is thus still owed digital assets (made up of both investment principal and interest due) worth approximately $1,561,039.56; and

18

c)    Plaintiff Morone invested 999.92422541ETH, 99.20280623 BTC, and 144.50378282 BTC directly with Genesis, but on Aug. 2, 2024 received distributions from the Genesis bankruptcy estate of only 124 BTC and 658 ETH, leaving Plaintiff Morone owed digital assets (made up of both investment principal and interest due) worth approximately $9,123,202.01.

**ANSWER**:  States that the allegations in Paragraph 18 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 18 and denies on that basis.

19.    The Genesis bankruptcy estate has now distributed substantially all its assets and investors who loaned assets directly to Genesis such as Plaintiffs Translunar, Morone, and Ameli and have received nothing close to the full value of the digital assets they are owed. In fact, preliminary calculations show that post-distribution, Plaintiffs and class members who invested directly with Genesis Global Capital such as Translunar, Morone, and Ameli are still collectively owed digital assets worth *over one billion dollars*.

**ANSWER**:  States that the allegations in Paragraph 19 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 19, except states that Paragraph 19 purports to characterize distributions to creditors pursuant to the Plan, and refers to the Plan for a complete and accurate description of its contents.

20.    DCG's past representations suggesting that harm Plaintiffs and class members' have suffered is "temporary" and that their alleged damages were "speculative" because Plaintiffs "may recover the entire value of [their] assets" (ECF No. 149 at 11) thus ring hollow.

**ANSWER**:  States that the allegations in Paragraph 20 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 20, except states that Paragraph 20 purports to quote and characterize the Reply Memorandum of Law in Further Support of Defendants Digital Currency Group, Inc., Barry Silbert, Glenn Hutchins, Lawrence Lenihan, and Mark Murphy's Motion to Dismiss the Amended Complaint filed on February 21, 2024, and refers to that memorandum for a complete and accurate description of its contents.

21.    As a result of the violations of the federal securities laws, and state law and common law alleged herein, Plaintiffs and members of the Class have been damaged by Defendants' wrongful conduct.

**ANSWER**: States that the allegations in Paragraph 21 constitute legal conclusions or relate partially to the Dismissed Claims, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 21.

22.    Class members who invested assets with Genesis Global Capital through the Gemini Earn platform seek damages for unpaid interest for the period from the end of the Class Period through the dates on which Genesis Global Capital returned assets to Gemini Earn investors.

**ANSWER**:  States that the allegations in Paragraph 22 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 22.

23.    Genesis Global Capital returned some but not all assets invested directly to it by members of the Class and no interest has been paid since the end of the Class Period. Class members who directly invested with Genesis Global Capital have been damaged and seek the recovery of any assets invested with Genesis Global Capital that have not been returned with interest thereon.

**ANSWER**:  Denies the allegations in Paragraph 23, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 23 and denies on that basis.

## II.    OVERVIEW OF THE SECURITIES ACT CLAIMS.

24.    The Securities Act claims are contained in Section XI of this complaint. The Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations of scienter and fraud.

**ANSWER**:  States that the allegations in Paragraph 24 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 24.

25.    During the Class Period, Genesis Global Capital offered and sold securities (Genesis Yield) to Lead Plaintiffs, Plaintiff Ameli and members of the Class whereby they

tendered consideration (the investment principal) to Genesis Global Capital in exchange for Genesis Global Capital's promise to pay back the investment principal in-kind, together with accrued interest, on demand.

**ANSWER**:  States that the allegations in Paragraph 25 constitute legal conclusions, to which no response is required.  To the extent that a response is required, denies the allegations in Paragraph 25, except states that to the extent Paragraph 25 purports to characterize the Lending Agreements, refers to the Lending Agreements for a complete and accurate description of their terms and contents.

26.    Genesis Global Capital did not register the offer or sale of the Genesis Yield securities with the SEC and there was no registration statement in effect as to the Genesis Yield securities as required under Section 5 of the Securities Act. Because no applicable exemption from registration applied, Genesis Global Capital's failure to register the Genesis Yield securities violated Section 5 of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 26 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 26, except admits that GGC did not register the Lending Agreements with the SEC.

27.    Because Genesis Global Capital offered or sold securities to members of the Class in violation of Section 5 of the Securities Act, Genesis Global Capital violated Section 12(a)(1) of the Securities Act and Lead Plaintiffs, Plaintiff Ameli and members of the Class are entitled to recover the consideration paid (digital assets or cash) for Genesis Yield securities with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if the securities are no longer owned.

**ANSWER**:  States that the allegations in Paragraph 27 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 27.

28.    As a result of Genesis Global Capital's violations of the Securities Act, Lead Plaintiffs, Plaintiff Ameli and members of the Class have suffered damages and seek the recovery of digital assets that have not been returned with interest thereon.

21

**ANSWER**:  States that the allegations in Paragraph 28 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 28.

29.    Under the Securities Act, the Company is strictly liable for its violations of Section 12(a)(1). But for Genesis Global Capital's bankruptcy, it would have been named as a defendant for violating Sections 5 and 12(a)(1) of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 29 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 29; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 29 and denies on that basis.

30.    Under Section 15 of the Securities Act, the following Defendants were controlling persons of Genesis Global Capital during the Class Period through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controlled Genesis Global Capital: a) Defendant DCG as 100% owner of Genesis Global Capital through GGH; b) Defendant Silbert, founder of DCG and controlling shareholder of DCG (40% share ownership) and chair of the DCG board of directors and its CEO; c) Defendant Kraines, the former CFO of DCG and a member of the board of GGH, which was the sole managing member of the Company; d) Defendant Murphy, the COO and President of DCG and a member of the board of GGH, which was the sole managing member of the Company; e) Defendant Moro, the former CEO of Genesis Global Capital, and f) Defendant Islim, the COO and interim CEO of Genesis Global Capital and member of the board of GGH, which was the sole managing member of the Company.

**ANSWER**:  States that the allegations in Paragraph 30 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 30, except states that Mr. Kraines served on GGH's board of directors from July 19, 2022 to April 3, 2023.

31.    Because Defendants were controlling persons of the Company, each of them is liable jointly and severally with and to the same extent as the Company to members of the Class under Section 15 of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 31 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 31.

### III.    OVERVIEW OF THE EXCHANGE ACT CLAIMS.

32.    The Exchange Act claims are brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, and under Section 20(a) of the Exchange Act against Defendants. But for Genesis Global Capital's and GGH's bankruptcy, they would have been named as defendants for violating Section 10(b) or Section 20(a) of the Exchange Act.

**ANSWER**:  States that the allegations in Paragraph 32 constitute legal conclusions, to which no response is required. To the extent a response is required, denies the allegations in Paragraph 32; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 32 and denies on that basis.

33.    Under Section 10(b) of the Exchange Act and Rule 10b-5 "it shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

**ANSWER**:  States that the allegations in Paragraph 33 constitute legal conclusions, to which no response is required.

34.    During the Class Period, as alleged below, in violation of Section 10(b) and Rule 10b-5(b), Defendants caused Genesis Global Capital to conceal and fail to disclose that the Company was insolvent in connection with each purchase of Genesis Yield securities during the period starting on June 17, 2022, and Defendants employed a device, scheme or artifice to defraud, and engaged in practices, or a course of business which operated or would operate as a fraud or deceit upon members of the Class in violation of Rule 10b-5(a) and (c).

**ANSWER**:  States that the allegations in Paragraph 34 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 34.

35.    Defendants defrauded investors in at least two ways: 1) in response to a liquidity crisis at Genesis Global Capital in June 2022 as a result of a counterparty's bankruptcy which, in effect, rendered Genesis Global Capital insolvent, Defendants engaged in a fraudulent scheme and

23

accounting fraud to hide Genesis Global Capital's insolvency from investors (Rule 10b-5(a) and (c) scheme liability); and 2) in connection with each investment in Genesis Yield securities, Genesis Global Capital failed to disclose that the Company was insolvent (10b-5(b) material omissions).

**ANSWER**: Denies the allegations in Paragraph 35.

36.    During the Class Period, Defendants invested the digital assets Genesis Global Capital received from investors in ways designed to line DCG's and Silbert's own pockets even though pursuit of these strategies contravened Genesis Global Capital's stated risk-management protocols, including, as discussed *infra* Section XII that Genesis Global Capital, was "well protected" using "collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools," and responsible risk management procedures such as lending on "an 'over-collateralized' basis."

**ANSWER**: Denies the allegations in Paragraph 36, except incorporates by reference its responses to the paragraphs in Section XII; and states that Paragraph 36 purports to quote and characterize a document titled "Overview of Enterprise Credit Risk Management," and refers to that document for a complete and accurate description of its contents.

37.    For example, Defendants caused Genesis Global Capital to use Genesis Yield investors' digital assets to engage in transactions designed to benefit the DCG conglomerate. Defendants caused Genesis Global Capital to loan digital assets to DCG itself without requiring DCG to post sufficient collateral, knowing the loan would be used for the purchase of shares of the Grayscale Bitcoin Trust ("GBTC"), a publicly traded security managed by DCG and Silbert's Grayscale Investments, LLC ("Grayscale") subsidiary, to maximize the management fees collectable by the DCG conglomerate. GBTC traded over the counter ("OTC") under the symbol "GBTC."

**ANSWER**: Denies the allegations in Paragraph 37, except admits that shares of Grayscale Bitcoin Trust ("GBTC") are quoted on OTC Markets Group Inc.'s OTCQX Best Marketplace under the ticker symbol "GBTC"; and admits that Grayscale Investments, LLC ("Grayscale") is a wholly-owned subsidiary of DCG.

38.    Defendants also caused Genesis Global Capital to contravene their own stated risk-management practices and take on an unreasonable amount of counterparty concentration risk by lending almost 30% of Genesis Global Capital's total loan book to a single party, digital asset hedge fund Three Arrows Capital ("3AC") in undercollateralized loans. This too was designed to benefit the DCG conglomerate by maximizing the management fees earned for managing GBTC.

24

**ANSWER**:  Denies the allegations in Paragraph 38.

39.     These self-interested acts and undercollateralized loans had disastrous results. On June 13, 2022, 3AC defaulted on its loans from Genesis Global Capital, and on June 27, 2022, 3AC declared bankruptcy. As a result, Genesis Global Capital was left with an uncollectable $1.1 billion debt, an impairment in value which Defendants should have caused Genesis Global Capital to recognize on its balance sheet regularly distributed to investors or their agents.

**ANSWER**:  Denies the allegations in Paragraph 39, except admits that GAP issued a notice

of default to 3AC on June 13, 2022; and admits that 3AC filed for bankruptcy on July 1, 2022.

40.     Recognition of the impairment, however, would have meant Genesis Global Capital recognizing its own insolvency, which would have terminated all Genesis Yield Investment Agreements and entitled investors such as members of the Class to the return of their digital assets. It also would have meant the end of Genesis Global Capital's business and DCG's source of capital.

**ANSWER**:  States that the allegations in Paragraph 40 constitute legal conclusions, to

which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 40.

41.     Furthermore, Defendants DCG and Silbert had motive and opportunity to commit the fraud alleged herein. Because Defendants DCG and Silbert personally borrowed heavily from Genesis Global Capital, the viability of DCG as an ongoing concern and Silbert's personal fortune were inextricably intertwined with the fate of Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 41.

42.     As Defendant Silbert explained to DCG executives (Matt Beck, DCG Director of Investments, and Bill Kruger, DCG Chief Operating Officer for Investments) on June 21, 2022, days after the 3AC default:

> **we** are all focused on making sure that the trust and confidence in Genesis remains high because **we** can't risk money leaving Genesis and depleting **our** liquidity[.] [O]nce **we** get through this, Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give **us** a major competitive advantage in a market where there is limited liquidity and will help power the next stage of investing . . .

> what I didn't say, which we need to keep between us, is that even though **our** liquidity is super super strong right now, the hole in Genesis equity due to the Three Arrows exposure is something they **we** need to fill by 6/30 . . . this is super confidential/sensitive stuff, so please don't share with anybody . . . .

(Emphasis added).

**ANSWER**:  States that Paragraph 42 purports to quote and characterize a June 21, 2022 Microsoft Teams conversation between Mr. Silbert, Matt Beck, Bill Kruger, and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents; and admits that Mr. Beck and Mr. Kruger held the positions of Director of Investments and Chief Operating Officer for Investments, respectively, at DCG on June 21, 2022.

43.     Instead of recognizing the impairment, Defendants DCG, Silbert, Murphy and Kraines directed and caused Genesis Global Capital and its executives, specifically Defendant Moro, to engage in a misleading sham transaction designed to conceal its insolvency. Defendants DCG and Silbert caused Genesis Global Capital and Defendant Moro to "sell" the uncollectable $1.1 billion 3AC debt to DCG in exchange for a 10-year promissory note (the "DCG Promissory Note") with an interest rate of 1% per year due in 2032. The DCG Promissory Note was executed by Defendant Silbert on behalf of DCG and by Defendant Moro on behalf of the Company. Importantly, no cash, cash equivalents, or any assets meeting the definition of a current asset changed hands in this transaction, which meant that Genesis Global Capital received zero capitalization from DCG. Instead, Genesis Global Capital magically erased the bad debt from its books and replaced it with a "good" debt.

**ANSWER**:  Denies the allegations in Paragraph 43, including specifically the allegation that Mr. Kraines caused Genesis Global Capital to take any action, much less "engage in a misleading sham transaction designed to conceal its insolvency."  Admits that, on June 30, 2022, GAP assigned to DCG its approximately $1.1 billion account receivable from 3AC in exchange for DCG providing a $1.1 billion promissory note with 1% annual interest, maturing in 2032, to GGC (the "Promissory Note") and that Mr. Silbert executed the Promissory Note on behalf of DCG and Mr. Moro executed the Promissory Note on behalf of GGC.  States that Paragraph 43 purports to characterize the Promissory Note, and refers to the Promissory Note for a complete and accurate description of its terms and contents.

44.     Defendants Moro and Islim caused Genesis Global Capital to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a "current asset and/or receivable," which falsely portrayed Genesis Global Capital as solvent when, in fact, it was insolvent.

26

**ANSWER**:  States that the allegations in Paragraph 44 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 44 and denies on that basis.

45.    Defendants Moro and Islim did so despite the fact that the DCG Promissory Note was objectively worth nowhere near $1.1 billion (its face value) at the time DCG, Silbert, Moro, and Genesis Global Capital executed the DCG Promissory Note. Gemini, the appointed agent for hundreds of thousands of Class Members, believes the DCG Promissory Note should have immediately been discounted by approximately 70%, and on July 11, 2023, the *Notice of Filing of Exhibit to Disclosure Statement* filed by Genesis Global Capital in the Genesis Bankruptcy Action estimated the value of the DCG Promissory Note as being somewhere between only $90 million (a 92% discount) to $323 million (a 70% discount).[10] Defendant Silbert has reportedly valued the DCG Promissory Note at $200 million.

**ANSWER**:  Denies the allegations in Paragraph 45, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Gemini and denies on that basis; and states that the second sentence of Paragraph 45 and its associated footnote purport to characterize a notice filed in the Genesis Bankruptcy Action on July 10, 2023, and refers to that notice for a complete and accurate description of its contents.

46.    As discussed in further detail below Defendants Moro, Kraines, Murphy and Islim caused Genesis Global Capital and Ballensweig to disseminate misleading balance sheets and other documents containing misrepresentations to Genesis Yield investors and their appointed agent intended to induce additional parties to invest in Genesis Yield securities, convince existing Genesis Global Capital investors to reinvest in Genesis Yield securities and/or to prevent them from requesting redemptions of their securities and return of investors digital assets.

**ANSWER**:  States that the allegations in Paragraph 46 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 46, including specifically the allegation that Mr. Kraines caused Genesis Global Capital to take any action, much less "to disseminate misleading balance sheets and other documents containing misrepresentations."

---

[10] *In re: Genesis Global Holdco, LLC, et al.,* Case No.: 23-10063, ECF No. 488 (Bankr. S.D.N.Y.).

47.    Genesis Global Capital and Defendants Moro and Islim, as the most senior officers of Genesis Global Capital and who had control over its lending business, had a duty to disclose to *each investor* that purchased Genesis Yield securities during the period July 1, 2022 through the end of the Class Period that the Company was insolvent due to the 3AC bankruptcy in June 2022.

**ANSWER**:  States that the allegations in Paragraph 47 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 47.

48.    These material omissions concerning Genesis Global Capital's insolvency violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, codified at 17 CFR 240.10b-5, which prohibit defrauding or deceiving, including through failure to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

**ANSWER**:  States that the allegations in Paragraph 48 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 48.

49.    The omissions were material, as no reasonable investor would have invested in Genesis Yield securities had they known of Genesis Global Capital's undisclosed concentration of risk and under collateralization, true financial condition, or the undisclosed details of the $1.1 billion DCG Promissory Note, *i.e.*, that Genesis Global Capital was in effect insolvent.

**ANSWER**:  States that the allegations in Paragraph 49 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 49.

50.    The facts that Genesis Global Capital withheld and concealed in connection with each purchase of Genesis Yield securities were material and a reasonable investor would have considered them important in making an investment decision.

**ANSWER**:  States that the allegations in Paragraph 50 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 50.

51.    Thus, as a result of the material omissions, Genesis Global Capital received assets with a value of billions of dollars from Lead Plaintiffs, Plaintiff Ameli and members of the Class that Genesis Global Capital otherwise would not have.

**ANSWER**:  States that the allegations in Paragraph 51 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and denies on that basis.

52.     The truth began to be revealed on November 16, 2022 when Genesis Global Capital experienced a slew of withdrawal requests in the wake of the collapse of digital asset trading platform FTX with whom GGT and Genesis Global Capital engaged in substantial business. The collapse of FTX began to reveal Genesis Global Capital's true financial condition and that Genesis Global Capital neither had the assets to honor redemption requests from investors nor make interest payments. The risk that had materialized in June 2022 and that Defendants concealed through their fraudulent scheme—that Genesis Global Capital was insolvent—began to be revealed to investors.

**ANSWER**:  Denies the allegations in Paragraph 52, except admits that GGC had outstanding loans to Alameda Research Ltd. ("Alameda"), an affiliated entity of FTX Trading Ltd. ("FTX," and together with Alameda, the "FTX Entities"), at the time of the FTX Entities' chapter 11 filing on November 11, 2022.

53.     On November 16, 2022, Genesis Global Capital unilaterally stopped paying interest on Genesis Yield securities and stopped honoring redemption requests, meaning no investor could obtain their digital assets from Genesis Global Capital. Even then, Genesis Global Capital continued to conceal its true financial condition, calling the cause of its inability to honor redemptions a result of a "liquidity and duration mismatch" when in reality it was because of insolvency that was fraudulently concealed through the DCG Promissory Note.

**ANSWER**:  States that the allegations in Paragraph 53 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 53, except admits that GGC suspended redemptions and new loan originations on November 16, 2022; and states that the second sentence of Paragraph 53 purports to quote and characterize a November 21, 2022 letter from Barry Silbert to DCG shareholders, and refers to that letter for a complete and accurate description of its contents.

54.     On January 19, 2022, Genesis Global Capital, GGH and Genesis Asia Pacific filed the Genesis Bankruptcy Action. As alleged below, under the operating agreements of Genesis Global Capital and GGH, Defendants DCG and Silbert had the power and authority to put them into bankruptcy.

**ANSWER**:  Denies the allegations in Paragraph 54, except admits that GGC, GGH, and GAP initiated the Genesis Bankruptcy Action on January 19, 2023; and states that the second sentence of Paragraph 54 purports to characterize the Amended and Restated Operating Agreement of GGC, dated January 19, 2022 (the "GGC Operating Agreement") and the GGH Operating Agreement (together, with the GGC Operating Agreement, the "Operating Agreements"), and refers to the Operating Agreements for a complete and accurate description of their terms and contents.

55.    DCG's transactions involving Genesis Global Capital and GGT are reportedly being investigated by the U.S. Department of Justice and the SEC.

**ANSWER**:  Denies the allegations in Paragraph 55, except admits that the SEC and U.S. Department of Justice ("DOJ") have made certain inquiries to DCG. DCG further avers that the SEC inquiry was resolved pursuant to a publicly filed administrative order dated January 17, 2025, and in January 2026 the company was advised that the DOJ had closed its investigation.

56.    On August 4, 2023, *Bloomberg* published a story titled "Silbert's Crypto Empire DCG Faces NY Attorney General Probe Over Genesis Ties" that stated:

> Barry Silbert's crypto empire, Digital Currency Group, is facing another probe into its financial dealings with subsidiary Genesis Global Capital — this time by New York state's top law enforcement officer, according to two people familiar with the investigation.
>
> In recent months, New York Attorney General Letitia James's office has requested information from former executives of Genesis, a cryptocurrency lender that filed for bankruptcy in January, said the people, who asked not to be identified because the inquiry had not been made public. Former Genesis chief risk officer, Michael Patchen, was questioned recently, one of the people said.
>
> Federal prosecutors in Brooklyn and the Securities and Exchange Commission are already conducting investigations and seeking interviews with potential witnesses at Genesis and its parent company, DCG. Genesis suffered heavy losses last year during the crypto market downturn, primarily after the collapse of digital-assets hedge fund Three Arrows Capital and crypto exchange FTX. . . .

Patchen was an executive at Genesis for only three months before stepping down in October 2022. His lawyer, Doug Jensen, declined to comment when asked on Thursday about the testimony.

The state probe, which has not been previously reported, comes as James has sought to position herself as a leading crypto enforcer in the US, having raised the alarm about the industry several years ago and proposing a new state law in May to tighten rules over cryptocurrency companies. Lawmakers haven't taken up the proposal, but could do so at any time.

DCG, which was once valued at $10 billion, disclosed last year that the company received about $575 million in loans from Genesis Global Capital. In a letter to shareholders last November, Silbert, DCG's founder and chief executive officer, referred to a $1.1 billion promissory note, which he said came about as the parent company stepped in to assume liabilities from Genesis related to the implosion of Three Arrows. . . .

One focus for regulators and prosecutors has been on the promissory note and how it was characterized to investors, one person familiar with the investigations said. . . .

**ANSWER**:  States that Paragraph 56 purports to quote and characterize an August 4, 2023 article from *Bloomberg* titled "Silbert's Crypto Empire DCG Faces NY Attorney General Probe Over Genesis Ties," and refers to that article for a complete and accurate description of its contents.

57.     On October 19, 2023, the Attorney General for the State of New York filed claims against Defendants DCG, Silbert, Moro, the Company and others alleging:[11]

- Martin Act Securities Fraud ("DCG Defendants employed, or employs, or are about to employ a device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices "),

- Martin Act Failure to Register ("Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement."),

---

[11] *See* NYAG Action, NYSCEF Doc. No. 2.

- Repeated and Persistent Fraud ("DCG Defendants engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.");

- Repeated and Persistent Illegality ("DCG Defendants engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.");

- Repeated and Persistent Illegality and Scheme to Defraud under New York Penal Law ("DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 190.65(1)(b), Scheme to Defraud in the First Degree.");

- Repeated and Persistent Illegality and Conspiracy in the Fifth Degree under New York Penal Law ("DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 105.05(1), Conspiracy in the Fifth Degree."); and

- Repeated and Persistent Illegality, Failure to Register ("Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.").

**ANSWER**:  Admits that the Attorney General for the State of New York (the "<u>NY AG</u>") filed the NYAG Complaint on October 19, 2023; and states that Paragraph 57 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

58.    On February 8, 2024, the NYAG settled claims against the Company. That settlement was later approved by the court in the Genesis Bankruptcy Action. *See* https://ag.ny.gov/press-release/2024/attorney-general-james-secures-settlement-worth-2-billion-crypto-firm-genesis (last visited July 19, 2024); Genesis Bankr. Action, ECF No. 1275. Under the Order and Judgment on Consent, the Company is permanently restrained from conducting business in New York, and Genesis is barred from creating the impression that the complaint is without factual basis and denying any allegations in the complaint, which include allegations that the "cryptocurrencies bought, sold, and stored on Gemini's exchange and used as part of Earn, including Gemini dollar, bitcoin, and ether, among other cryptocurrencies, constituted securities or commodities under the Martin Act, and the pooled investment program that Gemini and Genesis Capital referred to as 'Gemini Earn' constituted securities under the Martin Act." NYAG Compl., ¶ 204. The NYAG Action against Defendants DCG, Silbert and Moro continues.

**ANSWER**:  Admits that on February 8, 2024, GGC, GAP, GGH, and the NY AG resolved the action captioned as *The People of the State of New York v. Gemini Trust Co. et. al.,* Case No. 452784/2023 against GGC, GAP, and GGH (the "<u>Settlement</u>"); admits that on June 7, 2024 the

United States Bankruptcy Court for the Southern District of New York in the Genesis Bankruptcy

Action approved the Settlement (the "Settlement Order"); and states that Paragraph 58 purports to

characterize the Settlement Order, and refers to the Settlement Order for a complete and accurate

description of its contents.  To the extent Paragraph 58 purports to quote and characterize the

NYAG Complaint, refers to that complaint for a complete and accurate description of its contents.

59.    On February 9, 2024, the NYAG filed an amended complaint that, among other amendments, added allegations to bring claims on behalf of investors who directly invested assets with Genesis Global Capital. NYAG Action, NYSCEF Doc. No. 17.

**ANSWER**:  States that Paragraph 59 purports to characterize an amended complaint filed

in the NYAG Action (the "NYAG Amended Complaint"), and refers to the NYAG Amended

Complaint for a complete and accurate description of its contents.

60.    On March 19, 2024, the SEC settled claims against Genesis Global Capital in the SEC Enforcement Action for $21 million. *See* https://www.sec.gov/newsroom/press-releases/2024-37 (last visited July 19, 2024). Under the final judgment, Genesis Global Capital is "precluded from arguing that it did not violate the federal securities laws as alleged in the Complaint . . .". SEC Enforcement Action, ECF No. 56.

**ANSWER**:  States that Paragraph 60 purports to quote and characterize a final judgment

entered in the action captioned *Securities and Exch. Comm'n v. Genesis Glob. Capital, LLC, et*

*al.*, No. 1:23-CV-00287 (Mar. 18, 2024 S.D.N.Y.) ("SEC Enforcement Action"), and refers to that

final judgment for a complete and accurate description of its contents.

61.    As a result of the conduct described herein, Lead Plaintiffs, Plaintiff Ameli and members of the Class defined below have suffered significant harm and are owed digital assets and interest.

**ANSWER**:  States that the allegations in Paragraph 61 constitute legal conclusions, to

which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 61.

IV.    **OVERVIEW OF THE COMMON LAW FRAUD AND CONSUMER PROTECTION CLAIMS.**

62.    The common law fraud and consumer protection claims are alleged by Plaintiffs in the alternative to the Securities Act claims and Exchange Act claims in the event a determination is made that the Genesis Yield securities do not qualify as "securities" under federal law.

**ANSWER**:  States that the allegations in Paragraph 62 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.

63.    The common law fraud and consumer protection claims are premised on the same conduct that forms the basis of the Exchange Act claims outlined above, and elsewhere in this Complaint.

**ANSWER**:  States that the allegations in Paragraph 63 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.

64.    Assuming, *arguendo*, Defendants' conduct did not violate the Exchange Act because the Genesis Yield securities are not "securities," Defendants' conduct nevertheless constitutes common law fraud and additionally violates of the consumer protection laws of New York, General Business Law § 349 *et seq.*, (the state Plaintiff Macri has at all relevant times resided and the state in which Defendants DCG and Silbert were domiciled and transacted business from during the Class Period), and Illinois, Uniform Deceptive Practices Act, 815 Ill. Comp. Stat. §§ 510/2, *et seq.*, Florida, Deceptive and Unfair Practices Act, Fla. Stat. §§ 501.201, *et seq.*, Kansas, KAN. STAT. ANN. § 50-634, Nevada, NEV. REV. STAT. § 598.0903, *et seq.*, Texas, Bus. & Com. Code §§ 17.41, *et seq.*, and Cal. Bus. & Prof. Code §§ 17200, *et seq.*.

**ANSWER**:  States that the allegations in Paragraph 64 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.

V.    **PARTIES.**

A.    **PLAINTIFFS.**

65.    William McGreevy ("McGreevy") is a resident of Kansas. McGreevy purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-2. As stated in the Genesis Yield Investment Agreement reviewed and signed by Plaintiff McGreevy, Plaintiff McGreevy reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Denies the allegations in Paragraph 65, except admits that Plaintiff McGreevy filed a certification with the Court on March 24, 2023 regarding his lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that certification and denies on that basis; states that the third sentence of Paragraph 65 purports to characterize a Lending Agreement, and refers to that Lending Agreement for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Mr. McGreevy's residence and the allegations in the third sentence of Paragraph 65 and denies on that basis.

66.    Ashwin Gowda ("Gowda") is a resident of Texas. Gowda purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-3. As stated in the Genesis Yield Investment Agreement reviewed and signed by Plaintiff Gowda, Plaintiff Gowda reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Denies the allegations in Paragraph 66, except admits that Plaintiff Gowda filed a certification with the Court on March 24, 2023 regarding his lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that certification and denies on that basis; states that the third sentence of Paragraph 66 purports to characterize a Lending Agreement, and refers to that Lending Agreement for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Mr. Gowda's residence and the allegations in the third sentence of Paragraph 66 and denies on that basis.

67.    Translunar Crypto LP ("Translunar") is a limited partnership organized and existing under the laws of the State of Delaware and domiciled in the State of Texas. On September 2, 2022, Translunar purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities) and was damaged, as reflected in its certification previously filed with the Court. ECF No. 38-4. Plaintiff Translunar reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to

loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**: Denies the allegations in Paragraph 67, except admits that Plaintiff Translunar filed a certification with the Court on March 24, 2023 regarding its lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that certification and denies on that basis; states that the third sentence of Paragraph 67 purports to characterize a Lending Agreement, and refers to that Lending Agreement for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff Translunar's legal status and domicile and the allegations in third sentence of Paragraph 67 and denies on that basis.

68.    Christopher Buttenham ("Buttenham") is a resident of Nevada. Buttenham purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-5. As stated in the Genesis Yield Investment Agreement reviewed and signed by Plaintiff Buttenham, Plaintiff Buttenham reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**: Denies the allegations in Paragraph 68, except admits that Plaintiff Buttenham filed a certification with the Court on March 24, 2023 regarding his lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that certification and denies on that basis; states that the third sentence of Paragraph 68 purports to characterize a Lending Agreement, and refers to that Lending Agreement for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff Buttenham's residence and the allegations in the third sentence of Paragraph 68 and denies on that basis.

69.    Remo Maria Morone ("Morone") is a resident of Turin, Italy. On August 4, 2021, June 15, 2022, and October 24, 2022, Morone purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities), and was damaged, as reflected in his certification

36

previously filed with the Court. ECF. No. 34-2. Morone purchased Genesis Yield securities directly from Genesis. On August 4, 2021, Morone invested 100 BTC is an open term loan at an annual interest rate of 1.5%. On June 15, 2022, Morone invested 44.50378282 BTC in an open term loan at an annual interest rate of 1.5%. On October 24, 2022, Morone invested 999.92422541 ETH in an open term loan at an annual interest rate of 1.5%, and invested 99.20280623 BTC in a fixed term loan at an annual interest rate of 6% with a maturity date of October 24, 2023. On August 2, 2024 he received in-kind distributions through the Genesis Bankruptcy Action of approximately 124 BTC and 658 ETH and has been damaged in the amount of approximately 120 BTC and 341 ETH plus interest.

**ANSWER**:  Denies the allegations in Paragraph 69, except admits that Plaintiff Morone filed a certification with the Court on March 24, 2023 regarding his lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that certification and denies on that basis; states that the third, fourth, fifth, and sixth sentences of Paragraph 69 purports to characterize the Lending Agreement and accompanying term sheets, and refers to that Lending Agreement and those term sheets for a complete and accurate description of their contents; states that the seventh sentence of Paragraph 69 purports to characterize certain distributions made to Plaintiff Morone pursuant to the Plan, and refers to the Plan for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff Morone's residence and the allegations in the seventh sentence of Paragraph 69 and denies on that basis.

70.     Daniel Ameli ("Ameli") is a resident of Florida. He purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities), and was damaged, as reflected in his attached certification. On August 2, 2024, he received in-kind distributions through the Genesis Bankruptcy Action of approximately 25 BTC and has been damaged in the amount of approximately 25 BTC. Plaintiff Ameli reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Denies the allegations in Paragraph 70, except admits that Plaintiff Ameli filed a certification with the Court on August 12, 2024 regarding his lending activities with GGC, but lacks knowledge or information sufficient to form a belief as to the truth or falsity of that

certification and denies on that basis; states that the third sentence of Paragraph 70 purports to characterize certain distributions made to Plaintiff Ameli pursuant to the Plan, and refers to the Plan for a complete and accurate description of its contents; states that the fourth sentence of Paragraph 70 purports to characterize a Lending Agreement, and refers to that Lending Agreement for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff Ameli's residence and the allegations in the fourth sentence of Paragraph 70 and denies on that basis.

71.     Derek Wilson is a resident of Indiana. During the Class Period, including when Plaintiff Wilson first invested in the Gemini Earn program in February 2021 through at least June 2022, Plaintiff Wilson was a resident of Illinois. Plaintiff Wilson purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities) beginning in February 2021 via the Gemini Earn platform and continuing throughout the Class Period, and was damaged. Plaintiff Wilson reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 71 and denies on that basis, except states that the fourth sentence of Paragraph 71 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

72.     Plaintiff Larry Wiener is a resident of California. He purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities) beginning prior to June 2022 via the Gemini Earn platform and continuing throughout the Class Period. Plaintiff Wiener reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 72 and denies on that basis, except states that the third sentence of Paragraph 72 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

73.     Plaintiff Dominic Macri is a resident of New York. He purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities) beginning in February 2021 via the Gemini Earn platform and continuing throughout the Class Period, and was damaged. Plaintiff Macri reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 73 and denies on that basis, except states that the third sentence of Paragraph 73 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

74.     Plaintiff Lee Jacobson is a resident of Illinois. He purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities) via the Gemini Earn platform and continuing throughout the Class Period, and was damaged. Plaintiff Jacobson reviewed and relied upon the representations and warranties by Genesis in the Genesis Yield Investment Agreements in determining whether to loan digital assets to Genesis, the amount to loan, and whether to recall loans of digital assets from Genesis.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 74 and denies on that basis, except states that the third sentence of Paragraph 74 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

**B.     DEFENDANTS.**

75.     Defendant DCG is a corporation formed and existing under and pursuant to the laws of Delaware. DCG maintains its principal place of business in Stamford, Connecticut. Prior to moving to Stamford, Connecticut, DCG maintained its principal place of business in New York, New York.

**ANSWER**:  Admits the allegations in Paragraph 75.

76.     Defendant Silbert is the founder and the CEO of DCG, and chair of DCG's board of directors. Upon information and belief, during part of the Class Period Silbert was a resident of Connecticut and is currently a resident of Rye, New York. Silbert reportedly owns 40% of the equity of DCG. Silbert has consistent and daily management responsibilities for DCG's and DCG's subsidiaries' operations, including the Company, GGT, and Grayscale Investments. For example, Silbert reportedly prefers focusing on the capital allocation activities of DCG and its subsidiaries. Silbert's activities and responsibilities include making the decision not to register Genesis Global Capital's securities (notes or investment contracts) with the SEC, and engaging in

the transaction which led to the issuance of the DCG Promissory Note and execution of the DCG Promissory Note. Silbert has repeatedly and publicly discussed his role in DCG and oversight of its wholly-owned subsidiaries.

**ANSWER**:  Denies the allegations in paragraph 76, except admits that Mr. Silbert is the founder and CEO of DCG, and chair of DCG's board of directors; admits that Mr. Silbert was and is a resident of Westchester County; admits that Mr. Silbert beneficially owns [approximately 38%] of the equity of DCG; admits that Mr. Silbert executed the Promissory Note on behalf of DCG; and states that the seventh sentence of Paragraph 76 purports to characterize unidentified public sources, and refers to those unidentified public sources for a complete and accurate description of their contents.

77.     Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022, with August 26, 2022 as his last day at the Company.

**ANSWER**:  Admits that Mr. Moro was the CEO of GGC from November 2017 to August 17, 2022; and admits that Mr. Moro was the CEO of GGT from February 2016 to August 17, 2022.

78.     Defendant Islim was the COO since the start of the Class Period and on August 17, 2022, he was appointed interim CEO by DCG and Murphy, and during the Class Period he was a member of the board of directors of GGH.

**ANSWER**:  Denies the allegations in Paragraph 78, except admits that Mr. Islim was the COO of GGT since February 2, 2022; admits that Mr. Islim became the interim CEO of GGC and GGT on August 17, 2022; and admits that Mr. Islim was a member of GGH's board of directors from July 19, 2022 to August 2, 2024.

79.     Defendant Kraines was CFO of DCG from on or around September 2021 through April 2023, and during the Class Period was a member of the board of directors of GGH, which was the sole managing member of the Company and through which Kraines controlled and managed the Company.

**ANSWER**:  Denies the allegations in Paragraph 79, including that Mr. Kraines "controlled and managed" Genesis, except admits that Mr. Kraines was the CFO of DCG from March 2021 to

April 3, 2023; admits that Mr. Kraines was a member of the GGH's board of directors from July 19, 2022 to April 3, 2023; and admits that GGH holds a 100% interest in GGC.

80.     Defendant Murphy was the COO of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH, which was the sole managing member of the Company and through which Murphy controlled and managed the Company. As COO of DCG Murphy worked closely with DCG's subsidiaries, including Genesis Global Capital, on strategy, execution, marketing and all management matters. Murphy led DCG's legal, communications, marketing, brand and public policy efforts and supported Defendant Silbert on day-to-day management of DCG. On August 17, 2022, Defendant Murphy, as COO of DCG and on DCG's behalf, stated "we're pleased to elevate [Defendant Islim] to the interim CEO role—he has our full trust and confidence and has been instrumental in developing key areas of the Genesis business," indicating that DCG and Murphy hand-picked the Company's interim CEO.

**ANSWER**:  Denies the allegations in Paragraph 80, except admits that Mr. Murphy was the COO of DCG from January 2020 to November 2022, has been the President of DCG since November 2022, and was a member of GGH's board of directors from July 19, 2022 to August 2, 2024; and states that fourth sentence of Paragraph 80 purports to quote and characterize an August 17, 2022 press release titled "Genesis Announces New Leadership Team," and refers to that press release for a complete and accurate description of its contents.

81.     Defendants because of their positions with the DCG, GGH, Genesis Global Capital and/or GGT, possessed the power and authority to control the sale or offering of securities by Genesis Global Capital, and/or acted within the scope of their authority or employment. Because of their positions and access to material non-public information available to them, but not to investors, each of them knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from investors in Genesis Yield Investment Agreements and that the positive representations which were being made were then materially false and misleading.

**ANSWER**:  States that the allegations in Paragraph 81 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 81.

## VI.     **JURISDICTION AND VENUE.**

82.     This Court has subject matter jurisdiction over the Action under 28 U.S.C. § 1331 because the complaint asserts claims under the Securities Act and the Exchange Act.

41

**ANSWER**:   States that the allegations in Paragraph 82 constitute legal conclusions, to which no response is required.

83.     Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 10(b) and 20(a).

**ANSWER**:   States that the allegations in Paragraph 83 constitute legal conclusions, to which no response is required.

84.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) because Defendants DCG and Silbert transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to the Action took place in this District.

**ANSWER**:   States that the allegations in Paragraph 84 constitute legal conclusions, to which no response is required.

85.     The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts throughout the United States, including in this District. The wrongful conduct alleged in this complaint have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**ANSWER**:   States that the allegations in Paragraph 85 constitute legal conclusions, to which no response is required.

86.     The Court also has personal jurisdiction over Defendants under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

**ANSWER**:   States that the allegations in Paragraph 86 constitute legal conclusions, to which no response is required.

87.     This Court has supplemental jurisdiction under 28 U.S. Code § 1367 over all other claims because they are so related to claims in the Action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

**ANSWER**:   States that the allegations in Paragraph 87 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.

88.     This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of

the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from Defendant.

**ANSWER**: States that the allegations in Paragraph 88 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.

89. This Court has jurisdiction over the Defendants who are domiciled in the State of Connecticut and because the Defendants have transacted business within the State of Connecticut.

**ANSWER**: States that the allegations in Paragraph 89 constitute legal conclusions, to which no response is required.

## VII. THE DCG CONGLOMERATE.

### A. DIGITAL CURRENCY GROUP.

90. Defendant DCG was founded by Defendant Silbert in 2015. In addition to founding DCG, Silbert has at all times served as CEO and Chairman of the board of directors of DCG. Until 2021, Defendant Silbert was also CEO of DCG's wholly-owned subsidiary business, Grayscale, and served as Chairman of Grayscale's board of directors.

**ANSWER**: Admits that Mr. Silbert founded the entity that would be renamed to DCG in 2004 and has served at all times as CEO and Chairman of the board of directors, as well as CEO and Chairman of Grayscale.

91. Defendant Silbert's aim has been to run DCG as a private conglomerate with divisions in every aspect of the digital asset market: "the model I use as an inspiration is Standard Oil," Silbert has stated, referring to the 19th-century oil conglomerate founded by John D. Rockefeller.

**ANSWER**: Denies the allegations in Paragraph 91, except states that Paragraph 91 purports to quote and characterize a November 1, 2021 article from the *Wall Street Journal* titled "Digital Currency Group Wants to Be Crypto's Standard Oil," and refers to that article for a complete and accurate description of its contents.

92. DCG describes itself as follows:

Founded in 2015 by CEO Barry Silbert, DCG is the most active investor in the blockchain sector, with a mission to accelerate the development of a better financial system through the proliferation of digital assets and blockchain technology.

> Today, DCG sits at the epicenter of the industry, backing more than 175 blockchain-related companies in over 35 countries. DCG also invests directly in digital currencies and other digital assets. In addition to its investment portfolio, DCG is the parent company of Genesis (a global digital asset prime brokerage), Grayscale Investments (the largest digital currency asset manager), CoinDesk (a leading financial media, data, and information company), Foundry (a leader in bitcoin mining and staking) and Luno (a leading cryptocurrency platform with a large international footprint).

**ANSWER**:  States that Paragraph 92 purports to quote and characterize a May 3, 2021 press release titled "Digital Currency Group Announces Plan to Increase Purchase Shares of Grayscale Bitcoin Trust (OTCQX: GBTC)," and refers to that press release for a complete and accurate description of its contents.

93.    To maintain control over Defendant DCG and its wholly-owned subsidiaries, Defendant Silbert has eschewed conducting an initial public offering to raise capital for Defendant DCG, stating "[DCG] doesn't need to dilute its ownership to raise capital . . . [i]t is not only not in the works, it's not even being discussed."[12]

**ANSWER**:  Denies the allegations in Paragraph 93 and its associated footnote, except states that Paragraph 93 and its associated footnote purport to quote and characterize a November 1, 2021 article from the *Wall Street Journal* titled "Digital Currency Group Wants to Be Crypto's Standard Oil," and refers to that article for a complete and accurate description of its contents.

94.    For example, while Defendant DCG engaged in a 2021 financing round which valued Defendant DCG at more than $10 billion, according to Defendant Silbert, this transaction was less about raising capital and was more "an opportunity for some early investors to exit and take profits . . . all the money raised went to the selling shareholders, and none sold their entire stake."

**ANSWER**:  Admits the allegations in Paragraph 94, except states that the investment round in 2021 valued DCG at approximately $10 billion; and states that Paragraph 94 purports to quote and characterize a November 1, 2021 article from the *Wall Street Journal* titled "Digital Currency

---

[12] Paul Vigna, *Digital Currency Group Wants to Be Crypto's Standard Oil*, Wall Street Journal (Nov. 1, 2021), https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-standard-oil-11635764400

Group Wants to Be Crypto's Standard Oil," and refers to that article for a complete and accurate description of its contents.

95.    Importantly, Defendant Silbert, who then owned approximately 40% of DCG, didn't sell any stock in the offering.

**ANSWER**:  Admits the allegations in Paragraph 95, except states Mr. Silbert beneficially owned approximately [38%] of the equity of DCG at the time of the investment round.

96.    As just one example of his control of Defendant DCG and its subsidiaries Defendant Silbert decided to move DCG and many of its subsidiary businesses, including Grayscale, from New York, New York to Stamford, Connecticut, where Defendant Silbert then lived.[13] Defendant DCG and Grayscale's moves were completed in early 2022.

**ANSWER**:  States that the allegations in Paragraph 96 and Footnote 8 constitute legal conclusions, to which no response is required.  To the extent that a response is required, denies the allegations in Paragraph 96 and its associated footnote, except admits that DCG and Grayscale have maintained offices in Stamford, Connecticut since September 2022 and previously maintained offices in New York, New York; and states that Paragraph 96 and its associated footnote purport to characterize a January 17, 2023 article from the *Wall Street Journal* titled "A Crypto Magnate Saw the Risks and Still Was Hammered," and refers to that article for a complete and accurate description of its contents.

97.    Defendant Silbert still owns approximately 40% of DCG and at all relevant times controlled the day-to-day activities of DCG and its wholly-owned subsidiaries Grayscale, Genesis Global Capital, GGH, and GGT, including the capital allocation and investment strategies employed by these entities.

**ANSWER**:  Denies the allegations in Paragraph 97, except admits that Mr. Silbert beneficially owns [approximately 38% of the equity of DCG]; admits that DCG holds a 100%

---

[13] Gregory Zucherman, Vicky Ge Huang and Caitlin Ostroff, *A Crypto Magnate Saw the Risks and Still Was Hammered*, Wall Street Journal (Jan. 17, 2023), https://www.wsj.com/articles/a-crypto-magnate-saw-the-risks-and-still-was-hammered-11673979412 ("Around 2020, Mr. Silbert decided to move most of the businesses from lower Manhattan to Stamford, Conn., where he lived.").

interest in GGH; admits that GGT is a wholly-owned subsidiary of DCG; admits that Grayscale is a wholly-owned subsidiary of DCG; and admits that GGH holds a 100% interest in GGC. .

98.    In April 2022, Forbes estimated Defendant Silbert's net worth at $3.2 billion, up from 2021's estimate of $1.6 billion.

**ANSWER**:  States that Paragraph 98 purports to characterize an April 6, 2021 article from *Forbes* titled "The Cryptocurrency Tycoons On Forbes' 2021 Billionaires List," and an April 5, 2022 article from *Forbes* titled "The Richest Crypto And Blockchain Billionaires In The World 2022," and refers to those articles for a complete and accurate description of their contents.

99.    Defendants DCG and Silbert closely managed and controlled its subsidiaries through interlocking directors and officers. Defendant Murphy was the COO of DCG during the period January 2020 through November 2022, has been President of DCG since October 2022, and is a member of the board of directors of GGH. Defendant Kraines was CFO of DCG from in or around September 2021 through April 2023, and is a member of the board of directors of GGH. GGH was the sole managing member of Genesis Global Capital and through their positions on the GGH board Kraines and Murphy controlled the Company on behalf of Defendants DCG and Silbert.

**ANSWER**:  Denies the allegations in Paragraph 99, including the claim that Mr. Kraines controlled Genesis Global Capital through his position on the GGH Board, except admits that Mr. Murphy was the COO of DCG from January 2020 to November 2022, has been the President of DCG since November 2022, and was a member of GGH's board of directors from July 19, 2022 to August 2, 2024; admits Mr. Kraines was the CFO of DCG from March 2021 to April 3, 2023 and was a member of GGH's board of directors from July 19, 2022 to April 3, 2023; and admits that GGH holds a 100% interest in GGC.

## B.    GRAYSCALE INVESTMENTS.

100.    Grayscale is a subsidiary of Defendant DCG and is a digital asset management company that offers investment products that provide exposure to the price movement of various digital currencies. Grayscale's most popular investment product is the Grayscale Bitcoin Trust, or "GBTC."

**ANSWER**: Denies the allegations in Paragraph 100, except admits that Grayscale is a wholly-owned subsidiary of DCG that provide investors with a cost-effective and convenient way to gain investment exposure to Bitcoin; admits that Grayscale's most purchased product is the Grayscale Bitcoin Trust, or "GBTC."

101.    GBTC is a publicly traded investment vehicle managed by Grayscale that provides exposure to bitcoin's price movements without the need to directly buy and hold the digital currency.

**ANSWER**: Admits that GBTC is sponsored by Grayscale and that GBTC's investment objective is to reflect the value of Bitcoin held by the Grayscale Bitcoin Trust, less expenses and other liabilities.

102.    Before and during the Class Period, GBTC was traded on OTCQX, a market for OTC securities.

**ANSWER**: Admits the allegations in Paragraph 102.

103.    Before and during the Class Period, GBTC shares could be acquired in two ways: (1) anyone with a brokerage account could buy GBTC shares in the OTC securities markets; and (2) investors could subscribe to the underlying trust (the "Trust").

**ANSWER**: Admits that GBTC shares could be purchased directly from GBTC or on OTCQX.

104.    Subscribing to the Trust required a minimum investment of $50,000 and was available only to accredited investors.

**ANSWER**: Admits the allegations in Paragraph 104.

105.    Trust subscribers received GBTC shares representing the value of Bitcoin held in the Trust equal to the amount of Bitcoin invested by the subscriber into the Trust.

**ANSWER**: Admits the allegations in Paragraph 105.

106.    GBTC shares issued via subscriptions were subject to a six-month lockup period during which subscribers could not sell their shares.

**ANSWER**: Admits the allegations in Paragraph 106.

107.    GBTC subscribers were free to sell their GBTC shares once the lockup period ended.

**ANSWER**:  Admits that any GBTC shares that qualified for the safe harbor exemption regarding the transfer of securities under 17 C.F.R. § 230.144 ("Rule 144") could be presented to outside counsel who may instruct a transfer agent to remove the transfer restriction, allowing the GBTC shares to then be resold without restriction.

108.    Grayscale charged a 2% annual management fee to manage GBTC, meaning that Grayscale, DCG, and Silbert took hundreds of millions of dollars annually and had an incentive to maximize the assets under management ("AUM") of Grayscale.

**ANSWER**:  Denies the allegations in Paragraph 108, except admits Grayscale charged a 2% sponsor's fee.

**C.    GENESIS GLOBAL TRADING, INC. & GENESIS GLOBAL CAPITAL, LLC.**

109.    GGT was formed in 2005 and was initially operated by Defendant Silbert as the bitcoin trading arm of Silbert's company SecondMarket, which Silbert launched in 2004 as a private marketplace where accredited investors could buy and sell shares of private companies. Silbert served as CEO of SecondMarket until selling SecondMarket to Nasdaq in 2015.

**ANSWER**:    Admits that GGT was formed in 2005 by Mr. Silbert; admits that SecondMarket was formed in 2004 by Mr. Silbert and was the largest secondary market dedicated to creating liquidity for alternative investments; admits that Mr. Silbert served as CEO of SecondMarket from 2004 to 2015; and admits that NASDAQ acquired SecondMarket in October 2015.

110.    Defendant Silbert spun GGT out of SecondMarket prior to selling SecondMarket to Nasdaq and relaunched GGT as a standalone broker-dealer specializing in digital currencies on April 16, 2015, over six months before Defendant Silbert announced the formation of DCG.

**ANSWER**:  Denies the allegations in Paragraph 110, except admits that in May 2015, SecondMarket filed registrations to form GGT, a crypto broker-dealer; and admits that Mr. Silbert announced the formation of DCG on October 27, 2015.

111.    In October 2015, in conjunction with the formation of DCG, Defendant Silbert caused GGT to become a wholly-owned subsidiary of DCG with Defendant Silbert serving as DCG's CEO, Chairman, and controlling shareholder, thus controlling GGT.

**ANSWER**:  Denies the allegations in Paragraph 111, except admits that GGT is a wholly-owned subsidiary of DCG; admits that Mr. Silbert is the founder and CEO of DCG; admits that Mr. Silbert is the chairman of DCG's board of directors; and admits that Mr. Silbert beneficially owned approximately [38%] of the equity of DCG as of December 31, 2022.

112.    GGT operated as a New York-based non-custodial, OTC market-maker in digital assets and brokerage, holding a virtual currency BitLicense with the New York Department of Financial Services ("NYDFS"), and registered as a broker-dealer with the SEC and the Financial Industry Regulatory Authority, or FINRA.

**ANSWER**:  Admits the allegations in Paragraph 112.

113.    In late 2017, Defendant Silbert and DCG organized Genesis Global Capital under the laws of the State of Delaware to house the growing digital asset investment business of the DCG conglomerate GGT had been operating for Silbert and DCG.

**ANSWER**:  Denies the allegations in Paragraph 113, except admits that GGC is organized under the laws of Delaware.

114.    Defendants Silbert and DCG formally spun Genesis Global Capital out of GGT as a standalone entity in April 2018, provided Genesis Global Capital with $40 million in seed capital,[14] and caused GGT to reassign all existing digital asset loan agreements to Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 114 and its associated footnote, except states that Paragraph 114 and its associated footnote purport to characterize a January 19, 2023 article from the *Wall Street Journal* titled "The 2018 Meeting That Kicked Off a Lending

---

[14] Vikcy Ge Huang & Caitlin Ostroff, *The 2018 Meeting That Kicked off a Lending Relationship Between Alameda and Genesis*, Wall Street Journal (Jan. 19, 2023), https://www.wsj.com/livecoverage/stock-market-news-today-01-19-2023/card/the-2018-meeting-that-kicked-off-a-lending-relationship-between-alameda-and-genesis-7dzw1fYOFJUQqxDRt2IY ("Its parent company, Digital Currency Group, gave Genesis $40 million to start the lending business, according to people familiar with the matter.")

Relationship Between Alameda and Genesis," and refers to that article for a complete and accurate description of its contents.

115.    According to the Genesis Global Capital, LLC Amended and Restated Operating Agreement entered into as of January 19, 2022 by Genesis Global Holdco, LLC (the "GGC Operating Agreement"), the managing member of Genesis Global Capital, LLC is Genesis Global Holdco, LLC, holding a 100% interest in Genesis Global Capital, LLC. The GGC Operating Agreement was signed by Defendant Moro as CEO and Managing Member of Genesis Global Holdco, LLC.

**ANSWER**:    States that Paragraph 115 purports to characterize the GGC Operating Agreement, and refers to the GGC Operating Agreement for a complete and accurate description of its terms and contents.

116.    Under the GGC Operating Agreement:

[Genesis Global Holdco, LLC] shall be the Company's Managing Member. The business and affairs of the Company shall be managed by [Genesis Global Holdco, LLC] . . . [Genesis Global Holdco, LLC] shall have the exclusive power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including, without limitation, all powers, statutory or otherwise, possessed by members under the Act. . . .

[Genesis Global Holdco, LLC] shall appoint a chief executive officer (the "CEO''). Each of [Genesis Global Holdco, LLC] or the CEO may hire other employees and appoint other officers of the Company, with such titles, authority and responsibilities as may be determined by the [Genesis Global Holdco, LLC] or the CEO, to oversee the daily operation of the Company. Such employees and officers shall be subject to removal by the [Genesis Global Holdco, LLC] or the CEO at any time. [Genesis Global Holdco, LLC], the CEO and any employee or officer authorized by [Genesis Global Holdco, LLC] or the CEO, is authorized to execute, deliver and file, in the name of and on behalf of the Company, any and all documents, agreements, certificates, receipts, instruments, forms, letters, or similar documents and to do or cause to be done any other actions as the [Genesis Global Holdco, LLC] or the CEO, or such authorized employee or officer, may deem necessary or desirable to further the interests of the Company, except as may be limited by the Act or the terms of this Agreement.

(b) Notwithstanding the foregoing, none of the CEO or any officer or employee may take any of the following actions without the written consent of [Genesis Global Holdco, LLC]: . . .

(iii) the filing of any petition in bankruptcy by the Company; . . .

(vi) any other matter required under the Act or this Agreement.

**ANSWER**: States that Paragraph 116 purports to quote and characterize the GGC Operating Agreement, and refers to the GGC Operating Agreement for a complete and accurate description of its terms and contents.

117.    According to the Genesis Global Holdco, LLC Amended and Restated Operating Agreement entered into as of July 19, 2022 by Defendant DCG (the "GGH Operating Agreement"), the managing member of Genesis Global Holdco, LLC is Defendant DCG, holding a 100% interest in Genesis Global Holdco, LLC. The GGH Operating Agreement was signed by Defendant Silbert as CEO of Genesis Global Holdco, LLC's parent, Defendant DCG.

**ANSWER**: Admits that the allegations in Paragraph 117 purports to characterize the GGH Operating Agreement, and refers to the GGH Operating Agreement for a complete and accurate description of its terms and contents.

118.    Under the GGH Operating Agreement:

The business and affairs of the Company shall be managed by a Board of Directors (the "Board"). The size of the Board shall be set by [Defendant DCG], but shall consist of at least three (3) directors (each, a "Director"). Each director shall be designated one of: a parent Director (each, a "Parent Director"), a Genesis Director (each, a "Genesis Director") or an independent Director (each, an "Independent Director"). Each Director shall serve as a "manager" of the Company within the meaning of the Act and the Board shall have overall management responsibility of the Company.

(b) The affirmative vote or written consent given by a majority in number of the Directors shall constitute the approval of the Board; *provided*, *however*, that the unanimous affirmative vote or written consent of the Parent [DCG] Directors shall be required for the approval of the following matters (and the Company will not take any of the following actions without such approval): . . .

(iii) the filing of any petition in bankruptcy by the Company;

**ANSWER**: States that Paragraph 118 purports to quote and characterize the GGH Operating Agreement, and refers to the GGH Operating Agreement for a complete and accurate description of its terms and contents.

119.    Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022, and CEO of Genesis Global Holdco, LLC, and during the Class Period he reported to Defendant Silbert.

**ANSWER**: Denies the allegations in Paragraph 119, except admits that Mr. Moro was the CEO of GGC from November 2017 to August 17, 2022; and admits that Mr. Moro was the CEO of GGT from February 2016 to August 17, 2022.

120.    Defendant Islim was the COO of Genesis Global Capital and on August 17, 2022, Defendants DCG and Murphy appointed him interim CEO of Genesis Global Capital and GGT. During the Class Period he was a member of the board of directors of GGH and the Company and he reported to Defendant Silbert.

**ANSWER**: Denies the allegations in Paragraph 120, except admits that Mr. Islim was the COO of GGC starting January 19, 2021, became the interim CEO of GGC and GGT on August 17, 2022, and was a member of GGH's board of directors from July 19, 2022 to August 2, 2024.

121.    Defendants Kraines and Murphy were members of the board of directors of Genesis Global Holdco, LLC that managed the business of Genesis Global Capital. Defendants Kraines and Murphy as DCG's representatives reported to Defendant Silbert.

**ANSWER**: Denies the allegations in Paragraph 121, including the claim that Mr. Kraines controlled Genesis Global Capital through his position on the GGH Board, except admits that Mr. Kraines was a member of GGH's board of directors from July 19, 2022 to April 3, 2023; admits that GGH holds a 100% interest in GGC; admits that GGH was the sole managing member of GGC; and admits that Mr. Kraines and Mr. Murphy reported to Mr. Silbert in connection with their employment at DCG.

122.    Ballensweig was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022. Ballensweig was responsible for the origination and execution of digital asset and cash loans and reported to Defendants Moro and Islim who oversaw and supervised the business of Genesis Global Capital.

**ANSWER**: Admits that Mr. Ballensweig was the co-Head of Sales and Trading until September 28, 2022.

52

123.    Defendants DCG and Silbert controlled Genesis Global Capital through, *inter alia*, DCG's 100% ownership of Genesis Global Capital, the placement of DCG and Silbert's representatives and agents on the board of GGH and GGT, as well as DCG and Silbert's ability to hire and fire executives of Genesis Global Capital and GGT, and other authority under the operating agreements of GGC and GGH.

**ANSWER**:  States that the allegations in Paragraph 123 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 123.

## VIII.   GEMINI TRUST COMPANY, LLC.

124.    Non-party Gemini Trust Company, LLC ("Gemini") is a New York-based cryptocurrency exchange and custodian founded in 2014 by Cameron and Tyler Winklevoss.

**ANSWER**:  Admits the allegations in Paragraph 124.

125.    In February 2021, together with Genesis Global Capital, Gemini launched the Gemini Earn program, which as described in greater detail herein, offered owners of digital assets the opportunity to earn yield by investing those assets with Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 125, except admits that Gemini Trust Company, LLC ("Gemini") operated a program known as "Gemini Earn" and GGC was a lending partner for that program.

126.    Each investor who invested digital assets with Genesis Global Capital via the Gemini Earn program signed a Genesis Yield Investment Agreement signed by Genesis Global Capital, Gemini, and the investor, with substantially identical terms to investors who invested directly with Genesis Global Capital, with the exception being certain sections of the agreement appointing Gemini as agent for Gemini Earn investors and outlining the purpose and scope of Gemini's agency.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 126 and denies on that basis, except states that Paragraph 126 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

127.    Specifically, each Genesis Yield Investment Agreement signed by Gemini Earn investors contained the following language:

## VI. Appointment of Custodian as Agent

a. Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

b. Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:

(i) has received and reviewed a copy of this Agreement;

(ii) has duly appointed Custodian as its agent to act on Lender's behalf *for all purposes under this Agreement*;

(iii) has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;

(iv) is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and

(v) has taken all necessary action to authorize such appointment of Custodian and such performance by it.

(Emphasis added).

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 127 and denies on that basis, except states that Paragraph 127 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

128.    Gemini was appointed as agent on behalf all Gemini Earn investors for *all purposes* relating to the performance of the Genesis Yield Investment Agreements, with Gemini treated as a principal to each agreement standing in the shoes of Gemini Earn investors for those purposes.

**ANSWER**: States that the allegations in Paragraph 128 constitute legal conclusions, to which no response is required. To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 128 and denies on that basis, except states that Paragraph 128 purports to characterize the Lending

54

Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

129.    The sole limitation placed on Gemini's agency was that Gemini was "not authorized … to exercise discretion in determining the amount, timing or selection of any Loan on [Gemini Earn investors'] behalf[.]" But in every other respect, Gemini stood in the shoes of Gemini Earn investors.

**ANSWER**:  States that the allegations in Paragraph 129 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 129, except states that Paragraph 129 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

130.    To this end and as appointed agent for Gemini Earn investors, Gemini received, reviewed, and monitored quarterly disclosures from Genesis Global Capital regarding the Company's risk management practices, balance sheet status and health, and investment strategies. Gemini relied upon Genesis Global Capital's disclosures in determining whether to continue its partnership with Genesis via the Gemini Earn program or whether to terminate the program and recall all Gemini Earn investors' digital assets.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 130 and denies on that basis.

## IX.    **GENESIS GLOBAL CAPITAL'S YIELD SECURITIES.**

131.    Beginning at least as early as July 2020, Genesis Global Capital began offering an investment and selling securities called "Yield Generation" (Genesis Yield securities), which allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty."

**ANSWER**:  Denies the allegations in Paragraph 131, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 131 regarding the offering of "Yield Generation" and denies on that basis; and states that Paragraph 131 purports to quote and characterize genesistrading.com, and refers to that website for a complete and accurate description of its contents.

132.    The following is a screenshot showing Genesis Global Capital's website on July 21, 2020, which include the Genesis and DCG logos:[15]



***

**ANSWER**:  Admits that the allegations in Paragraph 132 and its associated footnote quote and characterize GGT's website, and refers to that website for a complete and accurate description of its contents.

133.    The basic terms of investment in Genesis Yield securities were simple: in exchange for an investor tendering digital assets or cash to Genesis Global Capital and granting Genesis Global Capital the attendant rights to use those assets or cash in Genesis Global Capital's investment activities, Genesis Global Capital promised to pay the investor lucrative rates of return and promised the return of investors' assets at maturity of the loans.

**ANSWER**:  Denies the allegations in Paragraph 133, except states that Paragraph 133 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

134.    Investments made directly with Genesis Global Capital could be for fixed terms such as six-months, or could be open-term. Genesis Global Capital referred to open term

---

[15]  https://web.archive.org/web/20200721225619/https://genesistrading.com/lending/ (visited Nov. 9, 2023).

investments as having a "call option." These "call options" on investments permitted an investor to demand repayment of all or a portion of an investment on any given business day, which would trigger an obligation on behalf of Genesis Global Capital to return the investor's capital.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 134 and denies on that basis, except states that Paragraph 134 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

135.    Initially, investment in Genesis Yield securities was open to public investment as long as an individual could meet certain investment minimums set by Genesis Global Capital. Although the investment minimums changed over time, Genesis Global Capital did not always adhere to these requirements. In November 2022, the minimums purportedly enforced by Genesis Global Capital were 100 BTC, 1,000 ETH, $2 million U.S. Dollars, or $1 million of certain alternative digital assets. During the Class Period, Genesis Global Capital did not enforce or dropped the investment minimum for direct investors.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 135 and denies on that basis, except admits that GGC established certain lending minimums at certain points in time.

136.    Beginning February 2, 2021, however, Genesis Global Capital dropped the investment minimum and began offering investors a way to invest any amount of digital assets in Genesis Yield securities via the Gemini digital asset platform.

**ANSWER**: Denies the allegations in Paragraph 136, except admits that the Gemini Earn program launched on February 2, 2021.

137.    Dubbed the "Gemini Earn" program on the Gemini digital asset platform, Genesis Global Capital began permitting any investor that held a Gemini digital asset platform account to elect to invest their digital assets in the Genesis Yield securities.

**ANSWER**: Denies the allegations in Paragraph 137.

138.    To invest, Gemini digital platform users entered into the Genesis Yield Investment Agreement with Genesis Global Capital and Gemini, and expressly appointed Gemini as their agent for purposes of their Genesis Yield investments. The agreement was a standard agreement and not individually negotiated with Gemini Earn investors. Genesis Yield investments made via Gemini Earn were open term investments, meaning that investors could redeem their investment at any time by giving notice to Genesis Global Capital.

**ANSWER**: States that the allegations in Paragraph 138 constitute legal conclusions, to which no response is required. To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 138 and denies on that basis, except states that Paragraph 138 purports to characterize the Lending Agreements, and refer to the Lending Agreements for a complete and accurate description of their terms and contents.

139.    Other investors who purchased Genesis Yield securities directly from the Company likewise entered into a standard Master Borrow Agreement which was not individually negotiated by direct investors. Investments made directly with the Company were fixed term or open term, where investors could redeem their investment at any time by giving notice to the Company.

**ANSWER**: Denies the allegations in Paragraph 139, except states that Paragraph 139 purports to characterize the Lending Agreements, and refer to the Lending Agreements for a complete and accurate description of their terms and contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 139 and denies on that basis.

140.    The accrual of interest on the Genesis Yield securities were calculated using a daily periodic rate applied to the principal invested, and interest was paid the month after it accrued. Interest payments were denominated in the same type of cryptocurrency or digital asset (or cash) originally invested.

**ANSWER**: States that the allegations in Paragraph 140 constitute legal conclusions, to which no response is required. To the extent a response is required, admits the allegations in Paragraph 140; and states that the allegations in Paragraph 140 purport to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

141.    Each Genesis Yield investor—whether or not the investment was made via the Gemini Earn program—entered into a Genesis Yield Investment Agreement with Genesis Global Capital which set forth the terms of the investment, including the types of occurrences that constituted events of default and what could cause termination of the agreement and required

parties to make certain representations and warranties regarding the parties' financial condition (*i.e.*, neither party is insolvent), and more.

**ANSWER**: States that the allegations in Paragraph 141 constitute legal conclusions, to which no response is required. To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 141 and denies on that basis, except states that Paragraph 141 purports to characterize the Lending Agreements, and refer to the Lending Agreements for a complete and accurate description of their terms and contents.

142. In each Genesis Yield Investment Agreement, Genesis Global Capital made the following representations to investors:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws. (the "Solvency Warranty")

> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder. (the "Adverse Proceedings Warranty").

**ANSWER**: States that Paragraph 142 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

143. As detailed above, Plaintiffs reviewed and relied upon these representations and warranties in deciding to invest in Genesis Yield securities.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 143 and denies on that basis.

144. Importantly, each Genesis Yield Investment Agreement executed by each Genesis Yield investor with Genesis Global Capital stated that the Solvency Warranty and Adverse Proceedings Warranty "shall continue" during the term of the investments meaning either:

a)    the Solvency Warranty and Adverse Proceedings Warranty were deemed to have been made to each Genesis Yield investor every day during the life of each Genesis Yield Investment Agreement; or

b)    that because of the Solvency Warranty and Adverse Proceedings Warranty made at the time of execution of the agreement, Genesis Global Capital had an affirmative duty to disclose or update member of the Class if either the Solvency Warranty or Adverse Proceedings Warranty ceased to be truthful.

**ANSWER**:  States that the allegations in Paragraph 144 constitute legal conclusions, to which no response is required.  To the extent a response is required, states that Paragraph 144 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents

145.    To generate the yield promised to investors, Genesis Global Capital commingled and/or pooled Genesis Yield investor principal with those of other Genesis Yield investors; held Genesis Yield investor's principal in accounts in Genesis Global Capital's name or other names; pledged, repledged, hypothecated, rehypothecated, sold, lent, staked, arranged for staking, and otherwise transferred Genesis Yield investors' digital assets separately or together with other property; and otherwise used or invested such digital assets or currency at the investor's sole risk.

**ANSWER**:  States that the allegations in Paragraph 145 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 145.

146.    Genesis Global Capital had to engage in risky investment strategies to generate yield. As just one example, Genesis Global Capital invested billions of dollars worth of Genesis Yield investors' digital assets and cash with now-infamous digital asset hedge funds Alameda Research, LLC (owned by Sam Bankman-Fried) and Three Arrows Capital (previously defined herein as "3AC"), as well as Genesis Global Capital's parent DCG, who themselves believed they would earn outsized returns with those funds via their own proprietary investment strategies. At the height of their relationship, Genesis Global Capital provided Alameda Research with over $6.5 billion in capital via loans that were often only 50% secured and were not over collateralized.

**ANSWER**:  States that the allegations in Paragraph 146 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 146, except lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in the first sentence of Paragraph 146 and denies on that basis; and admits

that at various times GGC loaned digital assets to the FTX Entities, 3AC, and DCG.

147.    Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund 3AC, on behalf of Genesis Global Capital. Genesis Global Capital provided virtually all of Genesis Asia Pacific's lending capital. Genesis Asia Pacific, in turn, repaid Genesis Global Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific. Genesis Global Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.[16]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in Paragraph 147 and its associated footnote and denies on that basis,

except states that Paragraph 147 and its associated footnote purport to characterize the NYAG

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its

contents.

148.    In short, Genesis Global Capital engaged in undisclosed, unduly risky and self-interested investment strategies with investors' capital to earn yield. The returns earned by each Genesis Yield investor depended on the pooling of the invested digital assets, and importantly the ways in which Genesis Global Capital invested those assets. Ultimately, investor returns on Genesis Yield securities were dependent on Genesis Global Capital's managerial or entrepreneurial or efforts and risk management in investing activities. Because Genesis Global Capital sought to gain by reinvesting investors' assets with counterparties, investors were dependent on the skill, experience and risk management policies and procedures of Genesis and its executives and employees.

**ANSWER**:  States that the allegations in Paragraph 148 constitute legal conclusions, to

which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 148.

149.    The income Genesis Global Capital earned investing Genesis Yield investors' assets was the only revenue-generating activity in which Genesis Global Capital engaged.

**ANSWER**:  Denies the allegations in Paragraph 149.

150.    Although Genesis Global Capital styled Genesis Yield investors' investments as "loans" to Genesis Global Capital and characterized Genesis Global Capital's redeployment of

---

[16] NYAG Compl., ¶40.

those assets as a "borrowing and lending" business, in substance, Genesis Global Capital managed a pooled investment vehicle and/or issued note securities used to fund its own investment business.

**ANSWER**:  Denies the allegations in Paragraph 150, except states that Paragraph 150 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

151.    Despite the economic realities of the Genesis Yield product, however, Genesis Global Capital made no attempt to comply with federal or state securities laws.

**ANSWER**:  Denies the allegations in Paragraph 151.

152.    GGC is not licensed, registered, or qualified, and did not otherwise file notice with the SEC.

**ANSWER**:  States that the allegations in Paragraph 152 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 152 and denies on that basis.

153.    Genesis Yield securities are not registered with the SEC or any other securities regulatory authority, nor are they exempt from registration.

**ANSWER**:  States that the allegations in Paragraph 153 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 153, except admits that the Lending Agreements were not registered with the SEC.

154.    Genesis Global Capital failed to disclose to Genesis Yield investors that Genesis Yield securities were not registered with federal or state securities regulatory authorities.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 154 and denies on that basis.

155.    Genesis Yield investors' principal was thus not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA"). This lack of a protective scheme or regulatory oversight subjected Genesis Yield investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, or with banks, savings associations, or credit unions.

**ANSWER**:  States that the allegations in Paragraph 155 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 155 and denies on that basis.

**X.    THE GENESIS YIELD SECURITIES ARE A "SECURITY" UNDER THE FEDERAL SECURITIES LAWS.**

156.    An analysis of the facts and circumstances surrounding the offer and sale execution of Genesis Global Capital's Genesis Yield securities, including the analysis set forth in a complaint filed by the SEC,[17] show that the Genesis Yield securities are: (1) "investment contracts" when the Genesis Yield Investment Agreements are coupled with investors' deposits under the test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946); and (2) "notes" under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990). *SEC v. Genesis Global Capital, LLC, et al*., No. 23-CV-00287 (ER), 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024). Under the Securities Act, loan term sheets or the terms presented to investors through the Gemini Earn platform under the Genesis Yield Investment Agreements are "evidence of indebtedness" that show class members invested their assets to Genesis Global Capital in return for a promise of interest and return of principal at maturity. 15 U.S.C. § 77b(a)(1).

**ANSWER**:  States that the allegations in Paragraph 156 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 156 and its associated footnote, except states that Paragraph 156 and its associated footnote purport to quote and characterize the complaint filed in the SEC Enforcement Action (the "SEC Complaint"), and refers to the SEC Complaint for a complete and accurate description of its contents.

157.    According to the NYAG's complaint, Genesis's Chief Legal Officer, Arianna Pretto-Sakmann, arrived at the same conclusion before the launch of the Gemini Earn program: "Genesis's Chief Legal Officer acknowledged several months before the launch of Gemini Earn that the program 'may be viewed as an investment contract under the securities laws.'"[18]

---

[17] *SEC v. Genesis Global Capital, LLC and Gemini Trust Company, LLC*, Case No. 1:23-cv-00287, ECF No. 1 (S.D.N.Y) ("SEC Enforcement Action"). As noted in the SEC Enforcement Action, "digital asset" is another term for crypto asset, *id*., at n.2, and thus both terms are used herein interchangeably.

[18] NYAG Compl., ¶191.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 157 and denies on that basis, except states that Paragraph 157 purports to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

158.    The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts," "notes," "bond," and "evidence of indebtedness." An "investment contract" is an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[19]

**ANSWER**:  States that the allegations in Paragraph 158 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 158 and its associated footnote, except states that Paragraph 158 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

159.    According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."[20]

**ANSWER**:  States that the allegations in Paragraph 159 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, states that Paragraph 159 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

---

[19] *SEC v. Genesis Global Capital.,* ¶19 (citing *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946)).

[20] *Id.* (citing *SEC v. Edwards*, 540 U.S. 389, 393 (2004)).

160.    Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the Internet, including digital assets.[21]

**ANSWER**:   States that the allegations in Paragraph 160 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, states that Paragraph 160 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

161.    Therefore, under the definition of security in the Securities Act and the tests articulated in *Reves* and *Howey,* Genesis Yield securities offered and sold by Genesis Global Capital are a "security" subject to the federal securities laws.

**ANSWER**:   States that the allegations in Paragraph 161 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 161.

162.    Perhaps the most relevant example of a common financial instrument that is universally recognized as a security is a bond.

**ANSWER**:   States that the allegations in Paragraph 162 constitute legal conclusions, to which no response is required.  To the extent a response is required, states that the allegations referring to bonds as "relevant" and "common" are generalized, vague, and non-specific, and denies on that basis.

163.    According to the SEC:

> [a] bond is a debt security, like an IOU. Borrowers issue bonds to raise money from investors willing to lend them money for a certain amount of time. When you buy a bond, you are lending to the issuer, which may be a government, municipality, or corporation. In return, the issuer promises to pay you a specified rate of interest during the life of the bond and to repay the principal, also known as face value or par value of the bond, when it 'matures,' or comes due after a set period of time. https://www.investor.gov/introduction-investing/investing-basics/investment-products/bonds-or-fixed-income-products/bonds

---

[21] *Id.*

**ANSWER**: States that Paragraph 163 purports to quote and characterize the SEC's website, and refers to that website for a complete and accurate description of its contents.

164. Similar to the investment contracts at issue here, bonds are intended to provide a predictable income stream. Typically, bonds pay interest on a regular schedule.

**ANSWER**: Denies the allegations in Paragraph 164, except states that the allegations concerning bonds are generalized, vague, and non-specific, and denies on that basis.

165. At maturity, bondholders get back the entire principal—as was intended with Plaintiffs' asset investments with Genesis Global Capital—so bonds are a way to preserve capital while investing.

**ANSWER**: Denies the allegations in Paragraph 165, except states that the allegations concerning bonds are generalized, vague, and non-specific, and denies on that basis; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiffs' "inten[t]" and denies on that basis.

166. Like a bond, a promissory note, according to the SEC:

is a form of debt – similar to a loan or an IOU – that a company may issue to raise money. Typically, an investor agrees to loan money to the company for a set period of time. In exchange, the company promises to pay the investor a fixed return on his or her investment, typically principal plus annual interest. https://www.sec.gov/investor/pubs/promise.htm

**ANSWER**: States that Paragraph 166 purports to quote and characterize the SEC's website, and refers to that website for a complete and accurate description of its contents

167. The transactional documents that effectuated the offer or sale of Genesis Yield securities—the Genesis Lending Agreement and the loan terms sheets or terms presented via the Gemini Earn platform—are instruments that evidence class members' investment in Genesis Yield securities in which they invested assets with Genesis Global Capital in exchange for a rate of return in the form of interest on an unsecured basis and the promise of the return of principal at maturity.

**ANSWER**: States that the allegations in Paragraph 167 constitute legal conclusions, to which no response is required. To the extent that a response is required, denies the allegations in

Paragraph 167, except states that Paragraph 167 purports to characterize the Lending Agreements,

and refers to the Lending Agreements for a complete and accurate description of its contents.

168.    Class members' investment with Genesis Global Capital were the same as or similar to investing in a bond or promissory notes that pays a fixed rate of return in the form of interest payments with a return of principal at maturity.

**ANSWER**:  States the allegations in Paragraph 168 constitute legal conclusions, to which

no response is required.  To the extent that a response is required, denies the allegations in

Paragraph 168.

169.    Courts have found that both bonds and promissory notes are securities under the federal securities laws. *See Pollack v. Laidlaw Holdings, Inc*. 27 F.3d 808, 812-13 (2d Cir. 1994) (finding that promissory notes at issue were like bonds that offered fixed rate of return in the form of interest and that district court erred in finding promissory note with fixed rate of return cut against the presumption that the notes are securities); *S.E.C. v. Thompson*, 732 F.3d 1151, 1155 (10th Cir. 2013) (finding unsecured promissory note a security where borrower promised to repay the principal amount after six months plus monthly interest of 3-5% depending upon whether holder chose monthly payments or a lump sum at maturity); *Stoiber v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998) (finding security where lender executed unsecured promissory note for terms of two to five years for fixed rates of interest); *McNabb v. SEC*, 298 F.2d 1126, 1131 (9th Cir. 2002) (finding loans of cash in exchange for promissory notes with fixed rates of interest were securities); *Hunssinger v. Rockford Business Credits, Inc*., 745 F.2d 484, 491 (7th Cir. 1984) (finding fixed rate note a security and reversing district court that found note was not an investment because plaintiff received a set rate of interest that did not depend on the success or failure or the enterprise: "[I]f the term 'profits' . . . were not to encompass fixed interest payments, then a twenty-year corporate bond issued in a public offering would not be a security . . . That result would clearly contradict Congress's intention to protect investors, and it would make superfluous several terms—such as 'bond' and 'note'—in the definitional sections of the securities acts."); *S.E.C. v. Wallenbrock,* 313 F.3d 532, 539 (9th Cir. 2002) (applying the *Reves* test to determine if fixed rate note was a security: "the promise of a high, stable 20% interest rate likely attracted investors looking for significant profits."); 15 U.S.C. § 77b (defining "bond" as a security).

**ANSWER**:  States that the allegations in Paragraph 169 constitute legal conclusions, to

which no response is required.  To the extent that a response is required, states that Paragraph 169

purports to quote and characterize judicial opinions from *Pollack v. Laidlaw Holdings, Inc*., 27

F.3d 808, 812-13 (2d Cir. 1994), *SEC v. Thompson*, 732 F.3d 1151, 1155 (10th Cir. 2013), *Stoiber*

*v. SEC*, 161 F.3d 745, 750 (D.C. Cir. 1998), *McNabb v. SEC*, 298 F.2d 1126, 1131 (9th Cir. 2002),

*Hunssinger v. Rockford Business Credits, Inc*., 745 F.2d 484, 491 (7th Cir. 1984), *SEC v.*

*Wallenbrock,* 313 F.3d 532, 539 (9th Cir. 2002), as well as 15 U.S.C. § 77b, and refers to those

decisions and statute for a complete and accurate description of their contents.

170.    Genesis Global Capital's current and former officers, directors, managers and employees have explained the economic substance of the transactions in Genesis Yield securities: 1) the investors' assets would be utilized by Genesis Global Capital to generate revenue that would be the source of investors' rate of return; 2) that investors' rates of return were dependent upon the yield the Company could earn when it reinvested investors' capital; 3) that when investors invested assets with the Company, they had a reasonable expectation of profits and shared in the success of the Company's efforts when it reinvested investors' capital; and 4) based on its expertise the Company would invest assets on investors' behalf and for their benefit, earn yield on behalf of both itself and investors, and investors would share in the success of the Company's efforts in generating yield because they would receive a portion of the yield generated by the Company in the form interest payments.

**ANSWER**:  States that the allegations in Paragraph 170 constitute legal conclusions, to

which no response is required.  To the extent that a response is required, denies the allegations in

Paragraph 170.

171.    On May 21, 2021, during a podcast on Modern Finance titled "How Safe is My Crypto?," Ballensweig explained how GGC's investment business model worked:

> the way the model works, is that deposits, like you said, will get aggregated in batched and swept over to Genesis from Gemini and our other partnerships as well . . . the way it works is when we face our partners, they basically sweep over the assets. We now, you know, have access to this working capital. You know, just step back. We're facing about 250 or so unique institutional borrowers on the other side. So, these are some of your leading hedge funds, quant trading firms, market neutral firms, other exchanges, other dealers, other lending, portals and platforms. And so we'll go out and lend the capital that we borrow from our depositors out to the market. . . . .
>
> And then similarly, like the Gemini model, it's anybody that uses, you know, Gemini Earn now can basically transfer assets from their regular Gemini wallet to their Gemini Earn wallet, and then Gemini on a daily basis will come to Genesis basically deposit those assets with us, we go out to the market, lend those assets out to our, you know, network of borrowers, generate the yield and then pay Gemini back so that it can pay its users.

**ANSWER**:  Denies the allegations in Paragraph 171, except states that Paragraph 171

purports to quote and characterize a May 21, 2021 episode of the podcast *Modern Finance* titled

"How Safe is My Crypto?" and refers to that podcast for a complete and accurate description of its contents.

172.    On September 17, 2020, during a podcast on The Block titled "The Evolution of Crypto Lending," Ballensweig explained the economics concerning Genesis Global Capital's investment business:

**QUESTION**:    I'm wondering if you can kind of unpack the unit economics behind that. And how this all really works? Like, is it really too good to be true? And kind of highlighting that for wider audience would be interesting.

**BALLENSWEIG**:    Yeah no, absolutely. It's a really good question. And it's certainly a question that we get a lot of Genesis when we're talking to prospective lenders, or capital pools, is how is it possible that you guys can pay eight percent on stable coin or cash? Why is that so much different than traditional markets? What's driving the discrepancy there? And then, a lot of the times people are skeptical to hear those kinds of rates because they immediately think that there's more risk associated with that opportunity.

And so, on one end you have lenders that are like trying to figure out, what is the right interest rate for me to basically loan out my capital, earn interest, knowing the either platform risk that I'm taking, whether if you're kind of going the Defi route, or what's the credit and counterparty risk that I'm taking if you're going kind of the more centralized lending route?

And then on the other end, we feel like, we're - what sets Genesis apart is the fact that we're kind of uniquely positioned in the middle. Our roots are obviously in trading and understanding OTC markets and understanding exchanges and the nuances of the market structure and who all the participants are that are actually utilizing the end capital.

And so, we see where the deployment of wealth goes. We see who's using it, how often, what they're deploying it towards. And so, I think we're really a nexus point in the space to kind of understand the economics around lending, why rates are the way they are.

**ANSWER**: Denies the allegations in Paragraph 172, except states that Paragraph 172 purports to quote and characterize a September 17, 2020 episode of the podcast *The Block* titled "The Evolution of Crypto Lending," and refers to that podcast for a complete and accurate description of its contents.

173. On January 22, 2021, during the GBBC Virtual Members Forum, Defendant Islim stated the following about GGC's investment business:

> **ISLIM**: we definitely offer one of the best yields in the market and a lot of our clients reach us to provide their assets for us to be able to get yield on that overall. We offer a lot of products around lending when it comes to open term, fixed term, and all of that is really just to service clients who have very different views about the market, or they are looking forward to look at certain rates, or are they more short-term investors - they want to have open-term loans without just to get extra used in the short-term like extra funding. It's definitely we are experts in this space. We understand the crypto funding market very very well. And this gives us a cutting edge in providing the right liquidity and also the best yield in the market.

**ANSWER**: Denies the allegations in Paragraph 173, except states that Paragraph 173 purports to quote and characterize a statement made by Mr. Islim during the January 22, 2021 GBBC Virtual Members Forum, and refers to that statement for a complete and accurate description of its contents.

174. On February 26, 2024, at a hearing in the Genesis Bankruptcy Action, Paul Aronzon, a director of GGH explained that: "[t]he people who gave us their assets, they own them. Yes, **they gave them to us to invest**." (Emphasis added).

**ANSWER**: States that the allegations in Paragraph 174 purport to quote and characterize a February 26, 2024 hearing transcript in the Genesis Bankruptcy Action, and refers to that transcript for a complete and accurate description of its contents; and admits that Paul Aronzon was an independent director of GGH's board of directors at the time of the hearing.

A. **THE GENESIS YIELD SECURITIES ARE NOTES UNDER *REVES*.**

175. A note is a type of debt security that, as done in the Genesis Yield securities, represents a promise to pay a specific amount of money at a specified time or on demand.

70

**ANSWER**: States that the allegations in Paragraph 175 constitute legal conclusions, to which no response is required. To the extent a response is required, denies the allegations in Paragraph 175.

176. To invest in Genesis Yield securities, class members invested cash or digital assets with the Company under the Genesis Yield Investment Agreements in which Genesis Global Capital promised to pay interest and repay the entirety of the loan at maturity. Class members invested with Genesis Global Capital by entering into the Genesis Yield Investment Agreements and then tendering digital assets or cash to Genesis Global Capital pursuant to either executed loan term sheets (for direct investors) or the terms presented to them via the Gemini Earn platform (for Gemini Earn investors).

**ANSWER**: States that the allegations in Paragraph 176 constitute legal conclusions, to which no response is required. To the extent a response is required, denies the allegations in Paragraph 176, except states that Paragraph 176 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents.

177. To determine whether a loan of money with a promise of interest and return of principal qualifies as a "note" under the federal securities laws, the U.S. Supreme Court established the "family resemblance" test in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

**ANSWER**: States that the allegations in Paragraph 177 constitute legal conclusions, to which no response is required.

178. The "family resemblance" test starts with a presumption that every note is a security. The test involves four factors to determine if a note should be considered a security.

**ANSWER**: States that the allegations in Paragraph 178 constitute legal conclusions, to which no response is required.

179. A note is presumed to be security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory scheme that "significantly reduces the risk of

the instrument" for investors other than securities laws, "thereby rendering application of the Securities Acts unnecessary."[22]

**ANSWER**:   States that the allegations in Paragraph 179 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, states that Paragraph 179 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

180.    Under the test articulated in *Reves*, the Genesis Yield securities are "notes" under the federal securities laws that were offered and sold by Genesis Global Capital as securities.

**ANSWER**:   States that the allegations in Paragraph 180 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 180.

### i.    Motivations of Genesis Yield Securities Investors.

181.    Genesis Global Capital offered and sold the Genesis Yield securities to obtain digital assets, cash, and other capital to use in its business—namely, to run its investment activities, generate profits for itself, and to pay the interest promised to Genesis Yield investors.

**ANSWER**:   States that the allegations in Paragraph 181 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 181.

182.    Genesis Yield securities investors—including those who invested through the Gemini Earn program—were primarily interested in the profit they expected the Genesis Yield product to generate.[23]

**ANSWER**:   States that the allegations in Paragraph 182 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 182 and its associated footnote and denies on that basis; and states that Paragraph

---

[22] *Id.*, ¶44 (citing *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990)).

[23] *Id.*, ¶45.

182 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

183.    Class members sought to invest in Genesis Yield securities by loaning crypto or cash in exchange for a fixed rate of return in the form of interest on an unsecured basis and the promise of the return of principal at maturity.

**ANSWER**:  States that the allegations in Paragraph 183 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 183 and denies on that basis.

184.    In other words, Genesis Global Capital sought to generate enough revenue by reinvesting investors' assets to (1) return profits to Genesis Global Capital, Defendant DCG, and Defendant Silbert; and (2) to pay interest to Genesis Yield securities investors.

**ANSWER**:  States that the allegations in Paragraph 184 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 184.

185.    Genesis Global Capital, at the direction and subject to the control of Defendants, controlled the digital assets invested by purchasers of Genesis Yield securities.

**ANSWER**:  States that the allegations in Paragraph 185 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 185.

186.    Genesis Global Capital controlled the digital assets it obtained from investors and had complete discretion in determining how much to hold, lend and otherwise use. Genesis Global Capital used the digital assets it raised from investors to make loans to institutional borrowers or as collateral for Genesis Global Capital's own borrowing. Genesis also had the discretion to hold the assets on its balance sheet to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program.[24]

---

[24] *Id.*, ¶46.

**ANSWER**:   States that the allegations in Paragraph 186 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 186 and its associated footnote and denies on that basis; and states that Paragraph 186 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

187.   In turn, Plaintiffs and members of the Class invested in Genesis Yield securities primarily for profit, *i.e.*, to receive a return on their digital assets. Genesis and Gemini both touted the profits investors could earn by investing their digital assets with Genesis, including for example, by advertising Gemini Earn as an investment and touting that investors could receive up to 8.05% annual percentage yield ("APY") on their digital assets. Investors who purchased Genesis securities were led to expect that by tendering and giving control over their digital assets to Genesis, they would receive profit in the form of interest on those assets.[25]

**ANSWER**:   States that the allegations in Paragraph 187 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 187 and its associated footnote and denies on that basis; and states that Paragraph 187 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

188.   Genesis Global Capital also described itself as the "premier institutional digital asset financial services firm," and "the world's largest digital asset lender" and that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." Accordingly, Genesis Yield investors were led to expect that Defendants' efforts to generate the investment returns – *i.e.*, the promised interest – would result in profit for investors.[26]

**ANSWER**:  Denies the allegations in Paragraph 188 and its associated footnote, except states that the first sentence of Paragraph 188 purports to quote and characterize GGC's website,

[25] *Id.*, ¶47.
[26] *Id.*, ¶63.

and refers to that website for a complete and accurate description of its contents; and states that Paragraph 188 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

189.    As part of the Genesis Yield Investment Agreements, investors ceded control over their digital assets to Genesis, who had complete discretion in deploying the digital assets. Genesis, not investors, undertook various complex tasks of pooling Genesis Yield digital assets, identifying institutional borrowers to serve as counterparties, negotiating individual agreements with those counterparties, and managing market and counterparty risk. Investors understood that Genesis would conduct due diligence on institutional borrowers and evaluate market conditions in determining the appropriate collateral levels.[27]

**ANSWER**:  Denies the allegations in Paragraph 189 and its associated footnote, except states that the first sentence of Paragraph 189 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their terms and contents; states that Paragraph 189 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second and third sentences of Paragraph 189 and denies on that basis.

190.    Moreover, the economic realities of the Genesis Yield securities demonstrate that Genesis Global Capital was motivated to use its experience and skill as the "premier institutional digital asset financial services firm" and its economic power as "the world's largest digital asset lender " to select appropriate institutional borrowers to serve as counterparties, negotiate for the highest interest rates from those institutional borrowers, and set appropriate collateral levels in order to generate maximum profit for itself. Defendants' efforts were essential to the success or failure of the enterprise.[28]

**ANSWER**:  Denies the allegations in Paragraph 190 and its associated footnote, except states that the first sentence of Paragraph 190 purports to quote and characterize genesistrading.com, and refers to that website for a complete and accurate description of its

---

[27] *Id.*, ¶64.

[28] *Id.*, ¶65.

contents; and states that Paragraph 190 and its associated footnote purport to characterize the SEC

Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

191.    As a large institutional lender in the cryptocurrency industry, Genesis Global Capital negotiated more favorable loan terms and interest rates with borrowers than Genesis Yield investors could negotiate on their own. Genesis Global Capital paid yield to the Genesis Yield investors from the interest it earned on its loans to third parties. Thus, the Genesis Yield investors' fortunes were tied to the effort and expertise of Genesis Global Capital, and the investors shared in the profits made by Genesis Global Capital.[29]

**ANSWER**:  Denies the allegations in Paragraph 191 and its associated footnote, except

states that Paragraph 191 and its associated footnote purport to characterize the NYAG Complaint,

and refers to the NYAG Complaint for a complete and accurate description of its contents; and

lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

in the first sentence of Paragraph 191 and denies on that basis.

192.    Investors in open-term Genesis Yield securities understood that, on a monthly basis, the interest rate for their Gemini Earn investments would be revised by Genesis Global Capital, reflecting Genesis Global Capital's ongoing managerial efforts to pay among "the highest rates in the market."[30] The interest rates were typically undated weekly for investors who directly invested assets with Genesis Global Capital.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in Paragraph 192 and its associated footnote and denies on that basis,

except states that the first sentence of Paragraph 192 and its associated footnote quote and

characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate

description of its contents.

193.    Thus, representations made by Genesis Global Capital to Genesis Yield investors in the Genesis Yield Investment Agreements caused Plaintiffs and members of the Class to invest their digital assets with the expectation of profits in the form of interest on those digital assets.

---

[29] NYAG Compl., ¶50.

[30] SEC Enforcement Action, ¶66.

**ANSWER**:  States that the allegations in Paragraph 193 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 193 and denies on that basis.

194.    Genesis Global Capital adjusted the yield it marketed, offered, and thus promised to pay Genesis Yield securities investors primarily based on two factors:

(1)    the opportunities to invest digital assets and earn yield Genesis Global Capital saw in the market; and

(2)    the rate of return Genesis Global Capital determined it needed to offer prospective investors to attract investment capital to take advantage of the investment opportunities.

**ANSWER**:  Denies the allegations in Paragraph 194.

195.    The rates of return Genesis Global Capital offered to Gemini Earn customers to attract their investment capital were posted on Gemini's website. For example, on February 1, 2021, the Earn Page set forth yield rates that Earn investors would receive on their invested cryptocurrencies as follows:[31]

## Interest Rates

| Asset | APY | Asset | APY | Asset | APY |
|-------|-----|-------|-----|-------|-----|
| Aave AAVE | 5.83% | Amp AMP | 1.98% | Balancer BAL | 1.54% |
| Basic Attention Token BAT | 3.49% | Bitcoin Cash BCH | 4.55% | Bitcoin BTC | 3.05% |
| Compound COMP | 2.47% | Curve CRV | 1.98% | Dai DAI | 4.16% |
| Ether ETH | 3.05% | Filecoin FIL | 7.40% | Kyber Network KNC | 2.58% |
| Chainlink LINK | 4.46% | Litecoin LTC | 5.10% | Decentraland MANA | 1.80% |
| Maker MKR | 1.98% | Orchid OXT | 2.47% | PAX Gold PAXG | 3.92% |
| Ren REN | 2.71% | Synthetix SNX | 2.69% | Storj STORJ | 1.98% |
| Uma UMA | 2.69% | Uniswap UNI | 3.59% | Yearn.finance YFI | 3.29% |
| Zcash ZEC | 2.25% | 0x ZRX | 3.68% | | |

---

[31] NYAG Compl., ¶52.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 195 and its associated footnote and denies on that basis, except states that Paragraph 195 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents; and states that the second sentence of Paragraph 195 purports to quote and characterize Gemini's website as of February 1, 2021, and refers to that website as of that date for a complete and accurate description of its contents.

196.    These rates periodically changed based on the considerations described above. For example, a Gemini Earn investor who invested one bitcoin at the start of the Gemini Earn program could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022.

**ANSWER**: Denies the allegations in Paragraph 196, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 196 and denies on that basis.

197.    On the Earn page, Gemini claimed the rates Genesis Global Capital was offering were "more than 100x the average national interest rate, among the highest rates on the market."[32]

**ANSWER**: Denies the allegations in Paragraph 197 and its associated footnote, except states that Paragraph 197 and its associated footnote purport to quote and characterize Gemini's website and the NYAG Complaint, and refers to that website and the NYAG Complaint for a complete and accurate description of their contents.

198.    Genesis and Gemini controlled the interest rates and stated to investors: "rates may increase or decrease in the future."[33]

**ANSWER**: Denies the allegations in Paragraph 198 and its associated footnote, except states that Paragraph 198 and its associated footnote purport to quote and characterize the NYAG

---

[32] *Id.*, ¶53.
[33] *Id.*, ¶54.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

199.    Likewise, as depicted below, Genesis Global Capital offered investment opportunities to direct investors, presenting the types of cryptocurrencies it was willing to borrow, the yield it was willing to pay for each type of asset, and duration, as depicted below. Genesis' Sales/Trading/Operations team would solicit direct investors through email, MS Teams or Telegram chats through which it would disseminate "rate cards." Rates would typically adjust weekly. The terms offered to direct lenders were not subject to negotiation.

## Genesis
### A Digital Currency Group Company

| BTC | | ETH | | USD and major stables | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| open term | 2.50% | open term | 2.00% | open term | 5.25% |
| 1-month | 2.80% | 1-month | 2.50% | 1-month | 5.50% |
| 2-month | 2.83% | 2-month | 2.47% | 2-month | 5.55% |
| 3-month | 2.80% | 3-month | 2.45% | 3-month | 5.60% |
| 4-month | 2.77% | 4-month | 2.43% | 4-month | 5.65% |
| 5-month | 2.75% | 5-month | 2.40% | 5-month | 5.70% |
| 6-month | 2.73% | 6-month | 2.37% | 6-month | 5.75% |
| 7-month | 2.70% | 7-month | 2.35% | 7-month | 5.80% |
| 8-month | 2.67% | 8-month | 2.33% | 8-month | 5.85% |
| 9-month | 2.65% | 9-month | 2.30% | 9-month | 5.90% |
| 10-month | 2.63% | 10-month | 2.27% | 10-month | 5.95% |
| 11-month | 2.60% | 11-month | 2.25% | 11-month | 6.00% |
| 12-month | 2.57% | 12-month | 2.20% | 12-month | 6.05% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $1mm
* indicative rates as of June 28th, 2021. Genesis borrows unsecured. Rates are subject to change.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 199 and denies on that basis, except states that Paragraph 199 purports to quote and characterize an April 9, 2021 email from Hanson Birringer to Isaac Fernandez, and refers to that email for a complete and accurate description of its contents.

### ii.    Distribution Plan of Genesis Yield Securities.

200.    Genesis Global Capital publicly advertised Genesis Yield securities on its own websites, third party websites, podcasts, crypto industry webinars, and social media, and offered or sold Genesis Yield securities to a broad segment of the general public. The offer or sale of Genesis Yield securities was not limited to only institutional and corporate entities, but rather involved broad-based, unrestricted sales to the general investing public to whom the risks of investing with Genesis Global Capital were not disclosed and who were not provided access to records needed to assess Genesis Global Capital's creditworthiness, risks and financial plans.

**ANSWER**:  Denies the allegations in Paragraph 200.

201.    For example, on February 2, 2021, Genesis Global Capital tweeted the following from the GGT @genesistrading twitter account:



https://x.com/GenesisTrading/status/1356606264130871299?s=20

**ANSWER**:  States that Paragraph 201 purports to quote and characterize a February 2, 2021 X post from the @genesistrading X account, and refers to that X post for a complete and accurate description of its contents.

202.    Also on February 2, 2021, Genesis Global Capital tweeted the following from the @genesistrading account:



https://x.com/GenesisTrading/status/1356601826796326913?s=20

**ANSWER**:  States that Paragraph 202 purports to quote and characterize a February 2, 2021 X post from the @genesistrading X account, and refers to that X post for a complete and accurate description of its contents.

203.    Genesis Yield securities were offered and sold directly to investors and through the Gemini Earn Program.

**ANSWER**:  States that the allegations in Paragraph 203 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 203.

204.    An FAQ entitled "What are the risks of Gemini Earn?" on the Gemini Earn website described Gemini Earn as an investment:

> Cryptocurrency, like many assets, can be volatile and subject to price swings. There is always a risk in **investing**, and each customer needs to assess their own risk tolerance before making any <u>investment decisions</u>. Our partners in Gemini Earn have an obligation to return funds according to the terms of their loan agreement. However, Gemini Earn customers (the lenders) always assume some level of risk when they decide to lend their funds. We believe **Gemini Earn gives our retail**

**investors another way to stay long-term in the asset class and have the <u>option to invest and earn interest</u>**, all on the Gemini platform. (Emphasis added).[34]

**ANSWER**:  Denies the allegations in Paragraph 204 and its associated footnote, except states that Paragraph 204 and its associated footnote purport to quote and characterize Gemini's website and the SEC Complaint, and refers to that website and the SEC Complaint for a complete and accurate description of their contents.

205.    Gemini similarly promoted the profit that investors could earn through the Gemini Earn program. In a February 2021 press release launching Gemini Earn, Gemini CEO Tyler Winklevoss stated, "We designed a program that allows our customers the ability to generate a real return on their crypto holdings." On February 27, 2021, Gemini also posted a video on YouTube titled, "Invest Better with Gemini Earn." On its website, Gemini described how users would earn interest, noting, "We are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." Similarly, Gemini advertised on its website that investors could "[p]ut [their] crypto to work. With Gemini Earn, you can receive up to 8.05% APY on your cryptocurrency," and listed the interest rate that investors could earn for each eligible crypto asset.[35]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 205 and its associated footnote and denies on that basis, except states that Paragraph 205 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents; states that the second sentence in Paragraph 205 purports to quote and characterize a February 2021 press release, and refers to that press release for a complete and accurate description of its contents; states that the third sentence in Paragraph 205 purports to quote and characterize a YouTube video titled "Invest Better with Gemini Earn," and refers to that video for a complete and accurate description of its contents; and states that the fourth and fifth sentences in Paragraph

---

[34] SEC Enforcement Action, ECF No. 1 at ¶35.

[35] *Id.*, ¶34.

205 purport to quote and characterize Gemini's website, and refers to that website for a complete and accurate description of its contents.

206.    There was no minimum investment amount to be eligible to participate in the Gemini Earn program. As of November 16, 2022, over 340,000 investors, most residing in the United States, had digital assets invested in Genesis Yield through Genesis Yield Investment Agreements.[36]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 206 and denies on that basis.

207.    Likewise, Genesis Global Capital promoted its high yield rates to direct investors. For example, Genesis Global Capital promoted and solicited investment in Genesis Yield securities as follows through Telegram messages to potential investors: "We're still best bid for BTC at 7-month FT at 6% and USD/stables for 12-month FT at 10.75%" and "For BTC, we are best bid for 8-month FT at 6%. For USD/stables, we've raised our rates on the front end of the curve and are best bid for 12mo FT at 12%."

**ANSWER**:  Denies the allegations in the first sentence of Paragraph 207; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 207 and denies on that basis, except states that the second sentence of Paragraph 207 purports to quote and characterize unidentified Telegram messages, and refers to those Telegram messages for a complete and accurate description of their contents.

208.    While Genesis Global Capital purportedly had a minimum investment threshold to invest directly in Genesis Yield securities, these restrictions were not enforced and individual investors with less than the stated minimum requirements of cash or crypto were allowed to directly invest.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 208 and denies on that basis.

---

[36] *Id.*, ¶25.

### iii.    Expectations of the Investing Public.

209.    Genesis Global Capital and Gemini, through websites, podcasts, crypto industry webinars, and social media, promoted Genesis Yield securities as an investment, specifically as a way to earn high "returns" or "yield" on investors digital assets.[37]

**ANSWER**:  Denies the allegations in Paragraph 209 and its associated footnote, except states that Paragraph 209 and its associated footnote purport to quote and characterize unidentified sources and the SEC Complaint, and refers to those unidentified sources and the SEC Complaint for a complete and accurate description of their contents.

210.    Gemini repeatedly described Gemini Earn as an investment on its own website and social media and repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and "higher than most existing options." Gemini's website further claimed that Gemini Earn investors could "receive more than 100x the national interest rate."[38]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 210 and its associated footnote and denies on that basis, except states that Paragraph 210 and its associated footnote purport to quote and characterize Gemini's website and the SEC Complaint, and refers to that website and the SEC Complaint for a complete and accurate description of their contents.

211.    Genesis Global Capital promoted direct investment in Genesis Yield securities through the Genesis-entities website, press releases and dissemination of Market Observation Reports that described Genesis Yield as an investment. For example, a Market Observation Reports for Q2 2020 stated: "Investors who know they want to be long for an extended period of time and want to earn incremental interest on their holdings can receive monthly payments at rates ranging between 6% and 12% annually depending on the asset."

**ANSWER**:  Denies the allegations in Paragraph 211, except states that the first sentence of Paragraph 211 purports to quote and characterize unidentified sources, and refers to those unidentified sources for a complete and accurate description of their contents; and states that the second sentence of Paragraph 211 purports to quote and characterize a GGC Report titled "Q2

---

[37] *Id.*, ¶50.

[38] *Id.*

2020 Genesis Market Observation," and refers to that report for a complete and accurate description of its contents.

212.     The economic realities of the transaction, in which investors had an opportunity to tender digital assets to Genesis in exchange for earning interest with some of the "highest rates" available for digital assets, further underscore why the investing public considered Genesis Yield to be an investment opportunity.[39]

**ANSWER**:  Denies the allegations in Paragraph 212 and its associated footnote, except states that Paragraph 212 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

213.     Class members understood that the cash or digital assets invested with Genesis Global Capital would be reinvested by Genesis Global Capital and that the interest rate offered was dependent on Genesis Global Capital using its expertise and knowledge of the crypto market to find investment opportunities and earn the yield necessary to pay investors the agreed upon returns. To accomplish this, Genesis Global Capital would aggregate assets from investors and use class members' assets as working capital to reinvest with institutional borrowers in the crypto market to generate yield for Genesis Global Capital and for investors.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 213 and denies on that basis.

### iv.     No Risk Reducing Factors Exist.

214.     No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to Genesis Yield investment.[40]

**ANSWER**:  States that the allegations in Paragraph 214 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 214 and its associated footnote, except states that Paragraph 214 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

215.     For example, in its own FAQs, Genesis Global Capital noted that "[d]igital assets are not covered by SIPC [(Securities Industry Protection Corporation)] insurance" and that

---

[39] *Id.*

[40] *Id.*, ¶51.

"[e]stablishing a lending and borrowing relationship with Genesis is not the same as opening a depository account or a savings account" and that "[a]ccounts with Genesis do not enjoy FDIC protection."[41]

**ANSWER**:  Denies the allegations in Paragraph 215 and its associated footnote, except states that Paragraph 215 and its associated footnote purport to quote and characterize GGC's website and the SEC Complaint, and refers to the website and the SEC Complaint for a complete and accurate description of their contents.

216.    Under the terms of the Genesis securities, Genesis Global Capital was not required to post collateral. Gemini told investors, "All lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit." Although Genesis Global Capital later provided some collateral to Gemini in August 2022, the collateral Genesis Global Capital provided to Gemini was in the form of restricted shares that could not be liquidated immediately and amounted to only a fraction of the total investor assets held in Gemini Earn.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 216 and denies on that basis, except states that Paragraph 216 purports to characterize the Gemini Earn Authorization Agreement, and refers to that agreement for a complete and accurate description of its contents.

217.    Similarly, although Gemini is registered with NYDFS as a New York limited purpose trust company, NYDFS did not have oversight over Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 217, except admits that Gemini is registered with NYDFS as a New York limited liability trust company; and admits that GGC was not licensed by NYDFS.

218.    Similarly, NYDFS did not have oversight over DCG or Silbert.[42]

**ANSWER**:  Admits the allegations in Paragraph 218.

---

[41] *Id.*

[42] *Id.*, ¶52.

219.    Months before the launch of the Gemini Earn program, Gemini knew that Genesis Capital was regulated only by FinCEN and, in fact, categorized Genesis Capital's lack of regulation as a "high" risk factor in internal documents.[43]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 219 and its associated footnote and denies on that basis, except states that Paragraph 219 and its associated footnote purport to quote and characterize the NYAG Complaint and unidentified internal documents, and refers to the NYAG Complaint and those unidentified internal documents for a complete and accurate description of their contents.

220.    FinCEN, the Financial Crimes Enforcement Network, is a bureau of the United States Department of the Treasury that collects and analyzes information about financial transactions in order to combat domestic and international money laundering, terrorist financing, and other financial crimes. FinCEN does not purport to regulate securities or the disclosure of risks to investors.

**ANSWER**:  Admits that the Financial Crimes Enforcement Network ("FinCEN") is a bureau of the United States Department of the Treasury and its mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence; and otherwise denies the allegations in Paragraph 220.

221.    These statements and facts above demonstrate that alternative regulatory schemes provided no protection for Genesis Yield investors.

**ANSWER**:  States that the allegations in Paragraph 221 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 221.

---

[43] NYAG Compl., ¶195.

**B.     THE GENESIS YIELD INVESTMENT AGREEMENTS ARE INVESTMENT CONTRACTS UNDER *HOWEY*.**

222.     The Genesis Yield Investment Agreements, when coupled with investors' deposits of assets with Genesis Global Capital constitutes the offer and sale of investment contracts under *Howey*.[44]

**ANSWER**:     States that the allegations in Paragraph 222 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 222 and its associated footnote, except states that Paragraph 222 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

223.     Digital assets qualify as "money" under the federal securities laws. Genesis Yield securities therefore involved an investment of money.

**ANSWER**:     States that the allegations in Paragraph 223 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 223.

224.     During the Class Period, Genesis Global Capital raised billions of dollars from hundreds of thousands of investors, who tendered digital assets to Genesis Global Capital pursuant to the Genesis Yield Investment Agreements.[45]

**ANSWER**:     Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 224 and its associated footnote and denies on that basis, except states that Paragraph 224 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

225.     Investors in Genesis Yield securities invested in a common enterprise with other investors. Genesis Global Capital pooled Genesis Yield investors' digital assets on Genesis Global Capital's balance sheet and invested those assets in order to generate returns for both Genesis

---

[44] SEC Enforcement Action, ¶56.

[45] *Id.*, ¶57.

Global Capital and investors.[46] In practice Genesis Global Capital did not segregate the digital assets it received from different groups of investors.[47]

**ANSWER**:  States that the allegations in Paragraph 225 and its associated footnotes constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 225 and its associated footnotes, except states that Paragraph 225 and its associated footnotes purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

226.    Investment contracts like Genesis Yield securities that offer fixed rates of interest are securities. *See S.E.C. v. Edwards*, 540 U.S. 389, 395–97 (2004) ("The fact that investors have bargained for a return on their investment does not mean that the return is not also expected to come solely from the efforts of others. Any other conclusion would conflict with our holding that an investment contract was offered in *Howey* itself."); *SEC v. Genesis Global Capital, LLC, et al.*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024).

**ANSWER**:  States that the allegations in Paragraph 226 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 226, except admits that the second sentence of Paragraph 226 quotes and characterizes *S.E.C. v. Edwards*, 540 U.S. 389, 395–97 (2004), and *SEC v. Genesis Global Capital, LLC, et al.*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024), and refers to those decisions for a complete and accurate description of their contents.

227.    Genesis Global Capital then invested the pooled digital assets in ways designed to generate returns for DCG, Silbert, Genesis Global Capital, and investors. Genesis retained possession and control over the investors' digital assets on its balance sheet, and determined how much to hold, lend out to others, and otherwise use. Genesis Global Capital exercised its discretion in how to use investors' digital assets to generate revenue for its business and to pay the interest rates it promised Gemini Earn investors and other investors. Genesis Yield securities did not contain any explicit terms restricting how investors' digital assets would be used by Genesis Global Capital.[48]

---

[46] *Id.*, ¶¶58-59.

[47] *Id.*, ¶38.

[48] *Id.*

**ANSWER**:  States that the allegations in Paragraph 227 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 227 and its associated footnote, except states that Paragraph 227 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

228.    As the invested digital assets were not segregated in any way by Genesis Global Capital, each investor's fortune was tied to the fortunes of the other investors. Genesis did not manage individual or separate accounts for each investor in Gemini Earn. Instead, the returns earned by each investor were reliant on the pooling of the invested digital assets and the investment of those pooled assets. As the invested digital assets were not segregated in any way by Genesis Global Capital, each investor's fortune was tied to the fortunes of the other investors.[49]

**ANSWER**:  States that the allegations in Paragraph 228 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 228 and its associated footnote, except states that Paragraph 228 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

229.    Generally, Genesis Global Capital deployed the Genesis Yield investors' digital assets by either lending them to institutional borrowers or using the assets as collateral for Genesis Global Capital's own borrowing. Digital assets not loaned to institutional borrowers or used for collateral were held by Genesis Global Capital on its balance sheet in an effort to provide the Company with liquidity to meet potential demand for loans as well as to repay the investors in its Genesis Yield securities. Genesis Global Capital also had the ability to loan the digital assets to related parties including DCG, its parent company or DCG's affiliates.[50]

**ANSWER**:  States that the allegations in Paragraph 229 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 229 and denies on that basis, except admits that GGC and DCG engaged in

[49] *Id.*, ¶59.
[50] *Id.*, ¶39.

90

intercompany loans involving digital assets; and states that Paragraph 229 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

230.    Genesis Global Capital employed its discretion and judgment in determining the terms of transactions with institutional borrowers. For example, Genesis Global Capital conducted due diligence on the institutional borrowers before entering into a transaction. Genesis Global Capital negotiated an initial agreement with each institutional borrower, and then individually negotiated the terms—including the type of digital assets to be lent, interest rate, duration of the loan, and collateral (if any) – of every subsequent lending transaction. Genesis Global Capital separately evaluated each institutional borrower, as well as market conditions, when determining collateral rates.[51]

**ANSWER**:  Denies the allegations in Paragraph 230 and its associated footnote, except states that Paragraph 230 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second, third, and fourth sentences of Paragraph 230 and denies on that basis, except states that the third sentence of Paragraph 230 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their  contents.

231.    Genesis Yield investors' fortunes were also tied to Genesis Global Capital's fortunes; both Genesis Global Capital and investors earned profits when Genesis Global Capital deployed the pooled assets.[52] The returns earned by each Genesis Yield investor were reliant on the pooling of the invested digital assets and the ways in which Genesis Global Capital deployed those assets, including Genesis Global Capital's evaluation of the institutional borrowers, negotiation of favorable terms, and management of market and counterparty risk. When Genesis Global Capital loaned digital assets it received through the Genesis Yield securities, the assets were transferred to the institutional borrowers and left Genesis Global Capital's balance sheet. Ultimately, the returns of Genesis Yield investors were dependent on Genesis' managerial efforts and risk management in its lending activities.[53]

---

[51] *Id.*, ¶40.

[52] *Id.*, ¶60.

[53] *Id.*, ¶41.

**ANSWER**:  Denies the allegations in Paragraph 231 and its associated footnotes, except states that Paragraph 231 and its associated footnotes purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

232.    The income that Genesis Global Capital received from investing Genesis Yield securities investors' digital assets to institutional borrowers was used to generate revenue for Genesis Global Capital and to pay the promised interest to Genesis Yield investors. Genesis Global Capital did not have any other revenue-generating activities. For example, for the three months ended March 31, 2022, Genesis received approximately $169.8 million in interest income from institutional borrowers and paid $166.2 million in interest to Genesis Yield securities investors.[54]

**ANSWER**:  Denies the allegations in the second sentence of Paragraph 232;  and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and third sentences of Paragraph 232 and its associated footnote and denies on that basis, except states that Paragraph 232 and its associated footnote purport to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

233.    Similarly, Genesis Global Capital's suffering of losses and entering bankruptcy has harmed Plaintiffs and members of the Class by restricting their ability to access their digital assets and to receive the promised interest payments.

**ANSWER**:  States that the allegations in Paragraph 233 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 233.

234.    In other words, Genesis Global Capital ran a pooled investment fund where it pooled investors' capital and purported to use its investment expertise and knowledge of the digital assets markets to invest those assets in ways designed to earn returns that exceeded the returns Genesis Global Capital promised its investors.

**ANSWER**:  Denies the allegations in Paragraph 234.

235.    This is a familiar business model: it is the same business model utilized by commercial banks and pooled investment funds such as hedge funds. Both activities are covered by the Securities Act.

---

[54] *Id.*, ¶42.

**ANSWER**:  States that the allegations in Paragraph 235 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 235.

236.    For example, commercial banks attract depositors by advertising and promising to pay attractive rates of interest based on the returns the banks believe they can generate by reinvesting those assets. Accordingly, commercial banks aggregate the deposits of its depositors and re-lend those deposits in ways designed to earn a yield higher than the returns, or interest, the banks have promised to pay its depositors. Congress recognized that this activity meets the definition of a security under the Securities Act, but specifically exempted much of it from the definition of a security under the Securities Act because commercial banks are subject to strict capital controls and other limitations in how they may re-invest customer deposits, these activities are specifically exempted from the Securities Act. *See* 15 U.S.C. § 77c (Classes of securities under this subchapter).

**ANSWER**:  States that the allegations in Paragraph 236 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 236.

237.    Genesis Yield securities investors enjoyed no such protections.

**ANSWER**:  Denies the allegations in Paragraph 237.

**C.    STATE AND FEDERAL REGULATORS HAVE CONCLUDED IDENTICAL INVESTMENT PRODUCTS ARE "SECURITIES" AS DEFINED BY STATE AND FEDERAL SECURITIES LAWS.**

238.    The SEC and numerous state securities regulators have evaluated investment products offered by other companies that are nearly identical to the Genesis Yield securities and have concluded that the products constitute "securities."

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 238 and denies on that basis.

239.    For example, Nexo, Inc., Nexo Capital Inc., and Nexo Financial, LLC (collectively, "Nexo") offered and sold the Nexo Earn Interest Product ("EIP") accounts, which "allowed United States investors to tender to Nexo certain digital assets, which Nexo deposited in interest-yielding accounts and then used in various ways to generate income for its own business and to fund interest payments to EIP investors," including "staking, lending, and engaging in arbitrage on purportedly 'decentralized' finance platforms; investing in certain digital assets; loaning funds to retail and institutional borrowers; and entering into options and swap contracts with respect to the digital assets tendered."

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 239 and denies on that basis.

240.    The SEC determined that the EIP accounts were unregistered securities, and as a result, Nexo agreed to cease offer and sale thereof and pay a $22.5 million fine.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 240 and denies on that basis.

241.    Eight state regulators similarly determined that the EIP accounts were securities, including the:

a)      California Department of Financial Protection and Innovation;

b)      State of Vermont Department of Financial Regulation;

c)      State of Oklahoma Department of Securities;

d)      South Carolina Attorney General, as Securities Commissioner;

e)      Commonwealth of Kentucky Public Protection Cabinet, Department of Financial Institutions, Division of Securities;

f)      Securities Division of the Office of the Maryland Attorney General;

g)      State of Washington Department of Financial Institutions, Securities Division; and

h)      Office of Attorney General of New York.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 241 and denies on that basis.

242.    BlockFi Lending LLC ("BlockFi") "offered and sold BlockFi Interest Accounts ("BIAs") to investors, through which investors lend digital assets to BlockFi in exchange for BlockFi's promise to provide a variable monthly interest payment," was generated and paid out to investors "in various ways, including loans of digital assets made to institutional and corporate borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures."[55]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 242 and its associated footnote and denies on that basis,

---

[55] *Order Instituting Cease-And Desist Proceedings*, *In the Matter of BlockFi Lending,* LLC, SEC Administrative Proceeding File No. 3-20785, https://www.sec.gov/litigation/admin/2022/33-11029.pdf.

except states that Paragraph 242 and its associated footnote purport to characterize a cease and desist order filed on February 14, 2022, in the action captioned *In the Matter of Blockfi Lending LLC,* Administrative Proceeding File No. 3-20758 (the "Blockfi SEC Order"), and refers to the Blockfi SEC Order for a complete and accurate description of its contents.

243.    The SEC determined that the BIAs were securities because they were notes under *Reves* and investment contracts under *Howey*.[56] As a result, BlockFi agreed to pay a $50 million penalty.[57]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 243 and its associated footnotes  and denies on that basis, except states that Paragraph 243 and its associated footnotes purport to characterize the Blockfi SEC Order and a February 14, 2022 press release titled "Blockfi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product," and refers to the Blockfi SEC Order and the press release for a complete and accurate description of their contents.

244.    The State of New Jersey Bureau of Securities also found that BlockFi's BIAs are "unregistered securities in the form of cryptocurrency interest-earning accounts."[58] BlockFi agreed to pay a $50 million penalty to state regulators in *all fifty states* (including New Jersey) as well Washington D.C., Puerto Rico, and the Virgin Islands, as participants in the North American Securities Administrators Association.[59]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 244 and its associated footnotes and denies on that basis,

---

[56] *Id.*

[57] *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022) https://www.sec.gov/news/press-release/2022-26.

[58] *In the Matter of BlockFi Inc., BlockFi Lending, LLC, and BlockFi Trading, LLC*, New Jersey Attorney General Office, https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf.

[59] *Acting AG Platkin: Cryptocurrency Lending Platform BlockFi Agrees to $100 Million Settlement with State and Federal Securities Regulators*, New Jersey Attorney General Office (Feb. 14, 2022), https://www.njoag.gov/acting-ag-platkin-cryptocurrency-lending-platform-blockfi-agrees-to-100-million-settlement-with-state-and-federal-securities-regulators/; see also *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product,* SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

except states that Paragraph 244 and its associated footnotes purport to quote and characterize a February 14, 2022 press release titled "Cryptocurrency Lending Platform Blockfi Agrees to $100 Million Settlement with State and Federal Securities Regulators," and refers to that press release for a complete and accurate description of its contents.

245.    Voyager Digital Ltd., Voyager Digital Holdings, Inc., and Voyager Digital LLC (collectively, "Voyager") offered and sold Voyager Interest Accounts, through which investors opened accounts by transferring cryptocurrency or other digital assets to Voyager, "use[d] their principal to buy and trade more than 90 … digital assets," and then earned "interest on their purchase of certain digital assets" at a rate set by Voyager. Several state enforcement agencies found that the Voyager Interest Accounts constituted securities under their respective state laws, including the:

a)    Texas State Securities Board;

b)    Securities Division of the Office of the Attorney General of the State of South Carolina;

c)    State of New Jersey Bureau of Securities;

d)    State of Washington Department of Financial Institutions Securities Division;

e)    State of Oklahoma Department of Securities; and

f)    State of Vermont Department of Financial Regulation.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 245 and denies on that basis, except states that Paragraph 245 purports to characterize the (a) filings in the action captioned *Texas State Securities Board v. Voyager Digital LTD.; Voyager Digital Holdings, INC.; and Voyager Digital LLC*, SOAH Docket No. 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, (b) a cease and desist order filed in the action captioned *Voyager Digital, Ltd., Voyager Digital Holdings, Inc, and Voyager Digital, LLC*, Matter No. 20221067, (c) a summary cease and desist filed in the action captioned *In the Matter of Voyager Ltd., Voyager Digital Holdings, Inc. and Voyager Digital, LLC*, (d) a statement of charges and notice of intent to enter order to cease and desist, to impose fines, and to charge costs filed in the action captioned *In the*

*Matter of Determining Whether There Has Been a Violation of the Securities Act of Washington by: Voyager Digital LLC*, Matter No. 20221615, Order No.: S-21-3218-22-SC01, (e) an order to cease and desist filed in the action captioned *In the Matter of Voyager Digital Ltd. And Voyager Digital Holdings, Inc.*, ODS File No; 22-038, and (f) an *ex parte* order to cease and desist filed in the action captioned *In Re: Voyager Digital LTD., Voyager Digital Holdings, Inc., and Voyager Digital, LLC*, and refers to those filings for a complete and accurate description of their contents.

246.    Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Network, LLC, and Celsius Lending, LLC (collectively, "Celsius") offered and sold interest-earning accounts, known as the "Earn Rewards" program, through which investors "open accounts by transferring eligible cryptocurrency to [Celsius] to invest in Celsius Earn Interest-Bearing Accounts" and relinquish control of the cryptocurrency, in exchange for earning "lucrative interest rates." Several state regulatory agencies took action, finding that the Earn Interest-Bearing Accounts reward program constituted the offer and sale of unregistered securities, including the:

a)    Texas State Securities Board;

b)    State of New Jersey Bureau of Securities;

c)    State of Vermont Department of Financial Regulation;

d)    State of Alabama Securities Commission;

e)    Commonwealth of Kentucky; and

f)    State of Washington Department of Financial Institutions, Securities Division.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 246 and denies on that basis, except states that Paragraph 246 purports to characterize (a) a consent order in the action captioned *In the Matter of Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC*, Order No. ENF-24-CDO01885, (b) a summary cease and desist order in the action captioned *In the Matter of Celsius Network, LLC*, (c) an *ex parte* order to cease and desist in the action captioned *In Re: Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, Celsius Lending LLC, Celsius Keyfi LLC, Celsius Networks Lending*

*LLC, Celsius Mining LLC*, Docket No. 22-021-S, (d) a statement of charges and notice of intent to enter order to cease and desist, to impose fines, and to charge costs filed in the action captioned *In the Matter of Determining Whether There Has Been a Violation of the Securities Act of Washington by: Voyager Digital LLC*, Matter No. 20221615, Order No.: S-21-3218-22-SC01, (e) an order to cease and desist filed in the action captioned *In the Matter of Voyager Digital Ltd. And Voyager Digital Holdings, Inc.*, ODS File No; 22-038, and (f) an *ex parte* order to cease and desist filed in the action captioned *In Re: Voyager Digital LTD., Voyager Digital Holdings, Inc., and Voyager Digital, LLC*, and refers to those filings for a complete and accurate description of their contents.

247.     Coinbase, Inc. and Coinbase Global Inc. (collectively, "Coinbase") planned to offer a program called "Coinbase Lend," allowing "eligible customers to earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)" by, specifically, investors "lending the USDC they hold on Coinbase's platform" and earning interest from their participation. The SEC issued a Wells notice to Coinbase about its Lend program, advising that after assessing under *Howey* and *Reves*, the SEC will sue Coinbase if the program launches, because such a program would constitute a security.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 247 and denies on that basis, except states that Paragraph 247 purports to quote and characterize  a *Coinbase* blog post titled "The SEC has told us it wants to sue us over Lend. We don't know why," and a *Bloomberg* article titled "Money Stuff: Lending Bitcoin is Tricky," and refers to that blog post and article for a complete and accurate description of their contents.

## XI.    SECURITIES ACT CLAIMS.

248.     The Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations of scienter and fraud.

**ANSWER**:  States that the allegations in Paragraph 248 constitute legal conclusions, to which no response is required.

249.    The federal securities laws require offers and sales of securities to be registered with the SEC unless an exemption from registration applies and to additionally require issuers to provide a slate of disclosures informing investors of the risks of investing.

**ANSWER**:  States that the allegations in Paragraph 249 constitute legal conclusions, to which no response is required.

250.    Specifically, Sections 5(a) and 5(c) of the Securities Act require that an issuer like Genesis Global Capital file a registration statement with the SEC in order to offer or sell securities, including notes and investment contracts, unless an exemption from registration applies.

**ANSWER**:  States that the allegations in Paragraph 250 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 250.

251.    Genesis Global Capital did not seek exemption from registration with the SEC.

**ANSWER**:  States that the allegations in Paragraph 251 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 251 and denies on that basis, except admits that GGC did not seek an exemption from registration with the SEC in connection with the Lending Agreements.

252.    Genesis Global Capital never had a registration statement filed or in effect with the SEC regarding Genesis Yield securities.

**ANSWER**:  States that the allegations in Paragraph 252 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 252 and denies on that basis, except admits that GGC did not file a registration statement with the SEC in connection with the Lending Agreements.

253.    Lead Plaintiffs, Plaintiff Ameli and members of the Class were harmed by the failure to register the offer and sale of Genesis Yield securities because Genesis Global Capital's public disclosures contained selective or no information about Genesis Global Capital's financial

history, audited financial statements, management discussion and analysis of financial condition and results of operations, ability to generate profits, and risk factors.

**ANSWER**:  States that the allegations in Paragraph 253 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 253.

254.    Genesis Yield investors had limited or inadequate information about Genesis Global Capital's operations, financial condition, liquidity, risks, related party transactions and other factors relevant in considering whether to invest in Genesis Yield securities.

**ANSWER**:  States that the allegations in Paragraph 254 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 254 and denies on that basis.

255.    Lead Plaintiffs, Plaintiff Ameli and members of the Class lacked full and detailed information regarding how Genesis Global Capital deployed their digital assets, including its exposure to volatility in crypto asset markets, the financial condition of Genesis Global Capital's counterparties, and the amount of collateral Genesis Global Capital obtained, if any, as part of its loans to institutional borrowers, related party transactions, and concentrations of risk.

**ANSWER**:  States that the allegations in Paragraph 255 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 255 and denies on that basis.

256.    Because of the above-described conduct, investors in Genesis Yield securities lacked information about Genesis Global Capital that the SEC requires issuers to provide under the Securities Act when they offer or sell securities to the investing public.

**ANSWER**:  States that the allegations in Paragraph 256 constitute legal conclusions, to which no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 256 and denies on that basis.

257.    On January 12, 2023, the SEC Enforcement Action was filed against non-parties Genesis Global Capital and Gemini for engaging "in an unregistered offer and sales of securities to U.S. retail investors, in violation of the federal securities laws" by offering the Genesis Yield securities via the Gemini Earn program.

**ANSWER**:    Admits that on January 12, 2023, the SEC filed the SEC Complaint against non-parties GGC and Gemini in which it alleged the non-parties engaged in the unregistered offer and sale of securities through their joint crypto lending program, Gemini Earn; and states that Paragraph 257 purports to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

258.    In the SEC Enforcement Action, the SEC alleges that Genesis Yield investors who invested via the Gemini Earn program entered into Genesis Yield Investment Agreements with Genesis Global Capital and Gemini, and Genesis Global Capital "pooled the [digital] assets from [Genesis Yield] investors with assets from other investors. Genesis then deployed the [digital] assets – primarily by lending the [digital] assets to institutional counterparties ('Institutional Borrowers') – in order to generate revenue for its business, including the revenue necessary to pay interest to [Genesis Yield] investors. Genesis earned revenue by lending the digital assets at a higher rate than it paid to [Genesis Yield] and other investors."[60]

**ANSWER**:    States that Paragraph 258 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

259.    The SEC alleges the conduct described in the preceding paragraph "were securities that Genesis . . . offered and sold to the investing public … without registering the offer and sale with the SEC as required by the federal securities laws."[61]

**ANSWER**:    States that Paragraph 259 and its associated footnote purport to quote and characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

260.    As a result, the SEC alleges, Genesis Yield investors such as Lead Plaintiffs, Plaintiff Ameli and members of the Class lacked material information about the risks of their

---

[60] SEC Enforcement Action, ¶4.

[61] SEC Enforcement Action, ¶¶5-6.

investment in the Genesis Yield investment products, and have suffered significant harm as a result of Genesis Global Capital's conduct.

**ANSWER**: Denies the allegations in Paragraph 260, except states that Paragraph 260 purports to characterize the SEC Complaint, and refers to the SEC Complaint for a complete and accurate description of its contents.

261.    On March 13, 2024, the court in the SEC Enforcement Action denied defendants' motion to dismiss. *SEC v. Genesis Global Capital, LLC, et al.*, 2024 WL 1116877 (S.D.N.Y. Mar. 13, 2024).

**ANSWER**: States that Paragraph 261 purports to characterize the opinion and order filed on March 13, 2024 in the SEC Enforcement Action, and refers to that opinion and order for a complete and accurate description of its contents

262.    As alleged above, on October 19, 2023, the New York Attorney General filed a complaint against Defendants DCG, Silbert, Moro, the Company and others alleging violations of New York's Martin Law for the sale of unregistered securities.

**ANSWER**: Admits the allegations in Paragraph 262, except states that Paragraph 262 purports to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

263.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of Section 77e of this title … shall be liable … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a)(1).

**ANSWER**: States that the allegations in Paragraph 263 constitute legal conclusions, to which no response is required.

264.    Lead Plaintiffs, Plaintiff Ameli and members of the Class invested in Genesis Yield securities offered or sold by Genesis Global Capital through the Genesis Yield Investment Agreements whereby investors agreed to tender their digital assets or cash to Genesis in exchange for interest payments and the eventual return of the digital assets on demand.

**ANSWER**:  States that the allegations in Paragraph 264 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 264.

265.    Under the Securities Act, the terms "offer to sell", "offer for sale" or "offer" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. 15 U.S.C.A. § 77b(a)(3). Genesis Global Capital offered Genesis Yield securities to members of the Class through the Genesis Yield Investment Agreements and related marketing and solicitations alleged above.

**ANSWER**:  States that the allegations in Paragraph 265 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 265.

266.    By entering into the Genesis Yield Investment Agreements, investors sought an opportunity to invest in Genesis Yield securities offered by Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 266.

267.    Furthermore, Genesis sold Genesis Yield securities to Lead Plaintiffs, Plaintiff Ameli and members of the Class. To invest in Genesis Yield, investors entered into the Genesis Yield Investment Agreement with Genesis, and executed a "Loan Term Sheet," which incorporated the applicable Genesis Yield Investment Agreement, or authorized wire or electronic transactions through the Gemini Earn program, through which investors tendered their digital assets or cash to Genesis in exchange for interest payments from Genesis and the promise of eventual return of the digital assets on demand.

**ANSWER**:  Denies the allegations in Paragraph 267, except states that Paragraph 267 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

268.    The Securities Act broadly defines "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value. 15 U.S.C. § 77b(a)(3). The Genesis Yield Investment Agreements provide that a "loan" means an exchange for digital currency or cash "in accordance with this Agreement." Master Borrow Agreement at 3; Master Digital Asset Loan Agreement at 3.

**ANSWER**:  States that the allegations in Paragraph 268 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 268, except states that the second sentence of Paragraph 268 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

269.    The Genesis Yield Investment Agreements were one component of the entire Genesis Yield investment program, through which Defendants offered and sold securities. The entirety of the parties' interactions regardless of whether transactions took effect at different points in time, constitutes Genesis Global Capital's sale of Genesis Yield securities.

**ANSWER**:  Denies the allegations in Paragraph 269.

270.    During the Class Period, Genesis Global Capital raised billions of dollars in assets from hundreds of thousands of investors who tendered digital assets to Genesis Global Capital under the Genesis Yield Investment Agreements through loan term sheets, or via wire or electronic transfer through the Gemini Earn program.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 270 and denies on that basis.

271.    Transactions reflected in Lead Plaintiffs' and Plaintiff Ameli's certifications constitute a purchase of Genesis Yield securities through which Lead Plaintiffs and Plaintiff Ameli tendered consideration (the investment principal) in exchange for Genesis's promise to pay back the investment principal, together with accrued interest, on demand.

**ANSWER**:  Denies the allegations in Paragraph 271.

272.    Lead Plaintiffs, Plaintiff Ameli and members of the Class have been damaged under the Securities Act as alleged above in paragraphs 246-269 and seek rescission or a recessionary form of relief for Defendants' wrongful conduct in connection with the purchase of Genesis Yield securities.

**ANSWER**:  Incorporates by reference the responses to Paragraph 246–269 and otherwise denies the allegations in Paragraph 272.

## XII.    <u>EXCHANGE ACT CLAIMS.</u>

### A.    **DEFENDANTS DISREGARD GENESIS GLOBAL CAPITAL RISK MANAGEMENT PRACTICES.**

273.    According to Gemini, the agent for Genesis Yield investors who invested via the Gemini Earn program, and the NYAG, from at least February 2, 2021, Genesis Global Capital—in concert with Defendants and Defendants' active support and encouragement—induced the Genesis Yield investors who invested via the Gemini Earn program to invest by touting Genesis

Global Capital's purportedly robust risk-management practices and a supposedly thorough vetting process of the counterparties to which Defendants caused Genesis Global Capital to reinvest Class members' assets.

**ANSWER**:  Denies the allegations in Paragraph 273.

274.    When Genesis sought to initiate the Gemini Earn Program and begin its lending relationships with Gemini Earn Lenders (at the start of the Class Period) Genesis Global Capital shared its "Overview of Enterprise Credit Risk Management" (the "Overview"). Gemini has stated that when Genesis Global Capital sought to solicit Genesis Yield investment from Gemini users, Genesis Global Capital shared the Overview with Gemini, the agent of Gemini users who invested in Genesis Yield.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 274 and denies on that basis.

275.    The Overview, according to Gemini, declared that Genesis Global Capital had "many levers to pull to ensure Genesis Global Capital is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools." It emphasized Genesis Global Capital's "ability to responsibly manage credit risk and face zero defaults" and to "maintain a consistently high level of creditworthiness across our entire loan portfolio."

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 275 and denies on that basis, except states that Paragraph 275 purports to quote and characterize a document titled "Overview of Enterprise Credit Risk Management," and refers to that document for a complete and accurate description of its contents.

276.    In the Overview, Genesis Global Capital represented to Gemini that, "[a]side from credit extension, Genesis [Global Capital] primarily lends on an 'over-collateralized' basis – *i.e.*, the collateral pledged exceeds the value of the loan." With respect to unsecured credit, Genesis Global Capital promised Gemini—who would serve as the agent for Gemini users that chose to invest in Genesis Yield—that "it would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance."

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 276 and denies on that basis, except states that Paragraph 276 purports to quote and characterize a document titled "Overview of Enterprise Credit Risk Management," and refers to that document for a complete and accurate description of its contents.

277.    Genesis Global Capital used the Overview to give Gemini the misimpression that Genesis Global Capital was a responsible financial institution, representing purportedly sound risk-management practices and a safe, over-collateralized loan book.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 277 and denies on that basis.

278.    These representations to the agent of Genesis Yield investors who invested through Gemini Earn caused hundreds of thousands of investors to invest in Genesis Yield, believing that Genesis Global Capital observed sound risk management and counterparty risk policies.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 278 and denies on that basis.

279.    According to a February 2, 2021 *CoinDesk* article titled "Gemini Partners with Crypto Lender Genesis to Offer 7.4% Yield on Customer Deposits":

> The product is offered in all 50 states, including New York where Gemini has its trust license. Users can get yield on any cryptocurrency available on the Gemini platform now and on Gemini's GUSD stablecoin at some point in the future. The product is open to active Gemini customers currently and will be rolled out to all Gemini customers later this month.
>
> Gemini collects part of the spread between interest paid on the crypto and interest Genesis charges on its loans to institutions. As part of the partnership, **Gemini reviewed Genesis' financial statements and verified that the lender's loans are overcollateralized, said Yusuf Hussain, Gemini's head of risk.**
>
> This is the third partnership of its kind for Genesis. It also powers interest-bearing accounts at crypto lender Ledn and crypto exchange Luno, which is also owned by Digital Currency Group.
>
> "As far as percentages of loans coming from partnerships, it's still relatively a small part right now, largely because they are relatively new," Genesis CEO Michael Moro said. "But we expect the numbers to become more significant over time as a sign of the success of these partnerships."

(Emphasis added).

**ANSWER**:  States that Paragraph 279 purports to quote and characterize a *CoinDesk* article titled "Gemini Partners with Crypto Lender Genesis to Offer 7.4% Yield on Customer Deposits," and refers to that article for a complete and accurate description of its contents.

280.    According to the NYAG Complaint, Gemini repeated Genesis' representations to investors: "For example, on March 5, 2021, a business development employee at Gemini responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."[62]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 280 and its associated footnote and denies on that basis, except states that Paragraph 280 and its associated footnote purport to quote and characterize the NYAG Complaint and refers to the NYAG Complaint for a complete and accurate description of its contents

### i.    Genesis Global Capital Misrepresented its Risk Management Practices to Counterparties and Gemini Earn Investors' Agent.

281.    Genesis Global Capital's representations regarding its risk-management practices made to counterparties and their agents, including Gemini, were lies. In truth, according to the NYAG Complaint, Genesis Global Capital's loan book was not over-collateralized, and the below chart shows the approximate collateral coverage ratio for the following financial quarters:[63]

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

**ANSWER**:  Denies the allegations in Paragraph 281 and its associated footnote, except states that Paragraph 281 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

### a.    Genesis Was Overly Concentrated in Risky Counterparty 3AC

282.    Moreover, as it turned out, Genesis Global Capital was recklessly lending huge amounts to a counterparty, Three Arrows Capital, or 3AC.

**ANSWER**:  Denies the allegations in Paragraph 282.

---

[62] NYAG Compl., ¶72.

[63] *Id.*, ¶73.

283.    Genesis Global Capital and Genesis Asia Pacific failed to conduct adequate due diligence on 3AC. Contrary to assurances to Gemini on February 18, 2022, that Genesis Global Capital reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence," neither Genesis Global Capital nor Genesis Asia Pacific had received audited financial statements from 3AC since July 2020. Genesis Global Capital and Genesis Asia Pacific also accepted from 3AC illiquid collateral to secure more than $500 million in loans.[64]

**ANSWER**:  Denies the allegations in Paragraph 283 and its associated footnote, except states that the second sentence of Paragraph 283 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

#### b.    Genesis Was Overly Concentrated in Related Parties

284.    From January 2022 through July 2022, DCG and its subsidiary, DCG International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from Genesis Global Capital.[65]

**ANSWER**:  To the extent the allegations in Paragraph 284 and its associated footnote disregard the substantial loans made to GGC from DCG and/or DCG International Investments, Ltd. ("DCGI") from January 2022 through July 2022, denies the allegations in Paragraph 284.

285.    On January 24, 2022, Genesis Global Capital lent DCG $100 million in cash on an unsecured basis, with a stated maturity date of July 24, 2022.[66]

**ANSWER**:  Admits that Paragraph 285 and its associated footnote purport to characterize a loan term sheet dated January 24, 2022, between GGC and DCG, and refers to that loan term sheet for a complete and accurate description of its contents and states that Paragraph 285 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

---

[64] NYAG Compl., ¶120.

[65] *Id.*, ¶180.

[66] *Id.*, ¶181.

286.    Similarly, on February 23, 2022, Genesis Global Capital lent DCG another $100 million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022.[67]

**ANSWER**:  Admits that Paragraph 286 and its associated footnote purport to characterize a loan term sheet dated February 23, 2022, between GGC and DCG, and refers to that loan term sheet for a complete and accurate description of its contents and states that Paragraph 286 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

287.    During the period from January 2022 through May 2022, an entity called HQ Cash Management invested over $100 million with Genesis Global Capital:

| Entity | Fund | Date | | | |
|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | $ - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ - | $ (1,000,000.00) | $ (1,000,000.00 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ (1,000,000.00) | $ (1,004,554.79) | $ (4,554.79 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ (1,004,554.79) | $ (1,011,297.69) | $ (6,742.90 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ (1,011,297.69) | $ (1,018,813.16) | $ (7,515.47 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ (1,018,813.16) | $ (100,526,140.24) | $ (99,507,327.08 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ (100,526,140.24) | $ (1,197,327.65) | $ 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ (1,197,327.65) | $ - | $ 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ - | $ - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ - | $ - | $ - |

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 287 and denies on that basis, except states that Paragraph 287 purports to quote and characterize a Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, filed in the Genesis Bankruptcy Action at ECF. No 143, and refers to that document for a complete and accurate description of its contents.

288.    HQ Digital appears to have served a single purpose: managing the personal wealth of Defendant Silbert and a select few other top DCG executives.

**ANSWER**:  Denies the allegations in Paragraph 288.

---

[67] *Id.*, ¶184.

289. A Form ADV filed by HQ Digital entity HQ Investments LLC revealed that HQ Digital had four clients: one high net worth individual with over $3.6 billion AUM, and three pooled investment vehicles with a combined total of $8.1 million AUM:

| Type of *Client* | (1) Number of Client(s) | (2) Fewer than 5 *Clients* | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | | ☐ | $ |
| (b) *High net worth individuals* | 1 | ☐ | $ 3,653,499,019 |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 8,100,000 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | ☐ | $ |
| (h) Charitable organizations | | ☐ | $ |
| (i) State or municipal *government entities* (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☐ | $ |
| (n) Other: | | ☐ | $ |

**ANSWER**: Denies the allegations in Paragraph 289, except admits that HQ Investments LLC filed a Form ADV on December 2, 2022, and refers to that Form ADV for a complete and accurate description of its contents.

290. Upon information and belief, the high net worth individual with over $3.6 billion AUM with HQ Digital reflected on the Form ADV was Defendant Silbert.

**ANSWER**: Admits the allegations in Paragraph 290.

291. The Form ADV lists two "Control Person(s)" as controlling HQ Digital: Defendants DCG and Silbert.

**ANSWER**: Admits that the HQ Investments LLC filed a Form ADV on December 2, 2022 that lists Mr. Silbert and DCG as "Control Person(s)," among others, for purposes of that Form ADV.

292. HQ Digital managed the funds of Defendant Silbert and others via a series of limited partnerships named, *inter alia*, HQ Founders Liquidity Fund I LP, HQ Ecosystem Fund I LP, HQ Cash Management Fund LP, and HQ Enhanced Yield Fund LP, LP.

**ANSWER**:  Admits that HQ Investments LLC was the investment manager of HQ Cash Management Fund LP, and HQ Enhanced Yield Fund LP; admits that HQ Investments LLC was the managing member of HQ Founders Liquidity Fund I LP, and HQ Ecosystem Fund I LP.

293.    Bankruptcy filings show that the HQ Cash Management Fund invested extensively with Genesis Global Capital during the Class Period as HQ Digital sought to earn money for Defendant Silbert and other HQ Digital members.

**ANSWER**:  Denies the allegations in Paragraph 293, except states that Paragraph 293 purports to characterize filings in the Genesis Bankruptcy Action, and refers to those filings for a complete and accurate description of their contents.

294.    From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.[68]

**ANSWER**:  States that the allegations in Paragraph 294 and its associated footnote constitute legal conclusions concerning corporate structures, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 294 and its associated footnote concerning the unsecured loans to DCG; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 294 and its associated footnote and denies on that basis.

295.    As later revealed, Genesis' related-party unsecured lending to DCG had disastrous consequences when DCG failed to repay loans to Genesis.

**ANSWER**:  Denies the allegations in Paragraph 295.

### ii.    3AC and Babel Finance Default on Genesis Loans.

296.    In the days leading up to June 13, 2022, 3AC was the Genesis Entities' second-largest borrower. Although 3AC nominally borrowed from Genesis Asia Pacific, Genesis Global Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to 3AC. Genesis

---

[68] NYAG Compl., ¶99.

Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific. 3AC paid between 8-15% interest on these loans.[69]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 296 and its associated footnote and denies on that basis, except states that Paragraph 296 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents; and admits that 3AC borrowed from GAP.

297.    On June 13, 2022, 3AC defaulted on billions in loans from Genesis Asia Pacific. As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business generally) incurred a loss of approximately $1 billion in open-term, on-demand assets. Around the same time as 3AC's default, Genesis Global Capital also incurred more than $100 million in losses arising from the default of another borrower, Babel Finance.[70]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 297 and its associated footnote and denies on that basis, except states that Paragraph 297 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents; and admits that on June 13, 2022 GAP and GGC issued a margin call to 3AC and 3AC failed to meet the margin call.

298.    The losses from 3AC and Babel created negative equity value at the Genesis Entities and created a deficit in the open-term assets available to repay Genesis Yield investors. Genesis Global Capital's internal documents stated that these losses opened a $1.1 billion structural hole in Genesis Global Capital's loan book.[71]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 298 and its associated footnote and denies on that basis, except states that Paragraph 298 and its associated footnote purport to characterize the NYAG

---

[69] *Id.*, ¶117.
[70] *Id.*, ¶121.
[71] *Id.*, ¶122.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its

contents.

B.    **DEFENDANTS' FRAUDULENT SCHEME TO COVER-UP THE EQUITY HOLE AT GENESIS GLOBAL CAPITAL.**

299.    As of June 13, 2022, as a result of the 3AC and Babel defaults, Genesis Global Capital's liabilities exceeded its assets by approximately $1.1 billion. In other words, the Company was insolvent.

**ANSWER**:  Denies the allegations in Paragraph 299.

300.    Genesis Global Capital's insolvency constituted an "Event of Default" under the Genesis Yield Investment Agreements:

**VII. Default**

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":
. . .

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;
…

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

**ANSWER**:  Denies the allegations in Paragraph 300, except states that Paragraph 300

purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements

for a complete and accurate description of their contents.

301.    As Defendants were aware, the Genesis Yield Investment Agreements provided that if an Event of Default (as defined above) occurred, lenders such as Plaintiffs had the right to "declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable" and if the Event of Default persisted for 30 days or more, terminate the agreement.

**ANSWER**:  Denies the allegations in Paragraph 301, except states that Paragraph 301 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

302.    As described in further detail below, knowing that the recall of loans or termination of the Genesis Yield Investment Agreements would be the end of Genesis Global Capital, Defendants engaged in a scheme which ultimately directed and caused Genesis Global Capital to conceal its insolvency in order to induce Plaintiffs and members of the class not to recall their loans or to make new loans to Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 302.

303.    Accordingly, following 3AC's default on June 13, 2022, Defendants engaged in a scheme to misrepresent the true financial condition of Genesis Global Capital (*i.e.*, conceal Genesis Global Capital's insolvency) from lenders such as Plaintiffs who had loaned digital assets to Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 303.

304.    Defendants' scheme was intended to, and did, conceal Genesis Global Capital's insolvency and thereby induced investors such as Plaintiffs and class members to continue loaning digital assets to Genesis Global Capital and to prevent Plaintiffs and class members from calling their outstanding loans.

**ANSWER**:  Denies the allegations in Paragraph 304.

305.    During the Class Period, representatives of DCG and Genesis Global Capital, including Silbert, normally met weekly via Microsoft Teams. However, following 3AC's default, these meetings occurred daily, sometimes multiple times per day, with Silbert frequently personally participating. In these daily meetings, Defendants discussed how Genesis Global Capital should communicate with lenders such as Plaintiffs, members of the Class, and their agents such as Gemini.

**ANSWER**:  Denies the allegations in Paragraph 305, except states that the allegations concerning "frequent[]" meetings in Paragraph 305 are generalized, vague, and non-specific, and thus denies on that basis.

306.    From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's COO [Defendant Murphy] met with Genesis Global Capital's leadership daily, often multiple times a day. During these meetings, DCG and Genesis Global Capital employees, agents and principals discussed how to communicate with counterparties about 3AC, and how to bolster the Genesis Entities' financial condition in the wake of these losses. During the same period, DCG's COO [Defendant Murphy] and DCG's Head of Communications [Amanda Cowie]

helped draft talking points documents for use by DCG and Genesis Global Capital personnel in conversations with counterparties.[72]

**ANSWER**:  Denies the allegations in Paragraph 306 and its associated footnote, except admits that certain representatives from GGC communicated with Mr. Silbert, Mr. Murphy, and others from DCG following 3AC's default; states that allegations in the third sentence of Paragraph 306 regarding "talking points documents" are generalized, vague, and non-specific, and thus denies on that basis; and states that Paragraph 306 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

307.    On June 13, 2022, Silbert directed Moro and COO [Defendant Murphy] to lead the company's response to the 3AC situation "with support and guidance from DCG" and asked that defendants Moro and Islim attend a "DCG board update and strategy called" scheduled for June 14, 2022.[73]

**ANSWER**:  Denies the allegations in Paragraph 307 and its associated footnote, except states that Paragraph 307 and its associated footnote purport to quote and characterize a June 13, 2022 Microsoft Teams conversation between Mr. Silbert, Mr. Moro, Mr. Murphy, and others, and refers to that Microsoft Teams message for a complete and accurate description of its contents.

308.    Moro responded to Silbert by saying: "Derar [Islim] and I are involved every step [sic] of what has been happening . . . We will manage through this with help from you and DCG."[74] Moro reported that these steps included "drafting both internal and external talking points on the [3AC] situation as needs arise."

**ANSWER**:  States that Paragraph 308 and its associated footnote purport to quote and characterize a June 13, 2022 Microsoft Teams conversation between Mr. Silbert, Mr. Moro, Mr.

---

[72] *Id.*, ¶124.
[73] NYAG Action, NYSCEF DOC. NO. 40, at NY-DCG_00068082.
[74] *Id.* at NY-DCG_00068083.

Murphy, and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents.

309.    On June 13, 2022, Silbert reported to DCG's board that 3AC defaulted and that Genesis Global Capital's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well over $500 mm now)" and that "[t]hings have continued to deteriorate all around," including "the situation with [3AC]", and that as a result, Silbert was expecting a "bank run."[75]

**ANSWER**:  Denies the allegations in Paragraph 309 and its associated footnote, except states that Paragraph 309 and its associated footnote purport to quote and characterize a June 13, 2022 email from Mr. Silbert addressed to certain members of the DCG Board, and refers to that email for a complete and accurate description of its contents.

310.    Silbert went on to explain that some of the collateral provided by 3AC was illiquid as it consisted of shares of the GBTC issued by DCG-subsidiary Grayscale, which Genesis Global Capital could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert informed the board that he was "starting to think about bringing in equity partners directly into Genesis," showing concern for Genesis' equity balance sheet, and stating "[e]verything needs to be on the table" regarding financing.[76]

**ANSWER**:  Denies the allegations in Paragraph 310 and its associated footnote, except states that Paragraph 310 and its associated footnote purport to quote and characterize a June 13, 2022 email from Mr. Silbert addressed to certain members of the DCG Board, and refers to that email for a complete and accurate description of its contents.

311.    On June 13, 2022, Defendant Silbert wrote to Genesis Global Capital's management team: "Just want to make sure everybody is clear that Genesis [Capital] is not to sell th[e] [GBTC] shares or enter into any transaction without consulting with me first."[77]

**ANSWER**:  States that Paragraph 311 and its associated footnote purport to quote and characterize a June 17, 2022 Microsoft Teams conversation between Mr. Silbert and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents.

---

[75] NYAG Action, NYSCEF DOC. NO. 41.

[76] NYAG Action, NYSCEF DOC. NO. 41; NYAG Compl., ¶126.

[77] NYAG Action, NYSCEF DOC. NO. 17 ("Am. Compl."), filed Feb. 9, 2024, ¶128.

312.    Also on June 13, 2020, Defendants caused the Company to tweet and Defendant Moro to repost the following tweet that falsely represented that Genesis has "strong risk management practices and frameworks":



https://x.com/GenesisTrading/status/1536360521682849792?s=20

**ANSWER**:  Denies the allegations in Paragraph 312, except states that Paragraph 312 purports to characterize a June 13, 2022 X post by @genesistrading, and refers to that X post for a complete and accurate description of its contents.

313.    However, things were much different behind the scenes. Genesis Global Capital's Head of Trading Matthew Ballensweig was "nervous and rattled … and [wasn't] entirely thinking straight" according to Defendant Moro, who agreed to help Ballensweig "shore up liquidity."

**ANSWER**:  Denies the allegations in Paragraph 313, except states that Paragraph 313 purports to quote and characterize a June 13, 2022 Microsoft Teams conversation between Mr. Silbert, Mr. Murphy, Mr. Moro and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents.

314.    For example, according to sworn testimony and evidence in *U.S. v. Sam Bankman-Fried*, on or around June 13, 2022, Ballensweig in a Telegram chat with executives from Alemeda, including Caroline Ellison ("Ellison") asked Alemeda to return hundreds of millions loaned to Alemeda by Genesis Global Capital on an open-term basis: "hey, guys - seeing a fair amount of continued outflows from retail deposit aggregators, so to get ahead of this, we're going to increase the OT [open term] loan pullback to $400 million. Can you please let us know once the first batch and second batch are sent. Do we have an ETA on the first 250 million?"

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 314 and denies on that basis, except states that Paragraph 314 purports to characterize an unidentified Telegram chat, and refers to that unidentified chat for a complete and accurate description of its contents.

315.     On June 14, 2022, in advance of a strategy call with the DCG board and Genesis Global Capital personnel Moro, Islim, and others, Silbert emailed the DCG' board of directors regarding Genesis Global Capital's strategy after the 3AC default. In the email, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying the Company with additional capital to strengthen its balance sheet, an admission that Genesis Global Capital as it currently stood was unable to withstand continued withdrawals because it was insolvent.[78] Silbert also set forth two additional options, the first being to "support Genesis" by helping Genesis Global Capital to "stabilize its balance sheet, and the second being to fire Genesis's CEO Moro with Silbert himself replacing him as CEO of Genesis, while raising pre-IPO capital to "further strengthen the balance sheet, or down the road once things have stabilized." All three options discussed in this email (jettisoning Genesis Global Capital, supporting Genesis Global Capital with additional capital, and firing Moro with Silbert himself raising capital) were premised on the fact that Genesis Global Capital was insolvent and unable to meet its obligations.

**ANSWER**:  Denies the allegations in Paragraph 315 and its associated footnote, except states that Paragraph 315 and its associated footnote purport to quote and characterize a June 14, 2022 email from Mr. Silbert to certain members of DCG's board of directors, and refers to that email for a complete and accurate description of its contents.

316.     And on June 14, 2022, Silbert, on behalf of DCG's board instructed that Moro and Genesis Global Capital deviate from its normal lending operations and "continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."[79] Of course, as discussed elsewhere herein, Defendants had repeatedly assured Gemini, agent for hundreds of thousands of class members, that Genesis Global Capital already had these controls and risk monitoring procedures in place.

**ANSWER**:  Denies the allegations in Paragraph 316 and its associated footnote, except states that Paragraph 316 and its associated footnote purport to quote and characterize a June 14,

---

[78] NYAG Action, NYSCEF DOC. NO. 70; NYAG Compl., ¶128.
[79] NYAG Compl., ¶127.

2022 Microsoft Teams conversation between Mr. Silbert, Mr. Moro, and others, and refers to that

Microsoft Teams conversation for a complete and accurate description of its contents; and states

that Paragraph 316 and its associated footnote purport to characterize the NYAG Complaint, and

refers to the NYAG Complaint for a complete and accurate description of its contents.

317.    On June 15, 2022, Defendants Silbert, Moro, Islim, Kraines, as well as Ballensweig and others strategized on how to proceed in a Microsoft Teams chat and agreed that the group needed to prioritize concealing Genesis's financial condition from lenders such as Plaintiffs and class members, as well from as the public. For example, in the June 15, 2022 Teams Chat, in advance of a call regarding the 3AC default, Ballensweig and Moro had the following exchange regarding leaking Genesis's overall financial health:

> **BALLENSWEIG**:    we need to still be very cautious about what we say and how we sat it, we don't know theyre not recording . . . I know I sound like a conspiracy theorist but Im very concerned about any leakage of our overall net position
>
> **MORO**:    I agree with the caution. Happy to join.[80]

**ANSWER**:  Denies the allegations in Paragraph 317 and its associated footnote.  States

that the Paragraph 317 and its associated footnote purport to quote and characterize a June 15,

2022 Microsoft Teams conversation between Mr. Silbert, Mr. Moro, Mr. Islim, Mr. Kraines, Mr.

Ballensweig, and others, and refers to that Microsoft Teams conversation for a complete and

accurate description of its contents; states that Paragraph 317 and its associated footnote purport

to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and

accurate description of its contents.

318.    Later in the same June 15, 2022 Microsoft Teams Chat, Ballensweig shared the following "good news," highlighting the importance of Gemini Earn lenders to Genesis Global Capital's financial health and the group's belief that and willingness to perpetuate the false notion that Genesis Global Capital was in good financial health:

> **BALLENSWEIG**:    good news is this:
> **BALLENSWEIG**:    From Gemini: the rate of redemptions has been slowing since 6/13 at 10: 00 pm
> **MARK MURPHY**:    Great

---

[80] NYAG Action, NYSCEF DOC. NO. 75.

…

| | |
|---|---|
| **BALLENSWEIG**: | weve been defen[d]ing the castle all night and day on phone with depositers, prosepcts etc [sic] |
| **SILBERT**: | is there anything we/DCG can do to further install confidence in Genesis? |
| **BALLENSWEIG**: | it ultimately comes down to our ops/processing etc, as people see our responsiveness, word spreads fast. We have some portcos that have wanted to hop on calls today – I just woke to Wyre, we're speaking with Decentraland etc so if they triangulate with you, you can just reaffirm our position etc. |
| **SILBERT**: | great … marcus says that the word on the street is that genesis is the "blue chip" in this mess . . . we need to perpetuate that of course |
| **BALLENSWEIG**: | yes definitely[81] |

**ANSWER**:  Denies the allegations in Paragraph 318 and its associated footnote, except states that Paragraph 318 and its associated footnote purport to quote and characterize a June 15, 2022 Microsoft Teams conversation between Mr. Silbert, Mr. Murphy, Mr. Ballensweig, and others, and refers to that conversation for a complete and accurate description of its contents.

319.    Consistent with Silbert's instructions to perpetuate the false notion that Genesis Global Capital was in good financial condition and "blue chip," on June 15, 2022 the Genesis Entities tweeted via their shared Twitter account:



**ANSWER**:  Denies the allegations in Paragraph 319, except states that Paragraph 319 purports to quote and characterize a June 15, 2022 X post by the @genesistrading X account, and refers to that X post for a complete and accurate description of its contents.

320.    Defendants Silbert, DCG, Murphy and Kraines, and Ballensweig re-tweeted this statement on June 15, 2022 that falsely represented that Genesis Global Capital's balance sheet was "strong" when at that time it had massive unsecured exposure to 3AC. Far from "operating

---

[81] *Id.*

normally," the Defendants knew, or at least recklessly disregarded, that Genesis Global Capital was facing a "bank run."

**ANSWER**:  Denies the allegations in Paragraph 320, including that Mr. Kraines "knew" or "recklessly disregarded" that the contents were not true.  Admits that a June 15, 2022 X post by the @genesistrading X account was reposted by the X accounts @DCGco and @mtballensweig, as well as by Mr. Silbert, Mr. Murphy, and Mr. Kraines, and refers to those reposts for a complete and accurate description of their contents.

321.    To that end, Genesis employee Michael Paleokrassas told the group in the June 15, 2022 Microsoft Teams the following:

> **PALEOKRASSAS**: Just heard from Josh B, he said that multiple clients have stated that our tweet helped them get comfortable and keep their loans to us."[82]

**ANSWER**:  Denies the allegations in Paragraph 321 and its associated footnote, except states that Paragraph 321 and its associated footnote purport to quote and characterize a June 15, 2022 Microsoft Teams message to Mr. Silbert, Mr. Murphy, Mr. Kraines, Mr. Ballensweig, and others, and refers to that Microsoft Teams message for a complete and accurate description of its contents.

322.    Similarly, internal documents from Gemini indicate that several Gemini Earn investors expressed being reassured by public communications that Defendants caused to be made on behalf of Genesis Global Capital.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 322 and denies on that basis.

323.    On June 16, 2022, Defendant Moro and a managing director at Genesis Global Capital discussed "how to think about the equity hole on the [Genesis] balance sheet and plan to minimize that."[83] Yet, on June 17, 2022, Defendant Moro tweeted the following:

---

[82] *Id.* (emphasis added).

[83] NYAG Am. Compl., ¶146.



https://x.com/michaelmoro/status/1537822426536546306?s=20;

https://x.com/michaelmoro/status/1537822427790680066?s=20

**ANSWER**:  States that Paragraph 323 and its associated footnote purport to quote and characterize a June 16, 2022 Microsoft Teams message from Mr. Murphy, and refers to that Microsoft Teams message for a complete and accurate description of its contents; states that Paragraph 323 purports to quote a June 16, 2022 X post from @michaelmoro and refers to that X post for a complete and accurate description of its contents; and states that Paragraph 323 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents

324.    Also on June 17, 2022, Defendants DCG, Kraines, and Ballensweig reposted Defendant Moro's twitter thread:



**ANSWER**: Admits that a June 17, 2022 X post by the @michaelmoro X account was reposted by Mr. Kraines. States that Paragraph 324 purports to quote and characterize June 17, 2022 X posts made by @mtballensweig and @DCGco, as well as a re-post Mr. Kraines, and refers to those X posts for a complete and accurate description of their contents.

325. DCG's COO [Defendant Murphy] reviewed and edited these tweets before Moro posted them. In strategizing the release of the tweets, DCG's COO [Defendant Murphy] directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Global Capital's compliance department that these tweets should come from the Genesis Entities corporate account. The Genesis Entities reposted Moro's tweets that same day.[84]

**ANSWER**: Denies the allegations in Paragraph 325 and its associated footnote, except states that the X account @genesistrading reposted a June 17, 2022 X post from @michaelmoro and refers to that repost for a complete and accurate description of its contents; states that the second sentence of Paragraph 325 and its associated footnote purport to characterize a June 17, 2022 email communication between Mr. Murphy, Mr. Moro, and others, and refers to that email for a complete and accurate description of its contents; and states that Paragraph 325 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

326. Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 [Ballensweig] stated, "Genesis remains solvent and operates [business

---

[84] *Id.*, NYAG Compl., ¶133.

as usual] at the moment. With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations." In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."[85]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 326 and its associated footnote and denies on that basis; except states that Paragraph 326 and its associated footnote purport to quote and characterize an unidentified call transcript, and refers to that call transcript for a complete and accurate description of its contents; states that Paragraph 326 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

327.    After the call with Gemini, Silbert and DCG's COO [Defendant Murphy] were updated that same day that Gemini "asked hard [questions] about [3AC]," but that Managing Director No. 1 "fended it off."[86]

**ANSWER**: States that Paragraph 327 and its associated footnote purport to quote and characterize a June 17, 2022 email from Matt Kummell to Mr. Silbert, Mr. Murphy, and others, and refers to that email for a complete and accurate description of its contents; and states that Paragraph 327 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

328.    The tweets and statements to Gemini set forth above were false and misleading in at least five ways.[87]

**ANSWER**: Denies the allegations in Paragraph 328 and its associated footnote, except states that Paragraph 328 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

---

[85] *Id.*, ¶134.

[86] *Id.*, ¶135.

[87] *Id.*, ¶137.

329.    First, client funds had been impacted—the 3AC losses severely impaired Genesis Capital's ability to repay its counterparties, including Earn investors.[88]

**ANSWER**:    States that the allegations concerning the "impact" and level of severity referenced in Paragraph 329 and its associated footnote are generalized, vague, and non-specific, and denies on that basis; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 329 and its associated footnote and denies on that basis; and states that Paragraph 329 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

330.    Second, due to 3AC's default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity. Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us." Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.[89]

**ANSWER**:    Denies the allegations in Paragraph 330 and its associated footnote, except states that the second sentence of Paragraph 330 purports to quote and characterize a June 21, 2022 email from Mr. Silbert to Mike Katz, Rumi Morales, Daniel Levan, Jason Kacavone, Mr. Beck, and Mr. Kruger, and refers to that email for a complete and accurate description of its contents; states that the third sentence of Paragraph 330 purports to characterize a June 24, 2022 Microsoft Teams message from Mr. Silbert to Mr. Kraines, Mr. Murphy, and others and refers to that Microsoft Teams message for a complete and accurate description of its contents; states that Paragraph 330 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

[88] *Id.*, ¶138.
[89] *Id.*, ¶139.

125

331.    Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.[90]

**ANSWER**:  Denies the allegations in Paragraph 331 and its associated footnote, except states that Paragraph 331 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

332.    Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to 3AC as an uncollectible asset on its balance sheet.[91]

**ANSWER**:  Denies the allegations in Paragraph 332 and its associated footnote, except lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations regarding GGC's balance sheet in Paragraph 332 and denies on that basis; and states that Paragraph 332 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

333.    Fifth, Genesis Capital was not operating "business as usual;" the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.[92]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 333 and its associated footnote and denies on that basis, except states that Paragraph 333 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

---

[90] *Id.*, ¶140.
[91] *Id.*, ¶141.
[92] *Id.*, ¶142.

334.    As a result of and in reliance on the statements made by Genesis to Gemini, Gemini continued to send Genesis Global Capital additional investor funds after June 17, 2022.[93]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 334 and its associated footnote and denies on that basis, except states that Paragraph 334 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

335.    On or around June 20, 2022, in a Telegram chat with Alemeda executive Caroline Ellison, Ballensweig indicated that he discussed Genesis' loans to Alemeda with Sam Bankman-Fried and further indicated that Genesis sought repayment of $500 million loaned to Alemeda:

> BALLENSWEIG:    hey there - so spoke with Sam [Bankman-Fried] and I'm sure he filled you in——wouldn't be pushing you guys here if it wasn't totally necessary but we want to unwind $500 million in 250 clips. If you guys can show us what that's going to cost, it would be helpful, but we're basically in that position where this is no longer a luxury.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 335 and denies on that basis, except states that Paragraph 335 purports to quote and characterize a Telegram message from Mr. Ballensweig and refer to that Telegram message for a complete and accurate description of its contents.

336.    Ellison testified that Ballensweig told her that Genesis was experiencing recalls from its lenders and that she understood that Genesis needed Alemeda to repay $500 million in loans from Genesis or that it "might go under"—directly contradicting Genesis Global Capital's representation that its balance sheet was "strong":

> Q. Can you just explain what you mean by recalls that Genesis was getting on their end.

> [Ellison] A. It meant Genesis was——the money that they were lending us, they were borrowing from others, including retail lending platforms, and customers were withdrawing their money from those platforms, so Genesis had to have a way to fulfill those withdrawals, and that's why they needed their money back from us.

---

[93] *Id.*, ¶136.

Q. This refers to speaking with Sam. What, if anything, did the defendant [Sam Bankman-Fried] tell you about his call with Matt Ballensweig?

[Ellison] A. He told me that he talked to Matt and that Matt said that Genesis really needed the money and implied that they might go under or have to default on some loans if they didn't get it . . . .

**ANSWER**:  Denies the allegations in Paragraph 336, except states that Paragraph 336 purports to quote and characterize Caroline Ellison's testimony, and refers to that testimony for a complete and accurate description of its contents.

337.    Silbert's focus on concealing Genesis's insolvency (or "equity hole") to maintain the false perception of Genesis Global Capital's financial health is further highlighted in a June 21, 2022 instant messaging thread in which Silbert indicated he had told a new employee the following:

**SILBERT**: "-our industry is in the midst of a healthy cleansing and deleveraging, but it is painful and nobody has been. spared, even us

-across DCG and Genesis we have about —$2 billion of liquidity, but that is precious right now and we are in bunker mode and not deploying in order to be able to withstand whatever negative event comes next

- we are all focused on making sure that the trust and confidence in Genesis remains high because we can't risk money leaving Genesis and depleting our liquidity - once we get through this, the Genesis access to low priced capital via the institutional investor and retail channel like Gemini is going to give us a major competitive advantage in a market where there is limited liquidity and will help power the next stage of investing
…
- what I didn't say, which we need to keep between us, is that even though our liquidity is super super strong right now, *the hole in Genesis equity due to the Three Arrows exposure is something they we will need to fill by 6/30*. It is my sense that DCGI will play a role here in addressing the hole, hopefully temporarily, through the pledge of assets or if need be, the downstream of certain/all assets until prices recover. The challenge is we don't know what will be the recovery on the Three Arrows claim, or what will be the BTC price on 6/30, so it is difficult to calculate the hole. We're trying to come up with as many options as possible. This is super confidential/sensitive stuff, so please don't share with anybody, including Daniel, *until he is in the circle of trust*."[94]

(Emphasis added).

---

[94] NYAG Action, NYSCEF DOC NO. 44.

**ANSWER**:  Denies the allegations in Paragraph 337, except states that Paragraph 337 and its associated footnote purport to quote and characterize a June 21, 2022 Microsoft Teams message from Mr. Silbert to Mike Katz, Rumi Morales, Daniel Levan, Jason Kacavone, Mr. Beck, and Mr. Kruger, and refers to that message for a complete and accurate description of its contents.

338.    On June 24, 2022, Silbert reiterated to colleagues that "[w]e just can't allow people inside or outside [to] question Genesis' solvency."[95]

**ANSWER**:  States that Paragraph 338 and its associated footnote purport to quote and characterize a June 24, 2022 Microsoft Teams message from Mr. Silbert to Mr. Kraines and others, and refers to that Microsoft Teams message for a complete and accurate description of its contents; states that Paragraph 338 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

339.    On June 27, 2022, Genesis Global Capital's then CEO, Moro, emailed DCG and Genesis Global Capital executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.

> And yes, at some point, our losses in [3AC] and potentially Babel will become public. But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.

> But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.[96]

**ANSWER**:  Denies the allegations in Paragraph 339 and its associated footnote, except states that the second sentence of Paragraph 339 and its associated footnote purport to quote and characterize a June 27, 2022 email from Mr. Moro to Mr. Ballensweig, Mr. Islim, Mr. Murphy,

---

[95] NYAG Compl., ¶147.
[96] *Id.*, ¶143.

and Mr. Kraines, and refers to that email for a complete and accurate description of its contents; and states that Paragraph 339 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

340. In a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Capital representatives how to "best fill the equity hole," euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.[97]

**ANSWER**: Denies the allegations in Paragraph 340 and its associated footnote, except states that Paragraph 340 and its associated footnote purport to quote and characterize a June 28, 2022 email from Mr. Moro to Mr. Silbert, and refers to that email for a complete and accurate description of its contents; states that Paragraph 340 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

341. At this time, the Earn investors were one of Genesis Global Capital's largest sources of unsecured funding.[98]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the quoted statements in Paragraph 341 and its associated footnote and denies on that basis, except states that Paragraph 341 and its associated footnote purport to characterize the

---

[97] *Id.*, ¶144.
[98] *Id.*, ¶145.

130

NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

342.    Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.[99]

**ANSWER**:  States that Paragraph 342 and its associated footnote purport to quote and characterize a June 28, 2022 email from Mr. Silbert to Mr. Moro, and refers to that email for a complete and accurate description of its contents; and states that Paragraph 342 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

### i.    3AC Declares Bankruptcy.

343.    On June 27, 2022, 3AC was required to liquidate its assets by a British Virgin Islands court following default on several of its liabilities. Subsequently, on July 1, 2022, 3AC sought Chapter 15 bankruptcy protection within the United States Bankruptcy Court for the Southern District of New York.

**ANSWER**:  Admits that on June 27, 2022, a British Virgin Islands court ordered the appointment of joint liquidators of 3AC; and admits that on July 1, 2022 3AC filed a Chapter 15 Petition for Recognition of a Foreign Proceeding in the United States Bankruptcy Court for the Southern District of New York.

344.    3AC's bankruptcy filings revealed it had procured billions in loans from Genesis Global Capital. As of July 1, 2022, 3AC was indebted to Genesis Global Capital to the tune of approximately $2.3 billion. Post-liquidation, 3AC's outstanding obligation to Genesis Global Capital was $1.1 billion.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the quoted statements in Paragraph 344 and denies on that basis, except states that

---

[99] *Id.*, ¶146.

Paragraph 344 purports to characterize unidentified filings from 3AC's bankruptcy proceedings

and refers to those unidentified filings for a complete and accurate description of their contents.

345.    Because 3AC also owed other creditors billions of dollars, Genesis Global Capital would not recover any amount close to the $1.1 billion outstanding, which should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on Genesis Global Capital's balance sheet.

**ANSWER**:  Denies the allegations in Paragraph 345.

346.    The insolvency of 3AC sent shockwaves through the digital asset market, inducing a credit crunch that detrimentally impacted digital asset companies like Genesis Global Capital and its competitors. This crisis led to several of Genesis Global Capital's competitors filing for bankruptcy protection or seeking emergency lines of credit, reflecting the severity of the resultant turmoil.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in Paragraph 346 and denies on that basis.

### i.    Defendant Silbert Saves DCG and Himself by Draining Liquidity from Genesis.

347.    At the same time as Genesis was, in effect, insolvent and facing an "equity hole," starting in June 2022, Silbert and DCG began extracting liquidity from Genesis Global Capital despite Silbert's own acknowledgment of the perilous financial condition the Company was in.

**ANSWER**:  Denies the allegations in Paragraph 347.

348.    Remarkably, on or about June 18, 2022, Genesis Global Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis which *reduced* Genesis's liquidity when every communication acknowledged the need to *improve* Genesis's liquidity to meet withdrawals.[100]

**ANSWER**:  Denies the allegations in Paragraph 348 and its associated footnote, except

admits that GGC lent approximately 18,697 BTC to DCGI pursuant to a loan term sheet dated

June 18, 2022, and refers to that term sheet for a complete and accurate description of its contents;

and states that Paragraph 348 and its associated footnote purport to characterize the NYAG

---

[100] *Id.*, ¶185.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its

contents.

349.    Further, Genesis Global Capital bankruptcy filings show that in June and July of 2022, Defendant Silbert personally extracted over $100 million of personal capital he had invested with Genesis Global Capital via HQ Cash Management Fund LP by recalling investments HQ Cash Management Fund LP had made in Genesis Global Capital:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | | $ | - | $ | | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ | - | $ | (1,000,000.00) | $ | (1,000,000.00) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ | (1,000,000.00) | $ | (1,004,554.79) | $ | (4,554.79) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ | (1,004,554.79) | $ | (1,011,297.69) | $ | (6,742.90) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ | (1,011,297.69) | $ | (1,018,813.16) | $ | (7,515.47) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ | (1,018,813.16) | $ | (100,526,140.24) | $ | (99,507,327.08) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ | (100,526,140.24) | $ | (1,197,327.65) | $ | 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ | (1,197,327.65) | $ | - | $ | 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ | - | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ | - | $ | - | $ | - |

Capital withdrawn

**ANSWER**:  Denies the allegations in Paragraph 349, except states that Paragraph 349

purports to quote and characterize a filing in the Genesis Bankruptcy Action, and refers to that

filing for a complete and accurate description of its contents.

350.    Bankruptcy filings show further that other DCG and Genesis Global Capital insiders were extracting hundreds of millions of dollars' worth of capital from Genesis Global Capital by redeeming their investments. The following two charts show that other Defendant DCG, Genesis Global Capital and GTT insiders extracted millions out of Genesis Global Capital:

SOFA 4 - Rider 2: Wages, Benefits, Loans and Other Beneficial Transfers

| NAME | DATE | DESCRIPTION | VALUE |
|---|---|---|---|
| **CONHEENEY, THOMAS**<br>Director | 1/19/2023 | Director Fees* | $ 250,000.00 |
| **KRAINES, MICHAEL**<br>Director | 2/1/2022 | Interest Paid | $ 2,123.28 |
| | 3/1/2022 | Interest Paid | $ 1,917.81 |
| | 4/1/2022 | Interest Paid | $ 2,123.28 |
| | 5/2/2022 | Interest Paid | $ 2,054.79 |
| | 6/1/2022 | Interest Paid | $ 2,123.28 |
| | 7/1/2022 | Interest Paid | $ 2,054.79 |
| | 8/1/2022 | Interest Paid | $ 2,123.28 |
| | 9/1/2022 | Interest Paid | $ 2,123.28 |
| | 10/3/2022 | Interest Paid | $ 2,054.79 |
| | 11/1/2022 | Interest Paid | $ 2,123.28 |
| **PALEOKRASSAS, MICHAEL**<br>Former Co-Head of Trading and Lending | 2/7/2022 | Borrow Returned | $ 60,000.00 |
| | 2/24/2022 | Borrow Returned | $ 40,000.00 |
| | 4/6/2022 | Borrow Returned | $ 20,000.00 |
| | 4/12/2022 | Borrow Returned | $ 70,000.00 |
| | 5/3/2022 | Borrow Returned | $ 75,000.00 |
| | 6/15/2022 | Borrow Returned | $ 1,295,890.81 |
| | 6/15/2022 | Interest Paid | $ 37.35 |
| | 6/15/2022 | Interest Paid | $ 4,970.53 |
| | 11/10/2022 | Borrow Returned | $ 37,801.39 |
| **PRETTO-SAKMANN, ARIANNA**<br>Chief Legal Officer | 6/13/2022 | Loan Book Activity | $ 758,919.97 |
| **SILBERT, BARRY**<br>Chief Executive Officer<br>(Digital Currency Group) | 2/1/2022 | Interest Paid | $ 23,671.23 |
| | 3/1/2022 | Interest Paid | $ 24,547.95 |
| | 4/1/2022 | Interest Paid | $ 27,178.08 |
| | 4/14/2022 | Interest Paid | $ 11,397.26 |
| | 4/14/2022 | Borrow Returned | $ 4,000,000.00 |



Capital withdrawn

SOFA Question 4: Payments or other transfers of property made within 1 year before filing this case that benefited any insider

SOFA 4 - Rider 3: Coin Transactions

| NAME | DATE | TYPE | DESCRIPTION | COIN | COIN QUANTITY | COIN VALUE (USD) |
|---|---|---|---|---|---|---|
| **BALLENSWEIG, MATT**<br>Former Co-Head of Trading and Lending | 10/12/2022 | Outflow | Collateral Returned | BTC | 4.25 | $ 81,408.75 |
| **PALEOKRASSAS, MICHAEL**<br>Former Co-Head of Trading and Lending | 6/15/2022 | Outflow | Borrow Returned | BTC | 415.58718963 | $ 9,374,566.47 |
| | 6/15/2022 | Outflow | Borrow Returned | USDC | 12,173.504 | $ 12,173.50 |
| | 11/8/2022 | Outflow | Borrow Returned | ETH | 225.00 | $ 300,341.25 |
| | 11/9/2022 | Outflow | Borrow Returned | BCH | 415.70924001 | $ 37,018.91 |
| | 11/9/2022 | Outflow | Borrow Returned | USDC | 8,420.358958 | $ 8,420.36 |
| | 11/9/2022 | Outflow | Borrow Returned | SUSHI | 29,609.27643424 | $ 30,085.99 |
| | 11/9/2022 | Outflow | Borrow Returned | ZEC | 2,238.08806066 | $ 78,109.27 |
| **PRETTO-SAKMANN, ARIANNA**<br>Chief Legal Officer | 6/18/2022 | Outflow | Borrow Returned | ETH | 29.35833993 | $ 29,183.07 |
| | 6/18/2022 | Outflow | Interest Paid | ETH | 1.19938374 | $ 1,192.22 |
| | 6/20/2022 | Outflow | Borrow Returned | FIL | 120.0573083 | $ 658.27 |
| | 6/20/2022 | Outflow | Interest Paid | ETH | 0.05692946 | $ 64.16 |
| | 6/20/2022 | Outflow | Interest Paid | FIL | 9.17193948 | $ 50.29 |



Capital withdrawn

**ANSWER**:  Denies the allegations in Paragraph 350, except states that Paragraph 350 purports to quote and characterize filings in the Genesis Bankruptcy Action, and refers to those filings for a complete and accurate description of their contents.

351.    As a former restructuring investment banker, Defendant Silbert knew that if Genesis Global Capital recognized its own insolvency immediately upon 3AC's collapse in June 2022 as it should have, it would have had to halt redemptions and potentially declare bankruptcy, which would have prevented *anyone*, including Defendant Silbert and other Genesis and DCG insiders, from withdrawing their capital from Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 351.

352.    Instead, at least in part to preserve access to their personal investments, as alleged below, the Exchange Act Defendants orchestrated the sham DCG Promissory Note transaction and used it as an excuse to continue to claim Genesis Global Capital was solvent while they extracted their own capital.

**ANSWER**:  Denies the allegations in Paragraph 352.

C.    **DEFENDANTS FILLED THE EQUITY HOLE WITH A DECEITFUL AND TRANSACTION AND CONTINUED MISREPRESENTING GENESIS'S FINANCIAL CONDITION.**

353.    As detailed above, from mid-June through June 30, 2022, DCG and Genesis Global Capital engaged in a communications campaign designed to conceal Genesis Global Capital's financial condition and mislead counterparties into believing Genesis Capital was operating "business as usual." Those counterparties included Gemini, who Gemini Earn investors had appointed as their agent for "all purposes" relating to the Genesis Yield Investment Agreements and who was tasked with conducting ongoing due diligence on behalf of their behalf.[101]

**ANSWER**:  Denies the allegations in Paragraph 353 and its associated footnote, except states that Paragraph 353 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

354.    The economic reality of Genesis Global Capital's financial condition dictated that Defendants should have caused the Company to declare itself insolvent and either seek recapitalization or restructuring. The myriad internal communications cited above make clear that Defendants were aware that the Company was insolvent, yet schemed in ways designed

---

[101] *Id.*, ¶123.

specifically to conceal this fact. Indeed, instead of causing the Company to truthfully admit its insolvency, Defendants instead caused Genesis Global Capital to dubiously maintain that 3AC's $1.1 billion debt to Genesis Global Capital was still worth $1.1 billion and engage in a deceitful financial transaction with DCG and Silbert designed to mislead the Company's counterparties and their agents.

**ANSWER**: Denies the allegations in Paragraph 354.

355. This course of conduct was, according to Defendant Silbert, decided upon and executed by himself, DCG and its board: "***DCG and its board*** determined that it was in the best interest of Genesis [Global Capital], its lenders, and DCG to try to help support Genesis [Global Capital]."[102]

**ANSWER**: Denies the allegations in Paragraph 355 and its associated footnote, except states that Paragraph 355 and its associated footnote purport to quote and characterize a January 10, 2022 Letter from Barry Silbert to DCG Shareholders, and refers to that letter for a complete and accurate description of its contents.

356. Accordingly, on June 30, 2022, Silbert, DCG, and the other Defendants caused Genesis Global Capital to engage in a sham transaction, causing Genesis to "sell" 3AC's debt to DCG in exchange for the DCG Promissory Note executed by Defendant Silbert to Genesis Global Capital for $1.1 billion due in 10 years at an interest rate of 1%. Under the [DCG]Promissory Note, DCG agreed to pay Genesis Global Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Global Capital would have otherwise received from Genesis Asia Pacific for the 3AC loans. Genesis Global Capital categorized this $1.1 billion as an asset on its balance sheet.[103]

**ANSWER**: Denies the allegations in Paragraph 356 and its associated footnote, except states that Paragraph 356 purports to characterize the Promissory Note, and refers to the Promissory Note for a complete and accurate description of its terms and contents; and states that Paragraph 356 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

357. Silbert signed the [DCG] Promissory Note as CEO of DCG.[104]

---

[102] Barry Silbert, Q&A, https://dcgupdate.com/ (Jan. 10, 2023) (emphasis added).

[103] NYAG Compl., ¶147.

[104] *Id.*, ¶148.

**ANSWER**:  Admits that Mr. Silbert signed the Promissory Note in his capacity as CEO of DCG; states that Paragraph 357 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

358.    According to DCG, the [DCG] Promissory Note was fully approved by DCG's board of directors, which includes Defendant Silbert.

**ANSWER**:  Admits that the Promissory Note was fully approved by DCG's board of directors, which included Mr. Silbert, Lawrence Lenihan, and Glenn Hutchins.

359.    Moro signed the [DCG] Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.[105]

**ANSWER**:  Admits the allegations in Paragraph 359, except states that Paragraph 359 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

360.    DCG dictated the terms of the [DCG] Promissory Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the [DCG] Promissory Note. To the contrary, DCG's repayment of the [DCG] Promissory Note was subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the [DCG] Promissory Note.[106]

**ANSWER**:  Denies the allegations in Paragraph 360 and its associated footnote, except states that Paragraph 360 and its associated footnote purport to characterize the Promissory Note, and refers to the Promissory Note for a complete and accurate description of its contents; and states that Paragraph 360 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

361.    The [DCG] Promissory Note failed to ensure that Genesis Global Capital had sufficient capital to operate its business. The [DCG] Promissory Note required DCG to provide cash payments in no sooner than 10 years, whereas the 3AC-related liabilities DCG purportedly

---

[105] *Id.*, ¶149.
[106] *Id.*, ¶150.

137

"assumed" were callable on demand; this created a mismatch between the [DCG] Promissory Note and Genesis Global Capital's billions of dollars' worth of on-demand obligations to Earn users. Genesis Global Capital's and DCG's internal documents reveal that the [DCG] Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the 3AC losses. In an internal document, Genesis Capital's Chief Risk Officer acknowledged that the [DCG] Promissory Note "wreaks havoc on our balance sheet impacting everything we do."[107] According to filings in the Genesis Bankruptcy Action, Michael Patchen was Genesis Global Capital's Chief Risk Officer during the period January 19, 2022 through October 2022.

**ANSWER**: Denies the allegations in Paragraph 361 and its associated footnote, except states that the second sentence of Paragraph 361 purports to quote and characterize the Promissory Note, and refers to the Promissory Note for a complete and accurate description of its contents; states that the third sentence of Paragraph 361 purports to quote and characterize a September 26, 2022 presentation prepared by Ducera for DCG, and refers to that presentation for a complete and accurate description of its contents; states that the fourth sentence of Paragraph 361 purports to quote and characterize an unidentified GGC internal document, and refers to that unidentified document for a complete and accurate description of its contents; states that the fifth sentence of Paragraph 361 purports to characterize filings in the Genesis Bankruptcy Action, and refers to those filings for a complete and accurate description of their contents; and states that Paragraph 361 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

### i. The Promissory Note Did Not Change Genesis's Financial Condition: Genesis Remained Insolvent.

362. This June 30, 2022 "sale," however, was a sham. There was no exchange of money and no movement of capital. Moreover, this sale could never have occurred between two parties negotiating at arm's length for at least three reasons:

**ANSWER**: Denies the allegations in Paragraph 362.

363. First, the 3AC debt was not worth $1.1 billion at the time, and is not worth $1.1 billion now. The odds of Genesis Global Capital or DCG collecting anything near the full value of

---

[107] *Id.*, ¶154.

the debt were and remain incredibly low, and no party negotiating at arm's length with Genesis Global Capital would have valued the debt at $1.1 billion.

**ANSWER**:  Denies the allegations in the first sentence of Paragraph 363; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 363 and denies on that basis.

364.    Second, even if the debt *were* worth $1.1 billion, the terms of payment were simply not competitive with the financing terms DCG would have received from a nonrelated party. No party other than a subsidiary completely controlled by Defendants DCG and Silbert would have "sold" a $1.1 billion debt for a 10-year promissory note at 1% interest.

**ANSWER**:  Denies the allegations in the first sentence of Paragraph 364; and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 364 and denies on that basis.

365.    Third, given the first two realities, there is simply no reasonable possibility the resulting DCG Promissory Note from DCG is worth anything close to $1.1 billion. According to Gemini, given the duration of the note and the underlying economic realities, the "note would be heavily discounted (approximately 70%) to reflect its value as of today (perhaps $300 million)."

**ANSWER**:  Denies the allegations in Paragraph 365, except states that the second sentence of Paragraph 365 purports to quote and characterize an "Open Letter" from Mr. Winklevoss "to the Board of [DCG]," and refers to that letter for a complete and accurate description of its contents.

366.    In fact, on July 11, 2023 Genesis Global Capital itself filed a Notice of Filing of Exhibit to Disclosure Statement in the Genesis Bankruptcy Action **which estimated the value of the DCG Promissory Note between $90 million (a 92% discount) to $323 million (a 70% discount).**[108]

**ANSWER**:  Denies the allegations in Paragraph 366 and its associated footnote, except states that Paragraph 366 and its associated footnote purport to characterize a July 10, 2023 Notice

---

[108] *In re: Genesis Global Holdco, LLC, et al.,* Case No.: 23-10063, ECF No. 488 (Bankr. S.D.N.Y.).

of Filing of Exhibit to Disclosure Statement in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

367.    According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis and were members of an ad hoc committee of creditors, after the Class Period Defendant Silbert informed a steering committee of Genesis Global Capital creditors that he placed a value of $200 million on the [DCG] Promissory Note: "Genesis was saying it's worth $1.1 billion. . . When we demanded the payment from Barry [Silbert] for it, he said, oh, well, you can't expect us to pay $1.1 billion for that piece of paper. It's only worth 200 million."

**ANSWER**:  Denies the allegations in Paragraph 367, except states that Paragraph 367 purports to quote and characterize a November 4, 2023 podcast interview which appeared on the *Unchained* podcast episode titled "Two Genesis Creditors Describe Their Frustrations With the Bankrupt Crypto Lender" published on YouTube.com, and refers to that interview for a complete and accurate description of its contents.

368.    The DCG Promissory Note was a sham because the loan was uncollectable, and the economic reality was that Genesis Global Capital was insolvent at the time Defendants DCG and Silbert caused Genesis Global Capital to execute the DCG Promissory Note.

**ANSWER**:  Denies the allegations in Paragraph 368.

369.    Worse, after Defendant Silbert executed the DCG Promissory Note on June 30, 2022, Defendants Moro, Islim, Kraines and Murphy caused Genesis Global Capital at the direction of and/or subject to the control of Defendants DCG and Silbert to disseminate misleading and false financial statements to prospective and existing investors, directly or via their designated agent, Gemini.

**ANSWER**:  Denies the allegations in Paragraph 369, including that Mr. Kraines "caused Genesis Global Capital . . . to disseminate misleading and false financial statements."

370.    In furtherance of the Defendants' scheme, from July 2022 through November 2022, Genesis Global Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Global Capital's financial condition. For example, these reports falsely included the [DCG] Promissory Note as an asset that could be reduced to cash within a year. To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022. Genesis Global Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the [DCG] Promissory Note's true nature. Genesis Global Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Global Capital's financial

condition. Instead, members of Genesis Global Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms.[109]

**ANSWER**:  Lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 370 and its associated footnote and denies on that basis, except states that Paragraph 370 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

371.    On July 6, 2022, in reference to 3AC, Moro tweeted:



https://x.com/michaelmoro/status/1544733041045786626?s=20;

https://x.com/michaelmoro/status/1544733042849320960?s=20.

**ANSWER**:  States that Paragraph 371 purports to quote and characterize X posts from @michaelmoro, and refers to those X posts for a complete and accurate description of their contents.

---

[109] NYAG Compl., ¶14.

372.    DCG's COO [Defendant Murphy] and Head of Communications [Amanda Cowie] edited and helped draft these tweets. Silbert reviewed these tweets before Moro posted them.[110] DCG approved these tweets before they were published.[111]

**ANSWER**:    Denies the allegations in Paragraph 372, except admits that certain social media posts concerning DCG were sent in draft form to Mr. Murphy and Ms. Cowie before they were published; states that the second and third sentences of Paragraph 372 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

373.    The tweets were false, misleading, and omitted material facts. DCG did not simply "assume" the $1.1 billion, open-term liability related to 3AC, which could be called at any time; it *replaced* that liability with an illiquid ten-year [DCG] Promissory Note.[112]

**ANSWER**:    Denies the allegations in Paragraph 373 and its associated footnote, except states that Paragraph 373 and its associated footnote purport to quote and characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents

374.    According to Gemini, this statement was false and misleading. In reality, DCG had not ensured that Genesis Global Capital had the capital to operate. In fact, DCG had not given Genesis Global Capital so much as a penny of actual funding to make up for the 3AC losses. Instead, DCG entered into a 10-year promissory note with Genesis Global Capital at an interest rate of 1% — due in 2032. This note was a complete gimmick that did nothing to improve Genesis Global Capital's immediate liquidity position or make its balance sheet solvent. As described above, no cash, capital, or assets changed hands from DCG to Genesis Global Capital.

**ANSWER**:    Denies the allegations in Paragraph 374, except states Paragraph 374 purports to characterize the Promissory Note, and refers to the Promissory Note for a complete and accurate description of its terms and contents.

375.    On July 6, 2022, Genesis Global Capital's Head of Communications and Public Relations [Marc Yaklofsky] sent a document titled "Talking Points to [Three Arrows] Questions"

---

[110] *Id.*, ¶152.

[111] NYAG Am. Compl., ¶161.

[112] NYAG Compl., ¶153.

to Moro, as well as DCG's COO [Defendant Murphy], DCG's Head of Communications [Amanda Cowie], and various other senior employees at Genesis Capital and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Capital personnel in conversations with counterparties, including Gemini.[113]

**ANSWER**:   Denies the allegations in Paragraph 375, except lacks knowledge and information sufficient to form a belief as to the truth or falsity of the allegations in the fourth sentence of Paragraph 375 and denies on that basis; and states that Paragraph 375 purports to quote and characterize a July 6, 2022 email from Marc Yaklofsky to Mr. Murphy, Mr. Moro, Mr. Islim, and others and its attachments, and refers to that email and its attachments for a complete and accurate description of their contents; and states that Paragraph 375 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

376.   These talking points did not provide any information regarding the [DCG] Promissory Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Global Capital's losses. Instead, the talking points included the misrepresentations that DCG "absorbed" the losses, that Genesis Global Capital was "well capitalized," and that "DCG has assumed certain liabilities of Genesis related to [Three Arrows] to ensure [Genesis Global Capital] ha[d] more than adequate capital to operate and scale our business for the long-term."[114]

**ANSWER**:  Denies the allegations in Paragraph 376, except states that Paragraph 376 and its associated footnote purport to quote and characterize an attachment to a July 6, 2022 email from Mr. Yaklofsky to Mr. Murphy, Mr. Moro, Mr. Islim, and others, titled "Talking Points for 3AC Questions," and refers to that document for a complete and accurate description of its content; and states that Paragraph 376 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

377.   Relying on these talking points, on July 6, 2022, Genesis Entities' Co-Head of Trading and Lending, Managing Director No.1, (Ballensweig) informed Gemini, both over the

---

[113] *Id.*, ¶157.
[114] *Id.*, ¶158.

phone and in writing, that the 3AC "[l]osses [were] predominantly absorbed by and netted against DCG balance sheet" and that Genesis Global Capital remained "well-capitalized." Genesis Global Capital misled investors and omitted material facts regarding its financial condition during these communications, including that Genesis Capital's balance sheet contained an illiquid $1.1 billion [DCG] Promissory Note.[115]

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 377 and its associated footnote and denies on that basis, except states that Paragraph 377 and its associated footnote purport to quote and characterize a July 7, 2022 email from Mr. Ballensweig and an attachment to a July 7, 2022 email from Mr. Ballensweig to Echo Guan and others, titled "Three Arrows Post-Mortem," and refers to that document for a complete and accurate description of its contents; and states that Paragraph 377 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

378.    The same day—July 6, 2022—representatives of Genesis Global Capital and/or GGT spoke to Gemini representatives (the "July 6 Call"). People participating from Gemini wanted accurate information about Genesis Global Capital's financial condition.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 378 and denies on that basis, except admits that a call occurred on July 6, 2022.

379.    During the July 6 Call, Genesis Global Capital representatives made false and misleading statements about Genesis Global Capital's financial condition. These included false statements about Genesis Global Capital's assets and the nature of the collateral it was holding against loans Genesis Global Capital had made.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 379 and denies on that basis.

380.    Following the July 6 Call, Ballensweig sent an email to Gemini (the "July 6 Email") attaching three documents. The July 6 Email and its attachments contained multiple false statements.

---

[115] *Id.*, ¶159.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 380 and denies on that basis, except states that Paragraph 380 purports to characterize a July 7, 2022 email and attachments from Mr. Ballensweig to Mr. Guan and others, and refers to that email and its attachments for a complete and accurate description of their contents.

381.    One attachment to the July 6 Email is a document entitled "Three Arrows Post-Mortem." This document stated, in part:

> We previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital.
>
> The loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.
>
> Since then, we worked with DCG to find the optimal strategy to further isolate the risk. DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.

**ANSWER**: States that Paragraph 381 purports to quote and characterize a document titled "Three Arrows Post-Mortem," and refers to that document for a complete and accurate description of its contents.

382.    Statements in the "Three Arrows Post-Mortem" were false. It was not true that "DCG has assumed certain liabilities of Genesis." It was not true that Genesis Global Capital ensured that it had the "capital to operate . . . for the long term."

**ANSWER**: Denies the allegations in Paragraph 382.

383.    The second document attached to the July 6 Email is entitled "Gemini Risk Metric Request" and has a section titled "Financial Position per Asset." It included the following table:

| | Current | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | Assets | Loans | Collateral Rec. | Borrows | Collateral Pay. |
| Total | $3,377,241,616 | $4,449,809,050 | $2,845,541,484 | $7,178,964,609 | $3,401,109,542 |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| **Assets** | **$10,672,592,150** | **Liabilities** | **$10,580,074,150** | **Equity** | **$92,518,000** |

**ANSWER**:  States that Paragraph 383 purports to quote and characterize an attachment to a July 7, 2022 email from Mr. Ballensweig to Mr. Guan and others, titled "Gemini Risk Metric Request," and refers to that document for a complete and accurate description of its contents.

384.    The table in the Gemini Risk Metric Request document is a fraud, because it includes the DCG Promissory Note as a "Current Asset" (within "Other Assets").

**ANSWER**:  Denies the allegations in Paragraph 384.

385.    As a matter of generally accepted accounting principles—and common understanding—a "current asset" refers to cash and other resources that are reasonably expected to be realized in cash within a one-year period.[116] The term thus specifically excludes amounts that are owed by an affiliate but are not collectible in the ordinary course of business within a year.[117]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 385 and its associated footnotes and denies on that basis, except states that Paragraph 385 and its associated footnotes purport to characterize the Financial Accounting Standards Board Code, Accounting Standards Codification ¶¶ 210-10-45-1, -1(d), -3, -4(c), and refers to that Code for a complete and accurate description of its contents.

386.    By including the DCG Promissory Note at its full-face value within the category of "Current Assets," Genesis Global Capital falsely represented that there was $1.1 billion in value on its balance sheet that could be collected in cash within one year. The DCG Promissory Note is worth only a fraction of its notional value and does not mature for 10 years. The note is plainly not a current asset, but Genesis Global Capital falsely presented it as one in order to prevent Gemini

---

[116] *See, e.g.*, FASB Accounting Standards Codification ¶¶210-10-45-1, 210-10-45-3.

[117] *See, e.g.*, FASB Accounting Standards Codification ¶210-10-45-1.d; *id*. ¶210-10-45-4.c ("current assets" do not encompass "Receivables arising from unusual transactions (such as . . . loans or advances to affiliates, officers, or employees) that are not expected to be collected within 12 months.").

Earn investors' appointed agent Gemini from pulling Gemini Earn investments from Genesis Global Capital.

**ANSWER**:    Denies the allegations in Paragraph 386, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding GGC's motivations and denies on that basis.

387.    It is not a matter of conjecture that the DCG Promissory Note is included in the "Current Assets" category in the Financial Position per Asset table. Gemini specifically inquired about this and received more lies from Genesis in response.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 387 and denies on that basis.

388.    On July 27, 2022, a Gemini representative sent Genesis an email inquiring about the "Other Assets" row in the "Current Assets" column (as depicted by Genesis in a subsequent iteration of the Financial Position per Asset table) and highlighted it:

|  | Current Assets | Loans | Receivable Collat Rec | Liabilities Borrows | Collat Pay |
|---|---|---|---|---|---|
| Total | $3,630 | $5,105 | $2,516 | $7,838 | $4,019 |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |

| Assets | $11,251 | Liabilities | $11,057 | Equity | $194 |
|---|---|---|---|---|---|

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 388 and denies on that basis, except states that Paragraph 388 purports to quote and characterize a July 28, 2022 email from Leo Jiang to Hamill Serrant and others, and refers to that email for a complete and accurate description of its contents.

389.    According to Gemini, on July 27, 2022, Gemini asked Genesis Global Capital: "Do we know what's included in the $2.2bn other assets? Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light on this?"

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 389 and denies on that basis, except states that Paragraph

389 purports to quote and characterize a July 28, 2022 email from Mr. Jiang to Mr. Serrant and others, and refers to that email for a complete and accurate description of its contents.

390.    On July 28, 2022, a Genesis Global Capital employee sent the following response:

"Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis. This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 390 and denies on that basis, except states that Paragraph 390 purports to quote and characterize a July 28, 2022 email from Mr. Serrant to Mr. Jiang and others, and refers to that email for a complete and accurate description of its contents.

391.    Genesis Global Capital's July 28, 2022 statement thus confirms that the $1.1 billion DCG Promissory Note was included in the "Other Assets" row in the "Current Assets" column represented on the documents given to Gemini. That was fraudulent. The DCG Promissory Note was not "receivable on a real-time basis."

**ANSWER**:  Denies the allegations in Paragraph 391.

392.    In addition, the Risk Metric report shared with Gemini on July 6 contained another section, labeled "Loan Book Metrics," in which Genesis Global Capital purported to provide information regarding (among other things) the weighted average duration of its outstanding portfolio of loans.

**ANSWER**:  States that Paragraph 392 purports to quote and characterize a document titled "Gemini Risk Metric Request," and refers to that document for a complete and accurate description of its contents.

393.    The Loan Book Metrics table stated, falsely, that the overall weighted average duration of Genesis Global Capital's outstanding loans was just 54.3 days:

**Loan Book Metrics**

*Duration calculated as Expiry Days from Today (Open Term as 7 Days). Rating from 1 to 12 corresponds to A to F rating, directionally*

| | Weighed Avg | | Rating | Rating Characteristics |
|---|---|---|---|---|
| | Loan Duration (Days) | Rating | 1 | de minimis risk profile; excellent capitalization; minimal to no leverage; demonstrable outstanding risk management |
| | | | 2 | |
| Total | 54.3 | 5.5 | 3 | |
| USD / Stables | 76.3 | 5.1 | 4 | low risk profile; strong capitaliztion; solid returns and performance trends; modest leverage; strong risk management |
| *USDT* | *58.9* | *4.4* | 5 | |
| | | | 6 | |
| BTC | 23.7 | 5.5 | 7 | moderate risk profile; sustained capitalization; sustained positive returns and performance; demonstrable debt service capacity; established risk management |
| ETH | 47.2 | 6.6 | 8 | |
| Alt | 33.6 | 6.9 | 9 | |
| | | | 10 | minimum acceptable risk profile; short history of results; thin capitalization; adverse developments |
| | | | 11 | event of default; collateral shortfall; cessation of operations; adverse management change |
| | | | 12 | realized loss event; insolvency; fraud |

**ANSWER**: Denies the allegations in Paragraph 393, except states that Paragraph 393 purports to excerpt and characterize the "Gemini Risk Metric Request," and refers to that document for a complete and accurate description of its contents.

394.    Genesis Global Capital's statement that the weighted average duration of its outstanding loans was just 54.3 days was yet another fraud, because that calculation excluded the $1.1 billion DCG Promissory Note and its 10-year duration. Had the DCG Promissory Note been included, upon information and belief, the resulting calculation would have yielded a weighted average loan duration of more than *765 days*—approximately *14 times* the figure that Genesis Global Capital falsely reported.

**ANSWER**: Denies the allegations in Paragraph 394, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 394 and denies on that basis.

395.    Genesis Global Capital excluded the DCG Promissory Note from its loan-duration calculations in order to conceal the existence and terms of the DCG Promissory Note from Genesis Global Capital's investors, thereby misrepresenting its true financial position.

**ANSWER**: Denies the allegations in Paragraph 395.

396.    Another attachment to the July 6 Email purported to be Genesis Global Capital's balance sheet as of June 30, 2022. This document also materially misrepresented Genesis Global Capital's financial condition.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 396 and denies on that basis; except states that Paragraph 396 purports to characterize an attachment to a July 7, 2022 email from Mr. Ballensweig to Mr.

149

Guan and others, titled "[GGC] Statement of Financial Condition (Unaudited)," and refers to that

document for a complete and accurate description of its contents.

397. As with the "Financial Position per Asset" table, the balance sheet did not disclose the existence of the $1.1 billion promissory note. Instead, apparently, the note was included as an asset on the balance sheet in a line item labeled "Receivable from related parties"—which had a stated value of approximately $1.137 billion. The DCG Promissory Note was included on the balance sheet at its full face value of $1.1 billion, even though, as discussed above, its true fair value was only a small fraction of that amount.

**ANSWER**: States that Paragraph 397 purports to characterize an attachment to a July 7,

2022 email from Mr. Ballensweig, and refers to those documents for a complete and accurate

description of their contents.

398. The purpose of misrepresenting the DCG Promissory Note's value is obvious: despite including the note at its full face value, the balance sheet showed "Total member's equity" of just $92.5 million. If the DCG Promissory Note had been included on the balance sheet at any reasonable estimate of its fair value, it would have disclosed that Genesis Global Capital was insolvent by *at least* hundreds of millions of dollars.

**ANSWER**: Denies the allegations in Paragraph 398.

399. In the following weeks and months, Genesis Global Capital made numerous other false statements to Gemini. These included, for example, updates to the false "Risk Metric" document described above, which contained the same Financial Position per Asset table that falsely included the DCG Promissory Note as a Current Asset. These updates were shared on a regular (sometimes daily) basis with Gemini.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations in Paragraph 399 and denies on that basis.

400. On July 18, 2022, DCG filed a bankruptcy claim against 3AC for more than $1 billion. The same day, DCG's COO (Defendant Murphy) instructed Managing Director No. 1 (Ballensweig) in writing to "manage [G]emini and the other largest counterparties" because DCG was concerned that Earn investors would withdraw their assets. Thus, on July 18, 2022, Managing Director No.1 [Ballensweig] told Gemini's risk personnel conducting due diligence for Earn investors: "There might be some information relating to DCG's claim against [3AC] that gets published today or tomorrow. None of this is new information and all of our loses [sic] have already been absorbed by DCG/realized on our balance sheet.… All of the losses have already been reflected and are with DCG."[118]

---

[118] NYAG Compl., ¶160.

**ANSWER**:  Denies the allegations in Paragraph 400, except states that on July 18, 2022, DCG filed a bankruptcy claim in the 3AC bankruptcy proceedings, and refers to that filing for a complete and accurate description of its contents; states that Paragraph 400 and its associated footnote purport to quote and characterize a July 18, 2022 Microsoft Teams conversation between Mr. Murphy, Mr. Ballensweig, and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents; and states that Paragraph 400 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

401.    Even after July 18, 2022, Gemini transferred hundreds of millions of dollars' worth of investor assets to Genesis Global Capital under Earn.[119]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 401 and its associated footnote and denies on that basis, except states that Paragraph 401 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

402.    These statements on July 6 and 18, 2022, were false, misleading, and omitted material information. DCG did not "absorb" the Genesis Entities' losses. The [DCG] Promissory Note concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-term assets. On July 7, 2022, Managing Director No. 1 [Ballensweig] described the issue to DCG's COO [Defendant Murphy] as follows:

> the issue is more structural … even though DCG took on liability from [Genesis Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the book down to nothing, the liquidity hole long-term = the $900 m2m loss on [Three Arrows] + the lack of liquidity on the GBTC collateral which is another $450mm, so structurally, we have about 1.345B we'd need to get in the form of long-term debt or equity to ultimately have enough liquid capital to wind everything down.[120]

---

[119] *Id.*, ¶161.

[120] *Id.*, ¶162.

**ANSWER**:  Denies the allegations in the first and second sentences of Paragraph 402; states that the allegations in the third sentence of Paragraph 402 purports to quote and characterize a July 7, 2022 Microsoft Teams conversation between Mr. Ballensweig and Mr. Murphy, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents; and states that Paragraph 402 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

403.    In another communication dated July 22, 2022, Managing Director No. 1 (Ballensweig) explained to a high-level DCG employee that the 3AC losses created a "[d]uration mismatch [at Genesis Capital] because we had [one billion] of open term assets with [Three Arrows] which no longer exist and thus cannot be used to offset all of our open term liabilities" including liabilities to the Earn investors. Managing Director No. 1 [Ballensweig] continued to explain that there was an additional "asset quality mismatch because $500 [million] of the collateral we absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So both of these things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an organization."[121]

**ANSWER**:  Denies the allegations in Paragraph 403, except states that Paragraph 403 purports to quote and characterize a July 22, 2022 conversation between Mr. Ballensweig and Mr. Kummell, and refers to that communication for a complete and accurate description of its contents; states that Paragraph 403 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

404.    Further, the losses were not reflected on Genesis Capital's balance sheet—they were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital never provided to Gemini.[122]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 404 and its associated footnote and denies on that basis,

---

[121] *Id.*, ¶163.
[122] *Id.*, ¶164.

except states that Paragraph 404 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

405.    On July 21, 2022, Genesis Global Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss." The same day, Genesis Capital's CFO also messaged Managing Director No. 1 [Ballensweig] and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."[123]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 405 and its associated footnote and denies on that basis, except states that the first sentence of Paragraph 405 purports to quote and characterize a July 21, 2022 email from Alice Chan to Ashley Senior, Mr. Ballensweig, and others, and refers to that email for a complete and accurate description of its contents; states that the second sentence of Paragraph 405 purports to quote and characterize a July 21, 2022 Microsoft Teams conversation between Ms. Chan, Mr. Serrant, and others, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents; and states that Paragraph 405 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

406.    On July 21, 2022, Genesis Global Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points. Neither DCG nor Genesis Global Capital corrected any prior misstatements made to Gemini.[124]

**ANSWER**:  Denies the allegations in Paragraph 406 and its associated footnote, except states that Paragraph 406 purports to characterize a July 21, 2022 Microsoft Teams conversation between Ms. Chan and Ryan McMahon and refers to that Microsoft Teams conversation for a

---

[123] *Id.*, ¶165.
[124] *Id.*, ¶166.

153

complete and accurate descriptions of its contents; and states that Paragraph 406 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

407.    Genesis Global Capital's CFO objected to these false statements to further conceal Genesis Global Capital's financial condition. As Genesis Global Capital's CFO explained to Genesis Global Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."[125]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 407 and its associated footnote and denies on that basis, except states that Paragraph 407 and its associated footnote purport to quote and characterize a July 21, 2022 Microsoft Teams message between Ms. Chan and Jordan Goldman, and refers to that message for a complete and accurate description of its contents; and states that Paragraph 407 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

408.    Genesis Global Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Global Capital's financial condition. Instead, members of Genesis Global Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms. In a private message dated August 30, 2022, Genesis Global Capital's CFO confided to a colleague:

> We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot. It's putting the firm on the spot. That's what we have to convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."[126]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 408 and its associated footnote and denies on that basis, except states that Paragraph 408 and its associated footnote purport to quote and characterize an

---

[125] *Id.*, ¶167.
[126] *Id.*, ¶168.

internal GGC communication, and refers to that communication for a complete and accurate description of its contents; and states that Paragraph 408 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

409.    Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Global Capital provided reports to Gemini that listed the value of Genesis Global Capital's "current assets." A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year. These reports fraudulently categorized the [DCG] Promissory Note as a current asset, even though it was payable ten years later. In response to inquiries from Gemini, on July 28, 2022, Genesis Global Capital's CFO helped Genesis Global Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the [DCG] Promissory Note. This email to Gemini omitted any reference to the [DCG] Promissory Note's duration or other terms.[127]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 409 and its associated footnote and denies on that basis, except states that Paragraph 409 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

a.    **Defendants DCG Fails to Repay Hundreds of Millions of Dollars Owed to Genesis Global Capital, Worsening Genesis Global Capital's Financial Condition**

410.    On July 24, 2022, with respect to the $100 million Genesis Global Capital loaned to DCG on January 24, 2022, DCG failed to repay that loan on or before its maturity date. Instead, on July 25, 2022, a DCG executive informed Managing Director No. 1 [Ballensweig] that DCG "literally [did not] have the money right now" to repay the loan.[128]

**ANSWER**:  Denies the allegations in Paragraph 410, except states that the second sentence of Paragraph 410 and its associated footnote purport to quote and characterize a July 25, 2022 Microsoft Teams message from Mr. Kraines to Mr. Ballensweig, Mr. Islim, and Mr. Paleokrassas,

---

[127] *Id.*, ¶169.
[128] *Id.*, ¶181.

and refers to that message for a complete and accurate description of its contents; and states that

Paragraph 410 and its associated footnote purport to characterize the NYAG Complaint, and refers

to the NYAG Complaint for a complete and accurate description of its contents.

411.    At this juncture, Genesis was insolvent and DCG was in existential danger. Had Genesis Global Capital gone bankrupt at that time, DCG's loans to Genesis Global Capital would have been due, but DCG did not have the ability to repay the loan and would have been forced into bankruptcy.

**ANSWER**:  Denies the allegations in Paragraph 411.

412.    Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's COO [Defendant Islim] and Managing Director No. 1 [Ballensweig]:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th maturity) from Genesis to DCG by 10 months (until May 2023). Please let us know what documentation is needed to execute on the new loan. Also, we need to include language that the loan could be repaid early without any penalty.[129]

**ANSWER**:  Admits that Paragraph 412 and its associated footnote purport to quote and

characterize a July 25, 2022 email from Diliana Damianova to Mr. Islim, Mr. Ballensweig, and

others, and refers to that email for a complete and accurate description of its contents; and states

that Paragraph 412 and its associated footnote purport to characterize the NYAG Complaint, and

refers to the NYAG Complaint for a complete and accurate description of its contents.

413.    Managing Director No. 1 [Ballensweig] objected, stating: "given the continued pressure from major lenders such as … Gemini … this duration mismatch will certainly put Genesis in a much worse spot." The same day, on July 25, 2022, DCG's Treasurer responded that DCG "need[ed] to preserve liquidity to meet our operating cash needs over the next few months." After additional objections, the next day, Managing Director No.1 [Ballensweig] relented stating: "it sounds like we don't have much room to push back, so we will do what DCG needs us to do." DCG also dictated the interest rate for this loan.[130]

**ANSWER**:  Denies the allegations in Paragraph 413 and its associated footnote, except

states that Paragraph 413 and its associated footnote purport to quote and characterize a July 25

---

[129] *Id.*, ¶182.
[130] *Id.*, ¶183.

and July 26, 2022 email conversation between Mr. Ballensweig, Ms. Damianova, Mr. Islim, and others, and refers to that conversation for a complete and accurate description of its contents; and states that Paragraph 413 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

414.    With respect to the February 23, 2022 loan from Genesis Global Capital to DCG of $100 million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022, after the payment became due, at DCG's insistence, Genesis Global Capital extended the maturity date of this loan to May 2023.[131]

**ANSWER**:  Denies the allegations in Paragraph 414 and its associated footnote, except states that on November 11, 2022, DCG and GGC executed a Loan Term Sheet to extend a loan agreement dated February 23, 2022; and states that Paragraph 414 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

415.    As an initial matter, although Defendants DCG, Silbert, Kraines and Murphy should and could have corrected Defendant Moro's public statements regarding the nature of DCG's support for Genesis Global Capital, *see supra*, paragraph 369, it failed to do so. Defendant DCG, Silbert, Kraines and Murphy knew, or had reason to know, that Genesis Global Capital investors would rely on Moro's statements regarding Defendant DCG's support. Defendants DCG, Silbert, Kraines and Murphy's silence in the face of Moro's misstatements demonstrates that Defendant DCG, Silbert, Kraines and Murphy likewise intended to mislead Genesis Yield investors.

**ANSWER**:  Incorporates Paragraph 369 of this Answer set forth above as if fully set forth herein.  Denies the allegations in Paragraph 415.

416.    Even more troubling, key DCG officers and employees directly participated in the effort to mislead. For example, on July 18, 2022, in response to an email exchange with another Genesis Yield investor, Mark Nuvelstijn, CEO and co-founder of Bitvavo, regarding the possibility of a parent guaranty of Genesis Global Capital's borrowing from DCG, Ballensweig suggested the investor's representative speak with DCG's then-COO, Defendant Murphy. Ballensweig stated: "I've broached the topic of a guarantee with [Defendant] Mark Murphy, DCG's COO and before we get there, I think it would make sense for you guys to set up a call to go through how DCG has viewed the loss and their plans to support Genesis [Global Capital] in perpetuity. There are many

---

[131] *Id.*, ¶184.

157

implications of establishing a formal guarantee but I think for starters you guys should hop on a call. Let me know if that works and we'll set something up this week."

**ANSWER**: Denies the allegations in Paragraph 416, except states that the second and third sentences of Paragraph 416 purport to quote and characterize a July 18, 2022 email from Mr. Ballensweig to Mark Nuvelstijn and others, and refers to that email for a complete and accurate description of its contents.

417.    On July 19, 2022, Defendant Murphy held a call with that investor's representative. In substance, speaking on behalf of Defendant DCG, Defendant Murphy reiterated the false story that had previously been shared with the investor in the same "Three Arrows Post-Mortem" document that Genesis Global Capital had sent to Gemini. Defendant Murphy stated that Defendant DCG stepped in to absorb Genesis Global Capital's losses on its 3AC exposure, and he stated that those losses had been netted against Defendant DCG's balance sheet. He further stated that, following Defendant DCG's support, Genesis Global Capital was well capitalized to continue doing business as normal in the future. And he reassured the investor that Genesis Global Capital was among the most important parts of the broader DCG empire, that Defendant DCG had big plans for Genesis Global Capital's future business, and that DCG was committed to providing ongoing support to Genesis Global Capital to allow the company to continue growing.

**ANSWER**:  Denies the allegations in Paragraph 417, except admits that on July 19, 2022, there was a phone call involving Mr. Murphy and Mr. Nuvelstijn.

418.    Each of these statements—made by Defendant Murphy on behalf of Defendant DCG—was false.

**ANSWER**: Denies the allegations in Paragraph 418.

419.    Genesis Global Capital's losses were not absorbed by Defendant DCG or netted against Defendant DCG's balance sheet. Genesis Global Capital was insolvent, not well capitalized. And, as evidenced by Defendant DCG's failure to provide even the support that Genesis Global Capital had publicly claimed in the aftermath of 3AC's collapse, Defendant DCG in fact had no plans to continue providing ongoing support to Genesis Global Capital in order to permit Genesis Global Capital to avoid failure and continue growing.

**ANSWER**: Denies the allegations in Paragraph 419.

420.    Defendant Murphy made these affirmative misrepresentations as part of Defendants' fraudulent scheme.

**ANSWER**: Denies the allegations in Paragraph 420.

421.    Thereafter, Defendant Murphy and other DCG representatives were copied on email exchanges in which Genesis Global Capital continued to provide false information in response to the investor's requests for information. For example, on July 26, 2022, Defendant Murphy, then Defendant DCG's COO, was copied on an email exchange in which Ballensweig made a series of false statements in response to inquiries from the investor. Ballensweig explained that his response had been prepared with assistance from the "Finance and Accounting teams at both DCG and Genesis."

**ANSWER**:  Denies the allegations in Paragraph 421, except states that the second and third sentences of Paragraph 421 purport to quote and characterize a July 26, 2022 email from Mr. Ballensweig to Mr. Nuvelstijn, Mr. Murphy, and others, and refers to that email for a complete and accurate description of its contents.

422.    The Finance and Accounting team at DCG and Genesis included Ron DiPrete, and DCG's Head of Special Project, Finance, and DCG CFO Defendant Kraines.

**ANSWER**:  States that the allegations in Paragraph 422 are generalized, vague, and non-specific, and denies the allegations in Paragraph 422 on that basis, except admits that Ronald DiPrete was the Head of Special Projects and a member of the Finance team at DCG from May 31, 2022 through June 30, 2024; and admits that Mr. Kraines was the CFO of DCG from March 1, 2021 to April 3, 2023.

423.    As part of that response, Ballensweig provided details about approximately $1.8 billion in lending from Genesis Global Capital to affiliated entities that had been disclosed in Genesis Global Capital's prior reports. Ballensweig falsely stated that Genesis Global Capital had approximately $922 million in outstanding loans to DCG—an amount that purposefully omitted the $1.1 billion promissory note that Defendants DCG and Silbert sought to conceal from Genesis Global Capital's investors. At the same time, Ballensweig falsely stated that DCG had "assumed the $1.1bn loan on June 30, 2022"—a misrepresentation calculated to reassure the investor that Genesis Global Capital had already been made whole for its loss on the 3AC loans.

**ANSWER**:  Denies the allegations in Paragraph 423, except states that Paragraph 423 purports to quote and characterize a July 26, 2022 email from Mr. Ballensweig to Mr. Nuvelstijn, Mr. Murphy, and others, and refers to that email for a complete and accurate description of its contents.

424.    That was entirely fictitious, but Defendant Murphy made no effort to correct Ballensweig's misrepresentations. Nor did Ronald DiPrete, DCG's Head of Special Projects, Finance, who was also copied on the exchange.

**ANSWER**:  Denies the allegations in Paragraph 424.

425.    Later, on August 16, 2022, Defendant Murphy and DiPrete were copied (along with Jason Yacavone, a Director in DCG's Investments group) when Genesis Global Capital's Hamill Serrant sent an updated Genesis Global Capital balance sheet to the same investor. The updated balance sheet, dated as of July 29, 2022, once again falsely included the $1.1 billion DCG Promissory Note at its full face value in a "Receivable from related parties" line item. Even with that false entry, the balance sheet showed "Total member's equity" of just $95.4 million. And once again, none of DCG's representatives lifted a finger to correct the falsehood, preferring instead to keep the public and Genesis Global Capital investors in the dark.

**ANSWER**:  Denies the allegations in Paragraph 425, except states that the first sentence of Paragraph 425 purports to characterize an August 16, 2022 email from Mr. Serrant to Mr. Nuvelstijn, Mr. Murphy, Mr. DiPrete, Jason Yacavone, and others, and refers to that email for a complete and accurate description of its contents; and states that the second and third sentences of Paragraph 425 purport to characterize a GGC balance sheet dated July 29, 2022, and refers to that balance sheet for a complete and accurate description of its contents.

426.    During this period, Defendant DCG's representatives were repeatedly copied on email exchanges with Genesis Global Capital's personnel, in which Genesis Global Capital provided additional information in response to the investor's questions and requests. But DCG's representatives never stated that the core premise of the parties' discussions—namely, that DCG had already stepped in to absorb Genesis Global Capital's losses from its 3AC exposure—was false.

**ANSWER**:  States that the allegations in Paragraph 426 concerning communications involving DCG's representatives are generalized, vague, and non-specific, and denies the allegations in Paragraph 426 on that basis.

427.    The participation of DCG officers and employees in these communications demonstrates that the effort to mislead was an agreed-upon common scheme. The participation of DCG officers and employees in these communications also assisted Genesis Global Capital in misleading Genesis Global Capital investors.

**ANSWER**:  Denies the allegations in Paragraph 427.

428.     More broadly, the basic nature of the DCG Promissory Note also demonstrates that Defendant DCG was a willing participant in the scheme to mislead. After 3AC's collapse triggered a $1.2 billion loss for Genesis Global Capital, investors had good reason to question Genesis Global Capital's liquidity and the solvency of its balance sheet. The DCG Promissory Note was (unbeknownst to investors at the time) the basis of misrepresentations by Genesis that Defendant DCG had covered the loss. But a promissory note such as this would not be a rational response to investors' concerns: The DCG Promissory Note did not provide any short-term liquidity, and (on any reasonable statement of its actual present value on a balance sheet basis) the DCG Promissory Note represented at most a small fraction of Genesis Global Capital's loss on the 3AC loan. For both Defendant DCG and Genesis Global Capital, the DCG Promissory Note made sense only if its existence and terms could be concealed—because doing so allowed DCG to pretend to support Genesis Global Capital, without taking on the financial cost that would haves required DCG to actually do so. Put simply, the terms of the DCG Promissory Note were tailor-made to allow Defendant DCG and Genesis Global Capital to conspire to deceive Genesis Global Capital investors.

**ANSWER**:  Denies the allegations in Paragraph 428.

429.     Eliminating any doubt that Defendant DCG and Genesis Global Capital worked hand-in-hand on the deception, multiple present or former Genesis Global Capital employees have stated as much in correspondence with Genesis Global Capital investors. Those communications specifically confirm that Defendant DCG's and Genesis Global Capital's finance and executive teams collaborated to prepare the false financial statements that were shared by Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 429.

430.     Defendants DCG and Genesis Global Capital thus agreed to the misleading financial presentation that would conceal the DCG Promissory Note's existence and its terms from Genesis Global Capital's investors.

**ANSWER**:  Denies the allegations in Paragraph 430.

431.     According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis:

> [Defendants Silbert and Moro] went out and publicly told people that [they] filled the hole . . . publicly said Genesis balance sheet is strong, it hasn't been affected. You induced us to loan new Bitcoin to you based on the fact that you stated Genesis was solvent because you have provided the $1.1 billion dollar note . . . If in June [2022], Barry [Silbert] had said, look, we're going to help Genesis by giving them $1.1 billion, and this is how we did it. We give them a promissory note that's due in 10 years at 1% interest, nobody would have re-loaned. We would have seen basically what happened. But what they did is they kept it a secret. They guarded that.

**ANSWER**:  Denies the allegations in Paragraph 431, except states that Paragraph 431 purports to quote and characterize a November 4, 2023 podcast interview transcript which appeared on the *Unchained* podcast episode titled "Two Genesis Creditors Describe Their Frustrations With the Bankrupt Crypto Lender" published on YouTube.com, and refers to that transcript for a complete and accurate description of its contents.

### D.    DEFENDANTS AND GENESIS GLOBAL CAPITAL CONCEALED INFORMATION THAT WOULD HAVE REVEALED THEIR DECEIT.

432.    Genesis Global Capital's CFO and other personnel directed employees not to disclose the [DCG] Promissory Note to counterparties such as Gemini. Indeed, many Genesis Global Capital employees were not informed of the [DCG] Promissory Note until months after its signature.[132]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 432 and its associated footnote and denies on that basis, except states that Paragraph 432 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

433.    When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Global Capital continued to conceal and suppress information that would have revealed the [DCG] Promissory Note or losses on counterparty defaults. In July 2022, Genesis Global Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Global Capital's balance sheet—which would have explained the [DCG] Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false. Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.[133]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 433 and its associated footnote and denies on that basis, except states that Paragraph 433 and its associated footnote purport to characterize the NYAG

---

[132] NYAG Compl., ¶170.

[133] *Id.*, ¶171.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

434.    In a July 2022 Microsoft Teams chat, Genesis Global Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the [DCG] Promissory Note.[134]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 434 and denies on that basis, except states that Paragraph 434 and its associated footnote purport to quote and characterize July 21, 2022 Microsoft Teams messages from Ms. Chan to Mr. Serrant and others, and refers to those messages for a complete and accurate description of their contents; and states that Paragraph 434 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

435.    In another Microsoft Teams chat, in September 2022, Genesis Global Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the [DCG] Promissory Note from the balance sheet alone.[135]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 435 and its associated footnote and denies on that basis, except states that Paragraph 435 and its associated footnote purport to characterize a September 9, 2022 Microsoft Teams message from Ms. Chan to Mr. DiPrete, and refers to that message for a complete and accurate description of its contents; and states that Paragraph 435 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

---

[134] *Id.*, ¶172.
[135] *Id.*, ¶173.

436.    After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties. These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."[136]

**ANSWER**:  Denies the allegations in Paragraph 436 and its associated footnote regarding "consultation with DCG," and lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 436 and its associated footnote and denies on that basis; and states that Paragraph 436 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

437.    Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors. Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.[137]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 437 and its associated footnote and denies on that basis, except states that Paragraph 437 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

438.    Genesis Capital ignored these requests and Gemini allowed them to do so.[138]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 438 and its associated footnote and denies on that basis, except states that Paragraph 438 and its associated footnote purport to characterize the NYAG

---

[136] *Id.*, ¶174.

[137] *Id.*, ¶175.

[138] *Id.*, ¶176.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

439.    Before executing the [DCG] Promissory Note, Genesis Global Capital executives, including Moro, Genesis Global Capital's CFO, and Managing Director No 1 [Ballensweig], informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini. Thus, both DCG and Genesis Global Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.[139]

**ANSWER**:  Denies the allegations in Paragraph 439 and its associated footnote, except states that Paragraph 439 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

440.    Genesis Global Capital personnel soon grew concerned that Genesis Global Capital had provided false information to counterparties. On September 1, 2022, Genesis Capital's Director of Lending reported to its interim CEO [Defendant Islim]: "I'm hearing concerns from front office folks…. They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'." Nevertheless, neither DCG nor Genesis Global Capital's CEO Defendant Islim corrected the misstatements that Genesis Global Capital employees made to counterparties, including the Earn investors.[140]

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of Paragraph 440 and its associated footnote and denies on that basis; except states that the second sentence of Paragraph 440 as well as its associated footnote purport to quote and characterize a September 1, 2022 email from Mr. Serrant to Mr. Islim, and refers to that email for a complete and accurate description of its contents; and states that Paragraph 440 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

[139] *Id.*, ¶177.
[140] *Id.*, ¶178.

**E.      DEFENDANT SILBERT PERSONALLY INTERVENED TO KEEP INVESTORS FROM WITHDRAWING INVESTMENTS.**

441.    Defendant Silbert—DCG's founder and CEO—personally participated in perpetuating the lie that Genesis was solvent and capable of honoring its obligations. On the afternoon of October 13, 2022 (following several direct discussions regarding the future of the Gemini Earn Program), Gemini sent an email to Genesis Global Capital providing 30 days' notice of the termination of the Gemini Earn Program and the Gemini Earn MLAs. Within 24 hours, Defendant Silbert personally emailed Cameron Winklevoss, co-founder of Gemini, seeking a face-to-face meeting.

**ANSWER**:   Denies the allegations in Paragraph 441, except admits that the second sentence of Paragraph 441 purports to characterize an October 13, 2022 letter signed by Noah Perlman, President and CEO of Gemini, and refers to that letter for a complete and accurate description of its contents; and states that the third sentence of Paragraph 441 purports to characterize an October 14, 2022 email from Mr. Silbert to Cameron Winklevoss, and refers to that email for a complete and accurate description of its contents.

442.    Defendant Silbert acknowledged that his request was prompted by the uncertain "future of the Gemini-Genesis lending relationship." Defendant Silbert posited that he and Cameron Winklevoss should be exploring "ways to take advantage of the crypto winter" and suggested that "there are a number of ways that Gemini-Genesis-DCG could more closely collaborate."

**ANSWER**:   Denies the allegations in Paragraph 442, except admits that Paragraph 442 purports to quote and characterize an October 14, 2022 email from Mr. Silbert to Mr. Winklevoss, and refers to that email for a complete and accurate description of its contents.

443.    Defendant Silbert's request resulted in a lunch meeting between Cameron Winklevoss and Silbert at a restaurant in New York City on October 22, 2022. At that lunch meeting, Defendant Silbert made numerous representations designed to induce Gemini not to discontinue the Earn program. Silbert was aware at the time that Genesis Global Capital was massively insolvent, because—unbeknownst to Gemini and Genesis Global Capital investors—DCG had provided Genesis with a 10-year promissory note rather than assuming the 3AC losses as had been claimed. Defendant Silbert was further aware that Defendant DCG had not provided meaningful near-term liquidity to Genesis Global Capital sufficient to allow Genesis Global Capital to honor its obligations, again contrary to statements made to Genesis Global Capital investors. Defendant Silbert disclosed none of those highly material facts regarding Genesis Global Capital's insolvency and lack of liquidity, even as he was urging Gemini to continue the Gemini Earn Program.

166

**ANSWER**: Denies the allegations in Paragraph 443, except admits that in the fall of 2022, Mr. Silbert had lunch with Mr. Winklevoss.

444.    Defendant Silbert did more than conceal those numerous material facts. Rather, he created a cover story that was designed to—and did, in fact—affirmatively misrepresent the reason why he was urging Gemini to continue the Earn program. Defendant Silbert represented that Genesis Global Capital simply needed sufficient time to affect an orderly unwinding of its "complex" loan book, and that any difficulty that the termination of the Gemini Earn Program would cause for Genesis Global Capital was merely a mismatch in the timing of Genesis Global Capital's loan positions. That is, Silbert affirmatively misrepresented that Genesis Global Capital faced only a short-term timing mismatch between its outstanding loans and borrowing.

**ANSWER**: Denies the allegations in Paragraph 444.

445.    In reality, as Defendant Silbert well knew, Genesis Global Capital's problems ran far deeper than a mere "timing" issue. Genesis Global Capital had a gaping hole in its balance sheet, because the $1.1 billion of support that DCG had purportedly given Genesis in order to "assume" the Genesis 3AC losses was, in actuality, the 10-year-distant promissory note. As explained above, the DCG Promissory Note was worth (at most) a tiny fraction of its face value and offered no realistic prospect of allowing Genesis to meet its obligations as they came due. And the weighted average duration of Genesis's outstanding loans was more than 765 days (or more than 2 years), hardly a short-term timing mismatch. Defendant Silbert pushed his cover story even further, suggesting that Genesis Global Capital, Defendant DCG, and Gemini should explore an arrangement to collaborate closely in the future.

**ANSWER**: Denies the allegations in Paragraph 445.

446.    Defendant Silbert's misrepresentations had the desired effect. Relying on Defendant Silbert's claims, Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Defendant Silbert had stated the truth.

**ANSWER**:    Denies the allegations in Paragraph 446, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the second sentence of Paragraph 446 and denies on that basis.

447.    Then, just days before the end of the Class Period, Defendant Silbert caused DCG to negotiate and enter into a November 10 tripartite agreement between and among Genesis Global Capital, Defendant DCG, and Gemini. Pursuant to that agreement, Defendant DCG promised to transmit additional collateral in the amount of 31,180,804 shares of GBTC (valued in excess of $626.1 million as of July 6, 2023) to Genesis Global Capital for the benefit of Gemini Earn investors. On information and belief, Defendant DCG transmitted the collateral to Genesis Global Capital but did not instruct or allow Genesis Global Capital to transfer that collateral to Gemini as agreed.

167

**ANSWER**: Denies the allegations in Paragraph 447, except admits that on November 10, 2022, DCG, GGC, and Gemini entered into the Second Amendment to the Security Agreement dated August 15, 2022 between GGC and Gemini, and refers to that agreement for a complete and accurate description of its contents.

448. But even assuming that Defendant DCG nominally fulfilled its contractual obligation, the real purpose of the agreement was a ruse. By purporting to demonstrate still further support for Genesis Global Capital's obligations in the form of collateral—despite knowing that Genesis Global Capital was massively insolvent—Defendant DCG induced Gemini to continue the Gemini Earn Program. Gemini would not have done so if Defendants Silbert and DCG had come clean about Genesis Global Capital's true financial condition, rather than repeatedly misrepresenting it.

**ANSWER**: Denies the allegations in Paragraph 448.

449. Under these circumstances, Defendants Silbert and DCG were under a legal obligation not to conceal the true nature of Genesis Global Capital's financial condition. Defendants Silbert and DCG understood that Gemini was relying on the financial information and other representations provided by Genesis Global Capital—including, in particular, multiple assurances that Genesis Global Capital's losses relating to 3AC had been absorbed by Defendant DCG—as essential facts in deciding whether to terminate the Gemini Earn Program on the 30-day timeline Gemini had previously communicated. Moreover, the falsity of those representations was not discoverable by Gemini through ordinary diligence. Thus, Defendants Silbert and DCG were under a legal obligation to speak the truth and to correct those misrepresentations.

**ANSWER**: Denies the allegations in Paragraph 449.

450. Defendant Silbert's partial disclosures regarding Genesis Global Capital's financial condition were equivalent to actual misrepresentations—made on Defendant DCG's behalf—regarding Genesis Global Capital's solvency. In particular, Defendant Silbert's assurances that Genesis's problems were a mere "timing" issue were deliberate half-truths, calculated to mislead Gemini into concluding that Genesis Global Capital was not in fact insolvent.

**ANSWER**: Denies the allegations in Paragraph 450.

451. The above acts committed by Defendants DCG, Silbert, Moro, Islim, Kraines and Murphy caused Genesis Global Capital to mispresent its financial health to Plaintiffs via affirmative false statements made directly to investors and investors' agent *and* via Genesis Global Capital omitting to inform investors of its insolvency when it had a duty to do so under the Genesis Yield Investment Agreements.

**ANSWER**: Denies the allegations in Paragraph 451.

452.    As a result of the fraudulent scheme and material omissions described above, Plaintiffs and members of the Class purchased Genesis Yield securities. Plaintiffs and members of the Class would not have (nor would any reasonable investor) purchased Genesis Yield securities had they known Genesis Global Capital's true financial conditions.

**ANSWER**:    Denies the allegations in Paragraph 452, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 452 and denies on that basis.

453.    As alleged above, on or about June 18, 2022, Genesis Global Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis. Rather than repaying this loan in bitcoin—the denomination of the loan— DCGI partially repaid that loan on November 10, 2022, with 25,999,457 shares of GBTC which were worth approximately $250 million as of November 10, 2022.[141]

**ANSWER**:    Denies the allegations in Paragraph 453 and its associated footnote, except admits that on June 18, 2022, GGC and DCGI entered into a Loan Term Sheet, for 18,697.74308758 BTC, and refers to that loan term sheet for a complete and accurate description of its contents; admits that on November 10, 2022, DCGI paid GGC 25,999,457 GBTC in partial payoff of the June 18, 2022 loan; and states that Paragraph 453 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

454.    This repayment deprived Genesis Global Capital of liquidity because unlike bitcoin, Genesis Global Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due to affiliate sales restrictions.[142]

**ANSWER**:    Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 454 and its associated footnote and denies on that basis, except states that Paragraph 454 and its associated footnote purport to characterize the NYAG

---

[141] NYAG Compl., ¶185.
[142] *Id.*, ¶186.

Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

455.    After this repayment, 4,550.45 bitcoin (approximately $80 million as of November 10, 2022) remained outstanding on Genesis Global Capital's loan to DCGI. On November 10, 2022, DCG made Genesis Global Capital extend the maturity date for the remaining amount to May 11, 2023. These loans all remain unpaid.[143]

**ANSWER**:  Denies the allegations in Paragraph 455 and its associated footnote, except admits that, on November 11, 2022, GGC and DCGI executed a Loan Term Sheet for 4,550.45173345 BTC with a maturity date of May 11, 2023, and refers to that loan term sheet for a complete and accurate description of its contents; and states that Paragraph 455 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

456.    On or about November 12, 2022, Genesis Global Capital privately sought an emergency loan of between $750 million and $1 billion from a third party, and informed the proposed lender that it was facing a "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet following the events of [Three Arrows]" including (1) the [DCG] Promissory Note; (2) GBTC; and (3) unsecured loans to DCG. Genesis Global Capital did not—or could not—obtain this emergency loan.[144]

**ANSWER**:  Denies the allegations in Paragraph 456 and its associated footnote, except states that Paragraph 456 and its associated footnote purport to quote and characterize a November 12, 2022 GGC internal memorandum, and refers to that memorandum for a complete and accurate description of its contents; and states that Paragraph 456 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

---

[143] *Id.*, ¶187.
[144] *Id.*, ¶197.

F.    THE TRUTH BEGINS TO BE REVEALED: GENESIS GLOBAL
CAPITAL SUSPENDS REDEMPTIONS CAUSING INVESTOR LOSSES
AND MISREPRESENTS THE REASON.

457.    On November 16, 2022, Genesis Global Capital announced, via Twitter, that Genesis Global Capital would not permit further redemptions or new loan originations due to withdrawal requests exceeding Genesis Global Capital's liquidity, and the undisclosed material negative risks of Genesis' true financial condition that Defendants concealed since June 2022 began to be revealed:

> FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, which have exceeded our current liquidity... In consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business[.]

**ANSWER**:  States that Paragraph 457 purports to quote and characterize a November 16, 2022 X post by @genesistrading, and refers to that X post for a complete and accurate description of its contents.

458.    The November 16, 2022 announcement misleadingly blamed FTX for Genesis Global Capital's inability to honor customer redemptions instead of acknowledging that the blame lay with the dubious transactions and accounting methods employed by Genesis Global Capital and Defendants.

**ANSWER**:  Denies the allegations in Paragraph 458.

459.    In fact, Genesis Global Capital was unable to continue to process redemption requests because Genesis Global Capital had become insolvent in June 2022 when it was unable to collect $1.1 billion of the $2.3 billion loaned to 3AC and the loan to parent Defendant DCG continued to decline in value.

**ANSWER**:  Denies the allegations in Paragraph 459.

460.    Genesis Global Capital was not merely illiquid; it was insolvent and had been since June 2022. This fact was confirmed when, on January 19, 2023, Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., voluntarily filed petitions under Chapter 11 of the U.S. Bankruptcy Code in the Southern District of New York.

**ANSWER**:  Denies the allegations in Paragraph 460, except admits that on January 19, 2023, GGH, GGC, and GAP voluntarily filed petitions under Chapter 11 of the U.S. Bankruptcy

171

Code in the Southern District of New York which were consolidated in the Genesis Bankruptcy Action, and refers to those filings for a complete and accurate description of their contents.

### G.      RELIANCE FOR EXCHANGE ACT CLAIMS.

461.    **DIRECT RELIANCE**: Genesis Yield investors who invested in Genesis Yield securities after June 13, 2022, including Plaintiff Translunar, relied on misstatements made directly to each of them by Genesis Global Capital regarding Genesis Global Capital's solvency and the pendency of proceedings likely to have an adverse effect on the Genesis Yield securities investments.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of what information "Genesis Yield investors who invested in Genesis Yield securities after June 13, 2022" or Plaintiff Translunar relied on and denies on that basis.

462.    Genesis Global Capital made the following representations to each purchaser of Genesis Yield securities via the Genesis Yield Investment Agreements, including investors such as Plaintiff Translunar who purchased Genesis Yield securities *after* June 13, 2022, the date on which Genesis Global Capital was rendered insolvent by 3AC's default:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

**ANSWER**:   Denies the allegations in Paragraph 462, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of when Plaintiff Translunar and other lenders entered the Genesis Yield program or made subsequent loans and denies on that basis; and states that Paragraph 462 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

463.    As alleged above, Plaintiff Translunar reviewed and relied upon these material false and misleading representations when it purchased Genesis Yield securities.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 463 and denies on that basis.

464.    Plaintiff Translunar and members of the Class would not have (nor would any reasonable investor) purchased Genesis Yield securities had they known Genesis Global Capital's true financial conditions, and that the representations made with respect to Genesis's solvency and adverse proceedings were false.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 464 and denies on that basis.

465.    **PRESUMPTION OF RELIANCE**: For class members who entered into Genesis Yield Investment Agreements prior to June 13, 2022 (the date on which Genesis Global Capital was rendered insolvent by 3AC's default) and reinvested after the Company was rendered insolvent, Lead Plaintiffs, Plaintiff Ameli and the Class's Exchange Act claims are grounded in Defendants' failure to disclose material adverse facts that Defendants had a duty to update or to disclose.

**ANSWER**:  Denies the allegations in Paragraph 465.

466.    Lead Plaintiffs, Plaintiff Ameli and the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

**ANSWER**:  States that the allegations in Paragraph 466 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 466.

467.    The withheld facts were material in the sense that a reasonable investor may have considered them important in making investment decisions.

**ANSWER**:  States that the allegations in Paragraph 467 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 467.

468.    A fact is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

**ANSWER**:  States that the allegations in Paragraph 468 constitute legal conclusions, to which no response is required.

469.    Lead Plaintiffs and Plaintiff Ameli allege at least two material omissions, including:

(1)    Defendants did not disclose that Genesis Global Capital was insolvent; and

173

(2)    Defendants did not disclose that 3AC's default and bankruptcy proceedings could reasonably be anticipated to have an adverse effect on the transactions contemplated by Genesis Yield Investment Agreements or the accuracy of the representations and warranties made in the Genesis Yield Investment Agreements.

**ANSWER**:  States that the allegations in Paragraph 469 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 469.

470.    Genesis Global Capital had a duty to disclose these undisclosed adverse, material facts or to update the representations to investors that "[Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws" and "[Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder."

**ANSWER**:  Denies the allegations in Paragraph 470, except states that Paragraph 470 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

471.    An additional material omission Lead Plaintiffs and Plaintiff Ameli allege is that Defendants did not disclose that 3AC's bankruptcy proceedings would have a material adverse effect on the transactions contemplated by Genesis Yield Investment Agreements or the accuracy of the representations and warranties hereunder or thereunder.

**ANSWER**:  Denies the allegations in Paragraph 471.

472.    The omissions alleged here are common to all Lead Plaintiffs and Plaintiff Ameli and none of these them were made aware of the insolvency of Genesis Global Capital.

**ANSWER**:    Denies the allegations in Paragraph 472, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of Lead Plaintiffs' and Plaintiff Ameli's "aware[ness]."

473.    Lead Plaintiffs, Plaintiff Ameli and members of the Class would not have invested in Genesis securities had they known the undisclosed, material adverse facts that were not disclosed at the time of their investment.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 473 and denies on that basis.

474.    **RELIANCE ON AGENT**: Defendants also made direct misrepresentations to the appointed agent of investors who purchased Genesis Yield securities through the Gemini Earn program.

**ANSWER**:  Denies the allegations in Paragraph 474.

475.    As set forth above, Lead Plaintiffs and members of the Class who purchased Genesis Yield securities through the Gemini Earn program did so in reliance on Genesis Global Capital's direct representations to Gemini, the appointed agent of Gemini Earn investors, regarding Genesis Global Capital's management practices, investment strategy, and financial condition. Lead Plaintiffs and members of the Class who purchased Genesis Yield securities through the Gemini Earn program would not have (nor would any reasonable investor) purchased Genesis Yield securities had they known the truth about Genesis Global Capital's true financial conditions and risk management policies and procedures.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 475 and denies on that basis.

## XIII.    CONSUMER PROTECTION AND COMMON LAW FRAUD CLAIMS.

476.    The common law fraud and Consumer Protection Claims (as defined below) are pled in the alternative to the Securities Act and Exchange Act claims alleged herein.

**ANSWER**:  States that the allegations in Paragraph 476 relate to the Dismissed Claims and no response is required.

### A.    CONSUMER PROTECTION CLAIMS.

477.    Genesis Yield was offered to consumers, who were exposed to the Consumer Protection Defendants' fraudulent marketing, advertising, and sales tactics designed to induce consumers to purchase, transfer, borrow, loan, and/or trade digital assets via Genesis Yield.

**ANSWER**:  States that the allegations in Paragraph 477 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 477.

478.    Genesis Global Capital, individually and through the Consumer Protection Defendants, touted Genesis Yield as an opportunity to earn money, through which consumers

175

could tender digital assets in exchange for earning some of the "highest" returns or yields and the eventual return of their digital assets – making it an attractive opportunity to the investing public.

**ANSWER**: States that the allegations in Paragraph 478 relate to the Dismissed Claims and no response is required. To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 478 and denies on that basis.

479. The Consumer Protection Defendants made various representations that Genesis Global Capital was and would remain solvent and was not and would not be subject to any bankruptcy or insolvency proceedings.

**ANSWER**: States that the allegations in Paragraph 479 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 479.

480. In doing so, the Consumer Protection Defendants led consumers to expect that, by tendering and giving control of their digital assets to Genesis Global Capital, (1) they would receive profit in the form of interest on those assets, up to 8.05% annual percentage yield ("APY"), and (2) their digital assets would remain safe until their return.

**ANSWER**: States that the allegations in Paragraph 480 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 480.

481. Despite the Consumer Protection Defendants' representations, the structure of Genesis Yield was such that Genesis Global Capital profited, not consumers, and Genesis Global Capital was in fact insolvent.

**ANSWER**: States that the allegations in Paragraph 481 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 481.

482. Consumers such as Plaintiffs and Class Members reasonably relied on Consumer Protection Defendants' misrepresentations and omissions, as set forth herein, to their detriment, and would not have otherwise entered into the Genesis Yield Investment Agreements.

**ANSWER**:  States that the allegations in Paragraph 482 relate to the Dismissed Claims and no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 482 and denies on that basis.

483.    Consumer Protection Defendants each engaged in a wrongful scheme designed to mislead – and profit from – consumers such as Plaintiffs and Class Members, including but not limited to the following:

a)    Defendant Moro and causing Genesis Global Capital, at the direction of and/or subject to the control of Defendants DCG and Silbert to disseminate misleading and false financial statements to consumers, as prospective investors, either directly or through Gemini as their designated agent, to induce consumers to invest their digital assets with Genesis Global Capital;

b)    Defendants Moro, Islim, DCG, Silbert, Kraines and Murphy causing Genesis Global Capital to use consumers' digital assets to engage in transactions designed to benefit the DCG conglomerate, including the purchase of GBTC, which Grayscale, as wholly owned subsidiary of DCG, received significant profit therefrom, ultimately leading DCG (as the corporate parent) and Silbert (as DCG's controlling shareholder) to profit, rather than Genesis or Plaintiffs and Class Members;

c)    Defendants Moro, Islim, DCG, Silbert, Kraines and Murphy causing Genesis Global Capital to lend almost 30% of Genesis Global Capital's total loan book to 3AC in order to maximize DCG's profit, rather than Genesis or Plaintiffs and Class Members;

d)    Defendants DCG and Silbert, forcing Genesis Global Capital to sell the 3AC bankruptcy claim and execute a sham loan transaction on unfavorable terms whereby the fair market value of the DCG Promissory Note was a fraction of its $1.1 billion face amount, it would not mature until 2032, and it bore interest at a rate of a mere 1% – which was done for DCG's and Silbert's benefit, and to mislead consumers as to Genesis Global Capital's financial standing, by artificially propping up the value of GBTC shares;

e)    Defendant Silbert misrepresenting to Gemini, as authorized agent, that DCG "absorbed" 3AC losses and that Genesis Global Capital remained solvent, when that was not the case, in order to convince Gemini to not terminate the Gemini Earn program;

f)    Defendant Moro publicly announcing on Twitter, following the collapse of 3AC, that Genesis Global Capital had mitigated any losses due to its exposure and loss was "finite," when in fact 3AC owed a large debt of $2.36 billion to Genesis, and

177

Genesis suffered a loss of roughly $1.2 billion at the time 3AC's liquidation commenced, and that DCG had assumed certain liabilities to ensure that Genesis had the capital to operate, when it had not;

g)    Defendant Moro making misleading statements as to Genesis Global Capital's solvency, including that the $1.1 billion amount of the DCG Promissory Note on its balance sheet was a "current asset and/or receivable" when it was not; and

h)    Defendants Moro and Islim causing Genesis Global Capital and Ballensweig to disseminate balance sheets and other documents misrepresenting Genesis's solvency to induce consumers to continue to invest in Genesis Global Capital Genesis Yield securities and/or to prevent them from requesting redemptions of their investments.

**ANSWER**: States that the allegations in Paragraph 483 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 483.

484.    As a result of Consumer Protection Defendants' deceptive and unfair acts or practices, since the start of the Class Period, Plaintiffs and Class Members, have suffered harm, including, *inter alia*, loss of access to their digital assets and nonreceipt of interest on their digital assets as promised.

**ANSWER**: States that the allegations in Paragraph 484 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 484.

## B.    COMMON LAW FRAUD.

485.    Defendants caused Genesis Global Capital to falsely represent and warrant to each investor that signed a Genesis Yield Investment Agreement after June 13, 2022 that (1) Genesis Global Capital was not insolvent and (2) Genesis Global capital was not aware of any proceedings which could reasonably be anticipated to have any adverse effect on the Genesis Yield transactions or the accuracy of the representations and warranties hereunder or thereunder.

**ANSWER**: States that the allegations in Paragraph 485 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 485.

486.    Plaintiff Translunar read, reviewed, and relied upon these representations in determining to loan digital assets Genesis Global Capital.

**ANSWER**:  States that the allegations in Paragraph 486 relate to the Dismissed Claims and no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 486 and denies on that basis.

487.    Plaintiff Translunar would not have, nor would any reasonable investor, loaned digital assets to Genesis Global Capital had it known these representations and warrantees were false.

**ANSWER**:  States that the allegations in Paragraph 487 relate to the Dismissed Claims, and no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 487 and denies on that basis.

488.    Defendants also caused Genesis Global Capital to conceal its insolvency from Genesis Yield investors who signed Genesis Yield Investment Agreements prior to June 13, 2022. Genesis Global Capital represented and warranted to every investor who invested in Genesis Yield prior to June 13, 2022 that it was (1) not insolvent and (2) it was not aware of any proceedings which could reasonably be anticipated to have any adverse effect on the Genesis Yield transactions or the accuracy of the representations and warranties hereunder or thereunder.

**ANSWER**:  States that the allegations in Paragraph 488 relate to the Dismissed Claims, and no response is required.  To the extent a response is required, denies the allegations in Paragraph 488, except states that Paragraph 488 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

489.    3AC's default on June 13, 2022 rendered both representations and warrantees false, and Genesis Global Capital had a duty to promptly disclose this fact to Genesis Yield investors such as Plaintiffs Ameli, Buttenham, Gowda, McGreevy, Morone, Macri, Wiener, and Wilson, and members of the class who signed Genesis Yield Investment Agreements prior to June 13, 2022.

**ANSWER**:  States that the allegations in Paragraph 489 constitute legal conclusions and relate partially to the Dismissed Claims, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 489.

179

490.    Despite Genesis Global Capital's duty to disclose, Defendants conspired with and caused Genesis Global Capital to conceal these material facts from Plaintiffs Ameli, Buttenham, Gowda, McGreevy, Morone, Macri, Wiener, and Wilson, and members of the class who signed Genesis Yield Investment Agreements prior to June 13, 2022.

**ANSWER**:  States that the allegations in Paragraph 490 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 490.

491.    Had Plaintiffs Ameli, Buttenham, Gowda, McGreevy, Morone, Macri, Wiener, and Wilson, and members of the class who signed Genesis Yield Investment Agreements prior to June 13, 2022 known that the solvency and adverse proceeding representations and warranties discussed above had been rendered untrue and inaccurate, they would not have continued lending digital assets to Genesis Global Capital after June 13, 2022.

**ANSWER**:  States that the allegations in Paragraph 491 relate to the Dismissed Claims and no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 491 and denies on that basis.

492.    Exchange Act Defendants made direct misrepresentations to Gemini, the appointed agent of investors who purchased Genesis Yield securities through the Gemini Earn program.

**ANSWER**:  States that the allegations in Paragraph 492 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 492.

493.    Defendants were aware Gemini was the appointed agent "for all purposes" under the Genesis Yield Investment Agreements.

**ANSWER**:  States that the allegations in Paragraph 493 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 493, except states that Paragraph 493 purports to quote and characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

494.    As set forth above, Lead Plaintiffs and members of the Class who purchased Genesis Yield securities through the Gemini Earn program did so in reliance on Genesis Global Capital's direct representations to Gemini, the appointed agent of Gemini Earn investors, regarding Genesis Global Capital's management practices, investment strategy, and financial condition. Lead Plaintiffs and members of the Class who purchased Genesis Yield securities through the Gemini Earn program would not have (nor would any reasonable investor) purchased Genesis Yield securities had they known the truth about Genesis Global Capital's true financial conditions and risk management policies and procedures.

**ANSWER**:  States that the allegations in Paragraph 494 relate to the Dismissed Claims and no response is required.  To the extent a response is required, lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 494 and denies on that basis.

## CLASS ALLEGATIONS

495.    Plaintiffs bring the Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

**ANSWER**:  States that the allegations in Paragraph 495 constitute legal conclusions, to which no response is required.

496.    Plaintiffs seek class certification of the Class defined above in paragraph 2.

**ANSWER**:  States that the allegations in Paragraph 496 constitute legal conclusions, to which no response is required.

497.    Plaintiffs also seek to represent subclasses of individuals who invested assets with Genesis Global Capital under the Genesis Yield Investment Agreements in New York, Connecticut, Florida, Illinois, Texas, California, Nevada and Kansas with representative plaintiffs as addressed in this Complaint. As detailed below in their respective causes of action, each state subclass is referenced by the name of its state.

**ANSWER**:  States that the allegations in Paragraph 497 constitute legal conclusions, to which no response is required.

498.    Plaintiffs reserve the right to modify or refine the definitions of the Class or add subclasses based upon discovery of new information.

**ANSWER**:  States that the allegations in Paragraph 498 constitute legal conclusions, to which no response is required.

499.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

**ANSWER**:  States that the allegations in Paragraph 499 constitute legal conclusions, to which no response is required.

500.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

**ANSWER**:  States that the allegations in Paragraph 500 constitute legal conclusions, to which no response is required.

501.    **Ascertainability**. The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow class members to determine if they are a member of the Class. Further, the Class can be readily identified through records maintained by Genesis Global Capital.

**ANSWER**:  States that the allegations in Paragraph 501 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 501.

502.    **Numerosity (Rule 23(a)(1))**. The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified and described, is not known, upon information and belief there are hundreds of thousands of individuals and entities that purchased Genesis Yield securities who were damaged.

**ANSWER**:  States that the allegations in Paragraph 502 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 502.

182

503.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including:

a)    Whether the Genesis Yield products were securities;

b)    Whether Genesis Global Capital was required to file a registration statement for the Genesis Yield Investment Agreements with the SEC;

c)    Whether an exemption from registration applied to Genesis Global Capital's offer and sale of the Genesis Yield securities;

d)    Whether Genesis Global Capital violated Sections 5 and 12(a)(1) of the Securities Act;

e)    Whether Defendants were control persons under Section 15 of the Securities Act;

f)    The means and form of rescission or appropriate measure of statutory damages under the Securities Act;

g)    Whether Genesis Global Capital made untrue statement of a material fact or to omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

h)    Whether Defendants employed any device, scheme, or artifice to defraud, or engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

**ANSWER**:  States that the allegations in Paragraph 503 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 503.

504.    Whether Defendants acted with the requisite state of mind;

**ANSWER**:  States that the allegations in Paragraph 504 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 504.

505.    Whether misstatements or omission made by Genesis Global Capital were material to the decision made by Lead Plaintiffs, Plaintiff Ameli and the Class to purchase securities offered or sold by Genesis Global Capital;

**ANSWER**:  States that the allegations in Paragraph 505 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 505.

506.    Whether Plaintiffs and members of the Class suffered damages as a result of the misconduct alleged herein;

**ANSWER**:  States that the allegations in Paragraph 506 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 506.

507.    Whether Defendants were control persons of Genesis Global Capital under Section 20(a) of the Exchange Act;

**ANSWER**:  States that the allegations in Paragraph 507 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 507.

508.    The appropriate measure of damages under the Exchange Act; and

**ANSWER**:  States that the allegations in Paragraph 508 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 508.

509.    Whether Defendants' conduct violated certain state consumer protection laws and engaged in common law fraud, and the appropriate measure of damages.

**ANSWER**:  States that the allegations in Paragraph 509 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 509.

510.    **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and members of the Class suffered injuries as a result of Genesis Global Capital and Defendants' wrongful conduct that is uniform across the Class.

**ANSWER**:  States that the allegations in Paragraph 510 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 510.

511.  **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting the Action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

**ANSWER**:  States that the allegations in Paragraph 511 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 511.

512.  **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

**ANSWER**:  States that the allegations in Paragraph 512 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 512.

513.  Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**ANSWER**:  States that the allegations in Paragraph 513 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 513.

514.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

**ANSWER**:  States that the allegations in Paragraph 514 constitute legal conclusions, to which no response is required.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES ACT SECTION 5, SECTION 12(a)(1) AND SECTION 15 OF THE SECURITIES ACT (Against All Defendants)

515.    Lead Plaintiffs and Plaintiff Ameli reallege the allegations above alleged in ¶¶3-14, and Sections II, V, and VII-XI, and expressly disclaim incorporation of any allegations of fraud.

**ANSWER**:  Incorporates Paragraphs ¶¶3–14, and Sections II, V, and VII–XI of this Answer set forth above as if fully set forth herein.

516.    This claim is asserted against Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o.

**ANSWER**:  States that the allegations in Paragraph 516 constitute legal conclusions, to which no response is required.

517.    This claim is based on strict liability.

**ANSWER**:  States that the allegations in Paragraph 517 constitute legal conclusions, to which no response is required.

518.    Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom

such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id*. § 77o(a).

**ANSWER**: States that Paragraph 518 purports to quote Section 15 of the Securities Act or 15 U.S.C § 77o(a), and refers to that statute for a complete and accurate description of its contents.

519.    Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

**ANSWER**: States that Paragraph 519 purports to quote Section 5(a) of the Securities Act or 15 U.S.C § 77e(a), and refers to that statute for a complete and accurate description of its contents.

520.    Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

**ANSWER**: States that Paragraph 520 purports to quote Section 5(c) of the Securities Act or 15 U.S.C § 77e(c), and refers to that provision for a complete and accurate description of its contents.

521.    As alleged herein, Genesis Global Capital violated Sections 5 of the Securities Act directly or indirectly, and making use of any means or instruments of transportation or communication in interstate commerce or of the mails sold and offered Genesis Yield securities without registering the securities offering or qualifying for an exemption from registration.

**ANSWER**: Denies the allegations in Paragraph 521.

522.    Under Section 12(a)(1) of the Securities Act, any person who offers or sells a security in violation of Section 5 of the Securities Act shall be liable to the person purchasing such

security from the offeror or seller and may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if the security is no longer owned.

**ANSWER**: States that Paragraph 522 purports to characterize Section 12(a)(1) of the Securities Act or 15 U.S.C § 77l, and refers to that statute for a complete and accurate description of its contents.

523.    "There is no indication that Congress intended the word 'consideration' in § 12(2) to mean anything other than what the context would suggest—the money or property given by the investor in exchange for the security." *Randall v. Loftsgaarden*, 478 U.S. 647, 659-60 (1986).

**ANSWER**: States that Paragraph 523 purports to quote and characterize *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), and refers to that decision for a complete and accurate description of its contents.

524.    "Rescission is the avoidance or undoing of the transaction. Its purpose is to return the defrauded purchaser to the status quo ante; it contemplates the return of the injured party to the position he occupied before he was wrongfully induced to enter the transaction." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 554 (5th Cir. 1981).

**ANSWER**: States that Paragraph 524 purports to quote and characterize *Huddleston v. Herman & MacLean*, 640 F.2d 534 (5th Cir. 1981), and refers to that decision for a complete and accurate description of its contents.

525.    The consideration that class members paid for Genesis Yield securities included cash and digital assets in exchange for interest payments and the promise of return of the consideration paid to Genesis Global Capital at maturity.

**ANSWER**: Denies the allegations in Paragraph 525, except states that Paragraph 525 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

526.    Lead Plaintiffs, Plaintiff Ameli and members of the Class have been damaged under the Securities Act as alleged above in paragraphs and seek rescission or a rescissionary form of relief for Defendants wrongful conduct in connection with the purchase of Genesis Yield securities.

**ANSWER**:  States that the allegations in Paragraph 526 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 526.

527.    As set forth above, Genesis Global Capital violated Section 5 of the Securities Act and is therefore liable to Lead Plaintiffs, Plaintiff Ameli and members of the Class under Section 12(a)(1).

**ANSWER**:    States that the allegations in Paragraph 527 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 527.

528.    Lead Plaintiffs and Plaintiff Ameli have tendered or if they have not done so already hereby tender the securities purchased from Genesis Global Capital.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 528 and denies on that basis.

529.    But for Genesis Global Capital's bankruptcy, the Company would have been named a defendant and violations of Sections 5 and 12(a)(1) would have been asserted against it on behalf of Lead Plaintiffs, Plaintiff Ameli and the Class.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 529 and denies on that basis, except admits that GGC filed for bankruptcy on January 19, 2023.

530.    At the time of the violations of Sections 5 of the Securities Act by Genesis Global Capital alleged herein, Defendants controlled Genesis Global Capital. Defendants, by virtue of their stock ownership, agency, agreements or understandings (including the GGC and GGH operating agreements), specific acts alleged above, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendants at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital, and as alleged above engaged in acts that demonstrate Defendants exercised their power to direct the management and policies of Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 530.

531.    Defendants exercised their power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by promoting, soliciting, offering, and

189

selling unregistered securities to Lead Plaintiffs, Plaintiff Ameli and members of the Class in violation of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

**ANSWER**:  States that the allegations in Paragraph 531 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 531.

532.    Defendants had sufficient influence and power to cause Genesis Global Capital to refrain from offering and selling unregistered securities in violation of the Securities Act.

**ANSWER**:  Denies the allegations in Paragraph 532.

### 1.    Defendant DCG Controlled Genesis

533.    At all times alleged herein DCG was the 100% owner of GGH, which was the 100% owner of the Genesis Global Capital and the Company's sole managing member. Defendant DCG had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant DCG, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 533, except admits that DCG holds a 100% interest in GGH; and admits that GGH holds a 100% interest in GGC.

534.    Defendant DCG exercised its power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by directing Genesis Global Capital not to register as an exchange or broker-dealer prior to offering and selling securities to Lead Plaintiffs, Plaintiff Ameli and members of the Class in violation of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

**ANSWER**:  Denies the allegations in Paragraph 534.

535.    At the time of the violations of Section 5 of the Securities Act by Genesis Global Capital alleged herein, Defendant DCG had sufficient influence to cause Genesis Global Capital to refrain from offering and selling unregistered securities in violation of the Securities Act.

**ANSWER**:  Denies the allegations in Paragraph 535.

536.    DCG executives, Defendants Silbert, Kraines and Murphy had effective control over GGH, the Company and GGT—controlling strategy, hiring, allocation of resources, which were implemented with DCG executives on board of GGH, namely Murphy and Kraines. Furthermore, Matt Kummell, DCG Senior VP of Operations, was Defendant Silbert's eyes and

ears at the Company. Kummell was plugged into everything at Genesis and had a direct line to Defendant Silbert.

**ANSWER**:  Denies the allegations in Paragraph 536.

537.    For example, on June 14, 2022, Defendant Silbert, on behalf of the DCG board instructed Genesis to "shrink" its loan book.[145]

**ANSWER**:  Denies the allegations in Paragraph 537 and its associated footnote, except admits that Paragraph 537 and its associated footnote purport to quote and characterize a June 14, 2022 Microsoft Teams message from Mr. Silbert to Mr. Murphy, Mr. Kraines, Mr. Moro, and Mr. Islim, and refers to that message for a complete and accurate description of its content.

538.    On June 17, 2022, Defendant Moro sent two tweets from his personal account regarding Genesis losses and its plan for recovery. Those tweets were reviewed and edited by DCG's COO, Defendant Murphy, who directed Defendant Moro to send the tweets from his personal account, "despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account."[146]

**ANSWER**:  Denies the allegations in Paragraph 538 and its associated footnote, except states that the first sentence of Paragraph 538 purports to characterize a June 17, 2022 X post from @michaelmoro, and refers to that X post for a complete and accurate description of its contents; and states that the second sentence purports to quote and characterize allegations from the NYAG Complaint, and refers to that document for a complete and accurate description of its contents.

539.    Further, in July 2022 to November 2022, DCG and Silbert caused Genesis to extend the maturity date for hundreds of millions of dollars of loans to DCG for no consideration. In fact, on November 10, 2022, Defendant DCG "made" Genesis extend the maturity date for outstanding loans to May 11, 2023.[147] This shows DCG and Silbert's total domination and control over Genesis Global Capital.

---

[145] NYAG Compl., ¶127.

[146] *Id.*, ¶¶132-33.

[147] *Id.*, ¶187.

**ANSWER**:   States that the allegations in Paragraph 539 and its associated footnote constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 539 and its associated footnote.

540.    Defendant DCG had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under Section 12(a)(1) of the Securities Act.

**ANSWER**:   States that the allegations in Paragraph 540 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 540, except states that to the extent the allegations in Paragraph 540 references other allegations in the TAC, refers and incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

541.    Accordingly, pursuant to Section 15 of the Securities Act, Defendant DCG is jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Lead Plaintiffs, Plaintiff Ameli and the Class for damages relating to the Genesis Yield securities. *See id.* § 77*l*(a)(1).

**ANSWER**:   States that the allegations in Paragraph 541 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 541.

### 2.    Defendant Silbert Controlled Genesis

542.    As CEO and founder of both Defendant DCG and Genesis Global Capital, and controlling shareholder owning 40% of the equity of DCG (which in turn owned 100% of Genesis Global Capital through GGH), Defendant Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant Silbert, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

**ANSWER**:   States that the allegations in Paragraph 542 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 542, except admits that Mr. Silbert is the founder of the entity that would become DCG

and is DCG's CEO; admits that Mr. Silbert beneficially owned approximately 38% of the equity

of DCG as of December 31, 2022; admits that Mr. Silbert was the CEO of DCG when GGC was

created; admits that DCG holds a 100% interest in GGH; and admits that GGH holds a 100%

interest in GGC.

543.    Defendant Silbert exercised his power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by directing Genesis Global Capital not to register as an exchange or broker-dealer prior to offering and selling securities to Lead Plaintiffs, Plaintiff Ameli and members of the Class in violation of Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

**ANSWER**:  States that the allegations in Paragraph 543 constitute legal conclusions, to

which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 543.

544.    At the time of the violations of Section 5 of the Securities Act by Genesis Global Capital alleged herein, Defendant Silbert had sufficient influence to cause Genesis Global Capital to refrain from offering and selling unregistered securities in violation of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 544 constitute legal conclusions, to

which no response is required.  To the extent a response is required, denies the allegations in

Paragraph 544.

545.    According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Silbert controlled Genesis Global Capital:

23-10063-shl    Doc 143    Filed 03/21/23    Entered 03/21/23 01:05:04    Main Document
Debtor Name: Genesis Global Capital, LLC                Pg 81 of 82                Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 28: List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S 5TH FLOOR NEW YORK, NY 10003 | SOLE MEMBER | 100 |

**ANSWER**: Denies the allegations in Paragraph 545, except states that Paragraph 545 purports to quote and characterize a filing in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

546.    Defendant Silbert exercised his power to direct or cause the direction of the management and policies of Genesis numerous times throughout the Class Period. For example, according to the NYAG Complaint, on June 14, 2022, Defendant Silbert, on behalf of the DCG board, used his power and influence by giving Defendant Moro and Genesis instructions on how to utilize Genesis' loan book.[148] The next day, June 15, 2022, Defendant Silbert again demonstrated his power and influence over Genesis by directing Genesis Capital personnel, including Defendant Moro, to perpetuate the idea that Genesis Capital was "highly stable."[149] This instruction by Defendant Silbert to Defendant Moro, who was Genesis' CEO, resulted in Defendant Moro tweeting the sentiment that Genesis had "shed the risk."[150] Furthermore, in July 2022, Defendant Silbert reviewed tweets that Defendant Moro made on behalf of the Company concerning its financial condition before Defendant Moro posted them.[151]

**ANSWER**: Denies the allegations in Paragraph 546 and associated footnotes, except states that the second, third, fourth, and fifth sentences of Paragraph 546 purport to quote and characterize allegations from the NYAG Complaint, and refers to that document for a complete and accurate description of its contents.

---

[148] NYAG Compl., ¶127.
[149] *Id.*, ¶131.
[150] *Id.*, ¶132.
[151] *Id.*, ¶152.

194

547.    When Gemini indicated that it intended to terminate the Gemini Earn program with Genesis Global Capital—Silbert, not Islim, then Genesis Global Capital CEO—intervened to convince Gemini not to do so because it was in the best interest of Gemini and DCG.

**ANSWER**:  Denies the allegations in Paragraph 547.

548.    Defendant Silbert had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under Section 12(a)(1) of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 548 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 548, except states that to the extent the allegations in Paragraph 548 references other allegations in the TAC, refers and incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

549.    Accordingly, pursuant to Section 15 of the Securities Act, Defendant Silbert is jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Lead Plaintiffs, Plaintiff Ameli and the Class for damages as to each Genesis Yield Investment Agreement. *See id.* § 77*l*(a)(1).

**ANSWER**:  States that the allegations in Paragraph 549 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 549.

### 3.    Defendant Moro Controlled Genesis

550.    Defendant Moro was CEO of Genesis before and during the Class Period until August 2022, and during this time, Defendant Moro caused the Company to offer or sell Genesis Yield securities.

**ANSWER**:  Denies the allegations in Paragraph 550, except admits that Mr. Moro was the CEO of GGC from November 2017 to August 17, 2022.

551.    According to Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Moro controlled Genesis:

195

23-10063-shl    Doc 143    Filed 03/21/23    Entered 03/21/23 01:05:04    Main Document
Debtor Name: Genesis Global Capital, LLC                    Pg 82 of 82                    Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 29: Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

| Name | Address | Position | Start | End |
|------|---------|----------|-------|-----|
| KRISTOPHER JOHNSON | ADDRESS ON FILE | FORMER SENIOR RISK MANAGER | 01/19/2022 | 01/20/2022 |
| MATTHEW BALLENSWEIG | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PALEOKRASSAS | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PATCHEN | ADDRESS ON FILE | FORMER CHIEF RISK OFFICER | 01/19/2022 | 10/2022 |
| SOICHIRO MICHAEL MORO | ADDRESS ON FILE | FORMER CHIEF EXECUTIVE OFFICER | 01/19/2022 | 08/15/2022 |

**ANSWER**: Denies the allegations in Paragraph 551, except states that Paragraph 551 purports to quote and characterize a filing in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

552.    As CEO of Genesis, Moro had the power to speak publicly, act on behalf of Genesis and enter into contracts and agreements on behalf of Genesis, and to hire executives of Genesis, and he exercised that power, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. For example, on June 30, 2022, Moro executed the DCG Promissory Note on behalf of Genesis, GGH and as a director of Genesis Asia Pacific, and directed that the DCG Promissory Note be reported as an asset on Genesis' balance sheet, and tweeted publicly on behalf of Genesis concerning its impact on the financial condition of Genesis.

**ANSWER**: Denies the allegations in Paragraph 552, except admits that Mr. Moro was the CEO of GGC February 2018 to August 17, 2022; admits that Mr. Moro executed the Promissory Note on behalf of GGC and GAP; admits that Mr. Moro was a director of GAP when the Promissory Note was executed; and states that the second sentence of Paragraph 552 purports to characterize certain unidentified X posts made by Mr. Moro, and refers to those unidentified X posts for a complete and accurate description of their contents.

553.    On June 13, 2022, after the 3AC default, during a chat among Defendant Silbert, Moro, Islim and Kraines, Defendant Silbert directed Defendants Moro and Islim to "guide the ship." Defendant Silbert further stated to Defendants Moro and Islim that he wanted "to make sure you're leading this process with support and guidance from DCG," to which Defendant Moro responded "Derar [Islim] and I are involved in every step of what has been happening." Defendant Silbert concluded with a request that Defendants Moro, Islim, Matt Ballensweig and Arianna Pretto-Sakmann provide an update to the DCG board.

196

**ANSWER**:  Denies the allegations in Paragraph 553, except states that Paragraph 553 purports to quote and characterize a June 13, 2022 Microsoft Teams conversation between Mr. Silbert, Mr. Islim, Mr. Murphy, Mr. Kraines, and Mr. Moro, and refers to that Microsoft Teams conversation for a complete and accurate description of its contents.

554.    As CEO, in 2019 Moro led Genesis' acquisitions of Qu Capital, an algorithmic trading firm, and in 2020 Vo1t, a digital currency custodian. Throughout the Class Period, Moro communicated with investors about Genesis through twitter, including updates on Genesis' financial condition. In 2019, Moro announced that he hired additional members to the Genesis leadership team, stating "It is really exciting to add this talented group to the Genesis team . . . We are confidential that these individuals will build on our sustained success in the digital currency marketplace and play critical role in expanding our business around the world." Furthermore, according to the *Wall Street Journal*, in late 2018, Moro participated in due diligence of Genesis' partners, including a 2018 site visit to meet Sam Bankman-Fried and Alameda Research in Berkeley, California. During the Class Period and during the time Defendant Moro served as CEO of Genesis, Genesis made hundreds of millions of dollars of unsecured loans to Alameda.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 554 and denies on that basis, except states that the third sentence of Paragraph 554 purports to quote and characterize a July 1, 2019 GGT press release, and refers to that press release for a complete and accurate description of its contents; and states that the fourth sentence of Paragraph 554 purports to characterize a January 19, 2023 *Wall Street Journal* article, and refers to that article for a complete and accurate description of its contents.

### 4.    Defendant Islim Controlled Genesis

555.    Defendant Islim has served as the COO of Genesis Global Capital and GGT since the start of the Class Period. On or around August 17, 2022, Defendants DCG and Murphy hand-picked Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH which was sole managing member of the Company, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. As a member of the board of GGH, which was the sole managing member of Genesis, and CEO, Islim controlled the Company, and during the time Islim held these positions through the end of the Class Period, Defendant Islim caused the Company to offer or sell Genesis Yield securities.

**ANSWER**:  Denies the allegations in Paragraph 555, except admits that Mr. Islim was the COO of GGC starting January 19, 2021; admits Mr. Islim was the COO of GGT since February 2,

2022; admits that Mr. Islim was the interim CEO of GGC and GGT since August 17, 2022; and

admits that Mr. Islim was a member of the GGH's board of directors from July 19, 2022 to August

2, 2024.

556.    On June 13, 2022, after the 3AC default, during a chat among Defendant Silbert, Moro, Islim and Kraines, Defendant Silbert directed Defendants Moro and Islim to "guide the ship." In response, Defendant Islim stated: "I am working closely with him [Matt Ballensweig] . . . He wants to ensure the [Genesis Global Capital loan] book is in good liquidity stand[ing] at this point." Defendant Silbert further stated that he wanted "to make sure you're leading this process with support and guidance from DCG," to which Defendant Moro responded "Derar [Islim] and I are involved in every step of what has been happening." Defendant Silbert concluded with a request that Defendants Moro, Islim, Matt Ballensweig and Arianna Pretto-Sakmann provide an update to the DCG board.

**ANSWER**:  Denies the allegations in Paragraph 556, except states that Paragraph 556

purports to quote and characterize a June 13, 2022 Microsoft Teams messages between Mr. Silbert,

Mr. Islim, Mr. Murphy, Mr. Kraines, and Mr. Moro, and refers to those messages for a complete

and accurate description of their contents.

557.    According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG Islim as Interim CEO of Genesis, during the Class Period Islim controlled Genesis:

23-10063-shl   Doc 143   Filed 03/21/23   Entered 03/21/23 01:05:04   Main Document

Debtor Name: Genesis Global Capital, LLC

Pg 81 of 82

Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 28: List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S 5TH FLOOR NEW YORK, NY 10003 | SOLE MEMBER | 100 |

**ANSWER**:   Denies the allegations in Paragraph 557, except states that Paragraph 557 purports to quote and characterize a filing in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

**Defendant Murphy Controlled Genesis**

558.    Defendant Murphy was DCG's Chief Operating Officer during the period January 2020 through November 2022, and since October 2022 has served as President of DCG. According to his LinkedIn profile, Murphy led DCG's legal, communications, marketing, brand, and public policy efforts and supported DCG's CEO (Defendant Silbert) on day-to-day management of DCG.

**ANSWER**:   Admits that Mr. Murphy was the COO of DCG from January 2020 to November 2022; admits that Mr. Murphy was President of DCG as of October 2022; and states that the second sentence of Paragraph 558 purports to characterize Mr. Murphy's LinkedIn profile, and refers to that profile page for a complete and accurate description of its contents.

559.    Defendant Murphy served as a director of GGH, a wholly owned subsidiary of DCG, and as a director of GGH, which was the sole managing member of Genesis, through which he controlled and managed Genesis Global Capital, and through his acts alleged herein exercised his power and influence over Genesis Global Capital. According to his LinkedIn profile, Defendant Murphy worked closely with DCG's wholly owned subsidiaries, which include Genesis, on strategy, execution, and all management matters.

**ANSWER**:   Denies the allegations in Paragraph 559, except admits that Mr. Murphy was a member of GGH's board of directors from July 19, 2022 to August 2, 2024; and states that the second sentence of Paragraph 559 purports to characterize Mr. Murphy's LinkedIn profile, and refers to that profile page for a complete and accurate description of its contents.

560.    On or around August 17, 2022, Defendant Murphy hand-picked Defendant Islim to serve as interim COO of the Company and GGT and to serve as a member of the board of GGH, he further and hand-picked Tom Conheeney to serve as a special advisor to the Company and GGT and to serve as a member of the board of GGH.

**ANSWER**: Denies the allegations in Paragraph 560, except admits that Mr. Islim was the COO of GGC starting January 19, 2021; admits that Mr. Islim was a member of GGH's board of directors from July 19, 2022 to August 2, 2024; and admits that Tom Conheeney served as an

199

advisor to GGT and was a member of GGH's board of directors except lacks knowledge or information sufficient to form a belief as to the truth or falsity of the timing of his appointment and denies on that basis.

561.    In July 2022, Defendant Murphy edited and helped draft tweets that Defendant Moro made on behalf of the Company concerning its financial condition.[152]

**ANSWER**:  Denies the allegations in Paragraph 561 and its associated footnote, except admits that Mr. Murphy reviewed certain social media posts; and states that Paragraph 561 and its associated footnote purport to characterize the NYAG Complaint, and refers to the NYAG Complaint for a complete and accurate description of its contents.

562.    On June 15, 2022, during a Microsoft Team teams chat that involved Defendants Islim, Silbert, Murphy, Moro and Kraines, Defendant Murphy directed that Genesis from its twitter account retweet Defendant Silbert's tweet.

**ANSWER**:  Denies the allegations in Paragraph 562, except states that Paragraph 562 purports to characterize a June 15, 2022 Microsoft Teams message from Mr. Murphy to Mr. Silbert, Mr. Ballensweig, and Arianna Pretto-Sakmann, and refers to that message for a complete and accurate description of its contents.

563.    Defendant Murphy formulated and disseminated information on behalf of the Company to Genesis Global Capital investors concerning its solvency, as alleged above in Paragraphs 414-418.

**ANSWER**:  Incorporates Paragraphs 414–418 of this Answer set forth above as if fully set forth herein.  Denies the allegations in Paragraph 563.

564.    According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG Islim as Interim CEO of Genesis, during the Class Period Murphy controlled Genesis through his position with GGH:

---

[152] NYAG Compl., ¶152.

Pg 41 of 42

Debtor Name: Genesis Global Holdco, LLC                                              Case Number: 23-10063

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 28: List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|------|---------|----------|-----------|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER / DIRECTOR | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING; CORPORATE SECRETARY | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| DIANA KIM | ADDRESS ON FILE | CORPORATE SECRETARY | N/A |
| DIGITAL CURRENCY GROUP, INC. | 262 HARBOR DRIVE 3RD FLOOR STAMFORD, CT 06092 | SOLE MEMBER | 100 |
| MARK MURPHY | ADDRESS ON FILE | DIRECTOR | N/A |
| MICHAEL KRAINES | ADDRESS ON FILE | DIRECTOR | N/A |
| PAUL ARONZON | ADDRESS ON FILE | DIRECTOR | N/A |
| TOM CONHEENEY | ADDRESS ON FILE | DIRECTOR | N/A |

**ANSWER**: Denies the allegations in Paragraph 564, except states that Paragraph 564 purports to characterize a filing in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

### 6.    Defendant Kraines Controlled Genesis

565.    Defendant Kraines is the CFO of DCG. In that role he oversaw all of DCG's financial operations, M&A activity, and corporate development efforts. Defendant Kraines also supported the continued growth of DCG's operating subsidiaries which included Genesis.

**ANSWER**: Denies the allegations in Paragraph 565 (and the subheading thereto) except admits that Mr. Kraines was the CFO of DCG from March 2021 to April 3, 2023.

566.    Kraines further exercised his control over Genesis as a member of the board of GGH, which was the sole managing member of Genesis.

**ANSWER**: Denies the allegations in Paragraph 566, except admits that Mr. Kraines was a member of GGH's board of directors from July 19, 2022 to April 3, 2023.

567.    For example, on June 15, 2022, during a Microsoft Team teams chat that involved Defendants Islim, Silbert, Murphy, Moro and Kraines, Defendant Kraines directly participated in the management of Genesis Global Capital, providing input regarding the status of Genesis Global Capital's collateral and whether it should be preserved for investor redemptions or hedged to mitigate downside risk.

201

**ANSWER**:  Denies the allegations in Paragraph 567, and states that Paragraph 567 purports to characterize June 15, 2022 Microsoft Teams messages between Mr. Islim, Mr. Silbert, Mr. Murphy, Mr. Moro, and Mr. Kraines, and refers to those messages for a complete and accurate description of their contents.

568.    Defendant Kraines formulated and disseminated on behalf of the Company information to Genesis Global Capital investors concerning its solvency, as alleged above in paragraphs 367-68.

**ANSWER**:  Incorporates Paragraphs 367–368 of this Answer set forth above as if fully set forth herein.  Denies the allegations in Paragraph 568.

569.    By virtue of his position as CFO of DCG, which wholly owns GGH, and as a member of the board of GGH, Kraines possessed the power and influence to cause the direction and management of Genesis Global Capital, and through his acts alleged herein exercised his power and influence over Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 569, except admits that Mr. Kraines was the CFO of DCG from March 2021 to April 3, 2023; and admits that Mr. Kraines was a member of GGH's board of directors from July 19, 2022 to April 3, 2023.

570.    According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant DCG Islim as Interim CEO of Genesis Global Capital, during the Class Period Kraines controlled Genesis through his position with GGH:

Debtor Name: Genesis Global Holdco, LLC          Pg 41 of 42          Case Number: 23-10063

Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy

SOFA Question 28: List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER / DIRECTOR | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING; CORPORATE SECRETARY | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| DIANA KIM | ADDRESS ON FILE | CORPORATE SECRETARY | N/A |
| DIGITAL CURRENCY GROUP, INC. | 262 HARBOR DRIVE 3RD FLOOR STAMFORD, CT 06092 | SOLE MEMBER | 100 |
| MARK MURPHY | ADDRESS ON FILE | DIRECTOR | N/A |
| MICHAEL KRAINES | ADDRESS ON FILE | DIRECTOR | N/A |
| PAUL ARONZON | ADDRESS ON FILE | DIRECTOR | N/A |
| TOM CONHEENEY | ADDRESS ON FILE | DIRECTOR | N/A |

202

**ANSWER**:  Denies the allegations in Paragraph 570, except states that Paragraph 570 purports to characterize a filing in the Genesis Bankruptcy Action, and refers to that filing for a complete and accurate description of its contents.

571.    Defendants Moro, Islim, Kraines and Murphy had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under Section 12(a)(1) of the Securities Act.

**ANSWER**:  States that the allegations in Paragraph 571 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 571, except states that to the extent the allegations in Paragraph 571 references other allegations in the TAC, refers and incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

572.    Accordingly, pursuant to Section 15 of the Securities Act, Defendants Moro, Islim, Kraines and Murphy are jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and are liable to Lead Plaintiffs, Plaintiff Ameli and the Class for damages relating to the Genesis Yield securities. *See id.* § 77*l*(a)(1).

**ANSWER**:  To the extent the allegations in Paragraph 572 constitute legal conclusions, no response is required.  To the extent a response is required, denies the allegations in Paragraph 572.

**SECOND CLAIM FOR RELIEF**

**FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT
AND RULE 10B-5
(Against All Defendants)**

573.    Lead Plaintiffs and Plaintiff Ameli reallege the allegations above.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

574.    During the Class Period, Genesis Global Capital and Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b), and (a) and (c).

203

**ANSWER**:  States that the allegations in Paragraph 574 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 574.

575.    But for Genesis Global Capital's bankruptcy, the Company would have been named a defendant and violations of Section 10(b) and Rule 10b-5(b) would have been asserted against it on behalf of Plaintiffs and the Class.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 575 and denies on that basis.

576.    Section 10(b) of the Exchange Act Section 10(b) declares it unlawful for any person to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

**ANSWER**:  States that Paragraph 576 purports to quote and characterize Section 10(b) of the Exchange Act or 15 U.S.C. § 78j(b), and refers to that statute for a complete and accurate description of its contents.

577.    SEC Rule 10b-5 promulgated pursuant to Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o employ any device, scheme, or artifice to defraud . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

**ANSWER**:  States that Paragraph 577 purports to quote and characterize 17 C.F.R. § 240.10b-5 ("SEC Rule 10b-5"), and refers to that rule for a complete and accurate description of its contents.

578.    Defendants DCG, Silbert, Murphy, Islim and Moro caused Genesis Global Capital, by the use by use of the instrumentalities of interstate commerce, to intentionally, or at least recklessly:

a)    employ a device, scheme, or artifice to defraud Plaintiffs and members of the Class and their agents into investing digital assets with Genesis Global Capital in

connection with the sale of Genesis Yield securities under the Genesis Yield Investment Agreements;

b)      make untrue statements of material fact and omit to state material facts necessary in order to make the statements made not misleading in connection with the sale of Genesis Yield securities under the Genesis Yield Investment Agreements, and/or

c)      engage in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the Class in connection with Plaintiffs' purchases of Genesis Yield securities under the Genesis Yield Investment Agreements, which constitute securities pursuant to 15 U.S.C.§ 77b(a)(1), in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**ANSWER**:  Denies the allegations in Paragraph 578.

### 1.      Violations of Rule 10b-5(b) of the Exchange Act by Genesis Global Capital

579.    Genesis Global Capital knowingly and intentionally, or at least recklessly, failed to disclose its insolvency to investors.

**ANSWER**:  States that the allegations in Paragraph 579 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 579.

580.    Genesis Global Capital failed to disclose the material facts with the intention of deceiving the investing public, including Lead Plaintiffs, Plaintiff Ameli and members of the Class and their agents, and inducing Lead Plaintiffs, Plaintiff Ameli and members of the Class to continue to invest digital assets with Genesis Global Capital.

**ANSWER**:  States that the allegations in Paragraph 580 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 580.

581.    In connection with the Genesis Yield Investment Agreements, Genesis Global Capital made the Solvency Warranty and Adverse Proceedings Warranty.

**ANSWER**:  States that Paragraph 581 purports to characterize the Lending Agreements, and refers to the Lending Agreements for a complete and accurate description of their contents.

582.    After the 3AC default rendered Genesis Global Capital insolvent, it had a duty to disclose or update investors of the material fact that it was insolvent and faced an adverse proceeding.

**ANSWER**:  States that the allegations in Paragraph 582 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 582.

583.    Genesis Global Capital knew of the material omissions alleged herein and intended thereby to deceive Lead Plaintiffs, Plaintiff Ameli and the other members of the Class, or, in the alternative, Genesis Global Capital acted with at least reckless disregard for the truth in that it failed or refused to ascertain and disclose such facts as would reveal the insolvency of Genesis Global Capital, although such facts were readily available to Genesis Global Capital.

**ANSWER**:  States that the allegations in Paragraph 583 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 583.

584.    The state of mind of Genesis Global Capital executives, officers, directors, agents acting and individuals that controlled the Company in the ordinary course of business, including Defendants, are imputed to the Company.

**ANSWER**:   States that the allegations in Paragraph 584 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 584.

585.    As a result of the aforementioned or omissions, Lead Plaintiffs, Plaintiff Ameli and the other members of the Class purchased securities from the Company and were damaged thereby.

**ANSWER**:  States that the allegations in Paragraph 585 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 585.

586.    Had Lead Plaintiffs, Plaintiff Ameli and members of the Class known the truth, they would not have purchased securities from Genesis Global Capital.

**ANSWER**:  Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 586 and denies on that basis.

### 2.    Violations of Rule 10b-5(a) and (c) of the Exchange Act by Genesis Global Capital and Defendants

587.    Genesis Global Capital and Defendants engaged in the fraudulent and deceitful acts or practices alleged in Section XII that are distinct from the alleged material omissions alleged above, including the following:

a.    Defendants DCG and Silbert forced Genesis Global Capital to execute the loan in the amount of approximately $500 million to Defendant DCG for Defendant DCG to use in its own profit seeking endeavors and to artificially prop up the value of GBTC shares;

b.    Defendant DCG and Silbert caused Genesis Global Capital to execute the transaction whereby DCG assumed the 3AC bankruptcy claim in exchange for the DCG Promissory Note due to Genesis Global Capital.

c.    Defendants Moro and Murphy, and Ballensweig caused Genesis Global Capital, at the direction of and/or subject to the control of Defendant DCG, Silbert, Kraines and Murphy to disseminate misleading and false financial statements to prospective investors either directly or through Gemini as their designated agent.

d.    Defendants Moro and Islim caused Genesis Global Capital to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a "current asset and/or receivable."

e.    Defendant Moro caused Genesis Global Capital and Ballensweig to disseminate its balance sheets and other documents containing misrepresentations (including Ballensweig's July 6, 2022 "Three Arrows Post-Mortem" email) as to its solvency to members of the Class, and/or their agent in order to induce the parties to continue to invest digital assets and/or to prevent them from requesting redemptions of their securities.

f.    Defendant Moro publicly announced on Twitter that DCG had assumed certain liability to ensure that Genesis had the capital to operate, when it had not, tweets that were edited, reviewed and draft by DCG employees and Defendant Silbert.

**ANSWER**: Incorporates by reference all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 587.

588.    By reason of the conduct alleged herein, Gensis Global Capital and Defendants knowingly, or at least recklessly, violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

**ANSWER**:  Incorporates by reference all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 588.

589.    As a direct and proximate result omissions and fraudulent scheme of Gensis Global Capital and Defendants, Lead Plaintiffs, Plaintiff Ameli and members of the Class have suffered damages in connection with their purchases of Genesis Yield securities from Genesis Global Capital in an amount to be determined at trial.

**ANSWER**:  States that the allegations in Paragraph 589 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 589.

## THIRD CLAIM FOR RELIEF

### CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### (Against All Defendants)

590.    Lead Plaintiffs and Plaintiff Ameli reallege the allegations above.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

591.    This claim is asserted against Defendants pursuant to Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

**ANSWER**:  States that the allegations in Paragraph 591 constitute legal conclusions, to which no response is required.

592.    Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

**ANSWER**:  States that Paragraph 592 quotes Section 20(a) of the Exchange Act or 15 U.S.C. § 78t(a), and refers to that statute for a complete and accurate description of its contents.

593.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, Defendant DCG controlled Genesis Global Capital. Defendant DCG, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of

herein. Defendant DCG, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 593, except admits that DCG holds a 100% interest in GGH; and admits that GGH holds a 100% interest in GGC.

594.    Defendant DCG purposefully exercised its power and influence to cause Genesis Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of Genesis Global Capital.

**ANSWER**:  Denies the allegations in Paragraph 594.

595.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, Defendant DCG had sufficient influence to cause Genesis Global Capital to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act.

**ANSWER**:  Denies the allegations in Paragraph 595.

596.    Defendant DCG culpably participated in Genesis Global Capital's violations of the Exchange Act alleged herein.

**ANSWER**:  Denies the allegations in Paragraph 596.

597.    Accordingly, Defendant DCG is jointly and severally liable for the violations of the Exchange Act by Genesis Global Capital complained of herein and is liable to Lead Plaintiffs, Plaintiff Ameli and the Class for rescission and/or damages as to all transactions in which Plaintiffs Plaintiff Ameli and Class members relied on statement made by Genesis Global Capital in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

**ANSWER**:  States that the allegations in Paragraph 597 constitute legal conclusions, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 597.

598.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein:

**ANSWER**:  States that the allegations in Paragraph 598 are generalized, vague, and non-specific, and denies on that basis.

599.    Defendant Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees, including Defendants Moro and Islim, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to

his status as founder and CEO of both DCG and Genesis Global Capital and controlling shareholder of DCG.

**ANSWER**: Denies the allegations in Paragraph 599.

600.    Defendant Moro had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022 and through his conduct alleged herein.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 600 and denies on that basis.

601.    Defendant Islim had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the COO of Genesis Global Capital and GGT since the start of the Class Period, and interim CEO of Genesis Global Capital and GTT, and member of the board of GGH, and through his conduct alleged herein.

**ANSWER**: Lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 601 and denies on that basis.

602.    Defendant Kraines had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the CFO of Defendant DCG from in or around September 2021 through April 2023 and member of the board of directors of GGH, and through his conduct alleged herein.

**ANSWER**: Denies the allegations in Paragraph 602.

603.    Defendant Murphy had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the COO of Defendant DCG during the period January 2020 through November 2022, President of Defendant DCG since October 2022, and member of the board of directors of GGH and through his conduct alleged herein.

**ANSWER**: Denies the allegations in Paragraph 603.

604.    Defendants Silbert, Moro, Islim, Kraines, and Murphy purposefully exercised their power and influence to cause Genesis Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of Genesis Global Capital.

210

**ANSWER**:  Denies the allegations in Paragraph 604.

605.    At the time of the wrongs alleged herein, Defendants Silbert, Moro, Islim, Kraines, and Murphy had sufficient influence to cause Genesis Global to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act, but purposefully decided not to do so.

**ANSWER**:  Denies the allegations in Paragraph 605.

606.    Defendants Silbert, Moro, Islim, Kraines, and Murphy culpably participated in Genesis Global Capital's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as alleged herein.

**ANSWER**:  Denies the allegations in Paragraph 606.

607.    Defendants' culpable participation is illustrated by the acts and omissions alleged above, including that:

**ANSWER**:  States that the allegations in Paragraph 607 are generalized, vague, and non-

specific, and denies on that basis.

608.    **DCG and Silbert**: engaged in insider trading (¶347), and suspicious related-party transactions (¶¶410-14); engaged in scheme to convince investors that Genesis Global Capital was solvent and entered into DCG Promissory Note to cover up insolvency (Section XII); lied to Earn Investors' Agent, Gemini, to prevent Gemini from terminating the Gemini Earn Program (¶¶441-50).

**ANSWER**:  To the extent the allegations in Paragraph 608 constitute legal conclusions, no

response is required.  To the extent a response is required, denies the allegations in Paragraph 608;

and incorporates Paragraphs 237–475 of this Answer set forth above as if fully set forth herein.

609.    **Murphy and Kraines**: engaged in scheme to convince investors that Genesis Global Capital was solvent (Section XII); both had control over the formulation and dissemination of misleading information concerning Genesis' financial condition to investors (¶¶369-72, 415, 417-22).

**ANSWER**:  To the extent the allegations in Paragraph 609 constitute legal conclusions, no

response is required.  To the extent a response is required, denies the allegations in Paragraph 609;

and incorporates Paragraphs 273–475 of this Answer set forth above as if fully set forth herein.

610.    **Moro**: as CEO he was aware that Genesis Global Capital was insolvent and engaged in scheme to convince investors that Genesis Global Capital was solvent and entered into

211

DCG Promissory Note to cover up insolvency (Section XII); responsible as CEO for material omissions in connection with every transaction after the 3AC default rendered Genesis Global Capital insolvent.

**ANSWER**: Incorporates Paragraphs 273–475 of this Answer set forth above as if fully set forth herein; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 610 and denies on that basis, except admits that Mr. Moro became the CEO of GGC upon its creation on November 28, 2017 and served as CEO until on or about July 18, 2022 before submitting his official resignation on August 15, 2022, which was accepted on August 17, 2022.

611.    **Islim**: as CEO he was aware that Genesis Global Capital was disseminating false financial information to investors (¶440); responsible as CEO for material omissions in connection with every transaction after the 3AC default rendered Genesis Global Capital insolvent.

**ANSWER**:  Incorporates Paragraph 440 of this Answer set forth above as if fully set forth herein; lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 611 and denies on that basis, except admits that Mr. Islim was the interim CEO of GGC as of August 17, 2022.

612.    Accordingly, Defendants are jointly and severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by Genesis Global Capital complained of herein and are liable to Lead Plaintiffs, Plaintiff Ameli and the Class for rescission and/or damages as to all transactions in which Lead Plaintiffs, Plaintiff Ameli and Class members relied on statements or made by Genesis Global Capital or material omissions, or relied upon Defendants' deceptive acts and scheme in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

**ANSWER**:  Denies the allegations in Paragraph 612.

**FOURTH CLAIM FOR RELIEF**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW Cal. Bus. & Prof. Code §§ 17200, *et seq.*, (On behalf of Plaintiff Larry Wiener and the California Subclass Against All Defendants)**

613.    Plaintiff Larry Wiener individually and on behalf of the California subclass, repeats and realleges all preceding allegations as if fully set forth herein.

212

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

614.    Plaintiff Wiener and California subclass members are residents of California.

**ANSWER**:  States that the allegations in Paragraph 614 relate to the Dismissed Claims and no response is required.

615.    Defendants are each "person" as defined by Cal. Bus. & Prof. Code §17201.

**ANSWER**:  States that the allegations in Paragraph 615 relate to the Dismissed Claims and no response is required.

616.    Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.*, ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices, including:

a)    Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of Genesis Yield;

b)    Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to enter into the Genesis Yield Investment Agreements;

c)    Making misleading statements and misrepresentations to induce consumers to continue to invest their digital assets with Genesis Global Capital;

d)    Providing false promises and using deceptive tactics to prevent Plaintiff Wiener and California subclass members from requesting redemptions of their investments;

e)    Ignoring consumer requests for redemptions of their investments; and

f)    Failing to return consumers' digital assets and/or pay interest owed thereon as promised.

**ANSWER**:  States that the allegations in Paragraph 616 relate to the Dismissed Claims and no response is required.  To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 616.

617.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

**ANSWER**:  States that the allegations in Paragraph 617 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 617.

618.    As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices Plaintiff Wiener and California subclass members were injured and suffered monetary as described herein related to the investment of their digital assets.

**ANSWER**:  States that the allegations in Paragraph 618 relate to the Dismissed Claims and no response is required.

619.    Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff Wiener and California subclass members' rights.

**ANSWER**:  States that the allegations in Paragraph 619 relate to the Dismissed Claims and no response is required.

620.    Plaintiff Wiener and the California subclass members seek all monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; and other any appropriate equitable relief this Court deems fit.

**ANSWER**:  States that the allegations in Paragraph 620 relate to the Dismissed Claims and no response is required.

## FIFTH CLAIM FOR RELIEF

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT Fla. Stat. §§ 501.201, *et seq.*, (On behalf of Plaintiff Daniel Ameli and the Florida Subclass Against All Defendants)

621.    Plaintiff Ameli, individually and on behalf of the Florida Subclass, repeats and realleges the allegations above as if fully set forth herein.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

622.    Ameli and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

214

**ANSWER**:  States that the allegations in Paragraph 622 relate to the Dismissed Claims and no response is required.

623.    Defendants advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

**ANSWER**:  States that the allegations in Paragraph 623 relate to the Dismissed Claims and no response is required.

624.    Defendants engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

a)    Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of Genesis Yield;

b)    Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to enter into the Genesis Yield Investment Agreements;

c)    Making misleading statements and misrepresentations to induce consumers to continue to invest their digital assets with Genesis Global Capital;

d)    Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from requesting redemptions of their investments;

e)    Ignoring consumer requests for redemptions of their investments; and

f)    Failing to return consumers' digital assets and/or pay interest owed thereon as promised.

**ANSWER**:  States that the allegations in Paragraph 624 relate to the Dismissed Claims and no response is required. To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 624.

625.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

**ANSWER**:  States that the allegations in Paragraph 625 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 625.

626. As a direct and proximate result of Defendants' unconscionable, unfair, and deceptive acts and practices, Plaintiff and Florida subclass members have suffered injury, ascertainable losses of money or property, and monetary damages, as described herein.

**ANSWER**: States that the allegations in Paragraph 626 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 626.

627. Plaintiff Ameli and Florida subclass members seek all monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

**ANSWER**: States that the allegations in Paragraph 627 relate to the Dismissed Claims and no response is required.

## SIXTH CLAIM FOR RELIEF

### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT 815 Ill. Comp. Stat. §§ 510/2, *et seq.*, (On behalf of Plaintiffs Derek Wilson and Lee Jacobson, and the Illinois Subclass Against All Defendants)

628. Plaintiff Wilson, individually and on behalf of the Illinois subclass, repeats and realleges all preceding allegations as if fully set forth herein

**ANSWER**: Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

629. Defendants are each a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

**ANSWER**: States that the allegations in Paragraph 629 relate to the Dismissed Claims and no response is required.

630. Defendants engaged in deceptive acts and trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

a) Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of the Genesis Yield product;

b) Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to invest in the Genesis Yield product;

c) Making misleading statements and misrepresentations to induce consumers to continue to invest in Genesis Yield product;

216

  d) Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from redeeming their investments in the Genesis Yield product;

  e) Failing to return consumer funds after they had requested redemption of their investments in the Genesis Yield product; and

  f) Failing to return consumers' digital assets and/or pay interest owed thereon as promised.

**ANSWER**:  States that the allegations in Paragraph 630 relate to the Dismissed Claims and no response is required.  To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 630.

631. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

**ANSWER**:  States that the allegations in Paragraph 631 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 631.

632. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Wilson and Illinois subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

**ANSWER**:  States that the allegations in Paragraph 632 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 632.

633. As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff Wilsom and Illinois subclass members have suffered ascertainable losses of money or property, and monetary damages, as described herein.

**ANSWER**:  States that the allegations in Paragraph 633 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 633.

634.    Plaintiff Wilson and Illinois subclass members seek all monetary and relief allowed by law.

**ANSWER**:  States that the allegations in Paragraph 634 relate to the Dismissed Claims and no response is required.

## SEVENTH CLAIM FOR RELIEF

### FOR DECEPTIVE AND UNFAIR PRACTICES IN VIOLATION OF THE NEW YORK UNIFORM DECEPTIVE TRADE PRACTICES ACT, N.Y. GEN. BUS. LAW. § 349, *et seq.*, (On behalf of Plaintiff Macri and the New York Subclass Against All Defendants)

635.    Plaintiff Macri repeats and realleges all allegations if fully set forth herein.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

636.    This claim is asserted against Defendants DCG, Silbert, Kraines, Murphy, Moro, and Islim pursuant to New York's Uniform Deceptive Trade Practice Act ("GBL § 349") which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

**ANSWER**:  States that the allegations in Paragraph 636 relate to the Dismissed Claims and no response is required.

637.    Defendants conducted business, trade, or commerce in New York State.

**ANSWER**:  States that the allegations in Paragraph 637 relate to the Dismissed Claims and no response is required.

638.    Plaintiff Macri is authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h).

**ANSWER**:  States that the allegations in Paragraph 638 relate to the Dismissed Claims and no response is required.

639.    Plaintiff Macri and the New York subclass members executed transactions with Genesis Global Capital concerning the Genesis Yield product in connection with transactions in "business" "trade" or "commerce" within the meaning of GBL § 349.

**ANSWER**:  States that the allegations in Paragraph 639 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 639.

640.    This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts concerning the Genesis Yield product, as alleged herein.

**ANSWER**:  States that the allegations in Paragraph 640 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 640.

641.    Defendants DCG, Silbert, Kraines, Murphy, Moro, and Islim through their conduct as described above, engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce.

**ANSWER**:  States that the allegations in Paragraph 641 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 641.

642.    Defendants each engaged in unfair and deceptive acts or practices relating to the Genesis Yield product, including but not limited to:

a)    Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of the Genesis Yield product;

b)    Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to invest in the Genesis Yield product;

c)    Making misleading statements and misrepresentations to induce consumers to continue to invest in Genesis Yield product;

d)    Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from redeeming their investments in the Genesis Yield product;

e)    Failing to return consumer funds after they had requested redemption of their investments in the Genesis Yield product; and

f)    Failing to return consumers' digital assets and/or pay interest owed thereon as promised.

219

**ANSWER**: States that the allegations in Paragraph 642 relate to the Dismissed Claims and no response is required. To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 642.

643. Defendants systematically engaged in these deceptive, misleading, and unlawful acts and practices to the detriment of Plaintiff Macri and the New York subclass members.

**ANSWER**: States that the allegations in Paragraph 643 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 643.

644. Defendants willfully engaged in such acts and practices and knew or acted in reckless disregard for whether they violated GBL § 349.

**ANSWER**: States that the allegations in Paragraph 644 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 644.

645. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers regarding the Genesis Yield product, including its true risks and characteristics.

**ANSWER**: States that the allegations in Paragraph 645 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 645.

646. Plaintiff Macri and the New York subclass members relied on Defendants' deceptive representations and omissions when they paid money or other consideration in exchange for yield via the Genesis Yield product.

**ANSWER**: States that the allegations in Paragraph 646 relate to the Dismissed Claims and no response is required. To the extent a response is required, denies the allegations in Paragraph 646.

647.    Plaintiff Macri and the New York subclass members had no way of knowing Defendants' misrepresentations were false, as Defendants had exclusive knowledge of their own business practices.

**ANSWER**:  States that the allegations in Paragraph 647 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 647.

648.    Plaintiff Macri and the New York subclass members have been injured as a direct and proximate result of Defendants' violations as they would not invested in, or would have invested significantly less in, the Genesis Yield product had they known these statements were false and of Defendants' omissions.

**ANSWER**:  States that the allegations in Paragraph 648 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 648.

649.    The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

**ANSWER**:  States that the allegations in Paragraph 649 relate to the Dismissed Claims and no response is required.

650.    Plaintiff Macri and the New York subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per class member, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

**ANSWER**:  States that the allegations in Paragraph 650 relate to the Dismissed Claims and no response is required.

## EIGHTH CLAIM FOR RELIEF

### FOR TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT
**Texas Bus. & Com. Code §§ 17.41, *et seq.*, (On behalf of Plaintiffs Ashwin Gowda and Translunar and the Texas Subclass Against All Defendants)**

651.    Plaintiffs Gowda and Translunar individually, and on behalf of the Texas subclass, repeats and realleges all allegations if fully set forth herein.

221

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

652.    Defendants are each a "person," as defined by Tex. Bus. & Com. Code § 17.45(3). 648. Plaintiff Gowda and Translunar and Texas subclass members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

**ANSWER**:  States that the allegations in Paragraph 652 relate to the Dismissed Claims and no response is required.

653.    Defendants advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

**ANSWER**:  States that the allegations in Paragraph 653 relate to the Dismissed Claims and no response is required.

654.    Defendants engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a)    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b)    Representing that goods or services are of a particular standard, quality or grade, if they are of another;

c)    Advertising goods or services with intent not to sell them as advertised;

d)    Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transact into which the consumer would not have entered had the information been disclosed.

**ANSWER**:  States that the allegations in Paragraph 654 relate to the Dismissed Claims and no response is required.  To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 654.

655.    Defendants' false, misleading and deceptive acts and practices include:

a)    Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of Genesis Yield;

222

b)      Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to enter into the Genesis Yield Investment Agreements;

c)      Making misleading statements and misrepresentations to induce consumers to continue to invest their digital assets with Genesis Global Capital;

d)      Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from requesting redemptions of their investments;

e)      Ignoring consumer requests for redemptions of their investments; and

f)      Failing to return consumers' digital assets and/or pay interest owed thereon as promised

**ANSWER**:  States that the allegations in Paragraph 655 relate to the Dismissed Claims and no response is required.  To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 655.

656.    Defendants intended to mislead Plaintiffs Gowda and Translunar and the Texas Subclass Members and induce them to rely on its misrepresentations and omissions.

**ANSWER**:  States that the allegations in Paragraph 656 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 656.

657.    Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about their investments.

**ANSWER**:  States that the allegations in Paragraph 657 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 657.

658.    Had Defendants disclosed to Plaintiffs Gowda and Translunar and Texas subclass members that they would not earn the interest promised or be able to redeem their digital assets, Defendants would have been unable to continue in business and it would have been forced to comply with their obligations. Defendants were trusted with the Texas Subclass investments and accepted the responsibility. Accordingly, Plaintiffs Gowda and Translunar and the Texas subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

**ANSWER**: States that the allegations in Paragraph 658 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 658.

659.    Defendants had a duty to disclose the above facts due to the circumstances of this case and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiffs Gowda and Translunar and the Texas subclass members, and Defendants because consumers are unable to fully protect their interests regarding their digital assets, and placed trust and confidence in Defendants.

**ANSWER**: States that the allegations in Paragraph 659 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 659.

660.    Defendants engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendants engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

**ANSWER**: States that the allegations in Paragraph 660 relate to the Dismissed Claims and no response is required.

661.    Defendants acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act.

**ANSWER**: States that the allegations in Paragraph 661 relate to the Dismissed Claims and no response is required.

662.    As a direct and proximate result of Defendants' unconscionable and deceptive acts or practices, Plaintiffs Gowda and Translunar and the Texas subclass members have suffered ascertainable losses of money or property as described herein.

**ANSWER**: States that the allegations in Paragraph 662 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 662.

663.    Plaintiffs Gowda and Translunar and the Texas subclass members seek all monetary relief allowed by law, including economic damages; treble damages for each act committed

224

intentionally or knowingly; court costs; reasonably and necessary attorneys' fees; and any other relief which the court deems proper.

**ANSWER**:  States that the allegations in Paragraph 663 relate to the Dismissed Claims and no response is required.

## NINTH CLAIM FOR RELIEF

### VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT, KAN. STAT. ANN. § 50-623, *et seq.*, (On behalf of McGreevy and the Kansas Subclass Against All Defendants)

664.    Plaintiff McGreevy reallege and incorporate by reference all paragraphs as though fully set forth herein.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

665.    Defendants are "suppliers" under the Kansas Consumer Protection Act ("Kansas CPA"), KAN. STAT. ANN. § 50-624(1).

**ANSWER**:  States that the allegations in Paragraph 665 relate to the Dismissed Claims and no response is required.

666.    Plaintiff McGreevy and Kansas subclass members are "consumers," within the meaning of KAN. STAT. ANN. § 50-624(b)

**ANSWER**:  States that the allegations in Paragraph 666 relate to the Dismissed Claims and no response is required.

667.    The transactions described herein were "consumer transactions" within the meaning of KAN. STAT. ANN. § 50-624(c).

**ANSWER**:  States that the allegations in Paragraph 667 relate to the Dismissed Claims and no response is required.

668.    The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," KAN. STAT. ANN. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the

225

representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-627(a).

**ANSWER**:  States that the allegations in Paragraph 668 relate to the Dismissed Claims and no response is required.

669.    Defendants participated in misleading, false, or deceptive acts that violated the Kansas CPA by, amongst other things:

a)    Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of Genesis Yield;

b)    Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to enter into the Genesis Yield Investment Agreements;

c)    Making misleading statements and misrepresentations to induce consumers to continue to invest their digital assets with Genesis Global Capital;

d)    Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from requesting redemptions of their investments;

e)    Ignoring consumer requests for redemptions of their investments; and

f)    Failing to return consumers' digital assets and/or pay interest owed thereon as promised

**ANSWER**:  States that the allegations in Paragraph 669 relate to the Dismissed Claims and no response is required.  To the extent a response is required, incorporates all paragraphs of this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in Paragraph 669.

670.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

**ANSWER**:  States that the allegations in Paragraph 670 relate to the Dismissed Claims and no response is required.

671.    By failing to disclose and the truth related to Plaintiff McGreevy and the Kansas subclass members' investments, Defendants engaged in unfair and deceptive business practices in violation of the Kansas CPA.

226

**ANSWER**:  States that the allegations in Paragraph 671 relate to the Dismissed Claims and no response is required.

672.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

**ANSWER**:  States that the allegations in Paragraph 672 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 672.

673.    Defendants intentionally and knowingly misrepresented material facts regarding Plaintiff McGreevy and Kansas subclass members' investments with the intent to mislead Plaintiffs.

**ANSWER**:  States that the allegations in Paragraph 673 constitute legal conclusions and relate to the Dismissed Claims, to which no response is required.  To the extent a response is required, denies the allegations in Paragraph 673.

674.    As a direct and proximate result of Defendants' violations of the Kansas CPA, Plaintiff McGreevy and Kansas subclass members have suffered injury-in-fact and/or actual damage as alleged above.

**ANSWER**:  States that the allegations in Paragraph 674 relate to the Dismissed Claims and no response is required.

675.    Pursuant to KAN. STAT. ANN. § 50-634, Plaintiff McGreevy and the Kansas subclass members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff.

**ANSWER**:  States that the allegations in Paragraph 675 relate to the Dismissed Claims and no response is required.

**TENTH CLAIM FOR RELIEF**

**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**

**NEV. REV. STAT. § 598.0903, *et seq.*, (On Behalf of Plaintiff Buttenham and Nevada
Subclass Against All Defendants)**

676.    Plaintiff Buttenham realleges and incorporates by reference all paragraphs as
though fully set forth herein.

**ANSWER**:  Incorporates by reference all paragraphs of this Answer set forth above as if

fully set forth herein.

677.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), NEV. REV. STAT.
§ 598.0903, *et seq.*, prohibits deceptive trade practices. NEV. REV. STAT. § 598.0915 provides
that a person engages in a "deceptive trade practice" if, in the course of business or occupation,
the person: "Knowingly makes a false representation as to the characteristics, ingredients, uses,
benefits, alterations or quantities of goods or services for sale or lease or a false representation as
to the sponsorship, approval, status, affiliation or connection of a person therewith"; "Represents
that goods or services for sale or lease are of a particular standard, quality or grade, or that such
goods are of a particular style or model, if he or she knows or should know that they are of another
standard, quality, grade, style or model"; "Advertises goods or services with intent not to sell or
lease them as advertised"; or "Knowingly makes any other false representation in a transaction."

**ANSWER**:  States that the allegations in Paragraph 677 relate to the Dismissed Claims

and no response is required.

678.    Defendants engaged in deceptive trade practices that violated the Nevada DTPA,
including:

  a.    Systematically misrepresenting the solvency of Genesis Global Capital and the
        benefits of Genesis Yield;

  b.    Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to
        enter into the Genesis Yield Investment Agreements;

  c.    Making misleading statements and misrepresentations to induce consumers to
        continue to invest their digital assets with Genesis Global Capital;

  d.    Providing false promises and using deceptive tactics to prevent Plaintiffs and Class
        Members from requesting redemptions of their investments;

  e.    Ignoring consumer requests for redemptions of their investments; and

  f.    Failing to return consumers' digital assets and/or pay interest owed thereon as
        promised

**ANSWER**:  States that the allegations in Paragraph 678 relate to the Dismissed Claims

and no response is required.  To the extent a response is required, incorporates all paragraphs of

this Answer set forth above as if fully set forth herein; and otherwise denies the allegations in

Paragraph 678.

679.    Defendants' actions, as set forth above, occurred in the conduct of trade or commerce or the course of their business, and Defendants willfully failed to disclose and actively concealed the truth.

**ANSWER**:  States that the allegations in Paragraph 679 relate to the Dismissed Claims

and no response is required. To the extent a response is required, denies the allegations in

Paragraph 679.

680.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Buttenham and members of the Nevada subclass.

**ANSWER**:  States that the allegations in Paragraph 680 relate to the Dismissed Claims

and no response is required. To the extent a response is required, denies the allegations in

Paragraph 680.

681.    Defendants knew or should have known that its conduct violated the Nevada Deceptive Trade Practices Act.

**ANSWER**:  States that the allegations in Paragraph 681 relate to the Dismissed Claims

and no response is required.

682.    As a direct and proximate result of Defendants' violations of the Nevada Deceptive Trade Practices Act, Plaintiff Buttenham and members of the Nevada subclass have suffered injury-in-fact and/or actual damage, as alleged above.

**ANSWER**:  States that the allegations in Paragraph 682 relate to the Dismissed Claims

and no response is required.

683.    Accordingly, Plaintiff Buttenham and the Nevada subclass members seek their actual damages, punitive damages, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act. NEV. REV. STAT. § 41.600.

**ANSWER**:  States that the allegations in Paragraph 683 relate to the Dismissed Claims

and no response is required.

**ELEVENTH CLAIM FOR RELIEF**

**COMMON LAW FRAUD**
**(Against All Defendants)**

684.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER**:  Incorporates all paragraphs of this Answer set forth above as if fully set forth herein.

685.    As described above, Defendants made false representations to Plaintiffs and to Gemini, the appointed agent of Gemini Earn investors, including Plaintiffs Buttenham, Gowda, Macri, McGreevy, Wilson, and Wiener, regarding Genesis's financial condition and the support it had received from DCG, and Defendants concealed material facts regarding Genesis's financial condition and the support it had received from DCG under circumstances in which Defendants were under a legal obligation to state the truth.

**ANSWER**:  States that the allegations in Paragraph 685 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 685.

686.    Defendants knew that their representations were false and that their material omissions would convey false and misleading information to Plaintiffs and to Gemini, the appointed agent of Gemini Earn investors, including Plaintiffs Buttenham, Gowda, Macri, McGreevy, Wilson, and Wiener, Defendants intended that their representations and omissions would induce Plaintiffs to keep their funds with Genesis, invest funds with Genesis, and to induce Gemini, the agent of Gemini Earn Plaintiffs to keep the Gemini Earn Program in place and to refrain from terminating the Gemini Earn Program.

**ANSWER**:  States that the allegations in Paragraph 686 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 686.

687.    Plaintiffs and Gemini, appointed agent of Gemini Earn investors, including Plaintiffs Buttenham, Gowda, Macri, McGreevy, Wilson, and Wiener, Gemini reasonably relied on Defendants' misrepresentations and omissions because Defendants would be in the best position to understand and speak accurately about the support that Genesis had received from DCG and the resulting effect on Genesis Global Capital's financial condition.

230

**ANSWER**:  States that the allegations in Paragraph 687 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 687.

688.    As a result of Plaintiffs' and Gemini's reliance on Defendants' misrepresentations, Plaintiffs have been harmed and suffered damages. In particular, because Plaintiffs were induced to invest with Genesis, to keep their funds invested with Genesis, and because Gemini was induced to keep the Gemini Earn Program in place and to refrain from terminating the Gemini Earn Program, Plaintiffs and class members were unable to withdraw their digital assets from Genesis Global Capital.

**ANSWER**:  States that the allegations in Paragraph 688 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 688.

689.    As a result of their conspiracy and scheme to defraud, Defendants are jointly liable for one another's tortious conduct directed towards Plaintiffs and Gemini Earn investors' appointed agent Gemini.

**ANSWER**:  States that the allegations in Paragraph 689 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 689.

690.    Defendants' fraudulent conduct was willful, egregious, and wanton such that punitive damages are warranted and appropriate.

**ANSWER**:  States that the allegations in Paragraph 690 relate to the Dismissed Claims and no response is required.  To the extent a response is required, denies the allegations in Paragraph 690.

231

## PRAYER FOR RELIEF

Denies the allegations in Plaintiffs' prayer for relief and denies that Plaintiff is entitled to any relief.

## AFFIRMATIVE AND OTHER DEFENSES

Without admitting or suggesting that Mr. Kraines bears the burden of proof on any of the following issues or defenses, and without waiving his right to assert any defenses, Mr. Kraines asserts the defenses and affirmative defenses below with respect to the causes of action alleged in the TAC.

Mr. Kraines expressly reserves the right: (i) to amend or supplement this Answer, its defenses and affirmative defenses, and all other pleadings; (ii) to assert any and all additional defenses and affirmative defenses under any applicable law; and (iii) assert any cross-claims, counterclaims, and third-party claims.

## FIRST DEFENSE

1.      Plaintiffs have failed to state a cause of action upon which relief may be granted, because they have not alleged facts that plausibly give rise to a claim for relief under the Securities Act or the Exchange Act.

## SECOND DEFENSE

2.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack Article III standing and have not suffered any injury-in-fact.  All Plaintiffs have received a full recovery of the purchase or sale price of any purported securities sold or offered for sale by Genesis.

**THIRD DEFENSE**

3.      Plaintiffs' claims are barred because Plaintiffs, and any putative class member have recovered on their claims in full through distributions Plaintiffs have received or will receive through the Genesis Bankruptcy Action

**FOURTH DEFENSE**

4.      Plaintiffs' claims are barred, in whole or in part, because neither DCG nor Genesis offered or sold any "securities" within the meaning of Section 2(a)(1) of the Securities Act or Section 3(a)(10) of the Exchange Act.

**FIFTH DEFENSE**

5.      Mr. Kraines at all times, and with respect to all matters contained herein, acted in good faith, exercised reasonable care, understood that expert outside advisors were involved in the decision-making processes, and did not know, and in the exercise of reasonable care could not have known, of the purported misstatements, and/or omissions alleged in the TAC.

**SIXTH DEFENSE**

6.      Mr. Kraines did not participate in any device, scheme, or artifice to defraud in connection with the purchase or sale of any security.

**SEVENTH DEFENSE**

7.      No action taken by Mr. Kraines was unlawful, improper, or inconsistent with his duties and obligations under the securities laws, and Mr. Kraines did not otherwise have any obligation or duty to take any other action or make any other disclosure under the securities laws.

**EIGHTH DEFENSE**

8.      Mr. Kraines did not act with scienter under the securities laws. Any inference of scienter is not as compelling as any plausible opposing inference of non-fraudulent intent,

including good-faith business decisions made in a rapidly evolving and unprecedented digital asset market and with the involvement of counsel.

### NINTH DEFENSE

9.      The alleged misstatements at issue were not materially false or misleading.

### TENTH DEFENSE

10.      The alleged misstatements at issue were not material to the investment decisions of a reasonable investor.

### ELEVENTH DEFENSE

11.      Mr. Kraines owed no duty to disclose information allegedly omitted from the statements at issue.

### TWELFTH DEFENSE

12.      Plaintiffs did not reasonably rely on any alleged misrepresentations or omissions when lending assets.

### THIRTEENTH DEFENSE

13.      The alleged misstatements constitute (a) nonactionable matters of opinion, puffery, or soft information, or (b) forward-looking statements (i) that contained sufficient cautionary language and risk disclosures, and/or (ii) were not made by Mr. Kraines with actual knowledge that such statements were false or misleading, as to render them nonactionable under the safe harbor for forward-looking statements in the Private Securities Litigation Reform Act of 1995 and/or the "bespeaks caution" doctrine.

### FOURTEENTH DEFENSE

14.      Plaintiffs' claims are barred by Plaintiffs' own actions, omissions, negligence, acquiescence, and/or assumption of the risk, including their failure to exercise reasonable care and due diligence in making investment decisions, their failure to review or act upon publicly available

information about the risks of cryptocurrency lending, and their failure to recall their loans when they were entitled to do so.

## FIFTEENTH DEFENSE

15.     Damages sought exceed those permitted under the Securities Act of 1933, the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule, or regulation and the alleged damages, if any, proximately resulted from the conduct of parties, persons, and/or entities other than Mr. Kraines, and therefore Mr. Kraines should have no liability, or Mr. Kraines' liability, if any, should be limited in direct proportion to the percentage of fault actually attributed to Mr. Kraines.

## SIXTEENTH DEFENSE

16.     Mr. Kraines was not a "control person[]" of GGC within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77o, or Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Mr. Kraines did not have the power to direct or cause the direction of the management and policies of GGC with respect to the specific transactions at issue.

## SEVENTEENTH DEFENSE

17.     The Lending Agreements, even if they were deemed securities, were exempt from registration under one or more applicable exemptions from the Securities Act.

## EIGHTEENTH DEFENSE

18.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, waiver, equitable estoppel, in pari delicto, unclean hands, and/or other related equitable doctrines, to the extent that Plaintiffs or their agents (including Gemini) were themselves complicit in, or had knowledge of, the conduct at issue.

## NINETEENTH DEFENSE

19.     This action is not properly maintainable as a class action.

## TWENTIETH DEFENSE

20.     Mr. Kraines is not liable for Plaintiffs' claims because Mr. Kraines reasonably and in good faith relied on information, opinions, reports, and statements prepared or presented by officers or employees of DCG and GGC whom he believed to be reliable and competent in the matters presented, as well as outside advisors as to matters which he believed to be within such advisors' professional or expert competence.

## TWENTY-FIRST DEFENSE

21.     Mr. Kraines is not liable for Plaintiffs' claims because Mr. Kraines reasonably relied on institutional processes—both managerial and legal—to ensure adequate review and disclosure of material information, and he cannot be held liable for alleged failings of those processes.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Kraines respectfully requests that the Court enter a judgment:

a.  In favor of Mr. Kraines and against Plaintiffs;

b.  Denying all claims for relief asserted by Plaintiffs;

c.  Awarding Mr. Kraines costs, including attorneys' fees; and

d.  Granting Mr. Kraines such other and further relief as the Court deems just and appropriate.

236

237

Dated: April 27, 2026

*/s/ Richard Donaghue*
Richard Donoghue (admitted *pro hac vice*)
Ari Berman (admitted *pro hac vice*)
**PILLSBURY WINTHROP SHAW PITTMAN LLP**
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1638
richard.donoghue@pillsburylaw.com
ari.berman@pillsburylaw.com

Stephen P. Fogerty
Federal Bar No. 01398
**FLB LAW, PLLC**
315 Post Road West
Westport, CT 06880
Telephone: (203) 977-7300
fogerty@flb.law

***Counsel for Defendant Michael Kraines***